# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| SKY FEDERAL CREDIT UNION, on Behalf of Itself and All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| FAIR ISAAC CORPORATION, |  |
| Defendant. |  |

## **TABLE OF CONTENTS**

I.   NATURE OF THE ACTION ................................................................... 1

II.  PARTIES ............................................................................................... 4

    A.   Plaintiff ......................................................................................... 4

    B.   Defendant ...................................................................................... 5

III. JURISDICTION, VENUE, AND INTERSTATE COMMERCE ................. 5

IV.  ALLEGATIONS OF FACT SUPPORTING THE CLAIM FOR RELIEF ...... 6

    A.   Credit Scores ................................................................................. 6

    B.   The Markets for Credit Scores in the United States ......................... 7

    C.   Fair Isaac Has a Monopoly in the B2B Credit Score Market .............. 10

    D.   Attempts to Compete Have Been Stymied by Fair Isaac's Monopoly in the B2B Credit Score Market ...................................................... 11

    E.   Fair Isaac Has Contracted with the Credit Bureaus as Agents and Co-Conspirators in Its Scheme to Monopolize ................................. 13

    F.   Fair Isaac's Other Anticompetitive and Exclusionary Conduct ........... 14

        1.   Fair Isaac and the Credit Bureaus Have Entered into Anticompetitive Contract Terms that Restrict Their Ability to Compete and Sell VantageScore ........................................................................... 15

            a.   The Anticompetitive Agreements Restrict the Credit Bureaus' Ability to Develop or Sell Other Credit Scores Compatible with B2B Purchasers' Existing Systems ......................................... 15

            b.   Fair Isaac and the Credit Bureaus Have Agreed to a Penalty Pricing and Bundling Scheme to Foreclose Competition from Competitors in the B2B Credit Score Market ............................. 17

            c.   Fair Isaac and the Credit Bureaus Have Agreed to Contract Provisions that Allow Fair Isaac to Extract Monopoly Prices ...... 18

        2.   Fair Isaac's Campaign to Create Fear, Uncertainty, and Doubt About VantageScore Among B2B Purchasers .................................... 19

        3.   Fair Isaac's Anticompetitive and Exclusionary Conduct Harms Competition .......................................................................... 21

V.   CLASS ACTION ALLEGATIONS ........................................................ 22

VI.  STATUTES OF LIMITATIONS AND TOLLING ..................................... 25

VII. CLAIMS FOR RELIEF ........................................................................ 25

    CLAIM ONE: MONOPOLIZATION 15 U.S.C. §2 ...................................... 25

    CLAIM TWO: CONSPIRACY TO MONOPOLIZE 15 U.S.C. §2 ................. 27

    CLAIM THREE: UNREASONABLE RESTRAINT OF TRADE 15 U.S.C. §1 ........... 29

    CLAIM FOUR: STATE ANTITRUST LAWS ........................................... 30

    CLAIM FIVE: STATE UNFAIR TRADE PRACTICES LAWS .................... 32

VIII.    PRAYER FOR RELIEF ................................................................................................... 33

IX.      DEMAND FOR JURY TRIAL ....................................................................................... 33

Plaintiff Sky Federal Credit Union, on behalf of itself and all other similarly situated residents of the United States, brings claims under the Sherman Act and state laws against Defendant Fair Isaac Corporation ("Fair Isaac") for redress of the injury and damages resulting from its monopolizing, conspiring to monopolize, and otherwise unreasonably restraining trade from at least as early as January 1, 2006, through the date by which the anticompetitive effects of Defendant's violations of law shall have ceased, but in any case no earlier than the present (the "Class Period"). Based upon personal knowledge, information and belief, proceedings and admissions made in Case No. 1:17-cv-08318 (N.D. Ill.), related ongoing federal government investigations, and investigation of counsel, Plaintiff alleges:

## I.      NATURE OF THE ACTION

1.      "Credit Scores" are three digit numbers that rank or "score" creditworthiness within a range by applying certain algorithms to credit histories. There are two distinct markets for Credit Scores in the United States: (1) the market for the sale of Credit Scores to lenders, financial institutions, and other businesses for risk management decisions (the "B2B Credit Score Market"); and (2) the market for the sale of Credit Scores directly to consumers to monitor their own credit records (the "business-to-consumer" or "B2C Credit Score Market").

2.      This case concerns the B2B Credit Score Market, over which Defendant Fair Isaac has unlawfully maintained a 90% monopoly for many years.

3.      Fair Isaac has abused its monopoly power by engaging in anticompetitive and exclusionary conduct and agreements. Fair Isaac has suppressed competition, stymied innovation, and limited access to credit for millions of Americans – all in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 & 2, as well as numerous state antitrust and unfair trade practices laws.

4.      Fair Isaac's FICO Credit Scores ("FICO Scores") have dominated the market for nearly three decades.  Fair Isaac executives have bragged that their FICO Scores are "the 800-pound gorilla" and are "deeply embedded in the system in North America."  Fair Isaac admitted in 2017 that it has "maintained a 90-plus percent market share for at least 13 years."  Fair Isaac advertises that its FICO Scores are used for 90% of all lending decisions in the United States and that Fair Isaac sells four times more FICO Scores per year than McDonald's sells hamburgers worldwide.

5.      TransUnion, Experian, and Equifax are credit reporting agencies that collect, standardize, and distribute information on consumer credit activity (collectively, the "Credit Bureaus").  Credit Bureaus sell lenders, financial institutions, and other businesses credit reports and Credit Scores – including Fair Isaac's FICO Scores – that are used to make decisions about whether and on what terms to evaluate and extend credit.  Credit Bureaus sell those credit reports and Credit Scores to businesses in every state.  For decades, Credit Bureaus have acted as Fair Isaac's agents and co-conspirators to broker sales between businesses and Fair Isaac of the dominant FICO Scores.  Fair Isaac has used these distribution agreements to place anticompetitive restrictions on the three dominant Credit Bureaus' ability to develop or distribute competitive Credit Scores; prohibited Credit Bureaus from individually negotiating royalty prices for access to FICO Scores; charged discriminatory and prohibitively high royalty prices for FICO Scores if a Credit Bureau customer purchases a FICO Score while providing the consumer with a competing score; and increased the royalty prices that must be paid by Credit Bureaus.  Nevertheless, the Credit Bureaus have agreed to, and acquiesced in, these restrictions.

