# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| IN RE FICO ANTITRUST LITIGATION | ) | **Judge Edmond E. Chang** |
| _____ | ) | |
| | ) | **Magistrate Judge M. David Weisman** |
| **This Document Relates to the** | ) | |
| **Following Cases:** | ) | **No. 1:20-CV-02114** |
| | ) | |
| **INDIRECT PURCHASER CASES** | ) | **JURY TRIAL DEMANDED** |
| _____ | ) | |

## INDIRECT PURCHASER PLAINTIFFS'
## AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................1

II. PARTIES ..............................................................................................6

III. JURISDICTION AND VENUE .................................................................8

IV. FACTUAL ALLEGATIONS .....................................................................9

    A. Credit Scores and Credit Reports..................................................9

    B. The Markets for Credit Scores .....................................................13

    C. Fair Isaac's FICO Score Has a Monopoly in the B2B Credit Score Market .............20

    D. Fair Isaac Has Been Able to Maintain its Monopoly.................................23

    E. Fair Isaac's Conduct in Furtherance of its Anticompetitive Scheme .......................27

        1. Fair Isaac's Anticompetitive Litigation .......................................27

        2. Fair Isaac and the Credit Bureaus' Conspiracy.............................................31

            a. Fair Isaac's Anticompetitive Contracts with the Credit Bureaus.......34

                i. The "No Equivalent Products Clause"..................................35

                ii. The "Dynamic royalty Schedule" ..........................................38

                iii. The "Level Playing Field" ....................................................40

        3. Fair Isaac's Negative Advertising Campaign in Furtherance of its Scheme.........42

    F. Fair Isaac's Anticompetitive Conduct has harmed Competition ..............................45

V. CLASS ACTION ALLEGATIONS ...............................................................47

VI. STATUTES OF LIMITATION AND TOLLING...............................................50

VII. DEFENDANTS' ACTIONS CONSTITUTE A CONTINUING VIOLATION ...................53

VIII. CLAIMS FOR RELIEF .............................................................................54

    FIRST CLAIM FOR RELIEF: UNREASONABLE RESTRAINT OF TRADE.................54

i

SECOND CLAIM FOR RELIEF:  UNREASONABLE RESTRAINT
OF TRADE .................................................................................................................57

THIRD CLAIM FOR RELIEF: UNREASONABLE RESTRAINT OF TRADE ................60

FOURTH CLAIM FOR RELIEF:  UNREASONABLE RESTRAINT OF TRADE............62

FIFTH CLAIM FOR RELIEF: MONOPOLIZATION ........................................................65

SIXTH CLAIM FOR RELIEF: CONSPIRACY TO MONOPOLIZE.................................67

SEVENTH CLAIM FOR RELIEF: VIOLATION OF STATE ANTITRUST
STATUTES ..................................................................................................................69

EIGHTH CLAIM FOR RELIEF:  VIOLATIONS OF STATE CONSUMER
PROTECTION LAWS ................................................................................................103

NINTH CLAIM FOR RELIEF:  UNJUST ENRICHMENT.................................................134

PRAYER FOR RELIEF ....................................................................................................135

DEMAND FOR JURY TRIAL ..........................................................................................135

Plaintiffs Garner Properties & Management LLC ("Garner") and Lake City Exports, Inc. ("Lake City") (collectively, "Plaintiffs"), bring this action against Defendants Fair Isaac Corporation ("Fair Isaac"), Equifax, Inc. ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and TransUnion, LLC ("TransUnion") (collectively "Defendants," with the latter three referred to collectively as the "Credit Bureaus" or "CBs"), individually and on behalf of proposed Classes of all end-users that purchased FICO Scores[1] in the B2B Credit Score Market from anyone other than Fair Isaac and/or a Credit Bureau from October 1, 2006 through the present.[2] Defendants have engaged in anticompetitive behavior, which forced Plaintiffs and members of the proposed Classes to pay artificially inflated prices for credit scoring services and generated millions of dollars in supra-competitive annual revenues for Defendants. Fair Isaac has maintained a monopoly share in excess of 90% of the market for credit scores by suppressing competition and inhibiting innovation. Therefore, Plaintiffs and the proposed Classes seek damages, injunctive relief and other relief pursuant to federal antitrust laws, state antitrust, unfair competition, and consumer protection laws, and the laws of unjust enrichment, and demand a trial by jury.

## I.    INTRODUCTION

1.      A "credit score" is a three-digit numerical summary of a customer's creditworthiness based on factors such as payment history and the duration of that history; balances, available credit, and the percentage of existing credit lines being utilized; public records like bankruptcies or adverse judgments; and the assumption of new debt. There are two distinct markets for such scores. The first is the market for the sale of such scores to banks, mortgage companies, credit unions, and other businesses that assess individual credit

---

[1] "FICO Score" includes a credit report that contains a FICO Score.
[2] "Third-party" constitutes any entity that who purchased a FICO Score from any Defendants.

risk – *i.e.*, business-to- business sales. That market is referred to herein as the "B2B Credit Score Market." The second is the market for the sale of such scores to the individual who is the subject of them – *i.e.*, business-to-consumer. That market is referred to herein as the "B2C Credit Score Market." This case concerns the B2B Credit Score Market.

2.     According to Fair Isaac, FICO Scores are used for over 90% of all lending decisions in the United States. Fair Isaac's FICO credit scores have dominated the market for nearly three decades and have "maintained a 90-plus percent market share for at least 13 years."[3]

3.     Credit Bureaus collect and maintain information for credit reports. The three major CBs in the United States are Defendants Equifax, Experian, and TransUnion. The CB Defendants control virtually 100% ofaggregate credit-related data formed by aggregating credit data collected from businesses, and theyjointly dominate the market for B2B credit reports.

4.     Credit reports list bill payment history, loans, current debt, and other financial information. They show where consumers work and live and whether they have been sued, arrested, or filed for bankruptcy.

5.     Credit reports help lenders decide if they will give consumers credit or approve a loan. The reports also help determine what interest rates consumers are charged. Employers, insurers, and rental property owners also use credit reports.

6.     CBs purchase FICO Scores and then sell them as part of the credit reporting services they provide to millions of lenders, financial institutions, landlords, employers, and other businesses, that then use the credit reports to determine credit history and/or default risk.

7.     Fair Isaac also directly sells FICO Scores to creditors and other businesses

---

[3] TransUnion LLC's Redacted Counterclaims, Dkt 38, *Fair Isaac Corp. . TransUnion LLC*, No. 1:17-cv-08318, ¶ 32 (N.D. Ill. Feb. 12, 2018)("TransUnion Counterclaims").)

–bypassing the Credit Bureaus, and competing with them, when it does so.

8.     Plaintiff Garner is a real estate brokerage and property management company that purchases Fair Isaac's FICO scores from third-parties which, in turn, purchase those FICO Scores from one of the three major CBs. The third-parties pass on to Garner and all other Class Members the cost of each FICO Score.

9.     Plaintiff Lake City is used automobile dealer that purchases Fair Isaac's FICO scores from third-parties which, in turn, purchase those FICO Scores from one of the three major CBs. The third-parties pass on to Lake City and all other Class Members the cost of each FICO Score.

10.    In 2006, VantageScore Solutions, LLC ("VantageScore Solutions") launched VantageScore - a credit score to compete against Fair Isaac's FICO Scores. VantageScore Solutions is an independent joint venture of the three major CBs, Equifax, Experian, and TransUnion. Similar to Fair Isaac's FICO Score, VantageScore Solutions uses scoring codes and algorithms to convert a consumer's information in a consumer credit report into a credit score. Thus, VantageScore presented a competitively priced alternative to FICO Scores.

11.    In addition, a VantageScore has relevant and important advantages over a FICO Score.  For example, a VantageScore considers a consumers' rental and utility payments, which enables it to provide a credit score for consumers with less than six months of credit history.  Fair Isaac's FICO Score cannot do this. A VantageScore therefore provides a credit score for tens of millions more Americans than Fair Isaac's algorithms allow. If Plaintiffs and similarly situated businesses were able to purchase VantageScores on economically sensible terms, they would be able to see credit scores of tens of millions more consumers, enabling them to contract with millions more customers, tenants, and employees than they can using

FICO Scores alone.

12. Rather than compete on the merits with VantageScore, Fair Isaac undertook a lengthy campaign of anticompetitive conduct to discourage the adoption of VantageScore and preserve its own monopoly. Fair Isaac also succeeded in recruiting the CBs to join a conspiracy to monopolize the B2B Credit Score Market, despite their own interest in VantageScore's success.

13. Specifically, in 2006, Fair Isaac filed a lawsuit against TransUnion, Equifax, and Experian with the intended purpose of driving VantageScore Solutions out of business. Experian settled the case in 2008 and entered into a lucrative partnership with Fair Isaac following the settlement. TransUnion and Equifax fought on, eliminating most of Fair Isaac's claims through a summary judgment motion and winning a jury trial on the remaining trademark claim.

14. When its lawsuit failed, Fair Isaac engaged in a further pattern of anticompetitive conduct designed to discourage use of alternatives to FICO Scores, including VantageScores. Fair Isaac accomplished this goal by abusing its monopoly power to enlist the CBs in a conspiracy in which they entered into contracts that contained anticompetitive restrictions aimed at extracting supracompetitive profits from B2B purchasers. Those contracts include contractual provisions that: (1) prohibit CBs from marketing non-FICO credit scores (*i.e.*, VantageScore); (2) charge discriminatory and prohibitively high prices for FICO Scores if a CB customer purchases a FICO Score while providing the consumer with a competing score (*i.e.*, a VantageScore); and (3) eliminate price competition among the CBs, thereby disincentivizing the CBs from negotiating a lower price for FICO Scores.

15. Upon information and belief, each of the CBs was aware of Fair Isaac's

imposition of these restrictive terms on the other CBs and each CB agreed to the contracts despite the terms being against their own, as well as their collective, economic self-interest. The conspiracy and the contracts that effectuated it were intended to, and had the effect of, hobbling VantageScore Solutions' ability to compete and forcing B2B Purchasers to pay supracompetitive prices for credit scores.

16.     As part of its goal of eliminating competition, Fair Isaac also waged a public relations and advertising campaign to disparage VantageScores and create uncertainty about the reliability of VantageScores. The purpose of FICO's anticompetitive scheme is to prevent competition with VantageScore and other scoring systems and to preserve Fair Isaac's monopoly.

17.     Fair Isaac's scheme worked. Through the anticompetitive conducted alleged herein, Fair Isaac succeeded in preventing VantageScore Solutions from gaining market share and thwarted the entry of other entities into the market for credit scores.  Having successfully suppressed all other competition, Fair Isaac was able to, and did, artificially increase prices for its FICO products.

18.     For example, Fair Isaac's net income for the third quarter of 2021 was ***more than double*** that of the previous year period, increasing from $64.1 million in Q3 2020 to $151.2 million in Q3 2021.[4] Sources in the financial  industry have attributed Fair Isaac's profitability to "[p]rice increases in its credit scoring segment and gains in applications sold to banking institutions," which have "helped the company log year- over-year gains in revenue and profit."[5]  But for Fair Isaac's and the CBs' anticompetitive conduct, VantageScore and

[4] Press Release, Fair Isaac, *FICO Announces Earnings of $5.18 per Share for Third Quarter Fiscal 2021* (Aug. 3, 2021), https://investors.fico.com/news-releases/news-release-details/fico- announces-earnings-518-share-third-quarter-fiscal-2021.
[5] Motley Fool, *Fair Isaac Corporation Scores 13% Revenue Growth in the First Quarter* (Jan. 31, 2019),

other competitors of Fair Isaac would have gained market share, allowing for price competition and reducing the prices Plaintiffs and similarly situated businesses paid for FICO Scores.

19.     Plaintiffs and other indirect purchasers of Fair Isaac's FICO Scores paid supracompetitive prices and have therefore suffered harm as a result of Defendants' anticompetitive conduct, which harmed competition in the B2B Credit Score Market. Opening this market to competition will spur innovation so that credit scores are fairly priced and more accurate.

20.     Plaintiffs and other similarly situated businesses are indirect purchasers of Fair Isaac's FICO Scores. They do not purchase FICO Scores directly from Defendants but instead purchase them from third-parties, who purchase them from Defendants.

## II.     PARTIES

21.     Plaintiff Garner Properties & Management LLC is a real estate brokerage and property management company located in Taylor, Michigan. During the Class Period, Garner purchased Fair Isaac's FICO Scores from third-parties which, in turn, purchased those FICO Scores from one of the three major CBs. The CBs, through the third-parties, sell FICO Scores to Plaintiffs and Class members pursuant to agreements between Fair Isaac and each Credit Bureau, which provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to the Class. The artificially inflated cost of those FICO Scores is then passed on to Garner, and all other Class members.

22.     Plaintiffs Lake City Exports, Inc., is a used automobile dealer located in Maine. During the Class Period, Lake City purchased Fair Isaac's FICO Scores from third-parties which,

---

https://www.fool.com/investing/2019/01/31/fair-isaac-corporation-scores-13- revenue-growth-in.aspx.

in turn, purchased those FICO Scores from one of the three major CBs. The CBs, through the third-parties, sell FICO Scores to Plaintiffs and Class Members pursuant to agreements between Fair Isaac and each Credit Bureau, which provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to the Class. The artificially inflated cost of those FICO Scores is then passed on to Lake City, and all other Class members.

23. Plaintiffs were injured in their business or property as a direct, proximate, and material result of Defendants' violation of the law. Plaintiffs are also threatened with future injury to their business and property by reason of Defendants' continuing violations of the law.

24. Defendant Fair Isaac is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California, 95110.

25. Defendant Equifax is a Credit Bureau incorporated in Georgia that has its principalplace of business at 1550 Peachtree St. NW, Atlanta, Georgia.

26. Defendant Experian is a Credit Bureau incorporated in Ohio that has its principal place of business in the United States at 475 Anton Blvd., Costa Mesa, California.

27. Defendant TransUnion is a Delaware limited liability Credit Bureau that has its principal place of business at 555 W. Adams St., Chicago, Illinois.

28. Plaintiffs bring this state law class action on behalf of the proposed Classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injuries caused by Defendants' conduct in restricting the development and sale of credit scores and causing the prices of FICO Scores to be artificially inflated. Plaintiffs also seek injunctive relief under Sections 1 and 2 of the Sherman Act.

### III.    JURISDICTION AND VENUE

29.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332(d) and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court possesses supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

30.    This Court has personal jurisdiction over Defendants because Defendants transacted business, maintained substantial contacts, and are located and/or committed unlawful conduct in this District. Their unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

31.    Venue is proper in this District pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d). Defendants regularly transact business within this District and a substantial portion of the affected interstate trade and commerce described in this Complaint were carried out in this District.

32.    Defendants market their products and receive substantial payments across state lines. Defendants' business activities that are the subject of this Complaint are within the law of and have substantially affected, interstate trade and commerce.

33.    During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States Mail, to effectuate their illegal scheme.

34.    Defendants' conduct also had a substantial effect on the intrastate commerce of the states listed in counts Seven and Eight of this Complaint.

## IV.    FACTUAL ALLEGATIONS

### A.    Credit Scores and Credit Reports

35.    A credit score is a numerical expression of a person's credit history and is designed to measure their creditworthiness. It helps creditors determine whether to give credit, decide the terms they offer and what interest rates consumers pay. Higher scores generally indicate that an individual or business poses less credit risk and is more likely to make payments under a contract and manage money more responsibly. Thus, having a high credit score can make it easier to get a loan, credit card, lower interest rates, rent an apartment, or provide access to lower insurance rates.

36.    Credit scores typically are produced by applying scoring algorithms to a person's consumer credit history. A credit score is based on multiple factors, such as payment history, outstanding balances, length of credit history, applications for new credit accounts, and types of credit accounts (*e.g.*, mortgages, car loans, credit cards).

