**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | Case No. 1:20-CV-02114 |
| *This document relates to:*<br><br>ALL ACTIONS | Hon. Edmond E. Chang<br>Magistrate Judge David E. Weisman |

**THE CREDIT BUREAUS' MOTION TO DISMISS
PLAINTIFFS' CLASS ACTION COMPLAINTS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iv

INTRODUCTION ...................................................................................................... 1

BACKGROUND ......................................................................................................... 4

    A.    The Business-to-Business Market for Credit Scores in the United States............. 4

    B.    Fair Isaac's 2013-2015 Distribution Agreements with the Bureaus...................... 5

    C.    Fair Isaac's 2006 Lawsuit and Disparagement of VantageScore .......................... 7

    D.    TransUnion's 2018 Antitrust Counterclaims ......................................................... 8

    E.    The 2020-2021 Class Action Complaints ............................................................. 8

STANDARD............................................................................................................... 10

ARGUMENT .............................................................................................................. 11

    I.    The Complaints Do Not Plausibly Allege a "Hub-And-Spokes"
        Conspiracy Among Fair Isaac and the Bureaus.................................................... 11

        A.    The Complaints Do Not Plausibly Allege Agreement Among the
            Bureaus in Their Negotiations with Fair Isaac, Either Directly or
            Circumstantially ...................................................................................... 12

            i.    The Bureaus' Respective Negotiations with Fair Isaac
                Across Several Years Do Not Constitute "Parallel" Conduct ...... 13

            ii.    Each Bureau Had an Independent, Legitimate Business
                Interest in Preserving Its Access to the Must-Have FICO
                Score ........................................................................................... 14

            iii.    The Complaints Cannot Plausibly Imply a Conspiracy
                from Mere Claims of "Opportunities to Communicate".............. 16

        B.    The Complaints Do Not Plausibly Allege That the Conduct at
            Issue Was Interdependent as Between the Bureaus.................................. 18

            i.    The No Equivalent Products Provisions ....................................... 20

            ii.    The Dynamic Royalty Schedule and Level Playing Field
                Provisions.................................................................................... 21

        C.    A Profit Motive Cannot Substitute for Plausible Allegations of
            Conspiracy .............................................................................................. 24

        D.    Any "Hub-and-Spokes" Conspiracy Is Contrary to the Complaints'
            Own Factual Admissions That VantageScore Remains Competitive....... 26

    II.    The Complaints Do Not Plausibly Allege That Individual Bureaus
        Conspired with Fair Isaac in Violation of Sherman Act Section One ................. 28

A.    The Complaints Do Not Plausibly Allege That the Bureaus' Individual Agreements with Fair Isaac Can Be Viewed as *Per Se* Antitrust Violations ................................................................... 28

B.    The Complaints Do Not Plausibly Allege That the Bureaus' Individual Agreements with Fair Isaac Violate the Rule of Reason ........ 31

     i.     No Equivalent Products Provisions ............................... 32

     ii.    Dynamic Royalty Schedule Provisions .......................... 33

     iii.   Level Playing Field Provisions ...................................... 34

III.   The Complaints Do Not Plausibly Allege That All Defendants Conspired to Violate Section Two of the Sherman Act ........................................ 35

A.    Plaintiffs Do Not Plausibly Allege a Conspiracy Among All Defendants ............................................................................ 35

B.    Plaintiffs Do Not Plausibly Allege That the Bureaus Had a Specific Intent to Further Fair Isaac's Monopoly ..................................... 36

IV.   Because the Complaints Do Not Plausibly Allege Any Conspiracy, the Plaintiffs' Federal Claims for Damages Are Barred by *Illinois Brick* ............ 37

V.    The Complaints' State Law Claims Must Be Dismissed for the Same Reasons ....................................................................................... 38

VI.   The Complaints Must Be Dismissed as to Individual Bureaus for Additional Independent Reasons ......................................................... 38

A.    All Claims Should Be Dismissed as to TransUnion ................................ 38

B.    All Claims Should Be Dismissed as to Experian ..................................... 41

C.    All Claims Should Be Dismissed as to Equifax ....................................... 43

CONCLUSION ..................................................................................... 44

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alarm Detection Sys., Inc. v. Vill. of Schaumberg*,
   930 F.3d 812 (7th Cir. 2019) ................................................. 13

*Always Towing & Recovery, Inc. v. City of Milwaukee*,
   2 F.4th 695 (7th Cir. 2021) ................................................. 28

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................. 10

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
   15 F.4th 831 (7th Cir. 2021) ................................................. 10, 38

*Associated Gen. Contractors of Cal., Inc.*,
   459 U.S. 519 (1983) ................................................. 40

*Beef Industry Antitrust Litig., In re*,
   600 F.2d 1148 (5th Cir. 1979) ................................................. 41

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................. 10, 12, 13, 14, 17, 20, 43

*Berkey Photo, Inc. v Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979) ................................................. 33

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
   65 F.3d 1406 (7th Cir. 1995) ................................................. 22, 35

*Brillhart v. Mut. Med. Ins., Inc.*,
   768 F.2d 196 (7th Cir. 1985) ................................................. 30

*Cook Inc. v. Boston Sci. Corp.*,
   333 F.3d 737 (7th Cir. 2003) ................................................. 32

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984) ................................................. 31, 34

*D'Last Corp. v. Ugent*,
   863 F. Supp. 763 (N.D. Ill. 1994), *aff'd*, 51 F.3d 275 (7th Cir. 1995) ................................................. 36

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ................................................. 12

*Fair Isaac Corp. v. Experian Info. Sols. Inc.*,
  645 F. Supp. 2d 734 (D. Minn. 2009), *aff'd*, 650 F.3d 1139 (8th Cir. 2011) ............ 18, 32, 42

*FICO Antitrust Litig. Related Cases, In re*,
  2021 WL 4478042 (N.D. Ill. Sept. 30, 2021) ............................................................ 9

*FTC v. Actavis, Inc.*,
  570 U.S. 136 (2013) .................................................................................................. 38

*Graphics Processing Units Antitrust Litig., In re*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) .................................................................... 13

*Great Escape, Inc. v. Union City Body Co.*,
  791 F.2d 532 (7th Cir. 1986) .................................................................................... 35

*Hackman v. Dickerson Realtors, Inc.*,
  520 F. Supp. 2d 954 (N.D. Ill. 2007) ....................................................................... 35

*Henson v. CSC Credit Servs.*,
  29 F.3d 280 (7th Cir. 1994), ...................................................................................... 7

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010) .................................................................. 19, 20, 24, 35, 37

*Humira (Adalimumab) Antitrust Litig., In re*,
  465 F. Supp. 3d 811 (N.D. Ill. 2020), *appeal filed*,
  No. 20-2402 (7th Cir. July 30, 2020) ........................................................................ 38

*Idx Sys. Corp. v. Epic Sys. Corp.*,
  285 F.3d 581 (7th Cir. 2002) .................................................................................... 32

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ....................................................................................... 9, 25, 39, 41

*Ins. Brokerage Antitrust Litig., In re*,
  618 F.3d 300 (3d Cir. 2010) ................................................................................. 14, 43

*K-Dur Antitrust Litig., In re*,
  2016 WL 755623 (D.N.J. Feb. 25, 2016) .................................................................. 18

*Kansas v. UtiliCorp United, Inc.*,
  497 U.S. 199 (1990) .................................................................................................. 25

*Kleen Prods. LLC v. Ga.-Pac. LLC*,
  910 F.3d 927 (7th Cir. 2018) .................................................................................... 17

*Kloth v. Microsoft Corp.*,
  444 F.3d 312 (4th Cir. 2006) .................................................................................... 41

*Kotteakos v. United States*,
   328 U.S. 750 (1946)...................................................................................... 12

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)........................................................................... 29, 30, 31

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
   952 F.3d 832 (7th Cir. 2020) ............................................... 1, 11, 37, 39

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)................................................... 13, 14, 19

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
   238 F. Supp. 2d 1024 (N.D. Ill. 2003), *aff'd*, 354 F.3d 661 (7th Cir. 2004) ....................... 15

*Microsoft Corp. Antitrust Litig., In re*,
   127 F. Supp. 2d 728 (D. Md. 2001), *aff'd*, 309 F.3d 193 (4th Cir. 2002) ....................... 36, 41

*Moore v. Boating Indus. Ass'n*,
   819 F.2d 693, 712 (7th Cir. 1987) ............................................. 17

*Musical Instruments & Equip. Antitrust Litig., In re*,
   798 F.3d 1186 (9th Cir. 2015) ................................. 11, 14, 15, 16, 20, 24, 43, 44

*Nexium (Esomeprazole) Antitrust Litig., In re*,
   842 F.3d 34 (1st Cir. 2016)................................................... 15, 23

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018)............................................................ 29, 31

*Olson v. Bemis Co.*,
   800 F.3d 296 (7th Cir. 2015) ................................................... 13

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
   281 F.3d 629 (7th Cir. 2002) ....................................... 3, 39, 40

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
   911 F.3d 505 (8th Cir. 2018) ................................................... 13

*PepsiCo, Inc. v. Coca-Cola Co.*,
   315 F.3d 101 (2d Cir. 2002)............................................... 16, 20

*Pink Supply Corp. v. Hiebert, Inc.*,
   788 F.2d 1313 (8th Cir. 1986) ................................................ 36

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*,
   412 F. Supp. 3d 941 (N.D. Ill. 2019) ..................................... 13

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004). ................................................................. 28

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) ................................................................. 40

*Siegel Transfer, Inc. v. Carrier Express, Inc.*,
    54 F.3d 1125 (3d Cir. 1995) ................................................................. 36

*Simon v. KeySpan Corp.*,
    694 F.3d 196 (2d Cir. 2012) ................................................................. 40

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ................................................................. 40

*Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*,
    309 F.3d 836 (5th Cir. 2002) ................................................................. 36

*Svanaco, Inc. v. Brand*,
    417 F. Supp. 3d 1042 (N.D. Ill. 2019) ................................................................. 41

*Tamoxifen Citrate Antitrust Litig., In re*,
    277 F. Supp. 2d 121 (E.D.N.Y. 2003), *aff'd*, 466 F.3d 187 (2d Cir. 2006) ................. 38

*Tech. Learning Collective, Inc. v. Daimler-Benz Aktiengesellschaft*,
    1980 WL 1943 (D. Md. Aug. 28, 1980) ................................................................. 42

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ................................................................. 16

*Travel Agent Comm'n Antitrust Litig., In re*,
    583 F.3d 896 (6th Cir. 2009) ................................................................. 17

*Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*,
    433 F.3d 1024 (7th Cir. 2006) ................................................................. 28

*United States v. Brasher*,
    962 F.3d 254 (7th Cir. 2020 ................................................................. 11

*United States v. Read*,
    658 F.2d 1225 (7th Cir. 1981) ................................................................. 41

*Valley Liquors, Inc. v. Renfield Importers, Ltd.*,
    822 F.2d 656 (7th Cir. 1987) ................................................................. 30

*Warren Gen. Hosp. v. Amgen Inc.*,
    643 F.3d 77 (3d Cir. 2011) ................................................................. 41

*Washington Cty. Health Care Auth., Inc v Baxter Int'l Inc.*,
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ............................................................ 13, 17

*Washington Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
    2020 WL 1666454 (N.D. Ill. Apr. 3, 2020) .......................................................... 43

*Williamson v. Curran*,
    714 F.3d 432 (7th Cir. 2013) ................................................................................. 7

## STATUTES

15 U.S.C. § 1 ................................................................. 3, 13, 15, 17, 28, 34, 35, 36, 43

15 U.S.C. § 2 ........................................................................................ 3, 8, 35, 36, 37

## OTHER AUTHORITY

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (5th ed. 2021)...................................... 17

## INTRODUCTION

If Fair Isaac has maintained a monopoly in the market for credit scores by placing restrictions on distributors of its FICO Scores, then the Credit Bureaus (the "Bureaus") are the distributors that Fair Isaac has restricted. To maintain access to the FICO Scores demanded by their customers, and thus compete with one another, each Bureau must comply with Fair Isaac's conditions and pay the royalties Fair Isaac demands. And if Fair Isaac has run a "smear campaign" against its competitor VantageScore, then the Bureaus—each of which owns a one-third share of VantageScore Solutions, LLC ("VantageScore"), the developer of VantageScore Scores—are victims of that scheme. If Fair Isaac's campaign against VantageScore has worked, the Bureaus are the biggest, and most direct, losers.

