# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| *In re FICO Antitrust Litigation* | Case No. 20-cv-02114 |
| *This document relates to:* | Honorable Edmond E. Chang |
| ALL ACTIONS | Magistrate Judge David E. Weisman |

## FAIR ISAAC CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' AND INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED COMPLAINTS

Dated: January 18, 2022

Britt M. Miller
Matthew D. Provance
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
(312) 701-7711—Facsimile
bmiller@mayerbrown.com
mprovance@mayerbrown.com
jglickstein@mayerbrown.com

*Counsel for Defendant*
*Fair Isaac Corporation*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

I.     The Alleged Credit Score Markets. ....................................................... 3

II.    Purportedly Anticompetitive Activity.................................................... 6

        A.     The *Equifax* litigation. ............................................................ 7

        B.     License agreements........................................................................ 8

        C.     Advertising. ................................................................................... 9

ARGUMENT ...................................................................................................... 9

I.     Plaintiffs Fail To Plead A Plausible Monopolization Claim. ............... 10

        A.     Plaintiffs do not plausibly allege that FICO possesses monopoly power. ........... 10

        B.     Plaintiffs do not plead anticompetitive conduct................................. 13

                1.     The *Equifax* litigation was not anticompetitive. ..................... 13

                        a.     The *Equifax* litigation is well outside the statute of limitations. ................................................. 13

                        b.     The *Equifax* litigation cannot be the basis for liability. ............... 15

                2.     The license agreements are not anticompetitive. ..................... 16

                          a.     The No Equivalent Products provision. ........................ 17

                          b.     The Dynamic Royalty Schedule. .................................. 20

                          c.     The Level Playing Field provision............................... 21

                  3.     The alleged disparagement is not anticompetitive................. 23

II.    Plaintiffs' Other Federal Claims Also Fail. ....................................... 25

        A.     Plaintiffs do not plead a horizontal Section 1 claim. ......................... 26

                 1.     The alleged conspiracy is irrational. ...................................... 26

                 2.     Plaintiffs do not plead a "rim" to the conspiracy. ................... 27

        B.     Plaintiffs do not plead a vertical Section 1 claim. ............................. 30

                 1.     The *per se* standard does not apply........................................ 30

                 2.     Plaintiffs fail to state a claim under the rule of reason. ........... 31

III.   Plaintiffs Do Not Plead Anticompetitive Effects.............................. 34

IV.   Plaintiffs' Federal Damages Claims Are Barred By *Illinois Brick*..... 36

        A.     The "Direct Purchaser" Complaint involves only indirect purchasers. .............. 36

B.      No "conspiracy exception" to *Illinois Brick* applies.............................................. 39

V.      Plaintiffs' State Law Claims Also Should Be Dismissed. ................................................. 39

A.      The state law claims fail for the same reasons as the federal claims. .................. 39

B.      Plaintiffs' state law claims fail for additional reasons. ........................................ 40

CONCLUSION.................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aggrenox Antitrust Litig.*,
   2016 WL 4204478 (D. Conn. Aug. 9, 2016) .........................................................................44

*Al George, Inc. v. Envirotech Corp.*,
   939 F.2d 1271 (5th Cir. 1991) ...........................................................................................14

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
   486 U.S. 492 (1988).............................................................................................................25

*Always Towing & Recovery, Inc. v. City of Milwaukee*,
   2 F.4th 695 (7th Cir. 2021) .................................................................................................30

*Am. Dental Ass'n v. Delta Dental Plans Ass'n*,
   126 F.3d 977 (7th Cir. 1997) ..............................................................................................19

*Apple Inc. v. Pepper*,
   139 S. Ct. 1514 (2019)........................................................................................................38

*Arnett Physician Grp., PC v. Greater LaFayette Health Servs., Inc.*,
   382 F. Supp. 2d 1092 (N.D. Ind. July 29, 2005)................................................................23

*Asa Accugrade, Inc. v. Am. Numismatic Ass'n*,
   370 F.Supp.2d 213 (D.D.C.2005) .......................................................................................23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................................9

*Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*,
   275 F. Supp. 3d 957 (W.D. Wis. 2017) ..............................................................................40

*AT&T Corp. v. JMC Telecom, LLC*,
   470 F.3d 525 (3d Cir. 2006).................................................................................................31

*Atl. Coast Airlines Holdings, Inc. v. Mesa Air Grp., Inc.*,
   295 F. Supp. 2d 75 (D.D.C. 2003) ......................................................................................39

*In re Auto. Parts Antitrust Litig.*,
   2014 WL 3687035 (E.D. Mich. July 23, 2014) ..................................................................42

*Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins.*,
   784 F.2d 1325 (7th Cir. 1986) ......................................................................................10, 17

i

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................9

*Bennett v. Visa U.S.A. Inc.*,
198 S.W.3d 747 (Tenn. Ct. App. 2006) ..........................................42

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
483 F. Supp. 3d 38 (D. Mass. 2020) ............................................34

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995)...............................................22, 29

*Broad. Music, Inc. v. CBS*,
441 U.S. 1 (1979).................................................................30

*Brooks v. Ross*,
578 F.3d 574 (7th Cir. 2009) ....................................................13

*Brown v. Visa U.S.A., Inc.*,
674 F. Supp. 249 (N.D. Ill. 1987) ..............................................33

*Brownmark Films, LLC v. Comedy Partners*,
682 F.3d 687 (7th Cir. 2012) .....................................................3

*Ill. ex rel. Burris v. Panhandle E. Pipe Line Co.*,
935 F.2d 1469 (7th Cir. 1991) ...................................................42

*Byre v. City of Chamberlain*,
362 N.W.2d 69 (S.D. 1985).......................................................40

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)..............................................................15

*Cal. v. Infineon Techs. AG*,
531 F. Supp. 2d 1124 (N.D. Cal. 2007) ..........................................41

*Car Carriers, Inc. v. Ford Motor Co.*,
745 F.2d 1101 (7th Cir. 1984) ...................................................26

*CBC Companies, Inc. v. Equifax, Inc.*,
561 F.3d 569 (6th Cir. 2009) ...............................................21, 35

*Chi. Pro. Sports Ltd. P'ship v. NBA*,
961 F.2d 667 (7th Cir. 1992) ....................................................32

*City of Pittsburgh v. W. Penn. Power Co.*,
147 F.3d 256 (3d Cir. 1998)......................................................35

*Crain v. Debartolo*,
    2015 WL 73961 (E.D.N.C. Jan. 6, 2015) ............................................................40

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) ....................................................44

*Dalton v. Camp*,
    548 S.E.2d 704 (N.C. 2001)..............................................................................43

*Davric Me. Corp. v. Rancourt*,
    216 F.3d 143 (1st Cir. 2000)..............................................................................40

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    360 F. Supp. 3d 788 (N.D. Ill. 2019) ...............................................................33

*Denan v. Trans Union LLC*,
    959 F.3d 290 (7th Cir. 2020) ...............................................................................6

*Deslandes v. McDonald's USA, LLC*,
    2021 WL 3187668 (N.D. Ill. July 28, 2021)................................................30, 31

*In re Dicamba Herbicides Litig.*,
    2019 WL 1160817 (E.D. Mo. Mar. 13, 2019) ..................................................38

*Dichello Distribs., Inc. v. Anheuser-Busch, LLC*,
    2021 WL 4170681 (D. Conn. Sept. 14, 2021) ..................................................39

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) .............................................................................34

*In re Digital Music Antitrust Litig.*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011)...............................................................44

*Duke Energy Int'l, L.L.C. v. Napoli*,
    748 F. Supp. 2d 656 (S.D. Tex. 2010) ..............................................................41

*In re Dynamic Random Access Memory (DRAM I) Antitrust Litig.*,
    516 F. Supp. 2d 1072 (N.D. Cal. 2007) ......................................................41, 42

*E-One, Inc. v. Oshkosh Truck Corp.*,
    2006 WL 3320441 (N.D. Ill. Nov. 13, 2006) ...................................................33

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
    129 F.3d 240 (2d Cir. 1997) ..............................................................................31

*ERI Max Ent., Inc. v. Streisand*,
    690 A.2d 1351 (R.I. 1997) .................................................................................40

*Evans v. State*,
963 P.2d 177 (Utah 1998) ................................................................................. 40

*Feitelson v. Google Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) ............................................................. 36

*FICO v. Equifax Inc.*,
2008 WL 623120 (D. Minn. Mar. 4, 2008) ....................................... 7, 13, 14, 16

*FICO v. Experian Info. Sols., Inc.*,
645 F. Supp. 2d 734 (D. Minn. 2009) ............................................................... 16

*FICO v. Experian Info. Sols., Inc.*,
650 F.3d 1139 (8th Cir. 2011) ....................................................................... 7, 15

*FICO v. Experian Info. Sols., Inc.*,
711 F. Supp. 2d 991 (D. Minn. 2010) ............................................................... 15

*FICO v. Trans Union LLC*,
No. 1:17-cv-8318 (N.D. Ill. Feb. 12, 2018) ..................................................... 38

*Freeman Indus., LLC v. Eastman Chem. Co.*,
172 S.W. 3d 512 (Tenn. 2005) .......................................................................... 41

*Freeman v. MAM USA Corp.*,
528 F. Supp. 3d 849 (N.D. Ill. 2021) ............................................................... 45

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ............................................................................ 36

*Futurevision Cable Sys., Inc. v. Multivision Cable TV Corp.*,
789 F. Supp. 760 (S.D. Miss. 1992) ................................................................. 40

*G.O.A.T. Climb & Cryo, LLC v. Twin City Fire Ins. Co.*,
2021 WL 2853370 (N.D. Ill. July 8, 2021) ....................................................... 3

*Generac Corp. v. Caterpillar Inc.*,
172 F.3d 971 (7th Cir. 1999) ....................................................................... 31, 32

*Genetic Sys. Corp. v. Abbott Labs.*,
691 F. Supp. 407 (D.D.C. 1988) ....................................................................... 27

*GlobalTap LLC v. Smart Tap LLC*,
2015 WL 791256 (N.D. Ill. Feb. 24, 2015) ...................................................... 16

*Goldwasser v. Ameritech Corp.*,
222 F. 3d 390 (7th Cir. 2000) ..................................................................... 10, 21

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ......................................42, 43

*In re Humira (Adalimumab) Antitrust Litig*
  465 F. Supp. 3d 811, 847 (N.D. Ill. 2020) ..................................40, 42

*Great Escape, Inc. v. Union City Body Co., Inc.*,
  791 F.2d 532 (7th Cir. 1986) .............................................................27

*Gutnayer v. Cendant Corp.*,
  116 Fed. App'x 758 (7th Cir. 2004) ................................................39

*H-Quotient, Inc. v. Knight Trading Grp., Inc.*,
  2005 WL 323750 (S.D.N.Y. Feb. 9, 2005)......................................41

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)...........................................................................14

*Havoco of Am., Ltd. v. Shell Oil Co.*,
  626 F.2d 549 (7th Cir. 1980) .............................................................34

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010)..............................................................30

*IDX Sys. Corp. v. Epic Sys. Corp.*,
  285 F.3d 581 (7th Cir. 2002) .......................................................17, 32

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977).................................................................. *passim*

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
  864 F.2d 1409 (7th Cir. 1989) ...............................................11, 12, 34

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)..............................................................29

*Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*,
  812 F.2d 786 (2d Cir. 1987)..............................................................11

*In re Intel Corp. Microprocessor Antitrust Litig.*,
  496 F. Supp. 2d 404 (D. Del. 2007)..................................................44

*Intel Corp. v. Fortress Inv. Grp. LLC*,
  511 F. Supp. 3d 1006 (N.D. Cal. 2021) ............................................35

*Ireland v. Microsoft Corp.*,
  2001 WL 1868946 (Mo. Cir. Ct. Jan. 24, 2001)..............................43

*Kaiser Found. v. Abbott Labs.*,
  2009 WL 3877513 (C.D. Cal. Oct. 8, 2009).............................................14

*Kessel v. Monongalia Cnty. Gen. Hosp. Co.*,
  648 S.E.2d 366 (W. Va. 2007).............................................................40

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019)................................................28

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
  910 F.3d 927 (7th Cir. 2018) .............................................................28

*Kloth v. Microsoft Corp.*,
  444 F.3d 312 (4th Cir. 2006) .............................................................38

*Lenhoff Enters., Inc. v. United Talent Agency, Inc.*,
  729 F. App'x 528 (9th Cir 2018) ........................................................39

*Leopoldo Fontanillas, Inc. v. Luis Ayala Colon Sucesores, Inc.*,
  283 F. Supp. 2d 579 (D.P.R. 2003).....................................................27

*Lifeline Ltd. No. II v. Conn. Gen. Life Ins. Co.*,
  821 F. Supp. 1201 (E.D. Mich. 1993).................................................27

*In re Lipitor Antitrust Litig.*,
  336 F. Supp. 3d 395 (D.N.J. 2018) .....................................................42

*Liston v. King.com*,
  254 F. Supp. 3d 989 (N.D. Ill. 2017) ..................................................45

*Litovich v. Bank of Am. Corp.*,
  2021 WL 4952034 (S.D.N.Y. Oct. 25, 2021) ......................................14

*Little Caesar Enters., Inc. v. Smith*,
  895 F. Supp. 884 (E.D. Mich. 1995)...................................................40

*In re Loestrin 24 FE Antitrust Litig.*,
  410 F. Supp. 3d 352 (D.R.I. 2019).......................................................44

*Marion Diagnostic Ctr., LLC v. Becton, Dickinson & Co.*,
  2021 WL 961728 (S.D. Ill. Mar. 15, 2021) .........................................30

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
  952 F.3d 832 (7th Cir. 2020) ................................................... *passim*

*Marucci Sports, LLC. v. NCAA*,
  751 F.3d 368 (5th Cir. 2014) .............................................................34

*Mayor and City Council of Baltimore v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)..................................................................29

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011) ...................................................17, 23, 24

*Meridian Project Sys. Inc. v. Hardin Constr. Co.*,
404 F. Supp. 2d 1214 (E.D. Cal. 2005)..................................................41

*In re Microsoft Corp. Antitrust Litig.*,
2003 WL 22070561 (D. Md. Aug. 22, 2003) .........................................41

*Microsoft Corp. v. Computer Support Servs. of Carolina, Inc.*,
123 F. Supp. 2d 945 (W.D.N.C. 2000) ...................................................33

*Minuteman, LLC v. Microsoft Corp.*,
795 A.2d 833 (N.H. 2002) .....................................................................40

*Moore v. Boating Indus. Ass'ns*,
819 F.2d 693 (7th Cir. 1987) .................................................................28

