**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

IN RE: FICO ANTITRUST LITIGATION      )
     )
     )      No. 1:20-CV-2114
     )
     )      Honorable Edmond E. Chang
_____)

**PLAINTIFFS' JOINT OPPOSITION TO MOTIONS TO DISMISS**
**PLAINTIFFS' CONSOLIDATED COMPLAINTS**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ................................................................................................. 2

I.    THE BUSINESS-TO-BUSINESS CREDIT SCORE MARKET ........................... 2

II.   FAIR ISAAC'S MONOPOLY IN THE B2B CREDIT SCORE MARKET ............. 3

III.  VANTAGESCORE THREATENS FAIR ISAAC'S MONOPOLY ........................ 4

IV.   THE SCHEME TO UNDERMINE VANTAGESCORE AND PRESERVE FAIR ISAAC'S
      MONOPOLY ......................................................................................... 6

      A.   Fair Isaac Files a Lawsuit to Destroy VantageScore Solutions ............ 6

      B.   Fair Isaac's Public Smear Campaign Against VantageScore ................ 7

      C.   Fair Isaac and the Credit Bureaus' Anticompetitive Agreements ........... 7

           1.   The No Equivalent Products Provision ........................................ 8

           2.   The Dynamic Royalty Schedule Provision ................................... 9

           3.   The Level Playing Field Provision ............................................ 10

V.    PROCEDURAL HISTORY ........................................................................ 10

      A.   The TransUnion Litigation ..................................................... 10

      B.   The Class Litigation ............................................................ 12

ARGUMENT ..................................................................................................... 13

I.    THE COMPLAINTS ADEQUATELY STATE A MONOPOLIZATION CLAIM IN VIOLATION OF
      SECTION TWO OF THE SHERMAN ACT ................................................... 14

      A.   The Complaints Adequately Allege Fair Isaac's Monopoly Power in the B2B Credit
           Score Market ....................................................................... 15

      B.   The Complaints Adequately Allege Anticompetitive Conduct in the U.S. B2B Credit
           Score Market ....................................................................... 18

      C.   Fair Isaac's Defenses Miss the Mark ......................................... 21

           1.   The Noerr-Pennington Doctrine Does Not Apply ......................... 22

           2.   Fair Isaac's Campaign of Disparagement Demonstrates Its
                Anticompetitive Intent ........................................................ 23

           3.   The Section Two Claim Is Timely ........................................... 23

II.   THE COMPLAINTS ADEQUATELY ALLEGE THAT ALL DEFENDANTS CONSPIRED TO VIOLATE
      SECTION TWO OF THE SHERMAN ACT ................................................... 25

III.  THE COMPLAINTS ADEQUATELY ALLEGE THAT THE CREDIT BUREAUS
      INDIVIDUALLY CONSPIRED WITH FAIR ISAAC IN VIOLATION OF SECTION ONE
      OF THE SHERMAN ACT ......................................................................... 27

      A.   The Complaints Adequately Plead Market Power ......................... 28

      B.   The Complaints Adequately Plead Anticompetitive Effects ............... 29

      1.    *The Fair Isaac-Credit Bureau Agreements Have Anticompetitive Effects* ............... 29

      2.    *Defendants' Procompetitive Justifications Are Not Properly Before the Court and Lack Merit in Any Event* ..................................................... 34

IV.   THE COMPLAINTS ADEQUATELY ALLEGE A CONSPIRACY TO RESTRAIN TRADE AMONG ALL DEFENDANTS IN VIOLATION OF SECTION ONE OF THE SHERMAN ACT .................. 37

  A.   Allegations of a Conscious Commitment to an Unlawful Scheme Are Sufficient to Plead a Conspiracy ................................................................ 37

  B.   The Complaints Adequately Plead that All Defendants Had a Conscious Commitment to a Common Unlawful Scheme ............................................. 39

      1.    *Parallel Contracting Between Sophisticated Parties Supports an Inference of Conspiracy* ........................................................................... 40

      2.    *Absent a Conspiracy, the No Equivalent Products Clause Would Be Contrary to the Credit Bureaus' Individual Self-Interest* ...................................... 42

      3.    *The Dynamic Royalty Schedule and Level Playing Field Clauses Provide Further Evidence of Conspiracy* .......................................................... 44

      4.    *The Timing of the Agreements Suggests Conspiracy* ................................. 46

      5.    *The Highly Concentrated Market Structure Supports Conspiracy Allegations* ........ 46

      6.    *The Credit Bureaus Had Ample Opportunity and Reason to Communicate with One Another About Their Common Anticompetitive Scheme* ........................... 47

  C.   Defendants' Remaining Arguments Lack Merit ............................................ 49

  D.   Defendants' Scheme Is a *Per Se* Violation of the Sherman Act ........................... 52

V.    *ILLINOIS BRICK* DOES NOT BAR THE DIRECT PURCHASER PLAINTIFFS' CLAIMS ................ 53

  A.   The Direct Purchaser Complaint Adequately Alleges that Plaintiffs Are the First Purchasers Outside of the Conspiracy ..................................................... 54

  B.   The Direct Purchaser Complaint Adequately Alleges that Direct Purchaser Plaintiffs Directly Pay Fair Isaac and Are the First Purchasers of FICO Scores ........................ 58

      1.    *The Direct Purchaser Complaint Alleges that B2B Purchasers Pay Fair Isaac Directly* ................................................................................ 58

      2.    *The Direct Purchaser Complaint Alleges that the B2B Purchasers Are the First Purchasers of FICO Scores* ............................................................. 60

VI.   FAIR ISAAC'S GRAB-BAG OF STATE-LAW ARGUMENTS FAILS ...................................... 62

  A.   Plaintiffs Have Article III Standing to Bring All State Law Claims Alleged in the Complaints ............................................................................... 63

  B.   Fair Isaac's Remaining Arguments Lack Merit .......................................... 64

CONCLUSION ...................................................................................... 75

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
 683 F.3d 328 (7th Cir. 2012) .................................................52

*Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chi.,*
 45 F.3d 1144 (7th Cir. 1995) .................................................36

*Al George, Inc. v. Envirotech Corp.,*
 939 F.2d 1271 (5th Cir. 1991) .................................................24

*Am. Tobacco Co. v. U.S.,*
 328 U.S. 781 (1946)................................................. *passim*

*Apple Inc. v. Pepper,*
 139 S. Ct. 1514 (2019).................................................54, 58, 60

*Atwood v. Oregon Dep't of Transp,*
 No. CV-06-1726, 2008 WL 803020 (D. Or. Mar. 20, 2008).................72

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins, Inc.,*
 784 F.2d 1325 (7th Cir. 1986) .................................................34

*Bell Atlantic Corp. v. Twombly,*
 550 U.S. 544 (2007).................................................14, 39

*Bennett v. Visa U.S.A. Inc.,*
 198 S.W.3d 747 (Tenn. Ct. App. 2006) .................................................67

*Benson v. Newell Brands, Inc.,*
 No. 19 C 6836, 2020 WL 1863296 (N.D. Ill. Apr. 14, 2020).................62

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,*
 65 F.3d 1406 (7th Cir. 1995) .................................................37, 59, 60

*Brooks v. Ross,*
 578 F.3d 574 (7th Cir. 2009) .................................................13

*Bruno v. Glob. Experience Specialists, Inc.,*
 No. 19-CV-06710, 2020 WL 5253139 (N.D. Ill. Sept. 3, 2020) (Chang, J.) .................14, 16

*Bunker Ramo Corp. v. United Bus. Forms, Inc.,*
 713 F.2d 1272 (7th Cir. 1983) .................................................52

*Cada v. Baxter Healthcare Corp.*,
  920 F.2d 446 (7th Cir. 1990) ............................................................25

*Calif. Dental Ass'n v. F.T.C.*,
  526 U.S. 756 (1999)..........................................................................29

*California v. ARC Am. Corp.*,
  490 U.S. 93 (1989)............................................................................61

*Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
  961 F.2d 667 (7th Cir. 1992) ............................................................30

*City of Mishawaka, Ind. v. Am. Elec. Power Co. Inc.*,
  616 F.2d 976 (7th Cir. 1980) ............................................................18

*City of Rockford v. Mallinckrodt ARD, Inc.*,
  360 F. Supp. 3d 730 (N.D. Ill. 2019) ........................................ *passim*

*Clark v. City of Braidwood*,
  318 F.3d 764 (7th Cir. 2003) ............................................................72

*Colquitt v. Manufacturers & Traders Tr. Co.*,
  144 F. Supp. 3d 1219 (D. Or. 2015) ................................................72

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962).....................................................18, 23, 24, 38

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002) ............................................................31

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984)..........................................................................58

*Ctr. Video Indus. Co. v. United Media, Inc.*,
  995 F.2d 735 (7th Cir. 1993) ............................................................52

*Culver v. Gorman & Co.*,
  416 F.3d 540 (7th Cir. 2005) ............................................................46

*D.R. Ward Const. Co. v. Rohm & Haas Co.*,
  470 F. Supp. 2d 485 (E.D. Pa. 2006) ..............................................73

*Dalton v. Camp*,
  548 S.E.2d 704 (N.C. 2001)..............................................................71

*Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.*,
  381 F.2d 879 (7th Cir. 1967) ............................................................22

*DSM Desotech Inc. v. 3D Sys. Corp.*,
No. 08-cv-15312009 WL 174989 (N.D. Ill. Jan. 26, 2009)........................................23, 26, 31

*Eastman Kodak Co. v. Image Tech. Serves.*,
504 U.S. 451 (1992)..............................................................................................................14

*Endsley v. City of Chicago*,
230 F.3d 276 (7th Cir. 2000) ................................................................................................18

*Erie Cnty. v. Morton Salt, Inc.*,
702 F.3d 860 (6th Cir. 2012) ..........................................................................................39, 45

*Evergreen Partnering Grp. Inc. v. Pactiv Corp.*,
720 F.3d 33 (1st Cir. 2013)..............................................................................................39, 45

*F.T.C. v. Indiana Fed. of Dentists*,
476 U.S. 447 (1986)..............................................................................................................29

*Fair Isaac Corp. v. Equifax, Inc.*,
No. 06-CV-4112 (D. Minn. filed Apr. 18, 2007).....................................................................6

*Fair Isaac Corp. v. Experian Info. Sols., Inc.*,
650 F.3d 1139 (8th Cir. 2011) ..........................................................................................7, 35

*Fair Isaac Corp. v. Experian Info. Sols., Inc.*,
711 F. Supp. 2d 991 (D. Minn. 2010)....................................................................................7

*Fair Isaac Corp v. Experian Info. Solutions, Inc.*,
645 F. Supp. 2d 734 (D. Minn. 2009), *aff'd* 650 F.3d 1139 (8th Cir. 2011) .........................48

*Fair Isaac Corp. v. TransUnion, Inc.*,
No. 17-cv-8318, 2019 WL 1382068 (N.D. Ill. Mar. 27, 2019) ...................................15, 18, 19

*Fair Isaac Corp. v. TransUnion*,
No. 1:17-cv-08318 (N.D. Ill. filed Nov. 16, 2017)...........................................................10, 11

*Fontana Aviation, Inc. v. Cessna Aircraft Co.*,
617 F.2d 478 (7th Cir. 1980) ................................................................................................55

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
852 F. Supp. 2d 1171 (N.D. Cal. 2012) ................................................................................24

*Freedom Broadcasting of TN, Inc. v. Tenn. Dept. of Rev.*,
83 S.W.3d 776 (Tenn. Ct. App. 2002) ..................................................................................67

*Freeman Indus. LLC v. Eastman Chem. Co.*,
172 S.W.3d 512 (Tenn. 2005)...............................................................................................74

*Freeman v. MAM USA Corp*,
    528 F. Supp. 3d 849 (N.D. Ill. 2021) (Chang, J.) .............................................................63, 64

*FTC v. Cement Inst.*,
    333 U.S. 683 (1948)........................................................................................................38, 48

*FTC v. Mylan Labs., Inc.*,
    62 F. Supp. 2d 25 (D.D.C.), *on recons.*, 99 F. Supp. 2d 1 (D.D.C. 1999)............................73

*GEICO Corp. v. Autoliv, Inc.*,
    345 F. Supp. 3d 799 (E.D. Mich. 2018)..............................................................................65

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016).................................................................................................39

*Generac Corp. v. Caterpillar Inc.*,
    172 F.3d 971 (7th Cir. 1999) ..............................................................................................36

*Gibbons v. J. Nuckolls, Inc.*,
    216 S.W.3d 667 (Mo. 2008) ...............................................................................................72

*Gibson v. City of Chicago*,
    910 F.2d 1510 (7th Cir. 1990) ............................................................................................13

*Gray v. Hardy*,
    826 F.3d 1000 (7th Cir. 2016) ............................................................................................38

*Great Escape, Inc. v. Union City Body Co.*,
    791 F.2d 532 (7th Cir. 1986) ...................................................................................25, 26, 27

*Havoco of Am., Ltd. v. Shell Oil Co.*,
    626 F.2d 549 (7th Cir. 1980) ..............................................................................................26

*Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*,
    353 F. Supp. 3d 678 (M.D. Tenn. 2018)..............................................................................64

*IDX Systems Corp. v. Epic Systems Corp.*,
    285 F.3d 581 (7th Cir. 2002) ..............................................................................................36

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)...........................................................................................53, 54, 60, 61

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
    864 F.2d 1409 (7th Cir. 1989) ............................................................................................16

*In re Aftermarket Filters Antitrust Litig.*,
    No. 08 C 4883, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009)......................................67, 68, 71

*In re Aggrenox Antitrust Litig.*,
No. 3:14-MD-2516, 2016 WL 4204478 (D. Conn. Aug. 9, 2016) ........................................66

*In re Auto. Parts Antitrust Litig.*,
29 F. Supp. 3d 982 (E.D. Mich. 2014)................................................................................65, 71

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ............................................................................ *passim*

*In re Broiler Chicken Antitrust Litig.*,
No. 16 C 8637, 2019 WL 1003111 (N.D. Ill. Feb. 28, 2019)................................................42

*In re Cardizem CD Antitrust Litig.*,
105 F. Supp. 2d 618 (E.D. Mich. 2000)................................................................................73

*In re Chocolate Confectionary Antitrust Litig.*,
602 F. Supp. 2d 538 (M.D. Pa. 2009) ............................................................................65, 75

*In re Copper Antitrust Litig.*,
436 F.3d 782 (7th Cir. 2006) ................................................................................................25

*In re Credit Default Swaps Antitrust Litig.*,
No. 13-MD-2476, 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)...........................................75

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
MDL No. 2031, 2015 WL 3988488 (N.D. Ill. June 29, 2015) ...............................................64

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
362 F. Supp. 3d 477 (N.D. Ill. 2019) ............................................................................ *passim*

*In re Digital Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011)...................................................................................74

*In re Disposable Contact Lens Antitrust Litig.*,
No. 3:15-md-2626, 2019 WL 6463343 (M.D. Fla. Nov. 27, 2019) .......................................60

*In re Domestic Drywall Antitrust Litig.*,
No. CV 2:18-MD-2836, 2019 WL 1397228 (E.D. Va. Feb. 6, 2019), *report and recommendation adopted as modified*, 400 F. Supp. 3d 418 (E.D. Va. 2019) ....................................................................................................................................75

*In re DRAM Antitrust Litig.*,
536 F. Supp. 2d 1129 (N.D. Cal. 2008) ...............................................................................68

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007) ...............................................................................68

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004)..................................................................................42

*In re Generic Pharms. Pricing Antitrust Litig.*,
    368 F. Supp. 3d 814 (E.D. Pa. 2019) ...................................................64, 68, 69, 70

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...........................................................41, 68

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ........................................................................ *passim*

*In re Indep. Serv. Orgs. Antitrust Litig.*,
    203 F.3d 1322 (Fed. Cir. 2000)............................................................................35

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)................................................................................38

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    496 F. Supp. 2d 404 (D. Del. 2007).....................................................................65

*In re JPMorgan Chase Bank Home Equity Line of Credit Litig.*,
    794 F. Supp. 2d 859 (N.D. Ill. 2011) ..................................................................74

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004) ......................................................................73

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019)..................................................................31

*In re Microsoft Corp. Antitrust Litig.*,
    127 F. Supp. 2d 728 (D. Md. 2001) ...............................................................26, 27

*In re Musical Instruments and Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) .......................................................................50, 51

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
    350 F. Supp. 2d 160 (D. Me. 2004) ..........................................................65, 69, 71

*In re NorthShore Univ. HealthSystem Antitrust Litig.*,
    No. 07-CV-4446, 2018 WL 2383098 (N.D. Ill. Mar. 31, 2018) (Chang, J.)....................58, 59

*In re Opana ER Antitrust Litig.*,
    No. 14 C 10150, 2016 WL 4245516 (N.D. Ill. Aug. 11, 2016)..............................74

*In re Packaged Ice Antitrust Litig.*,
    779 F. Supp. 2d 642 (E.D. Mich. 2011).............................................................75

ix

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  764 F. Supp. 2d 991 (N.D. Ill. 2011) .............................................................41, 42

*In re Pool Prods. Dist. Mkt. Antitrust Litig.*,
  946 F. Supp. 2d 554 (E.D. La. 2013) ...................................................................73

*In re Propranolol Antitrust Litig.*,
  249 F. Supp. 3d 712 (S.D.N.Y. 2017) ..................................................................75

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ..................................................................... *passim*

*In re U.S. Ins. Grp., LLC*,
  429 B.R. 903 (E.D. Tenn. 2010) ..........................................................................67

*Int'l Dist. Centers, Inc. v. Walsh Trucking Co.*,
  812 F.2d 786 (2d Cir. 1987)..................................................................................16

*Int'l Equip. Trading, Ltd. v. Illumina, Inc.*,
  No. 17 C 5010, 2018 WL 3861575 (N.D. Ill. Aug. 14, 2018) ..................................16

*Interstate Cir. v. United States*,
  306 U.S. 208 (1939)...........................................................................38, 39, 40, 43

*Ireland v. Microsoft Corp.*,
  No. 00cv-201515, 2001 WL 1868946 (Mo. Cir. Ct. Jan. 24, 2001).......................73

*ITCO Corp. v. Michelin Tire Corp., Com. Div.*,
  722 F.2d 42, 48 (4th Cir. 1983), *on reh'g*, 742 F.2d 170 (4th Cir. 1984).............72

*JTC Petrol. Co. v. Piasa Motor Fuels, Inc.*,
  190 F.3d 775 (7th Cir. 1999) ...............................................................................44

*Kansas v. Utilicorp United, Inc.*,
  497 U.S. 199 (1990).............................................................................................61

*Kleen Prods. LLC v. Int'l Paper Co.*,
  831 F.3d 919 (7th Cir. 2016) ...............................................................................29

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
  775 F. Supp. 2d 1071 (N.D. Ill. 2011) .............................................................41, 46

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997).............................................................................................24

*Kohen v. Pacific Investment Mgmt. Co. LLC*,
  571 F.3d 672 (7th Cir. 2009) ...............................................................................63

*L&W/Lindco Prods., Inc. v. Pure Asphalt Co.*,
    979 F. Supp. 632 (N.D. Ill. 1997) ...................................................27

*Le v. Kohls Dep't Stores, Inc.*,
    160 F. Supp. 3d 1096 (E.D. Wis. 2016)...........................................74

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007).........................................................................27

*Lewert v. P.F. Chang's China Bistro, Inc.*,
    819 F.3d 963 (7th Cir. 2016) ..........................................................63

*Lifewatch Servs. Inc. v. Highmark Inc.*,
    902 F.3d 323 (3d Cir. 2018).............................................................48

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) .............................................60, 61, 62

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
    952 F.3d 832 (7th Cir. 2020) ................................................. *passim*

*MCI Commc'n's Corp. v. Am. Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) ...................................................16, 51

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
    62 F.3d 967 (7th Cir. 1995) ........................................................45, 51

*McReynolds v. Merrill Lynch & Co., Inc.*,
    694 F.3d 873 (7th Cir. 2012) ..............................................14, 16, 17

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011) ......................................................14, 22

*Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*,
    795 F. Supp. 639 (S.D.N.Y. 1992) ..................................................22

*Moehrl v. Nat'l Ass'n of Realtors*,
    492 F. Supp. 3d 768 (N.D. Ill. 2020) ...............................................34

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984).........................................................................37

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984).......................................................28, 29, 32, 52

*Neale v. Volvo Cars of N. Am., LLC*,
    794 F.3d 353 (3d Cir. 2015)............................................................63

*Nexstar Broad., Inc. v. Granite Broad. Corp.*,
    No. 1:11-cv-249, 2012 WL 2838547 (N.D. Ind. July 9, 2012) ..............................................23

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985).................................................................................................................52

*P & M Servs., Inc. v. Gubb*,
    No. 07-12816, 2008 WL 4185903 (E.D. Mich. Sept. 8, 2008).................................................24

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
    281 F.3d 629 (7th Cir. 2002) ..................................................................................................55

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    911 F.3d 505 (8th Cir. 2018)...................................................................................................41

*Reiser v. Residential Funding Corp.*,
    380 F.3d 1027 (7th Cir. 2004) .................................................................................................72

*Riggs Nat'l Bank of Washington, D.C. v. D.C.*,
    581 A.2d 1229 (D.C. 1990) .....................................................................................................71

*Rocha v. Rudd*,
    826 F.3d 905 (7th Cir. 2016) ..................................................................................................69

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ..................................................................................................30

*Rossi v. Standard Roofing, Inc.*,
    156 F.3d 452 (3d Cir. 1998)....................................................................................................52

*Sandee's Catering v. Agri Stats, Inc.*,
    No. 20 C 2295, 2020 WL 6273477 (N.D. Ill. Oct. 26, 2020) ...........................................68, 69

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*,
    No. 15 CIV. 6549 (CM), 2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) ...............................74

*Sargent-Welch Sci. Co. v. Ventron Corp.*,
    567 F.2d 701 (7th Cir. 1977) ..................................................................................................18

*Sawyer v. Atlas Heating and Sheet Metal Works, Inc.*,
    642 F.3d 560 (7th Cir. 2011) ..................................................................................................66

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015), *as amended on reh'g* (Oct. 29, 2015) ........................38, 41, 47

*Serfecz v. Jewel Food Stores, Inc.*,
    No. 92 C 4171, 1993 WL 262465 (N.D. Ill. July 12, 1993) ....................................................26

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010)................................................................................66

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
    737 F. Supp. 2d 380 (E.D. Pa. 2010) .................................................73

*SIG, Inc. v. AT & T Digital Life, Inc.*,
    971 F. Supp. 2d 1178 (S.D. Fla. 2013) ...............................................69

*Smith-Brown v. Ulta Beauty, Inc.*,
    No. 18 C 610, 2019 WL 932022 (N.D. Ill. Feb. 26, 2019)....................64

*Svanaco, Inc. v. Brand*,
    417 F. Supp. 3d 1042 (N.D. Ill. 2019) ................................................57

*Tex. Hill Country Landscaping, Inc. v. Caterpillar, Inc.*,
    522 F. Supp. 3d 402 (N.D. Ill. 2021) ..................................................63

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)................................................................46

*Toys "R" Us, Inc. v. F.T.C.*,
    221 F.3d 928 (7th Cir. 2000) ...............................................28, 43, 52

