**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re FICO Antitrust Litigation* | Case No. 20-cv-02114 |
| *This document relates to:* | Honorable Edmond E. Chang |
| ALL ACTIONS | Magistrate Judge David E. Weisman |

**FAIR ISAAC CORPORATION'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' AND
INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED COMPLAINTS**

Dated: March 29, 2022

Britt M. Miller
Matthew D. Provance
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
(312) 701-7711—Facsimile
bmiller@mayerbrown.com
mprovance@mayerbrown.com
jglickstein@mayerbrown.com

*Counsel for Defendant
Fair Isaac Corporation*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

I. The Opposition Confirms That Plaintiffs Do Not State A Monopolization Claim. .......... 2

    A. Plaintiffs Fail To Allege Monopoly Power In A Relevant Market......................... 2

    B. Plaintiffs Fail To Allege Anticompetitive Conduct. ................................................. 4

        1. Plaintiffs' attempted aggregation of conduct fails. ................................... 4

        2. Claims based on the *Equifax* litigation are untimely. ............................... 7

    C. The *TransUnion* Decision Is Not Controlling. .......................................................... 7

II. The Opposition Confirms That Plaintiffs Do Not State A Horizontal Section 1 Claim. ................................................................................................................... 8

III. The Opposition Confirms That Plaintiffs Do Not State A Vertical Section 1 Claim. ................................................................................................................. 10

    A. Plaintiffs Do Not Allege Actual Anticompetitive Effects On Price Or Output. ..................................................................................................................... 11

        1. The No Equivalent Products provision. ................................................... 11

        2. The Dynamic Royalty Schedule. ............................................................ 13

        3. The Level Playing Field provision........................................................... 15

    B. Plaintiffs Ignore Facially Obvious Procompetitive Justifications. ...................... 16

        1. The provisions protect FICO's intellectual property. ............................. 16

        2. The provisions discourage consumer confusion and free-riding. ........... 17

IV. The Opposition Confirms That Plaintiffs Do Not Satisfy *Illinois Brick*. ....................... 18

    A. Plaintiffs Do Not Pay FICO Directly.................................................................. 18

    B. Plaintiffs' Alternative Direct Purchaser Theory Fails. ....................................... 19

V. The Opposition Confirms That Plaintiffs' State Claims Fail............................................ 21

CONCLUSION.................................................................................................. 23

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Apple, Inc. v. Pepper*,
    139 S. Ct. 1514 (2019) ................................................................................................18

*In re Asacol Antitrust Litig.*,
    233 F. Supp. 3d 247 (D. Mass. 2017) ...........................................................................5

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
    784 F.2d 1325 (7th Cir. 1986) ......................................................................................6

*BanxCorp v. Bankrate, Inc.*,
    847 F. App'x 116 (3d Cir. 2021) .................................................................................13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................................3

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ......................................................................................15

*Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*,
    935 F.2d 1469 (7th Cir. 1991) ....................................................................................22

*In re Cardizem CD Antitrust Litig.*,
    105 F. Supp. 2d 618 (E.D. Mich. 2000) .....................................................................22

*CBC Companies, Inc. v. Equifax, Inc.*,
    561 F.3d 569 (6th Cir. 2009) ......................................................................................13

*City of Mishawaka v. American Electric Power Co.*,
    616 F.2d 976 (7th Cir. 1980) ........................................................................................5

*City of Rockford v. Mallinckrodt ARD, Inc.*,
    360 F. Supp. 3d 730 (N.D. Ill. 2019) ...........................................................................4

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) .......................................................................................................5

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    362 F. Supp. 3d 510 (N.D. Ill. 2019) .........................................................................22

*In re Dicamba Herbicides Litig.*,
    2019 WL 1160817 (E.D. Mo. Mar. 13, 2019) ...........................................................19

*Doe v. Grosch*,
    2017 WL 3970515 (N.D. Ill. Sept. 8, 2017) ................................................................4

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
    747 F. 3d 145 (2d Cir. 2014) ........................................................................................2

*Eatoni Ergonomics, Inc. v. Research In Motion Corp.*,
    826 F. Supp. 2d 705 (S.D.N.Y. 2011), *aff'd*, 486 F. App'x 186 (2d Cir. 2012).....................5

*Fair Isaac Corp. v. TransUnion, LLC*,
    2019 WL 1382068 (N.D. Ill. Mar. 27, 2019) ........................................................7, 8

*Generac Corp. v. Caterpillar Inc.*,
    172 F.3d 971 (7th Cir. 1999) .....................................................................................11

*In re Generic Pharms. Pricing Antitrust Litig.*,
    368 F. Supp. 3d 814 (E.D. Pa. 2019) .......................................................................23

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
    221 F. Supp. 3d 1033 (N.D. Ind. 2016) .....................................................................7

*Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*,
    353 F. Supp. 3d 678 (M.D. Tenn. 2018) ..................................................................22

*IDX Sys. Corp. v. Epic Sys. Corp.*,
    285 F.3d 581 (7th Cir. 2002) .....................................................................................12

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ....................................................................................18, 20, 21

*Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v.*
    *Philip Morris Inc.*,
    196 F.3d 818 (7th Cir. 1999) .....................................................................................20

*Jackson v. Marion Cnty.*,
    66 F.3d 151 (7th Cir. 1995) .........................................................................................3

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ....................................................................................................7

*Kloth v. Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006) .....................................................................................19

*Leonard v. Ala. State Bd. of Pharmacy*,
    — F. Supp. 3d —, 2022 WL 736262 (M.D. Ala. Mar. 10, 2022) .........................13

*Loeb Industries, Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) .....................................................................................20

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
— F.4th —, 2022 WL 818751 (7th Cir. Mar. 18, 2022) ........................................9, 10, 20, 21

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) ........................................................................................8, 9, 20

*Mercatus Group LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011) ..............................................................................................6

*Microsoft Corp. v. Computer Support Servs. of Carolina, Inc.*,
123 F. Supp. 2d 945 (W.D.N.C. 2000) .............................................................................13

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) .............................................................................................9

*New York v. Facebook, Inc.*,
549 F. Supp. 3d 6 (D.D.C. 2021) ........................................................................................5

*Nexstar Broad., Inc. v. Granite Broad. Corp.*,
2012 WL 2838547 (N.D. Ind. July 9, 2012) ......................................................................7

*In re NorthShore Univ. HealthSystem Antitrust Litig.*,
2018 WL 2383098 (N.D. Ill. Mar. 31, 2018) ...................................................................18

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ........................................................................................16

*Ogden v. Little Caesar Enters., Inc.*,
393 F. Supp. 3d 622 (E.D. Mich. 2019)............................................................................11

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)............................................................................................................5

*ProCD, Inc. v. Zeidenberg*,
86 F.3d 1447 (7th Cir. 1996) ............................................................................................12

*Rock the Vote v. Trump*,
2020 WL 6342927 (N.D. Cal. Oct. 29, 2020)....................................................................1

