**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE FICO ANTITRUST LITIGATION | ) ) ) | Judge Edmond E. Chang |
| This Document Relates to the Following Cases: | ) ) ) | Magistrate Judge David E. Weisman No. 1:20-CV-02114 |
| INDIRECT PURCHASER CASES | ) ) ) | JURY TRIAL DEMANDED |

**DEFENDANT FAIR ISAAC COMPANY'S ANSWER AND AFFIRMATIVE DEFENSES TO INDIRECT PURCHASER PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

Defendant Fair Isaac Company ("FICO") hereby answers the Indirect Purchaser Plaintiffs' ("Plaintiffs'") Amended Class Action Complaint ("Complaint").

Unless expressly stated otherwise, FICO denies each and every allegation in the Complaint, including any allegations in the preamble, unnumbered and numbered paragraphs, titles, headings, subheadings, table of contents, exhibits, and characterization of documents, and specifically denies any liability to Plaintiffs. In addition, Plaintiffs' Complaint contains footnotes that are recited herein. To the extent the contents of those footnotes are not addressed in the text of the response to the Complaint paragraph to which the footnote relates and/or to the extent that the content of any footnote can be read to contain factual allegations, FICO denies each and every one of them. To the extent not expressly denied, all allegations for which FICO denies possessing knowledge or information sufficient to form a belief are denied.

**I.      INTRODUCTION**

1.      A "credit score" is a three-digit numerical summary of a customer's creditworthiness based on factors such as payment history and the duration of that history;

balances, available credit, and the percentage of existing credit lines being utilized; public records like bankruptcies or adverse judgments; and the assumption of new debt. There are two distinct markets for such scores. The first is the market for the sale of such scores to banks, mortgage companies, credit unions, and other businesses that assess individual credit risk - *i.e.*, business-to-business sales. That market is referred to herein as the "B2B Credit Score Market." The second is the market for the sale of such scores to the individual who is the subject of them - *i.e.*, business-to-consumer. That market is referred to herein as the "B2C Credit Score Market." This case concerns the B2B Credit Score Market.

**ANSWER:** FICO admits that credit scores are a numerical representation of credit risk. The allegations in Paragraph 1 pertaining to an alleged "B2B Credit Score Market" and "B2C Credit Score Market" are legal conclusions to which no response is required, but to the extent a response is required, they are denied. FICO denies the remaining allegations in Paragraph 1.

2.      According to Fair Isaac, FICO Scores are used for over 90% of all lending decisions in the United States. Fair Isaac's FICO credit scores have dominated the market for nearly three decades and have "maintained a 90-plus percent market share for at least 13 years."[1]

**ANSWER:** FICO admits that at certain points in time FICO Scores have been widely used by lenders and others to assess consumer credit risks. FICO further admits that at certain points in time FICO Scores have been used by approximately 90% of top lenders, including as part of decision strategies and custom models developed by lenders that utilize multiple credit scores, which is not necessarily equivalent to an estimated "market share" associated with FICO Scores, and that this statistic appears in material published by FICO. FICO denies the remaining allegations in Paragraph 2.

3.      Credit Bureaus collect and maintain information for credit reports. The three major CBs in the United States are Defendants Equifax, Experian, and TransUnion. The CB Defendants control virtually 100% of aggregate credit-related data formed by aggregating credit data collected from businesses, and they jointly dominate the market for B2B credit reports.

**ANSWER:** FICO admits that TransUnion, Experian, and Equifax are consumer reporting agencies and that they are sometimes referred to as the three national "Credit Bureaus." FICO

---

[1] TransUnion LLC's Redacted Counterclaims, Dkt 38, *Fair Isaac Corp. v. TransUnion LLC*, No. 1:17-cv-08318, ¶ 32 (N.D. Ill. Feb. 12, 2018)("TransUnion Counterclaims").)

further admits that the Credit Bureaus collect and maintain information for credit reports. FICO further admits, upon information and belief, that the Credit Bureaus control aggregated consumer credit data needed to generate credit scores and that such control gives the Credit Bureaus significant market power. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 3 pertaining to the Credit Bureaus and, on that basis, denies them. FICO denies the remaining allegations in Paragraph 3.

4.      Credit reports list bill payment history, loans, current debt, and other financial information. They show where consumers work and live and whether they have been sued, arrested, or filed for bankruptcy.

**ANSWER:** FICO admits that credit reports include information about the subject of the credit report's credit activity. FICO denies, upon information and belief, that traditional credit reports generated by the Credit Bureaus contain all of the information listed in Paragraph 4. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 4 and, on that basis, denies them.

5.      Credit reports help lenders decide if they will give consumers credit or approve a loan. The reports also help determine what interest rates consumers are charged. Employers, insurers, and rental property owners also use credit reports.

**ANSWER:** FICO admits that lenders may use credit reports in connection with extending credit to consumers, approving loans, and establishing interest rates in connection with the extension of credit, and that, upon information and belief, employers, insurers, and rental property owners also may use credit reports. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 5 and, on that basis, denies them.

6.      CBs purchase FICO Scores and then sell them as part of the credit reporting services they provide to millions of lenders, financial institutions, landlords, employers, and other businesses, that then use the credit reports to determine credit history and/or default risk.

**ANSWER:** FICO admits that the Credit Bureaus are permitted to generate FICO Scores from FICO and then sell them to their customers, including businesses, according to prices and

3

other terms and conditions established between the Credit Bureaus and their customers. FICO

lacks sufficient knowledge or information pertaining to the remaining allegations in Paragraph 6

and, on that basis, denies them.

7.     Fair Isaac also directly sells FICO Scores to creditors and other businesses–bypassing the Credit Bureaus, and competing with them, when it does so.

**ANSWER:** FICO denies the allegations in Paragraph 7.

8.     Plaintiff Garner is a real estate brokerage and property management company that purchases Fair Isaac's FICO scores from third-parties which, in turn, purchase those FICO Scores from one of the three major CBs. The third-parties pass on to Garner and all other Class Members the cost of each FICO Score.

**ANSWER:** FICO lacks sufficient knowledge or information to admit or deny the

allegations in Paragraph 8 and, on that basis, denies them.

9.     Plaintiff Lake City is used automobile dealer that purchases Fair Isaac's FICO scores from third-parties which, in turn, purchase those FICO Scores from one of the three major CBs. The third-parties pass on to Lake City and all other Class Members the cost of each FICO Score.

**ANSWER:** FICO lacks sufficient knowledge or information to admit or deny the

allegations in Paragraph 9 and, on that basis, denies them.

10.    In 2006, VantageScore Solutions, LLC ("VantageScore Solutions") launched VantageScore - a credit score to compete against Fair Isaac's FICO Scores. VantageScore Solutions is an independent joint venture of the three major CBs, Equifax, Experian, and TransUnion. Similar to Fair Isaac's FICO Score, VantageScore Solutions uses scoring codes and algorithms to convert a consumer's information in a consumer credit report into a credit score. Thus, VantageScore presented a competitively priced alternative to FICO Scores.

**ANSWER:** FICO admits that the Credit Bureaus formed VantageScore Solutions, LLC

("VantageScore") in or about 2006 through a joint venture and that the Credit Bureaus own

VantageScore. FICO further admits that VantageScore offers a credit scoring model known as

"VantageScore," which can be used to generate credit scores ("VantageScores") that compete with

FICO Scores in some respects. FICO lacks sufficient knowledge or information to admit or deny

the allegations in Paragraph 10 pertaining to the Credit Bureaus' purposes for creating

4

VantageScore and, on that basis, denies them. FICO denies the remaining allegations in Paragraph

10.

11. In addition, a VantageScore has relevant and important advantages over a FICO Score. For example, a VantageScore considers a consumers' rental and utility payments, which enables it to provide a credit score for consumers with less than six months of credit history. Fair Isaac's FICO Score cannot do this. A VantageScore therefore provides a credit score for tens of millions more Americans than Fair Isaac's algorithms allow. If Plaintiffs and similarly situated businesses were able to purchase VantageScores on economically sensible terms, they would be able to see credit scores of tens of millions more consumers, enabling them to contract with millions more customers, tenants, and employees than they can using FICO Scores alone.

**ANSWER:** FICO admits that some consumers with insufficient credit history may not be capable of being assigned a credit score by FICO's credit scoring models. FICO lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 11 pertaining to whether VantageScore assigns a credit score to such consumers or the number thereof and, on that basis, denies them. FICO denies the remaining allegations in Paragraph 11.

12. Rather than compete on the merits with VantageScore, Fair Isaac undertook a lengthy campaign of anticompetitive conduct to discourage the adoption of VantageScore and preserve its own monopoly. Fair Isaac also succeeded in recruiting the CBs to join a conspiracy to monopolize the B2B Credit Score Market, despite their own interest in VantageScore's success.

**ANSWER:** FICO denies the allegations in Paragraph 12. Answering further, FICO states that Plaintiffs' conspiracy allegations and Section 1 claims have been dismissed.

13. Specifically, in 2006, Fair Isaac filed a lawsuit against TransUnion, Equifax, and Experian with the intended purpose of driving VantageScore Solutions out of business. Experian settled the case in 2008 and entered into a lucrative partnership with Fair Isaac following the settlement. TransUnion and Equifax fought on, eliminating most of Fair Isaac's claims through a summary judgment motion and winning a jury trial on the remaining trademark claim.

**ANSWER:** FICO admits that it filed a lawsuit against TransUnion, Equifax, Experian, and VantageScore in 2006, that Equifax settled with FICO in 2008, that some of FICO's claims were resolved at summary judgment, and that the defendants prevailed following a jury trial. Answering further, FICO states that the proceedings and outcome of the 2006 litigation are a matter of public record. FICO denies the remaining allegations in Paragraph 13.

14.     When its lawsuit failed, Fair Isaac engaged in a further pattern of anticompetitive conduct designed to discourage use of alternatives to FICO Scores, including VantageScores. Fair Isaac accomplished this goal by abusing its monopoly power to enlist the CBs in a conspiracy in which they entered into contracts that contained anticompetitive restrictions aimed at extracting supracompetitive profits from B2B purchasers. Those contracts include contractual provisions that: (1) prohibit CBs from marketing non-FICO credit scores (*i.e.*, VantageScore); (2) charge discriminatory and prohibitively high prices for FICO Scores if a CB customer purchases a FICO Score while providing the consumer with a competing score (*i.e.*, a VantageScore); and (3) eliminate price competition among the CBs, thereby disincentivizing the CBs from negotiating a lower price for FICO Scores.

**ANSWER:** FICO denies the allegations in Paragraph 14. Answering further, FICO states that Plaintiffs' conspiracy allegations and Section 1 claims have been dismissed.

15.     Upon information and belief, each of the CBs was aware of Fair Isaac's imposition of these restrictive terms on the other CBs and each CB agreed to the contracts despite the terms being against their own, as well as their collective, economic self-interest. The conspiracy and the contracts that effectuated it were intended to, and had the effect of, hobbling VantageScore Solutions' ability to compete and forcing B2B Purchasers to pay supracompetitive prices for credit scores.

**ANSWER:** FICO denies the allegations in Paragraph 15. Answering further, FICO states that Plaintiffs' conspiracy allegations and Section 1 claims have been dismissed.

16.     As part of its goal of eliminating competition, Fair Isaac also waged a public relations and advertising campaign to disparage VantageScores and create uncertainty about the reliability of VantageScores. The purpose of FICO's anticompetitive scheme is to prevent competition with VantageScore and other scoring systems and to preserve Fair Isaac's monopoly.

**ANSWER:** FICO denies the allegations in Paragraph 16.

17.     Fair Isaac's scheme worked. Through the anticompetitive conducted alleged herein, Fair Isaac succeeded in preventing VantageScore Solutions from gaining market share and thwarted the entry of other entities into the market for credit scores. Having successfully suppressed all other competition, Fair Isaac was able to, and did, artificially increase prices for its FICO products.

**ANSWER:** FICO denies the allegations in Paragraph 17.

18.     For example, Fair Isaac's net income for the third quarter of 2021 was ***more than double*** that of the previous year period, increasing from $64.1 million in Q3 2020 to $151.2 million

in Q3 2021.[2] Sources in the financial industry have attributed Fair Isaac's profitability to "[p]rice increases in its credit scoring segment and gains in applications sold to banking institutions," which have "helped the company log year- over-year gains in revenue and profit."[3] But for Fair Isaac's and the CBs' anticompetitive conduct, VantageScore and other competitors of Fair Isaac would have gained market share, allowing for price competition and reducing the prices Plaintiffs and similarly situated businesses paid for FICO Scores.

**ANSWER:** FICO admits that it reported net income of $151.2 million in Q3 2021 and $64.1 million in Q3 2020 and that analyst reports contain the quoted statements in Paragraph 18, but denies that the quoted statements are presented in their full and complete context. FICO denies that VantageScore has been excluded from competing with FICO in any market. FICO denies the remaining allegations in Paragraph 18.

19.     Plaintiffs and other indirect purchasers of Fair Isaac's FICO Scores paid supracompetitive prices and have therefore suffered harm as a result of Defendants' anticompetitive conduct, which harmed competition in the B2B Credit Score Market. Opening this market to competition will spur innovation so that credit scores are fairly priced and more accurate.

**ANSWER:** FICO denies the allegations in Paragraph 19.

20.     Plaintiffs and other similarly situated businesses are indirect purchasers of Fair Isaac's FICO Scores. They do not purchase FICO Scores directly from Defendants but instead purchase them from third-parties, who purchase them from Defendants.

**ANSWER:** FICO admits that Plaintiffs and the proposed classes defined in the Complaint purport to be indirect purchasers of FICO Scores.

## II.    PARTIES

21.     Plaintiff Garner Properties & Management LLC is a real estate brokerage and property management company located in Taylor, Michigan. During the Class Period, Garner purchased Fair Isaac's FICO Scores from third-parties which, in turn, purchased those FICO Scores from one of the three major CBs. The CBs, through the third-parties, sell FICO Scores to Plaintiffs and Class members pursuant to agreements between Fair Isaac and each Credit Bureau, which provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to the Class.

---

[2] Press Release, Fair Isaac, *FICO Announces Earnings of $5.18 per Share for Third Quarter Fiscal 2021* (Aug. 3, 2021), https://investors.fico.com/news-releases/news-release-details/fico- announces-earnings-518-share-third-quarter-fiscal-2021.

[3] Motley Fool, *Fair Isaac Corporation Scores 13% Revenue Growth in the First Quarter* (Jan. 31, 2019), https://www.fool.com/investing/2019/01/31/fair-isaac-corporation-scores-13- revenue-growth-in.aspx.

The artificially inflated cost of those FICO Scores is then passed on to Garner, and all other Class members.

**ANSWER:** FICO lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 21 pertaining to Plaintiff Garner Properties & Management LLC's corporate structure and general business activities and, on that basis, denies them. FICO admits that it has entered into license agreements with the Credit Bureaus, pursuant to which the Credit Bureaus are permitted to generate FICO Scores. FICO further admits that the Credit Bureaus sell FICO Scores to their customers, including businesses, according to prices and other terms and conditions established between the Credit Bureaus and their customers. FICO denies the remaining allegations in Paragraph 21.

22. Plaintiffs Lake City Exports, Inc., is a used automobile dealer located in Maine. During the Class Period, Lake City purchased Fair Isaac's FICO Scores from third-parties which, in turn, purchased those FICO Scores from one of the three major CBs. The CBs, through the third-parties, sell FICO Scores to Plaintiffs and Class Members pursuant to agreements between Fair Isaac and each Credit Bureau, which provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to the Class. The artificially inflated cost of those FICO Scores is then passed on to Lake City, and all other Class members.

**ANSWER:** FICO lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 22 pertaining to Lake City Exports, Inc.'s corporate structure and general business activities and, on that basis, denies them. FICO admits that it has entered into license agreements with the Credit Bureaus, pursuant to which the Credit Bureaus are permitted to generate FICO Scores. FICO further admits that the Credit Bureaus sell FICO Scores to their customers, including businesses, according to prices and other terms and conditions established between the Credit Bureaus and their customers. FICO denies the remaining allegations in Paragraph 22.

23. Plaintiffs were injured in their business or property as a direct, proximate, and material result of Defendants' violation of the law. Plaintiffs are also threatened with future injury to their business and property by reason of Defendants' continuing violations of the law.

**ANSWER:** FICO denies the allegations in Paragraph 23.

24.     Defendant Fair Isaac is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California, 95110.

**ANSWER:** FICO admits that it is a Delaware corporation and that it has an office in San Jose, California. FICO denies the remaining allegations in Paragraph 24.

25.     Defendant Equifax is a Credit Bureau incorporated in Georgia that has its principal place of business at 1550 Peachtree St. NW, Atlanta, Georgia.

**ANSWER:** FICO admits that Equifax is one of the three national Credit Bureaus. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 25 and, on that basis, denies them.

26.     Defendant Experian is a Credit Bureau incorporated in Ohio that has its principal place of business in the United States at 475 Anton Blvd., Costa Mesa, California.

**ANSWER:** FICO admits that Experian is one of the three national Credit Bureaus. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 26 and, on that basis, denies them.

27.     Defendant TransUnion is a Delaware limited liability Credit Bureau that has its principal place of business at 555 W. Adams St., Chicago, Illinois.

**ANSWER:** FICO admits that TransUnion is one of the three national Credit Bureaus. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 27 and, on that basis, denies them.

28.     Plaintiffs bring this state law class action on behalf of the proposed Classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre-and post-judgment interest, costs, and attorneys' fees for the injuries caused by Defendants' conduct in restricting the development and sale of credit scores and causing the prices of FICO Scores to be artificially inflated. Plaintiffs also seek injunctive relief under Sections 1 and 2 of the Sherman Act.

**ANSWER:** The allegations in Paragraph 28 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established

or can establish the prerequisites to certification and/or maintenance of the alleged "Classes" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 28. FICO denies the remaining allegations in Paragraph 28.

## III. JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332(d) and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court possesses supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

**ANSWER:** The allegations in Paragraph 29 state legal conclusions to which no response is required, but, to the extent a response is required, FICO admits that Plaintiffs invoke 28 U.S.C. §§ 1331, 1332(d), 1337, and 1367, as well as 15 U.S.C. §§ 15(a) and 26, as the basis for jurisdiction over certain claims. FICO denies the remaining allegations in Paragraph 29.

30.     This Court has personal jurisdiction over Defendants because Defendants transacted business, maintained substantial contacts, and are located and/or committed unlawful conduct in this District. Their unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

**ANSWER:** FICO admits that it transacts business in this District. The remaining allegations in Paragraph 30 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

31.     Venue is proper in this District pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d). Defendants regularly transact business within this District and a substantial portion of the affected interstate trade and commerce described in this Complaint were carried out in this District.

**ANSWER:** The allegations in Paragraph 31 state legal conclusions to which no response is required, but, to the extent a response is required, FICO admits that it transacts business in this District and that Plaintiffs purport to invoke 15 U.S.C. §§ 15(a) & 22 and 28 U.S.C. § 1391(b), (c), and (d) as the basis for their assertion that venue is proper in this District. FICO denies the remaining allegations in Paragraph 31.

32. Defendants market their products and receive substantial payments across state lines. Defendants' business activities that are the subject of this Complaint are within the law of and have substantially affected, interstate trade and commerce.

**ANSWER:** The allegations in Paragraph 32 state legal conclusions to which no response is required, but, to the extent a response is required, FICO admits that it transacts business across state lines. FICO denies the remaining allegations in Paragraph 32.

33. During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States Mail, to effectuate their illegal scheme.

**ANSWER:** The allegations in Paragraph 33 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

34. Defendants' conduct also had a substantial effect on the intrastate commerce of the states listed in counts Seven and Eight of this Complaint.

**ANSWER:** The allegations in Paragraph 34 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

## IV.     FACTUAL ALLEGATIONS

### A.     Credit Scores and Credit Reports

35. A credit score is a numerical expression of a person's credit history and is designed to measure their creditworthiness. It helps creditors determine whether to give credit, decide the terms they offer and what interest rates consumers pay. Higher scores generally indicate that an individual or business poses less credit risk and is more likely to make payments under a contract and manage money more responsibly. Thus, having a high credit score can make it easier to get a loan, credit card, lower interest rates, rent an apartment, or provide access to lower insurance rates.

**ANSWER:** FICO admits that credit scores are a numerical representation of credit risk. FICO further admits that higher credit scores can, as a general matter, indicate lower credit risk, and that indication of lower credit risk can be a factor in decisions made by lenders, financial institutions, and other businesses to extend credit. FICO denies the remaining allegations in Paragraph 35.

11

36.     Credit scores typically are produced by applying scoring algorithms to a person's consumer credit history. A credit score is based on multiple factors, such as payment history, outstanding balances, length of credit history, applications for new credit accounts, and types of credit accounts (*e.g.*, mortgages, car loans, credit cards).

**ANSWER:** FICO admits that credit data maintained and controlled by the Credit Bureaus is applied to a scoring model to produce a credit score. FICO further admits that it has developed proprietary credit scoring models which take multiple factors into account, including payment history, amounts owed, length of credit history, new credit, and credit mix. FICO lacks sufficient knowledge or information pertaining to the remaining allegations in Paragraph 36 and, on that basis, denies them.

37.     Credit scores usually are accompanied by "reason statements," which inform the purchaser about the factors that most significantly affected that individual's credit score. A number or alphanumeric code - called a "reason code"- is associated with each reason statement. Examples of reason statements include: "Account payment history is too new to rate"; "Amount owed on accounts is too high"; and "Too many recently active accounts." VantageScore explains this process as follows:

> No matter where you get your score, the documents that accompany it will include up to four or five statements explaining why your score wasn't higher. These statements are called reason codes and sometimes go by several other names. Some people call them score factors; others call them adverse action codes. They're all the same thing.

> The next time you see your credit score, regardless of where it comes from, look for the reason codes. They'll be worded and displayed something like this:

> Your Credit Score Is: 705

> 32: Balances on bankcard or revolving accounts too high compared to credit limits

> 16: The total of all balances on your open accounts is too high

> 85: You have too many inquiries on your credit report

> 13: Your most recently opened account is too new

The numbers preceding each statement are numeric identifiers; sometimes they appear with the text, and sometimes they do not.

The four (or five) factors are listed in order of the impact they have. In this example, the number one reason the credit score is not higher is "Balances on bankcard or revolving accounts too high compared to credit limits." That means the consumer's credit card debt is too high relative to his or her credit limits.

In our example, the reason with the second-greatest impact is "The total of all balances on your open accounts is too high." That means the consumer is carrying too much debt on his or her open accounts.

The third reason the score isn't higher is "You have too many inquiries on your credit report." This means the consumer has recently applied for credit several times, which led to some number of credit inquiries.

The fourth reason the score isn't higher is "Your most recently opened account is too new." Clearly this means the consumer has a very new account on his or her credit report.[4]

**ANSWER:** FICO admits that both it and VantageScore have developed sets of reason codes that accompany their credit scores. FICO further admits, on information and belief, that VantageScore has published statements about its reason codes at www.reasoncode.org. FICO lacks sufficient knowledge or information to admit or deny the accuracy of VantageScore's purported statements regarding its reason codes set forth in Paragraph 37 and, on that basis, denies them. FICO denies the remaining allegations in Paragraph 37.

38.     Fair Isaac has a webpage that sets forth its various "reason codes."[5] VantageScore also has a dedicated website that explains its various "reason codes."[6]

---

[4] VantageScore Solutions, ReasonCode.org, https://www.reasoncode.org.

[5] Fair Isaac, *US FICO® Score Reason Codes*, https://www.fico.com/en/latest-thinking/solution-sheet/us-fico-score-reason-codes (link to download).

[6] VantageScore Solutions, *Reason Codes 101*, https://www.reasoncode.org.

**ANSWER:** Admitted.

39.     CBs collect and store financial data about individuals that is submitted to them by creditors, such as lenders, credit card companies, and other financial companies. Creditors are not required to report to every credit-reporting company. Utilizing these files, the CBs create a credit report.

**ANSWER:** FICO admits that Credit Bureaus gather credit and financial data about individuals. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 39 and, on that basis, denies them.

40.     The information in a credit report is often used to calculate a credit score. Credit reports list a consumer's bill payment history, loans, current debt, and other financial information. They show where the individual works and lives and whether they have been sued, arrested, or filed for bankruptcy. CBs essentially collect consumer credit data and present the aggregated information in the form of a credit report.

**ANSWER:** FICO admits that credit scores and credit reports are generated using aggregated credit data that is collected, maintained, and controlled by the Credit Bureaus. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 40 and, on that basis, denies them.

41.     CBs continually gather credit and financial data about individuals from creditors, government entities, public records, collection agencies, and other third parties, and compile this information into a credit file. The CBs then use an individual's credit file to populate a credit report on that individual for sale to businesses (B2B purchasers) and consumers (B2C purchasers).

**ANSWER:** FICO admits that Credit Bureaus gather credit and financial data about individuals and that Credit Bureaus sell aggregated credit data in the form of credit reports to businesses and consumers. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 41 and, on that basis, denies them.

42.     Credit reports help lenders decide if they will give credit or approve a loan. The reports also help determine what interest rate to charge. Employers, insurers, and rental property owners also look at credit reports.

**ANSWER:** FICO admits that lenders may use credit reports in connection with extending credit to consumers, approving loans, and establishing interest rates in connection with the

extension of credit, and that, upon information and belief, employers, insurers, and rental property owners also may use credit reports. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 42 and, on that basis, denies them.

