**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE FICO ANTITRUST LITIGATION | ) ) ) | Judge Edmond E. Chang |
| This Document Relates to the Following Cases: | ) ) ) ) | Magistrate Judge David E. Weisman<br><br>No. 1:20-CV-02114 |
| DIRECT PURCHASER CASES | ) ) ) | JURY TRIAL DEMANDED |

**DIRECT PURCHASER PLAINTIFFS'**
**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................. 1

PARTIES ................................................................................... 6

    I.     PLAINTIFFS .................................................................. 6

    II.    DEFENDANTS ............................................................... 9

JURISDICTION, VENUE, AND INTERSTATE COMMERCE ..................... 9

FACTUAL ALLEGATIONS ............................................................. 10

    I.     CREDIT SCORING AND REPORTING ............................... 10

         A.     Credit Scores ....................................................... 10

         B.     Credit Reports ...................................................... 12

    II.    THE MARKETS FOR CREDIT SCORES IN THE UNITED STATES ............ 15

    III.   FAIR ISAAC'S MONOPOLY POWER IN THE B2B CREDIT SCORE MARKET ................................................................ 19

    IV.   VANTAGESCORE SOLUTIONS' ENTRY INTO THE B2B CREDIT SCORE MARKET AND ITS INNOVATIVE PRODUCT ................................. 23

    V.    FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT.. 27

         A.     Fair Isaac's Anticompetitive Litigation ................... 27

         B.     Litigation Between Fair Isaac and TransUnion ......................... 29

         C.     Fair Isaac and the Credit Bureaus' Agreements to Restrain Competition 31

             1.     Fair Isaac and the Credit Bureaus Agree to Anticompetitive Provisions in Licensing Agreements ............................................. 31

             2.     The Anticompetitive Terms of the Contracts Fair Isaac and the Credit Bureaus Entered into ........................................................ 34

                  i.     The "No Equivalent Products" Provisions........................ 37

                  ii.    The "Dynamic Royalty Schedule" Provisions................. 38

                  iii.   The "Level Playing Field" Provisions ............................. 41

         D.     Fair Isaac's Additional Efforts to Deter B2B Purchasers from Using VantageScore ........................................................ 46

    VI.   THE CONTRACTS BETWEEN FAIR ISAAC AND EACH OF THE CREDIT BUREAUS CONTAINING ANTICOMPETITIVE TERMS, ALONG WITH FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT, HARM COMPETITION IN THE B2B CREDIT SCORE MARKET ................ 50

CLASS ACTION ALLEGATIONS ..................................................... 51

STATUTES OF LIMITATIONS AND TOLLING........................................ 53

I.      THE STATUTES OF LIMITATIONS DID NOT BEGIN TO RUN BECAUSE PLAINTIFFS DID NOT DISCOVER, AND COULD NOT HAVE DISCOVERED, DEFENDANTS' UNLAWFUL SCHEME ............................... 53

II.     FRAUDULENT CONCEALMENT TOLLED THE STATUTES OF LIMITATIONS ...................................................................................................... 55

III.    DEFENDANTS' ACTIONS CONSTITUTE A CONTINUING VIOLATION .. 57

CLAIMS FOR RELIEF ................................................................................................ 58

CLAIM ONE: UNREASONABLE RESTRAINT OF TRADE
(15 U.S.C. §§1, 3) ............................................................................................ 58

CLAIM TWO: UNREASONABLE RESTRAINT OF TRADE
(15 U.S.C. §§1, 3) ............................................................................................ 60

CLAIM THREE: UNREASONABLE RESTRAINT OF TRADE
(15 U.S.C. §§1, 3) ............................................................................................ 62

CLAIM FOUR: UNREASONABLE RESTRAINT OF TRADE
(15 U.S.C. §§1, 3) ............................................................................................ 64

CLAIM FIVE: MONOPOLIZATION
(15 U.S.C. §2) .................................................................................................. 66

CLAIM SIX: STATE ANTITRUST LAWS .................................................... 67

CLAIM SEVEN: STATE UNFAIR AND DECEPTIVE TRADE PRACTICES LAWS ................................................................................................................ 78

PRAYER FOR RELIEF ................................................................................................ 92

DEMAND FOR JURY TRIAL .................................................................................... 93

CERTIFICATE OF SERVICE ..................................................................................... 97

Plaintiffs Sky Federal Credit Union, Alcoa Community Federal Credit Union, Amalgamated Bank, City of Boston Credit Union, First Choice Federal Credit Union, Getten Credit Company, and Holmes County Bank & Trust Company ("Plaintiffs"), on behalf of themselves and all similarly situated entities in the United States and its territories, bring this action pursuant to Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§1, 2, 3) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26), as well as certain state antitrust and consumer protection laws, against Defendants Fair Isaac Corporation ("Fair Isaac"), Equifax, Inc. ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and TransUnion, LLC ("TransUnion") (collectively "Defendants," with the latter three referred to collectively as the "Credit Bureaus," the "Credit Rating Agencies," or the "Credit Bureau Defendants"), resulting from their restraining trade and Fair Isaac's monopolizing the B2B Credit Score Market from October 1, 2006 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased (the "Class Period"). The allegations of this Complaint are based on personal knowledge as to the allegations concerning each Plaintiff and on information and belief as to all other matters.

## <u>NATURE OF THE ACTION</u>

1.      A "credit score" is a three-digit numerical summary of a customer's creditworthiness based on factors such as payment history and the duration of that history; balances, available credit, and the percentage of existing credit lines being utilized; public records like bankruptcies or adverse judgments; and the assumption of new debt. There are two distinct markets for such scores. The first is the market for the sale of such scores to banks, mortgage companies, credit unions, and other businesses that assess individual credit risk – *i.e.*, business-to-business sales. That market is referred to herein as the "B2B Credit Score Market." The second

is the market for the sale of such scores to the individual who is the subject of them – *i.e.*, business-to-consumer. That market is referred to herein as the "B2C Credit Score Market."

2.    This case concerns the B2B Credit Score Market, which Defendant Fair Isaac has dominated for nearly three decades (and continues to dominate) with its FICO® Scores. FICO Scores are used routinely by lenders and others to assess individual credit risks. Fair Isaac executives have bragged that their FICO Scores are "the 800-pound gorilla" and are "deeply embedded in the system in North America."[1] Fair Isaac advertises that its FICO Scores are used for 90% of all lending decisions in the United States and that Fair Isaac sells four times more FICO Scores per year than McDonald's sells hamburgers worldwide. The dominance of FICO Scores is reflected in the following chart taken from a December 2019 "Investor Overview" presentation that is available on Fair Isaac's corporate website:[2]



---

[1]    Trans Union LLC's Redacted Counterclaims, Dkt. 38, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318, ¶2 (N.D. Ill. Feb. 12, 2018) ("TransUnion Counterclaims").

[2]    Fair Isaac, *FICO: The Decisions Company Investor Overview*, at 5 (Dec. 2019), https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.

3. TransUnion, Experian, and Equifax are credit reporting agencies that collect, standardize, and distribute information on the credit and financial history of individuals. Those Credit Bureaus sell lenders, financial institutions, and other businesses credit reports and credit scores – including Fair Isaac's FICO Scores – that are used to make decisions about whether and on what terms to evaluate and extend credit. Credit Bureaus sell those credit reports and credit scores to businesses in every state. The three Credit Bureau Defendants control virtually 100% of aggregate credit-related data formed by aggregating credit data collected from businesses, and they jointly dominate the market for B2B credit reports.

4. For decades, the Credit Bureaus have worked with Fair Isaac, including by entering into licensing agreements with Fair Isaac, and distribution agreements with businesses and/or Fair Isaac to broker sales of FICO Scores.

5. Fair Isaac also directly sells FICO Scores to creditors and other businesses – bypassing the Credit Bureaus, and competing with them, when it does so.

6. In 2006, the Credit Bureaus banded together to launch VantageScore Solutions, LLC ("VantageScore Solutions") through a joint venture. The Credit Bureaus own VantageScore Solutions. The Credit Bureaus' purpose behind their joint venture was to create a competitor to the FICO Score, known as the "VantageScore."[3]

---

[3] *See* Third Amended Complaint, Dkt. 436, *Fair Isaac Corporation v. Experian Info. Sols.*, No. 06-CV-4112, ¶63 (D. Minn. Nov. 10, 2008) ("VantageScore is owned by Equifax, Experian, and TransUnion."); Dkt. 477, Credit Bureaus' Answer to Third Amended Complaint, *Fair Isaac Corporation v. Experian Info. Sols.*, No. 06-CV-4112, ¶63 (D. Minn. Dec. 4, 2008) (admitting same); Business Wire, *VantageScore Solutions Hires Capital Markets Expert Latonia Hubbs as Senior Vice President* (Sept. 7, 2021), https://www.businesswire.com/news/home/20210907005583/en/VantageScore-Solutions-Hires-Capital-Markets-Expert-Latonia-Hubbs-as-Senior-Vice-President.

7.      From the outset, VantageScore was competitively priced, highly predictive, and scored millions more Americans than Fair Isaac's FICO Score.  VantageScore Solutions is capable of providing credit scores for 30 million more Americans than Fair Isaac can.  Notably, Fair Isaac leaves many people of color and lower-income individuals unscored.  Were VantageScores widely adopted by businesses, millions more creditworthy Americans would have the opportunity to apply for a home mortgage, car loan, or credit card, and to obtain credit at a lower cost.

8.      Rather than compete on the merits with VantageScore, Fair Isaac undertook a ***decades-long campaign of anticompetitive conduct*** to discourage the adoption of VantageScore and preserve its own monopoly.  Fair Isaac also entered into contracts with each Credit Bureau that contained anticompetitive provisions, including provisions that would necessarily eliminate or drastically reduce the competitive threat posed by VantageScore, thus unreasonably restraining trade.

9.      First, in 2006, Fair Isaac filed a lawsuit against TransUnion, Equifax, and Experian with the intended purpose of driving VantageScore Solutions out of business.  Experian settled in 2008 and entered into a lucrative partnership with Fair Isaac following the settlement.  TransUnion and Equifax fought on, eliminated most of Fair Isaac's claims through a summary judgment motion and won a jury trial on the remaining trademark claim.

10.      Second, when the litigation gambit failed, Fair Isaac entered into contracts with the Credit Bureaus containing anticompetitive restrictions aimed at extracting supracompetitive profits from B2B Purchasers.  Those contracts include contractual provisions that: (1) prohibit Credit Bureaus from marketing non-FICO credit scores (*i.e.*, VantageScore); (2) charge discriminatory and prohibitively high prices for FICO Scores if a Credit Bureau customer purchases a FICO Score while providing the consumer with a competing score (*i.e.*, a

VantageScore); and (3) eliminate price competition among the Credit Bureaus thereby disincentivizing the Credit Bureaus from negotiating a lower price for FICO Scores. The agreements had the effect of hobbling VantageScore Solutions' ability to compete and forcing B2B Purchasers to pay supracompetitive prices for credit scores.

11.     Finally, Fair Isaac commenced a public smear campaign intended to dissuade potential customers from using VantageScore.

12.     By unlawfully maintaining its monopoly through such anticompetitive tactics, Fair Isaac, with the agreement of the Credit Bureaus, has been able to exclude VantageScore from competing for customers in the B2B Credit Score Market. The effect of this exclusion has been Fair Isaac's ability to *maintain the prices for FICO Scores at a supracompetitive level for decades and raise prices with impunity for its credit scoring products*. For example, Fair Isaac's net income for the third quarter of 2021 was *more than double* that of the previous year period, increasing from $64.1 million in the third quarter of 2020 to $151.2 million in the third quarter of 2021.[4] Over time, Fair Isaac's net income has remained very high, with $236 million net income in 2020, $392 million in 2021, and $374 million in 2022.[5] Sources in the financial industry have attributed Fair Isaac's profitability to "[p]rice increases in its credit scoring segment and gains in

---

[4]     Press Release, Fair Isaac, *FICO Announces Earnings of $5.18 per Share for Third Quarter Fiscal 2021* (Aug. 3, 2021), https://investors.fico.com/news-releases/news-release-details/fico-announces-earnings-518-share-third-quarter-fiscal-2021.

[5]     Fair Isaac Corporation, Q4 2020 Earnings Call, BAMSEC (Nov. 10, 2020), https://www.bamsec.com/document-search?query=236&entityId=814547; Fair Isaac Corporation, Q4 2020 Earnings Call, BAMSEC (Nov. 10, 2020), https://www.bamsec.com/document-search?query=392&entityId=814547; Fair Isaac Corporation, Q4 2022 Earnings Call, BAMSEC (Nov. 9, 2022), https://www.bamsec.com/document-search?query=374&entityId=814547.

applications sold to banking institutions," which have "helped the company log year-over-year gains in revenue and profit."[6]

13.    Fair Isaac's and the Credit Bureaus' conduct harmed competition and injured Plaintiffs and members of the class by forcing them to pay supracompetitive prices for FICO Scores.

14.    Plaintiffs and the Class are the first purchasers from outside the Fair Isaac-Credit Bureaus conspiracies.

## PARTIES

### I.    PLAINTIFFS

15.    Plaintiff Sky Federal Credit Union ("Sky FCU") is a federally chartered credit union with a principal place of business at 111 North B Street, Livingston, Montana.  Sky FCU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers.  During the Class Period, Sky FCU directly purchased B2B credit scores from Fair Isaac and Experian.  Sky FCU was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law.  Sky FCU is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

16.    Plaintiff Alcoa Community Federal Credit Union ("Alcoa FCU") is a Federal Credit Union with its principal place of business at 1125 Military Road, Benton, Arkansas.  Alcoa FCU makes loans and other credit-related facilities available to consumers.  Alcoa FCU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards,

---

[6]    Motley Fool, *Fair Isaac Corporation Scores 13% Revenue Growth in the First Quarter* (Jan. 31, 2019), https://www.fool.com/investing/2019/01/31/fair-isaac-corporation-scores-13-revenue-growth-in.aspx.

and lending and other credit-related facilities for consumers. During the Class Period, Alcoa FCU directly purchased B2B credit scores from Fair Isaac, TransUnion, and Experian. Alcoa FCU was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Alcoa FCU is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

17.     Plaintiff Amalgamated Bank ("Amalgamated Bank") is a New York State chartered commercial bank and trust company with a principal place of business at 275 Seventh Avenue, New York, New York. Amalgamated Bank is the largest union-owned bank in the United States. Workers United and affiliated organizations are the largest shareholders of Amalgamated Bank. Amalgamated Bank provides financial services, including personal banking services for consumers; services for businesses, non-profit organizations; and institutional investing services. During the Class Period, Amalgamated Bank directly purchased B2B credit scores from Fair Isaac, Experian, and Equifax. Amalgamated Bank was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Amalgamated Bank is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

18.     Plaintiff City of Boston Credit Union ("City of Boston CU") is a credit union with its principal place of business at One Union Street, 3rd Floor, Boston, Massachusetts. City of Boston CU is a member-owned credit union that was established on November 15, 1915. City of Boston CU is one of the oldest credit unions in the United States. City of Boston CU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers. During the Class Period, City of Boston CU directly purchased B2B credit scores from Fair Isaac and Experian. City of Boston

CU was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. City of Boston CU is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

19.     Plaintiff First Choice Federal Credit Union ("First Choice FCU") is a federally chartered credit union with a principal place of business at 2209 West State Street, New Castle, Pennsylvania. First Choice FCU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers. During the Class Period, First Choice FCU directly purchased B2B credit scores from Fair Isaac and TransUnion. First Choice FCU was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. First Choice FCU is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

20.     Plaintiff Getten Credit Company ("Getten") is a corporation with its principal place of business at 1310 Sibley Memorial Highway, Mendota, Minnesota. Getten is a small, family-owned independent finance company that specializes in helping consumers with various financial needs including debt consolidation, purchasing vehicles, and rebuilding credit. During the Class Period, Getten directly purchased B2B credit scores from TransUnion. Getten was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Getten is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

21.     Plaintiff Holmes County Bank & Trust Company ("Holmes County Bank") is a bank with its principal place of business at 316 Court Square, Lexington, Mississippi. Holmes County Bank has provided financial services to its customers since 1932. During the Class Period,

Holmes County Bank directly purchased B2B credit scores from Equifax and TransUnion. Holmes County Bank was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Holmes County Bank is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

## II.    DEFENDANTS

22.    Defendant Fair Isaac is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California.

23.    Defendant Equifax is a Credit Bureau incorporated in Georgia that has its principal place of business at 1550 Peachtree St. NW, Atlanta, Georgia.

