**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

|  |  |
|---|---|
| IN RE:  FICO ANTITRUST LITIGATION RELATED CASES | Case No. 1:20-CV-02114 |
| *This document relates to:*<br><br>ALL ACTIONS | Hon. Edmond E. Chang<br>Magistrate Judge David E. Weisman |

**THE CREDIT BUREAUS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINTS**

1

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ......................................................................................................................... 5

    **A.**    **The Bureaus Introduced Competition Against the FICO Score, and FICO Responded with Litigation Against the Bureaus.** ...................................................... 5

    **B.**    **FICO's 2013-2015 Distribution Agreements** ......................................................... 6

    **C.**    **TransUnion's 2018 Antitrust Counterclaims** ..................................................... 7

    **D.**    **This Court Dismissed Plaintiffs' Claims Against the Bureaus, and Limited Plaintiffs' Surviving Claims to Direct Purchases from FICO** ........................... 7

    **E.**    **Plaintiffs' Amended Complaints Do Not Change the Substance of Their Already-Dismissed Allegations Challenging the Bureaus' Separate Vertical Agreements With FICO** ........................................................................................ 10

STANDARD ............................................................................................................................... 11

ARGUMENT ............................................................................................................................. 12

    **I.**    **The Complaints Offer No Basis to Reverse This Court's Ruling on the "No Equivalent Products" and "Dynamic Royalty Schedule" Provisions** ............ 12

    **II.**    **The Complaints Do Not Plausibly Allege That the Level Playing Field Provision Was Anything More Than a Routine MFN** .................................... 14

        A.    The Amended Complaints Cannot Transform a Most Favored Nations Provision Into a "Cost-Information-Sharing" Mechanism ...................... 15

        B.    The Amended Complaints Cannot Overcome the Court's Dismissal By Alleging That the Level Playing Field Provision Was Important to the Bureaus ....................................................................................................... 17

        C.    Plaintiffs' Allegation That the Level Playing Field Provision Raised the Bureaus' Costs Further Undermines the Amended Complaints .............. 19

        D.    Plaintiffs' Allegation That the Bureaus and FICO (Briefly) Made Peace Do Not Support Plaintiffs' Conspiracy Allegations ................................. 20

    **III.**   **The Amended Complaints Do Not Plausibly Allege That Individual Bureaus Had Market Power Such That Their Individual, Vertical Agreements With FICO Could Plausibly Harm Competition** ..................................................... 21

    **IV.**   **The Court Should Dismiss the Claims Against Each of the Bureaus for the Reasons Identified in the Prior Motion to Dismiss** ......................................... 23

    **V.**    **The Amended Complaints' State Law Claims Must Be Dismissed for the Same Reasons** ................................................................................................... 23

    **VI.**   **Dismissal Should Be With Prejudice** ................................................................. 24

CONCLUSION .......................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Agnew v. NCAA*
683 F.3d 328 (7th Cir. 2012) ................................................................................24

*Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*
499 F.3d 663 (7th Cir. 2007) ................................................................................24

*Apple, Inc. v. Pepper*
139 S. Ct. 1514 (2019) ..........................................................................................9

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ..............................................................................................11

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*
15 F.4th 831 (7th Cir. 2021) .................................................................................11

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*
2020 WL 5642941 (N.D. Ill. Sept. 22, 2020) ..................................................21, 22

*Assoc. Milk Dealers, Inc. v. Milk Drivers Union, Loc. 753, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*
422 F.2d 546 (7th Cir. 1970) ...............................................................2, 8, 15, 16

*In re Baby Food Antitrust Litig.*
166 F.3d 112 (3d Cir. 1999) .................................................................................16

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) ..........................................................................3, 11, 15, 19

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*
65 F.3d 1406 (7th Cir. 1995) ........................................................................ passim

*Bowers v. Jones*
978 F.2d 1004 (7th Cir. 1992) ..............................................................................24

*Christie Clinic, P.C. v. MultiPlan, Inc.*
2009 WL 175030 (N.D. Ill. Jan. 26, 2009) ..........................................................13

*Fair Isaac Corp. v. Experian Info. Sols., Inc.*
650 F.3d 1139 (8th Cir. 2011) ..........................................................................6, 21

AMERICAS 125628796

*Fair Isaac Corp. v. Experian Info. Sols., Inc.*
  711 F. Supp. 2d 991 (D. Minn. 2010) ................................................................................6

*Foman v. Davis*
  371 U.S. 178 (1962) ...........................................................................................................24

*Gurvey v. Cowan, Liebowitz & Lathman, P.C.*
  2015 WL 4460859 (S.D.N.Y. July 21, 2015) .....................................................................13

*Hannah's Boutique, Inc. v. Surdej*
  112 F. Supp. 3d 758 (N.D. Ill. 2015) .................................................................................21

*Hanover Shoe v. United Shoe Mach. Corp.*
  392 U.S. 481 (1968) ...........................................................................................................19

*In re Humira (Adalimumab) Antitrust Litig.*
  465 F. Supp. 3d 811 (N.D. Ill. 2020), *aff'd sub nom. Mayor of Baltimore v. Abbvie Inc.*, 42
  F.4th 709 (7th Cir. 2022) ...................................................................................................23

*Illinois Brick Co. v. Illinois*
  431 U.S. 720 (1977) .......................................................................................................4, 19

*Kitsap Physicians Serv. v. Wash. Dental Serv.*
  671 F. Supp. 1267 (W.D. Wash. 1987) ..............................................................................16

*Long v. Borough of Downingtown*
  2014 U.S. Dist. LEXIS 70936 (E.D. Pa. May 23, 2014) ....................................................13

*Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*
  29 F.4th 337 (7th Cir. 2022) ...................................................................................... passim

*Marion Healthcare, LLC v. Becton Dickinson & Co.*
  952 F.3d 832 (7th Cir. 2020) ........................................................................................8, 14

*Martin v. Wendy's Int'l, Inc.*
  2017 WL 1545684 (N.D. Ill. Apr. 28, 2017) ......................................................................12

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island*
  883 F.2d 1101 (1st Cir. 1989) ...........................................................................................16

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*
  281 F.3d 629 (7th Cir. 2002) ..............................................................................................9

*Sheridan v. Marathon Petroleum Co. LLC*
  530 F.3d 590 (7th Cir. 2008) ............................................................................................22

iii

*Slep-Tone Entm't Corp. v. Kalamata, Inc.*
   75 F. Supp. 3d 898 (N.D. Ill. 2014) ..................................................................21

*In re Tamoxifen Citrate Antitrust Litig.*
   277 F. Supp. 2d 121 (E.D.N.Y. 2003), *aff'd*, 466 F.3d 187 (2d Cir. 2006), *abrogated on other
   grounds by FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) .........................................23

*Valley Liquors, Inc. v. Renfield Imps., Ltd.*
   822 F.2d 656 (7th Cir. 1987) ..........................................................................22

*Villars v. Kubiatowski*
   128 F. Supp. 3d 1039 (N.D. Ill. 2015) ..............................................................24

*Wakeen v. Hoffman House, Inc.*
   724 F.2d 1238 (7th Cir. 1983) ........................................................................24

*Weslowski v. Zugibe*
   96 F. Supp. 3d 308 (S.D.N.Y. 2015) ................................................................13

