**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *In re FICO Antitrust Litigation* | Case No. 20-cv-02114 |
| *This document relates to:* | Honorable Edmond E. Chang |
| ALL ACTIONS | Magistrate Judge M. David Weisman |

### FAIR ISAAC CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS THE PLAINTIFFS' AMENDED COMPLAINTS

Dated: December 1, 2023

Britt M. Miller
Matthew D. Provance
Michael A. Scodro
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
(312) 701-7711—Facsimile
bmiller@mayerbrown.com
mprovance@mayerbrown.com
mscodro@mayerbrown.com

*Counsel for Defendant*
*Fair Isaac Corporation*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND BACKGROUND ......................................................................... 1

ARGUMENT ................................................................................................................ 4

I.     The Amended Complaints Plead No New Facts To Support The Previously-Dismissed Sherman Act Section 1 And Related State-Law Claims. ................................ 4

II.    Plaintiffs Fail To State A Claim Based On FICO's License Agreements. ....................... 7

    A.    The License Agreements Allow Distribution Of Non-FICO Credit Scores. ......... 7

        1.    The No Equivalent Products provision expressly allows competition. ....................................................................................... 7

            a.    The Credit Bureaus can and do market VantageScore. ................. 8

            b.    VantageScore can develop and sell any competing credit score to B2B Purchasers. ....................................................... 9

        2.    FICO's Royalty Schedules do not foreclose competition. ...................... 11

            a.    There is no "penalty" rate for pre-qualification. .......................... 11

            b.    Plaintiffs fail to allege that pre-qualification represents a substantial portion of the alleged B2B Credit Score Market. ...... 13

        3.    VantageScore's growth since 2013 independently shows that the license agreements have not substantially foreclosed competition.......... 14

    B.    The Level Playing Field Provision Furthers Competition. ................................. 16

        1.    The Level Playing Field does not discourage discounting. .................... 18

        2.    The Level Playing Field does not facilitate price coordination. ............. 18

III.    Plaintiffs Otherwise Fail To State A Monopolization Claim........................................... 20

    A.    Any Claim Based On The *Equifax* Litigation Is Time-Barred. .......................... 20

    B.    The Alleged Disparagement Of VantageScore Is Not Actionable. .................... 23

IV.    Plaintiffs' Derivative State-Law Claims Should Be Dismissed. ...................................... 25

CONCLUSION................................................................................................................ 25

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Al George, Inc. v. Envirotech Corp.*,
939 F.2d 1271 (5th Cir. 1991) .................................................................................................23

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) ..................................................................................................13

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988) ................................................................................................................25

*Arnett Physician Grp., PC v. Greater LaFayette Health Servs., Inc.*,
382 F. Supp. 2d 1092 (N.D. Ind. 2005) ..................................................................................24

*Bank of Waunakee v. Rochester Cheese Sales, Inc.*,
906 F.2d 1185 (7th Cir. 1990) ..................................................................................................6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................................12

*Blue Cross & Blue Shield United of Wis. V. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ......................................................................................17, 18, 19

*Bower v. Jones*,
978 F.2d 1004 (7th Cir. 1992) ..................................................................................................6

*Brown v. Visa U.S.A., Inc.*,
674 F. Supp. 249 (N.D. Ill. 1987) ...........................................................................................12

*CDC Techs., Inc. v. IDEXX Lab'ys, Inc.*,
186 F.3d 74 (2d Cir. 1999) ......................................................................................................11

*CDC Techs., Inc. v. IDEXX Lab'ys, Inc.*,
7 F. Supp. 2d 119 (D. Conn. 1998), *aff'd*, 186 F.3d 74 (2d Cir. 1999) .................................10

*Chase Mfg., Inc. v. Johns Manville Corp.*,
2019 WL 2866700 (D. Colo. July 3, 2019) ............................................................................14

*City of Rockford v. Mallinckrodt ARD, Inc.*,
360 F. Supp. 3d 730 (N.D. Ill. 2019) ........................................................................................7

*Dardai v. Cook Cnty.*,
1997 WL 160689 (N.D. Ill. Apr. 2, 1997) ..............................................................................22

i

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
313 F. Supp. 3d 931 (N.D. Ill. 2018) .................................................................9

*Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*,
684 F.2d 1346 (7th Cir. 1982) ..........................................................................7

*E-One, Inc. v. Oshkosh Truck Corp.*,
2006 WL 3320441 (N.D. Ill. Nov. 13, 2006) ....................................................8

*E.I. du Pont de Nemours & Co. v. FTC*,
729 F.2d 128 (2d Cir. 1984).............................................................................20

*Ellenby Techs., Inc. v. Fireking Sec. Grp.*,
533 F. Supp. 3d 656 (N.D. Ill. 2021) ................................................................6

*Elzeftawy v. Pernix Grp., Inc.*,
477 F. Supp. 3d 734 (N.D. Ill. 2020) ................................................................2

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022) ...............................................................9, 10, 12, 13

*Feitelson v. Google Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) ............................................................14

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ...........................................................................13

*G&G Closed Cir. Events, LLC v. Castillo*,
327 F. Supp. 3d 1119 (N.D. Ill. 2018) ..............................................................1

*Gonzalez v. City of Elgin*,
2007 WL 4246899 (N.D. Ill. Nov. 28, 2007) ....................................................6

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
221 F. Supp. 3d 1033 (N.D. Ind. 2016) ..........................................................22

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982).........................................................................................23

*In re Humira (Adalimumab) Antitrust Litig.*,
465 F. Supp. 3d 811 (N.D. Ill. 2020) .........................................................20, 26

*Kaiser Found. v. Abbott Labs.*,
2009 WL 3877513 (C.D. Cal. Oct. 8, 2009)....................................................23

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997).........................................................................................22

ii

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983) ........................................................................13

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011) ..........................................................................24

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
    2016 WL 5817176 (C.D. Ill. Sept. 30, 2016) ................................................13

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
    859 F.3d 408 (7th Cir. 2017) ......................................................................9, 13

*No Spill LLC v. Scepter Can., Inc.*,
    2022 WL 1078435 (D. Kan. Apr. 6, 2022) ....................................................18

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*,
    883 F.2d 1101 (1st Cir. 1989) ........................................................................17

*Omega Env't, Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ..................................................................15, 16

*P & M Servs., Inc. v. Gubb*,
    2008 WL 4185903 (E.D. Mich. Sept. 8, 2008), *aff'd*, 372 F. App'x 613 (6th
    Cir. 2010) ........................................................................................................23

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) ........................................................................................17

*Power Analytics Corp. v. Operation Tech., Inc.*,
    2017 WL 11486807 (C.D. Cal. Dec. 7, 2017) ..................................................9

*R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
    199 F. Supp. 2d 362 (M.D.N.C. 2002) ................................................10, 15, 16

*Roland Mach. Co. v. Dresser Indus., Inc.*
    749 F.2d 380 (7th Cir. 1984) ....................................................................7, 8, 16

*Sanderson v. Culligan Int'l Co.*,
    415 F.3d 620 (7th Cir. 2005) ..........................................................................24

*Schachar v. Am. Acad. of Opthalmology, Inc.*,
    870 F.2d 397 (7th Cir. 1989) ..........................................................................24

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*,
    782 F.3d 922 (7th Cir. 2015) ..........................................................................21

*Simon & Simon, PC v. Align Tech., Inc.*,
    533 F. Supp. 3d 904 (N.D. Cal. 2021) ..............................................................9

iii

*Sterling Merch., Inc. v. Nestlé, S.A.*,
  656 F.3d 112 (1st Cir. 2011) ............................................................14, 15

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
  373 F.3d 57 (1st Cir. 2004) ...................................................................13

*In re Surescripts Antitrust Litig.*,
  608 F. Supp. 3d 629 (N.D. Ill. 2022) .....................................................13

