**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-2114 |
| | Judge Edmond E. Chang |
| This document relates to: | |
| ALL ACTIONS | Magistrate Judge M. David Weisman |

**PLAINTIFFS' JOINT OPPOSITION**
**TO THE CREDIT BUREAUS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

I.      The Credit Bureaus' Contracts with Fair Isaac ................................................. 2

II.     TransUnion's Lawsuit Against Fair Isaac .......................................................... 3

III.    This Court's Previous Ruling that the Credit Bureaus' Contracts
        with Fair Isaac Have Anticompetitive Effects ................................................... 4

IV.     The Operative Complaints Address the Deficiencies the Court Identified ........ 5

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT ..................................................................................................................... 6

I.      The Operative Complaints State a Section 1 Claim Against the Bureaus .......... 6

II.     The Operative Complaints Plausibly Allege that the Level Playing Field Provision
        Has Anticompetitive Effects ............................................................................. 10

        A.      Sharing Price Information Among the Credit Bureaus Through the
                Level Playing Field Provision Causes Anticompetitive Effects .......... 11

        B.      The Credit Bureaus' Agreements with Fair Isaac Show How and
                Why They Made Peace (To Line Their Own Pockets) ........................ 17

III.    The Operative Complaints Plausibly Allege Anticompetitive Effects from the
        Individual Agreements Between Each Credit Bureau and Fair Isaac ................ 18

IV.     The Credit Bureaus' Recycled Arguments Fail ................................................ 22

V.      The State-Law Claims Rise, but Do Not Fall, with the Federal Claims ........... 23

VI.     Any Dismissal Should Be Without Prejudice to Amending at the Conclusion of
        Document Production ....................................................................................... 24

CONCLUSION ................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*,
881 F.2d 1396 (7th Cir. 1989) .................................................14

*Agnew v. NCAA*,
683 F.3d 328 (7th Cir. 2012) .................................................6, 7

*AliveCor, Inc. v. Apple Inc.*,
592 F. Supp. 3d 904 (N.D. Cal. 2022) ...........................................20

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019)..........................................................17

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)............................................................15

*Associated Milk Dealers, Inc. v. Milk Drivers Union, Local 753*,
422 F.2d 546 (7th Cir. 1970) ...............................................10, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................2, 6

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ..................................................10

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ..........................................13

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)...........................................................21

*Carroll v. Lynch*,
698 F.3d 561 (7th Cir. 2012) .................................................7, 9

*Champagne Metals v. Ken-Mac Metals, Inc.*,
458 F.3d 1073 (10th Cir. 2006) .................................................7

*Chisholm v. Foothill Cap. Corp.*,
940 F. Supp. 1273 (N.D. Ill. 1996) ............................................24

*In re Cipro Cases I & II*,
348 P.3d 845 (Cal. 2015).......................................................23

*Connell Constr. Co., Inc. v. Plumbers & Steamfitters Local Union No. 100*,
421 U.S. 616 (1975)...........................................................14

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)........................................................................................9

*Denny's Marina, Inc. v. Renfro Prods., Inc.*,
8 F.3d 1217 (7th Cir. 1993) ............................................................................6

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ......................................................................8, 23

*Foman v. Davis*,
371 U.S. 178 (1962)........................................................................................9

*Frame-Wilson v. Amazon.com, Inc.*,
591 F. Supp. 3d 975 (W.D. Wash. 2022)......................................................23

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013)......................................................................................18

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986)................................................................................19, 20

*Garot Anderson Mktg., Inc. v. Blue Cross & Blue Shield United*,
772 F. Supp. 1054 (N.D. Ill. 1990) ..............................................................24

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
830 F.2d 716 (7th Cir. 1987) .......................................................................17

*Great Atl. & Pac. Tea Co., Inc. v. FTC*,
440 U.S. 69 (1979)........................................................................................13

*Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v.
AT&T Commn'cns, Inc.*, No. 92-cv-7862, 1996 WL 312535
(S.D.N.Y. June 10, 1996)..............................................................................24

*In re Humira (Adalimumab) Antitrust Litig.*,
465 F. Supp. 3d 811 (N.D. Ill. 2020) ...........................................................23

*Ill. Brick Co. v. Illinois*,
431 U.S. 720 (1977)......................................................................................17

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)............................................................................6

*Isaksen v. Vt. Castings, Inc.*,
825 F.2d 1158 (7th Cir. 1987) ........................................................................8

**Opposition to Credit Bureaus' Motion to Dismiss**

*Mailand v. Burckle*,
  572 P.2d 1142 (Cal. 1978) ..................................................................................23

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
  29 F.4th 337 (7th Cir. 2022) ..........................................................................9, 10

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
  952 F.3d 832 (7th Cir. 2020) ...............................................................................5

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*,
  62 F.3d 967 (7th Cir. 1995) .............................................................................7, 8

*McMaken ex rel. Chemonics Int'l, Inc. Emp. Stock Ownership Plan v.*
  *Greatbanc Tr. Co.*, No. 17-cv-4983, 2019 WL 10891860
  (N.D. Ill. Dec. 27, 2019) .....................................................................................24

*McReynolds v. Merrill Lynch & Co.*,
  694 F.3d 873 (7th Cir. 2012) ...................................................................15, 20, 21

*Moehrl v. Nat'l Ass'n of Realtors*,
  492 F. Supp. 3d 768 (N.D. Ill. 2020) ..................................................................15

*Montano v. City of Chicago*,
  375 F.3d 593 (7th Cir. 2004) ..............................................................................23

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ........................................................................................19

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*,
  No. 19-cv-8318, 2020 WL 6134982 (N.D. Ill. Oct. 19, 2020) .............................13

*Omnicare, Inc. v. Unitedhealth Grp., Inc.*,
  524 F. Supp. 2d 1031 (N.D. Ill. 2007) ..................................................................5

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
  630 F. Supp. 3d 968 (N.D. Ill. 2022) ....................................................................7

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ...............................................................................23

*Premier Elec. Constr. Co. v. Miller-Davis Co.*,
  422 F.2d 1132 (7th Cir. 1970) ............................................................................17

*In re Pork Antitrust Litig.*,
  495 F. Supp. 3d 753 (D. Minn. 2020) ..................................................................13

*Sanner v. Bd. of Trade of City of Chi.*,
  62 F.3d 918 (7th Cir. 1995) ................................................................................13

*Silverman v. Bd. of Educ. of City of Chi.*,
No. 08-cv-2220, 2010 WL 3000187 (N.D. Ill. July 26, 2010) .................................................22

*Starr v. Sony BMG Music Ent.*,
592 F.3d 314 (2d Cir. 2010)...................................................................................................11

*Systemcare, Inc. v. Wang Labs. Corp.*,
117 F.3d 1137 (10th Cir. 1997) ................................................................................................7

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ...................................................................................................6

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)...................................................................................................14

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) ..................................................................................19, 20, 21

*United Mine Workers of Am. v. Pennington*,
381 U.S. 657 (1965)................................................................................................................15

*United States v. Bullis*,
77 F.3d 1553 (7th Cir. 1996) ...............................................................................................8, 22

*United States v. Container Corp. of Am.*,
393 U.S. 333 (1969)...................................................................................................11, 12, 14

*United States v. Delta Dental of R.I.*,
943 F. Supp. 172 (D.R.I. 1996)..............................................................................................14

*Vasquez v. Ind. Univ. Health, Inc.*,
40 F.4th 582 (7th Cir. 2022) ....................................................................................6, 8, 13, 21

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ............................................................................................15, 20

*Zimmerman v. Bornick*,
25 F.4th 491 (7th Cir. 2022) ....................................................................................................7

## STATUTES

15 U.S.C. § 1 ..............................................................................................................................1

28 U.S.C. § 1367(c)(3) .........................................................................................................23, 24

### OTHER AUTHORITIES

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2d ed. 2003).............................................7

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2014) .......................................17

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
(3d ed. 2023) ............................................................................................................................9

U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* (2023) .............................13, 20

## INTRODUCTION

The Sherman Act proscribes (1) "every ***contract***, combination . . . or conspiracy" (2) that unreasonably restrains trade (3) resulting in antitrust injury. 15 U.S.C. § 1 (emphasis added). The Credit Bureaus do not dispute that they contracted with Fair Isaac, satisfying the first element. Dkt. 220 ("CB Br.") at 3. The Bureaus also do not dispute that their contracts contain "the No Equivalent [Products] Provision and the Dynamic Royalty Schedule clauses" that this Court has held in the Section 2 context "together qualify as sufficient" to plead "anticompetitive effects," satisfying the second and third elements. Dkt. 173 ("MTD Op.") at 13. Each Credit Bureau contract is an actual agreement to unreasonably restrain trade. Plaintiffs have thus plausibly alleged sufficient facts to proceed to discovery on the Section 1 claims against the Credit Bureaus.

