**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE:  FICO ANTITRUST LITIGATION RELATED CASES | Case No. 1:20-CV-02114 |
| *This document relates to:*<br><br>ALL ACTIONS | Hon. Edmond E. Chang<br>Magistrate Judge David E. Weisman |

**THE CREDIT BUREAUS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS
PLAINTIFFS' CLASS ACTION COMPLAINTS**

1

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ...................................................................................................... ii

**INTRODUCTION** .................................................................................................................... 1

**ARGUMENT** ............................................................................................................................ 2

    I.     The Amended Complaints Offer No Basis to Reverse This Court's Ruling .......... 2

            a.     The Amended Complaints Include No New Material Factual
                  Allegations ................................................................................................. 3

            b.     Plaintiffs Cannot Avoid the Need to Plead New Facts By Applying
                  New Labels ................................................................................................ 4

            c.     Plaintiffs Cannot Avoid *Marion II*, Which This Court Cited in the
                  September 28 Order Dismissing Plaintiffs' Claims .................................... 5

    II.    The Complaints Do Not Plausibly Allege That the Level Playing Field
          Provision Was Anything More Than a Routine MFN ............................................ 8

            a.     Plaintiffs Cannot Transform an Ordinary MFN Provision into an
                  Anticompetitive Information Exchange ...................................................... 8

            b.     Plaintiffs' Allegation That the Level Playing Field Provision
                  Raised the Bureaus' Costs Further Undermines the Amended
                  Complaints .............................................................................................. 10

            c.     Plaintiffs' Opposition Offers No Meaningful Response to the Other
                  Arguments for Dismissal with Respect to The Level Playing Field
                  Provision ................................................................................................. 11

    III.   The Amended Complaints Do Not Plausibly Allege That Individual
          Bureaus Had Market Power Such That Their Individual, Vertical
          Agreements with FICO Could Plausibly Harm Competition .............................. 12

    IV.   The Amended Complaints' State Law Claims Must Be Dismissed .................... 14

    V.    Dismissal Should Be with Prejudice, and Plaintiffs Should Not Be Given
          Leave to Try to Once Again Manufacture Renewed Claims ............................... 15

**CONCLUSION** ...................................................................................................................... 15

AMERICAS 126121213

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Agnew v. NCAA*,
   683 F.3d 328 (7th Cir. 2012) ...................................................................6

*Am. Needle, Inc. v. NFL*,
   560 U.S. 183 (2010)...................................................................................4

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................................5

*Associated Milk Dealers, Inc. v. Milk Drivers Union, Local 753*,
   422 F.2d 546 (7th Cir. 1970) ...................................................................8

*Bank of Waunakee v. Rochester Cheese Sales, Inc.*,
   906 F.2d 1185 (7th Cir. 1990) .................................................................2

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...................................................................................5

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
   65 F.3d 1406 (7th Cir. 1995) ...................................................................8

*In re Broiler Chicken Antitrust Litigation*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017) ......................................................9

*Caine v. Burge*,
   897 F. Supp. 2d 714 (N.D. Ill. 2012) ..................................................3, 5

*Canter v. AT&T Umbrella Benefit Plan No. 3*,
   2019 WL 13202181 (N.D. Ill. Nov. 13, 2019) ......................................15

*Chisholm v. Foothill Cap. Corp.*,
   940 F. Supp. 1273 (N.D. Ill. 1996) .......................................................15

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) .................................................................13

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ....................................................................6

*In re EpiPen Direct Purchaser Litig.*,
   2022 WL 1017770 (D. Minn. Apr. 5, 2022)......................................12, 14

AMERICAS 126121213

*Frame-Wilson v. Amazon.com, Inc.*,
591 F. Supp. 3d 975 (W.D. Wash. 2022) ............................................................................15

*Great Atlantic & Pacific Tea Co. v. FTC*,
440 U.S. 69 (1979) ...............................................................................................................9

*Hannah's Boutique, Inc. v. Surdej*,
112 F. Supp. 3d 758 (N.D. Ill. 2015) .............................................................................12, 13

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968) ............................................................................................................10

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ..............................................................................................................4

*Isaksen v. Vermont Castings, Inc.*,
825 F.2d 1158 (7th Cir. 1987) ..............................................................................................6

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ...............................................................................................................14

*Kansas v. UtiliCorp United, Inc.*,
497 U.S. 199 (1990) ............................................................................................................10

*Mailand v. Burckle*,
572 P.2d 1142 (Cal. 1978) ..................................................................................................15

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
29 F.4th 337 (7th Cir. 2022) ....................................................................................... passim

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) ..............................................................................................12

*MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*,
62 F.3d 967 (7th Cir. 1995) ..................................................................................................6

*McWane, Inc. v FTC*,
783 F.3d 814 (11th Cir. 2015) ........................................................................................12, 14

*No Spill LLC v. Scepter Canada, Inc.*,
2022 WL 1078435 (D. Kan. Apr. 6, 2022) ...........................................................................8

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) ........................................................................................................13

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*,
2020 WL 6134982 (N.D. Ill. Oct. 19, 2020) ........................................................................9

iii

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
    967 F. Supp. 2d 1347 (N.D. Cal. 2013) ...................................................................13