6.      In 2006, VantageScore Solutions, LLC ("VantageScore"), a joint venture of the Credit Bureaus, launched a competitive Credit Score known as VantageScore.  From the outset,

VantageScore was competitively priced, highly predictive, and scored millions more Americans than Fair Isaac's FICO products. Today, by making full use of the Credit Bureaus' consumer data, including rental and utility payments, VantageScore is capable of providing Credit Scores for an additional 30 million Americans than FICO can. Were VantageScore widely adopted by businesses, millions more creditworthy Americans would have the opportunity to apply for a home mortgage, car loan, or credit card, and obtain credit at lower cost.

7.     Rather than compete on the merits with VantageScore, Fair Isaac has engaged in a pattern of anticompetitive conduct over the course of more than a decade to discourage the adoption of VantageScore and preserve its own monopoly, with the Credit Bureaus' assistance. Fair Isaac has abused its monopoly power to prevent the Credit Bureaus from successfully marketing and selling a competitive alternative to FICO Scores and has waged a disparaging public relations and advertising campaign to create fear, uncertainty, and doubt about VantageScore's viability and reliability with lenders and consumers.

8.     Through its exclusionary conduct, Fair Isaac has succeeded in preventing the substantial sales growth that VantageScore or a competing credit scoring system would have achieved though competition on the merits. Having suppressed competition, Fair Isaac has been able to significantly increase prices, including most recently in September 2019, for its FICO Scores. But for Fair Isaac's suppression of competition and the resulting contractual agreements not to compete, VantageScore or another competitive credit scoring system would have thrived and won substantial market share through its innovative product and would have reduced the prices paid for B2B Credit Scores by Plaintiff and members of the Class.

9.     Fair Isaac's anticompetitive and exclusionary conduct has harmed businesses that have been deprived of competitive pricing for instruments to allow them to gauge credit risk and

have had their freedom of choice restricted. Opening the market to competition is essential to competitive pricing and product innovation, including scoring the tens of millions of creditworthy Americans who have been denied access to credit.

10.     In February 2018, TransUnion filed antitrust counterclaims for monopolization and related claims against Fair Isaac in this District. *See Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318, ECF No. 38 (redacted counterclaims). In March 2019, The Honorable Sharon Johnson Coleman denied Fair Isaac's motion to dismiss TransUnion's antitrust counterclaims. *See id.*, ECF No. 96. The matter is ongoing.

11.     On March 15, 2020, Fair Isaac disclosed that it was under investigation by the Antitrust Division of the United States Department of Justice for exclusionary conduct relating to that alleged in the counterclaim upheld by Judge Coleman.[1]

## II.     PARTIES

### A.     Plaintiff

12.     Plaintiff Sky Federal Credit Union is a federally chartered credit union with a principal place of business in Livingston, Montana.

13.     Plaintiff is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers.

14.     During the Class Period, Plaintiff directly purchased B2B Credit Scores from Defendant and a Credit Bureau.

15.     Plaintiff was injured in its business or property as a direct, proximate, and material result of Defendant's violations of law.

---

[1]     *See* Press Release, Fair Isaac Corporation, FICO Statement Regarding Antitrust Investigation, https://www.prnewswire.com/news-releases/fico-statement-regarding-antitrust-investigation-301024452.html (Mar. 15, 2020).

16.     Plaintiff is threatened with future injury to its business and property by reason of Defendant's continuing violations of law.

**B.     Defendant**

17.     Defendant Fair Isaac Corporation is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California 95110.

## III.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE

18.     This action arises under Sections 1 and 2 of the Sherman Antitrust Act of 1890 (as amended), 15 U.S.C. §§1 & 2, and Sections 4 & 16 of the Clayton Antitrust Act of 1914 (as amended), 15 U.S.C. §§15 & 26.

19.     This Court has subject matter jurisdiction under 28 U.S.C. §§1331, 1332(d), and 1337.

20.     The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims.

21.     Venue is proper in this District under 15 U.S.C. §§15(a) & 22, and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period, Defendant resided, transacted business, was found, or had agents in the United States, including in this District, and a substantial portion of the alleged activity affected interstate trade and commerce, including in this District.

22.     During the Class Period, Defendant's conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.

23.     During the Class Period, Defendant used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the U.S. mail, to effectuate its illegal scheme.

24. Defendant's conduct also had a substantial effect on the intrastate commerce of at least Arizona; Arkansas; California; Connecticut; District of Columbia; Florida; Hawaii; Illinois; Iowa; Kansas; Maine; Maryland; Massachusetts; Michigan; Minnesota; Mississippi; Missouri; Montana; Nebraska; Nevada; New Mexico; New York; North Carolina; North Dakota; Oregon; Rhode Island; South Carolina; South Dakota; Tennessee; Utah; Vermont; West Virginia; and Wisconsin.

25. This Court has personal jurisdiction over Defendant because Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. The unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

26. Plaintiff purchased at least one FICO Score from Fair Isaac and TransUnion, which is headquartered in this District.

27. Defendant employs persons who work in its Credit Score business in this District.

28. Defendant is registered to do business in Illinois with the Illinois Secretary of State.

29. Defendant selected this District to institute Case No. 1:17-cv-08318, to which this case is filed as related by Plaintiff.

## IV.    ALLEGATIONS OF FACT SUPPORTING THE CLAIM FOR RELIEF

### A.    Credit Scores

30. Credit Scores are typically three-digit numbers that are designed to assess credit risk. Higher scores generally indicate that a consumer poses less credit risk. Credit Scores are produced using credit scoring systems that apply a credit scoring algorithm to a consumer credit report. Credit Scores are usually accompanied by "reason codes," which inform the lender about the reasons that contributed most significantly to reducing a particular consumer's Credit Score.