37.    Credit scores usually are accompanied by "reason statements," which inform the purchaser about the factors that most significantly affected that individual's credit score. A number or alphanumeric code - called a "reason code"- is associated with each reason statement. Examples of reason statements include: "Account payment history is too new to rate"; "Amount owed on accounts is too high"; and "Too many recently active accounts." VantageScore explains this process as follows:

> No matter where you get your score, the documents that accompany it will include up to four or five statements explaining why your score wasn't higher. These statements are called reason codes and sometimes go by several other names. Some people call them score factors; others call them adverse action codes. They're all the same thing.
>
> The next time you see your credit score, regardless of where

it comes from, look for the reason codes. They'll be worded and displayed something like this:

Your Credit Score Is: 705

32: Balances on bankcard or revolving accounts too high compared to credit limits

16: The total of all balances on your open accounts is too high

85: You have too many inquiries on your credit report

13: Your most recently opened account is too new

The numbers preceding each statement are numeric identifiers; sometimes they appear with the text, and sometimes they do not.

The four (or five) factors are listed in order of the impact they have. In this example, the number one reason the credit score is not higher is "Balances on bankcard or revolving accounts too high compared to creditlimits." That means the consumer's credit card debt is too high relative to his or her credit limits.

In our example, the reason with the second-greatest impact is "The total of all balances on your open accounts is too high." That means the consumer is carrying too much debt on his or her open accounts.

The third reason the score isn't higher is "You have too many inquiries on your credit report." This means the consumer has recently applied for credit several times, which led to some number of credit inquiries.

The fourth reason the score isn't higher is "Your most recently opened account is too new." Clearly this means the consumer has a very new account on his or her credit report.[6]

38.     Fair Isaac has a webpage that sets forth its various "reason codes."[7]

---

[6] VantageScore Solutions, *Reason Codes 101*, https://www.reasoncode.org/reasoncode101.
[7] Fair Isaac, *US FICO® Score Reason Codes*, https://www.fico.com/en/latest-thinking/solution-sheet/us-fico-score-

VantageScore also has a dedicated website that explains its various "reason codes."[8]

39.    CBs collect and store financial data about individuals that is submitted to them by creditors, such as lenders, credit card companies, and other financial companies. Creditors are not required to report to every credit-reporting company. Utilizing these files, the CBs create a credit report.

40.    The information in a credit report is often used to calculate a credit score. Credit reports list a consumer's bill payment history, loans, current debt, and other financial information. They show where the individual works and lives and whether they have been sued, arrested, or filed for bankruptcy. CBs essentially collect consumer credit data and present the aggregated information in the form of a credit report.

41.    CBs continually gather credit and financial data about individuals from creditors, government entities, public records, collection agencies, and other third parties, and compile this information into a credit file. The CBs then use an individual's credit file to opulate a credit report on that individual for sale to businesses (B2B purchasers) and consumers (B2C purchasers).

42.    Credit reports help lenders decide if they will give credit or approve a loan. The reports also help determine what interest rate to charge. Employers, insurers, and rental property owners also look at credit reports.

43.    Credit scores are the most widely used indicators of consumers' creditworthiness in the United States and Fair Isaac's FICO Score is, by far, the most widely-used credit score.  According to Fair Isaac, FICO Scores are used in over 90% of U.S. lending

---

reason-codes (link to download).

[8] VantageScore Solutions,  ReasonCode.org,  https://www.reasoncode.org.

decisions.[9] They are crucial to millions of businesses that rely on indicators of creditworthiness to assess risk and make business decisions.

44.    Credit scores and credit reports are separate and distinct products that can be sold together or independently.

45.    Fair Isaac works with the CBs to perpetuate and extend its monopoly. Fair Isaac's relationship with B2B purchasers is often dependent on B2B purchasers' relationships with the CBs, which facilitate the sale of FICO Scores to B2B purchasers.

46.    FICO Scores and credit reports are often sold to businesses as a bundle. Such bundles can be sold by the CBs, which are licensed by Fair Isaac to sell FICO Scores and in return, pay a royalty to Fair Isaac. Thus, when a B2B purchaser requires a credit score, it purchases a credit report from a CB and a credit score from that CB and Fair Isaac, often through a contract with both Fair Isaac and the CB. Although the payment for the credit report and the credit score may at times occur in a single transaction, the reality is that both the CB and Fair Isaac act as the providers of the FICO Score. In this example, Plaintiffs and proposed Class members would then purchase the credit report and credit score from the B2B purchaser.

47.    In its 2020 Form 10-K filed with the SEC, Fair Isaac states that, "[d]uring fiscal 2020, 2019 and 2018, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for 32%, 29%, and 25% of our total revenues, respectively."[10]

48.    The FICO Score and credit report bundles can also be sold by Fair Isaac to businesses. "In those situations, Fair Isaac requests a credit score and credit report from the

---

[9] Fair Isaac, *FICO: The Decisions Company Investor Overview*, at 5 (Dec. 2019), https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.

[10] Fair Isaac, Annual Report (Form 10-K), at 4 (Nov. 10, 2020), https://fico.gcs- web.com/node/23951/html (hereinafter, "Fair Isaac 2020 10-K").

CBs-selected by the lender or consumer. The CBs applies Fair Isaac's CB-tailored FICO algorithm to a consumer's aggregated credit data and provides the consumer's credit report and credit score to Fair Isaac. Fair Isaac then delivers the bundle to the consumer or lender. Fair Isaac pays the CB for the cost of processing and providing the bundle."[11] Thus, Fair Isaac and the CBs act as horizontal competitors and compete with each other for some B2B Purchasers.

49.     This direct competition between Fair Isaac and the CBs, as well as the close relationship among them, continues to this day. At an August 3, 2021 earnings conference, Fair Isaac's CEO, William Lansing, said, "we stay close to it [B2B scores] through our channel partners, the bureaus. But we also – certainly for all of the major institutions, we have direct sales relationships."[12] TransUnion's current Form 10-K acknowledges that it "compete[s] with FICO in the Financial Services" market for B2B purchasers.[13] Similarly, Equifax's current Form 10-K acknowledges that it too "compete[s] with Fair Isaac Corporation with respect to certain of [its] analytical tools and solutions."[14] Experian has also recognized that its "comparator companies" include "FICO.[15]

## B.     The Markets for Credit Scores

50.     There are two distinct markets for credit scores—the "B2B Credit Score Market" and the "B2C Credit Score Market."

51.     The "B2B Credit Score Market" consists of sales from a business (a credit score generator, such as Fair Isaac, directly or through a CB, or indirectly through a third-party

---

[11] *Fair Isaac Corp. v. Equifax, Inc*., No. 06-4112, 2008 WL 623120, at *2 (D. Minn. March 4, 2008).
[12] Motley Fool, *Fair Isaac Corp. (FICO) Q3 2021 Earnings Call Transcript* (Aug. 3, 2021) (hereinafter, "Q3 Earnings Call"), https://www.fool.com/earnings/call-transcripts/2021/08/03/ fair-isaac-corporation-fico-q3-2021-earnings-call/.
[13] TransUnion, Annual Report (Form 10-K) (Feb. 16, 2021), at 12.
[14] Equifax, Annual Report (Form 10-K) (Feb. 25, 2021), at 8.
[15] Experian plc, *Annual Report 2021* (2021), at 127, https://www.experianplc.com/media/ 4223/experian-annual-report-2021.pdf.

credit reporting company) to lenders, such as banks and credit card companies, financial institutions, and other businesses. The "B2C Credit Score Market" consists of credit scores sold to consumers to monitor their own credit records. The claims in this case concern the B2B Credit Score Market. The B2B Credit Score Market is the relevant product market in which the claims that require a market definition are to be assessed.

52.     In the B2B Credit Score Market, businesses purchase the credit scores of individuals and businesses to help them understand credit risk, make better-informed lending decisions, assess creditworthiness, and make business decisions. The B2B Credit Score Market also includes the FICO Scores that Plaintiffs and other businesses indirectly purchased from Fair Isaac and the CBs.

53.     In the B2C Credit Score Market, Fair Isaac and other credit score producers, as well as CBs, sell consumers their own credit scores. A consumer often purchases their own credit score for personal use, including to see how lenders view their creditworthiness, to understand the types and terms of financing they may be able to secure, to monitor their financial health, manage their debt, protect their identity, and to determine if they are potentially eligible to make certain purchases.

54.     The B2B Credit Score Market for credit scores is a distinct product market for antitrust purposes. The businesses that use credit scores to assess creditworthiness, manage risk, and make business decisions do not consider credit reports, insurance scores, or any part of an individual's consumer and credit history to be a substitute for credit scores. Likewise, the businesses that resell or otherwise provide credit scores to their own downstream customers do not consider credit reports, insurance scores, or any part of an individual's consumer and credit history to be a substitute for credit scores.

55.    The relevant geographic market in which B2B credit scores are provided is the United States (including its territories). The restraints on competition contained in Defendants' contracts relate to business and consumer credit scores in the United States.

56.    Business customers, such as banks, credit card companies, financial institutions, real estate companies, insurance companies and other businesses, in the B2B Credit Score Market are a separate and distinct group of purchasers of credit scores. Business customers who purchase credit scores in the B2B Credit Score Market do not use credit scores in the same manner as consumer customers who purchase credit scores in the B2C Credit Score Market.

57.    Business customers in the B2B Credit Score Market purchase credit scores to make informed decisions, sell, advertise, or complement another product.  On the other hand, consumer customers in the B2C Credit Score Market purchase the credit scores as an end-product.

58.    Business customers in the B2B Credit Score Market also purchase credit scores in ways that consumer customers do not. For example, business customers in the B2B Credit Score Market who engage in pre-screening, such as credit card companies, often purchase credit scores in batches as part of their marketing efforts. They use credit scores as a method of selecting consumers in a particular credit score range that they wish to extend credit card offers to under particular terms. However, consumer customers in the B2C Credit Score Market only purchase their own score.

59.    The Consumer Financial Protection Bureau ("CFPB") noted in a 2011 report to Congress that "many of the credit scores sold to lenders are not offered for sale to

consumers."[16] The agency went on to explain:

> When a consumer purchases a score from a CRA [Credit Rating Agency], it is likely that the credit score that the consumer receives will not be the same score as that purchased and used by a lender to whom the consumer applies for a loan. This could occur if the score the consumer purchased is an educational score that is not used by lenders, but differences between the score a consumer buys and the score a lender buys can occur for other reasons as well. Since so many scores are in use in the marketplace, it could also be the case that the particular lender to which the consumer applies uses a different scoring model than the one purchased by the consumer, or that the CRA from which the consumer obtains a score is not the same CRA that the lender uses to obtain scores, or that the underlying data in the consumer's credit report changes significantly between the time the consumer purchases a score and the time the lender obtains a score for that consumer. It is also possible that a consumer and a lender could access different reports from the CRA, if they were to use different identifying information about the consumer. Any of these differences could lead to differences between the credit score a consumer sees and the credit score a lender uses to assess that consumer.[17]

60.     The vast majority of the credit reporting and credit scoring industry, industry analysts, policy analysts, and investors recognize the B2B Credit Score Market as a separate market from the B2C Credit Score Market. Fair Isaac itself recognizes its Business and Consumer offerings as distinct product and revenue lines. Fair Isaac has divided its "Scores" profits and revenues into separate "business-to-business" or "B2B" and "business-to-consumer" or "B2C" segments in its Securities and Exchange Commission filings and shareholder calls over the last several years. In its 10-K and 10-Q filings for the past several years, Fair Isaac has distinguished between its "business-to-business scoring solutions and services" and its "business-to-consumer scoring solutions and services including my FICO solutions for consumers."

61.     Purchases in the B2B Credit Score Market for credit scores and B2C Credit

---

[16] Consumer Financial Protection Bureau, *The impact of differences between consumer- and creditor-purchased credit scores*, at 1 (July 19, 2011), https://files.consumerfinance.gov/ f/2011/07/Report_20110719_CreditScores.pdf.
[17] *Id.*

Score Market for credit scores are also different. While business customers purchase credit scores from Fair Isaac through CBs and/or third-party intermediaries, credit scores in the B2C Credit Score Market are often sold to consumers directly, such as when consumers purchase their credit score from Fair Isaac at myFICO.com.

62.     The B2B Credit Score Market exhibits high barriers to entry. As noted in a 2018 article: "The deep integration of FICO scores and products into companies' operations has raised switching costs."[18]

63.     Likewise, VantageScore Solutions has observed that in the residential mortgage sector, FICO's "imprint inhibits competition by raising switching costs and granting the irreplaceable brand value of utter ubiquity. It gives FICO unparalleled and highly controversial negotiating leverage with almost every participant in the industry."[19]

64.     "Larger lenders use the [FICO] score as an input to customized models they've built for specific situations or portfolios. After a recent review one major US lender recently identified over 600 places they were using a FICO score in their business processes. Switching to a new score not only means proving the new score is better (a long process in itself) but extensive testing to ensure all of those moving parts are still working as designed. Citibank recently announced that after an 18 month review they've decided it's safe to switch to the latest version of the FICO score (FICO 8). This wasn't a migration to a new score mind you, just a more recent version of the score they're already using. The barriers to entry are indeed

---

[18] *Fair Isaac: A Royalty on U.S. Credit Scoring* (Sept. 25, 2018), https://seekingalpha.com/ article/4208014-fair-isaac-royalty-on-u-s-credit-scoring.
[19] Press Release, VantageScore, *VantageScore Solutions Issues Statement Reacting to FHFA's Proposed Rules for Validating and Approving New Credit Scoring Models* (Dec. 17, 2018),
https://vantagescore.com/press/vantagescore-solutions-issues-statement-reacting-to-fhfas- proposed-rules-for-validating-and-approving-new-credit-scoring-models.

high . . . and expensive."[20]

65.     "Network effects" – *i.e.*, the phenomenon where a product or service increases in value when the total number of customers increase – serve as a barrier to entry into the B2B Credit Score Market. As one analyst has noted: "The 'network effects' keeping FICO's dominant position [are] indeed incredibly strong."[21]

66.     In 2011, at Fair Isaac's Analyst/Investor Day, Fair Isaac's then-CEO, Mark Greene, explained: "In about 10 seconds, an entire commerce transaction taking place because 720 FICO was understood by the broker, by the mortgage banker on the other end of line and the customer to be shorthand for good credit risk, gave this guy a favorable mortgage rate. And that network effect, having everybody in the loop understand that shorthand and standardize on a FICO Score, that's magic."[22]

67.     The anticompetitive conduct by Fair Isaac alleged herein accounts in significant part for the FICO Score's dominance in the B2B Credit Score Market.

68.     The CBs participate in a market for credit reports. A credit report contains detailed information about a consumer's credit activity and current credit situation. The detailed information in a credit report is used to generate a FICO Score for a specific customer, which B2B lenders can use in making their lending decisions.

69.     On information and belief, the CBs control virtually all of the credit report market (they have been called a "triopoly") and enjoy roughly equivalent market shares."[23]

70.     The three CBs are all members of a trade association called the Consumer Data

---

[20] John Ulzheimer, *Why FICO Isn't Going Away Any Time Soon*, Smart Credit (July 5, 2011), https://blog.smartcredit.com/2011/07/05/why-fico-isnt-going-away-any-time-soon/.
[21] Harrison Schwartz, *Fair Isaac: Share Buybacks Likely To End As Cash Reserves Run Low*, Seeking Alpha (Dec. 17, 2019), https://seekingalpha.com/article/4312953-fair-isaac-share- buybacks-likely-to-end-cash-reserves-run-low.
[22] SA Transcripts, Seeking Alpha, *Fair Isaac Corp. – Analyst/Investor Day* (Nov. 3, 2011), https://seekingalpha.com/article/307417-fair-isaac-corp-analyst-investor-day.
[23] *See* Consumer Financial Protection Bureau, *List of Consumer Reporting Companies* (2021), https://files.consumerfinance.gov/f/documents/cfpb_consumer-reporting-companies- list_2021-06.pdf.