Plaintiffs nevertheless attempt to label the Bureaus as "co-conspirators" in Fair Isaac's scheme to advance its monopoly and "crush" VantageScore. The reason is obvious: to circumvent the usual rule that only direct purchasers have standing to sue for damages under the federal antitrust laws. Because the federal antitrust laws allow only direct purchasers to bring antitrust claims seeking damages, and only about half of the states permit indirect purchasers to do so, Plaintiffs that purchased FICO Scores from the Bureaus need to conjure a conspiracy between Fair Isaac and the Bureaus. But the Seventh Circuit has instructed trial courts to scrutinize carefully such litigation-driven attempts to draw distributors or other middlemen into a conspiracy. *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 839 (7th Cir. 2020).

If the Court finds that Plaintiffs' claims against Fair Isaac fail for any of the reasons identified in Fair Isaac's Motion to Dismiss, those claims necessarily fail as to the Bureaus for the same reasons. The claims against the Bureaus should also be dismissed for the following reasons.

First, while the Complaints assert (in Claims One and Six) an "overarching" "hub-and-spokes" conspiracy—with Fair Isaac as the "hub" and the Bureaus as the "spokes"—they lack

1

allegations plausibly suggesting the required "rim" linking the Bureaus to the claimed overarching scheme. In other words, there are no factual allegations plausibly suggesting that the Bureaus conspired with one another in negotiating their respective licensing and distribution agreements with Fair Isaac. Instead, the Complaints offer only the barest of "opportunity" allegations—that the Bureaus belonged to a trade association and had a joint venture to market a competing credit score—but such "opportunity" allegations alone cannot render a conspiracy claim plausible. This is particularly so where Plaintiffs do not plausibly allege parallel conduct—the Bureaus entered their respective licensing and distribution agreements at disparate points in time *over a two-year period*, and compete with one another to sell FICO Scores to businesses, as the Complaints concede. And Plaintiffs allege no facts suggesting that any Bureau's licensing and distribution agreement with Fair Isaac was contingent on any other Bureau acceding to the same Fair Isaac terms, nor anything but implausible conclusions that any Bureau's agreement made sense only if the other two agreed to the same terms. These failures mandate dismissal of Claims One and Six.

Second, the Complaints assert (in Claims Two, Three, and Four) that each individual Fair Isaac-Bureau agreement *itself* qualifies as an independent antitrust violation. These claims also fail. Among other things, Plaintiffs' attempt to depict plainly *vertical* distribution agreements as bi-lateral *horizontal* price-fixing conspiracies—and thus subject to *per se* condemnation—is not remotely plausible given that, as the Complaints concede, the Bureaus *distribute* the FICO Score. Nor do the Complaints come close to adequately alleging that any individual Fair Isaac-Bureau agreement plausibly violates the antitrust rule of reason. Among other things, while the Complaints themselves describe obvious procompetitive benefits to the Bureaus distributing FICO Scores, they allege nothing making it plausible that any individual Fair Isaac-Bureau agreement

foreclosed competition at all, let alone in a substantial portion of the claimed markets. Therefore, dismissal of Claims Two, Three, and Four is appropriate.

Third, Plaintiffs cannot save their Sherman Act § 1 conspiracy claims by recasting them as a claimed violation of Sherman Act § 2, which addresses conspiracies to monopolize (in Claim Six). These allegations fail for the reasons described above, but also because the suggestion that each Bureau had a specific intent to further Fair Isaac's monopoly, at that Bureau's own direct expense as the victim of Fair Isaac's alleged monopolization, is simply not plausible.

Fourth, dismissal of the state law claims (in Claims Seven and above) is appropriate for the same reasons as the federal law claims. As courts consistently recognize, where a plaintiff brings state antitrust or consumer protection claims alongside federal antitrust claims, and the federal antitrust claims are dismissed, the state claims should be dismissed for the same reasons.

Finally, each Bureau has independent reasons why dismissal of some or all of the claims against that Bureau would be appropriate. The fact that TransUnion asserted a federal antitrust claim seeking damages against Fair Isaac underscores the impropriety of purchasers *from TransUnion* seeking damages for the same alleged misconduct by Fair Isaac. *See Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631-32 (7th Cir. 2002). Experian was the first Bureau to enter into a renewed license and distribution agreement with Fair Isaac, and cannot plausibly be said to have known that Equifax and TransUnion might enter similar agreements months or years later. Meanwhile, Equifax entered into its license agreement in October 2013, approximately six months after Experian and more than a year before TransUnion. Not a single allegation was made that Equifax ever communicated with, held meetings with, or struck an agreement with the other Bureaus when it unilaterally negotiated its licensing agreement with Fair Isaac.

Dismissal of the claims against the Bureaus is therefore appropriate.

3

## BACKGROUND

The facts described below are as alleged in the Direct Purchaser Plaintiffs' Consolidated Class Action Complaint ("DPPC") and Indirect Purchaser Plaintiffs' Amended Class Action Complaint ("IPPC") (collectively the "Complaints").

### A.    The Business-to-Business Market for Credit Scores in the United States

Fair Isaac developed a "complex algorithm" that can be used to calculate a credit score—i.e., a three-digit number "designed to represent an individual's credit risk"—using the information about a consumer's credit history that is collected in their credit report.  DPPC ¶¶ 1, 34-35; IPPC ¶¶ 1, 35-36.  Fair Isaac advertises that its credit scores, branded FICO Scores, are the most widely-used credit scores in the United States and are used in the majority of lending decisions.  DPPC ¶¶ 62-66; IPPC ¶¶ 2, 43, 75-81, 85.  The Credit Bureaus—Experian, Equifax, and TransUnion—produce the credit reports used to generate FICO Scores, DPPC ¶¶ 3, 38-40, 56; IPPC ¶¶ 3-5, 39-41, and distribute FICO Scores to businesses, often as part of a bundle that includes a credit report and a FICO Score, DPPC ¶¶ 35, 42; IPPC ¶¶ 6, 46.  The Bureaus pay Fair Isaac royalties for each FICO Score that they sell.  DPPC ¶¶ 42-43; IPPC ¶¶ 46-47.  Each of the Bureaus has been selling FICO Scores to their business customers "[f]or decades."  DPPC ¶ 4.

In some cases, Fair Isaac also sells its own FICO Scores to lenders.  DPPC ¶ 44.  Notably, when Fair Isaac does so it does not generate the FICO Score itself—rather, it pays one or more of the Bureaus to generate the FICO Score, and to provide it to the customer with the applicable credit reports.  *Id.*  Although the Complaints characterize this as "competition" with the Bureaus, in both cases Fair Isaac controls the payment it receives for its FICO Scores.  *See* DPPC ¶ 44 (Fair Isaac sets the price the customer pays and pays the Bureaus only the cost of processing and providing the bundle); *id.* ¶ 116 (Fair Isaac sets the royalties paid by each Bureau when distributing FICO Scores to customers).

4

Fair Isaac's primary competitor is VantageScore, a joint venture the Bureaus created in 2005 for the purpose of offering a competitive alternative in a market long dominated by Fair Isaac. DPPC ¶ 73; IPPC ¶¶ 85-87, 89. VantageScore developed its own algorithm that results in a "competitively priced, highly predictive" score that scores millions of consumers that might otherwise not have a credit score and would thus be "invisible" to lenders. DPPC ¶¶ 6-7, 79-82; *see* IPPC ¶¶ 10-11, 90. The Bureaus each individually distribute, and price, VantageScore Scores to businesses, often as part of a bundle that includes a credit report and VantageScore Score. DPPC ¶¶ 71-73; IPPC ¶¶ 10, 87-88. In 2018, VantageScore issued a report stating that more than 1.4 billion VantageScore credit scores had been distributed to consumers during a 12-month period, and it expected more lenders to adopt VantageScore in the future. DPPC ¶¶ 83-84; IPPC ¶¶ 98-99.

### B. Fair Isaac's 2013-2015 Distribution Agreements with the Bureaus

Fair Isaac renewed its licensing and distribution agreements with the Bureaus at different times between 2013 and 2015: Fair Isaac entered a new contract with Experian in May 2013, Equifax in October 2013,[1] and TransUnion in February 2015. DPPC ¶ 105; IPPC ¶ 122. Plaintiffs allege that each of these contracts included two provisions they label anticompetitive: (1) the No Equivalent Products provision and (2) the Dynamic Royalty Schedule provision. DPPC ¶ 108; IPPC ¶ 125. Plaintiffs assert that by agreeing to these provisions the Bureaus joined a conspiracy to further Fair Isaac's monopoly and "crush" their own joint venture, VantageScore. DPPC ¶ 101; IPPC ¶ 118. Plaintiffs also assert that these terms were against the Bureaus' "own individual, as well as collective, economic self-interest." DPPC ¶ 108; IPPC ¶ 125.

---

[1] Plaintiffs incorrectly allege that this agreement was entered into in November 2013, but the difference between October and November is immaterial to this Motion.

**No Equivalent Products.** The No Equivalent Products provision allegedly prohibits the Bureaus from developing or distributing a credit score that uses the same odds-to-score relationships as FICO Scores, or that uses too many of the same reason codes as FICO Scores. DPPC ¶ 109; IPPC ¶ 126. The odds-to-score relationship is the relationship between a particular numerical score (e.g., a "700") and the risk that a consumer will default on a loan. DPPC ¶ 111; IPPC ¶ 130. Reason codes explain why a consumer's score was not higher. DPPC ¶¶ 36-37; IPPC ¶¶ 37-38. Plaintiffs do not allege that VantageScore uses, or has ever used, the same odds-to-score relationship or reason codes as FICO Scores—in fact, VantageScore does not do so. DPPC ¶ 37; IPPC ¶ 38. Nor do Plaintiffs allege the Bureaus stopped distributing VantageScore Scores—in fact, they distribute billions of VantageScore Scores annually. DPPC ¶ 83; IPPC ¶ 98.

**Dynamic Royalty Schedule.** The Dynamic Royalty Schedule provision allows Fair Isaac to change the royalties it charges the Bureaus for FICO Scores once a year. DPPC ¶¶ 116, 128; IPPC ¶ 136. Plaintiffs allege that Fair Isaac has used this provision to repeatedly increase the royalties it charges the Bureaus. DPPC ¶¶ 117-118, 142; IPPC ¶¶ 137, 163. Plaintiffs further allege that Fair Isaac has "abused and exploited" this provision to establish a brand new category of royalties designed to discourage businesses from buying non-FICO Scores—which they label a "penalty price." DPPC ¶¶ 117-123; IPPC ¶¶ 136-144. Plaintiffs nowhere allege that Fair Isaac informed the Bureaus during negotiations that it intended to implement this "penalty price."

**Level Playing Field.** Plaintiffs also allege that Fair Isaac's contracts include a so-called Level Playing Field provision that benefits the Bureaus by requiring Fair Isaac to offer each Bureau the same royalty prices for FICO Scores. DPPC ¶¶ 108, 124; IPPC ¶ 145. Plaintiffs describe this provision in one paragraph as "forbid[ding] Fair Isaac to charge any Credit Bureau a price that is lower than the price it charges any other Credit Bureau." DPPC ¶ 124; IPPC ¶ 145. But, the

6

allegation from TransUnion's Counterclaims on which Plaintiffs expressly rely stated that this provision "requires that the prices that are made available to TransUnion be made available to the other credit reporting agencies"—not that Fair Isaac is "forbidden" from lowering prices. TransUnion Counterclaims ¶ 59, *Fair Isaac Corp. v. Trans Union LLC*, No. 17-cv-08318 (N.D. Ill. Feb. 12, 2018), Dkt. No. 38 (hereinafter, "TransUnion Counterclaims").[2]

### C.       Fair Isaac's 2006 Lawsuit and Disparagement of VantageScore

Fair Isaac has viewed VantageScore as a competitive threat since its launch in 2006.  DPPC ¶ 88; IPPC ¶ 103.  Shortly after the launch of VantageScore, Fair Isaac brought a lawsuit against the Bureaus and VantageScore "with the intended purpose of driving VantageScore Solutions out of business."  DPPC ¶¶ 9, 88; *see* IPPC ¶¶ 103-104.  The case included antitrust, trademark, false advertising, and theft of trade secret allegations, including allegations that the Bureaus had founded VantageScore in an attempt to drive *Fair Isaac* out of business.  *See generally Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011) (cited at DPPC ¶ 89 & n.57; IPPC ¶ 104 & n.51).  Fair Isaac also alleged that it had a trademark over credit score numbers in the range of 300-850, such that VantageScore—which, at the time, used a 501-990 scale—allegedly infringed Fair Isaac's trademark.  *See id.* at 1147.  Fair Isaac's lawsuit was unsuccessful in driving VantageScore out of the market—a jury decided the case against Fair Isaac, the Eighth Circuit affirmed, and the Bureaus continued to offer VantageScore Scores in competition with FICO Scores.  DPPC ¶¶ 89-94; IPPC ¶¶ 104-109; *see also Fair Isaac*, 650 F.3d 1139.