*Mueller Co. v. U.S. Pipe & Foundry Co.*,
2003 WL 22272135 (D.N.H. Oct. 2, 2003) ...........................................41

*Mueller v. Wellmark, Inc.*,
861 N.W.2d 563 (Iowa 2015) ................................................................39

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ..........................................................28, 29

*N. Jackson Pharmacy, Inc. v. Caremark RX, Inc.*,
385 F. Supp. 2d 740 (N.D. Ill. 2005) .....................................................31

*In re Namenda Indirect Purchaser Antitrust Litig.*,
338 F.R.D. 527 (S.D.N.Y. 2021) ...........................................................40

*Nat'l Flood Servs., Inc. v. Torrent Techs., Inc.*,
2006 WL 1518886 (W.D. Wash. May 26, 2006)....................................17

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
350 F. Supp. 2d 160 (D. Me. 2004) ...................................................42, 44

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) .............................................................17

*O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*,
36 F.3d 565 (7th Cir. 1994) ...................................................................34

*Ocean State Phys. Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*,
  883 F.2d 1101 (1st Cir. 1989) ........................................................10, 22

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  572 U.S. 545 (2014) ..................................................................15

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ...............................................................30

*Olstad v. Microsoft Corp.*,
  700 N.W.2d 139 (Wis. 2005) ..........................................................41

*In re Opana ER Antitrust Litig.*,
  162 F. Supp. 3d 704 (N.D. Ill. 2016) ................................................42

*Or. Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*,
  185 F.3d 957 (9th Cir. 1999) ........................................................40

*Oxbow Carbon & Minerals LLC v. Union Pac. R. Co.*,
  926 F. Supp. 2d 36 (D.D.C. 2013) ....................................................12

*P & M Servs., Inc. v. Gubb*,
  2008 WL 4185903 (E.D. Mich. Sept. 8, 2008) .........................................14

*Pac. Bell Tel. Commc'ns v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009) ..................................................................16

*In re Packaged Ice Antitrust Litig.*,
  779 F. Supp. 2d 642 (E.D. Mich. 2011) ............................................42, 44

*State ex rel. Palumbo v. Graley's Body Shop, Inc.*,
  425 S.E.2d 177 (W. Va. 1992) ........................................................41

*PepsiCo. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) .........................................................29

*In re Plavix Indirect Purchaser Antitrust Litig.*,
  2011 WL 335034 (S.D. Ohio Jan. 31, 2011) ...........................................40

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
  776 F.2d 185 (7th Cir. 1985) ........................................................31

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
  988 F. Supp. 2d 696 (E.D. La. 2013) .................................................28

*ProCD, Inc. v. Zeidenberg*,
  86 F.3d 1447 (7th Cir. 1996) ........................................................17

*Prof'l Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ................................................................................15

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
    615 F.3d 412 (5th Cir. 2010) ..............................................................29

*Racher v. Westlake Nursing Home Ltd. P'ship*,
    871 F.3d 1152 (10th Cir. 2017) ...........................................................42

*Re/Max Int'l v. Realty One*,
    900 F. Supp. 132 (N.D. Ohio 1995) ....................................................23

*In re Refrigerant Compressors Antitrust Litig.*,
    2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) .....................................41

*Riggs Nat'l Bank v. D.C.*,
    581 A.2d 1229 (D.C. 1990) ..................................................................43

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ...............................................................33

*Romero v. Philip Morris Inc.*,
    242 P.3d 280 (N.M. 2010) ...................................................................40

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
    661 F. Supp. 2d 218 (E.D.N.Y. 2009), *aff'd*, 391 F. App'x 59 (2d Cir. 2010).......................27

*Sanderson v. Culligan Int'l Co.*,
    415 F.3d 620 (7th Cir. 2005) ...............................................................23

*Schachar v. Am. Acad. of Opthalmology, Inc.*,
    870 F.2d 397 (7th Cir. 1989) ...............................................................24

*Schor v. Abbot Labs.*,
    457 F.3d 608 (7th Cir. 2006) .........................................................16, 23

*Seagood Trading Corp. v. Jerrico, Inc.*,
    924 F.2d 1555 (11th Cir. 1991) ...........................................................33

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*,
    559 U.S. 393 (2010)..............................................................................42

*Shuffle Tech Int'l LLC v. Sci. Games Corp.*,
    2017 WL 3838096 (N.D. Ill. Sept. 1, 2017) ........................................15

*Siena v. Microsoft Corp.*,
    796 A.2d 461 (R.I. 2002) ......................................................................38

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ...................................................................45

*Smith-Brown v. Ulta Beauty*,
    2019 WL 932022 (N.D. Ill. Feb. 26, 2019) ............................44

*Spahr v. Leegin Creative Leather Prods., Inc.*,
    2008 WL 3914461 (E.D. Tenn. Aug. 20, 2008) ......................40

*Sperry v. Crompton Corp.*,
    863 N.E.2d 1012 (N.Y. 2007) ................................................40

*Spinelli v. Nat'l Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) ........................................25

*Spinelli v. Nat'l Football League*,
    903 F.3d 185 (2d Cir. 2018)....................................................35

*Stamatakis Industries, Inc. v. King*,
    965 F.2d 469 (7th Cir. 1992) ............................................26, 27

*State v. Alpine Air Prods, Inc.*,
    490 N.W.2d 888 (Minn. Ct. App. 1992)..................................40

*Stensto v. Sunset Mem'l Park, Inc.*,
    759 S.W.2d 261 (Mo. Ct. App. 1988)......................................40

*In re Sulfuric Acid Antitrust Litig.*,
    703 F.3d 1004 (7th Cir. 2012) ................................................31

*Sun Dun, Inc. of Wash. v. Coca-Cola Co.*,
    740 F. Supp. 381 (D. Md. 1990)........................................12, 41

*Tee Time Arrangers, Inc. v. Vistoso Gold Partners, LLC*,
    2008 WL 4149295 (Ariz. Ct. App. Feb. 28, 2008)..................39

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ...................................................................30

*Top Rank, Inc. v. Haymon*,
    2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) ........................35

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)......................................................38, 45

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) ..................................................30

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
    964 F.2d 1022 (10th Cir. 1992) ...................................................................27

*U.S. Futures Exchange, LLC v. Bd. of Trade of the City of Chi.*,
    953 F.3d 955 (7th Cir. 2020) .......................................................................15

*United States Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*,
    390 F. Supp. 3d 892 (N.D. Ill. 2019) ..........................................................23

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)......................................................................................10

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
    2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) .............................................27

*Verizon Comm'cns v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).....................................................................................13

*Vincent v. Utah Plastic Surgery Soc'y*,
    621 F. App'x 546 (10th Cir. 2015) ..............................................................34

*Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ..........................................................28

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971).....................................................................................13

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016).........................................................12

**Statutes**

15 U.S.C. § 15b.................................................................................................13

Ark. Code Ann. § 4-88-113(f)(1)(B) ...............................................................41

Fla. Stat. § 501.204 ..........................................................................................42

Haw. Rev. Stat. § 480-1 ...................................................................................43

Ill. Comp. Stat. 10/11 .......................................................................................39

Ill. Comp. Stat. § 10/7(2) .................................................................................41

Kan. Stat. § 50-163(b).......................................................................................40

Mass. Gen. Laws Ch. 93A, § 11 ......................................................................41

Mo. Rev. Stat. § 407.010 ..................................................................................43

Mont. Code § 30-14-133(1) ................................................................41

Mont. Code § 30-14-103/30-14-201 ....................................................43

N.C. Gen. Stat. § 75-1 ........................................................................41

N.H. Rev. Stat. Ann. § 356.14 ............................................................40

N.R.S. 598A.050 .................................................................................40

Neb. Rev. Stat. § 59-829 .....................................................................40

Nev. Rev. Stat. Ann. § 598A.060(1) ...................................................41

ORS § 646.638 ...................................................................................43

R.I. Gen. Laws § 6–36–2(b) ...............................................................40

R.I. Gen. Laws § 6-13.1-5.2 ...............................................................43

S.C. Code Ann. § 39-5-140(a) ............................................................41

S.D. Codified Laws § 37–24–6 ...........................................................42

Utah Code Ann. § 76-10-3118 ............................................................40

Vt. Stat. Ann. tit. 9, § 2453(b) ...........................................................40

W. Va. Code § 47-18-16 ......................................................................40

**Other Authorities**

Alistair Gray, FINANCIAL TIMES, *Credit score row as FICO chief hits out at banks over 'Fako' rivals*, Dec. 5, 2017, https://www.ft.com/content/2222880c-cfa5-11e7-9dbb-291a884dd8c6 ...........................................11, 24

Consumer Fin. Protection Bureau, *Key Dimensions and Processes in the U.S. Credit Reporting System: A Review of How The Nation's Largest Credit Bureaus Manage Consumer Data* (Dec. 2012)..........................................6

Consumer Financial Protection Bureau, *The Impact of Differences Between Consumer- and Creditor-Purchased Credit Scores* (2011) ..............21. 24

Fed. Housing Fin. Agency, *Credit Score Request for Input* 11 (Dec. 20, 2017), https://www.fhfa.gov/Media/PublicAffairs/PublicAffairsDocuments/CreditScore_RFI-2017.pdf; ...........................................................................6

Fed. Housing Finance Agency, *Validation and Approval of Credit Score Models*, 83 Fed. Reg. 65575 (Dec. 21, 2018) ...................................................8

Fed. Housing Fin. Agency, *Validation and Approval of Credit Score Models Final Rule*, 84 Fed. Reg. 41886 (Aug. 16, 2019) ............................................................................6

Jose Karlo & Mari Tottoc, *Headwaters Capital: 'Fair Isaac Corp (FICO) Can Grow Its Free Cash Flow by 15-20% Annually'*, YAHOO! FINANCE (Jan. 23, 2021), https://finance.yahoo.com/news/headwaters-capital-fair-isaac-corp-202237954.html ...........................................................................................................35

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* (2017).............................................................32

VantageScore Solutions, *VantageScore Solutions Announces Score Use Grows to More than 12 Billion* (Oct. 29, 2019), https://vantagescore.com/press/vantagescore-solutions-announces-score-use-grows-to-more-than-12-billion .......................19

VantageScore Solutions, *Market Adoption*, https://vantagescore.com/lenders/why-vantagescore/market-adoption-who-uses-vs ......................................................................5

VantageScore Solutions, *The Dynamic Relationship Between a Credit Score and Risk* 3-5 (May 2020), https://vantagescore.com/pdfs/Credit-Scores-and-Risk-Relationship-WP-FINAL_2020-10-29-021228.pdf...............................................18

VantageScore Solutions, *FDIC New Definition of High Risk Consumer Loan Securities* (July 2013), https://vantagescore.com/pdfs/VantageScore_New_Definition_of_High_Risk_whitepaper-05-2015.pdf ....................................18

VantageScore Solutions, *10 Years, 10 Milestones* (Mar. 2016), https://vantagescore.com/the-score-newsletter/10-years-10-milestones-1 .........................8, 19

VantageScore Solutions, *VantageScore® Credit Scores and The Mortgage Market*, https://vantagescore.com/pdfs/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf (2018)......................................................................11, 19, 24

# INTRODUCTION

This litigation consolidates 10 substantially identical complaints filed by plaintiffs' attorneys in early 2020. Relying on recycled allegations and empty labels, Plaintiffs assert that Fair Isaac Corporation ("FICO") masterminded a sweeping conspiracy to protect its supposed "monopoly" in the "business-to-business" market for credit scores. These claims are not plausible, even taking the complaints' selective and misleading allegations as true.

FICO develops and licenses credit scoring algorithms that help businesses make rapid, accurate decisions about extensions of credit. FICO cannot produce credit scores on its own. Its algorithms must be combined with consumer credit data controlled by three major credit bureaus—Equifax, Experian, and TransUnion (the "Credit Bureaus"). Accordingly, FICO licenses its scoring models to the Credit Bureaus, who in turn sell FICO Scores and other products and services to end-users. Such licensing arrangements are quintessentially procompetitive.

Plaintiffs principally challenge certain alleged terms of FICO's license agreements with the Credit Bureaus, which Plaintiffs have never seen. The crux of Plaintiffs' argument is that the license agreements, while not purporting to do so on their face, have "excluded" competing credit scoring algorithms from the market and thereby allowed FICO to raise prices. But Plaintiffs do not allege that they even wished to use competing scores, let alone that they or any other purchaser sought to obtain a competing score from the Credit Bureaus and were refused. Moreover, the purported target of these practices—the Credit Bureaus' competing credit scoring venture, VantageScore—has reported tremendous year-over-year growth throughout the period in which Plaintiffs allege it was effectively excluded from the market.

Unsurprisingly, Plaintiffs' attempt to construct viable antitrust claims from these allegations does not withstand scrutiny.

**First**, the allegation that FICO is liable for monopolization of the alleged "B2B" credit score market cannot get off the ground. Plaintiffs fail to allege that FICO has monopoly power in that market, or that FICO maintained its so-called "monopoly" through anticompetitive means.

**Second**, Plaintiffs fail to plausibly allege an agreement between FICO and the Credit Bureaus that unreasonably restrains competition. Plaintiffs' first theory—that the Credit Bureaus conspired among themselves to destroy their *own* joint venture that competes with FICO—is inherently implausible and contrary to Seventh Circuit law. Their second theory—that the Credit Bureaus' *individual* distribution agreements with FICO are each unlawful *per se* or under the rule of reason—also fails. The provisions Plaintiffs challenge are part and parcel of a procompetitive vertical arrangement to facilitate the production and distribution of FICO Scores. Moreover, despite asserting that these terms have effectively "excluded" competitors by precluding the Credit Bureaus from distributing competing credit scores, Plaintiffs do not allege any facts showing the exclusion of any competitor from the market.

**Third**, all of Plaintiffs' claims fail because Plaintiffs do not allege that FICO's conduct had anticompetitive effects. Plaintiffs rely on conclusory allegations about reduced "choice" or "supracompetitive prices" but do not allege facts showing that the prices *they* pay for credit scores have gone up—much less that FICO caused any such increase.

**Finally**, even if Plaintiffs could state a federal antitrust claim—they cannot—they could not recover damages because they are indirect purchasers under *Illinois Brick*. And Plaintiffs' state law claims merely restate their failed federal theories and are insufficient for independent reasons. In short, Plaintiffs' claims fail as a matter of law and should be dismissed.