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)........................................................................64

*U.S. v. Apple*,
    791 F.3d (2d Cir. 2015)............................................................. *passim*

*U.S. v. Bullis*,
    77 F.3d 1553 (7th Cir. 1996) ..............................................................56

*U.S. v. Consol. Packaging Corp.*,
    575 F.2d 117 (7th Cir. 1978) ..............................................38, 40, 49

*U.S. v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005)................................................................31

*U.S. v. Gen. Elec. Co.*,
    42 Fed. Reg. 17,005 (Mar. 25, 1977)..................................................44

*U.S. v. Grinnell Corp.*,
    384 U.S. 563 (1966)............................................................................16

*U.S. v. Masonite Corp.*,
    316 U.S. 265 (1942)..............................................................38, 49

*U.S. v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .............................................................35

*U.S. v. Paramount Pictures*,
   334 U.S. 131 (1948).........................................................................38

*U.S. v. Read*,
   658 F.2d 1225 (7th Cir. 1981) .........................................................57

*U.S. v. Socony–Vacuum Oil Co.*,
   310 U.S. 150 (1940).........................................................................34

*U.S. v. Swiss Valley Farms Co., Inc.*,
   912 F. Supp. 401 (C.D. Ill. 1995) ....................................................56

*U.S. v. U.S. Gypsum Co.*,
   333 U.S. 364 (1948).........................................................................40

*U.S. Gypsum Co. v. Indiana Gas Co.*,
   350 F.3d 623 (7th Cir. 2003) ...........................................................32

*United Mine Workers of Am. v. Pennington*,
   381 U.S. 657 (1965).........................................................................40

*Viamedia, Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020) .............................................28, 29, 32, 34

*Wagner v. Magellan Health Servs., Inc.*,
   121 F. Supp. 2d 673 (N.D. Ill. 2000) ...............................................26

*Walker Process Equip., Inc. v. Food Mach. & Chemical Corp.*,
   382 U.S. 172 (1965).........................................................................22

*Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*,
   669 F. Supp. 2d 895 (N.D. Ill. 2009) ...............................................16

*Wash. Cnty Health Care Auth., Inc. v. Baxter Int'l Inc.*,
   328 F. Supp. 3d 824 (N.D. Ill. 2018) ...............................................41

*Wilk v. Am. Medical Ass'n*,
   895 F.2d 352 (7th Cir. 1990) ...........................................................28

*Wilson v. Price*,
   624 F.3d 389 (7th Cir. 2010) ...................................................14, 16

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
   372 F.3d 899 (7th Cir. 2004) ...........................................................24

*Yakas v. Chase Manhattan Bank, U.S.A., N.A.*,
No. C 09-02964, 2010 WL 367475 (N.D. Cal. Jan. 25, 2010) ...............................................74

**Statutes, Rules, and Regulations**

15 U.S.C.
§4...................................................................................................................................13
§15(a)............................................................................................................................54
§16.................................................................................................................................13

17 U.S.C.
§102...............................................................................................................................35

Federal Rules of Civil Procedure
Rule 8(a)(2)...................................................................................................................13
Rule 9(b) .......................................................................................................................69
Rule 12(b)(6)............................................................................................................13, 72
Rule 23 ..........................................................................................................................63

**Other Authorities**

Jonathan B. Baker & Judith A. Chevalier, *The Competitive Consequences of
Most-Favored-Nation Provisions* ................................................................................37

Jonathan B. Baker, *Vertical Restraints with Horizontal Consequences:
Competitive Effects of "Most-Favored-Customer" Clauses*, 64 ANTITRUST
L.J. 517 (1996)...........................................................................................................36, 37

The Direct Purchaser Plaintiffs[1] and Indirect Purchaser Plaintiffs[2] respectfully submit this joint brief in opposition to Defendants' Motions to Dismiss the Consolidated Complaints. Dkts. 135 ("CB MTD"), 139 ("FICO MTD").

## PRELIMINARY STATEMENT

FICO Scores are the leading credit scores in the industry – used in 90% of all U.S. lending decisions. As the Credit Bureaus (TransUnion, Equifax, and Experian) put it, FICO Scores are a "***must have***." FICO Scores' market dominance enables Fair Isaac – the company behind FICO Scores – to enjoy profit margins of at least 86%.

In 2006, the Credit Bureaus banded together to challenge Fair Isaac's dominance. They launched a joint venture called VantageScore Solutions, LLC to develop a competitor to FICO Scores. The result was VantageScore – an innovative credit-scoring product that was competitively priced, highly predictive, and scored millions more Americans than FICO Scores. Faced with a threat to its market dominance and rich profit margins, instead of choosing to compete on price or quality, Fair Isaac hatched a plan to destroy its competitor, preserve its monopoly, and ensure it could continue to reap inordinately high profits: It filed a meritless lawsuit based on an invalid trademark obtained through fraud and undertook a campaign of disinformation against VantageScore – a campaign that continues to this day.

When that gambit did not destroy VantageScore Solutions, Fair Isaac tried another tactic: It persuaded the Credit Bureaus to adopt contracts that prop up Fair Isaac's monopoly in exchange

---

[1]    "Direct Purchaser Plaintiffs" mean Sky Federal Credit Union, Alcoa Community Federal Credit Union, Amalgamated Bank, City of Boston Credit Union, First Choice Federal Credit Union, Getten Credit Company, and Holmes County Bank & Trust Company.

[2]    "Indirect Purchaser Plaintiffs" mean Garner Properties & Management LLC and Lake City Exports, Inc. Together, Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs are referred to as "Plaintiffs."

for terms that protect the Credit Bureaus against competition in selling credit reports. Those contracts contain terms that prohibit the Credit Bureaus from developing or distributing products that could compete most effectively with FICO Scores. They contain terms that allow Fair Isaac to penalize sales of competing products by forcing lenders to pay *up to seven times more* for FICO Scores when they display VantageScores in pre-qualification decisions. And they contain terms that eliminate the incentive for the Credit Bureaus to compete with each other by negotiating discounts for FICO Scores. That collusion has caused purchasers of credit reports containing credit scores, *i.e.*, Plaintiffs and the Classes, to pay supracompetitive prices.

By resorting to collusion and anticompetitive tactics, Defendants have violated the Sherman Act's prohibitions against monopolization and agreements unreasonably restraining trade, as well as various state competition and consumer-welfare statutes. One judge in this District has *already held* that the terms of the Defendants' contracts are sufficiently anticompetitive to state a claim against Fair Isaac for violation of Section Two of the Sherman Act. There is no reason to reach a different result here. Defendants' motions to dismiss – which disregard pleading standards, rely on facts outside the Complaints,[3] and take a myopic view of the factual allegations – should be denied in their entirety.

## **BACKGROUND**

### I. **THE BUSINESS-TO-BUSINESS CREDIT SCORE MARKET**

These actions concern the Business-to-Business Credit Score Market ("B2B Credit Score Market") where banks and other businesses purchase credit scores to assess their customers' creditworthiness. DPP Compl., ¶¶1-2; IPP Compl., ¶¶1-2. A "credit score" is a three-digit

---

[3] The Direct Purchaser Plaintiffs' Consolidated Class Action Complaint (Dkt. 121) ("DPP Compl.") and Indirect Purchaser Plaintiffs' Consolidated Class Action Complaint (Dkt. 122) ("IPP Compl.") are referred to herein as the "Complaints."

numerical summary of a customer's creditworthiness, typically between 300 and 850. DPP Compl., ¶¶1, 34-35; IPP Compl., ¶¶1, 35-36. Credit scores are generated by algorithms that rely on information about a consumer's credit history. DPP Compl., ¶¶38-39; IPP Compl., ¶¶39-40.

"[C]redit reports," are statements that contain information about an individual's credit activity and credit situation. DPP Compl., ¶¶38-39; IPP Compl., ¶¶39-40. The Credit Bureaus dominate the market for credit reports. DPP Compl., ¶¶3, 38-39; IPP Compl., ¶¶3, 39-40. Together, the Credit Bureaus control virtually 100% of the aggregate credit data that is used to create credit reports. DPP Compl., ¶¶3, 38-39, 57; IPP Compl., ¶¶3, 39-40, 69.

Credit reports and credit scores – including Fair Isaac's FICO Scores – are often sold in a bundle to lenders, financial institutions, and other businesses, like the Direct Purchaser Plaintiffs and the Direct Purchaser Class ("B2B Purchasers"), typically through contracts with **both** Fair Isaac and the Credit Bureau. DPP Compl., ¶¶3, 40, 42; IPP Compl., ¶¶3, 46. Various contracts specify that, "in consideration of *[the Credit Bureau]/Fair Isaac's performance*," the purchaser shall "pay *[the Credit Bureau]/Fair Isaac fees*." DPP Compl., ¶42.[4] In certain cases, Fair Isaac also sells FICO Scores and credit report bundles directly to B2B Purchasers. DPP Compl., ¶44; IPP Compl., ¶48.

## II. FAIR ISAAC'S MONOPOLY IN THE B2B CREDIT SCORE MARKET

FICO Scores "are used in the majority of U.S. credit decisions, by nearly **all** of the major banks, credit card organizations, mortgage lenders and auto loan originators," and are "the standard measure in the U.S. of consumer credit risk." DPP Compl., ¶65; IPP Compl., ¶81. FICO Scores are used for **90% of all lending decisions** in the U.S. DPP Compl., ¶¶2, 63; IPP Compl., ¶¶2, 77. As Michael Pung, Fair Isaac's former Chief Financial Officer and Executive Vice-President,

---

[4]     Unless otherwise noted, emphasis is added and citations are omitted.

touted: FICO Scores are the "most widely used credit scoring system here in the U.S." and are used by "[v]irtually every major lender in the U.S.," giving Fair Isaac "a *90-plus percent market share* for at least . . . 13 years." DPP Compl., ¶66; IPP Compl., ¶78. Fair Isaac's monopoly in the B2B Credit Score Market has given it the power to control prices and impose monopoly rents. DPP Compl., ¶68; IPP Compl., ¶83. Fair Isaac's CEO, William Lansing, has stressed that Fair Isaac's dominance in the B2B Credit Score Market gives it "quite a bit of discretion" in whether it wants its "margins to be higher or lower or where they are." DPP Compl., ¶68; IPP Compl., ¶83. As the Credit Bureaus put it, FICO Scores are a "*must have*" in the industry. CB MTD, at 12, 14, 19, 21-22.

The B2B Credit Score Market has high barriers to entry, and purchasers incur high costs by switching from a FICO Score to a new score. DPP Compl., ¶¶50-54; IPP Compl., ¶¶62-66. Larger lenders use FICO Scores as an input to customized models built for specific situations or portfolios. DPP Compl., ¶52; IPP Compl., ¶64. For example, a major U.S. lender used FICO Scores in 600 places throughout its business processes and explained that switching to a new score would involve "extensive testing to ensure all of those moving parts are still working as designed." DPP Compl., ¶52; IPP Compl., ¶64. In the residential mortgage industry, FICO Scores have "unparalleled" and "highly controversial negotiating leverage" with almost every industry participant. DPP Compl., ¶51; IPP Compl., ¶63. To preserve its power to extract monopoly rent, Fair Isaac sought to maintain its dominance in the B2B Credit Score Market through the anticompetitive conduct described below. DPP Compl., ¶55; IPP Compl., ¶67.

## III. VANTAGESCORE THREATENS FAIR ISAAC'S MONOPOLY

In 2006, the Credit Bureaus launched VantageScore Solutions, LLC ("VantageScore Solutions"), a joint venture they continue to own. DPP Compl., ¶¶6, 71; IPP Compl., ¶¶10, 87. The purpose behind the joint venture was to create a competitor to the FICO Score, known as the

VantageScore, with its own credit scoring system and score. DPP Compl., ¶¶6, 71-72; IPP Compl.,

¶¶10, 87. Like the FICO Score, VantageScore applies complex algorithms to arrive at a numerical

credit score accompanied by "reason codes" which explain to lenders and creditors why the score

was not higher. DPP Compl., ¶¶35, 36; IPP Compl., ¶¶36-37. VantageScore Solutions licenses

its VantageScore credit models or credit scores to the Credit Bureaus, which may incorporate

VantageScores into their credit reports. DPP Compl., ¶72; IPP Compl., ¶88.

The Credit Bureaus created VantageScore Solutions to serve consumers who received no

or lower scores from FICO Scores, including those who lacked credit history. DPP Compl., ¶74;

IPP Compl., ¶¶91-92. VantageScore was a competitively priced, highly predictive product that

was capable of providing credit scores for 30 million more Americans than FICO Scores. DPP

Compl., ¶7; Compl., ¶10. While FICO Scores leave many low-income individuals and racial

minorities unscored, VantageScore Solutions was poised to provide credit opportunities to those

individuals and to encroach on Fair Isaac's market share. DPP Compl., ¶¶74-84; IPP Compl.,

¶¶91-100.

Rather than compete with VantageScore Solutions on price or quality, Fair Isaac undertook

a decades-long scheme to hobble VantageScore Solutions and preserve its monopoly in the B2B

Credit Score Market. That scheme included filing meritless litigation; undertaking a

disparagement and disinformation campaign against VantageScore; and, when the litigation

proved unsuccessful, convincing the Credit Bureaus to sign distribution agreements that

undermined their own joint venture in exchange for an anticompetitive provision that protects the

Credit Bureaus against competition in selling credit reports. DPP Compl., ¶¶8, 85, 87, 102, 108,

124-27; IPP Compl., ¶¶12, 100, 102, 119, 125, 145-49.

## IV.    THE SCHEME TO UNDERMINE VANTAGESCORE AND PRESERVE FAIR ISAAC'S MONOPOLY

### A.    Fair Isaac Files a Lawsuit to Destroy VantageScore Solutions

In October 2006, Fair Isaac filed a meritless lawsuit against the Credit Bureaus to drive VantageScore Solutions out of business, accusing them, *inter alia*, of unfair advertising, antitrust violations, and trademark infringement (the "*Equifax* Litigation").  DPP Compl., ¶¶88-89; IPP Compl., ¶¶103-04.[5]   Fair Isaac sought an order requiring the Credit Bureaus "to dissolve VantageScore and/or to take all measures necessary to prevent VantageScore from having an unreasonable anticompetitive effect in any market."  DPP Compl., ¶¶88-89; IPP Compl., ¶¶103-04.  The filing of the *Equifax* Litigation hobbled VantageScore Solutions' prospects during the pendency of the suit – it created uncertainty about whether the product would be declared infringing on Fair Isaac's trademark or whether VantageScore Solutions would be dissolved.  DPP Compl., ¶91; IPP Compl., ¶106.[6]

Fair Isaac's claims were ultimately rejected as devoid of merit.  DPP Compl., ¶92; IPP Compl., ¶107.  The district court granted the Credit Bureaus' summary judgment on the antitrust and false advertising claims, and a jury found against Fair Isaac on the remaining claim for trademark infringement, concluding that:  (1) the mark "300-850" (which denoted the range of FICO Scores) was merely descriptive; (2) Fair Isaac knowingly made false representations to the U.S. Patent and Trademark Office ("PTO") to register the mark; and (3) the PTO relied on the

---

[5]     Second Amended Complaint, Dkt. 81, *Fair Isaac Corp. v. Equifax, Inc*., No. 06-CV-4112 (D. Minn. filed Apr. 18, 2007).

[6]     In June 2008, Equifax agreed to resolve the *Equifax* Litigation with Fair Isaac and entered a settlement agreement that formed "a partnership [with Fair Isaac] to develop and sell advanced analytics and scoring solutions for businesses and consumers."  DPP Compl., ¶90; IPP Compl., ¶105.  The terms of that partnership are nonpublic.  The other Credit Bureaus continued to litigate the case following Equifax's settlement with Fair Isaac.

false representations in deciding to issue registrations. *Id.* The court upheld the verdict, noting that "[t]his extensive, expensive litigation seems to have been initiated largely *in response to a perceived threat to Fair Isaac's dominant position in the credit scoring industry*." DPP Compl., ¶93; IPP Compl., ¶108; *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1000 (D. Minn. 2010). The Eighth Circuit affirmed. DPP Compl., ¶94; IPP Compl., ¶109; *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011).

### B. Fair Isaac's Public Smear Campaign Against VantageScore

Fair Isaac has also waged an aggressive public relations and advertising campaign against VantageScore designed to mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScores. DPP Compl., ¶¶11, 131-40; IPP Compl., ¶¶12, 154-61. In advertisements, letters, and blog posts, Fair Isaac has disparaged VantageScore, falsely claiming it is an unreliable measure of creditworthiness. DPP Compl., ¶¶131-40; IPP Compl., ¶¶154-61.

In December 2017, for example, William Lansing, Fair Isaac's CEO, criticized banks for using the "Fako" VantageScores. DPP Compl., ¶132; IPP Compl., ¶154. Similarly, in December 2017, Fair Isaac took out a full-page advertisement in *The Wall Street Journal*, stating that the alternative credit score was less reliable than FICO Scores in evaluating credit risk and failed to use "sound practices" or "science-based credit evaluation." DPP Compl., ¶134; IPP Compl., ¶155.

### C. Fair Isaac and the Credit Bureaus' Anticompetitive Agreements

Despite that campaign, around 2013, with litigation designed to "put [it] out of business" in its rearview, VantageScore Solutions was poised to grab market share from Fair Isaac and erode its 86% profit margin. DPP Compl., ¶¶9, 104, 142; IPP Compl., ¶¶14, 119, 122. VantageScore Solutions had formed a partnership with the Consumer Federation of America (an association of nearly 300 consumer groups), launched an improved scoring system, and stood to benefit from favorable regulatory changes. DPP Compl., ¶104; IPP Compl., ¶121. Faced with that threat and

having failed to put VantageScore Solutions out of business through its meritless litigation, Fair Isaac enlisted the Credit Bureaus in its anticompetitive scheme through a series of anticompetitive agreements.  DPP Compl., ¶¶10, 102, 105; IPP Compl., ¶¶14, 119, 122.

As discussed further below, Fair Isaac's and the Credit Bureaus' agreements contained anticompetitive terms that prohibit the Credit Bureaus from marketing certain non-FICO (*i.e.*, VantageScore) credit scores and permit Fair Isaac to penalize customers that would like to provide consumers both a FICO Score and a VantageScore.  DPP Compl., ¶¶10, 108; IPP Compl., ¶¶14, 125.  Each Credit Bureau agreed to the anticompetitive restrictions knowing the other Credit Bureaus had agreed or would agree to substantially the same terms.  DPP Compl., ¶¶10, 102, 106-08, 116, 130; IPP Compl., ¶¶14, 119, 123-25, 136, 148-49.  They agreed to provisions that would harm their own joint venture in exchange for a quid pro quo from Fair Isaac – a provision that would minimize price competition between the Credit Bureaus.  DPP Compl., ¶¶102, 108, 124-27; IPP Compl., ¶¶119, 125, 145-49.

### 1.     *The No Equivalent Products Provision*

Each contract contains a No Equivalent Products provision.  That provision sustains Fair Isaac's monopoly by providing that the Credit Bureaus may not "develop" or "distribute" a non-Fair Isaac analytic "that is 'aligned to the odds-to-score relationship of any Fair Isaac Analytic' or uses more than a limited number of reason codes that 'match' reason codes used by any Fair Isaac Analytic."  DPP Compl., ¶¶107, 109-10; IPP Compl., ¶¶124, 126-27.  The clause expressly names VantageScore Solutions as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "'Equivalent Product.'"  DPP Compl., ¶109; IPP Compl., ¶126.

In practice, the No Equivalent Products provision prevents the Credit Bureaus from developing or selling an alternative to FICO Scores that would be compatible with systems, models, and processes B2B Purchasers have spent substantial effort developing.  DPP Compl.,

¶112; IPP Compl., ¶128.  It deprives B2B Purchasers of a legitimate choice between credit scoring analytics, forcing them to choose between using FICO Scores or redesigning their lending programs and systems to use a different scoring analytic at great cost.  DPP Compl., ¶114; IPP Compl., ¶134.

### 2. *The Dynamic Royalty Schedule Provision*

Fair Isaac's contracts with each Credit Bureau also include a Dynamic Royalty Schedule provision that allows Fair Isaac to control FICO Score pricing and penalize the distribution of non-FICO Scores.  DPP Compl., ¶116; IPP Compl., ¶136.

TransUnion itself has admitted that "Fair Isaac has abused and exploited this provision in 2015, 2016, and 2017 by not only raising prices, but also introducing entirely new and non-negotiated contract terms, royalty categories, and definitions."  DPP Compl., ¶117; IPP Compl., ¶137.  For instance, in 2015, Fair Isaac unilaterally imposed a new "Pre-Qualification" royalty category.  DPP Compl., ¶118; IPP Compl., ¶138.  This royalty category distinguishes between: "(1) lenders that use FICO Scores for 'Pre-Qualification' without providing any credit score or credit data to consumers; and (2) lenders that use FICO Scores for 'Pre-Qualification' while also providing credit score or credit data to consumers 'in connection' with 'Pre-Qualification.'"  DPP Compl., ¶118; IPP Compl., ¶¶138-39.  "If a lender purchases a FICO Score for use in 'Pre-Qualification' and does not provide any credit score or credit data to the consumer 'in connection' with the 'Pre-Qualification,' there is one per-score royalty rate.  If the lender purchases a FICO score for use in 'Pre-Qualification' and provides a VantageScore (or any other credit score) to the consumer 'in connection' with the 'Pre-Qualification,'" Fair Isaac imposes a ***seven times penalty rate*** for that FICO Score.  DPP Compl., ¶119; IPP Compl., ¶140.  That steep penalty is meant to dissuade – and indeed has dissuaded – lenders from providing competing credit scores, such as VantageScores.  DPP Compl., ¶¶119, 123; IPP Compl., ¶¶140, 144.

According to TransUnion, the penalty has worked: No B2B Purchaser has been willing to pay the penalty associated with this provision. DPP Compl., ¶123; IPP Compl., ¶144.

### 3. *The Level Playing Field Provision*

In exchange for their agreement to the other anticompetitive contract restrictions, Fair Isaac offered the Credit Bureaus a quid pro quo: Fair Isaac committed not to offer any Credit Bureau a more favorable price for distributing FICO Scores than any other Credit Bureau through Level Playing Field clauses. DPP Compl., ¶124; IPP Compl., ¶145. The Level Playing Field provision's effect is to reduce price competition, as it eliminates each Credit Bureau's incentive to negotiate better prices from Fair Isaac. DPP Compl., ¶126; IPP Compl., ¶147. It reduces Fair Isaac's incentive to give the Credit Bureaus more favorable pricing because any discount must be offered to all the Credit Bureaus. DPP Compl., ¶127; IPP Compl., ¶151. And it protects the Credit Bureaus from the threat that Fair Isaac will use favorable pricing to entice a new credit bureau to enter the market to compete with the established players. DPP Compl., ¶125; IPP Compl., ¶146.

As a result of these anticompetitive restrictions, B2B Purchasers pay a higher price for FICO Scores than they otherwise would have. DPP Compl., ¶127; IPP Compl., ¶151.