*Rosenblum v. Travelbyus.com Ltd.*,
299 F.3d 657 (7th Cir. 2002) ..............................................................................................2

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010)..........................................................................................................22

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
507 F. Supp. 2d 1096 (C.D. Cal. 2007) ...........................................................................17

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021) .................................................................................................21

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) .....................................................................................15, 20

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ....................................................................................12, 17

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) .......................................................................................16

*Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
328 F. Supp. 3d 824 (N.D. Ill. 2018) ............................................................................10

*In re Zinc Antitrust Litig.*,
155 F. Supp. 3d 337 (S.D.N.Y. 2016) .............................................................................3

**Other Authorities**

FICO, *US FICO® Score Reason Codes*, https://www.fico.com/en/resource-
access/download/3425 .................................................................................................17

VantageScore Solutions, *10 Years, 10 Milestones* (Mar. 2016),
https://vantagescore.com/newsletter/252/10-years-10-milestones-1[*] ..............................1

VantageScore Solutions, *VantageScore® Credit Scores and The Mortgage
Market* (2018), https://vantagescore.com/wp-content/uploads/2022/02/FAQs-
VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf [†] .................................1

VantageScore Solutions, *VantageScore Solutions Announces Score Use Grows to
More than 12 Billion* (Oct. 29, 2019),
https://vantagescore.com/press/vantagescore-solutions-announces-score-use-
grows-to-more-than-12-billion ......................................................................................12

---

[*]    This document is cited in the complaints using an alternative link, which is no longer functional:
https://thescore.vantagescore.com/article/252/10-years-10-milestones.
[†]    This document is cited in the complaints using an alternative link, which is no longer functional:
https://vantagescore.com/pdfs/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf.

## INTRODUCTION

Plaintiffs argue that they have plausibly alleged a decades-long unlawful monopoly by FICO *and* a horizontal conspiracy formed by all Defendants in 2013 to "destroy" VantageScore, FICO's primary competitor. As multiple publicly available sources cited in Plaintiffs' own complaints confirm, however, competition in the alleged B2B credit scoring market has flourished since 2013.[1] Indeed, just a week before Plaintiffs filed their Opposition (Dkt. 147), VantageScore tweeted the following graphic reflecting its strong growth during this period.[2]



This image perfectly illustrates why Plaintiffs cannot plausibly identify a substantial foreclosure of competition necessary to sustain their claims. But this failing, while sufficient to warrant dismissal, is hardly the only defect in Plaintiffs' complaints. As explained below, the Opposition repeatedly attempts to sidestep other grounds for dismissal while failing to

---

[1]      *See, e.g.*, VantageScore Solutions, *10 Years, 10 Milestones* (Mar. 2016), https://vantagescore.com/ newsletter/10-years-10-milestones-1 (cited at DPP nn. 56, 66-68 & IPP nn. 50, 60-62) ("more than 6 billion VantageScore credit scores were used from July 2014 to June 2015 by more than 2000 lenders and other market participants," representing "an increase in usage of more than 100 percent over the previous 12-month period"); VantageScore Solutions, *VantageScore® Credit Scores and The Mortgage Market* at 9 (2018), https://vantagescore.com/wp-content/uploads/2022/02/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf (cited at DPP nn. 50-51, 93 & IPP nn. 46-47, 78) ("A recent report by Oliver Wyman estimated that VantageScore was used more than 8.5 billion times by more than 2,200 lenders during a twelve mo[nth] window."). All websites were last visited on March 29, 2022.

[2]      https://twitter.com/VantageScore/status/1497305915594354693 (Feb. 25, 2022); *see also Rock the Vote v. Trump*, 2020 WL 6342927, at *4 (N.D. Cal. Oct. 29, 2020) (taking judicial notice of tweets "cited in the government's Motion to Dismiss as information available on publicly available websites").

meaningfully dispute FICO's arguments and taking positions that the Seventh Circuit has rejected in other cases. For all these reasons, Plaintiffs' claims are implausible and should be dismissed.

## I. The Opposition Confirms That Plaintiffs Do Not State A Monopolization Claim.

### A. Plaintiffs Fail To Allege Monopoly Power In A Relevant Market.

Monopolization claims require plausible allegations that the defendant exercises monopoly power in the alleged relevant market. FICO's opening brief (Dkt. 139) identified several reasons why Plaintiffs failed to allege monopoly power. Mem. 10-12. Plaintiffs hardly engage with these arguments; they simply repeat that FICO has "a 90-plus percent market share." Opp. 4, 14-15, 16, 18. That mantra does not establish monopoly power for at least three reasons.

*First*, the refrain that FICO has a 90% "market share" has no basis in the facts pled in the complaints. Plaintiffs actually allege that "FICO Scores *are used* for 90% of all lending decisions in the U.S." Mem. 11 (citing DPP ¶ 2 & IPP ¶ 2, emphasis added). The number of lending decisions that "use" a FICO Score does not equate to any market share of FICO Scores because, as the documents cited in Plaintiffs' own complaints recognize, lenders often use multiple credit scores. *Id.* The Court is not bound to accept Plaintiffs' characterizations when they are unsupported by the specific allegations in the complaint. *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F. 3d 145, 151-52 (2d Cir. 2014); *see also Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) ("The court is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions").

*Second*, even if Plaintiffs *had* alleged that there is a 90% "market share" for FICO Scores, the "market" Plaintiffs are talking about in these allegations is an unalleged market for credit scoring *algorithms*, not the alleged market for "B2B Credit Scores" that matters for purposes of their Section 2 claims. Mem. 11-12. Virtually all credit scores sold are created, priced, and delivered to end-users by the Credit Bureaus, as the complaints, the industry, and government

regulators all recognize. Mem. 2-5.[3] Since Plaintiffs allege that the vast majority of FICO's revenue comes from licensing its scoring algorithm, moreover, FICO's allegedly high "operating margin" (Opp. 17) is not relevant. *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 518e2 ("the ability to charge prices above short-run marginal cost is often not useful for establishing power in markets dominated by IP rights"). As in *In re Zinc Antitrust Litigation*—which Plaintiffs ignore—Plaintiffs "cite no authority for the proposition that Section 2 makes cognizable a theory that a company has an unlawful monopoly in a market in which it does not control price or competition" because conduct in one market "has some indirect impact on the prices charged in another market." 155 F. Supp. 3d 337, 379-80 (S.D.N.Y. 2016).

**Third**, Plaintiffs fail to grapple with their own allegations that each Credit Bureau possesses "substantial market power." Mem. 4 & n.5 (citing DPP and IPP allegations). This is incompatible with FICO's alleged monopoly power: a monopolist cannot exist in a market where other firms—much less three firms—simultaneously possess "substantial market power" in that market. Mem. 12; *see also Jackson v. Marion Cnty.*, 66 F.3d 151, 153 (7th Cir. 1995) ("a plaintiff can plead himself out of court by alleging facts which show that he has no claim").