43.     Credit scores are the most widely used indicators of consumers' creditworthiness in the United States and Fair Isaac's FICO Score is, by far, the most widely-used credit score. According to Fair Isaac, FICO Scores are used in over 90% of U.S. lending decisions.[7] They are crucial to millions of businesses that rely on indicators of creditworthiness to assess risk and make business decisions.

**ANSWER:** FICO admits that credit scores are used to assess consumers' creditworthiness in the United States. FICO further admits that at certain points in time FICO Scores have been used by approximately 90% of top lenders, including as part of decision strategies and custom models developed by lenders that utilize multiple credit scores, which is not necessarily equivalent to an estimated "market share" associated with FICO Scores, and that this statistic appears in material published by FICO. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 43, and on that basis, denies them.

44.     Credit scores and credit reports are separate and distinct products that can be sold together or independently.

**ANSWER:** FICO admits, upon information and belief, that Credit Bureaus sell credit reports and credit scores together and separately. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 44 and, on that basis, denies them.

45.     Fair Isaac works with the CBs to perpetuate and extend its monopoly. Fair Isaac's relationship with B2B purchasers is often dependent on B2B purchasers' relationships with the CBs, which facilitate the sale of FICO Scores to B2B purchasers.

**ANSWER:** FICO admits that the Credit Bureaus sell FICO Scores to so-called "B2B purchasers." FICO further admits, upon information and belief, that the Credit Bureaus have

---

[7] Fair Isaac, FICO: The Decisions Company Investor Overview, at 5 (Dec. 2019), https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.

entrenched relationships with "B2B purchasers" and that they control the pricing and distribution of FICO Scores to those entities. FICO denies the remaining allegations in Paragraph 45.

46. FICO Scores and credit reports are often sold to businesses as a bundle. Such bundles can be sold by the CBs, which are licensed by Fair Isaac to sell FICO Scores and in return, pay a royalty to Fair Isaac. Thus, when a B2B purchaser requires a credit score, it purchases a credit report from a CB and a credit score from that CB and Fair Isaac, often through a contract with both Fair Isaac and the CB. Although the payment for the credit report and the credit score may at times occur in a single transaction, the reality is that both the CB and Fair Isaac act as the providers of the FICO Score. In this example, Plaintiffs and proposed Class members would then purchase the credit report and credit score from the B2B purchaser.

**ANSWER:** FICO admits that it has entered into license agreements with the Credit Bureaus by which the Credit Bureaus are permitted to generate FICO Scores for sale to their customers, including so-called "B2B Purchasers," and pay FICO contractually-agreed royalties. Answering further, FICO states that the Credit Bureaus sell FICO Scores to their customers according to prices and other terms and conditions established between the Credit Bureaus and their customers. FICO further admits that Credit Bureaus also sell or license credit reports to "B2B Purchasers," some of which are in the business of reselling credit reports to other businesses. FICO denies that these sales occur "often through a contract with both [FICO] and the [Credit Bureau]," or that "the reality is that both the [Credit Bureau] and [FICO] act as the providers of the FICO Score" to end-users, including "B2B purchasers." FICO denies the remaining allegations in Paragraph 46.

47. In its 2020 Form 10-K filed with the SEC, Fair Isaac states that, "[d]uring fiscal 2020, 2019 and 2018, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for 32%, 29%, and 25% of our total revenues, respectively."[8]

**ANSWER:** Admitted.

48. The FICO Score and credit report bundles can also be sold by Fair Isaac to businesses. "In those situations, Fair Isaac requests a credit score and credit report from the CBs-

---

[8] Fair Isaac, Annual Report (Form 10-K), at 4 (Nov. 10, 2020), https://fico.gcs-web.com/node/23951/html (hereinafter, "Fair Isaac 2020 10-K").

selected by the lender or consumer. The CBs applies Fair Isaac's CB-tailored FICO algorithm to a consumer's aggregated credit data and provides the consumer's credit report and credit score to Fair Isaac. Fair Isaac then delivers the bundle to the consumer or lender. Fair Isaac pays the CB for the cost of processing and providing the bundle."[9] Thus, Fair Isaac and the CBs act as horizontal competitors and compete with each other for some B2B Purchasers.

**ANSWER:** FICO denies the allegations in the first sentence of Paragraph 48. FICO admits the allegations in the second through fourth sentences as to consumers, but denies the allegations in the second through fourth sentences as to lenders. FICO denies the remaining allegations in Paragraph 48.

49. This direct competition between Fair Isaac and the CBs, as well as the close relationship among them, continues to this day. At an August 3, 2021 earnings conference, Fair Isaac's CEO, William Lansing, said, "we stay close to it [B2B scores] through our channel partners, the bureaus. But we also – certainly for all of the major institutions, we have direct sales relationships."[10] TransUnion's current Form 10-K acknowledges that it "compete[s] with FICO in the Financial Services" market for B2B purchasers.[11] Similarly, Equifax's current Form 10-K acknowledges that it too "compete[s] with Fair Isaac Corporation with respect to certain of [its] analytical tools and solutions."[12] Experian has also recognized that its "comparator companies" include "FICO.[13]

**ANSWER:** FICO admits that the quoted statement in Paragraph 49 is attributed to William Lansing in the purported transcript of an August 3, 2021 earnings call, but it denies that Mr. Lansing asserted in that purported statement that FICO sells FICO Scores directly to "all of the major institutions." FICO further denies that the quoted statement is presented in its full and complete context. FICO lacks sufficient knowledge of information to admit or deny the allegations

---

[9] *Fair Isaac Corp. v. Equifax, Inc.*, No. 06-4112, 2008 WL 623120, at *2 (D. Minn. March 4, 2008).

[10] Motley Fool, *Fair Isaac Corp. (FICO) Q3 2021 Earnings Call Transcript* (Aug. 3, 2021) (hereinafter, "Q3 Earnings Call"), https://www.fool.com/earnings/call-transcripts/2021/08/03/ fair-isaac-corporation-fico-q3-2021-earnings-call/.

[11] TransUnion, Annual Report (Form 10-K) (Feb. 16, 2021), at 12.

[12] Equifax, Annual Report (Form 10-K) (Feb. 25, 2021), at 8.

[13] Experian plc, *Annual Report 2021* (2021), at 127, https://www.experianplc.com/media/ 4223/experian-annual- report-2021.pdf.

in Paragraph 49 pertaining to TransUnion, Equifax, and Experian and, on that basis, denies them.

FICO denies the remaining allegations in Paragraph 49.

### B.     The Markets for Credit Scores

50.     There are two distinct markets for credit scores—the "B2B Credit Score Market" and the "B2C Credit Score Market."

**ANSWER:** The allegations in Paragraph 50 state legal conclusions to which no response

is required, but, to the extent any response is required, they are denied.

51.     The "B2B Credit Score Market" consists of sales from a business (a credit score generator, such as Fair Isaac, directly or through a CB, or indirectly through a third-party credit reporting company) to lenders, such as banks and credit card companies, financial institutions, and other businesses. The "B2C Credit Score Market" consists of credit scores sold to consumers to monitor their own credit records. The claims in this case concern the B2B Credit Score Market. The B2B Credit Score Market is the relevant product market in which the claims that require a market definition are to be assessed.

**ANSWER:** The allegations in Paragraph 51 state legal conclusions to which no response

is required, but, to the extent any response is required, they are denied.

52.     In the B2B Credit Score Market, businesses purchase the credit scores of individuals and businesses to help them understand credit risk, make better-informed lending decisions, assess creditworthiness, and make business decisions. The B2B Credit Score Market also includes the FICO Scores that Plaintiffs and other businesses indirectly purchased from Fair Isaac and the CBs.

**ANSWER:** The allegations in Paragraph 52 state legal conclusions to which no response

is required, but, to the extent any response is required, they are denied.

53.     In the B2C Credit Score Market, Fair Isaac and other credit score producers, as well as CBs, sell consumers their own credit scores. A consumer often purchases their own credit score for personal use, including to see how lenders view their creditworthiness, to understand the types and terms of financing they may be able to secure, to monitor their financial health, manage their debt, protect their identity, and to determine if they are potentially eligible to make certain purchases.

**ANSWER:** The allegations in Paragraph 53 state legal conclusions to which no response

is required, but, to the extent any response is required, they are denied.

54.     The B2B Credit Score Market for credit scores is a distinct product market for antitrust purposes. The businesses that use credit scores to assess creditworthiness, manage risk, and make business decisions do not consider credit reports, insurance scores, or any part of an individual's consumer and credit history to be a substitute for credit scores. Likewise, the businesses that resell or otherwise provide credit scores to their own downstream customers do not consider credit reports, insurance scores, or any part of an individual's consumer and credit history to be a substitute for credit scores.

**ANSWER:** The allegations in Paragraph 54 state legal conclusions to which no response is required, but, to the extent any response is required, they are denied.

55.     The relevant geographic market in which B2B credit scores are provided is the United States (including its territories). The restraints on competition contained in Defendants' contracts relate to business and consumer credit scores in the United States.

**ANSWER:** The allegations in Paragraph 55 state legal conclusions to which no response is required, but, to the extent any response is required, they are denied.

56.     Business customers, such as banks, credit card companies, financial institutions, real estate companies, insurance companies and other businesses, in the B2B Credit Score Market are a separate and distinct group of purchasers of credit scores. Business customers who purchase credit scores in the B2B Credit Score Market do not use credit scores in the same manner as consumer customers who purchase credit scores in the B2C Credit Score Market.

**ANSWER:** The allegations in Paragraph 56 state legal conclusions to which no response is required, but, to the extent any response is required, FICO lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 56 pertaining to purported actions of business customers, and, on that basis, denies them. FICO denies the remaining allegations in Paragraph 56.

57.     Business customers in the B2B Credit Score Market purchase credit scores to make informed decisions, sell, advertise, or complement another product. On the other hand, consumer customers in the B2C Credit Score Market purchase the credit scores as an end-product.

**ANSWER:** The allegations in Paragraph 57 state legal conclusions to which no response is required, but, to the extent any response is required, FICO lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 57 pertaining to the purported intent

behind business customers' purchase of credit scores, and, on that basis, denies them. FICO denies the remaining allegations in Paragraph 57.

58.     Business customers in the B2B Credit Score Market also purchase credit scores in ways that consumer customers do not. For example, business customers in the B2B Credit Score Market who engage in pre-screening, such as credit card companies, often purchase credit scores in batches as part of their marketing efforts. They use credit scores as a method of selecting consumers in a particular credit score range that they wish to extend credit card offers to under particular terms. However, consumer customers in the B2C Credit Score Market only purchase their own score.

**ANSWER:** The allegations in Paragraph 58 state legal conclusions to which no response is required, but, to the extent any response is required, FICO lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 58 pertaining to differences in ways business customers and consumer customers purchase credit scores, and, on that basis, denies them. FICO denies the remaining allegations in Paragraph 58.

59.     The Consumer Financial Protection Bureau ("CFPB") noted in a 2011 report to Congress that "many of the credit scores sold to lenders are not offered for sale to consumers."[14] The agency went on to explain:

> When a consumer purchases a score from a CRA [Credit Rating Agency], it is likely that the credit score that the consumer receives will not be the same score as that purchased and used by a lender to whom the consumer applies for a loan. This could occur if the score the consumer purchased is an educational score that is not used by lenders, but differences between the score a consumer buys and the score a lender buys can occur for other reasons as well. Since so many scores are in use in the marketplace, it could also be the case that the particular lender to which the consumer applies uses a different scoring model than the one purchased by the consumer, or that the CRA from which the consumer obtains a score is not the same CRA that the lender uses to obtain scores, or that the underlying data in the consumer's credit report changes significantly between the time the consumer purchases a score and the time the lender obtains a score for that consumer. It is also possible that a

---

[14] Consumer Financial Protection Bureau, *The impact of differences between consumer- and creditor-purchased credit scores*, at 1 (July 19, 2011), https://files.consumerfinance.gov/f/2011/07/Report_20110719_CreditScores.pdf.

> consumer and a lender could access different reports from the CRA, if they were to use different identifying information about the consumer. Any of these differences could lead to differences between the credit score a consumer sees and the credit score a lender uses to assess that consumer.[15]

**ANSWER:** FICO admits that the quoted statements appear in a July 19, 2011 report published by the Consumer Financial Protection Bureau ("CFPB"), but denies that the quoted statement is presented in its full and complete context. FICO denies the remaining allegations in Paragraph 59.

60. The vast majority of the credit reporting and credit scoring industry, industry analysts, policy analysts, and investors recognize the B2B Credit Score Market as a separate market from the B2C Credit Score Market. Fair Isaac itself recognizes its Business and Consumer offerings as distinct product and revenue lines. Fair Isaac has divided its "Scores" profits and revenues into separate "business-to-business" or "B2B" and "business-to-consumer" or "B2C" segments in its Securities and Exchange Commission filings and shareholder calls over the last several years. In its 10-K and 10-Q filings for the past several years, Fair Isaac has distinguished between its "business-to-business scoring solutions and services" and its "business-to-consumer scoring solutions and services including my FICO solutions for consumers."

**ANSWER:** FICO admits that its recent Form 10-K and 10-Q filings refer to "business-to-business" and "business-to-consumer" scoring solutions and services. FICO further admits, upon in information and belief, that these terms have been mentioned during shareholder calls when the financial results reported in FICO's Form 10-Ks and 10-Qs were discussed. FICO denies that the use of either term recognizes the existence of any relevant product market alleged in this action. FICO lacks sufficient knowledge or information to admit or deny the allegations that it has used the quoted language in the last sentence of Paragraph 60 in its 10-K and 10-Q filings "for the past several years" and, on that basis, denies them. FICO denies the remaining allegations in Paragraph 60.

---

[15] *Id.*

61.     Purchases in the B2B Credit Score Market for credit scores and B2C Credit Score Market for credit scores are also different. While business customers purchase credit scores from Fair Isaac through CBs and/or third-party intermediaries, credit scores in the B2C Credit Score Market are often sold to consumers directly, such as when consumers purchase their credit score from Fair Isaac at myFICO.com.

**ANSWER:** FICO admits that businesses obtain credit scores from Credit Bureaus and other sources. FICO further admits that consumers can obtain FICO Scores from the website www.myFICO.com, but they can also obtain FICO Scores and other credit scores from Credit Bureaus and other sources. The remaining allegations in Paragraph 61 state legal conclusions to which no response is required, but, to the extent any response is required, they are denied.

62.     The B2B Credit Score Market exhibits high barriers to entry. As noted in a 2018 article: "The deep integration of FICO scores and products into companies' operations has raised switching costs."[16]

**ANSWER:** FICO admits that an article was published in 2018 with the statements quoted in Paragraph 62, but denies that such statements are accurate or reliable for any purpose. FICO further denies that switching costs impede competition from other credit scoring models. The allegation in Paragraph 62 pertaining to the purported "B2B Credit Score Market" state legal conclusions to which no response is required, but to the extent any response is required, they are denied. FICO denies the remaining allegations in Paragraph 62.

63.     Likewise, VantageScore Solutions has observed that in the residential mortgage sector, FICO's "imprint inhibits competition by raising switching costs and granting the irreplaceable brand value of utter ubiquity. It gives FICO unparalleled and highly controversial negotiating leverage with almost every participant in the industry."[17]

---

[16] *Fair Isaac: A Royalty on U.S. Credit Scoring* (Sept. 25, 2018), https://seekingalpha.com/ article/4208014-fair-isaac-royalty-on-u-s-credit-scoring.

[17] Press Release, VantageScore, *VantageScore Solutions Issues Statement Reacting to FHFA's Proposed Rules for Validating and Approving New Credit Scoring Models* (Dec. 17, 2018), https://vantagescore.com/press/vantagescore-solutions-issues-statement-reacting-to-fhfas- proposed-rules-for-validating-and-approving-new-credit-scoring-models.

**ANSWER:** FICO admits that VantageScore issued a press release that contains the quoted statements in Paragraph 63, but denies that such statements are accurate or reliable for any purpose. FICO denies the remaining allegations in Paragraph 63.

64. "Larger lenders use the [FICO] score as an input to customized models they've built for specific situations or portfolios. After a recent review one major US lender recently identified over 600 places they were using a FICO score in their business processes. Switching to a new score not only means proving the new score is better (a long process in itself) but extensive testing to ensure all of those moving parts are still working as designed. Citibank recently announced that after an 18 month review they've decided it's safe to switch to the latest version of the FICO score (FICO 8). This wasn't a migration to a new score mind you, just a more recent version of the score they're already using. The barriers to entry are indeed high . . . and expensive."[18]

**ANSWER:** FICO admits that an article was published in 2011 with the statements quoted in Paragraph 64, but denies that such statements are accurate or reliable for any purpose. FICO further denies that switching costs impede competition from other credit scoring models. FICO denies the remaining allegations in Paragraph 64.

65. "Network effects" – *i.e.*, the phenomenon where a product or service increases in value when the total number of customers increase – serve as a barrier to entry into the B2B Credit Score Market. As one analyst has noted: "The 'network effects' keeping FICO's dominant position [are] indeed incredibly strong."[19]

**ANSWER:** FICO admits that an analyst report contains the quoted statements in Paragraph 65, but denies that such statements are accurate or reliable for any purpose. FICO further denies that so-called "network effects" impede competition from other credit scoring models. FICO denies the remaining allegations in Paragraph 65.

66. In 2011, at Fair Isaac's Analyst/Investor Day, Fair Isaac's then-CEO, Mark Greene, explained: "In about 10 seconds, an entire commerce transaction taking place because 720 FICO was understood by the broker, by the mortgage banker on the other end of line and the customer

---

[18] John Ulzheimer, *Why FICO Isn't Going Away Any Time Soon*, Smart Credit (July 5, 2011), https://blog.smartcredit.com/2011/07/05/why-fico-isnt-going-away-any-time-soon/.

[19] Harrison Schwartz, *Fair Isaac: Share Buybacks Likely To End As Cash Reserves Run Low*, Seeking Alpha (Dec. 17, 2019), https://seekingalpha.com/article/4312953-fair-isaac-share- buybacks-likely-to-end-cash-reserves-run-low.

to be shorthand for good credit risk, gave this guy a favorable mortgage rate. And that network effect, having everybody in the loop understand that shorthand and standardize on a FICO Score, that's magic."[20]

**ANSWER:** FICO admits that the quoted statement in Paragraph 66 is attributed to Mark Greene, who was FICO's then-CEO, from a purported investor day transcript published in 2011, but denies that the quoted statement is presented in its full and complete context. However, FICO denies that so-called "network effects" impede competition from other credit scoring models. FICO denies the remaining allegations in Paragraph 66.

67.     The anticompetitive conduct by Fair Isaac alleged herein accounts in significant part for the FICO Score's dominance in the B2B Credit Score Market.

**ANSWER:** The allegation in Paragraph 67 pertaining to the purported "B2B Credit Score Market" state legal conclusions to which no response is required, but to the extent any response is required, they are denied. FICO denies the remaining allegations in Paragraph 67.

68.     The CBs participate in a market for credit reports. A credit report contains detailed information about a consumer's credit activity and current credit situation. The detailed information in a credit report is used to generate a FICO Score for a specific customer, which B2B lenders can use in making their lending decisions.

**ANSWER:** The allegations in the first sentence of Paragraph 68 state legal conclusions to which no response is required. FICO admits the remaining allegations in Paragraph 68 to the extent they describe credit reports generally.

69.     On information and belief, the CBs control virtually all of the credit report market (they have been called a "triopoly") and enjoy roughly equivalent market shares."[21]

**ANSWER:** FICO admits, upon information and belief, that the Credit Bureaus control aggregated consumer credit data needed to generate credit scores and that such control gives the

---

[20] SA Transcripts, Seeking Alpha, *Fair Isaac Corp. – Analyst/Investor Day* (Nov. 3, 2011), https://seekingalpha.com/article/307417-fair-isaac-corp-analyst-investor-day.

[21] *See* Consumer Financial Protection Bureau, *List of Consumer Reporting Companies* (2021), https://files.consumerfinance.gov/f/documents/cfpb_consumer-reporting-companies- list_2021-06.pdf.

Credit Bureaus significant market power. FICO lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 69 pertaining to the Credit Bureaus' "market shares" and, on that basis, denies them. FICO denies the remaining allegations in Paragraph 69.

70.    The three CBs are all members of a trade association called the Consumer Data Industry Association ("CDIA"). Through the CDIA, the three CBs frequently work together, including to: (i) develop a standard electronic data reporting format called Metro 2®; (ii) issue joint statements on matters of public importance; (iii) provide guidelines to businesses that use credit reports; and (iv) respond to public criticisms of their industry. The three CBs also cooperated in the establishment of VantageScore Solutions as a joint venture.[22]

**ANSWER:** FICO admits that the Credit Bureaus cooperated to establish and promote VantageScore. FICO further admits, upon information and belief, that the Credit Bureaus are members of the CDIA. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 70 and, on that basis, denies them.

71.    The market for credit reports exhibits strong barriers to entry, resulting from the relationships that the CBs establish with businesses that supply information to them and to which they in return sell reports. As one market expert commented, "replicating the databases of the leading credit bureaus would be incredibly difficult."[23] Similarly, Fair Isaac has explained:

> In order to compete with the Credit Bureaus, a new entrant must build a database that is equivalent to the databases built by the Credit Bureaus over decades. Building such a competitive database involves considerable time and costs to develop the infrastructure, to populate the database with current information and historical data, and to format and

---

[22] *See* Consumer Data Industry Ass'n, *About CDIA*, https://www.cdiaonline.org/about/about- cdia/ (last visited Oct. 21, 2021); Consumer Data Industry Ass'n, *Metro 2 Format for Credit Reporting*, https://www.cdiaonline.org/resources/furnishers-of-data-overview/metro2- information/ (last visited Oct. 21, 2021);

Dana Fowle, *Industry Pushes Back Against Claims of High Credit Reporting Errors*, Fox5    Atlanta (Sept. 15, 2021), https://www.fox5atlanta.com/news/industry-pushes-back-against-claims-of-high-credit-reporting-errors; Press Release, Consumer Data Industry Ass'n, *Consumer Data Industry Association Releases Study on the Value of Credit Reporting in U.S.* (June 15, 2020), https://cdia-news.s3.amazonaws.com/White+Paper+Press+Release+6.15.20.pdf; Consumer Data Industry Ass'n, *Equifax, Experian, & TransUnion Endorse CARES Act*, https://www.cdiaonline.org/equifax-experian-transunion-endorse-cares-act/ (last visited Oct. 21, 2021); Consumer Data Industry Ass'n, *COVID-19*, https://www.cdiaonline.org/covid-19/ (last visited Oct. 21, 2021).

[23] Brett Horn, *Credit Bureaus' Wide Moats Can't Be Breached*, Morningstar (Aug. 24, 2018), https://www.morningstar.com/articles/880439/credit-bureaus-wide-moats-cant-be-breached.

store the data (*e.g.*, Experian's FileOne database cost more than $100 million and took four years to develop, despite Experian already having much of the underlying data).[24]

**ANSWER:** FICO admits, upon information and belief, that the Credit Bureaus control aggregated consumer credit data needed to generate credit scores and that such control gives the Credit Bureaus significant market power. FICO further admits, upon information and belief, that the Credit Bureaus' market power is entrenched and durable, including due to their joint control over aggregated consumer credit data in the United States. FICO further admits that the quoted statements in Paragraph 71 appear in an article published on www.morningstar.com in 2018 and in FICO's Third Amended Complaint in the 2006 litigation, but denies that such statements are presented in their full and complete context. FICO denies the remaining allegations in Paragraph 71.

72.     "As a result of their market power, the Credit Bureaus' returns are well in excess of any reasonable estimate of the cost of capital."[25]

**ANSWER:** FICO admits, upon information and belief, that the Credit Bureaus control aggregated consumer credit data needed to generate credit scores and that such control gives the Credit Bureaus significant market power. FICO further admits that the quoted statements in Paragraph 72 appear in an article published on www.morningstar.com in 2018, but denies that statements are presented in their full and complete context. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 72 and, on that basis, denies them.

### C.     Fair Isaac's FICO Score Has a Monopoly in the B2B Credit Score Market

---

[24] Third Amended Compl., Dkt. 436, *Fair Isaac Corp. v. Experian Info. Sols.* (D. Minn. Nov. 10, 2018), ¶ 116.

[25] Horn, *supra* n.25.

73.     Fair Isaac came into existence in 1956, possessed a monopoly on credit-scoring algorithms until the mid-1970s, and continues to wield a dominant market share.[26]

**ANSWER:** FICO admits that the company known today as Fair Isaac Corporation ("FICO") was formed in 1956. FICO denies the remaining allegations in Paragraph 73.

74.     Fair Isaac's "FICO Classic" credit scores are the best known and most widely used credit scores in the B2B Credit Score Market. Fair Isaac applies an algorithm to each credit reporting agency's data to generate a FICO Classic Score between 300 and 850 that purports to give an indication of the individual's credit risk. It also generates a set of "reason statements," with corresponding codes, that explain the reasons the consumer has not been assigned the maximum score.

**ANSWER:** FICO admits that it has developed proprietary credit scoring models, including some that may be referred to as "classic" FICO Score models, which are applied to credit data maintained and controlled by the Credit Bureaus to generate credit scores. FICO further admits that some FICO Scores use a numerical range of 300 to 850 to indicate credit risk, and that FICO Scores are accompanied by reason codes which explain the basis for the credit score. The allegations in Paragraph 74 pertaining to the purported "B2B Credit Score Market" state legal conclusions to which no response is required, but to the extent any response is required, they are denied. FICO denies the remaining allegations in Paragraph 74.