24.    Defendant Experian is a Credit Bureau incorporated in Ohio that has its principal place of business in the United States at 475 Anton Blvd., Costa Mesa, California.

25.    Defendant TransUnion is a Delaware limited liability Credit Bureau that has its principal place of business at 555 W. Adams St., Chicago, Illinois.

### JURISDICTION, VENUE, AND INTERSTATE COMMERCE

26.    This action arises under Sections 1 through 3 of the Sherman Act (15 U.S.C. §§ 1-3) and Sections 4 & 16 of the Clayton Act (15 U.S.C. §§ 15 & 26).

27.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337.

28.    The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims.

29.    Venue is proper in this District under 15 U.S.C. §§ 15(a) & 22, and 28 U.S.C. § 1391(b), (c), and (d), because, during the Class Period, Defendants resided, transacted business, were found, or had agents in the United States, including in this District, and a substantial portion of the alleged activity affected interstate trade and commerce, including in this District.

9

30.     During the Class Period, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States and its territories, including in this District.

31.     During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States Mail, to effectuate their illegal scheme.

32.     Defendants' conduct also had a substantial effect on the intrastate commerce of the states listed in counts Six and Seven of this Complaint.

33.     This Court has personal jurisdiction over Defendants because Defendants transacted business, maintained substantial contacts, and are located and/or committed unlawful conduct in this District.  Their unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

## FACTUAL ALLEGATIONS

## I.     CREDIT SCORING AND REPORTING

### A.     Credit Scores

34.     A credit score is a three-digit number, typically between 300 and 850, designed to represent an individual's credit risk or the likelihood the individual will pay bills on time.

35.     Credit scores are calculated using information in an individual's credit reports, including an individual's payment history, the amount of debt the individual has, and the length of the individual's credit history.  Higher scores mean the individual has demonstrated responsible credit behavior in the past, which may make potential lenders and creditors more confident when evaluating a request for credit.  Credit scoring companies like Fair Isaac and VantageScore Solutions apply complex algorithms to arrive at a numerical credit score.

36.     Credit scores are accompanied by "reason codes," which explain to the potential

lender or creditor why the score was not higher.  VantageScore explains this process as follows:

> No matter where you get your score, the documents that accompany it will include up to four or five statements explaining why your score wasn't higher.  These statements are called reason codes and sometimes go by several other names.  Some people call them score factors, others call them adverse action codes.  They're all the same thing.

> The next time you see your credit score, regardless of where it comes from, look for the reason codes.  They'll be worded and displayed something like this:

> Your Credit Score Is: 705

> 32: Balances on bankcard or revolving accounts too high compared to credit limits

> 16: The total of all balances on your open accounts is too high

> 85: You have too many inquiries on your credit report

> 13: Your most recently opened account is too new

> The numbers preceding each statement are numeric identifiers; sometimes they appear with the text, and sometimes they do not.

> The four (or five) factors are listed in order of the impact they have.  In this example, the number one reason the credit score is not higher is "Balances on bankcard or revolving accounts too high compared to credit limits."  That means the consumer's credit card debt is too high relative to his or her credit limits.

> In our example, the reason with the second-greatest impact is "The total of all balances on your open accounts is too high."  That means the consumer is carrying too much debt on his or her open accounts.

> The third reason the score isn't higher is "You have too many inquiries on your credit report."  This means the consumer has recently applied for credit several times, which led to some number of credit inquiries.

> The fourth reason the score isn't higher is "Your most recently opened account is too new."  Clearly this means the consumer has a very new account on his or her credit report.[7]

---

[7]     VantageScore Solutions, *Reason Codes 101*, https://www.reasoncode.org/reasoncode101 (last visited on Oct. 30, 2023).

37.     Fair Isaac has a webpage that sets forth its various "reason codes."[8]  VantageScore also has a dedicated website that explains its various "reason codes."[9]

**B.      Credit Reports**

38.     Credit Bureaus collect and store financial data about individuals that is submitted to them by creditors, such as lenders, credit card companies, and other financial companies. Creditors are not required to report to every credit-reporting company.

39.     Utilizing these files, Credit Bureaus create a credit report, which is a statement that has information about an individual's credit activity and current credit situation, such as loan payment history and the status of credit accounts.  The information contained in such reports is used to create credit scores.

40.     Credit Bureaus sell these credit reports to lenders or creditors such as Plaintiffs and the Class ("B2B Purchasers") in the "B2B market."  They also sell them to individuals wishing to monitor their own credit ("B2C Purchasers").

41.     Fair Isaac works with the Credit Bureaus to perpetuate and extend its monopoly. Fair Isaac's relationship with B2B Purchasers is often dependent on B2B Purchasers' relationships with the Credit Bureaus: The Credit Bureaus facilitate the sale of FICO Scores to B2B Purchasers.

42.     FICO Scores and credit reports are often sold to businesses as a bundle.  Such bundles can be sold by Credit Bureaus, which are licensed by Fair Isaac to sell FICO Scores and in return, pay a royalty to Fair Isaac.  Thus, when a B2B Purchaser requires a credit score, it purchases a credit report from a Credit Bureau and a credit score from that Credit Bureau and Fair

---

[8]      Fair Isaac, *US FICO® Score Reason Codes*, https://www.fico.com/en/latest-thinking/solution-sheet/us-fico-score-reason-codes (link to download) (last visited on Oct. 30, 2023).

[9]      VantageScore Solutions, REASONCODE.ORG, https://www.reasoncode.org (last visited Oct. 26, 2023).

Isaac often through a contract with both Fair Isaac and the Credit Bureau. Although the payment for the credit report and the credit score may at times occur in a single transaction, the reality is that both the Credit Bureau and Fair Isaac act as the providers of the FICO Score. Indeed, certain Class members' contracts for the sale of FICO Scores and credit reports to B2B Purchasers specify that "in consideration of [the Credit Bureau]/Fair Isaac's performance" of their obligations to provide those products, the purchaser shall "pay [the Credit Bureau]/Fair Isaac fees" for those products.

43. In its 2020 Form 10-K filed with the Securities and Exchange Commission, Fair Isaac stated that, "[d]uring fiscal 2020, 2019 and 2018, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for 32%, 29% and 25% of our total revenues, respectively."[10] In its 2022 Form 10-K filed with the SEC, Fair Isaac disclosed significant increases of the revenue Fair Isaac generated from its agreements with the Credit Bureaus, reporting that "during fiscal 2022, 2021 and 2020, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for *39*%, *38*% and *33*% of our total revenues, respectively."[11] The same Form 10-K describes the Credit Bureaus as Fair Isaac's "partners in offering [FICO's] scoring solutions."[12]

44. The FICO Score and credit report bundles can also be sold by Fair Isaac to businesses. "In those situations, Fair Isaac requests a credit score and credit report from the Credit Bureau selected by the lender or consumer. The Credit Bureau applies Fair Isaac's Bureau-tailored

---

[10] Fair Isaac Corporation, Annual Report (Form 10-K), at 11 (Nov. 10, 2020), https://fico.gcs-web.com/node/23951/html (hereinafter, "Fair Isaac 2020 10-K").

[11] Fair Isaac Corporation, Annual Report (Form 10-K), at 9 (Nov. 9, 2022), https://fico.gcs-web.com/static-files/9050c8f5-9c87-4d41-8ecd-6d9f3d179a8a (hereinafter, "Fair Isaac 2022 10-K") (emphasis added).

[12] *Id.*

FICO algorithm to a consumer's aggregated credit data and provides the consumer's credit report and credit score to Fair Isaac. Fair Isaac then delivers the bundle to the consumer or lender. Fair Isaac pays the Credit Bureau for the cost of processing and providing the bundle."[13]

45.   Thus, Fair Isaac and the Credit Bureaus act as horizontal competitors and compete with each other for some B2B Purchasers – separate and apart from Fair Isaac's competition with VantageScore.

46.   This direct competition between Fair Isaac and the Credit Bureaus, as well as the close relationship among them, continues to this day. At an August 3, 2021 earnings conference, Fair Isaac's Chief Executive Officer and Director, William J. Lansing, said, "we stay close to it [B2B scores] through our channel partners, the bureaus. But we also – certainly for all of the major institutions, we have direct sales relationships."[14] TransUnion's 2022 Form 10-K acknowledges that it "compete[s] with FICO in the Financial Services" market for B2B Purchasers.[15] Similarly, Equifax's 2022 Form 10-K acknowledges that it too "compete[s] with Fair Isaac Corporation with respect to certain of [its] analytical tools and solutions."[16] Experian has also recognized that its "comparator companies" include "FICO."[17]

---

[13]   *Fair Isaac Corp. v. Equifax, Inc.*, No. 06-4112, 2008 WL 623120, at *2 (D. Minn. March 4, 2008).

[14]   Motley Fool, *Fair Isaac Corp. (FICO) Q3 2021 Earnings Call Transcript* (Aug. 3, 2021) (hereinafter, "Q3 Earnings Call"), https://www.fool.com/earnings/call-transcripts/2021/08/03/fair-isaac-corporation-fico-q3-2021-earnings-call/.

[15]   TransUnion, Annual Report (Form 10-K), at 12 (Feb. 14, 2023).

[16]   Equifax Inc., Annual Report (Form 10-K), at 8 (Feb. 23, 2023).

[17]   Experian *Annual Report 2022*, EXPERIAN PLC, (2022), at 139, https://www.experianplc.com/content/dam/marketing/global/plc/en/assets/documents/reports/2022/experian_ar2022_web.pdf.

## II.     THE MARKETS FOR CREDIT SCORES IN THE UNITED STATES

47.     As noted above, there are distinct B2B and B2C Credit Score Markets.  The B2B Credit Score Market comprises sales from a business (a credit score generator, such as Fair Isaac, directly or through a Credit Bureau) to a lender, creditor, or financial institution.  The B2C Credit Score Market comprises sales directly to an individual.  The claims in this case concern the B2B Credit Score Market.  The B2B Credit Score Market is the relevant product market in which the claims that require a market definition are to be assessed.

48.     Fair Isaac has recognized the existence of the distinct B2B and B2C markets.  For example, its 2020 Form-10K states: "*Scores*.  This segment includes our business-to-business scoring solutions and services, our business-to-consumer scoring solutions and services including myFICO® solutions for consumers, and associated professional services."[18]  Likewise, Fair Isaac measures quarterly scores revenues with "the company's business-to-business (B2B) scoring solutions and associated professional services, and business-to-consumer (B2C) service," as reflected in its recent earnings report for the first quarter of 2020.[19]

49.     The credit scores that lenders purchase often differ significantly from the credit scores that consumers purchase.  The Consumer Financial Protection Bureau ("CFPB") noted in a 2011 report to Congress that "many of the credit scores sold to lenders are not offered for sale to consumers."[20]  The agency went on to explain:

When a consumer purchases a score from a CRA [Credit Rating Agency], it is likely

---

[18]     Fair Isaac 2020 10-K, at 3.

[19]     Press Release, Fair Isaac Corp., *FICO Announces Earnings of $1.82 per Share for First Quarter Fiscal 2020* (Jan. 30, 2020), https://fico.gcs-web.com/news-releases/news-release-details/fico-announces-earnings-182-share-first-quarter-fiscal-2020.

[20]     Consumer Financial Protection Bureau, *The impact of differences between consumer- and creditor-purchased credit scores*, at 1 (July 19, 2011), https://files.consumerfinance.gov/f/2011/07/Report_20110719_CreditScores.pdf.

that the credit score that the consumer receives will not be the same score as that purchased and used by a lender to whom the consumer applies for a loan. This could occur if the score the consumer purchased is an educational score that is not used by lenders, but differences between the score a consumer buys and the score a lender buys can occur for other reasons as well. Since so many scores are in use in the marketplace, it could also be the case that the particular lender to which the consumer applies uses a different scoring model than the one purchased by the consumer, or that the CRA from which the consumer obtains a score is not the same CRA that the lender uses to obtain scores, or that the underlying data in the consumer's credit report changes significantly between the time the consumer purchases a score and the time the lender obtains a score for that consumer. It is also possible that a consumer and a lender could access different reports from the CRA, if they were to use different identifying information about the consumer. Any of these differences could lead to differences between the credit score a consumer sees and the credit score a lender uses to assess that consumer.[21]

50. The United States (including its territories) is the relevant geographic market in which B2B credit scores are provided. The restraints on competition in the B2B Credit Score Market contained in Fair Isaac's contracts relate to the provision of B2B credit scores to businesses throughout the United States.

51. The B2B Credit Score Market exhibits high barriers to entry. As noted in a 2018 article: "The deep integration of FICO scores and products into companies' operations has raised switching costs."[22]

52. Likewise, VantageScore Solutions has observed that in the residential mortgage sector, Fair Isaac's "imprint *inhibits competition* by raising switching costs and granting the irreplaceable brand value of utter ubiquity. It gives FICO unparalleled and highly controversial negotiating leverage with almost every participant in the industry."[23]

---

[21] *Id*.

[22] *Fair Isaac: A Royalty on U.S. Credit Scoring* (Sept. 25, 2018), https://seekingalpha.com/ article/4208014-fair-isaac-royalty-on-u-s-credit-scoring.

[23] Press Release, VantageScore, *VantageScore Solutions Issues Statement Reacting to FHFA's Proposed Rules for Validating and Approving New Credit Scoring Models* (Dec. 17, 2018), https://vantagescore.com/press/vantagescore-solutions-issues-statement-reacting-to-fhfas-

53.     "Larger lenders use the [FICO] score as an input to customized models they've built for specific situations or portfolios.  After a recent review one major US lender recently identified over 600 places they were using a FICO score in their business processes.  Switching to a new score not only means proving the new score is better (a long process in itself) but extensive testing to ensure all of those moving parts are still working as designed.  Citibank recently announced that after an 18 month review they've decided it's safe to switch to the latest version of the FICO score (FICO 8).  This wasn't a migration to a new score mind you, just a more recent version of the score they're already using.  The **barriers to entry are indeed high** . . . and expensive."[24]

54.     "Network effects" – *i.e.*, the phenomenon where a product or service increases in value when the total number of customers increase – serve as a barrier to entry into the B2B Credit Score Market.  As one analyst has noted: "The 'network effects' keeping FICO's dominant position [are] indeed incredibly strong."[25]

55.     In 2011, at Fair Isaac's Analyst/Investor Day, Fair Isaac's then-CEO, Mark Greene, explained:  "In about 10 seconds, an entire commerce transaction taking place because 720 FICO was understood by the broker, by the mortgage banker on the other end of line and the customer to be shorthand for good credit risk, gave this guy a favorable mortgage rate.  And that network

---

proposed-rules-for-validating-and-approving-new-credit-scoring-models (emphasis added).