## STATUTES AND RULES

15 U.S.C. § 1 .................................................................................................1, 12, 22

15 U.S.C. § 2 ..................................................................................................7, 9, 10

## MISCELLANEOUS

Michael Bloom, *Information exchange: be reasonable*, Fed. Trade Comm'n (Dec. 11, 2014),
   available at https://www.ftc.gov/enforcement/competition-matters/2014/12/information-
   exchange-be-reasonable) ................................................................................16

iv

**INTRODUCTION**

After carefully reviewing the original Complaints and the Bureaus' motion to dismiss, the Court issued a Memorandum Opinion and Order (the "Sept. 28 Order") concluding that Plaintiffs failed to plausibly allege that any of the Bureaus had conspired with FICO—either collectively under a "hub-and-spokes" theory *or* through their individual, bilateral license-distribution agreements with FICO. The Court accordingly dismissed *both* sets of claims against the Bureaus. Sept. 28 Order, *In re FICO Antitrust Litig.*, No. 1:20-cv-2114 (N.D. Ill. Sept. 28, 2023), Dkt. 173. Although the dismissal was without prejudice, the Court warned Plaintiffs to "realistically assess whether they can fill the gap in an amended pleading, bearing in mind that the Plaintiffs already gave it a fulsome shot in the current 300-plus-paragraph Complaints." Sept. 28 Order at 22.

Despite this warning, and despite having now abandoned their "hub-and-spokes" and conspiracy to monopolize claims, Plaintiffs continue to assert that each Bureau's license-distribution agreement with FICO, standing alone, violates Section 1 of the Sherman Act. But, as shown in the earlier briefing, the Complaints make clear that the terms Plaintiffs challenge were either imposed by the alleged monopolist FICO or are exactly what each Bureau would seek to protect its individual ability *to compete* against the other Bureaus and FICO in the sale of credit scores. Nothing in the new Amended Complaints plausibly suggests that these vertical agreements violate the Sherman Act, or otherwise overcomes the Court's dismissal of Plaintiffs' allegations.

Dismissal of the Amended Complaints with prejudice is appropriate for at least the following four reasons.

First, the Amended Complaints make *no new substantive allegations* regarding the challenged "No Equivalent Products" and "Dynamic Royalty Schedule" provisions that this Court has already concluded fail to support a claim. *See* Blackline of Direct Purchaser Plaintiffs' Amended Complaint (Ex. A) at 42–47; Blackline of Indirect Purchaser Plaintiffs' Amended

1

Complaint (Ex. B) at 40–46; Direct Purchaser Plaintiffs' First Amended Consolidated Class Action Complaint ("DPACC"), Dkt. 184, at ¶¶ 119–33; Indirect Purchaser Plaintiffs' Second Amended Consolidated Class Action Complaint ("IPACC"), Dkt. 185, at ¶¶ 130–48. Instead, Plaintiffs simply double down on their argument—already rejected by the Court under *Marion Diagnostic Center, LLC v. Becton Dickinson & Co.* ("*Marion II*"), 29 F.4th 337, 350 (7th Cir. 2022)—that each Bureau can plausibly be viewed as conspiring with FICO to undermine the Bureaus' own competing VantageScore joint venture. *See* Sept. 28 Order at 21–22. As this Court noted, Plaintiffs themselves allege that the Bureaus "took significant measures to invest and to support VantageScore[ Scores] as a 'competitively priced, highly predictive' alternative to FICO Scores." *See id.* at 21 (quoting DPCC ¶ 7). And as the Court already ruled, "the allegation that the Credit Bureaus conspired with FICO in exchange for protection from competition . . . is implausible." *Id.* at 20–21. Plaintiffs add nothing to these arguments and are well past the date for moving for reconsideration. Plaintiffs' claims regarding these provisions should therefore be dismissed.

Second, Plaintiffs' amended allegations with respect to the "Level Playing Field" provision involve only minimal (if any) substantive changes from the original Complaint, and ultimately fare no better. As the Court has already recognized, and Plaintiffs now admit, the Level Playing Field provisions are "most favored nations" clauses ("MFNs"), and the Seventh Circuit repeatedly has held that such provisions are "standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers" and do not ordinarily raise antitrust concerns, particularly absent a "predatory purpose." *See* Sept. 28 Order at 20–21 (citing *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995), *as amended on denial of reh'g* (Oct. 13, 1995); *Assoc. Milk Dealers, Inc. v. Milk Drivers Union, Loc. 753, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*,

2

422 F.2d 546, 554 (7th Cir. 1970)); DPACC ¶ 140.  The Level Playing Field MFN provisions were plainly in the interest of each Bureau to pursue in their respective negotiations with FICO—to ensure the pricing they received for the must-have FICO Score allowed them to be competitive in the sale of such scores against the other Bureaus.  *See* Sept. 28 Order at 20–21.  Nothing about entering such standard contractual terms suggests harm to competition.

Plaintiffs' amendment adds nothing to negate this common-sense reality.  Plaintiffs simply repeat their original Complaints' attempt to depict the basic operation of an MFN as an anticompetitive "cost-information-sharing mechanism."  DPACC ¶¶ 136–38; IPACC ¶¶ 150–51.  But this label is contrived.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (courts must look past "labels and conclusions").  As a starting point, Plaintiffs, not surprisingly, fail to make a single allegation that any Bureau *actually* shared information with another Bureau through the MFNs.  Thus, even if viewed as a new argument (and one that was not already rejected), the MFNs described here are no more a "cost information" exchange than the MFNs at issue in the above-noted Seventh Circuit cases—where the only "information" the MFN provided was the procompetitive assurance that the MFN holder's supplier would not raise the MFN holder's costs relative to rivals' and thus impair its ability to compete downstream.  *See* Sept. 28 Order at 20 (collecting authority).  And while the Amended Complaints assert that the MFN "provision is demonstrably important to the Credit Bureaus," and seek to buttress this conclusion by alleging that TransUnion requested a similar provision in a contract with FICO in Canada, i.e., outside the alleged relevant geographic market, *see* DPACC ¶ 139; IPACC ¶ 153, it remains implausible in the extreme that this MFN provision was so important to any Bureau that it would conspire with FICO to undermine VantageScore, let alone that all three would do so.  *See* Sept. 28 Order at 21–22.

3

Third, as in the original Complaints, the amendments assert that the challenged provisions allowed the alleged monopolist FICO to raise prices—principally, the prices it charged the Bureaus *themselves*. *See* DPACC ¶¶ 140–45; IPACC ¶¶ 156–58. These allegations continue to make no sense, and therefore remain implausible. *See* Sept. 28 Order at 21–22. Plaintiffs do not attempt to explain why any Bureau would enter into an arrangement with FICO to allow FICO to overcharge *that very Bureau*. As "direct purchasers" of FICO scores, the Bureaus would be the victims of such overcharges and thus the real plaintiffs authorized to recover such overcharges under the Sherman Act. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735, 746 (1977). And, as the Supreme Court has recognized, even if a Bureau could pass on some or all of a FICO overcharge, the inflated price could impact demand for FICO Scores and, thus, harm the Bureau's sales—making it implausible that a Bureau (let alone all three) would assent to such self-immolation. *See id.*

Finally, particularly now that Plaintiffs focus exclusively on the respective individual agreements between FICO and each Bureau, the Amended Complaints fail to allege that any of those Bureaus individually would have sufficient market power for its agreement with FICO to harm competition. Indeed, the Amended Complaints fail to even allege what portion of credit scores are sold through the Bureaus *collectively*—much less the share of that market each Bureau holds *individually*—and certainly do not adequately articulate how any such share would be sufficient to impact competition. Instead, the Amended Complaints concede that there is vigorous competition from at least four sellers of credit scores (the Bureaus and FICO). In the absence of plausible allegations of market power, dismissal is appropriate.