*U.S. Futures Exch., LLC v. Bd. of Trade of the City of Chi., Inc.*,
  346 F. Supp. 3d 1230 (N.D. Ill. 2018), *aff'd* 953 F.3d 995 (7th Cir. 2020) ...................7, 9, 16

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) .................................................................13

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
  873 F.3d 185 (3d Cir. 2017) ..................................................................19

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ..............................................................................12

*Wakeen v. Hoffman House, Inc.*,
  724 F.2d 1238 (7th Cir. 1983) .................................................................6

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971) ..............................................................................21

**Statutes & Rules**

15 U.S.C. § 15b.........................................................................................21

15 U.S.C. § 45...........................................................................................20

Fed. R. Civ. P. 54(b) ..................................................................................7

**Other Authorities**

Alistair Gray, *Credit score row as FICO chief hits out at banks over 'Fako'
  rivals*, FINANCIAL TIMES (Dec. 5, 2017),
  https://www.ft.com/content/2222880c-cfa5-11e7-9dbb-291a884dd8c6 ...............................25

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law:
  An Analysis of Antitrust Principles & Their Application* (2023).......................................10, 22

Press Release, VantageScore, *Usage of VantageScore Credit Scores Surges More than 20 percent versus the Previous Year and Over 300 percent over the Past Five Years* (Oct. 15, 2018), https://www.vantagescore.com/press_releases/usage-of-vantagescore-credit-scores-surges-more-than-20-percent-versus-the-previous-year-and-over-300-percent-over-the-past-five-years/ ........................................................................................16

Press Release, VantageScore, *VantageScore Solutions Announces Score Use Grows to More than 12 Billion* (Oct. 29, 2019), https://www.vantagescore.com/press_releases/vantagescore-solutions-announces-score-use-grows-to-more-than-12-billion/ ............................................................16

Press Release, VantageScore, *VantageScore® Credit Score Usage Up 30% in 2022* (June 1, 2023), https://www.vantagescore.com/press_releases/vantagescore-credit-score-usage-up-30-in-2022/ ................................................................................................16

VantageScore, *10 years, 10 milestones* (June 30, 2020), https://www.vantagescore.com/newsletter/10-years-10-milestones-1/ ...................................15

VantageScore, *FAQs: VantageScore® Credit Scores and the Mortgage Market* (2018), https://www.vantagescore.com/wp-content/uploads/2022/02/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf ...................................................15

## INTRODUCTION AND BACKGROUND

In its prior ruling, *see* Mem. Op. & Order, 9/28/23, Dkt. 173 ("Order"), the Court dismissed Counts One through Four and Count Six of the complaints because Plaintiffs failed to plausibly allege either horizontal or vertical conspiracies. This Court instructed Plaintiffs to "realistically assess whether they can fill [this] gap [in their pleadings], bearing in mind that the Plaintiffs already gave it a fulsome shot in the current 300-plus-paragraph Complaints." Order at 22. Plaintiffs now reassert these claims with even fewer facts alleged in support, and with only superficial wording changes in the relevant parts of their amended complaints. For the reasons cited in this Court's initial Order, these claims should be dismissed with prejudice.

With respect to Count Five against FICO for monopolization, the Court held that Plaintiffs had offered "sufficient allegations of anticompetitive effects" resulting from the "No Equivalent Products" and "Dynamic Royalty Schedule" provisions in FICO's license agreements.[1] Order at 13. At that time, however, prior to the entry of an appropriate Confidentiality Order, the Court did not have the actual terms of those agreements before it. As this Court has recognized, "[w]hen a plaintiff decides to amend a complaint, she takes her chances that the opposing party will come up with new and better arguments in favor of dismissal." *G&G Closed Cir. Events, LLC v. Castillo*, 327 F. Supp. 3d 1119, 1134 n.15 (N.D. Ill. 2018).[2] This motion now presents the Court with a copy of the Analytic and Data License Agreement ("ADLA") between FICO and TransUnion, Jones Decl. Exs. 1-2, which the Court may consider as incorporated into the amended complaints by

---

[1]  The Court also allowed related state-law claims against FICO to proceed (Counts Six through Seven and Six through Eight in the amended complaints). Order at 24–30.

[2]  FICO maintains that Plaintiffs fail to state a claim, and their federal damages claims are barred by the *Illinois Brick* doctrine, for the additional reasons set forth in its initial motion to dismiss. FICO reserves all rights to challenge these aspects of Plaintiffs' claims at later stages in the case, if necessary.

reference.[3] The terms of the ADLA show that Plaintiffs fail to state a claim based on anything in these contracts. In relevant part, the terms provide as follows:

**No Equivalent Products**. Section 12.5 of the ADLA, entitled "No Equivalent Products," appears in Article 12, regarding "Intellectual Property." Ex. 1 at 34-35. That section provides that the Credit Bureaus may not "internally develop" or "distribute" a competing credit score that "has an odds-to-score relationship that has been intentionally aligned to the odds-to-score relationship of any [FICO Score]." *Id.* And "intentionally aligned," in turn, means that the credit score "specifically used the [FICO Score] odds-to-score relationship . . . to develop the odds-to-score relationship of the competing analytic[.]" Section 12.5 further provides that the Credit Bureaus may not internally develop or distribute a competing credit score using reason codes "that match more than the greater of 20% or 7 of the" reason codes used by a FICO Score. *Id.* at 35.

The No Equivalent Products provision is limited in two critical respects not mentioned in the amended complaints. First, it does not apply to any competing credit score in existence on the ADLA's effective date. *Id.* at 35. Second, it does nothing to limit the ability of VantageScore (or any other third-party competing credit score provider) to develop competing credit scores that *are*

---

[3]      The Declaration of Nathan Jones includes a copy of the ADLA as well as the 2015 Royalty Schedule applicable to "Pre-Qualification" FICO Score use referenced throughout Plaintiffs' amended complaints. Because Plaintiffs purport to rely on these documents as grounds for their allegations and they are central to the claims, the Court may consider them without converting this motion to a motion for summary judgment. *See, e.g.*, *Elzeftawy v. Pernix Grp., Inc.*, 477 F. Supp. 3d 734, 758 (N.D. Ill. 2020) (explaining that "exhibits attached to the parties' briefs may be considered" in evaluating a motion to dismiss if "'referred to' in the complaint and 'central' to the plaintiff's claims"). FICO attaches only the ADLA between FICO and TransUnion to this motion, but Plaintiffs allege, and FICO does not dispute for purposes of this motion, that the challenged provisions in FICO's license agreements with Experian and Equifax contain "the same or similar terms." DPP Am. Compl. ¶ 114; *see* IPP Second Am. Compl. ¶ 125.

As used herein, "DPP Compl." and "IPP Am. Compl." refer to the Direct Purchaser Plaintiffs' Consolidated Class Action Complaint and the Indirect Purchaser Plaintiffs' Amended Class Action Complaint, which were the operative complaints addressed in the Court's prior Order. "DPP Am. Compl." and "IPP Second Am. Compl." refer to the Direct Purchaser Plaintiffs' First Amended Consolidated Class Action Complaint (Dkt. 184) and the Indirect Purchaser Plaintiffs' Second Amended Class Action Complaint (Dkt. 185), both filed on October 30, 2023.

intentionally aligned to FICO's odds-to-score relationship or that copy its reason codes and license or distribute them to lenders directly. *See id.* at 34 ("development by VantageScore Solutions, LLC or other third parties shall not be deemed to be internal development" by a Credit Bureau). Accordingly, looking at its *actual* terms, the No Equivalent Products provision does not support Plaintiffs' claim that it "had the effect of eliminating or drastically reducing the competitive threat posed by VantageScore."[4]

**Dynamic Royalty Schedule**. In exchange for its license to generate and distribute FICO Scores using FICO's proprietary software, each Credit Bureau pays FICO royalties set forth in a Royalty Schedule. Ex. 1 at 22 (§ 9.1). And pursuant to Section 9.2, entitled "Dynamic Royalty Schedule," FICO has the right to "replace the Royalty Schedule" with a new one every 12 months during the term of the agreement, *id.*, a periodic right to revise royalty rates enjoyed by any company that licenses its intellectual property.