The Credit Bureaus' arguments to the contrary miss the mark. The Bureaus wrongly contend that Plaintiffs have "double[d] down on their argument" that "each Bureau can plausibly be viewed as conspiring with FICO to undermine the Bureaus' own competing VantageScore joint venture." CB Br. 2. That claim mischaracterizes the operative complaints. Plaintiffs no longer allege a conspiracy, or conspiracies, of any kind; rather, they allege separate anticompetitive contracts between each Credit Bureau and Fair Isaac that restrain trade through provisions this Court has already determined to be anticompetitive. *See, e.g.*, Dkt. 184 ("DPAC") ¶ 10; Dkt. 185 ("IPAC") ¶¶ 12-15; *see also* MTD Op. at 13, 27.[1]

That the anticompetitive contract terms "were either imposed by the alleged monopolist FICO," or "are exactly what each Bureau would seek to protect its individual ability to compete against the other Bureaus and FICO in the sale of credit," as the Bureaus argue (at 1), is irrelevant.

---

[1] "DPAC" refers to Direct Purchaser Plaintiffs' First Amended Consolidated Complaint, Dkt. 184; "IPAC" refers to Indirect Purchaser Plaintiffs' Second Amended Consolidated Complaint, Dkt. 185.

The Bureaus undisputedly *agreed* to those contract terms. Finally, the Credit Bureaus' claim that they would have independently agreed to the contract terms in order to compete against the other Bureaus is just another way of arguing that Plaintiffs have failed to present allegations sufficient to show the concerted action required to prove conspiracy. But such allegations have been required only as "proof of a § 1 conspiracy," which Plaintiffs no longer allege. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). The motion to dismiss should be denied in its entirety.

## BACKGROUND

### I. THE CREDIT BUREAUS' CONTRACTS WITH FAIR ISAAC

Before 2006, each Credit Bureau had developed its own proprietary credit score: TransUnion had "TransRisk," Experian had "ScorexPlus" (for lenders) and "Plus" (for consumers), and Equifax had "ERS." TransUnion Counterclaims ("TUCC") ¶36, *Fair Isaac Corp. v. Trans Union LLC*, No. 17-cv-8318, Dkt. 38 (N.D. Ill. Feb. 12, 2018).[2] Having "failed to gain substantial market share," the Bureaus abandoned their own in-house scoring products. *Id.*

In 2006, the Credit Bureaus launched a joint venture called VantageScore "to compete against Fair Isaac." DPAC ¶6; IPAC ¶10. Fair Isaac responded by bringing antitrust, false advertising, and trademark claims against the Credit Bureaus and VantageScore. DPAC ¶¶8, 87; IPAC ¶¶12, 102. The Credit Bureaus won summary judgment on the antitrust and false advertising claims, and a jury rejected Fair Isaac's trademark claims. DPAC ¶¶91-92; IPAC ¶¶106-07.

Subsequently, each Bureau signed contracts with Fair Isaac that permitted them to distribute FICO Scores subject to "new provisions designed to restrict the competitive reach of VantageScore." DPAC ¶¶101-02; IPAC ¶¶117-18. Those provisions include:

---

[2] "TUCC" refers to the TransUnion Redacted Counterclaims, *Fair Isaac Corp. v. Trans Union LLC*, No. 17-cv-8318 (N.D. Ill.), Dkt. 38, which are publicly available and incorporated by reference into the operative complaints. *See, e.g.*, DPAC ¶¶97, 112; IPAC ¶¶111, 125.

- the "No Equivalent Products" provision, which prohibits the Credit Bureaus from "distributing" VantageScore in the relevant business-to-business ("B2B") market, DPAC ¶¶119-25; IPAC ¶¶130-39;

- the "Dynamic Royalty Schedule" provision, which punishes B2B customers for using VantageScore, DPAC ¶¶126-33; IPAC ¶¶140-48; and

- the "Level Playing Field" provision, which requires FICO to disclose to the other Bureaus any "written agreement" with another Bureau "that has any royalty amount" for FICO Scores that is "lower than the corresponding royalty amount" established between Fair Isaac and the other Bureaus, 2015 Analytic and Data License Agreement ("ADLA") §9.16, Ex. 1 to FICO Mot. to Dismiss (Dkt. 225-2); *see* DPAC ¶134; IPAC ¶149.[3]

The contracts also contain "revenue sharing arrangement[s]" through which Fair Isaac gives each Credit Bureau a cut of FICO Score sales.  DPAC ¶110; IPAC ¶123.

## II.    TRANSUNION'S LAWSUIT AGAINST FAIR ISAAC

In December 2017, Fair Isaac sued TransUnion for unpaid royalties, and TransUnion counterclaimed, alleging Sherman Act violations against Fair Isaac based on the same contractual provisions at issue here.  DPAC ¶96-97; IPAC ¶110-11; *see* TUCC ¶¶42-64.  TransUnion alleged that the "No Equivalent Products" provision "effectively prevents TransUnion from selling an alternative to FICO's credit scores that would be compatible with many businesses' systems, models, and processes and allow lenders to have a legitimate choice between using FICO scores and an alternative score."  TUCC ¶46.  According to TransUnion, the "Dynamic Royalty Schedule" provision "effectively foreclose[s] the credit reporting agencies from selling lenders FICO scores for use in the B2B market and VantageScore for use in the B2C market, and drives

---

[3] Plaintiffs have not included hyperlinks to documents filed under seal.  Fair Isaac and TransUnion agreed by emails dated January 10 and 12, respectively, that Plaintiffs may quote the No Equivalent Products, Dynamic Royalty Schedule, and Level Playing Field provisions and a portion of the royalty schedule in publicly filed documents (Sections 9.1, 9.2, 9.16, and 12.5 of the ADLA, and footnote (i) of the royalty schedule).  References to, or quotations from, any other provisions have been redacted pursuant to this Court's order on Fair Isaac's request for sealing (Dkt. 227).

lenders to buy exclusively Fair Isaac's FICO scores." *Id.* ¶55. Further, TransUnion claimed that "Fair Isaac has used the 'Level Playing Field' and 'Dynamic Royalty Schedule' provisions" to "prevent any credit reporting agency from negotiating lower royalty prices." *Id.* ¶60.

The court denied Fair Isaac's motion to dismiss, concluding that the provisions in the contract between TransUnion and Fair Isaac "are unlawful attempts to 'maintain monopoly power.'" *Fair Isaac Corp. v. Trans Union, LLC*, No. 17-cv-8318, Dkt. 96 at 4 (N.D. Ill. Mar. 27, 2019). TransUnion and Fair Isaac settled on undisclosed terms in 2020. DPAC ¶99; IPAC ¶113.

## III. THIS COURT'S PREVIOUS RULING THAT THE CREDIT BUREAUS' CONTRACTS WITH FAIR ISAAC HAVE ANTICOMPETITIVE EFFECTS

Plaintiffs filed their lawsuit in 2020. Following consolidation of the actions, Plaintiffs filed complaints alleging monopolization of the B2B Credit Score market by Fair Isaac in violation of Section 2 of the Sherman Act; a conspiracy among the Credit Bureaus and Fair Isaac and conspiracies between each Bureau and Fair Isaac to restrain trade, in violation of Section 1 of the Sherman Act; and related state-law claims. Dkt. 121; Dkt. 122. To support the conspiracy allegations, Plaintiffs alleged that Fair Isaac facilitated each Bureau's participation in the scheme, Dkt. 121 ¶¶107-08; Dkt. 122 ¶¶124-25; that the Bureaus had ample opportunities to conspire, Dkt. 121 ¶¶58, 103; Dkt. 122 ¶¶70, 120; and a quid pro quo: Fair Isaac agreed to the Level Playing Field provision in exchange for the Credit Bureaus agreeing to the No Equivalent Products and Dynamic Royalty Schedule provisions. Dkt. 121 ¶125; Dkt. 122 ¶146.