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
    281 F.3d 629 (7th Cir. 2002) .................................................................................12

*In re Pork Antitrust Litig.*,
    495 F. Supp. 3d 753 (D. Minn. 2020) ......................................................................9

*Procaps S.A. v. Patheon, Inc.*,
    845 F.3d 1072 (11th Cir. 2016) ................................................................................4

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) .................................................................................13

*Starr v. Sony BMG Music Entertainment*,
    592 F.3d 314 (2d Cir. 2010) .....................................................................................9

*In re Surescripts Antitrust Litig.*,
    608 F. Supp. 3d 629 (N.D. Ill. 2022) ......................................................................4

*Thompson v. Ill. Dep't of Pro. Regul.*,
    300 F.3d 750 (7th Cir. 2002) .................................................................................15

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ..................................................................................11

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) .................................................................................14

*United States v. Container Corp. of America*,
    393 U.S. 333 (1969) .................................................................................................9

*United States v. Nunez*,
    673 F.3d 661 (7th Cir. 2012) ...................................................................................4

*United States v. Yellow Cab Co.*,
    332 U.S. 218 (1947) .................................................................................................4

*W. Concrete Structures Co. v. Mitsui & Co. (U.S.A.), Inc.*,
    760 F.2d 1013 (9th Cir. 1985) .................................................................................7

*Weiss v. Altholtz*,
    2011 WL 4538459 (N.D. Ill. Sept. 29, 2011) ........................................................15

## OTHER AUTHORITIES

2023 DOJ & FTC Merger Guidelines..............................................................................9

iv

Areeda & Hovenkamp, *Antitrust Law* ............................................................................7

Reply Br. for Pls.-Appellants, *Marion Diagnostic Ctr. LLC v. Becton Dickinson & Co.*,
    2021 WL 4762038 (7th Cir. Sept. 30, 2021) ..........................................................5

AMERICAS 126121213

## <u>INTRODUCTION</u>

As explained in the Bureaus' motion to dismiss, Plaintiffs' Amended Complaints suffer from the same fatal defects that led this Court to dismiss their initial effort. *See* Sept. 28 Order (ECF 173). Their opposition brief does not reverse those defects. Instead, Plaintiffs seek to reargue the Court's September 28 dismissal order with essentially the same alleged facts, but with repackaged labels and theories. Plaintiffs come nowhere close to meeting the standard for reconsideration in this Circuit, and, in any event, this Court did not err in granting dismissal.

<u>First</u>, Plaintiffs attempt to change the label they seek to apply to the Bureaus' respective distribution agreements with FICO—from "conspiracies" to "contracts." But doing so will not revive their failed Section 1 claims. Far from being newly alleged, the agreements, and the challenged terms thereof, were at the heart of the claims addressed in the September 28 Order. *See, e.g.*, Sept. 28 Order at 3-6, 21-22. And ultimately none of Plaintiffs' semantic games make any difference because the antitrust laws look to economic substance, not labels, and do not apply differently to "contract-based" versus "conspiracy" claims.

<u>Second</u>, Plaintiffs' Opposition fails to articulate any legitimate reason why the Court's September 28 Order was wrong. Plaintiffs assert that the Court misunderstood the Seventh Circuit's decision in *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.* ("*Marion II*"), 29 F.4th 337 (7th Cir. 2022), which they seek to cabin to "conspiracy" claims rather than "contract-based" claims. But *Marion II* involved similar allegations to those presented by Plaintiffs here— including contracts between the alleged monopolist and its distributors. As in *Marion II*, Plaintiffs here failed to allege facts that would make any such vertical agreement plausibly actionable.

<u>Third</u>, rather than confront this Court's holding that the Level Playing Field provision is nothing more than a "standard" most favored nations clause, they attempt a bait-and-switch, citing

a string of cases involving *horizontal* agreements to exchange information regarding the prices competitors *themselves charged*. But the allegation here is nothing like that—instead, Plaintiffs challenge three distinct, bilateral, *vertical* agreements, each containing a "standard" MFN provision, assuring each Bureau that it will not receive worse terms than its competitors.

Finally, Plaintiffs remain unable to allege that any of the Bureaus individually has market power in the claimed B2B Credit Score Market, such that any *individual* agreement between a *single* Bureau and FICO could substantially foreclose competition. While Plaintiffs try to fill this gap by discussing a *different* market—one for credit reports—even that sleight of hand would not suffice. At best, the Amended Complaints suggest that each of the Bureaus would have around a 33% market share in credit *reports* (not scores), but case law cited by Plaintiffs themselves makes clear that a market share of roughly 30% reflects insufficient market power to harm competition.

Plaintiffs' Amended Complaints should be dismissed with prejudice.

## ARGUMENT

### I.     The Amended Complaints Offer No Basis to Reverse This Court's Ruling

Courts consistently reject amended complaints that fail to offer new factual allegations. *See* Credit Bureaus' Motion to Dismiss, ECF 220 ("CB MTD") 12-13 (collecting cases). Indeed, given the absence of new factual allegations in the Amended Complaints, and that this Court specifically rejected Plaintiffs' claim of individual vertical conspiracies between FICO and the respective Bureaus, Plaintiffs' Opposition amounts to a request for reconsideration of the Court's September 28 Order. *See* Sept. 28 Order at 21-22. But reconsideration requires that "the court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *See, e.g.*, *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citation

AMERICAS 126121213

omitted).  Reconsideration should not be used to "relitigat[e] arguments that the Court previously rejected or for arguing issues that could have been raised during the consideration of the [original] motion. . . ."  *Caine v. Burge*, 897 F. Supp. 2d 714, 717 (N.D. Ill. 2012) (collecting authority).