31. Credit Scores are the most widely used indicators of consumers' creditworthiness in the United States. Lenders, financial institutions, and other businesses rely on Credit Scores to decide whether and on what terms to extend credit to consumers. Consumers, in contrast, rely on Credit Scores to determine whether they will be able to get a mortgage, credit card, auto loan, or other credit product and the rate they will pay.

32. The Credit Bureaus collect and supply aggregated consumer credit data in the form of consumer reports. The Credit Bureaus continuously gather credit and financial data about consumers from creditors, governmental entities, public records, collection agencies, and other third parties. This information is then compiled into a "credit file." The Credit Bureaus sell credit reports, which include information gathered from a consumer's credit file, to businesses and consumers.

33. While Credit Scores are sometimes sold together with credit reports, credit reports are different from Credit Scores and can be sold independently. A credit report is a statement that has detailed information about a consumer's credit activity and current credit situation. A consumer's credit report might, for example, include information about that consumer's history of mortgage payments, credit card balances, credit card payments, and credit inquiries. A Credit Score takes the detailed information in a credit report and turns it into a single three-digit number.

**B.     The Markets for Credit Scores in the United States**

34. There are two distinct markets for Credit Scores in the United States: (1) the B2B Credit Score Market and (2) the B2C Credit Score Market. B2B and B2C Credit Scores are priced, purchased, and used very differently and serve very different purposes. The lenders, financial institutions, and other businesses in the B2B Credit Score Market that purchase and use Credit Scores to assess creditworthiness and make decisions about whether and on what terms to extend

credit or otherwise take on risk do not consider credit reports, insurance scores, or any other information about borrowers, to be a substitute for Credit Scores.

35.     Consumers in the B2C Credit Score Market purchase their own Credit Scores to better understand their own creditworthiness and how they likely will be viewed by potential lenders.

36.     The United States is the relevant geographic market in which B2B Credit Scores are provided.  The restraints on competition in the B2B Credit Score Market contained in Fair Isaac's contracts relate to the provision of B2B Credit Scores to businesses throughout the United States.

37.     Purchasers in the B2B Credit Score Market are comprised of lenders, financial institutions, and other businesses that purchase B2B Credit Scores in order to make risk management decisions ("B2B Purchasers").  Lenders, financial institutions, and other businesses that purchase Credit Reports from Defendant and/or the Credit Bureaus generally purchase Credit Scores in order to determine the credit-worthiness and identity of qualified borrowers to whom a preapproved credit offer will be extended ("pre-screening"), make lending decisions ("lending"), or review the risk associated with existing borrowers for purposes such as extending additional credit or changing other account terms ("account management").

38.     Customers in the B2C Credit Score Market, in contrast, purchase Credit Scores in order to manage their credit, protect their identity, or assess their likelihood of obtaining credit. Today, American consumers have signed up for over 160 million credit monitoring or identity protection accounts from businesses such as Capital One, Credit Karma, and LifeLock.  Many of those accounts include access to the consumer's own Credit Score.

39.     The credit risk scoring industry, industry analysts, policy analysts, and investors recognize the B2B Credit Score Market as distinct from the B2C Credit Score Market.  Fair Isaac also regularly acknowledges that the B2B Credit Score Market is distinct from the B2C Credit Score Market.  For example, in its 2019 Form 10-K, Fair Isaac distinguished between its "business-to-business scoring solutions and services" and "business-to-consumer scoring solutions and services including myFICO solutions for consumers."

40.     The B2B Credit Score Market is characterized by significant barriers to entry.  B2B Purchasers encounter significant "switching costs" if they adopt a new Credit Score that has different score-to-risk relationships or that uses different reason codes – regardless of whether it is an updated version of the score they already use or an entirely new brand of Credit Score (unlike consumers in the B2C Credit Score Market).  These switching costs arise because employees have to be trained in the properties and characteristics of a new score; B2B Purchasers must ensure that the new score will be adequately predictive of the creditworthiness of their own customer base; B2B Purchasers often conduct extensive, costly, and time-consuming validation tests to determine whether the new score is cost-effective; and B2B Purchasers may need to invest in updating their internal systems to ensure technical compatibility between those systems and a new score.

41.     Network effects also characterize the B2B Credit Score Market.  For example, in the mortgage and auto loan industries the consistent use of particular Credit Scores with similar score-to-risk relationships and reason codes facilitates the bundling of large groups of mortgage and auto loans from different originators into securities that can be sold to investors.  Because of the consistent use of a single type of Credit Score, marketing materials for these securities can include data on the average and stratified Credit Scores of the borrowers associated with the underlying loans.

**C.      Fair Isaac Has a Monopoly in the B2B Credit Score Market**

42.      Fair Isaac has maintained a monopoly over the B2B Credit Score Market in the United States for roughly three decades, largely through the unlawfully achieved dominance of its FICO product line, which includes many different types of FICO Scores.  Introduced in the 1980s, Fair Isaac's "FICO Classic" Credit Scores are the best known and most widely used B2B Credit Scores in the United States.  FICO Classic applies an algorithm to each Credit Bureau's data and generates a score between 300 and 850 that purports to give an indication of the individual's credit risk.  It also generates a set of "reason codes" that explain the reasons the consumer has not been assigned the maximum score.

43.      Fair Isaac advertises its monopoly in the B2B Credit Score Market.  On its website, Fair Isaac advertises: 10 billion FICO Scores are sold each year, which is four times the number of hamburgers that McDonald's sells worldwide each year; 27.4 million FICO Scores are sold every day, which is over twice the number of cups of coffee Starbucks sells worldwide in a day; and 90% of all lending decisions in the United States rely on FICO Scores.

44.      Similarly, in its 2019 Form 10-K, Fair Isaac described its "FICO Scores" as "the standard measure in the U.S. of consumer credit risk" and reported that "FICO Scores are used . . . by nearly all of the major banks, credit card organizations, mortgage lenders, and auto loan originators."