18

Industry Association ("CDIA"). Through the CDIA, the three CBs frequently work together, including to: (i) develop a standard electronic data reporting format called Metro 2®; (ii) issue joint statements on matters of public importance; (iii) provide guidelines to businesses that use credit reports; and (iv) respond to public criticisms of their industry. The three CBs also cooperated in the establishment of VantageScore Solutions as a joint venture.[24]

71.     The market for credit reports exhibits strong barriers to entry, resulting from the relationships that the CBs establish with businesses that supply information to them and to which they in return sell reports. As one market expert commented, "replicating the databases of the leading credit bureaus would be incredibly difficult."[25] Similarly, Fair Isaac has explained:

> In order to compete with the Credit Bureaus, a new entrant must build a database that is equivalent to the databases built by the Credit Bureaus over decades. Building such a competitive database involves considerable time and costs to develop the infrastructure, to populate the database with current information and historical data, and to format and store the data (*e.g.*, Experian's FileOne database cost more than $100 million and took four years to develop, despite Experian already having much of the underlying data).[26]

72.     "As a result of their market power, the Credit Bureaus' returns are well in excess of any reasonable estimate of the cost of capital."[27]

---

[24] *See* Consumer Data Industry Ass'n, *About CDIA*, https://www.cdiaonline.org/about/about- cdia/ (last visited Oct. 21, 2021); Consumer Data Industry Ass'n, *Metro 2 Format for Credit Reporting*, https://www.cdiaonline.org/resources/furnishers-of-data-overview/metro2- information/ (last visited Oct. 21, 2021); Dana Fowle, *Industry Pushes Back Against Claims of High Credit Reporting Errors*, Fox5      Atlanta   (Sept. 15, 2021), https://www.fox5atlanta.com/news/industry-pushes-back-against-claims-of-high-credit- reporting-errors; Press Release, Consumer Data Industry Ass'n, *Consumer Data Industry Association Releases Study on the Value of Credit Reporting in U.S.* (June 15, 2020), https://cdia-
news.s3.amazonaws.com/White+Paper+Press+Release+6.15.20.pdf; Consumer Data Industry Ass'n, *Equifax, Experian, & TransUnion Endorse CARES Act*, https://www.cdiaonline.org/equifax-experian-transunion-endorse-cares-act/ (last visited Oct. 21, 2021); Consumer Data Industry Ass'n, *COVID-19*, https://www.cdiaonline.org/covid-19/ (last visited Oct. 21, 2021).
[25] Brett Horn, *Credit Bureaus' Wide Moats Can't Be Breached*, Morningstar (Aug. 24, 2018), https://www.morningstar.com/articles/880439/credit-bureaus-wide-moats-cant-be-breached.
[26] Third Amended Compl., Dkt. 436, *Fair Isaac Corp. v. Experian Info. Sols.* (D. Minn. Nov. 10, 2018), ¶ 116.
[27] Horn, *supra* n.25.

### C. Fair Isaac's FICO Score Has a Monopoly in the B2B Credit Score Market

73.     Fair Isaac came into existence in 1956, possessed a monopoly on credit-scoring algorithms until the mid-1970s, and continues to wield a dominant market share.[28]

74.     Fair Isaac's "FICO Classic" credit scores are the best known and most widely used credit scores in the B2B Credit Score Market. Fair Isaac applies an algorithm to each credit reporting agency's data to generate a FICO Classic Score between 300 and 850 that purports to give an indication of the individual's credit risk. It also generates a set of "reason statements," with corresponding codes, that explain the reasons the consumer has not been assigned the maximum score.

75.     FICO Scores are the credit scores most widely used by lenders and are used in over 90% of U.S. credit lending decisions.[29] Every year, lenders access billions of FICO Scores to help them understand people's credit risk and make better-informed lending decisions.

76.     On its website, Fair Isaac claims that "10 billion FICO Scores are purchased every year" and "27 million Fico Scores are purchased every day." FICO Scores are also used in over 30 countries.[30]

77.     Fair Isaac also advertises that its FICO Score is "widely accepted" and "used by 90% of top U.S. lenders." FICO Scores have been "an industry standard for over 30 years."[31]

78.     Fair Isaac's executives have confirmed the dominance of Fair Isaac's FICO Score. In November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair

---

[28] Raymond Anderson, *A History of Credit Scoring*, at 75-76   (2019),
https://www.researchgate.net/profile/Raymond_Anderson4/publication/331533723_Chapter_B0
6_History_of_Credit_Scoring/links/5c7ed843299bf1268d3ccc5d/Chapter-B06-History-of- Credit-
Scoring.pdf?origin=publication_detail.
[29] https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.
[30] https://www.ficoscore.com/about.
[31] *Id.*

Isaac's CFO and Executive Vice President Michael Pung stated that the FICO scoring system "is the most widely used credit scoring system here in the U.S.," that "[v]irtually every major lender in the U.S. [uses] the FICO Score for some sort of credit lending decision," and that Fair Isaac has "maintained a 90-plus percent market share for at least the [last] 13 years."[32] In 2008, Craig Watts, a public affairs manager at Fair Isaac, described the FICO Score as the "800 pound gorilla."[33]

79.     Fair Isaac states in its 2020 Form 10-K:

> Our products and services serve clients in multiple industries, including primarily banking, insurance, retail, healthcare and public agencies. End users of our products include 96 of the 100 largest financial institutions in the U.S., and two-thirds of the largest 100 banks in the world. Our clients also include more than 600 insurers, including nine of the top ten U.S. property and casualty insurers; more than 300 retailers and general merchandisers; more than 150 government or public agencies; and more than 200 healthcare and pharmaceuticals companies, including nine of the world's top ten pharmaceuticals companies. Eight of the top ten companies on the 2020 Fortune 500 list use one or more of our solutions. In addition, our consumer services are marketed to an estimated 200 million U.S. consumers whose credit relationships are reported to the three major U.S. credit reporting agencies.[34]

80.     An infographic on Fair Isaac's website states: "10 BILLION FICO SCORES ARE SOLD EACH YEAR," which is "FOUR TIMES the number of hamburgers McDonald's sells WORLDWIDE in a year," and "27,400,000 FICO scores are sold every day," which is "OVER TWICE the number of cups of coffee Starbucks sells WORLDWIDE in a day."[35]

---

[32] TransUnion Counterclaims, ¶ 32.

[33] Dana Dratch, *What Does 'Good' Credit Really Mean?*, CNBC (Oct. 30, 2008), https://www.cnbc.com/id/27458815.

[34] Fair Isaac 2020 10-K at 10.

[35] Fair Isaac, *Learn About the FICO Score and Its Long History*, https://www.fico.com/25years/.



81.    Fair Isaac's 2020 Form 10-K states that FICO Scores "are used in the majority of U.S. credit decisions, by nearly all of the major banks, credit card organizations, mortgage lenders and auto loan originators," and it describes FICO Scores as "the standard measure in the U.S. of consumer credit risk."[36]

82.    A May 2021 report by Yale University's Thurman Arnold Project, a collaborative project among Yale faculty and students, as well as other scholars dedicated to research on competition policy and antitrust enforcement, notes that Fair Isaac "enjoys a virtual monopoly in the credit score market" and that "[b]ecause of the lack of competition in

---

[36]Fair Isaac 2020 10-K at 3, 7.

this domain, there has been limited innovation in scoring methodology."[37]

83. Fair Isaac's monopoly in the B2B Credit Score Market has given it considerable power to control prices and impose monopoly rents. Fair Isaac's CEO Will Lansing has noted that, in the B2B Credit Score Market, Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are."[38]

84. In February 2013, at a Morgan Stanley Conference, Lansing explained that Fair Isaac's "Scores business, which is the cash generator, is a very, very high-margin business. It's deeply embedded into the systems of the bank customers who use it."[39]

**D.      Fair Isaac Has Been Able to Maintain its Monopoly**

85. Despite Fair Isaac's 90% share in the Business Market, several companies have attempted to compete with Fair Isaac's FICO Scores. These competitors' products use the same data as FICO Scores. However, many also incorporate data not used by FICO Scores—data such as, rental, utility, and telecom payment data and/or public records information, including property deeds, mortgages, liens, personal property titles, tax records, and licensing data.

86. Some of these competitors to Fair Isaac's FICO Scores in the B2B Credit Score Market include: SageStream's Credit Optics Score; LexisNexis's RiskView score; CoreLogic Credco's Anthem Credit Score; PRBC; ChexSystems; L2C's Link2Credit Score; and ScoreLogix LLC's JSS Credit Score.

87. Another competitor, VantageScore Solutions, represented the biggest threat to Fair Isaac's FICO Scores in the B2B Credit Score Market because it was a joint venture

---

[37] Yale University Thurman Arnold Project, *Updating Antitrust and Competition Policy: Finance Issues*, at 14, 15 (May 2021), https://som.yale.edu/sites/default/files/TeamFinance- Final.pdf.
[38] TransUnion Counterclaims, ¶ 34.
[39] Seeking Alpha, *Fair Isaac's CEO Presents at Morgan Stanley Technology, Media & Telecom Conference (Transcript)* (Feb. 27, 2013), https://seekingalpha.com/article/1231981-fair- isaacs-ceo-presents-at-morgan-stanley-technology-media-and-telecom-conference-transcript.

founded by the three major CBs. As part of its attempt to compete against Fair Isaac's FICO Scores in the B2B Credit Score Market, VantageScore Solutions introduced the VantageScore credit scoring system in March 2006. The three CB Defendants continue to own VantageScore Solutions.

88.     VantageScore Solutions does not sell or market its VantageScore credit models or credit scores; instead, it licenses them to the three CB Defendants, which may incorporate VantageScores in their credit reports.

89.     VantageScores are a competitor to FICO Scores in the B2B Credit Score Market.

90.     In addition to being backed by the three major CBs, the VantageScore credit scoring model provides reliable credit scores for millions more consumers than FICO Scores by relying on additional and alternative sources of data. VantageScore, for example, calculates scores for consumers who have not used credit for up to two years and use utility and telecommunications payment histories. As such, VantageScore provides insights into individuals' and businesses' desirability as customers, clients, and/or tenants that Fair Isaac's FICO Scores cannot. In contrast, Fair Isaac's FICO scoring systems do not generate a score if a consumer does not have at least one credit account that has been open for six months or more, or if no credit account of the consumer has been reported to the reporting CB.  Thus, millions of otherwise creditworthy individuals do not have a FICO Score.

91.     Obtaining a mortgage, car loan, credit card or reasonable interest rates on personal lines of credit is almost impossible without a credit score. Landlords are also increasingly screening potential tenants using credit scores. Thus, those excluded by Fair Isaac's traditional FICO scoring systems--including a disproportionate number of low-income

and minority consumers--face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and housing.

92.     For example, the CFPB has found that, as of 2010, 26 million consumers in the United States were "credit invisible" – *i.e.*, they lacked credit history with one of the nationwide credit reporting companies.[40] Those individuals cannot be scored by FICO.[41]

93.     The CFPB's research suggests "a strong relationship between income and having a credit record. Almost 30 percent of consumers in low-income neighborhoods are credit invisible and an additional 16 percent have unscored records. These percentages are notably lower in higher-income neighborhoods. For example, in upper-income neighborhoods, only 4 percent of the population is credit invisible and another 5 percent has an unscored record."[42]

94.     Moreover, the CFPB found "significant differences in the incidence of having a limited credit history across racial and ethnic groups," specifically, while White and Asian individuals "are almost equally likely to be credit invisible or have an unscored record, the shares of [Black and Hispanic individuals] with limited credit history are much larger," and individuals in those groups are thus less likely to be able to obtain a credit score.[43]

95.     According to the CFPB, "[a]bout 15 percent" of Black[ ] and Hispanic[ ] individuals "are credit invisible . . . and an additional 13 percent of [Black individuals] and 12 percent of [Hispanic individuals] have unscored records. . . . This elevated incidence . . . is observed across ages, suggesting that these differences across racial and ethnic groups

[40] CFPB Office of Research, *Data Point: Credit Invisibles*, at 4, 6 (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf.
[41] *Id.*
[42] Id. at 24.
[43] *Id.*

materialize early in the adult lives of these consumers and persist thereafter."[44]

96.    The CFPB went on to conclude that "[t]hese results suggest that the problems that accompany having a limited credit history are disproportionally borne by Black[ ], Hispanic[ ], and lower-income consumers."[45]

97.    Furthermore, it is widely recognized that FICO Scores are a measure of past ability to pay. Competing products incorporate an analysis of prospective creditworthiness. For example, Scorelogix's JSS score incorporates job and income stability to determine whether the borrower will have the ability to repay debt in the future. L2C offers an alternative credit score that uses utility payment histories to determine creditworthiness, including future ability to pay.

98.    VantageScore has achieved some limited success. In a 2018 report, VantageScore Solutions stated:

> During the twelve months ending in July 2017, over 1.4 billion VantageScore credit scores were delivered directly to consumers by lenders like Chase and Capital One and educational websites like CreditKarma, Lending Tree, and Mint. These scores are calculated using the same VantageScore model used by lenders (i.e., not an "educational" model). They are most often provided free of charge as part of educational offerings that include simulators, credit reports, educational articles, and explanations.[46]

99.    VantageScore Solutions went on to note that "[a]s lenders adopt VantageScore, we believe that such adoption will improve consumers' access to credit in certain segments and enable many more borrowers to obtain fairer pricing."[47] VantageScore Solutions also reported that "[m]any of the most sophisticated secondary market participants use the

---

[44] *Id*. at 24-25.
[45] *Id*. at 25.
[46] VantageScore Solutions, *VantageScore® Credit Scores and The Mortgage Market*, at 8 (2018) ("VantageScore Report"), https://vantagescore.com/pdfs/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf.
[47] *Id*. at 5.

VantageScore model to help evaluate and monitor risk, and to price and benchmark deals more accurately.[48]

100.    Despite the advantages of using VantageScore or another competing credit scoring model, Fair Isaac continues to have a monopoly in the B2B Credit Score Market and extracts monopoly rents through anticompetitive and exclusionary conduct and by conspiring with the Credit Bureaus. In February 2013, at a Morgan Stanley Conference, Fair Isaac's CEO Will Lansing explained that despite the existence of VantageScore, "there [is] not that much competition around our Scores business" because "FICO Scores are very much part of the fabric of the banking industry" and "really deeply embedded."

### E.    Fair Isaac's Conduct in Furtherance of its Anticompetitive Scheme

101.    Fair Isaac anticipated the threat VantageScore could pose to its dominance in the B2B Credit Score Market. Fair Isaac's own models of future losses predicted "substantial double-digit declines" if the use of VantageScore continued to expand.[49]

102.    Faced with the prospect of a significant hit to its market dominance, and its profits, Fair Isaac used its monopoly power to coordinate a comprehensive attack on VantageScore that included filing anticompetitive litigation; enlisting the Credit Bureaus to sign on to licensing agreements that undermined their own joint venture; and undertaking a campaign of disparagement against, and disinformation about, VantageScore Solutions and VantageScore.