---

[2]       The Court may consider TransUnion's Counterclaims in ruling on this Motion either by taking judicial notice of the existence of those claims, *see Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994), or because they are incorporated by reference into Plaintiffs' Complaints, *see Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

Fair Isaac also "waged an aggressive public relations and advertising campaign" against VantageScore. DPPC ¶ 131; *see* IPPC ¶ 154. As part of this campaign, Fair Isaac's CEO disparaged the VantageScore Score as a "Fako" score, Fair Isaac took out a full-page advertisement in the *Wall Street Journal* attacking VantageScore and the Bureaus, and Fair Isaac's executives blogged about the VantageScore Score's supposed inferiority. DPPC ¶¶ 131-139; IPPC ¶¶ 154-160.

### D. TransUnion's 2018 Antitrust Counterclaims

In February 2018, TransUnion brought a Sherman Act § 2 counterclaim against Fair Isaac in a case that arose out of a dispute over the royalties TransUnion pays for FICO Scores. DPPC ¶ 97; IPPC ¶ 112. TransUnion alleged that Fair Isaac had monopolized the business-to-business ("B2B") market for credit scores in the United States by imposing unfair terms on the Bureaus and waging a "media and advertising campaign" against VantageScore. TransUnion Counterclaims ¶ 76. It sought overcharge damages "as a direct purchaser (or licensee) of Fair Isaac's FICO products, which it also supplies to its customers" based on "Fair Isaac's supracompetitive royalty prices." *Id*. ¶¶ 7, 77. The parties settled and the case was dismissed in September 2020. DPPC ¶ 99; IPPC ¶ 114. [3]

### E. The 2020-2021 Class Action Complaints

Between April and June 2020, ten purported class action complaints were filed asserting federal and state antitrust claims against Fair Isaac—only one of which named the three Bureaus as defendants. *See Kenmore NY Teachers Fed. Credit Union v. Fair Isaac Corp.*, No. 20-cv-02755 (N.D. Ill. filed May 6, 2020). These classes purported to include businesses that purchased FICO

---

[3] *See* Notice of Dismissal, *Fair Isaac Corp. v. Trans Union LLC*, No. 17-cv-08318 (N.D. Ill.), Dkt. No. 258. Plaintiffs incorrectly allege that this settlement was entered into in November 2020, but again the difference is immaterial to this motion.

Scores from the Bureaus and other third party entities. However, the fact that many (if not all) of those plaintiffs purchased FICO Scores from entities other than Fair Isaac limited their ability to recover damages from Fair Isaac. Under *Illinois Brick*'s direct-purchaser rule "only *direct purchasers*—those who purchased goods or services directly from the alleged antitrust-violator at a monopoly price—may recover under federal antitrust law" and "[i]ndirect purchasers—those who would have to show that the direct purchaser passed on the monopoly pricing to the next purchaser, through every link in the alleged supply chain—are out of luck." *In re FICO Antitrust Litig. Related Cases*, 2021 WL 4478042, at *3 (N.D. Ill. Sept. 30, 2021) (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735, 746 (1977)). Indirect purchasers may only recover damages under certain state antitrust laws that have "repeal[ed]" *Illinois Brick*'s direct-purchaser rule. *Id*. at *4.

The lawyers representing the plaintiffs at the time agreed that businesses that purchased FICO Scores from third parties are indirect purchasers barred from recovering under federal law by *Illinois Brick*, but splintered on how to litigate claims brought by businesses that purchased FICO Scores from the Bureaus. Scott + Scott argued that the plaintiffs should allege that the Bureaus conspired with Fair Isaac and, therefore, that the so-called "conspiracy exception" to *Illinois Brick*'s direct-purchaser rule applies. Cohen Milstein countered that any allegation of a conspiracy between Fair Isaac and the Bureaus would be frivolous, and argued that the plaintiffs should instead focus on seeking damages under the state laws that have "repeal[ed]" *Illinois Brick*. Without making any determination about "which law firm is right," this Court appointed Scott + Scott to represent businesses that purchased FICO Scores from Bureaus because it had chosen the "more aggressive" theory. *Id.* at *3-4.[4]

---

[4] The lone plaintiff that had originally named the Bureaus as defendants withdrew in November 2021, citing "resource constraints." Joint Status Report (filed Nov. 12, 2021), Dkt. No. 109.

Plaintiffs filed consolidated Complaints in late 2021, all of which name the Bureaus as defendants and allege that the Bureaus conspired with Fair Isaac to further its monopoly. The Direct Purchaser ("DP") Plaintiffs purport to have purchased FICO Scores "from Fair Isaac and/or a Credit Bureau." DPPC ¶¶ 15-21, 144. Those plaintiffs seek damages under both federal and state antitrust law on the theory that Fair Isaac charged inflated royalties and the plaintiffs thus paid higher prices for FICO Scores they purchased *from the Bureaus*—and likewise that the Bureaus' other customers paid inflated prices for FICO Scores. *See* DPPC ¶¶ 127, 183, 304. The Indirect Purchaser ("IP") Plaintiffs purport to represent businesses that purchased FICO Scores from entities other than the Bureaus or Fair Isaac. IPPC ¶¶ 8-9, 166. Those plaintiffs allege the same violations of federal and state antitrust law as the DP Plaintiffs, but seek damages under only state law. *See* IPPC ¶¶ 167, 211, 337.

## STANDARD

"[A] complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and that rises "above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Where—as here—a complaint alleges a conspiracy to violate the antitrust laws, the plaintiff must come forward with factual allegations "plausibly suggesting (not merely consistent with) agreement" to survive a motion to dismiss. *Id.* at 557. Determining whether a complaint states a plausible claim for relief is a context-specific task that requires a court to rely on "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Conclusory allegations, such as that defendants " 'agreed,' 'conspired,' 'colluded,' or 'induced' agreement, conspiracy, or collusion" will be disregarded and "cannot substitute for factual allegations." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 834 (7th Cir. 2021).

## ARGUMENT

I.   **The Complaints Do Not Plausibly Allege a "Hub-And-Spokes" Conspiracy Among Fair Isaac and the Bureaus**

The Complaints' first attempt to plead a conspiracy is to assert that Fair Isaac and the Bureaus formed a single, overarching antitrust conspiracy, orchestrated by Fair Isaac, to "crush" Fair Isaac's primary competitor, VantageScore, and advance Fair Isaac's monopoly in the B2B market for credit scores.  *See* DPPC ¶¶ 101, 171, 263 (Claims One and Six); IPPC ¶¶ 118, 201, 295 (Claims One and Six).  Plaintiffs have attempted to plead this overarching conspiracy on a "hub-and-spokes" basis, that is, one in which a "central coordinating party" (the "hub") brings other participants (the "spokes" along the "rim") into the conspiracy.  *Marion Healthcare*, 952 F.3d at 842.  Here, Plaintiffs seek to describe Fair Isaac as the hub and the Bureaus as the spokes. DPPC ¶ 101; IPPC ¶ 118.

In order to plausibly allege a "hub-and-spokes" conspiracy, a plaintiff must allege facts that give rise to plausible inference that each of the "spokes"—the non-central participants in the alleged conspiracy—made a "conscious commitment to participate in an illegal scheme" and "recognized that it was part of the greater arrangement, and it coordinated or otherwise carried out its duties as part of the broader group."  *Marion Healthcare*, 952 F.3d at 842-43.  Put differently, "the plaintiffs must show that similarly situated members of the conspiracy coordinated not only with the ['hub'], *but also with each other*." *Id*. at 842 (emphasis added).  In the absence of such coordination, there is no "rim" connecting the "spokes" and, therefore, no "hub-and-spokes" conspiracy.  *Id*.; *see also United States v. Brasher*, 962 F.3d 254, 262 (7th Cir. 2020) ("To qualify as a single conspiracy, a hub-and-spoke operation must have a 'rim' connecting the spokes.").[5]

---

[5]    *See also*, *e.g.*, *United States v. Apple, Inc.*, 791 F.3d 290, 314 n.15 (2d Cir. 2015) ("plaintiff must also prove the existence of a 'rim' to the wheel in the form of an agreement among the horizontal competitors"); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015)

The Complaints fail to plausibly allege the required components of a "hub-and-spokes" conspiracy. First, they make no factual allegations of a direct agreement among the Bureaus, and the circumstantial facts alleged in the Complaints do not support any inference of agreement among the Bureaus. Part I.A. Second, the Complaints allege no facts making it even remotely plausible that any of the Bureaus' individual agreements with Fair Isaac could be viewed as interdependent or reflecting a unity of purpose, such that the agreements would benefit the Bureaus only if each of the other Bureaus entered the same agreement. Part I.B. Third, Plaintiffs cannot fill this gap by pointing to the Bureaus' purported profit motive in entering into agreements with Fair Isaac. Part I.C. Finally, there is no allegation that the Bureaus abandoned VantageScore or that the alleged conspiracy drove VantageScore out of business, and it is implausible that the Bureaus coordinated to destroy their own joint venture. Part I.D.

### A. The Complaints Do Not Plausibly Allege Agreement Among the Bureaus in Their Negotiations with Fair Isaac, Either Directly or Circumstantially

The Complaints allege no direct evidence of Bureau agreement (or a "rim") as to their respective renegotiations of their licensing and distribution agreements with Fair Isaac. Instead, Plaintiffs ask this Court to infer a conspiracy from the circumstantial fact that each Bureau allegedly acceded, in separate contracts and at different times over two years, to similar conditions in exchange for continued access to Fair Isaac's must-have FICO Scores. But the lesson of *Twombly* is that allegations of parallel conduct that "could just as well be independent action" are insufficient to allege an antitrust conspiracy, as rational and ordinary business decisions provide an "obvious alternative explanation" for the alleged conduct. *Twombly*, 550 U.S. at 557, 567; *see*

---

("A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes."); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002) (citing *Kotteakos v. United States*, 328 U.S. 750, 755 (1946), to hold that "a wheel without a rim is not a single conspiracy").

also *Alarm Detection Sys., Inc. v. Vill. of Schaumberg*, 930 F.3d 812, 821 (7th Cir. 2019); *Olson v. Bemis Co.*, 800 F.3d 296, 304 (7th Cir. 2015). Where—as here—plaintiffs fail to plead facts "plausibly suggesting (not merely consistent with) agreement," their conspiracy claims must be dismissed. *Twombly*, 550 U.S. at 557; *see*, *e.g.*, *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 138-40 (2d Cir. 2013) (affirming dismissal of § 1 claim; refusing to infer a conspiracy from "parallel action" where the alleged actions "made perfect business sense"); *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 955 (N.D. Ill. 2019) (dismissing § 1 claim where "the allegations describe a pattern of conduct that is just as consistent with non-conspiratorial conduct").

### i. The Bureaus' Respective Negotiations with Fair Isaac Across Several Years Do Not Constitute "Parallel" Conduct

The absence of such plausible allegations is particularly problematic where, as here, the conduct is not truly "parallel" in the first place. As the Complaints admit, the agreement between Fair Isaac and Experian was entered in May 2013, the agreement between Fair Isaac and Equifax was entered in October 2013, and the agreement between Fair Isaac and TransUnion not until February 2015. DPPC ¶ 105; IPPC ¶122. Such disparate time periods cannot be depicted as "parallel conduct." *See*, *e.g.*, *Washington Cty. Health Care Auth., Inc. v Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 836 (N.D. Ill. 2018) ("timing of the [allegedly parallel product] recalls [did not] support a plausible inference of collusion" where they "d[id] not occur in a predictable pattern or scale, much less move in lockstep").[6]

---

[6]    *See also Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516 (8th Cir. 2018) (conduct "lack[ed] temporal proximity" because it was separated by six months); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) (rejecting the idea that launches months apart were "lockstep" pricing, because "competitive market forces will tend to drive the prices of like goods to the same level").