# BACKGROUND[1]

## I. The Alleged Credit Score Markets.

Plaintiffs are banks, credit unions, financial services companies, property management companies and automobile dealers that use credit scores to assist them in making individual credit decisions. Their complaints focus on the alleged "business to business" ("B2B") credit score market, defined as "the market for the sale of [credit] scores to banks, mortgage companies, credit unions, and other businesses that assess individual credit risk." Plaintiffs allege that the B2B market is distinct from the alleged "business to consumer" ("B2C") credit score market, defined as "the market for the sale of [credit] scores to the individual who is the subject of them."[2]

A "credit score" refers to the output of a model used to predict the likelihood that a given consumer will become delinquent on a credit obligation. Each credit score is accompanied by "reason codes," model-specific alphanumeric codes and descriptions corresponding to the primary factors that impact a given individual's credit score.[3] The generation and delivery of a credit score involves at least three steps: collecting credit data, applying an algorithm (or "scoring model"), and distributing the score to end-users.

***Step 1: Data***. Plaintiffs allege that the three nationwide Credit Bureaus—sometimes known as "credit reporting agencies" or "CRAs"— control "virtually 100%" of the aggregated credit data

---

[1]     This section draws on allegations in the complaints, documents cited in the complaints and incorporated by reference, and documents subject to judicial notice. FICO assumes the truth of Plaintiffs' allegations only for purposes of this motion. *See G.O.A.T. Climb & Cryo, LLC v. Twin City Fire Ins. Co.*, 2021 WL 2853370, at *1 (N.D. Ill. July 8, 2021); *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment").

[2]     Direct Purchaser Plaintiffs' Consolidated Class Action Complaint, Dkt. 121 ("DPP") ¶ 1; Indirect Purchaser Plaintiffs' Amended Class Action Complaint, Dkt. 122 ("IPP") ¶ 1.

[3]     DPP ¶ 36; IPP ¶ 37.

needed to generate credit scores.[4] As Plaintiffs allege, "replicating the databases of the leading credit bureaus would be incredibly difficult," and control over this key input gives each of the Credit Bureaus "substantial market power."[5]

***Step 2: Scoring Model(s)***. Many different companies offer credit scoring algorithms, including FICO, VantageScore Solutions, LLC ("VantageScore"), SageStream, LexisNexis, CoreLogic Credco, PRBC, ChexSystems, L2C, and ScoreLogix LLC.[6] FICO offers different types of "FICO Scores" for specific purposes, such as auto and credit card lending. FICO's best-known score ranges from 300 to 850, with higher numbers indicating lower credit risk.[7]

FICO licenses its scoring models to the Credit Bureaus, and the Credit Bureaus generate scores and distribute them to end-users. The Credit Bureaus pay FICO royalties for using FICO's scoring models, which vary based on volume and use case—*e.g.*, approving a mortgage or loan application, making a "pre-qualified" credit solicitation, or disclosing a credit score to the end-user's customers as part of a credit monitoring program.[8]

In 2006, the three Credit Bureaus created a joint venture, VantageScore, that competes with FICO by developing and promoting alternative credit scoring models. VantageScore differentiates its credit scores from FICO's in a number of ways. For example, VantageScore claims that its credit scores are consistent across the three Credit Bureaus and that it uses more granular data to develop its models.[9] VantageScore's most recent models are VantageScore 3.0 and 4.0, which debuted in 2013 and 2017, respectively. Like FICO, VantageScore licenses its scoring models to

---

[4]      DPP ¶ 3; IPP ¶ 3.
[5]      DPP ¶¶ 59-60, 202, 220, 236; IPP ¶¶ 71-72, 229, 248, 267.
[6]      IPP ¶¶ 86-87.
[7]      DPP ¶ 89; IPP ¶ 74.
[8]      DPP ¶ 42; IPP ¶ 46.
[9]      DPP ¶ 104; IPP ¶ 121.

each of the Credit Bureaus.[10] VantageScore regularly publishes reports touting its market penetration. A recent market adoption report available on VantageScore's public website claims that "the VantageScore models accounted for approximately 12.3 billion of the credit scores used in the period between July 2018 – June 2019," with "[m]ore than 2,500 unique users of VantageScore credit scores, including 2,200 financial institutions."[11]

***Step 3: Distribution***. Once generated, credit scores are distributed to end-users. Sometimes, the score is distributed as a standalone product. Other times, the score is included with other credit information known as a "credit report." Plaintiffs allege that the Credit Bureaus dominate both distribution channels. FICO is "often dependent" on the Credit Bureaus, which "sell lenders, financial institutions, and other businesses credit reports and credit scores—including Fair Isaac's FICO Scores—in every state."[12] Plaintiffs also allege that the Credit Bureaus control "virtually all" of the credit report market.[13]

In limited cases, FICO allegedly sold scores "directly" to business end-users, although for such sales the Credit Bureau generated the credit score (and, if applicable, credit report) and provided it to FICO for delivery.[14] Plaintiffs do not allege any facts about these sales, including what proportion of FICO Scores or credit reports are "FICO-Direct" sales. This reflects the fact that, as discussed below, no Plaintiff purchases FICO Scores from FICO. Instead, Plaintiffs purchase from and make payment to the Credit Bureaus. *See* pp. 36-39 *infra*.

The Credit Bureaus' control over distribution of credit scores also includes control over price. As noted above, the Credit Bureaus pay FICO a royalty for using FICO's scoring models to

---

[10]     DPP ¶¶ 6, 71-73, 138; IPP ¶¶ 10, 87-89, 158.
[11]     VantageScore, *Market Adoption*, https://vantagescore.com/lenders/why-vantagescore/market-adoption-who-uses-vs (all websites last visited January 18, 2022).
[12]     DPP ¶¶ 3-5, 41; IPP ¶¶ 5-7, 45.
[13]     DPP ¶¶ 56-57, 59; IPP ¶¶ 68-69, 71.
[14]     DPP ¶ 44; IPP ¶ 48.

generate a FICO Score. But Plaintiffs do not—and cannot—allege that FICO sets the prices that end-users pay for FICO Scores. It is well-understood in the industry that "[t]he CRAs . . . own, price, and distribute consumer credit data and credit scores."[15] As the Federal Housing Finance Agency ("FHFA") has explained, "it is the CRAs, not FICO and VantageScore, that sell and negotiate the price of these scores to lenders and other end-users"; "[e]ach CRA sets the price of the FICO score when it is sold as either a standalone score or bundled with a credit report."[16]

The Credit Bureaus thus are alleged to have substantial, and often dominant, control over the sale and distribution of credit scores in the United States.

## II.     Purportedly Anticompetitive Activity.

Plaintiffs filed a series of overlapping complaints in this District in April and May 2020. FICO promptly moved to centralize all of the complaints pursuant to Local Rule 40.4(b). After the Court granted FICO's motion, Dkt. 49, a leadership dispute arose between Plaintiffs' counsel over the proper characterization of certain Plaintiffs under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). In particular, Plaintiffs' counsel disagreed over the status of the "Credit Bureau Purchasers"—businesses that allegedly "bought credit scores from FICO through agreements with FICO *and* the credit bureaus." Dkt. 83 at 7 (emphasis added).

The Court resolved the dispute by appointing Scott+Scott as interim lead counsel for the businesses who purportedly purchased credit scores directly from FICO (the "FICO-Direct Purchasers") *and* the Credit Bureau Purchasers. *Id*. at 18. Although the Court grouped the Credit

[15]     Fed. Housing Fin. Agency, *Validation and Approval of Credit Score Models Final Rule*, 84 Fed. Reg. 41886, 41891 (Aug. 16, 2019) (cited at DPP n.99 and IPP n.84).
[16]     Fed. Housing Fin. Agency, *Credit Score Request for Input* 11 (Dec. 20, 2017), https://www.fhfa.gov/Media/PublicAffairs/PublicAffairsDocuments/CreditScore_RFI-2017.pdf; *see also* Consumer Fin. Protection Bureau, *Key Dimensions and Processes in the U.S. Credit Reporting System: A Review of How The Nation's Largest Credit Bureaus Manage Consumer Data* 10 (Dec. 2012) ("The lender will pay the bureau a fee for the credit report information and an additional amount for the score."); *Denan v. Trans Union LLC*, 959 F.3d 290, 294 n.3 (7th Cir. 2020) (taking judicial notice of a CFPB report).

Bureau Purchasers with the FICO-Direct Purchasers for purposes of consolidation, the Court did not decide whether the FICO-Direct Purchasers or Credit Bureau Purchasers were direct or indirect purchasers under *Illinois Brick*. *See id.* at 12. Following the Court's Order, Plaintiffs filed separate consolidated amended complaints on behalf of putative classes of all purported "direct" and "indirect" U.S. purchasers of FICO scores from October 1, 2006 to the present. Dkt. 121; Dkt. 122.

The two consolidated complaints are nearly identical. Both rest on allegations that FICO leveled a "comprehensive attack" against VantageScore to exclude it from the market and enable FICO to charge "supracompetitive" prices for FICO Scores.[17] This supposed "attack" had three facets, which are discussed in turn below.

### A.     The *Equifax* litigation.

In 2006, FICO sued the Credit Bureaus and VantageScore for copyright infringement, false advertising, and antitrust violations. *FICO v. Equifax et al.*, No. 06-cv-4112 (D. Minn.). Following a trial, the district court entered judgment in defendants' favor, and the Eighth Circuit affirmed. *FICO v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011). Plaintiffs assert that the *Equifax* litigation "inhibited" VantageScore's growth during its "first few years."[18] The only support Plaintiffs offer for this statement is a 2016 VantageScore release, which states that the matter was "put to rest" when the Eighth Circuit affirmed the trial court's decision. That same release highlights numerous developments that enhanced VantageScore's competitive position since 2006, including 2012 changes to the Federal Deposit Insurance Corporation's rules for assessing default risk that "enable[d] FDIC-insured large banks to use any valid credit scoring model they choose," and possible changes to credit scoring rules in the conforming mortgage market. The release also makes clear that to the extent VantageScore was "inhibited" in its first few years, it

---

[17]     DPP ¶ 87; IPP ¶ 102.
[18]     DPP ¶¶ 89, 95; IPP ¶¶ 104, 110.

showed no ill-effect a decade later. "[M]ore than 6 billion VantageScore credit scores were used from July 2014 to June 2015 by more than 2000 lenders and other market participants," representing "an increase in usage of more than 100 percent over the previous 12-month period."[19]

## B. License agreements.

FICO separately negotiated new license agreements with each of the Credit Bureaus between 2013 and 2015: May 2013 (Experian), November 2013 (Equifax), and February 2015 (TransUnion).[20] Plaintiffs have never seen any of these agreements and rely on allegations in a counterclaim TransUnion filed against FICO during since-settled litigation over TransUnion's royalty payments.[21] Based on these second- and third-hand allegations, Plaintiffs assert that certain terms in FICO's license agreements with the Credit Bureaus "preserve[d] Fair Isaac's monopoly while compensating the Credit Bureaus for the marginalization of VantageScore[]."[22]

The claim that FICO's license agreements have inhibited competition rests on mischaracterization and conjecture. While Plaintiffs contend that those agreements have "exclude[d] VantageScore from competing for customers in the B2B credit score market,"[23] Plaintiffs do not allege any facts about VantageScore's market share or ability to compete after the agreements were signed. Nor can they reconcile their allegations with the fact that all three Credit Bureaus still market and distribute VantageScore, which competes against FICO to this day.[24]

---

[19]    VantageScore Solutions, *10 Years, 10 Milestones* (Mar. 2016) ("*Milestones*"), https://vantagescore.com/the-score-newsletter/10-years-10-milestones-1 (cited in DPP n.56 & IPP n. 50). S*ee also* DPP ¶ 104; IPP ¶ 121.

[20]    DPP ¶¶ 96-97, 105-06; IPP ¶¶ 122-23.

[21]    As Plaintiffs note, the Department of Justice initiated a civil investigation into TransUnion's allegations, but closed the investigation without action in December 2020. DPP ¶ 100; IPP ¶ 115.

[22]    DPP ¶ 105; IPP ¶ 122.

[23]    DPP ¶ 12; IPP ¶¶ 202, 220, 258, 276.

[24]    *See, e.g.*, Experian, *VantageScore Lenders*, https://www.experian.com/consumer-information/vantagescore-lenders; Equifax, *VantageScore*, https://www.equifax.com/business/product/vantagescore. TransUnion, *VantageScore 3.0*, https://www.transunion.com/product/vantagescore; *see also* Fed. Housing Finance Agency, *Validation and Approval of Credit Score Models*, 83 Fed. Reg. 65575, 65576 n.7 (Dec.

C. **Advertising.**

Plaintiffs' final challenge is based on allegedly "disparaging" statements FICO made about VantageScore after 2016. This includes statements that VantageScores are not FICO Scores and studies concluding that a FICO research score for traditionally "unscoreable" consumers with sparse or old credit data was not strongly predictive. It also includes statements FICO allegedly made in 2018 and 2019 concerning FHFA rulemaking activities. Plaintiffs claim that FICO's purported "campaign" led to "fear, uncertainty, and doubt about VantageScore in the marketplace."[25] But Plaintiffs do not offer any factual allegations to substantiate this assertion. To the contrary, Plaintiffs allege that the FHFA ultimately "adopted a final rule that permitted rival generators of credit scores to apply to serve Fannie Mae and Freddie Mac" in 2019.[26]

## ARGUMENT

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In making this assessment, a court ignores conclusory statements and focuses on well-pled factual allegations. *Id*. The plausibility requirement is particularly important in antitrust cases given the enormous costs of discovery. "It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process." *Twombly*, 550 U.S. at 559. Rather, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id*. at 558 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983)).

---

21, 2018) ("[c]urrently" the three "nationwide CRAs" sell consumer credit data, "including credit scores that are produced by algorithms developed by other companies (*e.g.*, FICO or VantageScore LLC)").

[25]    DPP ¶¶ 131-39, 143; IPP ¶¶ 154-61.
[26]    DPP ¶ 139; IPP ¶ 159.

# I. Plaintiffs Fail To Plead A Plausible Monopolization Claim.

Plaintiffs' Claim 5 alleges that FICO has unlawfully monopolized the "B2B" credit score market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, through a "decades-long campaign" to "crush" its competitor, VantageScore.[27] Like so much of the complaints, that FICO purportedly wished to "crush" VantageScore is mere rhetoric. "Intent to harm rivals" is "not a useful standard" in antitrust law." *Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins.*, 784 F.2d 1325, 1338-39 (7th Cir. 1986). "Vigorous competitors intend to harm rivals, to do all the business if they can. To penalize this intent is to penalize competition." *Id.*; *see also Ocean State Phys. Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1113 (1st Cir. 1989) ("desire to crush a competitor" is "insufficient to make out a violation of the antitrust laws").