## V. PROCEDURAL HISTORY

### A. The TransUnion Litigation

In November 2017, Fair Isaac filed a lawsuit in this District against TransUnion, alleging that TransUnion failed to pay millions of dollars in royalties under the parties' licensing agreement and that it engaged in the unauthorized use of Fair Isaac's proprietary algorithms in violation of those agreements and federal law. *See* Dkt. 1, Redacted Compl., *Fair Isaac Corp. v. TransUnion*, No. 1:17-cv-08318 (N.D. Ill. filed Nov. 16, 2017). In January 2018, TransUnion filed counterclaims against Fair Isaac (which were made public in redacted form in February 2018), alleging that Fair Isaac's conduct – including much of the same conduct alleged here – violated

Section Two of the Sherman Act. *See* Dkt. 38, TransUnion LLC's Redacted Counterclaims, *Fair Isaac Corp. v. TransUnion*, No. 1:17-cv-08318 (N.D. Ill. filed Feb. 12, 2018) ("TransUnion Counterclaims"). TransUnion's counterclaims publicly revealed for the first time the anticompetitive terms underlying these class actions. *See* DPP Compl., ¶97; IPP Compl., ¶112.

Fair Isaac moved to dismiss the counterclaims. *See* Dkt. 54-56, *Fair Isaac Corp. v. TransUnion*, No. 1:17-cv-08318 (N.D. Ill. filed Mar. 23, 2018). Fair Isaac argued – as Defendants do in this suit – that it did not engage in any anticompetitive, "exclusionary conduct" because the terms of the Credit Bureaus' agreements with Fair Isaac are not anticompetitive. Dkt. 56, Fair Isaac Corp.'s Mot. to Dismiss Trans Union LLC's Antitrust and Unilateral Mistake Counterclaims, *Fair Isaac Corp. v. TransUnion*, No. 1:17-cv-08318, at 4-15 (N.D. Ill. filed Mar. 23, 2018).

The district court denied the motion in its entirety. Dkt. 96, Mem. Op. & Order, *Fair Isaac Corp. v. TransUnion*, No. 1:17-cv-08318 (N.D. Ill. Mar. 27, 2019). Analyzing the No Equivalent Products, Dynamic Royalty, and Level Playing Field provisions – the same provisions that form the basis for antitrust liability in these suits – Judge Coleman held that the "actual and attempted monopolization" claims were "adequately pled" because the counterclaims' allegations were sufficient to plead that Fair Isaac "engages in practices that are intended to drive out competition." *Id.* at 4. Further, Judge Coleman held that the allegations regarding those provisions – *i.e.*, allegations like those advanced in this litigation, that they "are unlawful attempts to 'maintain monopoly power through exclusionary conduct'" – were sufficient to withstand a motion to dismiss. *Id.* Fair Isaac's arguments – like the arguments Defendants advance here – "pertain[ed] more to the merits of [the] allegations, which [wa]s inappropriate" at the motion to dismiss stage. *Id.*

In November 2020, after the court ruled that TransUnion's counterclaim for violation of Section Two of the Sherman Act could proceed to discovery, TransUnion and Fair Isaac settled the lawsuit on undisclosed terms. DPP Compl., ¶99; IPP Compl., ¶114. Shortly thereafter, TransUnion announced that it had entered a long-term (presumably lucrative) contract to distribute FICO Scores throughout Canada. *Id.*

### B. The Class Litigation

While the TransUnion suit was still pending, on April 2, 2020, Sky Federal Credit Union ("Sky Federal") filed a class action complaint against Fair Isaac. Dkt. 1. Nine other direct and indirect purchasers of FICO Scores followed suit, filing their own actions in this District. On October 29, 2020, Sky Federal and seven other direct purchaser plaintiffs moved to consolidate the direct purchaser actions and appoint interim lead and liaison counsel. Dkt. 64. The Court granted Direct Purchaser Plaintiffs' motion in its entirety (Dkt. 83), allowing the claims to proceed along two tracks:

**Direct Purchaser Plaintiffs**. Direct Purchaser Plaintiffs and the Direct Purchaser Class directly purchased B2B credit scores from Fair Isaac and one or more Credit Bureaus, submitting payment to Fair Isaac directly, to the Credit Bureaus directly, or to both "[the Credit Bureau]/Fair Isaac" directly. DPP Compl., ¶¶15-21, 42. As described below, Direct Purchaser Plaintiffs and the Direct Purchaser Class are direct purchasers of FICO Scores. Fair Isaac's and the Credit Bureaus' conduct harmed competition and forced Direct Purchaser Plaintiffs and the Direct Purchaser Class to pay supracompetitive prices for such scores.

**Indirect Purchaser Plaintiffs**. Indirect Purchaser Plaintiffs and the Indirect Purchaser Class purchased FICO Scores in the B2B Credit Score Market from third parties. IPP Compl., ¶¶8-9, 20-23. The Defendants, through third parties, sell FICO Scores to Indirect Purchaser Plaintiffs and the Indirect Purchaser Class pursuant to agreements between Fair Isaac and each

Credit Bureau.  IPP Compl., ¶¶21-22.  Indirect Purchaser Plaintiffs and the Indirect Purchaser Class are indirect purchasers of FICO Scores.  Fair Isaac's and the Credit Bureaus' conduct harmed competition and forced Indirect Purchaser Plaintiffs and the Indirect Purchaser Class to pay supracompetitive prices for such scores.  IPP Compl., ¶¶8-9, 15, 19-23, 162, 164.

Direct Purchaser Plaintiffs filed their consolidated amended complaint on December 3, 2021 (Dkt. 121), and Indirect Purchaser Plaintiffs filed their consolidated amended complaint on December 6, 2021 (Dkt. 122).  Both classes are pursuing claims for violations of the Sherman Act §§1-3 and various states' competition and consumer-protection statutes through the same Class Period (October 1, 2006 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased).  Both classes seek injunctive and equitable relief in connection with the federal claims and damages in connection with the state-law claims.  Only Direct Purchaser Plaintiffs have brought claims for damages under the federal antitrust laws (Clayton Act Sections 4 and 16, 15 U.S.C. §§4, 16).

## ARGUMENT

The Complaints adequately plead claims for actual and attempted monopolization in violation of Sherman Act Section Two, conspiracy to restrain trade in violation of Sherman Act Section One, and violations of state competition and consumer-welfare statutes.  Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief."  This rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court."  *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009).

On a Rule 12(b)(6) motion, the court decides the adequacy of the complaint, not the merits of the case or whether a plaintiff will ultimately prevail.  *Gibson v. City of Chicago*, 910 F.2d 1510,

1520 (7th Cir. 1990). To survive a motion to dismiss, a plaintiff need only allege enough facts to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The court must accept all well-pleaded facts as true and draw all possible inferences in favor of the plaintiff. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 879 (7th Cir. 2012). Moreover, "[i]t is well established that courts generally only look to matters within the four corners of the complaint in deciding a motion to dismiss." *Bruno v. Glob. Experience Specialists, Inc.*, No. 19-CV-06710, 2020 WL 5253139, at *2 (N.D. Ill. Sept. 3, 2020) (Chang, J.); *see also Wilson v. Price*, 624 F.3d 389, 392 n.1 (7th Cir. 2010).

## I. THE COMPLAINTS ADEQUATELY STATE A MONOPOLIZATION CLAIM IN VIOLATION OF SECTION TWO OF THE SHERMAN ACT

Fair Isaac violated Section Two of the Sherman Act by maintaining its monopoly in the B2B Credit Score Market through anticompetitive agreements, meritless litigation, and false statements. To state a Section Two claim, a plaintiff must plausibly allege that a defendant (1) possessed monopoly power in a well-defined antitrust market, and (2) willfully acquired or maintained that power by means other than the quality of its product, its business acumen, or historical accident. *See Eastman Kodak Co. v. Image Tech. Serves.*, 504 U.S. 451, 4891 (1992); *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011).

The Complaints do just that. Defendants themselves admit that Fair Isaac holds more than a 90% market share. And rather than compete on price or quality alone, Fair Isaac instead engaged in an extended campaign to harm VantageScore. Indeed, one judge in this District has already held that such allegations are sufficient to state a Section Two claim against Fair Isaac at the pleading stage. *See* Background §V.A., *supra*. There is no basis for a different conclusion here.

A.  **The Complaints Adequately Allege Fair Isaac's Monopoly Power in the B2B Credit Score Market**

Fair Isaac does not dispute that the Complaints adequately define the relevant market, *i.e.*, the B2B Credit Score Market, which comprises "sales from a business (a credit score generator, such as Fair Isaac, directly or through a Credit Bureau) to a lender, creditor, or financial institution." DPP Compl., ¶46; IPP Compl., ¶51. Fair Isaac instead contends that the Complaints' allegations are insufficient to establish its monopoly power in that market. *See* FICO MTD, at 10-12. Fair Isaac's critiques are easily dismissed.

The Complaints allege Fair Isaac has "maintained a ***90-plus percent market share*** for at least . . . 13 years." DPP Compl., ¶66; IPP Compl., ¶78. Fair Isaac's monopoly in the B2B Credit Score Market has given it the power to control prices and impose monopoly rents. DPP Compl., ¶68; IPP Compl., ¶83. That allegation is well pleaded and grounded in ***Fair Isaac's own admissions*** that it is "the 800-pound gorilla," that "virtually every major lender in the U.S." uses the FICO Score, and that it "maintains a 90-plus percent market share." DPP Compl, ¶2; IPP Compl., ¶78. Fair Isaac's co-defendants, the Credit Bureaus, also recognize Fair Isaac's market power in the relevant market, repeatedly characterizing the FICO Score as a "***must have***." CB MTD, at 14; *see, e.g.*, *id*. ("Fair Isaac's FICO Scores are the most-used credit scores in the United States (and therefore essentially a 'must have')"); *id*. at 22 ("FICO Scores are a 'must have' for the bundles each Bureau sells"). In denying Fair Isaac's motion to dismiss TransUnion's Counterclaims for monopolization, Judge Coleman, too, recognized that Fair Isaac holds a monopoly. *See Fair Isaac Corp. v. TransUnion, Inc.*, No. 17-cv-8318, 2019 WL 1382068, at *2 (N.D. Ill. Mar. 27, 2019).

In an attempt to escape those well-pleaded allegations, Fair Isaac impermissibly refers (FICO MTD, at 11 nn.30-31) the Court to materials that fall outside "the four corners of the

complaint." *Bruno*, 2020 WL 5253139, at *2; *see Wilson*, 624 F.3d at 392 n.1. But those materials are not properly before the Court, and, in any event, the Complaints' allegations must be taken as true at the pleading stage. *See McReynolds*, 694 F.3d at 879.

Fair Isaac's assertion that a 90% market share "would not suggest FICO has a monopoly" is ludicrous. It is well settled that "[t]he existence of [market] power ordinarily may be inferred from the predominant share of the market." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *see also Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, No. 17 C 5010, 2018 WL 3861575, at *7 (N.D. Ill. Aug. 14, 2018) ("Courts regularly find pleading the defendant's share of the relevant market sufficient to allege this element at the pleading stage."). Fair Isaac's 90% market share in the relevant market is more than sufficient to establish its monopoly power. *See, e.g.*, *Grinnell*, 384 U.S. at 571 (87% market share); *MCI Commcn's Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1107 (7th Cir. 1983) ("seventy to eighty percent" market share); *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 902 (N.D. Ill. 2009) (65% market share).

The cases Fair Isaac cites do not support its position. *See* FICO MTD, at 11. In *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409 (7th Cir. 1989), the Seventh Circuit held an alleged 50% market share insufficient because other firms could "enter, expand, or import [into the relevant market] sufficiently quickly." *Id.* at 1414. Similarly, in *Int'l Dist. Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786 (2d Cir. 1987), the Second Circuit determined that market characteristics such as "the barriers to entry" and "the elasticity of consumer demand," among others, should be considered in the market-power analysis. *Id.* at 792. Both cases are easily distinguishable: Not only does Fair Isaac have at least a 90% market share, the Complaints also allege that there are high barriers to enter the relevant market due to "network effects" and high

"switching costs." DPP Compl., ¶¶50-54; IPP Compl., ¶¶62-66. At least at the pleading stage, Fair Isaac's dominance in the B2B Credit Score Market is beyond question.

Fair Isaac's assertion that it lacks power to "raise prices" in the B2B Credit Score Market does not change that conclusion. FICO MTD, at 11, 12. The argument is premised on ***factual arguments*** that the Credit Bureaus control the distribution and price of credit scores that find no support in the Complaints. *Id*. at 5-6, 12. At most, those arguments raise factual issues that are inappropriate for resolution on a motion to dismiss. *McReynolds*, 694 F.3d at 879. Here, the Complaints sufficiently allege that Fair Isaac has the power to control prices and impose monopoly rents in the relevant market. DPP Compl., ¶68; IPP Compl., ¶83. Fair Isaac's FICO Score business operates with an incredibly high operating margin of 86% and Fair Isaac has "discretion in whether [it] want[s its] margins to be higher or lower or where they are." DPP Compl., ¶¶68, 142; IPP Compl., ¶¶83, 163. By exercising its monopoly power, Fair Isaac implemented a 75% pricing increase for mortgage customers in 2018 and increased the pricing for auto customers and credit card customers in the following two years. DPP Compl., ¶142; IPP Compl., ¶163. Fair Isaac's power to raise prices of FICO Scores is further evidenced by its enforcement of the Dynamic Royalty Schedule provision, which allows Fair Isaac to charge a ***seven-times*** penalty rate directly to ***lenders*** that provide a consumer with a VantageScore. DPP Compl., ¶119; IPP Compl., ¶140. The Court should decline Fair Isaac's invitation to reach the merits of the case, rather than assess the adequacy of the pleadings.

Fair Isaac's argument regarding a "shared monopoly" with the Credit Bureaus is misleading and relies on misrepresentations of the Complaints' allegations (rather than taking them as true and making inferences in Plaintiffs' favor as required on a motion to dismiss). FICO MTD, at 12. The monopolization claim (Claim 5) is brought against Fair Isaac only. The Complaints

clearly and sufficiently allege that, by maintaining a 90% market share, Fair Isaac, as a single entity, has monopoly power in the B2B Credit Score Market. The Credit Bureaus' combined control over consumer credit data and combined market power in the market for ***credit reports***, a separate market from the relevant market, is irrelevant to that claim.

### B. The Complaints Adequately Allege Anticompetitive Conduct in the U.S. B2B Credit Score Market

Fair Isaac argues that Plaintiffs fail to plead anticompetitive conduct. FICO MTD, at 13-25. To the contrary, the Complaints sufficiently plead that Fair Isaac employed "unjustifiable means to gain that [monopoly] power" and maintain it. *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000). One judge in this District has already held that the anticompetitive conduct alleged in the Complaints "adequately pl[eaded] actual and attempted monopolization," rejecting Fair Isaac's arguments – like the arguments advanced here – as "pertain[ing] more to the merits of [the] allegations, which is inappropriate" at the motion to dismiss stage. *TransUnion*, 2019 WL 1382068, at *2.

It is well established that acts taken to maintain a monopoly cannot be "tightly compartmentaliz[ed]." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). Rather, courts must "look at the whole picture." *Id.*; *see also City of Mishawaka, Ind. v. Am. Elec. Power Co. Inc.*, 616 F.2d 976, 986 (7th Cir. 1980) (rejecting the argument that the court must consider each separate aspect of defendants' conduct "in a vacuum"). Even "acts which would be lawful in the absence of a monopoly" can be "unlawful under §2 if done by a monopolist" "because of their tendency to foreclose competitors from access to markets or customers." *Sargent-Welch Sci. Co. v. Ventron Corp.*, 567 F.2d 701, 711 (7th Cir. 1977). It may be "the mix of the various ingredients . . . in a monopoly broth that produces the unsavory flavor." *City of Mishawaka*, 616 F.2d at 986.

When Fair Isaac's actions are viewed in their entirety, the Complaints sufficiently allege that Fair Isaac knew the significant competitive threat posed by VantageScore Solutions and VantageScores and undertook an overall scheme to protect and extend its dominance in the B2B Credit Score Market in violation of Section Two.

*First*, as a judge in this District has already recognized, the No Equivalent Products, Dynamic Royalty Schedule, and Level Playing Field provisions are anticompetitive and designed to maintain Fair Isaac's monopoly. *TransUnion*, 2019 WL 1382068, at *2. The No Equivalent Products provision prohibits the Credit Bureaus from distributing credit scores that would be compatible with systems and models that B2B Purchasers have developed at great cost. DPP Compl., ¶¶109, 111; IPP Compl., ¶¶126, 131. It thus "prevent[s] competition," reduces consumers' choice, and protects FICO Scores' dominance in the B2B Credit Score Market. *TransUnion*, 2019 WL 1382068, at *2. The Dynamic Royalty Schedule provision, moreover, penalizes VantageScore by enabling Fair Isaac to charge seven times the normal rate for FICO Scores if a lender provides a consumer with a VantageScore as well as a FICO Score. DPP Compl., ¶¶116-19; IPP Compl., ¶¶136-40. This stiff penalty effectively "prevents" B2B Purchasers from using competing credit scores, such as VantageScore. *TransUnion*, 2019 WL 1382068, at *2. As TransUnion confirmed, at least as of the filing of its counterclaims, no B2B Purchaser had chosen to pay the penalty price. *See* DPP Compl., ¶123; IPP Compl., ¶144. Finally, the Level Playing Field provision "stifles competition" among the Credit Bureaus and stifles new entry into the credit report marketing. *See* DPP Compl., ¶¶125-27; IPP Compl., ¶¶146-47. The result of these anticompetitive provisions is higher rates paid by B2B Purchasers. *See TransUnion*, 2019 WL 1382068, at *2. In short, by imposing those anticompetitive provisions, Fair Isaac has maintained

its "monopoly power through anticompetitive means." *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 756 (N.D. Ill. 2019).

The fact that, as discussed below (Argument §§III., IV., *infra*) the anticompetitive agreements run afoul of Section One of the Sherman Act makes the Section Two violation all the clearer. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 477, 498 (N.D. Ill. 2019) ("Where defendant has engaged in unlawful restraint of trade that would independently violate Section 1 of the Sherman Antitrust Act, it is well established that it also violates Section 2 if it acquires or maintains a monopoly by means of that restraint of trade."). As Judge Coleman has already recognized, Fair Isaac's anticompetitive contract provisions alone are sufficient to state a Section Two claim.

***Second***, to the extent more is needed (and it is not), Fair Isaac has undertaken additional conduct that confirms the anticompetitive nature of its scheme to drive VantageScore out of the market. In response to the threat posed by VantageScore, Fair Isaac filed the *Equifax* Litigation against the Credit Bureaus. DPP Compl., ¶¶88-95; IPP Compl., ¶¶103-10. As relief, Fair Isaac requested that the Credit Bureaus "be ordered to dissolve VantageScore and/or to take all measures necessary to prevent VantageScore from having an unreasonable anticompetitive effect in any market." DPP Compl., ¶¶88-89; IPP Compl., ¶¶103-04.

The courts ultimately found Fair Isaac's claims meritless. DPP Compl., ¶92; IPP Compl., ¶107. In particular, they upheld a verdict against Fair Isaac on the trademark infringement claim that found that: (1) the asserted mark "300-850" (which denoted the range of FICO Scores) was merely descriptive; (2) Fair Isaac knowingly made false representations to the PTO to register the mark; and (3) the PTO relied on the false representations in deciding to issue registrations. *Id*. Yet, the very filing of the litigation enabled Fair Isaac to stunt VantageScore Solutions' growth

during its critical first few years. As the *Equifax* court noted, "[t]his extensive, expensive litigation seems to have been initiated largely in response to a perceived threat to Fair Isaac's dominant position in the credit scoring industry." DPP Compl., ¶93; IPP Compl., ¶108.

Fair Isaac also waged a years-long campaign to disparage VantageScore Solutions and VantageScore by misrepresenting VantageScore Solutions' credit scoring system and falsely claiming that VantageScore is unreliable in evaluating credit risks. *See, e.g.*, DPP Compl., ¶134; IPP Compl., ¶155 (advertisement that the VantageScore is "less reliable than FICO scores" and fails to use "sound practices" or "science-based evaluations"); DPP Compl., ¶137; IPP Compl., ¶157 (false and misleading statements alleging VantageScore is not a "reliable score" and "were weak and did a poor job forecasting future performance"); DPP Compl., ¶138; IPP Compl., ¶158 (blog post conveying false message that VantageScore does not differentiate medical from non-medical collections). Fair Isaac's disparaging and often false statements about VantageScore were designed to undercut VantageScore as a competitor.

## C.  Fair Isaac's Defenses Miss the Mark

Fair Isaac raises a number of affirmative defenses that are devoid of merit and, in any event, do not apply to the anticompetitive agreements Fair Isaac struck with the Credit Bureaus to maintain its monopoly. First, the *Noerr-Pennington* doctrine plainly does not apply to those agreements (and Fair Isaac does not suggest it does). Second, the agreements do not rely on the campaign of disparagement to be considered anticompetitive. And, finally, the claims based on the anticompetitive agreements are plainly within the four-year statute of limitations because Plaintiffs could not have discovered the terms of those confidential agreements until February 2018 at the earliest (less than two years before Plaintiffs filed their initial complaints in this matter) – when TransUnion filed its unredacted counterclaims and the anticompetitive provisions were first made public. At most, these defenses limit the conduct that is actionable under Section Two

21

to the agreements between Fair Isaac and the Credit Bureaus. They do not provide a basis to dismiss the claim entirely.

### 1. *The Noerr-Pennington Doctrine Does Not Apply*

Fair Isaac's invocation of the *Noerr-Pennington* doctrine fails. *See* FICO MTD, at 15-16. That doctrine "extends absolute immunity under the antitrust laws to 'businesses and other associations when they join together to petition legislative bodies, administrative agencies, or courts for action that may have anticompetitive effects.'" *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 841 (7th Cir. 2011). However, the doctrine does not extend to misrepresentations made to a government agency during the prosecution of intellectual property rights. *See, e.g.*, *Walker Process Equip., Inc. v. Food Mach. & Chemical Corp.*, 382 U.S. 172, 177 (1965) (holding that an entity that obtains a patent fraudulently and then uses that patent to exclude a competitor from the market from infringement suits is not entitled to antitrust immunity); *Donald F. Duncan, Inc. v. Royal Tops Mfg. Co*., 381 F.2d 879, 883 (7th Cir. 1967) (recognizing that proof that plaintiff's registration of its trademarks by fraud was necessary for establishing an exception to the *Noerr-Pennington* immunity); *Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*, 795 F. Supp. 639, 647 (S.D.N.Y. 1992) (recognizing that the fraudulent procurement of a copyright by means of knowing and willful misrepresentation to the Copyright Office may strip a copyright holder of its exemption from the antitrust laws).

That carveout precludes the *Noerr-Pennington* doctrine's application here. In the *Equifax* Litigation, a jury found that, in an attempt to deceive the PTO, Fair Isaac knowingly made a false representation in its PTO application for the registrations of the "300-850" trademark. DPP Compl., ¶92; IPP Compl., ¶107. The fact that Fair Isaac obtained the registration of its "300-850" trademarks by fraud and sought to exclude VantageScore Solutions from the market through an

22

infringement suit based on those false representations is sufficient to trigger the misrepresentation exception of *Noerr-Pennington*.