Plaintiffs' response that their own contradictory allegations of the Credit Bureaus' market power can be ignored because "[t]he monopolization claim (Claim 5) is brought against [FICO] only" (Opp. 17) is unpersuasive. Claim Five incorporates all prior factual allegations—including Plaintiffs' affirmative allegations that the Credit Bureaus possess "substantial market power."

---

[3]     Plaintiffs argue that the Court should not look outside "the four corners of the complaint" (Opp. 15-16) in assessing whether Plaintiffs have plausibly alleged FICO's monopoly power. However, it is entirely appropriate for the Court to take judicial notice of public information and the full scope of documents referenced or cited to in a complaint. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007) ("the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn"); Mem. 3 n.1, 6 n.16 (collecting cases). Plaintiffs do not challenge the authenticity of the documents FICO cites in its opening brief or contend that the documents are not subject to judicial notice.

DPP ¶ 239; IPP ¶ 229. Plaintiffs also argue that the Credit Bureaus' alleged market power is in a "separate market" for "credit reports." Opp. 18. By Plaintiffs' own allegations, that is semantics. Plaintiffs allege that FICO Scores and credit reports are sold together in a "bundle" in the "B2B market." DPP ¶¶ 40-42; IPP ¶¶ 46-48. Indeed, Plaintiffs even allege that FICO Scores "are defined as 'a *credit report* that contains a FICO Score.'" Opp. 67; DPP ¶ 3; IPP ¶ 1 n.1. Plaintiffs thus affirmatively allege that each of the three Credit Bureaus has "substantial market power" with respect to the same alleged product and market in which FICO is a purported monopolist. These allegations are self-defeating and require dismissal of Plaintiffs' monopolization claim.

### B. Plaintiffs Fail To Allege Anticompetitive Conduct.

Even if Plaintiffs had plausibly alleged monopoly power, they do not plausibly allege anticompetitive conduct, described by one of Plaintiffs' cases as "conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition." *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 756 (N.D. Ill. 2019). Plaintiffs fail to show anticompetitive conduct through FICO's negotiation of the challenged license terms for the same reasons they fail to state a Section 1 claim based on those terms. Mem. 16-23, 34-56; *see also* pp. 10-18 *infra*. Plaintiffs' allegations based on the *Equifax* litigation and supposedly "disparaging" statements about VantageScore also fail.

### 1. Plaintiffs' attempted aggregation of conduct fails.

Plaintiffs admit that their allegations about the *Equifax* litigation and "disparagement" of VantageScore are not Section 2 violations standing alone,[4] but suggest that this conduct supports a Section 2 claim in two ways. Neither theory is availing.

---

[4]    Plaintiffs concede that the *Equifax* litigation is not an independent basis for a Section 2 claim. *See* Opp. 23 (Plaintiffs "never allege that the *Equifax* Litigation *alone* states a claim for monopolization"). And by failing to argue that supposedly "disparaging" statements are independently actionable, Plaintiffs have forfeited any such claims. *Doe v. Grosch*, 2017 WL 3970515, at *3 (N.D. Ill. Sept. 8, 2017).

*First*, Plaintiffs argue that the alleged conduct forms a "monopoly broth" that can be actionable even if none of the component ingredients is unlawful standing alone. Opp. 18, 20-21 (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), and *City of Mishawaka v. American Electric Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980)). This theory fails for two independent reasons. The first is that "monopoly broth" liability is highly dubious as a matter of law. The *Continental Ore* decision that Plaintiffs cite "does not concern unilateral conduct" and "does not stand for the unworkable proposition that business conduct that does not offend the antitrust laws may violate the Sherman Act once it is combined with other lawful business conduct." *Eatoni Ergonomics, Inc. v. Research In Motion Corp.*, 826 F. Supp. 2d 705, 710 (S.D.N.Y. 2011), *aff'd*, 486 F. App'x 186 (2d Cir. 2012). Moreover, the Supreme Court has effectively abrogated *City of Mishawaka*—which considered a monopolization claim against a utility accused of engaging in a "price squeeze" and related exclusionary acts—by holding that "price-squeeze" claims are not cognizable under Section 2 and that plaintiffs cannot "alchemize . . . a new form of antitrust liability" by "join[ing]" one claim "that cannot succeed" with another. *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009).

Even those courts that continue to entertain "monopoly broth" theories, moreover, require the plaintiff to show that the various conduct thrown into the pot has an overall "synergistic effect." *In re Asacol Antitrust Litig.*, 233 F. Supp. 3d 247, 261 (D. Mass. 2017); *see also New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 46-47 (D.D.C. 2021) (expressing skepticism about such a theory, but noting at a minimum that the theory requires aggregation of arrangements that do not "foreclose enough of the market to affect competition" on their own, but "when evaluated together, did have that forbidden effect"). Yet Plaintiffs do not attempt to identify synergistic effects from the conduct they challenge. Nor could they. There is no synergy between a 2006 lawsuit, three

commercial license agreements executed between 2013 and 2015, and unrelated statements that occurred sporadically at disparate times over a fifteen-year period.

**Second**, Plaintiffs alternatively argue that FICO's conduct unrelated to the license agreements is evidence of anticompetitive "intent" to "undercut" VantageScore as a competitor. Opp. 21, 23. But "intent to harm rivals" is "not a useful standard" in antitrust law. *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir. 1986) (cited at Mem. 10). And several considerations make inferring anticompetitive intent especially inappropriate here.

As Plaintiffs do not dispute, the *Equifax* court found both that FICO advanced colorable infringement claims and that FICO showed a dangerous probability of monopolization at the outset of the case. The *Equifax* litigation thus cannot give rise to antitrust liability under *Noerr-Pennington*. Mem. 15-16. Moreover, because the underlying conduct is immune, it cannot be aggregated with other conduct. Such an approach "would nullify the immunity." *Mercatus Group LLC v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011).[5]

Plaintiffs assert that "Fair Isaac does not deny that many of its statements regarding VantageScore were false or misleading." Opp. 23. That is both untrue and, more importantly, irrelevant, because such allegations are not cognizable under the antitrust laws. Mem. 9 & 24-25. In addition, the key statements Plaintiffs identify relate to FICO's position on contemplated FHFA rule changes in the mortgage market and are thus indisputably immune from antitrust liability as well. Mem. 25. Again, these statements cannot be aggregated with other conduct under Seventh Circuit law. *Mercatus Group*, 641 F.3d at 839.[6]

---

[5]    Plaintiffs emphasize the *Equifax* jury's determination that FICO's "300-850" trademark was invalid. Opp. 22-23. But this has nothing to do with the argument FICO made in its motion to dismiss. FICO did not argue that *Noerr-Pennington* immunity applied to FICO's trademark or to statements made to the Patent and Trademark Office. Rather, the immunity applies to the *Equifax* litigation itself.
[6]    The sole case Plaintiffs cite considering "denigrating speech" as "part of a course of conduct" cuts against them. Unlike in that decision, Plaintiffs identify no "coercive enforcement mechanism" that FICO