75.     FICO Scores are the credit scores most widely used by lenders and are used in over 90% of U.S. credit lending decisions.[27] Every year, lenders access billions of FICO Scores to help them understand people's credit risk and make better-informed lending decisions.

**ANSWER:** FICO admits that FICO Scores are widely used by lenders and others to assess credit risks. FICO further admits that at certain times FICO Scores have been used by approximately 90% of top lenders, including as part of decision strategies and custom models

---

[26]     Raymond     Anderson,     *A     History     of     Credit     Scoring*,     at     75-76     (2019), https://www.researchgate.net/profile/Raymond_Anderson4/publication/331533723_Chapter_B0 6_History_of_Credit_Scoring/links/5c7ed843299bf1268d3ccc5d/Chapter-B06-History-of-     Credit-Scoring.pdf?origin=publication_detail.

[27] https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.

27

developed by lenders that utilize multiple credit scores, which is not necessarily equivalent to an estimated "market share" associated with FICO Scores, and that this statistic appears in material published by FICO. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 75, and on this basis, denies them.

76.     On its website, Fair Isaac claims that "10 billion FICO Scores are purchased every year" and "27 million Fico Scores are purchased every day." FICO Scores are also used in over 30 countries.[28]

**ANSWER:** FICO admits that the quoted statements in Paragraph 76 appear on the website www.ficoscore.com, but denies that such statements are presented in their full and complete context. FICO denies the remaining allegations in Paragraph 76.

77.     Fair Isaac also advertises that its FICO Score is "widely accepted" and "used by 90% of top U.S. lenders." FICO Scores have been "an industry standard for over 30 years."[29]

**ANSWER:** FICO admits that the quoted statements in Paragraph 77 appear on the website www.ficoscore.com, but denies that such statements are presented in their full and complete context. FICO denies the remaining allegations in Paragraph 77.

78.     Fair Isaac's executives have confirmed the dominance of Fair Isaac's FICO Score. In November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President Michael Pung stated that the FICO scoring system "is the most widely used credit scoring system here in the U.S.," that "[v]irtually every major lender in the U.S. [uses] the FICO Score for some sort of credit lending decision," and that Fair Isaac has "maintained a 90-plus percent market share for at least the [last] 13 years."[30] In 2008, Craig Watts, a public affairs manager at Fair Isaac, described the FICO Score as the "800 pound gorilla."[31]

**ANSWER:** FICO admits that the quoted statements in Paragraph 78 attributed to former FICO employee Michael Pung appear in the purported transcript from a 2017 JPMorgan Ultimate

---

[28] https://www.ficoscore.com/about.

[29] *Id.*

[30] TransUnion Counterclaims, ¶ 32.

[31] Dana Dratch, *What Does 'Good' Credit Really Mean?*, CNBC (Oct. 30, 2008), https://www.cnbc.com/id/27458815.

Services Investor Conference and that the quoted statements in Paragraph 78 attributed to former FICO employee Craig Watts appear in a 2008 CNBC website article, but denies that the quoted statements are presented in their full and complete context. FICO denies the remaining allegations in Paragraph 78.

79.     Fair Isaac states in its 2020 Form 10-K:

> Our products and services serve clients in multiple industries, including primarily banking, insurance, retail, healthcare and public agencies. End users of our products include 96 of the 100 largest financial institutions in the U.S., and two-thirds of the largest 100 banks in the world. Our clients also include more than 600 insurers, including nine of the top ten U.S. property and casualty insurers; more than 300 retailers and general merchandisers; more than 150 government or public agencies; and more than 200 healthcare and pharmaceuticals companies, including nine of the world's top ten pharmaceuticals companies. Eight of the top ten companies on the 2020 Fortune 500 list use one or more of our solutions. In addition, our consumer services are marketed to an estimated 200 million U.S. consumers whose credit relationships are reported to the three major U.S. credit reporting agencies.[32]

**ANSWER:** FICO admits that the quoted statement appears in its 2020 Form 10-K, but denies that such statement is presented in its full and complete context.

80.     An infographic on Fair Isaac's website states: "10 BILLION FICO SCORES ARE SOLD EACH YEAR," which is "FOUR TIMES the number of hamburgers McDonald's sells WORLDWIDE in a year," and "27,400,000 FICO scores are sold every day," which is "OVER TWICE the number of cups of coffee Starbucks sells WORLDWIDE in a day."[33]

---

[32] Fair Isaac 2020 10-K at 10.

[33] Fair Isaac, *Learn About the FICO Score and Its Long History*, https://www.fico.com/25years/.



**ANSWER:** FICO admits, upon information and belief, that the graphic printed in Paragraph 80 appeared on the website www.fico.com at one point in time, but denies that the graphic is presented in its full and complete context. FICO denies the remaining allegations in Paragraph 80.

81. Fair Isaac's 2020 Form 10-K states that FICO Scores "are used in the majority of U.S. credit decisions, by nearly all of the major banks, credit card organizations, mortgage lenders and auto loan originators," and it describes FICO Scores as "the standard measure in the U.S. of consumer credit risk."[34]

**ANSWER:** FICO admits that the quoted statement appears in its 2020 Form 10-K, but denies that such statement is presented in its full and complete context.

82. A May 2021 report by Yale University's Thurman Arnold Project, a collaborative project among Yale faculty and students, as well as other scholars dedicated to research on competition policy and antitrust enforcement, notes that Fair Isaac "enjoys a virtual monopoly in

---

[34] Fair Isaac 2020 10-K at 3, 7.

the credit score market" and that "[b]ecause of the lack of competition in this domain, there has been limited innovation in scoring methodology."[35]

**ANSWER:** FICO admits that the quoted statement in Paragraph 82 appears in a May 2021 report published by the Thurman Arnold Project, but denies that the statement is accurate or reliable for any purpose. FICO denies the remaining allegations in Paragraph 82.

83.    Fair Isaac's monopoly in the B2B Credit Score Market has given it considerable power to control prices and impose monopoly rents. Fair Isaac's CEO Will Lansing has noted that, in the B2B Credit Score Market, Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are."[36]

**ANSWER:** FICO admits that the quoted statement in Paragraph 83 is attributed to William Lansing, FICO's current CEO, in the purported transcript of a 2017 Barclay's Global Technology, Media and Telecommunications Conference, but denies that the quoted statement is presented in its full and complete context. The allegations in Paragraph 83 pertaining to an alleged "B2B Credit Score Market" state legal conclusions to which no response is required, but, to the extent a response is required, they are denied. FICO denies the remaining allegations in Paragraph 83.

84.    In February 2013, at a Morgan Stanley Conference, Lansing explained that Fair Isaac's "Scores business, which is the cash generator, is a very, very high-margin business. It's deeply embedded into the systems of the bank customers who use it."[37]

**ANSWER:** FICO admits that the quoted statement in Paragraph 84 is attributed to William Lansing in the purported transcript of a 2013 Morgan Stanley Conference, but denies that the quoted statement is presented in its full and complete context. FICO denies the remaining allegations in Paragraph 84.

---

[35] Yale University Thurman Arnold Project, *Updating Antitrust and Competition Policy: Finance Issues*, at 14, 15 (May 2021), https://som.yale.edu/sites/default/files/TeamFinance- Final.pdf.

[36] TransUnion Counterclaims, ¶ 34.

[37] Seeking Alpha, *Fair Isaac's CEO Presents at Morgan Stanley Technology, Media & Telecom Conference (Transcript)* (Feb. 27, 2013), https://seekingalpha.com/article/1231981-fair- isaacs-ceo-presents-at-morgan-stanley-technology-media-and-telecom-conference-transcript.

### D. Fair Isaac Has Been Able to Maintain its Monopoly

85.     Despite Fair Isaac's 90% share in the Business Market, several companies have attempted to compete with Fair Isaac's FICO Scores. These competitors' products use the same data as FICO Scores. However, many also incorporate data not used by FICO Scores—data such as, rental, utility, and telecom payment data and/or public records information, including property deeds, mortgages, liens, personal property titles, tax records, and licensing data.

**ANSWER:** The allegations in the first part of the first sentence of Paragraph 85 pertaining to a "Business Market" state legal conclusions to which no response is required. However, to the extent a response is required, FICO denies these allegations. FICO admits that several companies offer competing credit scoring models. FICO lacks sufficient knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 85 and, on that basis, denies them.

86.     Some of these competitors to Fair Isaac's FICO Scores in the B2B Credit Score Market include: SageStream's Credit Optics Score; LexisNexis's RiskView score; CoreLogic Credco's Anthem Credit Score; PRBC; ChexSystems; L2C's Link2Credit Score; and ScoreLogix LLC's JSS Credit Score.

**ANSWER:** FICO admits, upon information and belief, that some of the entities listed in Paragraph 86 offer or have offered credit scoring models for use by lenders and other business end-users. The allegations in Paragraph 86 pertaining to an alleged "B2B Credit Score Market" state legal conclusions to which no response is required, but, to the extent a response is required, they are denied. FICO denies the remaining allegations in Paragraph 86.

87.     Another competitor, VantageScore Solutions, represented the biggest threat to Fair Isaac's FICO Scores in the B2B Credit Score Market because it was a joint venture founded by the three major CBs. As part of its attempt to compete against Fair Isaac's FICO Scores in the B2B Credit Score Market, VantageScore Solutions introduced the VantageScore credit scoring system in March 2006. The three CB Defendants continue to own VantageScore Solutions.

**ANSWER:** FICO admits that VantageScore competes with FICO in some respects. FICO further admits that VantageScore was created as a joint venture by the Credit Bureaus in 2006, and they continue to own VantageScore. The allegations in Paragraph 87 pertaining to an alleged "B2B

Credit Score Market" state legal conclusions to which no response is required, but, to the extent a response is required, they are denied. FICO denies the remaining allegations in Paragraph 87.

88.     VantageScore Solutions does not sell or market its VantageScore credit models or credit scores; instead, it licenses them to the three CB Defendants, which may incorporate VantageScores in their credit reports.

**ANSWER:** FICO admits that VantageScore offers its own credit scoring system and credit score known as VantageScore. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 88 and, on that basis, denies them.

89.     VantageScores are a competitor to FICO Scores in the B2B Credit Score Market.

**ANSWER:** FICO admits that VantageScore competes with FICO in some respects. The allegations in Paragraph 89 pertaining to an alleged "B2B Credit Score Market" state legal conclusions to which no response is required, but, to the extent a response is required, they are denied. FICO denies the remaining allegations in Paragraph 89.

90.     In addition to being backed by the three major CBs, the VantageScore credit scoring model provides reliable credit scores for millions more consumers than FICO Scores by relying on additional and alternative sources of data. VantageScore, for example, calculates scores for consumers who have not used credit for up to two years and use utility and telecommunications payment histories. As such, VantageScore provides insights into individuals' and businesses' desirability as customers, clients, and/or tenants that Fair Isaac's FICO Scores cannot. In contrast, Fair Isaac's FICO scoring systems do not generate a score if a consumer does not have at least one credit account that has been open for six months or more, or if no credit account of the consumer has been reported to the reporting CB. Thus, millions of otherwise creditworthy individuals do not have a FICO Score.

**ANSWER:** FICO admits that VantageScore is backed by the three major Credit Bureaus. FICO further admits that there are differences between VantageScore credit scores and FICO Scores. FICO further admits that some consumers with insufficient credit history, or no credit history, may not be capable of being assigned a credit score by FICO's credit scoring models. FICO lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 90

pertaining to precisely how VantageScore calculates credit scores and, on that basis, denies them. FICO denies the remaining allegations in Paragraph 90.

91.     Obtaining a mortgage, car loan, credit card or reasonable interest rates on personal lines of credit is almost impossible without a credit score. Landlords are also increasingly screening potential tenants using credit scores. Thus, those excluded by Fair Isaac's traditional FICO scoring systems—including a disproportionate number of low-income and minority consumers—face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and housing.

**ANSWER:** FICO admits that credit scores are used for a wide variety of reasons, including in connection with obtaining a mortgage, car loan, credit card, or rental property, and to determine interest rates on personal lines of credit. FICO further admits that not every consumer in the United States is capable of being a assigned a credit score by FICO's credit scoring models, but denies that its credit scoring models disproportionately exclude low-income and minority consumers. FICO denies the remaining allegations in Paragraph 91.

92.     For example, the CFPB has found that, as of 2010, 26 million consumers in the United States were "credit invisible" – *i.e.*, they lacked credit history with one of the nationwide credit reporting companies.[38] Those individuals cannot be scored by FICO.[39]

**ANSWER:** FICO admits that the CFPB referred to a portion of consumers as "credit invisible" in a 2015 report. FICO denies the remaining allegations in Paragraph 92.

93.     The CFPB's research suggests "a strong relationship between income and having a credit record. Almost 30 percent of consumers in low-income neighborhoods are credit invisible and an additional 16 percent have unscored records. These percentages are notably lower in higher-income neighborhoods. For example, in upper-income neighborhoods, only 4 percent of the population is credit invisible and another 5 percent has an unscored record."[40]

---

[38] CFPB Office of Research, *Data Point: Credit Invisibles*, at 4, 6 (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf.

[39] *Id.*

[40] Id. at 24.

**ANSWER:** FICO admits that the quoted statement in Paragraph 93 appears in a CFPB report published in 2015, but denies that the quoted statement is presented in its full and complete context. FICO denies the remaining allegations in Paragraph 93.

94.     Moreover, the CFPB found "significant differences in the incidence of having a limited credit history across racial and ethnic groups," specifically, while White and Asian individuals "are almost equally likely to be credit invisible or have an unscored record, the shares of [Black and Hispanic individuals] with limited credit history are much larger," and individuals in those groups are thus less likely to be able to obtain a credit score.[41]

**ANSWER:** FICO admits that the quoted statement in Paragraph 94 appears in a CFPB report published in 2015, but denies that the quoted statement is presented in its full and complete context. FICO denies the remaining allegation in Paragraph 94.

95.     According to the CFPB, "[a]bout 15 percent" of Black[ ] and Hispanic[ ] individuals "are credit invisible . . . and an additional 13 percent of [Black individuals] and 12 percent of [Hispanic individuals] have unscored records. . . . This elevated incidence . . . is observed across ages, suggesting that these differences across racial and ethnic groups materialize early in the adult lives of these consumers and persist thereafter."[42]

**ANSWER:** FICO admits that the quoted statement in Paragraph 95 appears in a CFPB report published in 2015, but denies that the quoted statement is presented in its full and complete context. FICO denies the remaining allegation in Paragraph 95.

96.     The CFPB went on to conclude that "[t]hese results suggest that the problems that accompany having a limited credit history are disproportionally borne by Black[ ], Hispanic[ ], and lower-income consumers."[43]

**ANSWER:** FICO admits that the quoted statement in Paragraph 96 appears in a CFPB report published in 2015, but denies that the quoted statement is presented in its full and complete context. FICO denies the remaining allegation in Paragraph 96.

97.     Furthermore, it is widely recognized that FICO Scores are a measure of past ability to pay. Competing products incorporate an analysis of prospective creditworthiness. For example,

---

[41] *Id.*

[42] *Id.* at 24-25.

[43] *Id.* at 25.

Scorelogix's JSS score incorporates job and income stability to determine whether the borrower will have the ability to repay debt in the future. L2C offers an alternative credit score that uses utility payment histories to determine creditworthiness, including future ability to pay.

**ANSWER:** FICO admits that FICO Scores can be based in part on a consumer's reported payment history. FICO lacks sufficient knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 97 and, on that basis, denies them.

98.     VantageScore has achieved some limited success. In a 2018 report, VantageScore Solutions stated:

> During the twelve months ending in July 2017, over 1.4 billion VantageScore credit scores were delivered directly to consumers by lenders like Chase and Capital One and educational websites like CreditKarma, Lending Tree, and Mint. These scores are calculated using the same VantageScore model used by lenders (i.e., not an "educational" model). They are most often provided free of charge as part of educational offerings that include simulators, credit reports, educational articles, and explanations.[44]

**ANSWER:** FICO admits that VantageScore has reported steady and significant growth in the use and adoption of VantageScore credit scores by all end-users, including so-called "B2B Purchasers." FICO further admits that the quoted statement in Paragraph 98 appears in a report published by VantageScore in 2018, but denies that such statements are presented in their full and complete context. FICO denies the remaining allegations in Paragraph 98.

99.     VantageScore Solutions went on to note that "[a]s lenders adopt VantageScore, we believe that such adoption will improve consumers' access to credit in certain segments and enable many more borrowers to obtain fairer pricing."[45] VantageScore Solutions also reported that

---

[44] VantageScore Solutions, *VantageScore® Credit Scores and The Mortgage Market*, at 8 (2018) ("VantageScore Report"), https://vantagescore.com/pdfs/FAQs-VantageScore-Credit- Scores-and-the-Mortgage-Market.pdf.

[45] *Id*. at 5.

"[m]any of the most sophisticated secondary market participants use the VantageScore model to help evaluate and monitor risk, and to price and benchmark deals more accurately.[46]

**ANSWER:** FICO admits that VantageScore has reported steady and significant growth in the use and adoption of VantageScore credit scores by all end-users, including so-called "B2B Purchasers." FICO further admits that the quoted statements in Paragraph 99 appear in reports published by VantageScore in 2016 and 2018, but lacks sufficient knowledge or information to admit or deny the veracity of the underlying statements and, on that basis, denies them. FICO denies the remaining allegations in Paragraph 99.

100.    Despite the advantages of using VantageScore or another competing credit scoring model, Fair Isaac continues to have a monopoly in the B2B Credit Score Market and extracts monopoly rents through anticompetitive and exclusionary conduct and by conspiring with the Credit Bureaus. In February 2013, at a Morgan Stanley Conference, Fair Isaac's CEO Will Lansing explained that despite the existence of VantageScore, "there [is] not that much competition around our Scores business" because "FICO Scores are very much part of the fabric of the banking industry" and "really deeply embedded."

**ANSWER:** The allegations in the first sentence of Paragraph 100 state legal conclusions to which no response is required, but, to the extent any response is required, they are denied. FICO admits that the quoted statement in the second sentence of Paragraph 100 is attributed to William Lansing in the purported transcript of a 2013 Morgan Stanley Conference, but denies that the quoted statement is presented in its full and complete context. FICO denies the remaining allegations in Paragraph 100.

### E.    Fair Isaac's Conduct in Furtherance of its Anticompetitive Scheme

101.    Fair Isaac anticipated the threat VantageScore could pose to its dominance in the B2B Credit Score Market. Fair Isaac's own models of future losses predicted "substantial double-digit declines" if the use of VantageScore continued to expand.[47]

---

[46] VantageScore Solutions, *Myth: VantageScore Is Not Accepted by Investors in Securitization Markets* (Mar. 23, 2016), https://vantagescore.com/education/blog/myth- vantagescore-is-not-accepted-by-investors-in-securitization-markets.

[47] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, No. CV 06-4112, 2008 WL 11348223, at *2 (D. Minn. Nov. 3, 2008).

**ANSWER:** FICO admits that, in the 2006 litigation between it and the Credit Bureaus, it made allegations that the Credit Bureaus' unlawful and tortious conduct related to VantageScore was injuring FICO's business. FICO denies the remaining allegations in Paragraph 101.

102.    Faced with the prospect of a significant hit to its market dominance, and its profits, Fair Isaac used its monopoly power to coordinate a comprehensive attack on VantageScore that included filing anticompetitive litigation; enlisting the Credit Bureaus to sign on to licensing agreements that undermined their own joint venture; and undertaking a campaign of disparagement against, and disinformation about, VantageScore Solutions and VantageScore.

**ANSWER:** FICO denies the allegations in Paragraph 102.

### 1.    Fair Isaac's Anticompetitive Litigation

103.    Fair Isaac, recognizing the creation of VantageScore as a competitive threat, initiated litigation against Equifax, Experian, TransUnion, and VantageScore Solutions. In October 2006, just after the introduction of VantageScore, Fair Isaac filed a meritless lawsuit against them, alleging that the development of VantageScore violated the antitrust laws and constituted trademark infringement. Fair Isaac sought the elimination of VantageScore Solutions requesting that the "Defendants be ordered to dissolve VantageScore." *Fair Isaac Corp. v. Equifax, Inc. et al*, No. 0:06-cv-04112, ECF No. 1-1 at 65 (D. Minn. Oct. 11, 2006). This frivolous lawsuit represented Fair Isaac's first attempt to kill VantageScore before it could gain traction in the market.

**ANSWER:** FICO admits that it filed a lawsuit against TransUnion, Equifax, Experian, and VantageScore in 2006 that asserted claims that included trademark infringement, unfair competition, and violation of the antitrust laws and that the quoted statement in Paragraph 103 appears in the Prayer for Relief in FICO's complaint, but denies that the quoted statement is presented in its full and complete context. Answering further, FICO states that the proceedings and outcome of the 2006 litigation are a matter of public record. FICO denies the remaining allegations in Paragraph 103.

104.    VantageScore Solutions characterized the litigation that Fair Isaac initiated as a "legal battle that sought to put us out of business, even as we scrambled to establish a competitive foothold."[48] Fair Isaac raised bogus antitrust claims that it knew lacked foundation, given its then-94% share of the B2B Credit Score Market. It also alleged trademark infringement that a jury

---

[48]    VantageScore Solutions, Inc., *10 years, 10 milestones* (Mar. 2016), https://thescore.vantagescore.com/article/252/10-years-10-milestones.

found to be based on a trademark that Fair Isaac had fraudulently obtained from the U.S. Patent and Trademark Office ("PTO"). In addition, Fair Isaac's contention that the "300-850" marks were anything other than "merely" descriptive lacked all foundation because - as the U.S. Court of Appeals for the Eighth Circuit later held - "consumers in this market immediately understand '300-850' to describe the qualities and characteristics of FICO's credit score - that the credit score will be within the range of 300850."[49]

**ANSWER:** FICO admits that the quoted statement in Paragraph 104 appears in an article

published by VantageScore, but denies that the statement is accurate or reliable for any purpose.

FICO further admits that, in the 2006 litigation between it and the Credit Bureaus, some of FICO's

claims were resolved at summary judgment, the defendants prevailed following a jury trial, and

the district court's summary judgment order and the jury's verdict were upheld by the Eighth

Circuit Court of Appeals. Answering further, FICO states that the proceedings and outcome of the

2006 litigation are a matter of public record. FICO denies the remaining allegations in Paragraph

104.

105.    Equifax settled the litigation in June 2008 and formed "a partnership [with Fair Isaac] to develop and sell advanced analytics and scoring solutions for businesses and consumers."[50]

**ANSWER:** Admitted.

106.    The litigation against Experian and TransUnion lasted into 2011. While it was ongoing, VantageScore Solutions remained under a cloud, with Fair Isaac's lawsuit hobbling its commercial prospects: Potential B2B Purchasers for VantageScore had no way of being sure that the product might not be declared infringing on Fair Isaac's trademarks or that VantageScore Solutions would not be dissolved.

**ANSWER:** FICO admits that the 2006 litigation between it and the Credit Bureaus

concluded in 2008 as to Equifax, in 2010 as to TransUnion when TransUnion settled with FICO

while an appeal was pending, and in 2011 as to Experian and VantageScore. Answering further,

---

[49] Fair *Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1148 (8th Cir. 2011).

[50] Fair Isaac, *Equifax and Fair Isaac Enter Partnership to Accelerate Development and Delivery of New Analytic Solutions* (June 10, 2008), https://www.fico.com/en/newsroom/equifax- and-fair-isaac-enter-partnership-accelerate-development-and-delivery-new-analytic.

FICO states that the proceedings and outcome of the 2006 litigation are a matter of public record.

FICO denies the remaining allegations in Paragraph 106.

107.    The district court entered summary judgment in favor of the Credit Bureaus on the antitrust and false advertising claims. A jury found against Fair Isaac on the remaining claim for trademark infringement, finding that the mark "300-850" (which denoted the range of FICO Scores) was merely descriptive. It also found that: (1) Fair Isaac made a false representation during the application process to the PTO for the registrations of the "300-850" marks; (2) Fair Isaac knew that representation to be false when it was made and intended to deceive the PTO; and (3) the PTO relied on the false representation in deciding to issue the registrations.[51]

**ANSWER:** FICO admits that, in the 2006 litigation between it and the Credit Bureaus, summary judgment was granted to the defendants on certain of FICO's claims and that the defendants prevailed following a jury trial. FICO further admits that the jury made certain findings as stated on the jury's verdict form. Answering further, FICO states that the proceedings and outcome of the 2006 litigation are a matter of public record. FICO denies the remaining allegations in Paragraph 107.

108.    The district court upheld the verdict, noting that "[t]his extensive, expensive litigation seems to have been initiated largely in response to a perceived threat to Fair Isaac's dominant position in the credit scoring industry."[52]

**ANSWER:** FICO admits that the jury's verdict in the 2006 litigation between it and the Credit Bureaus was upheld by the district court. FICO further admits that the quoted statement in Paragraph 108 appears in the district court's opinion, but denies that such statements are presented in their full and complete context. Answering further, FICO states that in the same opinion, the district court also held that FICO's Lanham Act claims were not "groundless," "unreasonable," or "wholly without merit" in the course of denying certain defendants' requests for attorney's fees.

---

[51] Fair *Isaac*, 650 F.3d at 1148-50.