[24]     John Ulzheimer, *Why FICO Isn't Going Away Any Time Soon*, Smart Credit (July 5, 2011), https://blog.smartcredit.com/2011/07/05/why-fico-isnt-going-away-any-time-soon/     (emphasis added).

[25]     Harrison Schwartz, *Fair Isaac: Share Buybacks Likely To End As Cash Reserves Run Low*, Seeking Alpha (Dec. 17, 2019), https://seekingalpha.com/article/4312953-fair-isaac-share-buybacks-likely-to-end-cash-reserves-run-low.

effect, having everybody in the loop understand that shorthand and standardize on a FICO Score, that's magic."[26]

56.     The anticompetitive conduct by Fair Isaac alleged herein accounts in significant part for the FICO Score's dominance in the B2B Credit Score Market.

57.     The Credit Bureaus participate in a market for credit reports.  A credit report contains detailed information about a consumer's credit activity and current credit situation.  The detailed information in a credit report is used to generate a FICO Score for a specific customer, which B2B lenders can use in making their lending decisions.

58.     On information and belief, the Credit Bureaus control virtually all of the credit report market (they have been called a "triopoly") and enjoy roughly equivalent market shares.[27]

59.     The three Credit Bureaus are all members of a trade association called the Consumer Data Industry Association ("CDIA").  Through the CDIA, the three Credit Bureaus frequently work together, including to: (i) develop a standard electronic data reporting format called Metro 2®; (ii) issue joint statements on matters of public importance; (iii) provide guidelines to businesses that use credit reports; and (iv) respond to public criticisms of their industry.  The three Credit Bureaus also cooperated in the establishment of VantageScore Solutions as a joint venture.[28]

---

[26]     SA Transcripts, Seeking Alpha, *Fair Isaac Corp. – Analyst/Investor Day* (Nov. 3, 2011), https://seekingalpha.com/article/307417-fair-isaac-corp-analyst-investor-day.

[27]     *See* Consumer Financial Protection Bureau, *List of Consumer Reporting Companies* (2021),     https://files.consumerfinance.gov/f/documents/cfpb_consumer-reporting-companies-list_2021-06.pdf.

[28]     *See* Consumer Data Industry Ass'n, *About CDIA*, https://www.cdiaonline.org/about/about-cdia/ (last visited Oct. 26, 2023); Consumer Data Industry Ass'n, *Metro 2 Format for Credit Reporting*,     https://www.cdiaonline.org/resources/furnishers-of-data-overview/metro2-information/ (last visited Oct. 26, 2023); Dana Fowle, *Industry Pushes Back Against Claims of High Credit Reporting Errors*, Fox5 Atlanta (Sept. 15 2021), https://www.fox5atlanta.com/

## III.    FAIR ISAAC'S MONOPOLY POWER IN THE B2B CREDIT SCORE MARKET

60.    Fair Isaac came into existence in 1956, possessed a monopoly on credit-scoring

algorithms until the mid-1970s, and continues to wield a dominant market share.[29]

61.    Fair Isaac states in its 2020 Form 10-K:

> Our products and services serve clients in multiple industries, including primarily
> banking, insurance, retail, healthcare and public agencies.  End users of our
> products include 96 of the 100 largest financial institutions in the U.S., and two-
> thirds of the largest 100 banks in the world.  Our clients also include more than 600
> insurers, including nine of the top ten U.S. property and casualty insurers; more
> than 300 retailers and general merchandisers; more than 200 government or public
> agencies; and more than 200 healthcare and pharmaceuticals companies, including
> nine of the world's top ten pharmaceuticals companies.  Eight of the top ten
> companies on the 2020 *Fortune* 500 list use one or more of our solutions.  In
> addition, our consumer services are marketed to an estimated 200 million U.S.
> consumers whose credit relationships are reported to the three major U.S. credit
> reporting agencies.[30]

62.    Fair Isaac itself has touted its dominance, noting in its "About" page that FICO

Scores are "the most widely used credit scores," used by "90% of top lenders," and have been the

"industry standard for 30 years."[31]

---

news/industry-pushes-back-against-claims-of-high-credit-reporting-errors;    Press    Release,
Consumer Data Industry Ass'n, *Consumer Data Industry Association Releases Study on the Value
of Credit Reporting in U.S.* (June 15, 2020), https://cdia-news.s3.amazonaws.com/White+Paper+
Press+Release+6.15.20.pdf; Kristina Poplawski, *Equifax, Experian, & TransUnion Endorse
CARES Act*, CONSUMER DATA INDUSTRY ASS'N (Mar. 30, 2020), https://www.cdiaonline.org/
equifax-experian-transunion-endorse-cares-act/; Consumer Data Industry Ass'n, *COVID-19*,
https://www.cdiaonline.org/covid-19/ (last visited Oct. 26, 2023).

[29]    Raymond    Anderson,    *A    History    of    Credit    Scoring*,    at    75-76    (2019),
https://www.researchgate.net/profile/Raymond_Anderson4/publication/331533723_Chapter_B0
6_History_of_Credit_Scoring/links/5c7ed843299bf1268d3ccc5d/Chapter-B06-History-of-
Credit-Scoring.pdf?origin=publication_detail.

[30]    Fair Isaac 2020 10-K, at 10.

[31]    Fair Isaac, *About*, https://www.ficoscore.com/about (last visited Oct. 26, 2023).



63.    An infographic on Fair Isaac's website states: "10 BILLION FICO SCORES ARE SOLD EACH YEAR," which is "FOUR TIMES the number of hamburgers McDonald's sells WORLDWIDE in a year," and "27,400,000 FICO scores are sold every day," which is "OVER TWICE the number of cups of coffee Starbucks sells WORLDWIDE in a day."[32]

---

[32]    Fair Isaac, *Learn About the FICO Score and Its Long History*, https://www.fico.com/25years/ (last visited Oct. 26, 2023) [https://web.archive.org/web/2018 0602142433/https://www.fico.com/25years/].



64.     Fair Isaac's 2020 Form 10-K states that FICO Scores "are used in the majority of U.S. credit decisions, by nearly all of the major banks, credit card organizations, mortgage lenders and auto loan originators," and it describes FICO Scores as "the standard measure in the U.S. of consumer credit risk."[33]

65.     Fair Isaac's executives frequently tout FICO's dominance.  In 2008, Craig Watts, a public affairs manager at Fair Isaac, described the FICO Score as the "800 pound gorilla."[34]  In November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's former

---

[33]     Fair Isaac 2020 10-K, at 3, 7.

[34]     Dana Dratch, *What Does 'Good' Credit Really Mean?*, CNBC (Oct. 30, 2008), https://www.cnbc.com/id/27458815.

Chief Financial Officer and Executive Vice-President, Michael Pung, stated that Fair Isaac's FICO Scores are: the "most widely used credit scoring system here in the U.S.," used by "[v]irtually every major lender in the U.S.," and that Fair Isaac has "maintained a **90-plus percent market share** for at least . . . 13 years."[35]

66.     A May 2021 report by Yale University's Thurman Arnold Project, a collaborative project among Yale faculty and students, as well as other scholars dedicated to research on competition policy and antitrust enforcement, notes that Fair Isaac "enjoys *a virtual monopoly* in the credit score market" and that "[b]ecause of the lack of competition in this domain, there has been limited innovation in scoring methodology."[36]

67.     Fair Isaac's monopoly in the B2B Credit Score Market has given it the power to control prices and impose monopoly rents.  Indeed, Mr. Lansing, Fair Isaac's CEO, has noted that in the B2B Credit Score Market, Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are."[37]

68.     In February 2013, at a Morgan Stanley Conference, Mr. Lansing explained that Fair Isaac's "Scores business, which is the cash generator, is a very, very high-margin business.  It's *deeply embedded* into the systems of the bank customers who use it."[38]

---

[35]     TransUnion Counterclaims, ¶ 32 (emphasis added).

[36]     Yale University Thurman Arnold Project, *Updating Antitrust and Competition Policy: Finance Issues*, at 14, 15 (May 2021), https://som.yale.edu/sites/default/files/TeamFinance-Final.pdf (emphasis added).

[37]     TransUnion Counterclaims, ¶ 34.

[38]     Seeking Alpha, *Fair Isaac's CEO Presents at Morgan Stanley Technology, Media & Telecom Conference (Transcript)* (Feb. 27, 2013), https://seekingalpha.com/article/1231981-fair-isaacs-ceo-presents-at-morgan-stanley-technology-media-and-telecom-conference-transcript (emphasis added).

69.     And in a 2021 Earnings Call, in response to a question regarding an instance where Fair Isaac lost scoring business to a competitor, Mr. Lansing responded: "Our business in Scores is as strong as it has ever been.  Our volumes are very strong.  We have not seen a decline.  And we don't see major issuers switching away.  So I guess the best way to characterize that is a one-off."[39]

## IV.     VANTAGESCORE SOLUTIONS' ENTRY INTO THE B2B CREDIT SCORE MARKET AND ITS INNOVATIVE PRODUCT

70.     In March 2006, the three Credit Bureau Defendants founded VantageScore Solutions as a joint venture, with the purpose of offering a credit scoring model that would compete with FICO Scores.  The three Credit Bureau Defendants continue to own VantageScore Solutions.

71.     VantageScore Solutions offers its own credit scoring system and score called VantageScore.  VantageScore Solutions does not sell or market its VantageScore credit models or credit scores; instead, it licenses them to the three Credit Bureau Defendants, which may incorporate VantageScores in their credit reports.

72.     VantageScores are a competitor to FICO Scores in the B2B Credit Score Market.

73.     VantageScore was a response to a recognized need.  Many individuals receive no or lower scores under FICO.  For example, the CFPB has found that, as of 2010, 26 million consumers in the United States were "credit invisible" – *i.e.*, they lacked credit history with one of the nationwide credit reporting companies.[40]  Those individuals cannot be scored by FICO.[41]

---

[39]     Q3 Earnings Call, *supra* n.14.

[40]     CFPB Office of Research, *Data Point: Credit Invisibles*, at 4, 6 (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf.

[41]     *Id*.

74.     The CFPB's research suggests "a strong relationship between income and having a credit record.  Almost 30 percent of consumers in low-income neighborhoods are credit invisible and an additional 16 percent have unscored records.  These percentages are notably lower in higher-income neighborhoods.  For example, in upper-income neighborhoods, only 4 percent of the population is credit invisible and another 5 percent has an unscored record."[42]

75.     Moreover, the CFPB found "significant differences in the incidence of having a limited credit history across racial and ethnic groups," specifically, while White and Asian individuals "are almost equally likely to be credit invisible or have an unscored record, the shares of Black[] and Hispanic[] [individuals] with limited credit history are much larger," and individuals in those groups are thus less likely to be able to obtain a credit score.[43]

76.     According to the CFPB, "[a]bout 15 percent of Black[] and Hispanic[] [individuals] are credit invisible . . . and an additional 13 percent of [Black individuals] and 12 percent of [Hispanic individuals] have unscored records.  .  .  .  This elevated incidence . . . is observed across ages, suggesting that these differences across racial and ethnic groups materialize early in the adult lives of these consumers and persist thereafter."[44]

77.     The CFPB went on to conclude that "[t]hese results suggest that the problems that accompany having a limited credit history are disproportionally borne by Black[], Hispanic[], and lower-income consumers."[45]

---

[42]     *Id.* at 24.

[43]     *Id.*

[44]     *Id.* at 24-25.

[45]     *Id.* at 25.

78.     Credit Karma has summarized some of the key differences between FICO and VantageScore.  One is the duration of credit history needed to obtain a VantageScore as opposed to a FICO Score:

> To have FICO® scores, consumers need to have one or more accounts that have been open for at least six months and at least one account that has reported to the credit bureaus within the past six months (plus no indication on your credit reports of being deceased).  Otherwise, FICO won't generate your scores.
>
> On the other hand, the VantageScore® model may be able to score consumers who are new to credit or use credit infrequently.  VantageScore can use data of just one month's history and one account reported within the previous 24 months.
>
> So if you're new to credit or you haven't used credit in a while, you may not have FICO® credit scores, but you might have VantageScore® credit scores.[46]

79.     Another difference concerns treatment of tax liens and civil judgments:

> In July 2017, changes to public-record reporting requirements were implemented that affected the information sent to consumer credit bureaus, leading them to eliminate many tax liens and civil judgments from consumers' credit reports.  In response to the changes, tax liens aren't weighed as heavily (but can still have a significant impact) in the latest VantageScore version, VantageScore® 4.0.  And they can still have a significant impact on FICO® scoring models.[47]

80.     A third difference involves the treatment of credit inquiries:

> It's a Catch-22.  Applying for new lines of credit – such as student loans, credit cards or mortgages – can negatively affect your credit scores.  But applying for multiple lines in order to compare rates makes sense if you want to get the best deal.  To minimize the impact that shopping for credit can have on your scores, newer FICO® versions count multiple credit inquiries of the same type within a 45-day period as a single inquiry.  This can be especially helpful when you're shopping around for a major loan, like for a car, as multiple auto loan inquiries within that window should only count as one hard inquiry.  For some older FICO® versions, the single-inquiry period can be 14 days.
>
> VantageScore counts multiple inquiries, even for different types of loans, within a 14-day period as a single inquiry.  Multiple inquiries on your reports for the same

---

[46]     Jennifer Brozic, Credit Karma, *VantageScore vs. FICO: What's the difference?* (Sept. 1, 2019), https://www.creditkarma.com/advice/i/vantagescore-vs-fico/.

[47]     *Id.*

type of loan or credit, spanning more than a 14-day period, may have a greater impact to your VantageScore® credit scores than to your FICO® scores.[48]

81.    And the final difference of significance involves the use of trending data:

Credit scores represent a snapshot of an individual's credit profile at the specific point in time when the scores are generated.  The FICO® credit-scoring models, for example, use data about consumers' borrowing and credit utilization that's been reported to the credit bureaus at the time the scores are generated.

VantageScore® 4.0, on the other hand, incorporates data that reflects patterns of behavior over time.  The latest scores may include up to two years' worth of consumer spending and credit utilization data in its calculation.[49]

82.    VantageScore has achieved some limited success.  In a 2018 report, VantageScore Solutions stated:

During the twelve months ending in July 2017, over 1.4 billion VantageScore credit scores were delivered directly to consumers by lenders like Chase and Capital One and educational websites like CreditKarma, Lending Tree, and Mint.  These scores are calculated using the same VantageScore model used by lenders (i.e., not an "educational" model).  They are most often provided free of charge as part of educational offerings that include simulators, credit reports, educational articles, and explanations.[50]

83.    VantageScore Solutions went on to note that "[a]s lenders adopt VantageScore, we believe that such adoption will improve consumers' access to credit in certain segments and enable many more borrowers to obtain fairer pricing."[51]  VantageScore Solutions also reported that "many of the most sophisticated secondary market participants use the VantageScore model to help evaluate and monitor risk, and to price and benchmark deals more accurately."[52]

---

[48]    *Id.*

[49]    *Id.*

[50]    VantageScore Solutions, *VantageScore® Credit Scores and The Mortgage Market*, at 8 (2018) ("VantageScore Report"), https://www.vantagescore.com/wp-content/uploads/2022/02/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf.