In short, this Court's skepticism as to Plaintiffs' ability to amend their way to a legitimate antitrust theory against the Bureaus has been borne out. *See* Sept. 28 Order at 22 (noting that

4

Plaintiffs had already given the exercise "a fulsome shot in the [previous] 300-plus paragraph complaints"). The Amended Complaints add nothing to their initial efforts and should now be dismissed with prejudice.

## BACKGROUND

The facts described below are as alleged in the DPACC and IPACC (collectively, the "Amended Complaints"). *See also* Sept. 28 Order 2–7 (describing the allegations); Credit Bureaus' Motion to Dismiss Plaintiffs' Class Action Complaints ("Prior MTD") at 4–10, Dkt 135.

### A. The Bureaus Introduced Competition Against the FICO Score, and FICO Responded with Litigation Against the Bureaus

Fair Isaac Corporation ("FICO") developed the FICO Score, a type of credit score. DPACC ¶¶ 1–2, 34–35; IPACC ¶¶ 1–2, 35–36. The Bureaus produce the credit reports used to generate FICO Scores, DPACC ¶¶ 3, 38–40, 57; IPACC ¶¶ 3, 39–41, and distribute FICO Scores to businesses, DPACC ¶ 42; IPACC ¶¶ 6, 46. The Bureaus pay FICO royalties for each FICO Score that they sell. DPACC ¶¶ 42–43; IPACC ¶¶ 46–47. FICO Scores are the most-used credit scores in the United States—essentially a "must have" for most lenders, DPACC ¶¶ 2, 60–69; IPACC ¶¶ 2, 74–83—and are deeply integrated into many lenders' decision-making (or "decisioning") operations, DPACC ¶¶ 51, 53–55, 68; IPACC ¶¶ 63–66. Accordingly, each Bureau has offered FICO Scores to its business customers "[f]or decades." DPACC ¶ 4.

FICO's primary competitor is VantageScore Solutions, LLC ("VantageScore"), a joint venture formed by the Bureaus in 2006 to offer a meaningful competitive alternative in a segment long dominated by FICO. DPACC ¶¶ 70–73; IPACC ¶¶ 10, 86–91. The Bureaus each individually distribute—and price—VantageScore Scores to businesses, often together with a credit report. DPACC ¶ 71; IPACC ¶ 87.

5

Shortly after the launch of VantageScore, FICO brought a lawsuit against the Bureaus and VantageScore "with the intended purpose of driving VantageScore Solutions out of business." DPACC ¶ 9; *see also id.* ¶ 86; IPACC ¶¶ 102–103. Indeed, the District Court in the litigation noted that the "extensive, expensive litigation seems to have been initiated largely in response to a perceived threat to Fair Isaac's dominant position in the credit scoring industry." DPACC ¶ 92 (emphasis deleted) (quoting *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1000 (D. Minn. 2010)). FICO's lawsuit did not succeed, and the Bureaus continued to offer VantageScore Scores in competition with FICO Scores. DPACC ¶¶ 87–93; IPACC ¶¶ 102–108; *see also Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011) (affirming summary judgment dismissing FICO's antitrust claims against the Bureaus).

The Amended Complaints' allegations concede (as they must) that VantageScore is still very much in business, and that the Bureaus continue to distribute its scores. DPACC ¶¶ 35–37, 71–73, 78–83; IPACC ¶¶ 37–38, 88–90. In Fall 2021—when Plaintiffs filed their Complaints and more than eight years after the first of the challenged agreements was entered into in May 2013— VantageScore was still promoting its score (as it continues to do to this day), *see* DPACC ¶ 37 & n.9; IPACC ¶ 38 n.9, VantageScore had just hired a new senior executive to promote the use of its score in capital markets, *see* DPACC ¶ 6 & n.3, and FICO was still attacking VantageScore on its website, *see* DPACC ¶ 152 & n.110; IPACC ¶ 167.

**B.     FICO's 2013-2015 Distribution Agreements**

FICO renewed its licensing and distribution agreements with the Bureaus at different times between 2013 and 2015: FICO entered a new contract with Experian in May 2013, with Equifax in October 2013, and with TransUnion in February 2015. DPACC ¶ 108; IPACC ¶ 120. The Amended Complaints repeat the assertion that each Bureau, in separately agreeing to (1) the No Equivalent Products provision, (2) the Dynamic Royalty Schedule provision, and (3) the Level

6

Playing Field provision of these agreements, conspired to further FICO's monopoly and "crush" its own joint venture, VantageScore.[1]  DPACC ¶¶ 101, 117; IPACC ¶¶ 117, 128.

### C.    TransUnion's 2018 Antitrust Counterclaims

In February 2018, TransUnion brought a Sherman Act Section 2 counterclaim against FICO in a dispute over the royalties FICO charged for FICO Scores.  DPACC ¶ 97; IPACC ¶ 111. TransUnion alleged that FICO had monopolized the business-to-business ("B2B") market for credit scores in the United States by imposing unfair terms on the Bureaus and waging a "media and advertising campaign" against VantageScore.  TransUnion Counterclaims ¶ 76, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Feb. 12, 2018), Dkt. 38.  It sought overcharge damages "as a direct purchaser (or licensee) of Fair Isaac's FICO products, which it also supplies to its customers" based on "Fair Isaac's supracompetitive royalty prices."  *Id.* ¶¶ 7, 77.  The parties ultimately settled, and the case was dismissed.  DPACC ¶ 99; IPACC ¶ 113.

### D.    This Court Dismissed Plaintiffs' Claims Against the Bureaus, and Limited Plaintiffs' Surviving Claims to Direct Purchases from FICO

Ten purported class action Complaints were originally filed in this matter, asserting federal and state antitrust claims against FICO—only one of which named the Bureaus as defendants.  *See Kenmore NY Teachers Fed. Credit Union v. Fair Isaac Corp.*, No. 1:20-cv-02755 (N.D. Ill. May 6, 2020).  The claims were then consolidated into two Complaints brought by two alleged classes of purchasers: Direct Purchasers (who claim to have purchased FICO Scores either directly from

---

[1]    According to the Amended Complaints, the No Equivalent Products provision prevents the Bureaus from "internally develop[ing]" a credit scoring system that is "aligned to the odds-to-score relationship of any Fair Isaac Analytic" or that uses "more than a limited number of reason codes that 'match' reason codes used by any Fair Isaac Analytic."  DPACC ¶ 119; IPACC ¶ 130.  The Dynamic Royalty Schedule provision provides that FICO has the right to "replace its existing royalty with a new one" and thereby gives FICO "the ability to control the prices of FICO Scores" paid by the Bureaus.  DPACC ¶ 126; IPACC ¶ 140. Finally, the Level Playing Field provision provides that FICO will not "offer any Credit Bureau a more favorable price for FICO Scores than any other Credit Bureau."  DPACC ¶ 134; IPACC ¶ 149.