In 2015, FICO introduced a royalty category, "Pre-Qualification," which applies when a lender (1) uses a FICO Score to qualify a consumer for a credit offer, in connection with (2) the online disclosure of credit data or a credit score directly to the consumer. Ex. 2 (fn. i).[5] In that instance, the contractual royalty that FICO may charge the Credit Bureaus is ▮▮▮. *Id.* Contrary to what Plaintiffs contend, there is no "seven times penalty rate" for FICO Scores used for pre-qualification when "the lender . . . provides a VantageScore (or any other credit score) to the consumer 'in connection with' the 'Pre-Qualification,'" which can be "avoided" only if FICO Scores are used for both the pre-qualification decision and the consumer disclosure.[6] Such a term appears nowhere in the Royalty Schedule or ADLA. In fact, the Royalty Schedule makes clear that

---

[4]    DPP Am. Compl. ¶ 125; IPP Second Am. Compl. ¶ 139.
[5]    *See also* DPP Am. Compl. ¶ 128; IPP Second Am. Compl. ¶ 142.
[6]    DPP Am. Compl. ¶¶ 129–30; IPP Second Am. Compl. ¶¶ 144–45.

FICO Scores used by lenders for pre-qualification may not be disclosed to consumers at all. *See id.* ("[FICO] Scores calculated for Pre-Qualification may not be disclosed to the consumer."). Any disclosure of FICO Scores to consumers in connection with the pre-qualification use case must occur pursuant to a separate, and additional, licensing arrangement.

As a result, neither the purpose nor the effect of this pricing structure is to "dissuade lenders from providing [consumers with] competing credit scores, such as VantageScore."[7] The pre-qualification royalty (which the Credit Bureaus, not the lenders, pay) is always avoided if lenders use another credit score, such as VantageScore, both to determine consumers' eligibility for a pre-qualified credit offer and as the basis for the consumer disclosure. In that scenario, FICO receives no royalty payments from the Credit Bureaus at all.

Finally, Plaintiffs reprise claims based on the *Equifax* litigation that FICO filed in 2006 and on allegedly disparaging remarks that FICO made to the market about VantageScore.[8] The law precludes both theories. The *Equifax* litigation began and ended well outside the limitations period for these suits, and neither fraudulent concealment nor the continuing-violation doctrine applies to the theories Plaintiffs plead. And it is well-settled that allegedly disparaging remarks about a competitor do not violate the antitrust laws.

Accordingly, the amended complaints should be dismissed in their entirety.

## ARGUMENT

### I. The Amended Complaints Plead No New Facts To Support The Previously-Dismissed Sherman Act Section 1 And Related State-Law Claims.

This Court dismissed claims in Plaintiffs' original complaints that were based on allegations that Defendants entered into agreements—which Plaintiffs labeled "conspiracies"—to

---

[7]     DPP Am. Compl. ¶ 129; IPP Second Am. Compl. ¶ 144.
[8]     DPP Am. Compl. ¶¶ 87–100, 146–53; IPP Second Am. Compl. ¶¶ 102–14, 163–70.

prevent competition with FICO Scores.[9] In various counts, Plaintiffs claimed that those agreements violated Section 1 of the Sherman Act and derivative state laws.[10] But the Court held that Plaintiffs failed to plausibly allege either an anticompetitive horizontal agreement among all Defendants or vertical agreements between FICO and each Credit Bureau. Order at 20-22. While the Court dismissed these claims without prejudice, it admonished Plaintiffs to reassert them only if they could "fill the gap" in their deficient factual allegations. *Id.* at 22.

Plaintiffs have ignored that admonition. Their amended complaints allege fewer facts to support their previously-dismissed claims. Instead, Plaintiffs slightly reframe the same factual allegations by cutting phrases like "per se violations" and substituting the word "agreements" for "conspiracies."[11] The following paragraphs from Direct Purchasers' amended complaint, shown in redline against the prior version, illustrate the purely cosmetic nature of the changes.

> ~~204.~~215.    In addition to competing with Experian in the credit scores market, Fair Isaac licenses its algorithm to Experian, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, Experian discourages its customers·from using or purchasing access to competing credit scores. Because Experian has substantial market power, ~~and because Experian knows that the other Credit Bureaus have agreed to the same provisions,~~ it can harm its customers in this way without taking the risk that they will switch to competing Credit Bureaus. In return for ~~conspiring~~contracting with Fair Isaac to restrain trade in the credit scores market, Experian benefits from the Level Playing Field clause, which ~~guarantees that Fair Isaac will not favor Experian's competitors and~~ reduces competition among the Credit Bureaus in the B2B credit reports market.

---

[9]    *See* DPP Compl. ¶¶ 170–249, ¶¶ 274–306; IPP Am. Compl. ¶¶ 208–367.
[10]    DPP Compl. ¶¶ 170–249, ¶¶ 274–306; IPP Am. Compl. ¶¶ 208–367.
[11]    *Compare, e.g.*, DPP Compl. ¶ 8, *with* DPP Am. Compl. ¶ 8; DPP Compl. ¶¶ 10, 84, 101, 103, 117, *with* DPP Am. Compl. ¶¶ 10, 84, 101, 104, 125; IPP Am. Compl. ¶¶ 12, 14–15, 100, 118–19, 135, *with* IPP Second Am. Compl ¶¶ 12, 14–15, 99, 117-18, 139; DPP Compl. ¶ 173, *with* DPP Am. Compl ¶ 186.

5

> 163.176. By their very nature, antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants engaged in a secret conspiracycontracted through confidential agreements that did not put Plaintiffs or the Class on inquiry notice that there was a conspiracywere contracts to restrain trade that raised the prices for credit scores above the competitive level. Credit scores are not exempt from antitrust regulation, and thus, before TransUnion filed its Counterclaims against Fair Isaac, Plaintiffs reasonably considered the market to be competitive. Moreover, Defendants employed deceptive tactics and techniques to avoid detection of, and to conceal, their anticompetitive scheme.

Such changes fail to add any *facts* that attempt to "fill the gap" identified by the Court. Rather, Plaintiffs' amendments "merely restate[ ] the same facts using different language." *Bower v. Jones*, 978 F.2d 1004, 1008 (7th Cir. 1992) (denying in part leave to amend as futile; quoting *Wakeen v. Hoffman House, Inc.*, 724 F.2d 1238, 1244 (7th Cir. 1983)). That does not suffice.

At best, these minor tweaks in phrasing are meant to show that Plaintiffs now seek to rely exclusively on a rule-of-reason theory for their Section 1 claims. But Plaintiffs asserted that theory (alongside their *per se* claim) in their prior complaints as well.[12] Defendants moved to dismiss Plaintiffs' rule-of-reason claim,[13] Plaintiffs responded to those arguments, and this Court rejected Plaintiffs' Section 1 claims under *both* the *per se* and rule-of-reason standards. *See* Order at 17. Absent any new factual allegations—and Plaintiffs offer none—there is no basis for the Court to revisit that decision now.[14] *See Gonzalez v. City of Elgin*, 2007 WL 4246899, at *3, (N.D. Ill. Nov.

---

[12] *See, e.g.*, DPP Compl. ¶ 172 ("In the alternative, these agreements violate Sections 1 and 3 of the Sherman Act . . . under a Rule of Reason Analysis."); IPP Am. Compl. ¶ 210 (same).

[13] *See, e.g.*, FICO Br. (Dkt. 139) at 31-33.

[14] Rather, if Plaintiffs believed the Court misapprehended their rule-of-reason theory, or how the alleged facts supported that theory, they should have moved for reconsideration of the Order under Fed. R. Civ. P. 54(b). *See Ellenby Techs., Inc. v. Fireking Sec. Grp.*, 533 F. Supp. 3d 656, 659 (N.D. Ill. 2021) ("A motion for reconsideration is proper where the court 'has patently misunderstood a party[.]'" (quoting *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990))). They did not, nor can they do so now under the guise of an amended complaint that simply restates dismissed claims without adding any new supporting factual allegations.