Defendants filed motions to dismiss, which this Court granted and denied in part. This Court ruled that Plaintiffs had adequately pled a monopolization claim against Fair Isaac, holding that "the No Equivalent Provision and the Dynamic Royalty Schedule clauses" in Fair Isaac's contracts with the Credit Bureaus "together qualify as sufficient allegations of anticompetitive effects." MTD Op. at 13. The Court also held that, "[i]n addition to the three clauses, the Plaintiffs

have plausibly alleged that FICO's Equifax Litigation was itself an anticompetitive act." *Id.* By contrast, the Court found Plaintiffs' Section 1 conspiracy allegations implausible and dismissed the Section 1 claims on that basis. *Id.* at 19, 21-22.

## IV.   THE OPERATIVE COMPLAINTS ADDRESS THE DEFICIENCIES THE COURT IDENTIFIED

This Court granted Plaintiffs leave to replead their Section 1 claims, suggesting that Plaintiffs should consider whether "there really is a fix for the problems identified in the Opinion." MTD Op. 30. Plaintiffs did precisely that. Responding to this Court's holding that the conspiracies alleged were implausible, the operative complaints no longer allege any conspiracy claims.[4] Dkts. 220-1 pp. 1, 4-6, 31, 35-36, 41-42, 48, 57-59, 61-77, 79-81, 91 & 220-2 pp. 4-5, 29, 33-35, 38-40, 43, 47, 54-55, 57, 59-74, 76-78, 111 (redlines). Instead, the complaints limit their Section 1 claims to the contracts between each Bureau and Fair Isaac. *See, e.g.*, DPAC ¶¶ 101-18; IPAC ¶¶ 102-29. Plaintiffs allege that those contracts – and more specifically, the No Equivalent Products, Dynamic Royalty Schedule, and Level Playing Field provisions – have "the effect of eliminating or drastically reducing the competitive threat posed by VantageScore" and other competing credit scores, resulting in injury to competition. DPAC ¶¶ 101-45; IPAC ¶¶ 102-62.

The operative complaints present additional facts to support those three separate Section 1 claims. For example, they incorporate admissions by Fair Isaac that its contracts with each Credit

---

[4] The operative complaints strip out all references to conspiracy with the exception of a single allegation in the Direct Purchasers' complaint that "Plaintiffs and the Class are the first purchasers from outside the Fair Isaac-Credit Bureaus conspiracies." DPAC ¶ 14. "Conspiracy" is used there to describe the "conspiracy 'exception' to the *Illinois Brick* rule," which "is not so much a real exception as it is a way of determining which firm, or group of firms collectively, should be considered to be the relevant seller (and from that, identifying which one is the direct purchaser) for purposes of the rule." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 839 (7th Cir. 2020). That "exception" applies whether the violators are co-conspirators or contracting parties. *See, e.g.*, *Omnicare, Inc. v. Unitedhealth Grp., Inc.*, 524 F. Supp. 2d 1031, 1042 (N.D. Ill. 2007) (*Illinois Brick* "no bar" because plaintiff alleged "it contracted directly with" defendant).

Bureau contain the challenged provisions. DPAC ¶¶114-16; IPAC ¶¶125-27. And they allege that each Credit Bureau has a "revenue sharing arrangement with Fair Isaac" providing each Bureau with a cut of Fair Isaac's revenue from FICO Score sales. DPAC ¶110; IPAC ¶123. Plaintiffs also allege that Defendants view their contracts as mutually beneficial: in the words of Fair Isaac's CEO, "a good thing for both of us." DPAC ¶109; IPAC ¶122.

## LEGAL STANDARD

To defeat a motion to dismiss, Plaintiffs "need only present 'enough fact to raise a reasonable expectation that discovery will reveal evidence' of illegal acts." *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 587 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "[T]he complaint must establish a nonnegligible probability that the claim is valid; but the probability need not be as great as such terms as 'preponderance of the evidence'" connote." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010).

## ARGUMENT

### I. THE OPERATIVE COMPLAINTS STATE A SECTION 1 CLAIM AGAINST THE BUREAUS

Section 1 of the Sherman Act "requires proof of three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993). Where, as here, a plaintiff challenges a contract under Section 1, "the first showing of an agreement or contract" is "not at issue." *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012).

No one disputes that each Credit Bureau entered into a contract with Fair Isaac. That is "direct evidence" of agreement, which is "independently adequate" to satisfy the first element. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323-24 (3d Cir. 2010); *see Text Messaging Antitrust Litig.*, 630 F.3d at 628-29 ("direct evidence" that defendants "agreed explicitly" is a "smoking gun"). Although the Bureaus supply many reasons why they would not **want** to agree

to the anticompetitive provisions, the fact remains that they ***did agree***. Why they agreed is beside the point. *See Agnew*, 683 F.3d at 335; *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1085 (10th Cir. 2006) ("[W]hen evaluating direct evidence of an agreement, we need not worry whether such an agreement would have been a rational one" (citing 2 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 101 (2d ed. 2003))); *Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1143 (10th Cir. 1997) ("To say that the buyer, having agreed to the contract, did not agree to an express term because the buyer would have preferred a contract without the term makes little sense.").[5]

Regarding the second and third elements, no one disputes that the contracts between the Bureaus and Fair Isaac contain the No Equivalent Products and Dynamic Royalty Schedule clauses that this Court held "together qualify as sufficient allegations of anticompetitive effects." MTD Op. 13. If the Plaintiffs' allegations regarding those provisions are "sufficient allegations of anti-competitive effects" as to Fair Isaac in the Section 2 context, they are also "sufficient allegations of anticompetitive effects" as to the Credit Bureaus in the Section 1 context. *Id.* "Treatment of the identical conduct" does not "vary under section 1 based upon the identity of the defendant." *MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 974 (7th Cir. 1995). The Credit Bureaus do not explain how they can escape Section 1 liability when they, too, signed contracts with provisions that have anticompetitive effects. The argument is therefore waived. *See Carroll v. Lynch*, 698 F.3d 561, 568 (7th Cir. 2012) (arguments "not raised in [an] opening brief" are

---

[5] The Bureaus incorrectly assert that Plaintiffs have "abandon[ed] . . . any claim of a 'per se' anti-trust violation." CB Br. 10. Plaintiffs need not plead a specific antitrust standard. *See Zimmerman v. Bornick*, 25 F.4th 491, 493 (7th Cir. 2022). The applicable standard depends on what the evidence reveals. This Court will have the opportunity to determine the appropriate standard at summary judgment or, more likely, when it rules on jury instructions. *See, e.g.*, *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 989 (N.D. Ill. 2022) (collecting cases).

waived). Nor do the Bureaus offer the Court any reason to reconsider its ruling that the provisions are anticompetitive – in fact, they urge the Court ***not*** to "reconsider its prior order(s)." CB Br. 12. Contrary to the Bureaus' assertion (at 13) that Plaintiffs seek reconsideration, Plaintiffs ***agree*** this Court should not revisit its ruling that those provisions are anticompetitive.

Stuck with the implications of this Court's ruling, the Credit Bureaus resort to irrelevant arguments and mischaracterization. Specifically, the Credit Bureaus cast themselves as the "victims" of their contracts with Fair Isaac. CB Br. 4. That inference in their favor is not permitted at this stage, *Vasquez*, 40 F.4th at 583, particularly given that the Bureaus benefitted handsomely from the bargain they negotiated, obtaining perks like revenue share agreements, DPAC ¶110; IPAC ¶123. Moreover, the Bureaus' claimed victimhood "is of no moment; an agreement procured by threats is still an agreement for purposes of section 1." *Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1163 (7th Cir. 1987); *see MCM Partners*, 62 F.3d at 974. "[T]o hold that a contract is exempt from antitrust scrutiny simply because one party 'reluctant[ly]' accepted its terms 'would be to read the word[ ] 'contract' out of the statute." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982 (9th Cir. 2023) (alterations in original).[6]

The Credit Bureaus emphasize this Court's ruling that the ***Level Playing Field*** provision does not plausibly provide the Credit Bureaus "protection from the wispy specter of external competition [from a hypothetical new credit bureau]." CB Br. 12 (alteration in original). That, too, is irrelevant. Whether the Level Playing Field provision is anticompetitive in isolation (which,

---

[6] And the Credit Bureaus do not argue that they withdrew from the conspiracy; they insist there was no conspiracy. Such an argument would fail in any event because the operative complaints do not support an inference that the Bureaus "cease[d] [their] activity in the conspiracy" and undertook "an affirmative act to defeat or disavow the conspiracy's purpose." *United States v. Bullis*, 77 F.3d 1553, 1562 (7th Cir. 1996). To the contrary, the complaints allege that the Bureaus have affirmatively agreed to provisions that have anticompetitive effects.

to be sure, Plaintiffs do allege) has no bearing on the anticompetitive effects of the No Equivalent Products and Dynamic Royalty Schedule provisions, whose anticompetitive impacts, considered together, are independently sufficient to uphold the Section 1 claims. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (courts must look at complaints as a whole).