However construed, Plaintiffs' amended complaints fail to state a claim under *Twombly* for all the reasons previously explained.  *See* CB MTD at 11.  The *Twombly* plausibility standard, as articulated in *Marion II*, recognizes that "courts should dismiss antitrust conspiracy complaints for failure to state a claim when the allegations, taken as true, could just as easily reflect innocent conduct or rational self-interest."  *Marion II*, 29 F.4th at 351.  The pleadings recite nothing more.

### a.  The Amended Complaints Include No New Material Factual Allegations

While Plaintiffs list pages on which they amended their complaints, even a cursory review shows that they largely changed only the language, without adding new substantive factual allegations.  *Compare* Pls.' Joint Opp'n to the Credit Bureaus' Mot. to Dismiss at 9, ECF 246 ("Opp'n"), *with* CB MTD Ex. A (Blackline of DPACC) at p. 5 (changing only the *description* of the at-issue contracts).  The Court should dismiss on this basis alone.  *See* CB MTD at 12-13 (citing, *e.g.*, *Marion II*, 29 F.4th at 349-50, and collecting authority).

Plaintiffs (Opp'n at 9) emphasize three factual allegations that they claim have been added to the Amended Complaints, but none of these are actually new:

1.  Plaintiffs claim that "Fair Isaac admitted the contracts exist."  Opp'n at 9.  But dismissal was not based on any uncertainty about whether the three Bureaus had entered into agreements with FICO.  *See, e.g.*, Sept. 28 Order at 3-6 (recognizing the existence of the contracts and provisions); CB MTD Ex. A ¶¶ 43, 101-45 (discussing the agreements).

2.  Plaintiffs allege that the Level Playing Field provision involves "sharing" information regarding the price each Bureau pays FICO for FICO Scores.  Opp'n at 9.  But the only information exchanged under the MFN provision is the information every MFN inherently provides.  *See* CB MTD at 15-16.  Plaintiffs have added nothing except a new way of trying to characterize the facts that have long been alleged in this litigation.

3.  Plaintiffs claim to have alleged for the first time a revenue sharing arrangement—*i.e.*, that the Bureaus profit from distributing FICO Scores.  Opp'n at 9.  Once again, this was in the

3

Original Complaints.[1] *See, e.g.*, CB MTD Ex. A ¶¶ 42-44 (discussing how the Bureaus distribute FICO Scores to banks and receive payment, and then pay royalties to FICO).

Plaintiffs have therefore alleged no new facts to overcome dismissal, and this failure alone warrants dismissal. *See* CB MTD at 12-13 (collecting authority).

### b. Plaintiffs Cannot Avoid the Need to Plead New Facts By Applying New Labels

Instead, Plaintiffs' Opposition relies only on new labels—though the Supreme Court has repeatedly instructed that, under the antitrust laws, it is the economic *substance* of the allegation that matters. *See, e.g.*, *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 192-93 (2010) (Sherman Act is "aimed at substance rather than form" (quoting *U.S. v. Yellow Cab Co.*, 332 U.S. 218, 227 (1947))). Most prominently, Plaintiffs re-label their "conspiracy" claims regarding FICO's agreements with each of the Bureaus to "contract-based" claims. *See, e.g.*, Opp'n at 1, 10; *but see* Opp'n at 8 n.6 (Plaintiffs asserting that "the Credit Bureaus do not argue that they withdrew from the *conspiracy*; they insist there was no *conspiracy*") (emphasis added); *cf.* Opp'n at 5 n.4 (admitting Plaintiffs seek to satisfy the "conspiracy 'exception'" to *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977))).

However, Sherman Act Section 1 is not applied differently based on which label Plaintiffs apply. *See, e.g.*, *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 651 n.16 (N.D. Ill. 2022) ("The distinction among the terms contracts, combinations, and conspiracies in [the text of Sherman Act] is unimportant. A '"conspiracy" in section 1 is simply a pejorative term for a contract, both "conspiracy" and "contract" signifying an agreement a meeting of minds.' 'Courts use the words "contract," "combination," and "conspiracy" interchangeably.'") (quoting, respectively, *United States v. Nunez*, 673 F.3d 661, 664 (7th Cir. 2012) and *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1080 (11th Cir. 2016)). Such re-labeling is especially inappropriate

---

[1] While the Opposition suggests that those complaints allege a separate "revenue-share agreement[] with Fair Isaac," Opp'n at 16, the complaints cite only a reference to a revenue sharing *arrangement—i.e.*, the same Licensing and Distribution Agreements at issue. *See* DPACC, Dkt. 184, at ¶ 110.