45.      Fair Isaac representatives have described Fair Isaac's FICO score as "***the 800-pound gorilla***" in the market for B2B Credit Scores and bragged about Fair Isaac's 90% market share.  For example, in November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President, Michael Pung, stated that Fair Isaac's FICO Scores are:

- ***The "most widely used credit scoring system here in the U.S.";***

- *Used by "[v]irtually every major lender in the U.S."; and that*

- *Fair Isaac has "maintained a 90-plus percent market share for at least . . . 13 years."*

46.     Fair Isaac representatives have also recognized that FICO Scores have benefited from the network effects created by the widespread use of FICO Scores in many industries.  For example, in November 2011, then-CEO of Fair Isaac, Mark Greene, explained that the "network effect" of "FICO Scores . . . being sort of the standard language" and "*having everybody . . . standardize on a FICO Score, that's magic*."

47.     Fair Isaac's monopoly in the B2B Credit Score Market for Credit Scores has given it the power to control prices.  Indeed, Fair Isaac's CEO, Will Lansing, has noted that in the B2B Credit Score Market Fair Isaac has "*quite a bit of discretion in whether we want our margins to be higher or lower or where they are*."

**D.     Attempts to Compete Have Been Stymied by Fair Isaac's Monopoly in the B2B Credit Score Market**

48.     In March 2006, VantageScore introduced the VantageScore Credit Score and credit scoring system.  VantageScore is a competitor to FICO Scores in the B2B Credit Score Market.

49.     From the time it was first released in 2006, VantageScore scored millions more consumers than the FICO scoring systems.  Whereas Fair Isaac's FICO scoring systems would not generate a score if a consumer had not used credit in more than six months or if a credit account was fewer than six months old, VantageScore calculated scores for consumers that had not used credit for up to two years.  It also reached more consumers by using utility and telecommunications payment histories when reported to the Credit Bureaus.

50.     Today, VantageScore scores 30 million more Americans than traditional FICO scoring systems.  Fair Isaac's outdated FICO Classic credit scoring systems – which are still used

11

by many lenders – exclude many creditworthy Americans that VantageScore can reliably score. About one-quarter of American adults – some 65 million people – do not have a traditional FICO score. VantageScore is capable of reducing the number of adults without a Credit Score by almost half. Ten million of those newly scored individuals are "prime" borrowers that should be attractive to traditional lenders.

51. Without a Credit Score, it is difficult or impossible to apply for or successfully obtain a mortgage, car loan, or reasonable interest rates on personal lines of credit. Not having a Credit Score can also have drastic effects outside of the credit market. For example, Credit Scores are increasingly used by landlords to screen potential tenants.

52. Those excluded by Fair Isaac's traditional FICO scoring systems – who face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and apartment housing – include disproportionate numbers of low-income and minority consumers.

53. Indeed, one advocacy group focused on making it possible for people with limited incomes, especially people of color, to achieve financial security has observed: "Black and Hispanic individuals are . . . significantly more likely than white individuals to be credit invisible" – meaning that they have "no established credit history," are "unscored," and "lack[] sufficient or recent enough credit history to be given a [FICO] Credit Score." VantageScore calculates a score for 9.5 million Hispanic and Black consumers who do not have a FICO score, including 2.7 million minority consumers who should be considered "prime" borrowers.

54. Despite the potential advantages of using VantageScore, Fair Isaac continues to maintain its monopoly in the B2B Credit Score Market. In February 2013, at a Morgan Stanley Conference, Fair Isaac's CEO, Will Lansing, explained that despite the existence of VantageScore,

"there [is] not that much competition around our [B2B] scores business" because "*FICO scores are very much part of the fabric of the banking industry*" and "*really deeply imbedded*."

**E.     Fair Isaac Has Contracted with the Credit Bureaus as Agents and Co-Conspirators in Its Scheme to Monopolize**

55.     With its dominant position in the B2B Credit Score Market, Fair Isaac uses the Credit Bureaus to perpetuate and extend its monopoly.  Fair Isaac's relationship with B2B Purchasers is often dependent on B2B Purchasers' relationships with the Credit Bureaus.  To facilitate the sale of its FICO Scores to B2B Purchasers, Fair Isaac enlists the assistance of the Credit Bureaus.

56.     When a B2B Purchaser requires a Credit Score, it purchases the report from the Credit Bureau, and the Credit Score jointly from the Credit Bureau and Fair Isaac.  Although the payment may at times occur in a single transaction, the practical reality, as expressly set forth in contracts governing the sale of Credit Scores to B2B Purchasers, is that both the Credit Bureau and Fair Isaac act as the provider of the FICO Score.

57.     B2B Purchasers' contracts for FICO Scores are often known as Credit Scoring Services Agreements ("CSSAs").  CSSAs provide for both the method of payment and fee model for the delivery of Credit Score services.

58.     For example, the CSSA between Plaintiff, its Credit Bureau, and Fair Isaac makes clear in the "Method of Payment" section that "Experian/Fair, Isaac will deliver to Subscriber invoices" for its Credit Scores and that "Subscriber will pay Experian/Fair, Isaac the amounts indicated on such invoices."  It also specifies that in "consideration of Experian/Fair, Isaac's performance of the Experian/Fair, Isaac Model, Subscriber will pay Experian/Fair, Isaac fees."

59.     In Plaintiff's and Class Members' procurement of FICO Scores, the Credit Bureaus act as co-conspirators and agents of Fair Isaac.  Indeed, Plaintiff's CSSA states that "the

13

Experian/Fair, Isaac Model results from the joint efforts of Experian Information Solutions, Inc. and Fair, Isaac and Company, Incorporated"; and authorizes the Credit Bureau to execute the contract "on behalf of itself and Fair, Isaac and Company, Incorporated." (Fair Isaac was formerly known as Fair, Isaac and Company.)