#### 1.    Fair Isaac's Anticompetitive Litigation

103.    Fair Isaac, recognizing the creation of VantageScore as a competitive threat,

---

[48] VantageScore Solutions, *Myth: VantageScore Is Not Accepted by Investors in Securitization Markets* (Mar. 23, 2016), https://vantagescore.com/education/blog/myth- vantagescore-is-not-accepted-by-investors-in-securitization-markets.
[49] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, No. CV 06-4112, 2008 WL 11348223, at *2 (D. Minn. Nov. 3, 2008).

initiated litigation against Equifax, Experian, TransUnion, and VantageScore Solutions. In October 2006, just after the introduction of VantageScore, Fair Isaac filed a meritless lawsuit against them, alleging that the development of VantageScore violated the antitrust laws and constituted trademark infringement. Fair Isaac sought the elimination of VantageScore Solutions requesting that the "Defendants be ordered to dissolve VantageScore." *Fair Isaac Corp. v. Equifax, Inc. et al*, No. 0:06-cv-04112, ECF No. 1-1 at 65 (D. Minn. Oct. 11, 2006). This frivolous lawsuit represented Fair Isaac's first attempt to kill VantageScore before it could gain traction in the market.

104.    VantageScore Solutions characterized the litigation that Fair Isaac initiated as a "legal battle that sought to put us out of business, even as we scrambled to establish a competitive foothold."[50] Fair Isaac raised bogus antitrust claims that it knew lacked foundation, given its then-94% share of the B2B Credit Score Market. It also alleged trademark infringement that a jury found to be based on a trademark that Fair Isaac had fraudulently obtained from the U.S. Patent and Trademark Office ("PTO"). In addition, Fair Isaac's contention that the "300-850" marks were anything other than "merely" descriptive lacked all foundation because – as the U.S. Court of Appeals for the Eighth Circuit later held – "consumers in this market immediately understand '300-850' to describe the qualities and characteristics of FICO's credit score – that the credit score will be within the range of 300-850."[51]

105.    Equifax settled the litigation in June 2008 and formed "a partnership [with Fair Isaac] to develop and sell advanced analytics and scoring solutions for businesses and

---

[50] VantageScore Solutions, Inc., *10 years, 10 milestones* (Mar. 2016), https://thescore.vantagescore.com/article/252/10-years-10-milestones.
[51] Fair *Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1148 (8th Cir. 2011).

consumers."[52]

106.　The litigation against Experian and TransUnion lasted into 2011. While it was ongoing, VantageScore Solutions remained under a cloud, with Fair Isaac's lawsuit hobbling its commercial prospects: Potential B2B Purchasers for VantageScore had no way of being sure that the product might not be declared infringing on Fair Isaac's trademarks or that VantageScore Solutions would not be dissolved.

107.　The district court entered summary judgment in favor of the Credit Bureaus on the antitrust and false advertising claims. A jury found against Fair Isaac on the remaining claim for trademark infringement, finding that the mark "300-850" (which denoted the range of FICO Scores) was merely descriptive. It also found that: (1) Fair Isaac made a false representation during the application process to the PTO for the registrations of the "300-850" marks; (2) Fair Isaac knew that representation to be false when it was made and intended to deceive the PTO; and (3) the PTO relied on the false representation in deciding to issue the registrations.[53]

108.　The district court upheld the verdict, noting that "[t]his extensive, expensive litigation seems to have been initiated largely in response to a perceived threat to Fair Isaac's dominant position in the credit scoring industry."[54]

109.　In 2011, the United States Court of Appeals for the Eighth Circuit affirmed both that decision and the earlier summary judgment ruling.[55]

110.　VantageScore Solutions's growth during its first few years was inhibited by

---

[52] Fair Isaac, *Equifax and Fair Isaac Enter Partnership to Accelerate Development and Delivery of New Analytic Solutions* (June 10, 2008), https://www.fico.com/en/newsroom/equifax-and-fair-isaac-enter-partnership-accelerate-development-and-delivery-new-analytic.
[53] Fair *Isaac*, 650 F.3d at 1148-50.
[54] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1000 (D. Minn. 2010).
[55] *Fair Isaac Corp. v. Experian Info. Sols., Inc*., 650 F.3d 1139 (8th Cir. 2011).

the litigation, which was part of a continuing antitrust violation by Fair Isaac that goes on to this day.

111.    In December 2017, Fair Isaac sued TransUnion for unpaid royalties.[56]

112.    In February 2018, TransUnion responded by filing antitrust counterclaims for, *inter alia*, monopolization against Fair Isaac. In paragraphs 42-60 of the counterclaims (which was partially redacted), the anticompetitive terms the Credit Bureaus and Fair Isaac had agreed upon were disclosed publicly for the first time. Those provisions are described in detail below.

113.    Fair Isaac moved to dismiss the counterclaims. Judge Coleman denied the motion, ruling that "TransUnion has adequately pled actual and attempted monopolization" through allegations that "FICO engages in practices that are intended to drive out competition" through "exclusive dealing provisions [that] are unlawful attempts to 'maintain monopoly power through exclusionary conduct.'"[57]

114.    In November 2020, TransUnion and Fair Isaac settled on undisclosed terms. One effect of this settlement was to cut Plaintiffs and proposed Class members off from obtaining further information about the anticompetitive agreements between Fair Isaac and the CBs. Fair Isaac essentially bought TransUnion off. This inference is bolstered by the fact that, in August 2021, TransUnion announced that it had entered into a long-term (presumably lucrative) contract to distribute FICO Scores to lenders and consumers in Canada.[58]

115.    The Antitrust Division of the United States Department of Justice took notice of Fair Isaac's conduct alleged in the TransUnion Action and instituted a civil investigation.

---

[56] *See* Complaint, Dkt. 1, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill.Nov. 16, 2017).
[57] *Fair Isaac Corp. v. Trans Union, LLC*, No. 17:cv-8318, 2019 WL 1382068, at *2 (N.D.Ill. Mar. 27, 2019).
[58] See Press Release, TransUnion, *TransUnion Enters New Long-term Agreement with FICOto Distribute FICO® Score in Canada* (Aug. 3, 2021), https://www.globenewswire.com/news-release/2021/08/03/2273895/0/en/TransUnion-Enters-New-Long-term-Agreement-with-FICO- to-Distribute-FICO-Score-in-Canada.html.

That investigation was closed without action in December 2020, shortly after TransUnion settled with Fair Isaac.[59]

2.    **Fair Isaac and the Credit Bureau's Conspiracy**

116.    Business customers in the B2B Credit Score Market purchase credit reports and FICO Scores from CBs and third-party credit reporting companies. As part of this process, CBs have entered into contractual relationships, called "Credit Scoring Services Agreements" ("CSSAs"), with their customers that govern the terms by which businesses purchase FICO Scores. These terms include the amount(s) paid to the CB, the fee model for delivery of credit score services, the method of payment, the mode of delivery, and restrictions on the business's use of FICO Scores.

117.    The CBs and Fair Isaac have entered into separate licensing agreements which set forth the royalties that CBs must pay to Fair Isaac for the FICO Scores that the CBs sell to their customers. These royalties are passed on to Plaintiffs and other members of the proposed Classes.

118.     After its litigation efforts failed to eliminate VantageScore, Fair Isaac elected to take another approach. When its existing licensing agreements with each CB expired in 2013 or 2015, Fair Isaac took it upon itself to function as a central coordinating party in a conspiracy with the CBs to crush the only real competition, VantageScore; maintain Fair Isaac's monopoly; and extract monopoly rents from B2B Purchasers.

119.    To effectuate the conspiracy, Fair Isaac and the CBs entered into new or renewed agreements that contained new provisions designed to restrict the competitive reach of VantageScore. Those provisions reflect Fair Isaac and the CBs' conscious commitment to a

---

[59] See Press Release, Fair Isaac, *FICO Statement Regarding Antitrust Investigation* (Mar. 15,2020), https://fico.gcs-web.com/news-releases/news-release-details/fico-statement-regarding- antitrust-investigation.

common scheme designed to achieve the unlawful objective of foreclosing competition in the B2B Credit Score Market. The anticompetitive contract provisions targeted the only significant competing credit score – VantageScore. And they specifically restricted the CBs' ability to market VantageScore to B2B purchasers. On information and belief, the CBs agreed to those provisions – cutting their own joint venture off at the knees – in return for Fair Isaac's acquiescence to a clause that protected them from price competition (and potentially in exchange for other benefits as well). The point of the conspiracy was to support supracompetitive prices for credit scores for the consumers – the B2B purchasers. In addition to other facts, the CBs' agreement to those provisions makes them co-conspirators with Fair Isaac.

120.    The CBs' frequent business dealings with Fair Isaac and with each other gave them ample opportunities to communicate, coordinate behavior, and engage in other actions pursuant to their conspiracy. Because Fair Isaac monopolized the market for Credit Scores, and the three CBs dominated the market for credit reports, the conspiracy, which restricted choice, innovation, and price competition for purchases of credit scores and credit reports, required the cooperation of only a few entities (four), all of which had extensive experience dealing with each other. In addition to the CBs' longstanding and continuing contractual relationships with Fair Isaac, the CBs cooperate with one another through CDIA, their trade association. Indeed, VantageScore Solutions was, and is, their joint venture.

121.    The agreements were consummated at a critical time. In 2011 through the first part of 2013, developments occurred that should have furthered VantageScore's ability to compete with FICO Scores. In 2011, VantageScore Solutions formed a partnership with the Consumer Federation of America, "a nonprofit association of nearly 300 consumer groups

founded in 1968 to advance consumers' interests through research, advocacy, and education";
that alliance led to the "use of annual consumer surveys to gauge awareness of credit scoring
related issues."[60] In October 2012, "the Federal Deposit Insurance Corporation ("FDIC")
revised its rules for assessing default risk on loans issued by banks with deposits in excess of
$10 billion. Instead of evaluating loans on any particular credit score, the revision called for
examining the underlying probability of default associated with those loans at the time of
origination."[61] In March 2013, VantageScore Solutions debuted a new scoring model,
VantageScore 3.0, which "built on the strengths of its predecessors and drew extensive news
coverage for its ability to score 98 percent of adult consumers in the United States (including
30-35 million who cannot get scores from conventional credit-scoring models [*i.e.*, FICO]); its
disregard of paid collections (including paid medical debt); and its simplified reason codes."[62]
And, in July 2013, VantageScore Solutions published a white paper explaining how
VantageScore could be aligned with the FDIC's new rules for evaluating probability of
default.[63]

122.     Fair Isaac's response to these developments was to agree on anticompetitive
contract terms with the CBs, commencing with Experian in May 2013, continuing with
Equifax in November 2013, and culminating with the February 2015 Analytic and Data
License Agreement ("ADLA") between Fair Isaac and TransUnion. These clauses would
preserve Fair Isaac's monopoly while compensating the CBs for the marginalization of
VantageScores. Fair Isaac and the CBs did not publicly reveal any of the terms of their
agreements until February 2018. Many of the agreements' terms remain confidential to this

---

[60] VantageScore Solutions, *10 Years, 10 Milestones*, *supra* n.56.
[61] *Id.*
[62] VantageScore, *10 years, 10 milestones*, *supra* n.56.
[63] VantageScore Solutions, *FDIC New Definition of High Risk Consumer Loan Securities* (July 2013),
https://paperzz.com/doc/8033743/fdic-new-definition-of-high-risk-consumer-loan- and-securi. l

day.

### a.     Fair Isaac's Anticompetitive Contracts with the CBs

123.    The discussion that follows is based on TransUnion's description of its ADLA in its counterclaims against Fair Isaac. The ADLA was filed under seal in the TransUnion action and is unavailable to Plaintiffs beyond what TransUnion has quoted in its counterclaims. While the counterclaims quote only the ADLA, TransUnion pled that "Fair Isaac represented to TransUnion that TransUnion's two major competitors, Experian and Equifax, had already agreed to materially similar new contracts with Fair Isaac."[64] Thus, on information and belief, the same anticompetitive provisions that exist in the ADLA also exist in the agreements between Experian and Fair Isaac and TransUnion and Fair Isaac. The allegations that follow therefore apply to all three CB Defendants.

124.    On information and belief, Fair Isaac informed all three CBs that the others had entered or would enter into the same anticompetitive contracts, and the CBs would not have agreed to the anticompetitive restrictions without assurance that each other CB would agree to and abide by the restrictions.[65]

125.    The restraints imposed in the contracts consist primarily of: (a) "No Equivalent Products" provisions; and (b) "Dynamic Royalty Schedule" provisions. A third set of provisions, the "Level Playing Field" provisions, compensated the CBs for their agreement not to promote VantageScore under the former provisions at the expense of B2B Purchasers. On information and belief, each of the CBs recognized they were part of the conspiracy because they knew that the other CBs had agreed or would agree to these restrictive terms. Each CB knew at the time they entered into the agreements with Fair Isaac that these terms

---

[64] TransUnion Counterclaims, ¶43.
[65] See *id.*

undermined VantageScore Solutions, which competed with Fair Isaac and were therefore against their own individual as well as collective economic self-interest. And each Credit Bureau complied with and enforced the anticompetitive provisions in the contracts as part of the broader conspiracy.

### i.    The "No Equivalent Products Clause"

126.    The "No Equivalent Products" clause is located at Section 12.5 of the ADLA between Fair Isaac and TransUnion. This clause provides that TransUnion may not "internally develop" a credit scoring system that is "aligned to the odds-to-score relationship of any Fair Isaac Analytic" or uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic. Section 12.5 of the ADLA further prohibits TransUnion from distributing "any competing analytic" (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes. The Section also expressly names VantageScore Solutions, LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."[66]

127.    On information and belief, Fair Isaac has imposed similar or identical "No Equivalent Products" clauses on Equifax and Experian. Thus, these CBs have agreed to and acquiesced in these anticompetitive agreements and the resulting anticompetitive effects.

128.    Fair Isaac's "No Equivalent Products" clause has effectively blocked the CBs from offering alternative credit scoring products, such as VantageScores, which would allow business customers in the B2B Credit Score Market to switch from FICO Scores without incurring the significant switching costs that using a new scoring system would entail. It also prevents the use of VantageScore or other credit scoring systems alongside or interchangeably

---

[66] Id., ¶44.

with FICO Scores without the business customer incurring those same switching costs.

129.    The "No Equivalent Products" clause thus protects and sustains Fair Isaac's monopoly.

130.    For example, if an alternative credit scoring product such as VantageScore used a score of 700 to indicate a less-than-five-percent risk of credit delinquency, and if a FICO Score of 700 also indicated the same risk of delinquency, the "No Equivalent Products" clause would prevent a CB from distributing the competing product. Similarly, if a competing credit score product used reason codes that match 20% of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause would prohibit a CB from distributing the product.

131.    Due to years of Fair Isaac's dominance, many business customers of credit scores have modeled and designed their internal systems for FICO Scores. These business customers' systems, models, and processes are calibrated to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data that it collects internally, and automatically produce a lending decision. The "No Equivalent Products" clause effectively prohibits the CBs from selling an alternative to FICO's credit scores since those scores would have to be incompatible with many businesses' existing systems. Thus, they are prevented from providing business customers a legitimate choice between using FICO Scores and an alternative score.

132.    Notably, the "No Equivalent Products" clause does not sustain Fair Isaac's intellectual property. Rather, it protects and sustains Fair Isaac's monopoly. For example, the

odds-to-score relationship is not protectable intellectual property. It is the arbitrary assignment of a number (score) to a related risk probability. The intellectual property entitled to protection in this product market is the analysis and the process used to predict a consumer's risk of default, not the shorthand numerical representation of a "less than-five-percent-risk-of-default" as "700."

133. Similarly, the reason codes that are prohibited from matching Fair Isaac's, under the "No Equivalent Products" clause, were not invented by Fair Isaac. Rather, there is an established set of reason codes that reflect well-established industry measures of creditworthiness.