### ii. Each Bureau Had an Independent, Legitimate Business Interest in Preserving Its Access to the Must-Have FICO Score

Fair Isaac's FICO Scores are the most-used credit scores in the United States (and therefore essentially a "must have"), DPPC ¶¶ 2, 61-70; IPPC ¶¶ 2, 69, 73-82, and FICO Scores are deeply integrated into many lenders' decision-making (or "decisioning") operations, DPPC ¶¶ 50, 52-54, 69; IPPC ¶¶ 62-65, 84, 100. Each Bureau has offered FICO Scores to its business customers "[f]or decades." DPPC ¶ 4. Given Fair Isaac's substantial market power, Fair Isaac could credibly threaten each Bureau with termination: each Bureau would thus face the choice of accepting Fair Isaac's preferred terms or losing access to the must-have FICO Score.

Each Bureau's independent decision to accept Fair Isaac's conditions, in order to be able to continue distributing FICO Scores, makes "perfect business sense" given the must-have status of the FICO Score. *Citigroup*, 709 F.3d at 138. The Bureaus compete with one another to sell risk-management tools to businesses, including credit scores and bundles of credit reports and credit scores. *See* DPPC ¶¶ 3, 38-40, 56-57; IPPC ¶¶ 3, 39-42, 68-69. Any Bureau that suddenly lost the ability to offer FICO Scores would lose a critical part of its market offerings. Any similarities between the Bureaus' contracts with Fair Isaac, therefore, most readily reflect "independent responses to common stimuli." *Twombly*, 550 U.S. at 556 n.4. When "the same important" trading partner uses its "considerable market power to demand similar terms from [multiple entities at the same level of distribution] for its own benefit," those entities' "similar response to this market pressure is a *hallmark of independent parallel conduct—not collusion*." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) (emphasis added). In this scenario, "the obvious explanation" for each entity's decision to agree to similar terms is "that each [entity] found that the benefits justified the costs" because agreeing to those terms was preferable to losing an important trading partner. *In re Ins. Brokerage Antitrust Litig.*,

618 F.3d 300, 328 (3d Cir. 2010) (affirming dismissal of § 1 claim of a "hub-and-spokes" conspiracy).[7]

*Musical Instruments* warrants particular attention.  There, a class of guitar buyers attempted to plead a "hub-and-spokes" conspiracy in which Guitar Center, a large retailer of musical instruments (the "hub"), pressured manufacturers of musical instruments (the "spokes") to adopt minimum retail pricing policies for its instruments, which all the manufacturers allegedly did.  But the Ninth Circuit held that such facts did not render plausible a conspiracy among the manufacturers to accede to Guitar Center's demands (which would have given the conspiracy the required "rim").  While the class asserted that the pricing policies were against the manufacturers' self-interest, the face of the complaint provided "ample independent business reasons why each of the manufacturers adopted and enforced [the pricing] policies even absent an agreement among the defendant manufacturers."  798 F.3d at 1195.  The complaint described how "each manufacturer was 'pressured by Guitar Center' to adopt [pricing] policies that were advantageous to Guitar Center" and "each manufacturer 'responded to Guitar Center's pressure and coercion' by adopting [the pricing] policies 'in exchange for Guitar Center's agreement to purchase large volumes of the manufacturer's product stock.'"  *Id*.  The competing manufacturers' "decisions to heed similar demands made by a common, important customer" did "not suggest conspiracy or collusion," but rather that those manufacturers "self-interested independent parallel conduct in an

---

[7]    *See also*, *e.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 56 (1st Cir. 2016) (affirming district court's ruling that plaintiffs failed to prove a "hub-and-spokes" § 1 conspiracy at trial; because similar agreements between a common brand-name drug manufacturer (the "hub") and generic drug manufacturers (the "spokes") could be explained by each generic drug manufacturer's "self-interest," there was insufficient evidence of an agreement between the generic drug manufacturers (a "rim")); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1033 (N.D. Ill. 2003) (dismissing § 1 claim at summary judgment; the "mere fact that large numbers of retailers agreed to [a dominant in-store marketing company's] exclusive contracts" was "not sufficient to support an inference of a horizontal agreement"), *aff'd*, 354 F.3d 661 (7th Cir. 2004).

interdependent market." *Id*. The Bureaus here responded exactly as did the manufacturers in *Musical Instruments*, acceding to Fair Isaac's demands to protect their respective businesses in the face of Fair Isaac's entrenched market position.[8]

Indeed, an irony of the Complaints' allegation of coordination is that if the Bureaus **had** communicated with one another with respect to their respective agreements with Fair Isaac, it is **implausible** that they would have collectively agreed to the disadvantageous terms alleged here. *See* DPPC ¶ 108; IPPC ¶ 125. If the Bureaus had any shared incentive, it would presumably have been to *reject* disadvantageous terms. The Complaints thus at most describe a classic situation in which Fair Isaac utilized its own position in the market and *the lack of a united front* among the Bureaus to impose its preferred terms on each one individually. In the absence of any such coordination among the Bureaus in their negotiations with Fair Isaac, there can be no "rim" on the Complaint's hub-and-spokes conspiracy. And the lack of a "unity of purpose" among the Bureaus is underscored by the fact that TransUnion would later sue Fair Isaac based on the very terms at issue. DPPC ¶ 97; TransUnion Counterclaims ¶ 173.

### iii. The Complaints Cannot Plausibly Imply a Conspiracy from Mere Claims of "Opportunities to Communicate"

Lacking any other basis to allege agreement, the Complaints allege that the Bureaus had "opportunities to communicate" through an industry trade association, the Consumer Data Industry Association ("CDIA"), and as owners of VantageScore. DPPC ¶¶ 58, 103; IPPC ¶¶ 70, 120. But mere "opportunities to communicate," absent allegations about what was discussed, do not support

---

[8] *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000), which counsel for the DP Plaintiffs has previously cited, does not help Plaintiffs. In that case, there was strong evidence of an agreement among the toy manufacturers (the "spokes") that supplied toys to Toys "R" Us (the "hub"), including direct evidence of communications between manufactures and an "abrupt shift"—rather than a gradual change over the course of multiple years—in those manufacturers' policies. *Id*. at 935; *see PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (per curiam) (distinguishing *Toys "R" Us*).

a plausible inference of conspiracy, especially where the alleged communications are "more likely explained by . . . lawful, free-market behavior," than an unlawful conspiracy. *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009); *see* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1417b (5th ed. 2021) ("ordinary and justifiable contact between rivals . . . do not suggest existence of a conspiracy").

Because industry trade associations, such as CDIA, are "ubiquitous and serve numerous legitimate and procompetitive purposes," allegations that defendants were members of the same organizations (along with many other non-Bureau members) or attended meetings held by those organizations are "unspectacular and fail to move the needle." *Baxter Int'l*, 328 F. Supp. 3d at 843; *see also Moore v. Boating Indus. Ass'n*, 819 F.2d 693, 712 (7th Cir. 1987) ("Mere membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws. . . . There must, instead, be some evidence of actual knowledge of, and participation in, an illegal scheme in order to establish a violation of the antitrust laws.") (brackets omitted; ellipses in original).[9]  The Complaints allege no facts regarding the Bureaus' participation in the CDIA sufficient to "move" the plausibility "needle" toward conspiracy.  This is especially so when the CDIA engages in plainly legitimate activities, including "(i) develop[ing] a standard electronic data reporting format called Metro 2®; (ii) issu[ing] joint statements on matters of public importance; (iii) provid[ing] guidelines to businesses that use credit reports; and (iv) respond[ing] to public criticisms of their industry."  DPPC ¶ 58; IPPC ¶ 70.

---

[9]    *See also*, *e.g.*, *Twombly*, 550 U.S. at 567 n.12 (simply "belong[ing] to the same trade guild" is insufficient to support claim of conspiracy); *Kleen Prods. LLC v. Ga.-Pac. LLC*, 910 F.3d 927, 938 (7th Cir. 2018) (affirming summary judgment on § 1 claim; evidence of "frequent contacts" between competitors "by phone and at trade association meetings" where there were "legitimate business reasons for their contacts" did not suggest a conspiracy).

Nor are there plausible allegations that the Bureaus used VantageScore as an improper conduit to coordinate a scheme to advance Fair Isaac's monopoly.  Indeed, a district court and the Eighth Circuit have both rejected the suggestion that the Bureaus' communications through VantageScore are anything other than procompetitive.  *See Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 645 F. Supp. 2d 734 (D. Minn. 2009), *aff'd*, 650 F.3d 1139 (8th Cir. 2011); *see also*, *e.g.*, DPPC ¶ 139 (alleging that the Eighth Circuit rejected the argument that VantageScore's "ownership by the Credit Bureaus was anticompetitive").  Indeed, the Bureaus compete to sell scores from VantageScore (which continues to grow), just as they compete to sell FICO Scores, credit reports, and other products and services that businesses use for risk-management.  And the allegation that the Bureaus used VantageScore to further the alleged conspiracy is particularly implausible here given that the goal of the alleged conspiracy was to "crush" VantageScore.  DPPC ¶ 101; IPPC ¶ 118.

## B. The Complaints Do Not Plausibly Allege That the Conduct at Issue Was Interdependent as Between the Bureaus

Lacking any plausible allegation of agreement among the Bureaus in their negotiations with Fair Isaac, Plaintiffs may resort to claiming that the Bureaus must have coordinated because it would be economically rational for any Bureau to enter into the agreements with Fair Isaac only if all other Bureaus did so, i.e., that the Bureaus' respective agreements with Fair Isaac are "interdependent."  "To evaluate interdependence, the court engages in an inquiry focused on 'the extent to which the success or failure of one conspiracy is independent of a corresponding success or failure by the other.'"  *In re K-Dur Antitrust Litig.*, 2016 WL 755623, at *21 (D.N.J. Feb. 25, 2016).  "In essence, the transactions must have been contingent on each other to establish interdependence."  *Id.* at *22.  Any such effort fails here, for two reasons.

18

First, the Complaints frankly admit a *lack* of interdependence, alleging no cross-conditionality among the bilateral agreements and conceding that the challenged provisions "were against [the Bureaus'] own individual, ***as well as collective***, economic self-interest." DPPC ¶ 108 (emphasis added); *see* IPPC ¶ 125 (same). This admission is fatal. It is not enough to allege that a party agreed to unfavorable terms. Rather, the Complaints must allege conduct that would be irrational if undertaken individually (i.e., with one Bureau) but ***becomes rational*** if conducted collectively (i.e., with all Bureaus). *See, e.g.*, *Citigroup*, 709 F.3d at 138 (distinguishing cases in which "plaintiffs have alleged behavior that would plausibly *contravene* each defendant's self-interest in the absence of similar behavior by rivals"). None is alleged here.

Second, as noted above, each Bureau had a legitimate and powerful business reason for entering its licensing and distribution agreement on the terms Fair Isaac is alleged to have demanded: FICO Scores are a "must have" for the bundles each Bureau sells, and, as discussed, losing access to such scores would deal a heavy blow to any Bureau's business, regardless of what the other Bureaus did. *See supra* Part I.A.ii. The flipside is a Bureau would likely have benefitted if another Bureau had not signed an agreement with Fair Isaac since it is likely that the Bureau with the Fair Isaac relationship would gain more business at the expense of the other Bureau without the Fair Isaac relationship. This is the very opposite of interdependent conduct, and any claim of interdependence fails for this independent reason.

Nor are the Complaints saved by the conclusory assertion—made "[o]n information and belief"—that Fair Isaac informed every Bureau that it intended to enter into similar contracts with all distributors of FICO Scores. DPPC ¶ 107; IPPC ¶ 124. The Third Circuit rejected nearly identical allegations in *Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.*, 602 F.3d 237 (3d Cir. 2010), involving an alleged "hub-and-spokes" conspiracy among a dominant

artificial tooth manufacturer and its dealers. Like those here, that complaint was "sprinkled" with assertions that the manufacturer "made clear" to each of its dealers that every dealer was required "to agree to the same exclusive dealing arrangement" in order to carry the manufacturer's artificial teeth, and "every Dealer knew that every other Dealer agreed, or would agree." *Id*. at 253-55. The Third Circuit explained that these conclusory allegations could not substitute for "factual allegations" plausibly suggesting an actual agreement among the dealers to join the manufacturer's conspiracy. *Id*. at 255 (citing *Twombly*, 550 U.S. at 564); *see also PepsiCo*, 315 F.3d at 109-10 (evidence Coca-Cola told distributors it would "uniformly enforce" its loyalty policy "and encouraged them to report violations" insufficient to establish "hub-and-spoke" conspiracy among distributors).