Once Plaintiffs' rhetoric is set aside, the monopolization claim crumbles. To state a claim for monopolization, Plaintiffs must allege both (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power through anticompetitive means. *Goldwasser v. Ameritech Corp.*, 222 F. 3d 390, 396-97 (7th Cir. 2000). As shown below, however, Plaintiffs fail to allege facts supporting either of these elements.

## A. Plaintiffs do not plausibly allege that FICO possesses monopoly power.

Monopoly power is "the power to control prices or exclude competition" in a market. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Here, Plaintiffs claim that the relevant market is "the market for the sale of B2B credit scores" and that FICO has a monopoly because it "has had and continues to have at least a 90% market share."[28] For at least three reasons, Plaintiffs' allegations are insufficient to establish that FICO has monopoly power.

---

[27]    DPP ¶ 8-13, 101; IPP ¶¶ 12-16, 118.
[28]    DPP ¶¶ 241-43; IPP ¶¶ 272-74.

***First***, Plaintiffs' allegations of a 90% "market share" are unsupported. Plaintiffs rely on estimates that "FICO Scores are used for 90% of all lending decisions in the United States" and more than 10 billion FICO Scores are sold each year.[29] But a source cited in Plaintiffs' complaints states that "[t]here is no reliable source of market share information between model developers because the total number of credit scores used is not ascertainable."[30] Additionally, that same source recognizes that lenders "use a variety of custom [*i.e.*, proprietary] and third-party credit scores to make decisions."[31] As a result, the allegation that FICO Scores are used in 90% of lending decisions does not mean that other credit scores, like VantageScore, have only 10% of the market.

***Second***, even if the complaints' allegations plausibly supported a 90% market share for FICO Scores, that still would not suggest that FICO has a monopoly. "[W]hile market share may indicate market power in certain cases, the two are not necessarily the same." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989); *see also Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir. 1987) ("market share analysis, while essential, is not necessarily determinative in the calculation of monopoly power"). Market share indicates market power only when it "reflect[s] an ability to curtail total market output" or raise price. *Indiana Grocery*, 864 F.2d at 1414. But Plaintiffs have not plausibly alleged that FICO has the power to control output or raise prices in the "B2B" market for credit scores.

At most, Plaintiffs have alleged that FICO has market power in the market for scoring algorithms, but that is insufficient to state a claim for monopolization of the alleged B2B credit

---

[29]    DPP ¶¶ 2, 63-64; IPP ¶¶ 2, 77-78.

[30]    VantageScore Solutions, *VantageScore® Credit Scores and The Mortgage Market* 9 (2018), https://vantagescore.com/pdfs/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf (cited at DPP n.50 & IPP n. 46) ("*Mortgage Market*"); *see also* Alistair Gray, FINANCIAL TIMES, *Credit score row as FICO chief hits out at banks over 'Fako' rivals*, Dec. 5, 2017, https://www.ft.com/content/2222880c-cfa5-11e7-9dbb-291a884dd8c6 ("Lenders often use several different measures in their decisions.") (cited at DPP n. 86).

[31]    VantageScore, *Mortgage Market*, *supra* n. 30, at 7.

score market, in which Plaintiffs are purchasers. FICO does not set the price for FICO Scores distributed to lenders and other "B2B" end-users. FICO sets the royalty the Credit Bureaus pay to license its algorithms, while the Credit Bureaus control the distribution and price of credit scores. *See supra* pp. 5-6; *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 380 (S.D.N.Y. 2016) (dismissing monopolization claim because the defendant's "alleged domination of certain aspects of the physical zinc market is irrelevant to a claim that it . . . monopolize[d] the market for LME zinc warehousing services").

The allegation that there are barriers to entry also cannot plausibly establish FICO's monopoly power in the alleged B2B credit score market.[32] Because Plaintiffs allege that the Credit Bureaus control the data and distribution channels necessary to deliver a credit score, *see supra* p. 5, any supposed barriers to entry by other model providers do not plausibly mean that FICO controls the price or output of credit scores. Without the power to "control a given market's total output" or price, "it matters little that high barriers to entry might exist to help that firm maintain monopoly power it could never achieve." *Indiana Grocery*, 864 F.2d at 1415.

**Third**, Plaintiffs' own allegations show that FICO does not have monopoly power. Plaintiffs allege that the Credit Bureaus' control over consumer credit data and channels of distribution gives each Credit Bureau "substantial market power."[33] Yet as courts have recognized, "[t]he very phrase 'shared monopoly' is paradoxical." *Oxbow Carbon & Minerals LLC v. Union Pac. R. Co.*, 926 F. Supp. 2d 36, 46 (D.D.C. 2013); *see also Sun Dun, Inc. of Wash. v. Coca-Cola Co.*, 740 F. Supp. 381, 391 (D. Md. 1990) ("monopoly" refers to "the complete domination of a market by a *single* economic entity"). To allege that FICO is a "monopolist" while also alleging that the three Credit Bureaus possess "substantial market power" is not plausible.

---

[32]     DPP ¶¶ 44, 52-53; IPP ¶¶ 62-63.
[33]     DPP ¶¶ 202, 220, 238; IPP ¶¶ 229, 248, 267.

### B.    Plaintiffs do not plead anticompetitive conduct.

Even assuming Plaintiffs have plausibly alleged monopoly power, they still fail to state a monopolization claim. "[T]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Verizon Comm'cns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Yet none of the conduct Plaintiffs identify is plausibly anticompetitive.

#### 1.    The *Equifax* litigation was not anticompetitive.

Plaintiffs' first attempt to show that FICO engaged in anticompetitive conduct challenges the 2006 *Equifax* litigation in Minnesota. As explained below, the Court does not need to consider those allegations because a claim based on decades-old litigation is clearly time-barred. Nevertheless, even if the Court finds the claim potentially timely, it fails as a matter of law.

##### a.    The *Equifax* litigation is well outside the statute of limitations.

Antitrust claims are subject to a four-year statute of limitations, which starts to run "when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); 15 U.S.C. § 15b. The only way Plaintiffs claim the *Equifax* litigation injured them is by "inhibit[ing]" VantageScore's growth during the "first few years" of its existence.[34] But the VantageScore litigation concluded in 2011. The limitations period for a claim based on this alleged conduct thus expired long ago. *See Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (a court may dismiss claims that are time-barred on the face of the complaint).

Plaintiffs do not offer any justification for waiting until nine years after the *Equifax* litigation concluded to bring a claim that the litigation violated the antitrust laws. Plaintiffs do not plead that they were unable to discover the *Equifax* litigation prior to 2018, nor could they. And

---

[34]    DPP ¶ 95; IPP ¶ 110.

although Plaintiffs plead that they could not have discovered the supposedly anticompetitive terms in FICO's license agreements until 2018, those are entirely separate from the 2006 litigation.[35] For similar reasons, the doctrine of fraudulent concealment—which Plaintiffs cite as a basis for tolling the statute of limitations on their license agreement-based claims—cannot possibly apply, because FICO did not "conceal" its public litigation conduct.[36]

Plaintiffs' assertion that the *Equifax* litigation was part of a "continuing antitrust violation" also fails as a matter of law.[37] The continuing violation doctrine applies only where a plaintiff challenges "not just one incident of [unlawful] conduct . . . but an unlawful practice that continues into the limitations period." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982). Plaintiffs do not—and cannot—allege that the *Equifax* litigation, which ended in 2011, was a "practice" continuing into the limitations period. *See Al George, Inc. v. Envirotech Corp.,* 939 F.2d 1271, 1275 (5th Cir. 1991) (a claim for anticompetitive litigation accrues when the suit is filed and does not continue thereafter); *P & M Servs., Inc. v. Gubb*, 2008 WL 4185903, at *6 (E.D. Mich. Sept. 8, 2008) (similar). Nor do Plaintiffs allege that the *effects* of the litigation continued into the limitations period—and even if they did, the claim would still be untimely. *See Kaiser Found. v. Abbott Labs.*, 2009 WL 3877513, at *7 (C.D. Cal. Oct. 8, 2009) ("merely charging a monopoly price" following allegedly anticompetitive litigation does not toll the statute of limitations).

---

[35]     Plaintiffs plead that the agreements were "*another* approach"—*i.e.*, an alternative pursued after the 2006 litigation ended. DPP ¶ 101; IPP ¶ 118 (emphasis added).

[36]     DPP ¶¶ 160-67; IPP ¶ 186. The only alleged hindrance to discovery of this claim that Plaintiffs identify during the class period are statements in FICO's Code of Business Conduct and Ethics, which do not toll the limitations period as a matter of law. *Litovich v. Bank of Am. Corp.*, 2021 WL 4952034, at *28 (S.D.N.Y. Oct. 25, 2021).

[37]     DPP ¶ 95; IPP ¶¶ 190-92.

### b.    The *Equifax* litigation cannot be the basis for liability.

In addition to being untimely, the attempt to characterize FICO's 2006 lawsuit as anticompetitive does not state a claim. Under the *Noerr-Pennington* doctrine, companies generally have immunity under the antitrust laws when they seek redress against other companies in court. *Prof'l Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993) ("*PRE*"); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). In light of the important First Amendment interests in protecting access to courts, a plaintiff may maintain an antitrust claim based on supposedly anticompetitive litigation only where the plaintiff alleges that the lawsuit was both (1) objectively baseless *and* (2) brought for an impermissible subjective purpose—in other words, that the lawsuit was a "sham." *U.S. Futures Exchange, LLC v. Bd. of Trade of the City of Chi.*, 953 F.3d 955, 963 (7th Cir. 2020).

Plaintiffs do not and cannot allege that the *Experian* litigation was a sham. In denying Experian and VantageScore's motion for attorney's fees in the 2006 litigation, the *Experian* court specifically concluded that FICO's infringement claims were not "groundless" or "unreasonable." *FICO v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1011 (D. Minn. 2010). Because a lawsuit is objectively baseless only if "no reasonable litigant could realistically expect to secure favorable relief," *PRE*, 508 U.S. at 62, the district court's refusal to award fees disposes of any claim based on the "sham litigation" exception. *See Shuffle Tech Int'l LLC v. Sci. Games Corp.*, 2017 WL 3838096, at *6 (N.D. Ill. Sept. 1, 2017). Indeed, the fee-shifting standard is *less* onerous than the sham-litigation standard, because "[t]he threat of antitrust liability . . . far more significantly chills the exercise of the right to petition than does the mere shifting of attorney's fees." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014).

Nor do Plaintiffs make any effort to demonstrate objective baselessness, simply asserting that FICO's antitrust claims were "bogus."[38] *Cf. GlobalTap LLC v. Smart Tap LLC*, 2015 WL 791256, at *7 (N.D. Ill. Feb. 24, 2015) (a "bare assertion" that a lawsuit was "baseless" is not sufficient). However, the *Equifax* court found it plausible that the Credit Bureaus had a "dangerous probability" of monopolization due to their alleged control over aggregated credit data:

> Defendants['] combined dominance in the aggregated credit data market and control of the sales of bundles of aggregated credit data and credit scores could create a dangerous probability that Defendants can install VantageScore as a monopoly in the credit scoring market if they agree to take anticompetitive measures such as manipulating the prices of credit scores and denying Fair Isaac access to aggregated credit data.

*FICO v. Equifax Inc.*, 2008 WL 623120, at *8 (D. Minn. Mar. 4, 2008). In later granting the non-settling Credit Bureaus' summary judgment motion, the court merely found that FICO could not show "that there *continues to be* a sufficiently impending threat [of monopolization] to warrant a finding that Fair Isaac has standing to seek injunctive relief"—in part because FICO had settled its claims with Equifax, ensuring continued access to credit data and distribution channels. *FICO v. Experian Info. Sols., Inc.*, 645 F. Supp. 2d 734, 754-56 (D. Minn. 2009) (emphasis added).

## 2. The license agreements are not anticompetitive.

Plaintiffs' second attempt to show anticompetitive conduct rests on alleged provisions in FICO's license agreements. Plaintiffs do not claim that these provisions reflect any "normal exclusionary practices," such as price-fixing or tying. *Schor v. Abbot Labs.*, 457 F.3d 608, 610 (7th Cir. 2006). Instead, Plaintiffs allege that these terms are indirectly exclusionary, because they purportedly restrict the Credit Bureaus from developing or distributing competing scores.

These arguments fail because a firm has "no duty to deal under terms and conditions" that rivals "find commercially advantageous." *Pac. Bell Tel. Commc'ns v. linkLine Commc'ns, Inc.*,

---

[38]     DPP ¶ 89; IPP ¶ 104.

555 U.S. 438, 450 (2009). "Even a monopolist," the Seventh Circuit has explained, "may bargain hard." *Ball Mem'l Hosp.*, 784 F.2d at 1339. While many kinds of conduct "may prevent or discourage a potential competitor from entering a particular market," the antitrust laws "are implicated only when that conduct is predatory or unjustifiable." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011). As shown below, Plaintiffs' allegations do not come close to meeting that standard.

### a. The No Equivalent Products provision.

Plaintiffs allege that FICO's license agreements contain a "No Equivalent Products" provision prohibiting each Credit Bureau—during the period that it acts as FICO's licensed distributor—from developing or distributing another credit scoring system that (i) is intentionally "aligned" to the odds-to-score relationship of any FICO Score or (ii) copies more than 20% of the reason codes used by any FICO Score.[39] But provisions that prevent licensees from copying FICO's intellectual property are obviously procompetitive. *See ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1455 (7th Cir. 1996) ("To the extent licenses facilitate distribution of object code while concealing the source code . . . , they serve the same procompetitive functions as does the law of trade secrets."). "Nothing in the antitrust laws gives one producer a right to sponge off another's intellectual property, even when the producer of that knowledge" has substantial market share. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 585 (7th Cir. 2002); *accord Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) ("Even a monopolist generally has no duty to share . . . its intellectual or physical property with a rival."); *Nat'l Flood Servs., Inc. v. Torrent Techs., Inc.*, 2006 WL 1518886, at *10 (W.D. Wash. May 26, 2006) (dismissing monopolization

---

[39]     DPP ¶¶ 109-11; IPP ¶¶ 126-28.

counterclaim). Such concerns are especially apparent here because the Credit Bureaus both have access to FICO's most sensitive intellectual property and jointly own and distribute VantageScore.

Plaintiffs characterize the odds-to-score relationship as merely an "arbitrary assignment of a number (score) to a related risk probability" rather than "the analysis and the process used to predict a consumer's risk of default."[40] Yet Plaintiffs' own complaints cite a VantageScore whitepaper explaining that the odds-to-score relationship of a scoring model "is not absolute" and "changes over time" as economic conditions evolve.[41] Therefore, maintaining an aligned odds-to-score relationship between a FICO Score model and a competing scoring model would require either (i) reverse-engineering FICO's algorithm to replicate how it responds to changing economic conditions, or (ii) the ability to generate FICO Scores from a large consumer population over time—which the Credit Bureaus enjoy as FICO's licensed distributors—so that the FICO Score's odds-to-score relationship could be continually replicated as economic conditions change.