### 2. *Fair Isaac's Campaign of Disparagement Demonstrates Its Anticompetitive Intent*

Fair Isaac's arguments (FICO MTD, at 23-25) regarding its smear campaign against VantageScore also lack merit. Fair Isaac does not deny that many of its statements regarding VantageScore were false or misleading, but instead retreats to the assertion that its disparaging remarks about VantageScore cannot be the basis of Plaintiffs' antitrust claims. That is incorrect. Even if Fair Isaac's disparaging remarks are not actionable in isolation, those statements are part of Fair Isaac's multi-faceted monopolistic scheme and evidence of Fair Isaac's specific intent to monopolize the relevant market. *See DSM Desotech Inc. v. 3D Sys. Corp.*, No. 08-cv-15312009 WL 174989, at *10 (N.D. Ill. Jan. 26, 2009) ("'[I]ntent to control prices and destroy competition' can be inferred from predatory or anticompetitive conduct"); *Nexstar Broad., Inc. v. Granite Broad. Corp.*, No. 1:11-cv-249, 2012 WL 2838547, at *8 (N.D. Ind. July 9, 2012) ("[A]llegations of denigrating speech" are "part of a course of conduct . . . and show [defendant's] intent to monopolize . . . and destroy competition.").

### 3. *The Section Two Claim Is Timely*

Finally, Fair Isaac argues (FICO MTD, at 13-14) that the Sherman Act's four-year statute of limitations bars reliance on the *Equifax* Litigation. But that argument errs because it assumes allegations about the *Equifax* Litigation form a stand-alone claim. As set forth above, Plaintiffs never allege that the *Equifax* Litigation *alone* states a claim for monopolization. Instead, the Complaints clearly allege the *Equifax* Litigation is *a part of* Fair Isaac's multi-faceted scheme to maintain a monopoly. DPP Compl., ¶87; IPP Compl., ¶102. Fair Isaac's argument again invites the Court to impermissibly dismember Plaintiffs' allegations. *See Cont'l Ore Co.*, 370 U.S. at 699.

Similarly, Fair Isaac's argument that the continuing violation doctrine does not apply (FICO MTD, at 14) is misplaced. As Fair Isaac points out, Plaintiffs do not allege that the *Equifax* Litigation is a continuing "practice." *Id.* Plaintiffs allege that the *Equifax* Litigation was part of a decades-long, multi-faceted monopolistic scheme. *See* DPP Compl., ¶¶95, 164-67; IPP Compl., ¶¶190-92. It is well established that "[t]he period of limitations for antitrust litigation runs from the most recent injury caused by the defendants' activities rather than from the violation's inception." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004). Because "improperly prolonging a monopoly is as much an offense against the Sherman Act as is wrongfully acquiring market power in the first place, [e]ach discrete act with fresh adverse consequences starts its own period of limitations." *Id.*; *see also Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1187-88 (N.D. Cal. 2012) (finding that plaintiffs' Section Two claim is not based "solely" on the challenged merger and the alleged post-merger anti-competitive acts constitute "new and independent" acts that restarted the statute of limitations). Under the continuing violation doctrine, each of Defendants' overt acts in furtherance of the conspiracy started the statutory period running anew, regardless of the plaintiff's knowledge of the illegality at earlier times. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Even though the *Equifax* Litigation ended in 2011, it kickstarted Fair Isaac's monopolistic scheme in 2006, and that scheme continues to this day through the anticompetitive restrictions in the agreements between the Credit Bureaus and Fair Isaac, and Fair Isaac's ongoing disparagement campaign against VantageScore.[7]

---

[7]    The cases cited by Fair Isaac are plainly distinguishable. In those cases, the antitrust claims were time-barred because the ***last*** or ***sole*** overt act alleged was the anticompetitive litigation. *See Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1275 (5th Cir. 1991) (holding that the continuing conspiracy theory could not be invoked because the ***last*** overt act in pursuance of alleged conspiracy was filing of patent infringement suit); *P & M Servs., Inc. v. Gubb*, No. 07-12816, 2008 WL 4185903, at *5 (E.D. Mich. Sept. 8, 2008) (finding that the only act complained

In any event, Plaintiffs' claims are timely due to equitable estoppel and tolling. Equitable estoppel applies where a plaintiff shows "that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *In re Copper Antitrust Litig.*, 436 F.3d 782, 791 (7th Cir. 2006). Similarly, equitable tolling applies where, "despite all due diligence," a plaintiff cannot "obtain vital information bearing on the existence of his claim." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). Both doctrines apply here: Plaintiffs did not discover, and could not have discovered, Fair Isaac's overall scheme and their injuries through the exercise of reasonable diligence until (at the earliest) February 12, 2018, when TransUnion publicly revealed the substance of Fair Isaac's agreements with the Credit Bureaus for the first time. DPP Compl., ¶160; IPP Compl., ¶186. Indeed, Fair Isaac had affirmatively concealed the existence of a critical element to its monopolization scheme – the anticompetitive contract provisions – through confidentiality provisions that prohibited the Credit Bureaus from disclosing them. DPP Compl., ¶162; IPP Compl., ¶157. Fair Isaac does not dispute that point.

It was thus TransUnion's Counterclaims that first allowed Plaintiffs to piece the puzzle together and discover their injuries stemming from Fair Isaac's monopolization campaign.

## II. THE COMPLAINTS ADEQUATELY ALLEGE THAT ALL DEFENDANTS CONSPIRED TO VIOLATE SECTION TWO OF THE SHERMAN ACT

Plaintiffs adequately plead a claim for conspiracy to monopolize in violation of Section Two of the Sherman Act. To state such a claim, a plaintiff must allege "1) the existence of a combination or conspiracy, 2) overt acts in furtherance of the conspiracy, 3) an effect upon a substantial amount of interstate commerce and 4) the existence of specific intent to monopolize." *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 540-41 (7th Cir. 1986).

---

of in the case was the alleged sham patent lawsuit that was filed outside the limitations period). Here, the *Equifax* Litigation was simply the ***first step*** of Fair Isaac's monopolistic scheme.

Those elements are established here. It is undisputed that the Complaints adequately pleaded three individual conspiracies between Fair Isaac and the Credit Bureaus, satisfying the first element. The only dispute concerns whether a broader conspiracy involving all Defendants is adequately alleged – and indeed it is. *See* Argument §IV., *infra*. Nor do the Credit Bureaus dispute that signing anticompetitive agreements with Fair Isaac constitutes an overt act in furtherance of the conspiracy that had a substantial effect on interstate commerce. And while Fair Isaac denies the agreements are anticompetitive – an argument that fails for the reasons above – it offers no independent argument regarding the overt-act and substantial-amount requirements.

Citing an out-of-district case, the Credit Bureaus rest their defense on the argument that the Complaints' allegations are not "'specific enough' to support an inference that the Bureaus 'affirmatively wanted to perpetuate'" Fair Isaac's monopoly. CB MTD, at 36 (citing *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 731-32 (D. Md. 2001)).

As a preliminary matter, however, courts in this District are "wary to dismiss antitrust cases on intent solely on the pleading, because evidence of intent is often in the control of the defendants." *Wagner v. Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 682 (N.D. Ill. 2000); *Serfecz v. Jewel Food Stores, Inc.*, No. 92 C 4171, 1993 WL 262465, at *1 (N.D. Ill. July 12, 1993) ("where a claim under the antitrust laws has been stated, 'the factual, subjective questions of intent and purpose are properly resolved only after discovery and trial'") (quoting *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 553 (7th Cir. 1980)); *City of Rockford*, 360 F. Supp. 3d at 756 ("await[ing] discovery to determine how to best characterize defendants' conduct").

In the Seventh Circuit, moreover, "[s]pecific intent may be inferred from predatory conduct." *Great Escape*, 791 F.2d at 541; *see, e.g.*, *DSM Desotech*, 2009 WL 174989, at *9-10 (plaintiff "sufficiently alleged predatory or anticompetitive conduct" and thus specific intent);

*L&W/Lindco Prods., Inc. v. Pure Asphalt Co.*, 979 F. Supp. 632, 638-39 (N.D. Ill. 1997) ("specific intent is often established by the same evidence that is used to prove exclusionary conduct"). In cases involving exclusive dealing arrangements, courts typically infer specific intent when overt acts are adequately pleaded. *City of Rockford*, 360 F. Supp. 3d at 756-57. Here, specific intent can be inferred from Defendants' overt acts, which include signing anticompetitive agreements that have permitted Fair Isaac to prevent or penalize the distribution of competing products. The Complaints contain sufficient allegations to move forward on the conspiracy to monopolize claim.[8]

## III. THE COMPLAINTS ADEQUATELY ALLEGE THAT THE CREDIT BUREAUS INDIVIDUALLY CONSPIRED WITH FAIR ISAAC IN VIOLATION OF SECTION ONE OF THE SHERMAN ACT

The Complaints not only state a claim for violation of Section Two of the Sherman Act, they also state a claim for violations of Section One of the Sherman Act. Section One prohibits every "agreement," "combination," and "conspiracy" that constitutes a "restraint of trade or commerce." 15 U.S.C. §1. Here, there is no dispute that the Credit Bureaus and Fair Isaac each individually entered into agreements and conspired with Fair Isaac. The only dispute is whether those agreements are "in restraint of trade or commerce." *See* CB MTD, at 28-35; FICO MTD, at 30-36.

To determine whether an individual agreement unreasonably restrains trade, courts typically apply a "rule of reason" analysis. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,

---

[8]   Defendants' cases do not hold otherwise. *See* FICO MTD, at 27; CB MTD, at 35. In *Great Escape*, an appeal from dismissal on summary judgment, the court determined that specific intent could not be inferred because the plaintiff failed to create a genuine issue of material fact as to whether the defendant had engaged in predatory conduct. 791 F.2d at 541. Likewise, in *Microsoft Corp.*, 127 F. Supp. 2d 728, the court's decision rested, in significant part, on the plaintiffs' failure to allege that the original equipment manufacturer defendants "either individually or collectively, possessed sufficient market power to control the price of computers in any way." *Id*. at 732. Here, Plaintiffs have sufficiently alleged that Fair Isaac possessed monopoly power in the B2B Credit Score Market and that the Credit Bureaus dominate the market for credit reports which contain information used to generate credit scores. *See* Argument §I.A., *supra*.

551 U.S. 877, 893 (2007); *see also Wilk v. Am. Medical Ass'n*, 895 F.2d 352, 359 (7th Cir. 1990). At the pleading stage, that analysis requires courts to examine whether there are plausible allegations of (1) market power in the relevant markets; and (2) an "exclusionary" or anticompetitive effect. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020). Exclusionary conduct includes conduct that is "'part of a larger anticompetitive enterprise, such as . . . seeking to drive a rival from the market or disciplining it for daring to compete on price,'" the result of which "is to harm competition by 'entrench[ing] a dominant firm and enabl[ing] it to extract monopoly rents.'" *Id.*

The Complaints plausibly allege both market power and anticompetitive effects. As explained above, Fair Isaac's 90% market share – a number its officers have touted – sufficiently establishes its market power in the B2B Credit Score Market. *See* Argument §I.A., *supra.* And Fair Isaac's agreements with the Credit Bureaus have anticompetitive effects: They not only block the development and distribution of an alternative to the FICO Score, they also restrict price competition among the Credit Bureaus. Those sorts of restraints on product development, product distribution, and price competition are anticompetitive. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 105-06 (1984) (output and price restraints); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 936 (7th Cir. 2000) (distribution restraints).

## A.     The Complaints Adequately Plead Market Power

As discussed above, the Complaints allege that Fair Isaac possesses monopoly power, holding at least 90% market share in the B2B Credit Score Market. *See* DPP Compl., ¶175; IPP Compl., ¶198; *see also* Argument §I.A., *supra.* Similarly, the Complaints allege that the Credit Bureaus possess market power, "control virtually all of the credit report market," and, as a "triopoly," "enjoy roughly equivalent market shares." DPP Compl., ¶¶57, 202, 220, 238; IPP

Compl., ¶¶69, 229, 248, 267. The Credit Bureaus do not seriously dispute those allegations. Thus, the Complaints satisfy the first step of the rule of reason analysis. *See Viamedia*, 951 F.3d at 462.

## B. The Complaints Adequately Plead Anticompetitive Effects

The Complaints adequately allege that the distribution agreements between Fair Isaac and the Credit Bureaus – which effectively bar the sale of competing products that customers most desire, prevent innovation, and stifle price competition, DPP Compl., ¶¶109-11, 118-19, 124; IPP Compl., ¶¶126-28, 138-39, 145 – produce anticompetitive effects, including supracompetitive prices. *See Nat'l Collegiate Athletic Ass'n*, 468 U.S. at 105-06.

### 1. The Fair Isaac-Credit Bureau Agreements Have Anticompetitive Effects

**No Equivalent Products Provision**. The No Equivalent Products provision effectively deprives customers of access to products that they most desire and that pose the most severe competitive threat to FICO Scores' dominance – products compatible with systems purchasers have developed at great cost. It is well established that "[a] refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them." *F.T.C. v. Indiana Fed. of Dentists*, 476 U.S. 447, 459 (1986); *see also Calif. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999); *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 921 (7th Cir. 2016) ("The antitrust laws prohibit competing economic actors from colluding to agree on prices, either directly or through such mechanisms as output restrictions.").

That is what the No Equivalent Products provision does. It prohibits the Credit Bureaus from developing or selling any credit-scoring system that is "'aligned to the odds-to-score relationship of any Fair Isaac Analytic' or uses more than a limited number of reason codes that 'match' reason codes used by any Fair Isaac Analytic." DPP Compl., ¶109; IPP Compl., ¶126

29

(quoting TransUnion-Fair Isaac Agreement). That provision "expressly names VantageScore Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an 'Equivalent Product.'" *Id*. Because B2B Purchasers have developed systems and models designed to analyze and process FICO's odds-to-score relationship and reason codes, DPP Compl., ¶112; IPP Compl., ¶128, the No Equivalent Products provision reduces consumer choice in the B2B Credit Score Market by restricting the Credit Bureaus from offering products that would be compatible with the existing systems, models, and processes B2B Purchasers have spent substantial effort and resources developing. Through the No Equivalent Products provision, Fair Isaac and the Credit Bureaus essentially agreed not to allow VantageScore to develop a system that would be compatible with the B2B Purchasers' infrastructure, assuring that the Credit Bureaus would not compete with Fair Isaac to develop a competitor product. *Id*.

Defendants suggest that Fair Isaac's restraints are only anticompetitive if they completely eliminate "a Bureau's ability to develop or distribute" a competing product or foreclose VantageScore entirely. CB MTD, at 32-33; *see also* FICO MTD, at 33 (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984)).[9] That argument fails as a matter of fact and law. On the facts, the Complaints allege that the anticompetitive contract restrictions **have** effectively foreclosed VantageScore Solutions from developing and distributing a different, more marketable and useful product. *See* DPP Compl., ¶112 (describing how B2B Purchasers' systems and models are designed for FICO's odds-to-score relationship and reason codes); IPP Compl., ¶128. That is true even if VantageScore has managed to capture some minor amount of the market despite being hamstrung by the agreements' anticompetitive restrictions. *See* CB MTD, at 26.

---

[9]     *Roland* is inapposite because it does not concern a **concerted** refusal-to-deal, and "long ago the Court rejected" the "reasonableness" of **agreements** that restrain output and price. *Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 674 (7th Cir. 1992).

And it is wrong as a matter of law that anticompetitive harm requires a competitor's total demise. *See, e.g.*, *U.S. v. Dentsply Int'l, Inc*., 399 F.3d 181, 191 (3d Cir. 2005) ("The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."); *Conwood Co., L.P. v. U.S. Tobacco Co*., 290 F.3d 768, 780, 795 (6th Cir. 2002) (affirming judgment for plaintiff where plaintiff's market share grew despite defendant's anticompetitive activity); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 235 (S.D.N.Y. 2019) (rejecting argument that competitors' increased sales undercuts claim of anticompetitive effect); *see also Dealer Mgmt. Sys.*, 362 F. Supp. 3d at 535 (discussing stifling of innovation as anticompetitive harm); *DSM Desotech*, 2009 WL 174989, at \*11-12 (finding allegations of licensing agreements that, among other things, discouraged innovation, unreasonably restrained trade under Section One).

**Dynamic Royalty Schedule and Level Playing Field Provisions**. The Dynamic Royalty Schedule and Level Playing Field provisions inflict further anticompetitive harm. Together, they created a mechanism for Fair Isaac and the Credit Bureaus to charge the B2B Purchasers supracompetitive prices. The Dynamic Royalty Schedule allows Fair Isaac to unilaterally raise its royalty rates and charge a B2B Purchaser a steep penalty rate for a FICO Score if the lender also provides its consumer with a rival's credit score (*i.e.*, VantageScore) in pre-qualification decisions. DPP Compl., ¶¶116-23; IPP Compl., ¶¶150-53. Accordingly, this provision enables Fair Isaac to preserve its supracompetitive profit and foreclose rival credit scores from being provided to consumers at more competitive prices. And the Level Playing Field clause guarantees that Fair Isaac will not charge any one Credit Bureau a more favorable price for distributing FICO Scores, reducing their incentive to oppose price hikes and preventing new entrants into the credit-reporting market. DPP Compl., ¶¶124-30; IPP Compl., ¶¶145-50. Those clauses functioned to drive

"rival[s] from the market" and prevent them from "compet[ing] on price," allowing Fair Isaac and the Credit Bureaus to "extract monopoly rents." *Viamedia*, 951 F.3d at 462.

The Level Playing Field clause ensures that the Credit Bureaus will not compete with each other for discounts – why would they when Fair Isaac would have to offer the same lower prices to the other Bureaus? DPP Compl., ¶¶126-27; IPP Compl., ¶¶147, 151. Because Credit Bureaus would not get a price discount for innovative methods of distributing credit scores, the Level Playing Field provision effectively disincentivized the Credit Bureaus from developing such innovations, which could have led to lower prices for FICO Scores. This provision also protected the Credit Bureaus against the threat that Fair Isaac would seek to increase competition in distributing FICO Scores by facilitating the entry of a new credit bureau through favorable pricing offers. DPP Compl., ¶125; IPP Compl., ¶146. Those are "paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit." *Nat'l Collegiate Athletic* 468 U.S. at 107-08; *U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 626-27 (7th Cir. 2003) (Antitrust injury is "injury by reason of those things that make the practice unlawful, such as reduced output and higher prices.").

Those agreements' anticompetitive provisions – the No Equivalent Products, Dynamic Royalty, and Level Playing Field provisions – resulted in harm to B2B Purchasers. DPP Compl., ¶¶128-29; IPP Compl., ¶¶151-52. Fair Isaac's monopoly has allowed it to charge supracompetitive prices "for decades." DPP Compl., ¶12. The Leveling Play Field provision compensated the Credit Bureaus by shielding them from pricing competition from each other and new market entrants. As the Complaints allege, the conspiracies, in their totality, worked because ***both*** Fair Isaac and the Credit Bureaus benefitted at the expense of B2B Purchasers. *See, e.g.*, DPP Compl., ¶10; IPP Compl., ¶15 ("The conspiracy and the contracts that effectuated the conspiracy were

intended to, and had the effect of, hobbling VantageScore Solutions' ability to compete and forcing B2B Purchasers to pay supracompetitive prices for credit scores."); DPP Compl., ¶42; IPP Compl., ¶48 (stating that certain contracts require purchasers to pay fees to Fair Isaac and Credit Bureaus for FICO Scores); DPP Compl., ¶102; IPP Compl., ¶119 ("The point of the conspiracy was to support supracompetitive prices for credit scores for the consumers – the B2B Purchasers.").

The Credit Bureaus claim only *they* are harmed by the exorbitant royalties Fair Isaac may charge under the Dynamic Royalty Schedule. CB MTD, at 33. That assertion strains credulity. The Credit Bureaus are not shouldering the burdens of Fair Isaac's supracompetitive prices; the B2B Purchasers are. First, the Credit Bureaus do not purchase FICO Scores; they license Fair Isaac's credit-score-generating algorithm. *See* DPP Compl., ¶44; FICO MTD, at 1, 4 ("FICO licenses its scoring models to the Credit Bureaus."); CB MTD, at 4 (similar). Second, multiple class members have contracts that instruct payment to be made directly to "*[the Credit Bureau]/Fair Isaac*," without interposing the Credit Bureaus as middlemen. DPP Compl., ¶42. Finally, regardless of how payment is made, no rational Credit Bureau would agree to give Fair Isaac power to raise prices at whim – which Fair Isaac has exercised to impose price increases of at least 75%, DPP Compl., ¶142 – unless they also expected to benefit from those higher prices.[10] In fact, TransUnion has admitted that any higher prices resulting from the contracts were "ultimately . . . borne by 'banks [and] mortgage lenders (*i.e.*, B2B Purchasers)." DPP Compl., ¶129; IPP Compl., ¶¶152-53. That purchasers – not the Credit Bureaus – pay higher prices for

---

[10]    Defendants argue that the Complaints fail to allege that "new royalty categories" and the seven-times penalty resulted from the Dynamic Royalty Schedule. CB MTD, at 33-34. That is a blatant misreading of the Complaints. The Dynamic Royalty Schedule *allows* Fair Isaac to "replace" the Royalty Schedule every 12 months, including introducing new categories, DPP Compl., ¶¶116-17, IPP Compl., ¶¶136-37, and, as part of the new Royalty Schedule introduced in 2015 (pursuant to the Dynamic Royalty Schedule), Fair Isaac introduced an additional economic penalty for purchasers receiving a VantageScore. DPP Compl., ¶118; IPP Compl., ¶138.

FICO Scores is confirmed by TransUnion's admission that purchasers refused to pay penalty pricing imposed by Fair Isaac pursuant to the Dynamic Royalty Schedule provision. DPP Compl., ¶123; IPP Compl., ¶143. If the Credit Bureaus were absorbing price increases as they claim, purchasers would not have noticed. Being forced to pay supracompetitive prices is quintessential antitrust injury. *See Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins, Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986) ("[I]njury from higher prices or lower output [are] the principal vices proscribed by the antitrust laws."); *see, e.g.*, *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940); *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 782 (N.D. Ill. 2020).

### 2.     *Defendants' Procompetitive Justifications Are Not Properly Before the Court and Lack Merit in Any Event*

Defendants posit that the anticompetitive restrictions in their agreements have a host of procompetitive justifications, including that the No Equivalent Products provision protects against "free riding," and the Dynamic Royalty Schedule and Level Playing Field provisions are necessary to avoid "confusion" and "compensat[e]" Fair Isaac for contributing to another provider's brand. *See* CB MTD, at 31-35; FICO MTD, at 17-23. But courts typically do not consider "procompetitive justifications" on a motion to dismiss because weighing pro-competitive justifications against anti-competitive effects is a fact-intensive exercise. *See Viamedia*, 951 F.3d at 462. "[W]hether challenged conduct has a procompetitive effect on balance so as to survive scrutiny under a rule-of-reason analysis presents a factual issue that cannot be resolved at this stage of the case." *Moehrl*, 492 F. Supp. 3d at 783; *see also Dealer Mgmt. Sys.*, 360 F. Supp. 3d at 803 (same). In any event, Defendants' "procompetitive" justifications lack merit.