## 2. Claims based on the *Equifax* litigation are untimely.

Plaintiffs offer no meaningful response to FICO's argument that the applicable limitations period bars any claim based on the 2006 *Equifax* litigation, which ended no later than 2011. Mem. 13-14. Plaintiffs cite no cases that permit them to recover damages for any conduct they proclaim to be part of a "decades-long, multi-faceted monopolistic scheme." Opp. 24. That is unsurprising, for such a rule would obliterate the statute of limitations for Section 2. Courts widely agree that the continuing violation doctrine "generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Further, neither equitable estoppel nor equitable tolling applies to the 2006 *Equifax* litigation, which was public record as soon as the case was filed. Mem. 13-14.[7]

## C. The *TransUnion* Decision Is Not Controlling.

Plaintiffs repeatedly seek refuge in Judge Coleman's denial of FICO's motion to dismiss the monopolization and attempted monopolization counterclaims in the *TransUnion* litigation. *See, e.g.*, Opp. 2, 11, 14-15. That decision does not help Plaintiffs for three reasons.

***First***, Plaintiffs' failure to plausibly allege that FICO has monopoly power provides a new and independent basis for dismissal that Judge Coleman did not consider. Indeed, Plaintiffs' contradictory allegation that the Credit Bureaus possess "substantial market power" in the same market in which FICO is a purported monopolist was never made in *TransUnion*. Plaintiffs are wrong that Judge Coleman "recognized that Fair Isaac holds a monopoly" in an alleged market for

---

"could use . . . to back its [allegedly] derogatory statements" and eliminate competition. *Nexstar Broad., Inc. v. Granite Broad. Corp.*, 2012 WL 2838547, at *7-8 (N.D. Ind. July 9, 2012).

[7]     *See also Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 221 F. Supp. 3d 1033, 1043 (N.D. Ind. 2016) ("in antitrust claims, new acts cannot be used to bootstrap damages that resulted from injuries prior to the limitations period"); Areeda & Hovenkamp, *Antitrust Law* ¶ 320c ("the plaintiff's damage claim will be limited to those acts of the cartel that both damaged the plaintiff *and* occurred within the four years prior to the suit") (emphasis added).

B2B credit scores. Opp. 15. Judge Coleman never addressed that element of the monopolization claims asserted in *TransUnion*. *See Fair Isaac Corp. v. TransUnion, LLC*, 2019 WL 1382068, at *2 (N.D. Ill. Mar. 27, 2019) ("FICO's main contention is that TransUnion has not adequately pled any anticompetitive conduct").

*Second*, when addressing the anticompetitive-conduct element of the Section 2 claims that were asserted in *TransUnion*, Judge Coleman analyzed the alleged license agreement terms as "exclusive dealing" provisions. *See TransUnion*, 2019 WL 1382068, at *2 ("TransUnion puts forth claims that, if proven, could establish that FICO's exclusive dealing provisions are unlawful"). Plaintiffs do not attempt to defend their Section 2 claims under an exclusive-dealing theory—with good reason, *see* Mem. 33—so Judge Coleman's analysis does not apply.

*Third*, in any event, the Court is not bound to reach the same conclusion that Judge Coleman reached. This is a new case brought by different parties asserting different claims based on different allegations that affirmatively undercut their theories. Plaintiffs' regurgitation of some of Transunion's allegations does not bind the Court to adopt Judge Coleman's ultimate decision.

## II.    The Opposition Confirms That Plaintiffs Do Not State A Horizontal Section 1 Claim.

FICO's opening brief explained that a supposed "conspiracy" between the Credit Bureaus and FICO to destroy the Credit Bureaus' own joint venture is implausible on its face. Mem. 26-27. In their response, Plaintiffs do not address any of the decisions from the Seventh Circuit and elsewhere that reject such theories as inherently implausible.

FICO also explained that Plaintiffs had not pled a plausible "rim" to the alleged conspiracy—merely that the Credit Bureaus each independently agreed to certain terms FICO proposed to each Bureau. Mem. 27-30. As the Seventh Circuit held in a strikingly similar case, allegations that multiple distributors agreed to the same supposedly "anticompetitive contractual terms" are not enough to "describe a hub-and-spokes conspiracy." *Marion Healthcare, LLC v.*

*Becton Dickinson & Co.*, 952 F.3d 832, 842-43 (7th Cir. 2020) ("*Marion I*"); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015). When that case recently returned to the Seventh Circuit, the court held that the allegations could not be recast as "vertical" conspiracies for similar reasons. *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, — F.4th —, 2022 WL 818751, at *9-10 (7th Cir. Mar. 18, 2022) (*"Marion II"*).

Plaintiffs fail to distinguish this case from the *Marion Healthcare* decisions, instead making arguments that the Seventh Circuit has now twice rejected. Opp. 40-49. For instance, Plaintiffs argue that it was "contrary" to the Credit Bureaus' individual interests to agree to the No Equivalent Products clause. Opp. 42-43. But virtually any bilateral negotiations between sophisticated businesses will result in provisions that—in isolation—are arguably contrary to one side's interest. Inferring a conspiracy simply because one side agrees to terms that benefit the other, and vice versa, would chill vast swathes of procompetitive commercial activity, if not the very concept of commercial agreements. Plaintiffs also argue that the Level Playing Field provision provided a "powerful incentive" for the Credit Bureaus to conspire. Opp. 44. Plaintiffs concede, however, a straightforward *unilateral* reason why each Credit Bureau would want this provision: to ensure that the prices paid to license FICO's algorithm were in line with the prices paid by its competitors. *See id*. ("No Credit Bureau would give Fair Isaac the power to raise royalty rates unilaterally unless it could be sure the other Credit Bureaus were paying similar prices.").

It is not sufficient to label the Level Playing Field provision a "quid pro quo." Opp. 45. As *Marion II* recognizes, the question is not whether a particular provision could be viewed as a "quid pro quo," but whether the conduct being challenged is "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." 2022 WL 818751, at *9-10. If the complaint's "allegations, taken as true, could just as easily reflect

innocent conduct or rational self-interest"—as is the case here—then "courts should dismiss antitrust conspiracy complaints for failure to state a claim." *Id*.

In addition, Plaintiffs toss out several supposed "plus factors," including allegedly parallel timing, market structure, and opportunity to coordinate, that Plaintiffs say make a conspiracy explanation more likely. Opp. 46-49. These factors are drawn largely from inapposite cases about alleged cartel price-fixing and have no probative value in the licensing context. But even so, the factors do not plausibly suggest a conspiracy here.