[52] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1000 (D. Minn. 2010).

Answering further, FICO states that the proceedings and outcome of the 2006 litigation are a matter of public record. FICO denies the remaining allegations in Paragraph 108.

109.     In 2011, the United States Court of Appeals for the Eighth Circuit affirmed both that decision and the earlier summary judgment ruling.[53]

**ANSWER:** FICO admits that, in the 2006 litigation between it and the Credit Bureaus, the Eighth Circuit Court of Appeals upheld the district court's summary judgment ruling and the jury verdict. Answering further, FICO states that the proceedings and outcome of the 2006 litigation are a matter of public record. FICO denies the remaining allegations in Paragraph 109.

110.     VantageScore Solutions's growth during its first few years was inhibited by the litigation, which was part of a continuing antitrust violation by Fair Isaac that goes on to this day.

**ANSWER:** FICO denies the allegations in Paragraph 110.

111.     In December 2017, Fair Isaac sued TransUnion for unpaid royalties.[54]

**ANSWER:** FICO admits that it sued TransUnion in 2017 for unpaid royalties, among other claims. Answering further, FICO states that the proceedings and outcome of the 2017 litigation are a matter of public record.

112.     In February 2018, TransUnion responded by filing antitrust counterclaims for, *inter alia*, monopolization against Fair Isaac. In paragraphs 42-60 of the counterclaims (which was partially redacted), the anticompetitive terms the Credit Bureaus and Fair Isaac had agreed upon were disclosed publicly for the first time. Those provisions are described in detail below.

**ANSWER:** FICO admits that TransUnion asserted counterclaims in the 2017 litigation. Answering further, FICO states that the proceedings and outcome of the 2017 litigation are a matter of public record. FICO denies the remaining allegations in Paragraph 112.

113.     Fair Isaac moved to dismiss the counterclaims. Judge Coleman denied the motion, ruling that "TransUnion has adequately pled actual and attempted monopolization" through allegations that "FICO engages in practices that are intended to drive out competition" through

---

[53] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011).

[54] *See* Complaint, Dkt. 1, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Nov. 16, 2017).

"exclusive dealing provisions [that] are unlawful attempts to 'maintain monopoly power through exclusionary conduct.'"[55]

**ANSWER:** FICO admits that it moved to dismiss TransUnion's counterclaims in the 2017 litigation and that FICO's motion to dismiss was granted in part and denied in part. Answering further, FICO states that the proceedings and outcome of the 2017 litigation are a matter of public record. FICO denies the remaining allegations in Paragraph 113.

114.    In November 2020, TransUnion and Fair Isaac settled on undisclosed terms. One effect of this settlement was to cut Plaintiffs and proposed Class members off from obtaining further information about the anticompetitive agreements between Fair Isaac and the CBs. Fair Isaac essentially bought TransUnion off. This inference is bolstered by the fact that, in August 2021, TransUnion announced that it had entered into a long-term (presumably lucrative) contract to distribute FICO Scores to lenders and consumers in Canada.[56]

**ANSWER:** FICO admits that it and TransUnion settled their litigation in 2020. FICO denies the remaining allegations in Paragraph 114.

115.    The Antitrust Division of the United States Department of Justice took notice of Fair Isaac's conduct alleged in the TransUnion Action and instituted a civil investigation. That investigation was closed without action in December 2020, shortly after TransUnion settled with Fair Isaac.[57]

**ANSWER:** FICO admits that the Antitrust Division of the United States Department of Justice ("DOJ") notified it of an investigation into potential exclusionary conduct in March 2020. Answering further, FICO states that it fully cooperated with the DOJ's investigation and that, in December 2020, the DOJ notified FICO that it had closed the investigation without taking any

---

[55] *Fair Isaac Corp. v. Trans Union, LLC*, No. 17:cv-8318, 2019 WL 1382068, at *2 (N.D. Ill. Mar. 27, 2019).

[56] See Press Release, TransUnion, *TransUnion Enters New Long-term Agreement with FICO to Distribute FICO® Score in Canada* (Aug. 3, 2021), https://www.globenewswire.com/news-release/2021/08/03/2273895/0/en/TransUnion-Enters-New-Long-term-Agreement-with-FICO-to-Distribute-FICO-Score-in-Canada.html.

[57] See Press Release, Fair Isaac, *FICO Statement Regarding Antitrust Investigation* (Mar. 15, 2020), https://fico.gcs-web.com/news-releases/news-release-details/fico-statement-regarding-antitrust-investigation.

enforcement action. FICO denies that the foregoing facts in any way support Plaintiffs' claims or allegations. FICO denies the remaining allegations in Paragraph 115.

### 2. Fair Isaac and the Credit Bureau's Conspiracy

116. Business customers in the B2B Credit Score Market purchase credit reports and FICO Scores from CBs and third-party credit reporting companies. As part of this process, CBs have entered into contractual relationships, called "Credit Scoring Services Agreements" ("CSSAs"), with their customers that govern the terms by which businesses purchase FICO Scores. These terms include the amount(s) paid to the CB, the fee model for delivery of credit score services, the method of payment, the mode of delivery, and restrictions on the business's use of FICO Scores.

**ANSWER:** FICO admits that businesses purchase credit reports and FICO Scores from Credit Bureaus and resellers. The allegation in Paragraph 116 pertaining to the purported "B2B Credit Score Market" state legal conclusions to which no response is required, but to the extent any response is required, they are denied. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 116 and, on that basis, denies them.

117. The CBs and Fair Isaac have entered into separate licensing agreements which set forth the royalties that CBs must pay to Fair Isaac for the FICO Scores that the CBs sell to their customers. These royalties are passed on to Plaintiffs and other members of the proposed Classes.

**ANSWER:** FICO admits that it has entered into separate licensing agreements with the Credit Bureaus which set forth the royalties that Credit Bureaus pay to FICO for FICO Scores that the Credit Bureaus sell to their customers. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 117 and, on that basis, denies them.

118. After its litigation efforts failed to eliminate VantageScore, Fair Isaac elected to take another approach. When its existing licensing agreements with each CB expired in 2013 or 2015, Fair Isaac took it upon itself to function as a central coordinating party in a conspiracy with the CBs to crush the only real competition, VantageScore; maintain Fair Isaac's monopoly; and extract monopoly rents from B2B Purchasers.

**ANSWER:** FICO denies the allegations in Paragraph 118. Answering further, FICO states that Plaintiffs' conspiracy allegations and Section 1 claims have been dismissed.

119.    To effectuate the conspiracy, Fair Isaac and the CBs entered into new or renewed agreements that contained new provisions designed to restrict the competitive reach of VantageScore. Those provisions reflect Fair Isaac and the CBs' conscious commitment to a common scheme designed to achieve the unlawful objective of foreclosing competition in the B2B Credit Score Market. The anticompetitive contract provisions targeted the only significant competing credit score – VantageScore. And they specifically restricted the CBs' ability to market VantageScore to B2B purchasers. On information and belief, the CBs agreed to those provisions – cutting their own joint venture off at the knees – in return for Fair Isaac's acquiescence to a clause that protected them from price competition (and potentially in exchange for other benefits as well). The point of the conspiracy was to support supracompetitive prices for credit scores for the consumers – the B2B purchasers. In addition to other facts, the CBs' agreement to those provisions makes them co-conspirators with Fair Isaac.

**ANSWER:** FICO denies the allegations in Paragraph 119. Answering further, FICO states that Plaintiffs' conspiracy allegations and Section 1 claims have been dismissed.

120.    The CBs' frequent business dealings with Fair Isaac and with each other gave them ample opportunities to communicate, coordinate behavior, and engage in other actions pursuant to their conspiracy. Because Fair Isaac monopolized the market for Credit Scores, and the three CBs dominated the market for credit reports, the conspiracy, which restricted choice, innovation, and price competition for purchases of credit scores and credit reports, required the cooperation of only a few entities (four), all of which had extensive experience dealing with each other. In addition to the CBs' longstanding and continuing contractual relationships with Fair Isaac, the CBs cooperate with one another through CDIA, their trade association. Indeed, VantageScore Solutions was, and is, their joint venture.

**ANSWER:** FICO admits that VantageScore is a joint venture owned by the Credit Bureaus. FICO denies the remaining allegations in Paragraph 120. Answering further, FICO states that Plaintiffs' conspiracy allegations and Section 1 claims have been dismissed.

121.    The agreements were consummated at a critical time. In 2011 through the first part of 2013, developments occurred that should have furthered VantageScore's ability to compete with FICO Scores. In 2011, VantageScore Solutions formed a partnership with the Consumer Federation of America, "a nonprofit association of nearly 300 consumer groups founded in 1968 to advance consumers' interests through research, advocacy, and education"; that alliance led to the "use of annual consumer surveys to gauge awareness of credit scoring related issues."[58] In October 2012, "the Federal Deposit Insurance Corporation ("FDIC") revised its rules for assessing default risk on loans issued by banks with deposits in excess of $10 billion. Instead of evaluating loans on any particular credit score, the revision called for examining the underlying probability of default associated with those loans at the time of origination."[59] In March 2013, VantageScore

---

[58] VantageScore Solutions, *10 Years, 10 Milestones*, *supra* n.56.

[59] *Id.*

44

Solutions debuted a new scoring model, VantageScore 3.0, which "built on the strengths of its predecessors and drew extensive news coverage for its ability to score 98 percent of adult consumers in the United States (including 30-35 million who cannot get scores from conventional credit-scoring models [*i.e.*, FICO]); its disregard of paid collections (including paid medical debt); and its simplified reason codes."[60] And, in July 2013, VantageScore Solutions published a white paper explaining how VantageScore could be aligned with the FDIC's new rules for evaluating probability of default.[61]

**ANSWER:** FICO admits that the Federal Deposit Insurance Corporation ("FDIC") revised its rules regarding assessment of default risk on loans issued by certain banks in 2012, that VantageScore introduced a new credit scoring model known as VantageScore 3.0 in 2013, and that VantageScore published a white paper in the same year. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 121 pertaining to VantageScore's credit scoring model and business activities and, on that basis, denies them. FICO denies the remaining allegations in Paragraph 121.

122.    Fair Isaac's response to these developments was to agree on anticompetitive contract terms with the CBs, commencing with Experian in May 2013, continuing with Equifax in November 2013, and culminating with the February 2015 Analytic and Data License Agreement ("ADLA") between Fair Isaac and TransUnion. These clauses would preserve Fair Isaac's monopoly while compensating the CBs for the marginalization of VantageScores. Fair Isaac and the CBs did not publicly reveal any of the terms of their agreements until February 2018. Many of the agreements' terms remain confidential to this day.

**ANSWER:** FICO admits that it entered into an Analytic and Data License Agreement ("ADLA") with TransUnion in February 2015 but otherwise denies Plaintiffs' characterization of the ADLA. FICO denies the remaining allegations in Paragraph 122.

### a.    Fair Isaac's Anticompetitive Contracts with the CBs

123.    The discussion that follows is based on TransUnion's description of its ADLA in its counterclaims against Fair Isaac. The ADLA was filed under seal in the TransUnion action and is unavailable to Plaintiffs beyond what TransUnion has quoted in its counterclaims. While the counterclaims quote only the ADLA, TransUnion pled that "Fair Isaac represented to TransUnion

---

[60] VantageScore, *10 years, 10 milestones*, *supra* n.56.

[61] VantageScore Solutions, *FDIC New Definition of High Risk Consumer Loan Securities* (July 2013), https://paperzz.com/doc/8033743/fdic-new-definition-of-high-risk-consumer-loan- and-securi. l

that TransUnion's two major competitors, Experian and Equifax, had already agreed to materially similar new contracts with Fair Isaac."[62] Thus, on information and belief, the same anticompetitive provisions that exist in the ADLA also exist in the agreements between Experian and Fair Isaac and TransUnion and Fair Isaac. The allegations that follow therefore apply to all three CB Defendants.

**ANSWER:** FICO admits that Plaintiffs' allegations pertaining to the ADLA are largely based upon TransUnion's counterclaim allegations, which mischaracterize the terms of the ADLA, as well as the negotiations between FICO and TransUnion related to the ADLA. FICO denies the remaining allegations in Paragraph 123.

124. On information and belief, Fair Isaac informed all three CBs that the others had entered or would enter into the same anticompetitive contracts, and the CBs would not have agreed to the anticompetitive restrictions without assurance that each other CB would agree to and abide by the restrictions.[63]

**ANSWER:** FICO denies the allegations in Paragraph 124.

125. The restraints imposed in the contracts consist primarily of: (a) "No Equivalent Products" provisions; and (b) "Dynamic Royalty Schedule" provisions. A third set of provisions, the "Level Playing Field" provisions, compensated the CBs for their agreement not to promote VantageScore under the former provisions at the expense of B2B Purchasers. On information and belief, each of the CBs recognized they were part of the conspiracy because they knew that the other CBs had agreed or would agree to these restrictive terms. Each CB knew at the time they entered into the agreements with Fair Isaac that these terms undermined VantageScore Solutions, which competed with Fair Isaac and were therefore against their own individual as well as collective economic self-interest. And each Credit Bureau complied with and enforced the anticompetitive provisions in the contracts as part of the broader conspiracy.

**ANSWER:** FICO admits that the ADLA contains section headings titled "No Equivalent Products," "Dynamic Royalty Schedule," and "Level Playing Field," but denies Plaintiffs' characterizations of those terms or the contractual provisions to which they relate. FICO denies the remaining allegations in Paragraph 125. Answering further, FICO states that Plaintiffs' conspiracy allegations and Section 1 claims have been dismissed.

---

[62] TransUnion Counterclaims, ¶ 43.

[63] See *id.*

### i.     The "No Equivalent Products Clause"

126.     The "No Equivalent Products" clause is located at Section 12.5 of the ADLA between Fair Isaac and TransUnion. This clause provides that TransUnion may not "internally develop" a credit scoring system that is "aligned to the odds-to-score relationship of any Fair Isaac Analytic" or uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic. Section 12.5 of the ADLA further prohibits TransUnion from distributing "any competing analytic" (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes. The Section also expressly names VantageScore Solutions, LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."[64]

**ANSWER:** The allegations in Paragraph 126 state legal conclusions to which no response is required, but, to the extent a response is required, FICO admits that Section 12.5 of the ADLA between FICO and TransUnion is titled "No Equivalent Products" and that Section 12.5 contains the excerpted language that is partially quoted in Paragraph 126, but denies that the excerpted language is presented in full and complete context. Moreover, the allegations in Paragraph 126 do not include all relevant language from Section 12.5 or accurately characterize the meaning and effect of that provision. FICO denies the remaining allegations in Paragraph 126.

127.     On information and belief, Fair Isaac has imposed similar or identical "No Equivalent Products" clauses on Equifax and Experian. Thus, these CBs have agreed to and acquiesced in these anticompetitive agreements and the resulting anticompetitive effects.

**ANSWER:** FICO admits that there are provisions titled "No Equivalent Products" in its license agreements with Equifax and Experian, and that the provisions are similar but not identical. FICO denies the remaining allegations in Paragraph 127.

128.     Fair Isaac's "No Equivalent Products" clause has effectively blocked the CBs from offering alternative credit scoring products, such as VantageScores, which would allow business customers in the B2B Credit Score Market to switch from FICO Scores without incurring the significant switching costs that using a new scoring system would entail. It also prevents the use of VantageScore or other credit scoring systems alongside or interchangeably with FICO Scores without the business customer incurring those same switching costs.

---

[64] Id., ¶44.

**ANSWER:** The allegations in Paragraph 128 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

129. The "No Equivalent Products" clause thus protects and sustains Fair Isaac's monopoly.

**ANSWER:** The allegations in Paragraph 129 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

130. For example, if an alternative credit scoring product such as VantageScore used a score of 700 to indicate a less-than-five-percent risk of credit delinquency, and if a FICO Score of 700 also indicated the same risk of delinquency, the "No Equivalent Products" clause would prevent a CB from distributing the competing product. Similarly, if a competing credit score product used reason codes that match 20% of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause would prohibit a CB from distributing the product.

**ANSWER:** The allegations in Paragraph 130 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

131. Due to years of Fair Isaac's dominance, many business customers of credit scores have modeled and designed their internal systems for FICO Scores. These business customers' systems, models, and processes are calibrated to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data that it collects internally, and automatically produce a lending decision. The "No Equivalent Products" clause effectively prohibits the CBs from selling an alternative to FICO's credit scores since those scores would have to be incompatible with many businesses' existing systems. Thus, they are prevented from providing business customers a legitimate choice between using FICO Scores and an alternative score.

**ANSWER:** FICO admits, upon information and belief, that some business end-users have used credit scores, including FICO Scores and other credit scores, in connection with their systems, models, and processes, but denies that such use impedes competition from other credit scoring models. FICO lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 131 pertaining to how a hypothetical bank's software "might be designed" and, on that basis, denies them. FICO denies the remaining allegations in Paragraph 131.

132.    Notably, the "No Equivalent Products" clause does not sustain Fair Isaac's intellectual property. Rather, it protects and sustains Fair Isaac's monopoly. For example, the odds-to-score relationship is not protectable intellectual property. It is the arbitrary assignment of a number (score) to a related risk probability. The intellectual property entitled to protection in this product market is the analysis and the process used to predict a consumer's risk of default, not the shorthand numerical representation of a "less than-five-percent-risk-of-default" as "700."

**ANSWER:** The allegations in Paragraph 132 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

133.    Similarly, the reason codes that are prohibited from matching Fair Isaac's, under the "No Equivalent Products" clause, were not invented by Fair Isaac. Rather, there is an established set of reason codes that reflect well-established industry measures of creditworthiness.

**ANSWER:** FICO denies the allegations in Paragraph 133.

134.    The "No Equivalent Products" clause was effective because when one CB stops using VantageScore, it becomes even less attractive to the other CBs. B2B purchasers will not want to use a credit scoring system unless all of the main CBs use it. This phenomenon is often referred to as the "network effect." Presumably, the CBs coordinated through VantageScore in the first place due to the network effect, *i.e.*, to ensure that B2B purchasers would want to use their new credit scoring product. Fair Isaac exploited this effect to attempt to destroy VantageScore Solutions and its VantageScore product. By imposing a "No Equivalent Products" term, Fair Isaac sought to block the CBs from enabling B2B purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems and from using VantageScore alongside or interchangeably with FICO Scores.

**ANSWER:** FICO denies the allegations in Paragraph 134.

135.    By agreeing to the "No Equivalent Products" provisions, the CBs agreed among themselves and with Fair Isaac to eliminate or drastically reduce the competitive threat posed by VantageScore, thus preserving and strengthening FICO's monopoly.

**ANSWER:** FICO denies the allegations in Paragraph 135. Answering further, FICO states that Plaintiffs' conspiracy allegations and Section 1 claims have been dismissed.

### ii.    The "Dynamic Royalty Schedule"

136.    Fair Isaac's contracts with each Credit Bureau include a similar or identical "Dynamic Royalty Schedule" clause that allowed Fair Isaac to replace its existing royalty with a new one and thereby gave Fair Isaac the ability to control the prices of FICO Scores. The "Dynamic Royalty Schedule" is detailed in Section 9.2 of the ADLA between Fair Isaac and TransUnion. This provision states that "once every twelve (12) months during the Term, Fair Isaac shall have

the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing."[65]

**ANSWER:** The allegations in Paragraph 136 state legal conclusions to which no response is required, but, to the extent a response is required, FICO admits that Section 9.2 of the ADLA between FICO and TransUnion is titled "Dynamic Royalty Schedule" and that Section 9.2 contains the excerpted language that is partially quoted in Paragraph 136, but denies that the excerpted language is presented in full and complete context. Moreover, the allegations in Paragraph 136 do not include all relevant language from Section 9.2 or accurately characterize the meaning and effect of that provision. FICO further admits that its agreements with Equifax and Experian also contain provisions that use the heading "Dynamic Royalty Schedule"; however, those provisions are not identical to Section 9.2 of the ADLA between FICO and TransUnion. FICO denies the remaining allegations in Paragraph 136.

137.    According to TransUnion, "Fair Isaac has abused and exploited this provision in 2015, 2016, and 2017 by not only raising prices, but also introducing entirely new and non-negotiated contract terms, royalty categories, and definitions."[66]

**ANSWER:** FICO admits that TransUnion made an allegation in Paragraph 50 of its counterclaim that contains the statement quoted in Paragraph 137, but denies the substance of TransUnion's allegation. FICO denies the remaining allegations in Paragraph 137.

138.    In 2015, Fair Isaac inserted a new "Pre-Qualification" royalty category into its contracts with CBs. "Pre-Qualification" is defined as "an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category created a distinction between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any credit score or credit data to consumers, and (2) lenders that use FICO Scores for "Pre-Qualification" while also providing credit scores or credit data to consumers "in connection" with the "Pre-Qualification."

---

[65] TransUnion Counterclaims, ¶ 50.

[66] *Id.*

**ANSWER:** The allegations in Paragraph 138 contain legal conclusions to which no response is required, but, to the extent a response is required, FICO admits that a "Pre-Qualification" royalty category was introduced in late 2015 and applied to FICO Scores used to qualify a potential consumer customer for a lender's own internal lending offering when such use case occurred in connection with the online disclosure of credit data or a credit score to the consumer. Answering further, FICO states that the allegations in Paragraph 138 that purport to quote from the portion of FICO's royalty schedules that pertain to the Pre-Qualification royalty category introduced in late 2015 do not include all relevant language or accurately characterize the meaning and effect of that provision. FICO denies the remaining allegations in Paragraph 138.

139.   As an incentive, some business customers in the B2B Credit Score Market provide to their consumer customers, to whom they are often offering credit, the opportunity to receive their personal credit score. This can serve as a valuable marketing tool for the business customers.

**ANSWER:** FICO admits, upon information and belief, that some businesses disclose credit scores to consumers in connection with making credit offers. The allegations in Paragraph 139 pertaining to the alleged "B2B Credit Score Market" state legal conclusions to which no response is required, but, to the extent a response is required, they are denied. FICO lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 139 and, on that basis, denies them.

140.   Under Fair Isaac's contracts with the CBs, the royalty price paid to Fair Isaac for use of its FICO Score for "Pre-Qualification" is directly tied to whether credit scores or credit data are provided to consumers. There is a lower per-score royalty rate if a business customer purchases a FICO Score for use in "Pre-Qualification" and does not provide any credit score or credit data to their consumer customer "in connection" with the "Pre-Qualification." If the lender purchases a FICO score for use in 'Pre-Qualification' and provides a VantageScore (or any other credit score) to the consumer 'in connection' with the 'Pre- Qualification,'" Fair Isaac charges the lender a seven times penalty rate for that FICO Score. That steep penalty is meant to dissuade lenders from providing competing credit scores, such as a VantageScore.[67]

---

[67] *Id.*, ¶ 52.

**ANSWER:** The allegations in Paragraph 140 contain legal conclusions to which no response is required, but, to the extent a response is required, FICO admits that the Pre-Qualification royalty category introduced in late 2015 applied to FICO Scores used to qualify a potential consumer customer for a lender's own internal lending offering when such use case occurred in connection with the online disclosure of credit data or a credit score to the consumer. Answering further, FICO states that Plaintiffs mischaracterize the Pre-Qualification royalty category as creating a "penalty" to be paid by the Credit Bureaus for promoting the use of other credit scores, such as VantageScore. Lenders could always choose to purchase VantageScore credit scores (or any other credit score besides FICO Scores) from the Credit Bureaus and use those other credit scores to qualify potential consumer customers for their own internal lending offerings, in which case the Credit Bureaus would not pay FICO any royalty at all. FICO denies the remaining allegations in Paragraph 140.

141. The higher royalty rate can only be avoided if the business customer exclusively purchases FICO Scores. One way to avoid paying the higher royalty rate is for the business customer to purchase the FICO Score but not provide a credit score or credit data to the consumer. A second way to avoid the higher royalty rate requires the business customer to purchase a bundled FICO product from Fair Isaac and provide the bundled FICO Score to its consumer customer. Fair Isaac offers bundled products to lenders that combine the use of scores designed for use by business customers with the provision of scores to their consumer customers.[68]

**ANSWER:** The allegations in Paragraph 141 state legal conclusions to which no response is required, but, to the extent a response is required, FICO states that Plaintiffs mischaracterize the Pre-Qualification royalty category as creating a "higher royalty" to be paid by the Credit Bureaus for promoting the use of other credit scores, such as VantageScore. Lenders could always choose to purchase VantageScore credit scores (or any other credit score besides FICO Scores) from the Credit Bureaus and use those other credit scores to qualify potential consumer customers for their

---

[68] *Id.*, ¶ 53.

own internal lending offerings, in which case the Credit Bureaus would not pay FICO any royalty

at all. FICO denies the remaining allegations in Paragraph 141.

142. TransUnion accepted, complied with, and made royalty payments according to the new "Pre-Qualification" royalty category. On information and belief, so have the remaining CBs.[69]

**ANSWER:** FICO denies that the Credit Bureaus have paid FICO royalties in accordance

with the Pre-Qualification royalty category as introduced by FICO. Answering further, FICO states

that any payments from the Credit Bureaus for FICO Score usage consistent with or similar to the

Pre-Qualification royalty category have been significantly discounted from the base royalty rates

set by the Pre-Qualification royalty category. FICO denies the remaining allegations in Paragraph

142.