[51]    *Id*. at 5.

[52]    VantageScore Solutions, *Myth: VantageScore Is Not Accepted by Investors in*

84.     Despite VantageScore's innovations and advantages, Fair Isaac has maintained its monopoly in the B2B Credit Score Market and extracted monopoly rents through anticompetitive and exclusionary conduct and through anticompetitive agreements with each Credit Bureau.

## V.     FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT

85.     Fair Isaac anticipated the threat VantageScore could pose to its dominance in the B2B Credit Score Market.  Fair Isaac's own models of future losses predicted "***substantial double-digit declines***" if the use of VantageScore continued to expand.[53]

86.     Faced with the prospect of a significant hit to its market dominance, and its profits, Fair Isaac used its monopoly power to launch a comprehensive attack on VantageScore that included filing anticompetitive litigation; signing licensing agreements with anticompetitive provisions with the Credit Bureaus; and undertaking a campaign of disparagement against, and disinformation about, VantageScore Solutions and VantageScore.

### A.     Fair Isaac's Anticompetitive Litigation

87.     Fair Isaac viewed the creation of VantageScore as a competitive threat and filed a lawsuit against the Credit Bureaus in October 2006, accusing them of copyright infringement (by using a three-digit credit score like Fair Isaac did), unfair advertising, and antitrust violations.  As part of its requested relief, Fair Isaac asked that the Credit Bureaus "be ordered to dissolve VantageScore and/or to take all measures necessary to prevent VantageScore from having an

---

*Securitization Markets* (Mar. 23, 2016), https://vantagescore.com/education/blog/myth-vantagescore-is-not-accepted-by-investors-in-securitization-markets.

[53]     *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, No. CV 06-4112, 2008 WL 11348223, at *2 (D. Minn. Nov. 3, 2008) (emphasis added).

unreasonable anticompetitive effect in any market."[54]  It made this claim even though, at the time, Fair Isaac had 94% of the B2B market.[55]

88.  VantageScore Solutions characterized the litigation Fair Isaac initiated as a "legal battle that *sought to put us out of business*, even as we scrambled to establish a competitive foothold."[56]  Fair Isaac raised bogus antitrust claims that it knew lacked foundation, given its then-94% share of the B2B Credit Score Market.  It also alleged trademark infringement that a jury found to be based on a trademark that Fair Isaac had fraudulently obtained from the U.S. Patent and Trademark Office ("PTO").  In addition, Fair Isaac's contention that the "300-850" marks were anything other than "merely" descriptive lacked all foundation because – as the U.S. Court of Appeals for the Eighth Circuit later held – "consumers in this market immediately understand '300-850' to describe the qualities and characteristics of FICO's credit score – that the credit score will be within the range of 300-850."[57]

89.  Equifax settled the litigation in June 2008 and formed "a partnership [with Fair Isaac] to develop and sell advanced analytics and scoring solutions for businesses and consumers."[58]

90.  The litigation against Equifax and TransUnion lasted into 2011.  While it was ongoing, VantageScore Solutions remained under a cloud, with Fair Isaac's lawsuit hobbling its

---

[54]    Second Amended Complaint, Dkt. 81, *Fair Isaac Corp. v. Equifax, Inc.*, No. 06 CV 4112, at 86 (D. Minn. Apr. 18, 2007).

[55]    *Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645 F. Supp. 2d 734, 738 (D. Minn. 2009).

[56]    VantageScore Solutions, Inc., *10 years, 10 milestones* (June 30, 2020), https://www.vantagescore.com/newsletter/10-years-10-milestones-1/ (emphasis added).

[57]    *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1148 (8th Cir. 2011).

[58]    Fair Isaac, *Equifax and Fair Isaac Enter Partnership to Accelerate Development and Delivery of New Analytic Solutions* (June 10, 2008), https://www.fico.com/en/newsroom/equifax-and-fair-isaac-enter-partnership-accelerate-development-and-delivery-new-analytic.

commercial prospects: Potential B2B Purchasers for VantageScore had no way of being sure that the product might not be declared infringing on Fair Isaac's trademarks or that VantageScore Solutions would not be dissolved.

91.    The district court entered summary judgment in favor of the Credit Bureaus on the antitrust and false advertising claims.  A jury found against Fair Isaac on the remaining claim for trademark infringement, finding that the mark "300-850" (which denoted the range of FICO Scores) was merely descriptive.  It also found that: (1) Fair Isaac made a false representation during the application process to the PTO for the registrations of the "300-850" marks; (2) Fair Isaac knew that representation to be false when it was made and intended to deceive the PTO; and (3) the PTO relied on the false representation in deciding to issue the registrations.[59]

92.    The district court upheld the verdict, noting that "[t]his extensive, expensive litigation seems to have been initiated largely *in response to a perceived threat to Fair Isaac's dominant position in the credit scoring industry*."[60]

93.    In 2011, the United States Court of Appeals for the Eighth Circuit affirmed both that decision and the earlier summary judgment ruling.[61]

94.    VantageScore Solutions' growth during its first few years was inhibited by the litigation, which was part of a continuing antitrust violation by Fair Isaac that goes on to this day.

**B.    Litigation Between Fair Isaac and TransUnion**

96.    In December 2017, Fair Isaac sued TransUnion for unpaid royalties.[62]

---

[59]    *Fair Isaac*, 650 F.3d at 1148-50.

[60]    *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1000 (D. Minn. 2010) (emphasis added).

[61]    *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011).

[62]    *See* Complaint, Dkt. 1, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Nov. 16, 2017).

97.     In February 2018, TransUnion responded by filing antitrust counterclaims for, *inter alia*, monopolization against Fair Isaac.  In paragraphs 42-60 of the counterclaims (which was partially redacted), the anticompetitive terms the Credit Bureaus and Fair Isaac had agreed upon were disclosed publicly for the first time.  Those provisions are described in detail below.

98.     Fair Isaac moved to dismiss the counterclaims.  Judge Coleman denied the motion, ruling that "TransUnion has adequately pled actual and attempted monopolization" through allegations that "FICO engages in practices that are intended to drive out competition" through "exclusive dealing provisions [that] are unlawful attempts to 'maintain monopoly power through exclusionary conduct.' "[63]

99.     In November 2020, TransUnion and Fair Isaac settled on undisclosed terms.  One effect of this settlement was to cut Plaintiffs off from obtaining further information about the anticompetitive agreements between Fair Isaac and the Credit Bureaus.  Fair Isaac essentially bought TransUnion off.  This inference is bolstered by the fact that, in August 2021, TransUnion announced that it had entered into a long-term (presumably lucrative) contract to distribute FICO Scores to lenders and consumers in Canada.[64]

100.    The Antitrust Division of the United States Department of Justice took notice of Fair Isaac's conduct alleged in the TransUnion Action and instituted a civil investigation.  That

---

[63]     *Fair Isaac Corp. v. Trans Union, LLC*, No. 17:cv-8318, 2019 WL 1382068, at *2 (N.D. Ill. Mar. 27, 2019).

[64]     *See* Press Release, TransUnion, *TransUnion Enters New Long-term Agreement with FICO to Distribute FICO® Score in Canada* (Aug. 3, 2021), https://www.globenewswire.com/news-release/2021/08/03/2273895/0/en/TransUnion-Enters-New-Long-term-Agreement-with-FICO-to-Distribute-FICO-Score-in-Canada.html.

investigation was closed without action in December 2020, shortly after TransUnion settled with Fair Isaac.[65]

### C. Fair Isaac and the Credit Bureaus' Agreements to Restrain Competition

#### 1. Fair Isaac and the Credit Bureaus Agree to Anticompetitive Provisions in Licensing Agreements

101.    Rebuffed by the courts in its attempts to snuff out VantageScore in its infancy, Fair Isaac elected to take another approach.  When its existing licensing agreements with each Credit Bureau expired in 2013 or 2015, Fair Isaac reentered into agreements with each Credit Bureaus containing new and anticompetitive provisions that aimed to crush the only real competition, (VantageScore), maintain Fair Isaac's monopoly, and extract monopoly rents from B2B Purchasers.

102.    Fair Isaac and the Credit Bureaus entered into new or renewed agreements that contained new provisions designed to restrict the competitive reach of VantageScore.  In their memorandum of law in support of their motion to dismiss, the Credit Bureaus characterized their licensing agreements with Fair Isaac as "vertical distribution agreements."[66]

103.    The anticompetitive contract provisions targeted the only significant competing credit score – VantageScore.  And they specifically restricted the Credit Bureaus' ability to market VantageScore to B2B Purchasers.

104.    On information and belief, the Credit Bureaus agreed to those provisions in return for Fair Isaac's acquiescence to a clause that protected them from price competition (and

---

[65]    *See* Press Release, Fair Isaac, *FICO Statement Regarding Antitrust Investigation* (Mar. 15, 2020), https://fico.gcs-web.com/news-releases/news-release-details/fico-statement-regarding-antitrust-investigation.

[66]    *See* The Credit Bureaus' Motion to Dismiss Plaintiffs' Class Action Complaints, Dkt. 135, *In re FICO Antitrust Litig.*, No.1:20-cv-02114, at 2 (Jan. 18, 2022).

potentially in exchange for other benefits as well).  The benefit of the *quid pro quo* for the Credit

Bureaus was that they were able to charge consumers, *i.e.*, B2B Purchasers, supracompetitive

prices for credit scores.

105.    The Credit Bureaus and Fair Isaac entered into these anticompetitive licensing

agreements after what Fair Isaac considered a "rough year."  In its second quarter of 2013 earnings

call, Fair Isaac's Chief Financial Officer Michael Joseph Pung admitted:

> [W]e've been experiencing a long period of time, as you know, where our Scores
> business, and the volumes underneath our Scores business on the origination side,
> ***have been going sideways***, and we are starting to see some improvement on that
> end. It just so happens ***we had a tough comparable period for our B2B Scores
> business in that last year***.[67]

106.    The agreements were consummated at a critical time.  In 2011 through the first part

of 2013, developments occurred that should have furthered VantageScore's ability to compete with

FICO Scores.   In 2011, VantageScore Solutions formed a partnership with the Consumer

Federation of America, "a nonprofit association of nearly 300 consumer groups founded in 1968

to advance the consumer interest through research, advocacy, and education"; that alliance led to

the "use of annual consumer surveys to gauge awareness of credit scoring related issues."[68]  In

October 2012, "the Federal Deposit Insurance Corporation ["FDIC"] revised its rules for assessing

default risk on loans issued by banks with deposits in excess of $10 billion.  Instead of evaluating

loans on a particular credit score, the revision calls for examining the underlying probability of

default [] associated with those loans at the time of origination."[69]  In March 2013, VantageScore

---

[67]    Q2 2013 FICO Earnings Conference Call – Final, SEEKING ALPHA (April 24, 2013),
https://seekingalpha.com/article/1368671-fair-isaac-management-discusses-q2-2013-results-
earnings-call-transcript (emphasis added).

[68]    VantageScore Solutions, *10 Years, 10 Milestones*, *supra* n.56.

[69]    *Id*.

Solutions debuted a new scoring model, VantageScore 3.0, which "built on the strengths of its predecessors and drew extensive news coverage for its ability to score 98 percent of adult consumers in the U.S. (including 30-35 million who cannot get scores from conventional credit-scoring models [*i.e.*, FICO]); its disregard of paid collections (including paid medical debt); and its simplified reason codes."[70] And, in July 2013, VantageScore Solutions published a white paper explaining how VantageScore could be aligned with the FDIC's new rules for evaluating probability of default.[71]

107. Fair Isaac's response to these developments – which signaled the possibility of increased competition between FICO Scores and VantageScore – was to agree on anticompetitive contract terms with the Credit Bureaus. The necessary consequence of the Credit Bureaus' and Fair Isaac's contracts was the stifling of competition in the B2B Credit Score Market.

108. Specifically, in May 2013, Fair Isaac and Experian entered into a contract containing anticompetitive terms (*i.e.*, the No Equivalent Products and Dynamic Royalty Schedule provisions, among others, as explained *infra*). In October 2013, Fair Isaac and Equifax entered into a contract containing anticompetitive terms (*i.e.*, the No Equivalent Products and Dynamic Royalty Schedule provisions, among others, as explained *infra*). And in February 2015, TransUnion and Fair Isaac entered into an Analytic and Data License Agreement ("ADLA") containing anticompetitive terms (*i.e.*, the No Equivalent Products and Dynamic Royalty Schedule provisions, among others, as explained *infra*).[72]

---

[70] *Id.*

[71] VantageScore Solutions, *FDIC New Definition of High Risk Consumer Loan Securities* (July 2013), https://paperzz.com/doc/8033743/fdic-new-definition-of-high-risk-consumer-loan-and-securi (last visited Oct. 27, 2023).

[72] Fair Isaac and the Credit Bureaus executed parallel anticompetitive contracts at the first available opportunity. TransUnion's original agreement with Fair Isaac did not expire until 2015.

109.    Mr. Lansing, Fair Isaac's CEO, confirmed that the "exclusive deal[s]" Fair Isaac and the Credit Bureaus entered into essentially sidelined VantageScore, which never gained "a lot of traction in the banking space," and that, even though VantageScore was a joint venture of the Credit Bureaus, working together with FICO has been "a good thing for both of us [*i.e.*, both the Credit Bureaus and Fair Isaac]."[73]

110.    According to Mr. Lansing, instead of being "at war" with one another, the Credit Bureaus decided instead "to be partnered" with Fair Isaac. Explaining the relationship with Experian, for example, Mr. Lansing stated that Experian and Fair Isaac "have a rev share arrangement with them that works for them and works for us really good." Similarly, with respect to its arrangement with Equifax, Mr. Lansing stated "it is a rev share model. We're in it together." Given Fair Isaac's own admission that all three Credit Bureaus have substantially similar contract terms, it follows that TransUnion would also have a similar revenue sharing arrangement with Fair Isaac.

## 2.    The Anticompetitive Terms of the Contracts Fair Isaac and the Credit Bureaus Entered into

111.    The terms of the contracts Fair Isaac and the Credit Bureaus entered into were not publicly revealed until February 2018. Many of the contract terms remain confidential to this day.

112.    The discussion that follows is based on TransUnion's description of its ADLA in its counterclaims against Fair Isaac. The ADLA was filed under seal in the TransUnion action and is unavailable to Plaintiffs beyond what TransUnion has quoted in its counterclaim.

---

As a result, there is a temporal gap between TransUnion's agreement with Fair Isaac and Fair Isaac's agreements with the other Credit Bureaus.

[73]    Remarks by William J. Lansing, President, CEO & Director, Fair Isaac, Fair Isaac Corp at Barclays Global Financial Services Conference (Sept. 25, 2015).