AMERICAS 125628796

FICO or indirectly through the Bureaus) and Indirect Purchasers (who claim to have purchased FICO Scores from unnamed third parties who in turn purchased those scores from the Bureaus, who in turn purchased them from FICO). *See* DPACC ¶¶ 15–21; IPACC ¶ 21.

On September 28, 2023, this Court granted the Bureaus' motion to dismiss all claims against them. *See* Sept. 28 Order at 16–22, 30.

**Hub-and-Spokes Conspiracy.** The Court first held that the original Complaints failed to plausibly allege that the Bureaus engaged in a "hub-and-spokes" conspiracy because Plaintiffs could not "plausibly allege that the Credit Bureaus conspired with each other." Sept. 28 Order at 19 (relying on *Marion Healthcare, LLC v. Becton Dickinson & Co.* ("*Marion I*"), 952 F.3d 832, 842 (7th Cir. 2020)). In doing so, the Court held that "the premise [in Plaintiffs' complaints] that the Level Playing Field clause protected the Credit Bureaus from each other is flawed," as this clause is a "'most favored nations'-type clause, which 'are standard devices by which buyers try to bargain for low prices, by getting the seller to treat them as favorably as their other customers.'" Sept. 28 Order at 20 (quoting *Blue Cross & Blue Shield*, 65 F.3d at 1415). The Court noted that the "Seventh Circuit has held that most-favored-nations clauses are 'not price-fixing.'" *Id.* (quoting *Assoc. Milk*, 422 F.2d at 554 (requiring "compelling proof" concerning "[predatory] purpose" in adopting the MFN and a resulting "anticompetitive effect" to establish that an MFN violates the antitrust laws)). This Court further held that Plaintiffs could not plausibly plead that the Bureaus adopted the Level Playing Field clause with "predatory purpose" where (a) FICO sued one of the Bureaus—TransUnion—shortly after entering into the at-issue licensing and distribution agreements, (b) there was no plausible allegation that the provision protected the Bureaus from competing against a hypothetical new credit bureau, and (c) it was not plausible to suggest that the Bureaus wanted to "sabotage their own joint venture to receive some protection from the wispy

8

specter of external competition." Sept. 28 Order at 20–21. Plaintiffs have since abandoned their hub-and-spokes conspiracy in the Amended Complaints. *See* Ex. A at 66 (amending Claim One to allege claims only as to FICO); Ex. B at 63 (same).

**Individual Conspiracies.** On the same basis, the Court likewise dismissed all claims against the Bureaus based on alleged individual, vertical agreements with FICO. Sept. 28 Order at 21–22 ("Because the Level Playing Field provision is not plausibly a sufficient incentive for Credit Bureaus to conspire together, it is also not a sufficient incentive for each Credit Bureau to conspire separately with FICO. Put another way, the Plaintiffs are unable to adequately allege that the Level Playing Field was so lucrative for each Credit Bureau that they served to advance FICO's monopoly power.") (citing *Marion II*, 29 F.4th at 350).

**Conspiracy to Monopolize.** Finally, the Court dismissed all claims against the Bureaus based on alleged conspiracy to monopolize under Sherman Act Section 2. *See* Sept. 28 Order at 22. Plaintiffs abandon this claim in their Amended Complaints. *See* Ex. A at 79–81 (withdrawing claim of conspiracy to monopolize); Ex. B at 76–78 (same).

***Illinois Brick.*** In dismissing the claims against the Bureaus, the Court also foreclosed Plaintiffs' efforts to rely on the co-conspirator exception to the *Illinois Brick* doctrine. Sept. 28 Order at 24 ("[T]he Plaintiffs can sue FICO and seek to recover damages as direct purchasers of FICO Scores but cannot (under federal law) claim damages stemming from an 'overcharge' passed down a chain of distribution. Neither may the Plaintiffs allege that they have the right to sue middlemen that joined the conspiracy, because claims against the Credit Bureaus have been dismissed.") (cleaned up) (citing *Apple, Inc. v. Pepper*, 139 S. Ct. 1514, 1525 (2019); *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631–32 (7th Cir. 2002)). Plaintiffs are thus left only with federal claims based on purchases they might have made from FICO directly. *See id.*

9

E.    **Plaintiffs' Amended Complaints Do Not Change the Substance of Their Already-Dismissed Allegations Challenging the Bureaus' Separate Vertical Agreements With FICO**

In their Amended Complaints, Plaintiffs abandon (a) any claim that the Bureaus conspired with one another (i.e., in a "hub-and-spokes" conspiracy), (b) any claim of a "per se" antitrust violation, and (c) any claim that the Bureaus' agreements with FICO should be treated as a "conspiracy to monopolize" under Section 2 of the Sherman Act.  *See* Ex. A at 66 (amending Claim One to allege claims only as to FICO), 79–81 (withdrawing claim of conspiracy to monopolize; Ex. B at 63, 76–78 (same); DPACC Claims Two, Three & Four (asserting claims only under rule of reason); IPACC Claims Two, Three & Four (same).  The DPPs' Amended Complaint also omits the implausible allegation that the purpose of the Level Playing Field clause was to protect against the risk of a new credit bureau entering the market.  DPACC ¶ 136; *compare* Sept. 28 Order at 20–21 (finding any such allegation implausible); *but see* IPACC ¶ 152 (continuing to make this allegation despite the Court's holding).

The Amended Complaints, like the original Complaints, continue to assert that the Bureaus each individually conspired with FICO by acceding to the challenged terms in their respective license-distribution agreements, and that these three individual "conspiracies" violated the Sherman Act under the rule of reason.  Plaintiffs made the following revisions to their Amended Complaints in a half-hearted attempt to support this theory:

- Despite having dropped any allegation of a conspiracy among the Bureaus, Plaintiffs assert that the Level Playing Field provision functions as a "cost-information-sharing mechanism among the Credit Bureaus."  DPACC ¶¶ 137–38, 140; IPACC ¶¶ 150–51.

- Plaintiffs assert that the Level Playing Field provision "is demonstrably important to the Credit Bureaus" on the basis that TransUnion allegedly unsuccessfully requested a similar provision in its contract with FICO in Canada, a wholly separate market from the market alleged in the Amended Complaints.  DPACC ¶ 139; IPACC ¶ 153.

- Plaintiffs allege that FICO has consistently overcharged the Bureaus for FICO Scores, but nonetheless claim that each Bureau "conspired" with FICO because, according to

10

Plaintiffs, the Bureaus were able to pass on at least a portion of such FICO overcharges to downstream purchasers. DPACC ¶¶ 141–45; IPACC ¶¶ 156–61.

- Finally, Plaintiffs allege that in 2015, the then-CEO of FICO described FICO's relationships with the Bureaus (i.e., FICO's distributors) as partnerships rather than describing them as being "at war." DPACC ¶¶ 109–10; IPACC ¶¶ 122–23. Similarly, Plaintiffs allege that FICO describes the Bureaus—again, FICO's distributors—as "partners in offering [FICO's] scoring solutions." DPACC ¶ 43; IPACC ¶ 48.

None of these lightly altered allegations states a valid Sherman Act claim against any of the Bureaus, and dismissal with prejudice is accordingly appropriate.[2]

## STANDARD

"[A] complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and that rises "above the speculative level," *Twombly*, 550 U.S. at 555. Where—as here—a complaint alleges a conspiracy to violate the antitrust laws, the plaintiff must come forward with factual allegations "plausibly suggesting (not merely consistent with) agreement" in order to survive a motion to dismiss. *Id.* at 557. Determining whether a complaint states a plausible claim for relief is a context-specific task that requires a court to rely on "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Conclusory allegations, such as that defendants " 'agreed,' 'conspired,' 'colluded,' or 'induced' agreement, conspiracy, or collusion" will be disregarded and "cannot substitute for factual allegations." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 834 (7th Cir. 2021).