28, 2007) ("[L]eave to amend . . . is not a means by which a plaintiff can get around prior rulings in an action and rehash resolved legal issues with each new complaint."). Accordingly, Plaintiffs' Section 1 claims, and analogous state-law claims, should be dismissed.

## II.     Plaintiffs Fail To State A Claim Based On FICO's License Agreements.

Plaintiffs' Section 1 and Section 2 claims also fail because the terms of FICO's license agreements—which are now properly before the Court—do not violate the antitrust laws.

### A.     The License Agreements Allow Distribution Of Non-FICO Credit Scores.

Plaintiffs allege that the "No Equivalent Products" and "Dynamic Royalty Schedule" provisions in the license agreements foreclose competition in the alleged "B2B Credit Score Market."[15] To survive a motion to dismiss, however, Plaintiffs must plausibly plead that the agreements "result[] in a substantial foreclosure of competition," *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1352 (7th Cir. 1982), meaning the agreements must "keep at least one significant competitor of [FICO] from doing business" in the relevant market,[16] *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984). That competitor, according to Plaintiffs, is VantageScore.[17] But the actual terms of the No Equivalent Products and Dynamic Royalty Schedule provisions show that VantageScore has not been excluded, practically or otherwise, from any market.

#### 1.     The No Equivalent Products provision expressly allows competition.

Plaintiffs assert that the No Equivalent Products provision effectively keeps VantageScore

---

[15]     *See* DPP Am. Compl. ¶¶ 122, 130; IPP Second Am. Compl. ¶¶ 132, 145.

[16]     This standard applies to both the Section 1 and Section 2 claims. *See U.S. Futures Exch., LLC v. Bd. of Trade of the City of Chi., Inc.*, 346 F. Supp. 3d 1230, 1263 (N.D. Ill. 2018), *aff'd* 953 F.3d 995 (7th Cir. 2020); *see also City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 756 (N.D. Ill. 2019) (noting that exclusive-dealing claims under Sections 1 and 2 based on the alleged exclusionary nature of vertical distribution agreements "are analyzed in much the same way" (citation omitted)).

[17]     DPP Am. Compl. ¶¶ 12, 125, 193; IPP Second Am. Compl. ¶¶ 139, 211.

from competing.[18] In reality, however, that provision both (a) allows the Credit Bureaus to sell VantageScore credit scores to B2B Purchasers, and (b) allows VantageScore to develop competing credit scores—even those that copy FICO's own—and sell them to B2B Purchasers directly.

### a. The Credit Bureaus can and do market VantageScore.

The No Equivalent Products provision prevents the Credit Bureaus from developing or distributing credit scores that: (i) are "intentionally aligned to the odds-to-score relationship" used to create a FICO Score; or (ii) copy more than 20% (or seven) of a FICO Score's reason codes and descriptions. Ex. 1 at 34–35. No existing VantageScore credit score fell within these restrictions. Nor, for that matter, did any other competing credit score in the Credit Bureaus' inventory. The ADLA says this specifically. The No Equivalent Products provision states that it does not apply to "(i) VantageScore 3.0 []or (ii) any analytic publicly announced and commercialized by Trans Union prior to the Effective Date." *Id.* at 35. The No Equivalent Products provision thus permits the Credit Bureaus to sell all existing VantageScore products alongside FICO's.

It is implausible that the No Equivalent Products provision keeps "a significant competitor" out of the market when the only one Plaintiffs identify has not been excluded. *Roland Mach. Co.*, 749 F.2d at 394; *see E-One, Inc. v. Oshkosh Truck Corp.*, 2006 WL 3320441, at *3 n.3 (N.D. Ill. Nov. 13, 2006) (dismissing state-law substantial-foreclosure claim when supposedly excluded competitor "is still a market participant"). Indeed, contract terms that allow the Credit Bureaus to continue marketing VantageScore products (along with "any analytic" they are already selling) exclude nothing. Ex. 1 at 35. And without plausibly alleging exclusivity, much less any substantial foreclosure of competition, the No Equivalent Products provision is "not plausible exclusive dealing." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 957 (N.D. Ill. 2018); *see*

---

[18]    DPP Am. Compl. ¶¶ 125, 193; IPP Second Am. Compl. ¶¶ 139, 211.

*U.S. Futures Exch., LLC*, 346 F. Supp. 3d at 1264 (rejecting exclusive-dealing challenge to agreement that "did not in fact exclude [the competitor] from the [relevant] market" (citing *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 410 (7th Cir. 2017))).

In fact, the amended complaints admit that the Credit Bureaus continue to sell VantageScore credit scores. Plaintiffs allege that VantageScore "licenses [its credit scores] to the three Credit Bureau Defendants, which may incorporate VantageScores in their credit reports."[19] There is nothing plausibly exclusive about license agreements that allow the Credit Bureaus to continue dealing with FICO's competitors. *See Power Analytics Corp. v. Operation Tech., Inc.*, 2017 WL 11486807, at *14 (C.D. Cal. Dec. 7, 2017) (dismissing claims that strategic partnership agreement constituted exclusive dealing when defendant remained free to "enter[] into similar strategic partnerships with Plaintiff and other suppliers").

> **b.    VantageScore can develop and sell any competing credit score to B2B Purchasers.**

Plaintiffs' allegations also fail because the No Equivalent Products provision expressly permits VantageScore and others to develop competing credit scores—even ones that copy FICO's odds-to-score relationship and reason codes—and sell them to B2B Purchasers.

When "competitors can reach the ultimate consumers of the product by employing existing *or potential alternative channels* of distribution, it is unclear whether [exclusive dealing arrangements] foreclose from competition *any* part of the relevant market." *Simon & Simon, PC v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 916 (N.D. Cal. 2021) (emphasis added) (quoting *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997)); *see In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 986 (10th Cir. 2022) ("*In re EpiPen Antitrust Litig.*") (explaining why potential for alternative distribution methods prevents

---

[19]    DPP Am. Compl. ¶ 71; *see* IPP Second Am. Compl. ¶ 87.

firms from charging prices above the competitive level). The court in *CDC Technologies, Inc. v. IDEXX Laboratories, Inc.* thus concluded that an exclusive-dealing agreement between a manufacturer and its distributors did not foreclose competition given the "numerous alternatives on which [the plaintiff] can, and did, rely to pursue direct sales to the customers." 7 F. Supp. 2d 119, 122 (D. Conn. 1998), *aff'd*, 186 F.3d 74 (2d Cir. 1999). Similarly, the court in *R. J. Reynolds Tobacco Co. v. Philip Morris Inc.* held that contracts purportedly limiting competitors from marketing their products in stores did not substantially foreclose competition because competitors still had "non-retail marketing opportunities to communicate with [consumers]." 199 F. Supp. 2d 362, 393 (M.D.N.C. 2002), *aff'd*, 67 F. App'x 810 (4th Cir. 2003); *see* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶ 1802f n.69 (2023) (collecting cases).