The Credit Bureaus mischaracterize the operative complaints as "substantively identical" to the prior ones. CB Br. 12. A comparison demonstrates that is not true. *See* Dkt. 220-1 pp. 1, 4-6, 14-15, 31, 35-39, 40-44, 46-52, 57-59, 61-77, 79-81, 91 & Dkt. 220-2 pp. 4-7, 14, 29-30, 33-40, 41-43, 45-51, 54-55, 57, 59-74, 76-78, 111 (redlines). Plaintiffs added factual allegations to respond to the Court's ruling on Defendants' initial motions to dismiss, including allegations that (1) the Level Playing Field provision is a price-information sharing mechanism that stabilizes prices for FICO scores, DPAC ¶¶137-38; IPAC ¶¶150-51; (2) Fair Isaac admitted the contracts exist, DPAC ¶¶102, 109-10, 114-16; IPAC ¶¶118, 122-23, 125-27; and (3) Fair Isaac pays the Bureaus a revenue share based on their sales of FICO Scores, DPAC ¶110; IPAC ¶123. No rule requires Plaintiffs to dramatically overhaul their complaints when they amend. Nor is it improper to amend to "state an alternative theory for recovery." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *See* 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §1474 & nn.7, 9-10, 15 (3d ed. 2023) (collecting cases).

The Credit Bureaus do not claim that Plaintiffs' contract-based allegations are implausible. That argument is therefore waived. *See Carroll*, 698 F.3d at 568. The Bureaus' only substantive argument regarding the No Equivalent Products and Dynamic Royalty Schedule provisions focuses on Plaintiffs' inability to allege conspiracy under *Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*, 29 F.4th 337 (7th Cir. 2022). CB Br. 14. But the Seventh Circuit affirmed the dismissal in *Marion* because the amended complaint – which changed the case theory from a hub-

and-spokes conspiracy to separate vertical conspiracies – did not allege "sufficient circumstantial evidence" to render the conspiracies plausible. 29 F.4th at 340, 350. Here, Plaintiffs are not pursuing Sherman Act claims on the basis of conspiracies, but on the basis of **anticompetitive contractual agreements** between Fair Isaac and each Credit Bureau. That theory was unavailable in *Marion* because the defendant distributors were not parties to, or "involved in negotiating" the Net Dealer Contracts with the alleged monopolist that allowed the monopolist to "raise prices" above competitive levels. *Id.* at 350-51. *Marion* thus sheds no light on the issues here.[7]

## II. THE OPERATIVE COMPLAINTS PLAUSIBLY ALLEGE THAT THE LEVEL PLAYING FIELD PROVISION HAS ANTICOMPETITIVE EFFECTS

Plaintiffs' Section 1 claims may be upheld solely on the basis of the No Equivalent Products and Dynamic Royalty Schedule provisions, but they should encompass the Level Playing Field provision as well. That provision – which requires Fair Isaac to share with the Credit Bureaus information about the royalties it charges the other Bureaus – is anticompetitive too.

The Credit Bureaus wrongly suggest that the Seventh Circuit has blessed the "general legality" of most-favored-nation ("MFN") provisions like the Level Playing Field clause. CB Br. 15 & n.5. As the Credit Bureaus' own cases show, MFNs (like any other contract provision) are illegal if they unreasonably restrain trade. *Id.* at 2-3, 16 (citing *Associated Milk Dealers, Inc. v. Milk Drivers Union, Local 753*, 422 F.2d 546, 554 (7th Cir. 1970) (remanding for factfinding on MFN's "anticompetitive effect")). Even in *Blue Cross & Blue Shield United of*

---

[7] Another obstacle in *Marion* was that the plaintiffs alleged conspiracies involving only two distributors in a market where there were "at least four major distributors." 29 F.4th at 350. Given those market characteristics, it was "not plausible" that "vertical conspiracies involving just two distributors . . . could plausibly influence the prices that the Providers pay for the Products, regardless of which distributor they purchase from." *Id.* That concern is not present here because Plaintiffs allege a triopoly on distribution of credit scores comprising the three named Credit Bureau defendants. *See* pp. 20-21, *infra*.

*Wisconsin v. Marshfield Clinic*, on which the Credit Bureaus rely (at 14-15), the Seventh Circuit acknowledged that MFNs can be "misused to anticompetitive ends." 65 F.3d 1406, 1415 (7th Cir. 1995); *see Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 319 (2d Cir. 2010) (upholding Section 1 claims based on defendants' agreement on a "wholesale price floor" that they "enforced in part through MFN agreements"). Facilitating the "exchange of price information" is one way an MFN can produce anticompetitive effects: Such exchanges can have the effect of "chilling the vigor of price competition." *See United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969).

That is precisely what the Level Playing Field provision does: It contractually obligates Fair Isaac to provide pricing information to the Credit Bureaus, thereby diminishing price competition among the Bureaus. Specifically, the clause requires Fair Isaac to share with a Credit Bureau any "royalty schedule" entered into with the other two Bureaus "that is lower than the corresponding royalty amount" applicable to that Bureau. ADLA § 9.16. Sharing that royalty information allows the Bureaus to stabilize prices for FICO Scores at artificially high levels. DPAC ¶¶ 137-38; IPAC ¶¶ 150-51. Such a provision is not a "routine MFN"; it is an anticompetitive price-information-sharing mechanism. CB Br. 14; *see, e.g.*, *Container Corp.*, 393 U.S. at 336-37.

## A. Sharing Price Information Among the Credit Bureaus Through the Level Playing Field Provision Causes Anticompetitive Effects

The Credit Bureaus admit that "the Level Playing Field provision provided each Bureau with the minimum price that its rivals were paying for FICO Scores." CB Br. 16. That admission, coupled with the operative complaints' allegations regarding the market conditions under which the Bureaus agreed to that provision and the effects that provision has had on prices for FICO Scores, is sufficient for a Section 1 claim against the Credit Bureaus to proceed.

For example, in *Container Corporation*, the Supreme Court held that allegations that corrugated container sellers shared with their competitors "information as to the most recent price

charged" was sufficient to plead a Section 1 violation. 393 U.S. at 335. Although the Court recognized that "[p]rice information exchanged in some markets may have no effect on a truly competitive price," it nevertheless found plausible anticompetitive effects because the industry was "dominated by relatively few sellers." *Id.* at 337. Given those circumstances, defendants' price sharing plausibly had the effect of "[s]tabilizing prices" and was "within the ban of § 1." *Id.*

Similar circumstances are present here. First, through the Level Playing Field clause, each Credit Bureau agreed to share their pricing for FICO Scores with their only two competitors and to receive those two competitors' pricing in return. DPAC ¶¶ 137-38; IPAC ¶¶ 150-51.[8] Second, the market is "dominated by relatively few sellers." 393 U.S. at 335. In fact, the three Credit Bureaus "control virtually all of the credit report market." DPAC ¶ 58 & IPAC ¶ 70 (describing their "triopoly"). Third, demand for the product at issue is "inelastic," as both the containers at issue in *Container Corporation* and the credit reports at issue here are sold only for "immediate, short-run needs." 393 U.S. at 337; DPAC ¶ 57 & IPAC ¶ 69 (credit reports are used, for example, for "generat[ing] a FICO Score for a specific customer, which B2B lenders can use in making their lending decisions."). And fourth, as in *Container Corporation*, the information sharing required under the Level Playing Field clause has resulted in FICO Score prices that are "stabilized at artificially high levels." DPAC ¶ 301; IPAC ¶ 293. The Credit Bureaus have used the Level Playing Field provision to share the prices they pay for a key input to their services (FICO Scores) and have thereby "reduce[d] price competition for the services they provide." DPAC ¶ 138; *see* IPAC ¶ 151.