4

here, as Plaintiffs cannot claim that their arguments on this issue were somehow unavailable to them during the last round of briefing. *See Caine*, 897 F. Supp. 2d at 717 (refusing to consider arguments that could have been raised previously). Moreover, the only authority Plaintiffs cite for the proposition that the antitrust laws are applied differently based on such re-labeling is *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), *see* Opp'n at 2, and *Twombly* does not stand for this proposition at all. *See Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (refusing to limit *Twombly* to antitrust claims (much less antitrust claims based on one particular label as Plaintiffs suggest)). In short, Plaintiffs' "label game" cannot salvage their claims against the Bureaus.

### c. Plaintiffs Cannot Avoid *Marion II*, Which This Court Cited in the September 28 Order Dismissing Plaintiffs' Claims

Relying on their spurious re-labelling, Plaintiffs criticize this Court's application of *Marion II*, asserting that the Court should have distinguished the Seventh Circuit's decision as a "conspiracy" case rather than a "contract" case. Opp'n at 9-10. But the distributors in *Marion II* *did* sign contracts with the alleged monopolist, agreeing to carry through terms the plaintiffs claimed were anticompetitive. *See Marion II*, 29 F.4th at 341 ("[T]he Distributors make 'Dealer Notification Agreements' with BD, in which the Distributors agree to distribute BD's Products in accordance with the Net Dealer Contracts."). Indeed, the plaintiffs in *Marion II* conceded in briefing that "simply . . . agreeing to distribute a manufacturer's products on the terms the manufacturer set" could "hardly" be enough to state a claim against the distributor, and that such "[d]istributors only run the risk that a vertical-conspiracy claim could be stated (not proven) against them if . . . they lie to, bully, and spy on their customers to benefit a manufacturer's monopoly in exchange for substantial payments from that monopolist." Reply Br. for Pls.-Appellants, *Marion Diagnostic Ctr. LLC v. Becton Dickinson & Co.*, 2021 WL 4762038, at *5 (7th Cir. Sept. 30, 2021).

5

Dismissal in *Marion II* was appropriate not because the distributors had not entered written agreements with the alleged monopolist (they had), but rather because there was no plausible allegation the distributors entered agreements with "an intent to restrain trade"—*i.e.*, a "conscious commitment to a common scheme" with the alleged monopolist—"when the allegations, taken as true, could just as easily reflect innocent conduct or rational self-interest." *Marion II*, 29 F.4th at 349-51. The same holds true here, as this Court has already found. *See* Sept. 28 Order at 20-22.

Because Plaintiffs' attempt to recast *Marion II* fails, their remaining arguments boil down to an effort to re-argue the Seventh Circuit's decision in that case. But Plaintiffs' contentions contradict well-established law in this Circuit.

First, Plaintiffs cite *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012), for the proposition that, so long as they are challenging a written contract, they need not show any further agreement by the alleged co-conspirators. Opp'n at 6. That is not true. In *Agnew* the Seventh Circuit held only that the issue of agreement had not been raised and was thus not in dispute.

Second, Plaintiffs cite *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158 (7th Cir. 1987) and *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023). *See* Opp'n at 7. But these cases involved claims brought by the counterparty to the allegedly anticompetitive agreement—Mr. Isaksen in *Isaksen* and Epic Games in *Epic Games*. *See Isaksen*, 825 F.2d at 1162-63; *Epic Games*, 67 F.4th at 982. These cases thus suggest that the *Bureaus* would have the right to bring antitrust claims against FICO—not that downstream purchasers can bring claims against the Bureaus.

Finally, Plaintiffs cite *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 62 F.3d 967, 974 (7th Cir. 1995), for the proposition that treatment of "the identical conduct" does not "vary under section 1 based upon the identity of the defendant." Opp'n at 7-8. But Plaintiffs' Section 1 claims were *dismissed* as to all defendants. Sept. 28 Order at 22, 30. And while Plaintiffs

6

assert that the allegations regarding the No Equivalent Products and Dynamic Royalty Schedule provisions have been found to state a plausible *Section 2* claim against FICO, *see* Opp'n at 1, 7-8, "a Section 2 violation is 'broader and less categorical in its definition of proscribed conduct' than a Section 1 claim." Sept. 28 Order at 11 (quoting Areeda & Hovenkamp, *Antitrust Law* ¶ 777a, at 324). To that end, conduct that is "predatory or anticompetitive in a section 2 context" can nonetheless be lawful and "competitive in a section 1 context." *W. Concrete Structures Co. v. Mitsui & Co. (U.S.A.), Inc.*, 760 F.2d 1013, 1018 (9th Cir. 1985).

For example, the "Dynamic Royalty Schedule" provision allegedly gives FICO the ability to unilaterally set the royalty prices it charges each Bureau for FICO Scores. *See* DPACC, Dkt. 184, at ¶ 126 (alleging that the provision "gives Fair Isaac the ability to control the prices of FICO Scores"), IPACC, Dkt. 185, at ¶ 140 (same). But nothing in the Amended Complaints or the Analytic and Data License Agreement between FICO and TU ("FICO-TU ADLA") supports Plaintiffs' assertion that any Bureau conspired or agreed to specific royalty pricing with the intent to discourage the use of VantageScore. *Compare* Opp'n at 3, 19 *with* FICO-TU ADLA, § 9.2 (Dkt. 225-2). Rather, Plaintiffs merely allege that each Bureau unilaterally agreed to let FICO set the price. *See* Opp'n at 19. While FICO allegedly then exercised that right in a way that furthered its monopoly position—for example, allegedly setting royalty prices with the aim of punishing users of VantageScore—there is no plausible allegation that any *Bureau* entered the Dynamic Royalty Schedule with the intention of having FICO set prices to damage its own joint venture.