### F. Fair Isaac's Other Anticompetitive and Exclusionary Conduct

60. Fair Isaac has used its monopoly power to coordinate a multi-faceted campaign to eliminate competition from VantageScore. Fair Isaac has been explicit that this is its goal. In April 2015, Will Lansing informed investors on a quarterly earnings conference call that Fair Isaac's strategic goal was to ensure that "the entire industry adopts FICO scores instead of [other] scores." To achieve this goal, Fair Isaac has enlisted its competitors (the Credit Bureaus, which jointly own and control VantageScore) to agree to anticompetitive contracts that: prevent them from developing or selling alternative Credit Scores that could be seamlessly integrated into many lenders' systems or used interchangeably with FICO Scores; prevent them from competing with each other to negotiate prices from FICO; and create a pricing scheme effectively foreclosing B2B Purchasers from choosing to use FICO Scores in their lending decisions at the same time as providing customers with a competing Credit Score, including VantageScore. At the same time, Fair Isaac has waged a media campaign against VantageScore and made false and misleading statements in order to sow fear, uncertainty, and doubt about VantageScore's reliability. By its anticompetitive and exclusionary conduct, Fair Isaac has injured competition in the B2B Credit Score Market, increased prices for Plaintiff and the Class, and limited access to credit for millions of Americans.

1.  **Fair Isaac and the Credit Bureaus Have Entered into Anticompetitive Contract Terms that Restrict Their Ability to Compete and Sell VantageScore**

61.     In January 2015, Fair Isaac and TransUnion entered into a contract, the Analytic and Data License Agreement.  With TransUnion's prior contracts with Fair Isaac set to expire on December 31, 2014, Fair Isaac demanded that the parties enter into a new contract rather than renew their existing contracts.  Fair Isaac represented to TransUnion that Experian and Equifax had already agreed to materially similar new contracts with Fair Isaac.  If TransUnion did not agree to the terms demanded by Fair Isaac, it would lose substantial business from customers that depend on FICO Scores.  On information and belief, TransUnion, Equifax, and Experian all agreed to Fair Isaac's plan to exclude competitors and maintain its monopoly.

a.  **The Anticompetitive Agreements Restrict the Credit Bureaus' Ability to Develop or Sell Other Credit Scores Compatible with B2B Purchasers' Existing Systems**

62.     Fair Isaac has imposed a similar or identical "No Equivalent Products" clause on each of the Credit Bureaus.  By imposing a "No Equivalent Products" term, Fair Isaac has sought to block the Credit Bureaus from offering alternative Credit Score products, such as VantageScore, that would allow B2B Purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems, or to use VantageScore alongside or interchangeably with FICO Scores.  The Credit Bureaus have agreed to and acquiesced in these anticompetitive agreements, terms, and resulting anticompetitive effects.

63.     The "No Equivalent Products" clause provides that a Credit Bureau may not internally develop a credit scoring system that is aligned to the odds-to-score relationship of any Fair Isaac Analytic or that uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic.  It also prohibits a Credit Bureau from distributing any competing analytic (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many

15

of the same reason codes, and the clause expressly names Vantage Score Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."

64.     For example, if a competing Credit Score product used a 700 score to indicate a less-than-five-percent risk of credit delinquency, and if a 700 FICO score also indicated the same risk of delinquency, then the "No Equivalent Products" clause prevents a Credit Bureau from distributing the competing product.  Similarly, if a competing Credit Score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause prohibits a Credit Bureau from distributing the product.

65.     The "No Equivalent Products" clause effectively prevents a Credit Bureau from developing (contrary to the original goal of VantageScore and the easy ability to do so) or selling an alternative to FICO's Credit Scores that would (i) be compatible with many B2B Purchasers' systems, models, and processes; and (ii) allow B2B Purchasers to have a legitimate choice between using FICO Scores and an alternative score.  Many B2B Purchasers have spent substantial effort and resources to develop systems, models, and processes that are designed for FICO Scores.  B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default).  For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

66.     The "No Equivalent Products" clause protects and sustains Fair Isaac's monopoly. The odds-to-score relationship is an arbitrary mapping between risk and score and does not reflect protectable intellectual property.  Similarly, the reason codes that may not be used by an

16

"Equivalent Product" were not invented by Fair Isaac but reflect well-established industry best practices for lending.

> **b.** **Fair Isaac and the Credit Bureaus Have Agreed to a Penalty Pricing and Bundling Scheme to Foreclose Competition from Competitors in the B2B Credit Score Market**

67. Fair Isaac's contracts with each Credit Bureau include a similar or identical "Dynamic Royalty Schedule" clause and a similar or identical "Pre-Qualification" royalty category. Through the "Pre-Qualification" royalty category, Fair Isaac has effectively foreclosed lenders from the ability to purchase and use a FICO score in their lending decision while providing a consumer with a competing Credit Score, which drives lenders to buy exclusively Fair Isaac's FICO Scores and not to purchase competing Credit Scores. As a consequence of Fair Isaac's imposition of the "Pre-Qualification" royalty category, TransUnion has lost sales of VantageScore to major banks to provide to consumers.

68. In 2015, Fair Isaac unilaterally imposed, and the Credit Bureaus have complied with, a new "Pre-Qualification" royalty category, which Fair Isaac defines to "mean an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category distinguishes between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any Credit Score or credit data to consumers; and (2) lenders that use FICO Scores for "Pre-Qualification" while also providing Credit Scores or credit data to consumers "in connection" with the "Pre-Qualification." Certain banks and lenders offer consumers opportunities to apply to qualify for credit opportunities (*e.g.*, a credit card or loan) and, at the same time, receive their personal Credit Score. The offer of a free Credit Score to a consumer can entice consumers to apply for credit opportunities.

69. The royalty price associated with a FICO score used for "Pre-Qualification" depends on whether other Credit Scores or credit data are provided to consumers. If a lender

purchases a FICO score for use in "Pre-Qualification" and does not provide any Credit Score or credit data to the consumer "in connection" with the "Pre-Qualification," there is one per-score royalty rate. If the lender purchases a FICO score for use in "Pre-Qualification" and provides any other Credit Score (such as a VantageScore) to the consumer "in connection" with the "Pre-Qualification," there is a different per-score royalty rate that is higher – a penalty rate.