134. The "No Equivalent Products" clause was effective because when one CB stops using VantageScore, it becomes even less attractive to the other CBs. B2B purchasers will not want to use a credit scoring system unless all of the main CBs use it. This phenomenon is often referred to as the "network effect." Presumably, the CBs coordinated through VantageScore in the first place due to the network effect, *i.e.*, to ensure that B2B purchasers would want to use their new credit scoring product. Fair Isaac exploited this effect to attempt to destroy VantageScore Solutions and its VantageScore product. By imposing a "No Equivalent Products" term, Fair Isaac sought to block the CBs from enabling B2B purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems and from using VantageScore alongside or interchangeably with FICO Scores.

135. By agreeing to the "No Equivalent Products" provisions, the CBs agreed among themselves and with Fair Isaac to eliminate or drastically reduce the competitive threat posed by VantageScore, thus preserving and strengthening FICO's monopoly.

## ii. The "Dynamic Royalty Schedule"

136.    Fair Isaac's contracts with each Credit Bureau include a similar or identical "Dynamic Royalty Schedule" clause that allowed Fair Isaac to replace its existing royalty with a new one and thereby gave Fair Isaac the ability to control the prices of FICO Scores. The "Dynamic Royalty Schedule" is detailed in Section 9.2 of the ADLA between Fair Isaac and TransUnion. This provision states that "once every twelve (12) months during the Term, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing."[67]

137.    According to TransUnion, "Fair Isaac has abused and exploited this provision in 2015, 2016, and 2017 by not only raising prices, but also introducing entirely new and non-negotiated contract terms, royalty categories, and definitions."[68]

138.    In 2015, Fair Isaac inserted a new "Pre-Qualification" royalty category into its contracts with CBs. "Pre-Qualification" is defined as "an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category created a distinction between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any credit score or credit data to consumers, and (2) lenders that use FICO Scores for "Pre-Qualification" while also providing credit scores or credit data to consumers "in connection" with the "Pre-Qualification."

139.    As an incentive, some business customers in the B2B Credit Score Market provide to their consumer customers, to whom they are often offering credit, the opportunity to receive their personal credit score. This can serve as a valuable marketing tool for the business customers.

---

[67] TransUnion Counterclaims, ¶ 50.
[68] Id.

140.     Under Fair Isaac's contracts with the CBs, the royalty price paid to Fair Isaac for use of its FICO Score for "Pre-Qualification" is directly tied to whether credit scores or credit data are provided to consumers. There is a lower per-score royalty rate if a business customer purchases a FICO Score for use in "Pre-Qualification" and does not provide any credit score or credit data to their consumer customer "in connection" with the "Pre-Qualification." If the lender purchases a FICO score for use in 'Pre-Qualification' and provides a VantageScore (or any other credit score) to the consumer 'in connection' with the 'Pre- Qualification,'" Fair Isaac charges the lender a seven times penalty rate for that FICO Score.  That steep penalty is meant to dissuade lenders from providing competing credit scores, such as a VantageScore.[69]

141.     The higher royalty rate can only be avoided if the business customer exclusively purchases FICO Scores. One way to avoid paying the higher royalty rate is for the business customer to purchase the FICO Score but not provide a credit score or credit data to the consumer. A second way to avoid the higher royalty rate requires the business customer to purchase a bundled FICO product from Fair Isaac and provide the bundled FICO Score to its consumer customer. Fair Isaac offers bundled products to lenders that combine the use of scores designed for use by business customers with the provision of scores to their consumer customers.[70]

142.     TransUnion accepted, complied with, and made royalty payments according to the new "Pre-Qualification" royalty category. On information and belief, so have the remaining CBs.[71]

143.     The only reason for the higher royalty rate is to force all business customers

---

[69] *Id.*, ¶ 52.
[70] *Id.*, ¶ 53.
[71] See *id.*, ¶ 55.

that participate in "Pre-Qualification" to purchase FICO Scores alone and make it cost prohibitive for business customers that engage in "Pre-Qualification" to provide an alternative credit score to its consumers. There is no legitimate business justification for the higher royalty rate Fair Isaac and the CBs jointly agreed upon for FICO Scores when the business customer also purchases a competing credit score (i.e. VantageScore) to provide its consumer customers. The higher royalty rate has anticompetitive effects and has assisted Fair Isaac in maintaining its monopoly position as, on information and belief, few, if any, business customers have opted to pay the higher royalty rate.

144. According to TransUnion, "[t]his scheme has been effective, and no B2B Purchasers from TransUnion have opted to pay the penalty rate."[72] The purpose and effect of this clause was to prevent VantageScore from obtaining market share.

### iii. The "Level Playing Field"

145. In exchange for agreeing to the "No Equivalent Products" and "Dynamic Royalty" provisions in their agreements with Fair Isaac – which effectively prevent the CBs from marketing VantageScore to B2B purchasers – Fair Isaac committed not to offer any CB a more favorable price for FICO Scores than any other CB. This commitment was embodied in the "Level Playing Field" clauses of the agreements with the CBs. Those provisions forbid Fair Isaac to charge any CB a price that is lower than the price it charges any other CB.[73]

146. The CBs advanced Fair Isaac's interests by agreeing to the No Equivalent Products and Dynamic Royalty Schedule clauses, which sabotaged the CBs' own competing VantageScore and gave FICO flexibility to raise prices. The Level Playing Field clause, in return, protected the CB s from the risk that Fair Isaac would grant discounts that could expose

---

[72] *Id.*, ¶ 54.
[73] See *id.*, ¶ 59.

them to the risk of losing market share to their competitors. As Fair Isaac has pointed out, the CBs faced "the threat that independent scoring algorithm vendors, such as Fair Isaac, will facilitate the entry of new Credit Bureaus."[74] But by agreeing to the Level Playing Field provisions, Fair Isaac deprived itself of the only way of carrying out that threat – by offering new credit bureaus prices lower than those it charges the incumbent CBs. Thus, the CBs have secured from Fair Isaac a significant source of protection from future competition in the market for the sale of credit reports to B2B Purchasers.

147.  Moreover, the Level Playing Field clause reduced price competition among the CBs. As Fair Isaac has pointed out, "a Credit Bureau could not be sure what its competitors' costs were and, consequently, to what extent its competitors could cut the price of their Credit Scores. This uncertainty could be used by Lenders to induce price competition among the Credit Bureaus." Fair Isaac claimed in its earlier lawsuit that the CBs sought to use VantageScore so that "each Credit Bureau will know that it is paying exactly the same cost as its competitors for its scoring algorithm, and Lenders will no longer be able to use this uncertainty to play one Credit Bureau against the others."[75] In a rich irony, the Level Playing Field provision does exactly what Fair Isaac accused the CBs of trying to accomplish through VantageScore: prevent their customers from playing one CB against the others, thereby reducing price competition for credit reports.

148.  The "Level Playing Field" section of the ADLA between Fair Isaac and TransUnion is located in Section 9.16. This provision mandates that the prices that are made available to TransUnion will also be made available to other CBs.

149.  On information and belief, Fair Isaac's contracts with Equifax and Experian

[74] *See* Third Amended Complaint, Dkt. 436, *Fair Isaac Corporation v. Experian Info. Sols.,*No. 06-CV-4112 (D. Minn. Nov. 10, 2008), ¶140.
[75] *Id.*, ¶138.

include similar or identical "Level Playing Field" clauses.

150.   Collectively, the "Dynamic Royalty Schedule" and "Level Playing Field" clauses allow Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores.

151.   The "Level Playing Field" and "Dynamic Royalty Schedule" clauses disincentivize CBs from negotiating for lower royalty prices for Fair Isaac's FICO Scores, because the CBs will not obtain a competitive advantage if they were to obtain lower pricing for royalty rates. The "Level Playing Field" clause does not provide Fair Isaac with any rights it does not have. Fair Isaac could offer the same royalty rates to all CBs absent the clause. The "Level Playing Field" clause exists to inform the CBs that negotiating for lower prices is useless.

152.   Notably, while TransUnion complained in its suit against Fair Isaac that the Level Playing Field provision raised costs for the CBs, it admitted that, to the extent the provision resulted in higher rates, those costs were ultimately also borne by "banks [and] mortgage lenders" (*i.e.*, B2B purchasers).[76] While the CBs' agreement to the restrictive terms was against their self-interest, much of the cost was borne by B2B purchasers, while the CBs were otherwise compensated by the Level Playing Field provisions.

153.   Fair Isaac and the CBs have used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in their contracts for anticompetitive purposes and to extract monopoly prices from all business customers in the B2B Credit Score Market.

### 3.   Fair Isaac's Negative Advertising Campaign in Furtherance of its Scheme

154.   Having successfully induced the CBs to agree with Fair Isaac and with each other to impose restrictions on VantageScore's ability to compete with FICO, Fair Isaac also

---

[76] TransUnion Counterclaims, ¶60.

engaged in an advertising campaign that disseminated false and misleading information with the goal of maintaining its monopoly in the B2B Credit Score Market. In advertisements, letters, and blog posts, Fair Isaac disparaged VantageScore and other credit scoring systems by calling them "FAKO" scores, falsely claimed that VantageScore and other alternative scoring systems do not reliably measure creditworthiness, and misrepresented the information considered by VantageScore and other credit scoring systems.

155.    For example, on December 12, 2017 Fair Isaac took out a full-page advertisement in the *Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates." This advertisement that attacked VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative credit score, which the is owned by CBs. According to the advertisement, the credit score owned by CBs (impliedly VantageScore) is less reliable than FICO Scores in evaluating credit risk and does not use "sound practices" or "science-based credit evaluation." This advertisement conveyed Fair Isaac's false message that VantageScore is "Weakening scoring standards, [and] harm[ing] consumers, and the lending system."[77]

156.    Furthermore, the *Wall Street Journal* advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that links visitors to articles and blog posts that disparage VantageScore by name. One of these blog post claims: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

157.    Another example or Fair Isaac's false and misleading advertising campaign can

---

[77] TransUnion Counterclaims, ¶ 66

be found on its website where a blog post claims that "Research results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance." This statement is false and misleading. VantageScore and other scoring models consider an individual consumer or business's full credit and financial history, even if the consumer has not used a traditional credit line in the last six months. Further, studies have shown that VantageScore and other competing credit scoring models are strongly predictive.[78]

158.    A blog post written by Joanne Gaskin ("Gaskin"), the Vice President of Scores and Analytics at Fair Isaac, claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not."[79] TransUnion responded "This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non- medical ones."[80]

159.    Similarly, Fair Isaac fought hard against the efforts to create a process that would allow alternative credit scoring models to be validated and approved by Fannie Mae and Freddie Mac when they purchase mortgages. Such a rule would clearly benefit VantageScore, which could then attempt to break Fair Isaac's 100% monopoly in this sector. Public sentiment favored this move.[81] Fair Isaac did not. Indeed, it deployed Gaskin to give

[78] *See* VantageScore Report, *supra* n.44, at 2, 4, 5-6
[79] Joanne Gaskin, FICO BLOG, *Truth Squad: Is FICO Score 700 the Same as VantageScore 700?* (Feb. 6, 2017), https://www.fico.com/blogs/truth-squad-fico-score-700-same-vantagescore-700.
[80] TransUnion Counterclaims, ¶71.
[81] *See* Bloomberg Business News, *This Monopoly Is Holding Back the Mortgage Market,*(Jan. 18, 2018), https://www.bloomberg.com/opinion/articles/2018-01-18/this-credit-score- monopoly-is-holding-back-the-mortgage-

press interviews saying that Fair Isaac's alleged monopoly is a "myth."[82] Fair Isaac also hired a research group to present the argument that VantageScore's promise of home ownership to millions more Americans was deceptive and that the company's ownership by the CBs was anticompetitive, an argument that failed during the trademark litigation discussed above.[83] The FHFA ultimately adopted a final rule that permitted rival generators of credit scores to apply to serve Fannie Mae and Freddie Mac, saying that "FHFA has concluded that allowing all credit score model developers to submit applications is more consistent with [the applicable statute], which does not prevent any credit score model from being considered for potential use in the mortgage market." [84]

160. Fair Isaac's smear campaign against VantageScore was successful in sowing doubt about the reliability and accuracy of credit scoring alternatives to FICO Scores. For example, a media outlet devoted to personal finance issues, thebalance.com, posted in February 2017 that, "If you purchased your credit score from anywhere but MyFICO.com, then it's a FAKO score."

161. The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

**F.    Fair Isaac's Anticompetitive Conduct Has Harmed Competition**

162. Fair Isaac's anticompetitive conduct has harmed and continues to harm business customers in the B2B Credit Score Market. Fair Isaac's unlawful conduct, including

---

market; Paul Weinstein, Jr., *No Company Should Have a Monopoly on Credit Scoring*, The Hill (Dec. 7, 2017), https://thehill.com/opinion/finance/363755-no-company-should-have-a-monopoly-on-credit- scoring.
[82] *FICO: The 'Credit Score Monopoly' is a Myth*, DS News (Dec. 18, 2015), https://dsnews.com/news/12-18-2015/fico-the-credit-score-monopoly-is-a-myth.
[83] Quantilytic LLC, *Risks and Opportunities in Expanding Mortgage Credit Availability Through New Credit Scores*, at 22 (Dec. 2017), https://www.progressivepolicy.org/wp-content/uploads/2017/12/UpdatedCreditScoring_2017.pdf (research sponsored by Fair Isaac).
[84] Fed. Hous. Fin. Agency, *Validation and Approval of Credit Score Models Final Rule*, 12 C.F.R. 1254 (Aug. 16, 2019).

conduct taken in concert with the CBs, has foreclosed competition in the B2B Credit Score Market by eliminating fair opportunities for the major CBs to sell VantageScore or any other competing credit score product to B2B purchasers. This anticompetitive and exclusionary conduct has maintained Fair Isaac's monopoly and allowed it to charge supracompetitive prices for B2B credit scores to B2B purchasers during the Class Period.

163.    FICO's Scores business operates with an incredibly high operating margin of 86%.[85] To maximize its monopoly rent, Fair Isaac has increased its prices for FICO Scores significantly in recent years. In 2018, FICO implemented a special pricing increase for mortgage customers that was an approximately 75% increase from $0.06/score to $0.10/score.[86] In the following two years, FICO again rolled out special pricing increases to its auto customers and to some credit card customers.[87]

164.    Fair Isaac's conduct, in concert with the CBs, including through the agreements contained in contracts between the CBs and Fair Isaac, has reduced choice for business customers in the B2B Credit Score Market and frustrated the ability of business customers to purchase VantageScore or any other competing credit score. As a direct and proximate result of Fair Isaac's exclusionary and anticompetitive conduct, Fair Isaac has been able to indirectly charge Plaintiffs and all similarly situated businesses supracompetitive prices for credit scores. As indirect buyers of Fair Isaac's FICO Scores, Plaintiffs and all similarly situated business have been harmed by Fair Isaac's supracompetitive royalty prices.

165.    Fair Isaac's sales in the B2B Credit Score Market over the past five fiscal years have been extremely profitable. Fair Isaac maintains a supracompetitive profit margin on the

---

[85] Jose Karlo Mari Tottoc, Yahoo! Finance, *Headwaters Capital: 'Fair Isaac Corp (FICO) Can Grow Its Free Cash Flow by 15-20% Annually'* (Jan. 23, 2021), https://finance.yahoo.com/ news/headwaters-capital-fair-isaac-corp-202237954.html.
[86] *Id.*
[87] *Id.*

revenue it earns from its Business Credit Scoring Products. Plaintiffs and similarly situated businesses have vastly overpaid for FICO Scores due to Fair Isaac's anticompetitive activities.

## V. CLASS ACTION ALLEGATIONS

166. Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All end-users who purchased a FICO Score in the B2B Credit Score Market from anyone other than Fair Isaac and/or a Credit Bureau from October 1, 2006 through the present (the "Class Period").

167. Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws, as well as the law of unjust enrichment on behalf of the following class (the "Damages Class"):

> All end-users who in Indirect Purchaser States[88] purchased a FICO Score in the B2B Credit Score Market from anyone other than Fair Isaac and/or a Credit Bureau from October 1, 2006 through the present (the "Class Period").