Here, the Complaints assert that Fair Isaac represented to TransUnion that Experian and Equifax "had already agreed to materially similar new contracts with Fair Isaac." DPPC ¶ 106; IPPC ¶ 123. But the fact that Fair Isaac reported to TransUnion that it had ***already*** negotiated similar contracts with Experian and Equifax hardly suggests that any Bureau conditioned its contract on the other Bureaus agreeing to similar terms, particularly when the Bureaus did not enter into these contracts simultaneously, but rather at different times over two years—Experian in May 2013, Equifax in October 2013, and TransUnion in February 2015. *See Musical Instruments*, 798 F.3d at 1196 (the "slow adoption of similar policies" "over a period of several years, not simultaneously" did "not raise the specter of collusion").

Finally, any doubt about the lack of interdependence here is put to rest by reviewing the two sets of contract provisions that the Complaints suggest are interdependent:

### i. The No Equivalent Products Provisions

The Complaints first allege that it was against each Bureau's individual interest to restrict its ability to develop and sell scores intentionally aligned to the FICO Score. DPPC ¶¶ 109-115.

However, for each Bureau, the choice was to agree to Fair Isaac's demand or risk losing the Fair Isaac relationship. *See* DPPC ¶ 107 & n.70 (citing TransUnion Counterclaims ¶ 43 ("If TransUnion did not agree to the terms demanded by Fair Isaac, it would lose substantial business from customers that depend on FICO scores.")); IPPC ¶ 124 (same); *supra* Part I.A.ii. Moreover, although they insinuate that this term disadvantaged VantageScore, Plaintiffs do not claim that VantageScore ever used, or planned to use, the same odds-to-score relationships or reason codes as FICO Scores. Finally, it makes no sense that the Bureaus would spend five years and millions of dollars in legal expenses to successfully defend their VantageScore joint venture against Fair Isaac's lawsuit, only to then collectively agree to undermine that joint venture. *See* DPPC ¶¶ 88-95; IPPC ¶¶ 103-109.

## ii. The Dynamic Royalty Schedule and Level Playing Field Provisions

In their assertions regarding the so-called Dynamic Royalty Schedule and Level Playing Field provisions, the Complaints describe self-interested, non-interdependent actions by each Bureau in reaction to Fair Isaac. Under the Dynamic Royalty Schedule provisions, Fair Isaac insisted on the ability to unilaterally change the per-score royalties it would charge the Bureau for FICO Scores the Bureau distributed to lenders. DPPC ¶ 116; IPPC ¶ 136. Fair Isaac later used this power to unilaterally create new categories of royalties that, according to Plaintiffs, were designed to discourage the use of VantageScore Scores. DPPC ¶ 122; IPPC ¶ 143. The Complaints do not allege that Fair Isaac informed any Bureau of a plan to use the Dynamic Royalty Schedule provision terms to disadvantage VantageScore, much less that any Bureau agreed to such a plan.

And, while no Bureau would want to give Fair Isaac freedom to change its pricing at will, this is hardly a unique problem for distributors across industries. As discussed above, each Bureau had a unilateral, non-interdependent interest in not losing access to the must-have FICO Score, and thus a non-conspiratorial incentive to accede to Fair Isaac's conditions. And, while the

Complaints claim that the Dynamic Royalty Schedule provisions allow *Fair Isaac* to extract supracompetitive prices for its FICO Scores from the Bureaus and their customers, there is no allegation that any Bureau controlled the prices set by Fair Isaac, or that Fair Isaac in some manner shared any ill-gotten monopoly profits with the Bureaus. *See*, *e.g.*, DPPC ¶ 129 & n.84 (citing TransUnion Counterclaims ¶ 60 ("Fair Isaac has used the 'Level Playing Field' and 'Dynamic Royalty Schedule' provisions in its contracts with the [Bureaus] to extract monopoly prices ***from*** all three credit reporting agencies and their customers") (emphasis added)); IPPC ¶ 152 (same).[10] Instead, as with the No Equivalent Products provisions, the Complaints describe a dominant firm possessing the "must have" FICO Score imposing terms advantageous only to itself on its respective distributors in return for continued access to that score. *See* DPPC ¶ 65; IPPC ¶ 81.

The "obvious" unilateral nature of each Bureau's actions is reinforced when the Level Playing Field and Dynamic Royalty Schedule provisions are considered together. Under the Level Playing Field provisions, the contracting Bureau allegedly received protection against Fair Isaac selectively raising its royalties while not doing so for its competitors—a provision that would not be needed if there were an overarching conspiracy that included all Bureaus. DPPC ¶¶ 124-125; IPPC ¶ 148. The provision gave the contracting Bureau access to the lowest per-unit royalty available to any other Bureau. *Id.* Such "most favored nations" or "MFN" clauses are typically unremarkable, and in fact protect competition. In *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995), the Seventh Circuit explained that "[m]ost favored nations" clauses, by enabling "buyers . . . to bargain for low prices," contemplate "the sort of conduct that the antitrust laws seek to encourage" and are "not price-fixing." It made sense for

---

[10] These allegations only underscore that the Bureaus are the direct purchasers here, not the DP Plaintiffs.

each Bureau to seek protection against being placed at a competitive disadvantage vis-à-vis the others by a selective royalty change by Fair Isaac, especially because the individual Bureau contracts were concluded at widely different times.

Importantly, there was no interdependence in any Bureau insisting on such protection. For example, so long as Experian (the first Bureau to renegotiate its agreement with Fair Isaac) received assurance that it would not be disadvantaged by a cost change imposed by Fair Isaac, it would not care if the other Bureau's had similar protections—in fact, it might be happy if its rival Bureaus were unable to secure them from Fair Isaac! *See In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 56 (1st Cir. 2016) (alleged "most favored nation" provision (known there as a "contingent launch provision") equally explainable as independent conduct to protect each of the "spokes" in the alleged conspiracy).

The Complaints nonetheless assert that the Bureaus "collectively" benefitted from the Level Playing Field provisions because it supposedly made it possible for each of the Bureaus to know what the others were paying for FICO Scores. DPPC ¶ 126; IPPC ¶ 147. First, this assertion in no way negates the unilateral, non-interdependent nature of each Bureau's insistence on MFN-like protections, especially given that the agreements were staggered over a multi-year period. Second, the Complaints are silent as to how this situation is different from any other in which distributors know that the supplier sells its product at the same price to everyone; publishing a price and charging it is hardly anticompetitive. Third, while the Complaints claim that it is because of the Level Playing Field provisions that Fair Isaac "will resist demands for discounts," DPPC ¶ 127, the Complaints devote hundreds of paragraphs to alleging that Fair Isaac is a monopolist with extraordinary levels of market power. Against this backdrop it is not plausible to suggest that the reason Fair Isaac resists demands for discounts is because of this provision. Finally, the

23

Complaints admit that the Bureaus sell FICO Scores as part of a bundle that includes credit reports—which is the actual focus of competition between the Bureaus. DPPC ¶ 42; IPPC ¶ 46.

Failing to make out interdependent agreements in any other way, the Complaints finally claim that this provision protects the Bureaus from Fair Isaac's "threat" that it could "facilitate" the creation of a new credit bureau "by offering a new credit bureau prices lower than those it charges the incumbent Credit Bureaus." DPPC ¶ 125; IPPC ¶ 146. But the Level Playing Field provisions provide no meaningful protection from that supposed "threat." Because Fair Isaac sells FICO Scores to customers directly, Fair Isaac could work with a new credit bureau (or create one itself) to calculate those scores and undercut the Bureaus without violating the Level Playing Field provisions. DPPC ¶ 44; IPPC ¶ 48. That said, the Complaints do not allege that any would-be "fourth" bureau has considered entering the marketplace, much less that its ability to do so turns on receiving *lower pricing* for FICO Scores than the established Bureaus. On the contrary, the Complaints allege "strong barriers to entry" for *any* new bureau. *See* DPPC ¶ 59; IPPC ¶ 71. Plaintiffs thus cannot plausibly allege that the Bureaus would have had any collective reason to agree to the Level Playing Field provisions, and cannot rely on a theory of interdependence here.

### C.    A Profit Motive Cannot Substitute for Plausible Allegations of Conspiracy

The Complaints assert that the Bureaus had a motive to join Fair Isaac's conspiracy because the scheme would allow the Bureaus to raise the prices they charge businesses for FICO Scores and earn "supracompetitive profits." DPPC ¶¶ 10, 129; IPPC ¶ 14. Because a "common motive for increased profits always exists," and "simply restates that a market is independent," the existence of such a motive does not suggest a conspiracy. *Musical Instruments*, 798 F.3d at 1194-95 & n.8; *see also Dentsply*, 602 F.3d at 255 ("economic incentive" to help manufacturer raise prices did "not give rise to a plausible inference of an agreement among the Dealers themselves").

24

In any event, the Complaints' conclusion regarding the Bureaus' motives is unsupported by the facts alleged. The scheme Plaintiffs allege would be substantially more likely to hurt the Bureaus' bottom lines than increase their profits to "supracompetitive" levels. The alleged scheme gives Fair Isaac the right to raise the royalties the Bureaus pay for FICO Scores. DPPC ¶¶ 42, 116, 121, 128, 166; IPPC ¶¶ 46, 136, 142, 192. It does not fix the prices the Bureaus charge businesses for FICO Scores or bundles of credit reports and FICO Scores. Tellingly, Plaintiffs nowhere allege that the Bureaus charge the same prices for FICO Scores, or that the Bureaus charge the same prices for their respective bundles of credit reports and credit scores. Given that the Bureaus compete with one another on the price of credit reports and credit scores, there is no basis for Plaintiffs' assumption that the Bureaus would be able to pass on all of Fair Isaac's abrupt and significant royalty increases to their customers, much less profit from doing so. *See* DPPC ¶ 142 (alleging a 75% royalty increase in a single year); IPPC ¶ 163 (same); *see also Ill. Brick*, 431 U.S. 720; *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 211 (1990).

Indeed, it is far more likely that the Bureaus would lose profits as a result of Fair Isaac's royalty increases. *See* DPPC ¶ 129 (TransUnion "complained" that Fair Isaac's royalty rate increase "raised costs for the Credit Bureaus" and only a portion of this cost was "borne by B2B Purchasers"); IPPC ¶ 152 (similar). The alleged scheme would also be guaranteed to harm the Bureaus by "crush[ing]," VantageScore, their joint venture. DPPC ¶ 101; IPPC ¶ 118. By 2015, the Bureaus had been investing in VantageScore for more than a decade, and stood to profit from VantageScore's future success as its owners and distributors. DPPC ¶¶ 6-7, 71-84; IPPC ¶¶ 10-11, 87-99. The Complaints thus cannot use assumptions about the Bureaus' purported profit motive to substitute for allegations plausibly suggesting coordination among the Bureaus in their respective negotiations with Fair Isaac.

### D. Any "Hub-and-Spokes" Conspiracy Is Contrary to the Complaints' Own Factual Admissions That VantageScore Remains Competitive

Nor do the Complaints support the illogical inference that the Bureaus conspired to crush their own joint venture, VantageScore. The Bureaus made a substantial investment, and fought a long legal battle against Fair Isaac, in order to offer VantageScore Scores as a "competitively priced, highly predictive" alternative to the FICO Score, which the Bureaus each independently price and distribute in competition with each other. DPPC ¶¶ 6-7, 71-84, 88-94; *see* IPPC ¶¶ 10, 87, 103-109. And as the Complaints' own factual allegations show, the Bureaus continue to support and distribute VantageScore Scores notwithstanding Fair Isaac's "public relations and advertising campaign[s]" attacking VantageScore. *See supra* Background Part C; DPPC ¶¶ 131-140 (describing Fair Isaac's 2017-2021 attacks on VantageScore); IPPC ¶¶ 16, 154-161 (same).