Plaintiffs' assertions that reason codes merely reflect generic statements of factors that determine a consumer's creditworthiness[42] are similarly incorrect. Reason codes are tailored to capture unique aspects of a scoring model and reflect creative choices about what phrasing will be most informative or palatable to consumers. Indeed, Plaintiffs allege that VantageScore markets its "simplified reason codes" as a point of competitive *differentiation* from other credit scores, such as FICO Scores.[43] That reason codes allegedly include more mundane information as well

---

[40]    IPP ¶ 132; DPP ¶ 113.

[41]    VantageScore Solutions, *FDIC New Definition of High Risk Consumer Loan Securities* 2 (July 2013), https://vantagescore.com/pdfs/VantageScore_New_Definition_of_High_Risk_whitepaper-05-2015.pdf (cited at DPP n. 69 & IPP n. 63); *see also* VantageScore Solutions, *The Dynamic Relationship Between a Credit Score and Risk* 3-5 (May 2020), https://vantagescore.com/pdfs/Credit-Scores-and-Risk-Relationship-WP-FINAL_2020-10-29-021228.pdf ("[A] credit score does not predict the absolute level of risk; it is not designed to do that. At any point in time, the score can be translated into an estimate of risk, based on the various factors impacting risk levels, but this relationship changes meaningfully over time.").

[42]    DPP ¶ 113; IPP ¶ 133.

[43]    DPP ¶¶ 36-37, 104; IPP ¶¶ 37-38, 121.

does not negate their status as intellectual property. *See Am. Dental Ass'n v. Delta Dental Plans Ass'n*, 126 F.3d 977, 978-79 (7th Cir. 1997) (taxonomy of dental procedures, classified into groups with a number and short and long descriptions, was copyrightable expression of creativity).

Nor do Plaintiffs offer any plausible assertions that the No Equivalent Products provision "effectively prevents" Credit Bureaus from offering a "legitimate choice" between FICO Scores and other credit scores.[44] No Plaintiff even alleges that it ever wished to use a credit score other than a FICO Score, much less that it was unable to do so because the odds-to-score relationship or reason codes were not the same. Plaintiffs also do not allege that any existing VantageScore is covered by the No Equivalent Products provision—nor could they. The Credit Bureaus continue to offer VantageScore credit scores in direct competition with FICO Scores.

These omissions are especially notable given VantageScore's public declarations on the subject. In 2016, VantageScore disclosed that it delivered 6 billion credit scores.[45] In 2018, VantageScore reported that its scores were "used more than 8.5 billion times by more than 2,200 lenders" during a twelve-month period.[46] And in 2019, a VantageScore press release indicated that VantageScore's market penetration had grown even more. VantageScore reported that businesses used its score 12.3 billion times (an approximately 20% annual growth rate since 2015) and that 9 of the 10 largest banks and 29 of the 100 largest credit unions used VantageScore credit scores in one or more business lines; its CEO declared that "[t]he continued surge in usage of VantageScore credit scores is a testament to an increasingly competitive marketplace for credit scores."[47] In sum,

---

[44]    DPP ¶ 112; *see also* IPP ¶ 128 (claiming that the clause "prevents the use of VantageScore or other credit scoring systems alongside . . . FICO Scores" without incurring switching costs).
[45]    VantageScore Solutions, *Milestones*, *supra* n. 19.
[46]    VantageScore Solutions, *Mortgage Market*, *supra* n. 30, at 9; *see also* DPP ¶ 83; IPP ¶ 98.
[47]    VantageScore Solutions, *VantageScore Solutions Announces Score Use Grows to More than 12 Billion* (Oct. 29, 2019), https://vantagescore.com/press/vantagescore-solutions-announces-score-use-grows-to-more-than-12-billion.

since FICO signed the last of the license agreements with the Credit Bureaus, VantageScore's output of credit scores to business users appears to have *doubled*—directly contrary to Plaintiffs' conclusory allegations that the No Equivalent Products provision has had exclusionary effects.

### b. The Dynamic Royalty Schedule.

Plaintiffs next allege that the license agreements contain a "Dynamic Royalty Schedule," which allows FICO to provide a new royalty schedule to a Credit Bureau every 12 months during the term of the contract. However, Plaintiffs complain about only one royalty category, "Pre-Qualification," allegedly introduced in 2015. This category covers FICO Scores generated to help lenders decide whether to offer consumers "pre-qualified" extensions of credit. For example, consumers may receive an online offer from a prospective lender informing them that they are pre-qualified for a credit card with a $10,000 line of credit. In some cases, the lender may also disclose a credit score to the consumer for educational purposes.

Allegedly, FICO's Pre-Qualification category charges a higher royalty rate if the lender uses a FICO Score to evaluate the consumer's creditworthiness but then displays a *non*-FICO credit score to the consumer with the solicitation.[48] Plaintiffs claim that there is "no legitimate business justification" for this approach and that the only purpose of the category "is to drive all B2B Purchasers engaging in 'Pre-Qualification' to purchase exclusively FICO Scores."[49] But FICO's legitimate interest is obvious. A consumer who receives a non-FICO credit score may conclude (incorrectly) that the score disclosed to him or her was also used as the basis for the pre-qualification decision. The Consumer Financial Protection Bureau has long recognized that this is a significant problem within the industry, as consumers may be easily confused about whether a

---

[48]     DPP ¶¶ 118-119; IPP ¶¶ 139-40. These paragraphs state that FICO "charges the lender" the higher rate for the FICO Score. That is incorrect. As the complaints acknowledge, the higher rate is contained in the royalty schedule that sets charges paid by the Credit Bureaus. DPP ¶ 116; IPP ¶ 136.

[49]     DPP ¶ 122; IPP ¶ 143.

credit score they obtain is the same score used to make lending decisions.[50] Further, nothing in FICO's license agreements allegedly limits the distribution or use of a non-FICO score for both the pre-qualification and consumer disclosure. In that circumstance, the Credit Bureaus pay no royalty to FICO at all.

FICO has every right to discourage practices that may cause confusion in the marketplace, and to receive fair compensation for contributing to another credit score's brand equity (as would follow from disclosing a non-FICO credit score to a consumer along with a pre-qualified credit offer generated using a FICO Score). Monopolists "are just as entitled as other firms to choose efficient methods of doing business." *Goldwasser*, 222 F.3d at 397-98. Plaintiffs may believe that the Credit Bureaus should have negotiated different contract terms for this royalty category. But that is irrelevant to a Section 2 claim, since "antitrust law is not a negotiating tool" for "better contract terms," even "where a business carries a significant portion of the market share." *CBC Companies, Inc. v. Equifax, Inc.*, 561 F.3d 569, 571-73 (6th Cir. 2009).

### c. The Level Playing Field provision.

Lastly, Plaintiffs point to the "Level Playing Field" provisions, which allegedly provide that no Credit Bureau shall pay a royalty that is higher than the price paid by another Credit Bureau. Importantly, Plaintiffs do not claim that these provisions were themselves used to acquire or maintain supposed monopoly power. Rather, they portray the provisions as a concession *to the Credit Bureaus* in exchange for agreement to the No Equivalent Products provision and Dynamic Royalty Schedule discussed above.[51]

---

[50]    Consumer Financial Protection Bureau, *The Impact of Differences Between Consumer- and Creditor-Purchased Credit Scores* 1-2 (2011) (cited at DPP n.17 & IPP n.16) ("[c]onsumers obtaining educational scores may be confused about the usefulness of the score being sold if sellers of scores do not make it clear to consumers . . . that it is not the score the lender is likely to use").

[51]    DPP ¶¶ 102, 109, 116, 124-127; IPP ¶¶ 147-153.

Indeed, Plaintiffs cannot plausibly allege that the Level Playing Field provisions were anticompetitive. Plaintiffs analogize the provisions to most-favored nation clauses, which are "standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995). "[T]hat is the sort of conduct that the antitrust laws seek to encourage." *Id*. As the First Circuit has explained, "a policy of insisting on a supplier's lowest price—assuming that the price is not 'predatory' or below the supplier's incremental cost—tends to further competition on the merits and, as a matter of law, is not exclusionary." *Ocean State*, 883 F.2d at 1110.

At best, Plaintiffs allege that it is theoretically *possible* that a clause guaranteeing low prices might have anticompetitive effects, by preventing a supplier from offering lower prices to a hypothetical new entrant, weakening incentives for purchasers to negotiate, or making it harder for downstream purchasers to negotiate their own discounts.[52] But these effects are entirely speculative. Plaintiffs do not allege that there *were* any new entrants during this period, much less that the Level Playing Field provision actually inhibited entry. Nor do Plaintiffs allege any facts about the Credit Bureaus' negotiations with FICO, or about credit score purchasers' negotiations with the Credit Bureaus, before or after the agreements. Even with the Level Playing Field provision, moreover, each Credit Bureau continues to have the incentive to negotiate for lower royalty rates. A lower royalty rate always benefits a Credit Bureau directly, even if other Credit Bureaus might also benefit from paying a lower price.[53]

---

[52] DPP ¶¶ 125-126; IPP ¶¶ 146-47.
[53] Plaintiffs' argument that the provision weakens FICO's incentive to permit discounts is also contradicted by their own theory, which is that the Credit Bureaus *sought out* that provision during negotiations. *See* DPP ¶ 124; IPP ¶ 145.

Plaintiffs cannot obtain discovery just because "it is impossible to say that a given practice 'never' could injure consumers." *Schor*, 457 F.3d at 612. "Subjecting all low prices to litigation, and the inevitable risk of error in a search for the rare instances in which consumers could be made worse off in the long run by low prices today, would make it more risky for firms to reduce prices, and they would be less inclined to do so—to consumers' considerable detriment." *Id*. at 613.

### 3. The alleged disparagement is not anticompetitive.

Plaintiffs' final attempt to plead a monopolization claim rests on allegations that FICO engaged in an "aggressive public relations" campaign against VantageScore, which Plaintiffs claim has harmed VantageScore's standing.[54] But such a claim is contrary to the very purposes of antitrust law. *See Arnett Physician Grp., PC v. Greater LaFayette Health Servs., Inc.*, 382 F. Supp. 2d 1092, 1096 (N.D. Ind. July 29, 2005) ("Public expressions of opinion about competitors' plans cannot provide the basis for an antitrust claim and such conduct is clearly lawful.").[55]

"What producers say about each others' goods in an effort to sway consumers is competition in action. Some other law may require judicial intervention in order to increase the portion of truth in advertising; the Sherman Act does not." *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005). "[G]enuine anticompetitive effects of false and misleading statements about a competitor are minimal, at best." *Mercatus Grp.*, 641 F.3d at 852. Accordingly, the Seventh Circuit has said that courts should exercise "caution" in evaluating "isolated examples of disparagement," and "claims based on one competitor's disparagement of another should

---

[54]    DPP ¶¶ 131-40; IPP ¶¶ 154-61.

[55]    *See also, e.g.*, *United States Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 909 (N.D. Ill. 2019) (dismissing Section 2 claim); *Re/Max Int'l v. Realty One*, 900 F. Supp. 132, 159 (N.D. Ohio 1995) ("allegations of business disparagement are not the type of injuries to competition that the antitrust laws were designed to prevent"); *Asa Accuragde, Inc. v. Am. Numismatic Ass'n*, 370 F.Supp.2d 213, 215 (D.D.C.2005) (similar).

presumptively be ignored." *Id.* (internal quotations omitted).

Plaintiffs provide no reason to depart from these principles. For example, Plaintiffs principally object to statements by FICO and others that VantageScores are not FICO Scores. These statements are accurate and appropriate given the likelihood of confusion over the existence of different credit scores and distinctions between them.[56] Likewise, Plaintiffs cite FICO blog posts about FICO's minimum scoring criteria, which report on research concerning the minimum amount of credit data needed to generate a reliable FICO Score. These statements do not mention VantageScore and thus do not support claims that FICO campaigned to disparage its competitor.[57]

Regardless, if a defendant's public statements are allegedly "false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech—the marketplace of ideas." *Schachar v. Am. Acad. of Opthalmology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989). The complaints themselves acknowledge the robust debate in the marketplace. For instance, the article Plaintiffs cite as the basis for their disparagement claim quotes statements by VantageScore and TransUnion that "[t]housands of lenders use VantageScore credit scores in their businesses," and that VantageScore was "used by more than 2,400 lenders" and "yields the most consistent results."[58]

Elsewhere, Plaintiffs rely on blog posts and reports from 2018 and 2019 touting supposed advantages of VantageScore and noting that "many of the most sophisticated secondary market participants use the VantageScore model to help evaluate and monitor risk."[59] And to the extent

---

[56] DPP ¶ 132-33; IPP ¶ 160. *See supra* pp. 20-21 & n.50; *see also* Consumer Financial Protection Bureau, *The Impact of Differences Between Consumer- and Creditor-Purchased Credit Scores* 15 (2011) (cited at DPP n.17 & IPP n.16) (discussing potential for harm to consumers when "[a] consumer, unaware of the variety of credit scores available in the marketplace, may purchase a score believing it to be his or her 'true' (or only) credit score, when in fact there is no such single score.").
[57] DPP ¶ 137; IPP ¶ 157.
[58] Gray, *Credit score row*, *supra* n. 30 (cited at DPP n.86).
[59] DPP ¶¶ 74-84; VantageScore Solutions, *Mortgage Market*, *supra* n. 30, at 8.

VantageScore believes that it is possible to accurately score additional consumers using its own models, VantageScore is free to (and does) make that argument to the market.[60]

Lastly, Plaintiffs attack alleged statements by FICO in connection with the FHFA's consideration of rule changes to permit the use of non-FICO credit scores in connection with mortgage loans underwritten by Fannie Mae and Freddie Mac. Plaintiffs complain that Fair Isaac "fought hard" against changes to these rules, including by stating that FICO was "not owned by the credit bureaus;" that FICO believed its score was superior to other scores; and that FICO is not a "monopolist."[61] These allegations do not plausibly show that FICO "disparaged" VantageScore either. "A publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499-500 (1988). That is true "even when the campaign employs unethical and deceptive methods" (*id.*)—and Plaintiffs here allege nothing of the sort. Plaintiffs even admit that the FHFA decided to allow VantageScore to submit its models for validation and potential approval.[62] FICO's statements regarding the rulemaking cannot possibly have harmed competition if the agency ultimately decided to consider the use of competing credit scores.