Defendants claim that the No Equivalent Products clause is "procompetitive" because it "prevent[s] licensees from copying" Fair Isaac's "intellectual property." FICO MTD, at 17; *see id.* at 18, 31-32; CB MTD, at 32. But prohibiting the distribution of products with a similar odds-

to-score ratio does not implicate any protectable intellectual property: Odds-to-score ratios are assigned "arbitrar[ily]." DPP Compl., ¶113; IPP Compl., ¶132. Nor does prohibiting the use of too many "reason codes" (which lenders have long used) protect *Fair Isaac's* intellectual property: It did not invent reason codes. DPP Compl., ¶¶37, 113; IPP Compl., ¶¶38, 132-33.

Fair Isaac and the Credit Bureaus vaguely gesture at cases involving copyrights and trademarks. FICO MTD, at 18; CB MTD, at 31. But Defendants nowhere claim that Fair Isaac holds registered copyrights or valid trademarks for the odds-to-score ratios or reason codes Fair Isaac is supposedly protecting (much less do they refer to any allegations in the Complaint about that supposed intellectual property – there are none). Nor do Defendants explain how Fair Isaac could satisfy the statutory requirements for claiming copyright or trademark protection. *See, e.g.*, 17 U.S.C. §102 (requiring, among other things, copyrighted material to be "fixed" in a "tangible medium" and prohibiting copyright protection for any "idea," "method," or "concept"); *Fair Isaac Corp.*, 650 F.3d at 1147-50 (upholding verdict that a Fair Isaac trademark for range of odds-to-score ratios to be invalid and obtained through knowingly false representations to the PTO). Precisely what intellectual property Fair Isaac claims to own and the legal basis for owning it remains opaque.

In any event, merely holding some protectable intellectual property would not confer on Fair Isaac "an absolute and unfettered right" to impose whatever licensing terms "it wishes." *U.S. v. Microsoft Corp.*, 253 F.3d 34, 63 (D.C. Cir. 2001); *see In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000) ("Intellectual property rights do not confer a privilege to violate the antitrust laws."). Neither the Dynamic Royalty Schedule nor Level Playing Field clauses have anything to do with protecting intellectual property. They instead penalize the

distribution of VantageScore products and restrict price competition for selling FICO Scores.[11] And there are at least plausible allegations that the No Equivalent Products clause reaches more broadly than protecting Fair Isaac's intellectual property. It embraces "reason codes" that Fair Isaac did not invent and does not own. DPP Compl., ¶¶37, 113; IPP Compl., ¶¶38, 132-33.[12]

At most, whether Fair Isaac owns protectable intellectual property and whether the anticompetitive restrictions in its agreements with the Credit Bureaus serve to protect that intellectual property are "factual issues that should not be resolved on a motion to dismiss." *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chi.*, 45 F.3d 1144, 1154 (7th Cir. 1995).

Defendants also argue the Level Playing Field provision cannot be anticompetitive because the term is apparently standard in many contracts, akin to a "Most Favored Nation" clause. CB MTD, at 33-34. Standard or not, it is well established that, "[u]nder the right circumstances, a [most-favored-nations clause] can 'facilitate anticompetitive horizontal coordination' by 'reduc[ing] [a company's] incentive to deviate from a coordinated horizontal arrangement.'" *United States v. Apple*, 791 F.3d at 290, 320 (2d Cir. 2015) (quoting Jonathan B. Baker, *Vertical*

---

[11]    Fair Isaac suggests penalty pricing requiring consumers to pay more to see both FICO Scores and VantageScores protects consumers against confusion. FICO MTD, at 20. If that were true, Fair Isaac would not permit VantageScores to be shown alongside FICO Scores at any price, or it would insist upon clarifying disclosures. It would not require purchasers to pay more to provide a competing scoring analytic that actually helps "more borrowers to obtain fairer pricing" from lenders. DPP Compl., ¶¶73-84, 122; IPP Compl., ¶¶89-100, 143.

[12]    Defendants' reliance on *Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971 (7th Cir. 1999), is thus misplaced. In that case, the Seventh Circuit upheld an agreement prohibiting a distributor from licensing rights to sell Olympian-trademarked generators in a particular territory because it left distributors "free to sell or license" similar generators under "different trademark[s]." *Id.* at 973, 976-77. Here, by contrast, Defendants' agreements prohibit the sale of any equivalent products. Nor does *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581 (7th Cir. 2002), support Defendants' position. That case – which addressed state, not federal, antitrust laws – stands only for the generic proposition that antitrust laws do not create a privilege to violate valid confidentiality agreements. *Id.* at 585. It nowhere holds that a company may seek to prohibit a competitor from distributing a product developed through independent effort.

*Restraints with Horizontal Consequences: Competitive Effects of "Most-Favored-Customer" Clauses*, 64 ANTITRUST L.J. 517, 520-21 (1996)) (alterations in original); *see also Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995); Jonathan B. Baker & Judith A. Chevalier, *The Competitive Consequences of Most-Favored-Nation Provisions*, ANTITRUST, at 20-26 (Spring 2013). And the Complaints allege that is what the Level Playing Field clause did here. *See* DPP Compl., ¶¶126-30; IPP Compl., ¶¶147-53. Any disagreement about whether the clause was more anticompetitive or procompetitive on balance raises factual issues that must await resolution.

## IV.    THE COMPLAINTS ADEQUATELY ALLEGE A CONSPIRACY TO RESTRAIN TRADE AMONG ALL DEFENDANTS IN VIOLATION OF SECTION ONE OF THE SHERMAN ACT

Defendants' anticompetitive agreements not only individually violate Section One of the Sherman Act. They are also evidence of a broader "conspiracy" or "combination" involving all Defendants to restrain trade in violation of Section One of the Sherman Act. 15 U.S.C. §1. As the Complaints explain, the Credit Bureaus together agreed to terms preventing the distribution of products that could be a substitute for FICO Scores and agreed to terms allowing Fair Isaac to penalize VantageScore sales in exchange for greater protection against competition from each other. That broader arrangement is so plainly anticompetitive that it constitutes a *per se* violation of the Sherman Act.

### A.    Allegations of a Conscious Commitment to an Unlawful Scheme Are Sufficient to Plead a Conspiracy

To satisfy Section One's concerted-action requirement, a plaintiff must allege that the defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984); *see Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 841 (7th Cir. 2020). Satisfying that requirement does not require allegations of a "formal agreement," *Am. Tobacco Co. v. U.S.*, 328

U.S. 781, 809 (1946), "personal communication," *U.S. v. Consol. Packaging Corp.*, 575 F.2d 117, 126-27 (7th Cir. 1978), or "'simultaneous action,'" *U.S. v. Masonite Corp.*, 316 U.S. 265, 275 (1942) (quoting *Interstate Cir. v. U.S.*, 306 U.S. 208, 226 (1939)). Nor is the "form of the combination" "of importance," *Am. Tobacco*, 328 U.S. at 809; Defendants cannot insist that a conspiracy bear a particular label, *contra*, FICO MTD, at 27-30, 39 (characterizing alleged conspiracy as "hub-and-spokes conspiracy"); CB MTD, at 1, 11, 27, 43 (same). What matters is whether a "unity of purpose or common design and understanding" can be inferred from "dealings or other circumstances." *Am. Tobacco*, 328 U.S. at 809. "It is enough" to plausibly allege that the defendants "participate[d] in a scheme" with "knowledge that concerted action was contemplated." *FTC v. Cement Inst.*, 333 U.S. 683, 716 n.17 (1948); *see U.S. v. Paramount Pictures*, 334 U.S. 131, 142 (1948); *Interstate Cir.*, 306 U.S. at 226; *Consol. Packaging*, 575 F.2d at 126-27.

Typically, the existence of a conspiracy must be inferred from circumstantial evidence. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002). A wide variety of evidence can support an inference of conspiracy, including "parallel behaviors," *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010); "industry structure[s]" that facilitate collusion, *id.*; actions "contrary to [individual] interests," *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3d Cir. 2010); and "communications and meetings among conspirators," *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015), *as amended on reh'g* (Oct. 29, 2015). "[N]o single" allegation, however, need "point[] unequivocally to conspiracy." *High Fructose*, 295 F.3d at 655. The "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co.*, 370 U.S. at 699; *see also Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016).

To plausibly allege a conspiracy, all that is required is "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. There is no "probability requirement at the pleading stage." *Id*. The complaint must simply plead facts sufficient to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id*. For example, allegations of "parallel" behavior "plus" something else may suffice. *Text Messaging*, 630 F.3d at 627. A complaint need not "'rule out the possibility of independent action.'" *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016). A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556. There is no requirement that the facts pleaded "exclude the possibility of non-conspiratorial explanations." *Erie Cnty. v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012) (distinguishing between pleading standards and requirements imposed after opportunities for discovery); *see also Evergreen Partnering Grp. Inc. v. Pactiv Corp.*, 720 F.3d 33, 45-46 (1st Cir. 2013).

## B. The Complaints Adequately Plead that All Defendants Had a Conscious Commitment to a Common Unlawful Scheme

Defendants' claims that the Credit Bureaus were operating in the dark – *i.e.*, that the Credit Bureaus individually entered and adhered to anticompetitive restrictions unaware that the other Credit Bureaus had agreed, or would agree, to the same restrictions – ring false. *See* CB MTD, at 11-12; FICO MTD, at 28-29. There can be no question that TransUnion "participated in" Fair Isaac's scheme "aware that the other" Credit Bureaus "had joined." *Interstate Cir.*, 306 U.S. at 226-27. TransUnion *admitted* that it signed the challenged contract *after* learning from Fair Isaac "that TransUnion's two major competitors, Experian and Equifax, had already agreed to materially similar new contracts." TransUnion Counterclaims, ¶43; *see* DPP Compl., ¶107; IPP Compl., ¶124. And there is sufficient circumstantial evidence that Experian and Equifax agreed and

39

adhered to anticompetitive contracts knowing that the other Credit Bureaus had done, or would do, the same. *See Consol. Packaging*, 575 F.2d at 126 ("Once a conspiracy has been established, slight evidence is needed to connect a particular participant.").

### 1. *Parallel Contracting Between Sophisticated Parties Supports an Inference of Conspiracy*

The Credit Bureaus – sophisticated entities in a highly concentrated industry – each entered into and adhered to contracts with Fair Isaac containing the same anticompetitive terms. DPP Compl., ¶¶99, 106-07; IPP Compl., ¶¶114, 123-24. That parallel conduct creates a "strong inference" of "concerted action," particularly (as explained below) given that the contracts contained terms that would make no sense for individual Credit Bureaus to enter. *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 394 (1948); *see Apple*, 791 F.3d at 316 (separate but similar agreements "provide[d] strong evidence that Apple consciously orchestrated a conspiracy" with publishers). Each contract contains a No Equivalent Products provision that prohibits the development and distribution of products that could serve as drop-in replacements for FICO Scores. DPP Compl., ¶¶109, 111; IPP Compl., ¶¶114, 123-24. And each contract also contains a Dynamic Royalty Schedule provision that allows Fair Isaac to change royalty rates for FICO Scores unilaterally every 12 months and which Fair Isaac did, in fact, use to impose a penalty rate on B2B Purchasers who displayed a VantageScore in their pre-qualification decisions. DPP Compl., ¶¶116-20; IPP Compl., ¶¶136-41.

The Credit Bureaus do not dispute that the Complaints allege each entered into the same anticompetitive contracts. They nonetheless deny that conduct constitutes "parallel" conduct because the contracts were not signed "simultaneously." CB MTD, at 12-13, 20, 42-43; *see* FICO MTD, at 28-29. But "[i]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement." *Interstate Cir.*, 306 U.S. at 227; *see also United Mine*

*Workers of Am. v. Pennington*, 381 U.S. 657, 673 (1965); *SD3*, 801 F.3d at 429; *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077, nn.5, 9 (N.D. Ill. 2011); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011). Courts routinely hold that actions taken over periods of time "comparable to or longer than" the period alleged here constitute "parallel conduct." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) (collecting examples); *see, e.g.*, *Kleen Prods.*, 775 F. Supp. 2d at 1077-78 (five years); *Plasma-Derivative*, 764 F. Supp. 2d at 996 (two years).

The Complaints, moreover, explain why the contracts were executed less than two years apart – two of the Credit Bureaus' prior agreements with Fair Isaac "expired in 2013" while the third "expired . . . in 2015." DPP Compl., ¶101; IPP Compl., ¶118. Far from acting at "[un]predictable" times (CB MTD, at 13), Fair Isaac and the Credit Bureaus executed parallel anticompetitive contracts at the first available opportunity. That sets this case apart from *Wash. Cnty Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824 (N.D. Ill. 2018) (cited CB MTD, at 13), where the plaintiffs "offer[ed] no explanation" for why the challenged actions were "not remotely parallel in magnitude," occurred at times that were not "predictable," and in some instances, "contributed nothing to [the] allegedly collusive scheme." *Baxter*, 328 F. Supp. 3d at 836-37.[13]

---

[13]     *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505 (8th Cir. 2018), is also inapposite. Contrary to the Credit Bureaus' suggestion (CB MTD, at 13 n.6), the court expressly declined to hold that actions taken six months apart "can never constitute parallel conduct," 911 F.3d at 517. It instead held that actions allegedly taken in furtherance of a boycott were not parallel where they occurred "under dissimilar circumstances," they were "separated by six months," and actions inconsistent with a "boycott" were taken during that six-month period. *Id.* at 516-17. And *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007), found parallel conduct was alleged, but it held that parallel conduct alone is not sufficient to state a conspiracy. *Id.* at 1022-23.

### 2. Absent a Conspiracy, the No Equivalent Products Clause Would Be Contrary to the Credit Bureaus' Individual Self-Interest

Although the Credit Bureaus' parallel conduct may not be enough standing alone, other evidence makes allegations of conspiracy plausible. *See Text Messaging*, 630 F.3d at 627. The fact that it would have been "contrary to [the] interests" of any individual Credit Bureau to agree to the No Equivalent Products clause confirms the Credit Bureaus were aware that their rivals had agreed to and adhered to similar anticompetitive contracts (or would do so). *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004); *see, e.g.*, *Apple*, 791 F.3d at 320 (agreement to restrain trade can be inferred where "multiple competitors sign vertical agreements that would be against their own interests were they acting independently"); *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2019 WL 1003111, at *2 (N.D. Ill. Feb. 28, 2019) (considering motive); *In re Plasma-Deriv. Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002-03 (N.D. Ill. 2011). TransUnion's admission that it entered into the anticompetitive agreement with Fair Isaac ***knowing*** that Experian and Equifax had already agreed to materially similar new contracts" only underscores the point. TransUnion Counterclaims, ¶43; *see* DPP Compl., ¶107; IPP Compl., ¶124.

Although the Credit Bureaus jointly own VantageScore Solutions, they also compete with each other in selling VantageScore models and scores. DPP Compl., ¶¶71-72; IPP Compl., ¶¶87-88. If VantageScore Solutions offered a scoring system compatible with B2B Purchasers' existing models and systems – what Fair Isaac deems an "equivalent product" – each Credit Bureau would stand to earn significant revenue by distributing that analytic. DPP Compl., ¶¶109, 111; IPP Compl., ¶¶126, 128. Any Credit Bureau that agreed to the No Equivalent Products clause would lose out on the business to its competitor Credit Bureaus. DPP Compl., ¶109; IPP Compl., ¶126.[14]

---

[14] The provision also would harm the Credit Bureaus through their joint venture. DPP Compl., ¶¶72, 111; IPP Compl., ¶¶88, 128.

Accepting a prohibition on distributing a replacement for FICO Scores – a product likely to be in high demand – would thus make economic sense only if a Credit Bureau "could be sure its competitors were doing the same thing." *Toys "R" Us, Inc.*, 221 F.3d at 936. That fact combined with the Credit Bureaus' parallel conduct makes conspiracy allegations plausible. *See id.* (inferring conspiracy from economic sense of actions); *see also Interstate Cir.*, 306 U.S. at 222 (relying on similar evidence).

The Credit Bureaus nowhere dispute that they would lose out on distribution revenue. They instead attempt to manufacture a contradiction by pointing to allegations that Fair Isaac's anticompetitive restrictions would *also* harm them "collectively." CB MTD, at 19. But it is perfectly consistent to allege that the No Equivalent Products clause would cause both "individual" and "collective" harm given that the Credit Bureaus earn revenue individually from distributing VantageScore products and collectively from owning the company whose product is being distributed. DPP Compl., ¶108; IPP Compl., ¶125. Nor can the Credit Bureaus show that agreeing to the No Equivalent Products clause was in their individual interests by asserting that VantageScore Solutions does not *currently* offer products using "the same odds-to-score relationships or reason codes as FICO Scores." CB MTD, at 21. The No Equivalent Products clause itself indicates that VantageScore Solutions would have offered products with characteristics similar to FICO Scores but for the ban on equivalent products the Credit Bureaus agreed to at the behest of Fair Isaac: It "expressly names VantageScore Solutions LLC as a developer of such a scoring system." DPP Compl., ¶109; IPP Compl., ¶126. And the desirability of the banned product to purchasers provides further evidence that VantageScore Solutions would have otherwise offered the product. *See* DPP Compl., ¶112; IPP Compl., ¶128.

### 3. *The Dynamic Royalty Schedule and Level Playing Field Clauses Provide Further Evidence of Conspiracy*

The Dynamic Royalty Schedule and Level Playing Field provisions lend further support to the conspiracy allegations. No Credit Bureau would give Fair Isaac the power to raise royalty rates unilaterally unless it could be sure the other Credit Bureaus were paying similar prices. Otherwise, Fair Isaac could "selectively offer discounts that could expose them to the risk of losing market share to their competitors." DPP Compl., ¶125; IPP Compl., ¶146. Thus, to address that concern, Fair Isaac offered the Credit Bureaus a guarantee that they would not pay more than their competitors through the Level Playing Field clause. DPP Compl., ¶¶124-25; IPP Compl., ¶¶145-46. But that clause itself would suggest to each Credit Bureau that similar contract provisions were being offered to the other Credit Bureaus. *See U.S. v. Gen. Elec. Co.*, 42 Fed. Reg. 17,005, 17,007 (Mar. 25, 1977) (Department of Justice consent order prohibiting most-favored-nations clause "to prevent the implicit communication of a policy of equal treatment"). It does not require breaking "new ground" to conclude that clauses imposing similar pricing across an industry "can be 'misused to anticompetitive ends.'" *Apple*, 791 F.3d at 320; *see id.* at 316-17. Indeed, the "very act" of agreeing to a most-favored-nation clause can signal collusion. *Id.* at 317.

The Level Playing Field clause, moreover, provided a powerful incentive to conspire. That provision not only protected each Credit Bureau against competition from other Credit Bureaus, but also protected the Credit Bureaus against the "threat" that a new credit bureau would enter the market, enticed by favorable pricing offers. DPP Compl., ¶¶124-25; IPP Compl., ¶¶145-46. That "common motive to conspire" "'support[s] the inference that a conspiracy existed.'" *Apple*, 791 F.3d at 315; *see id.* at 317 (promise of "higher prices" obtained through a most-favored-nation clause provided evidence of "a conscious commitment" to a scheme); *JTC Petrol. Co. v. Piasa*

*Motor Fuels, Inc.*, 190 F.3d 775, 777 (7th Cir. 1999) (evidence that cartelists paid producers to "police their cartel" supported conspiracy allegations).

Defendants' arguments that it would be "irrational" for the Credit Bureaus to conspire to injure their own joint venture thus miss the mark. FICO MTD, at 26-27; *see* CB MTD, at 25. The facts alleged – that the Credit Bureaus accepted terms that would harm VantageScore in exchange for the quid pro quo of the Level Playing Field clause that reduced competition among themselves as distributors of FICO Scores – show why it was rational for the Credit Bureaus to conspire. *See Marion Healthcare*, 952 F.3d at 843 (allegations of "quid pro quo" support argument that co-conspirators were "compensated" for "participating in the alleged antitrust conspiracy").

Moreover, the Credit Bureaus themselves identify another reason for accepting Fair Isaac's restraints – FICO Scores are a "must have." CB MTD, at 14; *see* DPP Compl., ¶¶61-69; IPP Compl., ¶¶43, 77-84. That the Credit Bureaus may have conspired "unwillingly, reluctantly, or only in response to coercion" does not preclude conspiracy. *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 973 (7th Cir. 1995) (collecting cases). In any event, the Complaints need not establish that conspiracy is the ***most rational*** explanation for the Credit Bureaus' conduct or "exclude the possibility of non-conspiratorial explanations." *Erie Cnty.*, 702 F.3d at 869; *see also Evergreen*, 720 F.3d at 45-46. It suffices to establish that conspiracy is a plausible explanation. *See Text Messaging*, 630 F.3d at 627.[15]

---

[15] In arguing that it made economic sense to accept the Dynamic Royalty Schedule and Level Playing Field clauses, CB MTD, at 21-22, the Credit Bureaus misapprehend their significance. The Level Playing Field clause would be a hollow guarantee unless a Credit Bureau had a way to know whether it was, in fact, paying the lowest price. That supports an inference that each Credit Bureau was aware of the terms on which the other Credit Bureaus were dealing with Fair Isaac, either due to actual communication among the conspirators or a market structure that made communication unnecessary for collusion to occur. *Cf. High Fructose*, 295 F.3d at 656-57.

#### 4. The Timing of the Agreements Suggests Conspiracy

That Fair Isaac signed agreements with the Credit Bureaus at a "critical time" supports an inference of collusion. DPP Compl., ¶104; IPP Compl., ¶121; *see Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) ("Suspicious timing is thus 'often an important evidentiary ally of the plaintiff.'"); *Broiler Chicken*, 290 F. Supp. 3d at 800; *Kleen*, 775 F. Supp. 2d at 1080. Around 2013, the Credit Bureaus' VantageScore was poised to grab market share from Fair Isaac's FICO Score and erode Fair Isaac's 86% profit margin. DPP Compl., ¶¶104, 142; IPP Compl., ¶¶121, 163. VantageScore Solutions had successfully fended off litigation from Fair Isaac intended "'to put [it] out of business,'" formed a partnership with the Consumer Federation of America (an association of "'nearly 300 consumer groups'"), launched an improved scoring system, and stood to benefit from favorable regulatory changes. DPP Compl., ¶¶89, 104; IPP Compl., ¶¶104, 121. The Credit Bureaus had every incentive to build on that success, including by developing a new scoring system that could compete more effectively with FICO Scores (a so-called "equivalent product"). Instead, all three Credit Bureaus entered into contracts that diminished VantageScore in exchange for concessions from Fair Isaac. DPP Compl., ¶105; IPP Compl., ¶122. The Credit Bureaus' decision to change course on the eve of success points to conspiracy.