Most obviously, the alleged conduct at issue—the negotiation of each Credit Bureau's license agreement—was separated by nearly two years and therefore *not* parallel as a matter of law. *See* Mem. 28-29. Moreover, "while market structure can provide some evidence of an unlawful agreement, it (even combined with parallel conduct) cannot sustain plaintiffs' complaint all on its own." *Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 841 (N.D. Ill. 2018). Finally, the fact that the Credit Bureaus participated in the VantageScore joint venture and various other trade organizations does not suggest a conspiracy, let alone the one alleged here. *See id*. at 843 ("in virtually every industry," trade organizations "are ubiquitous and serve numerous legitimate and pro-competitive purposes."). It is not remotely plausible that the Credit Bureaus would use the "opportunity" presented by their joint venture to hatch a conspiracy aimed at the joint venture's destruction.

## III. The Opposition Confirms That Plaintiffs Do Not State A Vertical Section 1 Claim.

Without a plausible horizontal agreement, Plaintiffs are left challenging each of the three vertical licensing agreements as individually anticompetitive under Section 1 (as explained above, these individual agreements also form the faulty basis of the Section 2 claim). Plaintiffs attempted to allege in their complaints that the license agreements were *per se* illegal even absent a horizontal

10

conspiracy. Now, however, Plaintiffs appropriately concede that the individual agreements must be evaluated independently under the rule of reason. Opp. 27-28; Mem. 30-31.

### A.     Plaintiffs Do Not Allege Actual Anticompetitive Effects On Price Or Output.

To assert a vertical Section 1 claim, Plaintiffs must plausibly plead that each of the challenged license agreements had "substantial anticompetitive effects" in a relevant market. *Ogden v. Little Caesar Enters., Inc.*, 393 F. Supp. 3d 622, 636 (E.D. Mich. 2019) (quoting *Ohio v. American Express*, 138 S. Ct. 2274, 2284 (2018)). Plaintiffs, however, do not allege any facts demonstrating that price, output, choice, or any other aspect of competition has been meaningfully harmed. As in *Generac Corp. v. Caterpillar Inc.*, "no credible story of lowered output or increased price can be told on the basis of [the challenged] provisions." 172 F.3d 971, 978 (7th Cir. 1999). This alone warrants dismissal of Plaintiffs' Section 2 and vertical Section 1 claims.[8]

### 1.     The No Equivalent Products provision.

Plaintiffs argue that the No Equivalent Products provision has anticompetitive effects because it "effectively deprives customers of access" to competing credit scoring products "that they most desire." Opp. 29-30. But that is not a plausible characterization of the provision's effect. It is undisputed that VantageScore is free to develop competing scoring algorithms, the Credit Bureaus are free to distribute them even while acting as FICO's authorized distributor, and Plaintiffs and thousands of other lenders are free to use VantageScore (and do so). The Credit Bureaus are merely prohibited from distributing competing credit scores that intentionally copy certain distinctive aspects of FICO Scores—their odds-to-score relationship and reason codes. Mem. 17-18. The Seventh Circuit has expressly approved of ancillary contractual restrictions that

---

[8]     Plaintiffs call *Generac* inapposite because the agreement supposedly left the distributor (Caterpillar) "free to sell or license" other products than the ones covered by the agreement. Opp. 36 n.12. But the same is true of FICO's license agreements, which leave the Credit Bureaus free to license or distribute other credit scores that do not copy key elements of FICO Scores.

protect intellectual property or trade secrets, *see id.*, even if the restriction "may compel rivals . . . to do more work to develop software independently." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 585 (7th Cir. 2002). "[T]rade-secret law is compatible with antitrust law," as are "contracts protecting intellectual property that, though not demonstrably a trade secret, is commercially valuable." *Id.*; *see also ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1455 (7th Cir. 1996) (licenses that facilitate distribution of intellectual property are procompetitive).[9]

Plaintiffs' argument that restraints can be anticompetitive even if they do not "completely eliminate" competition (Opp. 30-31) misses the mark. As Plaintiffs admit, the question is whether the "challenged practices bar a *substantial number* of rivals or *severely restrict* the market's ambit." Opp. 31 (citing *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2015)) (emphasis added). Plaintiffs allege no facts showing that the No Equivalent Products provision has plausibly prevented or even slowed competition from VantageScore and other credit scoring models. And Plaintiffs simply ignore VantageScore's explosive growth since the first license agreement was executed in 2013—which VantageScore itself called "a testament to an increasingly competitive marketplace for credit scores."[10] This renders any claims that the agreements have "effectively bar[red]" the sale of competing products (Opp. 29) wholly implausible. *See* Mem. 19-20.

---

[9]     Plaintiffs have no convincing response to these cases. The Opposition does not address *ProCD* at all. Plaintiffs claim that *IDX* did not address federal antitrust laws, Opp. 36 n.12, but the decision cites an antitrust case—*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)—to explain that even alleged monopolists may prevent others from "spong[ing] off [their] intellectual property." 285 F.3d at 585. Plaintiffs also state that *IDX* "nowhere holds that a company may seek to prohibit a competitor from distributing a product developed through independent effort." Opp. 36 n.12. But that is not what the No Equivalent Products provision allegedly does. It is undisputed that the Credit Bureaus are free to and do distribute products, including VantageScore, that compete directly against FICO Scores.

[10]     VantageScore Solutions, *VantageScore Solutions Announces Score Use Grows to More than 12 Billion* (Oct. 29, 2019), https://vantagescore.com/press/vantagescore-solutions-announces-score-use-grows-to-more-than-12-billion (cited at Mem. 19 n.47).

## 2. The Dynamic Royalty Schedule.

Plaintiffs next argue that the Dynamic Royalty Schedule is anticompetitive because it supposedly created a "mechanism" to charge lenders "supracompetitive prices." Opp. 31-32. But Plaintiffs allege hardly any price increases after 2013, let alone supracompetitive ones. The only relevant allegations are an analyst's report stating that FICO increased the standard royalty for mortgage use-cases in 2018 by $0.04, which the report indicates was the first increase in 25 years, and that FICO made unspecified royalty increases for auto and credit card use-cases in 2019 and 2020. Opp. 17 (citing DPP ¶ 142 & IPP ¶ 163). An IP holder has "the right to determine the fees it will charge its own licensees." *Microsoft Corp. v. Computer Support Servs. of Carolina, Inc.*, 123 F. Supp. 2d 945, 951 (W.D.N.C. 2000). For this reason, "price increases, without more, do not constitute supracompetitive pricing." *BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 120 (3d Cir. 2021); *see also Leonard v. Ala. State Bd. of Pharmacy*, — F. Supp. 3d —, 2022 WL 736262, at *8 (M.D. Ala. Mar. 10, 2022) (dismissing claims for failure to allege "the 'baseline' competitive level against which the Court must judge" a defendant's actions); Mem. 34-35.[11]

Apart from their general and insufficient allegations about FICO's royalty prices, Plaintiffs contend that FICO harmed competition by using the Dynamic Royalty Schedule to impose a "Pre-Qualification" royalty category, which Plaintiffs call a "penalty rate for a FICO Score if a lender also provides its consumer with a rival's credit score (*i.e.*, VantageScore) in pre-qualification decisions." Opp. 31. Plaintiffs notably do not allege what proportion of the alleged "B2B" credit scoring market consists of pre-qualification decisions, nor do they explain how the supposed

---

[11]    Plaintiffs also fail to address FICO's argument (at Mem. 35) that "federal regulations are the more likely basis" for FICO's royalty pricing related to mortgage use-cases, and "not any specifically anticompetitive conduct." *CBC Companies, Inc. v. Equifax, Inc.*, 561 F.3d 569, 573 (6th Cir. 2009).