143. The only reason for the higher royalty rate is to force all business customers that participate in "Pre-Qualification" to purchase FICO Scores alone and make it cost prohibitive for business customers that engage in "Pre-Qualification" to provide an alternative credit score to its consumers. There is no legitimate business justification for the higher royalty rate Fair Isaac and the CBs jointly agreed upon for FICO Scores when the business customer also purchases a competing credit score (i.e. VantageScore) to provide its consumer customers. The higher royalty rate has anticompetitive effects and has assisted Fair Isaac in maintaining its monopoly position as, on information and belief, few, if any, business customers have opted to pay the higher royalty rate.

**ANSWER:** FICO denies the allegations in Paragraph 143.

144. According to TransUnion, "[t]his scheme has been effective, and no B2B Purchasers from TransUnion have opted to pay the penalty rate."[70] The purpose and effect of this clause was to prevent VantageScore from obtaining market share.

**ANSWER**: FICO denies the allegations in Paragraph 144. Answering further, FICO states

that the Pre-Qualification royalty category applies to the royalty that FICO charges to the Credit

Bureaus; it does not set the price that so-called "B2B Purchasers" pay to the Credit Bureaus for

---

[69] See *id.*, ¶ 55.

[70] *Id.*, ¶ 54.

FICO Scores, which are established pursuant to separate contractual agreements between "B2B Purchasers" and the Credit Bureaus.

### iii.     The "Level Playing Field"

145.    In exchange for agreeing to the "No Equivalent Products" and "Dynamic Royalty" provisions in their agreements with Fair Isaac - which effectively prevent the CBs from marketing VantageScore to B2B purchasers - Fair Isaac committed not to offer any CB a more favorable price for FICO Scores than any other CB. This commitment was embodied in the "Level Playing Field" clauses of the agreements with the CBs. Those provisions forbid Fair Isaac to charge any CB a price that is lower than the price it charges any other CB.[71]

**ANSWER:** FICO admits that the ADLA between it and TransUnion contains provisions under the heading "Level Playing Field," which require FICO to offer TransUnion the most favorable royalty pricing on FICO Scores distributed by TransUnion pursuant to the ADLA that FICO has agreed to in writing with Equifax or Experian, subject to additional terms and conditions. FICO further admits that its license agreements with Equifax and Experian also include requirements to offer each Credit Bureau the most favorable royalty pricing on FICO Scores distributed pursuant to those agreements that FICO has agreed to in writing with either of the other two national Credit Bureaus, subject to additional terms and conditions. FICO denies the remaining allegations in Paragraph 145.

146.    The CBs advanced Fair Isaac's interests by agreeing to the No Equivalent Products and Dynamic Royalty Schedule clauses, which sabotaged the CBs' own competing VantageScore and gave FICO flexibility to raise prices. The Level Playing Field clause, in return, protected the CB s from the risk that Fair Isaac would grant discounts that could expose them to the risk of losing market share to their competitors. As Fair Isaac has pointed out, the CBs faced "the threat that independent scoring algorithm vendors, such as Fair Isaac, will facilitate the entry of new Credit Bureaus."[72] But by agreeing to the Level Playing Field provisions, Fair Isaac deprived itself of the only way of carrying out that threat – by offering new credit bureaus prices lower than those it

---

[71] See *id.*, ¶ 59.

[72] *See* Third Amended Complaint, Dkt. 436, *Fair Isaac Corporation v. Experian Info. Sols.*, No. 06-CV-4112 (D. Minn. Nov. 10, 2008), ¶ 140.

charges the incumbent CBs. Thus, the CBs have secured from Fair Isaac a significant source of protection from future competition in the market for the sale of credit reports to B2B Purchasers.

**ANSWER:** FICO admits that the ADLA between it and TransUnion contains provisions under the heading "Level Playing Field," which require FICO to offer TransUnion the most favorable royalty pricing on FICO Scores distributed by TransUnion pursuant to the ADLA that FICO has agreed to in writing with Equifax or Experian, subject to additional terms and conditions. FICO further admits that its license agreements with Equifax and Experian also include requirements to offer each Credit Bureau the most favorable royalty pricing on FICO Scores distributed pursuant to those agreements that FICO has agreed to in writing with either of the other two national Credit Bureaus, subject to additional terms and conditions. FICO further admits that the quoted statement in Paragraph 146 appears in FICO's Third Amended Complaint in the 2006 litigation, but the statement is taken out of context and does not support Plaintiffs' allegations. Among other things, the alleged "Level Playing Field" does not prevent FICO from offering lower royalty pricing to a "new" Credit Bureau, should one emerge, compared to the three existing Credit Bureaus, and, therefore, it does not protect the incumbent Credit Bureaus from future competition in any alleged market for the sale of credit reports to so-called "B2B Purchasers." FICO denies the remaining allegations in Paragraph 146.

147.    Moreover, the Level Playing Field clause reduced price competition among the CBs. As Fair Isaac has pointed out, "a Credit Bureau could not be sure what its competitors' costs were and, consequently, to what extent its competitors could cut the price of their Credit Scores. This uncertainty could be used by Lenders to induce price competition among the Credit Bureaus." Fair Isaac claimed in its earlier lawsuit that the CBs sought to use VantageScore so that "each Credit Bureau will know that it is paying exactly the same cost as its competitors for its scoring algorithm, and Lenders will no longer be able to use this uncertainty to play one Credit Bureau against the others."[73] In a rich irony, the Level Playing Field provision does exactly what Fair Isaac accused the CBs of trying to accomplish through VantageScore: prevent their customers from playing one CB against the others, thereby reducing price competition for credit reports.

---

[73] *Id.*, ¶ 138.

**ANSWER:** FICO admits that the quoted statements in Paragraph 147 appear in FICO's Third Amended Complaint in the 2006 litigation, but the statements are taken out of context and do not support Plaintiffs' allegations. The allegations in Paragraph 147 pertaining to a purported reduction in "price competition" among the Credit Bureaus state legal conclusions to which no response is required, but, to the extent a response is required, they are denied. FICO denies the remaining allegations in Paragraph 147.

148.     The "Level Playing Field" section of the ADLA between Fair Isaac and TransUnion is located in Section 9.16. This provision mandates that the prices that are made available to TransUnion will also be made available to other CBs.

**ANSWER:** FICO admits that Section 9.16 of the ADLA between FICO and TransUnion is titled "Level Playing Field," which requires FICO to offer TransUnion the most favorable royalty pricing on FICO Scores distributed by TransUnion pursuant to the ADLA that FICO has agreed to in writing with Equifax or Experian, subject to additional terms and conditions. FICO denies the remaining allegations in Paragraph 148.

149.     On information and belief, Fair Isaac's contracts with Equifax and Experian include similar or identical "Level Playing Field" clauses.

**ANSWER:** FICO admits that its agreements with Equifax and Experian contain provisions that use the heading "Level Playing Field," which include requirements to offer each Credit Bureau the most favorable royalty pricing on FICO Scores distributed pursuant to those agreements that FICO has agreed to in writing with either of the other two national Credit Bureaus, subject to additional terms and conditions. FICO denies the remaining allegations in Paragraph 149.

150.     Collectively, the "Dynamic Royalty Schedule" and "Level Playing Field" clauses allow Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores.

**ANSWER:** The allegations in Paragraph 150 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

151.    The "Level Playing Field" and "Dynamic Royalty Schedule" clauses disincentivize CBs from negotiating for lower royalty prices for Fair Isaac's FICO Scores, because the CBs will not obtain a competitive advantage if they were to obtain lower pricing for royalty rates. The "Level Playing Field" clause does not provide Fair Isaac with any rights it does not have. Fair Isaac could offer the same royalty rates to all CBs absent the clause. The "Level Playing Field" clause exists to inform the CBs that negotiating for lower prices is useless.

**ANSWER:** FICO denies the allegations in the first sentence of Paragraph 151. FICO admits that, absent the "Level Playing Field" provision, it could hypothetically offer the same royalty pricing to the Credit Bureaus subject to the terms and conditions set forth in its license agreements with each Credit Bureau; however, the "Level Playing Field" provision does not decrease the Credit Bureaus' ability or incentive to bargain for lower prices. FICO denies the remaining allegations in Paragraph 151.

152.    Notably, while TransUnion complained in its suit against Fair Isaac that the Level Playing Field provision raised costs for the CBs, it admitted that, to the extent the provision resulted in higher rates, those costs were ultimately also borne by "banks [and] mortgage lenders" (*i.e.*, B2B purchasers).[74] While the CBs' agreement to the restrictive terms was against their self-interest, much of the cost was borne by B2B purchasers, while the CBs were otherwise compensated by the Level Playing Field provisions.

**ANSWER:** The allegations in Paragraph 152 state legal conclusions to which no response is required, but, to the extent a response is required, FICO admits that TransUnion made an allegation in Paragraph 60 of its counterclaim that contains the excerpted statement quoted in Paragraph 152, but denies the substance of TransUnion's allegation. FICO denies the remaining allegations in Paragraph 152.

153.    Fair Isaac and the CBs have used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in their contracts for anticompetitive purposes and to extract monopoly prices from all business customers in the B2B Credit Score Market.

**ANSWER:** The allegations in Paragraph 153 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

---

[74] TransUnion Counterclaims, ¶60.

### 3. Fair Isaac's Negative Advertising Campaign in Furtherance of its Scheme

154. Having successfully induced the CBs to agree with Fair Isaac and with each other to impose restrictions on VantageScore's ability to compete with FICO, Fair Isaac also engaged in an advertising campaign that disseminated false and misleading information with the goal of maintaining its monopoly in the B2B Credit Score Market. In advertisements, letters, and blog posts, Fair Isaac disparaged VantageScore and other credit scoring systems by calling them "FAKO" scores, falsely claimed that VantageScore and other alternative scoring systems do not reliably measure creditworthiness, and misrepresented the information considered by VantageScore and other credit scoring systems.

**ANSWER:** The allegations in Paragraph 154 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

155. For example, on December 12, 2017 Fair Isaac took out a full-page advertisement in the *Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates." This advertisement that attacked VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative credit score, which the is owned by CBs. According to the advertisement, the credit score owned by CBs (impliedly VantageScore) is less reliable than FICO Scores in evaluating credit risk and does not use "sound practices" or "science-based credit evaluation." This advertisement conveyed Fair Isaac's false message that VantageScore is "Weakening scoring standards, [and] harm[ing] consumers, and the lending system."[75]

**ANSWER:** FICO admits that it placed an advertisement in *The Wall Street Journal* in December 2017 that was addressed to "Lenders, Policymakers and Consumer Advocates" and that the excerpted quoted statements in Paragraph 155 appear in that advertisement, but denies that the quoted statements are presented in their full and complete context. The allegations in Paragraph 155 pertaining to the purported "disparagement" of VantageScore and the "B2B Credit Score Market" state legal conclusions to which no response is required, but, to the extent a response is required, they are denied. FICO denies the remaining allegations in Paragraph 155.

156. Furthermore, the *Wall Street Journal* advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that links visitors to articles and blog posts that disparage VantageScore by name. One of these blog post claims: "Despite claims by

---

[75] TransUnion Counterclaims, ¶ 66

VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

**ANSWER:** FICO admits that the December 2017 *Wall Street Journal* advertisement contains the excerpted quoted statements in the first sentence of Paragraph 156 and that www.fico.com is a "FICO-owned website," but denies that the statement is accurate or reliable for any purpose. FICO further admits that a blog post published on www.fico.com/independent includes the quoted statement in the second sentence of Paragraph 156, but denies that the quoted statement is presented in its full and complete context. The allegations in Paragraph 156 pertaining to the purported "disparagement" of VantageScore state legal conclusions to which no response is required, but, to the extent a response is required, they are denied. FICO denies the remaining allegations in Paragraph 156.

157. Another example or Fair Isaac's false and misleading advertising campaign can be found on its website where a blog post claims that "Research results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance." This statement is false and misleading. VantageScore and other scoring models consider an individual consumer or business's full credit and financial history, even if the consumer has not used a traditional credit line in the last six months. Further, studies have shown that VantageScore and other competing credit scoring models are strongly predictive.[76]

**ANSWER:** FICO admits that an article published on www.fico.com in November 2015, which is attributed to Ethan Dornhelm, then FICO's Vice-President of FICO Scores and Predictive Analytics, contains the quoted statement in the first sentence of Paragraph 157, but denies that the quoted statement is presented in its full and complete context. The allegations in Paragraph 157 pertaining to the purported "disparagement" of VantageScore state legal conclusions to which no response is required, but, to the extent a response is required, they are denied. FICO denies the remaining allegations in Paragraph 157.

---

[76] *See* VantageScore Report, *supra* n.44, at 2, 4, 5-6

158.    A blog post written by Joanne Gaskin ("Gaskin"), the Vice President of Scores and Analytics at Fair Isaac, claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not."[77] TransUnion responded "This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non- medical ones."[78]

**ANSWER:** FICO admits that a 2017 blog post attributed to Joanne Gaskin contains the

excerpted quoted statement in the first part of the first sentence of Paragraph 158, denies that the

statement is presented in its full and complete context. FICO further admits that TransUnion's

counterclaim allegations are repeated in the second part of the first sentence of Paragraph 158 but

denies the substance of TransUnion's allegations. FICO denies the allegations in the second

sentence of Paragraph 158. FICO lacks sufficient knowledge or information to admit or deny the

allegations in the third and fourth sentences of Paragraph 158 and, on that basis, denies them. FICO

denies the remaining allegations in Paragraph 158.

159.    Similarly, Fair Isaac fought hard against the efforts to create a process that would allow alternative credit scoring models to be validated and approved by Fannie Mae and Freddie Mac when they purchase mortgages. Such a rule would clearly benefit VantageScore, which could then attempt to break Fair Isaac's 100% monopoly in this sector. Public sentiment favored this move.[79] Fair Isaac did not. Indeed, it deployed Gaskin to give press interviews saying that Fair Isaac's alleged monopoly is a "myth."[80] Fair Isaac also hired a research group to present the argument that VantageScore's promise of home ownership to millions more Americans was deceptive and that the company's ownership by the CBs was anticompetitive, an argument that

---

[77] Joanne Gaskin, FICO BLOG, *Truth Squad: Is FICO Score 700 the Same as VantageScore 700?* (Feb. 6, 2017), https://www.fico.com/blogs/truth-squad-fico-score-700-same-vantagescore- 700.

[78] TransUnion Counterclaims, ¶ 71.

[79] *See* Bloomberg Business News, *This Monopoly Is Holding Back the Mortgage Market*, (Jan. 18, 2018), https://www.bloomberg.com/opinion/articles/2018-01-18/this-credit-score-    monopoly-is-holding-back-the-mortgage-Paul Weinstein, Jr., *No Company Should Have a Monopoly on Credit Scoring*, The Hill (Dec. 7,2017),    https://thehill.com/opinion/finance/363755-no-company-should-have-a-monopoly-on-credit-scoring.

[80] *FICO: The 'Credit Score Monopoly' is a Myth*, DS News (Dec. 18, 2015), https://dsnews.com/news/12-18-2015/fico-the-credit-score-monopoly-is-a-myth.

failed during the trademark litigation discussed above.[81] The FHFA ultimately adopted a final rule that permitted rival generators of credit scores to apply to serve Fannie Mae and Freddie Mac, saying that "FHFA has concluded that allowing all credit score model developers to submit applications is more consistent with [the applicable statute], which does not prevent any credit score model from being considered for potential use in the mortgage market."[82]

**ANSWER:** FICO admits that the Federal Housing Finance Agency ("FHFA") issued a final rule in August 2019 regarding the validation and approval of credit scoring models by Fannie Mae and Freddie Mac (the "Enterprises") and that the quoted statements in the final sentence of Paragraph 159 appear in the final rule, but denies that the quoted statement is presented in its full and complete context. FICO further admits that FHFA rules and regulations determine the eligibility of credit scoring models used by the Enterprises. FICO denies that "public sentiment" uniformly supported the FHFA's decision to allow VantageScore to submit its credit scoring system for validation and approval by the Enterprises. Answering further, FICO states that its position regarding the aforementioned FHFA rulemaking process, and the outcome thereof, is a matter of public record. FICO further admits that an article was published in December 2015 on the website www.dsnews.com with the title "FICO: The 'Credit Score Monopoly' is a Myth" and that the article includes statements purportedly attributed to Joanne Gaskin. FICO further admits that research sponsored by FICO was published in December 2017 by the research firm Quantilytic, LLC, but the allegations in Paragraph 159 do not accurately or completely describe the research and its findings. FICO denies the remaining allegations in Paragraph 159.

160.    Fair Isaac's smear campaign against VantageScore was successful in sowing doubt about the reliability and accuracy of credit scoring alternatives to FICO Scores. For example, a

---

[81] Quantilytic LLC, *Risks and Opportunities in Expanding Mortgage Credit Availability Through New Credit Scores*, at 22 (Dec. 2017), https://www.progressivepolicy.org/wp-content/uploads/2017/12/UpdatedCreditScoring_2017.pdf (research sponsored by Fair Isaac).

[82] Fed. Hous. Fin. Agency, *Validation and Approval of Credit Score Models Final Rule*, 12 C.F.R. 1254 (Aug. 16, 2019).

media outlet devoted to personal finance issues, thebalance.com, posted in February 2017 that, "If you purchased your credit score from anywhere but MyFICO.com, then it's a FAKO score."

**ANSWER:** FICO admits that other stakeholders in the credit reporting industry have recognized that it can be misleading for lenders to use FICO Scores to determine whether to offer credit to a consumer but show a different credit score, such as VantageScore, to the consumer for educational purposes. FICO further admits that the quoted statements in Paragraph 160 appear in content published on the website www.thebalance.com, but the statements are taken out of context and do not support Plaintiffs' allegations. FICO denies the remaining allegations in Paragraph 160.

161. The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

**ANSWER:** The allegations in Paragraph 161 state legal conclusions to which no response is required, but, to the extent a response is required, FICO lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 161 and, on that basis, denies them.

### F. Fair Isaac's Anticompetitive Conduct Has Harmed Competition

162. Fair Isaac's anticompetitive conduct has harmed and continues to harm business customers in the B2B Credit Score Market. Fair Isaac's unlawful conduct, including conduct taken in concert with the CBs, has foreclosed competition in the B2B Credit Score Market by eliminating fair opportunities for the major CBs to sell VantageScore or any other competing credit score product to B2B purchasers. This anticompetitive and exclusionary conduct has maintained Fair Isaac's monopoly and allowed it to charge supracompetitive prices for B2B credit scores to B2B purchasers during the Class Period.

**ANSWER:** The allegations in Paragraph 162 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

163. FICO's Scores business operates with an incredibly high operating margin of 86%.[83] To maximize its monopoly rent, Fair Isaac has increased its prices for FICO Scores significantly in recent years. In 2018, FICO implemented a special pricing increase for mortgage

---

[83] Jose Karlo Mari Tottoc, Yahoo! Finance, *Headwaters Capital: 'Fair Isaac Corp (FICO) Can Grow Its Free Cash Flow by 15-20% Annually'* (Jan. 23, 2021), https://finance.yahoo.com/ news/headwaters-capital-fair-isaac-corp-202237954.html.

customers that was an approximately 75% increase from $0.06/score to $0.10/score.[84] In the following two years, FICO again rolled out special pricing increases to its auto customers and to some credit card customers.[85]

**ANSWER:** FICO denies the allegations in the first sentence of Paragraph 163. To the extent the operating "margin" associated with the license of FICO's credit scoring models could be estimated at or about 86%, that is not "incredibly high" compared to operating margins reported by other companies that develop and license proprietary software. FICO admits that, over the last several years in the ordinary course of business, it has increased the base (*i.e.*, undiscounted) royalty prices that it charges to the Credit Bureaus pursuant to the processes set forth in its agreement with each Credit Bureau, including for mortgage and auto loan origination use cases. FICO lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 163 pertaining to unspecified royalty price increases related to "some credit card" use cases and, on that basis, denies them. FICO denies that any of its royalty prices constitute "monopoly rents" or that such royalties are charged "to" business end-users; FICO's royalties are charged to the Credit Bureaus. FICO denies the remaining allegations in Paragraph 163.

164. Fair Isaac's conduct, in concert with the CBs, including through the agreements contained in contracts between the CBs and Fair Isaac, has reduced choice for business customers in the B2B Credit Score Market and frustrated the ability of business customers to purchase VantageScore or any other competing credit score. As a direct and proximate result of Fair Isaac's exclusionary and anticompetitive conduct, Fair Isaac has been able to indirectly charge Plaintiffs and all similarly situated businesses supracompetitive prices for credit scores. As indirect buyers of Fair Isaac's FICO Scores, Plaintiffs and all similarly situated business have been harmed by Fair Isaac's supracompetitive royalty prices.

**ANSWER:** The allegations in Paragraph 164 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

165. Fair Isaac's sales in the B2B Credit Score Market over the past five fiscal years have been extremely profitable. Fair Isaac maintains a supracompetitive profit margin on the

---

[84] *Id.*

[85] *Id.*

revenue it earns from its Business Credit Scoring Products. Plaintiffs and similarly situated businesses have vastly overpaid for FICO Scores due to Fair Isaac's anticompetitive activities.

**ANSWER:** FICO denies the allegations in Paragraph 165.

## V. CLASS ACTION ALLEGATIONS

166. Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All end-users who purchased a FICO Score in the B2B Credit Score Market from anyone other than Fair Isaac and/or a Credit Bureau from October 1, 2006 through the present (the "Class Period").

**ANSWER:** The allegations in Paragraph 166 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Nationwide Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 166.

167. Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws, as well as the law of unjust enrichment on behalf of the following class (the "Damages Class"):

> All end-users who in Indirect Purchaser States[86] purchased a FICO Score in the B2B Credit Score Market from anyone other than Fair Isaac and/or a Credit Bureau from October 1, 2006 through the present (the "Class Period").

**ANSWER:** The allegations in Paragraph 167 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Damages

---

[86] The "Indirect Purchaser States" are the states and Districts listed in the Seventh, Eighth and Ninth Claims for Relief.

Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 167.

168. The Nationwide Class and the Damages Class are referred to herein as the "Classes."

**ANSWER:** The allegations in Paragraph 168 contain a definition to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Nationwide Class" or "Damages Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 168.

169. These class definitions exclude any and all natural persons who are not members of these Classes by their definitions. Also excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased FICO Scores directly or for resale.

**ANSWER:** The allegations in Paragraph 169 contain a definition to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Classes" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 169.

170. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least thousands of members in each Class. Members of the Classes are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Classes are readily identifiable from information and records in the possession of Defendants.

**ANSWER:** The allegations in Paragraph 170 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Classes" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 170.

171.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and members of the Classes were damaged by the same wrongful conduct of Defendants.

**ANSWER:** The allegations in Paragraph 171 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Classes" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 171.

172.    The interests of Plaintiffs are coincident with, and not antagonistic to, those of members of the Classes.

**ANSWER:** The allegations in Paragraph 172 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Classes" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 172.

173.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

**ANSWER:** The allegations in Paragraph 173 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Classes" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 173.

174.    Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Classes as a whole appropriate. Questions of law and fact common to members of the Classes include, but are not limited to:

a.      whether Fair Isaac monopolized, and whether Defendants conspired to monopolize or unreasonably restrain, trade in violation of federal law;

66

b.      whether Fair Isaac monopolized, and whether Defendants conspired to monopolize or unreasonably restrain, trade in violation of certain state antitrust laws;

c.      whether Defendants engaged in unfair or deceptive trade practices in violation of certain state laws;

d.      whether Defendants were unjustly enriched to the detriment of Plaintiffs and members of the Classes, thereby entitling Plaintiffs and members of the Classes to disgorgement of all benefits derived by Defendants;

e.      what was the duration of the alleged unlawful conduct;

f.      what injury was suffered by Plaintiffs and members of the Classes;

g.      what damages were suffered by Plaintiffs and members of the Classes; and

h.      whether Defendants acted or refused to act on grounds generally applicable to members of the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Classes as a whole.

**ANSWER:** The allegations in Paragraph 174 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Classes" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 174.

175.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

**ANSWER:** The allegations in Paragraph 175 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Classes" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 175.

176.    The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be

pursued individually, substantially outweighs potential difficulties in management of this class action.

**ANSWER:** The allegations in Paragraph 176 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Classes" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 176.

177.    The prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**ANSWER:** The allegations in Paragraph 177 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Classes" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 177.

178.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

**ANSWER:** The allegations in Paragraph 178 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Classes" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 178.

179.    Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

**ANSWER:** The allegations in Paragraph 179 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established

or can establish the prerequisites to certification and/or maintenance of the alleged "Classes" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 179.

180. Plaintiffs have defined members of the Classes based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

**ANSWER:** The allegations in Paragraph 180 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Classes" pursuant to Rule 23 of the Federal Rules of Civil Procedure and, on that basis, denies the allegations in Paragraph 180.

## VI. STATUTES OF LIMITATION AND TOLLING

181. Plaintiffs had no knowledge of the scheme or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) February 12, 2018, the date that TransUnion filed its Counterclaims against Fair Isaac. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in an anticompetitive scheme or conspiracy involving the distribution of credit scores.