113. While the counterclaims quote only the ADLA, TransUnion pled that "Fair Isaac represented to TransUnion that TransUnion's two major competitors, Experian and Equifax, had already agreed to materially similar new contracts with Fair Isaac."[74]

114. Fair Isaac itself admitted that Equifax, Experian, and TransUnion agreed to the same or similar terms. In FICO's Answer to Counterclaims in the TransUnion litigation, FICO "admit[ed] that prior to January 2015, it entered into separate contracts with Experian and Equifax that contained certain terms that were similar to certain terms in the ADLA."[75]

115. In its April 2018 Answer to the Counterclaims, Fair Isaac "admit[ed] that *Equifax and Experian have agreed to 'No Equivalent Products'* provisions with terms similar to the terms agreed to by TransUnion in the ADLA."[76] Fair Isaac also "admit[ted] that *Equifax and Experian have agreed to 'Dynamic Royalty Schedule' terms* that are similar to the terms agreed to by TransUnion in the ADLA, and that Equifax and Experian are subject to royalty schedules that contain a "Pre-Qualification" royalty category similar to that to which TransUnion is subject in its royalty schedule."[77] Finally, Fair Isaac "admit[ed] that Equifax and Experian have agreed to 'Level Playing Field' terms similar to the term agreed to by TransUnion in the ADLA."[78]

116. Fair Isaac has made similar admissions about the contract terms in its Answer in this case. Fair Isaac admits that its agreement with TransUnion contains the "No Equivalent

---

[74]     TransUnion Counterclaims, ¶43.

[75]     Fair Isaac's Redacted Answer to TransUnion Counterclaims, Dkt. 62, *Fair Isaac Corp. v. TransUnion LLC*, No 1:17-cv-08318 at 21 (N.D. Ill. Apr. 10, 2018) ("FICO Answer to Counterclaims").

[76]     FICO Answer to Counterclaims at 24.

[77]     *Id.* at 27.

[78]     *Id.* at 29-30.

Products" provision.[79]  It admits that the "Dynamic Royalty Schedule" and "Level Playing Field" terms appear in its agreements with all three Credit Bureaus, and that the latter requires it to offer the most favorable royalty pricing as to all three Credit Bureaus.[80]  And it admits that the "Pre-Qualification" royalty category has applied since 2015.[81]  Thus, for the foregoing reasons, provisions substantially similar to the anticompetitive "No Equivalent Products" and "Dynamic Royalty Schedule" provisions that exist in the ADLA between TransUnion and Fair Isaac also exist in the agreement between Experian and Fair Isaac.  Likewise, provisions substantially similar to the anticompetitive No Equivalent Products and Dynamic Royalty Schedule provisions that exist in the ADLA between TransUnion and Fair Isaac also exist in the agreement between Equifax and Fair Isaac.  The allegations that follow therefore apply to all three Credit Bureau Defendants.

117.    The restraints imposed in the contracts consist primarily of: (a) "No Equivalent Products" provisions; and (b) "Dynamic Royalty Schedule" provisions.  A third set of provisions, the "Level Playing Field" provisions, compensated the Credit Bureaus for their agreement not to promote VantageScore under the former provisions, at the expense of B2B Purchasers.

118.    In an order dated September 28, 2023, this Court held that "the No Equivalent [Products] Provision and the Dynamic Royalty Schedule clauses together qualify as sufficient allegations of anticompetitive effects" to allow the Sherman Act §2 claim against Fair Isaac to proceed to discovery.  Those provisions are described in turn below.

---

[79]    Fair Isaac's Answer and Affirmative Defenses to Direct Purchaser Plaintiffs' Consolidated Class Action Complaint, Dkt. 182, No. 1:20-cv-02114 ("FICO Answer to DPP Complaint"), (Oct. 23, 2023) ¶109.

[80]    FICO Answer to DPP Complaint, ¶¶116, 124.

[81]    *Id.*, ¶118.

### i.     The "No Equivalent Products" Provisions

119.    "Section 12.5 of the ADLA, the 'No Equivalent Products' provision, provides that TransUnion may not 'internally develop' a credit scoring system that is 'aligned to the odds-to-score relationship of any Fair Isaac Analytic' or uses more than a limited number of reason codes that 'match' reason codes used by any Fair Isaac Analytic.  Section 12.5 of the TransUnion ADLA further prohibits TransUnion from distributing 'any competing analytic' (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes, and it expressly names VantageScore Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an 'Equivalent Product.'"[82]

120.    The "No Equivalent Products" clause thus protects and sustains Fair Isaac's monopoly and unreasonably restrains trade.

121.    In practice, for example, if a competing credit score product used a 700 score to indicate a less-than five percent risk of credit delinquency, and if a 700 FICO Score also indicated the same risk of delinquency, the "No Equivalent Products" clause would prevent a Credit Bureau from distributing the competing product.  Similarly, if a competing credit score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause would prohibit a Credit Bureau from distributing the product.

122.    The "No Equivalent Products" clause undercuts VantageScore because it effectively prevents a Credit Bureau from offering an alternative to FICO Scores that would: (a) be compatible with many B2B Purchasers' systems, models, and processes; and (b) allow B2B Purchasers to have a legitimate choice between using FICO Scores and an alternative score.  As noted above, many B2B Purchasers have spent substantial effort and resources to develop systems,

---

[82]      *Id.*, ¶ 109.

models, and processes that are designed for FICO Scores. B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers) and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

123. The odds-to-score relationship is an arbitrary mapping between risk and score and does not reflect protectable intellectual property. Similarly, the reason codes that may not be used by an "Equivalent Product" were not invented by Fair Isaac, but rather reflect well-established industry best practices for lending.

124. The "No Equivalent Products" clause is an effective restraint of trade because when one Credit Bureau stops using VantageScore, it becomes even less attractive to the other Credit Bureaus. B2B Purchasers will not want to use a credit scoring system unless all of the main Credit Bureaus use it. This phenomenon is often referred to as a "network effect." By imposing a "No Equivalent Products" term, Fair Isaac sought to block the Credit Bureaus from enabling B2B Purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems and from using VantageScore alongside or interchangeably with FICO Scores.

125. By entering contracts containing anticompetitive "No Equivalent Products" provisions, the Credit Bureaus agreed to terms that had the effect of eliminating or drastically reducing the competitive threat posed by VantageScore, thus unreasonably restraining trade.

### ii. The "Dynamic Royalty Schedule" Provisions

126. The contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively, include a similar or identical "Dynamic Royalty Schedule" clause that allows Fair

Isaac to replace its existing royalty with a new one and thereby gives Fair Isaac the ability to control the prices of FICO Scores.  The TransUnion ADLA Dynamic Royalty Schedule Provision (§ 9.2) provides that "'once every twelve (12) months during the Term, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing.'"[83]

127.    According to TransUnion, "Fair Isaac has abused and exploited this provision in 2015, 2016, and 2017 by not only raising prices, but also introducing entirely new and non-negotiated contract terms, royalty categories, and definitions."[84]

128.    In 2015, Fair Isaac unilaterally imposed (in a footnote to its royalty schedule) a new "Pre-Qualification" royalty category, which Fair Isaac defines to "mean an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category distinguishes between: "(1) lenders that use FICO Scores for 'Pre-Qualification' without providing any credit score or credit data to consumers; and (2) lenders that use FICO Scores for 'Pre-Qualification' while also providing credit score or credit data to consumers 'in connection' with 'Pre-Qualification.'"  Certain B2B Purchasers offer consumers opportunities to apply to qualify for credit opportunities (*e.g.*, a credit card or loan) and, at the same time, receive their personal credit score.  "The offer of a free credit score to a consumer can entice consumers to apply for credit opportunities."[85]

129.    "The royalty price associated with a FICO score used for 'Pre-Qualification' depends on whether other credit score or credit data are provided to a consumer.  If a lender

---

[83]    TransUnion Counterclaims, ¶ 50.

[84]    *Id.*

[85]    *Id.*, ¶ 51.

purchases a FICO Score for use in 'Pre-Qualification' and does not provide any credit score or credit data to the consumer 'in connection' with the 'Pre-Qualification,' there is one per-score royalty rate. If the lender purchases a FICO score for use in 'Pre-Qualification' and provides a VantageScore (or any other credit score) to the consumer 'in connection' with the 'Pre-Qualification,'" Fair Isaac charges the lender a ***seven times penalty rate*** for that FICO Score. That steep penalty is meant to dissuade lenders from providing competing credit scores, such as a VantageScore.[86]

130.    "The penalty rate can be avoided in one of two ways, both of which involve ***purchasing exclusively FICO Scores***. First, the [B2B Purchaser] could purchase a FICO score for use in 'Pre-Qualification' and provide no credit score or credit data to the consumer. Second, the [B2B Purchaser] could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of scores by lenders (in the B2B market) with the provision of scores to consumers (in the B2C market)."[87]

131.    TransUnion accepted, complied with, and made royalty payments according to the new "Pre-Qualification" royalty category. On information and belief, so have Experian and Equifax.[88]

132.    The Dynamic Royalty Schedule provisions in the contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively, unreasonably restrain trade. Indeed, there is no legitimate business justification for the penalty rate agreed upon by Fair Isaac and each of the Credit Bureaus and that is charged when the B2B Purchaser also purchases other credit scores

---

[86]    *Id.*, ¶ 52.

[87]    *Id.*, ¶ 53 (emphasis added).

[88]    *See id.*, ¶ 55.

(*e.g.*, a VantageScore). The purpose of the "Pre-Qualification" royalty category is to drive all B2B Purchasers engaging in "Pre-Qualification" to purchase exclusively FICO Scores and make it cost-prohibitive for B2B Purchasers engaging in "Pre-Qualification" to purchase a competing credit score for disclosure to consumers.

133.    According to TransUnion, "[t]his scheme has been effective, and no B2B Purchasers from TransUnion have opted to pay the penalty rate."[89] The purpose and effect of this clause was to prevent VantageScore from obtaining market share, thereby unreasonably restraining trade.

### iii.    The "Level Playing Field" Provisions

134.    In exchange for agreeing to the "No Equivalent Products" and "Dynamic Royalty" provisions in their agreements with Fair Isaac – which effectively prevent the Credit Bureaus from marketing VantageScore to B2B Purchasers – Fair Isaac committed not to offer any Credit Bureau a more favorable price for FICO Scores than any other Credit Bureau. This commitment was embodied in the Level Playing Field clauses of the agreements with the Credit Bureaus. Those provisions forbid Fair Isaac to charge any Credit Bureau a price that is lower than the price it charges any other Credit Bureau.[90]

135.    The Level Playing Field provision of the TransUnion ADLA is contained in §9.16. Fair Isaac's contracts with TransUnion, Equifax, and Experian include similar or identical "Level

---

[89]    *Id.*, ¶ 54.

[90]    *See id.*, ¶ 59.

Playing Field" and "Dynamic Royalty Schedule" provisions.[91]  The Credit Bureaus agreed to, and have complied with, these contract provisions.[92]

136.    The Credit Bureaus advanced Fair Isaac's interests by agreeing to the No Equivalent Products and Dynamic Royalty Schedule clauses, which sabotaged the Credit Bureaus' own competing VantageScore and gave FICO flexibility to raise prices.  The Level Playing Field clause, in return, protected each Credit Bureau from the risk that Fair Isaac would selectively offer discounts that could expose it to price competition.

137.    The Level Playing Field provision also functions as a cost-information-sharing mechanism among the Credit Bureaus.  The Federal Trade Commission ("FTC") has determined that "when competing companies," like the Credit Bureaus, "exchang[e] price or other commercially sensitive information, that may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws."[93]  Indeed, "the sharing of information relating to price, *cost*, output, customers, or strategic planning is more likely to be of competitive concern than the sharing of less competitively sensitive information.[94]

138.    By ensuring that no one Credit Bureau receives a more favorable price than the other, the Level Playing Field provision essentially confirms to each Credit Bureau the price the other competing Credit Bureaus are paying for FICO's algorithm.  Information about what their competitors are paying for this must-have product is valuable to the Credit Bureaus who can then

---

[91]    FICO Answer to DPP Complaint, ¶116 (Dynamic Royalty Schedule), ¶124 (Level Playing Field).

[92]    *Id.*

[93]    Michael Bloom, *Information exchange: be reasonable*, FED. TRADE COMM'N (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable (emphasis added).

[94]    *Id*.

use this cost information to reduce price competition for the services they provide. As Fair Isaac has pointed out, previously, "a Credit Bureau could not be sure what its competitors' costs were and, consequently, to what extent its competitors could cut the price of their Credit Scores. This uncertainty could be used by Lenders to induce price competition among the Credit Bureaus."[95] Fair Isaac claimed in its earlier lawsuit that the Credit Bureaus sought to use VantageScore so that "each Credit Bureau will know that it is paying exactly the same cost as its competitors for its scoring algorithm, and Lenders will no longer be able to use this uncertainty to play one Credit Bureau against the others."[96] In a rich irony, the Level Playing Field provision does exactly what Fair Isaac accused the Credit Bureaus of trying to accomplish through VantageScore: prevent their customers from playing one Credit Bureau against the others, thereby reducing price competition for credit reports. The contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively – which all contain Level Playing Field provisions – thus unreasonably restrain trade.

139.     The provision is demonstrably important to the Credit Bureaus. As was revealed through Fair Isaac's suit against TransUnion, in the negotiations over its Canadian contract, TransUnion **insisted** that Fair Isaac include a "Level Playing Field" clause. That clause would have given TransUnion Canada a right to any discounts or special pricing terms that Fair Isaac might offer other Credit Bureaus for the license or distribution of FICO scores in Canada. The Level Playing Field clause was so valuable to TransUnion of Canada that it continued to insist on one until Fair Isaac threatened to withhold its Canadian business entirely.

140.     Fair Isaac and the Credit Bureaus have used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions to extract monopoly prices from B2B Purchasers. The

---

[95]     Third Amended Complaint, Dkt. 436, *Fair Isaac Corp. v. Experian Info Sols.*, No. 06-cv-4112 (D. Minn. Nov. 10, 2008), ¶138.
[96]     *Id.*

Level Playing Field clause, like a most-favored nation clause, reduces Fair Isaac's incentive to give any discounts to the Credit Bureaus given that, by the terms of that provision, the same discount would need to be extended to all Credit Bureaus. On the other hand, by the terms of the provision, if Fair Isaac were to give any one Credit Bureau a discount, it would have to offer the same discount to the other Credit Bureaus. Therefore, the provision ensures that no Credit Bureau could obtain a competitive price advantage, *i.e.*, more favorable pricing. The provision thus substantially weakens the incentives the Credit Bureaus have to negotiate a lower price with Fair Isaac. As a result, Fair Isaac can freely increase prices with little resistance from the Credit Bureaus. And it has done so – Fair Isaac admitted in its Answer that "over the last several years" it has "increased the base (*i.e.*, undiscounted) royalty prices that it charges to the Credit Bureaus."[97] That price increase is ultimately borne by B2B Purchasers who pay a higher price for FICO Scores than they would have but for the Credit Bureaus' agreements to anticompetitive contract provisions.

141. After entering into the contracts containing anticompetitive terms with the Credit Bureaus, Fair Isaac initiated multiple rounds of price increases. In 2019, Fair Isaac reported: ***"On the B2B side, revenues were up 36% over the previous year***, ***due primarily to the 2018 price adjustments***."[98] Again, in 2021, Fair Isaac reported that:

> ***[R]evenues were $169 million, up 31% from the same period last year***. ***B2B was up 25% over the same period last year***, driven by continued high volumes in mortgage originations as well as some unit price increases across our different score

---

[97]      FICO Answer to DPP Complaint, ¶142.