---

[2] The Amended Complaints also add citations to FICO's Answer, apparently in the hope that factual admissions by FICO can buttress the legal allegations in the original Complaints. *See, e.g.*, DPACC ¶ 114–16 (asserting that FICO has admitted that its agreements with the Bureaus each contain the provisions Plaintiffs now challenge). But in dismissing Plaintiffs' claims against the Bureaus, the Court accepted the factual allegations in the original Complaints as true, at least for purposes of assessing the plausibility of Plaintiffs' allegations under *Twombly*. *See* Sept. 28 Order at 8. Nonetheless, the Court held that Plaintiffs' original Complaints failed to state a claim with respect to the Bureaus. *See id.* at 22.

11

**ARGUMENT**

Plaintiffs continue to allege that each of the Bureaus' individual agreements with FICO separately violate Section 1 of the Sherman Act under the rule of reason. *See* DPACC Claims Two-Six; IPACC Claims Two-Six. But Plaintiffs' repackaged rule-of-reason claims do not address the defects the Court identified in dismissing the original Complaints. All of Plaintiffs' claims against the Bureaus should be dismissed with prejudice.

## I. The Complaints Offer No Basis to Reverse This Court's Ruling on the "No Equivalent Products" and "Dynamic Royalty Schedule" Provisions

The Amended Complaints add no new facts justifying reversal of this Court's ruling with respect to the challenged "No Equivalent Products" and "Dynamic Royalty Schedule" provisions. As the Court pointed out in dismissing the claims—and as remains equally true with respect to the Amended Complaints—the "face of the Complaints does not plausibly allege that the Credit Bureaus would sabotage their own joint venture to receive some protection from the wispy specter of external competition [from a hypothetical new credit bureau]. In fact, the most recent litigation involving TransUnion suggests the opposite—that the Credit Bureaus are emboldened to resist any pressure that FICO might try to exert on them." Sept. 28 Order at 21.

Plaintiffs' challenge to these provisions must be rejected for at least the following reasons.

First, as noted, Plaintiffs add no new facts to their claims as to these provisions, and thus the allegations here are substantively identical to those in the original Complaints. *See* Ex. A at 42–47 (blackline showing no substantive changes in DPACC); Ex. B. at 40–46 (same with respect to IPACC). When a plaintiff fails to add any new factual support to a dismissed complaint, the court should reach the same result and is certainly under no obligation to reconsider its prior order(s). *See, e.g.*, *Marion II*, 29 F.4th at 349–50 (declining to analyze allegations that were "recycled" as "we already deemed those allegations insufficient in *Marion I*"); *Martin v. Wendy's*

12

*Int'l, Inc.*, 2017 WL 1545684, at *5 (N.D. Ill. Apr. 28, 2017) (court not required to "revisit its earlier analysis" dismissing a complaint where "Plaintiffs' amended complaint and response brief include virtually no additional facts that might be relevant"); *Christie Clinic, P.C. v. MultiPlan, Inc.*, 2009 WL 175030, at *4 (N.D. Ill. Jan. 26, 2009) (finding Plaintiff's minor changes to its allegations did not address or correct the deficiencies which led the court to strike and dismiss certain allegations and claims). Based on this alone, the Court should dismiss Plaintiffs' allegations against the Bureaus regarding these provisions.

Second, because Plaintiffs add no new facts as to the No Equivalent Products and Dynamic Royalty Schedules provisions, and because what they have added amounts to little more than legal argument disagreeing with this Court's dismissal decision, the effort must be rejected as an improper—and meritless—motion for reconsideration. *See, e.g.*, DPACC ¶ 202 (adding language that takes issue with this Court's ruling with respect to Experian); *see also id.* ¶ 219 (same as to Equifax); *id.* ¶ 236 (same as to TransUnion); *Gurvey v. Cowan, Liebowitz & Lathman, P.C.*, 2015 WL 4460859, at *5 (S.D.N.Y. July 21, 2015) ("The mere filing of an Amended Complaint does not entitle Plaintiff to relitigate his claims absent new factual allegations. Because the Amended Complaint . . . is in large part identical to Plaintiffs' first Complaint, the law of the case doctrine counsels against reconsideration of the Court's [earlier] dismissal of the first Complaint." (quoting *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y. 2015))); *Long v. Borough of Downingtown*, 2014 U.S. Dist. LEXIS 70936, at *8 (E.D. Pa. May 23, 2014) (where "Plaintiff has added nothing whatsoever to the prior version of his complaint" the court "need not address the sufficiency of his pleading under [pleading] standards, as to do so would in essence be a reconsideration" of the court's dismissal order).

13

Third, any effort to secure reconsideration would be futile in any event, as this Court was entirely correct in dismissing these allegations, including for the reasons identified in *Marion II*.[3] *See* Sept. 28 Order at 21–22. In that case, as here, the Seventh Circuit initially considered and rejected a "hub-and-spokes" conspiracy claim. *See Marion II*, 29 F.4th at 343 (describing *Marion I*, 952 F.3d at 842–43). The plaintiffs, like Plaintiffs here, then attempted to narrow their allegations—abandoning any hub-and-spokes conspiracy—while continuing to assert a series of individual conspiracies between the "hub" and the erstwhile distributor "spokes." *Marion II*, 29 F.4th at 344. The Seventh Circuit rejected the attempt, noting that the distributors' conduct—including, as here, individual bi-lateral distribution agreements with the common supplier—could not plausibly be viewed as anticompetitive. *See id.* at 350–51. The Court here correctly cited *Marion II* to reach a similar result, and there is no reason to revisit that decision. *See* Sept. 28 Order at 21–22.

## II. The Complaints Do Not Plausibly Allege That the Level Playing Field Provision Was Anything More Than a Routine MFN

Nor can Plaintiffs state a claim by tweaking their characterization of the "Level Playing Field" MFN provision. Even Plaintiffs themselves concede that the Level Playing Field provision is an MFN provision. *See* DPACC ¶¶ 137–138, 140; IPACC ¶¶ 150–151. And as this Court made clear, such MFN clauses are typically unremarkable and "are 'not price-fixing.'" Sept. 28 Order at 20 (quoting *Blue Cross & Blue Shield*, 65 F.3d at 1415). This is because, as the Seventh Circuit explained in *Blue Cross & Blue Shield*, "[m]ost favored nations" clauses, by enabling "buyers . . .

---

[3]    To the extent that the Court does reconsiders its September 28 Order—and it should not do so—the Bureaus respectfully incorporate by reference their Prior Motion to Dismiss. For example, though the Court did not need to reach this issue, the Amended Complaints' focus on the Dynamic Royalty Schedule provisions is particularly baseless—as the harm there comes from FICO's *abuse* of that provision to set unfair royalties paid by the Bureaus. *See, e.g.*, Prior MTD at 21, 33–34. Plaintiffs cannot seriously be heard to suggest that each Bureau conspired with FICO to raise its own costs.