The same is true here. VantageScore is free to develop and sell any competing credit score to end users, including B2B Purchasers. Although the No Equivalent Products provision prevents the *Credit Bureaus* from "internally develop[ing]" duplicates of FICO's products, it states that "development by VantageScore Solutions, LLC or other third parties shall not be deemed to be internal development." Ex. 1 at 34.[20]

Further, the amended complaints actually allege that FICO "directly sells FICO Scores to creditors and other businesses—bypassing the Credit Bureaus . . . when it does so."[21] Indeed, several of the Direct Purchaser Plaintiffs say they have "purchased B2B credit scores from Fair Isaac."[22] In that same vein, Plaintiffs contend that FICO has "direct sales relationships" with "all

---

[20]    Of course, developing a credit score that is "intentionally aligned" with a FICO Score odds-to-score relationship or which copies FICO Score reason codes may well violate FICO's intellectual property rights. But what matters for purposes of Plaintiffs' antitrust claims is that FICO's license agreements do not prohibit VantageScore or any other credit score provider from engaging in that conduct.
[21]    DPP Am. Compl. ¶ 5; IPP Second Am. Compl. ¶ 7.
[22]    DPP Am. Compl. ¶¶ 15–19.

of the major institutions" that buy credit scores.[23] If FICO allegedly does so, then VantageScore could too, free of any alleged restraints imposed by the No Equivalent Products provision. VantageScore's ability to develop "competing analytic[s]" and sell them to "the ultimate consumer" belies Plaintiffs' assertion that the No Equivalent Products provision keeps it from competing effectively in the alleged B2B Credit Score Market. Ex. 1 at 34–35; *R. J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 393 (quoting *CDC Techs., Inc.*, 186 F.3d at 80).

### 2. FICO's Royalty Schedules do not foreclose competition.

Plaintiffs next challenge the license agreements' Dynamic Royalty Schedule provision. FICO uses it, they allege, to charge a "penalty" when a lender relies on a FICO Score to pre-qualify a consumer for a credit offer but then shows the consumer a different, non-FICO score.[24] Again, however, the actual terms in the agreements contradict Plaintiffs' theory.

### a. There is no "penalty" rate for pre-qualification.

FICO charges a Credit Bureau a different contractual royalty amount depending on how the lender uses a FICO Score. *See* Ex. 2. As relevant here, the ADLA's 2015 Royalty Schedule establishes a royalty of ███ for FICO Scores that lenders use to pre-qualify consumers for credit offers "in connection with the online disclosure of credit data or a credit score to the consumer[.]" Ex. 2 at 2-3 (fn. i); *supra* at 3–4. The ███ rate applies whenever lenders make an online disclosure of credit data or a credit score to the consumer in connection with pre-qualification, not only when the credit score disclosed by lenders to the consumer is a competing credit score, such as VantageScore. Thus, there is no "seven times penalty rate" for disclosing a non-FICO credit score

---

[23]   DPP Am. Compl. ¶ 46; IPP Second Am. Compl. ¶ 50.
[24]   DPP Am. Compl. ¶¶ 128–29; IPP Second Am. Compl. ¶¶ 142–44. Although Plaintiffs suggest the "lender" directly licenses the credit score from FICO for pre-qualification use case, this is incorrect. In fact, the Credit Bureaus pay the royalties. *See* Ex. 2 at 1.

to consumers in connection with pre-qualification.[25]

Contrary to the amended complaints, therefore, licensing "exclusively FICO Scores" for use by lenders for both the pre-qualification decision and consumer disclosure does not allow the Credit Bureaus to avoid paying the ██████ royalty rate.[26] In fact, FICO Scores "calculated for Pre-Qualification *may not be disclosed* to the consumer" at all, so the royalty cannot possibly operate to pressure lenders into using FICO Scores exclusively for pre-qualification. Ex. 2 at 3 (emphasis added).[27] And of course, if lenders use VantageScore credit scores—or any other competing credit score—to pre-qualify consumers, then FICO receives nothing under the license agreements. Thus, VantageScore "need only offer a better product or a better deal" to compete with FICO in connection with pre-qualification use cases. *In re EpiPen Antitrust Litig.*, 44 F.4th at 989 (citation omitted); *see Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (distinguishing anticompetitive conduct "from growth or development as a consequence of a superior product" (citation omitted)).

Indeed, even if Plaintiffs *had* plausibly alleged that FICO charges a lower royalty when Credit Bureaus license FICO Scores for both pre-qualification and consumer disclosure, there is nothing anticompetitive about that. The "existence of volume or package pricing does not support antitrust liability." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1130 (7th Cir. 1983); *see FTC v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020) (emphasizing that "volume

---

[25]    DPP Am. Compl. ¶ 129; IPP Second Am. Compl. ¶ 144.

[26]    DPP Am. Compl. ¶ 130 (emphasis omitted); *see* IPP Second Am. Compl. ¶ 145.

[27]    Plaintiffs vaguely suggest that Credit Bureaus may separately license FICO Scores that are authorized for consumer disclosures and "combine[d]" with FICO Scores used for pre-qualification. DPP Am. Compl. ¶ 130; IPP Second Am. Compl. ¶ 145. But Plaintiffs make no factual allegations about what these products are, how much they cost, or what role they play in the alleged market. That is not enough to "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Brown v. Visa U.S.A., Inc.*, 674 F. Supp. 249, 252 (N.D. Ill. 1987) ("Allegations as to a hypothetical anticompetitive effect are not enough to sustain this complaint.").

discount contracts are legal under antitrust law" (citation omitted)). The reason is simple: they exclude no one from the market. *See Qualcomm Inc.*, 969 F.3d at 1003–04. Here, for example, the Credit Bureaus could "choose at any[ ]time to forego the [alleged] discount" and instead use VantageScore credit scores or credit scores offered by another provider. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 (9th Cir. 2010).

> ### b. Plaintiffs fail to allege that pre-qualification represents a substantial portion of the alleged B2B Credit Score Market.

In the alternative, Plaintiffs fail to state a claim arising from the supposed pre-qualification "penalty" on the independent ground that they do not allege what portion of the alleged B2B Credit Score Market relates to pre-qualification score use. As a general rule, plaintiffs must "make an initial showing of foreclosure from competing in at least 30 to 40 percent of a market to proceed with a claim" under Section 1. *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176, at *8 (C.D. Ill. Sept. 30, 2016) (citing *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004)), *aff'd*, 859 F.3d 408 (7th Cir. 2017). Indeed, in Section 1 cases courts often require foreclosure of 40 to 50 percent or more.[28] *See, e.g.*, *In re EpiPen Antitrust Litig.*, 44 F.4th at 988; *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001). And although this court has yet to establish a bright-line cutoff, "extensive allegations regarding the foreclosure" are typically required when the agreement covers a smaller fraction of the alleged market. *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 655 (N.D. Ill. 2022).

Plaintiffs fall well short of these thresholds. Plaintiffs fail to allege any facts showing the volume of commerce related to pre-qualification credit score licensing or what share of the broader alleged B2B Credit Score Market relates to pre-qualification. A complaint without "facts regarding

---

[28]  Courts have held that foreclosure of less than 40% may suffice "in certain circumstances" in Section 2 cases. *See, e.g.*, *Microsoft Corp.*, 253 F.3d at 70. But regardless, the plaintiff still "must both define the relevant market and prove the degree of foreclosure." *Id.* at 69. Plaintiffs' allegations fail to do so here.

the size of the allegedly foreclosed . . . markets or how much of the . . . market is involved in the [alleged] exclusive[-]dealing agreements" does not suffice to state a claim. *Chase Mfg., Inc. v. Johns Manville Corp.*, 2019 WL 2866700, at *7 (D. Colo. July 3, 2019).

This fatal pleading deficiency is exacerbated by the fact that the so-called "penalty" applies only to a subset of pre-qualification use cases—namely, those that occur "in connection with the online disclosure of credit data or a credit score to the consumer." Ex. 2 at 3. The material question, then, is what share of the alleged B2B Credit Score Market involves *both* licensing of a credit score for pre-qualification *and* online disclosure of that (or another) credit score to the consumer. And having failed to allege facts needed to answer the first part of the question, Plaintiffs necessarily fail to allege facts needed to answer the second. They contend merely that "[c]ertain B2B Purchasers" may disclose credit scores to consumers when soliciting loan applications.[29] Absent any allegations about *how many* B2B Purchasers follow this practice, the amended complaints support no plausible inference that pre-qualification royalty rates affect any appreciable proportion of the alleged B2B Credit Score Market. *See, e.g.*, *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1031–32 (N.D. Cal. 2015) (plaintiffs failed to plausibly explain why licenses "that admittedly only cover a subset of Android devices" substantially foreclosed competition "in the market for general handheld [Internet] search"). This failure alone "make[s] dismissal easy." *Sterling Merch., Inc. v. Nestlé, S.A.*, 656 F.3d 112, 124 (1st Cir. 2011) (citation omitted).