---

[8] That Fair Isaac does the sharing on behalf of the Credit Bureaus instead of the Credit Bureaus directly sharing the pricing information with each other is a distinction without a difference. The point is that the Credit Bureaus agreed to provisions through which they would receive and share price information with their only competitors. *See Container Corp.*, 393 U.S. at 335.

Courts in this district and elsewhere routinely reject motions to dismiss Sherman Act Section 1 claims with similar allegations of price-information sharing. *See*, *e.g.*, *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, No. 19-cv-8318, 2020 WL 6134982, at *6 (N.D. Ill. Oct. 19, 2020) ("Plaintiffs adequately allege an anti-competitive effect . . . resulting from the information exchanged"); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 783 (N.D. Ill. 2017); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 766-67 (D. Minn. 2020). With good reason: "In a competitive market, uncertainty among sellers will cause them to compete for business by offering buyers lower prices." *Great Atl. & Pac. Tea Co., Inc. v. FTC*, 440 U.S. 69, 80 (1979). But, as the Supreme Court has explained, in a market like this one where competitors share price information, "[t]he exchange of price information, . . . by reducing uncertainty, lead[s] to price matching and anticompetitive cooperation among sellers." *Id.* The federal antitrust agencies agree: "A market is more susceptible to coordination if a firm's behavior can be promptly and easily observed by its rivals," *i.e.*, when competitively sensitive information such as costs "are readily discernible and relatively observable" via "exchange of information." U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 2.3.B (2023).

The Credit Bureaus do not – and cannot – dispute those basic facts and economic realities. They claim (at 16) that the information shared is "limited," but "the Level Playing Field provision essentially confirms to each Credit Bureau the price the other competing Credit Bureaus are paying for FICO's algorithm." DPAC ¶ 138; *see* IPAC ¶ 151. Given Fair Isaac's 90% market share and that FICO Scores are a "must have," CB Br. 3, that is hardly a "limited" exchange. The Bureaus are not entitled to the opposite inference. *See Vasquez*, 40 F.4th at 583. Moreover, the importance or scope of the information shared presents a factual dispute that "should not be resolved on a motion to dismiss." *Sanner v. Bd. of Trade of City of Chi.*, 62 F.3d 918, 926 (7th Cir. 1995).

13

The Credit Bureaus next assert that the price-information sharing required by the Level Playing Field provision cannot "create[] antitrust concerns" because "the Bureaus are no longer even alleged to have colluded with one another." CB Br. 16-17. But "information exchange itself" can violate Section 1. *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.) (observing that, in *Container Corp.*, "the Supreme Court held that information exchange itself could constitute a § 1 violation"). Even the Credit Bureaus admit that information sharing creates antitrust concerns if it "facilitate[s] collusion *or otherwise harm[s] competition*." CB Br. 16 (emphasis added). As explained, the Level Playing Field provision harms competition by reducing price competition for B2B Credit Scores and facilitating pricing coordination among the Bureaus.

Calling the Level Playing Field clause an "MFN provision" does not change that conclusion. CB Br. 15. As noted, the Seventh Circuit and other courts recognize that MFNs can have anticompetitive effects. *See* pp. 10-11, *supra* (collecting cases); *see, e.g.*, *United States v. Delta Dental of R.I.*, 943 F. Supp. 172, 180 (D.R.I. 1996) (rejecting arguments that MFN was not an "'unreasonable restraint' on trade" and denying motion to dismiss).

The Credit Bureaus claim that because the Level Playing Field clause is an MFN, the operative complaints were required to allege that it was adopted with "predatory purpose." *See, e.g.*, CB Br. 15 n.5, 17. But the Seventh Circuit requires allegations of "predatory purpose" only for breaches of labor agreements that are alleged to violate Section 1 of the Sherman Act. *Associated Milk Dealers*, 422 F.2d at 553; *see Connell Constr. Co., Inc. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 621-22 (1975) (discussing labor exception); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1401 (7th Cir. 1989) ("intent plays no useful role in [antitrust] litigation" even in "predatory pricing cases"). And that is only because labor agreements are ordinarily "exempt[] from the antitrust laws." *Associated Milk Dealers*, 422 F.2d

at 553.  No exception from the antitrust laws applies here (nor do the Credit Bureaus claim any such exception applies).  The Credit Bureaus' assertion (at 15 n.5) that MFNs are only unlawful if they were adopted with "predatory purpose" is thus false.

Even so, the operative complaints do allege predatory purpose:  They allege that the Bureaus agreed to restrain their ability to promote VantageScore to benefit themselves.  As the Credit Bureaus concede (at 17), the Level Playing Field provision "protect[s] each Credit Bureau from the risk that Fair Isaac would selectively offer discounts that could expose it to price competition."  DPAC ¶136; *see* IPAC ¶151 (similar).  "By ensuring that no one Credit Bureau receives a more favorable price than the other, the Level Playing Field provision essentially confirms to each Credit Bureau the price the other competing Credit Bureaus are paying for FICO's algorithm.  Information about what their competitors are paying for this must-have product is valuable to the Credit Bureaus who can then use this cost information to reduce price competition for the services they provide."  DPAC ¶138; *see* IPAC ¶151.  "It is just such restraints upon the freedom of economic units to act according to their own choice and discretion that run counter to antitrust policy."  *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 668 (1965).[9]

The Credit Bureaus claim it is implausible that they would " 'sabotage their own joint venture,' " CB Br. 12, but the complaints support the inference that going along with Fair Isaac is more profitable for the Bureaus than protecting VantageScore.  *See McReynolds v. Merrill Lynch*

---

[9] Tellingly, the Credit Bureaus do not dispute the economic importance of the provision to them. They focus on Plaintiffs' allegations about TransUnion's negotiations with Fair Isaac in Canada and claim (at 18) that "the market dynamics of credit scoring in Canada are irrelevant" because "the relevant market here is limited to the United States."  But courts routinely consider competitive dynamics in "other markets" to assess the relevant market. *See, e.g.*, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603 & n.30 (1985); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 463 (7th Cir. 2020).  "Comparable international markets" are no exception. *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 775 (N.D. Ill. 2020).

& Co., 694 F.3d 873, 879 (7th Cir. 2012) (court must "draw[ ] reasonable inferences in the plaintiffs' favor"). Given Fair Isaac's monopoly, the Bureaus need FICO Scores as an input for the credit-reporting services they sell. *See* DPAC ¶138 (FICO Score is a "must-have"); IPAC ¶2 ("FICO Scores are used for 90% of all lending decisions in the United States"). The Bureaus earn their money from selling those services. DPAC ¶40; IPAC ¶52. They also earn undisclosed sums from revenue-share agreements with Fair Isaac. DPAC ¶110; IPAC ¶123. Thus, having entered into anticompetitive contracts with Fair Isaac, the Credit Bureaus had (and continue to have) every economic incentive to promote and sell FICO Scores. By contrast, there are no allegations in the operative complaints that the Credit Bureaus receive revenue from VantageScore, much less revenue at a level high enough to render the Bureaus' agreements with Fair Isaac unprofitable or irrational. Nor have the Credit Bureaus claimed as much. As they made clear last time around, "VantageScore is a stand-alone venture, distinct from any of the Bureaus." Dkt. 135 at 29.

The operative complaints also allege that, "to the extent the Level Playing Field provision resulted in higher rates, those costs were ultimately also borne by 'banks [and] mortgage lenders' (*i.e.*, B2B Purchasers)" who had no alternative supplier or credit score they could turn to in order to avoid those price increases. DPAC ¶143, IPAC ¶159; *see* DPAC ¶144 & IPAC ¶160 (Experian CFO confirming that the Bureau "pass[es]" FICO price increases "through to [its] customers"); DPAC ¶145 & IPAC ¶161 (Equifax CEO confirming that price increases "rolled through" to customers). The Credit Bureaus do not (and, at the motion-to-dismiss stage, cannot) dispute that they do not bear the full (and potentially any) cost of FICO Score price increases.