Similarly, Plaintiffs cannot plausibly claim that the No Equivalent Products provision was an agreement by each Bureau to reduce competition from VantageScore. As this Court has noted, and as the complaints make clear, "the Credit Bureaus took significant measures to invest and to support VantageScores as a 'competitively priced, highly predictive' alternative to FICO Scores."

7

Sept. 28 Order at 21 (citing DPCC, Dkt. 121, at ¶¶ 6-7, 71-84, 88-94; IPAC, Dkt. 122, at ¶¶ 10, 87, 103-09). Nothing in the Amended Complaints or the FICO-TU ADLA supports Plaintiffs' assertion that any Bureau conspired or agreed to stop selling VantageScore to businesses. *Compare* Opp'n at 3, 19, 20 & n.12, *with* FICO-TU ADLA, § 12.5. Indeed, the Amended Complaints concede that the Bureaus currently distribute VantageScore to businesses. DPACC at ¶ 72 ("VantageScores are a competitor to FICO Scores in the B2B Credit Score Market."); *see also, e.g.*, *id.* ¶¶ 72, 82-83, 147; IPACC at ¶¶ 88-89, 97-98. In short, Plaintiffs cannot sidestep the implications of *Marion II* that this Court recognized in its September 28 Order.

## II. The Complaints Do Not Plausibly Allege That the Level Playing Field Provision Was Anything More Than a Routine MFN

As with the other provisions, Plaintiffs allege no new facts—rather than conclusions or characterizations or labels—regarding the "Level Playing Field" MFN provision. *See* CB MTD at 12-13 (failure to allege new facts alone dictates dismissal of amended complaint). Plaintiffs' arguments thus re-hash the earlier motion to dismiss—and should be rejected in any event.

### a. Plaintiffs Cannot Transform an Ordinary MFN Provision into an Anticompetitive Information Exchange

As this Court explained in holding that the Level Playing Field provisions were not anticompetitive, MFN provisions "are standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers." Sept. 28 Order at 20 (quoting *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995)); *see also No Spill LLC v. Scepter Canada, Inc.*, 2022 WL 1078435, at *7 (D. Kan. Apr. 6, 2022) (same). Because this Court cited *Associated Milk Dealers* in its September 28 Order, Plaintiffs attempt to limit the case to the labor context—but nothing in that decision requires such a limitation. *Compare* Opp'n at 10, *with Associated Milk Dealers, Inc.*

8

*v. Milk Drivers Union, Local 753*, 422 F.2d 546, 554 (7th Cir. 1970). On the contrary, the principle the Court took from that case—that a plaintiff must allege something "predatory" about an MFN, not just point to its existence—is well-established. *See* Sept. 28 Order at 20 (collecting authority).

Plaintiffs try to meet this standard through a "bait-and-switch." Plaintiffs' "bait" is to assert, in their Opposition, that "each Credit Bureau agreed to share *their pricing for FICO Scores* with their only two competitors." Opp'n at 12 (emphasis added). Consistent with this characterization, the cases Plaintiffs cite involve horizontal conspiracies, with competitors exchanging information regarding *the prices they are charging for their own products*. *See* Opp'n at 13.[2] The "switch" is that Plaintiffs in fact allege nothing like that. Rather, what Plaintiffs allege is an ordinary MFN, which by its very nature ensures each Bureau that the price it is *paying FICO* for FICO Scores will not be higher than its rival Bureaus are *paying FICO*. Not the price each Bureau is *charging* its customers. *See, e.g.*, DPACC at ¶ 138 ("the Level Playing Field provision essentially confirms to each Credit Bureau the price the other competing Credit Bureaus are paying for FICO's algorithm."). Plaintiffs cite no cases for the proposition that this type of MFN provision operates like the type of price information exchange discussed in the Opposition.

_____

[2] Plaintiffs cite *Great Atlantic & Pacific Tea Co. v. FTC*, 440 U.S. 69, 80 (1979) ("Because of the *evils of collusive action,* the Court has held that the exchange of price information by competitors violates the Sherman Act.") (emphasis added); *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 323-24 (2d Cir. 2010) (MFN clauses, among other things, "place[d] the *parallel conduct* in a context that raises a suggestion of a preceding agreement" in a case involving alleged conspiratorial conduct by horizontal competitors) (cleaned up) (emphasis added); *In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 3d 772, 783 (N.D. Ill. 2017) (plaintiffs alleged horizontal conspiracy to fix prices by sharing price/production information); *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, 2020 WL 6134982, at *6 (N.D. Ill. Oct. 19, 2020) (same with respect to turkey wholesalers); and *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 766-67 (D. Minn. 2020) (same with respect to pork). Plaintiffs also cite *United States v. Container Corp. of America*, 393 U.S. 333, 336-37 (1969), in which competitors likewise shared prices they were *charging customers*. Opp'n at 11-12. Finally, Plaintiffs misrepresent the 2023 DOJ & FTC Merger Guidelines § 2.3.B, which noted that a merger may increase the risk of market coordination "when the ***terms offered to customers*** are readily discernible and relatively observable" by rivals. *Id.* (emphasis added). The Opposition quotes this passage, but replaces the "terms offered to customers" (e.g., price) with "competitively sensitive information such as costs." But the DOJ & FTC did *not* raise the same concern with respect to costs—much less the limited cost information available through an MFN provision.