70.     The penalty rate can be avoided in one of two ways, both of which involve purchasing exclusively FICO Scores. First, the B2B Purchaser could purchase a FICO score for use in "Pre-Qualification" and provide no Credit Score or credit data to the consumer. Second, the B2B Purchaser could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of scores by lenders with the provision of scores to consumers.

71.     There is no legitimate business justification for the penalty rate agreed upon by Fair Isaac and the Credit Bureaus when the lender also purchases any other Credit Score to disclose to consumers. The transparent purpose of the "Pre-Qualification" royalty category is to drive all B2B Purchasers engaging in "Pre-Qualification" to purchase exclusively FICO Scores and make it cost-prohibitive for B2B Purchasers engaging in "Pre-Qualification" to purchase a competing Credit Score for disclosure to consumers. This scheme has been effective, and few, if any, B2B Purchasers have opted to pay the penalty rate.

**c.     Fair Isaac and the Credit Bureaus Have Agreed to Contract Provisions that Allow Fair Isaac to Extract Monopoly Prices**

72.     Fair Isaac's "Level Playing Field," requires that the prices that are made available to one Credit Bureau be made available to the other Credit Bureaus. Taken together, the "Dynamic Royalty Schedule" and the "Level Playing Field" clauses enable Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores. Fair Isaac's contracts with TransUnion, Equifax,

and Experian include similar or identical "Level Playing Field" and "Dynamic Royalty Schedule" provisions.

73. Fair Isaac has used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in its contracts with the Credit Bureaus to extract monopoly prices from B2B Purchasers. These provisions disincentivize a Credit Bureau from negotiating for a lower price because it knows that even if it succeeds, it will not as a result gain a competitive advantage over the other Credit Bureaus.

### 2. Fair Isaac's Campaign to Create Fear, Uncertainty, and Doubt About VantageScore Among B2B Purchasers

74. Despite having successfully induced the Credit Bureaus to agree with Fair Isaac and with each other to impose restrictions on VantageScore's ability to compete with FICO, Fair Isaac has gone even further and waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScore. In advertisements, letters, and blog posts, Fair Isaac has disparaged VantageScore by calling it a "Fako" score, falsely claimed that VantageScore is an unreliable measure of creditworthiness, and misrepresented the information considered by VantageScore's credit scoring system.

75. On December 12, 2017, Fair Isaac took out a full-page advertisement in *The Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates" that disparaged VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative Credit Score, which is "owned by the credit bureaus," is less reliable than FICO Scores in evaluating credit risk, and fails to use "sound practices" or "science-based credit evaluation." To anyone familiar with the market for Credit

Scores, the advertisement unambiguously conveys the false message that VantageScore is "[w]eakening scoring standards, [and] harm[ing] consumers, and the lending system," particularly in the B2B Credit Score Market.

76.     The *Wall Street Journal* advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name. One such blog post asserts: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

77.     Moreover, the implication that FICO Classic scoring systems provide Credit Scores for as many consumers as VantageScore is false and misleading. VantageScore provides Credit Scores for millions of American consumers that are not scored by FICO Classic scoring systems.

78.     Fair Isaac's website includes numerous posts disparaging VantageScore and making false or misleading statements about VantageScore's features. For example, one blog post claims that "[r]esearch results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance." This statement is false and misleading because it conveys the message that VantageScore's scoring model is "weak" and does a "poor job forecasting future performance" because it considers a consumer's full credit history even if the consumer has not used a traditional credit line in the last six months. In fact, studies have shown that VantageScore is strongly predictive.

79.     Another blog post claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not." This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0,

the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones.

80.     Fair Isaac's campaign against VantageScore is not new.  In 2006, just months after the launch of VantageScore, Fair Isaac filed a meritless lawsuit against the Credit Bureaus and VantageScore in the United States District Court for the District of Minnesota.  *See Fair Isaac Corporation v. Equifax Inc.*, No. 06-cv-04112 (D. Minn.).  This was the monopolist's first attempt to kill the nascent competitor.  Fair Isaac's numerous claims included a claim that the development of VantageScore violated the antitrust laws and a claim that the development of VantageScore constituted trademark infringement.  In its prayer for relief, Fair Isaac sought nothing less than the end of VantageScore:  it requested that the "Defendants be ordered to dissolve VantageScore."

81.     All of Fair Isaac's claims failed; in fact, the jury concluded that Fair Isaac was the wrongdoer.  In support of its trademark infringement claim, Fair Isaac had alleged that VantageScore's use of a scoring range of 501-990 constituted trademark infringement because it was similar to FICO's scoring range of 300-850.  The Credit Bureaus and VantageScore counterclaimed for fraud on the United States Patent and Trademark Office ("PTO"), alleging that Fair Isaac had misrepresented to the PTO that only FICO used the 300-850 score range.  The jury concluded that Fair Isaac had committed fraud on the PTO by making false statements as part of its application to register the score range of 300-850 as a trademark.

82.     The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

### 3.     Fair Isaac's Anticompetitive and Exclusionary Conduct Harms Competition

83.     Fair Isaac's campaign of exclusionary conduct to maintain and expand its monopoly has harmed and continues to harm participants in the B2B Credit Score Market.  Fair

21

Isaac's unlawful conduct, including that which has been taken in concert with the Credit Bureaus, has foreclosed competition in the B2B Credit Score Market by foreclosing opportunities for the Credit Bureaus to sell VantageScore or any other competitive products. The anticompetitive and exclusionary conduct has allowed Fair Isaac to maintain its monopoly and charge monopoly prices for B2B Credit Scores to B2B Purchasers during the Class Period.

84. Fair Isaac's conduct, in concert with the Credit Bureaus, including by the contracts entered into by the Credit Bureaus, has reduced choice for B2B Purchasers. The anticompetitive terms agreed to between Fair Isaac and the Credit Bureaus have frustrated the ability of B2B Purchasers to purchase VantageScore or any other competitive Credit Score that could be seamlessly integrated into lenders' existing processes and systems. Fair Isaac's media and advertising campaign against VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace.