168. The Nationwide Class and the Damages Class are referred to herein as the "Classes."

169. These class definitions exclude any and all natural persons who are not members of these Classes by their definitions. Also excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased FICO Scores directly or for resale.

---

[88] The "Indirect Purchaser States" are the states and Districts listed in the Seventh, Eighth and Ninth Claims for Relief.

170.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least thousands of members in each Class. Members of the Classes are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Classes are readily identifiable from information and records in the possession of Defendants.

171.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and members of the Classes were damaged by the same wrongful conduct of Defendants.

172.    The interests of Plaintiffs are coincident with, and not antagonistic to, those of members of the Classes.

173.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

174.    Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Classes as a whole appropriate. Questions of law and fact common to members of the Classes include, but are not limited to:

        a.    whether Fair Isaac monopolized, and whether Defendants conspired to monopolize or unreasonably restrain, trade in violation of federal law;

        b.    whether Fair Isaac monopolized, and whether Defendants conspired to monopolize or unreasonably restrain, trade in violation of certain state antitrust laws;

        c.    whether Defendants engaged in unfair or deceptive trade practices in violation of certain state laws;

        d.    whether Defendants were unjustly enriched to the detriment of Plaintiffs

and members of the Classes, thereby entitling Plaintiffs and members of the Classes to disgorgement of all benefits derived by Defendants;

e. what was the duration of the alleged unlawful conduct;

f. what injury was suffered by Plaintiffs and members of the Classes;

g. what damages were suffered by Plaintiffs and members of the Classes; and

h. whether Defendants acted or refused to act on grounds generally applicable to members of the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Classes as a whole.

175. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

176. The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

177. The prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

178. Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

179.     Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

180.     Plaintiffs have defined members of the Classes based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.    STATUTES OF LIMITATION AND TOLLING

181.     Plaintiffs had no knowledge of the scheme or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) February 12, 2018, the date that TransUnion filed its Counterclaims against Fair Isaac. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in an anticompetitive scheme or conspiracy involving the distribution of credit scores.

182.     Defendants repeatedly and expressly stated throughout the Class Period, including on their public websites, that they maintained policies that prohibited the type of anticompetitive conduct alleged in this Consolidated Complaint. For example:

          a.     Fair Isaac's Code of Business Conduct and Ethics states: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices."[89]

          b.     Equifax's Code of Ethics and Business Conduct states: "We believe in free and open competition and never engage in improper practices that

---

[89] Fair Isaac, *Code of Business Conduct and Ethics*, https://fico.gcs-web.com/static-files/ed6519a4-2148-4166-82f2-4636e0713531.

may limit competition."[90]

        c.      Experian's Code of Conduct states: "We will not engage in any form of agreement with competitors to fix prices, rig bids, allocate customers and/or restrict supply in the marketplace." "We will comply with all applicable laws, rules, and regulations in every jurisdiction in which we operate, including but not limited to . . . antitrust/competition."[91]

        d.      TransUnion's Code of Business Conduct states: "All TransUnion Team Members must understand the extent to which competition and antitrust laws affect their daily work. You must fully and consistently comply with applicable competition and antitrust laws.[92]

183.     It was reasonable for Plaintiffs and members of the Classes to believe that Defendants were complying with their own policies.

184.     Moreover, on information and belief, Plaintiffs and members of the Classes could not have discovered the anticompetitive provisions in the licensing agreements between Fair Isaac and the Credit Bureaus, such as the TransUnion ADLA, as those agreements are subject to confidentiality provisions that have prohibited the credit reporting agencies from disclosing their terms to third parties absent written authorization from Fair Isaac.[93]

185.     For these reasons, the statutes of limitations applicable to Plaintiffs' claims did not begin to run until the date that TransUnion filed its counterclaims against Fair Isaac and

---

[90] Equifax, *Code of Ethics and Business Conduct* (Aug. 2019), https://assets.equifax.com/ assets/corp/code_of_ethics.pdf.
[91] Experian, *Our Code of Conduct* (2019), https://www.experian.com/content/dam/ marketing/na/assets/corp/procurement-documents/experian-code-of-conduct-final-board- approved.pdf.
[92] TransUnion, *Code of Business Conduct* (2017), https://investors.transunion.com/~/media/Files/T/Transunion-IR/governance-documents/code-of-business-conduct-150618.pdf.
[93] *See* Dkt. 32, Motion for Leave to File Under Seal, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Jan. 22, 2018), ¶ 2 ("contracts between the Parties .  . are subject to confidentiality provisions that prohibit TransUnion from disclosing the terms of the contract to third parties absent written authorization from Fair Isaac").

have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

186. The doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiffs' claims. During the Class Period, Defendants wrongfully and affirmatively concealed their unlawful conduct. Plaintiffs and members of the Classes had no knowledge of Defendants' unlawful scheme and could not have discovered the scheme through the exercise of reasonable diligence until (at the earliest) February 12, 2018, when TransUnion filed its Counterclaims against Fair Isaac.

187. By their very nature, antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants engaged in a secret conspiracy that did not put Plaintiffs or the Classes on inquiry notice that there was a conspiracy that raised the prices for credit scores above the competitive level. Credit scores are not exempt from antitrust regulation, and thus, before TransUnion filed its Counterclaims against Fair Isaac, Plaintiffs reasonably considered the market to be competitive. Moreover, Defendants employed deceptive tactics and techniques to avoid detection of, and to conceal, their anticompetitive scheme.

188. Defendants wrongfully and affirmatively concealed the existence of their anticompetitive scheme and conspiracy from Plaintiffs and members of the Classes by, among other things:

> a. agreeing to confidentiality provisions that have prohibited the CBs from disclosing the anticompetitive provisions in the licensing agreements between Fair Isaac and the CBs, such as the TransUnion ADLA;
>
> b. concealing the fact that Fair Isaac and the CBs agreed, through the "No Equivalent Products" clause, not to internally develop a competing credit scoring system that is aligned with FICO Scores or uses too many of the

same reason codes;

      c.      concealing the fact that the purpose of the "No Equivalent Products" clause was to prevent the CBs from offering credit scoring products that would allow business-consumers a legitimate choice between FICO Scores and VantageScore or another alternative scoring product, thereby sustaining FICO Scores dominance in the market;

      d.      concealing the fact that Fair Isaac and the CBs agreed, through the "Level Playing Field" clauses, that prices made available to one credit bureau be made available to all the others;

      e.      concealing the fact that the purpose and effect of the "Level Playing Field" and "Dynamic Royalty Schedule" clauses is to disincentivize each CB from negotiating lower royalty prices for FICO Scores; and

      f.      engaging in a false and misleading campaign about VantageScore Solutions and VantageScore to misrepresent VantageScore's viability as a competitor to FICO Scores.

189.    As a result of Defendants' affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiffs and members of the Classes have been and are tolled, and Defendants are equitably estopped from raising statutes of limitations as a defense.

## VII.   DEFENDANTS' ACTIONS CONSTITUTE A CONTINUING VIOLATION

190.    In addition, and in the alternative, this Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statute of limitations.

191.     A claim accrued for the Class each time FICO Scores were sold to the Class at prices artificially inflated by Defendants' anticompetitive conduct. Each sale of FICO Scores at a supracompetitive price constituted another overt act in furtherance of Defendants' continuing anticompetitive scheme. Moreover, Defendants' statements and actions described above demonstrate that throughout the Class Period they engaged in new overt acts that further served the objectives of their anticompetitive scheme.

192.     Defendants' new overt acts were more than the inertial consequences of Defendants' initial violation. Rather, their acts were new and independent acts that perpetuated their agreement and kept it current with market conditions, including by renewing agreements, or entering into new agreements, with anticompetitive terms. Defendants continuously renewed and refined their agreement to reflect market conditions. With each refinement of their agreement, Defendants inflicted new and accumulating injury on Plaintiffs and members of the Class. For instance, as alleged above, Fair Isaac exploited the ADLA Royalty Schedule Provision in 2015, 2016, and 2017 to introduce entirely new and non-negotiated contract terms, royalty categories, and definitions that expanded the anticompetitive scheme.

193.     Therefore, Plaintiffs and members of the Damages Class are entitled to recover damages they suffered during any applicable limitations period.

## VIII.   CLAIMS FOR RELIEF

<u>**FIRST CLAIM FOR RELIEF:**</u>
<u>**UNREASONABLE RESTRAINT OF TRADE**</u>
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

194.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

195.    This Claim is brought against all Defendants.

196.    The relevant period of this Claim is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

197.    The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

198.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

199.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

200.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

201.    Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). Specifically, Fair Isaac entered into agreements with Equifax, Experian, and TransUnion that contained anticompetitive terms whereby each CB agreed with Fair Isaac to contractual limitations that harmed the ability of the CBs to market VantageScore, a competing product, to Plaintiffs and members of the Class and forestalled price competition in the B2B Credit Score Market. The CBs agreed to those anticompetitive terms and complied with those terms with the knowledge that the other CBs would also agree to, and comply with, those terms. The CBs and Fair Isaac thus knowingly formed a scheme to unreasonably restrain trade in the B2B Credit Score Market.

202.    The agreements between Fair Isaac and each of the CBs had substantial anticompetitive effects. The agreements effectively excluded VantageScore Solutions and every

other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

203.    The agreements between Fair Isaac and each of the CBs raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

204.    The acts done by Fair Isaac and each of the CBs as part of, and in furtherance of, their contract, combination, or conspiracy were authorized ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of its affairs.

205.    The anticompetitive acts were directed at the B2B Credit Score Market in the United States and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

206.    Defendants' exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

207.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property, and will continue to suffer such damages if Defendants do not cease their anticompetitive conduct.

208.    Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

209.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws because they are agreements between and among Fair Isaac and the CBs, all of whom are horizontal competitors who compete for the sale of credit scores in the B2B

Credit Score Market. Each of the CBs was aware of Fair Isaac's imposition of these restrictive terms on the other CBs, knew that each was agreeing to those terms, and knew that its and the other CBs' acceptance of those terms would maintain or advance Fair Isaac's monopoly, and was thus an act against their economic self-interest because it undermined the ability of VantageScore to compete. The CBs also knew that the Level Playing Field requirement in their agreements with Fair Isaac was meant to and did forestall price competition among the CBs in the market for credit reports, and hence was mutually beneficial for the CBs.

210. In the alternative, these agreements violate Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) under a Rule of Reason analysis and the pro-competitive benefits do not outweigh the anticompetitive effects.

211. Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF:**
**UNREASONABLE RESTRAINT OF TRADE**
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

212. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

213. This Claim is brought against Defendants Fair Isaac and Experian.

214. The relevant period of this Claim is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

215. The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

216. Fair Isaac has had and continues to have at least a 90% market share in the B2B

Credit Score Market in the United States and its territories.

217.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

218.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

219.    Fair Isaac entered into an agreement with Experian that contained anticompetitive terms whereby Experian agreed with Fair Isaac to contractual limitations that harmed the ability of Experian to market VantageScore, a competing product, to Plaintiffs and members of the Class and forestalled price competition in the B2B Credit Score Market.

220.    The agreement between Fair Isaac and Experian had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

221.    The agreement between Fair Isaac and Experian raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

222.    The acts done by Fair Isaac and Experian as part of, and in furtherance of, its contract, combination, or conspiracy were authorized ordered, or done by its officers, agents, employees, or representatives while actively engaged in the management of its affairs.

223.    The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

224.    Fair Isaac's and Experian's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

225.    Plaintiffs and members of the Nationwide Class have been injured and will

continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and Experian do not cease their anticompetitive conduct.

226.     Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Fair Isaac's and Experian's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

227.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws because Fair Isaac and Experian are horizontal competitors who compete for the sale of credit scores in the B2B Credit Score Market.

228.     In the alternative, the anticompetitive agreement between Fair Isaac and Experian violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) under a Rule of Reason analysis.

229.     In addition to competing with Experian in the credit scores market, Fair Isaac licenses its algorithm to Experian, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, Experian discourages its customers from using or purchasing access to competing credit scores. Because Experian has substantial market power, and because Experian knows that the other CBs have agreed to the same provisions, it can harm its customers in this way without taking the risk that they will switch to competing CBs. In return for conspiring with Fair Isaac to restrain trade in the credit scores market, Experian benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor Experian's competitors and reduces competition among the CBs in the B2B credit reports market.

230.     Plaintiffs and members of the Nationwide Class are entitled to an injunction

against Defendants, preventing and restraining the violations alleged herein.

**THIRD CLAIM FOR RELIEF:**
**UNREASONABLE RESTRAINT OF TRADE**
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide**
**Class for Injunctive and Equitable Relief)**

231. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

232. This Claim is brought against Defendants Fair Isaac and Equifax.

233. The relevant period of this Claim is from November 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

234. The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

235. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

236. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

237. Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

238. Fair Isaac entered into an agreement with Equifax that contained anticompetitive terms whereby Equifax agreed with Fair Isaac to contractual limitations that harmed the ability of Equifax to market VantageScore, a competing product, to Plaintiffs and members of the Nationwide Class and forestalled price competition in the B2B Credit Score Market.

239. The agreement between Fair Isaac and Equifax had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider

of credit scores from competing for a substantial portion of transactions in the relevant market.

240. The agreement between Fair Isaac and Equifax raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

241. The acts done by Fair Isaac and Equifax as part of, and in furtherance of, its contract, combination, or conspiracy were authorized ordered, or done by its officers, agents, employees, or representatives while actively engaged in the management of its affairs.

242. The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

243. Fair Isaac's and Equifax's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

244. Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and Equifax do not cease their anticompetitive conduct.

245. Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Fair Isaac's and Equifax's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

246. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws because Fair Isaac and Equifax are horizontal competitors who compete for the sale of credit scores in the B2B Credit Score Market.

247. In the alternative, the agreement between and Fair Isaac and Equifax violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) under a Rule of Reason analysis.

248.     In addition to competing with Equifax in the credit scores market, Fair Isaac licenses its algorithm to Equifax, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, Equifax discourages its customers from using or purchasing access to competing credit scores. Because Equifax has substantial market power, and because Equifax knows that the other CBs have agreed to the same provisions, it can harm its customers in this way without taking the risk that they will switch to competing CBs. In return for conspiring with Fair Isaac to restrain trade in the credit scores market, Equifax benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor Equifax's competitors and reduces competition among the CBs in the B2B credit reports market.

249.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**FOURTH CLAIM FOR RELIEF:**
**UNREASONABLE RESTRAINT OF TRADE**
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

250.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

251.     This Claim is brought against Defendants Fair Isaac and TransUnion.

252.     The relevant period of this Claim is from February 2015 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

253.     The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

254.     Fair Isaac has had and continues to have at least a 90% market share in the B2B

Credit Score Market in the United States and its territories.

255.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

256.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

257.    Fair Isaac entered into an agreement with TransUnion that contained anticompetitive terms whereby TransUnion agreed with Fair Isaac to contractual limitations that harmed the ability of TransUnion to market VantageScore, a competing product, to Plaintiffs and members of the Nationwide Class and forestalled price competition in the B2B Credit Score Market.

258.    The agreement between Fair Isaac and TransUnion had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

259.    The agreement between Fair Isaac and TransUnion raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

260.    The acts done by Fair Isaac and TransUnion as part of, and in furtherance of, its contract, combination, or conspiracy were authorized ordered, or done by its officers, agents, employees, or representatives while actively engaged in the management of its affairs.

261.    The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

262.    Fair Isaac's and TransUnion's exclusionary and anticompetitive acts have

injured and will continue to injure competition in this market.

263.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and TransUnion do not cease their anticompetitive conduct.