The Complaints occasionally insinuate that the Bureaus agreed to stop selling VantageScore Scores to their business customers in their 2013 or 2015 contracts with Fair Isaac. *See* DPPC ¶¶ 10, 87, 102; IPPC ¶¶ 102, 114, 119, 122. But that insinuation is contradicted elsewhere in the Complaints themselves. None of the challenged contract provisions barred the Bureaus from selling VantageScore Scores. DPPC ¶ 108; IPPC ¶ 125. The Complaints do not allege that the Bureaus agreed to abandon VantageScore, do not allege that VantageScore went out of business, do not allege that VantageScore competed less aggressively, and do not allege that VantageScore stopped seeking customers. On the contrary, the Complaints concede, for example, that in 2018 VantageScore announced that more than 1.4 billion VantageScore Scores had been distributed to consumers during the prior year and VantageScore expected usage of its score to increase as more lenders adopted VantageScore Scores in the future. DPPC ¶¶ 83-84; IPPC ¶¶ 98-99.

Indeed, Fair Isaac perceived VantageScore to be such a threat that it recently took out a full-page advertisement in the *Wall Street Journal* attacking VantageScore and the Bureaus. DPPC ¶¶ 134-136; IPPC ¶¶ 155-156. In Fall 2021—when Plaintiffs filed their Complaints and more than six years into the purported conspiracy—VantageScore was still promoting its score, *see* DPPC ¶ 37 & n.8; IPPC ¶¶ 88-89, VantageScore had just hired a new senior executive to promote the use of its score in capital markets, *see* DPPC ¶ 6 & n.3, and Fair Isaac was still attacking VantageScore on its website, *see* DPPC ¶ 137 & n.92; IPPC ¶ 157. It is implausible that, more than half a decade after the Bureaus supposedly conspired with Fair Isaac to "crush" their own joint venture, Fair Isaac would continue to expend substantial resources on "an aggressive public relations and advertising campaign" to attack VantageScore. DPPC ¶ 131; *see also* IPPC ¶ 16.

Nor is there any allegation that the No Equivalent Products provisions—barring Bureaus from selling a hypothetical score that used the same odds-to-score ratios or too many of the same reason codes as FICO Scores—impaired VantageScore. At most, Plaintiffs suggest that this provision would impair a hypothetical overhaul of the VantageScore Score to change its odds-to-score relationships or reason codes. *See* DPPC ¶ 112. But the Complaints do not even attempt to allege that VantageScore ever considered such an overhaul. *See supra* Part I.B.i.

Finally, the Dynamic Royalty Schedule provisions addressed the royalties the Bureaus pay Fair Isaac for FICO Scores; nothing in those provisions barred a Bureau from offering to sell non-FICO Scores to its business customers, or governed the prices that such customers could pay for such scores. DPPC ¶ 116; IPPC ¶ 136. Moreover, as discussed, the Complaints' own allegations show that VantageScore is still very much in business, and the VantageScore Score continues to be distributed by the Bureaus. DPPC ¶¶ 35-37, 71, 73, 79-85; IPPC ¶¶ 37-38, 87, 89, 90, 98-99.

27

## II.  The Complaints Do Not Plausibly Allege That Individual Bureaus Conspired with Fair Isaac in Violation of Sherman Act Section One

Unable to plausibly allege an overarching conspiracy, the Complaints resort to alleging in Claims Two, Three, and Four that each of the Bureaus' individual contracts with FICO separately violate Sherman Act § 1.  *See* DPPC ¶¶ 188, 206, 224; IPPC ¶¶ 226, 245, 264.  That fallback position fails both under the *per se* rule and the rule of reason.  None of those counts plausibly state a *per se* claim because, contrary to the Complaints' contentions, FICO and the Bureaus are not horizontal competitors in the B2B market for the sale of credit scores—an essential element of a *per se* claim under Sherman Act § 1.  And the rule of reason claim also fails because the Complaints do not plausibly allege that any of the contractual provisions at issue cause anticompetitive effects in the relevant market, or resulted in any type of foreclosure of competition.  Claims Two, Three, and Four should be dismissed.

### A.  The Complaints Do Not Plausibly Allege That the Bureaus' Individual Agreements with Fair Isaac Can Be Viewed as *Per Se* Antitrust Violations

None of the individual contracts with Fair Isaac can be judged under the *per se* framework.  *Per se* liability applies to Sherman Act § 1 actions "where the nature and necessary effects that result" from the challenged conduct "are so plainly anticompetitive that an in-depth analysis of their illegality is unnecessary."  *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 433 F.3d 1024, 1032 (7th Cir. 2006).  That rule generally applies to "horizontal price fixing" schemes—those between firms competing at the same level of distribution for a certain product.  *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 705 (7th Cir. 2021).  However, agreements "between firms at different levels of distribution"—known as vertical restraints or vertical agreements—are treated differently.  *Id.*  "Unlike horizontal agreements between competitors, vertical [restraints] are presumptively legal."  *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004).  Such agreements are reviewed under the rule of reason,

28

and "courts often approve them because of their procompetitive benefits." *Id.*; *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 899 (2007) ("the rule of reason, not a *per se* rule of unlawfulness, [is] the appropriate standard to judge vertical price restraints" and overruling prior Supreme Court precedent that held otherwise); *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("nearly every . . . vertical restraint . . . should be assessed under the rule of reason").

Here, the Complaints' *per se* claims in Claims Two, Three, and Four are premised on the fallacious allegation that Fair Isaac and the Bureaus "are horizontal competitors" when the Complaints describe a *vertical* relationship between Fair Isaac and the respective Bureaus. DPPC ¶¶ 188, 206, 224; *see also* IPPC ¶¶ 227, 246, 265. Indeed, the Complaints disclose that Fair Isaac's competitors are other scoring algorithm developers. *See, e.g.*, IPPC ¶¶ 85-87 ("Some of these competitors to Fair Isaac's FICO Scores in the B2B Credit Score Market include: SageStream's Credit Optics Score; LexisNexis's RiskView score; CoreLogic Credco's Anthem Credit Score; PRBC; ChexSystems; L2C's Link2Credit Score; and ScoreLogix LLC's JSS Credit Score. Another competitor, VantageScore Solutions, represented the biggest threat to Fair Isaac's FICO Scores.").

Plaintiffs' Complaints improperly conflate each of the Bureaus with VantageScore Solutions, LLC. *See, e.g.*, DPPC ¶ 6 ("The . . . purpose behind [VantageScore Solutions] was to create a competitor to the FICO Score . . . ."); IPPC ¶ 10 ("VantageScore Solutions, LLC . . . launched VantageScore—a credit score to compete against . . . FICO Scores."). But VantageScore is a stand-alone venture, distinct from any of the Bureaus. It is not named as a defendant in the Complaints, is not alleged to be a party to the supposedly anticompetitive agreements between Fair Isaac and the Bureaus, and is not an alleged coconspirator in this case. Plaintiffs make no attempt

to argue that the VantageScore venture is an alter ego of any of the Bureaus. As such, there is no plausible allegation of a horizontal agreement between any of the Bureaus and Fair Isaac.

As both Complaints make clear, the contracts at issue are licensing and distribution agreements under which the Bureaus license Fair Isaac's intellectual property and distribute FICO Scores. *See* DPPC ¶ 42; IPPC ¶ 46. These scores are critical to the Bureaus' business of selling packages—or "bundles"—of information about an individual's creditworthiness to lenders and financial institutions, such as Plaintiffs. *See* DPPC ¶ 3; IPPC ¶ 6. These packages include not only a credit score, but also "an individual's payment history, the amount of debt the individual has, and the length of the individual's credit history." DPPC ¶¶ 35, 42; *see also* IPPC ¶¶ 40, 46. In order to include an individual's FICO Score in the credit information package they sell to their customers, the Bureaus purchase licenses from Fair Isaac and pay Fair Isaac royalties. *See* DPPC ¶ 42; IPPC ¶ 46. In this way, in the product market alleged by the Complaints—the market for credit scores—the Bureaus are buyers and Fair Isaac is a seller. Any agreements between the Bureaus and Fair Isaac pertaining to this market are thus vertical, not horizontal, in nature. *See Brillhart v. Mut. Med. Ins., Inc.*, 768 F.2d 196, 199 (7th Cir. 1985) ("Since the agreement in the present case runs between [the buyer and the sellers], the agreement is really vertical, rather than horizontal."); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 660 n.5 (7th Cir. 1987) ("Alleged price fixing between a manufacturer and distributors . . . is more properly termed a 'vertical' conspiracy."). Such agreements are not amenable to the *per se* framework. *See, e.g., Leegin*, 551 U.S. at 907 ("Vertical price restraints are to be judged according to the rule of reason."). Hence, Claims Two, Three, and Four do not state an actionable *per se* claim.

**B.**     **The Complaints Do Not Plausibly Allege That the Bureaus' Individual Agreements with Fair Isaac Violate the Rule of Reason**

The Complaints' rule of reason claims also fail. *See* DPPC ¶¶ 189, 207, 225; IPPC ¶¶ 228, 247, 266. Under the rule of reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express*, 138 S. Ct. at 2284. Importantly, there is no presumption that a challenged agreement is unreasonably anticompetitive. *See id.* Instead, the rule of reason calls for "an inquiry into market power and market structure designed to assess the [agreement's] actual effect" on competition and consumers. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). "In its design and function the rule [of reason] distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin*, 551 U.S. at 886.

Plaintiffs come nowhere close to meeting this standard, as the Complaints fail to allege that any of the at-issue agreements between the Bureaus and Fair Isaac have a substantial anticompetitive effect that harms consumers. Specifically, Plaintiffs have not and cannot plausibly allege that any of the at-issue provisions in the Bureaus' agreements with Fair Isaac—the No Equivalent Products provisions, the Dynamic Royalty Schedule provisions, and the Level Playing Field provisions—cause anticompetitive effects in the B2B market for credit scores. And the Complaints do not and cannot allege that there would have been any significant foreclosure of competition from a Bureau entering the licensing and distribution agreement it entered with Fair Isaac. Thus, Plaintiffs' rule of reason claims set out in Claims Two, Three, and Four should be dismissed.

31

### i.    No Equivalent Products Provisions

Plaintiffs allege the No Equivalent Products provisions "provide[ ] that [the Bureaus] may not internally develop a credit scoring system that is aligned to the odds-to-score relationship of any [Fair Isaac] Analytic or uses more than a limited number of reason codes that match reason codes used by any [Fair Isaac] Analytic."  DPPC ¶ 109; IPPC ¶ 126 (cleaned up).  They claim that these provisions "prohibit[ ] [the Bureaus] from distributing any competing analytic . . . that is aligned with FICO Scores or uses too many of the same reason codes."  *Id.* (cleaned up).  But Plaintiffs fail to appreciate that these are license agreements, and Fair Isaac has long taken the position that provisions of this type are necessary to protect its intellectual property.  *See Fair Isaac*, 645 F. Supp. 2d at 742 (describing similar provisions in Fair Isaac's 2009 agreements with TransUnion).  The antitrust laws are well settled that there is nothing unlawful about a licensor protecting its intellectual property by being selective as to how—or even to whom—it grants licenses.[11]  *See Idx Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 585 (7th Cir. 2002) ("Nothing in the antitrust laws gives one producer a right to sponge off another's intellectual property[.]").[12]

The Complaints suggest that by accepting the No Equivalent Products provisions the Bureaus each agreed to stop distributing VantageScore Scores or other competitors to FICO Scores, but that premise is entirely false as discussed above.  *See* DPPC ¶ 112; IPPC ¶ 128.  These

---

[11]    There are further procompetitive efficiencies generated by Fair Isaac and the Bureaus having licensing agreements in place.  These agreements allow Bureaus to apply Fair Isaac's algorithm directly to an individual's aggregated credit data—which the Bureaus already possess—and seamlessly sell packages of credit information that include that individual's FICO Score.  *See* DPPC ¶ 44; IPPC ¶ 46.  Plaintiffs ignore entirely these obvious procompetitive efficiencies in the Complaints.