## II. Plaintiffs' Other Federal Claims Also Fail.

In addition to their failed monopolization claim, Plaintiffs try to portray FICO's license agreements with the Credit Bureaus as one or more "conspiracies" to restrain competition. Claim 1 alleges a conspiracy by all Defendants in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[63] Claim 6 alleges a Section 2 conspiracy to monopolize by all Defendants. Finally, Claims 2

---

[60]     DPP ¶¶ 74, 137; IPP ¶¶ 90, 157.
[61]     DPP ¶¶ 134-35, 139; IPP ¶¶ 159-60.
[62]     DPP ¶ 139; IPP ¶ 159.
[63]     Claims 1 through 4 also invoke Section 3 of the Sherman Act, which applies Section 1's rule to DC and the territories, and thus is analyzed "in the same manner as Section 1 claims." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 106 n.10 (S.D.N.Y. 2015).

through 4 allege Section 1 violations by FICO and each of the Credit Bureaus individually. Yet Plaintiffs' claims look no better when recast under these alternative theories.

## A.      Plaintiffs do not plead a horizontal Section 1 claim.

Claims 1 and 6 plead a conspiracy between FICO and all of the Credit Bureaus to crush VantageScore.[64] The allegation that FICO wished to "crush" VantageScore is insubstantial for the reasons already discussed. *See supra* p. 10. But in any event, it is not plausible that the *Credit Bureaus* had the intent to destroy their *own* joint venture, and if the Credit Bureaus and FICO did not share the same allegedly unlawful intent, then there can be no conspiracy as a matter of law.

### 1.      The alleged conspiracy is irrational.

To plead a conspiracy, Plaintiffs must allege that the members of the conspiracy shared "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 841 (7th Cir. 2020). There is no plausible reason why the Credit Bureaus would conspire to "cut[] their own joint venture off at the knees," especially after prevailing in litigation against FICO and when VantageScore was making strides in the market.[65] To the contrary, allegations that a defendant in effect conspired to injure itself are "inherently implausible." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984). If the Credit Bureaus had no plausible motive to participate in the alleged "conspiracy," the conspiracy falls apart as to FICO as well.

In *Car Carriers*, the plaintiffs alleged that Ford Motor Company conspired to exclude its existing car carrier and allow a different carrier to charge supracompetitive prices. The Seventh Circuit affirmed dismissal, noting that "the plaintiffs are alleging, in essence, that Ford conspired to injure itself." *Id*. Likewise, in *Stamatakis Industries, Inc. v. King*, the Seventh Circuit warned

---

[64]      DPP ¶¶ 100, 102; IPP ¶¶ 118-19.
[65]      DPP ¶¶ 102-04; IPP ¶¶ 119-21.

that "[a] theory of liability" that accuses defendants of "irrational[ly]" agreeing to injure themselves "does not get very far." 965 F.2d 469, 471-72 (7th Cir. 1992); *see also, e.g.*, *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1026-27 (10th Cir. 1992) (it is "implausible" that defendants would conspire with TNT in its efforts to maintain a monopoly in the market for the TNT channel because "achievement of the goal of the conspiracy would actually be contrary to the interests of the cable operators"). In short, a claim that "basically avers" that a defendant "was conspiring against itself by helping [a third party] monopolize a market in which [it] was a customer, not a producer," "stretches common sense to its breaking point." *Leopoldo Fontanillas, Inc. v. Luis Ayala Colon Sucesores, Inc.*, 283 F. Supp. 2d 579, 589-90 (D.P.R. 2003).[66]

The same is true of the Section 2 claim, which requires Plaintiffs to allege that the supposed conspirators shared a *specific intent* to create or maintain a monopoly. *Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 540 (7th Cir. 1986); *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *6 (N.D. Ill. Sept. 28, 2015). Plaintiffs offer no plausible reason why the Credit Bureaus would act with the specific purpose of destroying their own joint venture and giving FICO a monopoly—and without such allegations of shared intent, a conspiracy to monopolize claim fails.

### 2. Plaintiffs do not plead a "rim" to the conspiracy.

Claims 1 and 6 independently fail because Plaintiffs have not pled the requisites for a "hub-

---

[66] *See also, e.g.*, *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 241 (E.D.N.Y. 2009) ("it would be implausible to suggest that the other PWDs would conspire to create a monopoly for McKesson only, thereby driving themselves out of business"), *aff'd*, 391 F. App'x 59 (2d Cir. 2010); *Lifeline Ltd. No. II v. Conn. Gen. Life Ins. Co.*, 821 F. Supp. 1201, 1205 (E.D. Mich. 1993) (where "[t]he conspiracy that plaintiff alleges makes no economic sense," a plaintiff "must come forward with more persuasive evidence"); *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 422 (D.D.C. 1988) ("that a purchaser such as the Red Cross would conspire with a supplier such as Abbott to facilitate the supplier's monopolization of the market . . . is sufficiently implausible to limit any inference of an antitrust violation").

and-spoke" conspiracy. To plead such a conspiracy, a plaintiff must allege that (1) "there was a central coordinating party (the 'hub')," and (2) "each participant (along the 'rim') recognized that it was part of the greater arrangement, and it coordinated or otherwise carried out its duties as part of the broader group." *Marion Healthcare*, 952 F.3d at 842. In other words, a plaintiff must plausibly allege a "rim" that connects the individual "spokes." *Id.*; *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 242-43 (S.D.N.Y. 2019) (a "hub-and-spokes" conspiracy requires "both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other"). Plaintiffs offer no factual allegations that "similarly situated members of the conspiracy coordinated not only with the manufacturer" (*i.e.*, FICO) "but also with each other." *Marion Healthcare*, 952 F.3d at 842.

The complaints allege that the Credit Bureaus' "frequent business dealings" with each other and with FICO gave them "*opportunities*" to "communicate, coordinate behavior, and engage in other actions pursuant to their conspiracy."[67] But it is well-established that "having the opportunity to conspire does not necessarily imply that wrongdoing occurred." *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 938 (7th Cir. 2018). In particular, "allegations that defendants were members of the same trade organizations are unspectacular and fail to move the needle" in pleading conspiracy. *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 843 (N.D. Ill. 2018).[68]

Nor do allegations that, during negotiations over a new license agreement, FICO "represented" to TransUnion that Experian and Equifax had agreed to similar terms in prior years

---

[67]     DPP ¶ 103; IPP ¶ 120 (emphasis added).
[68]     *See also In re Musical Instruments & Equip. Antitrust Litig.,* 798 F.3d 1186, 1192 (9th Cir. 2015); *Moore v. Boating Indus. Ass'ns*, 819 F.2d 693, 712 (7th Cir. 1987); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 722 (E.D. La. 2013).

plausibly allege a "rim" to the conspiracy.[69] These allegations actually *undercut* Plaintiffs' desired inference. A conspiracy is not plausible where the complaint alleges that "defendants adopted the policies over a period of several years, not simultaneously." *Musical Instruments*, 798 F.3d at 1196; *see also Mayor and City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 139 (2d Cir. 2013) ("[I]f, for example, Merrill Lynch and Lehman were talking, the former would not have had to rely on third parties to confirm the latter's strategy.").

Finally, Plaintiffs' suggestion that the Level Playing Field provision provides the necessary impetus for agreement is also unavailing. Plaintiffs allege obvious reasons why each Credit Bureau would independently seek a "Level Playing Field" in its license agreements with FICO: the provision guaranteed that the Credit Bureau would pay the lowest royalty FICO offered to the market.[70] Each Credit Bureau had a clear motive for seeking such a provision in its own license agreement, whether or not the other Credit Bureaus agreed to license agreements with similar provisions. As noted above, these types of clauses are "standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers." *Marshfield Clinic*, 65 F.3d at 1415.

Courts frequently reject allegations of horizontal agreement where, as here, the complaint itself "provides ample independent business reasons" why the "spokes" would each reach similar agreements with a "common, important customer" even absent a horizontal agreement. *Musical*

---

[69]  DPP ¶¶ 106-07 ; IPP ¶¶ 123-24. *See PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 420 (5th Cir. 2010) ("A manufacturer's discussion of pricing policy with retailers and its subsequent decision to adjust pricing to enhance its competitive position do not create an antitrust violation or give rise to an antitrust claim."); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 330-31 (3d Cir. 2010) (no "inference of horizontal conspiracy arise[s] from the fact that each distributor knows which of its competitors have purchased the remaining portions of the manufacturer's product, as well as the specific terms of the other deals"); *PepsiCo. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (assurances that "hub" would enforce similar agreements with other "spokes" insufficient to show horizontal agreement).

[70]  DPP ¶ 126 ; IPP ¶ 147.

*Instruments*, 798 F.3d at 1195. In particular, as the Seventh Circuit held in *Marion Healthcare*, allegations that multiple distributors agreed to allegedly "anticompetitive contractual terms" do not "suffice to describe a hub-and-spokes conspiracy." 952 F.3d at 842-43; *see also Marion Diagnostic Ctr., LLC v. Becton, Dickinson & Co.*, 2021 WL 961728, at *4 (S.D. Ill. Mar. 15, 2021) (on remand, holding that "commonplace" features of a distribution relationship "do not indicate a quid pro quo for participation in an anticompetitive scheme").[71]

## B. Plaintiffs do not plead a vertical Section 1 claim.

Tacitly conceding that their allegations of a conspiracy among all Defendants are implausible, in Claims 2 to 4 Plaintiffs purport to challenge each of the three license agreements as independently unreasonable restraints on competition. Plaintiffs assert that these agreements are illegal *per se* and under the rule of reason. These claims fail on several independent grounds.

### 1. The *per se* standard does not apply.

To determine whether a contract or combination is unlawful, courts "presumptively" apply the rule of reason. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). That is particularly true for vertical agreements, like the license agreements between FICO and the Credit Bureaus as downstream suppliers of credit scores. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("nearly every" vertical restraint "should be assessed under the rule of reason").[72] *Per se* rules are appropriate only where a challenged practice "always or almost always" restricts competition and decreases output. *Broad. Music, Inc. v. CBS*, 441 U.S. 1, 19-20 (1979). None of the provisions at

---

[71]     *Accord, e.g.*, *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) ("simply because each Dealer, on its own, might have been economically motivated" to agree to a manufacturer's terms "does not give rise to a plausible inference of an agreement among the Dealers themselves"); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903-05, 908, 910 (6th Cir. 2009) (dismissing complaint where the alleged conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior").

[72]     *See also Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 705 (7th Cir. 2021); *Deslandes v. McDonald's USA, LLC*, 2021 WL 3187668, at *10 (N.D. Ill. July 28, 2021).

issue here plausibly fit that mold. In addition, the provisions are part of a broader agreement facilitating the production and distribution of FICO Scores. So-called "ancillary" restraints—those that are "part of a larger endeavor whose success they promote"—must be evaluated under the rule of reason. *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985).[73]

Ignoring this authority, Plaintiffs declare that FICO's license agreements are *per se* illegal because FICO allegedly engaged in limited direct sales of FICO Scores to end-users and in that respect is the Credit Bureaus' "horizontal competitor."[74] That is entirely immaterial. Even if a relationship between two entities has some horizontal components, where (as here) the character of the challenged agreement is predominantly vertical, the rule of reason applies. In fact, the Seventh Circuit has squarely held that where an agreement "involve[s] a transfer of intellectual property rights" to a dealer in exchange for an "agree[ment]" to restrict the dealer's operations, the agreement is "a vertical one" even if "in some ways the companies may have operated in similar lines of business." *Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 977 (7th Cir. 1999).[75]

### 2. Plaintiffs fail to state a claim under the rule of reason.

Plaintiffs cannot state a claim under the rule of reason. To do so, Plaintiffs must allege, "at a minimum," that one or more of the agreements they challenge have "an anticompetitive, welfare-reducing effect that is not overcome by any pro-competitive, welfare-enhancing consequences of the agreement." *Generac*, 172 F.3d at 977. But license agreements, which allow the holders of

---

[73]    *See also In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1010-12 (7th Cir. 2012); *Deslandes*, 2021 WL 3187668, at *6 ("Because the restraint alleged in plaintiff's complaint is ancillary to an agreement with a procompetitive effect, the restraint alleged in plaintiff's complaint cannot be deemed unlawful *per se*."); *N. Jackson Pharmacy, Inc. v. Caremark RX, Inc.*, 385 F. Supp. 2d 740, 748 (N.D. Ill. 2005) (same).

[74]    DPP ¶¶ 188, 206, 224; IPP ¶¶ 227, 246, 265.

[75]    *See also AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006) ("Vertical restraints are generally not per se violations of the Sherman Act, even where a distributor and manufacturer also compete at the distribution level."); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 243-44 (2d Cir. 1997) (same).

intellectual property to combine their know-how with complementary factors of production and distribution, are quintessentially procompetitive. Such integration "can lead to more efficient exploitation of the intellectual property," and various restrictions and limitations on such licensing often "serve procompetitive ends by allowing the licensor to exploit its property as efficiently and effectively as possible." U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* § 2.3 (2017).

Plaintiffs allege that FICO's license agreements are anticompetitive because FICO "has been able to exclude VantageScore from competing for customers in the B2B Credit Score Market."[76] But as in *Generac*, "[w]hat stands out prominently" from the challenged agreements in this case is that each "involved a transfer of intellectual property rights." 172 F.3d at 977. The Seventh Circuit dismissed the rule of reason claim in *Generac* because the agreement between the plaintiff and the defendant was "a vertical agreement in which both parties restricted their actions somewhat in the interest of more efficient promotion of the covered products and better sales." *Id*. at 978. That describes the alleged agreements between FICO and the Credit Bureaus as well.

As explained above, the No Equivalent Products provision addresses the development or distribution of models that *copy* distinctive aspects of FICO's model. "Firms that take advantage of costly efforts without paying for them . . . reduce the payoff that the firms making the investment receive" and make "investments in design and distribution of products less attractive, to the ultimate detriment of consumers." *Chi. Pro. Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 674-75 (7th Cir. 1992)*; see also IDX Sys. Corp.*, 285 F.3d at 585. In addition, by prohibiting the Credit Bureaus from developing or distributing other credit scores that copy the two most outwardly distinctive

---

[76]     DPP ¶ 12; *see also* IPP ¶¶ 220, 239, 258 (VantageScore "effectively excluded" from the market).

aspects of FICO Scores—their odds-to-score relationship and reason codes—the agreements protect against further confusion in the marketplace. *See supra* pp. 17-19, 20-21.