#### 5. The Highly Concentrated Market Structure Supports Conspiracy Allegations

The "market structure" for the B2B Credit Score Market further supports the inference of conspiracy. *Text Messaging*, 630 F.3d at 628. "[T]he possibility of anticompetitive collusive practices is most realistic in concentrated industries." *Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir. 2001). That makes sense: "Fewer 'minds' must 'meet' in a concentrated market." *Id*. In industries dominated by only a few major players, "elaborate communications, quick to be detected," are not necessary to facilitate collusion. *High Fructose*, 295 F.3d at 656. Moreover, in

such industries, if one participant in the conspiracy "broke ranks, the others would quickly discover the fact, and so the [defector] would have gained little from cheating on his coconspirators." *Id.*

The B2B Credit Score Market is highly concentrated. Fair Isaac controls a better than 90% market share, and the Credit Bureaus jointly own Fair Isaac's principal competitor. DPP Compl., ¶175; IPP Compl., ¶198. The Credit Bureaus, moreover, form a "triopoly" of distributors, "control[ing] virtually 100% of aggregate credit-related data formed by aggregating credit data collected from businesses." DPP Compl., ¶¶3, 103; IPP Compl., ¶¶3, 120. There could hardly be a market structure more favorable to collusion. *See SD3*, 801 F.3d at 432; *Text Messaging*, 630 F.3d at 627-28.

### 6. *The Credit Bureaus Had Ample Opportunity and Reason to Communicate with One Another About Their Common Anticompetitive Scheme*

The Credit Bureaus' participation in a joint venture and "trade association" further strengthen the inference of an agreement. *Text Messaging*, 630 F.3d at 628. "Allegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire." *SD3*, 801 F.3d at 432. In addition to being "a triopoly" in the credit reporting market, the Credit Bureaus jointly own Fair Isaac's primary competitor. DPP Compl., ¶57; IPP Compl., ¶69. And they "are all members of a trade association called the Consumer Data Industry Association," through which they "frequently work together, including to: (i) develop a standard electronic data reporting format called Metro 2®; (ii) issue joint statements on matters of public importance; (iii) provide guidelines to businesses that use credit reports; and (iv) respond to public criticisms of their industry." DPP Compl., ¶¶57-58; IPP Compl., ¶¶69-70.

Beyond that ample ***opportunity*** to communicate, the Credit Bureaus had ***reasons*** to communicate and be in a position to know of each other's actions. If a Credit Bureau signed, or

47

anticipated signing, a contract the with a No Equivalent Products clause, it would no longer be in its interest to support VantageScore Solutions' development of a scoring system with similar characteristics to a FICO Score. Such a decision would be immediately evident to the other participants in the joint venture. Similarly, as participants in the VantageScore joint venture, the Credit Bureaus would see the impact of penalty pricing implemented through the Dynamic Royalty Schedule on VantageScore sales. In essence, the joint venture provided earlier participants in the conspiracy an "auditing mechanism" for ensuring that later participants like TransUnion would agree to the same contract terms. *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 335 (3d Cir. 2018). If any Credit Bureau refused the terms, or later tried to negotiate new contracts without the anticompetitive restrictions, the other Credit Bureaus would know. It is particularly difficult to escape an inference that the Credit Bureaus knew of each other's conduct given Fair Isaac's negotiating tactics: It informed TransUnion during negotiations that the other Credit Bureaus "had already agreed to materially similar new contracts." TransUnion Counterclaims, ¶43; *see* DPP Compl., ¶107; IPP Compl., ¶124. That conduct supports an inference that Fair Isaac also informed Experian and Equifax that their fellow Credit Bureaus had agreed to, or would agree to, the same terms. DPP Compl., ¶107; IPP Compl., ¶124.[16]

Considered together, the Complaints' allegations are sufficient to plead that Defendants "participate[d] in a scheme" with "knowledge that concerted action was contemplated." *Cement*,

---

[16] The Credit Bureaus' assertion (CB MTD, at 18) that courts have "rejected the suggestion that the Bureaus' communications through VantageScore are anything other than procompetitive" is misguided. Conduct need not be unlawful or anticompetitive to provide evidence of a broader conspiracy to restrain trade. *See Am. Tobacco*, 328 U.S. at 809. Besides, *Fair Isaac Corp v. Experian Info. Solutions, Inc.*, 645 F. Supp. 2d 734 (D. Minn. 2009), *aff'd* 650 F.3d 1139 (8th Cir. 2011), nowhere held that VantageScore could only be put to competitive uses. That decision did not consider the anticompetitive contracts at issue here – which did not exist when it was issued. Nor did it address the allegations of conspiracy between Fair Isaac and the Credit Bureaus – the lawsuit was filed *by* Fair Isaac *against* the Credit Bureaus.

333 U.S. at 716 n.17; *Marion Healthcare*, 952 F.3d at 841 (requiring allegations of a "'conscious commitment to a common scheme designed to achieve an unlawful objective'").

### C. Defendants' Remaining Arguments Lack Merit

Defendants assert the conspiracy claim should be dismissed because the Complaints lack direct evidence of a "direct agreement" or actual "meetings" about the conspiracy. *See* CB MTD, at 12, 42-43; *see* FICO MTD, at 28. Experian and Equifax argue that they could not have conspired with TransUnion because each joined the conspiracy at different times. CB MTD, at 42-43. Those arguments defy binding precedent, which makes clear that no "formal agreement," *Am. Tobacco*, 328 U.S. at 809, "personal communication," *Consol. Packaging*, 575 F.2d at 126-27, or "'simultaneous action'" is required to establish a conspiracy, *Masonite, Corp.*, 316 U.S. at 275.

Defendants' arguments are indistinguishable from arguments the Supreme Court rejected in *Masonite*. There, Masonite and other participants in a price-fixing scheme signed a series of agreements between 1933 and 1937. 316 U.S. at 270. The Court held that the defendants had entered into an unlawful combination or conspiracy in violation of Section One of the Sherman Act, even though each defendant "acted independently of the others, negotiated only with Masonite, desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that Masonite make such an agreement with any of the others, and had no discussions with the others." *Id.* at 275. Indeed, the Court observed, it was "not clear at what precise point of time that each [defendant] became aware of the fact that its contract was not an isolated transaction." *Id.* But that did not preclude the existence of a conspiracy or antitrust liability. *Id.* It was sufficient that "the arrangement continued" once each member of the conspiracy "became familiar" with it. *Id.* The same is true here.

*Marion Healthcare* does not establish a different standard. There, the Seventh Circuit addressed the requirements for alleging a hub-and-spokes conspiracy – a specific type of scheme

in which some participants (there, distributors) do not communicate directly with each other, but instead interact with a "central coordinating party" (there, a manufacturer). 952 F.3d at 842. It did not address the requirements for conspiracies taking other forms. Nor does it require all conspiracies involving distributors to be pleaded as a hub-and-spokes conspiracy. Reading *Marion Healthcare* to impose such a rigid requirement would run headlong into the Supreme Court's holding that the "form of the combination or the particular means used" is "not of importance." *Am. Tobacco*, 328 U.S. at 809. Moreover, even where a hub-and-spokes conspiracy is alleged, *Marion Healthcare* recognizes that no "express agreement" or communication among the spokes is required. 952 F.3d at 842. Parties may "functionally join[]" a conspiracy by "play[ing] along" with conduct that would not make "economic sense for [an] individual" defendant to undertake – just as Defendants did in this case. *Id.* The Seventh Circuit thus ruled that the plaintiffs in *Marion Healthcare* could plausibly allege conspiracy by pleading that the alleged conspirators engaged in "*quid pro quo*," "played any role in setting the anticompetitive pricing," or "knowingly engaged in parallel anticompetitive conduct." *Id.* at 843. That sort of conduct is alleged here.

Defendants' reliance on a split decision from the Ninth Circuit is misplaced. *See* CB MTD, at 15; FICO MTD, at 29. In *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015), the Ninth Circuit held that plaintiffs had not plausibly alleged "plus factors" supporting an inference of a conspiracy. *Id.* at 1198. But the allegations there were far different from those here. Those plaintiffs offered no explanation for the "slow," "progressive[]" adoption of polices spanning over five years. *Id.* at 1995-96. Here, by contrast, the challenged agreements were adopted within two years, at the first opportunity. *See* Argument §IV.B.4., *supra*. In *Musical Instruments*, no allegations showed that an individual defendant would likely refuse to adopt the challenged policies absent assurance that "all other [defendants] would enter into similar

agreements." 798 F.3d at 1995. Here, by contrast, the facts alleged establish that a Credit Bureau would agree to the No Equivalent Products provision only if the others did so and that TransUnion, by its own admission, agreed to the anticompetitive restrictions knowing that the other Credit Bureaus had already agreed to them. *See* Argument §IV.B.2., *supra*. And while the Ninth Circuit suggested that each defendant may only have been responding to "pressure and coercion," 798 F.3d at 1995, the Seventh Circuit recognizes that responding to coercion does not provide a defense to conspiracy, *see MCM Partners*, 62 F.3d at 973. Regardless, unlike in *Musical Instruments*, the allegations here show that Fair Isaac incentivized the Credit Bureaus to join the conspiracy by protecting them against competition and offering them the quid pro quo of the Level Playing Field provision.

The Credit Bureaus' observation that VantageScore "is still in business" notwithstanding their contracts with Fair Isaac is beside the point. CB MTD, at 26-28. The Seventh Circuit has cautioned against falling into the "trap" of "failing to distinguish between the existence of a conspiracy and its efficacy" in "evaluating evidence of an antitrust conspiracy." *High Fructose*, 295 F.3d at 655-56. The Credit Bureaus, moreover, misapprehend the alleged conspiracy's object. With the No Equivalent Products provision, Fair Isaac sought to (and did) prevent the development and distribution of a new credit-scoring system that posed the greatest danger to the FICO Score's dominance – a system that would be "compatible" with purchasers' existing models. DPP Compl., ¶112; IPP Compl., ¶128. Similarly, through the Dynamic Royalty Schedule, Fair Isaac succeeded in obtaining the power to curtail sales of non-FICO Scores as needed. DPP Compl., ¶122; IPP Compl., ¶143. It had no need to "bar[] a Bureau from offering to sell non-FICO Scores" (CB MTD, at 27), when penalty pricing achieved the same result, *see, e.g.*, DPP Compl., ¶123 (stating that no sales have been made at penalty price). That Fair Isaac did not impose terms that more

51

severely inhibited VantageScores Solutions' growth, at most, shows there were limits to what Fair Isaac could ask in exchange for the Credit Bureaus' agreement to participate in the conspiracy to maintain its monopoly.

### D. Defendants' Scheme Is a *Per Se* Violation of the Sherman Act

The Court need not resolve any issues beyond the adequacy of the conspiracy allegations to hold that the Complaints state a claim under Section One of the Sherman Act. Defendants do not deny that a conspiracy among all of them to prevent and penalize the distribution of products competing with FICO Scores and to restrict price competition among the Credit Bureaus qualifies as a *per se* violation of Section One. *See* FICO MTD, at 30 (limiting argument about *per se* treatment to "Claims 2 to 4," the individual-conspiracy claims); CB MTD, at 28 (same).[17]

With good reason: The restraints imposed by Defendants' conspiracy are classic *per se* violations. Defendants' scheme "disadvantages" VantageScore Solutions – Fair Isaac's direct, horizontal competitor – by "deny[ing]" it access to the distribution "relationships" it "need[s]." *Toys "R" Us*, 221 F.3d at 936 (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)); *see Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 462, 464 (3d Cir. 1998). The No Equivalent Products clause bars distributors "control[ling] virtually

---

[17]     Fair Isaac elsewhere contends that the Complaints do "not plausibly plead [its] conduct has caused anticompetitive effects." FICO MTD, at 34. But "[w]hen a per se offense is alleged, a showing of anticompetitive effect is not required to establish a Sherman Antitrust Act violation – the conduct is considered anticompetitive without an inquiry into the precise harm caused." *Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir. 1983); *see Nat'l Collegiate Athletic Ass'n*, 468 U.S at 100 (in *per se* cases, "a restraint is presumed unreasonable without inquiry into the market context in which it is found"); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 336 (7th Cir. 2012); *Ctr. Video Indus. Co. v. United Media, Inc.*, 995 F.2d 735, 737 (7th Cir. 1993). In any event, the allegations show the agreements had anticompetitive effects by preventing a competing product's entry into the market, penalizing certain VantageScore purchases so severely that they ceased, and restricting price competition among distributors of scoring analytics. *See* Argument §III.B.1., *supra*. Those anticompetitive effects are even more pronounced when the agreements are considered collectively, as opposed to individually.

100%" of the market for credit reports from selling VantageScore products that resemble Fair Isaac analytics. DPP Compl., ¶¶3, 109; IPP Compl., ¶¶3, 126. And Fair Isaac's Dynamic Royalty Schedule provision requires those same distributors to impose penalty pricing so steep that no buyer is willing to pay it, effectively preventing the distribution and sale of VantageScore products in connection with pre-qualification. DPP Compl., ¶¶117-23; IPP Compl., ¶¶137-43.

Defendants' conspiracy, moreover, imposes horizontal restraints on price competition – another practice that is *per se* unlawful. *See Apple*, 791 F.3d at 314. Because the Credit Bureaus jointly participated in a scheme that permits Fair Isaac to impose penalty pricing, no B2B Purchaser can display both VantageScores and FICO Scores in pre-qualification decisions without paying the penalty price for FICO Scores. DPP Compl., ¶¶117-23; IPP Compl., ¶¶137-43. Nor can any B2B Purchaser escape the impact of the Level Playing Field provision, which "weaken[s] incentives" for the Credit Bureaus to negotiate lower prices for FICO Scores and permits Defendants "to extract monopoly prices." DPP Compl., ¶127; IPP Compl., ¶151.

## V. *ILLINOIS BRICK* DOES NOT BAR THE DIRECT PURCHASER PLAINTIFFS' CLAIMS

Defendants argue that *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), bars the Direct Purchaser Plaintiffs' federal damages claims. Those arguments fail.[18]

It is undisputed that, under *Marion Healthcare*, 952 F.3d 832, the first purchasers from outside an antitrust conspiracy are considered direct purchasers who may sue an antitrust violator

---

[18]     While the Credit Bureaus assert that "all federal antitrust damages claims against the Bureaus are barred by *Illinois Brick*" (CB MTD, at 28), that argument is misplaced. Although the parties dispute whether Direct Purchaser Plaintiffs purchase credit scores directly from Fair Isaac, there is no dispute that the Direct Purchaser Plaintiffs purchase credit reports directly from the Credit Bureaus. *See, e.g.*, *id.* at 10 ("Those [Direct Purchaser] plaintiffs seek damages under both federal and state antitrust law on the theory that Fair Isaac charged inflated royalties and the plaintiffs thus paid higher prices for FICO Scores they purchased ***from the Bureaus***."). The question is whether Direct Purchaser Plaintiffs are direct purchasers from Fair Isaac and/or the conspiracy. As explained below, they are.

for federal damages claims. *See* FICO MTD, at 39; CB MTD, at 37. Here, as explained, the Direct Purchaser Complaint alleges that Fair Isaac and the Credit Bureaus engaged in three independent conspiracies with Fair Isaac and/or a conspiracy among all Defendants to monopolize and unreasonably restrain trade in the B2B Credit Score Market, and that the Direct Purchaser Plaintiffs are the first purchasers from the conspiracies or conspiracy. Those allegations are sufficient to satisfy *Illinois Brick*. Even if the Direct Purchaser Complaint did not sufficiently allege conspiracy, the Direct Purchaser Plaintiffs are still direct purchasers because their Complaint plausibly alleges that they contract with and directly pay Fair Isaac for FICO Scores and that they are first purchasers of FICO Scores in the chain of distribution.

### A. The Direct Purchaser Complaint Adequately Alleges that Plaintiffs Are the First Purchasers Outside of the Conspiracy

Section Four of the Clayton Act allows "any person who shall be injured in his business or property" from an antitrust violation to recover treble damages. 15 U.S.C. §15(a). In *Illinois Brick*, the Supreme Court construed "any person" to encompass only the direct purchasers from an antitrust violator. 431 U.S. at 744-45. That direct purchaser "is entitled to the full value of the damages stemming from the overcharge, even if it passed on some or all of the overcharge to downstream purchasers and consequently mitigated the damage it suffered." *Marion Healthcare*, 952 F.3d at 838. By contrast, "***indirect*** purchasers who are two or more steps removed from the violator in a distribution chain may not sue." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) (emphasis in original). The rationale behind *Illinois Brick* is that it would be difficult to allocate the monopoly overcharge between direct and indirect purchasers and that a contrary rule would risk multiple liability for defendants. *See Illinois Brick*, 431 U.S. at 744-45; *Marion Healthcare*, 952 F.3d at 838.

A plaintiff alleging an antitrust conspiracy may sue any member of the conspiracy regardless of whether it was a purchaser from that conspiracy member. Commonly referred to as the conspiracy "exception" to *Illinois Brick*, this "is not so much a real exception" but rather a principle "inhering in *Illinois Brick* that allocates the right to collect 100% of the damages to the first non-conspirator in the supply chain." *Marion Healthcare*, 952 F.3d at 839; *see Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631 (7th Cir. 2002) ("the first purchasers from **outside** the conspiracy" are entitled to sue and recover the full overcharge) (emphasis in original). This rule applies whether the conspirators are competitors as well as "in circumstances where the manufacturer and the intermediary are both alleged to be co-conspirators in a common illegal enterprise resulting in intended injury to the buyer." *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 481 (7th Cir. 1980). Joint and several liability for antitrust violations means direct purchasers "are entitled to collect damages from both the manufacturers and their intermediaries if conspiracy and overcharges can be established." *Paper Sys.*, 281 F.3d at 632; *see Marion Healthcare*, 952 F.3d at 839.

*Illinois Brick* does not bar the Direct Purchaser Plaintiffs' federal antitrust claims. The Direct Purchaser Plaintiffs purchased FICO Scores at supracompetitive prices resulting from the conspiracy involving Fair Isaac and the Credit Bureaus – regardless of whether there is one conspiracy or three. *See* Argument §§III., IV., *supra*. Because the Direct Purchaser Plaintiffs purchased their credit scores from this conspiracy involving Fair Isaac and the Credit Bureaus, *Illinois Brick* does not bar their claims.

TransUnion argues that it cannot be liable for federal damages claims by the Direct Purchaser Plaintiffs because it withdrew from the conspiracy when it filed counterclaims against Fair Isaac in 2018. CB MTD, at 39. That argument fails. "In order to withdraw from a conspiracy,

a defendant must cease [its] activity in the conspiracy and take an affirmative act to defeat or disavow the conspiracy's purpose." *U.S. v. Bullis*, 77 F.3d 1553, 1562 (7th Cir. 1996). Critically, "[c]onduct by a defendant ***after*** a purported withdrawal is relevant to whether the withdrawal was actually complete and in good faith." *Id*. "[E]ven if a defendant has 'severed [its] ties' with a conspiracy in such a manner that ordinarily a withdrawal will be found, a defendant does not withdraw from a conspiracy if [it] 'continues to receive benefits from the conspiracy's operations.'" *U.S. v. Swiss Valley Farms Co., Inc.*, 912 F. Supp. 401, 402 (C.D. Ill. 1995) (no withdrawal if defendant continued to receive payments from rigged bids after resuming competitive practices); *see also Bullis*, 77 F.3d at 1563 (no withdrawal when employee left employer because he subsequently discussed hiding conspiracy from authorities).

TransUnion did not fully withdraw from the conspiracy despite counterclaiming against Fair Isaac in 2018. After TransUnion and Fair Isaac settled on undisclosed terms in November 2020, they continued enforcing their anticompetitive agreements – and even entered into a new agreement to distribute FICO Scores to Canadian lenders and consumers. DPP Compl., ¶¶43-45, 99. Indeed, from 2018 to 2020, Fair Isaac's anticompetitive contracts with TransUnion generated significant financial benefits for both companies, accounting for 29% of Fair Isaac's total revenue. *Id*., ¶43. The Direct Purchaser Complaint thus sufficiently alleges that, notwithstanding TransUnion's lawsuit in 2018, it continued participating in and reaping the benefits of the anticompetitive scheme with Fair Isaac and the other Credit Bureaus, such that it "was still acquiescent in the goals of the conspiracy." *Bullis*, 77 F.3d at 1562.[19]

---

[19] This post-withdrawal conduct also suggests that the settlement agreement between TransUnion and Fair Isaac contained anticompetitive provisions. As such, the Direct Purchaser Plaintiffs should have the opportunity to obtain discovery of evidence of continuation of that conspiracy.

In any event, a 2018 withdrawal by TransUnion would not justify dismissal. At a minimum, Direct Purchaser Plaintiffs can recover damages from TransUnion before its 2018 counterclaims. After a complete withdrawal, a "defendant is still liable . . . for [its] previous agreement and for the previous acts of [its] co-conspirators in pursuit of the conspiracy." *U.S. v. Read*, 658 F.2d 1225, 1232-33 (7th Cir. 1981); *see Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042, 1066 (N.D. Ill. 2019) ("any purported 'extinguish[ment]' of the conspiracy . . . does not affect [the defendant's] liability for the conspiracy up to that point"). TransUnion does not dispute the basic principle that a defendant is liable for its conduct before withdrawal – it only asserts that the Direct Purchaser Plaintiffs "lack[] antitrust standing." CB MTD, at 40. But the Direct Purchaser Plaintiffs are the proper plaintiffs under *Illinois Brick* because they are the first purchasers from outside the conspiracy among or between Fair Isaac and the Credit Bureaus (as well as for other reasons explained below).

Experian wrongly argues that, as "a direct purchaser from Fair Isaac," it "had the right to sue" and because it did not sue, *Illinois Brick* insulates it from liability. CB MTD, at 41. But the inquiry is not whether Experian **chose** to sue Fair Isaac. Instead, the question is whether Experian participated in a conspiracy to promote anticompetitive conduct. Because it participated in the conspiracy, it is not the first purchaser from outside the conspiracy – the Direct Purchaser Plaintiffs are. *See* Argument §§III., VI., *supra*.

The Credit Bureaus contend that the Section Two claims must be dismissed because a corporation and its agent cannot conspire together, citing to a single reference to an "agent" in the Complaints. CB MTD, at 36 (quoting DPP Compl., ¶263; IPP Compl., ¶295). But the Complaints' stray reference to an "agent" in a single paragraph is not an allegation that Fair Isaac and the Credit Bureaus are a "single enterprise" for purposes of antitrust liability, or that they have a "complete

57

unity of interest" as a corporation and its subsidiary, principal and agent, or employer and employee. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984). Rather, the Complaints allege that Fair Isaac and the Credit Bureaus are "separate economic actors pursuing separate economic interests" who conspired to accomplish anti-competitive activities. *See id.* at 769; *see* Argument §§III., VI., *supra*. The agency argument lacks merit.