"penalty rate" for this use case has substantially hampered VantageScore's growth in this narrow segment of the alleged market, much less in the market at large.

Plaintiffs also demonstrate that they either do not understand their own allegations about the Pre-Qualification royalty category or are intentionally misrepresenting it. Plaintiffs assert that the royalty rate "require[s] consumers to pay more to see both FICO Scores and VantageScores" disclosed to them side-by-side. Opp. 36 n.11. To begin, the Pre-Qualification royalty category establishes what *the Credit Bureaus* pay to license FICO's algorithm, not what lenders or consumers pay for FICO Scores or other credit scores.[12] Moreover, Plaintiffs allege that the purported "penalty" rate applies when Credit Bureaus supply a FICO Score for the lender to use in making its credit offer decision but the lender "provides a VantageScore (or any other credit score) to the consumer 'in connection' with the 'Pre-Qualification[.]'" DPP ¶ 120; IPP ¶¶ 139-40. Thus, the rate applies when lenders use FICO Scores behind the scenes to make lending decisions but disclose a different score to consumers when communicating that decision—directly raising the concern that consumers may become confused about which score was used for their lender's pre-qualification decision. FICO has a legitimate interest in discouraging this type of confusion in the marketplace and possible harm to its brand equity. Mem. 20-21; *see also* pp. 17-18 *infra*.

Plaintiffs also argue that the Pre-Qualification royalty "require[s] purchasers to pay more to provide a competing scoring analytic that actually helps 'more borrowers to obtain fairer pricing' from lenders." Opp. 36 n.11. Plaintiffs forget that if Credit Bureaus believe a competing scoring analytic allows "more borrowers to obtain fairer pricing," they are free to offer *that* score to lenders for pre-qualification decisions, and lenders are free to disclose that score to consumers

---

[12]     Plaintiffs make this mistake at several other points in their Opposition. *See, e.g.*, Opp. 17 (stating that the Dynamic Royalty Schedule allows FICO to charge rates "directly to lenders"), 31, 34, 40 (similar). As Plaintiffs elsewhere acknowledge, however, the alleged Dynamic Royalty Schedule allows FICO to set the "royalty rates" that the "*Credit Bureaus* were paying." Opp. 44 (emphasis added).

if they wish. It is therefore no help to allege that the Pre-Qualification royalty is "so steep that no buyer is willing to pay it," Opp. 53, as the "buyers" can simply choose to supply other credit scores instead of FICO Scores in connection with pre-qualification use-cases. That is the very essence of competition, not a plausible allegation of its substantial foreclosure.

### 3. The Level Playing Field provision.

Plaintiffs' last attempt to show an anticompetitive effect from the license agreement rests on the Level Playing Field provision. Plaintiffs do not dispute that these provisions are akin to "most favored nations" ("MFN") clauses that normally lower prices and reflect "the sort of conduct that the antitrust laws seek to encourage." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995). Plaintiffs merely say that, under the "right circumstances," such provisions *might* be anticompetitive. Opp. 36-37 (quoting *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015)).[13] This is insufficient because Plaintiffs do not allege any facts demonstrating that the alleged Level Playing Field provisions were anticompetitive here. For instance, Plaintiffs do not allege that the provision actually resulted in fewer discounts to the Credit Bureaus, or that any prospective entrants into the market actually were stymied because the Level Playing Field provision prevented them from negotiating better pricing than the Credit Bureaus. Mem. 22. And Plaintiffs simply ignore FICO's argument that the Level Playing Field provision does not eliminate the Credit Bureaus' incentive to negotiate with FICO for discounts because they benefit from a lower royalty rate regardless of whether similar rates could be offered to their competitors. *Id*. Plaintiffs' Level Playing Field allegations thus never cross the threshold from theoretical and speculative to actually *plausible*, as required to withstand a motion to dismiss.

---

[13]     In *Apple*, the Second Circuit found that MFNs were evidence of horizontal agreement because "multiple competitors sign[ed] vertical agreements that would be against their own interests were they acting independently." Id. at 320. But Plaintiffs themselves have explained why each Credit Bureau had a legitimate, unilateral interest in negotiating a Level Playing Field provision. *See* p. 9 *supra*.

**B.**     **Plaintiffs Ignore Facially Obvious Procompetitive Justifications.**

Plaintiffs' failure to allege plausible anticompetitive effects is further underscored by the licensing terms' facially procompetitive justifications. Plaintiffs attempt to sidestep these aspects of the challenged restrictions by calling them "factual" disputes and citing *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020). Opp. 28-29, 34. But *Viamedia* does not apply here. In *Viamedia*, the defendant's exclusionary practices were "not in dispute," 951 F.3d at 462, and the court expressly distinguished the case from *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013), where the defendant, like FICO, "was the sole owner of the intellectual property it had made available to independent software vendors." *Viamedia*, 951 F.3d at 465.

**1.**     **The provisions protect FICO's intellectual property.**

Plaintiffs pretend that FICO has only "vaguely gesture[d]" towards how the No Equivalent Products provision protects its intellectual property. Opp. 35. In fact, FICO specifically addressed this issue in its opening brief. *See* Mem. 17-19. Plaintiffs ignore FICO's arguments.

Plaintiffs concede that credit scoring models are dynamic and evolve in response to changing economic conditions. *See* Mem. 18 & n.41. Therefore, aligning a competing score's odds-to-score relationship to FICO's odds-to-score relationship requires either reverse engineering FICO's model or continually generating large numbers of FICO Scores to calibrate the competing model's output as the FICO model's odds-to-score relationship changes. Mem. 18. Plaintiffs do not attempt to explain how another score developer could design a model that is intentionally aligned to the FICO Score's odds-to-score relationship without doing one or the other, either of which would misappropriate FICO's intellectual property. Nor do Plaintiffs deny that the Credit Bureaus have unique access to and ability to misappropriate FICO's intellectual property by virtue of the very license agreements at issue.