**ANSWER:** The allegations in Paragraph 181 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

182. Defendants repeatedly and expressly stated throughout the Class Period, including on their public websites, that they maintained policies that prohibited the type of anticompetitive conduct alleged in this Consolidated Complaint. For example:

a. Fair Isaac's Code of Business Conduct and Ethics states: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices."[87]

---

[87] Fair Isaac, *Code of Business Conduct and Ethics*, https://fico.gcs-web.com/static- files/ed6519a4-2148-4166- 82f2-4636e0713531.

b.      Equifax's Code of Ethics and Business Conduct states: "We believe in free and open competition and never engage in improper practices that may limit competition."[88]

c.      Experian's Code of Conduct states: "We will not engage in any form of agreement with competitors to fix prices, rig bids, allocate customers and/or restrict supply in the marketplace." "We will comply with all applicable laws, rules, and regulations in every jurisdiction in which we operate, including but not limited to . . . antitrust/competition."[89]

d.      TransUnion's Code of Business Conduct states: "All TransUnion Team Members must understand the extent to which competition and antitrust laws affect their daily work. You must fully and consistently comply with applicable competition and antitrust laws.[90]

**ANSWER:** The allegations in Paragraph 182 state legal conclusions to which no response is required, but, to the extent a response is required, FICO admits that its Code of Business Conduct and Ethics contains the quoted statements in Paragraph 182(a), but denies that the quoted statements are presented in their full and complete context. However, FICO is without sufficient knowledge or information to admit or deny whether such statements appeared in the Code of Business Conduct "throughout the Class Period," which purports to span between October 1, 2006 and "the present," thus potentially stretching into periods after the date of FICO's answer. FICO lacks sufficient knowledge or information to admit or deny the allegations in Paragraphs 182(b)-(d) and, on that basis, denies them. FICO denies that any general statement in its Code of Business Conduct and Ethics operated to prevent Plaintiffs from discovering the alleged basis for their claims. FICO denies the remaining allegations in Paragraph 182.

183.    It was reasonable for Plaintiffs and members of the Classes to believe that Defendants were complying with their own policies.

---

[88]  Equifax, *Code of Ethics and Business Conduct* (Aug. 2019), https://assets.equifax.com/ assets/corp/code_of_ethics.pdf.

[89]  Experian, *Our Code of Conduct* (2019), https://www.experian.com/content/dam/ marketing/na/assets/corp/procurement-documents/experian-code-of-conduct-final-board- approved.pdf.

[90]  TransUnion, *Code of Business Conduct* (2017), https://investors.transunion.com/~/media/ Files/T/Transunion-IR/governance-documents/code-of-business-conduct-150618.pdf.

**ANSWER:** The allegations in Paragraph 183 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that any general statement in its Code of Business Conduct and Ethics operated to prevent Plaintiffs from discovering the alleged basis for their claims and, on that basis, denies the allegations in Paragraph 183.

184. Moreover, on information and belief, Plaintiffs and members of the Classes could not have discovered the anticompetitive provisions in the licensing agreements between Fair Isaac and the Credit Bureaus, such as the TransUnion ADLA, as those agreements are subject to confidentiality provisions that have prohibited the credit reporting agencies from disclosing their terms to third parties absent written authorization from Fair Isaac.[91]

**ANSWER:** The allegations in Paragraph 184 state legal conclusions to which no response is required, but, to the extent a response is required, FICO denies that any confidentiality provisions in any contractual agreement between FICO and the Credit Bureaus prevented Plaintiffs or members of the putative "Classes" from discovering the alleged basis for their claims, as evidenced by, among other things, the fact that the vast majority of allegations in TransUnion's counterclaim regarding such agreements—which are extensively relied upon by Plaintiffs in their complaint— were filed publicly. FICO denies the remaining allegations in Paragraph 184.

185. For these reasons, the statutes of limitations applicable to Plaintiffs' claims did not begin to run until the date that TransUnion filed its counterclaims against Fair Isaac and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**ANSWER:** The allegations in Paragraph 185 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

186. The doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiffs' claims. During the Class Period, Defendants wrongfully and affirmatively concealed their unlawful conduct. Plaintiffs and members of the Classes had no knowledge of Defendants' unlawful scheme and could not have discovered the scheme through the exercise of reasonable

---

[91] *See* Dkt. 32, Motion for Leave to File Under Seal, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Jan. 22, 2018), ¶ 2 ("contracts between the Parties . . . are subject to confidentiality provisions that prohibit TransUnion from disclosing the terms of the contract to third parties absent written authorization from Fair Isaac").

diligence until (at the earliest) February 12, 2018, when TransUnion filed its Counterclaims against Fair Isaac.

**ANSWER:** The allegations in Paragraph 186 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied. Answering further, FICO states that Plaintiffs' conspiracy allegations have been dismissed, including the allegations in Paragraph 186 pertaining to "Defendants' unlawful scheme."

187. By their very nature, antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants engaged in a secret conspiracy that did not put Plaintiffs or the Classes on inquiry notice that there was a conspiracy that raised the prices for credit scores above the competitive level. Credit scores are not exempt from antitrust regulation, and thus, before TransUnion filed its Counterclaims against Fair Isaac, Plaintiffs reasonably considered the market to be competitive. Moreover, Defendants employed deceptive tactics and techniques to avoid detection of, and to conceal, their anticompetitive scheme.

**ANSWER:** The allegations in Paragraph 187 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied. Answering further, FICO states that Plaintiffs' conspiracy allegations have been dismissed, including the allegations in Paragraph 187 pertaining to "Defendants['] . . . secret conspiracy."

188. Defendants wrongfully and affirmatively concealed the existence of their anticompetitive scheme and conspiracy from Plaintiffs and members of the Classes by, among other things:

a. agreeing to confidentiality provisions that have prohibited the CBs from disclosing the anticompetitive provisions in the licensing agreements between Fair Isaac and the CBs, such as the TransUnion ADLA;

b. concealing the fact that Fair Isaac and the CBs agreed, through the "No Equivalent Products" clause, not to internally develop a competing credit scoring system that is aligned with FICO Scores or uses too many of the same reason codes;

c. concealing the fact that the purpose of the "No Equivalent Products" clause was to prevent the CBs from offering credit scoring products that would allow business-consumers a legitimate choice between FICO Scores and VantageScore or another alternative scoring product, thereby sustaining FICO Scores dominance in the market;

d. concealing the fact that Fair Isaac and the CBs agreed, through the "Level Playing Field" clauses, that prices made available to one credit bureau be made available to all the others;

e.      concealing the fact that the purpose and effect of the "Level Playing Field" and "Dynamic Royalty Schedule" clauses is to disincentivize each CB from negotiating lower royalty prices for FICO Scores; and

f.      engaging in a false and misleading campaign about VantageScore Solutions and VantageScore to misrepresent VantageScore's viability as a competitor to FICO Scores.

**ANSWER:** The allegations in Paragraph 188 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied. Answering further, FICO states that Plaintiffs' conspiracy allegations have been dismissed, including the allegations in Paragraph 188 pertaining to "Defendants['] . . . anticompetitive scheme."

189.    As a result of Defendants' affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiffs and members of the Classes have been and are tolled, and Defendants are equitably estopped from raising statutes of limitations as a defense.

**ANSWER:** The allegations in Paragraph 189 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

## VII.    DEFENDANTS' ACTIONS CONSTITUTE A CONTINUING VIOLATION

190.    In addition, and in the alternative, this Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statute of limitations.

**ANSWER:** The allegations in Paragraph 190 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

191.    A claim accrued for the Class each time FICO Scores were sold to the Class at prices artificially inflated by Defendants' anticompetitive conduct. Each sale of FICO Scores at a supracompetitive price constituted another overt act in furtherance of Defendants' continuing anticompetitive scheme. Moreover, Defendants' statements and actions described above demonstrate that throughout the Class Period they engaged in new overt acts that further served the objectives of their anticompetitive scheme.

**ANSWER:** The allegations in Paragraph 191 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

192.    Defendants' new overt acts were more than the inertial consequences of Defendants' initial violation. Rather, their acts were new and independent acts that perpetuated

their agreement and kept it current with market conditions, including by renewing agreements, or entering into new agreements, with anticompetitive terms. Defendants continuously renewed and refined their agreement to reflect market conditions. With each refinement of their agreement, Defendants inflicted new and accumulating injury on Plaintiffs and members of the Class. For instance, as alleged above, Fair Isaac exploited the ADLA Royalty Schedule Provision in 2015, 2016, and 2017 to introduce entirely new and non-negotiated contract terms, royalty categories, and definitions that expanded the anticompetitive scheme.

**ANSWER:** The allegations in Paragraph 192 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

193.    Therefore, Plaintiffs and members of the Damages Class are entitled to recover damages they suffered during any applicable limitations period.

**ANSWER:** The allegations in Paragraph 193 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

## VIII.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF:**
**UNREASONABLE RESTRAINT OF TRADE**
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

194.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

**ANSWER:** Because the First Claim for Relief has been dismissed, no response to the allegations in Paragraph 194 is required. To the extent a response is required, FICO hereby incorporates its responses to all preceding allegations as if fully set forth herein.

195.    This Claim is brought against all Defendants.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the allegations in Paragraph 195 state legal conclusions in any event, no response is required.

196.    The relevant period of this Claim is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

**ANSWER:** Because The First Claim for Relief has been dismissed and because the allegations in Paragraph 196 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 196.

197.    The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the allegations in Paragraph 197 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 197.

198.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the allegations in Paragraph 198 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 198.

199.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the allegations in Paragraph 199 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 199.

200.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the allegations in Paragraph 200 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 200.

201.    Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). Specifically, Fair Isaac entered into agreements with Equifax, Experian, and TransUnion that contained anticompetitive terms whereby each CB agreed with Fair Isaac to contractual limitations that harmed the ability of the CBs to market VantageScore, a competing product, to Plaintiffs and

members of the Class and forestalled price competition in the B2B Credit Score Market. The CBs agreed to those anticompetitive terms and complied with those terms with the knowledge that the other CBs would also agree to, and comply with, those terms. The CBs and Fair Isaac thus knowingly formed a scheme to unreasonably restrain trade in the B2B Credit Score Market.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the

allegations in Paragraph 201 state legal conclusions in any event, no response is required.

However, to the extent a response is required, FICO denies the allegations in Paragraph 201.

202.    The agreements between Fair Isaac and each of the CBs had substantial anticompetitive effects. The agreements effectively excluded VantageScore Solutions and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the

allegations in Paragraph 202 state legal conclusions in any event, no response is required.

However, to the extent a response is required, FICO denies the allegations in Paragraph 202.

203.    The agreements between Fair Isaac and each of the CBs raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the

allegations in Paragraph 203 state legal conclusions in any event, no response is required.

However, to the extent a response is required, FICO denies the allegations in Paragraph 203.

204.    The acts done by Fair Isaac and each of the CBs as part of, and in furtherance of, their contract, combination, or conspiracy were authorized ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of its affairs.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the

allegations in Paragraph 204 state legal conclusions in any event, no response is required.

However, to the extent a response is required, FICO denies the allegations in Paragraph 204.

205.    The anticompetitive acts were directed at the B2B Credit Score Market in the United States and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the allegations in Paragraph 205 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 205.

206. Defendants' exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the allegations in Paragraph 206 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 206.

207. Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property, and will continue to suffer such damages if Defendants do not cease their anticompetitive conduct.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the allegations in Paragraph 207 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 207.

208. Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the allegations in Paragraph 208 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 208.

209. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws because they are agreements between and among Fair Isaac and the CBs, all of whom are horizontal competitors who compete for the sale of credit scores in the B2B Credit Score Market. Each of the CBs was aware of Fair Isaac's imposition of these restrictive terms on the other CBs, knew that each was agreeing to those terms, and knew that its and the other CBs' acceptance of those terms would maintain or advance Fair Isaac's monopoly, and was thus an act against their economic self-interest because it undermined the ability of VantageScore to compete. The CBs also knew that the Level Playing Field requirement in their agreements with Fair Isaac was meant to and did forestall price competition among the CBs in the market for credit reports, and hence was mutually beneficial for the CBs.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the allegations in Paragraph 209 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 209.

210. In the alternative, these agreements violate Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) under a Rule of Reason analysis and the pro-competitive benefits do not outweigh the anticompetitive effects.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the allegations in Paragraph 210 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 210.

211. Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**ANSWER:** Because the First Claim for Relief has been dismissed and because the allegations in Paragraph 211 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 211.

**SECOND CLAIM FOR RELIEF:**
**UNREASONABLE RESTRAINT OF TRADE**
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

212. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

**ANSWER:** Because the Second Claim for Relief has been dismissed, no response to the allegations in Paragraph 212 is required. To the extent a response is required, FICO hereby incorporates its responses to all preceding allegations as if fully set forth herein.

213. This Claim is brought against Defendants Fair Isaac and Experian.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the allegations in Paragraph 213 state legal conclusions in any event, no response is required.

214.     The relevant period of this Claim is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the allegations in Paragraph 214 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 214.

215.     The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the allegations in Paragraph 215 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 215.

216.     Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the allegations in Paragraph 216 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 216.

217.     Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the allegations in Paragraph 217 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 217.

218.     Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the allegations in Paragraph 218 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 218.

219.     Fair Isaac entered into an agreement with Experian that contained anticompetitive terms whereby Experian agreed with Fair Isaac to contractual limitations that harmed the ability

of Experian to market VantageScore, a competing product, to Plaintiffs and members of the Class and forestalled price competition in the B2B Credit Score Market.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the allegations in Paragraph 219 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 219.

220. The agreement between Fair Isaac and Experian had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the allegations in Paragraph 220 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 220.

221. The agreement between Fair Isaac and Experian raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the allegations in Paragraph 221 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 221.

222. The acts done by Fair Isaac and Experian as part of, and in furtherance of, its contract, combination, or conspiracy were authorized ordered, or done by its officers, agents, employees, or representatives while actively engaged in the management of its affairs.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the allegations in Paragraph 222 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 222.

223. The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the allegations in Paragraph 223 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 223.

224. Fair Isaac's and Experian's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the

allegations in Paragraph 224 state legal conclusions in any event, no response is required.

However, to the extent a response is required, FICO denies the allegations in Paragraph 224.

225. Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and Experian do not cease their anticompetitive conduct.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the

allegations in Paragraph 225 state legal conclusions in any event, no response is required.

However, to the extent a response is required, FICO denies the allegations in Paragraph 225.

226. Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Fair Isaac's and Experian's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the

allegations in Paragraph 226 state legal conclusions in any event, no response is required.

However, to the extent a response is required, FICO denies the allegations in Paragraph 226.

227. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws because Fair Isaac and Experian are horizontal competitors who compete for the sale of credit scores in the B2B Credit Score Market.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the

allegations in Paragraph 227 state legal conclusions in any event, no response is required.

However, to the extent a response is required, FICO denies the allegations in Paragraph 227.

228. In the alternative, the anticompetitive agreement between Fair Isaac and Experian violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) under a Rule of Reason analysis.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the allegations in Paragraph 228 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 228.

229.    In addition to competing with Experian in the credit scores market, Fair Isaac licenses its algorithm to Experian, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, Experian discourages its customers from using or purchasing access to competing credit scores. Because Experian has substantial market power, and because Experian knows that the other CBs have agreed to the same provisions, it can harm its customers in this way without taking the risk that they will switch to competing CBs. In return for conspiring with Fair Isaac to restrain trade in the credit scores market, Experian benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor Experian's competitors and reduces competition among the CBs in the B2B credit reports market.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the allegations in Paragraph 229 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO admits, upon information and belief, that Experian has substantial market power. FICO denies the remaining allegations in Paragraph 229.

230.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**ANSWER:** Because the Second Claim for Relief has been dismissed and because the allegations in Paragraph 230 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 230.

**THIRD CLAIM FOR RELIEF:**
**UNREASONABLE RESTRAINT OF TRADE**
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide**
**Class for Injunctive and Equitable Relief)**

231.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

**ANSWER:** Because the Third Claim for Relief has been dismissed, no response to the allegations in Paragraph 231 is required. To the extent a response is required, FICO hereby incorporates its responses to all preceding allegations as if fully set forth herein.

232.    This Claim is brought against Defendants Fair Isaac and Equifax.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 232 state legal conclusions in any event, no response is required.

233.    The relevant period of this Claim is from November 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 233 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 233.

234.    The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 234 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 234.

235.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 235 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 235.

236.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 236 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 236.

237.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 237 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 237.

238. Fair Isaac entered into an agreement with Equifax that contained anticompetitive terms whereby Equifax agreed with Fair Isaac to contractual limitations that harmed the ability of Equifax to market VantageScore, a competing product, to Plaintiffs and members of the Nationwide Class and forestalled price competition in the B2B Credit Score Market.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 238 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 238.

239. The agreement between Fair Isaac and Equifax had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 239 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 239.

240. The agreement between Fair Isaac and Equifax raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 240 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 240.

241. The acts done by Fair Isaac and Equifax as part of, and in furtherance of, its contract, combination, or conspiracy were authorized ordered, or done by its officers, agents, employees, or representatives while actively engaged in the management of its affairs.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 241 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 241.

242.     The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 242 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 242.

243.     Fair Isaac's and Equifax's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 243 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 243.

244.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and Equifax do not cease their anticompetitive conduct.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 244 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 244.

245.     Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Fair Isaac's and Equifax's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 245 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 245.

246.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws because Fair Isaac and Equifax are horizontal competitors who compete for the sale of credit scores in the B2B Credit Score Market.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 246 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 246.

247.    In the alternative, the agreement between and Fair Isaac and Equifax violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) under a Rule of Reason analysis.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 247 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 247.

248.    In addition to competing with Equifax in the credit scores market, Fair Isaac licenses its algorithm to Equifax, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, Equifax discourages its customers from using or purchasing access to competing credit scores. Because Equifax has substantial market power, and because Equifax knows that the other CBs have agreed to the same provisions, it can harm its customers in this way without taking the risk that they will switch to competing CBs. In return for conspiring with Fair Isaac to restrain trade in the credit scores market, Equifax benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor Equifax's competitors and reduces competition among the CBs in the B2B credit reports market.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 248 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO admits, upon information and belief, that Equifax has substantial market power. FICO denies the remaining allegations in Paragraph 248.

249.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**ANSWER:** Because the Third Claim for Relief has been dismissed and because the allegations in Paragraph 249 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 249.

**FOURTH CLAIM FOR RELIEF:**
**UNREASONABLE RESTRAINT OF TRADE**
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

250. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed, no response to the allegations in Paragraph 250 is required. To the extent a response is required, FICO hereby incorporates its responses to all preceding allegations as if fully set forth herein.

251. This Claim is brought against Defendants Fair Isaac and TransUnion.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the allegations in Paragraph 251 state legal conclusions in any event, no response is required.

252. The relevant period of this Claim is from February 2015 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the allegations in Paragraph 252 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 252.

253. The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the allegations in Paragraph 253 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 253.

254. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the allegations in Paragraph 254 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 254.

255. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the allegations in Paragraph 255 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 255.

256. Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the allegations in Paragraph 256 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 256.

257. Fair Isaac entered into an agreement with TransUnion that contained anticompetitive terms whereby TransUnion agreed with Fair Isaac to contractual limitations that harmed the ability of TransUnion to market VantageScore, a competing product, to Plaintiffs and members of the Nationwide Class and forestalled price competition in the B2B Credit Score Market.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the allegations in Paragraph 257 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 257.

258. The agreement between Fair Isaac and TransUnion had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the allegations in Paragraph 258 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 258.

259. The agreement between Fair Isaac and TransUnion raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the allegations in Paragraph 259 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 259.

260. The acts done by Fair Isaac and TransUnion as part of, and in furtherance of, its contract, combination, or conspiracy were authorized ordered, or done by its officers, agents, employees, or representatives while actively engaged in the management of its affairs.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the

allegations in Paragraph 260 state legal conclusions in any event, no response is required.

However, to the extent a response is required, FICO denies the allegations in Paragraph 260.

261. The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the

allegations in Paragraph 261 state legal conclusions in any event, no response is required.

However, to the extent a response is required, FICO denies the allegations in Paragraph 261.

262. Fair Isaac's and TransUnion's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the

allegations in Paragraph 262 state legal conclusions in any event, no response is required.

However, to the extent a response is required, FICO denies the allegations in Paragraph 262.

263. Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and TransUnion do not cease their anticompetitive conduct.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the

allegations in Paragraph 263 state legal conclusions in any event, no response is required.

However, to the extent a response is required, FICO denies the allegations in Paragraph 263.

264. Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Fair Isaac's and TransUnion's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the allegations in Paragraph 264 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 264.

265. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws because Fair Isaac and TransUnion are horizontal competitors who compete for the sale of credit scores in the B2B Credit Score Market.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the allegations in Paragraph 265 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 265.

266. In the alternative, the agreement between and Fair Isaac and TransUnion violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) under a Rule of Reason analysis.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the allegations in Paragraph 266 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 266.

267. In addition to competing with TransUnion in the credit scores market, Fair Isaac licenses its algorithm to TransUnion, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, TransUnion discourages its customers from using or purchasing access to competing credit scores. Because TransUnion has substantial market power, and because TransUnion knows that the other CBs have agreed to the same provisions, it can harm its customers in this way without taking the risk that they will switch to competing CBs. In return for conspiring with Fair Isaac to restrain trade in the credit scores market, TransUnion benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor TransUnion's competitors and reduces competition among the CBs in the B2B credit reports market.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the allegations in Paragraph 267 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO admits that TransUnion, upon information and belief, has substantial market power. FICO denies the remaining allegations in Paragraph 267.

268. Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**ANSWER:** Because the Fourth Claim for Relief has been dismissed and because the allegations in Paragraph 268 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 268.

## FIFTH CLAIM FOR RELIEF: MONOPLIZATON
### Violation of Section 2 of the Sherman Act 15 U.S.C. § 2
### (On behalf of Plaintiffs and the Nationwide Class
### for Injunctive and Equitable Relief)

269.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

**ANSWER:** The allegations in Paragraph 269 state legal conclusions to which no response is required, but, to the extent a response is required, FICO hereby incorporates its responses to all preceding allegations as if fully set forth herein.

270.    This Claim is brought against Defendant Fair Isaac.

**ANSWER:** The allegations in Paragraph 270 state legal conclusions to which no response is required, but, to the extent a response is required, FICO admits that Plaintiffs' Fifth Claim for Relief is brought against FICO but denies that Plaintiffs are entitled to any relief on such Claim or otherwise. FICO denies the remaining allegations in Paragraph 270.

271.    The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

**ANSWER:** The allegations in Paragraph 271 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

272.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

**ANSWER:** The allegations in Paragraph 272 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

273.    Fair Isaac has had and continues to have monopoly power in B2B Credit Score Market.

**ANSWER:** The allegations in Paragraph 273 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

274.     Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

**ANSWER:** The allegations in Paragraph 274 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

275.     Fair Isaac entered Isaac entered into agreements with Equifax, Experian, and TransUnion that contained anticompetitive terms that were designed to eliminate Fair Isaac's competitors and to keep prices for FICO Scores artificially high.

**ANSWER:** The allegations in Paragraph 275 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

276.     The agreements between Fair Isaac and the CBs had substantial anticompetitive effects. The agreements effectively excluded VantageScore Solutions and every other competing provider of credit scores from competing in the market for B2B credit scores in the United States in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

**ANSWER:** The allegations in Paragraph 276 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

277.     Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand to supracompetitive levels.

**ANSWER:** The allegations in Paragraph 277 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

278.     Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

**ANSWER:** The allegations in Paragraph 278 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

279.     Fair Isaac's monopolization has raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

**ANSWER:** The allegations in Paragraph 279 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

280.    The acts done by the Fair Isaac were authorized, ordered, or done by its officers, agents, employees, or representatives while actively engaged in the management of its affairs.

**ANSWER:** The allegations in Paragraph 280 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

281.    The anticompetitive acts were directed at the B2B Credit Score Market in the United States and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

**ANSWER:** The allegations in Paragraph 281 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

282.    Fair Isaac's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

**ANSWER:** The allegations in Paragraph 282 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

283.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property, and Plaintiffs and all other similarly situated businesses will continue to be injured if Fair Isaac does not cease its anticompetitive conduct.

**ANSWER:** The allegations in Paragraph 283 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

284.    Plaintiffs and all other similarly situated businesses are threatened with future injury to their business and property by reason of Fair Isaac's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**ANSWER:** The allegations in Paragraph 284 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

285.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**ANSWER:** The allegations in Paragraph 285 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

### SIXTH CLAIM FOR RELIEF:
### CONSPIRACY TO MONOPOLIZE
### Violation of Section 2 of the Sherman Act 15 U.S.C. § 2
### (On behalf of Plaintiffs and the Nationwide Class
### for Injunctive and Equitable Relief)

286. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed, no response to the allegations in Paragraph 286 is required. To the extent a response is required, FICO hereby incorporates its responses to all preceding allegations as if fully set forth herein.

287. This Claim is brought against all Defendants.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 287 state legal conclusions in any event, no response is required.

288. The relevant product market is the market for the sale of B2B credit scores.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 288 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 288.

289. The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 289 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 289.

290. Fair Isaac has had and continues to have at least 90% market share in the B2B Credit Score Market.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 290 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 290.

291. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 291 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 291.

292. Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 292 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 292.

293. Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Defendants have substantially foreclosed competition in the B2B Credit Score Market in the United States in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 293 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 293.

294. Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand to supracompetitive levels.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 294 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 294.

295. Fair Isaac entered into an agreement, combination, or conspiracy with Experian, Equifax, and TransUnion to maintain its monopoly power in the B2B Credit Score Market. Fair Isaac created and maintained this conspiracy through a series of agreements that each of the CBs

entered into with the knowledge that the others were also entering into the agreements. In these agreements, the CBs and Fair Isaac effectively agreed that the CBs would not offer or sell VantageScore or any other competing credit score to Plaintiffs and members of the Nationwide Class. Fair Isaac and the CB Defendants further agreed that the CBs would act as Fair Isaac's agent in the sale of FICO Scores to Plaintiffs and members of the Nationwide Class.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 295 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 295.