[98]      Motley Fool Transcription, *Fair Isaac Corporation (FICO) Q1 2019 Earnings Conference Call Transcript*, MOTLEY FOOL (Updated Apr. 24, 2019), https://www.fool.com/earnings/call-transcripts/2019/01/30/fair-isaac-corporation-fico-q1-2019-earnings-confe.aspx.

categories. In the B2B business, we also had a royalty true-up and an annual license deal this quarter that had a small positive impact on overall revenues.[99]

142.     As TransUnion has explained, taken together with the Dynamic Royalty Schedule provisions, the Level Playing Field provisions "enable Fair Isaac to unilaterally increase the royalty prices it charges [the Credit Bureaus] for FICO scores."[100]

143.     Notably, TransUnion has admitted that, to the extent the Level Playing Field provision resulted in higher rates, those costs were ultimately also borne by "banks [and] mortgage lenders" (*i.e.*, B2B Purchasers).[101] Thus, through their contracts containing anticompetitive terms, the Credit Bureaus and Fair Isaac extracted supracompetitive profits from consumers (*i.e.*, B2B Purchasers).

144.     In discussing the impact of "the FICO price increase" on Experian, Experian Vice President and Chief Financial Officer, John W. Gamble confirmed during a 2019 earnings call that Experian "pass[es] it through to [its] customers."[102]

145.     Equifax's Chief Executive Officer, Mark W. Begor confirmed the same: When FICO "put through a price increase . . . Equifax[,] TU and Experian deliver[ed] that price increase to the marketplace, when they increase the price of their credit score. So that rolled through."[103]

---

[99]     Motley Fool Transcribers, *Fair Isaac Corp (FICO) Q2 2021 Earnings Call Transcript*, MOTLEY FOOL (May 6, 2021), https://www.fool.com/earnings/call-transcripts/2021/05/06/fair-isaac-corp-fico-q2-2021-earnings-call-transcr/.

[100]     TransUnion Counterclaims, ¶59.

[101]     *Id.*, ¶60.

[102]     John W. Gamble, VP & CFO, Remarks at Q1 2019 Equifax Inc. Earnings Call (May 10, 2019) (transcript available in Westlaw).

[103]     Mark W. Begor, CEO, Remarks at Q2 2023 Equifax Inc. Earnings Call (July 20, 2023) (transcript available in Westlaw).

### D. Fair Isaac's Additional Efforts to Deter B2B Purchasers from Using VantageScore

146.     Having agreed with the Credit Bureaus to impose restrictions on VantageScore's ability to compete against FICO, Fair Isaac went even further and waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScore. In advertisements, letters, and blog posts, Fair Isaac disparaged VantageScore Solutions and VantageScore, falsely claiming that VantageScore is an unreliable measure of creditworthiness, and misrepresenting the information considered by VantageScore Solutions' credit scoring system.

147.     On December 5, 2017, for example, Mr. Lansing criticized banks for using VantageScore, saying that credit score was "fako"; "'looks like it, smells like it, feels like it – it's being presented as some kind of an indication of your health, but if you look at the fine print, you'll discover that it's not a FICO score.'"[104]

148.     Media sources, financial blogs, and consumers have absorbed Fair Isaac's message that VantageScore is a "Fako" score merely because it is not a FICO Score.  For example, thebalance.com – a website devoted to personal finance issues – posted at least as far back as August 2018: "If you purchased your Credit Score anywhere but myFICO.com, then it's a Fako score."  The post remains on the site to this day.[105]

149.     Similarly, on December 12, 2017, "Fair Isaac took out a full-page advertisement in *The Wall Street Journal* addressed to 'Lenders, Policymakers and Consumer Advocates' that disparaged VantageScore Solutions and VantageScore without identifying it by name.  The

---

[104]     Alistair Gray, *Credit score row as FICO chief hits out at banks over 'Fako' rivals*, FIN. TIMES (Dec. 5, 2017), https://www.ft.com/content/2222880c-cfa5-11e7-9dbb-291a884dd8c6.

[105]     Latoya Irby, THE BALANCE, *FICO & FAKO Credit Scores* (Oct. 30, 2021), https://www.thebalance.com/fico-and-fako-credit-scores-960497.

advertisement contrasted Fair Isaac, which 'is not owned by the credit bureaus' and whose FICO scores have been used 'by lenders and securitization investors for decades,' with an alternative credit score, which is 'owned by the credit bureaus,' is less reliable than FICO scores in evaluating credit risk, and fails to use 'sound practices' or 'science-based credit evaluation.'  To anyone familiar with the market for credit scores, the advertisement unambiguously conveys the false message that VantageScore is 'Weakening scoring standards, [and] harm[ing] consumers, and the lending system,'" particularly in the B2B Credit Score Market.[106]

150.  "The *Wall Street Journal* advertisement directed readers to '[l]earn more at FICO.com/independent,' a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name."[107]  One such blog post, written in 2016 by Joanne Gaskin, the Vice-President of Scores and Analytics at Fair Isaac, asserted: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."[108]

151.  Fair Isaac's disparagement and false or misleading statements are not limited to the "FICO.com/independent" page.  Fair Isaac's own blog (FICO.com/blogs) also includes numerous disparaging and false or misleading statements about VantageScore Solutions, VantageScore, and related topics.

152.  Fair Isaac executives have written multiple posts disparaging VantageScore Solutions and VantageScore.  Fair Isaac's Vice-President of FICO Scores and Predictive Analytics, Ethan Dornhelm, wrote: "We wanted to find out if it's possible to calculate a

---

[106]  TransUnion Counterclaims, ¶66 (alterations in original).

[107]  *Id.*, ¶67.

[108]  *Id*.

meaningful, reliable score using credit bureau data alone. Spoiler alert: it's not. Research results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance."[109] Ms. Gaskin echoed those findings.[110] Those statements are false and misleading because studies have shown that VantageScore is strongly predictive.[111]

153. Another blog post written by Ms. Gaskin claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not."[112] "This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones."[113]

154. Similarly, Fair Isaac fought hard against the efforts to create a process that would allow alternative credit scoring models to be validated and approved by Fannie Mae and Freddie Mac when they purchase mortgages. Such a rule would clearly benefit VantageScore, which could

---

[109]    Ethan Dornhelm, FICO BLOG, *Why Bureau Data Alone Can't Score More Consumers* (Nov. 16, 2015), https://www.fico.com/blogs/why-bureau-data-alone-cant-score-more-consumers.

[110]    Joanne Gaskin, FICO BLOG, *FICO Fact: Does FICO's Minimum Scoring Criteria Limit Consumers' Access to Credit?* (Oct. 12, 2021), https://www.fico.com/blogs/fico-fact-does-ficos-minimum-scoring-criteria-limit-consumers-access-credit ("Our research has consistently found that models that rely solely on sparse and/or outdated credit information are less reliable at forecasting future performance.").

[111]    *See* VantageScore Report, *supra* n.50 at 2, 4-6.

[112]    Joanne Gaskin, FICO BLOG, *Truth Squad: Is FICO Score 700 the Same as VantageScore 700?* (Feb. 6, 2017), https://www.fico.com/blogs/truth-squad-fico-score-700-same-vantagescore-700.

[113]    TransUnion Counterclaims, ¶71.

48

then attempt to break Fair Isaac's 100% monopoly in this sector. Public sentiment favored this move.[114] Fair Isaac did not. Indeed, it deployed Ms. Gaskin to give press interviews saying that Fair Isaac's alleged monopoly is a "myth."[115] Fair Isaac also hired a research group to present the argument that VantageScore's promise of home ownership to millions more Americans was deceptive and that the company's ownership by the Credit Bureaus was anticompetitive, an argument that failed during the trademark litigation discussed above.[116] The FHFA ultimately adopted a final rule that permitted rival generators of credit scores to apply to serve Fannie Mae and Freddie Mac, saying that "FHFA has concluded that allowing all credit score model developers to submit applications is more consistent with [the applicable statute], which does not prevent any credit score model from being considered for potential use in the mortgage market." [117]

155. The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

---

[114]     *See* Bloomberg Business News, *This Monopoly Is Holding Back the Mortgage Market*, (Jan. 18, 2018), https://www.bloomberg.com/opinion/articles/2018-01-18/this-credit-score-monopoly-is-holding-back-the-mortgage-market; Paul Weinstein, Jr., *No Company Should Have a Monopoly on Credit Scoring*, The Hill (Dec. 7, 2017), https://thehill.com/opinion/finance/363755-no-company-should-have-a-monopoly-on-credit-scoring.

[115]     *FICO: The 'Credit Score Monopoly' is a Myth*, DS News (Dec. 18, 2015), https://dsnews.com/news/12-18-2015/fico-the-credit-score-monopoly-is-a-myth.

[116]     Quantilytic LLC, *Risks and Opportunities in Expanding Mortgage Credit Availability Through New Credit Scores*, at 22 (Dec. 2017), https://www.progressivepolicy.org/wp-content/uploads/2017/12/UpdatedCreditScoring_2017.pdf (research sponsored by Fair Isaac).

[117]     Fed. Hous. Fin. Agency, *Validation and Approval of Credit Score Models Final Rule*, 12 C.F.R. 1254 at 23 (Aug. 16, 2019), https://www.fhfa.gov/SupervisionRegulation/Rules/RuleDocuments/8-7-19%20Validation%20Approval%20Credit%20Score%20Models%20Final%20Rule_to%20Fed%20Reg%20for%20Web.pdf.

49

## VI. THE CONTRACTS BETWEEN FAIR ISAAC AND EACH OF THE CREDIT BUREAUS CONTAINING ANTICOMPETITIVE TERMS, ALONG WITH FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT, HARM COMPETITION IN THE B2B CREDIT SCORE MARKET

156.    The anticompetitive terms contained in the contracts between Fair Isaac and each of the Credit Bureaus, along with Fair Isaac's campaign of exclusionary conduct to maintain and expand its monopoly has harmed and continues to harm participants in the B2B Credit Score Market.   Fair Isaac's unlawful conduct, including its agreements with the Credit Bureaus containing anticompetitive contract terms, has foreclosed competition in the B2B Credit Score Market by limiting the ability of VantageScore to compete with Fair Isaac.  The anticompetitive and exclusionary conduct unreasonably restrains trade and maintains Fair Isaac's monopoly by, among other things, allowing it to charge supracompetitive prices for B2B credit scores to B2B Purchasers during the Class Period.

157.    Fair Isaac's Scores business operates with an incredibly high operating margin of 86%.[118]  To maximize its monopoly rent, Fair Isaac has increased its prices for FICO Scores significantly in recent years.  In 2018, after securing agreements from each of the three Credit Bureaus to abide by anticompetitive contract terms, FICO implemented a special pricing increase for mortgage customers that was an approximately 75% increase from $0.06/score to $0.10/score.[119]  In the following two years, FICO again rolled out special pricing increases to its auto customers and to some credit card customers.[120]  FICO admitted in its Answer that, "over the last several years," it has "increased the base (*i.e.*, undiscounted) royalty prices that it charges to the Credit Bureaus."[121]

158.    Fair Isaac's conduct and the anticompetitive provisions agreed upon in contracts between the Credit Bureaus and Fair Isaac, have reduced choice for B2B Purchasers.   The anticompetitive terms agreed to between Fair Isaac and the Credit Bureaus have frustrated the

ability of B2B Purchasers to purchase VantageScore. Fair Isaac's media and advertising campaign against VantageScore Solutions and VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace.

## CLASS ACTION ALLEGATIONS

159.    Plaintiffs bring this action on behalf of themselves, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of:

> All B2B Purchasers residing in the United States and its territories that directly purchased a FICO score from Fair Isaac and/or a Credit Bureau during the period from October 1, 2006 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

Excluded from the Class are Defendants, their officers, directors, management, employees, subsidiaries, and affiliates. Also excluded are any natural persons who purchased their own credit score solely via myFico.com, the Credit Bureaus, or other entities for their personal use. Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household or the spouse of such a person.

160.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records in the possession of Defendants.

---

[118]    Jose Karlo Mari Tottoc, Yahoo! Finance, *Headwaters Capital: 'Fair Isaac Corp (FICO) Can Grow Its Free Cash Flow by 15-20% Annually'* (Jan. 23, 2021), https://finance.yahoo.com/news/headwaters-capital-fair-isaac-corp-202237954.html.

[119]    *Id.*

[120]    *Id.*

[121]    FICO Answer to DPP Complaint, ¶142.

161.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and members of the Class were damaged by the same wrongful conduct of Defendants.

162.    Plaintiffs will fairly and adequately protect and represent the interests of members of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of members of the Class.

163.    Plaintiffs are represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including class actions in the financial services industry.

164.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate. Questions of law and fact common to members of the Class include, but are not limited to:

    a.    whether Fair Isaac monopolized, and whether Defendants entered into contracts that unreasonably restrain trade, in violation of federal law;

    b.    whether Fair Isaac monopolized, and whether Defendants entered into contracts that unreasonably restrain trade, in violation of certain state antitrust laws;

    c.    whether Defendants engaged in unfair or deceptive trade practices in violation of certain state laws;

    d.    the duration of the alleged unlawful conduct;

    e.    injury suffered by Plaintiffs and members of the Class;

    f.    damages suffered by Plaintiffs and members of the Class; and

g.      whether Defendants have acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

165.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

166.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

167.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

168.    Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## <u>STATUTES OF LIMITATIONS AND TOLLING</u>

**I.  THE STATUTES OF LIMITATIONS DID NOT BEGIN TO RUN BECAUSE PLAINTIFFS DID NOT DISCOVER, AND COULD NOT HAVE DISCOVERED, DEFENDANTS' UNLAWFUL SCHEME**

169.    Plaintiffs had no knowledge of the agreements, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) February 12, 2018, the date that TransUnion filed its Counterclaims against Fair Isaac.  Prior to that time, no information in

the public domain or available to Plaintiffs suggested that any Defendant was involved in an anticompetitive scheme involving the distribution of credit scores.

170.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public websites, that they maintained policies that prohibited the type of anticompetitive conduct alleged in this First Amended Consolidated Complaint.  For example:

a.    Fair Isaac's Code of Business Conduct and Ethics states: "We seek to outperform our competition fairly and honestly.  We seek competitive advantages through superior performance, never through unethical or illegal business practices."[122]

b.    Equifax's Code of Ethics and Business Conduct states: "We believe in free and open competition and never engage in improper practices that may limit competition."[123]

c.    Experian's Code of Conduct states: "We will not engage in any form of agreement with competitors to fix prices, rig bids, allocate customers and/or restrict supply in the market place."  "We will comply with all applicable laws, rules, and regulations in every jurisdiction in which we operate, including but not limited to . . . antitrust/competition."[124]

d.    TransUnion's Code of Business Conduct states: "All TransUnion Team Members must understand how competition and antitrust laws affect their daily work.  You must fully and consistently comply with applicable competition and antitrust laws."[125]

---

[122]    Fair Isaac, *Code of Business Conduct and Ethics*, https://fico.gcs-web.com/static-files/ed6519a4-2148-4166-82f2-4636e0713531 (last visited Oct. 27, 2023).

[123]    Equifax, *Code of Ethics and Business Conduct* (Aug. 2019), https://web.archive.org/web/20210326175746/https://assets.equifax.com/assets/corp/code_of_ethics.pdf.

[124]    Experian, *Our Code of Conduct* (2019), https://www.experian.com/content/dam/marketing/na/assets/corp/procurement-documents/experian-code-of-conduct-final-board-approved.pdf.

[125]    TransUnion, *Code of Business Conduct* (2017), https://investors.transunion.com/~/media/Files/T/Transunion-IR/governance-documents/code-of-business-conduct-150618.pdf.

171. It was reasonable for Plaintiffs and members of the Class to believe that Defendants were complying with their own policies.