14

to bargain for low prices," contemplate "the sort of conduct that the antitrust laws seek to encourage."[4]  65 F.3d at 1415.  These principles hold equally true here, and none of the new allegations contradict this Court's prior holding that the Level Playing Field provisions are "not a sufficient incentive for each Credit Bureau to conspire separately with FICO."[5]  Sept. 28 Order at 21.

### A.  The Amended Complaints Cannot Transform a Most Favored Nations Provision Into a "Cost-Information-Sharing" Mechanism

In an apparent effort to cast the Level Playing Field MFN provision in a sinister light, Plaintiffs claim this "standard device[]" (Sept. 28 Order at 20) instead functions as a "cost-information-sharing mechanism among the Credit Bureaus."  DPACC ¶ 137–38, 140; IPACC ¶ 150–51.  But this attempted re-labeling cannot overcome dismissal.  *See Twombly*, 550 U.S. at 555 (courts must look past "labels and conclusions").

Plaintiffs allege no "exchange" of information here beyond that which is inherent to any MFN: the knowledge that no competitor would be receiving a more favorable price than the MFN-holder.  Although the Amended Complaints rattle off a laundry list of information exchanges that can supposedly facilitate collusion or harm competition—namely, information relating to "price, cost, output, customers, or strategic planning"—there are no allegations that the Bureaus exchanged these types of information, or that such information exchanges were made possible through the Level Playing Field provision.  DPACC ¶ 137; IPACC ¶ 150 (emphasis removed).  Instead, as applied in this case, through the Level Playing Field provision alleged in the Amended

---

[4]    This is particularly so with respect to Experian, which entered its agreement with FICO before the other Bureaus—and thus could only have wanted the Level Playing Field provision to remain competitive with the other Bureaus prospectively.  *See* DPACC ¶ 108; IPACC ¶ 120.

[5]    The only narrow exception to the general legality of MFNs is when a plaintiff plausibly pleads (and ultimately proves) that an MFN was entered into with "predatory purpose" and would likely cause "anticompetitive effect."  *See* Sept. 28 Order at 20 (quoting *Assoc. Milk Dealers*, 422 F.2d at 554).  Plaintiffs do not and cannot allege anything of the sort here.

15

Complaints, each Bureau could allegedly deduce that the price it was paying for FICO Scores was the lowest possible price that any other Bureau would be paying. That is it. Thus, at most, and as with any MFN, the Level Playing Field provision provided each Bureau with the minimum price that its rivals were paying for FICO Scores. Courts, including the Seventh Circuit, have refused to treat MFN provisions as anticompetitive in light of the unremarkable nature of the information sharing they facilitate. *See, e.g.*, *Blue Cross & Blue Shield*, 65 F.3d at 1415; *Assoc. Milk Dealers*, 422 F.2d at 554; *cf. Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island*, 883 F.2d 1101, 1110 (1st Cir. 1989); *Kitsap Physicians Serv. v. Wash. Dental Serv.*, 671 F. Supp. 1267, 1269 (W.D. Wash. 1987).

Plaintiffs' "information sharing" gloss on the Level Playing Field provision should not lead this Court to break with Seventh Circuit precedent—or its own prior ruling. In addition to the very limited information that the Bureaus could glean through that provision, Plaintiffs' assertions of "cost-information-sharing" ring hollow in light of their abandonment of their claims that the Bureaus conspired with one another. *See* Ex. A at 66 (amending Claim One to allege claims only as to FICO); Ex. B at 63 (same). Supposed information sharing creates antitrust concerns when competitors share cost information with one another (again, something not alleged here) to "facilitate collusion or otherwise harm competition." [6] DPACC ¶ 137 (quoting Michael Bloom,

---

[6] The Federal Trade Commission publication Plaintiffs cite only undermines their position here. In that publication, the FTC made clear that even ***direct exchanges of information between competitors***—something not alleged here—may not raise antitrust concerns. *See* FTC Information Exchange. The FTC also made clear that simply gathering market information—such as, here, cost information of competitors deduced from an MFN provision—was not only unproblematic, but affirmatively good for competition. *See id.* ("Each day companies seek out market information to gain insights on how to compete more effectively. When companies compete more effectively, that can be good for consumers, making more and better goods and services available to them at lower prices."); *see also*, *e.g.*, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) ("Gathering competitors' price information can be consistent with independent competitor behavior . . . [I]t makes common sense to obtain as much information as possible of the pricing policies . . . of one's competitors.") (collecting cases).

AMERICAS 125628796

*Information exchange: be reasonable*, Fed. Trade Comm'n (Dec. 11, 2014) ("FTC Information Exchange"), available at https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable); IPACC ¶ 150 (same). But here, the Bureaus are no longer even alleged to have colluded with one another. Plaintiffs' attempt to transform the Level Playing Field provision into a tool to support such collusion therefore gets them nowhere.

**B.     The Amended Complaints Cannot Overcome the Court's Dismissal By Alleging That the Level Playing Field Provision Was Important to the Bureaus**

Plaintiffs next attempt to suggest that the Level Playing Field MFN provision "is demonstrably important to the Credit Bureaus"—apparently in response to the Court concluding that "the Plaintiffs are unable to adequately allege that the Level Playing Field was so lucrative for each Credit Bureau that they served to advance FICO's monopoly power." *Compare* DPACC ¶ 139; IPACC ¶ 153 *with* Sept. 28 Order at 21. But adding this allegation does not resolve the deficiency identified by the Court.

The problem with the original Complaints was not that they did not allege that the Bureaus had an interest in the Level Playing Field provision. If the Level Playing Field provision allowed for information sharing at all, it provided each Bureau with basic knowledge about what its rivals paid for FICO Scores—knowledge that facilitated price competition amongst the Bureaus and assured each Bureau that it would not be victimized by selective price hikes from a common supplier. That the Bureaus would find valuable the ability to compete in this way is hardly surprising. Rather, the problem with Plaintiffs' original Complaints—like their Amended Complaints—was that it was implausible to suggest that each Bureau's interest in the Level Playing Field provision was so overwhelmingly important that the Bureau would have conspired to undermine its own competitive interests in exchange for including that provision in the licensing

17

and distribution agreement with FICO. *See* Sept. 28 Order at 20–21. Simply asserting that the Level Playing Field provision was "important" to the Bureaus does nothing to cure that deficiency.