### 3. VantageScore's growth since 2013 independently shows that the license agreements have not substantially foreclosed competition.

VantageScore's sustained success in the market since 2013 provides yet another alternative basis to dismiss Plaintiffs' claims based on the existence of purported exclusionary terms in FICO's license agreements. Sustained growth of a competitor's market share "precludes a finding

---

[29]     DPP Am. Compl. ¶ 128; *see* IPP Second Am. Compl. ¶ 143.

that exclusive dealing is an entry barrier of any significance." *Omega Env't*, 127 F.3d at 1164. For example, the Ninth Circuit rejected an exclusive-dealing claim in light of the "actual entry and expansion" of a competitor whose market share increased from about 6% to 8% despite the defendant's allegedly anticompetitive conduct. *Id.* Similarly, the court in *R.J. Reynolds Tobacco Co.* concluded that the defendant's exclusive-dealing arrangement did not substantially foreclose competition when competitors "successfully introduced new products," increased "revenues, profits, and cash reserves," or "gain[ed] market share." 199 F. Supp. 2d at 391; *see Sterling Merch., Inc.*, 656 F.3d at 124 (finding no harm to competition when plaintiff's "own market share has increased during the relevant . . . period").

Likewise, VantageScore's business has grown rapidly since 2013, when FICO entered into the first of the challenged license agreements.[30] According to material Plaintiffs cite in their amended complaints, lenders and others used over six billion VantageScore credit scores during a 12-month period in 2014 and 2015, "an increase in usage of more than 100 percent over the previous 12-month period."[31] By 2017, usage surpassed 8.5 billion in a 12-month period.[32] Indeed, VantageScore reports that its usage increased by more than 300% between 2013 and 2018.[33] These

---

[30]     *See* DPP Am. Compl. ¶ 101; IPP Second Am. Compl. ¶ 117.

[31]     VantageScore, *10 years, 10 milestones* (June 30, 2020), https://www.vantagescore.com/newsletter/10-years-10-milestones-1/ (cited in DPP Am. Compl. ¶ 88 n.56 & IPP Second Am. Compl. ¶ 103 n.49).

[32]     VantageScore, *FAQs: VantageScore® Credit Scores and the Mortgage Market*, at 9 (2018), https://www.vantagescore.com/wp-content/uploads/2022/02/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf (cited in DPP Am. Compl. ¶ 82 n.50 & IPP Second Am. Compl. ¶ 97 n.45).

[33]     Press Release, VantageScore, *Usage of VantageScore Credit Scores Surges More than 20 percent versus the Previous Year and Over 300 percent over the Past Five Years* (Oct. 15, 2018), https://www.vantagescore.com/press_releases/usage-of-vantagescore-credit-scores-surges-more-than-20-percent-versus-the-previous-year-and-over-300-percent-over-the-past-five-years/. Since 2018, moreover, VantageScore has reported growth rates at or above 20% over multiple 12-month periods. Press Release, VantageScore, *VantageScore Solutions Announces Score Use Grows to More than 12 Billion* (Oct. 29, 2019), https://www.vantagescore.com/press_releases/vantagescore-solutions-announces-score-use-grows-to-more-than-12-billion/; Press Release, VantageScore, *VantageScore® Credit Score Usage Up 30% in 2022* (June 1, 2023), https://www.vantagescore.com/press_releases/vantagescore-credit-score-usage-up-30-in-2022/.

15

growth rates well exceed the minimum needed to defeat a claim challenging agreement terms as purportedly exclusionary. *See Omega Env't*, 127 F.3d at 1164 (33% increase in market share). Meanwhile, VantageScore continues to release new products. *See R.J. Reynolds Tobacco Co.*, 199 F. Supp. 2d at 391. In 2017, it introduced VantageScore 4.0, successor to the latest version on the market when the license agreements were signed.[34]

Acknowledging that VantageScore "has achieved some limited success," Plaintiffs insist it would have done even better without the license agreements in place.[35] These allegations are speculative, at best. But even crediting them as true and putting aside the other, independent bases to dismiss Plaintiffs' claims, reduced growth is not enough to state a plausible antitrust claim. *See Roland Mach. Co.*, 749 F.2d at 394. An alleged exclusionary agreement that causes a competitor to "expand more slowly than it would otherwise have done, and at somewhat higher cost," does not qualify as having a "substantial anticompetitive effect." *Id.* So even if some terms in the license agreements allegedly had some incidental effect on VantageScore's growth, this does nothing to save Plaintiffs' theory from failing on this alternative ground as well. *See U.S. Futures Exch., LLC*, 346 F. Supp. 3d at 1264 (any lesser standard would be "in tension with Seventh Circuit law").

**B.    The Level Playing Field Provision Furthers Competition.**

Plaintiffs continue to allege that the Level Playing Field provision suppresses price competition between the Credit Bureaus.[36] But the Court previously held that Plaintiffs failed to state such a claim based on this provision, which operates like a most-favored-nation clause, because they had "not adequately alleged that the Credit Bureaus adopted [the provision] with a predatory purpose." Order at 20. The Court recognized that most-favored-nation clauses "are

---

[34]    *See* DPP Am. Compl. ¶ 153; IPP Second Am. Compl. ¶ 167; *see also* Ex. 1 at 35.
[35]    DPP Am. Compl. ¶ 82; IPP Second Am. Compl. ¶ 97; *see* DPP Am. Compl. ¶ 122; IPP Second Am. Compl. ¶ 132.
[36]    *See* DPP Am. Compl. ¶¶ 134–45, 249; IPP Second Am. Compl. ¶¶ 149–62, 269.

standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers." *Id.* (quoting *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995)). And pursuing low prices is "the sort of conduct that the antitrust laws seek to encourage." *Blue Cross & Blue Shield United of Wis.*, 65 F.3d at 1415; *see Pac. Bell Tel. Co.*, 555 U.S. at 451 ("mistaken inferences" in challenges to low prices "are especially costly, because they chill the very conduct the antitrust laws are designed to protect" (quotation marks omitted)). In light of these procompetitive benefits, this Court held that entering into most-favored-nation clauses is "not price-fixing." Order at 20 (quoting *Blue Cross & Blue Shield United of Wis.*, 65 F.3d at 1415); *see Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1110 (1st Cir. 1989) ("a policy of insisting on a supplier's lowest [non-predatory] price . . . tends to further competition on the merits and, as a matter of law, is not exclusionary").

The Court also rejected Plaintiffs' theory that the Level Playing Field protects the Credit Bureaus "from an outside competitor" by effectively discouraging FICO from offering discounts to a new market entrant. Order at 21. Those allegations "ring hollow," the Court held, because Plaintiffs failed to "allege that a new credit bureau was likely to emerge anyway[.]" *Id.*

The amended complaints offer nothing new. Plaintiffs neither identify a new competitor to the Credit Bureaus that is likely to emerge nor explain how the Level Playing Field provision differs from a garden-variety most-favored-nations clause.[37] So now, as before, the provision offers no basis for sustaining Plaintiffs' claims. Order at 20–21; *see also No Spill LLC v. Scepter Can., Inc.*, 2022 WL 1078435, at *7 (D. Kan. Apr. 6, 2022) (alleged "existence of a most-favored-

---

[37]     *Compare, e.g.*, DPP Am. Compl. ¶ 134, *with* DPP Compl. ¶ 126, *and* IPP Second Am. Compl. ¶ 149, *with* IPP Am. Compl. ¶ 145. In fact, Direct Purchasers have scaled back on their allegations concerning the Level Playing Field, now abandoning their claim that it was used to prevent competition from a new market entrant. *Compare* DPP Am. Compl. 136, *with* DPP Compl. ¶ 127.

nation clause in which [a company] has agreed not to license its intellectual property at lower rates to others" was "insufficient to establish . . . anticompetitive harm").