Seizing on their own quotes about passing on price hikes to customers (*i.e.*, Plaintiffs and the classes they represent), the Credit Bureaus claim (at 19) that "if FICO's price hikes were deemed anticompetitive, the Bureaus would be the direct victims of such overcharges, and thus

entitled to recover those overcharges in full despite any ability to pass on the added cost" under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). But they stop short of arguing that *Illinois Brick* bars Direct Purchaser Plaintiffs' claims. With good reason. Even if the Bureaus could pursue some direct purchaser claims against Fair Isaac,[10] that would not bar Plaintiffs' direct purchaser claims. The Supreme Court made that clear in *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019). *See id.* at 1525 (holding that "the 'mere fact that an antitrust violation produces two different classes of victims hardly entails that their injuries are duplicative of one another.' " (citing 2A Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶339d, at 136 (4th ed. 2014)). But those issues are not currently before the Court. As this Court held previously, "a direct payment from a plaintiff to the defendant [i]s the key element in deeming the plaintiff as the direct purchaser," and Plaintiffs allege direct payments to Fair Isaac. MTD Op. 23; DPAC ¶42.[11]

## B.     The Credit Bureaus' Agreements with Fair Isaac Show How and Why They Made Peace (To Line Their Own Pockets)

The Credit Bureaus assert that "mak[ing] peace" with Fair Isaac "do[es] not support Plaintiffs' conspiracy allegations." CB Br. 20. The Bureaus again misunderstand the operative complaints; there are no conspiracy allegations to support anymore.

The Bureaus also assert that because Fair Isaac and the Bureaus have previously sued each other, "Plaintiffs therefore cannot state a claim based on the Level Playing Field provision, and

---

[10] And it is unclear that the Credit Bureaus could, given that they are active participants in, and financially benefit from, the anticompetitive contracts at issue. *See Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 830 F.2d 716, 722-23 (7th Cir. 1987). In any event, such a defense involves "[d]ifficult factual questions" that cannot be resolved on a motion to dismiss. *Premier Elec. Constr. Co. v. Miller-Davis Co.*, 422 F.2d 1132, 1138 (7th Cir. 1970).

[11] Moreover, Plaintiffs do not allege a distribution chain. They allege that Fair Isaac and the Credit Bureaus jointly produce a single product for use by the Direct Purchaser Plaintiffs – a product that Plaintiffs are the first, and direct, purchasers of. The Credit Bureaus pay Fair Isaac royalties in exchange for the right to use its algorithms to generate credit scores; the Direct Purchaser Plaintiffs purchase the scores themselves from Fair Isaac. *See, e.g.*, DPAC ¶¶35, 42.

thus cannot state a claim with respect to any of the provisions at issue." CB Br. 21. That is nonsensical. First, it does not follow that because the Bureaus and Fair Isaac have sued each other at various points in history Plaintiffs "cannot state a claim" based on the provisions at issue. *Id.* The Credit Bureaus have provided no authority to support that spurious argument. Second, the No Equivalent Products and Dynamic Royalty Schedule provisions are anticompetitive for the reasons the Court found previously: Respectively, they "exclude the Credit Bureaus from using VantageScore" and "give[ ] FICO the ability to control the prices of FICO Scores in an abusive and exploitative manner." MTD Op. 12. Further, as previously explained, the Level Playing Field provision is an anticompetitive information-sharing mechanism. *See* pp. 11-13, *supra*. The provisions are anticompetitive for reasons that are ***independent of*** the history of litigation between the parties (although the "Equifax Litigation was itself an anticompetitive act" as this Court previously held, MTD Op. 13-14). It does not follow that if Plaintiffs cannot state a claim based on the Level Playing Field provision they cannot state a claim based on the ***other two*** anticompetitive provisions Plaintiffs have identified either.

Finally, the Credit Bureaus wrongly suggest that statements by Fair Isaac's CEO that Fair Isaac had been "at war" with the Bureaus and then decided to "be partnered" with them are irrelevant. CB Br. 20. Settlements of business disputes, like any other agreements, "can . . . unreasonably diminish competition in violation of the antitrust laws." *FTC v. Actavis, Inc.*, 570 U.S. 136, 141 (2013). That is particularly true for the settlement of TransUnion's counterclaims, through which Fair Isaac "bought TransUnion off." DPAC ¶99; IPAC ¶113.

## III. THE OPERATIVE COMPLAINTS PLAUSIBLY ALLEGE ANTICOMPETITIVE EFFECTS FROM THE INDIVIDUAL AGREEMENTS BETWEEN EACH CREDIT BUREAU AND FAIR ISAAC

The Credit Bureaus argue that none of them "individually possesses significant market power in the claimed market for credit scores sold to businesses." CB Br. 21. That contradicts

their admission (at 20) that they are "one of the key means by which the FICO Score is distributed."
And it is wrong for multiple reasons. There are "two ways of proving market power": showing
(1) "direct evidence of anticompetitive effects," or (2) "that the defendant's share" of the relevant
market "exceeds whatever threshold is important for the practice in the case." *Toys "R" Us, Inc.
v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000); ); *see FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447,
460-61 (1986). Plaintiffs have plausibly alleged both.

For direct effects, Plaintiffs must allege "actual detrimental effects" on competition, "such
as reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. Am.
Express Co.*, 138 S. Ct. 2274, 2284 (2018) (citation and quotation marks omitted).

**Reduced output.** Plaintiffs allege that each Credit Bureau "agreed to terms that had the
effect of eliminating or drastically reducing the competitive threat posed by VantageScore,"
"frustrat[ing] the ability of B2B Purchasers to purchase VantageScore." DPAC ¶¶ 125, 158;
IPAC ¶¶ 139, 173. Each agreement had independent anticompetitive effects "because when one
Credit Bureau stops using VantageScore, it becomes even less attractive to the other Credit
Bureaus." DPAC ¶ 124; IPAC ¶ 138. "B2B Purchasers will not want to use a credit scoring system
unless all of the main Credit Bureaus use it." DPAC ¶ 124; IPAC ¶ 138.

**Increased prices.** Plaintiffs allege that in 2018, Fair Isaac "implemented a special pricing
increase for mortgage customers that was an approximately 75% increase from $0.06/score to
$0.10/score. In the following two years, FICO again rolled out special pricing increases to its auto
customers and to some credit card customers." DPAC ¶ 157; IPAC ¶ 172.

**Decreased quality.** Plaintiffs allege that the Credit Bureaus' agreements decreased quality
by, among other things, foreclosing the only credit score (VantageScore) that scored low-income,

"credit invisible" individuals.  DPAC ¶¶ 73-81; IPAC ¶¶ 89-96.[12]

Those allegations are independently sufficient to plead anticompetitive effects.  The operative complaints, however, go further and also allege market power using market-share measures.  Such allegations require "showing that the defendant's share exceeds whatever threshold is important for the practice in the case."  *Toys "R" Us*, 221 F.3d at 937.  In a Section 1 case like this one, "something more than 30%" is more than enough.  *Id.*; *see* U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 2.1 (2023) ("a merger that creates a firm with a share over thirty percent is . . . presumed to substantially lessen competition or tend to create a monopoly").  Plaintiffs have alleged just that, pleading that the Credit Bureau "triopoly" "control[s] virtually all of the credit report market" for distribution of FICO or VantageScores.  DPAC ¶ 58; IPAC ¶ 70.  The Credit Bureaus "enjoy roughly equivalent market shares": 33% a piece of the 100% whole.  DPAC ¶ 58; IPAC ¶ 70.  Each Bureau thus has "more than 30%" of the relevant market, which is enough in a Section 1 case, *Toys "R" Us*, 221 F.3d at 937, particularly where the complaints offer other facts showing that the challenged "arrangement has the potential for genuine adverse effects on competition," *Ind. Fed'n of Dentists*, 476 U.S. at 460-61.

The Credit Bureaus suggest (at 22) that "FICO itself" is one of their competitors.  But they cannot dilute their market shares by gerrymandering Fair Isaac into the **credit report** market.

---

[12] The Bureaus make a big deal about VantageScore still being "very much in business," and the Bureaus "continu[ing] to distribute its scores."  CB Br. 6.  But they nowhere discuss whether, and to what extent, they distribute VantageScores **in the relevant market** (B2B Credit Scores) – something each of their contracts with Fair Isaac forecloses.  And they ignore that "imped[ing]" VantageScore's "expansion" is anticompetitive even if VantageScore was not stamped out of existence.  *Viamedia*, 951 F.3d at 483.  In any event, the Bureaus cannot ask the Court to credit factual assertions in their favor by seeking to incorporate by reference websites cited in the complaints.  *See McReynolds*, 694 F.3d at 879 (court must make inferences in plaintiffs' favor); *AliveCor, Inc. v. Apple Inc.* 592 F. Supp. 3d 904, 913 (N.D. Cal. 2022) (declining to "interpret the incorporated documents to contradict well-pled factual allegations in the complaint").