9

### b. Plaintiffs' Allegation That the Level Playing Field Provision Raised the Bureaus' Costs Further Undermines the Amended Complaints

Plaintiffs' Opposition cannot sidestep the fallacy in its Level Playing Field argument—that each Bureau agreed to allow FICO to impose overcharges *on the Bureau itself*. CB MTD at 19. It is no answer that the Bureaus might pass these overcharges on to purchasers. Opp'n at 16. Common sense dictates that if customers would accept increased prices from the distributor, the distributor would rather secure greater margins than pay a supplier a higher price. *See, e.g.*, *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 209 (1990); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 493 (1968). And Plaintiffs' "input inflation" argument is undercut further by their claim that the entire arrangement is somehow designed to undermine VantageScore. As this Court previously noted, it is implausible to believe any of the Bureaus would "sabotage [its] own joint venture" to secure the Level Playing Field provision. *See* Sept. 28 Order at 21. There would be even less reason for any Bureau to sacrifice VantageScore to secure a provision that Plaintiffs now claim would tend to result in that Bureau being overcharged.

Lacking any response, Plaintiffs instead assert for the first time that they "do not allege a distribution chain" but rather that "the Direct Purchaser Plaintiffs *purchase the scores themselves from Fair Isaac*." Opp'n at 17 n.11 (emphasis added). This not only differs wildly from Plaintiffs' Amended Complaints, but also further undermines any claim against the Bureaus. First, the Amended Complaints, like the original ones, assert that customers can make "payments [for FICO scores] . . . directly to either the Credit Bureau or FICO." Sept. 28 Order at 24 (discussing Plaintiffs' allegations, re-asserted in the Amended Complaints). Second, Plaintiffs' attempt at revision is self-defeating, as Plaintiffs would lack standing in respect of their Level Playing Field claims if we accept that they never purchased FICO scores from the Bureaus—if Plaintiffs exclusively purchase from FICO, then what the Bureaus pay FICO for their own sales is irrelevant.

10

c. **Plaintiffs' Opposition Offers No Meaningful Response to the Other Arguments for Dismissal with Respect to The Level Playing Field Provision**

Plaintiffs have no meaningful response to the other arguments for dismissal outlined in the Bureaus' Motion to Dismiss with respect to the Level Playing Field provision, either.

First, Plaintiffs cannot resolve the conflict between (a) their concession that the Bureaus are not conspiring with one another and (b) their attempt to claim that the MFN provisions are a form of collusive inter-Bureau information sharing (*see supra* § II(A)). *See* CB MTD at 16-17. Instead, Plaintiffs argue that in *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001), the Second Circuit noted that information exchanges could violate Sherman Act § 1 without an agreement to fix prices. Opp'n at 14. But *Todd v. Exxon* involved a hub-and-spokes agreement of the type that this Court has already dismissed and that *Plaintiffs now disclaim. See* 275 F.3d at 195-96.

Second, while Plaintiffs seize on the notion that the Level Playing Field provision was "importan[t]" to each Bureau (Opp'n at 15 n.9), its importance to a Bureau hardly makes it anticompetitive—as this Court recognized in its September 28 Order, it is important to any business not to be undercut by its competitors, which explains the ubiquity of MFNs across the economy. *See* CB MTD at 17-19. As this Court also pointed out, "Plaintiffs are unable to adequately allege that the Level Playing Field was so lucrative for each Credit Bureau that they served to advance FICO's monopoly power." Sept. 28 Order at 21. Simply labeling the provision "important" does nothing to overcome the implausibility of Plaintiffs' allegations.

Finally, Plaintiffs cannot survive dismissal by speculating that a Bureau might not earn revenue from selling VantageScore Scores. Opp'n at 15-16. The TransUnion Counterclaims that Plaintiffs purport to have incorporated by reference into their Amended Complaints explain that TransUnion earns revenues from sales of VantageScore Scores. *See, e.g.*, TU Counterclaims ¶¶ 77, 102, *Fair Isaac Corp. v. Trans Union LLC*, 17-cv-08318 (N.D. Ill. Feb. 12, 2018), Dkt. 38.

11

But in any event, Plaintiffs' newest theory undermines their claims. If Plaintiffs are correct that FICO Scores are more profitable to distribute than VantageScore Scores, this would negate any suggestion that, if a Bureau might prefer to sell a FICO score in any instance, it did so with an anticompetitive objective. It is hardly anticompetitive to compete by offering better terms to distributors, or for distributors to accept those terms.[3] *See, e.g.*, *Marion II*, 29 F.4th at 351.