85. Media sources, financial blogs, and consumers have absorbed Fair Isaac's message that VantageScore is a "***Fako***" ***score*** merely because it is not a FICO score. For example, thebalance.com – a website devoted to personal finance issues – posted in February 2017, and continues to display as of the date of this filing: "If you purchased your Credit Score anywhere but MyFICO.com, then it's a Fako score."[2]

## V.     CLASS ACTION ALLEGATIONS

86. Plaintiff brings this action on behalf of itself, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of:

> **All B2B Purchasers residing in the United States that directly purchased a FICO Score from Fair Isaac and/or a Credit Bureau during the Class Period.**

---

[2]     Latoya Irby, *FICO & FAKO Credit Scores*, The Balance, https://www.thebalance.com/fico-and-fako-credit-scores-960497 (last visited Apr. 2, 2020).

87.     Excluded from the Class are: Defendant, its officers, directors, management, employees, subsidiaries, and affiliates.  Also expressly excluded are any natural persons that purchased their own Credit Score solely via myFico.com, the Credit Bureaus, or other entities for their personal use.

88.     Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household or the spouse of such a person.

89.     Members of the Class are so numerous and geographically dispersed that joinder is impracticable.  Further, members of the Class are readily identifiable from information and records in the possession of Defendant.

90.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendant.

91.     Plaintiff will fairly and adequately protect and represent the interests of members of the Class.  The interests of Plaintiff are coincident with, and not antagonistic to, those of members of the Class.

92.     Plaintiff is represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including class actions in the financial services industry.

93.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate.  Questions of law and fact common to members of the Class include, but are not limited to:

> a.  whether Defendant monopolized, conspired to monopolize, or unreasonably restrained trade in violation of federal law;

b. whether Defendant monopolized, conspired to monopolize, or unreasonably restrained trade in violation of certain state antitrust laws;

c. whether Defendant engaged in unfair or deceptive trade practices in violation of certain state laws;

d. the duration of the alleged unlawful conduct;

e. injury suffered by Plaintiff and members of the Class;

f. damages suffered by Plaintiff and members of the Class; and

g. whether Defendant has acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

94.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

95.     The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

96.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

97.     Plaintiff has defined members of the Class based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.    STATUTES OF LIMITATIONS AND TOLLING

98.    By its very nature, the unlawful activity in which Defendant engaged was self-concealing from Plaintiff and the Class.    As a result of Defendant's affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiff and members of the Class have been and are tolled, and Defendant is equitably estopped from raising statutes of limitations as a defense.

99.    Any applicable statutes of limitations were tolled at least until February 12, 2018, the date that TransUnion filed its Counterclaim against Defendant.

100.    The federal government's initiation of its antitrust investigation of Defendant's unlawful conduct also operates to toll any federal statute of limitations under 15 U.S.C. §16.

## VII.    CLAIMS FOR RELIEF

### CLAIM ONE:
### MONOPOLIZATION
### 15 U.S.C. §2

101.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

102.    The relevant product market is the market for the sale of B2B Credit Scores.

103.    The relevant geographic market for the sale of B2B Credit Scores is the United States.

104.    The B2B Credit Score Market is the relevant market.

105.    Fair Isaac has had and continues to have at least 90% market share in the B2B Credit Score Market.

106.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

107.    Fair Isaac has had and continues to have the power to control prices or exclude competition in the B2B Credit Score Market.

108.    Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B Credit Scores in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

109.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand and to supracompetitive levels.

110.    Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

111.    Fair Isaac's monopolization has injured and will continue to injure competition in this market.

112.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

113.    The anticompetitive conduct raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

114.    Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

115.    Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

## CLAIM TWO:
## CONSPIRACY TO MONOPOLIZE
## 15 U.S.C. §2

116.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

117.    The relevant product market is the market for the sale of B2B Credit Scores.

118.    The relevant geographic market for the sale of B2B Credit Scores is the United States.

119.    The B2B Credit Score Market is the relevant market.

120.    Fair Isaac has had and continues to have at least 90% market share in the B2B Credit Score Market.

121.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

122.    Fair Isaac has had and continues to have the power to control prices or exclude competition in the B2B Credit Score Market.

123.    Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B Credit Score Market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

124.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand, and to supracompetitive levels.

125.    Fair Isaac entered into a combination or conspiracy with the Credit Bureaus to maintain its monopoly power in the B2B Credit Score Market. Fair Isaac created and maintained this conspiracy through a series of agreements with each of the Credit Bureaus. In these

agreements, the Credit Bureaus and Fair Isaac agreed that the Credit Bureaus would not offer or sell VantageScore or any other competing Credit Score to Plaintiff and members of the Class. Fair Isaac and the Credit Bureaus further agreed that the Credit Bureaus would act as Fair Isaac's agent in the sale of FICO Scores to Plaintiff and members of the Class.

126. These agreements foreclosed competition in a substantial portion of the B2B Credit Score Market and unlawfully maintained Fair Isaac's monopoly, resulting in Fair Isaac extracting supracompetitive prices for FICO Scores from Plaintiff and members of the Class.

127. Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

128. Fair Isaac's monopolization conspiracy has injured and will continue to injure competition in this market.

129. Fair Isaac has acted with the specific intent of monopolizing the market for B2B Credit Scores in the United States.

130. Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

131. The conspiracy raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

132. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

133. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

## CLAIM THREE:
## UNREASONABLE RESTRAINT OF TRADE
## 15 U.S.C. §1

134.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

135.    The relevant product market is the market for the sale of B2B Credit Scores.

136.    The relevant geographic market for the sale of B2B Credit Scores is the United States.

137.    The B2B Credit Score Market is the relevant market.

138.    Fair Isaac and the Credit Bureaus have had and continue to collectively have at least 90% market share in the B2B Credit Score Market.

139.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

140.    Fair Isaac has had and continues to have the power to control prices or exclude competition in the B2B Credit Score Market.

141.    Fair Isaac entered into agreements with TransUnion, Experian, and Equifax that contained anticompetitive terms whereby each Credit Bureau agreed not to offer or sell VantageScore as a competing product to Plaintiff and members of the Class.