264.     Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Fair Isaac's and TransUnion's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

265.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws because Fair Isaac and TransUnion are horizontal competitors who compete for the sale of credit scores in the B2B Credit Score Market.

266.     In the alternative, the agreement between and Fair Isaac and TransUnion violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) under a Rule of Reason analysis.

267.     In addition to competing with TransUnion in the credit scores market, Fair Isaac licenses its algorithm to TransUnion, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, TransUnion discourages its customers from using or purchasing access to competing credit scores. Because TransUnion has substantial market power, and because TransUnion knows that the other CBs have agreed to the same provisions, it can harm its customers in this way without taking the risk that they will switch to competing CBs. In return for conspiring with Fair Isaac to restrain trade in the credit scores market, TransUnion benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor TransUnion's competitors and reduces competition among the CBs in the B2B credit reports market.

268.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## FIFTH CLAIM FOR RELIEF: MONOPLIZATON
**Violation of Section 2 of the Sherman Act 15 U.S.C. § 2**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

269.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

270.     This Claim is brought against Defendant Fair Isaac.

271.     The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

272.     Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

273.     Fair Isaac has had and continues to have monopoly power in B2B Credit Score Market.

274.     Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

275.     Fair Isaac entered Isaac entered into agreements with Equifax, Experian, and TransUnion that contained anticompetitive terms that were designed to eliminate Fair Isaac's competitors and to keep prices for FICO Scores artificially high.

276.     The agreements between Fair Isaac and the CBs had substantial anticompetitive effects. The agreements effectively excluded VantageScore Solutions and every other competing provider of credit scores from competing in the market for B2B credit scores in the United States in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

277.     Fair Isaac has demonstrated its ability to control prices and exclude competition

by raising prices without a corresponding increase in demand to supracompetitive levels.

278.    Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

279.    Fair Isaac's monopolization has raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

280.    The acts done by the Fair Isaac were authorized, ordered, or done by its officers, agents, employees, or representatives while actively engaged in the management of its affairs.

281.    The anticompetitive acts were directed at the B2B Credit Score Market in the United States and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

282.    Fair Isaac's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

283.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property, and Plaintiffs and all other similarly situated businesses will continue to be injured if Fair Isaac does not cease its anticompetitive conduct.

284.    Plaintiffs and all other similarly situated businesses are threatened with future injury to their business and property by reason of Fair Isaac's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

285.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**SIXTH CLAIM FOR RELIEF:**
**CONSPIRACY TO MONOPOLIZE**
**Violation of Section 2 of the Sherman Act 15 U.S.C. § 2**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

286.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

287.     This Claim is brought against all Defendants.

288.     The relevant product market is the market for the sale of B2B credit scores.

289.     The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

290.     Fair Isaac has had and continues to have at least 90% market share in the B2B Credit Score Market.

291.     Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

292.     Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

293.     Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Defendants have substantially foreclosed competition in the B2B Credit Score Market in the United States in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

294.     Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand to supracompetitive levels.

295.     Fair Isaac entered into an agreement, combination, or conspiracy with Experian, Equifax, and TransUnion to maintain its monopoly power in the B2B Credit Score Market. Fair

Isaac created and maintained this conspiracy through a series of agreements that each of the CBs entered into with the knowledge that the others were also entering into the agreements. In these agreements, the CBs and Fair Isaac effectively agreed that the CBs would not offer or sell VantageScore or any other competing credit score to Plaintiffs and members of the Nationwide Class. Fair Isaac and the CB Defendants further agreed that the CBs would act as Fair Isaac's agent in the sale of FICO Scores to Plaintiffs and members of the Nationwide Class.

296.     These agreements foreclosed competition in a substantial portion of the B2B Credit Score Market and unlawfully maintained Fair Isaac's monopoly, resulting in Fair Isaac extracting supracompetitive prices for FICO Scores from Plaintiffs and members of the Nationwide Class.

297.     Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

298.     Defendants' conspiracy to monopolize has injured and will continue to injure competition in the B2B Credit Score Market.

299.     Defendants have acted with the specific intent of allowing Fair Isaac to monopolize the market for B2B credit scores in the United States and its territories.

300.     Defendants' conspiratorial acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

301.     The conspiracy raised the prices for credit scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

302.     Plaintiffs and members of the Nationwide Class have been injured in their business or property by reason of Defendants' violation of Section 2 of the Sherman Act (15 U.S.C. § 2) within the meaning of Section 4 of the Clayton Antitrust Act (15 U.S.C. § 15).

303.     Plaintiffs and members of the Nationwide Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 2 of the Sherman Act (15 U.S.C. § 2) within the meaning of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26).

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF STATE ANTITRUST STATUTES**
**(on behalf of Plaintiffs and the Damages Class)**

304.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

305.     Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

306.     This Claim is brought against all Defendants.

307.     Arizona:  By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. § 44-1401, *et seq.*

    a.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Arizona.

    b.     Defendants' combinations or conspiracies had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Arizona; (2) credit score prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-

competitive, artificially inflated prices for credit scores.

c.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

d.     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

e.     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*

f.     Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

g.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property and are threatened with further injury.

h.     By reason of the foregoing, Plaintiffs and members of the Damages Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq.*

308.     <u>California</u>:  By reason of the conduct alleged herein, Defendants have violated California Business and Professions Code, §§ 16700, *et seq.*

a     The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§

16700-16770, governs antitrust violations in California.

b.      California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

c.      Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

d.      A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

e.      Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within California.

f.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B

Credit Score Market.

g.      But for Defendants' conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

h.      Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

i.      Plaintiffs and members of Damages Class were injured in their business or property, with respect to purchases of FICO Scores in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

309.    Connecticut: By reason of the conduct alleged herein, Defendants have violated Connecticut General Statute §§ 35-26 *et seq.*

a.      During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and

property and are threatened with further injury.

     d.    By reason of the foregoing, Defendants have restrained trade in violation of Connecticut General Statute §§ 35-26 *et seq.*

     e.    Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Connecticut General Statute §§ 35-26 *et seq.*

310.   <u>District of Columbia</u>: By reason of the conduct alleged herein, Defendants have violated District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade).

     a.    Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the B2B Credit Score Market within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq.*

     b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

     c.    During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

     d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business

and property and are threatened with further injury.

  e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*

  f. Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

  g. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

311. <u>Illinois</u>: By reason of the conduct alleged herein, Defendants have violated the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

  a. Members of the Illinois Damages Class purchased FICO Scores within the State of Illinois during the Class Period.

  b. But for Defendants' conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

  c. Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 Ill. Comp. Stat. Ann. 10/7(2).

  d. Defendants entered into contracts or engaged in a combination or

conspiracy for the purpose of fixing, controlling or maintaining prices for FICO Scores sold within the State of Illinois.

  e.  Defendants further unreasonably restrained trade or commerce and established, maintained, or attempted to acquire monopoly power over the B2B Credit Score Market in Illinois for the purpose of excluding competition, in violation of 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

  f.  During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

  g.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

  h.  Members of the Illinois Damages Class were injured with respect to purchases of FICO Scores in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

312. <u>Iowa</u>:  By reason of the conduct alleged herein, Defendants have violated the Iowa Competition Law, Iowa Code § 553.1, *et seq.*

  a.  Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Iowa Code § 553.1, *et seq.*

  b.  Defendants' combinations or conspiracies had the following

effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

    c.       During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

    d       As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    e.       By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1, *et seq.*

    f.       Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449 (Iowa 2002).

    g.       Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

313.   <u>Kansas</u>:  By reason of the conduct alleged herein, Defendants have violated Kan. Stat. Ann. § 50-101, *et seq.*

    a.       Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Credit score prices were raised, fixed

maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

b.      Defendants combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of credit scores, increasing the price of credit scores, or preventing competition in the sale of credit scores, in a manner that established the price of credit scores and precluded free and unrestricted competition among themselves in the sale of credit scores, in violation of Kan. Stat. Ann. § 50-101, *et seq*

c.      During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50- 101, *et seq*.

f.      Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

314.    <u>Maine</u>:  By reason of the conduct alleged herein, Defendants have violated Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

a.      Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of credit scores within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Maine; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

f.      Under Maine law, indirect purchasers have standing to maintain

an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

315.   <u>Maryland</u>: By reason of the conduct alleged herein, Defendants have violated Maryland Code, Commercial Law, §§11-204 *et seq*.

a.      During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Maryland; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have restrained trade in violation of Maryland Code, Commercial Law, §§11-204 *et seq*.

e.      Accordingly, Plaintiffs and members of the Class seek all relief available under Maryland Code, Commercial Law, §§11-204 *et seq*.

316.   <u>Michigan</u>:  By reason of the conduct alleged herein, Defendants have violated

79

the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

      a.      Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in B2B Credit Score Market, in violation of Mich. Comp. Laws § 445.771, *et seq.*

      b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

      d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

      f.      Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 445.778(2).

      g.      Accordingly, Plaintiffs and members of the Damages Class

seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

317.    Minnesota:  By reason of the conduct alleged herein, Defendants have violated the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

a.    Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the B2B Credit Score Market within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the B2B Credit Score Market within the intrastate commerce of and outside of Minnesota; and fixed prices for credit scores within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq.*

b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.    During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their

business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*.

f.     Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.57.

g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

318.   <u>Mississippi</u>: By reason of the conduct alleged herein, Defendants have violated Mississippi Code Annotated §§ 75-21-1, *et seq*.

a.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Mississippi.

b.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Mississippi, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

c.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Credit score prices were raised, fixed

maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

d.  During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

e.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

f.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

g.  Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

h.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

319.  <u>Missouri</u>:  By reason of the conduct alleged herein, Defendants have violated Mo. Ann. Stat. § 407.010, *et seq.*

a.  Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the Business Market for credit scores within the intrastate commerce of Missouri by possessing monopoly power in the

market and willfully maintaining that power through agreements to fix prices and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mo. Ann. Stat. § 407.010, *et seq.*

f.      Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2008).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Mo. Ann. Stat. § 407.010, *et seq.*

320.    Nebraska:  By reason of the conduct alleged herein, Defendants have violated the Nebraska Revised Statutes §§ 59-801, *et seq.*

a.     Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the B2B Credit Score Market within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq.*

b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*

f.     Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this

Complaint. Neb. Rev. Stat. § 59-821.

g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

321.   Nevada:  By reason of the conduct alleged herein, Defendants have violated the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

a.     Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq.*

b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into

agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

      f.     Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

      g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

322.   <u>New Hampshire</u>: By reason of the conduct alleged herein, Defendants have violated the New Hampshire Revised Statutes §§ 356:1, *et seq*.

      a.     Defendants fixed, controlled or maintained prices for credit scores and established, maintained or used monopoly power, or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

      b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

      d.     As a direct and proximate result of Defendants' unlawful

conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*.

f.     Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

323.   <u>New Mexico</u>:  By reason of the conduct alleged herein, Defendants have violated the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

a.     Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for credit scores within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq*.

b.     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-

competitive, artificially inflated prices for credit scores.

     c.     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

     d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

     e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

     f.     Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3(A).

     g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

324.    <u>New York</u>: By reason of the conduct alleged herein, Defendants have violated the New York General Business Laws §§ 340, *et seq.*

     a.     Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of credit scores and restrained competition in the free exercise of the conduct of the business of credit scores within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

     b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and

eliminated throughout New York; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.      During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

      d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act.

      f.      Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

      g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

325.   <u>North Carolina</u>:  By reason of the conduct alleged herein, Defendants have violated the North Carolina General Statutes §§ 75-1, *et seq*.

      a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding

competition or controlling, fixing or maintaining prices for credit scores, in violation of North Carolina General Statutes §§ 75-1, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.

f.      Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

326.    <u>North Dakota</u>:  By reason of the conduct alleged herein, Defendants have

violated the North Dakota Century Code §§ 51-08.1-01, *et seq*.

   a.   Defendants contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*. Defendants' violations of North Dakota law were flagrant.

   b.   Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

   c.   During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

   d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

   e.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

   f.   Under North Dakota law, indirect purchasers have standing to

maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *See*, *e.g.*, *Howe v. Microsoft Corp.*, 656 N.W.2d 285, 298 (N.D. 2003).

g. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

327. <u>Oregon</u>: By reason of the conduct alleged herein, Defendants have violated the Oregon Revised Statutes §§ 646.705, *et seq*.

a. Defendants contracted, combined, or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of credit scores, in violation of Or. Rev. Stat. § 646.705, *et seq.*

b. Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*

f. Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

g. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

328. <u>Rhode Island</u>:  By reason of the conduct alleged herein, Defendants have violated R.I. Gen. Laws § 6-36-1, *et seq.*

a. Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

b. Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially

affected Rhode Island commerce.

d.　As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.　By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

f.　Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a).

g.　Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under R.I. Gen. Laws § 6-36-1, *et seq.*

329.　<u>South Dakota</u>:  By reason of the conduct alleged herein, Defendants have violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

a.　Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of credit scores within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1-3.1, *et seq.*

b.　Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.      During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.

      d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

      f.      Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

      g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

330.   <u>Tennessee</u>:  By reason of the conduct alleged herein, Defendants have violated the Tennessee Code Annotated §§ 47-25-101, *et seq.*

      a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Tenn. Code, § 47-25-101, *et seq.*

      b.      Defendants' combinations or conspiracies had the following

effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*

f. Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

g. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25- 101, *et seq.*

331. <u>Utah</u>: By reason of the conduct alleged herein, Defendants have violated Utah Code Annotated §§ 76-10-3101, *et seq.*

a. Defendants contracted, combined or conspired to restrain or

monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Utah Code Ann. § 76-10-3101, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Utah; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Utah commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq.*

f.      Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

g.      Accordingly, Plaintiffs and members of the Damages Class seek

all relief available under Utah Code Annotated §§ 76-10-3101, *et seq.*

332.   <u>Vermont</u>:  By reason of the conduct alleged herein, Defendants have violated Vermont Stat. Ann. 9 §§ 2453, *et seq.*

a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Defendants' violations of Vermont law were flagrant.

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*

f. Under Vermont law, indirect purchasers have standing to maintain an action under Vermont's antitrust laws based on the facts alleged in this Complaint. *Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

g. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

333. <u>West Virginia</u>: By reason of the conduct alleged herein, Defendants have violated West Virginia Code §§ 47-18-1, *et seq.*

a. Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of West Virginia Code §§ 47-18-1, *et seq.* Defendants' anticompetitive acts were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

b. Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.*

f.      Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. Va. Code R. 142-9-2.

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

334.   <u>Wisconsin</u>:  By reason of the conduct alleged herein, Defendants have violated Wisconsin Statutes §§ 133.01, *et seq.*

a.      Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of credit scores, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-

competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

f. Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(1)(a).

g. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

335. Defendants' anticompetitive activities have directly, foreseeably and proximately caused injury to members of the Damages Class. Plaintiffs and members of the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful monopolization, conspiracy to monopolize, and conspiratorial agreements. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced credit scores from Defendants and/or other sellers of credit scores, and/or (2) paying higher prices for FICO Scores than they would have in the absence of Defendants' conduct. These injuries are of the type of the laws of the above States were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

336. In addition, Defendants have profited significantly from the aforesaid unlawful

conduct. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

337.     Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## EIGHTH CLAIM FOR RELIEF:
## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS
### (on behalf of Plaintiffs and the Damages Class)

338.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

339.     This Claim is brought against all Defendants.

340.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

341.     <u>Arkansas</u>:  Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.*

a.     Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which credit scores were sold in Arkansas and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

b.     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of

103

Arkansas Code Annotated, § 4-88-107(a)(10).

c. Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

d. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

e. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

f. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

342. <u>California</u>: Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, et seq.

a. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and

Professions Code, by engaging in the acts and practices specified above.

b.    The violations of federal antitrust law set forth above constitute violations of section 17200, *et seq.* of California Business and Professions Code.

c.    This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated section 17200 of the California Business & Professions Code, commonly known as the Unfair Competition Law.

d.    Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

e.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

f.    Defendants' acts or practices are unfair to purchasers of FICO Scores in the State of California within the meaning of § 17200, California Business & Professions Code.

g.  Defendants' acts and practices are fraudulent or deceptive within the meaning of § 17200 of the California Business & Professions Code.

h.  Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

i.  The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

j.  The unlawful and unfair business practices of Defendants, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supra-competitive and artificially inflated prices for FICO Scores sold in the State of California. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

k.  The conduct of Defendants as alleged in this Complaint violated § 17200 of the California Business & Professions Code.

l.  As alleged in this Complaint, Defendants and its co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendant's unfair competition.

m. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to

California Business & Professions Code §§ 17203 and 17204.