[12]    *See also Idx Sys.*, 285 F.3d at 585 ("trade-secret law is compatible with antitrust law; the same can be said for contracts protecting intellectual property that, though not demonstrably a trade secret, is commercially valuable"); *Cook Inc. v. Boston Sci. Corp.*, 333 F.3d 737, 740-41 (7th Cir. 2003) ("[T]here is no argument that [the defendant] would have violated antitrust law . . . had it granted an exclusive, nonassignable license.  And so we cannot see how [defendant's] action in granting two licenses and forbidding the licensees to increase the number of competitors by means of assignment or sublicensing could raise an antitrust . . . issue.").

provisions do not prohibit developing or distributing VantageScore or other credit scoring systems; they only prohibit developing or distributing a credit scoring system "that is aligned with FICO Scores or uses too many of the same reason codes." DPPC ¶ 109; IPPC ¶ 126. Put differently, the No Equivalent Products provisions do not restrict a Bureau's ability to develop or distribute a product that competes horizontally with Fair Isaac, but rather amount, at most, to specific license restrictions on particular product design features (none of which are alleged to have been considered by VantageScore). And as discussed *supra* Part I.D, the Complaints' own allegations show that the Bureaus continue to distribute VantageScore Scores.

### ii. Dynamic Royalty Schedule Provisions

The same holds true for the Dynamic Royalty Schedule provisions. According to the Complaints, these provisions "provide[] that once every twelve (12) months during the [contract] [t]erm, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to [the Bureaus] in writing." DPPC ¶ 116; IPPC ¶ 136. There is nothing remarkable— much less anticompetitive—about a licensing agreement giving the licensor rights to increase royalties during the term of a license, even if that right is later abused. *Berkey Photo, Inc. v Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir. 1979) ("Setting a high price . . . is not in itself anticompetitive."). And the Complaints do not even attempt to connect Fair Isaac's alleged power to occasionally modify the amount of royalties owed to it by the Bureaus to any anticompetitive effects in the B2B market for credit scores. Nor could they. These royalties dictate the prices *the Bureaus pay for FICO Scores*—not the banks and other financial institutions that Plaintiffs allege are buyers in the market for B2B credit scores. *See* DPPC ¶ 46; IPPC ¶ 51.

Still, the Complaints focus on Fair Isaac allegedly "exploit[ing] this provision . . . by not only raising prices, but also introducing entirely new and non-negotiated contract terms, royalty categories, and definitions." DPPC ¶ 117; IPPC ¶ 137. Specifically, the Complaints allege that

33

Fair Isaac imposed royalty categories that penalized the Bureaus (and lenders) if they utilized non-FICO Scores, such as VantageScore. *See* DPPC ¶¶ 118-119; IPPC ¶¶ 138-140. The problem for Plaintiffs is that even if Fair Isaac *did* impose new royalty categories on the Bureaus, it did not do so pursuant to the terms of the Dynamic Royalty Schedule provisions. The Complaints only allege that Fair Isaac is allowed to change the value of existing royalty categories, but do not allow Fair Isaac to introduce new royalty categories altogether. *See* DPPC ¶ 116 (alleging that the Dynamic Royalty Schedule provisions permit Fair Isaac "to replace its existing royalty with a new one and thereby gave Fair Isaac the ability to control the prices of FICO Scores"); IPPC ¶ 136 (same). And in any event, such allegedly anticompetitive acts by Fair Isaac of imposing new royalty categories would stem not from the at-issue agreements between Fair Isaac and the Bureaus, but rather from Fair Isaac's "unilateral[ ]" behavior. DPPC ¶ 118; *see also* IPPC ¶ 138. Such unilateral behavior is not actionable under § 1 of the Sherman Act. *Copperweld*, 467 U.S. at 768 (holding that "Section 1 of the Sherman Act . . . does not reach conduct that is wholly unilateral"). Thus, Claims Two, Three, and Four, premised on *agreements* between Fair Isaac and the Bureaus, should be dismissed. DPPC ¶¶ 189, 207, 225; IPPC ¶¶ 228, 247, 266.

### iii. Level Playing Field Provisions

Finally, the third contractual provision—which allegedly prohibits Fair Isaac from "offer[ing] any [Bureau] a more favorable price for FICO Scores than any other [Bureau]"—cannot support a claim.[13] DPPC ¶ 124; IPPC ¶ 145. This provision is an example of a "most favored nations clause," which "are standard devices by which buyers try to bargain for low prices,

---

[13] Plaintiffs do not even directly label this provision anticompetitive. *See*, *e.g.*, DPPC ¶ 108 ("The restraints imposed in the contracts consist primarily of: (a) No Equivalent Products provisions; and (b) Dynamic Royalty Schedule provisions. A third set of provisions, the Level Playing Field provisions, compensated the Credit Bureaus for their agreement not to promote VantageScore under the former provisions at the expense of B2B Purchasers."); IPPC ¶ 125 (same) (internal quotation marks omitted).

by getting the seller to agree to treat them as favorably as any of their other customers." *Blue Cross*, 65 F.3d at 1415. Courts routinely decline to label these provisions as anticompetitive. *See supra* Part I.B.ii. That is the case here—there is no allegation that plausibly suggests the most favored nation clauses in the Bureau agreements produce any form of anticompetitive effect.

Thus, Claims Two, Three, and Four should be dismissed with prejudice.

## III. The Complaints Do Not Plausibly Allege That All Defendants Conspired to Violate Section Two of the Sherman Act

To state a claim for conspiracy to monopolize in violation of Sherman Act § 2, a plaintiff must plausibly allege, *inter alia*, that a conspiracy existed and each member of that conspiracy had a specific intent to create or maintain a monopoly. *See Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 540-41 (7th Cir. 1986). Plaintiffs fail to do so here for two, independent reasons: (1) Plaintiffs have not plausibly alleged that an overarching conspiracy involving all of the Bureaus existed, and (2) Plaintiffs have not plausibly alleged that the Bureaus acted with a specific intent to advance Fair Isaac's monopoly. Claim Six must therefore be dismissed for this additional reason.

### A. Plaintiffs Do Not Plausibly Allege a Conspiracy Among All Defendants

Plaintiffs' § 2 conspiracy claim is premised on the existence of an overarching conspiracy between Fair Isaac and the Bureaus to further Fair Isaac's monopoly and "crush" VantageScore. *See* DPPC ¶¶ 101, 263; IPPC ¶¶ 118, 295. But, as shown *supra* Part I, Plaintiffs have not plausibly alleged that this overarching conspiracy existed. This failure requires the dismissal of Plaintiffs' § 2 conspiracy claim as well as their § 1 claim. *See*, *e.g.*, *Dentsply*, 602 F.3d at 257 (affirming dismissal of § 1 and § 2 conspiracy claims because plaintiff failed to plausibly allege a conspiracy); *Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954, 968 (N.D. Ill. 2007) (similar).

For purposes of their § 2 conspiracy claim, Plaintiffs assert that the Bureaus functioned as "Fair Isaac's agent in the sale of FICO Scores to Plaintiffs and members of the Class."  DPPC ¶ 263; *see* IPPC ¶ 295 (similar).[14]  If so, the § 2 conspiracy claims must be dismissed for an additional reason:  as a matter of law, a corporation and its agent cannot conspire to violate antitrust laws. *See*, *e.g.*, *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 841 (5th Cir. 2002) (affirming dismissal of § 2 conspiracy claim; no conspiracy could exist between a corporation and its agent—a hospital and its management company).[15]

### B.  Plaintiffs Do Not Plausibly Allege That the Bureaus Had a Specific Intent to Further Fair Isaac's Monopoly

To plausibly allege that the Bureaus acted with specific intent to maintain Fair Isaac's monopoly, Plaintiffs would need to come forward with factual allegations "specific enough" to support an inference that the Bureaus decided that Fair Isaac's monopoly was "in their own interest and something they affirmatively wanted to perpetuate."  *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 731-32 (D. Md. 2001), *aff'd*, 309 F.3d 193 (4th Cir. 2002).  Plaintiffs have not done so.

Plaintiffs will presumably attempt to infer specific intent from the Bureaus' individual contracts with Fair Isaac.  But, as shown *supra* Part I.A.ii, each Bureau's contract with Fair Isaac

---

[14]    In contrast, for the purposes of their § 1 claims, Plaintiffs assert that the Bureaus are either Fair Isaac's competitors or distributors, and sell FICO Scores to their own customers.  DPPC ¶¶ 171, 188, 202, 206, 220, 224, 238; IPPC ¶¶ 209, 227, 229, 246, 248, 265, 267.

[15]    *See also*, *e.g.*, *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1134-35 (3d Cir. 1995) (affirming summary judgment as no conspiracy could exist between a corporation and its agents—a shipping company, a management company that oversaw the shipping company's "day-to-day" functions, and field agents that made "hauling arrangements" with subcontractors); *Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1316, 1318 (8th Cir. 1986) (affirming summary judgment on § 1 claim; no conspiracy could exist between a corporation and its agents—a furniture manufacturer and four of its sales representatives); *D'Last Corp. v. Ugent*, 863 F. Supp. 763, 769 (N.D. Ill. 1994) (dismissing § 1 and § 2 conspiracy claims; no conspiracy could exist between defendants that were alleged to "act[] as agents and principals of each other"), *aff'd*, 51 F.3d 275 (7th Cir. 1995).

is more likely explained by its independent decision that it was in its interest to accept Fair Isaac's terms in order to be able to continue distributing Fair Isaac's FICO Scores to its customers. It is "not enough" to support an inference of specific intent "to establish [that the Bureaus], confronted with demands made upon them by [Fair Isaac] by virtue of its monopoly power, decided to accede to those demands" in order to remain competitive. *Microsoft*, 127 F. Supp. 2d at 731-32 (dismissing § 2 conspiracy claim; allegations equipment manufacturers agreed to Microsoft's "restrictive agreements" were insufficient to support a plausible inference those manufacturers "concluded that maintaining Microsoft's monopolies was a goal that they themselves desired to accomplish").[16]

## IV. Because the Complaints Do Not Plausibly Allege Any Conspiracy, the Plaintiffs' Federal Claims for Damages Are Barred by *Illinois Brick*

Because the Bureaus would be the most direct victims of the scheme alleged in the Complaints, the DP Plaintiffs' allegations against the Bureaus (which the IP Plaintiffs copied) are an obvious attempt to get around the limitations of *Illinois Brick*'s direct-purchaser rule and add more corporate defendants to this case by taking advantage of the so-called "conspiracy exception" to *Illinois Brick*. But, in *Marion Healthcare* the Seventh Circuit made clear that when an otherwise-indirect purchaser seeks to avoid *Illinois Brick* by alleging that "the [manufacturer] and the middleman had formed a conspiracy together," a court must scrutinize those allegations to ensure that they "lay out a plausible case for relief." 952 F.3d at 841. It is "[o]nly by requiring plaintiffs to plead facts plausibly suggesting conspiracy" that the court can "avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery

---

[16] *See also*, *e.g.*, *Dentsply*, 602 F.3d at 257-58 (affirming dismissal of § 2 conspiracy claim based on alleged conspiracy between artificial tooth manufacturer and its dealers; complaint failed to plausibly allege specific intent because "the only actual conduct the Plaintiffs have alleged on the part of the Dealers is that each one of them, acting on its own, signed a bilateral dealing agreement" and "[t]he only plausible inference from that conduct is that each Dealer sought to acquire, retain and/or increase its own business").

process will reveal relevant evidence" of a conspiracy. *Ass'n of Am. Physicians & Surgeons*, 15 F.4th at 835. Because, as the Bureaus have shown, *supra* Part I, these Complaints fail to plausibly allege any conspiracy involving a Bureau, all federal antitrust damages claims against the Bureaus are barred by *Illinois Brick* and must be dismissed.

## V.     The Complaints' State Law Claims Must Be Dismissed for the Same Reasons

The Complaints' allegations should be dismissed as to all of the state law claims (Claims Seven and above) for all of the same reasons, in addition to those described in Fair Isaac's motion as to individual states. Federal courts routinely dismiss state law antitrust, consumer protection, or unjust enrichment claims when those claims rely on federal antitrust claims that have been dismissed. *See*, *e.g.*, *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 847 (N.D. Ill. 2020) ("[I]f the federal antitrust claims are dismissed, the state law antitrust claims should be dismissed [for the same reasons]. . . . [I]f [Plaintiff's] federal antitrust claims are dismissed, the state law antitrust claims brought pursuant to consumer protection statutes should be dismissed, too."), *appeal filed*, No. 20-2402 (7th Cir. July 30, 2020); *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003) ("state antitrust law should be construed similarly to federal antitrust law where possible"), *aff'd*, 466 F.3d 187 (2d Cir. 2006), *abrogated on other grounds in FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).