The Dynamic Royalty Schedule and Pre-Qualification category similarly serve the procompetitive purposes of avoiding confusion and compensating FICO for contribution to another provider's brand equity. *See supra* pp. 20-21; *Microsoft Corp. v. Computer Support Servs. of Carolina, Inc.*, 123 F. Supp. 2d 945, 951 (W.D.N.C. 2000) ("Microsoft clearly has the right to determine who can or cannot reproduce its software . . . and the right to determine the fees it will charge its own licensees."). And the alleged Level Playing Field provision is akin to standard procompetitive provisions in many contracts, whose potential anticompetitive effects are purely hypothetical. *See supra* pp. 21-23; *Brown v. Visa U.S.A., Inc.*, 674 F. Supp. 249, 252 (N.D. Ill. 1987) ("a hypothetical anticompetitive effect [is] not enough to sustain this complaint.").

Plaintiffs' failure to allege a plausible Section 1 claim is confirmed by the fact that VantageScore continues to do business to this day. To state an exclusive-dealing claim, a plaintiff must show that the exclusivity term "is likely to keep at least one significant competitor of the defendant from doing business in a relevant market." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984). "If there is no exclusion of a significant competitor, the agreement cannot possibly harm competition." *Id.* That is even more straightforward here, where FICO's license agreements with the Credit Bureaus contain no explicit exclusivity provisions and VantageScore trumpets an increasingly competitive landscape in the market. *See supra* pp. 19-20.[77]

---

[77]   *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 360 F. Supp. 3d 788, 799-800 (N.D. Ill. 2019) (dismissing claim where challenged provision had "no exclusivity"); *E-One, Inc. v. Oshkosh Truck Corp.*, 2006 WL 3320441, at *3 n.3 (N.D. Ill. Nov. 13, 2006) (dismissing exclusive dealing claim where "plaintiff is still a market participant"); *cf. Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991) (rejecting Section 1 claim where the plaintiffs "were simply inhibited from competing in one way with LJS; they were forced to offer packages different from LJS' to try to compete.")

**III.       Plaintiffs Do Not Plead Anticompetitive Effects.**

All of Plaintiffs' causes of action independently fail because Plaintiffs have not plausibly pled that FICO's conduct has caused anticompetitive effects—an element of each of their claims. *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980) ("the absence of a sufficient allegation of anticompetitive effects in a Sherman Act complaint is fatal to the existence of the cause of action"); *see also Ind. Grocery*, 864 F.2d at 1419; *Vincent v. Utah Plastic Surgery Soc'y*, 621 F. App'x 546, 548 (10th Cir. 2015); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002). Plaintiffs' allegations on this point are threadbare. "Speculation about anticompetitive effects is not enough." *Marucci Sports, LLC. v. NCAA*, 751 F.3d 368, 376 (5th Cir. 2014)

*First*, Plaintiffs allege that FICO's conduct has had anticompetitive effects by "eliminat[ing]" the Credit Bureaus' ability to sell other credit scores.[78] That is not plausible. VantageScore has long trumpeted explosive year-over-year growth, including since the last license agreement was executed in 2015. *See supra* pp. 19 & n.47 (VantageScore press release stating that "[s]ince June of 2015, VantageScore usage has grown approximately 20% per year"). Moreover, no Plaintiff alleges that they were unable to obtain VantageScores or other scores from the Credit Bureaus—or even that Plaintiffs *tried* to obtain such scores. *Cf. O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 573 (7th Cir. 1994) ("boycott" allegations were "frivolous" when plaintiff "never attempted to purchase O.K. Sand's products at the retail price").

*Second*, Plaintiffs allege that FICO has harmed competition by charging "monopoly rent[s]."[79] But "[c]laiming that prices are supra-competitive is a legal conclusion rather than a fact . . . and must be supported by specific factual allegations." *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 59 (D. Mass. 2020). Plaintiffs offer no such allegations here.

---

[78]       DPP ¶ 141; IPP ¶ 162.
[79]       DPP ¶ 142; IPP ¶ 163.

The only allegations of price increases in the complaints are an alleged four-cent increase in FICO's standard royalty for FICO Scores used in connection with mortgage transactions in 2018 and unspecified increases for FICO Scores distributed to some auto and credit card customers. This lone increase—alleged based on a 2021 investor letter that also notes "FICO had not increased the price for its score in over 25 years" before the increases[80]—does not suffice. That is particularly true because Plaintiffs allege that FHFA rules have required the use of FICO Scores for mortgages that are eligible for purchase by Fannie Mae and Freddie Mac.[81] Any alleged increase in the royalties that FICO charges for FICO Scores used for that purpose is far more likely the result of the "realities of the regulated environment" than the conduct Plaintiffs challenge. *City of Pittsburgh v. W. Penn. Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998); *see also CBC Companies*, 561 F.3d at 573 (affirming dismissal of monopolization claims because, "to the extent that CBC alleges an impact on the Mortgage Lender Market, the federal regulations are the more likely basis for any putative injury, and not any specifically anticompetitive conduct").

At any rate, Plaintiffs do not pay the royalties FICO charges to the Credit Bureaus for generating FICO Scores; they pay the prices set by the Credit Bureaus or other intermediaries. Plaintiffs allege nothing at all about *those* prices. *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 212 (2d Cir. 2018) (without "examples, data, or other facts to support [the] assertion," "a conclusory allegation that prices have increased will not suffice to state anticompetitive effect"); *Intel Corp. v. Fortress Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1027-28 (N.D. Cal. 2021) (allegations that "arguably suggest that supracompetitive pricing is possible" are insufficient); *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *8–9 (C.D. Cal. Oct. 16, 2015) (similar).

---

[80] Jose Karlo & Mari Tottoc, *Headwaters Capital: 'Fair Isaac Corp (FICO) Can Grow Its Free Cash Flow by 15-20% Annually'*, YAHOO! FINANCE (Jan. 23, 2021), https://finance.yahoo.com/news/headwaters-capital-fair-isaac-corp-202237954.html (cited in DPP n.100); DPP ¶ 139.

[81] DPP ¶ 139; IPP ¶ 159.

**Finally**, general claims that Plaintiffs were deprived of "choice" are also insufficient.[82] Conclusory allegations that conduct "has the effect of reducing consumers' choices . . . do[] not sufficiently allege an injury to competition" because these allegations "are fully consistent with a free, competitive market." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (quoting *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012)); *see also Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1029 (N.D. Cal. 2015) ("Plaintiffs' allegations of hypothetical loss of consumer choice and innovation are entirely too conclusory and speculative."). And once more, no Plaintiff alleges that it has been denied the choice between VantageScore and FICO.

## IV.     Plaintiffs' Federal Damages Claims Are Barred By *Illinois Brick*.

Even if Plaintiffs could state a claim under any of their federal causes of action—and they cannot—Plaintiffs are barred from seeking damages. Under well-established law, "only those buyers who purchased products directly from the antitrust violator have a claim against that party for treble damages." *Marion Healthcare*, 952 F.3d at 836 (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)). As to FICO, however, all Plaintiffs here are at best indirect purchasers.

### A.     The "Direct Purchaser" Complaint involves only indirect purchasers.

As noted above, in consolidating the complaints in these cases, the Court distinguished between two categories of potential plaintiffs. *See supra* pp. 6-7. The first category, the "FICO-Direct Purchasers," included "[a]ll B2B Purchasers residing in the United States that directly purchased a FICO Score from Fair Isaac." Dkt. 83 at 7. The second category, the "Credit Bureau Purchasers," included "all B2B Purchasers residing in the United States that directly purchased a FICO Score from Fair Isaac *and/or a Credit Bureau*." *Id*. (emphasis added by the Court). But the

---

[82]     DPP ¶ 143; IPP ¶ 164.

Court did not decide whether either category were direct purchasers from FICO under *Illinois Brick*, concluding that these questions should await adversarial briefing. *Id.* at 12.

It is now appropriate to answer that question. To begin, it is now clear that the only plaintiffs at issue in the "Direct Purchaser" complaint are Credit Bureau Purchasers. Previously, counsel for the "direct" Plaintiffs told the Court that Amalgamated Bank was a direct purchaser from FICO because Amalgamated Bank supposedly "contract[s] *only with Fair Isaac* to purchase credit scores." Dkt. 73 at 4 (emphasis in original); *see also* Dkt. 83 at 6 ("Amalgamated Bank . . . says it bought FICO scores directly from FICO as well as from Credit Bureaus"). But Plaintiffs have now walked back that allegation. Like all of the other named plaintiffs in the "direct" complaint, Amalgamated Bank allegedly purchases from FICO *and* a Credit Bureau; no plaintiff is alleged to have bought only from FICO directly.[83] Further, the "direct" complaint offers just one class definition, which tracks the Court's definition of "Credit Bureau Purchasers."[84]

The fact that the "direct" complaint is brought only by and on behalf of Credit Bureau Purchasers requires dismissal of the federal damages claims. As Plaintiffs explicitly allege, FICO Scores and credit reports are "sold by Credit Bureaus" and the Credit Bureaus "in return, pay a royalty to Fair Isaac."[85] As to FICO, Credit Bureau Purchasers are thus, at best, indirect purchasers.

Plaintiffs try to muddle this conclusion by alleging that in "reality" FICO and the Credit Bureaus both act as the provider of the FICO Score.[86] That conclusory label is irrelevant, for as the Supreme Court recently explained, the significant question for *Illinois Brick* is whether the

---

[83]    *See* DPP ¶ 17 ("Amalgamated Bank directly purchased B2B credit scores from Fair Isaac, Experian, and Equifax.") & ¶¶ 15-16, 18-21 (stating that plaintiffs "directly purchased" credit scores from either (1) FICO and one or more Credit Bureaus, or (2) a Credit Bureau only).

[84]    *Compare* Dkt. 83 at 7 *with* DPP ¶ 144 (proposed class of "[a]ll B2B Purchasers . . . that directly purchased a FICO score from Fair Isaac and/or a Credit Bureau").

[85]    DPP ¶¶ 3, 42.

[86]    DPP ¶ 42; IPP ¶ 46.

plaintiff "pay[s] the alleged overcharge directly to [the defendant]" or to some other intermediary. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019). Plaintiffs do not pay FICO anything, and the "overcharge" they identify relates to the royalty paid by the Credit Bureaus.

Plaintiffs also allege that "certain" class members' contracts with the Credit Bureaus "specify that 'in consideration of [the Credit Bureau]/Fair Isaac's performance' of their obligations to provide" FICO Scores or credit reports, the purchaser "shall 'pay [the Credit Bureau]/Fair Isaac fees' for those products."[87] But critically, Plaintiffs do *not* allege that putative class members with such a contract make payments directly to FICO either. Allegations that a plaintiff purchased from an intermediary while entering into a "financial relationship" with an upstream entity are insufficient to support direct purchaser status as a matter of law. *Kloth v. Microsoft Corp.*, 444 F.3d 312, 321 (4th Cir. 2006).[88]

Industry participants uniformly agree that Credit Bureau Purchasers are indirect purchasers. Government regulators, for example, recognize that when a lender purchases a FICO Score from a Credit Bureau, the Credit Bureau is the one distributing the score and setting the price. *See supra* pp. 5-6. Similarly, in the *TransUnion* litigation, which Plaintiffs rely on for nearly all of their substantive allegations, TransUnion stated that *it* was the "direct purchaser (or licensee) of Fair Isaac's FICO products."[89] And one Credit Bureau Purchaser, Alternative Finance, even submitted its contracts with Experian during the briefing on competing leadership proposals, explaining that "[t]he relevant relationships and payment flows show that the *credit bureaus* are the direct purchasers of FICO Scores in this distribution chain." Dkt. 62 at 2; Dkt. 63-1. Notably,

---

[87] DPP ¶ 42.

[88] *See also In re Dicamba Herbicides Litig.*, 2019 WL 1160817, at *2 (E.D. Mo. Mar. 13, 2019) (alleged requirement to enter into a license agreement with Monsanto as part of purchase from a third party did not make plaintiffs direct purchasers); *Siena v. Microsoft Corp.*, 796 A.2d 461, 464 (R.I. 2002) (similar).

[89] Dkt. 38 ¶ 7, *FICO v. Trans Union LLC*, No. 1:17-cv-8318 (N.D. Ill. Feb. 12, 2018).

Plaintiffs do not submit any of their own contracts—which they presumably would do if they thought the terms would support an entitlement to pursue damages from FICO.

## B.    No "conspiracy exception" to *Illinois Brick* applies.

Even where a plaintiff is an indirect purchaser from a defendant, the Seventh Circuit has held that the plaintiff can pursue damages claims if the intermediary and the upstream entity were involved in a conspiracy. The "conspiracy exception" to *Illinois Brick* provides that where there is a conspiracy to support supracompetitive prices, the buyer in the "first sale outside the conspiracy" has the right to sue for damages. *Marion Healthcare*, 952 F.3d at 839. This may explain *why* Plaintiffs have attempted to plead a hub-and-spoke conspiracy between the Credit Bureaus and FICO, but it cannot save Plaintiffs' federal damages claims. As already explained, allegations of a conspiracy between FICO and the Credit Bureaus are facially implausible. *See supra* pp. 26-30. Plaintiffs therefore cannot avail themselves of this exception.

## V.    Plaintiffs' State Law Claims Also Should Be Dismissed.

One final matter involves the tag-along state claims in the complaints. These include roughly 50 claims under state competition and unfair and deceptive practices laws (Claims 7 and 8) and, for the Indirect Purchaser Plaintiffs only, unjust enrichment (Claim 9). As explained below, the state law claims are derivative of the federal claims and also suffer from independent flaws.

## A.    The state law claims fail for the same reasons as the federal claims.

All of the state antitrust laws invoked in the complaints track federal law, based either on express statutory harmonization language or judicial interpretation.[90] The state antitrust claims

---

[90]    **Arizona**—*Tee Time Arrangers, Inc. v. Vistoso Gold Partners, LLC*, 2008 WL 4149295, at \*5 (Ariz. Ct. App. Feb. 28, 2008); **California**—*Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, 729 F. App'x 528, 531 (9th Cir 2018); **Connecticut**—*Dichello Distribs., Inc. v. Anheuser-Busch, LLC*, 2021 WL 4170681, at \*6 (D. Conn. Sept. 14, 2021); **DC.**— *Atl. Coast Airlines Holdings, Inc. v. Mesa Air Grp., Inc.*, 295 F. Supp. 2d 75, 87 (D.D.C. 2003); **Illinois**—*Gutnayer v. Cendant Corp.*, 116 Fed. App'x 758, 761 (7th Cir. 2004); 740 Ill. Comp. Stat. 10/11; **Iowa**—*Mueller v. Wellmark, Inc.*, 861 N.W.2d 563, 567 (Iowa

thus fail for the same reasons as the federal claims. *See, e.g., In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 847 (N.D. Ill. 2020); *In re Plavix Indirect Purchaser Antitrust Litig.*, 2011 WL 335034, at *5 (S.D. Ohio Jan. 31, 2011).