### B. The Direct Purchaser Complaint Adequately Alleges that Direct Purchaser Plaintiffs Directly Pay Fair Isaac and Are the First Purchasers of FICO Scores

#### 1. The Direct Purchaser Complaint Alleges that B2B Purchasers Pay Fair Isaac Directly

Even if the Court determines that there is no conspiracy among Fair Isaac and the Credit Bureaus, the Direct Purchaser Plaintiffs are still direct purchasers under *Illinois Brick* because their Complaint plausibly alleges that they contract with and pay Fair Isaac directly for FICO Scores. *See* DPP Compl., ¶¶15-19.[20]

"[T]he ***direct*** payment from [an entity] to [a monopolist] [is] the key element to deeming . . . the direct purchaser." *In re NorthShore Univ. HealthSystem Antitrust Litig.*, No. 07-CV-4446, 2018 WL 2383098, at *6 (N.D. Ill. Mar. 31, 2018) (Chang, J.) (emphasis in original). In *Apple v. Pepper*, 139 S. Ct. 1514, for instance, the Supreme Court held that consumers who made purchases from Apple's app store were direct purchasers from Apple, which was alleged to have set monopoly prices for the apps. *Id.* The Supreme Court found it "dispositive" that "iPhone owners pay the alleged overcharge directly to Apple," which then took a commission and reimbursed the application sellers. *Id.* at 1521. Similarly, in another case, the Seventh Circuit held that an insurer who paid a monopolist health clinic was the direct purchaser because "the money went directly

---

[20] Specifically, Sky Federal, Alcoa FCU, Amalgamated Bank, City of Boston CU, and First Choice FCU allege that they purchased B2B credit scores directly from Fair Isaac and at least one Credit Bureau. DPP Compl., ¶¶15-19.

from Blue Cross to the Clinic." *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1414 (7th Cir. 1995), *as amended on denial of reh'g* (Oct. 13, 1995). The patients, the court noted, could be the direct purchasers only if they "paid the entire fees to the Clinic and then were reimbursed in whole or part by [the insurer]." *Id.*

Here, the Direct Purchaser Complaint alleges that the Direct Purchaser Plaintiffs are "the entity actually sending money to [the monopolist] for payment." *NorthShore*, 2018 WL 2383098, at *7. In particular, several class members' contracts "specify that 'in consideration of [the Credit Bureau]/Fair Isaac's performance' of their obligations to provide those products, the purchaser shall 'pay [the Credit Bureau]/*Fair Isaac* fees' for those products." DPP Compl., ¶42. Under those contracts, then, payments can be made directly to *either* the Credit Bureau *or* Fair Isaac. Although Defendants may argue that the payments were actually processed some other way – for instance, through the Credit Bureaus rather than Fair Isaac – to the extent that is even relevant, that is a factual question that cannot be resolved on a motion to dismiss. It is, at the very least, a plausible inference from the Direct Purchaser Complaint's allegations that payments were made directly to Fair Isaac pursuant to a contract with Fair Isaac.

Nor does it matter that the Direct Purchaser Plaintiffs may contract with a Credit Bureau to purchase FICO Scores. *See* DPP Compl., ¶42. The party with whom the purchaser contracts is not necessarily the entity that receives payment. Indeed, in *Blue Cross*, the Seventh Circuit rejected the healthcare clinic's argument that the insurers were not the direct purchasers where the clinic's "fee-for-service contracts [were] with the patients themselves," and that "[the clinic] has no contracts with Blue Cross." 65 F.3d at 1414. The court explained that, "although [the insurer and the monopolist] were not linked by any overarching contract," the key was that "the money went directly from Blue Cross to the Clinic," so "each payment and acceptance was a separate

completed contract." *Id.* The Direct Purchaser Complaint thus plausibly alleges that the Direct Purchaser Plaintiffs made payments directly to Fair Isaac – even if their contracts were with the Credit Bureaus, or the Credit Bureaus and Fair Isaac together.

### 2. The Direct Purchaser Complaint Alleges that the B2B Purchasers Are the First Purchasers of FICO Scores

Even if Direct Purchaser Plaintiffs did not make direct payments to Fair Isaac, they are still direct purchasers of FICO Scores. By Defendants' own admissions, the Credit Bureaus pay Fair Isaac a royalty for use of Fair Isaac's credit-score-generating ***algorithm***; they do not purchase ***FICO Scores*** from Fair Isaac. *See* DPP Compl., ¶44; FICO MTD, at 1, 4 ("FICO licenses its scoring models to the Credit Bureaus and the Credit Bureaus generate scores and distribute them to end-users."); CB MTD, at 4 (similar). The Direct Purchaser Plaintiffs, by contrast, purchase a "bundle" containing the credit report and FICO Score. DPP Compl., ¶42. They are thus the first purchasers of FICO Scores and direct purchasers under *Illinois Brick*.

The indirect purchaser bar in *Illinois Brick* only applies to cases that involve an overcharge "pass-on" through a middleman. *See* 431 U.S. at 729-36 (holding that an indirect purchaser of a product cannot sue a distant manufacturer for alleged antitrust violations under a pass-on theory); *see also Apple*, 139 S. Ct. at 1520 ("[I]ndirect purchasers who are two or more steps removed from the violator in a distribution chain may not sue."). That is not the case here where Direct Purchaser Plaintiffs are not relying on a pass-on theory of recovery: Direct Purchaser Plaintiffs are the first group in the distribution chain to purchase FICO Scores. Under a straightforward application of *Illinois Brick*, they are direct purchasers. *See, e.g.*, *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 492 (7th Cir. 2002) (rejecting *Illinois Brick* arguments and holding that "first purchasers" of price-fixed product were the "only plaintiffs possibly situated to recover damages against the defendants for the anti-competitive harms they have inflicted"); *In re Disposable Contact Lens*

60

*Antitrust Litig.*, No. 3:15-md-2626, 2019 WL 6463343, at *5 (M.D. Fla. Nov. 27, 2019) (holding that the Supreme Court's *Illinois Brick* holding does not apply to cases that do not involve an overcharge "pass-on" through a middleman).

That conclusion not only makes sense as a matter of doctrine, it makes sense as a matter of policy. *Illinois Brick* was concerned with complexities involved in calculating overcharges through a distribution chain and with preventing duplicative recoveries. 431 U.S. at 730-31; *see also Kansas v. Utilicorp United, Inc*., 497 U.S. 199, 206-07 (1990) (explaining the rationales of *Illinois Brick*). Those problems do not exist here because the Direct Purchaser Plaintiffs are the first purchasers of the product at issue (*i.e.*, FICO Scores, not credit-score-generating algorithms). "In *Illinois Brick*, any 'pass-on' of damages would (because of *Hanover Shoe*) already be taken into account in its entirety in the recovery to another potential party, the direct purchaser." *Loeb*, 306 F.3d at 492. That is not the case here where what the Credit Bureaus could recover would be any overcharge related to the ***algorithm***, not the FICO Score itself. There is thus no "duplication" risk akin to the one addressed in *Illinois Brick*. *See id.*

Moreover, the *Illinois Brick* rule was intended to balance those concerns against the "longstanding policy of encouraging vigorous private enforcement of the antitrust laws." 431 U.S. at 745-46; *see California v. ARC Am. Corp.*, 490 U.S. 93, 102 n.6 (1989) ("In *Illinois Brick*, the Court was concerned not merely that direct purchasers have sufficient incentive to bring suit under the antitrust laws . . . but rather that at least some party have sufficient incentive to bring suit."). Who but the Direct Purchaser Plaintiffs have standing and an incentive to enforce the federal antitrust laws against Fair Isaac and the Credit Bureaus? The Credit Bureaus profit from the anticompetitive scheme described in the Direct Purchaser Complaint and, more importantly, they are not the ones purchasing the relevant product at supracompetitive prices or suffering from

decreased competition, choice, and innovation in the credit score market. If the federal antitrust laws are going to be enforced in this market, the prosecution will be brought by the Direct Purchaser Plaintiffs or no one. Allowing the Direct Purchaser Plaintiffs – the first purchasers of the at-issue product – to sue is perfectly consistent with *Illinois Brick* and the policy underlying it. *See, e.g.*, *Loeb*, 306 F.3d at 490 ("The solution to this problem, however, is not to deny a right to recover to everyone. Such a draconian rule would give a green light to antitrust scofflaws to conspire to fix prices in a particular market and would create incentives to engage in antitrust conspiracies in markets with complicated distribution structures. Instead, the proper course is to recognize only the best of the several potential plaintiffs who otherwise satisfy the requirements for bringing suit under the antitrust laws.").

## VI.   FAIR ISAAC'S GRAB-BAG OF STATE-LAW ARGUMENTS FAILS

Fair Isaac devotes roughly five pages (as well as a perfunctory appendix) to largely unsupported, scattershot arguments regarding Plaintiffs' state competition and unfair and deceptive practices claims, as well as Indirect Purchaser Plaintiffs' state law unjust enrichment claim. *See* FICO MTD, at 39-45. None of these arguments withstand scrutiny.[21]

---

[21]    In a footnote, Fair Isaac seeks to limit future potential discovery via its motion to dismiss. FICO MTD, at 45 n.97. However, the proper time for Fair Isaac to raise an objection to a discovery request is ***after*** the request is made. *See Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2020 WL 1863296, at *4 (N.D. Ill. Apr. 14, 2020) (rejecting the defendants' attempt to limit discovery via a motion to dismiss because "the proper scope of discovery [regarding putative class members' state-law claims], will be for the magistrate judge, who is supervising discovery" to decide). Moreover, this argument ignores that Plaintiffs have pleaded federal and state antitrust claims, as well as violations of consumer protection statutes. When a plaintiff's claims are allowed to proceed, it is entitled to discovery in the relevant jurisdictions. *Broiler Chicken*, 290 F. Supp. 3d at 818 ("[T]he fact that the antitrust claims are going forward in those jurisdictions is sufficient for the parties to proceed with discovery relevant to those jurisdictions.").

### A. Plaintiffs Have Article III Standing to Bring All State Law Claims Alleged in the Complaints

Plaintiffs have Article III standing to pursue their claims. Indeed, Fair Isaac does not dispute that Plaintiffs have Article III standing in the nine states in which they do business. *See* FICO MTD, at 44 (stating that Plaintiffs do business in Arkansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, New York, and Pennsylvania). Instead, Fair Isaac argues that the Complaints have not yet named plaintiffs for the claims brought under the laws of 25 other states and thus, the claims in those states should be dismissed for lack of standing.

Fair Isaac's argument improperly conflates Article III standing with Rule 23 class certification and is squarely foreclosed by Seventh Circuit precedent. In *Kohen v. Pacific Investment Mgmt. Co. LLC*, 571 F.3d 672 (7th Cir. 2009), the Seventh Circuit rejected the argument for dismissal based on standing of absent class members, holding that "as long as one member of a certified class has a plausible claim to have suffered damages, the requirement of standing is satisfied." *Id.* at 676; *see, e.g.*, *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966-69 (7th Cir. 2016) (analyzing only the standing of class representatives). Other courts agree. *See, e.g.*, *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 367 (3d Cir. 2015) ("Quite simply, requiring Article III standing of absent class members is inconsistent with the nature of an action under Rule 23."); *Broiler Chicken*, 290 F. Supp. 3d 772, 809-10; *Freeman v. MAM USA Corp*, 528 F. Supp. 3d 849, 859 (N.D. Ill. 2021) (Chang, J.); *Tex. Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, 522 F. Supp. 3d 402, 408 (N.D. Ill. 2021). Because Plaintiffs have plausibly alleged an injury in fact by alleging they paid supracompetitive prices (DPP Compl., ¶¶13, 15-21, 141; IPP Compl., ¶¶19, 162, 164), Plaintiffs have standing to assert the claims of class members in other states. *Broiler Chicken*, 290 F. Supp. 3d at 809-10.

Significantly, this Court has already considered and declined to follow the reasoning in the two unpublished decisions on which Fair Isaac relies. *See Freeman*, 528 F. Supp. 3d at 859 (declining to follow *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, MDL No. 2031, 2015 WL 3988488 (N.D. Ill. June 29, 2015) and *Smith-Brown v. Ulta Beauty, Inc.*, No. 18 C 610, 2019 WL 932022 (N.D. Ill. Feb. 26, 2019)). Fair Isaac's citation to *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) is equally misplaced. FICO MTD, at 45. *TransUnion* merely addressed what types of injuries are concrete monetary injuries for standing purposes under Article III. Here, it is undisputed that Plaintiffs have alleged concrete injuries and, thus, have standing.

### B. Fair Isaac's Remaining Arguments Lack Merit

**Plaintiffs' State Law Claims Are Valid**. For the same reasons the Complaints adequately plead federal antitrust claims, they also adequately plead claims for violations of state antitrust and consumer protection laws. *See In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 833 (E.D. Pa. 2019) (explaining that on a motion to dismiss for failure to state a claim, federal antitrust law is either determinative or highly persuasive with respect to its state law analogues).

**The Complaints Allege a Sufficient Intrastate Nexus**. Fair Isaac argues that certain states' laws "require a specific nexus between Defendants' conduct and intrastate commerce, not merely a purported increase in the prices paid by residents of a state." FICO MTD, at 41.[22] But federal courts have explained that, under state antitrust law, "[t]he 'intrastate effects' requirement is met at the pleading stage by a plaintiff's allegations . . . claiming that the anticompetitive conduct caused supracompetitive price effects in the relevant jurisdictions." *Hosp. Auth. of Metro. Gov't*

---

[22] Specifically, the antitrust laws of the District of Columbia, Mississippi, Nevada, New Hampshire, New York, North Carolina, South Dakota, Tennessee, West Virginia and Wisconsin, and consumer protection laws in California, Massachusetts, New Hampshire, and North Carolina. FICO MTD, at 41.

*of Nashville v. Momenta Pharms., Inc.*, 353 F. Supp. 3d 678, 695 (M.D. Tenn. 2018) (finding plaintiffs' allegations satisfied the intrastate nexus requirements of the antitrust laws of District of Columbia, Mississippi, Nevada, New York, North Carolina, South Dakota, Tennessee, Wisconsin, and West Virginia).[23]   Courts also recognize that similar allegations are sufficient to plead intrastate nexus under the consumer protection laws of California, Massachusetts, New Hampshire, and North Carolina.[24]   Plaintiffs' allegations that (1) Defendants engaged in anticompetitive conduct that affected commerce in the states Defendants cite; (2) Plaintiffs or members of the classes paid supracompetitive, artificially inflated prices for FICO Scores in those states; and (3) "Defendants' conduct . . . had a substantial effect on the intrastate commerce of the states listed" in the relevant counts satisfy those requirements.  *See* DPP Compl., ¶¶141-43, 278, 286, 288, 291-92, 296-97, 300-01; IPP Compl., ¶¶310, 318, 321-22, 324-25, 329-30, 333-34, 342, 346, 350, 353; *Auto. Parts*, 29 F. Supp. 3d at 1010.  Further, Plaintiffs specifically allege that "Defendants' conduct . . . had a substantial effect on the intrastate commerce of the states listed in counts Seven and Eight of [the] Complaint[s]."  DPP Compl., ¶32; IPP Compl., ¶34; *see, e.g.*, *Auto. Parts*, 29 F. Supp. 3d at 1010.  Therefore, Plaintiffs have adequately alleged an intrastate nexus.

---

[23]    *See also In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 582 (M.D. Pa. 2009) (similar allegations sufficient to allege intrastate conduct in Wisconsin); *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 411-14 (D. Del. 2007) (similar allegations sufficient to allege intrastate conduct in District of Columbia); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 171-75 (D. Me. 2004) (similar allegations sufficient to allege intrastate conduct in South Dakota, Tennessee, and West Virginia).

[24]    *GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 849-47 (E.D. Mich. 2018) (holding allegations that defendants' price-fixing conspiracy caused supracompetitive prices nationwide were sufficient to allege an intrastate nexus under the consumer protection laws of California, New Hampshire, and North Carolina); *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1010-11 (E.D. Mich. 2014) (finding allegations of a nationwide price-fixing conspiracy sufficient to allege intrastate anticompetitive conduct under the Massachusetts consumer protection statute).

**The State Law Claims May Proceed as Class Actions**. Fair Isaac argues that Plaintiffs are prohibited from bringing class action claims in federal court under the Illinois Antitrust Act and the consumer protection statutes in Arkansas, Montana, and South Carolina, which bar antitrust class actions. FICO MTD, at 41. At least one judge in this District has already considered and rejected these arguments. *See City of Rockford*, 360 F. Supp. 3d at 763-65 (adopting the reasoning of *In re Aggrenox Antitrust Litig.*, No. 3:14-MD-2516, 2016 WL 4204478, at *6 (D. Conn. Aug. 9, 2016)). Another judge in this District has rejected arguments that class action bars under the consumer protection laws of Arkansas, Montana, and South Carolina prohibit plaintiffs from bringing class action claims under those states' statutes in federal court. *Dealer Mgmt.*, 362 F. Supp. 3d at 553 (discussing application of *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), to plaintiffs' claims under the consumer protection statutes of Arkansas and South Carolina and denying motion to dismiss plaintiffs' class claims under the class action bars in those states); *Broiler Chicken*, 290 F. Supp. 3d at 820-21 (applying *Shady Grove* analysis as it related to Illinois's antitrust statute to the consumer protection laws of Montana and South Carolina and denying a motion to dismiss).

Further, Fair Isaac's reliance on Justice Stevens' concurrence in *Shady Grove*, 559 U.S. 393 (plurality), is misplaced. The Seventh Circuit "has indicated that Justice Scalia's plurality sets forth the controlling legal standard." *Dealer Mgmt.*, 362 F. Supp. 3d at 553 (citing *Sawyer v. Atlas Heating and Sheet Metal Works, Inc.*, 642 F.3d 560, 564 (7th Cir. 2011)).

**A Credit Report Is a Tangible Good**. Citing no relevant authority and offering no substantive explanation, Fair Isaac argues that credit scores are intangible services to which

Tennessee's antitrust law does not apply.[25]  FICO MTD, at 42.  However, the Complaints allege

that Defendants engaged in various illegal activities to promote FICO Scores, which are defined

as "a ***credit report*** that contains a FICO Score."  IPP Compl., ¶1; *see* DPP Compl., ¶3.  By their

common definition, "reports" are documents or goods – not services – and without any argument

to the contrary, a credit report should be considered a "tangible good" under Tennessee's antitrust

laws.  *See e.g.*, *In re U.S. Ins. Grp., LLC*, 429 B.R. 903, 913 (E.D. Tenn. 2010) (quoting Tenn.

Code Ann. §47-9-102(a)(42) (2001)) ("A 'general intangible' is currently defined as 'any personal

property, including things in action, ***other than*** accounts, chattel paper, commercial tort claims,

deposit accounts, ***documents***, goods, instruments, investment property, letter-of-credit rights,

letters of credit, money, and oil, gas, or other minerals before extraction.  The term includes

payment intangibles and software.'"); *Freedom Broadcasting of TN, Inc. v. Tenn. Dept. of Rev.*,

83 S.W.3d 776, 783 (Tenn. Ct. App. 2002) (quoting Tenn. Code §67-6-102(29)) ("[T]he Tennessee

Code defines tangible personal property as 'personal property, which may be seen, weighed,

measured, felt, or touched, or is in any other manner perceptible to the senses.'").[26]

    **The Complaints' Allegations Are Sufficient**.  While state consumer protection laws are

broadly worded and liberally construed,[27] Fair Isaac nevertheless challenges the sufficiency of

---

[25]    Fair Isaac cites *Bennett v. Visa U.S.A. Inc.,* 198 S.W.3d 747 (Tenn. Ct. App. 2006), where "the plaintiffs allege[d] that the defendants' conduct directly affected the market for payment card processing services which incidentally affected the market for tangible goods."  *Id.* at 751.  In *Bennett*, the "Defendants' conduct involved payment card ***processing services***, not products."  *Id.* at 752.  Here, the Complaints allege that Defendants' illegal conduct relates to FICO Scores reflected in the bundle sold with credit reports to Plaintiffs, not services.

[26]    In any event, the question of whether credit scores should be considered a "tangible good" under Tennessee's antitrust law is premature at this early stage of the litigation.  *Dealer Mgmt.*, 362 F. Supp. 3d at 551, n.21.

[27]    *See, e.g.*, *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2009 WL 3754041, at *9 (N.D. Ill. Nov. 5, 2009).

Plaintiffs' allegations under the consumer protection laws of Arkansas, New Mexico, Rhode Island, South Dakota, and West Virginia, claiming that Plaintiffs must allege "more than that a defendant violated the antitrust laws or charged supracompetitive prices."[28]  FICO MTD, at 42.

The Complaints' detailed and extensive factual accounting of Defendants' illegal conduct is applicable to Plaintiffs' claims under each of the challenged state consumer protection statutes and is sufficient to state a claim under those statutes, as this Court and others have found similar allegations to be actionable under these consumer protection statutes.  *See, e.g.*, *Dealer Mgmt.*, 362 F. Supp. 3d at 551-52 (denying motion to dismiss plaintiffs' claims under Arkansas and West Virginia consumer protection statutes); *Aftermarket Filters*, 2009 WL 3754041, at *9 (upholding indirect purchaser plaintiffs' claims under the consumer protection laws of Arkansas and New Mexico); *Sandee's Catering v. Agri Stats, Inc.*, No. 20 C 2295, 2020 WL 6273477, at *11 (N.D. Ill. Oct. 26, 2020) (finding plaintiffs' claims under South Dakota consumer protection statute actionable); *Generic Pharms. Pricing*, 368 F. Supp. 3d at 841-42 (finding defendants did not make a "persuasive argument" as to why indirect purchaser plaintiffs could not "assert consumer protection claims under the laws of [Arkansas, New Mexico, Rhode Island, and West Virginia, *inter alia*] simply because they also assert antitrust claims.  Whether they can ultimately prove a consumer protection claim separate and apart from their antitrust claims is not a question for

---

[28]     Fair Isaac cites *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029-30 (N.D. Cal. 2007), and *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1118 (N.D. Cal. 2007) to support its generic challenge to the actionability of Plaintiffs' allegations.  FICO MTD, at 42.  However, in *Dealer Mgmt.*, 362 F. Supp. 3d at 556-57, this Court upheld plaintiffs' state consumer protection claims under Arkansas, New Mexico, and West Virginia law over defendants' reliance on *Graphics* and *DRAM*.  Additionally, in a subsequent order in *DRAM*, the court allowed claims to proceed under the Rhode Island Deceptive Trade Practices Act.  *See In re DRAM Antitrust Litig.*, 536 F. Supp. 2d 1129, 1145 (N.D. Cal. 2008).

resolution at this stage of the litigation."); *id.* at 845-46 (upholding plaintiffs' claims under South Dakota consumer protection statute).

Accordingly, the totality of Plaintiffs' allegations, including state-specific allegations regarding Defendants' unfair, unconscionable, deceptive, and fraudulent acts or practices in violation of the various state consumer protection laws, sufficiently raises actionable claims.

**The Complaints' Allegations Are Sufficiently Particular**. Fair Isaac claims that the Florida and South Dakota consumer protection statutes require Plaintiffs to plead "specific allegations regarding fraud or deception." FICO MTD, at 42. Fair Isaac is incorrect.

A Florida federal district court rejected this argument with respect to the Florida statute. *See SIG, Inc. v. AT & T Digital Life, Inc.*, 971 F. Supp. 2d 1178, 1195 (S.D. Fla. 2013) ("FDUTPA claims can be based on deceptive or unfair practices that do not involve fraud . . . and need not be pled with particularity."). Because the Complaints are based on antitrust violations, not fraud, Rule 9(b)'s requirements do not apply to Plaintiffs' Florida law claims. *See Sandee's Catering*, 2020 WL 6273477, at *10.

The case Fair Isaac cites for South Dakota does not require that claims under this statute be pleaded with particularity, but merely notes that "[t]he defendants do not challenge the Second Amended Complaint for failure to state allegations of fraud with particularity as required by Federal Rule of Civil Procedure 9(b)." *New Motor Vehicles*, 350 F. Supp. 2d at 176 n.20. Plaintiffs have adequately pleaded their consumer protection claims.[29]

---

[29] Even if Plaintiffs must plead with particularity, they have satisfied Rule 9(b)'s requirements. *See Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) ("[P]laintiffs must plead the 'who, what, when, where, and how: the first paragraph of any newspaper story' of the alleged fraud.").