16

Plaintiffs' assertion that FICO "did not invent and does not own" the idea of reason codes (Opp. 36) is a strawman. The No Equivalent Products provision does not prevent the Credit Bureaus from distributing competing scores that use reason codes. The No Equivalent Products provision merely protects the particular arrangement and classification of reason codes that FICO has created for its own credit scores. FICO's unique classification qualifies for protection under intellectual property laws. Mem. 18-19 (citing *Am. Dental Ass'n v. Delta Dental Plans Ass'n*, 126 F.3d 977, 978-79 (7th Cir. 1997)). Plaintiffs also erroneously state that FICO's reason codes are not "fixed" in a "tangible medium." Opp. 35. Plaintiffs need only review their own complaints, which cite a "Fair Isaac . . . webpage that sets forth [FICO's] various 'reason codes.'"[14]

Plaintiffs finally assert that "merely holding some protectable intellectual property would not confer on Fair Isaac 'an absolute and unfettered right' to impose whatever licensing terms 'it wishes.'" Opp. 35 (quoting *Microsoft*, 253 F.3d at 63). That is another strawman. FICO does not argue that owning intellectual property gives it an absolute right to foreclose competition, nor has it done so. Instead, as explained above, the alleged restrictions in FICO's license agreements are tied to specific, legitimate, and procompetitive interests in preventing *copying* of FICO's intellectual property, and leave ample room for competition.

### 2. The provisions discourage consumer confusion and free-riding.

As FICO explained, the alleged Pre-Qualification royalty serves two facially legitimate interests: preventing consumer confusion regarding different credit scores—a problem the Consumer Financial Protection Bureau has recognized—and fairly compensating FICO in the event FICO's algorithm is used to build a competing score's brand equity. Mem. 20-21, 33.

---

[14] FICO, *US FICO® Score Reason Codes*, https://www.fico.com/en/resource-access/download/3425 (cited at DPP n.7 & IPP n.7). This document includes a notice at the bottom of several pages: "© 2013 Fair Isaac Corporation. All rights reserved." *See also Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1104 (C.D. Cal. 2007) (a website is a "tangible medium of expression").

Plaintiffs do not dispute the potential for consumer confusion or explain why it is anticompetitive for FICO to seek fair compensation when another credit score is presented to the consumer as the supposed basis for a pre-qualification decision made using a FICO Score. Plaintiffs respond that FICO could alternatively (a) categorically forbid the disclosure of VantageScore credit scores in this scenario or (b) "insist upon clarifying disclosures." Opp. 36 n.11. But the first alternative is *more* restrictive, and the second is entirely speculative—what sort of disclosures? would the Bureaus agree? how would FICO monitor compliance?—and would not address the free-riding problem in any event. *See* Mem. 21.

## IV.    The Opposition Confirms That Plaintiffs Do Not Satisfy *Illinois Brick*.

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), bars Plaintiffs' federal damages claims, providing a separate basis to dismiss those claims regardless of their underlying plausibility. As FICO has explained, all Plaintiffs—including the self-proclaimed "Direct Purchaser Plaintiffs" ("DPPs")—are at best indirect purchasers from FICO and thus cannot recover damages under federal law. Mem. 36-39. The Opposition makes clear that *Illinois Brick* applies.

### A.    Plaintiffs Do Not Pay FICO Directly.

The parties agree that the "key element" under *Illinois Brick* is whether the plaintiff made direct payments to the defendant. Opp. 58-59; Mem. 37-38. For example, this Court has found it dispositive that an intermediary, not the plaintiff, was "the entity actually sending money to NorthShore for payment." *In re NorthShore Univ. HealthSystem Antitrust Litig.*, 2018 WL 2383098, at *7 (N.D. Ill. Mar. 31, 2018). And in *Apple, Inc. v. Pepper*, it was dispositive that the plaintiffs "pay the alleged overcharge directly to Apple" in "[t]he absence of an intermediary." 139 S. Ct. 1514, 1521 (2019). Despite agreeing on the legal framework, however, no DPP alleges that it pays FICO directly "in the absence of an intermediary." *Id.* Indeed, Plaintiffs admit that two

DPPs purchase credit scores from a Credit Bureau only, while the other DPPs purchase "from Fair Isaac *and* at least one Credit Bureau." Opp. 58 n.20 (emphasis added).

Rather than clearly identifying who they pay for FICO Scores, Plaintiffs engage in misdirection by asserting that some DPPs purchase FICO Scores from a Credit Bureau and FICO together. Plaintiffs never explain what this means. They also contend that some purchasers have language in their contracts with the Credit Bureaus that authorize payments "to *either* the Credit Bureau *or* Fair Isaac." Opp. 59 (emphasis in original). But the DPPs do not claim that *they* have such language in their own contracts, and they argue that "[t]he party with whom the purchaser contracts is not necessarily the entity that receives payment." *Id.* Thus, this convoluted argument cannot obscure the fatal flaw in the complaints: the failure to allege facts showing that FICO was the entity that receives payment directly from any Plaintiff.

Plaintiffs also claim that determining which entity they paid "cannot be resolved on a motion to dismiss." Opp. 59. But Plaintiffs do not need discovery to allege who the DPPs pay directly for FICO Scores, a fact that is clearly within their own knowledge. Further, FICO cited two cases showing that courts routinely resolve *Illinois Brick* questions on the pleadings. *Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006); *In re Dicamba Herbicides Litig.*, 2019 WL 1160817 (E.D. Mo. Mar. 13, 2019) (cited at Mem. 38). In both of these cases, the plaintiffs alleged that they were direct purchasers from an upstream defendant because that defendant allegedly "maintain[ed] a financial relationship with end-users," but the courts granted the motion to dismiss. *Kloth*, 444 F.3d at 321-23; *see also Dicamba*, 2019 WL 1160817, at *2-3. Plaintiffs do not address either decision, let alone explain why the result in this case should be different.

### B. Plaintiffs' Alternative Direct Purchaser Theory Fails.

Plaintiffs also argue that they should be considered direct purchasers even if they do not make direct payments to FICO because the Credit Bureaus only license the algorithm from FICO,

19

making Plaintiffs the "first purchasers" of FICO Scores. Opp. 60-61.[15] This argument also fails. There is no requirement that a downstream purchaser must purchase the same product as the direct purchaser in order to trigger *Illinois Brick*. In *Illinois Brick* itself, the plaintiffs were indirect purchasers even though they did not purchase concrete blocks sold by the defendants, but buildings of which the concrete blocks were an incorporated component. 431 U.S. at 726.

Plaintiffs claim that *Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002), supports their "first purchaser" theory, but *Loeb* does no such thing. Opp. 60. First, unlike in *Loeb*, there are no allegations of a conspiracy to "directly . . . manipulate" prices in the supposed market where Plaintiffs are purchasers. 306 F.3d at 482. Second, *Loeb* discussed "first purchasers" in the context of proximate causation, not *Illinois Brick*. *Id*. at 492. These two doctrines are "analytically distinct." *Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 828 (7th Cir. 1999). Further, the Seventh Circuit has rejected the argument that *Loeb* shows that "a plaintiff has standing simply if it buys products at market prices affected by the defendants' conduct, even if that conduct occurred in a separate market," as this "would eviscerate *Illinois Brick's* direct-purchaser rule because plaintiffs could always argue that an upstream conspirator's conduct resulted in higher prices downstream." *Marion II*, 2022 WL 818751, at *6.[16]

Finally, as FICO has explained, the "conspiracy exception" to *Illinois Brick* does not apply because Plaintiffs have not pled a plausible conspiracy of any sort. Mem. 39; *see also* pp. 8-10 *supra*. Plaintiffs argue that the exception applies "regardless of whether there is one conspiracy or

---

[15]     Plaintiffs thus admit one of the grounds for dismissing their Section 2 claims—that FICO's purported "monopoly power" exists in a separate market for credit scoring algorithms in which Plaintiffs do not themselves participate. Mem. 11-12; *see also* pp. 2-3 *supra*.