296. These agreements foreclosed competition in a substantial portion of the B2B Credit Score Market and unlawfully maintained Fair Isaac's monopoly, resulting in Fair Isaac extracting supracompetitive prices for FICO Scores from Plaintiffs and members of the Nationwide Class.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 296 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 296.

297. Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 297 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 297.

298. Defendants' conspiracy to monopolize has injured and will continue to injure competition in the B2B Credit Score Market.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 298 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 298.

299. Defendants have acted with the specific intent of allowing Fair Isaac to monopolize the market for B2B credit scores in the United States and its territories.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 299 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 299.

300. Defendants' conspiratorial acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 300 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 300.

301. The conspiracy raised the prices for credit scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 301 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 301.

302. Plaintiffs and members of the Nationwide Class have been injured in their business or property by reason of Defendants' violation of Section 2 of the Sherman Act (15 U.S.C. § 2) within the meaning of Section 4 of the Clayton Antitrust Act (15 U.S.C. § 15).

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 302 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 302.

303. Plaintiffs and members of the Nationwide Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 2 of the Sherman Act (15 U.S.C. § 2) within the meaning of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26).

**ANSWER:** Because the Sixth Claim for Relief has been dismissed and because the allegations in Paragraph 303 state legal conclusions in any event, no response is required. However, to the extent a response is required, FICO denies the allegations in Paragraph 303.

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF STATE ANTITRUST STATUTES**
**(on behalf of Plaintiffs and the Damages Class)**

304.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

**ANSWER:** The allegations in Paragraph 304 state legal conclusions to which no response is required, but, to the extent a response is required, FICO hereby incorporates its responses to all preceding allegations as if fully set forth herein.

305.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

**ANSWER:** The allegations in Paragraph 305 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

306.    This Claim is brought against all Defendants.

**ANSWER:** The allegations in Paragraph 306 state legal conclusions to which no response is required, but, to the extent a response is required, FICO admits that Plaintiffs Seventh Claim for Relief is brought against FICO but denies that Plaintiffs are entitled to any relief on such Claim or otherwise. FICO denies the remaining allegations in Paragraph 306.

307.    Arizona: By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. § 44-1401, *et seq.*

a.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within Arizona.

b.    Defendants' combinations or conspiracies had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Arizona; (2) credit score prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which

98

occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

d.    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

e.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*

f.    Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

g.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business or property and are threatened with further injury.

h.    By reason of the foregoing, Plaintiffs and members of the Damages Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq.*

**ANSWER:** The allegations in Paragraph 307 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

308.    California: By reason of the conduct alleged herein, Defendants have violated California Business and Professions Code, §§ 16700, *et seq*.

a.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§16700-16770, governs antitrust violations in California.

b.    California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

c.    Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

d.    A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

e.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within California.

f.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

g.      But for Defendants' conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

h.      Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

i.      Plaintiffs and members of Damages Class were injured in their business or property, with respect to purchases of FICO Scores in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

**ANSWER:** The allegations in Paragraph 308 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

309.    Connecticut: By reason of the conduct alleged herein, Defendants have violated Connecticut General Statute §§ 35-26 *et seq.*

a.      During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have restrained trade in violation of Connecticut General Statute §§ 35-26 *et seq*.

e.      Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Connecticut General Statute §§ 35-26 *et seq*.

**ANSWER:** The allegations in Paragraph 309 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

310.    <u>District of Columbia</u>: By reason of the conduct alleged herein, Defendants have violated District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade).

a.    Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the B2B Credit Score Market within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq.*

b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.    During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*

f.    Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. Code § 284509(a).

g.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

**ANSWER:** The allegations in Paragraph 310 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

311.    <u>Illinois</u>: By reason of the conduct alleged herein, Defendants have violated the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

a.    Members of the Illinois Damages Class purchased FICO Scores within the State of Illinois during the Class Period.

b.    But for Defendants' conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

c.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 Ill. Comp. Stat. Ann. 10/7(2).

d.      Defendants entered into contracts or engaged in a combination or conspiracy for the purpose of fixing, controlling or maintaining prices for FICO Scores sold within the State of Illinois.

e.      Defendants further unreasonably restrained trade or commerce and established, maintained, or attempted to acquire monopoly power over the B2B Credit Score Market in Illinois for the purpose of excluding competition, in violation of 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

f.      During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

g.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

h.      Members of the Illinois Damages Class were injured with respect to purchases of FICO Scores in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**ANSWER:** The allegations in Paragraph 311 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

312.    <u>Iowa</u>: By reason of the conduct alleged herein, Defendants have violated the Iowa Competition Law, Iowa Code § 553.1, *et seq.*

a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Iowa Code § 553.1, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

d       As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1, *et seq.*

f.      Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449 (Iowa 2002).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

**ANSWER:** The allegations in Paragraph 312 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

313.    <u>Kansas</u>: By reason of the conduct alleged herein, Defendants have violated Kan. Stat. Ann. § 50-101, *et seq.*

a.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

b.      Defendants combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of credit scores, increasing the price of credit scores, or preventing competition in the sale of credit scores, in a manner that established the price of credit scores and precluded free and unrestricted competition among themselves in the sale of credit scores, in violation of Kan. Stat. Ann. § 50-101, *et seq*

c.      During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50- 101, *et seq.*

f.      Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

**ANSWER:** The allegations in Paragraph 313 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

314.    Maine: By reason of the conduct alleged herein, Defendants have violated Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

a.    Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of credit scores within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Maine; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

f.    Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

g.    Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

**ANSWER:** The allegations in Paragraph 314 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

315.    Maryland: By reason of the conduct alleged herein, Defendants have violated Maryland Code, Commercial Law, §§11-204 *et seq.*

a.    During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Maryland; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have restrained trade in violation of Maryland Code, Commercial Law, §§11-204 *et seq.*

e.      Accordingly, Plaintiffs and members of the Class seek all relief available under Maryland Code, Commercial Law, §§11-204 *et seq.*

**ANSWER:** The allegations in Paragraph 315 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

316.    <u>Michigan</u>: By reason of the conduct alleged herein, Defendants have violated the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

a.      Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in B2B Credit Score Market, in violation of Mich. Comp. Laws § 445.771, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

f.      Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 445.778(2).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

**ANSWER:** The allegations in Paragraph 316 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

317.     <u>Minnesota</u>: By reason of the conduct alleged herein, Defendants have violated the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

a.       Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the B2B Credit Score Market within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the B2B Credit Score Market within the intrastate commerce of and outside of Minnesota; and fixed prices for credit scores within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq*.

b.       Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.       During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

d.       As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.       By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*.

f.       Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.57.

g.       Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

**ANSWER:** The allegations in Paragraph 317 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

318.     <u>Mississippi</u>: By reason of the conduct alleged herein, Defendants have violated the Mississippi Code Annotated §§ 75-21-1, *et seq*.

a.       Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Mississippi.

b.       Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Mississippi, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

c.　　Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

d.　　During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

e.　　As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

f.　　By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

g.　　Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

h.　　Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

**ANSWER:** The allegations in Paragraph 318 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

319.　Missouri: By reason of the conduct alleged herein, Defendants have violated Mo. Ann. Stat. § 407.010, *et seq.*

a.　　Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the Business Market for credit scores within the intrastate commerce of Missouri by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq.*

b.　　Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.　　During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce.

107

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mo. Ann. Stat. § 407.010, *et seq.*

f.      Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2008).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Mo. Ann. Stat. § 407.010, *et seq.*

**ANSWER:** The allegations in Paragraph 319 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

320.    <u>Nebraska</u>: By reason of the conduct alleged herein, Defendants have violated the Nebraska Revised Statutes §§ 59-801, *et seq.*

a.      Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the B2B Credit Score Market within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59801, *et seq.*

f.      Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

**ANSWER:** The allegations in Paragraph 320 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

321.    <u>Nevada</u>: By reason of the conduct alleged herein, Defendants have violated the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

f.      Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

**ANSWER:** The allegations in Paragraph 321 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

322.    <u>New Hampshire</u>: By reason of the conduct alleged herein, Defendants have violated the New Hampshire Revised Statutes §§ 356:1, *et seq.*

a.      Defendants fixed, controlled or maintained prices for credit scores and established, maintained or used monopoly power, or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*.

f.      Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

**ANSWER:** The allegations in Paragraph 322 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

323.    <u>New Mexico</u>: By reason of the conduct alleged herein, Defendants have violated the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

a.      Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for credit scores within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq*.

b.      Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

     *e.*     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-11, *et seq.*

     f.     Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3(A).

     g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

**ANSWER:** The allegations in Paragraph 323 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

     324.     <u>New York</u>: By reason of the conduct alleged herein, Defendants have violated the New York General Business Laws §§ 340, *et seq*.

     a.     Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of credit scores and restrained competition in the free exercise of the conduct of the business of credit scores within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

     b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New York; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

     c.     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

     d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

     e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act.

     f.     Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

     g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

**ANSWER:** The allegations in Paragraph 324 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

325.    <u>North Carolina</u>: By reason of the conduct alleged herein, Defendants have violated the North Carolina General Statutes §§ 75-1, *et seq*.

a.    Defendants contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of North Carolina General Statutes §§ 75-1, *et seq*.

b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.

f.    Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

*g*.    Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

**ANSWER:** The allegations in Paragraph 325 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

326.    <u>North Dakota</u>: By reason of the conduct alleged herein, Defendants have violated the North Dakota Century Code §§ 51-08.1-01, *et seq*.

a.    Defendants contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*. Defendants' violations of North Dakota law were flagrant.

b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels

112

throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.     During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 5108.1-01, *et seq.*

f.     Under North Dakota law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *See*, *e.g.*, *Howe v. Microsoft Corp.*, 656 N.W.2d 285, 298 (N.D. 2003).

g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

**ANSWER:** The allegations in Paragraph 326 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

327.   <u>Oregon</u>: By reason of the conduct alleged herein, Defendants have violated the Oregon Revised Statutes §§ 646.705, *et seq*.

a.     Defendants contracted, combined, or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of credit scores, in violation of Or. Rev. Stat. § 646.705, *et seq*.

b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.     During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*

f. Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

g. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

**ANSWER:** The allegations in Paragraph 327 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

328. <u>Rhode Island</u>: By reason of the conduct alleged herein, Defendants have violated R.I. Gen. Laws § 6-36-1, *et seq.*

a. Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

b. Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

f. Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a).

*g.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under R.I. Gen. Laws § 6-36-1, *et seq.*

**ANSWER:** The allegations in Paragraph 328 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

329. <u>South Dakota</u>: By reason of the conduct alleged herein, Defendants have violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

a.     Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of credit scores within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1-3.1, *et seq.*

b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.     During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

f.     Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

**ANSWER:** The allegations in Paragraph 329 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

330.     Tennessee: By reason of the conduct alleged herein, Defendants have violated the Tennessee Code Annotated §§ 47-25-101, *et seq.*

a.     Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Tenn. Code, § 47-25-101, *et seq.*

b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*

f. Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

g. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25- 101, *et seq.*

**ANSWER:** The allegations in Paragraph 330 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

331. Utah: By reason of the conduct alleged herein, Defendants have violated Utah Code Annotated §§ 76-10-3101, *et seq.*

a. Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Utah Code Ann. § 76-10-3101, *et seq.*

b. Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Utah; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected Utah commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-103101, *et seq.*

f.      Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq.*

**ANSWER:** The allegations in Paragraph 331 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

332.    Vermont: By reason of the conduct alleged herein, Defendants have violated Vermont Stat. Ann. 9 §§ 2453, *et seq.*

a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Defendants' violations of Vermont law were flagrant.

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*

f.      Under Vermont law, indirect purchasers have standing to maintain an action under Vermont's antitrust laws based on the facts alleged in this Complaint. *Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

**ANSWER:** The allegations in Paragraph 332 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

333.    <u>West Virginia</u>: By reason of the conduct alleged herein, Defendants have violated West Virginia Code §§ 47-18-1, *et seq.*

a.    Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of West Virginia Code §§ 47-18-1, *et seq.* Defendants' anticompetitive acts were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.    During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.*

f.    Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. Va. Code R. 142-9-2.

g.    Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

**ANSWER:** The allegations in Paragraph 333 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

334.    <u>Wisconsin</u>: By reason of the conduct alleged herein, Defendants have violated Wisconsin Statutes §§ 133.01*, et seq.*

a.    Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of credit scores, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, *et seq.*

b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels

throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.     During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

f.     Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(1)(a).

g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

**ANSWER:** The allegations in Paragraph 334 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

335.     Defendants' anticompetitive activities have directly, foreseeably and proximately caused injury to members of the Damages Class. Plaintiffs and members of the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful monopolization, conspiracy to monopolize, and conspiratorial agreements. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced credit scores from Defendants and/or other sellers of credit scores, and/or (2) paying higher prices for FICO Scores than they would have in the absence of Defendants' conduct. These injuries are of the type of the laws of the above States were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

**ANSWER:** The allegations in Paragraph 335 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

336.     In addition, Defendants have profited significantly from the aforesaid unlawful conduct. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

**ANSWER:** The allegations in Paragraph 336 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

337.     Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or

otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**ANSWER:** The allegations in Paragraph 337 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

### EIGHTH CLAIM FOR RELIEF:
### VIOLATIONS OF STATE CONSUMER PROTECTION LAWS
#### (on behalf of Plaintiffs and the Damages Class)

338. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

**ANSWER:** The allegations in Paragraph 338 state legal conclusions to which no response is required, but, to the extent a response is required, FICO hereby incorporates its responses to all preceding allegations as if fully set forth herein.

339. This Claim is brought against all Defendants.

**ANSWER:** The allegations in Paragraph 339 state legal conclusions to which no response is required, but, to the extent a response is required, FICO admits that Plaintiffs' Eighth Claim for Relief is brought against FICO but denies that Plaintiffs are entitled to any relief on such Claim or otherwise. FICO denies the remaining allegations in Paragraph 339.

340. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**ANSWER:** The allegations in Paragraph 340 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

341. Arkansas: Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.*

a. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which credit scores were sold in Arkansas and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

b.      The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

c.      Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

d.      During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

e.      As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

f.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**ANSWER:** The allegations in Paragraph 341 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

342.    California: Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, et seq.

a.      During the Class Period, Defendants marketed, sold, or distributed FICO Scores in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

b.      The violations of federal antitrust law set forth above constitute violations of section 17200, *et seq.* of California Business and Professions Code.

c.      This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated section 17200 of the California Business & Professions Code, commonly known as the Unfair Competition Law.

d.      Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including,

but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

e.　　Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

f.　　Defendants' acts or practices are unfair to purchasers of FICO Scores in the State of California within the meaning of § 17200, California Business & Professions Code.

g.　　Defendants' acts and practices are fraudulent or deceptive within the meaning of § 17200 of the California Business & Professions Code.

h.　　Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

i.　　The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

j.　　The unlawful and unfair business practices of Defendants, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supra-competitive and artificially inflated prices for FICO Scores sold in the State of California. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

k.　　The conduct of Defendants as alleged in this Complaint violated § 17200 of the California Business & Professions Code.

l.　　As alleged in this Complaint, Defendants and its co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendant's unfair competition.

m.　　Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business & Professions Code §§ 17203 and 17204.

**ANSWER:** The allegations in Paragraph 342 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

343.　　District of Columbia: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code §§ 283901 *et seq.*

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which FICO Scores were sold, distributed or obtained in the District of Columbia.

b.    The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28- 3904.

c.    Plaintiffs and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged.

d.    There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores. Defendants had the sole power to set that price, and Plaintiffs and members of the Class had no power to negotiate a lower price.

e.    Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges.

f.    Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct with respect to fixing the price of FICO Scores at supracompetitive levels and overcharging consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

g.    Defendants took grossly unfair advantage of Plaintiffs and members of the Class.

h.    The suppression of competition that has resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for the FICO Scores. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

i.    As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**ANSWER:** The allegations in Paragraph 343 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

344.    Florida:    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

123

a.      The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

b.      A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

c.      Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

d.      Members of the Damages Class purchased FICO Scores within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

e.      Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Florida.

f.      Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2006 and continuing through the date of this filing.

g.      Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

h.      Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Florida; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

i.      Defendants' unlawful conduct substantially affected Florida's trade and commerce.

j.      As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property by virtue of overcharges for FICO Scores and are threatened with further injury.

k.      By reason of the foregoing, the members of the Damages Class are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

**ANSWER:** The allegations in Paragraph 344 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

345. <u>Hawaii</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

a. Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

b. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**ANSWER:** The allegations in Paragraph 345 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

346. <u>Massachusetts</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Mass. G.L. c. 93A*et seq.*.

a. Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

b. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which credit scores were sold, distributed, or obtained in Massachusetts and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

c. Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

d.     During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Massachusetts, and Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

e.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class were injured and are threatened with further injury.

f.     By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

**ANSWER:** The allegations in Paragraph 346 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

347.   Missouri: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

a.     Plaintiffs and the Damages Class purchased FICO Scores for personal, family, or household purposes.

b.     Defendants engaged in the conduct described herein in connection with the sale of credit scores in trade or commerce in a market that includes Missouri.

c.     Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which credit scores were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

d.     Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for credit scores. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of credit scores they purchased.

e.     Defendants' conduct concerning the price of credit scores was deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing credit scores at prices established by a free and fair market.

f.     Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Missouri; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra- competitive, artificially inflated prices for credit scores.

g.     The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

h.     As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

i.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce...," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

**ANSWER:** The allegations in Paragraph 347 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

348.     <u>Montana</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Consumer Protection Act, Mont. Code, §§ 30-14-101, *et seq.* and §§ 30- 14-201 *et seq.*

a.     Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Montana; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra- competitive, artificially inflated prices for credit scores.

b.     During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and §§ 30- 14-201 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**ANSWER:** The allegations in Paragraph 348 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

349.     <u>Nebraska</u>: By reason of the conduct alleged herein, Defendants have violated Neb. Rev. Stat. § 59-1602, *et seq.*

a. Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-1609.

b. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Nebraska.

c. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

d. Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of Defendants' actions within the stream of Nebraska commerce.

e. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

f. Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs and members-of-the-Class's ability to protect themselves.

g. Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

h. As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

i. By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59-1602, *et seq.*

**ANSWER:** The allegations in Paragraph 349 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

350. New Hampshire: By reason of the conduct alleged herein, Defendants have violated N.H. Rev. Stat. T. XXXI, § 358-A, *et seq.*

a. Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007).

b. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within New Hampshire.

c. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in B2B Credit Score Market, for the purpose of excluding or

128

limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

d.    Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of Defendants' actions within the stream of New Hampshire commerce.

e.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

f.    Defendants' conduct was willful and knowing.

g.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

h.    Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

i.    As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

j.    By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under N.H. Rev. Stat. T. XXXI, §§ 358-A:10 and 358-A:10-

**ANSWER:** The allegations in Paragraph 350 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

351.    <u>New Mexico</u>: By reason of the conduct alleged herein, Defendants have violated N.M. Stat. Ann. §§ 57-12-1, *et seq.*

a.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Mexico.

b.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which FICO Scores were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Class.

c.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

d.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

e.     Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to and the members of the Damages Class.

f.     Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

g.     Plaintiff and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores. Defendant Fair Isaac had the sole power to set that price and Plaintiffs and members of the Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct to fix the price of FICO Scores at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class.

h.     The suppression of competition that resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for the FICO Scores.

i.     Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

j.     Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the members of the Class and the price paid by them for FICO Scores as set forth in N.M. Stat. Ann. § 57-12-2E.

k.     Defendants' conduct was willful.

l.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

m.     By reason of the foregoing, members of the Damages Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

**ANSWER:** The allegations in Paragraph 351 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

352. <u>New York</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349 *et seq.*

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO scores were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Class, who are Defendants' consumers.

b.     Defendants made public statements about the prices of FICO Scores that omitted material information that rendered the statements that they made materially misleading; and Defendants alone possessed material information that were relevant to consumers but failed to provide the information.

c.     Because of Defendants' unlawful trade practices in the State of New York, Class members who purchased FICO Scores were misled to believe that they were paying a fair price for FICO Scores or the price increases for FICO Scores were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conduct.

d.     Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have an impact on New York consumers, including Plaintiffs and members of the Class.

e.     Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have a broad impact, causing Class members who purchased FICO Scores to be injured by paying more for FICO Scores than they would have paid in the absence of Defendants' unlawful trade acts and practices.

f.     The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New York; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

g.     During the Class Period, Defendants marketed, sold, or distributed FICO Scores in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

h.     During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in New York.

i.     Plaintiffs and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

**ANSWER:** The allegations in Paragraph 352 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

353.    <u>North Carolina</u>: By reason of the conduct alleged herein, Defendants have violated N.C. Gen. Stat.§ 75-1, *et seq.*

a.    Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

b.    Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within North Carolina.

c.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Class. Defendants' conduct could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' illegal activity. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Class could not possibly have been aware. Defendants' public statements concerning the price of FICO Scores created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conduct.

d.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

e.    Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

f.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

g.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

h.    Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

i.    Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

j.       During the Class Period, Defendants marketed, sold, or distributed FICO Scores in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in North Carolina.

k.       As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured and are threatened with further injury.

l.       By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 75-16.

**ANSWER:** The allegations in Paragraph 353 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

354.    Oregon: By reason of the conduct alleged herein, Defendants have violated Or. Rev. Stat. § 646.608, *et seq.*

a.       Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Oregon.

b.       Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.

c.       Defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of Defendants' actions within the stream of Oregon commerce.

d.       Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

e.       Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

f.       Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

g.       As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

h.       By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under Or. Rev. Stat. § 646.638.

**ANSWER:** The allegations in Paragraph 354 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

355. <u>Rhode Island</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1 *et seq.*).

a. Members of this Class purchased FICO Scores for personal, family, or household purposes.

b. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Rhode Island.

c. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO Scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence.

d. Defendants misrepresented to all purchasers during the Class Period that Defendants' FICO Scores prices were competitive and fair.

e. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

f. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market.

g. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO Scores they purchased.

h. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. §§ 6-13.1-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**ANSWER:** The allegations in Paragraph 355 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

356. <u>South Carolina</u>: By reason of the conduct alleged herein, Defendants have violated S.C. Code Ann. §§ 39-5-10, *et seq.*

a.      Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within South Carolina.

b.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

c.      Defendants' monopolization had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores during the Class Period.

d.      Defendants' conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of Defendants' actions within the stream of South Carolina commerce.

e.      Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Carolina.

f.      Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

g.      Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

h.      Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as at least thousands of South Carolina businesses purchase FICO Scores.

i.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10 *et seq.*, and, accordingly, Plaintiffs and the members of the Class seek all relief available under that statute.

**ANSWER:** The allegations in Paragraph 356 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

357. <u>South Dakota</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-6 *et seq*.).

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes South Dakota, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO credit scores were sold, distributed, or obtained in South Dakota.

b. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO credit scores. Defendants misrepresented to all purchasers during the Class Period that Defendants' FICO credit scores prices were competitive and fair Defendants owed a duty to disclose such facts, and they breached that duty by their silence.

c. Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores.

d. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.

e. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO credit scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO credit scores at prices set by a free and fair market.

f. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO credit scores they purchased.

g. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §§37-24-6 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**ANSWER:** The allegations in Paragraph 357 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

358. <u>Utah</u>: By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-11-1, *et seq.*

a.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Utah.

b.     Defendants are suppliers within the meaning of Utah Code Ann. §§ 13-113.

c.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the business market for credit scores, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

d.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

e.     Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions within the meaning of Utah Code Ann. §§ 13-11-3.

f.     Defendants knew or had reason to know that its conduct was unconscionable.

g.     Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

h.     Defendants' unlawful conduct substantially affected Utah's trade and commerce.

i.     As a direct and proximate cause of Defendants' unlawful conduct, the members Class have been injured in their business or property and are threatened with further injury.

j.     By reason of the foregoing, the members of the Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

**ANSWER:** The allegations in Paragraph 358 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

359.     Utah: By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-5-1, *et seq.*

a.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Utah.

b.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

137

c.        Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.

d.        Defendants' unlawful conduct substantially affected Utah's trade and commerce.

e.        As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have been injured in their business or property and are threatened with further injury.

f.        By reason of the foregoing, the members of the Class are entitled to seek all forms of relief, including actual damages or $2000 per Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5- 14, *et seq.*

**ANSWER:** The allegations in Paragraph 359 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

360.        Vermont: By reason of the conduct alleged herein, Defendants have violated Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

a.        Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Vermont.

b.        Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Vermont, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

c.        Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, controlling, and/or maintaining, at artificial and noncompetitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for the FICO Scores.

d.        Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' FICO Scores prices were competitive and fair.

e.        Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Vermont; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores.

f.      Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

g.      Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

h.      Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.*

i.      As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market.

j.      By reason of the foregoing, members of Class are entitled to seek all forms of relief available under Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

**ANSWER:** The allegations in Paragraph 360 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

361.   West Virginia: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code, §§46A-6-104 *et seq*.

a.      Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores.

b.      During the Class Period, Defendants marketed, sold, or distributed FICO credit scores in West Virginia, and Defendants' illegal conduct substantially affected West Virginia commerce and consumers.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury.

**ANSWER:** The allegations in Paragraph 361 state legal conclusions to which no response

is required, but, to the extent a response is required, they are denied.