172. Moreover, upon information and belief, Plaintiffs and members of the Class could not have discovered the anticompetitive provisions in the licensing agreements between Fair Isaac and the Credit Bureaus, such as the TransUnion ADLA, as those agreements are subject to confidentiality provisions that have prohibited the credit reporting agencies from disclosing their terms to third parties absent written authorization from Fair Isaac.[126]

173. Finally, Plaintiffs and members of the Class, as customers of Defendants, had no means to discover the existence of Defendants' anticompetitive contract provisions.

174. For these reasons, the statutes of limitations applicable to Plaintiffs' claims did not begin to run until the date that TransUnion filed its counterclaims against Fair Isaac and have been tolled with respect to the claims that Plaintiffs have alleged in this First Amended Consolidated Complaint.

## II. FRAUDULENT CONCEALMENT TOLLED THE STATUTES OF LIMITATIONS

175. In the alternative, the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiffs' claims. During the Class Period, Defendants wrongfully and affirmatively concealed their unlawful conduct. Plaintiffs and members of the Class had no knowledge of Defendants' anticompetitive contracts and could not have discovered them through the exercise of reasonable diligence until (at the earliest) February 12, 2018, when TransUnion filed its Counterclaims against Fair Isaac.

---

[126] *See* Dkt. 32, Motion for Leave to File Under Seal, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Jan. 22, 2018), ¶2 ("contracts between the Parties . . . are subject to confidentiality provisions that prohibit TransUnion from disclosing the terms of the contract to third parties absent written authorization from Fair Isaac").

176.     By their very nature, antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants contracted through confidential agreements that did not put Plaintiffs or the Class on inquiry notice that there were contracts to restrain trade that raised the prices for credit scores above the competitive level. Credit scores are not exempt from antitrust regulation, and thus, before TransUnion filed its Counterclaims against Fair Isaac, Plaintiffs reasonably considered the market to be competitive. Moreover, Defendants employed deceptive tactics and techniques to avoid detection of, and to conceal, their anticompetitive scheme.

177.     Defendants wrongfully and affirmatively concealed the existence of their anticompetitive contracts from Plaintiffs and members of the Class by, among other things:

a.     agreeing to confidentiality provisions that have prohibited the Credit Bureaus from disclosing the anticompetitive provisions in the licensing agreements between Fair Isaac and the Credit Bureaus, such as the TransUnion ADLA;

b.     concealing the fact that Fair Isaac and the Credit Bureaus agreed, through the "No Equivalent Products" clause, not to internally develop a competing credit scoring system that is aligned with FICO Scores or uses too many of the same reason codes;

c.     concealing the fact that the purpose of the "No Equivalent Products" clause was to prevent the Credit Bureaus from offering credit scoring products that would allow business-consumers a legitimate choice between FICO Scores and VantageScore or another alternative scoring product, thereby sustaining Fair Isaac's dominance in the market;

d.     concealing the fact that Fair Isaac and the Credit Bureaus agreed, through the "Level Playing Field" clauses, that prices made available to one credit bureau be made available to all the others;

e.      concealing the fact that the purpose and effect of the "Level Playing Field" and "Dynamic Royalty Schedule" clauses is to disincentivize each Credit Bureau from negotiating lower royalty prices for FICO Scores; and

f.      as to Fair Isaac, engaging in a false and misleading campaign about VantageScore Solutions and VantageScore to misrepresent VantageScore's viability as a competitor to FICO Scores.

178.    As a result of Defendants' affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiffs and members of the Class have been and are tolled, and Defendants are equitably estopped from raising statutes of limitations as a defense.

## III.    DEFENDANTS' ACTIONS CONSTITUTE A CONTINUING VIOLATION

179.    In addition, and in the alternative, this Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statute of limitations.

180.    A claim accrued for Plaintiffs each time FICO Scores were sold to Plaintiffs at prices artificially inflated by Defendants' anticompetitive conduct. Each sale of FICO Scores at a supracompetitive price constituted another overt act in furtherance of Defendants' agreements to restrain trade. Moreover, Defendants' statements and actions described above demonstrate that throughout the Class Period they engaged in new overt acts that further served the objectives of their anticompetitive agreements to restrain trade.

181.    Defendants' new overt acts were more than the inertial consequences of Defendants' initial violation. Rather, their acts were new and independent acts that perpetuated their agreement and kept it current with market conditions, including by renewing agreements, or entering into new agreements, with anticompetitive terms. Defendants continuously renewed and

refined their agreement to reflect market conditions. With each refinement of their agreement, Defendants inflicted new and accumulating injury on Plaintiffs and members of the Class. For instance, as alleged above, Fair Isaac exploited the ADLA Royalty Schedule Provision in 2015, 2016, and 2017 to introduce entirely new and non-negotiated contract terms, royalty categories, and definitions that expanded the anticompetitive scheme.

182. Therefore, Plaintiffs and members of the Class are entitled to recover damages they suffered during any applicable limitations period.

## CLAIMS FOR RELIEF

### CLAIM ONE: UNREASONABLE RESTRAINT OF TRADE
### (15 U.S.C. §§1, 3)

183. Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

184. This Claim One is brought against Defendant Fair Isaac.

185. The relevant period of this Claim One is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

186. The agreements between Fair Isaac and each of the Credit Bureau Defendants violate Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) because they are agreements between Fair Isaac and the Credit Bureaus that restrained trade in the relevant market.

187. The relevant product market is the market for the sale of B2B credit scores.

188. The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

189. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

190.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

191.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

192.    Fair Isaac entered into agreements with each of TransUnion, Experian, and Equifax that contained anticompetitive terms whereby each Credit Bureau agreed with Fair Isaac to contractual limitations that harmed the ability of the Credit Bureaus to market VantageScore, a competing product, to Plaintiffs and members of the Class and forestalled price competition in the B2B Credit Score Market.

193.    The agreements between Fair Isaac and each of the Credit Bureaus had substantial anticompetitive effects.  The agreements excluded VantageScore, a would-be significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

194.    The agreements raised the price for credit scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

195.    The aforesaid exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

196.    Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Defendants do not cease their anticompetitive conduct.

197.    Plaintiffs and members of the Class have been injured in their business or property by reason of Defendants' violation of Sections 1 and 3 of the Sherman Act, within the meaning of Section 4 of the Clayton Act (15 U.S.C. §15).

198.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Defendant Fair Isaac's violation of Sections 1 and 3 of the

Sherman Act (15 U.S.C §§1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. §26).

## CLAIM TWO: UNREASONABLE RESTRAINT OF TRADE
## (15 U.S.C. §§1, 3)

199.     Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

200.     This Claim Two is brought against Defendants Fair Isaac and Experian.

201.     The relevant period of this Claim Two is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

202.     The anticompetitive agreement between Fair Isaac and Experian violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), because it is a contract that unreasonably restrained trade – regardless of whether Experian shared Fair Isaac's anticompetitive purpose, and regardless of whether Experian accepted the agreement as a result of Fair Isaac's negotiating leverage.

203.     The relevant product market is the market for the sale of B2B credit scores.

204.     The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

205.     Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

206.     Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

207.     Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

208.     Fair Isaac entered into an agreement with Experian that contained anticompetitive terms whereby Experian agreed with Fair Isaac to contractual limitations that harmed

VantageScore's ability to compete and forestalled price competition in the B2B Credit Score Market.

209.    The agreement between Fair Isaac and Experian had substantial anticompetitive effects.  The agreement excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

210.    The agreement between Fair Isaac and Experian raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

211.    The foregoing exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

212.    Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac and Experian do not cease their anticompetitive conduct.

213.    Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac and Experian's violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3), within the meaning of Section 4 of the Clayton Act (15 U.S.C. § 15).

214.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac and Experian's continuing violation of Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. § 26).

215.    In addition to competing with Experian in the credit scores market, Fair Isaac licenses its algorithm to Experian, which uses the algorithm to calculate credit scores for B2B Purchasers.  As a result of the exclusionary contract terms, Experian discourages its customers from using or purchasing access to competing credit scores.  Because Experian has substantial

market power, it can harm its customers in this way without taking the risk that they will switch to competing Credit Bureaus. In return for contracting with Fair Isaac to restrain trade in the credit scores market, Experian benefits from the Level Playing Field clause, which reduces competition among the Credit Bureaus in the B2B credit reports market.

## CLAIM THREE: UNREASONABLE RESTRAINT OF TRADE
### (15 U.S.C. §§1, 3)

216.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

217.    This Claim Three is brought against Defendants Fair Isaac and Equifax.

218.    The relevant period of this Claim Three is from November 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

219.    The anticompetitive agreement between Fair Isaac and Equifax violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), because it unreasonably restrained trade – regardless of whether Equifax shared Fair Isaac's anticompetitive purpose, and regardless of whether Equifax accepted the agreement as a result of Fair Isaac's negotiating leverage.

220.    The relevant product market is the market for the sale of B2B credit scores.

221.    The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

222.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

223.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

224.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

225. Fair Isaac entered into an agreement with Equifax that contained anticompetitive terms whereby Equifax agreed with Fair Isaac to contractual limitations that harmed VantageScore's ability to compete and forestalled price competition in the B2B Credit Score Market.

226. The agreement between Fair Isaac and Equifax had substantial anticompetitive effects. The agreement excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

227. The agreement between Fair Isaac and Equifax raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

228. The aforesaid exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

229. Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac and Equifax do not cease their anticompetitive conduct.

230. Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac and Equifax's violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3), within the meaning of Section 4 of the Clayton Act (15 U.S.C. §15).

231. Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac and Equifax's continuing violation of Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. § 26).

232. In addition to competing with Equifax in the credit scores market, Fair Isaac licenses its algorithm to Equifax, which uses the algorithm to calculate credit scores for B2B

Purchasers. As a result of the exclusionary contract terms, Equifax discourages its customers from using or purchasing access to competing credit scores. Because Equifax has substantial market power, it can harm its customers in this way without taking the risk that they will switch to competing Credit Bureaus. In return for contracting with Fair Isaac to restrain trade in the credit scores market, Equifax benefits from the Level Playing Field clause, which reduces competition among the Credit Bureaus in the B2B credit reports market.

**CLAIM FOUR: UNREASONABLE RESTRAINT OF TRADE**
**(15 U.S.C. §§1, 3)**

233. Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

234. This Claim Four is brought against Defendants Fair Isaac and TransUnion.

235. The relevant period of this Claim Four is from February 2015 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

236. The anticompetitive agreement between Fair Isaac and TransUnion violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), because it unreasonably restrained trade – regardless of whether TransUnion shared Fair Isaac's anticompetitive purpose, and regardless of whether TransUnion accepted the agreement as a result of Fair Isaac's negotiating leverage.

237. The relevant product market is the market for the sale of B2B credit scores.

238. The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

239. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

240. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

241. Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

242. Fair Isaac entered into an agreement with TransUnion that contained anticompetitive terms whereby TransUnion agreed with Fair Isaac to contractual limitations that harmed VantageScore's ability to compete and forestalled price competition in the B2B Credit Score Market.

243. The agreement between Fair Isaac and TransUnion had substantial anticompetitive effects. The agreement excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

244. The agreement between Fair Isaac and TransUnion raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

245. The aforesaid exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

246. Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac and TransUnion do not cease their anticompetitive conduct.

247. Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac and TransUnion's violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3), within the meaning of Section 4 of the Clayton Act (15 U.S.C. §15).

248. Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac and TransUnion's continuing violation of Sections 1 and 3 of the Sherman Act (15 U.S.C §§1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. §26).

249. In addition to competing with TransUnion in the credit scores market, Fair Isaac licenses its algorithm to TransUnion, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, TransUnion discourages its customers from using or purchasing access to competing credit scores. Because TransUnion has substantial market power, it can harm its customers in this way without taking the risk that they will switch to competing Credit Bureaus. In return for contracting with Fair Isaac to restrain trade in the credit scores market, TransUnion benefits from the Level Playing Field clause, which reduces competition among the Credit Bureaus in the B2B credit reports market.

## CLAIM FIVE: MONOPOLIZATION
### (15 U.S.C. §2)

250. Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

251. This Claim Five is brought against Defendant Fair Isaac.

252. The relevant product market is the market for the sale of B2B credit scores.

253. The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

254. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

255. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

256. Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

257. Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market

for B2B credit scores in the United States in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

258.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand to supracompetitive levels.

259.    Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

260.    Fair Isaac's monopolization has injured and will continue to injure competition in this market.

261.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

262.    The anticompetitive conduct raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

263.    Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac's violation of Section 2 of the Sherman Act (15 U.S.C. § 2) within the meaning of Section 4 of the Clayton Antitrust Act (15 U.S.C. § 15).

264.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac's continuing violation of Section 2 of the Sherman Act (15 U.S.C. § 2) within the meaning of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26).

## CLAIM SIX: STATE ANTITRUST LAWS

265.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

266.    This Claim Six is brought against all Defendants.

267.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following antitrust statutes.

268.    <u>Arizona</u>: Defendants' anticompetitive conduct has restrained trade in violation of Arizona Revised Statutes §§ 44-1401 *et seq*.  During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.  As a direct and proximate result of the unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of Ariz. Rev. Stat. §§ 44-1401 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401 *et seq*.

269.    <u>California</u>: During the Class Period, Defendants engaged in anticompetitive conduct in unreasonable restraint of trade and commerce in violation of California Business & Professions Code §§ 16700 *et seq*.  To the extent that Plaintiffs seek recovery for Fair Isaac's acts of monopolization under these statutory provisions, while § 16700 does not reach solely unilateral conduct by a monopolist, it encompasses agreements between a monopolist and its customers where the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement.  That is what happened here.  This conduct constitutes a "combination" under the Cartwright Act.  As a direct result of Defendants' unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their FICO Scores.  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under § 16700.

270.    <u>Connecticut</u>: Defendants' anticompetitive conduct has restrained trade in violation of Connecticut General Statute §§ 35-26 *et seq.*  During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their

business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Connecticut General Statute §§ 35-26 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Connecticut General Statute §§ 35-26 *et seq*.

271.    District of Columbia: Defendants' anticompetitive conduct has restrained trade in violation of District of Columbia Code Annotated §§ 28-4501 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of District of Columbia Code Ann. §§ 28-4501 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501 *et seq*.

272.    Illinois: Defendants' anticompetitive conduct has restrained trade in violation of the Illinois Antitrust Act (740 ILCS 10/1 *et seq*.). During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of the Illinois Antitrust Act (740 ILCS 10/1 *et seq*.). Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the Illinois Antitrust Act (740 ILCS 10/1 *et seq*.).

273.    Iowa: Defendants' anticompetitive conduct has restrained trade in violation of Iowa Code §§ 553.1 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Iowa Code §§ 553.1 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §§ 553 *et seq*.

274. <u>Kansas</u>: Defendants' anticompetitive conduct has restrained trade in violation of Kansas Statutes Annotated §§ 50-101 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Kansas Stat. Ann. §§ 50-101 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101 *et seq*.

275. <u>Maine</u>: Defendants' anticompetitive conduct has restrained trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101 *et seq*.). During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101 *et seq*.

276. <u>Maryland</u>: Defendants' anticompetitive conduct has restrained trade in violation of Maryland Code, Commercial Law, §§11-204 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their

business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Maryland Code, Commercial Law, §§11-204 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Maryland Code, Commercial Law, §§11-204 *et seq*.