Plaintiffs' allegation concerning TransUnion's contract negotiations with FICO in Canada—the centerpiece of Plaintiffs' argument that the Level Playing Field provision was of vital importance to the Bureaus—misses the mark for at least three reasons. First, the market dynamics of credit scoring in Canada are irrelevant. Plaintiffs concede that the relevant market here is limited to the United States market for credit scores, and Plaintiffs' allegations would make even less sense in Canada because VantageScore has never been offered in the Canadian market. *See, e.g.*, DPACC ¶¶ 47, 50, 188, 204, 221, 238, 253; IPACC ¶¶ 51, 56, 206, 223, 240, 257, 273. Second, Plaintiffs allege only that TransUnion requested an MFN in its agreement with FICO in Canada, and FICO said "no." DPACC ¶ 139 ("The Level Playing Field clause was so valuable to TransUnion of Canada that it continued to insist on one until Fair Isaac threatened to withhold its Canadian business entirely."); IPACC ¶ 153 (same). This allegation sheds no light on how important the Level Playing Field provision was to TransUnion in Canada, much less in the United States. Third, if anything, Plaintiffs' allegation that "Fair Isaac threatened to withhold its Canadian business entirely" from TransUnion confirms the implausibility of their theory that TransUnion and FICO entered into in a conspiracy in 2015 that continues to this day. *See* DPACC ¶ 139; IPACC ¶ 153. Indeed, in the public filings from *Fair Isaac v. TransUnion* that Plaintiffs reference, *see* DPACC ¶ 139; IPACC ¶ 153, TransUnion alleged that FICO was threatening to withhold its "must have" scores from TransUnion in Canada because FICO and TransUnion were suing each other in the United States, *see, e.g.*, TransUnion's Motion to File Written Discovery at 4, *Fair Isaac Corp. v. TransUnion LLC*, No. 1:17-cv-08318 (Nov. 6, 2019), Dkt. 156 ("FICO is threatening TransUnion's business in Canada for the purpose of punishing TransUnion . . ."). As

18

this Court previously observed, "[t]he allegation that the Credit Bureaus conspired with FICO in exchange for protection from competition, only to be sued by FICO shortly after their agreement, is implausible (even giving the Plaintiffs the benefit of reasonable inferences)." Sept. 28 Order at 20–21. Merely claiming that the MFN provision was important does nothing to cure this defect.

### C. Plaintiffs' Allegation That the Level Playing Field Provision Raised the Bureaus' Costs Further Undermines the Amended Complaints

Next, the Amended Complaints add allegations suggesting that, as a result of the Level Playing Field MFN provision, the Bureaus have paid higher prices for FICO Scores. DPACC ¶¶ 141–45; IPACC ¶¶ 156–58. The only basis for this conclusion, however, is that the prices FICO charges the Bureaus for FICO Scores have gone up over time. *See id.* This allegation only undermines the Amended Complaints—Plaintiffs are, incredulously, apparently contending that each Bureau conspired with FICO so that FICO could overcharge that Bureau. Under well-established pleading standards, a plaintiff must allege facts that render the alleged conspiracy plausible; this deficiency is just another example of Plaintiffs doing the opposite. *Twombly*, 550 U.S. at 553–54, 556; *Marion II*, 29 F.4th at 349–50.

Of course, the Amended Complaints suggest that this alleged overcharge was "passed on" at least in part to the Bureaus' customers. *See, e.g.*, DPACC ¶¶ 144–45 ("Experian 'pass[es] it through to [its] customers"); *id.* ("When FICO 'put through a price increase . . . Equifax[,] TU and Experian deliver[ed] that price increase to the marketplace, when they increase the price of their credit score. So that rolled through."); IPACC ¶¶ 160–61 (same). But Plaintiffs cannot avoid the reality that if FICO's price hikes were deemed anticompetitive, the Bureaus would be the direct victims of such overcharges, and thus entitled to recover those overcharges in full despite any ability to pass on the added cost. *See Illinois Brick*, 431 U.S. at 735, 746–47; *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 491–94 (1968) (rejecting the view that a distributor

19

suffers no loss "where the overcharge is imposed equally on all of a buyer's competitors and where the demand for the buyer's product is so inelastic that the buyer and his competitors could all increase their prices by the amount of the cost increase without suffering a consequent decline in sales," and instead holding that the distributor in that scenario holds the claim for damages).

In any event, Plaintiffs' allegations on this front should be seen as simply their latest ill-fated attempt to wrestle with the *Illinois Brick* problem that has long stood in their way. Although the Court allowed Plaintiffs' claims to proceed with respect to purchases made directly from FICO, it is unclear from the Amended Complaints how many such purchases Plaintiffs actually made. Plaintiffs' first attempt to deal with this problem was to name the Bureaus—the direct victims of FICO's anticompetitive scheme—as "co-conspirators" to that scheme. When that failed (and it should fail again, with the claims in the Amended Complaints being dismissed), Plaintiffs instead sought to assert a "pass-on" theory to again seek to avoid the inconvenient fact that the Bureaus are the direct purchasers. This too fails.

### D. Plaintiffs' Allegation That the Bureaus and FICO (Briefly) Made Peace Do Not Support Plaintiffs' Conspiracy Allegations

Finally, Plaintiffs now allege that in 2015, the then-CEO of FICO described FICO's relationship with the Bureaus as a partnership rather than a war. DPACC ¶¶ 109–10 ("According to Mr. Lansing, instead of being 'at war' with one another, the Credit Bureaus decided instead 'to be partnered' with Fair Isaac"); IPACC ¶ 122–23 (same); *see also* DPACC ¶ 43 (describing FICO's relationship with the Bureaus as a partnership); IPACC ¶ 48 (same). The Bureaus are one of the key means by which the FICO Score is distributed; a company being "at war" with its distributors must surely be the exception rather than the rule. *See Marion II*, 29 F.4th at 349–50 (rejecting allegations of conspiracies with distributors).

20

But in any event, less than three years later FICO sued TransUnion, with TransUnion bringing antitrust counterclaims; if the parties were not officially "at war" in 2015, they certainly have been "at war" at times prior to 2015 ((*see Fair Isaac v. Experian*, 650 F.3d 1139 (affirming Bureaus' victory over FICO at trial) and after 2015 (*see Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill.) (FICO sued TransUnion in 2017))).

Plaintiffs therefore cannot state a claim based on the Level Playing Field provision, and thus cannot state a claim with respect to any of the provisions at issue.

### III. The Amended Complaints Do Not Plausibly Allege That Individual Bureaus Had Market Power Such That Their Individual, Vertical Agreements With FICO Could Plausibly Harm Competition

The Amended Complaints also fail to plausibly allege critical elements of a rule of reason claim—namely, that any Bureau individually possesses significant market power in the claimed market for credit scores sold to businesses—such that its agreement with FICO could plausibly substantially foreclose competition. *See, e.g.*, *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 2020 WL 5642941, at **17–22 (N.D. Ill. Sept. 22, 2020), *aff'd*, 15 F.4th 831 (7th Cir. 2021) (dismissing complaint for failure to plausibly allege market power); *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 772 (N.D. Ill. 2015) ("controlling Seventh Circuit law requires" plaintiffs to allege the relevant market and that defendants possess "substantial market share" (internal quotation marks and citation omitted)); *Slep-Tone Entm't Corp. v. Kalamata, Inc.*, 75 F. Supp. 3d 898, 907–08 (N.D. Ill. 2014) (antitrust claims dismissed under rule of reason because plaintiff failed to adequately allege market power).