### 1. The Level Playing Field does not discourage discounting.

Plaintiffs once again theorize that the Level Playing Field could lead to *higher* credit score prices by discouraging FICO from offering discounts to any Credit Bureau because that would mean extending the benefit to all three.[38] But that allegation is facially implausible, particularly next to Plaintiffs' claim that the Level Playing Field is "demonstrably important" to the Credit Bureaus.[39] Plaintiffs offer no explanation, much less a plausible one, for why the Credit Bureaus would demand the Level Playing Field provision if it had the effect of raising their royalty prices. In any event, this Court has already rejected the claim that the Level Playing Field offers the Credit Bureaus protection against competition from a new market entrant, and the amended complaints offer nothing new on this score. Moreover, the Seventh Circuit has also rejected the "ingenious but perverse argument" that most-favored-nation clauses effectively "put a floor underneath [a seller's] prices" by disincentivizing discounts that "automatically" benefit other customers. *Blue Shield & Blue Cross United of Wis.*, 65 F.3d at 1415.

### 2. The Level Playing Field does not facilitate price coordination.

Plaintiffs also now attempt to characterize the Level Playing Field provision as an information-exchange mechanism.[40] But this theory also fails.

Again, demanding the lowest available price is "the sort of conduct that the antitrust laws seek to encourage." *Blue Cross & Blue Shield United of Wis.*, 65 F.3d at 1415. That is why most-favored-nation clauses are "not price-fixing," even though they necessarily result in the indirect

---

[38]    DPP Am. Compl. ¶ 140; IPP Second Am. Compl. ¶ 155.
[39]    DPP Am. Compl. ¶ 139; IPP Second Am. Compl. ¶ 153.
[40]    *See* DPP Am. Compl. ¶¶ 137–38, 140; IPP Second Am. Compl. ¶¶ 150–51, 155.

18

exchange of *some* price information. Order at 20 (quoting *Blue Cross & Blue Shield United of Wis.*, 65 F.3d at 1415). Further, the license agreements include protections against the Credit Bureaus using information they might infer about competitors' *upstream* costs (the royalty rates charged by FICO) to "reduce price competition for the services they provide" *downstream* to lenders and other end users.[41] Under the ADLA, TransUnion must designate someone who "is not involved in determining downstream pricing" to receive royalty information related to the other Credit Bureaus pursuant to the Level Playing Field provision. Ex. 1 at 30. The royalty rates are also provided "on a 'blinded basis,' with all identification of the Equivalent CRA removed." Ex. 1 at 29. By preventing Credit Bureaus from knowing which competitor is subject to which pricing terms, this anonymization further safeguards independent pricing. *See Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 198–99 (3d Cir. 2017) (describing "aggregated and blinded" data about "sales, production, and inventory" as "innocuous" when compared to the sort of price information that might raise antitrust concerns). Plaintiffs fail even to acknowledge these safeguards, much less address them, in their amended complaints.

Nor does it matter that the Level Playing Field provision might, in theory, lead the Credit Bureaus to charge similar prices.[42] In *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128 (2d Cir. 1984), the question was whether most-favored-nation clauses between manufacturers and their customers constituted an unfair trade practice under Section 5 of the Federal Trade Commission Act[43] because (combined with other practices) they "had the effect, by removing some of the uncertainties about price determination, of substantially lessening competition by facilitating price parallelism at non-competitive levels." *Id.* at 130. The answer was no. *See id.* at 141–42. There, as

---

[41]    DPP Am. Compl. ¶¶ 138; *see* IPP Second Am. Compl. ¶¶ 151.

[42]    *See* DPP Am. Compl. ¶ 138; IPP Second Am. Compl. ¶ 151.

[43]    15 U.S.C. § 45. That provision is at least as expansive as Sections 1 and 2 of the Sherman Act. *See In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 847 (N.D. Ill. 2020).

here, the manufacturers used most-favored-nation clauses "for legitimate business reasons." *Id.* at 140. And legitimate business practices are not "unfair" just because "they have the effect of facilitating conscious price parallelism and interdependence." *Id.* Likewise, Plaintiffs' speculation about the Level Playing Field's potential effects does not change the fact that it is a "standard device[]" that, as this Court recognized, helps the Credit Bureaus appropriately "bargain for low prices." Order at 20 (quoting *Blue Cross & Blue Shield United of Wis.*, 65 F.3d at 1415).

### III. Plaintiffs Otherwise Fail To State A Monopolization Claim.

As in their original complaints, Plaintiffs allege two other ways in which FICO maintained a purported "monopoly" in the alleged B2B Credit Score Market: (1) by pursuing the 2006 *Equifax* litigation, and (2) by making "disparaging" public statements about VantageScore. Neither theory supports a monopolization claim independent of the license agreements.

#### A. Any Claim Based On The *Equifax* Litigation Is Time-Barred.

Plaintiffs allege that FICO engaged in anticompetitive conduct by bringing the *Equifax* litigation in 2006.[44] But once again, Plaintiffs allege that this litigation injured them only by "inhibit[ing]" VantageScore's growth during its "first few years."[45]

FICO's first motion to dismiss argued that any claim based on the *Equifax* litigation is time-barred because antitrust claims are subject to a four-year statute of limitations that begins "when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); 15 U.S.C. § 15b. Plaintiffs still fail to offer any justification for waiting nine years after the *Equifax* litigation concluded in 2011 to raise their antitrust claim based on it. And while the Court held that two of Plaintiffs' allegations might toll the limitations period—(1) that FICO's conduct could constitute fraudulent concealment, and (2)

---

[44]     DPP Am. Compl. ¶ 87; IPP Second Am. Compl. ¶ 13.
[45]     DPP Am. Compl. ¶ 94; IPP Second Am. Compl. ¶ 109.

that the continuing-violation doctrine postponed expiration of the limitations period—these allegations relate to the license agreements, not the *Equifax* litigation.

First, the Court reasoned that Plaintiffs must plead merely a "conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense." Order at 14 (quoting *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015)). And the Court held that such a conceivable set of facts exists here—namely, that FICO "affirmatively concealed the existence of . . . the anticompetitive contract provisions." *Id.* (cleaned up). This was a reference to Plaintiffs' allegations that terms in FICO's license agreements were anticompetitive. But for the reasons explained in Part II, *supra* at 7–20, those allegations fail; accordingly, they cannot support a claim for fraudulent concealment.

In any event, even if Plaintiffs' allegations concerning the license agreements were sufficient to state a monopolization claim (and again, they are not), Plaintiffs' claims based on the 2006 *Equifax* litigation still would be time-barred. Plaintiffs do not allege that the agreements somehow concealed the earlier litigation, nor could they. The *Equifax* case was public information as soon as it was filed. Nor could later events involving the agreements somehow allow Plaintiffs to recover for injuries allegedly arising from that litigation.

Second, the Court held that the continuing-violation doctrine tolled the limitations period: "Although the Equifax Litigation ended in 2011, the Plaintiffs have plausibly alleged the *anticompetitive restrictions in the agreements* between the Credit Bureaus and FICO continue to this day." Order at 15 (emphasis added). Thus, the Court again rested its holding on the license agreements, which are not actionable for the reasons discussed above.

But even if Plaintiffs had stated a claim arising from the license agreements, they could not use the continuing-violation doctrine to state a timely claim based on the *Equifax* litigation. "[T]he

21

commission of a *separate new overt act* generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189–90 (1997) (emphasis added) (collecting cases); *see also Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 221 F. Supp. 3d 1033, 1043 (N.D. Ind. 2016) ("[N]ew acts cannot be used to bootstrap damages that resulted from injuries prior to the limitations period."); Areeda & Hovenkamp, *Antitrust Law* ¶ 320c7 ("the plaintiff's damage claim will be limited to those acts of the cartel that both damaged the plaintiff *and* occurred within the four years prior to the suit" (emphasis added)). Further, there is no doubt portions of a claim that fall outside the applicable limitations period may be dismissed to streamline discovery and narrow the disputed issues in the case. *See Dardai v. Cook Cnty.*, 1997 WL 160689, at *6 (N.D. Ill. Apr. 2, 1997).