Indeed, this suggestion contradicts the complaints' allegations that the Credit Bureau "triopoly" "control[s] virtually all of the credit report market." DPAC ¶58; IPAC ¶70. And it is belied by the Bureaus' own recognition of who their competitors are. The Credit Bureaus agree they face no other competitors, repeatedly emphasizing that there is no "hypothetical new credit bureau" waiting to challenge their entrenched triopoly. CB Br. 8, 12. Such "[i]ndustry or public recognition" of who an entity competes against is compelling evidence regarding the scope of the relevant market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *see id.* ("The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity.").[13]

Finally, TransUnion's own claims confirm that, however market power is measured, each of the Bureaus' agreements with Fair Isaac has anticompetitive "effect[s] in the market." *Toys "R" Us*, 221 F.3d at 937. TransUnion alleged that the No Equivalent Products provision "***effectively prevents TransUnion*** from selling an alternative to FICO's credit scores" and that the "Dynamic Royalty Schedule" provision "***effectively foreclose[s]*** the credit reporting agencies from selling lenders FICO scores for use in the B2B market and VantageScore for use in the B2C market, and drives lenders to buy exclusively Fair Isaac's FICO scores." TUCC ¶¶42-58 (emphasis added). TransUnion also claimed that "Fair Isaac has used the 'Level Playing Field' and 'Dynamic Royalty Schedule' provisions" to "extract monopoly prices from all three credit

---

[13] The Bureaus essentially argue (at 22) that their contracts with Fair Isaac do not harm competition because VantageScore could enter the market through other distributors. But Plaintiffs allege that there are no other distributors. *See supra*, pp. 20-21. Defendants are not entitled to the opposite inference. *See Vasquez*, 40 F.4th at 583. Moreover, Fair Isaac cannot be a relevant, competing distributor because there is no indication – in the operative complaints or elsewhere – that it would ever distribute scores produced by its direct competitor, VantageScore. It would be an inappropriate inference in the Bureaus' favor to conclude on a motion to dismiss that VantageScore could somehow enter the market through Fair Isaac. *See McReynolds*, 694 F.3d at 879.

reporting agencies and ***their customers*** and prevent any credit reporting agency from negotiating lower royalty prices than the others." *Id.* ¶¶ 59-60 (emphasis added).

## IV. THE CREDIT BUREAUS' RECYCLED ARGUMENTS FAIL

The Credit Bureaus devote a few sentences (at 23) to incorporating by reference arguments they made in their prior motion to dismiss. Such "[s]kirting" page "limits through 'incorporation by reference' is impermissible." *Silverman v. Bd. of Educ. of City of Chi.*, No. 08-cv-2220, 2010 WL 3000187, at *1 (N.D. Ill. July 26, 2010), *aff'd*, 637 F.3d 729 (7th Cir. 2011). In any event, the arguments are just as meritless today as they were two years ago.

TransUnion claims in a parenthetical that its abandoned "antitrust claim against FICO" warrants dismissal of this lawsuit. Not so. It never withdrew from the challenged contracts. To the contrary, Plaintiffs allege that Fair Isaac "bought TransUnion off" so that it would abandon its challenge to the contracts. DPAC ¶ 99; IPAC ¶ 113. TransUnion thus cannot benefit from a withdrawal defense. *See Bullis*, 77 F.3d at 1562.

Experian asserts in a parenthetical that the claims against it should be dismissed because it is "a direct purchaser from FICO, and because Experian entered its agreements with FICO before any other Bureau." CB Br. 23. But its claim to be a direct purchaser doesn't help it. *See* pp. 16-17 & n.11, *supra*. And ***when*** Experian entered into contracts with Fair Isaac is utterly irrelevant given that Plaintiffs are no longer alleging that the timing of entry into the contracts is evidence of conspiracy.

Equifax raises the same timing argument in a parenthetical. It is just as unhelpful to Equifax as it is to Experian.[14]

---

[14] To the extent it matters, Plaintiffs allege that the Bureaus and Fair Isaac "executed parallel anticompetitive contracts at the first available opportunity." DPAC ¶ 108 n.72; *see* IPAC ¶ 120.

## V.     THE STATE-LAW CLAIMS RISE, BUT DO NOT FALL, WITH THE FEDERAL CLAIMS

The Credit Bureaus argue (at 23-24) that the state-law claims fall with the federal law claims.  That is not true.  Because of differences in the elements of multiple state laws, state-law antitrust claims can survive even if the Sherman Act claims are dismissed.

For example, California's Unfair Competition Law proscribes a wide range of "unfair" business conduct – even if that conduct "fail[s] to establish Sherman Act liability." *Epic Games*, 67 F.4th at 1001.  California's Cartwright Act is similarly "broader in range and deeper in reach than the Sherman Act." *In re Cipro Cases I & II*, 348 P.3d 845, 872 (Cal. 2015).  Under the Cartwright Act, a price restraint like the Level Playing Field provision is "per se illegal[]" regardless of whether it is deemed "horizontal or vertical." *Mailand v. Burckle*, 572 P.2d 1142, 1147-48 (Cal. 1978).  Thus, to succeed on their Cartwright Act claim, Plaintiffs need not allege that the Level Playing Field provision "had an actual anticompetitive effect." *Id.* at 1150.  Maryland's antitrust law is similar.  *See Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 993 (W.D. Wash. 2022) (discussing Maryland law).  Those are just a handful of examples.

For the Credit Bureaus' remaining dismissal arguments, because the state-law analysis "mirrors the Sherman Act analysis," their challenges to the state-law claims fail for the same reasons as their challenges to the Sherman Act claims.  *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 831-32 (9th Cir. 2022).[15]

In any event, if this Court dismisses the federal claims against the Credit Bureaus, it should retain supplemental jurisdiction over the state-law claims.  A district court may decline supplemental jurisdiction only if it "has dismissed all claims over which it has original

---

[15] The Credit Bureaus rely on *In re Humira (Adalimumab) Antitrust Litigation*, 465 F. Supp. 3d 811 (N.D. Ill. 2020), but the plaintiffs there "agree[d] that if the federal antitrust claims are dismissed, the state-law antitrust claims should be dismissed, too." *Id.*  Plaintiffs here disagree for the reasons explained above.

jurisdiction," 28 U.S.C. §1367(c)(3), or if another §1367(c) factor is met. *See Montano v. City of Chicago*, 375 F.3d 593, 601 (7th Cir. 2004). Here, if the Court rejects Fair Isaac's attempt to overturn this Court's denial of its first motion to dismiss (as it should), not all federal claims will be dismissed. And Plaintiffs' claims against the Credit Bureaus concern settled state antitrust law, which would not predominate over the related federal claims. Moreover, no exceptional circumstances exist for declining jurisdiction. Thus, none of the §1367(c) factors are met. Because "the same evidence, witnesses, and parties are involved" with prosecuting the federal claims against Fair Isaac and state-law claims against the Credit Bureaus, "judicial economy, convenience, and fairness interests will be served by this [C]ourt hearing Plaintiffs' state claims." *Garot Anderson Mktg., Inc. v. Blue Cross & Blue Shield United*, 772 F. Supp. 1054, 1064 (N.D. Ill. 1990). If Plaintiffs were required to refile their state-law claims in another court, all parties – Plaintiffs, Fair Isaac, and the Credit Bureaus – would be forced to litigate the same facts and very similar claims in at least two different fora (and likely many more).

## VI.   ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE TO AMENDING AT THE CONCLUSION OF DOCUMENT PRODUCTION

The Credit Bureaus urge dismissal with prejudice. CB Br. 24. For the foregoing reasons, the claims against the Credit Bureaus should not be dismissed at all. If this Court disagrees, however, Plaintiffs respectfully request dismissal without prejudice with leave to amend after the conclusion of document discovery, which the Court has allowed to proceed against Fair Isaac and the Credit Bureaus (as non-parties). Dkts. 198, 227. Courts routinely permit plaintiffs to renew dismissed claims "[a]fter discovery," if the evidence reveals "sufficient support to do so." *Chisholm v. Foothill Cap. Corp.*, 940 F. Supp. 1273, 1281 (N.D. Ill. 1996).[16]

---

[16] *See, e.g.*, *McMaken ex rel. Chemonics Int'l, Inc. Emp. Stock Ownership Plan v. Greatbanc Trust Co.*, No. 17-cv-4983, 2019 WL 10891860, at *2 (N.D. Ill. Dec. 27, 2019) (similar); *Grupo*

Discovery is likely to reveal further support for Plaintiffs' claims against the Credit Bureaus. Case in point: The only documents produced in this case to date (the 2015 ADLA with TransUnion and a royalty schedule) reveal ***additional*** anticompetitive provisions that Plaintiffs could not have discovered previously because of confidentiality provisions in the agreements. DPAC ¶ 172 & n.126; IPAC ¶ 193 & n.111. ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ ADLA at 6. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ And that is not the only additional

anticompetitive provision Plaintiffs have uncovered. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ ADLA § 2.5.