### III. The Amended Complaints Do Not Plausibly Allege That Individual Bureaus Had Market Power Such That Their Individual, Vertical Agreements with FICO Could Plausibly Harm Competition

This Court should dismiss the Amended Complaints as against the Bureaus for the independent reason that Plaintiffs do not even try to allege that any Bureau possesses market power. *See* CB MTD at 21-22. Where, as here, an antitrust plaintiff abandons a hub-and-spokes theory, and instead separately challenges a series of individual vertical agreements with the erstwhile spokes, the plaintiff must plausibly plead market power/substantial foreclosure in respect of the individual agreements. Courts do not hesitate to dismiss where plaintiffs fail in this regard, as they often do. *See, e.g.*, *In re EpiPen Direct Purchaser Litig.*, 2022 WL 1017770, at *8 (D. Minn. Apr. 5, 2022) (holding that vertical conspiracy claims against the would-be spokes failed because each had a "market share of 30% or less" which was "insufficient as a matter of law to establish 'substantial market power'") (citing *McWane, Inc. v FTC*, 783 F.3d 814, 837 (11th Cir. 2015) ("Traditionally a foreclosure percentage of at least 40% has been a threshold for liability.")).[4] Plaintiffs fail in this regard as well, because they cannot show market power.

---

[3] Because TransUnion brought an antitrust claim against FICO in 2018, Plaintiffs would lack antitrust standing to seek damages from TransUnion even if the Amended Complaints plausibly alleged a conspiracy. *See* CB MTD at 23 (citing prior briefing); *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631-32 (7th Cir. 2002); *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 841 (7th Cir. 2020). Plaintiffs have no answer to the authority TransUnion cited, and no support for their contention that TransUnion's decision to settle, rather than litigate to judgment, is relevant. Opp'n at 22.

[4] *See also Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 3d 758, 771 (N.D. Ill. 2015) (granting summary judgment because plaintiff did "not submit any evidence" that "any of the [individual] Designers

AMERICAS 126121213

Plaintiffs assert that they can skip the step of pleading that any Bureau has a significant share in the claimed relevant market by relying on a "direct effects" analysis. Opp'n at 19-20. But in cases involving alleged vertical restraints, like this one, the Supreme Court has held that a direct effects analysis requires first plausibly alleging market power in a relevant market. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284-85 & n.7 (2018).[5] Indeed, Plaintiffs ironically cite *American Express*, 138 S. Ct. at 2284, for the idea that anticompetitive effects can sometimes be shown through a direct effects test—but on that very same page, the Supreme Court explained why a party *in Plaintiffs' position* must also show market power in a relevant market. *Compare* Opp'n at 19, *with AmEx*, 138 S. Ct. at 2284-85 & n.7. As discussed below, Plaintiffs have failed to do so.

Plaintiffs have not plausibly alleged that any Bureau, standing alone, has sufficient market power to foreclose competition in the claimed B2B Credit Score Market. Indeed, Plaintiffs have not alleged that any Bureau holds ***any*** market power ***at all*** in that market. Instead, the Opposition argues that the Bureaus each have market power in an entirely different market: a market for credit ***reports***.[6] *See* Opp'n at 20-22 (making arguments about credit report market, but never explaining

---

themselves had market power"); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 208 (4th Cir. 2002) (holding that although Microsoft was an alleged monopolist, the plaintiff was "unable, as a matter of law, to demonstrate that Microsoft's agreements with Compaq and Dell, when considered individually, are capable of causing any substantial harm to competition" because neither had substantial market power); *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1363 (N.D. Cal. 2013) (similar, because "[i]f an individual supplier could be held liable for the cumulative impact of all suppliers' conduct, a company would have to investigate what other businesses were doing before it acted in order to make sure its own conduct wasn't anticompetitive, a burden the antitrust law does not impose.").

[5]    *See also Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737-38 (7th Cir. 2004) (explaining that only "if a plaintiff can show the rough contours of a relevant market, and show that the defendant commands a substantial share of the market, then direct evidence of anticompetitive effects can establish the defendant's market power"); *Hannah's Boutique*, 112 F. Supp. 3d at 772 (similar).

[6]    In support of this sleight of hand, Plaintiffs suggest that FICO Scores are exclusively distributed through the Credit Bureaus. *See* Opp'n at 20 (suggesting that the Credit Bureaus "control" the "credit report market for distribution of FICO or VantageScores") (cleaned up). But any such claim contradicts Plaintiffs' statement three pages earlier that "Plaintiffs do not allege a distribution chain" for credit scores and instead buy such scores from FICO directly. *See* Opp'n at 17 n.11. And in any event the Court has already

13

any connection to the B2B Credit Score Market). *But see, e.g.*, *EpiPen*, 2022 WL 1017770, at *8 (rejecting a similar attempt to substitute in one market for another).

Finally, even if Plaintiffs could substitute a credit report market for the B2B Credit Score Market they actually claim in this case, they have not alleged that any individual Bureau has sufficient market power in such a market to foreclose competition. Plaintiffs misrepresent *Toys "R" Us, Inc. v. FTC,* 221 F.3d 928, 937 (7th Cir. 2000), as holding that 30% is a large enough market share to show market power. Opp'n at 20 (citing *Toys "R" Us* as saying that "[i]n a Section 1 case like this one, 'something more than 30%' is more than enough"). But what *Toys "R" Us actually said* was that in *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984), a 30% market share was ***insufficient*** to show market power. 466 U.S. at 27. *Toys "R" Us* thus noted that *Jefferson Parish* had held that "***something more than 30% would be needed*** to show the kind of power" required under Sherman Act § 1. *Toys "R" Us*, 221 F.3d at 937 (emphasis added). In other cases, that "something more" has been in excess of at least 40%, if not more.[7] *See McWane*, 783 F.3d at 837 (requiring a foreclosure of more than 40% to be actionable). Plaintiffs do not allege that any Bureau has sufficient market power to meet this standard, and thus cannot plausibly allege that any Bureau's individual agreement with FICO harmed competition. The Court should dismiss all of Plaintiffs' claims on this independent basis.