142.    The agreements between Fair Isaac and the Credit Bureaus had substantial anticompetitive effects.  The agreements excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

143.    The agreements raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

144.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

145. Plaintiff and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac does not cease its anticompetitive conduct.

146. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

147. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

**CLAIM FOUR:**
**STATE ANTITRUST LAWS**

148. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

149. By reason of the foregoing, Defendant has violated, and Plaintiff and members of the Class are entitled to relief under, the antitrust laws of the States of Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

    i. Arizona Revised Statutes §44-1401, *et seq*.;

    ii. California Cartwright Act, California Business & Professions Code §16700, *et seq*.

    iii. Connecticut Antitrust Act, Conn. Gen. Stat. 35-24, *et seq*.;

    iv. District of Columbia Code §28-4501, *et seq*.;

    v. Hawaii Revised Statutes §480-2, *et seq*.;

vi. Illinois Antitrust Act, Illinois Complied Statutes §740, Ill. Comp. Stat. 1011, *et seq.*;

vii. Iowa Competition Law, Iowa Code §553.1, *et seq.*;

viii. Kansas Statutes Annotated §50-101, *et seq.*;

ix. Maine Revised Statutes Annotated, tit. 10, §1101, *et seq.*;

x. Maryland Code Annotated, Commercial Law, §11-204, *et seq.*;

xi. Michigan Compiled Laws §445.771, *et seq.*;

xii. Minnesota Antitrust Law of 1971, Minnesota Statutes §325D.49, *et seq.*;

xiii. Mississippi Code Annotated §75-21-1, *et seq.*;

xiv. Nebraska Revised Statutes §59-801, *et seq.*;

xv. Nevada Revised Statutes Annotated §598A.010, *et seq.*;

xvi. New Mexico Statutes Annotated §57-1-1, *et seq.*;

xvii. New York Donnelly Act, New York General Business Law §340, *et seq.*;

xviii. North Carolina General Statutes §75-1, *et seq.*;

xix. North Dakota Century Code §51-08.1-01, *et seq.*;

xx. Oregon Revised Statutes §646.705, *et seq.*;

xxi. Rhode Island General Laws §6-36-4, *et seq.*;

xxii. South Dakota Codified Laws §37-1-3.1, *et seq.*;

xxiii. Tennessee Code Annotated §47-25-101, *et seq.*;

xxiv. Utah Code Annotated §76-10-3104, *et seq.*;

xxv. Vermont Statutes Annotated, tit. 9, §2451, *et seq.*;

xxvi. West Virginia Code §47-18-1, *et seq.*; and

xxvii. Wisconsin Statutes §133.01, *et seq.*

**CLAIM FIVE:**
**STATE UNFAIR TRADE PRACTICES LAWS**

150. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

151. By reason of the foregoing, Defendant has violated, and Plaintiff and members of the Class are entitled to relief under, the Unfair Trade Practices and Consumer Protection Laws of the States of Arkansas, California, Connecticut, Florida, Massachusetts, Missouri, Montana, New Mexico, New York, North Carolina, Rhode Island, South Carolina, and Vermont, as well as the District of Columbia, as follows:

    i. Arkansas Code Annotated, §4-88-101, *et seq*.;

    ii. California Business and Professions Code §17200, *et seq*.;

    iii. Connecticut Unfair Trade Practices Act, Conn Gen. Stat. §42-110a, *et seq*.;

    iv. District of Columbia Code §28-3901, *et seq*.;

    v. Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq*.;

    vi. Massachusetts Consumer Protection Act, Mass. Gen. L. Ch. 93A, *et seq*.;

    vii. Missouri Merchandising Practices Act, Mo. Rev. Stat. §407.010, *et seq*.;

    viii. Montana Code, §30-14-103, *et seq*., and §30-14-201, *et seq*.;

    ix. New Mexico Statutes Annotated §57-12-1, *et seq*.;

    x. New York General Business Law §349, *et seq*.;

    xi. North Carolina General Statutes §75-1.1, *et seq*.;

    xii. Rhode Island General Laws §6-13.1-1, *et seq*.;

    xiii. South Carolina Code Annotated §39-5-10, *et seq*.; and

    xiv. Vermont Statutes Annotated, tit. 9, §2451, *et seq*.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and members of the Class, respectfully prays that This Honorable Court:

A. Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that it be named a Class Representative, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B. Adjudge that Defendant violated the federal antitrust laws as set forth above;

C. Adjudge that Defendant violated the state antitrust and unfair trade practices laws as set forth above;

D. Award Plaintiff and members of the Class actual, treble, and exemplary damages;

E. Award Plaintiff and members of the Class attorneys' fees and costs of suit, including costs of consulting and testifying experts;

F. Award Plaintiff and members of the Class pre- and post-judgment interest;

G. Enjoin Defendant from its violations of law; and

H. Grant such other, further and different relief, including structural relief, as may be just and proper.

## IX. DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a Trial by Jury as to all issues so triable.

Dated:  April 2, 2020

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 s/ Joseph P. Guglielmo
Joseph P. Guglielmo (N.D. Ill. No. 2759819)
Peter A. Barile III (N.D. Ill. No. 4364295)

Justin W. Batten (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
jgugliemo@scott-scott.com
pbarile@scott-scott.com
jbatten@scott-scott.com

Christopher M. Burke (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone:  619-233-4565
Facsimile:  619-233-0508
cburke@scott-scott.com

George A. Zelcs (Ill. Bar No. 3123738)
Randall P. Ewing, Jr. (Ill. Bar No. 6294238)
Ryan Z. Cortazar (Ill. Bar No. 6323766)
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile:  312-641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Steven M. Berezney (N.D. Ill. Bar No. 56091)
Michael E. Klenov (Ill. Bar No. 6300228)
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: 314-241-4844
Facsimile:  314-241-3525
sberezney@koreintillery.com
mklenov@koreintillery.com

*Counsel for Plaintiff Sky Federal Credit Union*