343. _District of Columbia_: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.*

       a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which FICO Scores were sold, distributed or obtained in the District of Columbia.

       b.      The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28- 3904.

       c.      Plaintiffs and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged.

       d.      There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores. Defendants had the sole power to set that price, and Plaintiffs and members of the Class had no power to negotiate a lower price.

       e.      Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges.

       f.      Defendants' conduct with regard to sales of FICO Scores, including their

illegal conduct with respect to fixing the price of FICO Scores at supracompetitive levels and overcharging consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

g. Defendants took grossly unfair advantage of Plaintiffs and members of the Class.

h. The suppression of competition that has resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for the FICO Scores. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

i. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

344. <u>Florida</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

a. The primary policy of the FDUTPA is "[t]o protect the consuming public

108

and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

b.　　A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

c.　　Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

d.　　Members of the Damages Class purchased FICO Scores within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

e.　　Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Florida.

f.　　Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2006 and continuing through the date of this filing.

g.　　Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

h.       Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Florida; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

i.       Defendants' unlawful conduct substantially affected Florida's trade and commerce.

j.       As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property by virtue of overcharges for FICO Scores and are threatened with further injury.

k.       By reason of the foregoing, the members of the Damages Class are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

345.    Hawaii:    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

a.       Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-

competitive, artificially inflated prices for credit scores.

      b.      During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

      c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

      d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

346.   <u>Massachusetts</u>:   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Mass. G.L. c. 93A*et seq.*.

      a.      Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

      b.      Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which credit scores were sold, distributed, or obtained in Massachusetts and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

      c.      Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

Class paid supra-competitive, artificially inflated prices for credit scores.

d.     During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Massachusetts, and Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

e.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class were injured and are threatened with further injury.

f.     By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

347.   Missouri:   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

a.     Plaintiffs and the Damages Class purchased FICO Scores for personal, family, or household purposes.

b.     Defendants engaged in the conduct described herein in connection with the sale of credit scores in trade or commerce in a market that includes Missouri.

c.     Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which credit scores were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical,

oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

d.      Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for credit scores. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of credit scores they purchased.

e.      Defendants' conduct concerning the price of credit scores was deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing credit scores at prices established by a free and fair market.

f.      Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Missouri; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra- competitive, artificially inflated prices for credit scores.

g.      The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

h.      As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

i.      Accordingly, Plaintiffs and members of the Damages Class seek all relief

available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

348. <u>Montana</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Consumer Protection Act, Mont. Code, §§ 30-14-101, *et seq.* and §§ 30- 14-201 *et seq.*

a. Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Montana; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra- competitive, artificially inflated prices for credit scores.

b. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq*., and §§ 30- 14-201 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

349.  <u>Nebraska</u>:  By reason of the conduct alleged herein, Defendants have violated Neb. Rev. Stat. § 59-1602, *et seq.*

a.  Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-1609.

b.  Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Nebraska.

c.  Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

d.  Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of Defendants' actions within the stream of Nebraska commerce.

e.  Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

f.  Defendants' conduct misled consumers, withheld material facts, and had a

direct or indirect impact upon Plaintiffs and members-of-the-Class's ability to protect themselves.

g.        Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

h.        As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

i.        By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59-1602, *et seq.*

350.    <u>New Hampshire</u>:   By reason of the conduct alleged herein, Defendants have violated N.H. Rev. Stat. T. XXXI, § 358-A, *et seq.*

a.        Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007).

b.        Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within New Hampshire.

c.        Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

d.     Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of Defendants' actions within the stream of New Hampshire commerce.

e.     Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

f.     Defendants' conduct was willful and knowing.

g.     Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

h.     Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

i.     As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

j.     By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under N.H. Rev. Stat. T. XXXI, §§ 358-A:10 and 358-A:10-

351.   New Mexico:  By reason of the conduct alleged herein, Defendants have violated N.M. Stat. Ann. §§ 57-12-1, *et seq.*

a.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Mexico.

b.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially

inflated levels, the prices at which FICO Scores were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Class.

      c.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

      d.      Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

      e.      Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to  and the members of the Damages Class.

      f.      Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

      g.      Plaintiff and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores. Defendant Fair Isaac had the sole power to set that price and Plaintiffs and members of the Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct to fix the price of

FICO Scores at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class.

h.      The suppression of competition that resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for the FICO Scores.

i.      Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

j.      Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the members of the Class and the price paid by them for FICO Scores as set forth in N.M. Stat. Ann. § 57-12-2E.

k.      Defendants' conduct was willful.

l.      As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

m.      By reason of the foregoing, members of the Damages Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

352.    <u>New York</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349 *et seq.*

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO scores were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Class, who are Defendants' consumers.

b.      Defendants made public statements about the prices of FICO Scores that omitted material information that rendered the statements that they made materially misleading; and Defendants alone possessed material information that were relevant to consumers but failed to provide the information.

c.      Because of Defendants' unlawful trade practices in the State of New York, Class members who purchased FICO Scores were misled to believe that they were paying a fair price for FICO Scores or the price increases for FICO Scores were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conduct.

d.      Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have an impact on New York consumers, including Plaintiffs and members of the Class.

e.      Defendants knew that their unlawful trade practices with respect to pricing

FICO Scores would have a broad impact, causing Class members who purchased FICO Scores to be injured by paying more for FICO Scores than they would have paid in the absence of Defendants' unlawful trade acts and practices.

      f.      The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New York; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

      g.      During the Class Period, Defendants marketed, sold, or distributed FICO Scores in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

      h.      During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in New York.

      i.      Plaintiffs and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

353.    <u>North Carolina</u>:  By reason of the conduct alleged herein, Defendants have violated N.C. Gen. Stat.§ 75-1, *et seq.*

a.      Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

b.      Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within North Carolina.

c.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Class. Defendants' conduct could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' illegal activity. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Class could not possibly have been aware. Defendants' public statements concerning the price of FICO Scores created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conduct.

d.      Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

e.      Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

f.      Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

g.     Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

h.     Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

i.     Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

j.     During the Class Period, Defendants marketed, sold, or distributed FICO Scores in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in North Carolina.

k.     As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured and are threatened with further injury.

l.     By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 75-16.

354.   Oregon:  By reason of the conduct alleged herein, Defendants have violated Or.

Rev. Stat. § 646.608, *et seq.*

a.       Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Oregon.

b.       Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.

c.       Defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of Defendants' actions within the stream of Oregon commerce.

d.       Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

e.       Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

f.       Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

g.       As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

h.       By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under Or. Rev. Stat. § 646.638.

355.    Rhode Island: Defendants have engaged in unfair competition or unfair,

unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade

Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1 *et seq.*).

a.      Members of this Class purchased FICO Scores for personal, family, or

household purposes.

b.      Defendants agreed to, and did in fact, act in restraint of trade or commerce

in a market that includes Rhode Island, by affecting, controlling, and/or maintaining, at

artificial and non-competitive levels, the prices at which FICO Scores were sold,

distributed, or obtained in Rhode Island.

c.      Defendants deliberately failed to disclose material facts to Plaintiffs and

members of the Class concerning Defendants' unlawful activities and artificially inflated

prices for FICO Scores. Defendants owed a duty to disclose such facts, and they breached

that duty by their silence.

d.      Defendants misrepresented to all purchasers during the Class Period that

Defendants' FICO Scores prices were competitive and fair.

e.      Defendants' unlawful conduct had the following effects: (1) FICO Scores'

price competition was restrained, suppressed, and eliminated throughout Rhode Island;

(2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high

levels throughout Rhode Island; (3) Plaintiffs and members of the Class were deprived of

free and open competition; and (4) Plaintiffs and members of the Class paid

supracompetitive, artificially inflated prices for FICO Scores.

f.      As a direct and proximate result of Defendants' violations of law,

Plaintiffs and members of the Class suffered an ascertainable loss of money or property

as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market.

g.      Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO Scores they purchased.

h.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. §§ 6-13.1-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

356.    <u>South Carolina</u>:  By reason of the conduct alleged herein, Defendants have violated S.C. Code Ann. §§ 39-5-10, *et seq.*

a.      Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within South Carolina.

b.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

c.      Defendants' monopolization had the following effects: (1) FICO Scores'

126

price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores during the Class Period.

d.      Defendants' conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of Defendants' actions within the stream of South Carolina commerce.

e.      Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Carolina.

f.      Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

g.      Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

h.      Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as at least thousands of South Carolina businesses purchase FICO Scores.

i.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10 *et seq.*, and, accordingly, Plaintiffs and the members of the Class seek all relief available under that statute.

357.    <u>South Dakota</u>:  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-6 *et seq*.).

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes South Dakota, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO credit scores were sold, distributed, or obtained in South Dakota.

b.      Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO credit scores. Defendants misrepresented to all purchasers during the Class Period that Defendants' FICO credit scores prices were competitive and fair Defendants owed a duty to disclose such facts, and they breached that duty by their silence.

c.      Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores.

d.      As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.

e.      That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO credit scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO credit scores at prices set by a free and fair market.

f.      Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO credit scores they purchased.

g.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §§37-24-6 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

358.    Utah:   By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-11-1, *et seq.*

a.      Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Utah.

b.      Defendants are suppliers within the meaning of Utah Code Ann. §§ 13-11-3.

c.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the business market for credit scores, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

d.      Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

e.      Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions within the meaning of Utah Code Ann. §§ 13-11-3.

f.      Defendants knew or had reason to know that its conduct was unconscionable.

g.      Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

h.      Defendants' unlawful conduct substantially affected Utah's trade and commerce.

i.      As a direct and proximate cause of Defendants' unlawful conduct, the members Class have been injured in their business or property and are threatened with further injury.

j.      By reason of the foregoing, the members of the Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

359.    Utah:  By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-5-1, *et seq.*

a.      Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Utah.

b.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

c.      Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.

d.      Defendants' unlawful conduct substantially affected Utah's trade and commerce.

e.      As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have been injured in their business or property and are threatened with further injury.

f.      By reason of the foregoing, the members of the Class are entitled to seek all forms of relief, including actual damages or $2000 per Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5- 14, *et seq.*

360.    Vermont:  By reason of the conduct alleged herein, Defendants have violated Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

a.      Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Vermont.

b.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Vermont, for the purpose of excluding

competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

c.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for the FICO Scores.

d.      Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' FICO Scores prices were competitive and fair.

e.      Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Vermont; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores.

f.      Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

g.      Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

h.      Defendants' misleading conduct and unconscionable activities constitutes

unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.*

    i.      As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market.

    j.      By reason of the foregoing, members of Class are entitled to seek all forms of relief available under Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

361.    West Virginia: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code, §§46A-6-104 *et seq.*

    a.      Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores.

    b.      During the Class Period, Defendants marketed, sold, or distributed FICO credit scores in West Virginia, and Defendants' illegal conduct substantially affected

West Virginia commerce and consumers.

c.　　As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury.

362.　Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code, §§46A-6-104 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### NINTH CLAIM FOR RELIEF
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Nationwide Class)**

363.　Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

364.　This Claim is brought against all Defendants.

365.　As a result of its unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices of and unlawful profits from FICO Scores.

366.　Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains.

367.　Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs and members of the Class in the following states: Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray that this Honorable Court:

1. Order that this action may be maintained as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that it be named Representative of the Classes, that the undersigned Interim Co-Lead Counsel be named Co-Lead Class Counsel, and that reasonable notice of this action be provided to members of the Class as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure;

2. Adjudge that Defendants violated the federal antitrust laws as set forth above;

3. Adjudge that Defendants violated the state antitrust and unfair trade practices laws as set forth above;

4. Adjudge that Defendants were unjustly enriched as set forth above;

5. Award Plaintiffs and members of the Damages Class actual, double, treble, and exemplary damages as permitted;

6. Award Plaintiffs and members of the Classes pre-and post-judgment interest;

7. Enjoin Defendants from continuing the unlawful actions alleged herein;

8. Award Plaintiffs attorneys' fees and all other costs, including costs of consulting and testifying experts, reasonably incurred in prosecution of this action; and

9. Award such other relief as it deems just and proper.


## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a

Trial by Jury as to all issues so triable.

December 6, 2021                          Respectfully submitted,


By _____/s/Garrett D. Blanchfield_____
 Garrett D. Blanchfield

REINHARDT WENDORF & BLANCHFIELD
Garrett D. Blanchfield (Pro Hac Vice)
Brant D. Penney (Pro Hac Vice)
Roberta A. Yard (Pro Hac Vice forthcoming)
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

SPECTOR ROSEMAN & KODROFF, P.C.
Jeffrey J. Corrigan (Pro Hac Vice)
William G. Caldes (Pro Hac Vice)
Icee N. Etheridge (Pro Hac Vice forthcoming)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611
JCorriganf@srkattorneys.com
BCaldes@srkattorneys.com
IEtheridge@srkattorneys.com

*Interim Co-Lead Counsel for Class Plaintiffs*


GUIN, STOKES & EVANS, LLC
Charles R. Watkins (3122790)
321 South Plymouth Court Suite 1250
Chicago, IL 60604
Tel: (312) 878-8391
Fax: (205) 226-2357
charlesw@gseattorneys.com

*Liaison Counsel for Class Plaintiffs*

PRETI FLAHERTY, BELIVEAU
& PACHIOS LLP
Michael S. Smith (*Pro Hac Vice* forthcoming)
Gregory P. Hansel (*Pro Hac Vice* forthcoming)
Randall B. Weill (*Pro Hac Vice* forthcoming)
Elizabeth F. Quinby (*Pro Hac Vice* forthcoming)
One City Center, P.O. Box 9546
Portland, ME 04101
Tel: (207) 791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com

GLANCY PRONGAY & MURRAY LLP
Brian P. Murray (*Pro Hac Vice* forthcoming)
Lee Albert (*Pro Hac Vice* forthcoming)
230 Park Avenue, Suite 358
New York, NY 10169
Tel: (212) 682-5340
Fax: (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

FREED KANNER LONDON
& MILLEN LLC
Douglas A. Millen
Brian M. Hogan
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
dmillen@fklmlaw.com
bhogan@fklmlaw.com

FREED KANNER LONDON
& MILLEN LLC
Jonathan M. Jagher (*Pro Hac Vice* forthcoming)
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
jjagher@fklmlaw.com

BONI, ZACK & SNYDER LLC
Michael J. Boni (*Pro Hac Vice* forthcoming)
Joshua D. Snyder (*Pro Hac Vice* forthcoming)
John E. Sindoni (*Pro Hac Vice* forthcoming)
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: 610-822-0200
Fax: 610-822-0206
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

MCLAFFERTY LAW FIRM, P.C.
David McLafferty (*Pro Hac Vice* forthcoming)
Attorneys at Law
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 940-4000 ext. 12
www.McLaffertyLaw.com

SALTZ, MONGELUZZI & BENDESKY, P.C.
Simon B. Paris, Esq. (*Pro Hac Vice* forthcoming)
Patrick Howard, Esq. (*Pro Hac Vice* forthcoming)
1650 Market Street, 52nd Floor
Philadelphia, PA  19103
Tel: (215) 575-3985
Fax: (215) 496-0999
sparis@smbb.com
phoward@smbb.com


*Attorneys for Class Plaintiffs*