## VI.    The Complaints Must Be Dismissed as to Individual Bureaus for Additional Independent Reasons

### A.     All Claims Should Be Dismissed as to TransUnion

TransUnion writes separately to establish that the Complaints should be dismissed as to TransUnion for two additional reasons. First, the contention that TransUnion conspired with Fair Isaac to further its monopoly and "crush" VantageScore is not plausible in light of TransUnion's

2018 antitrust claim against Fair Isaac, in which TransUnion alleged that it had been harmed by Fair Isaac's high royalty prices and attacks on VantageScore. TransUnion Counterclaims ¶¶ 7, 77.

Second, because TransUnion brought an antitrust claim against Fair Isaac in 2018, the DP Plaintiffs would lack antitrust standing to seek damages from TransUnion even if the Complaints plausibly alleged a conspiracy. The DP Plaintiffs have taken the position that they have antitrust standing to bring federal damages claims against TransUnion because they fall within the "conspiracy exception" to *Illinois Brick*'s direct-purchaser rule. Because it is presumed that where a distributor joins a manufacturer's conspiracy, the distributor (i.e., the direct purchaser) will not bring suit against the manufacturer, courts have sought to uphold "the longstanding policy of encouraging vigorous private enforcement of the antitrust laws," *Illinois Brick*, 431 U.S. at 745, by "allocat[ing] to the first non-conspirator in the distribution chain the right to collect 100% of the damages," *Paper Sys.*, 281 F.3d at 631-32. However, the Seventh Circuit has repeatedly indicated that if a distributor joins a manufacturer's conspiracy, but then "defects and sues its former comrade," the distributor would "own the right to damages." *Id.* at 632; *see Marion Healthcare*, 952 F.3d at 841 (same). In that scenario, there is no need for downstream purchasers to step into the direct purchaser's shoes to ensure the viability of private enforcement of the antitrust laws because the actual direct purchaser has fulfilled its role as a "private attorney[] general to enforce the antitrust laws." *Illinois Brick*, 431 U.S. at 746 (internal quotation marks omitted). Accordingly, even if the Complaints had plausibly alleged that TransUnion joined Fair Isaac's conspiracy (and they do not), because TransUnion sued Fair Isaac years ago, *Illinois Brick* would still bar the DP Plaintiffs from seeking damages from TransUnion.

The alternative would invite an epidemic of copycat lawsuits like this one and undermine private enforcement of the antitrust laws by those best situated to uncover wrongdoing. Anytime

a distributor brings a federal antitrust claim against a manufacturer, downstream buyers could be expected to file a class action alleging a manufacturer-distributor conspiracy and seeking overlapping damages from the distributor. The "powerful incentives" that distributors—who "deal directly with the manufacturers [and] are apt to know the most about the industry's behavior and thus are in the best position to detect cartels"—currently have to expose a manufacturer's wrongdoing would be shattered. *Paper Sys.*, 281 F.3d at 633. This case illustrates the danger. The DP Plaintiffs admit they learned of these alleged violations only because of TransUnion's 2018 antitrust claim and "could not have discovered the scheme" had that claim not been filed. DPPC ¶ 160.[17] If the DP Plaintiffs' claims against TransUnion are allowed to proceed, potential plaintiffs in TransUnion's position will be substantially less likely to file antitrust claims in the future, thereby undermining robust enforcement of the antitrust laws.

During earlier briefing, the DP Plaintiffs' counsel suggested that the DP Plaintiffs might still be able to seek damages from TransUnion for years before 2018. *See* Consensus Pls. Opp. to *Alternative Finance* Pls.' Mot. for Consolidation at 5, No. 20-cv-02114 (filed Nov. 5, 2020), Dkt. No. 73. That is incorrect. *Illinois Brick*'s direct-purchaser rule is an antitrust standing doctrine and, like all antitrust standing doctrines, its purpose is to determine "whether the plaintiff is [the] proper party to bring a private antitrust action." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983). If a plaintiff lacks antitrust standing, he is not the proper party to bring a private antitrust action and his claims must be dismissed. *See*, *e.g.*, *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 914-16 (7th Cir. 2020).[18]

---

[17] The DP Plaintiffs expressly purport to rely on TransUnion's Counterclaims in at least 19 paragraphs of their complaint. *See* DPPC ¶¶ 68, 106-107, 116-121, 123-124, 128-130, 134-135, 138.

[18] *See also*, *e.g.*, *Somers v. Apple, Inc.*, 729 F.3d 953, 961-62 (9th Cir. 2013) (affirming dismissal of federal antitrust claim for damages where plaintiff lacked antitrust standing); *Simon v. KeySpan Corp.*, 694

The two cases the DP Plaintiffs' counsel cited are inapposite; neither involved a federal antitrust claim or discussed antitrust standing. *Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042, 1066 (N.D. Ill. 2019), addressed a tort claim, brought under Illinois common law, for conspiracy to defame a website-making business and interfere with its prospective business advantage. *United States v. Read*, 658 F.2d 1225, 1229 & n.1 (7th Cir. 1981), was a criminal case involving a "massive manipulation" of a company's finances by top executives; a jury had found several defendants guilty of committing securities and bank fraud, and conspiring to do the same. All claims should therefore be dismissed with respect to TransUnion.

### B. All Claims Should Be Dismissed as to Experian

Experian writes separately because the claims must be dismissed as to Experian, even if they were not to be dismissed with respect to Fair Isaac or any other Bureau, for two reasons.

First, while Experian did not take the step of suing Fair Isaac, as did TransUnion, as detailed above, there is no question that Experian was a direct purchaser from Fair Isaac, that Experian was therefore a direct victim of Fair Isaac's alleged anticompetitive conduct, and thus that Experian had the right to sue. That Experian has not sued does not operate as an exception to the *Illinois Brick* rule. *See In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 728 (D. Md. 2001) ("Of course it is well established that the fact that direct purchasers may choose not to institute antitrust actions of their own does not establish an exception to the *Illinois Brick* rule.") (citing *Ill. Brick*, 431 U.S. at 746 ("We recognize that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers."); *In re Beef Industry Antitrust Litig.*, 600 F.2d 1148, 1156 n.8 (5th Cir. 1979) (noting that *Illinois Brick*

---

F.3d 196, 201 (2d Cir. 2012) (same); *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 79 (3d Cir. 2011) (same); *Kloth v. Microsoft Corp.*, 444 F.3d 312, 323 (4th Cir. 2006) (same).

emphasizes the "difficulty of proof," as opposed to the "deterrence" rationale); *Tech. Learning Collective, Inc. v. Daimler-Benz Aktiengesellschaft*, 1980 WL 1943, at *10 (D. Md. Aug. 28, 1980) ("Whether future suits by dealers are either speculative or unlikely is immaterial; *Illinois Brick* holds that the possibility of such suits is sufficient.")).

Second, Experian was the first Bureau to enter into an agreement that Plaintiffs consider suspect. *See* DPPC ¶ 105 (Experian entered its agreement in May 2013, Equifax in October 2013, and TransUnion in February 2015). Plaintiffs thus cannot plausibly allege that Experian knew that the other Bureaus would enter similar terms with Fair Isaac—only that if Experian did not agree to the terms that Fair Isaac demanded, then it would no longer be able to compete with the other Bureaus by selling credit reports with FICO Scores. *See* DPPC ¶ 2 (Fair Isaac the "800-pound gorilla") in the market. Nor was it in any sense obvious to Experian at the time that the other Bureaus would reach the same agreement. For example, while Equifax had settled Fair Isaac's antitrust and trademark claims by entering what Plaintiffs call a "lucrative partnership" with Fair Isaac, Experian and TransUnion had continued to litigate with Fair Isaac.[19] *See* DPPC ¶ 9. And of course TransUnion has a particularly contentious relationship with Fair Isaac, which culminated in contract and antitrust litigation. *See* DPPC ¶¶ 96-97.

Experian therefore had two choices, with no way to know what Equifax or TransUnion might later do if they were to be confronted with the same impossible choice: Agree, or stop doing business with Fair Isaac. Experian should not be subject to antitrust claims based on its decision to continue competing, and rank speculation that its independent contractual decision was

---

[19] Plaintiffs incorrectly claim that Experian settled, but this appears to be a typo as *Equifax* settled, while Experian litigated the matter successfully. *Fair Isaac*, 645 F. Supp. 2d at 756 (describing the Equifax settlement's impact on Fair Isaac's claims for injunctive relief; Experian still named as defendant).

somehow connected to other bilateral contracts executed months and years later is insufficient to make out a claim that Experian conspired with the other Bureaus or with Fair Isaac.

This is particularly the case with respect to the MFN provision the Complaints challenged—i.e., the "level playing field." It reflected common business sense for Experian to insist on such "MFN-type" protection if it were to agree to Fair Isaac's demand. *See Twombly*, 550 U.S. at 565-66 ("a plausible suggestion of conspiracy" requires viewing the alleged behavior "in light of common economic experience"); *Washington Cty. Health Care Auth., Inc. v. Baxter Int'l Inc*., 2020 WL 1666454, at *7 (N.D. Ill. Apr. 3, 2020) (citing *In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300 (3d Cir. 2010) ("*Twombly* makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if 'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior.")). All claims should therefore be dismissed with respect to Experian.

### C. All Claims Should Be Dismissed as to Equifax

The above arguments hold equally true for Equifax—there are no plausible allegations of a "hub-and-spokes" conspiracy involving Equifax. Not a single allegation was made that Equifax ever communicated, held meetings, or struck an agreement with the other Bureaus when it was unilaterally negotiating its licensing with Fair Isaac. And the timing of when Equifax entered into its agreement with Fair Isaac—in October 2013, approximately six months after Experian and more than a year before TransUnion—makes clear that Equifax negotiated and contracted with Fair Isaac independently, separately, and months apart from the other Bureaus. *See* DPPC ¶ 105; *Musical Instruments*, 798 F.3d at 1196 (affirming dismissal of Sherman Act § 1 claims and holding that "Allegations of such slow adoption of similar policies does not raise the specter of collusion").

Nor is it material that Equifax agreed to similar licensing terms as the other Bureaus.  Fair Isaac, as the owner of its intellectual property involving FICO Scores, would be expected to license its products on similar terms to different licensees.  As discussed above, the Bureaus would have little choice when negotiating these provisions with Fair Isaac.  When "the same important" trading partner uses its "considerable market power to demand similar terms from [multiple entities at the same level of distribution] for its own benefit," those entities' "similar response to this market pressure is a hallmark of independent parallel conduct—not collusion." *Musical Instruments*, 798 F.3d at 1196.  There is no plausible allegation of collusion here.  Equifax should be dismissed with prejudice.

## CONCLUSION

The Complaints should be dismissed as to the Credit Bureaus for the foregoing reasons.

Dated:  January 18, 2022

Respectfully submitted,

*/s/ Leslie V. Pope*
Leslie Pope (*pro hac vice*)
John Thorne, #6181458
KELLOGG, HANSEN, TODD, FIGEL
& FREDERICK, P.L.L.C.
1615 M Street NW
Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
jthorne@kellogghansen.com
lpope@kellogghansen.com

*/s/ Carolyn P. Gurland*
Carolyn Pelling Gurland, #6274399
WHITE & CASE LLP
111 South Wacker Drive
Suite 5100
Chicago, IL 60606
Tel: (312) 881-5400
carolyn.gurland@whitecase.com

Robert A. Milne (*pro hac vice*)
Martin M. Toto (*pro hac vice*)
Jack E. Pace III (*pro hac vice*)
Bryan D. Gant (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020-1095
Tel: (212) 819 8200
rmilne@whitecase.com
mtoto@whitecase.com
jpace@whitecase.com
bgant@whitecase.com

44

J. David Duffy, #6242374
THOMPSON COBURN LLP
55 East Monroe Street, 37th Floor
Chicago, Illinois 60603
Tel: (312) 346-7500
dduffy@thompsoncoburn.com

*Counsel for Defendant TransUnion, LLC*

*Counsel for Defendant Experian Information
Solutions, Inc.*

*/s/ James F. Herbison*
James F. Herbison, #6275116
Michael P. Mayer, #6272677
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Tel: (312) 558-5600
jherbiso@winston.com
mmayer@winston.com

*Counsel for Defendant Equifax Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 18, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record in this action.

*/s/ Leslie Pope*