Plaintiffs' consumer protection and unfair trade practices claims are also derivative of the federal claims. The complaints never "explain[] (or even imply[]) what was unfair or unconscionable" about the challenged conduct "beyond its potential to restrain competition or effect an unlawful monopoly." *Humira*, 465 F. Supp. 3d at 848.[91] Where a complaint "sounds in antitrust," tag-along consumer protection or unfair trade practices claims rise and fall with the antitrust claims unless "something more" is alleged "to understand why the nonactionable antitrust conduct" would support a claim under other laws. *Id.* at 847-48.

### B.    Plaintiffs' state law claims fail for additional reasons.

Plaintiffs would fail to state a claim under many of their state causes of action even if Plaintiffs' underlying antitrust theories were valid. A table summarizing these independent bases for dismissal is attached as Exhibit A hereto for the Court's convenience.

---

2015); **Kansas**—Kan. Stat. § 50-163(b); **Maine**—*Davric Me. Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000); **Michigan**—*Little Caesar Enters., Inc. v. Smith*, 895 F. Supp. 884, 898 (E.D. Mich. 1995); **Minnesota**—*State v. Alpine Air Prods, Inc.*, 490 N.W.2d 888, 894 (Minn. Ct. App. 1992); **Mississippi**—*Futurevision Cable Sys., Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 780 (S.D. Miss. 1992); **Missouri**—*Stensto v. Sunset Mem'l Park, Inc.*, 759 S.W.2d 261, 266 (Mo. Ct. App. 1988); **Nebraska**—Neb. Rev. Stat. § 59-829; **Nevada**—N.R.S. 598A.050; **New Hampshire**—*Minuteman, LLC v. Microsoft Corp.*, 795 A.2d 833, 836 (N.H. 2002); N.H. Rev. Stat. Ann. § 356.14; **New Mexico**—*Romero v. Philip Morris Inc.*, 242 P.3d 280, 291 (N.M. 2010); **New York**—*Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007); **North Carolina**—*Crain v. Debartolo*, 2015 WL 73961, at *8 n.3 (E.D.N.C. Jan. 6, 2015); **North Dakota**—*In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 572 (S.D.N.Y. 2021); **Oregon**—*Or. Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 n.4 (9th Cir. 1999); **Rhode Island**—*ERI Max Ent., Inc. v. Streisand*, 690 A.2d 1351, 1353 n.1 (R.I. 1997); R.I. Gen. Laws § 6–36–2(b); **South Dakota**—*Byre v. City of Chamberlain*, 362 N.W.2d 69, 74 (S.D. 1985); **Tennessee**—*Spahr v. Leegin Creative Leather Prods., Inc.*, 2008 WL 3914461, at *14 (E.D. Tenn. Aug. 20, 2008); **Utah**—*Evans v. State*, 963 P.2d 177, 180–82 (Utah 1998); Utah Code Ann. § 76-10-3118; **Vermont**—Vt. Stat. Ann. tit. 9, § 2453(b); **West Virginia**—*Kessel v. Monongalia Cnty. Gen. Hosp. Co.*, 648 S.E.2d 366, 379–81 (W. Va. 2007); W. Va. Code § 47-18-16; **Wisconsin**—*Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*, 275 F. Supp. 3d 957, 968–69 (W.D. Wis. 2017).

[91]    *See* DPP ¶¶ 309-21; IPP ¶¶ 341-61.

*No intrastate nexus*. The District of Columbia, Mississippi, Nevada, New Hampshire, New York, North Carolina, South Dakota, Tennessee, West Virginia, and Wisconsin antitrust laws, and the California, Massachusetts, New Hampshire, and North Carolina unfair trade practices laws require a specific nexus between Defendants' conduct and intrastate commerce, not merely a purported increase in the prices paid by residents of a state.[92] Contrary to this requirement, Plaintiffs' allegations as to each state simply repeat the boilerplate statement that Defendants' conduct "substantially affected" commerce in that jurisdiction. Plaintiffs also allege that credit score competition was "restrained, suppressed, and eliminated" in the relevant jurisdiction, credit score prices were "fixed" at "artificially high levels," Plaintiffs were deprived of "free and open competition," and Plaintiffs paid "supra-competitive, artificially inflated prices."[93] These conclusory statements fall far short of what is required.

*No class actions*. The Illinois Antitrust Act prohibits class action antitrust claims by indirect purchasers. 740 Ill. Comp. Stat. § 10/7(2). The same is true of consumer protection statutes in Arkansas, Montana, and South Carolina. Ark. Code Ann. § 4-88-113(f)(1)(B); Mont. Code § 30-14-133(1); S.C. Code Ann. § 39-5-140(a). These provisions are intertwined with the scope of the state-created right because they reflect substantive judgments "about the feasibility of trying such

---

[92]     **Antitrust Laws: District of Columbia**—*Sun Dun*, 770 F. Supp. at 289; **Mississippi**—*In re Microsoft Corp. Antitrust Litig.*, 2003 WL 22070561, at *2 (D. Md. Aug. 22, 2003); *Cal. v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1158-1159 (N.D. Cal. 2007); **Nevada**—Nev. Rev. Stat. Ann. § 598A.060(1); **New Hampshire**—*In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *17 (E.D. Mich. Apr. 9, 2013); **New York**—*H-Quotient, Inc. v. Knight Trading Grp., Inc.*, 2005 WL 323750, at *4 (S.D.N.Y. Feb. 9, 2005); **North Carolina**—N.C. Gen. Stat. § 75-1; **South Dakota**—*In re Dynamic Random Access Memory (DRAM I) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1099 (N.D. Cal. 2007); **Tennessee**—*Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W. 3d 512, 523-24 (Tenn. 2005); **West Virginia**—*State ex rel. Palumbo v. Graley's Body Shop, Inc.*, 425 S.E.2d 177, 183 n.11 (W. Va. 1992); **Wisconsin**—*Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 158 (Wis. 2005). **Unfair Trade Practices Laws: California**—*Meridian Project Sys. Inc. v. Hardin Constr. Co.*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005); **Massachusetts**—Mass. Gen. Laws Ch. 93A, § 11; **New Hampshire**—*Mueller Co. v. U.S. Pipe & Foundry Co.*, 2003 WL 22272135, at *6 (D.N.H. Oct. 2, 2003); **North Carolina**—*Duke Energy Int'l, L.L.C. v. Napoli*, 748 F. Supp. 2d 656, 677 (S.D. Tex. 2010).

[93]     *E.g.*, DPP ¶¶ 278, 308; IPP ¶ 310.

claims and the potential danger of duplicative recoveries." *Ill. ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1480 (7th Cir. 1991). Under Justice Stevens's concurrence in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010)—the narrowest and thus controlling opinion, *see Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1162 (10th Cir. 2017)—these provisions are applicable in federal court.[94]

*Intangible services*. Tennessee's antitrust statute "applies only to tangible goods, not intangible services." *Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 751–53 (Tenn. Ct. App. 2006). Credit scores are intangible services to which Tennessee antitrust law does not apply.

*Non-actionable allegations*. To state a claim under the consumer protection laws of Arkansas, New Mexico, Rhode Island, South Dakota, and West Virginia, plaintiffs must allege more than that a defendant violated the antitrust laws or charged supracompetitive prices. *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029-30 (N.D. Cal. 2007); *In re Dynamic Random Access Memory Antitrust Litig.*, 516 F. Supp. 2d 1072, 1118 (N.D. Cal. 2007); S.D. Codified Laws § 37–24–6 (antitrust violations not enumerated in list of "deceptive act or practices"). Plaintiffs do not make any such allegations.

*No particularity*. Florida and South Dakota's consumer protection laws require plaintiffs to plead specific allegations regarding fraud or deception. Fla. Stat. § 501.204; S.D. Codified Laws § 37-24-6. Yet Plaintiffs do not plead any such facts. *See In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 665 (E.D. Mich. 2011) (dismissing Florida claim); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 202 (D. Me. 2004) (South Dakota).

---

[94]     *See, e.g.*, *Humira*, 465 F. Supp. 3d at 850; *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016); *In re Auto. Parts Antitrust Litig.*, 2014 WL 3687035, at *2-3 (E.D. Mich. July 23, 2014); *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 416 (D.N.J. 2018) (all enforcing class action bars).

***Improper market definition***. Hawaii, Missouri, Montana, and Rhode Island's consumer protection laws do not provide a right of action for items purchased primarily for business or commercial purposes. *See* Haw. Rev. Stat. § 480-1; Mo. Rev. Stat. § 407.010; Mont. Code § 30-14-103/30-14-201; R.I. Gen. Laws § 6-13.1-5.2. Plaintiffs expressly allege antitrust violations in the "business to business" credit scoring market as distinct from the consumer market.

***No bargaining disparity***. New Mexico's consumer protection statute requires plaintiffs to plead a level of "grossly unequal bargaining power" that Plaintiffs have not alleged here. *See In re Graphics Processing Units*, 527 F. Supp. 2d at 1029–30. Accordingly, Plaintiffs' claims under that law must be dismissed.

***No unconscionability***. Arkansas and D.C.'s consumer protection laws require the plaintiff to plead some degree of unconscionability. *In re Graphics Processing Units*, 527 F. Supp. 2d at 1029; *Riggs Nat'l Bank v. D.C.*, 581 A.2d 1229, 1251 (D.C. 1990). North Carolina's unfair trade practices law similarly requires a plaintiff to allege egregious or aggravating circumstances, not mere "business-related conduct." *Dalton v. Camp*, 548 S.E.2d 704, 712 (N.C. 2001). Plaintiffs have not alleged such conduct here.

***Statute of limitations***. Oregon's consumer protection statute has a one-year limitations period. *See* ORS § 646.638. The first complaint by any plaintiff was not filed until April 2020. Yet the Indirect Purchaser Plaintiffs now admit that the statute of limitations began to run, at the latest, in February 2018.[95] Accordingly, the Oregon claim is untimely on the face of the complaint.

***No direct purchaser***. Missouri prohibits antitrust claims by plaintiffs who did not purchase products or services from, and therefore "made no payment directly to," a defendant. *Ireland v. Microsoft Corp.*, 2001 WL 1868946, at *1 (Mo. Cir. Ct. Jan. 24, 2001). Massachusetts' unfair

---

[95] IPP ¶¶ 112, 185.

trade practices law does the same. *In re Aggrenox Antitrust Litig.*, 2016 WL 4204478, at *8-9 (D. Conn. Aug. 9, 2016). Similarly, because Rhode Island's *Illinois Brick* repealer law applies only to damages incurred after July 15, 2013, claims for damages under Rhode Island law prior to July 15, 2013 are barred. *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 374 (D.R.I. 2019).

   **No unjust enrichment**. Only the Indirect Purchaser Plaintiffs bring claims for unjust enrichment. The complaint, however, does not specify whether the claim is an "autonomous" claim independent of the antitrust or consumer protection claims or a "parasitic" claim that merely seeks an alternative remedy. *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 411 (S.D.N.Y. 2011). If Plaintiffs are asserting autonomous claims, those claims fail because there is no cause of action for unjust enrichment separate and apart from the predicate causes of action. *Id.* at 412; *New Motor Vehicles*, 350 F. Supp. 2d at 209. If Plaintiffs are asserting parasitic claims, each fails for the same reasons as the underlying claims. *In re Digital Music*, 812 F. Supp. 2d at 412-13. Nor may Plaintiffs bring an unjust enrichment claim based on allegations that they overpaid for a bargained product or service. *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 421 (D. Del. 2007). Finally, where plaintiffs do not tailor unjust enrichment claims to the specific requirements of the laws of each state, as here, courts routinely dismiss the claims because the requirements vary by jurisdiction. *E.g.*, *In re Packaged Ice*, 779 F. Supp. 2d at 667-68.

   **No named plaintiffs**. Plaintiffs in these cases do business in 9 states.[96] But they purport to bring claims under the laws of 25 additional states where no Plaintiff does business. Claims "under the laws of the states in which no named [plaintiff] purchased" goods or services should be dismissed for lack of standing. *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, at *7-8 (N.D. Ill. Aug. 23, 2013); *see also Smith-Brown v. Ulta Beauty*, 2019 WL

---

[96]   DPP ¶¶ 15-21 (Arkansas, Massachusetts, Minnesota, Mississippi, Montana, New York, and Pennsylvania); IPP ¶¶ 21-22 (Maine, Michigan).

932022, at *5 (N.D. Ill. Feb. 26, 2019). Although this Court has previously concluded that challenges to an in-state plaintiff's ability to bring claims under the laws of other states do not implicate standing concerns and can be resolved at class certification, *Freeman v. MAM USA Corp.*, 528 F. Supp. 3d 849, 858-59 (N.D. Ill. 2021), the Supreme Court has since confirmed that plaintiffs "must demonstrate standing for *each claim* that they press." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (emphasis added). Deferring this question does not make sense because whether a class is certified "adds nothing" to the standing analysis. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976). Put another way, the class action device cannot create standing for out-of-state claims that Plaintiffs could not bring in their individual capacities. Accordingly, it is appropriate to dismiss these claims now, at the outset of the case.[97]

## CONCLUSION

The Court should dismiss Plaintiffs' complaints.

Dated: January 18, 2022

Respectfully submitted,

*/s/ Britt M. Miller*
Britt M. Miller
Matthew D. Provance
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com
jglickstein@mayerbrown.com

*Counsel for Defendant*
*Fair Isaac Corporation*

---

[97] Even if this Court concludes that it is not appropriate to dismiss claims brought under the laws of states in which Plaintiffs do not do business, at a minimum, this Court should stay discovery on those claims until it is clear that Plaintiffs will be able to pursue them. *See Liston v. King.com*, 254 F. Supp. 3d 989, 1001-02 (N.D. Ill. 2017) ("it would . . . be inappropriate to engage in wide-ranging discovery premised on a prospect as to which there is substantial doubt—namely, Liston's ability to assert causes of action created by other states for the benefit of other individuals injured in those other states").

**CERTIFICATE OF SERVICE**

I hereby certify that on January 18, 2022, I caused a true and correct copy of the foregoing document to be filed electronically. Notice of the filing will be sent to all counsel of record by operation of the Court's electronic filing system.

Dated: January 18, 2022                    By: /s/ *Britt M. Miller*

*Attorney for Fair Isaac Corporation*