**The Complaints' Market Definitions Are Proper**.  Fair Isaac argues that the consumer protection laws of Hawaii, Montana, Rhode Island, and Missouri do not provide a right of action for items purchased primarily for business or commercial purposes.  FICO MTD, at 43.  The Hawaii and Montana statutes do not require a non-business purpose.  *See* Haw. Rev. Stat. Ann. §480-13(a) (authorizing suits by "any person [defined to include businesses] who is injured in the person's business or property"); Mont. Code Ann. §30-14-222 (unfair trade practices act) ("A person [defined to include businesses] who is or will be injured" may bring suit.).

Nor do the Rhode Island and Missouri statutes bar Plaintiffs' claims.  Plaintiffs purchase FICO Scores for consumer transactions (DPP Compl., ¶¶15-21, 317), and thus "primarily for personal, family, or household purposes."  6 R.I. Gen. Laws §6-13.1-5.2(a); *see also* Mo. Ann. Stat. §407.025(1) (same); *Generic Pharms. Pricing*, 368 F. Supp. 3d at 846-48 (holding purchasers were "consumers" under the consumer protection laws of Missouri and Rhode Island, where purchasers alleged that, to extent that they were not individual consumers, they fell within relevant state statutes' definition of consumer, given that they were third party payors making purchases for personal purposes of patients).

**The Complaints Need Not Allege Unequal Bargaining Power**.  Fair Isaac claims that New Mexico's consumer protection statute requires Plaintiffs to plead a level of "grossly unequal bargaining power."  FICO MTD, at 43.  But "[n]othing in the statute or in caselaw from New Mexico limits consumer protection claims to those involving grossly unequal bargaining power." *Dealer Mgmt.*, 362 F. Supp. 3d at 557.  Plaintiffs allege that Defendants' conduct was unconscionable, and further allege the conduct was unfair and deceptive.  DPP Compl., ¶314; IPP Compl., ¶351.  Those allegations are sufficient to state a claim under the plain language of the

New Mexico statute, which does not require that the practices be both unfair or deceptive ***and*** unconscionable. *See* N.M. Stat. Ann. §57-12-3.[30]

**The Complaints Need Not Allege Unconscionability**. Fair Isaac asserts that Plaintiffs must plead a certain "degree" of unconscionable conduct under the Arkansas, D.C., and North Carolina statutes. FICO MTD, at 43. But the Arkansas and D.C. statutes are not limited to unconscionable acts; Plaintiffs may plead false or deceptive acts. *See Auto. Parts*, 2013 WL 2456612, at *24 ("[T]he [Arkansas] statute does not limit itself to unconscionable acts – false or deceptive acts are all that is needed . . . ."); D.C. Code §28-3904 ("[i]t shall be a violation of this chapter for any person to engage in ***an unfair or deceptive trade practice*** . . . .").[31] As such, courts recognize it is sufficient under both statutes to plead that a defendant engaged in anticompetitive conduct, as Plaintiffs have done. *See New Motor Vehicles*, 350 F. Supp. 2d at 178, 183; DPP Compl., ¶¶308, 310; IPP Compl., ¶¶341, 343. In the event that Plaintiffs must plead unconscionability, they ***do*** plead unconscionability. DPP Compl., ¶¶308, 310; IPP Compl., ¶¶341(b), 343(f).

Fair Isaac claims that North Carolina's unfair trade practices law "requires a plaintiff to allege egregious or aggravating circumstances, not mere 'business-related conduct.'" FICO MTD, at 43. However, the case relied on for this proposition, *Dalton v. Camp*, 548 S.E.2d 704, 712 (N.C. 2001), involved a breach of contract, and courts have rejected its application in the antitrust context. *Auto. Parts*, 2013 WL 2456612, at *26. Fair Isaac's argument also ignores that courts

---

[30] "Federal courts have generally permitted claims under the New Mexico Unfair Practices Act in price fixing cases if the plaintiff alleges a gross disparity between the price paid for the product and the value received." *Aftermarket Filters*, 2009 WL 3754041, at *9; *see also* discussion under "The Complaints' Allegations Are Sufficient" heading, *supra*.

[31] Fair Isaac's reliance on *Riggs Nat'l Bank of Washington, D.C. v. D.C.*, 581 A.2d 1229 (D.C. 1990), is misplaced – *Riggs* is not a consumer protection case and does not cite the consumer protection statute.

recognize that conduct violative of antitrust law is sufficient to establish a violation of North Carolina's unfair trade practices law. *See ITCO Corp. v. Michelin Tire Corp., Com. Div.*, 722 F.2d 42, 48 (4th Cir. 1983), *on reh'g*, 742 F.2d 170 (4th Cir. 1984). Because Plaintiffs have sufficiently alleged Fair Isaac violated antitrust law, they have stated a violation of North Carolina's unfair trade practices law. DPP Compl., ¶316; IPP Compl., ¶353.

**The Claims Are Timely**. Plaintiffs' Oregon consumer protection claim should not be dismissed based on the statute of limitations. The Seventh Circuit has made it clear that "because the period of limitations is an affirmative defense, it is rarely a good reason to dismiss under Rule 12(b)(6)." *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004). At this stage in the case, "the question is only whether there is *any* set of facts that if proven would establish a defense to the statute of limitations." *Clark v. City of Braidwood*, 318 F.3d 764, 768 (7th Cir. 2003) (emphasis in original). As previously discussed, Argument §I.C.3., *supra*, Defendants' acts constitute a continuing violation. *See Colquitt v. Manufacturers & Traders Tr. Co.*, 144 F. Supp. 3d 1219, 1228 (D. Or. 2015) (applying the continuing violation doctrine to plaintiff's Oregon consumer protection claims). Thus, Plaintiffs' Oregon consumer protection claims are not barred by the statute of limitations.[32]

**The Indirect Purchaser Plaintiffs' Indirect-Purchaser Claims May Proceed**. Fair Isaac's argument that indirect purchasers cannot bring claims under the Missouri Merchandising Practices Act ("MMPA") has been rejected by courts that have allowed such claims. *See, e.g.*, *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 668-69 (Mo. 2008); *Broiler Chicken*, 290 F. Supp. 3d at 821 ("Federal district courts have interpreted *Gibbons* to allow indirect purchaser claims

---

[32] Oregon courts apply federal law concerning the continuing violation doctrine. *Atwood v. Oregon Dep't of Transp*, No. CV-06-1726, 2008 WL 803020, at *13 (D. Or. Mar. 20, 2008).

under Missouri's consumer protection statute despite *Illinois Brick*."); *In re Pool Prods. Dist. Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 572 (E.D. La. 2013) ("IPPs allegations of antitrust violations are . . . sufficient to make out a claim of unfair practices under the MMPA.").[33]

Plaintiffs do not oppose Defendants' argument that under the Rhode Island Antitrust Act, the Indirect Purchaser Plaintiffs would be entitled to damages only after July 15, 2013. Finally, Indirect Purchaser Plaintiffs withdraw their claim under Mass. G. L. c. 93(A). IPP Compl., ¶346.[34]

**<u>The Indirect Purchaser Complaint Sufficiently Alleges Unjust Enrichment</u>**. Indirect Purchaser Plaintiffs have properly asserted claims for unjust enrichment and identified the laws of various states under which such claims are brought. IPP Compl., ¶¶363-67. In fact, Fair Isaac fails to cite any case from those jurisdictions in support of dismissing those claims. FICO MTD, at 44. Fair Isaac first claims that Indirect Purchaser Plaintiffs cannot bring independent claims for unjust enrichment. Many courts have rejected this argument based on basic principles, such as pleading in the alternative and the availability of equitable remedies even if there are also legal remedies.[35]

---

[33]     Fair Isaac cites only *Ireland v. Microsoft Corp.*, No. 00cv-201515, 2001 WL 1868946, at *1 (Mo. Cir. Ct. Jan. 24, 2001), which was abrogated by *Gibbons*, as is discussed in *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 415 (E.D. Pa. 2010).

[34]     Because Direct Purchaser Plaintiffs allege they made payments directly to Defendants, *see* Argument §V., *supra*, their claim under Mass. G. L. c. 93(A), *et seq.*, should be sustained. DPP Compl., ¶312.

[35]     *See, e.g.*, *D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 506 (E.D. Pa. 2006) ("plaintiffs may bring independent unjust enrichment claims under Arizona, Tennessee and Vermont law and . . . the viability of these claims does not hinge upon the success of the state statutory antitrust claims"); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 543-46 (D.N.J. 2004) (refusing to dismiss unjust enrichment claims for 50 states, District of Columbia and Puerto Rico); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 668-69 (E.D. Mich. 2000) ("the courts often award equitable remedies under common law claims for unjust enrichment in circumstances where claims based upon contract or other state law violations prove unsuccessful"). *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 46, 49, 56 & App. (D.D.C.), *on recons.*, 99 F. Supp. 2d 1, 11 (D.D.C.

Second, Fair Isaac argues that Indirect Purchaser Plaintiffs' unjust enrichment claims necessarily fail if their statutory claims fail.[36]  However, in *Digital Music*, the court recognized that the plaintiffs had based many of their claims for unjust enrichment on state laws and allowed many of those claims to proceed."[37]  Where plaintiffs have been careful to assert claims in states where they are allowed, as Indirect Purchaser Plaintiffs have done here, those claims have been permitted to proceed.[38]  Indeed, the case cited by Fair Isaac recognizes that unjust enrichment claims predicated on violations of state law are simply an exercise in an election of remedies.[39]

Third, Fair Isaac claims that unjust enrichment claims cannot be based on allegations that Indirect Purchaser Plaintiffs overpaid for a bargained product or service.  But courts have held to the contrary,[40] or that such transactions may be voidable, and refused to dismiss at this phase of the case.[41]

---

1999) (permitting restitution claims based on unjust enrichment to go forward even with respect to states where antitrust claims were dismissed).  *Cf. Freeman Indus. LLC v. Eastman Chem. Co*., 172 S.W.3d 512, 524-25 (Tenn. 2005) (reaching merits of unjust enrichment claim even where state antitrust claim was dismissed).

[36]    Citing *In re Digital Music Antitrust Litig*., 812 F. Supp. 2d 390 (S.D.N.Y. 2011).

[37]    *Id.* at 413-14.

[38]    *See, e.g.*, *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*, No. 15 CIV. 6549 (CM), 2018 WL 7197233, at *35 (S.D.N.Y. Dec. 26, 2018) ("[A]lthough state laws may vary to some degree in the elements that they require, the IPP has made an effort to limit its claims to state laws that share substantive foundational features – such as a right of action for "unfair," as opposed to "deceptive," trade practices.").

[39]    *Digital Music*, 812 F. Supp. 2d at 413.

[40]    *See, e.g.*, *In re Opana ER Antitrust Litig*., No. 14 C 10150, 2016 WL 4245516, at *3 (N.D. Ill. Aug. 11, 2016).

[41]    *Le v. Kohls Dep't Stores, Inc*., 160 F. Supp. 3d 1096, 1117-18 (E.D. Wis. 2016) ("[B]ecause Le's underlying purchase transactions may be voidable, the Court declines to dismiss Le's unjust enrichment claim at this juncture"); *In re JPMorgan Chase Bank Home Equity Line of Credit Litig*., 794 F. Supp. 2d 859, 884 (N.D. Ill. 2011) ("The court agrees that the existence of an express contract potentially covering these claims is not fatal at this stage and declines to dismiss Plaintiffs' unjust enrichment claims on this basis."); *Yakas v. Chase Manhattan Bank, U.S.A., N.A*., No. C

Finally, Fair Isaac claims that Indirect Purchaser Plaintiffs must tailor their unjust enrichment claims to the specific requirements of the laws of each state.[42]  However, courts have found that such detail is not necessary at the pleading stage.[43]  Indirect Purchaser Plaintiffs have set forth the facts that support their claims and have identified the states under whose law they bring their claims.  Nothing more is required at this time, and Indirect Purchaser Plaintiffs' unjust enrichment claims should be allowed to proceed.

## **CONCLUSION**

The Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs respectfully request that the Court deny the Defendants' Motions to Dismiss in their entirety.  Should the Court dismiss any

---

09-02964, 2010 WL 367475, at *7 (N.D. Cal. Jan. 25, 2010) ("At this point, the Court is unwilling to categorically exclude the possibility that unjust enrichment will turn out to be an appropriate remedy.").

[42]    Fair Isaac cites to *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642 (E.D. Mich. 2011), but fails to note that the unjust enrichment claims were dismissed because plaintiffs had not identified the state laws under which they brought them, and plaintiffs were given leave to amend to do so.  *Accord Chocolate Confectionary*, 602 F. Supp. 2d at 587 (dismissing, with opportunity to amend, plaintiffs' unjust enrichment claims which did not identify the states under whose laws they brought their claims).

[43]    *See, e.g.*, *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 729-30 (S.D.N.Y. 2017) (refusing to dismiss unjust enrichment claims for failure to specify under which state laws they are brought because "such identification is not necessary at the pleading stage because the elements of unjust enrichment are similar in every state."); *In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476, 2014 WL 4379112, at *18 (S.D.N.Y. Sept. 4, 2014); *Sergeants Benevolent*, 2018 WL 7197233, at *35 ("[T]he factual allegations that support the IPP's claims are well-pleaded throughout the Complaint, and it is not necessary that the IPP reiterate each of them when listing its causes of action in the final section of the Complaint."); *In re Domestic Drywall Antitrust Litig.*, No. CV 2:18-MD-2836, 2019 WL 1397228, at *35 (E.D. Va. Feb. 6, 2019), *report and recommendation adopted as modified*, 400 F. Supp. 3d 418 (E.D. Va. 2019) ("'Requiring recharacterization of every allegation into an unjust enrichment framework would create needlessly repetitive pleading.  And conclusory pleading is to some degree unavoidable, given that an element of unjust enrichment is the character of the defendants' actions, not simply the actions themselves.'").

portion of the Complaints, Plaintiffs respectfully request leave to amend their respective Complaints.

Dated: March 4, 2022                                        Respectfully submitted,

  *s/ Steven F. Molo*                                          *s/ Joseph P. Guglielmo*
Steven F. Molo                                             Joseph P. Guglielmo (N.D. Ill. 2759819)
Gerald Meyer                                               Michelle E. Conston (admitted *pro hac vice*)
Lisa W. Bohl                                               SCOTT+SCOTT ATTORNEYS AT LAW LLP
MOLOLAMKEN LLP                                             The Helmsley Building
300 N. LaSalle Street, Suite 5350                         230 Park Avenue, 17th Floor
Chicago, IL 60654                                          New York, NY 10169
Telephone: 312-450-6700                                    Telephone: 212-223-6444
Facsimile: 312-450-6701                                    Facsimile: 212-223-6334
smolo@mololamken.com                                       jguglielmo@scott-scott.com
gmeyer@mololamken.com                                      mconston@scott-scott.com
lbohl@mololamken.com

                                                           Christopher M. Burke (admitted *pro hac vice*)
Lauren M. Weinstein                                        SCOTT+SCOTT ATTORNEYS AT LAW LLP
MOLOLAMKEN LLP                                             600 W. Broadway, Suite 3300
600 New Hampshire Avenue, N.W., Suite 500                 San Diego, CA 92101
Washington, DC 20037                                       Telephone: 619-233-4565
Telephone: 202-556-2000                                    Facsimile: 619-233-0508
Facsimile: 202-556-2001                                    cburke@scott-scott.com
lweinstein@mololamken.com

                                                           *Interim Lead Class Counsel for Direct*
                                                           *Purchaser Plaintiffs and the Proposed Direct*
                                                           *Purchaser Class*
*Liaison Counsel for Direct Purchaser*
*Plaintiffs and the Proposed Direct Purchaser*
*Class*                                                    George A. Zelcs
                                                           Randall P. Ewing, Jr.
                                                           Ryan Z. Cortazar
Gary F. Lynch                                              John Libra
CARLSON LYNCH LLP                                          KOREIN TILLERY, LLC
1133 Penn Avenue, 5th Floor                               205 North Michigan Avenue, Suite 1950
Pittsburgh, PA 15222                                       Chicago, IL 60601
Telephone: 412-322-9243                                    Telephone: 312-641-9750
Facsimile: 412-231-0246                                    Facsimile: 312-641-9751
glynch@carlsonlynch.com                                    gzelcs@koreintillery.com
                                                           rewing@koreintillery.com
                                                           rcortazar@koreintillery.com
Katrina Carroll                                            jlibra@koreintillery.com
CARLSON LYNCH LLP
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
kcarroll@carlsonlynch.com

Jennifer W. Sprengel
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

Barbara J. Hart (admitted *pro hac vice*)
GRANT & EISENHOFER
485 Lexington Ave., 29th Floor
New York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Linda P. Nussbaum
Susan Schwaiger
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
Telephone: 917-438-9102
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Michael L. Roberts
Karen Sharp Halbert
ROBERTS LAW FIRM, P.A.
20 Rahling Circle
Little Rock, AR 72223
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Steven M. Berezney
Jamie Boyer
Michael E. Klenov
Carol O'Keefe
KOREIN TILLERY, LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: 314-241-4844
Facsimile: 314-241-3525
sberezney@koreintillery.com
jboyer@koreintillery.com
mklenov@koreintillery.com
cokeefe@koreintillery.com

Gregory S. Asciolla (admitted *pro hac vice*)
Karin E. Garvey (admitted *pro hac vice*)
Robin A. van der Meulen (admitted *pro hac vice*)
Matthew J. Perez (admitted *pro hac vice*)
Jonathan S. Crevier (admitted *pro hac vice*)
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: 212-907-0700
gasciolla@labaton.com
kgarvey@labaton.com
rvandermeulen@labaton.com
mperez@labaton.com
jcrevier@labaton.com

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: 312-332-3400
mmiller@millerlawllc.com
lfanning@millerlawllc.com

Guillaume Buell (admitted *pro hac vice*)
THORNTON LAW FIRM LLP
1 Lincoln Street, 13th Floor
Boston, MA 02111
Telephone: 617-720-1333
gbuell@tenlaw.com

Daniel E. Gustafson (admitted *pro hac vice*)
Daniel C. Hedlund (admitted *pro hac vice*)
Michelle J. Looby (admitted *pro hac vice*)
Joshua J. Rissman
Ling S. Wang
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
lwang@gustafsongluek.com

Dennis Stewart (admitted *pro hac vice*)
GUSTAFSON GLUEK PLLC
600 B Street, 17th Floor
San Diego, CA 92101
Telephone: 619-595-3200
dstewart@gustafsongluek.com

Kenneth A. Wexler
Melinda J. Morales
Michelle Perkovic
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

Charles F. Barrett (admitted *pro hac vice*)
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: 615-244-1713
cbarrett@nealharwell.com

Don Barrett (*pro hac vice* forthcoming)
BARRETT LAW GROUP, P.A.
404 Court Square
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
dbarrett@barrettlawgroup.com
donbarrettpa@gmail.com

Richard R. Barrett (*pro hac vice* forthcoming)
BARRETT LAW GROUP, P.A.
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: 662-380-5018
rrb@rrblawfirm.net

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1908
mlehmann@hausfeld.com
clebsock@hausfeld.com

Hilary K. Scherrer
Paul Gallagher
HAUSFELD LLP
1700 K Street, N.W., Suite 650
Washington, DC 20006
Telephone: 202-540-7200
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Scott A. Martin
Irving Scher
Jeanette Bayoumi
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: 646-357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

*Counsel for Direct Purchaser Plaintiffs and the Proposed Direct Purchaser Class*

 *s/Garrett D. Blanchfield*
Garrett D. Blanchfield
REINHARDT WENDORF & BLANCHFIELD
Garrett D. Blanchfield (*pro hac vice*)
Brant D. Penney (*pro hac vice*)
Roberta A. Yard (*pro hac vice* forthcoming)
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Telephone: 651-287-2100
Facsimile: 651-287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

SPECTOR ROSEMAN & KODROFF, P.C.
Jeffrey J. Corrigan (*pro hac vice*)
William G. Caldes (*pro hac vice*)
Icee N. Etheridge (*pro hac vice* forthcoming)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: 215-496-0300
Facsimile: 215-496-6611
JCorriganf@srkattorneys.com
BCaldes@srkattorneys.com
IEtheridge@srkattorneys.com

*Interim Co-Lead Counsel for Indirect Purchaser Plaintiffs and the Proposed Indirect Purchaser Class*

GUIN, STOKES & EVANS, LLC
Charles R. Watkins (3122790)
321 South Plymouth Court Suite 1250
Chicago, IL 60604
Telephone: 312-878-8391
Facsimile:  205-226-2357
charlesw@gseattorneys.com

*Liaison Counsel for Indirect Purchaser Plaintiffs and the Proposed Indirect Purchaser Class*

PRETI FLAHERTY, BELIVEAU
& PACHIOS LLP
Michael S. Smith (*pro hac vice* forthcoming)
Gregory P. Hansel (*pro hac vice* forthcoming)
Randall B. Weill (*pro hac vice* forthcoming)
Elizabeth F. Quinby (*pro hac vice* forthcoming)
One City Center, P.O. Box 9546
Portland, ME 04101
Telephone: 207-791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com

GLANCY PRONGAY & MURRAY LLP
Brian P. Murray (*pro hac vice* forthcoming)
Lee Albert (*pro hac vice* forthcoming)
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: 212-682-5340
Facsimile:  212-884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

FREED KANNER LONDON
& MILLEN LLC
Douglas A. Millen
Brian M. Hogan
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: 224-632-4500
dmillen@fklmlaw.com
bhogan@fklmlaw.com

FREED KANNER LONDON
& MILLEN LLC
Jonathan M. Jagher (*pro hac vice* forthcoming)
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-234-6487
jjagher@fklmlaw.com
BONI, ZACK & SNYDER LLC
Michael J. Boni (*pro hac vice* forthcoming)
Joshua D. Snyder (*pro hac vice* forthcoming)
John E. Sindoni (*pro hac vice* forthcoming)
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: 610-822-0200
Facsimile:  610-822-0206
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

MCLAFFERTY LAW FIRM, P.C.
David McLafferty (*pro hac vice* forthcoming)
Attorneys at Law
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-940-4000, ext. 12
www.McLaffertyLaw.com

SALTZ, MONGELUZZI & BENDESKY, P.C.
Simon B. Paris, Esq. (*pro hac vice* forthcoming)
Patrick Howard, Esq. (*pro hac vice* forthcoming)
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: 215-575-3985
Facsimile:  215-496-0999
sparis@smbb.com
phoward@smbb.com

*Counsel for Indirect Purchaser Plaintiffs and the Proposed Indirect Purchaser Class*

**<u>CERTIFICATE OF SERVICE</u>**

I, Joseph P. Guglielmo, an attorney, hereby certify that on March 4, 2022, I caused a true and correct copy of the foregoing Plaintiffs' Joint Opposition to Motions to Dismiss Plaintiffs' Consolidated Complaints to be filed and served electronically via the Court's CM/ECF system.

<u>    *s/ Joseph P. Guglielmo*                    </u>
Joseph P. Guglielmo