[16]     Plaintiffs assert that it would be good policy if they could sue FICO for damages, Opp. 61, but that is legally irrelevant. "*Illinois Brick* is a bright-line rule allocating the right to sue to direct purchasers alone, not a rule that requires analysis of competing policy justifications in each case." *Marion I*, 952 F.3d at 840; *see also Apple*, 139 S. Ct. at 1524 ("there is no reason to ask whether the rationales of *Illinois Brick* 'apply with equal force' in every individual case").

three." Opp. 55. But if indirect purchasers could sue under a "conspiracy exception" anytime there is a vertical agreement with a distributor, *Illinois Brick* would be largely meaningless. The "exception" would swallow the rule. Accordingly, even assuming that Plaintiffs had plausibly alleged that the vertical license agreements allowed FICO to charge supracompetitive prices—they have not—Plaintiffs still could not recover for those indirect harms under *Illinois Brick*.

## V. The Opposition Confirms That Plaintiffs' State Claims Fail.

Plaintiffs concede that their state claims are ultimately dependent on their federal antitrust claims. Mem. 39-40; Opp. 64. The state claims also fail for additional, independent reasons.[17]

*Out-of-state claims*. Plaintiffs do not dispute that they must establish standing for each claim they bring, and they admit that no named plaintiff does business in the 25 states whose laws are invoked in the complaints. Mem. 44-45. Plaintiffs argue that this does not matter because the Court does not need to assess standing for "absent class members." Opp. 63. But FICO's argument is about *Plaintiffs'* standing to bring these claims (or lack thereof). Plaintiffs also argue that *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), is inapposite because it "merely addressed what types of injuries are concrete monetary injuries for standing purposes under Article III." Opp. 64. But the Seventh Circuit recently cited *Ramirez* to remind courts that plaintiffs "cannot 'piggy-back on the injuries of the unnamed class members'" to establish standing, *Marion II*, 2022 WL 818751, at *6, as Plaintiffs attempt to do here for their out-of-state claims.

*No state nexus*. Plaintiffs do not dispute that the antitrust and consumer protection laws of several states require a specific nexus between Defendants' alleged conduct and intrastate commerce. Mem. 41. Instead, they dispute whether the nexus must be something more than a purported increase in the prices paid by residents of a state. Opp. 64-65. The distinction is largely

---

[17]    Because this reply is limited to 23 pages, Dkt. 127, FICO addresses only the principal issues related to the state claims. For the remaining issues, FICO respectfully rests on its opening brief. Mem. 40-45.

semantic, because Plaintiffs' complaints offer no more than conclusory averments that state commerce was "substantially affected." Even the authorities on which Plaintiffs rely recognize that when pleading an intrastate nexus, "boilerplate allegations are insufficient." *Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*, 353 F. Supp. 3d 678, 695 (M.D. Tenn. 2018).

**No class actions**. FICO has explained that Justice Stevens's concurrence in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010), is the narrowest and thus controlling opinion, and that under this framework the Illinois and other state claim-specific class action bars are intertwined with substantive considerations and enforceable in federal court. Plaintiffs do not attempt to show why the plurality opinion is narrower or controlling. Instead, Plaintiffs merely cite a decision that declined to decide this question. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 553 n.23 (N.D. Ill. 2019).[18] Plaintiffs also cite cases that did not apply class action bars, Opp. 66, but those cases are not persuasive. They disregard both the controlling *Shady Grove* concurrence and *Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1480 (7th Cir. 1991), which makes clear that the claim-specific class-action bars are intertwined with substantive considerations. *See* Mem. 41-42.

**No unjust enrichment**. Plaintiffs argue that they can bring stand-alone unjust enrichment claims "in the alternative" to their federal claims. Opp. 73 & n.35. But in the cases Plaintiffs cite, the unjust enrichment claims "depend[ed] upon allegations and proof" that were separate from the "allegations and proof of the elements necessary for [their] antitrust claims." *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000). Here, the only purportedly "unlawful" conduct is the alleged violation of antitrust law. Nor can Plaintiffs bring "parasitic" claims based

---

[18] In the *Dealer Management Systems* case, moreover, the defendant did not "identif[y] any authority for concluding that the class action bars at issue" satisfied Justice Steven's analysis. 362 F. Supp. 3d at 553. By contrast, FICO cited several cases applying the bars at the motion to dismiss stage. *See* Mem. 42 n.94.

on state law, because Plaintiffs' state claims are themselves derivative of their federal claims. Finally, Plaintiffs argue that they can simply "set forth the facts that support their claims." Opp. 75. But because unjust enrichment law is not the same in every jurisdiction, Mem. 44, it is not possible to determine if plaintiffs alleged such facts here.

***No business market***. Plaintiffs claim that they purchase FICO Scores "primarily for personal, family, or household purposes." Opp. 70. That is absurd. Plaintiffs' claims are based on the alleged *business-to-business* market, which Plaintiffs expressly distinguish from the alleged "business-to-consumer" market for credit scores. DPP ¶ 1; IPP ¶ 1. In the case Plaintiffs rely on, the court determined that a class of individual patients and third-party payers who made purchases "for the personal purposes of" the patients satisfied the "consumer" requirement. *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 847 (E.D. Pa. 2019). But Plaintiffs are not third-party payers, and they do not purchase credit scores on behalf of individuals, but for their own use, such as deciding whether and on what terms to extend credit. DPP ¶ 3; IPP ¶¶ 56-58.

## CONCLUSION

The Court should dismiss Plaintiffs' complaints.

Dated: March 29, 2022                    Respectfully submitted,

                                        */s/ Britt M. Miller*
                                        Britt M. Miller
                                        Matthew D. Provance
                                        Jed W. Glickstein
                                        MAYER BROWN LLP
                                        71 South Wacker Drive
                                        Chicago, IL 60606-4637
                                        (312) 782-0600
                                        bmiller@mayerbrown.com
                                        mprovance@mayerbrown.com
                                        jglickstein@mayerbrown.com

                                        *Counsel for Defendant*
                                        *Fair Isaac Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 29, 2022, I caused a true and correct copy of the foregoing document to be filed electronically. Notice of the filing will be sent to all counsel of record by operation of the Court's electronic filing system.

Dated: March 29, 2022                    By: /s/ *Britt M. Miller*

                                         *Attorney for Fair Isaac Corporation*