362.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code, §§46A-6-104 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**ANSWER:** The allegations in Paragraph 362 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

**NINTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Nationwide Class)**

363.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

**ANSWER:** The allegations in Paragraph 363 state legal conclusions to which no response is required, but, to the extent a response is required, FICO hereby incorporates its responses to all preceding allegations as if fully set forth herein.

364.    This Claim is brought against all Defendants.

**ANSWER:** The allegations in Paragraph 364 state legal conclusions to which no response is required, but, to the extent a response is required, FICO admits that Plaintiffs' Ninth Claim for Relief is brought against FICO but denies that Plaintiffs are entitled to any relief on such Claim or otherwise. FICO denies the remaining allegations in Paragraph 364.

365.    As a result of its unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices of and unlawful profits from FICO Scores.

**ANSWER:** The allegations in Paragraph 365 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

366.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains.

**ANSWER:** The allegations in Paragraph 366 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

367.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs and members of

140

the Class in the following states: Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

**ANSWER:** The allegations in Paragraph 367 state legal conclusions to which no response is required, but, to the extent a response is required, they are denied.

## REQUESTED RELIEF AND DEMAND FOR JURY TRIAL

**ANSWER:** FICO admits that Plaintiffs seek certain relief, but FICO denies that Plaintiffs are entitled to a judgment or any other relief requested in their Prayer for Relief or Jury Demand.

## DENIAL

FICO denies each and every allegation not specifically admitted herein.

## AFFIRMATIVE DEFENSES[92]

FICO states that Plaintiffs are not entitled to any relief on their Complaint, because, among other things, FICO has not engaged in any conduct that is proscribed by the antitrust laws and Plaintiffs lack injury and antitrust standing. FICO further asserts the following affirmative defenses, without conceding that it bears the burden of production or persuasion as to any of them.

## FIRST AFFIRMATIVE DEFENSE
### No Substantial Foreclosure of Competition

The conduct allegedly undertaken by FICO, which FICO denies, has not substantially foreclosed competition. In particular, the Credit Bureaus' own credit scoring system, VantageScore, has reported steady growth in use and adoption throughout the period that is

---

[92] The defenses that must be affirmatively stated in a pleading per Rule 8 of the Federal Rules of Civil Procedure are affirmative defenses referenced in Rule 8(c). *See id.* ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including [identified defenses]."). To the extent Plaintiffs take a different position, FICO states that the Complaint fails to state a claim upon which relief can be granted and fails to allege various elements of the asserted claims. To the extent the Court's rulings have limited or foreclosed any of these defenses, FICO continues to plead the defense to preserve it for appeal.

relevant to Plaintiffs' claims, including a reported 300% growth between 2013 and 2018 and another 20% in 2019 (for a total growth of 320% during the period 2013-2019).[93] More recently, in June 2023, VantageScore reported that "VantageScore credit score usage grew among financial institutions, including banks, fintechs, and other market participants by 30% in 2022 to over 19 billion credit scores."[94] VantageScore's former Chief Executive Officer Barrett Burns has specifically attributed this reported growth to "an increasingly competitive marketplace for credit scores[.]"[95] He also stated in 2018 that, "[i]n the past five years we've seen competition flourish. Within that time period, VantageScore credit score usage increased by more than 300 percent and the number of users increased by almost 12 percent."[96] VantageScore's research firm, Oliver Wyman, stated in its 2019 VantageScore Market Study Report that, "[n]otably, we observed growth, in particular, amongst lenders using VantageScore for origination and other credit decisions, which demonstrates that lenders don't appear to be as tethered to legacy processes as they once were."[97] With no substantial foreclosure of competition, Plaintiffs have not suffered any antitrust injury or damages.

## SECOND AFFIRMATIVE DEFENSE
### Procompetitive Benefits

FICO denies that any provision in its license agreements with the Credit Bureaus has resulted in a substantial foreclosure of competition or anticompetitive effects. However, if and to

---

[93] 2019 VantageScore Market Study Report, at 2, https://www.vantagescore.com/wp-content/uploads/2022/01/2019-VantageScore-Market-Adoption-Study-FINAL-1.pdf; VantageScore Press Release, "Usage of VantageScore Credit Scores Surges More than 20 percent versus the Previous Year and Over 300 percent over the Past Five Years" (Oct. 15, 2018).

[94] VantageScore Press Release, "VantageScore® Credit Score Usage Up 30% in 2022" (June 1, 2023).

[95] VantageScore Press Release, "VantageScore Solutions Announces Score Use Grows to More than 12 Billion" (Oct. 29, 2019).

[96] VantageScore Press Release, "Usage of VantageScore Credit Scores Surges More than 20 percent versus the Previous Year and Over 300 percent over the Past Five Years" (Oct. 15, 2018).

[97] VantageScore Press Release, "Market Adoption: 12.3 Billion & Counting" (June 22, 2020).

the extent there are any alleged restraints resulting from the provisions, they are supported by valid business justifications and any ancillary restraints are outweighed by procompetitive benefits. By way of example only, FICO identifies the following procompetitive benefits of the alleged restraints, based on FICO's current understanding of Plaintiffs' allegations and facts which are presently known.

1.     The "No Equivalent Products" provision protects FICO's intellectual property, included as reflected in the odds-to-score relationship of its credit scoring models and reason codes, and prevents confusion in the marketplace, particularly among consumers, regarding the difference between FICO Scores and other credit scores, including VantageScore credit scores. The two FICO Score attributes addressed by the "No Equivalent Products" provision—its odds-to-score relationship and reason codes—are among the primary external differentiating characteristics that remain between FICO Scores and VantageScore credit scores.

Moreover, consumer confusion regarding different credit scoring systems has been recognized as a significant problem by the Consumer Financial Protection Bureau ("CFPB") and others within the industry. Reports released by the CFPB in 2011 and 2012 found that many consumers did not understand the difference between FICO Scores, which are used by lenders most often to determine consumers' credit risk, and other credit scores (such as VantageScore credit scores) that are marketed to consumers primarily for credit education.[98] The CFPB found that "[c]onsumers obtaining educational scores may be confused about the usefulness of the score being sold if sellers of scores do not make it clear to consumers . . . that it is not the score the lender

---

[98] Report to Congress, "The Impact of Differences Between Consumer- and Creditor-Purchased Credit Scores," CFPB (July 19, 2011), at 2.

is likely to use."[99] In 2014, the CFPB opened an investigation into TransUnion's and Equifax's marketing practices related to VantageScore. In 2017, the CFPB found that TransUnion and Equifax had each "deceptively marketed credit scores to consumers by falsely representing . . . that the scores it marketed and sold to consumers were the same scores lenders typically use to determine creditworthiness" when, in reality, lenders most often used FICO Scores.[100] In other words, the Credit Bureaus were passing off VantageScore credit scores to consumers and claiming that they were equivalent to FICO Scores. In consent judgments entered on January 3, 2017, TransUnion and Equifax were ordered to pay $16.9 and $6.3 million, respectively, in fines and restitution.[101] TransUnion was sued by the CFPB again in April 2022 for allegedly violating the 2017 consent decree, based in part on allegations that TransUnion continued to make deceptive statements to consumers about VantageScore credit scores that are designed to confuse or mislead consumers as to whether the VantageScore credit scores being provided to them were the same credit scores used by those consumers' lenders.[102] The "No Equivalent Products" provision prevents the Credit Bureaus from copying distinctive characteristics of FICO Scores for use by their own VantageScore credit scores and encourages innovation and product differentiation between each credit scoring system.

    2.    The "Pre-Qualification" royalty category establishes a consistent base royalty price—which is subject to frequent and significant discounting—for FICO Scores used in

---

[99] Report to Congress, "The Impact of Differences Between Consumer- and Creditor-Purchased Credit Scores," CFPB (July 19, 2011), at 21.

[100] *See In the Matter of Equifax Inc.*, File No. 2017-CFPB-0001 (January 3, 2017); *In the Matter of TransUnion Interactive, Inc.*, File No. 2017-CFPB-0002 (January 3, 2017).

[101] *In the Matter of TransUnion Interactive, Inc.*, File No. 2017-CFPB-0002, at ¶¶ 47, 52; *In the Matter of Equifax Inc.*, File No. 2017-CFPB-0001, at ¶¶ 49, 54.

[102] Complaint, *Consumer Fin. Protection Bureau v. TransUnion et al.*, Case No. 1:22-cv-01880 (N.D. Ill.) (Apr. 12, 2022), at ¶¶ 56-77.

connection with consumer disclosures. In particular, when FICO Scores are used to qualify a consumer for a credit offer in connection with a consumer disclosure, the base royalty price is the same whether the FICO Score is disclosed to the consumer or another credit score is disclosed. In either scenario, the value generated by the use of a FICO Score—to facilitate an offer of credit—is comparable, which justifies a consistent base royalty price. Moreover, to the extent this pricing structure could disincentivize the Credit Bureaus and/or lenders from using FICO Scores to qualify consumers for credit offers while disclosing a different credit score (such as a VantageScore credit score) to those consumers in connection with the offer, that outcome is procompetitive. As detailed above, the CFPB and others have recognized that the Credit Bureaus have used similar tactics to mislead consumers into believing, erroneously, that their VantageScore credit score was used by their lenders to make credit decisions when, in fact, those lenders used FICO Scores. Further, the Pre-Qualification royalty may always be avoided if another credit score is used both to determine the consumer's eligibility for credit offers and for disclosure to the consumer.

3.     The "Level Playing Field" ensures that FICO does not disadvantage one of three national Credit Bureaus by offering more favorable pricing on comparable terms to the other two national Credit Bureaus, which, in turn, promotes fair competition among them. Further, upon information and belief, the extent of discounting against FICO's contractual royalty prices has increased, not decreased, following the introduction of "Level Playing Field" provisions in FICO's license agreements with the Credit Bureaus.

### THIRD AFFIRMATIVE DEFENSE
### Legitimate Business Justifications

The alleged conduct undertaken by FICO was supported by legitimate business and economic justifications, not a desire to attain or maintain monopoly power, and are ancillary to

procompetitive conduct. FICO acted, at all times, in good faith and in furtherance of its legitimate unilateral self-interest without causing injury to competition, the public, or Plaintiffs.

## FOURTH AFFIRMATIVE DEFENSE
### Credit Bureau Market Power

As a matter of law, FICO lacks "monopoly power" in any relevant antitrust market, because the Credit Bureaus control the aggregated consumer credit data needed to generate FICO scores. It is undisputed that such control gives each Credit Bureau "substantial market power." Compl. ¶¶ 229, 248, 267. The substantial market power held by the Credit Bureaus prevents FICO from exercising monopoly power in any market pertaining to credit scores.

## FIFTH AFFIRMATIVE DEFENSE
### Applicable Limitations Periods

Plaintiffs' claims and the claims of the putative classes are barred, in whole or in part, by applicable limitations periods. *See*, *e.g.*, 15 U.S.C. § 15b (four-year limitations period applies to claims for alleged violations of the Sherman Act). The alleged contractual provisions in FICO's license agreements with the Credit Bureaus were entered into outside the applicable limitations periods. Those terms and their alleged effect were not hidden from Plaintiffs or undiscoverable through ordinary diligence due to the existence of contractual confidentiality provisions or otherwise, as evidenced by the fact that Plaintiffs' allegations concerning these provisions were taken from the unredacted portions of a counterclaim filed in another matter. *See* Redacted Counterclaim (Dkt. 38), *Fair Isaac Corporation v. TransUnion LLC*, Case No. 1:17-cv-08318 (N.D. Ill. Feb. 12, 2018), at ¶¶ 16-77. To the extent Plaintiffs assert that FICO fraudulently concealed any actions, Plaintiffs have failed to allege such fraud with particularity under Federal Rule of Civil Procedure 9(b) or state law, and they have failed to adequately allege that they exercised sufficient due diligence to uncover facts in support of their claims.

As a result, Plaintiffs either discovered or should have discovered their alleged injuries prior to the onset of the applicable limitations periods, and the expiration of those periods are not tolled through fraudulent concealment or operation of the discovery rule. Moreover, the applicable limitations periods are not tolled by the continuing violation doctrine, because Plaintiffs' claimed injuries arise merely from the alleged ongoing effect of conduct outside the periods.

Further, if and to the extent Plaintiffs' claims are based in any part on the litigation between FICO and the Credit Bureaus that was initiated in 2006, the proceedings were at all times public and concluded no later than 2011, following a public trial. Plaintiffs' claims based on the 2006 litigation are therefore untimely, and no exception or tolling rule applies.

## SIXTH AFFIRMATIVE DEFENSE
### Waiver, Estoppel, and Laches

Setting aside that none of the Plaintiffs or putative class members faces a sufficient threat of future injury to support equitable relief, their request for such relief is barred by the doctrines of waiver, estoppel, and laches. As set forth in FICO's Fifth Affirmative Defense and incorporated by reference here, much of the alleged conduct complained of occurred decades ago, and Plaintiffs either discovered or should have discovered with reasonable diligence their alleged past and future injuries outside the applicable limitations periods. The doctrines of waiver, laches, and estoppel bar Plaintiffs' claims given their unreasonable delay in bringing suit.

## SEVENTH AFFIRMATIVE DEFENSE
### *Illinois Brick*

Plaintiffs and members of the putative classes purchase FICO Scores directly from the Credit Bureaus or from other entities that sit below the Credit Bureaus in the distribution chain according to prices established between Plaintiffs and the Credit Bureaus or those entities, and Plaintiffs pay the Credit Bureaus or those entities, not FICO. As a result, Plaintiffs' damages claims

147

are barred as a matter of law by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and related authority, in jurisdictions that have not effectively repealed *Illinois Brick*.

## EIGHTH AFFIRMATIVE DEFENSE
### Effect of Government Regulations

Plaintiffs' claims and the claims of the putative classes are barred, in whole or in part, by government regulations and rules that require the use of FICO Scores in certain circumstances, including the rules promulgated by the Federal Housing Finance Agency ("FHFA") and the rules and guidelines issued by the government-sponsored enterprises Fannie Mae and Freddie Mac. Such rules, regulations and guidelines mandate the use of FICO Scores for certain purposes, and, as a result, any alleged reduction in competition resulting from the conduct alleged in the Complaint could not have caused Plaintiffs to suffer any injury or damages.

## NINTH AFFIRMATIVE DEFENSE
### Permitted Conduct

Plaintiffs' claims and the claims of the putative classes are barred, in whole or in part, because FICO's alleged conduct was authorized or permitted under federal law or is otherwise exempt from regulation by the antitrust laws. Such conduct may include, for example, petitioning activities that are protected by the *Noerr-Pennington* doctrine and/or privileged under the First Amendment of the United States Constitution.

## TENTH AFFIRMATIVE DEFENSE
### Duty To Arbitrate or Participate in Other ADR Procedures

Plaintiffs' claims and the claims of the putative classes are barred, in whole or in part, by contractual arbitration provisions or other alternative dispute resolution ("ADR") provisions for which FICO may be a direct or third-party beneficiary.

## ELEVENTH AFFIRMATIVE DEFENSE
### Contractual Limitations of Liability and Remedies

Plaintiffs' claims and the claims of the putative classes are barred, in whole or in part, by contractual limitations of liability, indemnities, limitations of remedies or damages, contractual shortening of the applicable limitations periods, jury and class action waivers, forum selection clauses, and similar contractual limits of claims, liabilities, or remedies for which FICO may be a direct or third-party beneficiary.

## TWELFTH AFFIRMATIVE DEFENSE
### Champerty and Maintenance

To the extent that a third-party investor or litigation funder has asserted control over the prosecution or resolution of Plaintiffs' claims and/or those of the putative classes, such claims may be barred, in whole or in part, by the common law doctrines of champerty and maintenance.

## THIRTEENTH AFFIRMATIVE DEFENSE
### Collateral Estoppel and *Res Judicata*

Plaintiffs' claims and the claims of the putative classes are barred, in whole or in part, by the doctrines of collateral estoppel and/or res judicata to the extent that courts have upheld FICO's conduct as alleged in the Complaint.

## FOURTEENTH AFFIRMATIVE DEFENSE
### Failure To Mitigate Damages

Setting aside that Plaintiffs lack antitrust injury and standing, they are barred, in whole or in part, from recovery of any or some of the damages claimed because of and to the extent of Plaintiffs' failure to mitigate damages. Based on information and belief, Plaintiffs, through the exercise of reasonable diligence, could have elected to purchase other credit scores promoted by the Credit Bureaus instead of FICO Scores, such as VantageScore credit scores, in which case Plaintiffs may not have incurred any alleged injury caused by FICO's alleged conduct.

**FIFTEENTH AFFIRMATIVE DEFENSE**
**Duplicative and Multiple Recovery**

Plaintiffs' claims and the claims of the putative classes for damages are barred, in whole or in part, to the extent they seek improper multiple or duplicative damages awards, or damages awards that are duplicative of those sought in other actions, in violation of the Due Process guarantees of the Fifth and Fourteen Amendments to the U.S. Constitution.

**SIXTEENTH AFFIRMATIVE DEFENSE**
**Set-Off**

Without admitting the existence of any violation of the antitrust laws and by expressly denying same, Plaintiffs' claims and the claims of the putative classes for damages may be barred, in whole or in part, by FICO's right to set-off, including any amount paid to Plaintiffs by any other entity in exchange for a release of claims as asserted in the action.

**SEVENTEENTH AFFIRMATIVE DEFENSE**
**Unjust Enrichment**

Plaintiffs' claims and the claims of the putative classes for damages are barred, in whole or in part, because Plaintiffs would be unjustly enriched if allowed to recover any portion of the damages alleged in the Complaint.

**EIGHTEENTH AFFIRMATIVE DEFENSE**
**Bar on Unjust Enrichment**

Plaintiffs' unjust enrichment claims and the unjust enrichment claims of any putative classes are barred, in whole or in part, because Plaintiffs and any putative class members have an adequate remedy at law.

**NINETEENTH AFFIRMATIVE DEFENSE**
**Lack of Personal Jurisdiction**

Some or all of Plaintiffs' state law claims against FICO are barred because the Court lacks personal jurisdiction over Plaintiffs' state law claims. Plaintiffs fail to allege sufficient minimum

contacts to permit the Court to exercise personal jurisdiction over FICO with regard to their state law claims. In addition, Plaintiffs purport to bring claims under the laws of 32 states where no Plaintiff does business. These claims also fail.

<strong><u>TWENTIETH AFFIRMATIVE DEFENSE</u></strong><br><strong>No Intrastate Nexus</strong>

Some or all of Plaintiffs' state law claims against FICO are barred, in whole or in part, to the extent FICO's alleged conduct lacks a specific nexus to intrastate commerce.

<strong><u>TWENTY-FIRST AFFIRMATIVE DEFENSE</u></strong><br><strong>Intangible Services</strong>

Some or all of Plaintiffs' state law claims against FICO are barred, in whole or in part, to the extent FICO Scores are intangible services to which the state laws do not apply.

<strong><u>TWENTY-SECOND AFFIRMATIVE DEFENSE</u></strong><br><strong>Class Action Bar</strong>

Some or all of Plaintiffs' state law claims are barred by prohibitions on the maintenance of class actions and other substantive limitations in accordance with *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010).

<strong><u>TWENTY-THIRD AFFIRMATIVE DEFENSE</u></strong><br><strong>No Fraud or Deception</strong>

Some or all of Plaintiffs' state law claims are barred to the extent FICO has not engaged in fraudulent or deceptive acts or practices.

<strong><u>TWENTY-FOURTH AFFIRMATIVE DEFENSE</u></strong><br><strong>Primary Business or Commercial Purpose</strong>

Some or all of Plaintiffs' state law claims are barred because FICO's alleged conduct concerns items purchased primarily for business or commercial purposes.

<strong><u>TWENTY-FIFTH AFFIRMATIVE DEFENSE</u></strong><br><strong>No Bargaining Disparity</strong>

151

Some or all of Plaintiffs' state law claims are barred because there is not grossly unequal or disparate bargaining power between FICO and Plaintiffs and the putative class.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**
**No Unconscionability**

Some or all of Plaintiffs' state law claims are barred because FICO's conduct as alleged in the Complaint was not unconscionable.

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE**
**No Injunctive or Equitable Relief**

Plaintiffs are not entitled to injunctive or other equitable relief because to the extent they could prove their claims (which FICO disputes), Plaintiffs have an adequate remedy at law.

**ADDITIONAL AFFIRMATIVE DEFENSES**

If and to the extent any of the following matters are deemed to be affirmative defenses and not failures by Plaintiffs to establish *prima facie* elements of their claims or requests for relief, FICO hereby asserts the following additional affirmative defenses:

1. The Complaint fails to state a claim upon which relief may be granted.

2. Plaintiffs' claims and the claims of the putative classes are barred, in whole or in part, because Plaintiffs do not have standing to raise those claims.

3. Plaintiffs' claims and the claims of the putative classes are barred, in whole or in part, because Plaintiffs have not suffered any legally cognizable injury, including because Plaintiffs have not suffered an injury-in-fact and their alleged injuries are too speculative, indirect, and remote from the alleged conduct and cannot be ascertained and apportioned.

4. Plaintiffs and members of the putative classes have not sustained antitrust injury or any injury of the type that the relevant statutes were designed to prevent by reason of FICO's conduct as alleged in the Complaint.

5. Plaintiffs' claims and the claims of the putative classes are barred, in whole or in part, because Plaintiffs fail to define a cognizable antitrust market that is relevant to their claims and/or their alleged markets are so vague and ambiguous as to deny fair notice of them to FICO.

6. Plaintiffs' claims are preempted and barred, in whole or in part, because FICO's alleged conduct has implied or express immunity from the antitrust laws.

7. Plaintiffs' claims and the claims of the putative class are barred, in whole or in part, because FICO lacks monopoly power in any well-defined relevant antitrust market.

8. Plaintiffs' claims and the claims of the putative classes are barred, in whole or in part, because, to the extent Plaintiffs suffered any injury or incurred any damages as alleged in the Complaint, which FICO denies, FICO's alleged conduct was not the actual or proximate cause of any injury or damage to Plaintiffs.

9. Plaintiffs' claims and the claims of the putative classes are barred, in whole or in part, because, to the extent Plaintiffs suffered any injury or incurred any damages, which FICO denies, any such injury or damage was caused and brought about by the acts, conduct, or omissions of individuals or entities other than FICO, and, as such, any recovery herein should be precluded or diminished in proportion to the amount of fault attributable to such other individuals or entities. FICO cannot be held liable for loss or damage caused by such individuals or entities, whether or not they are parties to this action.

10. Plaintiffs' claims and the claims of the putative classes are barred, in whole or in part, because, to the extent Plaintiffs suffered any injury, which FICO denies, any such injury was caused and brought about by intervening or superseding events, factors, occurrences, conditions, or acts of others, including forces in the marketplace, and not by the alleged wrongful conduct of FICO.

11.     This action is not properly maintainable as a class action under the Federal Rules of Civil Procedure. Among other things, common issues of fact and law do not predominate over individual issues; a class action is not a superior method for adjudicating the purported claims that remain for adjudication as set forth in the Complaint; adjudication on a class basis would be unmanageable; the interests of the purported class members are in conflict with each other; Plaintiffs are not proper class representatives, and their claims are not sufficiently typical of the purported class; and Plaintiffs and/or their counsel will not fairly and adequately represent the purported class.

12.     The certification and maintenance of this action as a class action would violate FICO's Due Process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution and would deny FICO the right of access to the courts to the extent the certification and maintenance of a class action would deprive FICO of procedural and substantive safeguards and of traditional defenses to liability.

13.     To the extent Plaintiffs or any purported class members seek to assert claims or obtain relief under the laws of a state of which they are not a resident, those claims are barred by constitutional rights of due process, choice of law principles, and the laws of the states under which Plaintiffs assert their claims.

14.     Plaintiffs' state law claims and the claims of the putative classes are barred, in whole or in part, because Plaintiffs' Complaint fails to allege actionable conduct as enumerated in the relevant antitrust and/or consumer protection statute or statutes.

## **RESERVATION OF RIGHTS**

FICO presently has insufficient knowledge or information upon which to form a basis as to whether it may have additional, as-yet-unstated, separate defenses available. FICO therefore

reserves the right to amend this statement of Affirmative Defenses to add, supplement, or modify its defenses based upon legal theories that may be or will be divulged through clarification of the Complaint, through discovery, or through further factual or legal analysis of Plaintiffs' allegations, contentions, and/or positions in this action.

### JURY DEMAND

FICO hereby demands trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, FICO requests that Plaintiffs' Complaint be dismissed with prejudice, that the Court find that Plaintiffs are not entitled to any judgment or relief, that the Court enter judgment in favor of FICO, and that the Court award FICO its attorneys' fees, costs and expenses, pre-judgment interest, and such other and further relief as the Court deems just and proper.

Dated: October 23, 2023

/s/ *Matthew D. Provance*
Britt M. Miller
Matthew D. Provance
J. Gregory Deis
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
(312) 701-7711—Facsimile
bmiller@mayerbrown.com
mprovance@mayerbrown.com
gdeis@mayerbrown.com

*Counsel for Defendant Fair Isaac Corporation*

**CERTIFICATE OF SERVICE**

I, Matthew D. Provance, an attorney, hereby certify that on October 23, 2023, I caused a true and correct copy of the foregoing **DEFENDANT FAIR ISAAC COMPANY'S ANSWER AND AFFIRMATIVE DEFENSES TO INDIRECT PURCHASER PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

/s/ *Matthew D. Provance*
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
mprovance@mayebrown.com