277. <u>Michigan</u>: Defendants' anticompetitive conduct has restrained trade in violation of Michigan Compiled Laws Annotated §§ 445.771 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Michigan Comp. Laws Ann. §§ 445.771 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771 *et seq*.

278. <u>Minnesota</u>: Defendants' anticompetitive conduct has restrained trade in violation of Minnesota Annotated Statutes §§ 325D.49 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Minnesota Stat. §§325D.49 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Minnesota Stat. §§ 325D.49 *et seq*.

279. <u>Mississippi</u>: Defendants' anticompetitive conduct has restrained trade in violation of Mississippi Code Annotated §§ 75-21-1 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of

Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Mississippi Code Ann. §§ 75-21-1 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Mississippi Code Ann. §§ 75-21-1 *et seq*.

280. <u>Nebraska</u>: Defendants' anticompetitive conduct has restrained trade in violation of Nebraska Revised Statutes §§ 59-801 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Nebraska Revised Statutes §§ 59-801 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Nebraska Revised Statutes §§ 59-801 *et seq*.

281. <u>Nevada</u>: Defendants' anticompetitive conduct has restrained trade in violation of Nevada Revised Statutes Annotated §§ 598A.010 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A *et seq*.

282. <u>New Hampshire</u>: Defendants' anticompetitive conduct has restrained trade in violation of New Hampshire Revised Statutes §§ 356:1 *et seq*. During the Class Period,

Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of New Hampshire Revised Statutes §§ 356:1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under New Hampshire Revised Statutes §§ 356:1 *et seq.*

283.     New Mexico: Defendants' anticompetitive conduct has restrained trade in violation of New Mexico Statutes Annotated §§ 57-1-1 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

284.     New York: Defendants' anticompetitive conduct has restrained trade in violation of New York General Business Laws §§ 340 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of the New York's Donnelly Act, §§ 340 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under New York Gen. Bus. Law §§ 340 *et seq.*

285. <u>North Carolina</u>: Defendants' anticompetitive conduct has restrained trade in violation of North Carolina General Statutes §§ 75-1 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under North Carolina Gen. Stat. §§ 75-1 *et seq*.

286. <u>North Dakota</u>: Defendants' anticompetitive conduct has restrained trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01 *et seq*.

287. <u>Oregon</u>: Defendants' anticompetitive conduct has restrained trade in violation of Oregon Revised Statutes §§ 646.705 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Oregon Revised Statutes §§ 646.705 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Oregon Revised Statutes §§ 646.705 *et seq*.

288.    <u>Rhode Island</u>: Defendants' anticompetitive conduct has restrained trade in violation of Rhode Island General Laws, §§6-36-4 *et seq.*  During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of Rhode Island General Laws, §§6-36-4 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Rhode Island General Laws, §§6-36-4 *et seq.*

289.    <u>South Dakota</u>: Defendants' anticompetitive conduct has restrained trade in violation of South Dakota Codified Laws Ann. §§37-1-3.1 *et seq.*  During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of South Dakota Codified Laws Ann. §§37-1 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all relief available under South Dakota Codified Laws Ann. §§37-1 *et seq.*

290.    <u>Tennessee</u>: Defendants' anticompetitive conduct has restrained trade in violation of Tennessee Code Annotated §§47-25-101 *et seq.*  During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of Tennessee Code Ann. §§47-25-101 *et seq.*

Accordingly, Plaintiffs and members of the Class seek all relief available under Tennessee Code Ann. §§ 47-25-10 *et seq.*

291. <u>Utah</u>: Defendants' anticompetitive conduct has restrained trade in violation of Utah Code Annotated §§ 76-10-911 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Utah Code Annotated §§ 76-10-911 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Utah Code Annotated §§ 76-10-911 *et seq.*

292. <u>Vermont</u>: Defendants' anticompetitive conduct has restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453 *et seq.*

293. <u>West Virginia</u>: Defendants' anticompetitive conduct has restrained trade in violation of West Virginia Code §§ 47-18-1 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of West Virginia Code §§ 47-18-1 *et seq.*

Accordingly, Plaintiffs and members of the Class seek all relief available under West Virginia Code §§ 47-18-1 *et seq.*

294.　<u>Wisconsin</u>: Defendants' anticompetitive conduct has restrained trade in violation of Wisconsin Statutes §§ 133.01 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Wisconsin Stat. §§ 133.01 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Wisconsin Stat. §§ 133.01 *et seq.*

295.　Plaintiffs and members of the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful monopolization, and anticompetitive agreements. Plaintiffs and members of the Class have paid more for FICO Credit Scores than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

296.　In addition, Defendants have profited significantly from the aforesaid unlawful conduct. Their profits derived from monopolistic and/or and conspiratorial anticompetitive conduct that was undertaken at the expense and to the detriment of Plaintiffs and members of the Class.

297.　Accordingly, Plaintiffs and members of the Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**CLAIM SEVEN: STATE UNFAIR AND DECEPTIVE TRADE PRACTICES LAWS**

298.     Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

299.     This Claim Seven is brought against all Defendants.

300.     By reason of the foregoing, Defendants have violated, and Plaintiffs and members of the Class are entitled to relief under, the Unfair and Deceptive Trade Practices and Consumer Protection Laws of the following jurisdictions.

301.     <u>Arkansas</u>: Defendants have engaged in unfair, unconscionable, and/or deceptive practices in violation of Arkansas Code Annotated §§ 4-88-101 *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which FICO Scores were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Class.  The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).  Defendants' unlawful conduct had the following effects: (1) FICO Scores price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) FICO Scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.  During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated § 4-

88-107(a)(10) and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

302.  <u>California</u>:  Defendants have engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of California Business & Professions Code §§ 17200 *et seq.*  During the Class Period, Defendants marketed, sold, or distributed FICO Scores in California, and committed and continue to commit acts of unfair competition, as defined by §§ 17200 *et seq.* of the California Business & Professions Code, by engaging in the acts and practices specified above.  This claim is instituted pursuant to sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from these Defendant for acts, as alleged herein, that violated section 17200 of the California Business & Professions Code, commonly known as the Unfair Competition Law.  Defendants' conduct as alleged herein violated section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business & Professions Code §§ 17200 *et seq.*, including, but not limited to, the following: (1) the violations of Sections 1, 2, and 3 of the Sherman Act, as set forth above; and (2) the violations of §§ 16720 *et seq.* of the California Business & Professions Code, set forth above.  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of §§ 16720 *et seq.* of the California Business & Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of FICO Scores in the State of California within the meaning of § 17200, California Business & Professions Code; and (4) Defendants' acts and practices are fraudulent or

deceptive within the meaning of § 17200 of the California Business & Professions Code. Plaintiffs and members of the Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Class to pay supracompetitive and artificially inflated prices for FICO Scores. Plaintiffs and members of the Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violated § 17200 of the California Business & Professions Code. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business practices, pursuant to California Business & Professions Code §§ 17203 and 17204.

303. <u>District of Columbia</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in the District of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross

disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores. Defendants had the sole power to set that price, and Plaintiffs and members of the Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct with respect to fixing the price of FICO Scores at supracompetitive levels and overcharging consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class. The suppression of competition that has resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for the FICO Scores. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

304.    <u>Florida</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*  Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Florida; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.  During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. §§ 501.201 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

305.    <u>Massachusetts</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Consumer Protection Law (Mass. Gen. Law Ch. 93A *et seq.*).  Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.  During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Massachusetts, and Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.  As a direct and proximate result

of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Law Ch. 93A *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under Section 11 of that statute.

306. <u>Montana</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103 *et seq.*, and §§ 30-14-201 *et seq.* Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Montana; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103 *et seq.*, and §§ 30-14-201 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

307. <u>New Mexico</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. §§ 57-12-1 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices

at which FICO Scores were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Class and the prices paid by them for FICO Scores as set forth in N.M.S.A. § 57-12-2E. Plaintiffs and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores. Defendant Fair Isaac had the sole power to set that price and Plaintiffs and members of the Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct to fix the price of FICO Scores at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class. The suppression of competition that resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for the FICO Scores. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. §§ 57-12-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

308. <u>New York</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO scores were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Class, who are Defendants' consumers. Defendants made public statements about the prices of FICO Scores that omitted material information that rendered the statements that they made materially misleading; and Defendants alone possessed material information that were relevant to consumers but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, Class members who purchased FICO Scores were misled to believe that they were paying a fair price for FICO Scores or the price increases for FICO Scores were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conduct. Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have an impact on New York consumers, including Plaintiffs and members of the Class. Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have a broad impact, causing Class members who purchased

FICO Scores to be injured by paying more for FICO Scores than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New York; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in New York. Plaintiffs and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

309. <u>North Carolina</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. §§ 75-1.1 *et seq.* Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Class. Defendants' conduct could not have succeeded absent deceptive conduct by Defendant to cover up their illegal acts. Secrecy was

integral to the formation, implementation, and maintenance of Defendants' illegal activity. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Class could not possibly have been aware. Defendants' public statements concerning the price of FICO Scores created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conduct. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in North Carolina. Plaintiffs and members of the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. §§ 75-1.1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

310.   Rhode Island: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1 *et seq.*).  Members of this Class purchased FICO Scores for personal, family, or household purposes.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Rhode Island.  Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO Scores.  Defendants owed a duty to disclose such facts, and they breached that duty by their silence.  Defendant misrepresented to all purchasers during the Class Period that Defendants' FICO Scores prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.  As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.  Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market.  Defendants'

affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO Scores they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. §§ 6-13.1-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

311. <u>South Carolina</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10 *et seq.*). Defendants' monopolization had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores during the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10 *et seq.*, and, accordingly, Plaintiffs and the members of the Class seek all relief available under that statute.

312. <u>South Dakota</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-6 *et seq.*). Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes South

Dakota, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO credit scores were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO credit scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendants' FICO credit scores prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO credit scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO credit scores at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO credit scores they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §§37-24-6 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

90

313. <u>Vermont</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for the FICO Scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendants' FICO Scores prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Vermont; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or

deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

314. <u>West Virginia</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code, §§46A-6-104 *et seq.* Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores. During the Class Period, Defendants marketed, sold, or distributed FICO credit scores in West Virginia, and Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code, §§46A-6-104 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully prays that This Honorable Court:

A. Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that Plaintiffs be named as Class Representatives, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B. Adjudge that Defendants violated the federal antitrust laws as set forth above;

C.      Adjudge that Defendants violated the state antitrust and unfair and deceptive trade practices laws as set forth above;

D.      Award Plaintiffs and members of the Class actual, treble, and exemplary damages;

E.      Award Plaintiffs and members of the Class attorneys' fees and costs of suit, including costs of consulting and testifying experts;

F.      Award Plaintiffs and members of the Class pre- and post-judgment interest;

G.      Enjoin Defendants from their violations of law; and

H.      Grant such other, further, and different relief, including structural relief, as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury as to all issues so triable.

Dated: October 30, 2023         Respectfully submitted,

*/s/ Steven F. Molo*

Steven F. Molo
Lauren F. Dayton
**MOLOLAMKEN LLP**
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Telephone: 312-450-6700
smolo@mololamken.com
ldayton@mololamken.com


Lauren M. Weinstein
**MOLOLAMKEN LLP**
600 New Hampshire Avenue, N.W.,
Suite 500
Washington, DC 20037
Telephone: 202-556-2000
lweinstein@mololamken.com

*Liaison Counsel for Direct Purchaser Plaintiffs and the Proposed Direct Purchaser Class*

*/s/ Carmen Medici*

Carmen Medici
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-798-5319
cmedici@scott-scott.com


Joseph P. Guglielmo (N.D. Ill. 2759819)
Michelle E. Conston (admitted *pro hac vice*)
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com
mconston@scott-scott.com

93

Gary F. Lynch
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
Facsimile: 412-231-0246
glynch@carlsonlynch.com

Katrina Carroll
**CARLSON LYNCH LLP**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
kcarroll@carlsonlynch.com

Jennifer W. Sprengel
**CAFFERTY CLOBES
MERIWETHER &
SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

Barbara J. Hart (admitted *pro hac vice*)
**GRANT & EISENHOFER**
485 Lexington Ave., 29th Floor New
York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
**SPERLING & SLATER, P.C.**
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Patrick McGahan (admitted *pro hac vice*)
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct
Purchaser Plaintiffs and the Proposed Direct
Purchaser Class*

Christopher M. Burke
Walter Noss
Yifan (Kate) Lv
**KOREIN TILLERY PC**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 6225-5620
Facsimile: (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

George A. Zelcs
Randall P. Ewing, Jr.
Ryan Z. Cortazar
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Michael L. Roberts
Karen Sharp Halbert
**ROBERTS LAW FIRM, P.A.**
20 Rahling Circle
Little Rock, AR 72223
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Gregory S. Asciolla (admitted *pro hac vice*)
Karin E. Garvey (admitted *pro hac vice*)

Linda P. Nussbaum
Susan Schwaiger
**NUSSBAUM LAW GROUP, P.C.**
1211 Avenue of the Americas
40th Floor
New York, NY 10036
Telephone: 917-438-9102
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Daniel E. Gustafson
(admitted *pro hac vice*)
Daniel C. Hedlund
(admitted *pro hac vice*)
Michelle J. Looby
(admitted *pro hac vice*)
Joshua J. Rissman
Ling S. Wang
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
lwang@gustafsongluek.com

Dennis Stewart (admitted pro hac vice)
**GUSTAFSON GLUEK PLLC**
600 B Street, 17th Floor San
Diego, CA 92101
Telephone: 619-595-3200
dstewart@gustafsongluek.com

Kenneth A. Wexler Melinda J.
Morales Michelle Perkovic
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

Robin A. van der Meulen (admitted *pro hac vice*)
Matthew J. Perez (admitted *pro hac vice*)
Jonathan S. Crevier (admitted *pro hac vice*)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
Telephone: 646-933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
rvandermeulen@dicellolevitt.com
mperez@dicellolevitt.com
jcrevier@dicellolevitt.com

Marvin A. Miller
Lori A. Fanning
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: 312-332-3400
mmiller@millerlawllc.com
lfanning@millerlawllc.com

Guillaume Buell (admitted pro hac vice)
**THORNTON LAW FIRM LLP**
1 Lincoln Street, 13th Floor
Boston, MA 02111
Telephone: 617-720-1333
gbuell@tenlaw.com

Don Barrett (pro hac vice forthcoming)
**BARRETT LAW GROUP, P.A.**
404 Court Square
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
dbarrett@barrettlawgroup.com
donbarrettpa@gmail.com

Richard R. Barrett (pro hac vice forthcoming)
**BARRETT LAW GROUP, P.A.**
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: 662-380-5018
rrb@rrblawfirm.net

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)

95

Charles F. Barrett
(admitted *pro hac vice*)
**NEAL & HARWELL, PLC**
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: 615-244-1713
cbarrett@nealharwell.com

**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1908
mlehmann@hausfeld.com
clebsock@hausfeld.com

Hilary K. Scherrer
Paul Gallagher
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington, DC 20006
Telephone: 202-540-7200
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Scott A. Martin
Irving Scher
Jeanette Bayoumi
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: 646-357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

*Counsel for Direct Purchaser Plaintiffs and the Proposed Direct Purchaser Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Carmen A. Medici, an attorney, hereby certify that on October 30, 2023, I caused a true and correct copy of the foregoing Direct Purchaser Plaintiffs' First Amended Consolidated Class Action Complaint to be filed and served electronically via the Court's CM/ECF system.

*s/ Carmen A. Medici*
Carmen A. Medici