Plaintiffs allege a "B2B Credit Score Market," which the Amended Complaints define as "the market for the sale of [credit] scores to banks, mortgage companies, credit unions, and other businesses that assess individual credit risk – *i.e.*, business-to-business sales." *See, e.g.*, DPACC ¶¶ 1, 47, IPACC ¶¶ 1, 52. However, the Amended Complaints are silent as to any Bureau's share

21

of this alleged market. Indeed, the Amended Complaints fail even to allege the percentage of FICO Scores that are sold through Bureaus **generally**, rather than through some other source (including FICO itself), or for that matter the number of VantageScore Scores the Bureaus might sell as an alternative to FICO Scores. Not only do the Amended Complaints fail to even attempt to assert any **individual Bureau's share** of the claimed B2B Credit Score Market,[7] they also concede that each Bureau faces strong competitors in the B2B Credit Score Market—the other two Bureaus and FICO itself (which, as noted, sells FICO Scores directly to lenders in competition with the Bureaus). Because the Amended Complaints utterly ignore the market power requirement governing their claims against the individual Bureaus, and instead strongly suggest vigorous competition among at least four sellers, those claims must be dismissed for this reason alone. *See Ass'n of Am. Physicians & Surgeons, Inc.*, 2020 WL 5642941, at *17, **21–22 (dismissing Section 1 claim where the complaint did "not sufficiently allege . . . market power"; the complaint did not "provide any facts substantiating the alleged market share belonging to the [alleged co-conspirators], or any other participant in the alleged market"; "[u]nder the pleading regime created by *Twombly*, the plaintiffs' naked assertion of [defendant's] 'appreciable economic power'—an empty phrase—cannot save the complaint" (quoting *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 595 (7th Cir. 2008) (quotation marks omitted))); *Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987) (affirming summary judgment where district court "correctly found that [the plaintiff-appellant] has not alleged facts that give rise to an inference that [the defendant-appellee] had sufficient market power to control liquor prices in a relevant product and geographic market").

---

[7]    The Amended Complaints at most allege only that the Bureaus have a roughly equal share in **another** market (the market for credit **reports** rather than credit **scores**). *See* DPACC ¶¶ 57–58 ("On information and belief, the Credit Bureaus control virtually all of the credit report market (they have been called a 'triopoly') and enjoy roughly equivalent market shares."); IPACC ¶ 70 (similar).

AMERICAS 125628796

## IV.     The Court Should Dismiss the Claims Against Each of the Bureaus for the Reasons Identified in the Prior Motion to Dismiss

In the Prior Motion to Dismiss, each Bureau explained why the claims against it should be dismissed for reasons unique to that Bureau.  *See* Prior MTD at 38–41 (explaining that claims against TransUnion should be dismissed in light of TransUnion's antitrust claim against FICO); *id.* at 41–43 (explaining that claims against Experian should be dismissed in light of Experian's role as a direct purchaser from FICO, and because Experian entered its agreement with FICO before any other Bureau); *id.* at 43–44 (explaining that there is no basis to conclude that Equifax entered an anticompetitive agreement, based, in part, on the timing at which it entered into its agreement with FICO compared to the timing of the other Bureaus' agreements).  The Court did not need to reach these independent bases for dismissal in its September 28, 2023 Order—and need not reach them to dismiss the Amended Complaints.  Nonetheless, to the extent not otherwise dismissed for the above reasons, dismissal remains appropriate as to each of the Bureaus for these independent reasons.

## V.     The Amended Complaints' State Law Claims Must Be Dismissed for the Same Reasons

The Amended Complaints' allegations should be dismissed as to all the state law claims (Claims Six and Seven) for all the same reasons.  Federal courts routinely dismiss state law antitrust, consumer protection, or unjust enrichment claims when those claims rely on federal antitrust claims that have been dismissed.  *See*, *e.g.*, *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 847 (N.D. Ill. 2020) ("[I]f the federal antitrust claims are dismissed, the state law antitrust claims should be dismissed [for the same reasons]. . . . [I]f [Plaintiff's] federal antitrust claims are dismissed, the state law antitrust claims brought pursuant to consumer protection statutes should be dismissed, too."), *aff'd sub nom. Mayor of Baltimore v. Abbvie Inc.*, 42 F.4th 709 (7th Cir. 2022); *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139

23

(E.D.N.Y. 2003) ("state antitrust law should be construed similarly to federal antitrust law where possible"), *aff'd*, 466 F.3d 187 (2d Cir. 2006), *abrogated on other grounds by FTC v. Actavis, Inc.*, 570 U.S. 136 (2013)).  Dismissal of the state law claims is therefore appropriate for all the same reasons outlined above with respect to the federal Sherman Act claims.

## VI.     Dismissal Should Be With Prejudice

Finally, dismissal of all claims against the Bureaus should be with prejudice.  Plaintiffs have now had multiple opportunities to try to allege facts that would plausibly support claims against the Bureaus.  In the Court's Order dismissing the claims against the Bureaus in the original Complaints, the Court noted that Plaintiffs "already gave it a fulsome shot in the current 300-plus-paragraph Complaints."  Sept. 28 Order at 22.  The Court cautioned that Plaintiffs should amend their Complaints to re-name the Bureaus only if they really believed that doing so might allow the claims to survive dismissal.  *Id.*  Instead, Plaintiffs filed Amended Complaints that, at bottom, are merely a rehash of the original Complaints.  *See* Ex. A; Ex. B.  Plaintiffs have failed to allege any new factual matter to cure the deficiencies the Court identified in its Order, and any further amendment would be futile.  Dismissal with prejudice is therefore appropriate.  *See, e.g.*, *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007) (explaining the standards courts apply in determining whether to grant dismissal with prejudice (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *Agnew v. NCAA*, 683 F.3d 328, 347–48 (7th Cir. 2012) (refusing to allow further amendment when plaintiff had multiple opportunities to plead claims and failed to do so); *Bowers v. Jones*, 978 F.2d 1004, 1008 (7th Cir. 1992) ("An amendment is futile when it 'merely restates the same facts using different language, or reasserts a claim previously determined'" (quoting *Wakeen v. Hoffman House, Inc.*, 724 F.2d 1238, 1244 (7th Cir. 1983)); *Villars v. Kubiatowski*, 128 F. Supp. 3d 1039, 1043–47 (N.D. Ill. 2015) (similarly dismissing certain claims with prejudice when further amendment would be futile).

24

**CONCLUSION**

The Amended Complaints should be dismissed as to the Bureaus with prejudice for the foregoing reasons.

Dated:  December 1, 2023                Respectfully submitted,

/s/ Leslie Pope                                        /s/ Carolyn P. Gurland
Leslie Pope (*pro hac vice*)                 Carolyn Pelling Gurland, #6274399
John Thorne, #6181458                      WHITE & CASE LLP
KELLOGG, HANSEN, TODD, FIGEL      111 South Wacker Drive
& FREDERICK, P.L.L.C.                    Suite 5100
1615 M Street NW                          Chicago, IL 60606
Suite 400                                 Tel: (312) 881-5400
Washington, D.C. 20036                    carolyn.gurland@whitecase.com
Tel: (202) 326-7900
jthorne@kellogghansen.com
lpope@kellogghansen.com                   Robert A. Milne (*pro hac vice*)
                                          Martin M. Toto (*pro hac vice*)
                                          Jack E. Pace III (*pro hac vice*)
J. David Duffy, #6242374                  Bryan D. Gant (*pro hac vice*)
THOMPSON COBURN LLP                       WHITE & CASE LLP
55 East Monroe Street, 37th Floor         1221 Avenue of the Americas
Chicago, Illinois 60603                   New York, NY 10020-1095
Tel: (312) 346-7500                       Tel: (212) 819 8200
dduffy@thompsoncoburn.com                 rmilne@whitecase.com
                                          mtoto@whitecase.com
                                          jpace@whitecase.com
*Counsel for Defendant TransUnion, LLC*   bgant@whitecase.com

s/ James F. Herbison                      *Counsel for Defendant Experian Information*
James F. Herbison, #6275116               *Solutions, Inc.*
Michael P. Mayer, #6272677
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Tel: (312) 558-5600
jherbiso@winston.com
mmayer@winston.com

*Counsel for Defendant Equifax Inc.*