These authorities preclude application of the continuing-violation doctrine to Plaintiffs' allegations concerning the *Equifax* litigation. Plaintiffs allege that FICO was "[r]ebuffed by the courts in its attempt to snuff out VantageScore in its infancy," and therefore in "2013 or 2015" it "elected to take *another approach*"—"enter[ing] into new or renewed agreements that contained new provisions designed to restrict the competitive reach of VantageScore."[46] The license agreements thus constituted a "separate new overt act," and Plaintiffs cannot use that separate act to recover for injuries allegedly arising from the *Equifax* litigation.

Nor, finally, could the *Equifax* litigation itself constitute a "continuing antitrust violation."[47] The continuing-violation doctrine applies only where a plaintiff challenges "not just one incident of [unlawful] conduct . . . but an unlawful practice that continues into the limitations period." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982). And Plaintiffs do not, and cannot, allege that the *Equifax* litigation, which ended in 2011, was a "practice" continuing into

---

[46] DPP Am. Compl. ¶¶ 101-02 (emphasis added); IPP Second Am. Compl. ¶¶ 117-18 (same).
[47] DPP Am. Compl. ¶ 94; IPP Second Am. Compl. ¶ 109.

the limitations period. *See Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1274-75 (5th Cir. 1991) (claim for anticompetitive litigation accrues when suit is filed and does not continue thereafter); *P & M Servs., Inc. v. Gubb*, 2008 WL 4185903, at *5-7 (E.D. Mich. Sept. 8, 2008) (similar), *aff'd*, 372 F. App'x 613 (6th Cir. 2010). Nor do Plaintiffs allege that the *effects* of the litigation continued into the limitations period—and even if they did, the claim still would be untimely. *See Kaiser Found. v. Abbott Labs.*, 2009 WL 3877513, at *7 (C.D. Cal. Oct. 8, 2009) ("mere[ly] charging . . . a monopoly price" following allegedly anticompetitive litigation does not toll the statute of limitations (citation omitted)).

**B.** **The Alleged Disparagement Of VantageScore Is Not Actionable.**

Plaintiffs again attempt to plead a monopolization claim based on allegations that FICO engaged in an "aggressive public relations" campaign against VantageScore, which Plaintiffs claim has harmed VantageScore's competitive standing.[48] Plaintiffs object principally to statements by FICO and others that VantageScore credit scores are not FICO Scores. But these statements are accurate and appropriate given the likelihood of confusion over the existence of different credit scores and distinctions between them.[49] Likewise, Plaintiffs cite FICO blog posts about FICO's minimum scoring criteria, which report on research concerning the minimum amount of credit data needed to generate a reliable FICO Score.[50] These statements do not even mention VantageScore and thus cannot constitute disparagement.

In any event, allegations that one market participant has disparaged another are contrary to the very purposes of antitrust law. *See Arnett Physician Grp., PC v. Greater LaFayette Health Servs., Inc.*, 382 F. Supp. 2d 1092, 1096 (N.D. Ind. 2005) ("Public expressions of opinion about

---

[48]    DPP Am. Compl. ¶¶ 146-55; IPP Second Am. Compl. ¶¶ 16, 163-70.
[49]    DPP Am. Compl. ¶¶ 147-48; IPP Second Am. Compl. ¶¶ 163-64.
[50]    DPP Am. Compl. ¶ 150; IPP Second Am. Compl. ¶ 165.

competitors' plans cannot provide the basis for an antitrust claim and such conduct is clearly lawful."). "What producers say about each others' goods in an effort to sway consumers is competition in action. Some other law may require judicial intervention in order to increase the portion of truth in advertising; the Sherman Act does not." *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005). "[G]enuine anticompetitive effects of false and misleading statements about a competitor are minimal, at best." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 852 (7th Cir. 2011). Accordingly, "claims based on one competitor's disparagement of another should presumptively be ignored." *Id.* (internal quotations omitted).

This is so even where, unlike here, a defendant's public statements are allegedly "false or misleading or incomplete or just plain mistaken," for there "the remedy is not antitrust litigation but more speech—the marketplace of ideas." *Schachar v. Am. Acad. of Opthalmology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989). Indeed, the amended complaints acknowledge the robust debate in the marketplace. For instance, the article Plaintiffs cite as the basis for their disparagement claim quotes statements by VantageScore and TransUnion that "[t]housands of lenders use VantageScore credit scores in their businesses," and that VantageScore was "used by more than 2,400 lenders" and "yields the most consistent results."[51] Elsewhere, Plaintiffs rely on blog posts and reports from 2018 and 2019 touting the supposed advantages of VantageScore, noting that "many of the most sophisticated secondary market participants use the VantageScore model to help evaluate and monitor risk."[52] And to the extent VantageScore believes it can accurately score additional consumers using its own models, VantageScore is free to (and does) say so to the market.[53]

---

[51]    Alistair Gray, *Credit score row as FICO chief hits out at banks over 'Fako' rivals*, FINANCIAL TIMES (Dec. 5, 2017), https://www.ft.com/content/2222880c-cfa5-11e7-9dbb-291a884dd8c6 (cited at DPP Am. Compl. ¶ 147 n.111).
[52]    DPP Am. Compl. ¶ 83; IPP Second Am. Compl. ¶ 98.
[53]    DPP Am. Compl. ¶¶ 82-83; IPP Second Am. Compl. ¶¶ 97-98.

Lastly, Plaintiffs attack alleged statements by FICO in connection with the FHFA's consideration of rule changes to permit the use of non-FICO credit scores for mortgage loans underwritten by Fannie Mae and Freddie Mac. Plaintiffs complain that Fair Isaac "fought hard" against changes to these rules, stating that FICO was "not owned by the credit bureaus" and that FICO believed its score was superior to others.[54] But "[a] publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499-500 (1988). That is true "even when the campaign employs unethical and deceptive methods," *id.*, and Plaintiffs allege nothing of the sort here. In fact, they admit that the FHFA decided to allow VantageScore to submit its models for validation and potential approval.[55] FICO's statements cannot have harmed competition if the agency ultimately decided to consider the use of competing credit scores.

## IV. Plaintiffs' Derivative State-Law Claims Should Be Dismissed.

Because the amended complaints fail to plead a viable federal antitrust claim against FICO, the related state-law claims must be dismissed as well. *See In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 847 (N.D. Ill. 2020). Indeed, in its prior Order (at 24–25) the Court reached this conclusion for the state-law claims asserted against the Credit Bureaus.

## CONCLUSION

For the foregoing reasons, Plaintiffs' complaints should be dismissed in their entirety, and because Plaintiffs have amended their complaints before, dismissal should be with prejudice.

---

[54] DPP Am. Compl. ¶¶ 149, 154; IPP Second Am. Compl. ¶¶ 164, 168.
[55] DPP Am. Compl. ¶ 154; IPP Second Am. Compl. ¶ 168.

25

Dated: December 1, 2023

Respectfully submitted,

*/s/ Britt M. Miller*
Britt M. Miller
Matthew D. Provance
Michael A. Scodro
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com
mscodro@mayerbrown.com

*Counsel for Defendant*
*Fair Isaac Corporation*

26

**CERTIFICATE OF SERVICE**

I, Matthew D. Provance, an attorney, hereby certify that on December 1, 2023, I caused a true and correct copy of the foregoing **FAIR ISAAC CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS THE PLAINTIFFS' AMENDED COMPLAINTS** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

/s/ *Matthew D. Provance*
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
mprovance@mayerbrown.com