It is likely that discovery will reveal even more evidence substantiating Plaintiffs' claims.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Credit Bureaus' motion to dismiss or, in the alternative, dismiss without prejudice to amending at the conclusion of document discovery.

---

*Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT&T Commn'cns, Inc.*, No. 92-cv-7862, 1996 WL 312535, *7 (S.D.N.Y. June 10, 1996) (similar).

Dated: January 16, 2024

Respectfully Submitted,

  /s/ Steven F. Molo
Steven F. Molo
Lauren F. Dayton
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Telephone: 312-450-6700
smolo@mololamken.com
ldayton@mololamken.com

Lauren M. Weinstein
Robert Y. Chen
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.,
  Suite 500
Washington, DC 20037
Telephone: 202-556-2000
lweinstein@mololamken.com
rchen@mololamken.com

*Liaison Counsel for Direct Purchaser
Plaintiffs and the Proposed Direct
Purchaser Class*

Christopher M. Burke
Walter Noss
Yifan (Kate) Lv
KOREIN TILLERY PC
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: 619-625-5620
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

  /s/ Carmen Medici
Carmen Medici (*pro hac vice*)
Gary Foster (*pro hac vice*)
SCOTT+SCOTT
  ATTORNEYS AT LAW LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-798-5319
cmedici@scott-scott.com
gfoster@scott-scott.com

Joseph P. Guglielmo (N.D. Ill. 2759819)
Michelle E. Conston (*pro hac vice*)
Anna Hunanyan (*pro hac vice*)
SCOTT+SCOTT
  ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
jguglielmo@scott-scott.com
mconston@scott-scott.com
ahunanyan@scott-scott.com

Patrick McGahan (*pro hac vice*)
SCOTT+SCOTT
  ATTORNEYS AT LAW LLP
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct
Purchaser Plaintiffs and the Proposed Direct
Purchaser Class*

George A. Zelcs
Randall P. Ewing, Jr.
Chad E. Bell
Labeat Rrahmani
KOREIN TILLERY, LLC
205 North Michigan Avenue,
  Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com
cbell@koreintillery.com
lrrahmani@koreintillery.com

Jennifer W. Sprengel
CAFFERTY CLOBES MERIWETHER &
  SPRENGEL LLP
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

Barbara J. Hart (*pro hac vice*)
GRANT & EISENHOFER
485 Lexington Ave., 29th Floor
New York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

Brian M. Hogan
DICELLO LEVITT LLP
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Telephone: 312-214-7900
bhogan@dicellolevitt.com

Gregory S. Asciolla (*pro hac vice*)
Karin E. Garvey (*pro hac vice*)
John M. Shaw (*pro hac vice*)
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, NY 10017
Telephone: 646-933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
jshaw@dicellolevitt.com

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Linda P. Nussbaum
Susan Schwaiger
NUSSBAUM LAW GROUP, P.C.
1133 Avenue of the Americas, 31st Floor
New York, NY 10036
Telephone: 917-438-9102
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Michael L. Roberts
Karen Sharp Halbert
ROBERTS LAW FIRM, P.A.
20 Rahling Circle
Little Rock, AR 72223
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Charles F. Barrett (*pro hac vice*)
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: 615-244-1713
cbarrett@nealharwell.com

Don Barrett (*pro hac vice* forthcoming)
BARRETT LAW GROUP, P.A.
404 Court Square
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
dbarrett@barrettlawgroup.com

27

Gary F. Lynch
LYNCH CARPENTER LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
gary@lcllp.com

Katrina Carroll
LYNCH CARPENTER LLP
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
katrina@lcllp.com

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1908
mlehmann@hausfeld.com
clebsock@hausfeld.com

Hilary K. Scherrer
Paul Gallagher
HAUSFELD LLP
1700 K Street, N.W., Suite 650
Washington, DC 20006
Telephone: 202-540-7200
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Scott A. Martin
Irving Scher
Jeanette Bayoumi
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: 646-357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

Richard R. Barrett (*pro hac vice* forthcoming)
BARRETT LAW GROUP, P.A.
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: 662-380-5018
rrb@rrblawfirm.net

Daniel E. Gustafson (*pro hac vice*)
Michelle J. Looby (*pro hac vice*)
Daniel J. Nordin (*pro hac vice*)
Anthony J. Stauber
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
dnordin@gustafsongluek.com
tstauber@gustafsongluek.com

Dennis Stewart (*pro hac vice*)
GUSTAFSON GLUEK PLLC
600 B Street, 17th Floor
San Diego, CA 92101
Telephone: 619-595-3200
dstewart@gustafsongluek.com

Kenneth A. Wexler
Melinda J. Morales
Michelle Perkovic
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

*Counsel for Counsel for Direct Purchaser Plaintiffs
and the Proposed Direct Purchaser Class*

  /s/ Garrett D. Blanchfield
Garrett D. Blanchfield (*pro hac vice*)
Brant D. Penney (*pro hac vice*)
Roberta A. Yard (*pro hac vice* forthcoming)
REINHARDT WENDORF &
  BLANCHFIELD
222 South 9th Street, Suite 1600
Minneapolis, MN 55101
Telephone: 651-287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

*Interim Co-Lead Counsel for Indirect
Purchaser Plaintiffs and the Proposed
Indirect Purchaser Class*

Charles R. Watkins (3122790)
GUIN, STOKES & EVANS, LLC
321 South Plymouth Court
Suite 1250
Chicago, IL 60604
Telephone: 312-878-8391
charlesw@gseattorneys.com

*Liaison Counsel for Indirect Purchaser
Plaintiffs and the Proposed Indirect
Purchaser Class*

Brian P. Murray (*pro hac vice* forthcoming)
Lee Albert (*pro hac vice* forthcoming)
GLANCY PRONGAY & MURRAY LLP
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: 212-682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com

Jeffrey J. Corrigan (*pro hac vice*)
William G. Caldes (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
Icee N. Etheridge (*pro hac vice*)
SPECTOR ROSEMAN &
  KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: 215-496-0300
JCorriganf@srkattorneys.com
BCaldes@srkattorneys.com
JSpector@srkattorneys.com
IEtheridge@srkattorneys.com

Michael S. Smith (*pro hac vice*)
Gregory P. Hansel (*pro hac vice*)
Randall B. Weill (*pro hac vice*)
Elizabeth F. Quinby (*pro hac vice*)
PRETI FLAHERTY, BELIVEAU &
  PACHIOS LLP
One City Center,
P.O. Box 9546
Portland, ME 04101
Telephone: 207-791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com

David McLafferty (*pro hac vice* forthcoming)
MCLAFFERTY LAW FIRM, P.C.
  ATTORNEYS AT LAW
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-940-4000, ext. 12
www.McLaffertyLaw.com

Douglas A. Millen
FREED KANNER LONDON &
  MILLEN LLC
100 Tri-State International Drive, Suite 128
Lincolnshire, IL 60069
Telephone: 224-632-4500
dmillen@fklmlaw.com

29

Simon B. Paris, Esq.
  (*pro hac vice* forthcoming)
Patrick Howard, Esq.
  (*pro hac vice* forthcoming)
SALTZ MONGELUZZI & BENDESKY, P.C.
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: 215-575-3985
sparis@smbb.com
phoward@smbb.com

Jonathan M. Jagher
  (*pro hac vice* forthcoming)
FREED KANNER LONDON &
  MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-234-6487
jjagher@fklmlaw.com

Michael J. Boni (*pro hac vice* forthcoming)
Joshua D. Snyder (*pro hac vice* forthcoming)
John E. Sindoni (*pro hac vice* forthcoming)
BONI, ZACK & SNYDER LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: 610-822-0200
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

*Counsel for Indirect Purchaser Plaintiffs
and the Proposed Indirect Purchaser Class*