## IV.     The Amended Complaints' State Law Claims Must Be Dismissed

Plaintiffs' last-ditch attempt to save their complaints under state laws also fails. Plaintiffs claim that "a price restraint like the Level Playing Field provision" is *per se* illegal under California

---

recognized that credit scores can be distributed through either the Bureaus or through FICO directly. *See* Sept. 28 Order at 24 (holding that Plaintiffs only have standing because they purchase from FICO).

[7]     While Plaintiffs (Opp'n at 15 n.9) contend that this Court may consider the "competitive dynamics" of foreign markets, they do not explain why comparing the Canadian market for credit scores to the U.S. market would be justified or instructive.

AMERICAS 126121213

and Maryland law. Opp'n at 23. But the cases Plaintiffs cite for that proposition did not involve an MFN provision, but rather price-fixing—which, as discussed above, is very much unlike the conduct alleged here. *See Mailand v. Burckle*, 572 P.2d 1142, 1147-48 (Cal. 1978); *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 993 (W.D. Wash. 2022) (addressing claims related to "vertical price fixing"). Plaintiffs cite nothing to suggest that California or Maryland law would apply differently than federal law with respect to the *actual* allegations here.

## V. Dismissal Should Be with Prejudice, and Plaintiffs Should Not Be Given Leave to Try to Once Again Manufacture Renewed Claims

Finally, Plaintiffs assert that they should be allowed to renew their claims against the Bureaus after discovery. But only one of the cases Plaintiffs cite would have allowed a plaintiff to amend to re-add a dismissed party—and that was an employment case, decided prior to *Twombly. See Chisholm v. Foothill Cap. Corp.*, 940 F. Supp. 1273 (N.D. Ill. 1996). Plaintiffs are not entitled to yet a third bite at the apple.[8] *See, e.g.*, *See, e.g.*, *Thompson v. Ill. Dep't of Pro. Regul.*, 300 F.3d 750, 759 (7th Cir. 2002) (affirming decision to deny leave to amend "curtailing this cat and mouse game of motions to dismiss followed by a motion to amend"); *Weiss v. Altholtz*, 2011 WL 4538459, at *8 (N.D. Ill. Sept. 29, 2011) (Chang, J.) (dismissing complaint "with prejudice" where "Plaintiff has already amended the complaint twice, once in reaction to Defendants' motion to dismiss the initial complaint"); *cf. Canter v. AT&T Umbrella Benefit Plan No. 3*, 2019 WL 13202181, at *1, *3 (N.D. Ill. Nov. 13, 2019) ("[D]iscovery [may] not be used as a fishing expedition to determine whether plaintiff [can] pursue additional claims.").

## CONCLUSION

Plaintiffs' Amended Complaints should be dismissed with prejudice.

---

[8] Plaintiffs suggest the existence of additional "anticompetitive provisions" in the FICO-TU ADLA, Opp'n at 25, but misrepresent the FICO-TU ADLA. None of the provisions Plaintiffs cite control the price that TransUnion charges its customers for VantageScore Scores.

15

Dated:  February 12, 2024

Respectfully submitted,

*/s/ Leslie Pope*
Leslie Pope (*pro hac vice*)
John Thorne, #6181458
KELLOGG, HANSEN, TODD, FIGEL
& FREDERICK, P.L.L.C.
1615 M Street NW
Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
jthorne@kellogghansen.com
lpope@kellogghansen.com

J. David Duffy, #6242374
THOMPSON COBURN LLP
55 East Monroe Street, 37th Floor
Chicago, Illinois 60603
Tel: (312) 346-7500
dduffy@thompsoncoburn.com

*Counsel for Defendant TransUnion, LLC*

s/ *James F. Herbison*
James F. Herbison, #6275116
Michael P. Mayer, #6272677
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Tel: (312) 558-5600
jherbiso@winston.com
mmayer@winston.com

*Counsel for Defendant Equifax Inc.*

*/s/ Carolyn P. Gurland*
Carolyn Pelling Gurland, #6274399
WHITE & CASE LLP
111 South Wacker Drive
Suite 5100
Chicago, IL 60606
Tel: (312) 881-5400
carolyn.gurland@whitecase.com

Robert A. Milne (*pro hac vice*)
Martin M. Toto (*pro hac vice*)
Jack E. Pace III (*pro hac vice*)
Bryan D. Gant (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020-1095
Tel: (212) 819 8200
rmilne@whitecase.com
mtoto@whitecase.com
jpace@whitecase.com
bgant@whitecase.com

*Counsel for Defendant Experian Information Solutions, Inc.*

16

AMERICAS 126121213