# EXHIBIT 1

# EXHIBIT 1

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### Northern District of Illinois

| | | |
|---|---|---|
| In re FICO Antitrust Litigation | ) | |
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 1:20-cv-02114 |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant* | ) | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: VantageScore Solutions, LLC, c/o Corporation Service Company - 251 Little Falls Drive, Wilmington, DE 19808

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

| Place: VantageScore Solutions, LLC<br>601 Gateway Blvd., Suite 1210<br>South San Francisco, CA 94080 | Date and Time:<br><br>01/11/2024 11:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 12/21/2023

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | /s/ Matthew D. Provance |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Fair Isaac Corporation _____, who issues or requests this subpoena, are:
Matthew D. Provance, Mayer Brown LLP, 71 S. Wacker Dr., Chicago, IL 60606; Telephone: (312) 701-8598; Email: mprovance@mayerbrown.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:20-cv-02114

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected..

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

 **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| *In re FICO Antitrust Litigation* | Case No. 20-cv-02114 |
| | Honorable Edmond E. Chang |
| *This document relates to:*<br>ALL ACTIONS | Magistrate Judge M. David Weisman |

## NOTICE OF SUBPOENA TO VANTAGESCORE SOLUTIONS, LLC

Through the serving of this document, Defendant Fair Isaac Corporation ("FICO") hereby gives notice of its intent to serve on VantageScore Solutions, LLC a Subpoena to Produce Documents, Information, or Objects in a Civil Action, pursuant to Rule 45 of the Federal Rules of Civil Procedure. A copy of the subpoena is attached to this Notice.

Dated: December 21, 2023

Respectfully submitted,

*/s/ Matthew D. Provance*
Britt M. Miller
Matthew D. Provance
J. Gregory Deis
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com
gdeis@mayerbrown.com

Counsel for Defendant
Fair Isaac Corporation

## SCHEDULE A

Pursuant to the foregoing subpoena duces tecum, You are required to produce, by the date stated on the subpoena and in accordance with the following Definitions and Instructions, the documents and things requested in the following Requests.

## DEFINITIONS

For the purposes of these Requests, the following terms have the following meanings:

1.　　The term "Action" means the above-captioned consolidated action In re FICO Antitrust Litigation, Case No. 1:20-CV-02114, pending in the Northern District of Illinois.

2.　　"DPP Amended Complaint" means the First Amended Complaint filed by the Direct Purchaser Plaintiffs in the above-captioned matter on October 30, 2023 (Dkt. 184). For Your reference, a copy of the DPP Amended Complaint is attached hereto as **Exhibit 1**.

3.　　"IPP Amended Complaint" means the Second Amended Complaint filed by the Indirect Purchaser Plaintiffs in the above-captioned matter on October 30, 2023 (Dkt. 185). For Your reference, a copy of the IPP Amended Complaint is attached hereto as **Exhibit 2**.

4.　　"Communications" means the transmittal of information of any kind by any means, and includes, without limitation, any transfer or exchange between two or more persons or entities of any information, whether by document or oral means, including, but not limited to, in-person conversation, correspondence, telephone calls, electronic mail, text messages, and video conference.

5.　　"Documents" is used in its broadest sense allowed by Rule 34 of the Federal Rules of Civil Procedure, and includes any kind of written, typewritten, printed, or recorded material, all communications, and all other writings, including, without limitation, any drawings, graphs, charts, photographs, phonograph records, tape recordings, notes, diaries, calendars, checkbooks,

1

books, papers, accounts, electronic or videotape recordings, internal or external websites, compact discs, computer files and disks, and electronically stored information.

6. "Defendant" or "FICO" means Fair Isaac Corporation and its Affiliates, as well as the officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors and predecessors of any of the foregoing, and all persons or entities acting on behalf of any of the foregoing.

7. "Equifax" means Equifax Inc., Equifax Information Services, LLC, and their Affiliates, as well as the officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors and predecessors of any of the foregoing, and all persons or entities acting on behalf of any of the foregoing.

8. "Experian" means Experian Information Solutions, Inc., Experian PLC, and their Affiliates, as well as the officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors and predecessors of any of the foregoing, and all persons or entities acting on behalf of any of the foregoing.

9. "TransUnion" means TransUnion, LLC and its Affiliates, as well as the officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors and predecessors of any of the foregoing, and all persons or entities acting on behalf of any of the foregoing.

10. "Credit Bureaus" means Equifax, Experian, and TransUnion.

11. "Credit Reporting Agency" means the Credit Bureaus, as well as any other entity (other than a Reseller) that is a "consumer reporting agency" as that term is defined under Fair Credit Reporting Act, 15 U.S.C. § 1681(f).

12.     "VantageScore," "You," and "Your" means VantageScore Solutions LLC and its Affiliates, as well as the officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors and predecessors of any of the foregoing, and all persons or entities acting on behalf of any of the foregoing.

13.     "Reseller" means any entity that distributes Credit Scores or Credit Reports from a Credit Bureau and includes, without limitation, any "reseller" as that term is used in the Fair Credit Reporting Act, 15 U.S.C. § 1681(u).

14.     "End User" means any business or consumer that uses Credit Scores.

15.     "Credit Score" means any numerical representation of credit risk generated by applying a scoring model to aggregated credit information, and has the same breadth of meaning as that term is used in the DPP Amended Complaint and IPP Amended Complaint.

16.     "Credit Report" means any product, report, document, or data sold, distributed, delivered, or generated pursuant to a transaction between a Credit Reporting Agency or Reseller and an End User. "Credit Report" includes, without limitation, any "consumer report" as that term is used in the Fair Credit Reporting Act, 15 U.S.C. § 1681a(d).

17.     "FICO Score" means any Credit Score generated using a credit scoring model developed by or on behalf of FICO.

18.     "VantageScore Credit Score" means any Credit Score generated using a credit scoring model developed by VantageScore.

19.     "VantageScore Market Study Report" means, without limitation, the 2017 VantageScore Market Study Report,[1] 2018 VantageScore Market Study Report,[2] 2019

---

[1] https://www.vantagescore.com/wp-content/uploads/2022/02/2017-VantageScore-Market-Study_Public_FINAL.pdf.
[2] https://www.vantagescore.com/wp-content/uploads/2022/02/2018-VS-Market-Adoption-Study-FINAL.pdf.

VantageScore Market Study Report,[3] 2022 VantageScore Market Study Report,[4] the 2023 Market Adoption Study,[5] and any similar studies or reports on the use or adoption of VantageScore during the Relevant Time Period conducted by Oliver Wyman, Charles River, or another consultant.

20.    "Regarding" is to be construed broadly and includes anything in connection with, constituting, concerning, reflecting, referring to, discussing, describing, identifying, stating, quoting, incorporating, attaching, analyzing, or otherwise relating in any way to the topic identified in the discovery request.

21.    "Person" and "entity" mean individuals and entities, including, but not limited to, all natural persons, businesses, firms, partnerships, associates, organizations, governmental units, joint ventures, corporations, and any other entities.

22.    "Affiliate" means, with respect to any entity, any person or entity that, directly or indirectly, controls, is controlled by, or is under common control with, such entity.

23.    The use of singular shall be deemed to include the plural, and the use of one gender shall include all others as are appropriate in the context.

24.    The use of the verb in any tense shall be construed as the use of the verb in all other tenses.

25.    "Or" is defined to include "and," and "and" is defined to include "or."

## INSTRUCTIONS

The following instructions apply to each Request contained herein:

1.    In providing the documents or things called for by these Requests, You shall produce them as they are kept in the usual course of business, including all file folders, envelopes,

---

[3] https://www.vantagescore.com/wp-content/uploads/2022/01/2019-VantageScore-Market-Adoption-Study-FINAL-1.pdf.
[4] https://www.vantagescore.com/wp-content/uploads/2022/08/2022-VS-Market-Adoption-Study-Public-Report.pdf.
[5] https://www.vantagescore.com/vantagescore-credit-score-usage-up-30-in-2022/.

labels, indices, or other identifying or organizing material in which such documents are stored or filed, under which they are organized, or which accompany such documents or organize and label them to correspond with the specific request(s) to which they relate.

2.      You are instructed to produce all Documents and Communications identified by these Requests that are in Your actual or constructive possession, custody, or control, including Documents and Communications held by Oliver Wyman, Charles River Associates, or Berens & Miller at the direction of You or Your Affiliates.

3.      Each Request shall be construed independently, and no Request shall be viewed as limiting the scope of any other Request, except that Documents responsive to more than one Request need be produced only once.

4.      All responsive Documents are to be produced in accordance with the Stipulation and Order Establishing the Protocol for Production of Documents and Electronically Stored Information ("ESI Order") entered in this Action (Dkt. 207) and attached hereto as **Exhibit 3**.

5.      All responsive Documents are to be produced in accordance with the Confidentiality Order entered in this Action (Dkt. 199) and attached hereto as **Exhibit 4**. Please indicate whether any documents produced in response to this subpoena should be designated as Confidential or Highly Confidential pursuant to the Confidentiality Order. In addition, please be advised of the Court's admonition that parties and non-party subpoena recipients should make "careful and reasonable designations rather than over-designations" pursuant to the Confidentiality Order. *See* 11/16/2023 Minute Entry (Dkt. 198).

6.      Each and every draft and non-identical copy of a Document, whether different from the original because of stamps, indications of the recipient(s), handwritten notes, marks, attachments, or any other reason, is a separate Document that must be produced.

7. If You find the meaning of any term set forth in a Request or Definition to be unclear, You should assume a reasonable meaning, state what that assumed meaning is, and answer the Request on the basis of that assumed meaning.

8. If you cannot respond to any of the following Requests in full, respond as completely as possible, specifying the nature (if known) and reasons why you are unable to respond in full, and provide whatever information You have concerning the unprovided things, documents, or portions of documents, including the source or sources from which the things, documents, or portions of documents can be obtained and that portion of the documentation that can be produced.

9. If You become aware of any Documents or Communications requested in these Requests that have been destroyed, lost, or misplaced, or otherwise cannot be produced, You are instructed to respond by providing the following information:

a. The type of Document (e.g., e-mail, notes, letters, memoranda);

b. A description of the Document and its contents;

c. The identity of the author(s) of the Document;

d. The circumstances under which the Document was destroyed, lost, misplaced, or otherwise rendered incapable of production; and

e. The identity of all persons having knowledge of the Document or the circumstances under which the Document was destroyed, lost, misplaced, or otherwise rendered incapable of production.

10. Unless otherwise indicated, all Requests relate to the time period January 1, 2013 to the present (the "Relevant Time Period").

11.     These Requests shall be deemed continuing in accordance with Federal Rule of Civil Procedure Rule 26(e). If you obtain or become aware of any further Documents responsive to these Requests, you are required to promptly produce those Documents.

12.     To the extent you object to responding to any Requests in full or in part, FICO is willing to meet and confer in order to determine whether a compromise as to the Request might be reached to eliminate the need for motions practice concerning the Request.

## REQUESTS FOR PRODUCTION

1.     All LLC agreements or operating agreements of VantageScore Solutions, LLC that have been in effect during the Relevant Time Period.

2.     The license agreements under which You have licensed credit scoring analytics, software, or intellectual property to Credit Bureaus during the Relevant Time Period.

3.     Documents sufficient to show the number and type of VantageScore Credit Scores generated or distributed by Credit Reporting Agencies, including the Credit Bureaus, or Resellers, broken out by category of End User, distribution channel (*e.g.*, business-to-business, direct-to-consumer, or other), and, if known, by type of use case (*e.g.*, prescreen activities, pre-qualification activities, credit origination, account review, consumer disclosures, marketing, or other) during each year of the Relevant Time Period.

4.     Documents sufficient to show the number and identity of End Users and Resellers that use or distribute VantageScore, broken out by category referenced in the VantageScore Market Study Reports (*i.e.* credit card issuers, personal and installment loan companies, auto lenders, mortgage lenders, credit unions, banks, tenant screening, telecommunications screening, utility screening, consumer websites, government entities, other), and the type of use case (*e.g.*, prescreen

activities, pre-qualification activities, credit origination, account review, consumer disclosures, marketing, or other) during each year of the Relevant Time Period.

5.     All Documents that analyze, reflect, calculate, or estimate the number or share, on a percentage basis or otherwise, of VantageScore Credit Scores used by End Users of any kind (including businesses and consumers) in the United States.

6.     All Documents and Communications related to any market studies of VantageScore Credit Scores or FICO Scores, including but not limited to studies relating to brand awareness, consumer understanding or sentiment, or use and adoption by End Users. For the avoidance of doubt, this Request includes but is not limited to all Documents and Communications related to the VantageScore Market Study Reports (including, specifically, the 2017, 2018, 2019, and 2022 VantageScore Market Study Reports and the 2023 Market Adoption Study).

7.     All data and information You received from TransUnion, Equifax and Experian, or otherwise provided to Oliver Wyman or Charles River, which provides the basis of the statistics referenced in the VantageScore Market Study Reports (including, specifically, the 2017, 2018, 2019, and 2022 VantageScore Market Study Reports and the 2023 Market Adoption Study).

8.     All long-form summaries that were prepared in connection with the VantageScore Market Study Reports (including, specifically, the 2017, 2018, 2019, and 2022 VantageScore Market Study Reports and the 2023 Market Adoption Study).

9.     All Documents and Communications related to competitive assessments or comparisons between FICO Scores and VantageScore Credit Scores, including but not limited to assessments or comparisons of model design, reason codes, predictive capability, accuracy, reliability, consistency, value, marketing, brand equity or awareness, or price.

10. All Documents and Communications related to any study, evaluation, assessment, or attempt (whether consummated or not) to align the odds-to-score relationship between any VantageScore Credit Score and FICO Score, including but not limited to any study, evaluation or assessment of the need to align the odds-to-score relationship of VantageScore Credit Scores to the odds-to-score relationship of FICO Scores.

11. All Documents and Communications related to any study, evaluation, assessment, or attempt (whether consummated or not) to align the reason codes between any VantageScore Credit Score and FICO Score, including but not limited to any study, evaluation or assessment of the need to replicate or copy FICO Score reason codes.

12. All Documents and Communications related to the terms, conditions, or provisions in FICO's license agreements with the Credit Bureaus, including but not limited to the "No Equivalent Products," "Dynamic Royalty Schedule," "Pre-Qualification," and "Level Playing Field" provisions referenced in the DPP and IPP Amended Complaints. *See* DPP Amended Complaint ¶¶ 111-139; IPP Amended Complaint ¶¶ 124-155.

13. All Documents and Communications—including but not limited to all Documents and Communications that were sent, authored, or received by Barrett Burns, Silvio Tavarez, Dr. Rikard Bandebo, Susan Fahy, Anthony Hutchinson, Dr. Andrada Pacheco, Jeff Richardson, Benjamin Tagoe, Emre Sahingur, or anyone who has held predecessor or successor roles to the foregoing individuals—related to the following statements, press releases, and publications attributed to You during the Relevant Time Period:

a. VantageScore Solutions, Myth: VantageScore Is Not Accepted by Investors Securitization Markets (Mar. 23, 2016). *See* DPP Amended Complaint ¶ 83; IPP Amended Complaint ¶ 98.[6]

b. Press Release, VantageScore, VantageScore Solutions Issues Statement Reacting to FHFA's Proposed Rules for Validating and Approving New Credit Scoring Models (Dec. 17, 2018). *See* DPP Amended Complaint ¶ 52; IPP Amended Complaint ¶ 64.[7]

c. VantageScore® Credit Scores and The Mortgage Market (2018). *See* DPP Amended Complaint ¶ 82; IPP Amended Complaint ¶ 97.[8]

d. Press Release, VantageScore, The FICO score is losing ground to a different credit score (November 25, 2015).[9]

e. Press Release, VantageScore, VantageScore Threatens FICO Credit Score Dominance (December 1, 2015).[10]

f. Press Release, VantageScore, Annual Usage of VantageScore Credit Scores Surges Past 8 Billion (October 21, 2016).[11]

---

[6] https://vantagescore.com/education/blog/myth-vantagescore-is-not-accepted-by-investors-in-securitization-markets.

[7] https://vantagescore.com/press/vantagescore-solutions-issues-statement-reacting-to-fhfas-proposed-rules-for-validating-and-approving-new-credit-scoring-models.

[8] https://www.vantagescore.com/wp-content/uploads/2022/02/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf.

[9] https://www.vantagescore.com/press_releases/the-fico-score-is-losing-ground-to-a-different-credit-score/.

[10] https://www.vantagescore.com/press_releases/vantagescore-threatens-fico-credit-score-dominance/.

[11] https://www.vantagescore.com/press_releases/annual-usage-of-vantagescore-credit-scores-surges-past-8-billion/.

g.  Press release, VantageScore, Usage of VantageScore Credit Scores Surges More than 20 percent versus the Previous Year and Over 300 percent over the Past Five Years (October 15, 2018).[12]

h.  Press Release, VantageScore, VantageScore Solutions Announces Score Use Grows to More than 12 Billion (Oct. 29, 2019).[13]

i.  Press Release, VantageScore, Momentum of third-party credit scores to challenge FICO (October 31, 2019).[14]

j.  VantageScore Newsletter, Market Adoption: 12.3 Billion & Counting (June 22, 2020).[15]

k.  VantageScore Newsletter, Model usage surges 20+ percent (June 22, 2020).[16]

l.  Press Release, VantageScore, FICO Score's Hold on the Credit Market Is Slipping (July 26, 2021).[17]

m.  Press Release, VantageScore, 14.5 Billion VantageScore® Credit Scores Used by Over 3,000 Companies (August 2, 2022).[18]

---

[12] https://www.vantagescore.com/press_releases/usage-of-vantagescore-credit-scores-surges-more-than-20-percent-versus-the-previous-year-and-over-300-percent-over-the-past-five-years/.

[13] https://www.vantagescore.com/press_releases/vantagescore-solutions-announces-score-use-grows-to-more-than-12-billion/.

[14] https://www.vantagescore.com/press_releases/momentum-of-third-party-credit-scores-to-challenge-fico/.

[15] https://www.vantagescore.com/newsletter/market-adoption-12-3-billion-counting/.

[16] https://www.vantagescore.com/newsletter/model-usage-surges-20-percent/.

[17] https://www.vantagescore.com/press_releases/fico-scores-hold-on-the-credit-market-is-slipping/.

[18] https://www.vantagescore.com/press_releases/14-5-billion-vantagescore-credit-scores-used-by-over-3000-companies/.

n. VantageScore, 14.5 Billion Scores Used in 12-Months … VantageScore's Usage Grows by 18% According to New Study (August 2, 2022).[19]

o. Press Release, VantageScore, VantageScore® Credit Score Usage Up 30% in 2022, VantageScore Press Release (June 1, 2023).[20]

p. VantageScore, More Lenders Than Ever Are Accessing The Capital Markets with VantageScore (June 22, 2023).[21]

q. VantageScore, Automotive News: VantageScore Used for More Auto Finance Credit Checks In 2022 (August 9, 2023).[22]

r. VantageScore, Record Adoption of VantageScore in the ABS Market for 2023 (September 13, 2023).[23]

14. All audited financial statements, including consolidated financial statements, prepared for You, that pertain to the Relevant Time Period.

15. Your annual budgets for each year of the Relevant Time Period.

16. All Documents sufficient to show Your operating costs, capital expenses, R&D expenses, and investments in or by You during each year of the Relevant Time Period.

17. All Documents, including letters, comments, white papers, presentations, or written Communications that You have provided any state or federal agency or trade association that relate to the use, adoption, acceptance, or competitive standing of VantageScore Credit Scores.

---

[19] https://www.vantagescore.com/2022-market-adoption-study/.

[20] https://www.vantagescore.com/press_releases/vantagescore-credit-score-usage-up-30-in-2022/.

[21] https://www.vantagescore.com/more-lenders-than-ever-are-accessing-the-capital-markets-with-vantagescore/.

[22] https://www.vantagescore.com/automotive-news-vantagescore-used-for-more-auto-finance-credit-checks-in-2022/.

[23] https://www.vantagescore.com/abs-market-adoption-vantagescore-2023/.

18.    All Documents provided in response to any governmental request or demand related to competition or business practices regarding Credit Scores or Credit Reports.

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE FICO ANTITRUST LITIGATION | ) ) ) | Judge Edmond E. Chang |
| This Document Relates to the Following Cases: | ) ) ) | Magistrate Judge David E. Weisman |
| | ) | No. 1:20-CV-02114 |
| DIRECT PURCHASER CASES | ) ) ) | JURY TRIAL DEMANDED |

**DIRECT PURCHASER PLAINTIFFS'**
**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

### TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................ 1

PARTIES ............................................................................................................. 6

    I.     PLAINTIFFS ................................................................................... 6

    II.    DEFENDANTS ............................................................................... 9

JURISDICTION, VENUE, AND INTERSTATE COMMERCE ................................... 9

FACTUAL ALLEGATIONS ................................................................................. 10

    I.     CREDIT SCORING AND REPORTING ........................................... 10

        A.    Credit Scores ................................................................... 10

        B.    Credit Reports ................................................................. 12

    II.    THE MARKETS FOR CREDIT SCORES IN THE UNITED STATES ............ 15

    III.   FAIR ISAAC'S MONOPOLY POWER IN THE B2B CREDIT SCORE
         MARKET................................................................................. 19

    IV.   VANTAGESCORE SOLUTIONS' ENTRY INTO THE B2B CREDIT SCORE
         MARKET AND ITS INNOVATIVE PRODUCT ................................. 23

    V.    FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT.. 27

        A.    Fair Isaac's Anticompetitive Litigation ....................................... 27

        B.    Litigation Between Fair Isaac and TransUnion ........................... 29

        C.    Fair Isaac and the Credit Bureaus' Agreements to Restrain Competition 31

            1.    Fair Isaac and the Credit Bureaus Agree to Anticompetitive
                Provisions in Licensing Agreements ........................... 31

            2.    The Anticompetitive Terms of the Contracts Fair Isaac and the
                Credit Bureaus Entered into ........................................ 34

                i.    The "No Equivalent Products" Provisions........................ 37

                ii.   The "Dynamic Royalty Schedule" Provisions ................. 38

                iii.  The "Level Playing Field" Provisions ............................. 41

        D.    Fair Isaac's Additional Efforts to Deter B2B Purchasers from Using
            VantageScore .............................................................. 46

    VI.   THE CONTRACTS BETWEEN FAIR ISAAC AND EACH OF THE CREDIT
         BUREAUS CONTAINING ANTICOMPETITIVE TERMS, ALONG WITH
         FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT,
         HARM COMPETITION IN THE B2B CREDIT SCORE MARKET ................. 50

CLASS ACTION ALLEGATIONS ......................................................................... 51

STATUTES OF LIMITATIONS AND TOLLING........................................................ 53

i

I.     THE STATUTES OF LIMITATIONS DID NOT BEGIN TO RUN BECAUSE PLAINTIFFS DID NOT DISCOVER, AND COULD NOT HAVE DISCOVERED, DEFENDANTS' UNLAWFUL SCHEME ............................... 53

II.    FRAUDULENT CONCEALMENT TOLLED THE STATUTES OF LIMITATIONS ........................................................................... 55

III.   DEFENDANTS' ACTIONS CONSTITUTE A CONTINUING VIOLATION .. 57

CLAIMS FOR RELIEF ........................................................................... 58

    CLAIM ONE: UNREASONABLE RESTRAINT OF TRADE
    (15 U.S.C. §§1, 3) ........................................................................... 58

    CLAIM TWO: UNREASONABLE RESTRAINT OF TRADE
    (15 U.S.C. §§1, 3) ........................................................................... 60

    CLAIM THREE: UNREASONABLE RESTRAINT OF TRADE
    (15 U.S.C. §§1, 3) ........................................................................... 62

    CLAIM FOUR: UNREASONABLE RESTRAINT OF TRADE
    (15 U.S.C. §§1, 3) ........................................................................... 64

    CLAIM FIVE: MONOPOLIZATION
    (15 U.S.C. §2) ........................................................................... 66

    CLAIM SIX: STATE ANTITRUST LAWS ........................................ 67

    CLAIM SEVEN: STATE UNFAIR AND DECEPTIVE TRADE PRACTICES LAWS ........................................................................... 78

PRAYER FOR RELIEF ........................................................................... 92

DEMAND FOR JURY TRIAL ................................................................ 93

CERTIFICATE OF SERVICE ................................................................. 97

ii

Plaintiffs Sky Federal Credit Union, Alcoa Community Federal Credit Union, Amalgamated Bank, City of Boston Credit Union, First Choice Federal Credit Union, Getten Credit Company, and Holmes County Bank & Trust Company ("Plaintiffs"), on behalf of themselves and all similarly situated entities in the United States and its territories, bring this action pursuant to Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§1, 2, 3) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26), as well as certain state antitrust and consumer protection laws, against Defendants Fair Isaac Corporation ("Fair Isaac"), Equifax, Inc. ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and TransUnion, LLC ("TransUnion") (collectively "Defendants," with the latter three referred to collectively as the "Credit Bureaus," the "Credit Rating Agencies," or the "Credit Bureau Defendants"), resulting from their restraining trade and Fair Isaac's monopolizing the B2B Credit Score Market from October 1, 2006 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased (the "Class Period"). The allegations of this Complaint are based on personal knowledge as to the allegations concerning each Plaintiff and on information and belief as to all other matters.

## NATURE OF THE ACTION

1.      A "credit score" is a three-digit numerical summary of a customer's creditworthiness based on factors such as payment history and the duration of that history; balances, available credit, and the percentage of existing credit lines being utilized; public records like bankruptcies or adverse judgments; and the assumption of new debt. There are two distinct markets for such scores. The first is the market for the sale of such scores to banks, mortgage companies, credit unions, and other businesses that assess individual credit risk – *i.e.*, business-to-business sales. That market is referred to herein as the "B2B Credit Score Market." The second

1

is the market for the sale of such scores to the individual who is the subject of them – *i.e.*, business-to-consumer. That market is referred to herein as the "B2C Credit Score Market."

2.    This case concerns the B2B Credit Score Market, which Defendant Fair Isaac has dominated for nearly three decades (and continues to dominate) with its FICO® Scores. FICO Scores are used routinely by lenders and others to assess individual credit risks. Fair Isaac executives have bragged that their FICO Scores are "the 800-pound gorilla" and are "deeply embedded in the system in North America."[1] Fair Isaac advertises that its FICO Scores are used for 90% of all lending decisions in the United States and that Fair Isaac sells four times more FICO Scores per year than McDonald's sells hamburgers worldwide. The dominance of FICO Scores is reflected in the following chart taken from a December 2019 "Investor Overview" presentation that is available on Fair Isaac's corporate website:[2]



---

[1]    Trans Union LLC's Redacted Counterclaims, Dkt. 38, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318, ¶2 (N.D. Ill. Feb. 12, 2018) ("TransUnion Counterclaims").

[2]    Fair Isaac, *FICO: The Decisions Company Investor Overview*, at 5 (Dec. 2019), https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.

3.     TransUnion, Experian, and Equifax are credit reporting agencies that collect, standardize, and distribute information on the credit and financial history of individuals.  Those Credit Bureaus sell lenders, financial institutions, and other businesses credit reports and credit scores – including Fair Isaac's FICO Scores – that are used to make decisions about whether and on what terms to evaluate and extend credit.  Credit Bureaus sell those credit reports and credit scores to businesses in every state.  The three Credit Bureau Defendants control virtually 100% of aggregate credit-related data formed by aggregating credit data collected from businesses, and they jointly dominate the market for B2B credit reports.

4.     For decades, the Credit Bureaus have worked with Fair Isaac, including by entering into licensing agreements with Fair Isaac, and distribution agreements with businesses and/or Fair Isaac to broker sales of FICO Scores.

5.     Fair Isaac also directly sells FICO Scores to creditors and other businesses – bypassing the Credit Bureaus, and competing with them, when it does so.

6.     In 2006, the Credit Bureaus banded together to launch VantageScore Solutions, LLC ("VantageScore Solutions") through a joint venture.  The Credit Bureaus own VantageScore Solutions.  The Credit Bureaus' purpose behind their joint venture was to create a competitor to the FICO Score, known as the "VantageScore."[3]

---

[3]     *See* Third Amended Complaint, Dkt. 436, *Fair Isaac Corporation v. Experian Info. Sols.*, No. 06-CV-4112, ¶63 (D. Minn. Nov. 10, 2008) ("VantageScore is owned by Equifax, Experian, and TransUnion."); Dkt. 477, Credit Bureaus' Answer to Third Amended Complaint, *Fair Isaac Corporation v. Experian Info. Sols.*, No. 06-CV-4112, ¶63 (D. Minn. Dec. 4, 2008) (admitting same); Business Wire, *VantageScore Solutions Hires Capital Markets Expert Latonia Hubbs as Senior Vice President* (Sept. 7, 2021),
https://www.businesswire.com/news/home/20210907005583/en/VantageScore-Solutions-Hires-Capital-Markets-Expert-Latonia-Hubbs-as-Senior-Vice-President.

7.     From the outset, VantageScore was competitively priced, highly predictive, and scored millions more Americans than Fair Isaac's FICO Score. VantageScore Solutions is capable of providing credit scores for 30 million more Americans than Fair Isaac can. Notably, Fair Isaac leaves many people of color and lower-income individuals unscored. Were VantageScores widely adopted by businesses, millions more creditworthy Americans would have the opportunity to apply for a home mortgage, car loan, or credit card, and to obtain credit at a lower cost.

8.     Rather than compete on the merits with VantageScore, Fair Isaac undertook a ***decades-long campaign of anticompetitive conduct*** to discourage the adoption of VantageScore and preserve its own monopoly. Fair Isaac also entered into contracts with each Credit Bureau that contained anticompetitive provisions, including provisions that would necessarily eliminate or drastically reduce the competitive threat posed by VantageScore, thus unreasonably restraining trade.

9.     First, in 2006, Fair Isaac filed a lawsuit against TransUnion, Equifax, and Experian with the intended purpose of driving VantageScore Solutions out of business. Experian settled in 2008 and entered into a lucrative partnership with Fair Isaac following the settlement. TransUnion and Equifax fought on, eliminated most of Fair Isaac's claims through a summary judgment motion and won a jury trial on the remaining trademark claim.

10.     Second, when the litigation gambit failed, Fair Isaac entered into contracts with the Credit Bureaus containing anticompetitive restrictions aimed at extracting supracompetitive profits from B2B Purchasers. Those contracts include contractual provisions that: (1) prohibit Credit Bureaus from marketing non-FICO credit scores (*i.e.*, VantageScore); (2) charge discriminatory and prohibitively high prices for FICO Scores if a Credit Bureau customer purchases a FICO Score while providing the consumer with a competing score (*i.e.*, a

4

VantageScore); and (3) eliminate price competition among the Credit Bureaus thereby disincentivizing the Credit Bureaus from negotiating a lower price for FICO Scores. The agreements had the effect of hobbling VantageScore Solutions' ability to compete and forcing B2B Purchasers to pay supracompetitive prices for credit scores.

11.     Finally, Fair Isaac commenced a public smear campaign intended to dissuade potential customers from using VantageScore.

12.     By unlawfully maintaining its monopoly through such anticompetitive tactics, Fair Isaac, with the agreement of the Credit Bureaus, has been able to exclude VantageScore from competing for customers in the B2B Credit Score Market. The effect of this exclusion has been Fair Isaac's ability to *maintain the prices for FICO Scores at a supracompetitive level for decades and raise prices with impunity for its credit scoring products*. For example, Fair Isaac's net income for the third quarter of 2021 was *more than double* that of the previous year period, increasing from $64.1 million in the third quarter of 2020 to $151.2 million in the third quarter of 2021.[4] Over time, Fair Isaac's net income has remained very high, with $236 million net income in 2020, $392 million in 2021, and $374 million in 2022.[5] Sources in the financial industry have attributed Fair Isaac's profitability to "[p]rice increases in its credit scoring segment and gains in

---

[4]     Press Release, Fair Isaac, *FICO Announces Earnings of $5.18 per Share for Third Quarter Fiscal 2021* (Aug. 3, 2021), https://investors.fico.com/news-releases/news-release-details/fico-announces-earnings-518-share-third-quarter-fiscal-2021.

[5]     Fair Isaac Corporation, Q4 2020 Earnings Call, BAMSEC (Nov. 10, 2020), https://www.bamsec.com/document-search?query=236&entityId=814547; Fair Isaac Corporation, Q4 2020 Earnings Call, BAMSEC (Nov. 10, 2020), https://www.bamsec.com/document-search?query=392&entityId=814547; Fair Isaac Corporation, Q4 2022 Earnings Call, BAMSEC (Nov. 9, 2022), https://www.bamsec.com/document-search?query=374&entityId=814547.

applications sold to banking institutions," which have "helped the company log year-over-year gains in revenue and profit."[6]

13.     Fair Isaac's and the Credit Bureaus' conduct harmed competition and injured Plaintiffs and members of the class by forcing them to pay supracompetitive prices for FICO Scores.

14.     Plaintiffs and the Class are the first purchasers from outside the Fair Isaac-Credit Bureaus conspiracies.

## PARTIES

### I.     PLAINTIFFS

15.     Plaintiff Sky Federal Credit Union ("Sky FCU") is a federally chartered credit union with a principal place of business at 111 North B Street, Livingston, Montana. Sky FCU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers. During the Class Period, Sky FCU directly purchased B2B credit scores from Fair Isaac and Experian. Sky FCU was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Sky FCU is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

16.     Plaintiff Alcoa Community Federal Credit Union ("Alcoa FCU") is a Federal Credit Union with its principal place of business at 1125 Military Road, Benton, Arkansas. Alcoa FCU makes loans and other credit-related facilities available to consumers. Alcoa FCU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards,

---

[6]     Motley Fool, *Fair Isaac Corporation Scores 13% Revenue Growth in the First Quarter* (Jan. 31, 2019), https://www.fool.com/investing/2019/01/31/fair-isaac-corporation-scores-13-revenue-growth-in.aspx.

and lending and other credit-related facilities for consumers. During the Class Period, Alcoa FCU directly purchased B2B credit scores from Fair Isaac, TransUnion, and Experian. Alcoa FCU was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Alcoa FCU is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

17.     Plaintiff Amalgamated Bank ("Amalgamated Bank") is a New York State chartered commercial bank and trust company with a principal place of business at 275 Seventh Avenue, New York, New York. Amalgamated Bank is the largest union-owned bank in the United States. Workers United and affiliated organizations are the largest shareholders of Amalgamated Bank. Amalgamated Bank provides financial services, including personal banking services for consumers; services for businesses, non-profit organizations; and institutional investing services. During the Class Period, Amalgamated Bank directly purchased B2B credit scores from Fair Isaac, Experian, and Equifax. Amalgamated Bank was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Amalgamated Bank is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

18.     Plaintiff City of Boston Credit Union ("City of Boston CU") is a credit union with its principal place of business at One Union Street, 3rd Floor, Boston, Massachusetts. City of Boston CU is a member-owned credit union that was established on November 15, 1915. City of Boston CU is one of the oldest credit unions in the United States. City of Boston CU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers. During the Class Period, City of Boston CU directly purchased B2B credit scores from Fair Isaac and Experian. City of Boston

CU was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. City of Boston CU is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

19.     Plaintiff First Choice Federal Credit Union ("First Choice FCU") is a federally chartered credit union with a principal place of business at 2209 West State Street, New Castle, Pennsylvania. First Choice FCU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers. During the Class Period, First Choice FCU directly purchased B2B credit scores from Fair Isaac and TransUnion. First Choice FCU was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. First Choice FCU is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

20.     Plaintiff Getten Credit Company ("Getten") is a corporation with its principal place of business at 1310 Sibley Memorial Highway, Mendota, Minnesota. Getten is a small, family-owned independent finance company that specializes in helping consumers with various financial needs including debt consolidation, purchasing vehicles, and rebuilding credit. During the Class Period, Getten directly purchased B2B credit scores from TransUnion. Getten was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Getten is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

21.     Plaintiff Holmes County Bank & Trust Company ("Holmes County Bank") is a bank with its principal place of business at 316 Court Square, Lexington, Mississippi. Holmes County Bank has provided financial services to its customers since 1932. During the Class Period,

Holmes County Bank directly purchased B2B credit scores from Equifax and TransUnion. Holmes County Bank was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Holmes County Bank is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

## II.    DEFENDANTS

22.    Defendant Fair Isaac is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California.

23.    Defendant Equifax is a Credit Bureau incorporated in Georgia that has its principal place of business at 1550 Peachtree St. NW, Atlanta, Georgia.

24.    Defendant Experian is a Credit Bureau incorporated in Ohio that has its principal place of business in the United States at 475 Anton Blvd., Costa Mesa, California.

25.    Defendant TransUnion is a Delaware limited liability Credit Bureau that has its principal place of business at 555 W. Adams St., Chicago, Illinois.

### JURISDICTION, VENUE, AND INTERSTATE COMMERCE

26.    This action arises under Sections 1 through 3 of the Sherman Act (15 U.S.C. §§ 1-3) and Sections 4 & 16 of the Clayton Act (15 U.S.C. §§ 15 & 26).

27.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337.

28.    The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims.

29.    Venue is proper in this District under 15 U.S.C. §§ 15(a) & 22, and 28 U.S.C. § 1391(b), (c), and (d), because, during the Class Period, Defendants resided, transacted business, were found, or had agents in the United States, including in this District, and a substantial portion of the alleged activity affected interstate trade and commerce, including in this District.

30.    During the Class Period, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States and its territories, including in this District.

31.    During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States Mail, to effectuate their illegal scheme.

32.    Defendants' conduct also had a substantial effect on the intrastate commerce of the states listed in counts Six and Seven of this Complaint.

33.    This Court has personal jurisdiction over Defendants because Defendants transacted business, maintained substantial contacts, and are located and/or committed unlawful conduct in this District. Their unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

## FACTUAL ALLEGATIONS

### I.   CREDIT SCORING AND REPORTING

#### A.   Credit Scores

34.    A credit score is a three-digit number, typically between 300 and 850, designed to represent an individual's credit risk or the likelihood the individual will pay bills on time.

35.    Credit scores are calculated using information in an individual's credit reports, including an individual's payment history, the amount of debt the individual has, and the length of the individual's credit history. Higher scores mean the individual has demonstrated responsible credit behavior in the past, which may make potential lenders and creditors more confident when evaluating a request for credit. Credit scoring companies like Fair Isaac and VantageScore Solutions apply complex algorithms to arrive at a numerical credit score.

36.     Credit scores are accompanied by "reason codes," which explain to the potential lender or creditor why the score was not higher. VantageScore explains this process as follows:

> No matter where you get your score, the documents that accompany it will include up to four or five statements explaining why your score wasn't higher. These statements are called reason codes and sometimes go by several other names. Some people call them score factors, others call them adverse action codes. They're all the same thing.
>
> The next time you see your credit score, regardless of where it comes from, look for the reason codes. They'll be worded and displayed something like this:
>
> Your Credit Score Is: 705
>
> 32: Balances on bankcard or revolving accounts too high compared to credit limits
>
> 16: The total of all balances on your open accounts is too high
>
> 85: You have too many inquiries on your credit report
>
> 13: Your most recently opened account is too new
>
> The numbers preceding each statement are numeric identifiers; sometimes they appear with the text, and sometimes they do not.
>
> The four (or five) factors are listed in order of the impact they have. In this example, the number one reason the credit score is not higher is "Balances on bankcard or revolving accounts too high compared to credit limits." That means the consumer's credit card debt is too high relative to his or her credit limits.
>
> In our example, the reason with the second-greatest impact is "The total of all balances on your open accounts is too high." That means the consumer is carrying too much debt on his or her open accounts.
>
> The third reason the score isn't higher is "You have too many inquiries on your credit report." This means the consumer has recently applied for credit several times, which led to some number of credit inquiries.
>
> The fourth reason the score isn't higher is "Your most recently opened account is too new." Clearly this means the consumer has a very new account on his or her credit report.[7]

---

[7]     VantageScore Solutions, *Reason Codes 101*, https://www.reasoncode.org/reasoncode101 (last visited on Oct. 30, 2023).

37. Fair Isaac has a webpage that sets forth its various "reason codes."[8] VantageScore also has a dedicated website that explains its various "reason codes."[9]

**B. Credit Reports**

38. Credit Bureaus collect and store financial data about individuals that is submitted to them by creditors, such as lenders, credit card companies, and other financial companies. Creditors are not required to report to every credit-reporting company.

39. Utilizing these files, Credit Bureaus create a credit report, which is a statement that has information about an individual's credit activity and current credit situation, such as loan payment history and the status of credit accounts. The information contained in such reports is used to create credit scores.

40. Credit Bureaus sell these credit reports to lenders or creditors such as Plaintiffs and the Class ("B2B Purchasers") in the "B2B market." They also sell them to individuals wishing to monitor their own credit ("B2C Purchasers").

41. Fair Isaac works with the Credit Bureaus to perpetuate and extend its monopoly. Fair Isaac's relationship with B2B Purchasers is often dependent on B2B Purchasers' relationships with the Credit Bureaus: The Credit Bureaus facilitate the sale of FICO Scores to B2B Purchasers.

42. FICO Scores and credit reports are often sold to businesses as a bundle. Such bundles can be sold by Credit Bureaus, which are licensed by Fair Isaac to sell FICO Scores and in return, pay a royalty to Fair Isaac. Thus, when a B2B Purchaser requires a credit score, it purchases a credit report from a Credit Bureau and a credit score from that Credit Bureau and Fair

---

[8] Fair Isaac, *US FICO*® *Score Reason Codes*, https://www.fico.com/en/latest-thinking/solution-sheet/us-fico-score-reason-codes (link to download) (last visited on Oct. 30, 2023).

[9] VantageScore Solutions, REASONCODE.ORG, https://www.reasoncode.org (last visited Oct. 26, 2023).

Isaac often through a contract with both Fair Isaac and the Credit Bureau. Although the payment for the credit report and the credit score may at times occur in a single transaction, the reality is that both the Credit Bureau and Fair Isaac act as the providers of the FICO Score. Indeed, certain Class members' contracts for the sale of FICO Scores and credit reports to B2B Purchasers specify that "in consideration of [the Credit Bureau]/Fair Isaac's performance" of their obligations to provide those products, the purchaser shall "pay [the Credit Bureau]/Fair Isaac fees" for those products.

43.     In its 2020 Form 10-K filed with the Securities and Exchange Commission, Fair Isaac stated that, "[d]uring fiscal 2020, 2019 and 2018, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for 32%, 29% and 25% of our total revenues, respectively."[10] In its 2022 Form 10-K filed with the SEC, Fair Isaac disclosed significant increases of the revenue Fair Isaac generated from its agreements with the Credit Bureaus, reporting that "during fiscal 2022, 2021 and 2020, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for *39%*, *38%* and *33%* of our total revenues, respectively."[11] The same Form 10-K describes the Credit Bureaus as Fair Isaac's "partners in offering [FICO's] scoring solutions."[12]

44.     The FICO Score and credit report bundles can also be sold by Fair Isaac to businesses. "In those situations, Fair Isaac requests a credit score and credit report from the Credit Bureau selected by the lender or consumer. The Credit Bureau applies Fair Isaac's Bureau-tailored

---

[10]     Fair Isaac Corporation, Annual Report (Form 10-K), at 11 (Nov. 10, 2020), https://fico.gcs-web.com/node/23951/html (hereinafter, "Fair Isaac 2020 10-K").

[11]     Fair Isaac Corporation, Annual Report (Form 10-K), at 9 (Nov. 9, 2022), https://fico.gcs-web.com/static-files/9050c8f5-9c87-4d41-8ecd-6d9f3d179a8a (hereinafter, "Fair Isaac 2022 10-K") (emphasis added).

[12]     *Id.*

13

FICO algorithm to a consumer's aggregated credit data and provides the consumer's credit report and credit score to Fair Isaac. Fair Isaac then delivers the bundle to the consumer or lender. Fair Isaac pays the Credit Bureau for the cost of processing and providing the bundle."[13]

45.     Thus, Fair Isaac and the Credit Bureaus act as horizontal competitors and compete with each other for some B2B Purchasers – separate and apart from Fair Isaac's competition with VantageScore.

46.     This direct competition between Fair Isaac and the Credit Bureaus, as well as the close relationship among them, continues to this day. At an August 3, 2021 earnings conference, Fair Isaac's Chief Executive Officer and Director, William J. Lansing, said, "we stay close to it [B2B scores] through our channel partners, the bureaus. But we also – certainly for all of the major institutions, we have direct sales relationships."[14] TransUnion's 2022 Form 10-K acknowledges that it "compete[s] with FICO in the Financial Services" market for B2B Purchasers.[15] Similarly, Equifax's 2022 Form 10-K acknowledges that it too "compete[s] with Fair Isaac Corporation with respect to certain of [its] analytical tools and solutions."[16] Experian has also recognized that its "comparator companies" include "FICO."[17]

---

13      *Fair Isaac Corp. v. Equifax, Inc.*, No. 06-4112, 2008 WL 623120, at *2 (D. Minn. March 4, 2008).

14      Motley Fool, *Fair Isaac Corp. (FICO) Q3 2021 Earnings Call Transcript* (Aug. 3, 2021) (hereinafter, "Q3 Earnings Call"), https://www.fool.com/earnings/call-transcripts/2021/08/03/fair-isaac-corporation-fico-q3-2021-earnings-call/.

15      TransUnion, Annual Report (Form 10-K), at 12 (Feb. 14, 2023).

16      Equifax Inc., Annual Report (Form 10-K), at 8 (Feb. 23, 2023).

17      Experian *Annual Report 2022*, EXPERIAN PLC, (2022), at 139, https://www.experianplc.com/content/dam/marketing/global/plc/en/assets/documents/reports/2022/experian_ar2022_web.pdf.

## II.    THE MARKETS FOR CREDIT SCORES IN THE UNITED STATES

47.    As noted above, there are distinct B2B and B2C Credit Score Markets.  The B2B Credit Score Market comprises sales from a business (a credit score generator, such as Fair Isaac, directly or through a Credit Bureau) to a lender, creditor, or financial institution.  The B2C Credit Score Market comprises sales directly to an individual.  The claims in this case concern the B2B Credit Score Market.  The B2B Credit Score Market is the relevant product market in which the claims that require a market definition are to be assessed.

48.    Fair Isaac has recognized the existence of the distinct B2B and B2C markets.  For example, its 2020 Form-10K states: "*Scores*.  This segment includes our business-to-business scoring solutions and services, our business-to-consumer scoring solutions and services including myFICO® solutions for consumers, and associated professional services."[18]  Likewise, Fair Isaac measures quarterly scores revenues with "the company's business-to-business (B2B) scoring solutions and associated professional services, and business-to-consumer (B2C) service," as reflected in its recent earnings report for the first quarter of 2020.[19]

49.    The credit scores that lenders purchase often differ significantly from the credit scores that consumers purchase.  The Consumer Financial Protection Bureau ("CFPB") noted in a 2011 report to Congress that "many of the credit scores sold to lenders are not offered for sale to consumers."[20]  The agency went on to explain:

When a consumer purchases a score from a CRA [Credit Rating Agency], it is likely

---

[18]    Fair Isaac 2020 10-K, at 3.

[19]    Press Release, Fair Isaac Corp., *FICO Announces Earnings of $1.82 per Share for First Quarter Fiscal 2020* (Jan. 30, 2020), https://fico.gcs-web.com/news-releases/news-release-details/fico-announces-earnings-182-share-first-quarter-fiscal-2020.

[20]    Consumer Financial Protection Bureau, *The impact of differences between consumer- and creditor-purchased credit scores*, at 1 (July 19, 2011), https://files.consumerfinance.gov/f/2011/07/Report_20110719_CreditScores.pdf.

that the credit score that the consumer receives will not be the same score as that purchased and used by a lender to whom the consumer applies for a loan. This could occur if the score the consumer purchased is an educational score that is not used by lenders, but differences between the score a consumer buys and the score a lender buys can occur for other reasons as well. Since so many scores are in use in the marketplace, it could also be the case that the particular lender to which the consumer applies uses a different scoring model than the one purchased by the consumer, or that the CRA from which the consumer obtains a score is not the same CRA that the lender uses to obtain scores, or that the underlying data in the consumer's credit report changes significantly between the time the consumer purchases a score and the time the lender obtains a score for that consumer. It is also possible that a consumer and a lender could access different reports from the CRA, if they were to use different identifying information about the consumer. Any of these differences could lead to differences between the credit score a consumer sees and the credit score a lender uses to assess that consumer.[21]

50.　　The United States (including its territories) is the relevant geographic market in which B2B credit scores are provided. The restraints on competition in the B2B Credit Score Market contained in Fair Isaac's contracts relate to the provision of B2B credit scores to businesses throughout the United States.

51.　　The B2B Credit Score Market exhibits high barriers to entry. As noted in a 2018 article: "The deep integration of FICO scores and products into companies' operations has raised switching costs."[22]

52.　　Likewise, VantageScore Solutions has observed that in the residential mortgage sector, Fair Isaac's "imprint *inhibits competition* by raising switching costs and granting the irreplaceable brand value of utter ubiquity. It gives FICO unparalleled and highly controversial negotiating leverage with almost every participant in the industry."[23]

---

[21]　*Id.*

[22]　*Fair Isaac: A Royalty on U.S. Credit Scoring* (Sept. 25, 2018), https://seekingalpha.com/article/4208014-fair-isaac-royalty-on-u-s-credit-scoring.

[23]　Press Release, VantageScore, *VantageScore Solutions Issues Statement Reacting to FHFA's Proposed Rules for Validating and Approving New Credit Scoring Models* (Dec. 17, 2018), https://vantagescore.com/press/vantagescore-solutions-issues-statement-reacting-to-fhfas-

53.     "Larger lenders use the [FICO] score as an input to customized models they've built for specific situations or portfolios.  After a recent review one major US lender recently identified over 600 places they were using a FICO score in their business processes.  Switching to a new score not only means proving the new score is better (a long process in itself) but extensive testing to ensure all of those moving parts are still working as designed.  Citibank recently announced that after an 18 month review they've decided it's safe to switch to the latest version of the FICO score (FICO 8).  This wasn't a migration to a new score mind you, just a more recent version of the score they're already using.  The **barriers to entry are indeed high** . . . and expensive."[24]

54.     "Network effects" – *i.e.*, the phenomenon where a product or service increases in value when the total number of customers increase – serve as a barrier to entry into the B2B Credit Score Market.  As one analyst has noted: "The 'network effects' keeping FICO's dominant position [are] indeed incredibly strong."[25]

55.     In 2011, at Fair Isaac's Analyst/Investor Day, Fair Isaac's then-CEO, Mark Greene, explained: "In about 10 seconds, an entire commerce transaction taking place because 720 FICO was understood by the broker, by the mortgage banker on the other end of line and the customer to be shorthand for good credit risk, gave this guy a favorable mortgage rate.  And that network

---

proposed-rules-for-validating-and-approving-new-credit-scoring-models (emphasis added).

[24]     John Ulzheimer, *Why FICO Isn't Going Away Any Time Soon*, Smart Credit (July 5, 2011), https://blog.smartcredit.com/2011/07/05/why-fico-isnt-going-away-any-time-soon/     (emphasis added).

[25]     Harrison Schwartz, *Fair Isaac: Share Buybacks Likely To End As Cash Reserves Run Low*, Seeking Alpha (Dec. 17, 2019), https://seekingalpha.com/article/4312953-fair-isaac-share-buybacks-likely-to-end-cash-reserves-run-low.

effect, having everybody in the loop understand that shorthand and standardize on a FICO Score, that's magic."[26]

56.     The anticompetitive conduct by Fair Isaac alleged herein accounts in significant part for the FICO Score's dominance in the B2B Credit Score Market.

57.     The Credit Bureaus participate in a market for credit reports.  A credit report contains detailed information about a consumer's credit activity and current credit situation.  The detailed information in a credit report is used to generate a FICO Score for a specific customer, which B2B lenders can use in making their lending decisions.

58.     On information and belief, the Credit Bureaus control virtually all of the credit report market (they have been called a "triopoly") and enjoy roughly equivalent market shares.[27]

59.     The three Credit Bureaus are all members of a trade association called the Consumer Data Industry Association ("CDIA").  Through the CDIA, the three Credit Bureaus frequently work together, including to: (i) develop a standard electronic data reporting format called Metro 2®; (ii) issue joint statements on matters of public importance; (iii) provide guidelines to businesses that use credit reports; and (iv) respond to public criticisms of their industry.  The three Credit Bureaus also cooperated in the establishment of VantageScore Solutions as a joint venture.[28]

---

[26]     SA Transcripts, Seeking Alpha, *Fair Isaac Corp. – Analyst/Investor Day* (Nov. 3, 2011), https://seekingalpha.com/article/307417-fair-isaac-corp-analyst-investor-day.

[27]     *See* Consumer Financial Protection Bureau, *List of Consumer Reporting Companies* (2021), https://files.consumerfinance.gov/f/documents/cfpb_consumer-reporting-companies-list_2021-06.pdf.

[28]     *See* Consumer Data Industry Ass'n, *About CDIA*, https://www.cdiaonline.org/about/about-cdia/ (last visited Oct. 26, 2023); Consumer Data Industry Ass'n, *Metro 2 Format for Credit Reporting*, https://www.cdiaonline.org/resources/furnishers-of-data-overview/metro2-information/ (last visited Oct. 26, 2023); Dana Fowle, *Industry Pushes Back Against Claims of High Credit Reporting Errors*, Fox5 Atlanta (Sept. 15 2021), https://www.fox5atlanta.com/

18

## III. FAIR ISAAC'S MONOPOLY POWER IN THE B2B CREDIT SCORE MARKET

60. Fair Isaac came into existence in 1956, possessed a monopoly on credit-scoring algorithms until the mid-1970s, and continues to wield a dominant market share.[29]

61. Fair Isaac states in its 2020 Form 10-K:

Our products and services serve clients in multiple industries, including primarily banking, insurance, retail, healthcare and public agencies. End users of our products include 96 of the 100 largest financial institutions in the U.S., and two-thirds of the largest 100 banks in the world. Our clients also include more than 600 insurers, including nine of the top ten U.S. property and casualty insurers; more than 300 retailers and general merchandisers; more than 200 government or public agencies; and more than 200 healthcare and pharmaceuticals companies, including nine of the world's top ten pharmaceuticals companies. Eight of the top ten companies on the 2020 *Fortune* 500 list use one or more of our solutions. In addition, our consumer services are marketed to an estimated 200 million U.S. consumers whose credit relationships are reported to the three major U.S. credit reporting agencies.[30]

62. Fair Isaac itself has touted its dominance, noting in its "About" page that FICO Scores are "the most widely used credit scores," used by "90% of top lenders," and have been the "industry standard for 30 years."[31]

---

news/industry-pushes-back-against-claims-of-high-credit-reporting-errors; Press Release, Consumer Data Industry Ass'n, *Consumer Data Industry Association Releases Study on the Value of Credit Reporting in U.S.* (June 15, 2020), https://cdia-news.s3.amazonaws.com/White+Paper+Press+Release+6.15.20.pdf; Kristina Poplawski, *Equifax, Experian, & TransUnion Endorse CARES Act*, CONSUMER DATA INDUSTRY ASS'N (Mar. 30, 2020), https://www.cdiaonline.org/equifax-experian-transunion-endorse-cares-act/; Consumer Data Industry Ass'n, *COVID-19*, https://www.cdiaonline.org/covid-19/ (last visited Oct. 26, 2023).

[29] Raymond Anderson, *A History of Credit Scoring*, at 75-76 (2019), https://www.researchgate.net/profile/Raymond_Anderson4/publication/331533723_Chapter_B06_History_of_Credit_Scoring/links/5c7ed843299bf1268d3ccc5d/Chapter-B06-History-of-Credit-Scoring.pdf?origin=publication_detail.

[30] Fair Isaac 2020 10-K, at 10.

[31] Fair Isaac, *About*, https://www.ficoscore.com/about (last visited Oct. 26, 2023).



63.     An infographic on Fair Isaac's website states: "10 BILLION FICO SCORES ARE SOLD EACH YEAR," which is "FOUR TIMES the number of hamburgers McDonald's sells WORLDWIDE in a year," and "27,400,000 FICO scores are sold every day," which is "OVER TWICE the number of cups of coffee Starbucks sells WORLDWIDE in a day."[32]

---

[32]     Fair Isaac, *Learn About the FICO Score and Its Long History*, https://www.fico.com/25years/ (last visited Oct. 26, 2023) [https://web.archive.org/web/2018 0602142433/https://www.fico.com/25years/].



64. Fair Isaac's 2020 Form 10-K states that FICO Scores "are used in the majority of U.S. credit decisions, by nearly all of the major banks, credit card organizations, mortgage lenders and auto loan originators," and it describes FICO Scores as "the standard measure in the U.S. of consumer credit risk."[33]

65. Fair Isaac's executives frequently tout FICO's dominance. In 2008, Craig Watts, a public affairs manager at Fair Isaac, described the FICO Score as the "800 pound gorilla."[34] In November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's former

---

[33] Fair Isaac 2020 10-K, at 3, 7.

[34] Dana Dratch, *What Does 'Good' Credit Really Mean?*, CNBC (Oct. 30, 2008), https://www.cnbc.com/id/27458815.

21

Chief Financial Officer and Executive Vice-President, Michael Pung, stated that Fair Isaac's FICO Scores are: the "most widely used credit scoring system here in the U.S.," used by "[v]irtually every major lender in the U.S.," and that Fair Isaac has "maintained a *90-plus percent market share* for at least . . . 13 years."[35]

66.   A May 2021 report by Yale University's Thurman Arnold Project, a collaborative project among Yale faculty and students, as well as other scholars dedicated to research on competition policy and antitrust enforcement, notes that Fair Isaac "enjoys *a virtual monopoly* in the credit score market" and that "[b]ecause of the lack of competition in this domain, there has been limited innovation in scoring methodology."[36]

67.   Fair Isaac's monopoly in the B2B Credit Score Market has given it the power to control prices and impose monopoly rents. Indeed, Mr. Lansing, Fair Isaac's CEO, has noted that in the B2B Credit Score Market, Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are."[37]

68.   In February 2013, at a Morgan Stanley Conference, Mr. Lansing explained that Fair Isaac's "Scores business, which is the cash generator, is a very, very high-margin business. It's *deeply embedded* into the systems of the bank customers who use it."[38]

---

[35]   TransUnion Counterclaims, ¶ 32 (emphasis added).

[36]   Yale University Thurman Arnold Project, *Updating Antitrust and Competition Policy: Finance Issues*, at 14, 15 (May 2021), https://som.yale.edu/sites/default/files/TeamFinance-Final.pdf (emphasis added).

[37]   TransUnion Counterclaims, ¶ 34.

[38]   Seeking Alpha, *Fair Isaac's CEO Presents at Morgan Stanley Technology, Media & Telecom Conference (Transcript)* (Feb. 27, 2013), https://seekingalpha.com/article/1231981-fair-isaacs-ceo-presents-at-morgan-stanley-technology-media-and-telecom-conference-transcript (emphasis added).

69. And in a 2021 Earnings Call, in response to a question regarding an instance where Fair Isaac lost scoring business to a competitor, Mr. Lansing responded: "Our business in Scores is as strong as it has ever been. Our volumes are very strong. We have not seen a decline. And we don't see major issuers switching away. So I guess the best way to characterize that is a one-off."[39]

## IV. VANTAGESCORE SOLUTIONS' ENTRY INTO THE B2B CREDIT SCORE MARKET AND ITS INNOVATIVE PRODUCT

70. In March 2006, the three Credit Bureau Defendants founded VantageScore Solutions as a joint venture, with the purpose of offering a credit scoring model that would compete with FICO Scores. The three Credit Bureau Defendants continue to own VantageScore Solutions.

71. VantageScore Solutions offers its own credit scoring system and score called VantageScore. VantageScore Solutions does not sell or market its VantageScore credit models or credit scores; instead, it licenses them to the three Credit Bureau Defendants, which may incorporate VantageScores in their credit reports.

72. VantageScores are a competitor to FICO Scores in the B2B Credit Score Market.

73. VantageScore was a response to a recognized need. Many individuals receive no or lower scores under FICO. For example, the CFPB has found that, as of 2010, 26 million consumers in the United States were "credit invisible" – i.e., they lacked credit history with one of the nationwide credit reporting companies.[40] Those individuals cannot be scored by FICO.[41]

---

[39]   Q3 Earnings Call, *supra* n.14.

[40]   CFPB Office of Research, *Data Point: Credit Invisibles*, at 4, 6 (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf.

[41]   *Id.*

74.     The CFPB's research suggests "a strong relationship between income and having a credit record. Almost 30 percent of consumers in low-income neighborhoods are credit invisible and an additional 16 percent have unscored records. These percentages are notably lower in higher-income neighborhoods. For example, in upper-income neighborhoods, only 4 percent of the population is credit invisible and another 5 percent has an unscored record."[42]

75.     Moreover, the CFPB found "significant differences in the incidence of having a limited credit history across racial and ethnic groups," specifically, while White and Asian individuals "are almost equally likely to be credit invisible or have an unscored record, the shares of Black[] and Hispanic[] [individuals] with limited credit history are much larger," and individuals in those groups are thus less likely to be able to obtain a credit score.[43]

76.     According to the CFPB, "[a]bout 15 percent of Black[] and Hispanic[] [individuals] are credit invisible . . . and an additional 13 percent of [Black individuals] and 12 percent of [Hispanic individuals] have unscored records. . . . This elevated incidence . . . is observed across ages, suggesting that these differences across racial and ethnic groups materialize early in the adult lives of these consumers and persist thereafter."[44]

77.     The CFPB went on to conclude that "[t]hese results suggest that the problems that accompany having a limited credit history are disproportionally borne by Black[], Hispanic[], and lower-income consumers."[45]

---

[42]     *Id.* at 24.

[43]     *Id.*

[44]     *Id.* at 24-25.

[45]     *Id.* at 25.

78.     Credit Karma has summarized some of the key differences between FICO and VantageScore.  One is the duration of credit history needed to obtain a VantageScore as opposed to a FICO Score:

> To have FICO® scores, consumers need to have one or more accounts that have been open for at least six months and at least one account that has reported to the credit bureaus within the past six months (plus no indication on your credit reports of being deceased).  Otherwise, FICO won't generate your scores.
>
> On the other hand, the VantageScore® model may be able to score consumers who are new to credit or use credit infrequently.  VantageScore can use data of just one month's history and one account reported within the previous 24 months.
>
> So if you're new to credit or you haven't used credit in a while, you may not have FICO® credit scores, but you might have VantageScore® credit scores.[46] '

79.     Another difference concerns treatment of tax liens and civil judgments:

> In July 2017, changes to public-record reporting requirements were implemented that affected the information sent to consumer credit bureaus, leading them to eliminate many tax liens and civil judgments from consumers' credit reports.  In response to the changes, tax liens aren't weighed as heavily (but can still have a significant impact) in the latest VantageScore version, VantageScore® 4.0.  And they can still have a significant impact on FICO® scoring models.[47]

80.     A third difference involves the treatment of credit inquiries:

> It's a Catch-22.  Applying for new lines of credit – such as student loans, credit cards or mortgages – can negatively affect your credit scores.  But applying for multiple lines in order to compare rates makes sense if you want to get the best deal.  To minimize the impact that shopping for credit can have on your scores, newer FICO® versions count multiple credit inquiries of the same type within a 45-day period as a single inquiry.  This can be especially helpful when you're shopping around for a major loan, like for a car, as multiple auto loan inquiries within that window should only count as one hard inquiry.  For some older FICO® versions, the single-inquiry period can be 14 days.
>
> VantageScore counts multiple inquiries, even for different types of loans, within a 14-day period as a single inquiry.  Multiple inquiries on your reports for the same

---

[46]     Jennifer Brozic, Credit Karma, *VantageScore vs. FICO: What's the difference?* (Sept. 1, 2019), https://www.creditkarma.com/advice/i/vantagescore-vs-fico/.

[47]     *Id.*

type of loan or credit, spanning more than a 14-day period, may have a greater impact to your VantageScore® credit scores than to your FICO® scores.[48]

81.    And the final difference of significance involves the use of trending data:

Credit scores represent a snapshot of an individual's credit profile at the specific point in time when the scores are generated. The FICO® credit-scoring models, for example, use data about consumers' borrowing and credit utilization that's been reported to the credit bureaus at the time the scores are generated.

VantageScore® 4.0, on the other hand, incorporates data that reflects patterns of behavior over time. The latest scores may include up to two years' worth of consumer spending and credit utilization data in its calculation.[49]

82.    VantageScore has achieved some limited success. In a 2018 report, VantageScore Solutions stated:

During the twelve months ending in July 2017, over 1.4 billion VantageScore credit scores were delivered directly to consumers by lenders like Chase and Capital One and educational websites like CreditKarma, Lending Tree, and Mint. These scores are calculated using the same VantageScore model used by lenders (i.e., not an "educational" model). They are most often provided free of charge as part of educational offerings that include simulators, credit reports, educational articles, and explanations.[50]

83.    VantageScore Solutions went on to note that "[a]s lenders adopt VantageScore, we believe that such adoption will improve consumers' access to credit in certain segments and enable many more borrowers to obtain fairer pricing."[51] VantageScore Solutions also reported that "many of the most sophisticated secondary market participants use the VantageScore model to help evaluate and monitor risk, and to price and benchmark deals more accurately."[52]

---

[48]    *Id.*

[49]    *Id.*

[50]    VantageScore Solutions, *VantageScore® Credit Scores and The Mortgage Market*, at 8 (2018) ("VantageScore Report"), https://www.vantagescore.com/wp-content/uploads/2022/02/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf.

[51]    *Id.* at 5.

[52]    VantageScore Solutions, *Myth: VantageScore Is Not Accepted by Investors in*

84.     Despite VantageScore's innovations and advantages, Fair Isaac has maintained its monopoly in the B2B Credit Score Market and extracted monopoly rents through anticompetitive and exclusionary conduct and through anticompetitive agreements with each Credit Bureau.

## V.    FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT

85.     Fair Isaac anticipated the threat VantageScore could pose to its dominance in the B2B Credit Score Market. Fair Isaac's own models of future losses predicted "*substantial double-digit declines*" if the use of VantageScore continued to expand.[53]

86.     Faced with the prospect of a significant hit to its market dominance, and its profits, Fair Isaac used its monopoly power to launch a comprehensive attack on VantageScore that included filing anticompetitive litigation; signing licensing agreements with anticompetitive provisions with the Credit Bureaus; and undertaking a campaign of disparagement against, and disinformation about, VantageScore Solutions and VantageScore.

### A.     Fair Isaac's Anticompetitive Litigation

87.     Fair Isaac viewed the creation of VantageScore as a competitive threat and filed a lawsuit against the Credit Bureaus in October 2006, accusing them of copyright infringement (by using a three-digit credit score like Fair Isaac did), unfair advertising, and antitrust violations. As part of its requested relief, Fair Isaac asked that the Credit Bureaus "be ordered to dissolve VantageScore and/or to take all measures necessary to prevent VantageScore from having an

---

*Securitization Markets* (Mar. 23, 2016), https://vantagescore.com/education/blog/myth-vantagescore-is-not-accepted-by-investors-in-securitization-markets.

[53]     *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, No. CV 06-4112, 2008 WL 11348223, at *2 (D. Minn. Nov. 3, 2008) (emphasis added).

27

unreasonable anticompetitive effect in any market."[54]  It made this claim even though, at the time,

Fair Isaac had 94% of the B2B market.[55]

88.     VantageScore Solutions characterized the litigation Fair Isaac initiated as a "legal

battle that *sought to put us out of business*, even as we scrambled to establish a competitive

foothold."[56]  Fair Isaac raised bogus antitrust claims that it knew lacked foundation, given its then-

94% share of the B2B Credit Score Market.  It also alleged trademark infringement that a jury

found to be based on a trademark that Fair Isaac had fraudulently obtained from the U.S. Patent

and Trademark Office ("PTO").  In addition, Fair Isaac's contention that the "300-850" marks

were anything other than "merely" descriptive lacked all foundation because – as the U.S. Court

of Appeals for the Eighth Circuit later held – "consumers in this market immediately understand

'300-850' to describe the qualities and characteristics of FICO's credit score – that the credit score

will be within the range of 300-850."[57]

89.     Equifax settled the litigation in June 2008 and formed "a partnership [with Fair

Isaac] to develop and sell advanced analytics and scoring solutions for businesses and

consumers."[58]

90.     The litigation against Equifax and TransUnion lasted into 2011.  While it was

ongoing, VantageScore Solutions remained under a cloud, with Fair Isaac's lawsuit hobbling its

---

[54]     Second Amended Complaint, Dkt. 81, *Fair Isaac Corp. v. Equifax, Inc.*, No. 06 CV 4112, at 86 (D. Minn. Apr. 18, 2007).

[55]     *Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645 F. Supp. 2d 734, 738 (D. Minn. 2009).

[56]     VantageScore Solutions, Inc., *10 years, 10 milestones* (June 30, 2020), https://www.vantagescore.com/newsletter/10-years-10-milestones-1/ (emphasis added).

[57]     *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1148 (8th Cir. 2011).

[58]     Fair Isaac, *Equifax and Fair Isaac Enter Partnership to Accelerate Development and Delivery of New Analytic Solutions* (June 10, 2008), https://www.fico.com/en/newsroom/equifax-and-fair-isaac-enter-partnership-accelerate-development-and-delivery-new-analytic.

28

commercial prospects: Potential B2B Purchasers for VantageScore had no way of being sure that the product might not be declared infringing on Fair Isaac's trademarks or that VantageScore Solutions would not be dissolved.

91.` The district court entered summary judgment in favor of the Credit Bureaus on the antitrust and false advertising claims. A jury found against Fair Isaac on the remaining claim for trademark infringement, finding that the mark "300-850" (which denoted the range of FICO Scores) was merely descriptive. It also found that: (1) Fair Isaac made a false representation during the application process to the PTO for the registrations of the "300-850" marks; (2) Fair Isaac knew that representation to be false when it was made and intended to deceive the PTO; and (3) the PTO relied on the false representation in deciding to issue the registrations.[59]

92. The district court upheld the verdict, noting that "[t]his extensive, expensive litigation seems to have been initiated largely *in response to a perceived threat to Fair Isaac's dominant position in the credit scoring industry*."[60]

93. In 2011, the United States Court of Appeals for the Eighth Circuit affirmed both that decision and the earlier summary judgment ruling.[61]

94. VantageScore Solutions' growth during its first few years was inhibited by the litigation, which was part of a continuing antitrust violation by Fair Isaac that goes on to this day.

**B.     Litigation Between Fair Isaac and TransUnion**

96. In December 2017, Fair Isaac sued TransUnion for unpaid royalties.[62]

---

[59]     *Fair Isaac*, 650 F.3d at 1148-50.

[60]     *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1000 (D. Minn. 2010) (emphasis added).

[61]     *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011).

[62]     *See* Complaint, Dkt. 1, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Nov. 16, 2017).

97.     In February 2018, TransUnion responded by filing antitrust counterclaims for, *inter alia*, monopolization against Fair Isaac.  In paragraphs 42-60 of the counterclaims (which were partially redacted), the anticompetitive terms the Credit Bureaus and Fair Isaac had agreed upon were disclosed publicly for the first time.  Those provisions are described in detail below.

98.     Fair Isaac moved to dismiss the counterclaims.  Judge Coleman denied the motion, ruling that "TransUnion has adequately pled actual and attempted monopolization" through allegations that "FICO engages in practices that are intended to drive out competition" through "exclusive dealing provisions [that] are unlawful attempts to 'maintain monopoly power through exclusionary conduct.'"[63]

99.     In November 2020, TransUnion and Fair Isaac settled on undisclosed terms.  One effect of this settlement was to cut Plaintiffs off from obtaining further information about the anticompetitive agreements between Fair Isaac and the Credit Bureaus.  Fair Isaac essentially bought TransUnion off.  This inference is bolstered by the fact that, in August 2021, TransUnion announced that it had entered into a long-term (presumably lucrative) contract to distribute FICO Scores to lenders and consumers in Canada.[64]

100.     The Antitrust Division of the United States Department of Justice took notice of Fair Isaac's conduct alleged in the TransUnion Action and instituted a civil investigation.  That

---

[63]     *Fair Isaac Corp. v. Trans Union, LLC*, No. 17:cv-8318, 2019 WL 1382068, at *2 (N.D. Ill. Mar. 27, 2019).

[64]     *See* Press Release, TransUnion, *TransUnion Enters New Long-term Agreement with FICO to Distribute FICO® Score in Canada* (Aug. 3, 2021), https://www.globenewswire.com/news-release/2021/08/03/2273895/0/en/TransUnion-Enters-New-Long-term-Agreement-with-FICO-to-Distribute-FICO-Score-in-Canada.html.

investigation was closed without action in December 2020, shortly after TransUnion settled with Fair Isaac.[65]

### C. Fair Isaac and the Credit Bureaus' Agreements to Restrain Competition

#### 1. Fair Isaac and the Credit Bureaus Agree to Anticompetitive Provisions in Licensing Agreements

101. Rebuffed by the courts in its attempts to snuff out VantageScore in its infancy, Fair Isaac elected to take another approach. When its existing licensing agreements with each Credit Bureau expired in 2013 or 2015, Fair Isaac reentered into agreements with each Credit Bureaus containing new and anticompetitive provisions that aimed to crush the only real competition, (VantageScore), maintain Fair Isaac's monopoly, and extract monopoly rents from B2B Purchasers.

102. Fair Isaac and the Credit Bureaus entered into new or renewed agreements that contained new provisions designed to restrict the competitive reach of VantageScore. In their memorandum of law in support of their motion to dismiss, the Credit Bureaus characterized their licensing agreements with Fair Isaac as "vertical distribution agreements."[66]

103. The anticompetitive contract provisions targeted the only significant competing credit score – VantageScore. And they specifically restricted the Credit Bureaus' ability to market VantageScore to B2B Purchasers.

104. On information and belief, the Credit Bureaus agreed to those provisions in return for Fair Isaac's acquiescence to a clause that protected them from price competition (and

---

[65]     *See* Press Release, Fair Isaac, *FICO Statement Regarding Antitrust Investigation* (Mar. 15, 2020), https://fico.gcs-web.com/news-releases/news-release-details/fico-statement-regarding-antitrust-investigation.

[66]     *See* The Credit Bureaus' Motion to Dismiss Plaintiffs' Class Action Complaints, Dkt. 135, *In re FICO Antitrust Litig.*, No.1:20-cv-02114, at 2 (Jan. 18, 2022).

31

potentially in exchange for other benefits as well). The benefit of the *quid pro quo* for the Credit Bureaus was that they were able to charge consumers, *i.e.*, B2B Purchasers, supracompetitive prices for credit scores.

105.    The Credit Bureaus and Fair Isaac entered into these anticompetitive licensing agreements after what Fair Isaac considered a "rough year." In its second quarter of 2013 earnings call, Fair Isaac's Chief Financial Officer Michael Joseph Pung admitted:

> [W]e've been experiencing a long period of time, as you know, where our Scores business, and the volumes underneath our Scores business on the origination side, *have been going sideways*, and we are starting to see some improvement on that end. It just so happens *we had a tough comparable period for our B2B Scores business in that last year.*[67]

106.    The agreements were consummated at a critical time. In 2011 through the first part of 2013, developments occurred that should have furthered VantageScore's ability to compete with FICO Scores. In 2011, VantageScore Solutions formed a partnership with the Consumer Federation of America, "a nonprofit association of nearly 300 consumer groups founded in 1968 to advance the consumer interest through research, advocacy, and education"; that alliance led to the "use of annual consumer surveys to gauge awareness of credit scoring related issues."[68] In October 2012, "the Federal Deposit Insurance Corporation ["FDIC"] revised its rules for assessing default risk on loans issued by banks with deposits in excess of $10 billion. Instead of evaluating loans on a particular credit score, the revision calls for examining the underlying probability of default [] associated with those loans at the time of origination."[69] In March 2013, VantageScore

---

[67]    Q2 2013 FICO Earnings Conference Call – Final, SEEKING ALPHA (April 24, 2013), https://seekingalpha.com/article/1368671-fair-isaac-management-discusses-q2-2013-results-earnings-call-transcript (emphasis added).

[68]    VantageScore Solutions, *10 Years, 10 Milestones*, *supra* n.56.

[69]    *Id.*

Solutions debuted a new scoring model, VantageScore 3.0, which "built on the strengths of its predecessors and drew extensive news coverage for its ability to score 98 percent of adult consumers in the U.S. (including 30-35 million who cannot get scores from conventional credit-scoring models [*i.e.*, FICO]); its disregard of paid collections (including paid medical debt); and its simplified reason codes."[70] And, in July 2013, VantageScore Solutions published a white paper explaining how VantageScore could be aligned with the FDIC's new rules for evaluating probability of default.[71]

107. Fair Isaac's response to these developments – which signaled the possibility of increased competition between FICO Scores and VantageScore – was to agree on anticompetitive contract terms with the Credit Bureaus. The necessary consequence of the Credit Bureaus' and Fair Isaac's contracts was the stifling of competition in the B2B Credit Score Market.

108. Specifically, in May 2013, Fair Isaac and Experian entered into a contract containing anticompetitive terms (*i.e.*, the No Equivalent Products and Dynamic Royalty Schedule provisions, among others, as explained *infra*). In October 2013, Fair Isaac and Equifax entered into a contract containing anticompetitive terms (*i.e.*, the No Equivalent Products and Dynamic Royalty Schedule provisions, among others, as explained *infra*). And in February 2015, TransUnion and Fair Isaac entered into an Analytic and Data License Agreement ("ADLA") containing anticompetitive terms (*i.e.*, the No Equivalent Products and Dynamic Royalty Schedule provisions, among others, as explained *infra*).[72]

---

[70]    *Id.*

[71]    VantageScore Solutions, *FDIC New Definition of High Risk Consumer Loan Securities* (July 2013), https://paperzz.com/doc/8033743/fdic-new-definition-of-high-risk-consumer-loan-and-securi (last visited Oct. 27, 2023).

[72]    Fair Isaac and the Credit Bureaus executed parallel anticompetitive contracts at the first available opportunity. TransUnion's original agreement with Fair Isaac did not expire until 2015.

109.     Mr. Lansing, Fair Isaac's CEO, confirmed that the "exclusive deal[s]" Fair Isaac and the Credit Bureaus entered into essentially sidelined VantageScore, which never gained "a lot of traction in the banking space," and that, even though VantageScore was a joint venture of the Credit Bureaus, working together with FICO has been "a good thing for both of us [*i.e.*, both the Credit Bureaus and Fair Isaac]."[73]

110.     According to Mr. Lansing, instead of being "at war" with one another, the Credit Bureaus decided instead "to be partnered" with Fair Isaac. Explaining the relationship with Experian, for example, Mr. Lansing stated that Experian and Fair Isaac "have a rev share arrangement with them that works for them and works for us really good." Similarly, with respect to its arrangement with Equifax, Mr. Lansing stated "it is a rev share model. We're in it together." Given Fair Isaac's own admission that all three Credit Bureaus have substantially similar contract terms, it follows that TransUnion would also have a similar revenue sharing arrangement with Fair Isaac.

### 2.     The Anticompetitive Terms of the Contracts Fair Isaac and the Credit Bureaus Entered into

111.     The terms of the contracts Fair Isaac and the Credit Bureaus entered into were not publicly revealed until February 2018. Many of the contract terms remain confidential to this day.

112.     The discussion that follows is based on TransUnion's description of its ADLA in its counterclaims against Fair Isaac. The ADLA was filed under seal in the TransUnion action and is unavailable to Plaintiffs beyond what TransUnion has quoted in its counterclaim.

---

As a result, there is a temporal gap between TransUnion's agreement with Fair Isaac and Fair Isaac's agreements with the other Credit Bureaus.

[73]     Remarks by William J. Lansing, President, CEO & Director, Fair Isaac, Fair Isaac Corp at Barclays Global Financial Services Conference (Sept. 25, 2015).

113. While the counterclaims quote only the ADLA, TransUnion pled that "Fair Isaac represented to TransUnion that TransUnion's two major competitors, Experian and Equifax, had already agreed to materially similar new contracts with Fair Isaac."[74]

114. Fair Isaac itself admitted that Equifax, Experian, and TransUnion agreed to the same or similar terms. In FICO's Answer to Counterclaims in the TransUnion litigation, FICO "admit[ed] that prior to January 2015, it entered into separate contracts with Experian and Equifax that contained certain terms that were similar to certain terms in the ADLA."[75]

115. In its April 2018 Answer to the Counterclaims, Fair Isaac "admit[ed] that *Equifax and Experian have agreed to 'No Equivalent Products'* provisions with terms similar to the terms agreed to by TransUnion in the ADLA."[76] Fair Isaac also "admit[ted] that *Equifax and Experian have agreed to 'Dynamic Royalty Schedule' terms* that are similar to the terms agreed to by TransUnion in the ADLA, and that Equifax and Experian are subject to royalty schedules that contain a "Pre-Qualification" royalty category similar to that to which TransUnion is subject in its royalty schedule."[77] Finally, Fair Isaac "admit[ed] that Equifax and Experian have agreed to 'Level Playing Field' terms similar to the term agreed to by TransUnion in the ADLA."[78]

116. Fair Isaac has made similar admissions about the contract terms in its Answer in this case. Fair Isaac admits that its agreement with TransUnion contains the "No Equivalent

---

[74]     TransUnion Counterclaims, ¶ 43.

[75]     Fair Isaac's Redacted Answer to TransUnion Counterclaims, Dkt. 62, *Fair Isaac Corp. v. TransUnion LLC*, No 1:17-cv-08318 at 21 (N.D. Ill. Apr. 10, 2018) ("FICO Answer to Counterclaims").

[76]     FICO Answer to Counterclaims at 24.

[77]     *Id.* at 27.

[78]     *Id.* at 29-30.

Products" provision.[79] It admits that the "Dynamic Royalty Schedule" and "Level Playing Field" terms appear in its agreements with all three Credit Bureaus, and that the latter requires it to offer the most favorable royalty pricing as to all three Credit Bureaus.[80] And it admits that the "Pre-Qualification" royalty category has applied since 2015.[81] Thus, for the foregoing reasons, provisions substantially similar to the anticompetitive "No Equivalent Products" and "Dynamic Royalty Schedule" provisions that exist in the ADLA between TransUnion and Fair Isaac also exist in the agreement between Experian and Fair Isaac. Likewise, provisions substantially similar to the anticompetitive No Equivalent Products and Dynamic Royalty Schedule provisions that exist in the ADLA between TransUnion and Fair Isaac also exist in the agreement between Equifax and Fair Isaac. The allegations that follow therefore apply to all three Credit Bureau Defendants.

117. The restraints imposed in the contracts consist primarily of: (a) "No Equivalent Products" provisions; and (b) "Dynamic Royalty Schedule" provisions. A third set of provisions, the "Level Playing Field" provisions, compensated the Credit Bureaus for their agreement not to promote VantageScore under the former provisions, at the expense of B2B Purchasers.

118. In an order dated September 28, 2023, this Court held that "the No Equivalent [Products] Provision and the Dynamic Royalty Schedule clauses together qualify as sufficient allegations of anticompetitive effects" to allow the Sherman Act §2 claim against Fair Isaac to proceed to discovery. Those provisions are described in turn below.

---

[79] Fair Isaac's Answer and Affirmative Defenses to Direct Purchaser Plaintiffs' Consolidated Class Action Complaint, Dkt. 182, No. 1:20-cv-02114 ("FICO Answer to DPP Complaint"), (Oct. 23, 2023) ¶109.

[80] FICO Answer to DPP Complaint, ¶¶116, 124.

[81] *Id.*, ¶118.

### i. The "No Equivalent Products" Provisions

119. "Section 12.5 of the ADLA, the 'No Equivalent Products' provision, provides that TransUnion may not 'internally develop' a credit scoring system that is 'aligned to the odds-to-score relationship of any Fair Isaac Analytic' or uses more than a limited number of reason codes that 'match' reason codes used by any Fair Isaac Analytic. Section 12.5 of the TransUnion ADLA further prohibits TransUnion from distributing 'any competing analytic' (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes, and it expressly names VantageScore Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an 'Equivalent Product.'"[82]

120. The "No Equivalent Products" clause thus protects and sustains Fair Isaac's monopoly and unreasonably restrains trade.

121. In practice, for example, if a competing credit score product used a 700 score to indicate a less-than five percent risk of credit delinquency, and if a 700 FICO Score also indicated the same risk of delinquency, the "No Equivalent Products" clause would prevent a Credit Bureau from distributing the competing product. Similarly, if a competing credit score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause would prohibit a Credit Bureau from distributing the product.

122. The "No Equivalent Products" clause undercuts VantageScore because it effectively prevents a Credit Bureau from offering an alternative to FICO Scores that would: (a) be compatible with many B2B Purchasers' systems, models, and processes; and (b) allow B2B Purchasers to have a legitimate choice between using FICO Scores and an alternative score. As noted above, many B2B Purchasers have spent substantial effort and resources to develop systems,

---

[82] *Id.*, ¶ 109.

models, and processes that are designed for FICO Scores. B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers) and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

123.    The odds-to-score relationship is an arbitrary mapping between risk and score and does not reflect protectable intellectual property. Similarly, the reason codes that may not be used by an "Equivalent Product" were not invented by Fair Isaac, but rather reflect well-established industry best practices for lending.

124.    The "No Equivalent Products" clause is an effective restraint of trade because when one Credit Bureau stops using VantageScore, it becomes even less attractive to the other Credit Bureaus. B2B Purchasers will not want to use a credit scoring system unless all of the main Credit Bureaus use it. This phenomenon is often referred to as a "network effect." By imposing a "No Equivalent Products" term, Fair Isaac sought to block the Credit Bureaus from enabling B2B Purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems and from using VantageScore alongside or interchangeably with FICO Scores.

125.    By entering contracts containing anticompetitive "No Equivalent Products" provisions, the Credit Bureaus agreed to terms that had the effect of eliminating or drastically reducing the competitive threat posed by VantageScore, thus unreasonably restraining trade.

### ii.    The "Dynamic Royalty Schedule" Provisions

126.    The contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively, include a similar or identical "Dynamic Royalty Schedule" clause that allows Fair

Isaac to replace its existing royalty with a new one and thereby gives Fair Isaac the ability to control the prices of FICO Scores. The TransUnion ADLA Dynamic Royalty Schedule Provision (§ 9.2) provides that "'once every twelve (12) months during the Term, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing.'"[83]

127.    According to TransUnion, "Fair Isaac has abused and exploited this provision in 2015, 2016, and 2017 by not only raising prices, but also introducing entirely new and non-negotiated contract terms, royalty categories, and definitions."[84]

128.    In 2015, Fair Isaac unilaterally imposed (in a footnote to its royalty schedule) a new "Pre-Qualification" royalty category, which Fair Isaac defines to "mean an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category distinguishes between: "(1) lenders that use FICO Scores for 'Pre-Qualification' without providing any credit score or credit data to consumers; and (2) lenders that use FICO Scores for 'Pre-Qualification' while also providing credit score or credit data to consumers 'in connection' with 'Pre-Qualification.'" Certain B2B Purchasers offer consumers opportunities to apply to qualify for credit opportunities (*e.g.*, a credit card or loan) and, at the same time, receive their personal credit score. "The offer of a free credit score to a consumer can entice consumers to apply for credit opportunities."[85]

129.    "The royalty price associated with a FICO score used for 'Pre-Qualification' depends on whether other credit score or credit data are provided to a consumer. If a lender

---

[83]    TransUnion Counterclaims, ¶ 50.

[84]    *Id.*

[85]    *Id.*, ¶ 51.

purchases a FICO Score for use in 'Pre-Qualification' and does not provide any credit score or credit data to the consumer 'in connection' with the 'Pre-Qualification,' there is one per-score royalty rate. If the lender purchases a FICO score for use in 'Pre-Qualification' and provides a VantageScore (or any other credit score) to the consumer 'in connection' with the 'Pre-Qualification,'" Fair Isaac charges the lender a *seven times penalty rate* for that FICO Score. That steep penalty is meant to dissuade lenders from providing competing credit scores, such as a VantageScore.[86]

130. "The penalty rate can be avoided in one of two ways, both of which involve *purchasing exclusively FICO Scores*. First, the [B2B Purchaser] could purchase a FICO Score for use in 'Pre-Qualification' and provide no credit score or credit data to the consumer. Second, the [B2B Purchaser] could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of scores by lenders (in the B2B market) with the provision of scores to consumers (in the B2C market)."[87]

131. TransUnion accepted, complied with, and made royalty payments according to the new "Pre-Qualification" royalty category. On information and belief, so have Experian and Equifax.[88]

132. The Dynamic Royalty Schedule provisions in the contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively, unreasonably restrain trade. Indeed, there is no legitimate business justification for the penalty rate agreed upon by Fair Isaac and each of the Credit Bureaus and that is charged when the B2B Purchaser also purchases other credit scores

---

[86] *Id.*, ¶ 52.

[87] *Id.*, ¶ 53 (emphasis added).

[88] *See id.*, ¶ 55.

(*e.g.*, a VantageScore). The purpose of the "Pre-Qualification" royalty category is to drive all B2B Purchasers engaging in "Pre-Qualification" to purchase exclusively FICO Scores and make it cost-prohibitive for B2B Purchasers engaging in "Pre-Qualification" to purchase a competing credit score for disclosure to consumers.

133.    According to TransUnion, "[t]his scheme has been effective, and no B2B Purchasers from TransUnion have opted to pay the penalty rate."[89] The purpose and effect of this clause was to prevent VantageScore from obtaining market share, thereby unreasonably restraining trade.

### iii.    The "Level Playing Field" Provisions

134.    In exchange for agreeing to the "No Equivalent Products" and "Dynamic Royalty" provisions in their agreements with Fair Isaac – which effectively prevent the Credit Bureaus from marketing VantageScore to B2B Purchasers – Fair Isaac committed not to offer any Credit Bureau a more favorable price for FICO Scores than any other Credit Bureau. This commitment was embodied in the Level Playing Field clauses of the agreements with the Credit Bureaus. Those provisions forbid Fair Isaac to charge any Credit Bureau a price that is lower than the price it charges any other Credit Bureau.[90]

135.    The Level Playing Field provision of the TransUnion ADLA is contained in §9.16. Fair Isaac's contracts with TransUnion, Equifax, and Experian include similar or identical "Level

---

[89]    *Id.*, ¶ 54.
[90]    *See id.*, ¶ 59.

Playing Field" and "Dynamic Royalty Schedule" provisions.[91]  The Credit Bureaus agreed to, and have complied with, these contract provisions.[92]

136.   The Credit Bureaus advanced Fair Isaac's interests by agreeing to the No Equivalent Products and Dynamic Royalty Schedule clauses, which sabotaged the Credit Bureaus' own competing VantageScore and gave FICO flexibility to raise prices.  The Level Playing Field clause, in return, protected each Credit Bureau from the risk that Fair Isaac would selectively offer discounts that could expose it to price competition.

137.   The Level Playing Field provision also functions as a cost-information-sharing mechanism among the Credit Bureaus.  The Federal Trade Commission ("FTC") has determined that "when competing companies," like the Credit Bureaus, "exchang[e] price or other commercially sensitive information, that may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws."[93]  Indeed, "the sharing of information relating to price, *cost*, output, customers, or strategic planning is more likely to be of competitive concern than the sharing of less competitively sensitive information.[94]

138.   By ensuring that no one Credit Bureau receives a more favorable price than the other, the Level Playing Field provision essentially confirms to each Credit Bureau the price the other competing Credit Bureaus are paying for FICO's algorithm.  Information about what their competitors are paying for this must-have product is valuable to the Credit Bureaus who can then

---

[91]   FICO Answer to DPP Complaint, ¶116 (Dynamic Royalty Schedule), ¶124 (Level Playing Field).

[92]   *Id.*

[93]   Michael Bloom, *Information exchange: be reasonable*, FED. TRADE COMM'N (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable (emphasis added).

[94]   *Id.*

use this cost information to reduce price competition for the services they provide. As Fair Isaac has pointed out, previously, "a Credit Bureau could not be sure what its competitors' costs were and, consequently, to what extent its competitors could cut the price of their Credit Scores. This uncertainty could be used by Lenders to induce price competition among the Credit Bureaus."[95] Fair Isaac claimed in its earlier lawsuit that the Credit Bureaus sought to use VantageScore so that "each Credit Bureau will know that it is paying exactly the same cost as its competitors for its scoring algorithm, and Lenders will no longer be able to use this uncertainty to play one Credit Bureau against the others."[96] In a rich irony, the Level Playing Field provision does exactly what Fair Isaac accused the Credit Bureaus of trying to accomplish through VantageScore: prevent their customers from playing one Credit Bureau against the others, thereby reducing price competition for credit reports. The contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively – which all contain Level Playing Field provisions – thus unreasonably restrain trade.

139. The provision is demonstrably important to the Credit Bureaus. As was revealed through Fair Isaac's suit against TransUnion, in the negotiations over its Canadian contract, TransUnion *insisted* that Fair Isaac include a "Level Playing Field" clause. That clause would have given TransUnion Canada a right to any discounts or special pricing terms that Fair Isaac might offer other Credit Bureaus for the license or distribution of FICO scores in Canada. The Level Playing Field clause was so valuable to TransUnion of Canada that it continued to insist on one until Fair Isaac threatened to withhold its Canadian business entirely.

140. Fair Isaac and the Credit Bureaus have used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions to extract monopoly prices from B2B Purchasers. The

---

[95] Third Amended Complaint, Dkt. 436, *Fair Isaac Corp. v. Experian Info Sols.*, No. 06-cv-4112 (D. Minn. Nov. 10, 2008), ¶ 138.
[96] *Id.*

Level Playing Field clause, like a most-favored nation clause, reduces Fair Isaac's incentive to give any discounts to the Credit Bureaus given that, by the terms of that provision, the same discount would need to be extended to all Credit Bureaus. On the other hand, by the terms of the provision, if Fair Isaac were to give any one Credit Bureau a discount, it would have to offer the same discount to the other Credit Bureaus. Therefore, the provision ensures that no Credit Bureau could obtain a competitive price advantage, *i.e.*, more favorable pricing. The provision thus substantially weakens the incentives the Credit Bureaus have to negotiate a lower price with Fair Isaac. As a result, Fair Isaac can freely increase prices with little resistance from the Credit Bureaus. And it has done so – Fair Isaac admitted in its Answer that "over the last several years" it has "increased the base (*i.e.*, undiscounted) royalty prices that it charges to the Credit Bureaus."[97] That price increase is ultimately borne by B2B Purchasers who pay a higher price for FICO Scores than they would have but for the Credit Bureaus' agreements to anticompetitive contract provisions.

141.    After entering into the contracts containing anticompetitive terms with the Credit Bureaus, Fair Isaac initiated multiple rounds of price increases. In 2019, Fair Isaac reported: *"On the B2B side, revenues were up 36% over the previous year, due primarily to the 2018 price adjustments."*[98] Again, in 2021, Fair Isaac reported that:

> *[R]evenues were $169 million, up 31% from the same period last year.  B2B was up 25% over the same period last year*, driven by continued high volumes in mortgage originations as well as some unit price increases across our different score

---

[97]    FICO Answer to DPP Complaint, ¶142.

[98]    Motley Fool Transcription, *Fair Isaac Corporation (FICO) Q1 2019 Earnings Conference Call Transcript*, MOTLEY FOOL (Updated Apr. 24, 2019), https://www.fool.com/earnings/call-transcripts/2019/01/30/fair-isaac-corporation-fico-q1-2019-earnings-confe.aspx.

categories. In the B2B business, we also had a royalty true-up and an annual license deal this quarter that had a small positive impact on overall revenues.[99]

142.     As TransUnion has explained, taken together with the Dynamic Royalty Schedule provisions, the Level Playing Field provisions "enable Fair Isaac to unilaterally increase the royalty prices it charges [the Credit Bureaus] for FICO scores."[100]

143.     Notably, TransUnion has admitted that, to the extent the Level Playing Field provision resulted in higher rates, those costs were ultimately also borne by "banks [and] mortgage lenders" (i.e., B2B Purchasers).[101] Thus, through their contracts containing anticompetitive terms, the Credit Bureaus and Fair Isaac extracted supracompetitive profits from consumers (i.e., B2B Purchasers).

144.     In discussing the impact of "the FICO price increase" on Experian, Experian Vice President and Chief Financial Officer, John W. Gamble confirmed during a 2019 earnings call that Experian "pass[es] it through to [its] customers."[102]

145.     Equifax's Chief Executive Officer, Mark W. Begor confirmed the same: When FICO "put through a price increase . . . Equifax[,] TU and Experian deliver[ed] that price increase to the marketplace, when they increase the price of their credit score. So that rolled through."[103]

---

[99]     Motley Fool Transcribers, *Fair Isaac Corp (FICO) Q2 2021 Earnings Call Transcript*, MOTLEY FOOL (May 6, 2021), https://www.fool.com/earnings/call-transcripts/2021/05/06/fair-isaac-corp-fico-q2-2021-earnings-call-transcr/.

[100]     TransUnion Counterclaims, ¶59.

[101]     *Id.*, ¶60.

[102]     John W. Gamble, VP & CFO, Remarks at Q1 2019 Equifax Inc. Earnings Call (May 10, 2019) (transcript available in Westlaw).

[103]     Mark W. Begor, CEO, Remarks at Q2 2023 Equifax Inc. Earnings Call (July 20, 2023) (transcript available in Westlaw).

**D.    Fair Isaac's Additional Efforts to Deter B2B Purchasers from Using VantageScore**

146.    Having agreed with the Credit Bureaus to impose restrictions on VantageScore's ability to compete against FICO, Fair Isaac went even further and waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScore. In advertisements, letters, and blog posts, Fair Isaac disparaged VantageScore Solutions and VantageScore, falsely claiming that VantageScore is an unreliable measure of creditworthiness, and misrepresenting the information considered by VantageScore Solutions' credit scoring system.

147.    On December 5, 2017, for example, Mr. Lansing criticized banks for using VantageScore, saying that credit score was "fako"; "'looks like it, smells like it, feels like it – it's being presented as some kind of an indication of your health, but if you look at the fine print, you'll discover that it's not a FICO score.'"[104]

148.    Media sources, financial blogs, and consumers have absorbed Fair Isaac's message that VantageScore is a "Fako" score merely because it is not a FICO Score.  For example, thebalance.com – a website devoted to personal finance issues – posted at least as far back as August 2018: "If you purchased your Credit Score anywhere but myFICO.com, then it's a Fako score."  The post remains on the site to this day.[105]

149.    Similarly, on December 12, 2017, "Fair Isaac took out a full-page advertisement in *The Wall Street Journal* addressed to 'Lenders, Policymakers and Consumer Advocates' that disparaged VantageScore Solutions and VantageScore without identifying it by name.  The

---

[104]    Alistair Gray, *Credit score row as FICO chief hits out at banks over 'Fako' rivals*, FIN. TIMES (Dec. 5, 2017), https://www.ft.com/content/2222880c-cfa5-11e7-9dbb-291a884dd8c6.

[105]    Latoya Irby, THE BALANCE, *FICO & FAKO Credit Scores* (Oct. 30, 2021), https://www.thebalance.com/fico-and-fako-credit-scores-960497.

46

advertisement contrasted Fair Isaac, which 'is not owned by the credit bureaus' and whose FICO scores have been used 'by lenders and securitization investors for decades,' with an alternative credit score, which is 'owned by the credit bureaus,' is less reliable than FICO scores in evaluating credit risk, and fails to use 'sound practices' or 'science-based credit evaluation.' To anyone familiar with the market for credit scores, the advertisement unambiguously conveys the false message that VantageScore is 'Weakening scoring standards, [and] harm[ing] consumers, and the lending system,'" particularly in the B2B Credit Score Market.[106]

150. "The *Wall Street Journal* advertisement directed readers to '[l]earn more at FICO.com/independent,' a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name."[107] One such blog post, written in 2016 by Joanne Gaskin, the Vice-President of Scores and Analytics at Fair Isaac, asserted: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."[108]

151. Fair Isaac's disparagement and false or misleading statements are not limited to the "FICO.com/independent" page. Fair Isaac's own blog (FICO.com/blogs) also includes numerous disparaging and false or misleading statements about VantageScore Solutions, VantageScore, and related topics.

152. Fair Isaac executives have written multiple posts disparaging VantageScore Solutions and VantageScore. Fair Isaac's Vice-President of FICO Scores and Predictive Analytics, Ethan Dornhelm, wrote: "We wanted to find out if it's possible to calculate a

---

[106] TransUnion Counterclaims, ¶ 66 (alterations in original).

[107] *Id.*, ¶ 67.

[108] *Id.*

meaningful, reliable score using credit bureau data alone. Spoiler alert: it's not. Research results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance."[109] Ms. Gaskin echoed those findings.[110] Those statements are false and misleading because studies have shown that VantageScore is strongly predictive.[111]

153.    Another blog post written by Ms. Gaskin claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not." [112] "This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones."[113]

154.    Similarly, Fair Isaac fought hard against the efforts to create a process that would allow alternative credit scoring models to be validated and approved by Fannie Mae and Freddie Mac when they purchase mortgages. Such a rule would clearly benefit VantageScore, which could

---

[109]    Ethan Dornhelm, FICO BLOG, *Why Bureau Data Alone Can't Score More Consumers* (Nov. 16, 2015), https://www.fico.com/blogs/why-bureau-data-alone-cant-score-more-consumers.

[110]    Joanne Gaskin, FICO BLOG, *FICO Fact: Does FICO's Minimum Scoring Criteria Limit Consumers' Access to Credit?* (Oct. 12, 2021), https://www.fico.com/blogs/fico-fact-does-ficos-minimum-scoring-criteria-limit-consumers-access-credit ("Our research has consistently found that models that rely solely on sparse and/or outdated credit information are less reliable at forecasting future performance.").

[111]    *See* VantageScore Report, *supra* n.50 at 2, 4-6.

[112]    Joanne Gaskin, FICO BLOG, *Truth Squad: Is FICO Score 700 the Same as VantageScore 700?* (Feb. 6, 2017), https://www.fico.com/blogs/truth-squad-fico-score-700-same-vantagescore-700.

[113]    TransUnion Counterclaims, ¶ 71.

then attempt to break Fair Isaac's 100% monopoly in this sector. Public sentiment favored this move.[114] Fair Isaac did not. Indeed, it deployed Ms. Gaskin to give press interviews saying that Fair Isaac's alleged monopoly is a "myth."[115] Fair Isaac also hired a research group to present the argument that VantageScore's promise of home ownership to millions more Americans was deceptive and that the company's ownership by the Credit Bureaus was anticompetitive, an argument that failed during the trademark litigation discussed above.[116] The FHFA ultimately adopted a final rule that permitted rival generators of credit scores to apply to serve Fannie Mae and Freddie Mac, saying that "FHFA has concluded that allowing all credit score model developers to submit applications is more consistent with [the applicable statute], which does not prevent any credit score model from being considered for potential use in the mortgage market." [117]

155.    The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

---

[114]    *See* Bloomberg Business News, *This Monopoly Is Holding Back the Mortgage Market*, (Jan. 18, 2018), https://www.bloomberg.com/opinion/articles/2018-01-18/this-credit-score-monopoly-is-holding-back-the-mortgage-market; Paul Weinstein, Jr., *No Company Should Have a Monopoly on Credit Scoring*, The Hill (Dec. 7, 2017), https://thehill.com/opinion/finance/363755-no-company-should-have-a-monopoly-on-credit-scoring.

[115]    *FICO: The 'Credit Score Monopoly' is a Myth*, DS News (Dec. 18, 2015), https://dsnews.com/news/12-18-2015/fico-the-credit-score-monopoly-is-a-myth.

[116]    Quantilytic LLC, *Risks and Opportunities in Expanding Mortgage Credit Availability Through New Credit Scores*, at 22 (Dec. 2017), https://www.progressivepolicy.org/wp-content/uploads/2017/12/UpdatedCreditScoring_2017.pdf (research sponsored by Fair Isaac).

[117]    Fed. Hous. Fin. Agency, *Validation and Approval of Credit Score Models Final Rule*, 12 C.F.R. 1254 at 23 (Aug. 16, 2019), https://www.fhfa.gov/SupervisionRegulation/Rules/Rule Documents/8-7-19%20Validation%20Approval%20Credit%20Score%20Models%20Final%20 Rule_to%20Fed%20Reg%20for%20Web.pdf.

VI.   **THE CONTRACTS BETWEEN FAIR ISAAC AND EACH OF THE CREDIT BUREAUS CONTAINING ANTICOMPETITIVE TERMS, ALONG WITH FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT, HARM COMPETITION IN THE B2B CREDIT SCORE MARKET**

156.   The anticompetitive terms contained in the contracts between Fair Isaac and each of the Credit Bureaus, along with Fair Isaac's campaign of exclusionary conduct to maintain and expand its monopoly has harmed and continues to harm participants in the B2B Credit Score Market.   Fair Isaac's unlawful conduct, including its agreements with the Credit Bureaus containing anticompetitive contract terms, has foreclosed competition in the B2B Credit Score Market by limiting the ability of VantageScore to compete with Fair Isaac.   The anticompetitive and exclusionary conduct unreasonably restrains trade and maintains Fair Isaac's monopoly by, among other things, allowing it to charge supracompetitive prices for B2B credit scores to B2B Purchasers during the Class Period.

157.   Fair Isaac's Scores business operates with an incredibly high operating margin of 86%.[118]   To maximize its monopoly rent, Fair Isaac has increased its prices for FICO Scores significantly in recent years.   In 2018, after securing agreements from each of the three Credit Bureaus to abide by anticompetitive contract terms, FICO implemented a special pricing increase for mortgage customers that was an approximately 75% increase from $0.06/score to $0.10/score.[119]   In the following two years, FICO again rolled out special pricing increases to its auto customers and to some credit card customers.[120]   FICO admitted in its Answer that, "over the last several years," it has "increased the base (*i.e.*, undiscounted) royalty prices that it charges to the Credit Bureaus."[121]

158.   Fair Isaac's conduct and the anticompetitive provisions agreed upon in contracts between the Credit Bureaus and Fair Isaac, have reduced choice for B2B Purchasers.   The anticompetitive terms agreed to between Fair Isaac and the Credit Bureaus have frustrated the

ability of B2B Purchasers to purchase VantageScore. Fair Isaac's media and advertising campaign against VantageScore Solutions and VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace.

## CLASS ACTION ALLEGATIONS

159.    Plaintiffs bring this action on behalf of themselves, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of:

> All B2B Purchasers residing in the United States and its territories that directly purchased a FICO score from Fair Isaac and/or a Credit Bureau during the period from October 1, 2006 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

Excluded from the Class are Defendants, their officers, directors, management, employees, subsidiaries, and affiliates. Also excluded are any natural persons who purchased their own credit score solely via myFico.com, the Credit Bureaus, or other entities for their personal use. Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household or the spouse of such a person.

160.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records in the possession of Defendants.

---

[118]    Jose Karlo Mari Tottoc, Yahoo! Finance, *Headwaters Capital: 'Fair Isaac Corp (FICO) Can Grow Its Free Cash Flow by 15-20% Annually'* (Jan. 23, 2021), https://finance.yahoo.com/news/headwaters-capital-fair-isaac-corp-202237954.html.

[119]    *Id.*

[120]    *Id.*

[121]    FICO Answer to DPP Complaint, ¶142.

51

161.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and members of the Class were damaged by the same wrongful conduct of Defendants.

162.    Plaintiffs will fairly and adequately protect and represent the interests of members of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of members of the Class.

163.    Plaintiffs are represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including class actions in the financial services industry.

164.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate.  Questions of law and fact common to members of the Class include, but are not limited to:

a.    whether Fair Isaac monopolized, and whether Defendants entered into contracts that unreasonably restrain trade, in violation of federal law;

b.    whether Fair Isaac monopolized, and whether Defendants entered into contracts that unreasonably restrain trade, in violation of certain state antitrust laws;

c.    whether Defendants engaged in unfair or deceptive trade practices in violation of certain state laws;

d.    the duration of the alleged unlawful conduct;

e.    injury suffered by Plaintiffs and members of the Class;

f.    damages suffered by Plaintiffs and members of the Class; and

g. whether Defendants have acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

165. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

166. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

167. Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

168. Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## STATUTES OF LIMITATIONS AND TOLLING

### I. THE STATUTES OF LIMITATIONS DID NOT BEGIN TO RUN BECAUSE PLAINTIFFS DID NOT DISCOVER, AND COULD NOT HAVE DISCOVERED, DEFENDANTS' UNLAWFUL SCHEME

169. Plaintiffs had no knowledge of the agreements, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) February 12, 2018, the date that TransUnion filed its Counterclaims against Fair Isaac. Prior to that time, no information in

the public domain or available to Plaintiffs suggested that any Defendant was involved in an anticompetitive scheme involving the distribution of credit scores.

170.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public websites, that they maintained policies that prohibited the type of anticompetitive conduct alleged in this First Amended Consolidated Complaint.  For example:

a.    Fair Isaac's Code of Business Conduct and Ethics states: "We seek to outperform our competition fairly and honestly.  We seek competitive advantages through superior performance, never through unethical or illegal business practices."[122]

b.    Equifax's Code of Ethics and Business Conduct states: "We believe in free and open competition and never engage in improper practices that may limit competition."[123]

c.    Experian's Code of Conduct states: "We will not engage in any form of agreement with competitors to fix prices, rig bids, allocate customers and/or restrict supply in the market place."  "We will comply with all applicable laws, rules, and regulations in every jurisdiction in which we operate, including but not limited to . . . antitrust/competition."[124]

d.    TransUnion's Code of Business Conduct states: "All TransUnion Team Members must understand how competition and antitrust laws affect their daily work.  You must fully and consistently comply with applicable competition and antitrust laws."[125]

---

[122]    Fair Isaac, *Code of Business Conduct and Ethics*, https://fico.gcs-web.com/static-files/ed6519a4-2148-4166-82f2-4636e0713531 (last visited Oct. 27, 2023).

[123]    Equifax, *Code of Ethics and Business Conduct* (Aug. 2019), https://web.archive.org/web/20210326175746/https://assets. equifax.com/assets/corp/code_of_ethics.pdf.

[124]    Experian, *Our Code of Conduct* (2019), https://www.experian.com/content/dam/ marketing/na/assets/corp/procurement-documents/experian-code-of-conduct-final-board-approved.pdf.

[125]    TransUnion, *Code of Business Conduct* (2017), https://investors.transunion.com/~/media/ Files/T/Transunion-IR/governance-documents/code-of-business-conduct-150618.pdf.

54

171.     It was reasonable for Plaintiffs and members of the Class to believe that Defendants were complying with their own policies.

172.     Moreover, upon information and belief, Plaintiffs and members of the Class could not have discovered the anticompetitive provisions in the licensing agreements between Fair Isaac and the Credit Bureaus, such as the TransUnion ADLA, as those agreements are subject to confidentiality provisions that have prohibited the credit reporting agencies from disclosing their terms to third parties absent written authorization from Fair Isaac.[126]

173.     Finally, Plaintiffs and members of the Class, as customers of Defendants, had no means to discover the existence of Defendants' anticompetitive contract provisions.

174.     For these reasons, the statutes of limitations applicable to Plaintiffs' claims did not begin to run until the date that TransUnion filed its counterclaims against Fair Isaac and have been tolled with respect to the claims that Plaintiffs have alleged in this First Amended Consolidated Complaint.

## II.     FRAUDULENT CONCEALMENT TOLLED THE STATUTES OF LIMITATIONS

175.  .  In the alternative, the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiffs' claims.    During the Class Period, Defendants wrongfully and affirmatively concealed their unlawful conduct.   Plaintiffs and members of the Class had no knowledge of Defendants' anticompetitive contracts and could not have discovered them through the exercise of reasonable diligence until (at the earliest) February 12, 2018, when TransUnion filed its Counterclaims against Fair Isaac.

---

[126]      *See* Dkt. 32, Motion for Leave to File Under Seal, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Jan. 22, 2018), ¶ 2 ("contracts between the Parties . . . are subject to confidentiality provisions that prohibit TransUnion from disclosing the terms of the contract to third parties absent written authorization from Fair Isaac").

176.    By their very nature, antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants contracted through confidential agreements that did not put Plaintiffs or the Class on inquiry notice that there were contracts to restrain trade that raised the prices for credit scores above the competitive level. Credit scores are not exempt from antitrust regulation, and thus, before TransUnion filed its Counterclaims against Fair Isaac, Plaintiffs reasonably considered the market to be competitive. Moreover, Defendants employed deceptive tactics and techniques to avoid detection of, and to conceal, their anticompetitive scheme.

177.    Defendants wrongfully and affirmatively concealed the existence of their anticompetitive contracts from Plaintiffs and members of the Class by, among other things:

a.    agreeing to confidentiality provisions that have prohibited the Credit Bureaus from disclosing the anticompetitive provisions in the licensing agreements between Fair Isaac and the Credit Bureaus, such as the TransUnion ADLA;

b.    concealing the fact that Fair Isaac and the Credit Bureaus agreed, through the "No Equivalent Products" clause, not to internally develop a competing credit scoring system that is aligned with FICO Scores or uses too many of the same reason codes;

c.    concealing the fact that the purpose of the "No Equivalent Products" clause was to prevent the Credit Bureaus from offering credit scoring products that would allow business-consumers a legitimate choice between FICO Scores and VantageScore or another alternative scoring product, thereby sustaining Fair Isaac's dominance in the market;

d.    concealing the fact that Fair Isaac and the Credit Bureaus agreed, through the "Level Playing Field" clauses, that prices made available to one credit bureau be made available to all the others;

e. concealing the fact that the purpose and effect of the "Level Playing Field" and "Dynamic Royalty Schedule" clauses is to disincentivize each Credit Bureau from negotiating lower royalty prices for FICO Scores; and

f. as to Fair Isaac, engaging in a false and misleading campaign about VantageScore Solutions and VantageScore to misrepresent VantageScore's viability as a competitor to FICO Scores.

178. As a result of Defendants' affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiffs and members of the Class have been and are tolled, and Defendants are equitably estopped from raising statutes of limitations as a defense.

III. **DEFENDANTS' ACTIONS CONSTITUTE A CONTINUING VIOLATION**

179. In addition, and in the alternative, this Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statute of limitations.

180. A claim accrued for Plaintiffs each time FICO Scores were sold to Plaintiffs at prices artificially inflated by Defendants' anticompetitive conduct. Each sale of FICO Scores at a supracompetitive price constituted another overt act in furtherance of Defendants' agreements to restrain trade. Moreover, Defendants' statements and actions described above demonstrate that throughout the Class Period they engaged in new overt acts that further served the objectives of their anticompetitive agreements to restrain trade.

181. Defendants' new overt acts were more than the inertial consequences of Defendants' initial violation. Rather, their acts were new and independent acts that perpetuated their agreement and kept it current with market conditions, including by renewing agreements, or entering into new agreements, with anticompetitive terms. Defendants continuously renewed and

refined their agreement to reflect market conditions. With each refinement of their agreement, Defendants inflicted new and accumulating injury on Plaintiffs and members of the Class. For instance, as alleged above, Fair Isaac exploited the ADLA Royalty Schedule Provision in 2015, 2016, and 2017 to introduce entirely new and non-negotiated contract terms, royalty categories, and definitions that expanded the anticompetitive scheme.

182. Therefore, Plaintiffs and members of the Class are entitled to recover damages they suffered during any applicable limitations period.

## CLAIMS FOR RELIEF

## CLAIM ONE: UNREASONABLE RESTRAINT OF TRADE
(15 U.S.C. §§1, 3)

183. Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

184. This Claim One is brought against Defendant Fair Isaac.

185. The relevant period of this Claim One is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

186. The agreements between Fair Isaac and each of the Credit Bureau Defendants violate Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) because they are agreements between Fair Isaac and the Credit Bureaus that restrained trade in the relevant market.

187. The relevant product market is the market for the sale of B2B credit scores.

188. The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

189. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

190. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

191. Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

192. Fair Isaac entered into agreements with each of TransUnion, Experian, and Equifax that contained anticompetitive terms whereby each Credit Bureau agreed with Fair Isaac to contractual limitations that harmed the ability of the Credit Bureaus to market VantageScore, a competing product, to Plaintiffs and members of the Class and forestalled price competition in the B2B Credit Score Market.

193. The agreements between Fair Isaac and each of the Credit Bureaus had substantial anticompetitive effects. The agreements excluded VantageScore, a would-be significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

194. The agreements raised the price for credit scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

195. The aforesaid exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

196. Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Defendants do not cease their anticompetitive conduct.

197. Plaintiffs and members of the Class have been injured in their business or property by reason of Defendants' violation of Sections 1 and 3 of the Sherman Act, within the meaning of Section 4 of the Clayton Act (15 U.S.C. §15).

198. Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Defendant Fair Isaac's violation of Sections 1 and 3 of the

Sherman Act (15 U.S.C §§1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. §26).

## CLAIM TWO: UNREASONABLE RESTRAINT OF TRADE
### (15 U.S.C. §§1, 3)

199.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

200.    This Claim Two is brought against Defendants Fair Isaac and Experian.

201.    The relevant period of this Claim Two is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

202.    The anticompetitive agreement between Fair Isaac and Experian violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), because it is a contract that unreasonably restrained trade – regardless of whether Experian shared Fair Isaac's anticompetitive purpose, and regardless of whether Experian accepted the agreement as a result of Fair Isaac's negotiating leverage.

203.    The relevant product market is the market for the sale of B2B credit scores.

204.    The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

205.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

206.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

207.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

208.    Fair Isaac entered into an agreement with Experian that contained anticompetitive terms whereby Experian agreed with Fair Isaac to contractual limitations that harmed

VantageScore's ability to compete and forestalled price competition in the B2B Credit Score Market.

209.    The agreement between Fair Isaac and Experian had substantial anticompetitive effects.   The agreement excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

210.    The agreement between Fair Isaac and Experian raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

211.    The foregoing exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

212.    Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac and Experian do not cease their anticompetitive conduct.

213.    Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac and Experian's violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3), within the meaning of Section 4 of the Clayton Act (15 U.S.C. § 15).

214.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac and Experian's continuing violation of Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. § 26).

215.    In addition to competing with Experian in the credit scores market, Fair Isaac licenses its algorithm to Experian, which uses the algorithm to calculate credit scores for B2B Purchasers.   As a result of the exclusionary contract terms, Experian discourages its customers from using or purchasing access to competing credit scores.   Because Experian has substantial

61

market power, it can harm its customers in this way without taking the risk that they will switch to competing Credit Bureaus. In return for contracting with Fair Isaac to restrain trade in the credit scores market, Experian benefits from the Level Playing Field clause, which reduces competition among the Credit Bureaus in the B2B credit reports market.

## CLAIM THREE: UNREASONABLE RESTRAINT OF TRADE
### (15 U.S.C. §§1, 3)

216.     Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

217.     This Claim Three is brought against Defendants Fair Isaac and Equifax.

218.     The relevant period of this Claim Three is from November 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

219.     The anticompetitive agreement between Fair Isaac and Equifax violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), because it unreasonably restrained trade – regardless of whether Equifax shared Fair Isaac's anticompetitive purpose, and regardless of whether Equifax accepted the agreement as a result of Fair Isaac's negotiating leverage.

220.     The relevant product market is the market for the sale of B2B credit scores.

221.     The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

222.     Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

223.     Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

224.     Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

62

225. Fair Isaac entered into an agreement with Equifax that contained anticompetitive terms whereby Equifax agreed with Fair Isaac to contractual limitations that harmed VantageScore's ability to compete and forestalled price competition in the B2B Credit Score Market.

226. The agreement between Fair Isaac and Equifax had substantial anticompetitive effects. The agreement excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

227. The agreement between Fair Isaac and Equifax raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

228. The aforesaid exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

229. Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac and Equifax do not cease their anticompetitive conduct.

230. Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac and Equifax's violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3), within the meaning of Section 4 of the Clayton Act (15 U.S.C. §15).

231. Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac and Equifax's continuing violation of Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. §26).

232. In addition to competing with Equifax in the credit scores market, Fair Isaac licenses its algorithm to Equifax, which uses the algorithm to calculate credit scores for B2B

63

Purchasers. As a result of the exclusionary contract terms, Equifax discourages its customers from using or purchasing access to competing credit scores. Because Equifax has substantial market power, it can harm its customers in this way without taking the risk that they will switch to competing Credit Bureaus. In return for contracting with Fair Isaac to restrain trade in the credit scores market, Equifax benefits from the Level Playing Field clause, which reduces competition among the Credit Bureaus in the B2B credit reports market.

## CLAIM FOUR: UNREASONABLE RESTRAINT OF TRADE
## (15 U.S.C. §§1, 3)

233. Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

234. This Claim Four is brought against Defendants Fair Isaac and TransUnion.

235. The relevant period of this Claim Four is from February 2015 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

236. The anticompetitive agreement between Fair Isaac and TransUnion violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), because it unreasonably restrained trade – regardless of whether TransUnion shared Fair Isaac's anticompetitive purpose, and regardless of whether TransUnion accepted the agreement as a result of Fair Isaac's negotiating leverage.

237. The relevant product market is the market for the sale of B2B credit scores.

238. The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

239. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

240. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

64

241.     Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

242.     Fair Isaac entered into an agreement with TransUnion that contained anticompetitive terms whereby TransUnion agreed with Fair Isaac to contractual limitations that harmed VantageScore's ability to compete and forestalled price competition in the B2B Credit Score Market.

243.     The agreement between Fair Isaac and TransUnion had substantial anticompetitive effects.  The agreement excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

244.     The agreement between Fair Isaac and TransUnion raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

245.     The aforesaid exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

246.     Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac and TransUnion do not cease their anticompetitive conduct.

247.     Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac and TransUnion's violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3), within the meaning of Section 4 of the Clayton Act (15 U.S.C. §15).

248.     Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac and TransUnion's continuing violation of Sections 1 and 3 of the Sherman Act (15 U.S.C §§1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. §26).

249. In addition to competing with TransUnion in the credit scores market, Fair Isaac licenses its algorithm to TransUnion, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, TransUnion discourages its customers from using or purchasing access to competing credit scores. Because TransUnion has substantial market power, it can harm its customers in this way without taking the risk that they will switch to competing Credit Bureaus. In return for contracting with Fair Isaac to restrain trade in the credit scores market, TransUnion benefits from the Level Playing Field clause, which reduces competition among the Credit Bureaus in the B2B credit reports market.

## CLAIM FIVE: MONOPOLIZATION
### (15 U.S.C. §2)

250. Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

251. This Claim Five is brought against Defendant Fair Isaac.

252. The relevant product market is the market for the sale of B2B credit scores.

253. The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

254. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

255. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

256. Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

257. Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market

66

for B2B credit scores in the United States in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

258. Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand to supracompetitive levels.

259. Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

260. Fair Isaac's monopolization has injured and will continue to injure competition in this market.

261. Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

262. The anticompetitive conduct raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

263. Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac's violation of Section 2 of the Sherman Act (15 U.S.C. § 2) within the meaning of Section 4 of the Clayton Antitrust Act (15 U.S.C. § 15).

264. Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac's continuing violation of Section 2 of the Sherman Act (15 U.S.C. § 2) within the meaning of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26).

## CLAIM SIX: STATE ANTITRUST LAWS

265. Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

266. This Claim Six is brought against all Defendants.

267.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following antitrust statutes.

268.    Arizona: Defendants' anticompetitive conduct has restrained trade in violation of Arizona Revised Statutes §§ 44-1401 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of the unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Ariz. Rev. Stat. §§ 44-1401 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401 *et seq.*

269.    California: During the Class Period, Defendants engaged in anticompetitive conduct in unreasonable restraint of trade and commerce in violation of California Business & Professions Code §§ 16700 *et seq.* To the extent that Plaintiffs seek recovery for Fair Isaac's acts of monopolization under these statutory provisions, while § 16700 does not reach solely unilateral conduct by a monopolist, it encompasses agreements between a monopolist and its customers where the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement. That is what happened here. This conduct constitutes a "combination" under the Cartwright Act. As a direct result of Defendants' unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their FICO Scores. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under § 16700.

270.    Connecticut: Defendants' anticompetitive conduct has restrained trade in violation of Connecticut General Statute §§ 35-26 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their

business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Connecticut General Statute §§ 35-26 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Connecticut General Statute §§ 35-26 *et seq.*

271. <u>District of Columbia</u>: Defendants' anticompetitive conduct has restrained trade in violation of District of Columbia Code Annotated §§ 28-4501 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of District of Columbia Code Ann. §§ 28-4501 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501 *et seq.*

272. <u>Illinois</u>: Defendants' anticompetitive conduct has restrained trade in violation of the Illinois Antitrust Act (740 ILCS 10/1 *et seq.*). During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of the Illinois Antitrust Act (740 ILCS 10/1 *et seq.*). Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the Illinois Antitrust Act (740 ILCS 10/1 *et seq.*).

273. <u>Iowa</u>: Defendants' anticompetitive conduct has restrained trade in violation of Iowa Code §§ 553.1 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Iowa Code §§ 553.1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §§ 553 *et seq.*

274. <u>Kansas</u>: Defendants' anticompetitive conduct has restrained trade in violation of Kansas Statutes Annotated §§ 50-101 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Kansas Stat. Ann. §§ 50-101 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101 *et seq.*

275. <u>Maine</u>: Defendants' anticompetitive conduct has restrained trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101 *et seq.*). During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101 *et seq.*

276. <u>Maryland</u>: Defendants' anticompetitive conduct has restrained trade in violation of Maryland Code, Commercial Law, §§ 11-204 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their

business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of Maryland Code, Commercial Law, §§11-204 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all relief available under Maryland Code, Commercial Law, §§11-204 *et seq.*

277.  <u>Michigan</u>: Defendants' anticompetitive conduct has restrained trade in violation of Michigan Compiled Laws Annotated §§445.771 *et seq.*  During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of Michigan Comp. Laws Ann. §§445.771 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all relief available under Michigan Comp. Laws Ann. §§445.771 *et seq.*

278.  <u>Minnesota</u>: Defendants' anticompetitive conduct has restrained trade in violation of Minnesota Annotated Statutes §§325D.49 *et seq.*  During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of Minnesota Stat. §§325D.49 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all relief available under Minnesota Stat. §§325D.49 *et seq.*

279.  <u>Mississippi</u>: Defendants' anticompetitive conduct has restrained trade in violation of Mississippi Code Annotated §§75-21-1 *et seq.*  During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.  As a direct and proximate result of

Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Mississippi Code Ann. §§ 75-21-1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Mississippi Code Ann. §§ 75-21-1 *et seq.*

280. <u>Nebraska</u>: Defendants' anticompetitive conduct has restrained trade in violation of Nebraska Revised Statutes §§ 59-801 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Nebraska Revised Statutes §§ 59-801 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Nebraska Revised Statutes §§ 59-801 *et seq.*

281. <u>Nevada</u>: Defendants' anticompetitive conduct has restrained trade in violation of Nevada Revised Statutes Annotated §§ 598A.010 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A *et seq.*

282. <u>New Hampshire</u>: Defendants' anticompetitive conduct has restrained trade in violation of New Hampshire Revised Statutes §§ 356:1 *et seq.* During the Class Period,

72

Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of New Hampshire Revised Statutes §§ 356:1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under New Hampshire Revised Statutes §§ 356:1 *et seq.*

283. <u>New Mexico</u>: Defendants' anticompetitive conduct has restrained trade in violation of New Mexico Statutes Annotated §§ 57-1-1 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

284. <u>New York</u>: Defendants' anticompetitive conduct has restrained trade in violation of New York General Business Laws §§ 340 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of the New York's Donnelly Act, §§ 340 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under New York Gen. Bus. Law §§ 340 *et seq.*

285. <u>North Carolina</u>: Defendants' anticompetitive conduct has restrained trade in violation of North Carolina General Statutes §§ 75-1 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under North Carolina Gen. Stat. §§ 75-1 *et seq*.

286. <u>North Dakota</u>: Defendants' anticompetitive conduct has restrained trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01 *et seq*.

287. <u>Oregon</u>: Defendants' anticompetitive conduct has restrained trade in violation of Oregon Revised Statutes §§ 646.705 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Oregon Revised Statutes §§ 646.705 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Oregon Revised Statutes §§ 646.705 *et seq*.

74

288. <u>Rhode Island</u>: Defendants' anticompetitive conduct has restrained trade in violation of Rhode Island General Laws, §§6-36-4 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Rhode Island General Laws, §§6-36-4 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Rhode Island General Laws, §§6-36-4 *et seq.*

289. <u>South Dakota</u>: Defendants' anticompetitive conduct has restrained trade in violation of South Dakota Codified Laws Ann. §§37-1-3.1 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of South Dakota Codified Laws Ann. §§37-1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under South Dakota Codified Laws Ann. §§37-1 *et seq.*

290. <u>Tennessee</u>: Defendants' anticompetitive conduct has restrained trade in violation of Tennessee Code Annotated §§47-25-101 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Tennessee Code Ann. §§47-25-101 *et seq.*

Accordingly, Plaintiffs and members of the Class seek all relief available under Tennessee Code Ann. §§ 47-25-10 *et seq.*

291. <u>Utah</u>: Defendants' anticompetitive conduct has restrained trade in violation of Utah Code Annotated §§ 76-10-911 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Utah Code Annotated §§ 76-10-911 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Utah Code Annotated §§ 76-10-911 *et seq.*

292. <u>Vermont</u>: Defendants' anticompetitive conduct has restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453 *et seq.*

293. <u>West Virginia</u>: Defendants' anticompetitive conduct has restrained trade in violation of West Virginia Code §§ 47-18-1 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of West Virginia Code §§ 47-18-1 *et seq.*

Accordingly, Plaintiffs and members of the Class seek all relief available under West Virginia Code §§ 47-18-1 *et seq.*

294. <u>Wisconsin</u>: Defendants' anticompetitive conduct has restrained trade in violation of Wisconsin Statutes §§ 133.01 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Wisconsin Stat. §§ 133.01 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Wisconsin Stat. §§ 133.01 *et seq.*

295. Plaintiffs and members of the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful monopolization, and anticompetitive agreements. Plaintiffs and members of the Class have paid more for FICO Credit Scores than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

296. In addition, Defendants have profited significantly from the aforesaid unlawful conduct. Their profits derived from monopolistic and/or and conspiratorial anticompetitive conduct that was undertaken at the expense and to the detriment of Plaintiffs and members of the Class.

297. Accordingly, Plaintiffs and members of the Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## CLAIM SEVEN: STATE UNFAIR AND DECEPTIVE TRADE PRACTICES LAWS

298.     Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

299.     This Claim Seven is brought against all Defendants.

300.     By reason of the foregoing, Defendants have violated, and Plaintiffs and members of the Class are entitled to relief under, the Unfair and Deceptive Trade Practices and Consumer Protection Laws of the following jurisdictions.

301.     <u>Arkansas</u>: Defendants have engaged in unfair, unconscionable, and/or deceptive practices in violation of Arkansas Code Annotated §§ 4-88-101 *et seq.*  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which FICO Scores were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Class.  The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).  Defendants' unlawful conduct had the following effects: (1) FICO Scores price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) FICO Scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.  During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated § 4-

78

88-107(a)(10) and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

302.  <u>California</u>: Defendants have engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of California Business & Professions Code §§ 17200 *et seq.* During the Class Period, Defendants marketed, sold, or distributed FICO Scores in California, and committed and continue to commit acts of unfair competition, as defined by §§ 17200 *et seq.* of the California Business & Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from these Defendant for acts, as alleged herein, that violated section 17200 of the California Business & Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business & Professions Code §§ 17200 *et seq.*, including, but not limited to, the following: (1) the violations of Sections 1, 2, and 3 of the Sherman Act, as set forth above; and (2) the violations of §§ 16720 *et seq.* of the California Business & Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of §§ 16720 *et seq.* of the California Business & Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of FICO Scores in the State of California within the meaning of § 17200, California Business & Professions Code; and (4) Defendants' acts and practices are fraudulent or

deceptive within the meaning of § 17200 of the California Business & Professions Code. Plaintiffs and members of the Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Class to pay supracompetitive and artificially inflated prices for FICO Scores. Plaintiffs and members of the Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violated § 17200 of the California Business & Professions Code. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business practices, pursuant to California Business & Professions Code §§ 17203 and 17204.

303. <u>District of Columbia</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in the District of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross

disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores. Defendants had the sole power to set that price, and Plaintiffs and members of the Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct with respect to fixing the price of FICO Scores at supracompetitive levels and overcharging consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class. The suppression of competition that has resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for the FICO Scores. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

304. <u>Florida</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Florida; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. §§ 501.201 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

305. <u>Massachusetts</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Consumer Protection Law (Mass. Gen. Law Ch. 93A *et seq.*). Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Massachusetts, and Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result

of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Law Ch. 93A *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under Section 11 of that statute.

306. <u>Montana</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103 *et seq.*, and §§ 30-14-201 *et seq.* Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Montana; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103 *et seq.*, and §§ 30-14-201 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

307. <u>New Mexico</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. §§ 57-12-1 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices

83

at which FICO Scores were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Class and the prices paid by them for FICO Scores as set forth in N.M.S.A. § 57-12-2E. Plaintiffs and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores. Defendant Fair Isaac had the sole power to set that price and Plaintiffs and members of the Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct to fix the price of FICO Scores at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class. The suppression of competition that resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for the FICO Scores. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. §§ 57-12-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

308. <u>New York</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO scores were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Class, who are Defendants' consumers. Defendants made public statements about the prices of FICO Scores that omitted material information that rendered the statements that they made materially misleading; and Defendants alone possessed material information that were relevant to consumers but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, Class members who purchased FICO Scores were misled to believe that they were paying a fair price for FICO Scores or the price increases for FICO Scores were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conduct. Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have an impact on New York consumers, including Plaintiffs and members of the Class. Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have a broad impact, causing Class members who purchased

85

FICO Scores to be injured by paying more for FICO Scores than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New York; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in New York. Plaintiffs and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

309. <u>North Carolina</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. §§ 75-1.1 *et seq.* Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Class. Defendants' conduct could not have succeeded absent deceptive conduct by Defendant to cover up their illegal acts. Secrecy was

integral to the formation, implementation, and maintenance of Defendants' illegal activity. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Class could not possibly have been aware. Defendants' public statements concerning the price of FICO Scores created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conduct. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in North Carolina. Plaintiffs and members of the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. §§ 75-1.1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

310. <u>Rhode Island</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1 *et seq.*). Members of this Class purchased FICO Scores for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO Scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendants' FICO Scores prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market. Defendants'

affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO Scores they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. §§ 6-13.1-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

311. <u>South Carolina</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10 *et seq.*). Defendants' monopolization had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores during the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10 *et seq.*, and, accordingly, Plaintiffs and the members of the Class seek all relief available under that statute.

312. <u>South Dakota</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-6 *et seq.*). Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes South

Dakota, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO credit scores were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO credit scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendants' FICO credit scores prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO credit scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO credit scores at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO credit scores they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §§37-24-6 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

313. <u>Vermont</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for the FICO Scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendants' FICO Scores prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Vermont; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or

deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

314. <u>West Virginia</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code, §§ 46A-6-104 *et seq.* Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores. During the Class Period, Defendants marketed, sold, or distributed FICO credit scores in West Virginia, and Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code, §§ 46A-6-104 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully prays that This Honorable Court:

A. Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that Plaintiffs be named as Class Representatives, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B. Adjudge that Defendants violated the federal antitrust laws as set forth above;

C.     Adjudge that Defendants violated the state antitrust and unfair and deceptive trade practices laws as set forth above;

D.     Award Plaintiffs and members of the Class actual, treble, and exemplary damages;

E.     Award Plaintiffs and members of the Class attorneys' fees and costs of suit, including costs of consulting and testifying experts;

F.     Award Plaintiffs and members of the Class pre- and post-judgment interest;

G.     Enjoin Defendants from their violations of law; and

H.     Grant such other, further, and different relief, including structural relief, as may be just and proper.

## DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury as to all issues so triable.

Dated: October 30, 2023

Respectfully submitted,

/s/ Steven F. Molo
Steven F. Molo
Lauren F. Dayton
**MOLOLAMKEN LLP**
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Telephone: 312-450-6700
smolo@mololamken.com
ldayton@mololamken.com

Lauren M. Weinstein
**MOLOLAMKEN LLP**
600 New Hampshire Avenue, N.W.,
Suite 500
Washington, DC 20037
Telephone: 202-556-2000
lweinstein@mololamken.com

*Liaison Counsel for Direct Purchaser
Plaintiffs and the Proposed Direct
Purchaser Class*

/s/ Carmen Medici
Carmen Medici
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-798-5319
cmedici@scott-scott.com

Joseph P. Guglielmo (N.D. Ill. 2759819)
Michelle E. Conston (admitted *pro hac vice*)
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com
mconston@scott-scott.com

Gary F. Lynch
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
Facsimile: 412-231-0246
glynch@carlsonlynch.com

Katrina Carroll
**CARLSON LYNCH LLP**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
kcarroll@carlsonlynch.com

Jennifer W. Sprengel
**CAFFERTY CLOBES
MERIWETHER &
SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

Barbara J. Hart (admitted *pro hac vice*)
**GRANT & EISENHOFER**
485 Lexington Ave., 29th Floor New
York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
**SPERLING & SLATER, P.C.**
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Patrick McGahan (admitted *pro hac vice*)
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct
Purchaser Plaintiffs and the Proposed Direct
Purchaser Class*

Christopher M. Burke
Walter Noss
Yifan (Kate) Lv
**KOREIN TILLERY PC**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 6225-5620
Facsimile: (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

George A. Zelcs
Randall P. Ewing, Jr.
Ryan Z. Cortazar
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Michael L. Roberts
Karen Sharp Halbert
**ROBERTS LAW FIRM, P.A.**
20 Rahling Circle
Little Rock, AR 72223
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Gregory S. Asciolla (admitted *pro hac vice*)
Karin E. Garvey (admitted *pro hac vice*)

Linda P. Nussbaum
Susan Schwaiger
**NUSSBAUM LAW GROUP, P.C.**
1211 Avenue of the Americas
40th Floor
New York, NY 10036
Telephone: 917-438-9102
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Daniel E. Gustafson
(admitted *pro hac vice*)
Daniel C. Hedlund
(admitted *pro hac vice*)
Michelle J. Looby
(admitted *pro hac vice*)
Joshua J. Rissman
Ling S. Wang
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
lwang@gustafsongluek.com

Dennis Stewart (admitted pro hac vice)
**GUSTAFSON GLUEK PLLC**
600 B Street, 17th Floor San
Diego, CA 92101
Telephone: 619-595-3200
dstewart@gustafsongluek.com

Kenneth A. Wexler Melinda J.
Morales Michelle Perkovic
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

Robin A. van der Meulen (admitted *pro hac vice*)
Matthew J. Perez (admitted *pro hac vice*)
Jonathan S. Crevier (admitted *pro hac vice*)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
Telephone: 646-933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
rvandermeulen@dicellolevitt.com
mperez@dicellolevitt.com
jcrevier@dicellolevitt.com

Marvin A. Miller
Lori A. Fanning
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: 312-332-3400
mmiller@millerlawllc.com
lfanning@millerlawllc.com

Guillaume Buell (admitted pro hac vice)
**THORNTON LAW FIRM LLP**
1 Lincoln Street, 13th Floor
Boston, MA 02111
Telephone: 617-720-1333
gbuell@tenlaw.com

Don Barrett (pro hac vice forthcoming)
**BARRETT LAW GROUP, P.A.**
404 Court Square
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
dbarrett@barrettlawgroup.com
donbarrettpa@gmail.com

Richard R. Barrett (pro hac vice forthcoming)
**BARRETT LAW GROUP, P.A.**
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: 662-380-5018
rrb@rrblawfirm.net

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)

Charles F. Barrett
(admitted *pro hac vice*)
**NEAL & HARWELL, PLC**
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: 615-244-1713
cbarrett@nealharwell.com

**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1908
mlehmann@hausfeld.com
clebsock@hausfeld.com

Hilary K. Scherrer
Paul Gallagher
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington, DC 20006
Telephone: 202-540-7200
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Scott A. Martin
Irving Scher
Jeanette Bayoumi
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: 646-357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

*Counsel for Direct Purchaser Plaintiffs and the
Proposed Direct Purchaser Class*

**CERTIFICATE OF SERVICE**

I, Carmen A. Medici, an attorney, hereby certify that on October 30, 2023, I caused a true

and correct copy of the foregoing Direct Purchaser Plaintiffs' First Amended Consolidated Class

Action Complaint to be filed and served electronically via the Court's CM/ECF system.

*s/ Carmen A. Medici*
Carmen A. Medici

97

# EXHIBIT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE FICO ANTITRUST LITIGATION | Judge Edmond E. Chang |
| This Document Relates to the Following Cases: | Magistrate Judge M. David Weisman |
| INDIRECT PURCHASER CASES | No. 1:20-CV-02114 |
| | JURY TRIAL DEMANDED |

INDIRECT PURCHASER PLAINTIFFS'
SECOND AMENDED CLASS ACTION COMPLAINT

## **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................1

II.   PARTIES       …………………..............................................................6

III.  JURISDICTION AND VENUE .......................................................................8

IV.  FACTUAL ALLEGATIONS ...........................................................................9

    A. Credit Scores and Credit Reports .............................................................9

    B. The Markets for Credit Scores in The United States.............................14

    C. Fair Isaac's FICO Score Has a Monopoly in the B2B Credit Score Market...............20

    D. Fair Isaac Has Been Able to Maintain its Monopoly .............................23

    E. Fair Isaac's Conduct in Furtherance of its Anticompetitive Scheme ...........................27

        1.  Fair Isaac's Anticompetitive Litigation.................................................28

        2.  Fair Isaac and the Credit Bureaus' Anti-Competitive Agreements .......................33

            a.    Fair Isaac's Anticompetitive Contracts with the CBs...............................34

                i.    The "No Equivalent Products Clause" ...........................................38

                ii.   The "Dynamic Royalty Schedule".................................................39

                iii.  The "Level Playing Field" .............................................................42

        3.  Fair Isaac's Negative Advertising Campaign in Furtherance of its Scheme .........46

    F. The Contracts Between Fair Isaac and Each Credit Bureau Containing Anticompetitive Terms, In Combination With Fair Isaac's Anticompetitive Conduct Has Harmed Competition In the B2B Credit Score Market.........................................49

V.   CLASS ACTION ALLEGATIONS ..............................................................51

VI.  STATUTES OF LIMITATION AND TOLLING.............................................54

VII. DEFENDANTS' ACTIONS CONSTITUTE CONTINUING VIOLATIONS.................57

VIII. CLAIMS FOR RELIEF      ...................................................................58

i

FIRST CLAIM FOR RELIEF: UNREASONABLE RESTRAINT OF TRADE..............58

SECOND CLAIM FOR RELIEF: UNREASONABLE RESTRAINT OF TRADE.........60

THIRD CLAIM FOR RELIEF: UNREASONABLE RESTRAINT OF TRADE ............63

FOURTH CLAIM FOR RELIEF: UNREASONABLE RESTRAINT OF TRADE.........65

FIFTH CLAIM FOR RELIEF: MONOPLIZATON .........................................................67

SIXTH CLAIM FOR RELIEF: VIOLATION OF STATE ANTITRUST
STATUTES          …………......................................................................................69

SEVENTH CLAIM FOR RELIEF: VIOLATIONS OF STATE CONSUMER
PROTECTION LAWS ................................................................................................103

EIGHTH CLAIM FOR RELIEF: UNJUST ENRICHMENT .........................................132

PRAYER FOR RELIEF          …………......................................................................................133

Plaintiffs Garner Properties & Management LLC ("Garner") and Lake City Exports, Inc. ("Lake City") (collectively, "Plaintiffs"), bring this action against Defendants Fair Isaac Corporation ("Fair Isaac"), Equifax, Inc. ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and TransUnion, LLC ("TransUnion") (collectively "Defendants," with the latter three referred to collectively as the "Credit Bureaus" or "CBs"), individually and on behalf of proposed Classes of all end-users that purchased FICO Scores[1] in the B2B Credit Score Market from any third-party other than Fair Isaac and/or a Credit Bureau from October 1, 2006 through the present.[2] Defendants have engaged in anticompetitive behavior, which forced Plaintiffs and members of the proposed Classes to pay artificially inflated prices for credit scoring services and generated millions of dollars in supra-competitive annual revenues for Defendants. Fair Isaac has maintained a monopoly share in excess of 90% of the market for credit scores by suppressing competition and inhibiting innovation. Therefore, Plaintiffs and the proposed Classes seek damages, injunctive relief and other relief pursuant to federal antitrust laws, state antitrust, unfair competition, and consumer protection laws, and the laws of unjust enrichment, and demand a trial by jury.

## I.   INTRODUCTION

1.   A "credit score" is a three-digit numerical summary of a customer's creditworthiness based on factors such as payment history and the duration of that history; balances, available credit, and the percentage of existing credit lines being utilized; public records like bankruptcies or adverse judgments; and the assumption of new debt. There are two distinct markets for such scores. The first is the market for the sale of such scores to banks,

---

[1] "FICO Score" includes a credit report that contains a FICO Score.

[2] "Third-party" constitutes any entity that purchased a FICO Score from any Defendant.

1

mortgage companies, credit unions, and other businesses that assess individual credit risk – *i.e.*, business-to- business sales. That market is referred to herein as the "B2B Credit Score Market." The second is the market for the sale of such scores to the individual who is the subject of them – i.e., business-to-consumer. That market is referred to herein as the "B2C Credit Score Market. This case concerns the B2B Credit Score Market.

2.      According to Fair Isaac, FICO Scores are used for over 90% of all lending decisions in the United States. Fair Isaac's FICO credit scores have dominated the market for nearly three decades and have "maintained a 90-plus percent market share for at least 13 years."[3]

3.      Credit Bureaus collect and maintain information for credit reports. The three major CBs in the United States are Defendants Equifax, Experian, and TransUnion. The CB Defendants control virtually 100% of aggregate credit-related data formed by aggregating credit data collected from businesses, and they jointly dominate the market for B2B credit reports.

4.      Credit reports list bill payment history, loans, current debt, and other financial information. They show where consumers work and live and whether they have been sued, arrested, or filed for bankruptcy.

5.      Credit reports help lenders decide if they will give consumers credit or approve a loan. The reports also help determine what interest rates consumers are charged. Employers, insurers, and rental property owners also use credit reports.

6.      CBs purchase FICO Scores and then sell them as part of the credit reporting services they provide to millions of lenders, financial institutions, landlords, employers, and other businesses, that then use the credit reports to determine credit history and/or default risk.

---

[3] TransUnion LLC's Redacted Counterclaims, Dkt 38, *Fair Isaac Corp. . TransUnion LLC*, No. 1:17-cv-08318, ¶ 32 (N.D. Ill. Feb. 12, 2018) ("TransUnion Counterclaims").)

7.     Fair Isaac also directly sells FICO Scores to creditors and other businesses –
bypassing the Credit Bureaus, and competing with them, when it does so.

8.     Plaintiff Garner is a real estate brokerage and property management company
that purchases Fair Isaac's FICO scores from third-parties which, in turn, purchase those FICO
Scores from one of the three major CBs. The third-parties pass on to Garner and all other Class
Members the cost of each FICO Score.

9.     Plaintiff Lake City is a used automobile dealer that purchases Fair Isaac's FICO
scores from third-parties which, in turn, purchase those FICO Scores from one of the three major
CBs. The third-parties pass on to Lake City and all other Class Members the cost of each FICO
Score.

10.     In 2006, VantageScore Solutions, LLC ("VantageScore Solutions") launched
VantageScore - a credit score to compete against Fair Isaac's FICO Scores. VantageScore
Solutions is an independent joint venture of the Credit Bureaus. Similar to Fair Isaac's FICO Score,
VantageScore Solutions uses scoring codes and algorithms to convert a consumer's information
in a consumer credit report into a credit score. Thus, VantageScore presented a competitively
priced alternative to FICO Scores.

11.     In addition, a VantageScore has relevant and important advantages over a FICO
Score. For example, a VantageScore considers a consumers' rental and utility payments, which
enables it to provide a credit score for consumers with less than six months of credit history. Fair
Isaac's FICO Score cannot do this. A VantageScore therefore provides a credit score for tens of
millions more Americans than Fair Isaac's algorithms allow. If Plaintiffs and similarly situated
businesses were able to purchase VantageScores on economically sensible terms, they would be
able to see credit scores of tens of millions more consumers, enabling them to contract with

3

millions more customers, tenants, and employees than they can using FICO Scores alone.

12. Rather than compete on the merits with VantageScore, Fair Isaac undertook a lengthy campaign of anticompetitive conduct to discourage the adoption of VantageScore and preserve its own monopoly. As part of that campaign Fair Isaac also entered into contracts with each CB, which contained substantially similar anticompetitive provisions that were designed to, and did, substantially reduce or altogether eliminate the competitive threat posed by VantageScore. Through these contracts Fair Isaac imposed unreasonable restraints on trade.

13. As another part of that campaign, in 2006, Fair Isaac filed a lawsuit against TransUnion, Equifax, and Experian with the intended purpose of driving VantageScore Solutions out of business. Experian settled the case in 2008 and entered into a lucrative partnership with Fair Isaac following the settlement. TransUnion and Equifax fought on, eliminating most of Fair Isaac's claims through a summary judgment motion and winning a jury trial on the remaining trademark claim.

14. When its lawsuit failed, Fair Isaac engaged in a further pattern of anticompetitive conduct designed to discourage use of alternatives to FICO Scores, including VantageScore. Fair Isaac accomplished this goal by abusing its monopoly power and entering into contracts with the CBs that contained anticompetitive restrictions aimed at extracting supracompetitive profits from B2B purchasers. Those contracts include contractual provisions that: (1) prohibit CBs from marketing non-FICO credit scores (*i.e.*, VantageScore); (2) charge discriminatory and prohibitively high prices for FICO Scores if a CB customer purchases a FICO Score while providing the consumer with a competing score (*i.e.*, a VantageScore); and (3) eliminate price competition among the CBs, thereby disincentivizing the CBs from negotiating a lower price for FICO Scores.

4

15.     The contracts were intended to, and had the effect of, hobbling VantageScore Solutions' ability to compete and forcing B2B Purchasers to pay supracompetitive prices for credit scores.

16.     As part of its goal of eliminating competition, Fair Isaac also waged a public relations and advertising campaign to disparage VantageScore and create uncertainty about the reliability of VantageScores. The purpose of Fair Isaac's anticompetitive scheme is to prevent competition from VantageScore and other scoring systems and to preserve Fair Isaac's monopoly.

17.     Fair Isaac's scheme worked. Through the anticompetitive conduct alleged herein, Fair Isaac succeeded in preventing VantageScore Solutions from gaining market share and thwarted the entry of other entities into the market for credit scores. Having successfully suppressed all other competition, Fair Isaac was able to, and did, artificially increase prices for its FICO products.

18.     For example, Fair Isaac's net income for the third quarter of 2021 was *more than double* that of the previous year period, increasing from $64.1 million in Q3 2020 to $151.2 million in Q3 2021.[4] Fair Isaac's yearly net income has remained high and increased year-over-year; for example, Fair Isaac reported a net income of $236 million in 2020, $392 million in 2021, $374 million in 2022, and is on pace to surpass its net earnings in 2023 from the previous year.[5] Sources in the financial industry have attributed Fair Isaac's profitability to "[p]rice

---

[4] Press Release, Fair Isaac, *FICO Announces Earnings of $5.18 per Share for Third Quarter Fiscal 2021* (Aug. 3, 2021), https://investors.fico.com/news-releases/news-release-details/fico-announces-earnings-518-share-third-quarter-fiscal-2021.

[5] Fair Isaac Corporation, Annual Report (Form 10-K), at 36 (Nov. 9, 2022), https://fico.gcs-web.com/static-files/9050c8f5-9c87-4d41-8ecd-6d9f3d179a8a (hereinafter, "Fair Isaac 2022 10-K"); *see also* Fair Isaac Corporation, Quarterly Report (Form 10-Q), at 18 (Aug. 2, 2023),

increases in its credit scoring segment and gains in applications sold to banking institutions," which have "helped the company log year-over-year gains in revenue and profit."[6] But for Fair Isaac's and the CBs' anticompetitive conduct, VantageScore and other competitors of Fair Isaac would have gained market share, allowing for price competition and reducing the prices Plaintiffs and similarly situated businesses paid for FICO Scores.

19.     Plaintiffs and other indirect purchasers of Fair Isaac's FICO Scores paid supracompetitive prices and have therefore suffered harm as a result of Defendants' anticompetitive conduct, which harmed competition in the B2B Credit Score Market. Opening this market to competition will spur innovation so that credit scores are fairly priced and more accurate.

20.     Plaintiffs and other similarly situated businesses are indirect purchasers of Fair Isaac's FICO Scores. They do not purchase FICO Scores directly from Defendants but instead purchase them from third-parties, who purchase them from Defendants.

## II.     PARTIES

21.     Plaintiff Garner Properties & Management LLC is a real estate brokerage and property management company located in Taylor, Michigan. During the Class Period, Garner purchased Fair Isaac's FICO Scores from third-parties which, in turn, purchased those FICO Scores from one of the CBs. The CBs, through the third-parties, sell FICO Scores to Plaintiffs and Class members pursuant to agreements between Fair Isaac and each Credit Bureau, which

---

https://fico.gcs-web.com/sec-filings?field_nir_sec_form_group_target_id%5B%5D=496&field_nir_sec_date_filed_value=#views-exposed-form-widget-sec-filings-table.

[6] Motley Fool, *Fair Isaac Corporation Scores 13% Revenue Growth in the First Quarter* (Jan. 31, 2019), https://www.fool.com/investing/2019/01/31/fair-isaac-corporation-scores-13-  revenue-growth-in.aspx.

6

provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to the Class. The artificially inflated cost of those FICO Scores is then passed on to Garner, and all other Class members.

22.     Plaintiffs Lake City Exports, Inc., is a used automobile dealer located in Maine. During the Class Period, Lake City purchased Fair Isaac's FICO Scores from third-parties which, in turn, purchased those FICO Scores from one of the CBs. The CBs, through the third-parties, sell FICO Scores to Plaintiffs and Class Members pursuant to separate agreements between Fair Isaac and each Credit Bureau, which provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to the Class. The artificially inflated cost of those FICO Scores is then passed on to Lake City, and all other Class members.

23.     Plaintiffs were injured in their business or property as a direct, proximate, and material result of Defendants' violation of the law. Plaintiffs are also threatened with future injury to their business and property by reason of Defendants' continuing violations of the law.

24.     Defendant Fair Isaac is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California, 95110.

25.     Defendant Equifax is a Credit Bureau incorporated in Georgia that has its principalplace of business at 1550 Peachtree St. NW, Atlanta, Georgia.

26.     Defendant Experian is a Credit Bureau incorporated in Ohio that has its principal place of business in the United States at 475 Anton Blvd., Costa Mesa, California.

27.     Defendant TransUnion is a Delaware limited liability Credit Bureau that has its principal place of business at 555 W. Adams St., Chicago, Illinois.

28.     Plaintiffs bring this state law class action on behalf of the proposed Classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and

7

post-judgment interest, costs, and attorneys' fees for the injuries caused by Defendants' conduct in restricting the development and sale of credit scores and causing the prices of FICO Scores to be artificially inflated. Plaintiffs also seek injunctive relief under Sections 1 and 2 of the Sherman Act.

**III.    JURISDICTION AND VENUE**

29.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332(d) and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court possesses supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

30.    This Court has personal jurisdiction over Defendants because Defendants transacted business, maintained substantial contacts, and are located and/or committed unlawful conduct in this District. Their unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

31.    Venue is proper in this District pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d). Defendants regularly transact business within this District and a substantial portion of the affected interstate trade and commerce described in this Complaint were carried out in this District.

32.    Defendants market their products and receive substantial payments across state lines. Defendants' business activities that are the subject of this Complaint are within the law of and have substantially affected, interstate trade and commerce.

33.    During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States Mail, to effectuate their illegal scheme.

34.     Defendants' conduct also had a substantial effect on the intrastate commerce of the States listed in counts Seven and Eight of this Complaint.

## IV.     FACTUAL ALLEGATIONS

### A.     Credit Scores and Credit Reports

35.     A credit score is a numerical expression of a person's credit history and is designed to measure their creditworthiness. It helps creditors determine whether to give credit, decide the terms they offer and what interest rates consumers pay. Higher scores generally indicate that an individual or business poses less credit risk and is more likely to make payments under a contract and manage money more responsibly. Thus, having a high credit score can make it easier to get a loan, credit card, lower interest rates, rent an apartment, or provide access to lower insurance rates.

36.     Credit scores typically are produced by applying scoring algorithms to a person's consumer credit history. A credit score is based on multiple factors, such as payment history, outstanding balances, length of credit history, applications for new credit accounts, and types of credit accounts (*e.g.*, mortgages, car loans, credit cards).

37.     Credit scores usually are accompanied by "reason statements," which inform the purchaser about the factors that most significantly affected that individual's credit score. A number or alphanumeric code - called a "reason code"- is associated with each reason statement. Examples of reason statements include: "Account payment history is too new to rate"; "Amount owed on accounts is too high"; and "Too many recently active accounts." VantageScore explains this process as follows:

> No matter where you get your score, the documents that accompany it will include up to four or five statements explaining why your score wasn't higher. These statements are called reason codes and sometimes go by several other

names. Some people call them score factors; others call them adverse action codes. They're all the same thing.

The next time you see your credit score, regardless of where it comes from, look for the reason codes. They'll be worded and displayed something like this:

Your Credit Score Is: 705

32: Balances on bankcard or revolving accounts too high compared to credit limits

16: The total of all balances on your open accounts is too high

85: You have too many inquiries on your credit report

13: Your most recently opened account is too new

The numbers preceding each statement are numeric identifiers; sometimes they appear with the text, and sometimes they do not.

The four (or five) factors are listed in order of the impact they have. In this example, the number one reason the credit score is not higher is "Balances on bankcard or revolving accounts too high compared to credit limits." That means the consumer's credit card debt is too high relative to his or her credit limits.

In our example, the reason with the second-greatest impact is "The total of all balances on your open accounts is too high." That means the consumer is carrying too much debt on his or her open accounts.

The third reason the score isn't higher is "You have too many inquiries on your credit report." This means the consumer has recently applied for credit several times, which led to some number of credit inquiries.

The fourth reason the score isn't higher is "Your most recently opened account is too new." Clearly this means the consumer has a very new account on his or her credit report.[7]

---

[7] VantageScore Solutions, *Reason Codes 101*, https://www.reasoncode.org/reasoncode101.

10

38.     Fair Isaac has a webpage that sets forth its various "reason codes."[8] VantageScore also has a dedicated website that explains its various "reason codes."[9]

39.     CBs collect and store financial data about individuals that is submitted to them by creditors, such as lenders, credit card companies, and other financial companies. Creditors are not required to report to every credit-reporting company. Utilizing these files, the CBs create a credit report.

40.     The information in a credit report is often used to calculate a credit score. Credit reports list a consumer's bill payment history, loans, current debt, and other financial information. They show where the individual works and lives and whether they have been sued, arrested, or filed for bankruptcy. CBs essentially collect consumer credit data and present the aggregated information in the form of a credit report.

41.     CBs continually gather credit and financial data about individuals from creditors, government entities, public records, collection agencies, and other third parties, and compile this information into a credit file. The CBs then use an individual's credit file to populate a credit report on that individual for sale to businesses (B2B purchasers) and consumers (B2C purchasers).

42.     Credit reports help lenders decide if they will give credit or approve a loan. The reports also help determine what interest rate to charge. Employers, insurers, and rental property owners also look at credit reports.

43.     Credit scores are the most widely used indicators of consumers' creditworthiness in the United States and Fair Isaac's FICO Score is, by far, the most widely-used credit score.

---

[8] Fair Isaac, *US FICO® Score Reason Codes*, https://www.fico.com/en/latest-thinking/solution-sheet/us-fico-score-reason-codes (link to download).

[9] VantageScore Solutions, ReasonCode.org, https://www.reasoncode.org.

11

According to Fair Isaac, FICO Scores are used in over 90% of U.S. lending decisions.[10] They are crucial to millions of businesses that rely on indicators of creditworthiness to assess risk and make business decisions.

44.     Credit scores and credit reports are separate and distinct products that can be sold together or independently.

45.     Fair Isaac works with the CBs to perpetuate and extend its monopoly. Fair Isaac's relationship with B2B purchasers is often dependent on B2B purchasers' relationships with the CBs, which facilitate the sale of FICO Scores to B2B purchasers.

46.     FICO Scores and credit reports are often sold to businesses as a bundle. Such bundles can be sold by the CBs, which are licensed by Fair Isaac to sell FICO Scores and in return, pay a royalty to Fair Isaac. Thus, when a B2B purchaser requires a credit score, it purchases a credit report from a CB and a credit score from that CB and Fair Isaac, often through a contract with both Fair Isaac and the CB. Although the payment for the credit report and the credit score may at times occur in a single transaction, the reality is that both the CB and Fair Isaac act as the providers of the FICO Score. In this example, Plaintiffs and proposed Class members would then purchase the credit report and credit score from the B2B purchaser.

47.     In its 2020 Form 10-K filed with the SEC, Fair Isaac states that, "[d]uring fiscal 2020, 2019 and 2018, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for 32%, 29%, and 25% of our total revenues, respectively."[11]

48.     And in its 2022 10-K, Fair Isaac disclosed significant increases in the revenues

---

[10] Fair Isaac, *FICO: The Decisions Company Investor Overview*, at 5 (Dec. 2019), https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.

[11] Fair Isaac Corporation, Annual Report (Form 10-K), at 4 (Nov. 12, 2020), https://fico.gcs-web.com/node/23951/html (hereinafter, "Fair Isaac 2020 10-K").

generated from these same agreements. According to Fair Isaac, "during fiscal 2022, 2021 and 2020, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for 39%, 38% and 33% of our total revenues, respectively."[12] Fair Isaac characterized the CBs as "partners in offering [FICO's] scoring solutions."

49.     The FICO Score and credit report bundles can also be sold by Fair Isaac to businesses. "In those situations, Fair Isaac requests a credit score and credit report from the CBs-selected by the lender or consumer. The Credit Bureau applies Fair Isaac's CB-tailored FICO algorithm to a consumer's aggregated credit data and provides the consumer's credit report and credit score to Fair Isaac. Fair Isaac then delivers the bundle to the consumer or lender. Fair Isaac pays the CB for the cost of processing and providing the bundle."[13] Thus, Fair Isaac and the CBs act as horizontal competitors and compete with each other for some B2B Purchasers – separate and apart from Fair Isaac's competition with VantageScore.

50.     This direct competition between Fair Isaac and the CBs, as well as the close relationship among them, continues to this day. At an August 3, 2021 earnings conference, Fair Isaac's CEO, William J. Lansing, said, "we stay close to it [B2B scores] through our channel partners, the bureaus. But we also -- certainly for all of the major institutions, we have direct sales relationships."[14] TransUnion's 2022 Form 10-K acknowledges that it "compete[s] with FICO in the Financial Services" market for B2B purchasers.[15] Similarly, Equifax's 2022 Form

---

[12] Fair Isaac 2022 10-K at 9.

[13] *Fair Isaac Corp. v. Equifax, Inc.*, No. 06-4112, 2008 WL 623120, at *2 (D. Minn. March 4, 2008).

[14] Motley Fool, *Fair Isaac Corp. (FICO) Q3 2021 Earnings Call Transcript* (Aug. 3, 2021) (hereinafter, "Q3 Earnings Call"), https://www.fool.com/earnings/call-transcripts/2021/08/03/fair-isaac-corporation-fico-q3-2021-earnings-call/.

[15] TransUnion, Annual Report (Form 10-K) (Feb. 14, 2022), at 12.

10-K acknowledges that it too "compete[s] with Fair Isaac Corporation with respect to certain of [its] analytical tools and solutions."[16] Experian has also recognized that its "comparator companies" include FICO.[17]

**B.      The Markets for Credit Scores in The United States**

51.      There are two distinct markets for credit scores—the "B2B Credit Score Market" and the "B2C Credit Score Market."

52.      The "B2B Credit Score Market" consists of sales from a business (a credit score generator, such as Fair Isaac, directly or through a CB, or indirectly through a third-party credit reporting company) to lenders, such as banks and credit card companies, financial institutions, and other businesses. The "B2C Credit Score Market" consists of credit scores sold to consumers to monitor their own credit records. The claims in this case concern the B2B Credit Score Market. The B2B Credit Score Market is the relevant product market in which the claims that require a market definition are to be assessed.

53.      In the B2B Credit Score Market, businesses purchase the credit scores of individuals and businesses to help them understand credit risk, make better-informed lending decisions, assess creditworthiness, and make business decisions. The B2B Credit Score Market also includes the FICO Scores that Plaintiffs and other businesses indirectly purchased from Fair Isaac and the CBs.

54.      In the B2C Credit Score Market, Fair Isaac and other credit score producers, as well as CBs, sell consumers their own credit scores. A consumer often purchases their own credit

---

[16] Equifax, Annual Report (Form 10-K) (Feb. 23, 2022), at 8.

[17]       Experian    plc,    *Annual    Report    2021*    (2022),    at    139,
https://www.experianplc.com/media/4223/experian-annual-report-2021.pdf.

score for personal use, including to see how lenders view their creditworthiness, to understand the types and terms of financing they may be able to secure, to monitor their financial health, manage their debt, protect their identity, and to determine if they are potentially eligible to make certain purchases.

55.    The B2B Credit Score Market for credit scores is a distinct product market for antitrust purposes. The businesses that use credit scores to assess creditworthiness, manage risk, and make business decisions do not consider credit reports, insurance scores, or any part of an individual's consumer and credit history to be a substitute for credit scores. Likewise, the businesses that resell or otherwise provide credit scores to their own downstream customers do not consider credit reports, insurance scores, or any part of an individual's consumer and credit history to be a substitute for credit scores.

56.    The relevant geographic market in which B2B credit scores are provided is the United States (including its territories). The restraints on competition contained in Defendants' contracts relate to business and consumer credit scores in the United States.

57.    Business customers, such as banks, credit card companies, financial institutions, real estate companies, insurance companies and other businesses, in the B2B Credit Score Market are a separate and distinct group of purchasers of credit scores. Business customers who purchase credit scores in the B2B Credit Score Market do not use credit scores in the same manner as consumer customers who purchase credit scores in the B2C Credit Score Market.

58.    Business customers in the B2B Credit Score Market purchase credit scores to make informed decisions, sell, advertise, or complement another product. On the other hand, consumer customers in the B2C Credit Score Market purchase the credit scores as an end-product.

15

59. Business customers in the B2B Credit Score Market also purchase credit scores in ways that consumer customers do not. For example, business customers in the B2B Credit Score Market who engage in pre-screening, such as credit card companies, often purchase credit scores in batches as part of their marketing efforts. They use credit scores as a method of selecting consumers in a particular credit score range that they wish to extend credit card offers to under particular terms. However, consumer customers in the B2C Credit Score Market only purchase their own score.

60. The Consumer Financial Protection Bureau ("CFPB") noted in a 2011 report to Congress that "many of the credit scores sold to lenders are not offered for sale to consumers."[18] The agency went on to explain:

> When a consumer purchases a score from a CRA [Credit Rating Agency], it is likely that the credit score that the consumer receives will not be the same score as that purchased and used by a lender to whom the consumer applies for a loan. This could occur if the score the consumer purchased is an educational score that is not used by lenders, but differences between the score a consumer buys and the score a lender buys can occur for other reasons as well. Since so many scores are in use in the marketplace, it could also be the case that the particular lender to which the consumer applies uses a different scoring model than the one purchased by the consumer, or that the CRA from which the consumer obtains a score is not the same CRA that the lender uses to obtain scores, or that the underlying data in the consumer's credit report changes significantly between the time the consumer purchases a score and the time the lender obtains a score for that consumer. It is also possible that a consumer and a lender could access different reports from the CRA, if they were to use different identifying information about the consumer. Any of these differences could lead to differences between the credit score a consumer sees and the credit score a lender uses to assess that consumer.[19]

---

[18] Consumer Financial Protection Bureau, *The impact of differences between consumer- and creditor-purchased credit scores*, at 1 (July 19, 2011), https://files.consumerfinance.gov/f/2011/07/Report_20110719_CreditScores.pdf.

[19] *Id.*

61.     The vast majority of the credit reporting and credit scoring industry, industry analysts, policy analysts, and investors recognize the B2B Credit Score Market as a separate market from the B2C Credit Score Market. Fair Isaac itself recognizes its Business and Consumer offerings as distinct product and revenue lines. Fair Isaac has divided its "Scores" profits and revenues into separate "business-to-business" or "B2B" and "business-to-consumer" or "B2C" segments in its Securities and Exchange Commission filings and shareholder calls over the last several years. In its 10-K and 10-Q filings for the past several years, Fair Isaac has distinguished between its "business-to-business scoring solutions and services" and its "business-to-consumer scoring solutions and services including my FICO solutions for consumers."

62.     Purchases in the B2B Credit Score Market for credit scores and B2C Credit Score Market for credit scores are also different. While business customers purchase credit scores from Fair Isaac through CBs and/or third-party intermediaries, credit scores in the B2C Credit Score Market are often sold to consumers directly, such as when consumers purchase their credit score from Fair Isaac at myFICO.com.

63.     The B2B Credit Score Market exhibits high barriers to entry. As noted in a 2018 article: "The deep integration of FICO scores and products into companies' operations has raised switching costs."[20]

64.     Likewise, VantageScore Solutions has observed that in the residential mortgage sector, FICO's "imprint inhibits competition by raising switching costs and granting the irreplaceable brand value of utter ubiquity. It gives FICO unparalleled and highly controversial

---

[20] *Fair Isaac: A Royalty on U.S. Credit Scoring* (Sept. 25, 2018), https://seekingalpha.com/article/4208014-fair-isaac-royalty-on-u-s-credit-scoring.

negotiating leverage with almost every participant in the industry."[21]

65.     "Larger lenders use the [FICO] score as an input to customized models they've built for specific situations or portfolios. After a recent review one major US lender recently identified over 600 places they were using a FICO score in their business processes. Switching to a new score not only means proving the new score is better (a long process in itself) but extensive testing to ensure all of those moving parts are still working as designed. Citibank recently announced that after an 18 month review they've decided it's safe to switch to the latest version of the FICO score (FICO 8). This wasn't a migration to a new score mind you, just a more recent version of the score they're already using. The barriers to entry are indeed high . . . and expensive."[22]

66.     "Network effects" – *i.e.*, the phenomenon where a product or service increases in value when the total number of customers increase – serve as a barrier to entry into the B2B Credit Score Market. As one analyst has noted: "The 'network effects' keeping FICO's dominant position [are] indeed incredibly strong."[23]

67.     In 2011, at Fair Isaac's Analyst/Investor Day, Fair Isaac's then-CEO, Mark Greene, explained: "In about 10 seconds, an entire commerce transaction taking place because 720 FICO was understood by the broker, by the mortgage banker on the other end of line and

---

[21] Press Release, VantageScore, *VantageScore Solutions Issues Statement Reacting to FHFA's Proposed Rules for Validating and Approving New Credit Scoring Models* (Dec. 17, 2018), https://vantagescore.com/press/vantagescore-solutions-issues-statement-reacting-to-fhfas-proposed-rules-for-validating-and-approving-new-credit-scoring-models.

[22] John Ulzheimer, *Why FICO Isn't Going Away Any Time Soon*, Smart Credit (July 5, 2011), https://blog.smartcredit.com/2011/07/05/why-fico-isnt-going-away-any-time-soon/.

[23] Harrison Schwartz, *Fair Isaac: Share Buybacks Likely To End As Cash Reserves Run Low*, Seeking Alpha (Dec. 17, 2019), https://seekingalpha.com/article/4312953-fair-isaac-share-buybacks-likely-to-end-cash-reserves-run-low.

the customer to be shorthand for good credit risk, gave this guy a favorable mortgage rate. And that network effect, having everybody in the loop understand that shorthand and standardize on a FICO Score, that's magic."[24]

68.     The anticompetitive conduct by Fair Isaac alleged herein accounts in significant part for the FICO Score's dominance in the B2B Credit Score Market.

69.     The CBs participate in a market for credit reports. A credit report contains detailed information about a consumer's credit activity and current credit situation. The detailed information in a credit report is used to generate a FICO Score for a specific customer, which B2B lenders can use in making their lending decisions.

70.     On information and belief, the CBs control virtually all of the credit report market (they have been called a "triopoly") and enjoy roughly equivalent market shares."[25]

71.     The three CBs are all members of a trade association called the Consumer Data Industry Association ("CDIA"). Through the CDIA, the three CBs frequently work together, including to: (i) develop a standard electronic data reporting format called Metro 2®; (ii) issue joint statements on matters of public importance; (iii) provide guidelines to businesses that use credit reports; and (iv) respond to public criticisms of their industry. The three CBs also cooperated in the establishment of VantageScore Solutions as a joint venture.[26]

---

[24] SA Transcripts, Seeking Alpha, *Fair Isaac Corp. – Analyst/Investor Day* (Nov. 3, 2011), https://seekingalpha.com/article/307417-fair-isaac-corp-analyst-investor-day.

[25] *See* Consumer Financial Protection Bureau, *List of Consumer Reporting Companies* (2021), https://files.consumerfinance.gov/f/documents/cfpb_consumer-reporting-companies-   list_2021-06.pdf.

[26] *See* Consumer Data Industry Ass'n, *About CDIA*, https://www.cdiaonline.org/about/about-cdia/; Consumer Data Industry Ass'n, *Metro 2 Format for Credit Reporting*, https://www.cdiaonline.org/resources/furnishers-of-data-overview/metro2-information/;   Dana Fowle, *Industry Pushes Back Against Claims of High Credit Reporting Errors*, Fox5 Atlanta (Sept. 15,   2021),   https://www.fox5atlanta.com/news/industry-pushes-back-against-claims-of-high-

C.      **Fair Isaac's FICO Score Has a Monopoly in the B2B Credit Score Market**

72.      Fair Isaac came into existence in 1956, possessed a monopoly on credit-scoring algorithms until the mid-1970s, and continues to wield a dominant market share.[27]

73.      Fair Isaac's "FICO Classic" credit scores are the best known and most widely used credit scores in the B2B Credit Score Market. Fair Isaac applies an algorithm to each credit reporting agency's data to generate a FICO Classic Score between 300 and 850 that purports to give an indication of the individual's credit risk. It also generates a set of "reason statements," with corresponding codes, that explain the reasons the consumer has not been assigned the maximum score.

74.      FICO Scores are the credit scores most widely used by lenders and are used in over 90% of U.S. credit lending decisions.[28] Every year, lenders access billions of FICO Scores to help them understand people's credit risk and make better-informed lending decisions.

75.      On its website, Fair Isaac claims that "10 billion FICO Scores are purchased every year" and "27 million Fico Scores are purchased every day." FICO Scores are also used in over 30 countries.[29]

76.      Fair Isaac also advertises that its FICO Score is "widely accepted" and "used by

---

credit- reporting-errors; Press Release, Consumer Data Industry Ass'n, *Consumer Data Industry Association Releases Study on the Value of Credit Reporting in U.S.* (June 15, 2020), https://cdia-news.s3.amazonaws.com/White+Paper+Press+Release+6.15.20.pdf; Consumer Data Industry Ass'n, *Equifax, Experian, & TransUnion Endorse CARES Act*, https://www.cdiaonline.org/equifax-experian-transunion-endorse-cares-act/; Consumer Data Industry Ass'n, *COVID-19*, https://www.cdiaonline.org/covid-19/.

[27] Raymond Anderson, *A History of Credit Scoring*, at 75-76     (2019), https://www.researchgate.net/profile/Raymond_Anderson4/publication/331533723_Chapter_B0 6_History_of_Credit_Scoring/links/5c7ed843299bf1268d3ccc5d/Chapter-B06-History-of-Credit-Scoring.pdf?origin=publication_detail.

[28] https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.

[29] https://www.ficoscore.com/about.

90% of top U.S. lenders." FICO Scores have been "an industry standard for over 30 years."[30]

77.     Fair Isaac's executives have confirmed the dominance of Fair Isaac's FICO Score. In November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President Michael Pung stated that the FICO scoring system "is the most widely used credit scoring system here in the U.S.," that "[v]irtually every major lender in the U.S. [uses] the FICO Score for some sort of credit lending decision," and that Fair Isaac has "maintained a 90-plus percent market share for at least the [last] 13 years."[31] In 2008, Craig Watts, a public affairs manager at Fair Isaac, described the FICO Score as the "800 pound gorilla."[32]

78.     Fair Isaac states in its 2020 Form 10-K:

> Our products and services serve clients in multiple industries, including primarily banking, insurance, retail, healthcare and public agencies. Endusers of our products include 96 of the 100 largest financial institutions in the U.S., and two-thirds of the largest 100 banks in the world. Our clients also include more than 600 insurers, including nine of the top ten U.S. property and casualty insurers; more than 300 retailers and general merchandisers; more than 200 government or public agencies; and morethan 200 healthcare and pharmaceuticals companies, including nine of the world's top ten pharmaceuticals companies. Eight of the top ten companies on the 2020 Fortune 500 list use one or more of our solutions. In addition, our consumer services are marketed to an estimated 200 million U.S. consumers whose credit relationships are reported to the three major U.S. credit reporting agencies.[33]

79.     An infographic on Fair Isaac's website states: "10 BILLION FICO SCORES

---

[30] *Id.*

[31] TransUnion Counterclaims, ¶ 32.

[32] Dana Dratch, *What Does 'Good' Credit Really Mean?*, CNBC (Oct. 30, 2008), https://www.cnbc.com/id/27458815.

[33] Fair Isaac 2020 10-K at 10.

ARE SOLD EACH YEAR," which is "FOUR TIMES the number of hamburgers McDonald's sells WORLDWIDE in a year," and "27,400,000 FICO scores are sold every day," which is "OVER TWICE the number of cups of coffee Starbucks sells WORLDWIDE in a day."[34]



80.    Fair Isaac's 2020 Form 10-K states that FICO Scores "are used in the majority of U.S. credit decisions, by nearly all of the major banks, credit card organizations, mortgage lenders and auto loan originators," and it describes FICO Scores as "the standard measure in the U.S. of consumer credit risk."[35]

---

[34]Fair Isaac, *Learn About the FICO  Score and Its Long History*, https://www.fico.com/25years/.
[35]Fair Isaac 2020 10-K at 3, 7.

22

81.     A May 2021 report by Yale University's Thurman Arnold Project, a collaborative project among Yale faculty and students, as well as other scholars dedicated to research on competition policy and antitrust enforcement, notes that Fair Isaac "enjoys a virtual monopoly in the credit score market" and that "[b]ecause of the lack of competition in this domain, there has been limited innovation in scoring methodology."[36]

82.     Fair Isaac's monopoly in the B2B Credit Score Market has given it considerable power to control prices and impose monopoly rents. Mr. Lansing has noted that, in the B2B Credit Score Market, Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are."[37]

83.     In February 2013, at a Morgan Stanley Conference, Mr. Lansing explained that Fair Isaac's "Scores business, which is the cash generator, is a very, very high-margin business. It's deeply embedded into the systems of the bank customers who use it."[38]

**D.     Fair Isaac Has Been Able to Maintain its Monopoly**

84.     Despite Fair Isaac's 90% share in the Business Market, several companies have attempted to compete with Fair Isaac's FICO Scores. These competitors' products use the same data as FICO Scores. However, many also incorporate data not used by FICO Scores—data such as, rental, utility, and telecom payment data and/or public records information, including property deeds, mortgages, liens, personal property titles, tax records, and licensing data.

85.     Some of these competitors to Fair Isaac's FICO Scores in the B2B Credit Score

---

[36] Yale University Thurman Arnold Project, *Updating Antitrust and Competition Policy: Finance Issues*, at 14, 15 (May 2021), https://som.yale.edu/sites/default/files/TeamFinance- Final.pdf.

[37] TransUnion Counterclaims, ¶ 34.

[38] Seeking Alpha, *Fair Isaac's CEO Presents at Morgan Stanley Technology, Media & Telecom Conference (Transcript)* (Feb. 27, 2013), https://seekingalpha.com/article/1231981-fair- isaacs-ceo-presents-at-morgan-stanley-technology-media-and-telecom-conference-transcript.

Market include: SageStream's Credit Optics Score; LexisNexis's RiskView score; CoreLogic Credco's Anthem Credit Score; PRBC; ChexSystems; L2C's Link2Credit Score; and ScoreLogix LLC's JSS Credit Score.

86.     Another competitor, VantageScore Solutions, represented the biggest threat to Fair Isaac's FICO Scores in the B2B Credit Score Market because it was a joint venture founded by the three major CBs. As part of its attempt to compete against Fair Isaac's FICO Scores in the B2B Credit Score Market, VantageScore Solutions introduced the VantageScore credit scoring system in March 2006. The three CB Defendants continue to own VantageScore Solutions.

87.     VantageScore Solutions does not sell or market its VantageScore credit models or credit scores; instead, it licenses them to the three CB Defendants, which may incorporate VantageScores in their credit reports.

88.     VantageScores are a competitor to FICO Scores in the B2B Credit Score Market.

89.     In addition to being backed by the three major CBs, the VantageScore credit scoring model provides reliable credit scores for millions more consumers than FICO Scores by relying on additional and alternative sources of data. VantageScore, for example, calculates scores for consumers who have not used credit for up to two years and use utility and telecommunications payment histories. As such, VantageScore provides insights into individuals' and businesses' desirability as customers, clients, and/or tenants that Fair Isaac's FICO Scores cannot. In contrast, Fair Isaac's FICO scoring systems do not generate a score if a consumer does not have at least one credit account that has been open for six months or more, or if no credit account of the consumer has been reported to the reporting CB. Thus, millions of otherwise creditworthy individuals do not have a FICO Score.

24

90.     Obtaining a mortgage, car loan, credit card or reasonable interest rates on personal lines of credit is almost impossible without a credit score. Landlords are also increasingly screening potential tenants using credit scores. Thus, those excluded by Fair Isaac's traditional FICO scoring systems--including a disproportionate number of low-income and minority consumers--face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and housing.

91.     For example, the CFPB has found that, as of 2010, 26 million consumers in the United States were "credit invisible" – *i.e.*, they lacked credit history with one of the nationwide credit reporting companies.[39] Those individuals cannot be scored by FICO.[40]

92.     The CFPB's research suggests "a strong relationship between income and having a credit record. Almost 30 percent of consumers in low-income neighborhoods are credit invisible and an additional 16 percent have unscored records. These percentages are notably lower in higher-income neighborhoods. For example, in upper-income neighborhoods, only 4 percent of the population is credit invisible and another 5 percent has an unscored record."[41]

93.     Moreover, the CFPB found "significant differences in the incidence of having a limited credit history across racial and ethnic groups," specifically, while White and Asian individuals "are almost equally likely to be credit invisible or have an unscored record, the shares of Black and Hispanic individuals with limited credit history are much larger," and individuals in those groups are thus less likely to be able to obtain a credit score.[42]

---

[39] CFPB Office of Research, *Data Point: Credit Invisibles*, at 4, 6 (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf.

[40] *Id.*

[41] Id. at 24.

[42] *Id.*

94.     According to the CFPB, "[a]bout 15 percent of Black[ ] and Hispanic[ ] [individuals] are credit invisible . . . and an additional 13 percent of [Black individuals] and 12 percent of [Hispanic individuals] have unscored records. . . . This elevated incidence . . . is observed across ages, suggesting that these differences across racial and ethnic groups materialize early in the adult lives of these consumers and persist thereafter."[43]

95.     The CFPB went on to conclude that "[t]hese results suggest that the problems that accompany having a limited credit history are disproportionally borne by Black[ ], Hispanic[ ], and lower-income consumers."[44]

96.     Furthermore, it is widely recognized that FICO Scores are a measure of past ability to pay. Competing products incorporate an analysis of prospective creditworthiness. For example, Scorelogix's JSS score incorporates job and income stability to determine whether the borrower will have the ability to repay debt in the future. L2C offers an alternative credit score that uses utility payment histories to determine creditworthiness, including future ability to pay.

97.     VantageScore has achieved some limited success. In a 2018 report, VantageScore Solutions stated:

> During the twelve months ending in July 2017, over 1.4 billion VantageScore credit scores were delivered directly to consumers by lenders like Chase and Capital One and educational websites like CreditKarma, Lending Tree, and Mint. These scores are calculated using the same VantageScore model used by lenders (i.e., not an "educational" model). They are most often provided free of charge as part of educational offerings that include simulators, credit reports, educational articles, and explanations.[45]

---

[43] *Id.* at 24-25.

[44] *Id.* at 25.

[45] VantageScore Solutions, *VantageScore® Credit Scores and The Mortgage Market*, at 8 (2018) ("VantageScore Report"), https://vantagescore.com/pdfs/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf.

26

98.     VantageScore Solutions went on to note that "[a]s lenders adopt VantageScore, we believe that such adoption will improve consumers' access to credit in certain segments and enable many more borrowers to obtain fairer pricing."[46] VantageScore Solutions also reported that "many of the most sophisticated secondary market participants use the VantageScore model to help evaluate and monitor risk, and to price and benchmark deals more accurately."[47]

99.     Despite the advantages of using VantageScore or another competing credit scoring model, Fair Isaac continues to have a monopoly in the B2B Credit Score Market and extracts monopoly rents through anticompetitive and exclusionary conduct and anticompetitive agreements with each CB. In February 2013, Mr. Lansing explained that despite the existence of VantageScore, "there [is] not that much competition around our Scores business" because "FICO Scores are very much part of the fabric of the banking industry" and "really deeply embedded."

**E.      Fair Isaac's Conduct in Furtherance of its Anticompetitive Scheme**

100.    Fair Isaac anticipated the threat VantageScore could pose to its dominance in the B2B Credit Score Market. Fair Isaac's own models of future losses predicted "substantial double-digit declines" if the use of VantageScore continued to expand.[48]

101.    Faced with the prospect of a significant hit to its market dominance, and its profits, Fair Isaac used its monopoly power to coordinate a comprehensive attack on VantageScore that included filing anticompetitive litigation; enlisting the Credit Bureaus to sign

---

[46] *Id.* at 5.

[47] VantageScore Solutions, *Myth: VantageScore Is Not Accepted by Investors in Securitization Markets* (Mar. 23, 2016), https://vantagescore.com/education/blog/myth- vantagescore-is-not-accepted-by-investors-in-securitization-markets.

[48] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, No. CV 06-4112, 2008 WL 11348223, at *2 (D. Minn. Nov. 3, 2008).

27

on to licensing agreements with anticompetitive provisions that undermined their own joint venture; and undertaking a campaign of disparagement against, and disinformation about, VantageScore Solutions and VantageScore.

### 1. Fair Isaac's Anticompetitive Litigation

102. Fair Isaac, recognizing the creation of VantageScore as a competitive threat, initiated litigation against Equifax, Experian, TransUnion, and VantageScore Solutions. In October 2006, just after the introduction of VantageScore, Fair Isaac filed a meritless lawsuit against them, alleging that the development of VantageScore violated the antitrust laws and constituted trademark infringement. Fair Isaac sought the elimination of VantageScore Solutions, requesting that the "Defendants be ordered to dissolve VantageScore." *Fair Isaac Corp. v. Equifax, Inc. et al*, No. 0:06-cv-04112, Dkt. No. 1-1 at 65 (D. Minn. Oct. 11, 2006). This frivolous lawsuit represented Fair Isaac's first attempt to kill VantageScore before it could gain traction in the market.

103. VantageScore Solutions characterized the litigation that Fair Isaac initiated as a "legal battle that sought to put us out of business, even as we scrambled to establish a competitive foothold."[49] Fair Isaac raised bogus antitrust claims that it knew lacked foundation, given its then-94% share of the B2B Credit Score Market. It also alleged trademark infringement that a jury found to be based on a trademark that Fair Isaac had fraudulently obtained from the U.S. Patent and Trademark Office ("PTO"). In addition, Fair Isaac's contention that the "300-850" marks were anything other than "merely" descriptive lacked all foundation because – as the U.S. Court of Appeals for the Eighth Circuit later held – "consumers in this market

---

[49] VantageScore Solutions, Inc., *10 years, 10 milestones* (Mar. 2016), https://thescore.vantagescore.com/article/252/10-years-10-milestones.

immediately understand '300-850' to describe the qualities and characteristics of FICO's credit score – that the credit score will be within the range of 300-850."[50]

104. Equifax settled the litigation in June 2008 and formed "a partnership [with Fair Isaac] to develop and sell advanced analytics and scoring solutions for businesses and consumers."[51]

105. The litigation against Experian and TransUnion lasted into 2011. While it was ongoing, VantageScore Solutions remained under a cloud, with Fair Isaac's lawsuit hobbling its commercial prospects: Potential B2B Purchasers for VantageScore had no way of being sure that the product might not be declared infringing on Fair Isaac's trademarks or that VantageScore Solutions would not be dissolved.

106. The district court entered summary judgment in favor of the Credit Bureaus on the antitrust and false advertising claims. A jury found against Fair Isaac on the remaining claim for trademark infringement, finding that the mark "300-850" (which denoted the range of FICO Scores) was merely descriptive. It also found that: (1) Fair Isaac made a false representation during the application process to the PTO for the registrations of the "300-850" marks; (2) Fair Isaac knew that representation to be false when it was made and intended to deceive the PTO; and (3) the PTO relied on the false representation in deciding to issue the registrations.[52]

107. The district court upheld the verdict, noting that "[t]his extensive, expensive litigation seems to have been initiated largely in response to a perceived threat to Fair Isaac's

---

[50] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1148 (8th Cir. 2011).

[51] Fair Isaac, *Equifax and Fair Isaac Enter Partnership to Accelerate Development and Delivery of New Analytic Solutions* (June 10, 2008), https://www.fico.com/en/newsroom/equifax-and-fair-isaac-enter-partnership-accelerate-development-and-delivery-new-analytic.

[52] *Fair Isaac*, 650 F.3d at 1148-50.

29

dominant position in the credit scoring industry."[53]

108.    In 2011, the United States Court of Appeals for the Eighth Circuit affirmed both that decision and the earlier summary judgment ruling.[54]

109.    VantageScore Solutions's growth during its first few years was inhibited by the litigation, which was part of a continuing antitrust violation by Fair Isaac that goes on to this day.

110.    In December 2017, Fair Isaac sued TransUnion for unpaid royalties.[55]

111.    In February 2018, TransUnion responded by filing antitrust counterclaims for, *inter alia*, monopolization against Fair Isaac. In paragraphs 42-60 of the counterclaims (which was partially redacted), the anticompetitive terms the Credit Bureaus and Fair Isaac had agreed upon were disclosed publicly for the first time. Those provisions are described in detail below.

112.    Fair Isaac moved to dismiss the counterclaims. Judge Coleman denied the motion, ruling that "TransUnion has adequately pled actual and attempted monopolization" through allegations that "FICO engages in practices that are intended to drive out competition" through "exclusive dealing provisions [that] are unlawful attempts to 'maintain monopoly power through exclusionary conduct.'"[56]

113.    In November 2020, TransUnion and Fair Isaac settled on undisclosed terms. One effect of this settlement was to cut Plaintiffs and proposed Class members off from obtaining further information about the anticompetitive agreements between Fair Isaac and the CBs. Fair

---

[53] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1000 (D. Minn. 2010).

[54] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011).

[55] *See* Complaint, Dkt. 1, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill.Nov. 16, 2017).

[56] *Fair Isaac Corp. v. Trans Union, LLC*, No. 17:cv-8318, 2019 WL 1382068, at *2 (N.D.Ill. Mar. 27, 2019).

Isaac essentially bought TransUnion off. This inference is bolstered by the fact that, in August 2021, TransUnion announced that it had entered into a long-term (presumably lucrative) contract to distribute FICO Scores to lenders and consumers in Canada.[57]

114.    The Antitrust Division of the United States Department of Justice took notice of Fair Isaac's conduct alleged in the TransUnion Action and instituted a civil investigation. That investigation was closed without action in December 2020, shortly after TransUnion settled with Fair Isaac.[58]

### 2.    Fair Isaac and the Credit Bureaus' Anti-Competitive Agreements

115.    Business customers in the B2B Credit Score Market purchase credit reports and FICO Scores from CBs and third-party credit reporting companies. As part of this process, CBs have entered into contractual relationships, called "Credit Scoring Services Agreements" ("CSSAs"), with their customers that govern the terms by which businesses purchase FICO Scores. These terms include the amount(s) paid to the CB, the fee model for delivery of credit score services, the method of payment, the mode of delivery, and restrictions on the business's use of FICO Scores.

116.    The CBs and Fair Isaac have entered into separate licensing agreements which set forth the royalties that CBs must pay to Fair Isaac for the FICO Scores that the CBs sell to their customers. These royalties are passed on to Plaintiffs and other members of the proposed

---

[57] See Press Release, TransUnion, *TransUnion Enters New Long-term Agreement with FICO to Distribute FICO® Score in Canada* (Aug. 3, 2021), https://www.globenewswire.com/news-release/2021/08/03/2273895/0/en/TransUnion-Enters-New-Long-term-Agreement-with-FICO-to-Distribute-FICO-Score-in-Canada.html.

[58] See Press Release, Fair Isaac, *FICO Statement Regarding Antitrust Investigation* (Mar. 15, 2020), https://fico.gcs-web.com/news-releases/news-release-details/fico-statement-regarding-antitrust-investigation.

Classes.

117. After its litigation efforts failed to eliminate VantageScore, Fair Isaac elected to take another approach. When its existing licensing agreements with each CB expired in 2013 or 2015, Fair Isaac reentered agreements containing new anticompetitive provisions with each CB that aimed to crush the only real competition, VantageScore, maintain Fair Isaac's monopoly, and extract monopoly rents from B2B Purchasers.

118. Fair Isaac and the CBs entered into new or renewed agreements that contained new provisions designed to restrict the competitive reach of VantageScore. The CBs characterized the licensing agreements with Fair Isaac as "vertical distribution agreements" in their memorandum of law in support of their motion to dismiss in this litigation.[59] The anticompetitive contract provisions targeted the only significant competing credit score – VantageScore. And they specifically restricted the CBs' ability to market VantageScore to B2B purchasers. On information and belief, the CBs agreed to those provisions – cutting their own joint venture off at the knees – in return for Fair Isaac's acquiescence to a clause that protected them from price competition (and potentially in exchange for other benefits as well). The benefit of the quid pro quo to the CBs was that they could charge supracompetitive prices for credit scores to the consumers – the B2B purchasers.

119. The agreements were consummated at a critical time. In 2011 through the first part of 2013, developments occurred that should have furthered VantageScore's ability to compete with FICO Scores. In 2011, VantageScore Solutions formed a partnership with the Consumer Federation of America, "a nonprofit association of nearly 300 consumer groups

---

[59] See The Credit Bureaus' Motion to Dismiss Plaintiffs' Class Action Complaints, Dkt. No. 135, *In re FICO Antitrust Litig.*, No.1:20-cv-02114, at 2 (Jan. 18, 2022).

founded in 1968 to advance the consumer interest through research, advocacy, and education";

that alliance led to the "use of annual consumer surveys to gauge awareness of credit scoring

related issues."[60] In October 2012, "the Federal Deposit Insurance Corporation ["FDIC"]

revised its rules for assessing default risk on loans issued by banks with deposits in excess of

$10 billion. Instead of evaluating loans on a particular credit score, the revision calls for

examining the underlying probability of default [] associated with those loans at the time of

origination."[61] In March 2013, VantageScore Solutions debuted a new scoring model,

VantageScore 3.0, which "built on the strengths of its predecessors and drew extensive news

coverage for its ability to score 98 percent of adult consumers in the U.S. (including 30-35

million who cannot get scores from conventional credit-scoring models [*i.e.*, FICO]); its

disregard of paid collections (including paid medical debt); and its simplified reason codes."[62]

And, in July 2013, VantageScore Solutions published a white paper explaining how

VantageScore could be aligned with the FDIC's new rules for evaluating probability of

default.[63]

120. Fair Isaac's response to these developments was to agree on anticompetitive

contract terms with the CBs, commencing with Experian in May 2013, continuing with Equifax

in November 2013, and culminating with the February 2015 Analytic and Data License

Agreement ("ADLA") between Fair Isaac and TransUnion. These clauses would preserve Fair

Isaac's monopoly while compensating the CBs for the marginalization of VantageScore. Fair

---

[60] VantageScore Solutions, *10 Years, 10 Milestones, supra* n. 52.

[61] *Id.*

[62] VantageScore, *10 years, 10 milestones, supra* n. 52.

[63] VantageScore Solutions, *FDIC New Definition of High Risk Consumer Loan Securities* (July 2013), https://paperzz.com/doc/8033743/fdic-new-definition-of-high-risk-consumer-loan-and-securi. I

Isaac and the CBs did not publicly reveal any of the terms of their agreements until February 2018.

121. The necessary (and intended) consequences of the agreements between Fair Isaac and the CBs was the stifling of competition in the B2B Credit Score Market.

122. In fact, Mr. Lansing, confirmed that the "exclusive deal[s]" Fair Isaac and the Credit Bureaus entered into essentially sidelined VantageScore, which never gained "a lot of traction in the banking space," and that, even though VantageScore was a joint venture of the Credit Bureaus, working together with FICO has been "a good thing for both of us [i.e., both the Credit Bureaus and Fair Isaac]."[64]

123. According to Mr. Lansing, instead of being "at war" with one another, the Credit Bureaus decided instead "to be partnered" with Fair Isaac. Explaining the relationship with Experian, for example, Mr. Lansing stated that Experian and Fair Isaac "have a rev share arrangement with them that works for them and works for us really good." Similarly, with respect to its arrangement with Equifax, Mr. Lansing stated "it is a rev share model. We're in it together." Given Fair Isaac's own admission that all three Credit Bureaus have Level Playing Field clauses, it follows that TransUnion would also have a similar revenue sharing arrangement with Fair Isaac.

### a. Fair Isaac's Anticompetitive Contracts with the CBs

124. The terms of the contracts between Fair Isaac and the Credit Bureaus were not publicly revealed until February 2018. Many of the contract terms remain confidential to this day.

---

[64] Remarks by William J. Lansing, President, CEO & Director, Fair Isaac, Fair Isaac Corp at Barclays Global Financial Services Conference (September 25, 2015).

34

125.    The discussion that follows is based on TransUnion's description of its ADLA in its counterclaims against Fair Isaac. The ADLA was filed under seal in the TransUnion action and is unavailable to Plaintiffs beyond what TransUnion has quoted in its counterclaims. While the counterclaims quote only the ADLA, TransUnion pled that "Fair Isaac represented to TransUnion that TransUnion's two major competitors, Experian and Equifax, had already agreed to materially similar new contracts with Fair Isaac."[65] In fact, Fair Isaac admitted that Equifax, Experian, and TransUnion agreed to the same or similar provisions: In FICO's Answer to Counterclaims in the TransUnion litigation, Fair Isaac "admit[ed] that prior to January 2015, it entered into separate contracts with Experian and Equifax that contained certain terms that were similar to certain terms in the ADLA."[66]

126.    Furthermore, Fair Isaac "admit[ed] that Equifax and Experian have agreed to 'No Equivalent Products' provisions with terms similar to the terms agreed to by TransUnion in the ADLA."[67] FICO also "admit[ted] that Equifax and Experian have agreed to 'Dynamic Royalty Schedule' terms that are similar to the terms agreed to by TransUnion in the ADLA, and that Equifax and Experian are subject to royalty schedules that contain a "Pre-Qualification" royalty category similar to that to which TransUnion is subject in its royalty schedule."[68] Finally, Fair Isaac "admit[ed] that Equifax and Experian have agreed to 'Level Playing Field' terms similar to the term agreed to by TransUnion in the ADLA."[69]

---

[65] TransUnion Counterclaims, ¶43.

[66] Fair Isaac's Redacted Answer to TransUnion Counterclaims, Dkt. No. 62, Fair Isaac Corp. v. TransUnion LLC, No 1:17-cv-08318 at 21 (N.D. Ill. Apr. 10, 2018) ("FICO Answer to Counterclaims").

[67] FICO Answer to Counterclaims at 24

[68] *Id.* at 27.

[69] *Id.* at 27.

35

127. Fair Isaac has made similar admissions about the contract terms in its Answer in this litigation. Fair Isaac admits that its agreement with TransUnion contains the "No Equivalent Products" provision.[70] It also admits that the "Dynamic Royalty Schedule" and "Level Playing Field" terms appear in its agreements with all three credit bureaus,[71] and that the latter requires it to offer the most favorable royalty pricing as to all three credit bureaus.[72] Fair Isaac further admits that the "Pre-Qualification" royalty category has applied since 2015.[73] Thus, substantially similar anticompetitive No Equivalent Products and Dynamic Royalty Schedule provisions that exist in the ADLA between TransUnion and Fair Isaac also exist in the agreements between Experian and Fair Isaac and Equifax and Fair Isaac. The allegations that follow therefore apply to all three Credit Bureau Defendants.

128. The restraints imposed in the contracts consist primarily of: (a) "No Equivalent Products" provisions; and (b) "Dynamic Royalty Schedule" provisions (the "Restrictive Terms"). A third set of provisions, the "Level Playing Field" provisions, compensated the CBs for their agreement not to promote VantageScore under the former provisions at the expense of B2B Purchasers.

129. In an order dated September 28, 2023, this Court held that "the No Equivalent [Products] Provision and the Dynamic Royalty Schedule clauses together qualify as sufficient allegations of anticompetitive effects" to allow a claim against Fair Isaac under Act §2 of the

---

[70] Fair Isaac's Answer and Affirmative Defenses to Indirect Purchaser Plaintiffs' Consolidated Class Action Complaint, Dkt. No. 183, No. 1:20-cv-02114 ("FICO Answer to IPP Complaint"), (Oct. 23, 2023) ¶126.

[71] *Id.* at ¶125.

[72] *Id.* at ¶145.

[73] *Id.* at ¶138.

Sherman Act to proceed to discovery.[74] Those provisions are described in turn below.

### i.     The "No Equivalent Products Clause"

130.    The "No Equivalent Products" clause is located at Section 12.5 of the ADLA between Fair Isaac and TransUnion. This clause provides that TransUnion may not "internally develop" a credit scoring system that is "aligned to the odds-to-score relationship of any Fair Isaac Analytic" or uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic. Section 12.5 of the ADLA further prohibits TransUnion from distributing "any competing analytic" (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes. The Section also expressly names VantageScore Solutions, LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."[75]

131.    On information and belief, Fair Isaac has imposed similar or identical "No Equivalent Products" clauses on Equifax and Experian.[76] Thus, these CBs have agreed to and acquiesced in these anticompetitive agreements and the resulting anticompetitive effects.

132.    Fair Isaac's "No Equivalent Products" clause has effectively blocked the CBs from offering alternative credit scoring products, such as VantageScore, which would allow business customers in the B2B Credit Score Market to switch from FICO Scores without incurring the significant switching costs that using a new scoring system would entail. It also prevents the use of VantageScore or other credit scoring systems alongside or interchangeably with FICO Scores without the business customer incurring those same switching costs.

---

[74] Memorandum Opinion and Order, Dkt. No. 173, No. 1:20-cv-02114 (Sept. 28, 2023) at 13.

[75] TransUnion Counterclaims., ¶44.

[76] Fair Isaac has admitted its license agreements with Equifax and Experian include similar "No Equivalent Products" provisions. FICO Answer to IPP Complaint, ¶ 127.

133.     The "No Equivalent Products" clause thus protects and sustains Fair Isaac's monopoly.

134.     For example, if an alternative credit scoring product such as VantageScore used a score of 700 to indicate a less-than-five-percent risk of credit delinquency, and if a FICO Score of 700 also indicated the same risk of delinquency, the "No Equivalent Products" clause would prevent a CB from distributing the competing product. Similarly, if a competing credit score product used reason codes that match 20% of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause would prohibit a CB from distributing the product.

135.     Due to years of Fair Isaac's dominance, many business customers of credit scores have modeled and designed their internal systems for FICO Scores. These business customers' systems, models, and processes are calibrated to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data that it collects internally, and automatically produce a lending decision. The "No Equivalent Products" clause effectively prohibits the CBs from selling an alternative to FICO's Scores since those scores would have to be incompatible with many businesses' existing systems. Thus, they are prevented from providing business customers a legitimate choice between using FICO Scores and an alternative score.

136.     Notably, the "No Equivalent Products" clause does not sustain Fair Isaac's intellectual property. Rather, it protects and sustains Fair Isaac's monopoly. For example, the odds-to-score relationship is not protectable intellectual property. It is the arbitrary assignment of a number (score) to a related risk probability. The intellectual property entitled to protection

38

in this product market is the analysis and the process used to predict a consumer's risk of default, not the shorthand numerical representation of a "less than-five-percent-risk-of-default" as "700."

137.  Similarly, the reason codes that are prohibited from matching Fair Isaac's, under the "No Equivalent Products" clause, were not invented by Fair Isaac. Rather, there is an established set of reason codes that reflect well-established industry measures of creditworthiness.

138.  The "No Equivalent Products" clause was an effective restraint of trade because when one CB stops using VantageScore, it becomes even less attractive to the other CBs. B2B purchasers will not want to use a credit scoring system unless all of the main CBs use it. This phenomenon is often referred to as a "network effect." By imposing a "No Equivalent Products" term, Fair Isaac sought to block the CBs from enabling B2B purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems and from using VantageScore alongside or interchangeably with FICO Scores.

139.  By entering contracts with the anticompetitive "No Equivalent Products" provisions, the CBs agreed to anticompetitive terms that had the effect of eliminating or drastically reducing the competitive threat posed by VantageScore, thus unreasonably restraining trade.

### ii.  The "Dynamic Royalty Schedule"

140.  The contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively, include a similar or identical "Dynamic Royalty Schedule" clause that allowed Fair Isaac to replace its existing royalty with a new one and thereby gave Fair Isaac the ability to control the prices of FICO Scores. The "Dynamic Royalty Schedule" is detailed in Section 9.2

39

of the ADLA between Fair Isaac and TransUnion. This provision states that "once every twelve (12) months during the Term, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing."[77]

141.     According to TransUnion, "Fair Isaac has abused and exploited this provision in 2015, 2016, and 2017 by not only raising prices, but also introducing entirely new and non-negotiated contract terms, royalty categories, and definitions."[78]

142.     In 2015, Fair Isaac inserted a new "Pre-Qualification" royalty category into its contracts with CBs. "Pre-Qualification" is defined as "an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category created a distinction between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any credit score or credit data to consumers, and (2) lenders that use FICO Scores for "Pre-Qualification" while also providing credit scores or credit data to consumers "in connection" with the "Pre-Qualification."

143.     As an incentive, some business customers in the B2B Credit Score Market provide to their consumer customers, to whom they are often offering credit, the opportunity to receive their personal credit score. This can serve as a valuable marketing tool for the business customers.

144.     Under Fair Isaac's contracts with the CBs, the royalty price paid to Fair Isaac for use of its FICO Score for "Pre-Qualification" is directly tied to whether credit scores or credit data are provided to consumers. There is a lower per-score royalty rate if a business customer purchases a FICO Score for use in "Pre-Qualification" and does not provide any credit score or

---

[77] TransUnion Counterclaims, ¶ 50.

[78] *Id.*

credit data to their consumer customer "in connection" with the "Pre-Qualification." If the lender purchases a FICO score for use in 'Pre-Qualification' and provides a VantageScore (or any other credit score) to the consumer 'in connection' with the 'Pre- Qualification,'" Fair Isaac charges the lender a seven times penalty rate for that FICO Score. That steep penalty is meant to dissuade lenders from providing competing credit scores, such as a VantageScore.[79]

145.    The higher royalty rate can only be avoided if the business customer exclusively purchases FICO Scores. One way to avoid paying the higher royalty rate is for the business customer to purchase the FICO Score but not provide a credit score or credit data to the consumer. A second way to avoid the higher royalty rate requires the business customer to purchase a bundled FICO product from Fair Isaac and provide the bundled FICO Score to its consumer customer. Fair Isaac offers bundled products to lenders that combine the use of scores designed for use by business customers with the provision of scores to their consumer customers.[80]

146.    TransUnion accepted, complied with, and made royalty payments according to the new "Pre-Qualification" royalty category. On information and belief, so have Equifax and Experian.[81]

147.    The only reason for the higher royalty rate is to unreasonably restrain trade. There is no legitimate business justification for the higher royalty rate Fair Isaac and each CB agreed upon for FICO Scores when the business customer also purchases a competing credit score (i.e. VantageScore) to provide its consumer customers. The higher royalty rate has anticompetitive

---

[79] *Id.*, ¶ 52.

[80] *Id.*, ¶ 53.

[81] See *id.*, ¶ 55.

effects and has assisted Fair Isaac in maintaining its monopoly position as, on information and belief, few, if any, business customers have opted to pay the higher royalty rate.

148.    According to TransUnion, "[t]his scheme has been effective, and no B2B Purchasers from TransUnion have opted to pay the penalty rate."[82] The purpose and effect of this clause was to prevent VantageScore from obtaining market share, thereby unreasonably restraining trade.

### iii.    The "Level Playing Field"

149.    In exchange for agreeing to the "No Equivalent Products" and "Dynamic Royalty" provisions in their agreements with Fair Isaac – which effectively prevent the CBs from marketing VantageScore to B2B purchasers – Fair Isaac committed not to offer any CB a more favorable price for FICO Scores than any other CB. This commitment was embodied in the "Level Playing Field" clauses of the agreements with the CBs. Those provisions forbid Fair Isaac to charge any CB a price that is lower than the price it charges any other CB.[83]The "Level Playing Field" provision of the TransUnion ADLA is contained in §9.16. Fair Isaac's contracts with TransUnion, Equifax, and Experian include similar or identical "Level Playing Field" and "Dynamic Royalty Schedule" provisions.[84] The Credit Bureaus agreed to, and have complied with, these contract provisions.

150.    The Level Playing Field functions as a cost-information-sharing mechanism among the CBs. The FTC has determined that "when competing companies," like the Credit Bureaus, "exchang[e] price or other commercially sensitive information, that may facilitate

---

[82] *Id.*, ¶54.

[83] See *id.*, ¶59.

[84] FICO Answer to IPP Complaint, ¶136 (Dynamic Royalty Schedule), ¶145 (The Level Playing Field).

42

collusion or otherwise harm competition and consumers in violation of the antitrust laws." Indeed, "the sharing of information relating to price, cost, output, customers, or strategic planning is more likely to be of competitive concern than the sharing of less competitively sensitive information."[85]

151.    The Level Playing Field provision offered the CBs several advantages, even though it effectively prevented the CBs from marketing VantageScore to B2B purchasers. First, it confirmed to each CB how much the other competing CBs are paying for FICO's algorithm. This knowledge protected the CBs from the risk that Fair Isaac would grant discounts that could expose them each to the risk of losing market share to their competitors. Second, the CBs used the information gleaned from the Level Playing Field provision to reduce price competition. As Fair Isaac has pointed out, previously, "a Credit Bureau could not be sure what its competitors' costs were and, consequently, to what extent its competitors could cut the price of their Credit Scores. This uncertainty could be used by Lenders to induce price competition among the Credit Bureaus." Fair Isaac claimed in its earlier lawsuit that the Credit Bureaus sought to use VantageScore so that "each Credit Bureau will know that it is paying exactly the same cost as its competitors for its scoring algorithm, and Lenders will no longer be able to use this uncertainty to play one Credit Bureau against the others."[86] In a rich irony, the Level Playing Field provision does exactly what Fair Isaac accused the CBs of trying to accomplish through VantageScore: prevent their customers from playing one CB against the others, thereby reducing

---

[85] Michael Bloom, Information exchange: be reasonable, FED. TRADE COMM'N (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable (emphasis added).

[86] Third Amended Complaint, Dkt. No. 436, Fair Isaac Corp. v. Experian Info Sols., No. 06-cv-4112 (D. Minn. Nov. 10, 2008), ¶138.

price competition for credit reports

152.    It also protected CBs from new market entrants. As Fair Isaac has pointed out, the CBs faced "the threat that independent scoring algorithm vendors, such as Fair Isaac, will facilitate the entry of new Credit Bureaus."[87] But by agreeing to the Level Playing Field provisions, Fair Isaac could not carry out that threat – by offering new credit bureaus prices lower than those it charges the incumbent CBs. Thus, the CBs have secured from Fair Isaac a significant source of protection from future competition in the market for the sale of credit reports to B2B Purchasers.

153.    The provision is demonstrably important to the Credit Bureaus. As was revealed through Fair Isaac's suit against TransUnion, in the negotiations over its Canadian contract, TransUnion insisted that Fair Isaac include a "Level Playing Field" clause. That clause would have given TransUnion Canada a right to any discounts or special pricing terms that Fair Isaac might offer other credit bureaus for the license or distribution of FICO scores in Canada. The Level Playing Field clause was so valuable to TransUnion of Canada that it continued to insist on one until Fair Isaac threatened to withhold its Canadian business entirely.

154.    Collectively, the "Dynamic Royalty Schedule" and "Level Playing Field" clauses allow Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores. These clauses also allow the CBs to extract monopoly prices from B2B Purchasers.

155.    The "Level Playing Field" and "Dynamic Royalty Schedule" clauses disincentivize CBs from negotiating for lower royalty prices for Fair Isaac's FICO Scores, because the CBs will not obtain a competitive advantage if they were to obtain lower pricing for

---

[87] *See* Third Amended Complaint, Dkt. 436, *Fair Isaac Corporation v. Experian Info. Sols.*,No. 06-CV-4112 (D. Minn. Nov. 10, 2008), ¶140.

44

royalty rates. The "Level Playing Field" clause does not provide Fair Isaac with any rights it does not have. Fair Isaac could offer the same royalty rates to all CBs absent the clause. The "Level Playing Field" clause exists to inform the CBs that negotiating for lower prices is useless.

156. Thus, Fair Isaac can freely increase prices with little resistance from the Credit Bureaus. And it has done so – Fair Isaac admitted in its answer that "over the last several years" it has "increased the base (i.e., undiscounted) royalty prices that it charges to the Credit Bureaus."[88] That price increase is ultimately borne by B2B Purchasers who pay a higher price for FICO Scores than they would have but for the CB's agreements and adherence to anticompetitive contract provisions.

157. After entering into the contracts containing anticompetitive terms with the Credit Bureaus, Fair Isaac initiated multiple rounds of price increases. In 2019, Fair Isaac reported: *"On the B2B side, revenues were up 36% over the previous year, due primarily to the 2018 price adjustments."*[89] Again, in 2021, Fair Isaac reported that *"revenues were $169 million, up 31% from the same period last year. B2B was up 25% over the same period last year,"* driven by continued high volumes in mortgage originations as well as some unit price increases across our different score categories. In the B2B business, we also had a royalty true-up and an annual license deal this quarter that had a small positive impact on overall revenues."[90]

158. As TransUnion has explained, taken together with the Dynamic Royalty Schedule provisions, the Level Playing Field provisions "enable Fair Isaac to unilaterally increase the royalty prices it charges [the Credit Bureaus] for FICO scores."[91]

---

[88] FICO Answer to IPP Complaint, ¶163.

[89] Q1 2019 Fair Isaac Corp Earning Call – Final (January 30, 2019).

[90] Q2 2021 Fair Isaac Corp Earnings Call – Final (May 5, 2021).

[91] TransUnion Counterclaims, ¶59.

159. Notably, TransUnion has admitted that, to the extent the Level Playing Field provision resulted in higher rates, those costs were ultimately also borne by "banks [and] mortgage lenders" (*i.e.*, B2B purchasers).[92] While the CBs' agreement to the restrictive terms was against their self-interest, much of the cost was borne by B2B purchasers, while the CBs were otherwise compensated by the Level Playing Field provisions.

160. Experian Vice President and Chief Financial Officer confirmed during a 2019 earnings call that while "the FICO price increase impacts" Experian, it also "impacts [Experian's] customers" because Experian "pass[es] it through to [its] customers."[93]

161. Equifax's Chief Executive Officer confirmed the same: When Fair Isaac "put through a price increase . . . Equifax TU and Experian deliver[ed] that price increase to the marketplace, when they increase the price of their credit score. So that rolled through."[94]

162. Thus, Fair Isaac and the CBs have used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in their contracts for anticompetitive purposes and to extract monopoly prices from all business customers in the B2B Credit Score Market.

### 3. Fair Isaac's Negative Advertising Campaign in Furtherance of its Scheme

163. Having agreed with each of the CBs to impose restrictions on VantageScore's ability to compete against FICO, Fair Isaac also engaged in an advertising campaign that disseminated false and misleading information with the goal of maintaining its monopoly in the B2B Credit Score Market. In advertisements, letters, and blog posts, Fair Isaac disparaged

---

[92] TransUnion Counterclaims, ¶60.

[93] John W. Gamble, VP & CFO, Remarks at Q1 2019 Equifax Inc. Earnings Call (May 10, 2019) (transcript available in Westlaw).

[94] Mark W. Begor, CEO, Remarks at Q2 2023 Equifax Inc. Earnings Call (July 20, 2023) (transcript available in Westlaw).

VantageScore and other credit scoring systems by calling them "FAKO" scores, falsely claimed that VantageScore and other alternative scoring systems do not reliably measure creditworthiness, and misrepresented the information considered by VantageScore and other credit scoring systems.

164.   For example, on December 12, 2017 Fair Isaac took out a full-page advertisement in the *Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates." This advertisement that attacked VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative credit score, which is owned by CBs. According to the advertisement, the credit score owned by CBs (impliedly VantageScore) is less reliable than FICO Scores in evaluating credit risk and does not use "sound practices" or "science-based credit evaluation." This advertisement conveyed Fair Isaac's false message that VantageScore is "Weakening scoring standards, [and] harm[ing] consumers, and the lending system."[95]

165.   Furthermore, the *Wall Street Journal* advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that links visitors to articles and blog posts that disparage VantageScore by name. One of these blog post claims: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

166.   Another example of Fair Isaac's false and misleading advertising campaign can be found on its website where a blog post claims that "Research results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job

---

[95] TransUnion Counterclaims, ¶ 66

47

forecasting future performance." This statement is false and misleading. VantageScore and other scoring models consider an individual consumer or business's full credit and financial history, even if the consumer has not used a traditional credit line in the last six months. Further, studies have shown that VantageScore and other competing credit scoring models are strongly predictive.[96]

167.    A blog post written by Joanne Gaskin ("Gaskin"), the Vice President of Scores and Analytics at Fair Isaac, claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not."[97] TransUnion responded "This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones."[98]

168.    Similarly, Fair Isaac fought hard against the efforts to create a process that would allow alternative credit scoring models to be validated and approved by Fannie Mae and Freddie Mac when they purchase mortgages. Such a rule would clearly benefit VantageScore, which could then attempt to break Fair Isaac's 100% monopoly in this sector. Public sentiment favored this move.[99] Fair Isaac did not. Indeed, it deployed Gaskin to give press interviews saying that

---

[96] *See* VantageScore Report, *supra* n.44, at 2, 4, 5-6

[97] Joanne Gaskin, FICO BLOG, *Truth Squad: Is FICO Score 700 the Same as VantageScore 700?* (Feb. 6, 2017), https://www.fico.com/blogs/truth-squad-fico-score-700-same-vantagescore-700.

[98] TransUnion Counterclaims, ¶71.

[99] *See* Bloomberg Business News, *This Monopoly Is Holding Back the Mortgage Market,* (Jan. 18, 2018), https://www.bloomberg.com/opinion/articles/2018-01-18/this-credit-score- monopoly-is-holding-back-the-mortgage-market; Paul Weinstein, Jr., *No Company Should Have a Monopoly*

48

Fair Isaac's alleged monopoly is a "myth."[100] Fair Isaac also hired a research group to present the argument that VantageScore's promise of home ownership to millions more Americans was deceptive and that the company's ownership by the CBs was anticompetitive, an argument that failed during the trademark litigation discussed above.[101] The FHFA ultimately adopted a final rule that permitted rival generators of credit scores to apply to serve Fannie Mae and Freddie Mac, saying that "FHFA has concluded that allowing all credit score model developers to submit applications is more consistent with [the applicable statute], which does not prevent any credit score model from being considered for potential use in the mortgage market." [102]

169.     Fair Isaac's smear campaign against VantageScore was successful in sowing doubt about the reliability and accuracy of credit scoring alternatives to FICO Scores. For example, a media outlet devoted to personal finance issues, thebalance.com, posted in February 2017 that, "If you purchased your credit score from anywhere but MyFICO.com, then it's a FAKO score."

170.     The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

### F.     The Contracts Between Fair Isaac and Each Credit Bureau Containing Anticompetitive Terms, In Combination With Fair Isaac's Anticompetitive Conduct Has Harmed Competition In the B2B Credit Score Market

---

*on Credit Scoring*, The Hill (Dec. 7, 2017), https://thehill.com/opinion/finance/363755-no-company-should-have-a-monopoly-on-credit- scoring.

[100] *FICO: The 'Credit Score Monopoly' is a Myth*, DS News (Dec. 18, 2015), https://dsnews.com/news/12-18-2015/fico-the-credit-score-monopoly-is-a-myth.

[101] Quantilytic LLC, *Risks and Opportunities in Expanding Mortgage Credit Availability Through New Credit Scores*, at 22 (Dec. 2017), https://www.progressivepolicy.org/wp-content/uploads/2017/12/UpdatedCreditScoring_2017.pdf (research sponsored by Fair Isaac).

[102] Fed. Hous. Fin. Agency, *Validation and Approval of Credit Score Models Final Rule*, 12 C.F.R. 1254 (Aug. 16, 2019).

171.     The CBs and Fair Isaac's anticompetitive conduct has harmed and continues to harm business customers in the B2B Credit Score Market. Fair Isaac's unlawful conduct, including the anticompetitive terms in its agreements with the CBs, has foreclosed competition in the B2B Credit Score Market by eliminating fair opportunities for VantageScore or any other credit score product to compete with Fair Isaac. This anticompetitive and exclusionary conduct has unreasonably restrained trade and maintained Fair Isaac's monopoly, by, among other things, allowing it to charge supracompetitive prices for B2B credit scores to B2B purchasers during the Class Period.

172.     FICO's Scores business operates with an incredibly high operating margin of 86%.[103] To maximize its monopoly rent, Fair Isaac has increased its prices for FICO Scores significantly in recent years. In 2018, after securing agreements from each of the three Credit Bureaus to abide by anticompetitive contract terms, FICO implemented a special pricing increase for mortgage customers that was an approximately 66% increase from $0.06/score to $0.10/score.[104] In the following two years, FICO again rolled out special pricing increases to its auto customers and to some credit card customers.[105]

173.     Fair Isaac's conduct and the anticompetitive provisions contained in contracts between the CBs and Fair Isaac, have reduced choice for business customers in the B2B Credit Score Market and frustrated the ability of business customers to purchase VantageScore or any other competing credit score. As a direct and proximate result of Fair Isaac's exclusionary and

---

[103] Jose Karlo Mari Tottoc, Yahoo! Finance, *Headwaters Capital: 'Fair Isaac Corp (FICO) Can Grow Its Free Cash Flow by 15-20% Annually'* (Jan. 23, 2021), https://finance.yahoo.com/news/headwaters-capital-fair-isaac-corp-202237954.html.

[104] *Id.*

[105] *Id.*

anticompetitive conduct, Fair Isaac has been able to indirectly charge Plaintiffs and all similarly situated businesses supracompetitive prices for credit scores. As indirect buyers of Fair Isaac's FICO Scores, Plaintiffs and all similarly situated businesses have been harmed by Fair Isaac's supracompetitive royalty prices.

174.    Fair Isaac's sales in the B2B Credit Score Market over the past five fiscal years have been extremely profitable. Fair Isaac maintains a supracompetitive profit margin on the revenue it earns from its Business Credit Scoring Products. Plaintiffs and similarly situated businesses have vastly overpaid for FICO Scores due to Fair Isaac's and the CBs' anticompetitive activities.

## V.    CLASS ACTION ALLEGATIONS

175.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All end-users who purchased a FICO Score in the B2B Credit Score Market from anyone other than Fair Isaac and/or a Credit Bureau from October 1, 2006 through the present (the "Class Period").

176.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws, as well as the law of unjust enrichment on behalf of the following class (the "Damages Class"):

> All end-users who in Indirect Purchaser States[106] purchased a FICO Score in the B2B Credit Score Market from anyone other than Fair Isaac and/or a Credit Bureau from October 1, 2006 through the present

---

[106] The "Indirect Purchaser States" are the states and Districts listed in the Seventh, Eighth and Ninth Claims for Relief.

(the "Class Period").

177.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

178.    These class definitions exclude any and all natural persons who are not members of these Classes by their definitions. Also excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased FICO Scores directly or for resale.

179.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least thousands of members in each Class. Members of the Classes are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Classes are readily identifiable from information and records in the possession of Defendants.

180.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and members of the Classes were damaged by the same wrongful conduct of Defendants.

181.    The interests of Plaintiffs are coincident with, and not antagonistic to, those of members of the Classes.

182.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

183.    Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Classes as a whole appropriate. Questions of law and fact common to members of the Classes include, but are not limited to:

a.   whether Fair Isaac monopolized, and whether Defendants entered into contracts that unreasonably restrain, trade in violation of federal law;

b.   whether Fair Isaac monopolized, and whether Defendants entered into contracts that unreasonably restrain, trade in violation of certain state antitrust laws;

c.   whether Defendants engaged in unfair or deceptive trade practices in violation of certain state laws;

d.   whether Defendants were unjustly enriched to the detriment of Plaintiffs and members of the Classes, thereby entitling Plaintiffs and members of the Classes to disgorgement of all benefits derived by Defendants;

e.   what was the duration of the alleged unlawful conduct;

f.   what injury was suffered by Plaintiffs and members of the Classes;

g.   what damages were suffered by Plaintiffs and members of the Classes; and

h.   whether Defendants acted or refused to act on grounds generally applicable to members of the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Classes as a whole.

184.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

185.   The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

186.   The prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

187.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

188.    Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

189.    Plaintiffs have defined members of the Classes based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.    STATUTES OF LIMITATION AND TOLLING

190.    Plaintiffs had no knowledge of the agreements or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) February 12, 2018, the date that TransUnion filed its Counterclaims against Fair Isaac. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in an anticompetitive scheme involving the distribution of credit scores.

191.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public websites, that they maintained policies that prohibited the type of anticompetitive conduct alleged in this Consolidated Complaint. For example:

   a.    Fair Isaac's Code of Business Conduct and Ethics states: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices."[107]

   b.    Equifax's Code of Ethics and Business Conduct states: "We believe in free and open competition and never engage in improper practices that may limit competition."[108]

---

[107] Fair Isaac, *Code of Business Conduct and Ethics*, https://fico.gcs-web.com/static-files/ed6519a4-2148-4166-82f2-4636e0713531.

[108] Equifax, *Code of Ethics and Business Conduct* (Aug. 2019), https://assets.equifax.com/assets/corp/code_of_ethics.pdf.

    c.    Experian's Code of Conduct states: "We will not engage in any form of agreement with competitors to fix prices, rig bids, allocate customers and/or restrict supply in the marketplace." "We will comply with all applicable laws, rules, and regulations in every jurisdiction in which we operate, including but not limited to . . . antitrust/competition."[109]

    d.    TransUnion's Code of Business Conduct states: "All TransUnion Team Members must understand how competition and antitrust laws affect their daily work. You must fully and consistently comply with applicable competition and antitrust laws.[110]

192.    It was reasonable for Plaintiffs and members of the Classes to believe that Defendants were complying with their own policies.

193.    Moreover, on information and belief, Plaintiffs and members of the Classes could not have discovered the anticompetitive provisions in the licensing agreements between Fair Isaac and the Credit Bureaus, such as the TransUnion ADLA, as those agreements are subject to confidentiality provisions that have prohibited the credit reporting agencies from disclosing their terms to third parties absent written authorization from Fair Isaac.[111]

194.    For these reasons, the statutes of limitations applicable to Plaintiffs' claims did not begin to run until the date that TransUnion filed its counterclaims against Fair Isaac and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

195.    The doctrine of fraudulent concealment tolled the statutes of limitations on

---

[109] Experian, *Our Code of Conduct* (2019), https://www.experian.com/content/dam/marketing/na/assets/corp/procurement-documents/experian-code-of-conduct-final-board-approved.pdf.

[110] TransUnion, *Code of Business Conduct* (2017), https://investors.transunion.com/~/media/Files/T/Transunion-IR/governance-documents/code-of-business-conduct-150618.pdf.

[111] *See* Dkt. 32, Motion for Leave to File Under Seal, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Jan. 22, 2018), ¶ 2 ("contracts between the Parties . . . are subject to confidentiality provisions that prohibit TransUnion from disclosing the terms of the contract to third parties absent written authorization from Fair Isaac").

Plaintiffs' claims. During the Class Period, Defendants wrongfully and affirmatively concealed their unlawful conduct. Plaintiffs and members of the Classes had no knowledge of Defendants' unlawful scheme and could not have discovered the scheme through the exercise of reasonable diligence until (at the earliest) February 12, 2018, when TransUnion filed its Counterclaims against Fair Isaac.

196. By their very nature, antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants entered into confidential contracts with anticompetitive provisions that did not put Plaintiffs or the Classes on inquiry notice that the contracts had the effect of raising the prices for credit scores above the competitive level. Credit scores are not exempt from antitrust regulation, and thus, before TransUnion filed its Counterclaims against Fair Isaac, Plaintiffs reasonably considered the market to be competitive. Moreover, Defendants employed deceptive tactics and techniques to avoid detection of, and to conceal, their anticompetitive provisions.

197. Defendants wrongfully and affirmatively concealed the existence of their anticompetitive contracts from Plaintiffs and members of the Classes by, among other things:

a. agreeing to confidentiality provisions that have prohibited the CBs from disclosing the anticompetitive provisions in the licensing agreements between Fair Isaac and the CBs, such as the TransUnion ADLA;

b. concealing the fact that Fair Isaac and the CBs agreed, through the "No Equivalent Products" clause, not to internally develop a competing credit scoring system that is aligned with FICO Scores or uses too many of the same reason codes;

c. concealing the fact that the purpose of the "No Equivalent Products" clause was to prevent the CBs from offering credit scoring products that would allow business-consumers a legitimate choice between FICO Scores and VantageScore or another alternative scoring product, thereby sustaining FICO Scores dominance in the market;

d. concealing the fact that Fair Isaac and the CBs agreed, through the "Level Playing Field" clauses, that prices made available to one credit bureau be

56

made available to all the others;

e. concealing the fact that the purpose and effect of the "Level Playing Field" and "Dynamic Royalty Schedule" clauses is to disincentivize each CB from negotiating lower royalty prices for FICO Scores; and

f. as to Fair Isaac, engaging in a false and misleading campaign about VantageScore Solutions and VantageScore to misrepresent VantageScore's viability as a competitor to FICO Scores.

198. As a result of Defendants' affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiffs and members of the Classes have been and are tolled, and Defendants are equitably estopped from raising statutes of limitations as a defense.

## VII. DEFENDANTS' ACTIONS CONSTITUTE CONTINUING VIOLATIONS

199. In addition, and in the alternative, this Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statute of limitations.

200. A claim accrued for the Class each time FICO Scores were sold to the Class at prices artificially inflated by Defendants' anticompetitive conduct. Each sale of FICO Scores at a supracompetitive price constituted another overt act in furtherance of Defendants' continuing anticompetitive schemes. Moreover, Defendants' statements and actions described above demonstrate that throughout the Class Period they engaged in new overt acts that further served the objectives of their anticompetitive schemes.

201. Defendants' new overt acts were more than the inertial consequences of Defendants' initial violations. Rather, their acts were new and independent acts that perpetuated their agreements and kept them current with market conditions, including by renewing agreements, or entering into new agreements, with anticompetitive terms. Defendants continuously renewed and refined their agreements to reflect market conditions. With each

refinement of their agreements, Defendants inflicted new and accumulating injury on Plaintiffs and members of the Class. For instance, as alleged above, Fair Isaac exploited the ADLA Royalty Schedule Provision in 2015, 2016, and 2017 to introduce entirely new and non-negotiated contract terms, royalty categories, and definitions that expanded the anticompetitive schemes.

202.   Therefore, Plaintiffs and members of the Damages Class are entitled to recover damages they suffered during any applicable limitations period.

## VIII.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF:**
**UNREASONABLE RESTRAINT OF TRADE**
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

203.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

204.   This Claim is brought against Defendant Fair Isaac.

205.   The relevant period of this Claim is from May 2013 through the date by which the anticompetitive effects of Defendant's violations of law shall have ceased.

206.   The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

207.   Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

208.   Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

209.   Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

210.   Defendant entered into and engaged in contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). Specifically, Fair Isaac entered into agreements with Equifax, Experian, and TransUnion that contained anticompetitive terms whereby each CB agreed with Fair Isaac to contractual limitations that harmed the ability of the CBs to market VantageScore, a competing product, to Plaintiffs and members of the Class and forestalled price competition in the B2B Credit Score Market. The CBs and Fair Isaac thus knowingly formed schemes to unreasonably restrain trade in the B2B Credit Score Market.

211.   The agreements between Fair Isaac and each of the CBs had substantial anticompetitive effects. The agreements effectively excluded VantageScore Solutions and every other competing provider of credit scores from competing for a substantial portion of transactions in the B2B Credit Score Market.

212.   The agreements between Fair Isaac and each of the CBs raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

213.   The acts done by Fair Isaac and each of the CBs as part of, and in furtherance of, their contracts, combinations, or conspiracies were authorized ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of its affairs.

214.   The anticompetitive acts were directed at the B2B Credit Score Market in the United States and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

215.   Fair Isaac's exclusionary and anticompetitive acts have injured and will continue

to injure competition in this market.

216.     Plaintiffs and members of the Nationwide Class have been injured and will

continue to be injured in their business and property, and will continue to suffer such damages if

Defendant does not cease its anticompetitive conduct.

217.     Plaintiffs and all other members of the Nationwide Class are threatened with future

injury to their business and property by reason of Defendant's continuing violations of Sections

1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15

U.S.C. § 26.

218.     The alleged contracts, combinations, or conspiracies violates the federal antitrust

laws because they are agreements between and among Fair Isaac and the CBs, all of whom are

horizontal competitors who compete for the sale of credit scores in the B2B Credit Score Market.

Upon entering the anticompetitive agreement with Fair Isaac, each CB acted against their

economic self-interest because each agreement undermined the ability of VantageScore to

compete. The CBs also knew that the Level Playing Field requirement in their agreements with

Fair Isaac was meant to and did forestall price competition among the CBs in the market for credit

reports, and hence was mutually beneficial for the CBs.

219.     Plaintiffs and members of the Nationwide Class are entitled to an injunction

against Fair Isaac, preventing and restraining the violations alleged herein.

### SECOND CLAIM FOR RELIEF:
### UNREASONABLE RESTRAINT OF TRADE
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

220.     Plaintiffs incorporate by reference the allegations set forth in the preceding

paragraphs of this Complaint.

221.    This Claim is brought against Defendants Fair Isaac and Experian.

222.    The relevant period of this Claim is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

223.    The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

224.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

225.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

226.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

227.    Fair Isaac entered into an agreement with Experian that contained anticompetitive terms whereby Experian agreed with Fair Isaac to contractual limitations that harmed the ability of Experian to market VantageScore, a competing product, to Plaintiffs and members of the Class and forestalled price competition in the B2B Credit Score Market.

228.    The agreement between Fair Isaac and Experian had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

229.    The agreement between Fair Isaac and Experian raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

230.    The acts done by Fair Isaac and Experian as part of, and in furtherance of, their contract, combination, or conspiracy were authorized ordered, or done by their officers, agents,

employees, or representatives while actively engaged in the management of its affairs.

231.    The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

232.    Fair Isaac's and Experian's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

233.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and Experian do not cease their anticompetitive conduct.

234.    Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Fair Isaac's and Experian's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

235.    In addition to competing with Experian in the credit scores market, Fair Isaac licenses its algorithm to Experian, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, Experian discourages its customers from using or purchasing access to competing credit scores. Because Experian has substantial market power, it can harm its customers in this way without taking the risk that they will switch to competing CBs. In return for acting against its' self-interest and entering into the anticompetitive contract with Fair Isaac to restrain trade in the B2B Credit Scores Market, Experian benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor Experian's competitors and reduces competition among the CBs in the B2B Credit Score Market.

236.    Plaintiffs and members of the Nationwide Class are entitled to an injunction

against Fair Isaac and Experian, preventing and restraining the violations alleged herein.

### THIRD CLAIM FOR RELIEF:
### UNREASONABLE RESTRAINT OF TRADE
#### Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3
#### (On behalf of Plaintiffs and the Nationwide
#### Class for Injunctive and Equitable Relief)

237. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

238. This Claim is brought against Defendants Fair Isaac and Equifax.

239. The relevant period of this Claim is from November 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

240. The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

241. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

242. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

243. Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

244. Fair Isaac entered into an agreement with Equifax that contained anticompetitive terms whereby Equifax agreed with Fair Isaac to contractual limitations that harmed the ability of Equifax to market VantageScore, a competing product, to Plaintiffs and members of the Nationwide Class and forestalled price competition in the B2B Credit Score Market.

245. The agreement between Fair Isaac and Equifax had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider of

63

credit scores from competing for a substantial portion of transactions in the relevant market.

246.    The agreement between Fair Isaac and Equifax raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

247.    The acts done by Fair Isaac and Equifax as part of, and in furtherance of, their contract, combination, or conspiracy were authorized ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of its affairs.

248.    The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

249.    Fair Isaac's and Equifax's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

250.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and Equifax do not cease their anticompetitive conduct.

251.    Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Fair Isaac's and Equifax's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

252.    In addition to competing with Equifax in the credit scores market, Fair Isaac licenses its algorithm to Equifax, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, Equifax discourages its customers from using or purchasing access to competing credit scores. Because Equifax has substantial market power, it can harm its customers in this way without taking the risk that they will switch to

competing CBs. In return for acting against its' self-interest and entering an anticompetitive agreement with Fair Isaac that had the intent and effect of restraining trade in the B2B Credit Score Market, Equifax benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor Equifax's competitors and reduces competition among the CBs in the B2B Credit Score Market.

253. Plaintiffs and members of the Nationwide Class are entitled to an injunction against Fair Isaac and Equifax, preventing and restraining the violations alleged herein.

**FOURTH CLAIM FOR RELIEF:**
**UNREASONABLE RESTRAINT OF TRADE**
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

254. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

255. This Claim is brought against Defendants Fair Isaac and TransUnion.

256. The relevant period of this Claim is from February 2015 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

257. The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

258. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

259. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

260. Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

261.    Fair Isaac entered into an agreement with TransUnion that contained anticompetitive terms whereby TransUnion agreed with Fair Isaac to contractual limitations that harmed the ability of TransUnion to market VantageScore, a competing product, to Plaintiffs and members of the Nationwide Class and forestalled price competition in the B2B Credit Score Market.

262.    The agreement between Fair Isaac and TransUnion had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

263.    The agreement between Fair Isaac and TransUnion raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

264.    The acts done by Fair Isaac and TransUnion as part of, and in furtherance of, their contract, combination, or conspiracy were authorized ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of its affairs.

265.    The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

266.    Fair Isaac's and TransUnion's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

267.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and TransUnion do not cease their anticompetitive conduct.

268.    Plaintiffs and all other members of the Nationwide Class are threatened with future

injury to their business and property by reason of Fair Isaac's and TransUnion's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

269. In addition to competing with TransUnion in the credit scores market, Fair Isaac licenses its algorithm to TransUnion, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, TransUnion discourages its customers from using or purchasing access to competing credit scores. Because TransUnion has substantial market power, it can harm its customers in this way without taking the risk that they will switch to competing CBs. In return for against its' self-interest and entering an anticompetitive agreement with Fair Isaac that had the intent and effect of restraining trade in the B2B Credit Score Market, TransUnion benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor TransUnion's competitors and reduces competition among the CBs in the B2B Credit Score Market.

270. Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

### FIFTH CLAIM FOR RELIEF: MONOPLIZATON
#### Violation of Section 2 of the Sherman Act 15 U.S.C. § 2
#### (On behalf of Plaintiffs and the Nationwide Class
#### for Injunctive and Equitable Relief)

271. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

272. This Claim is brought against Defendant Fair Isaac.

273. The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

274. Fair Isaac has had and continues to have at least a 90% market share in the B2B

67

Credit Score Market.

275. Fair Isaac has had and continues to have monopoly power in B2B Credit Score Market.

276. Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

277. Fair Isaac entered into agreements with Equifax, Experian, and TransUnion that contained anticompetitive terms that were designed to eliminate Fair Isaac's competitors and to keep prices for FICO Scores artificially high.

278. The agreements between Fair Isaac and the CBs had substantial anticompetitive effects. The agreements effectively excluded VantageScore Solutions and every other competing provider of credit scores from competing in the B2B Credit Score Market in the United States in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

279. Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand to supracompetitive levels.

280. Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

281. Fair Isaac's monopolization has raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

282. The acts done by the Fair Isaac were authorized, ordered, or done by its officers, agents, employees, or representatives while actively engaged in the management of its affairs.

283. The anticompetitive acts were directed at the B2B Credit Score Market in the United States and had a substantial and foreseeable effect on interstate commerce and injured

68

competition nationwide.

284.   Fair Isaac's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

285.   Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property, and Plaintiffs and all other similarly situated businesses will continue to be injured if Fair Isaac does not cease its anticompetitive conduct.

286.   Plaintiffs and all other similarly situated businesses are threatened with future injury to their business and property by reason of Fair Isaac's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

287.   Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

### SIXTH CLAIM FOR RELIEF
### VIOLATION OF STATE ANTITRUST STATUTES
#### (on behalf of Plaintiffs and the Damages Class)

288.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

289.   Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

290.   This Claim is brought against all Defendants.

291.   Arizona:  By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. § 44-1401, *et seq.*

   a.   Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce

69

in the Business Market for credit scores, a substantial part of which occurred within Arizona.

b.      Defendants' combinations or conspiracies had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Arizona; (2) credit score prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

d.      During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

e.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*

f.      Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

g.      As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business

70

or property and are threatened with further injury.

      h.      By reason of the foregoing, Plaintiffs and members of the Damages Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq.*

292.   <u>California</u>: By reason of the conduct alleged herein, Defendants have violated California Business and Professions Code, §§ 16700, *et seq.*

      a.      The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

      b.      California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

      c.      Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

      d.      A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

      e.      Defendants entered into contracts, combinations, or conspiracies

between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within California.

f.        Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

g.        But for Defendants' conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

h.        Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

i.        Plaintiffs and members of Damages Class were injured in their business or property, with respect to purchases of FICO Scores in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

293.    Connecticut: By reason of the conduct alleged herein, Defendants have violated Connecticut General Statute §§ 35-26 *et seq.*

a.        During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

b.        Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and

72

eliminated throughout Connecticut; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

      d.      By reason of the foregoing, Defendants have restrained trade in violation of Connecticut General Statute §§ 35-26 *et seq.*

      e.      Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Connecticut General Statute §§ 35-26 *et seq.*

294.    <u>District of Columbia</u>: By reason of the conduct alleged herein, Defendants have violated District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade).

      a.      Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the B2B Credit Score Market within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq.*

      b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were

73

deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*

f. Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28- 4509(a).

g. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

295. <u>Illinois</u>: By reason of the conduct alleged herein, Defendants have violated the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

a. Members of the Illinois Damages Class purchased FICO Scores within the State of Illinois during the Class Period.

b. But for Defendants' conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

74

    c.      Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 Ill. Comp. Stat. Ann. 10/7(2).

    d.      Defendants entered into contracts or engaged in combinations or conspiracies for the purpose of fixing, controlling or maintaining prices for FICO Scores sold within the State of Illinois.

    e.      Defendants further unreasonably restrained trade or commerce and established, maintained, or attempted to acquire monopoly power over the B2B Credit Score Market in Illinois for the purpose of excluding competition, in violation of 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

    f.      During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

    g.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

    h.      Members of the Illinois Damages Class were injured with respect to purchases of FICO Scores in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

296.    <u>Iowa</u>: By reason of the conduct alleged herein, Defendants have violated the Iowa Competition Law, Iowa Code § 553.1, *et seq.*

    a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or

did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Iowa Code § 553.1, *et seq.*

b. Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

d As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1, *et seq.*

f. Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449 (Iowa 2002).

g. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

297. <u>Kansas</u>: By reason of the conduct alleged herein, Defendants have violated Kan.

Stat. Ann. § 50-101, *et seq.*

a.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

b.      Defendants combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of credit scores, increasing the price of credit scores, or preventing competition in the sale of credit scores, in a manner that established the price of credit scores and precluded free and unrestricted competition among themselves in the sale of credit scores, in violation of Kan. Stat. Ann. § 50-101, *et seq*

c.      During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50- 101, *et seq.*

f.      Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan.

77

Stat. Ann § 50-161(b).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

298.    <u>Maine</u>:  By reason of the conduct alleged herein, Defendants have violated Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

a.      Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of credit scores within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Maine; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into

agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

      f.      Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

      g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

299.    <u>Maryland</u>: By reason of the conduct alleged herein, Defendants have violated Maryland Code, Commercial Law, §§11-204 *et seq.*

      a.      During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

      b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Maryland; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

      d.      By reason of the foregoing, Defendants have restrained trade in violation of Maryland Code, Commercial Law, §§11-204 *et seq.*

      e.      Accordingly, Plaintiffs and members of the Class seek all relief available

under Maryland Code, Commercial Law, §§11-204 *et seq.*

300.    Michigan:  By reason of the conduct alleged herein, Defendants have violated the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

a.    Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in B2B Credit Score Market, in violation of Mich. Comp. Laws § 445.771, *et seq.*

b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

f.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in

80

this Complaint. Mich. Comp. Laws. § 445.778(2).

g.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

301.  <u>Minnesota</u>:  By reason of the conduct alleged herein, Defendants have violated the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

a.  Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the B2B Credit Score Market within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the B2B Credit Score Market within the intrastate commerce of and outside of Minnesota; and fixed prices for credit scores within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq.*

b.  Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.  During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

d.  As a direct and proximate result of Defendants' unlawful conduct,

81

Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.*

f.     Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.57.

g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

302.   <u>Mississippi</u>:  By reason of the conduct alleged herein, Defendants have violated Mississippi Code Annotated §§ 75-21-1, *et seq.*

a.     Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Mississippi.

b.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Mississippi, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

c.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Credit score prices were raised, fixed

82

maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

d.     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

e.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

f.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

g.     Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

h.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

303.     <u>Missouri</u>: By reason of the conduct alleged herein, Defendants have violated Mo. Ann. Stat. § 407.010, *et seq.*

a.     Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the Business Market for credit scores within the intrastate commerce of Missouri by possessing monopoly power in the

83

market and willfully maintaining that power through agreements to fix prices and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq.*

     b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

     c.    During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce.

     d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

     e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mo. Ann. Stat. § 407.010, *et seq.*

     f.    Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2008).

     g.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Mo. Ann. Stat. § 407.010, *et seq.*

304.   <u>Nebraska</u>: By reason of the conduct alleged herein, Defendants have violated the Nebraska Revised Statutes §§ 59-801, *et seq.*

a. Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the B2B Credit Score Market within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq.*

b. Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*.

f. Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb.

85

Rev. Stat. § 59-821.

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

305.    <u>Nevada</u>:  By reason of the conduct alleged herein, Defendants have violated the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into

86

agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

      f.     Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

      g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

306.    <u>New Hampshire</u>:  By reason of the conduct alleged herein, Defendants have violated the New Hampshire Revised Statutes §§ 356:1, *et seq.*

      a.     Defendants fixed, controlled or maintained prices for credit scores and established, maintained or used monopoly power, or attempted to, constituting contracts, combinations or conspiracies in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

      b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

      d.     As a direct and proximate result of Defendants' unlawful

conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.*

f.     Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

307.   <u>New Mexico</u>: By reason of the conduct alleged herein, Defendants have violated the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

a.     Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for credit scores within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq.*

b.     Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

88

c.     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

f.     Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3(A).

g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

308.     <u>New York</u>: By reason of the conduct alleged herein, Defendants have violated the New York General Business Laws §§ 340, *et seq.*

a.     Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of credit scores and restrained competition in the free exercise of the conduct of the business of credit scores within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New York; (2) Credit score prices were raised, fixed

89

maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a *per se* violation of the Act.

f.     Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

309.     <u>North Carolina</u>:   By reason of the conduct alleged herein, Defendants have violated the North Carolina General Statutes §§ 75-1, *et seq.*

a.     Defendants contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in

violation of North Carolina General Statutes §§ 75-1, *et seq.*

b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

f.     Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

310.     <u>North Dakota</u>: By reason of the conduct alleged herein, Defendants have violated the North Dakota Century Code §§ 51-08.1-01, *et seq.*

91

     a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*. Defendants' violations of North Dakota law were flagrant.

     b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

     c.      During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

     d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

     e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

     f.      Under North Dakota law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this

Complaint. *See, e.g., Howe v. Microsoft Corp.*, 656 N.W.2d 285, 298 (N.D. 2003).

       g.         Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

311.   <u>Oregon</u>: By reason of the conduct alleged herein, Defendants have violated the Oregon Revised Statutes §§ 646.705, *et seq.*

       a.         Defendants contracted, combined, or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of credit scores, in violation of Or. Rev. Stat. § 646.705, *et seq.*

       b.         Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

       c.         During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce.

       d.         As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

       e.         By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*

93

      f.      Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

      g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

312.    <u>Rhode Island</u>: By reason of the conduct alleged herein, Defendants have violated R.I. Gen. Laws § 6-36-1, *et seq.*

      a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

      b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.      During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.

      d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and

property and are threatened with further injury.

      e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

      f.      Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a).

      g.      Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under R.I. Gen. Laws § 6-36-1, *et seq.*

313.   <u>South Dakota</u>: By reason of the conduct alleged herein, Defendants have violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

      a.      Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of credit scores within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1-3.1, *et seq.*

      b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.      During the Class Period, Defendants' illegal conduct substantially

affected South Dakota commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

f.     Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

314.     <u>Tennessee</u>: By reason of the conduct alleged herein, Defendants have violated the Tennessee Code Annotated §§ 47-25-101, *et seq.*

a.     Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Tenn. Code, § 47-25-101, *et seq.*

b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and

96

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

       c.      During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.

       d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

       e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*

       f.      Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

       g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25- 101, *et seq.*

315.   <u>Utah</u>: By reason of the conduct alleged herein, Defendants have violated Utah Code Annotated §§ 76-10-3101, *et seq.*

       a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Utah Code

97

Ann. § 76-10-3101, *et seq.*

b.　　Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Utah; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.　　During the Class Period, Defendants' illegal conduct substantially affected Utah commerce.

d.　　As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.　　By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq.*

f.　　Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

g.　　Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq.*

316.　　<u>Vermont</u>: By reason of the conduct alleged herein, Defendants have violated Vermont Stat. Ann. 9 §§ 2453, *et seq.*

a.    Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Defendants' violations of Vermont law were flagrant.

b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.    During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*

f.    Under Vermont law, indirect purchasers have standing to maintain an action under Vermont's antitrust laws based on the facts alleged in this Complaint. *Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

g.    Accordingly, Plaintiffs and members of the Damages Class seek all

99

relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

317. <u>West Virginia</u>: By reason of the conduct alleged herein, Defendants have violated West Virginia Code §§ 47-18-1, *et seq.*

      a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of West Virginia Code §§ 47-18-1, *et seq.* Defendants' anticompetitive acts were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

      b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.      During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce.

      d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et*

*seq.*

  f.  Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. Va. Code R. 142-9-2.

  g.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

318. <u>Wisconsin</u>: By reason of the conduct alleged herein, Defendants have violated Wisconsin Statutes §§ 133.01, *et seq.*

  a.  Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of credit scores, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, *et seq.*

  b.  Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

  c.  During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.

  d.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and

property and are threatened with further injury.

      e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

      f.      Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(1)(a).

      g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

319.    Defendants' anticompetitive activities have directly, foreseeably and proximately caused injury to members of the Damages Class. Plaintiffs and members of the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful monopolization and anticompetitive agreements. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced credit scores from Defendants and/or other sellers of credit scores, and/or (2) paying higher prices for FICO Scores than they would have in the absence of Defendants' conduct. These injuries are of the type of the laws of the above States were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

320.    In addition, Defendants have profited significantly from the aforesaid unlawful conduct. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

321.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## SEVENTH CLAIM FOR RELIEF:
## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS
### (on behalf of Plaintiffs and the Damages Class)

322.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

323.    This Claim is brought against all Defendants.

324.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

325.    <u>Arkansas</u>:   Defendants have knowingly entered into unlawful agreements in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.*

    a.    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which credit scores were sold in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

    b.    The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

    c.    Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

103

and the members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

        d.   During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

        e.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

        f.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

    326.   <u>California</u>:   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, et seq.

        a.   During the Class Period, Defendants marketed, sold, or distributed FICO Scores in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

        b.   The violations of federal antitrust law set forth above constitute violations of section 17200, *et seq.* of California Business and Professions Code.

        c.   This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated section 17200 of the California

Business & Professions Code, commonly known as the Unfair Competition Law.

    d.  Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

    e.  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

    f.  Defendants' acts or practices are unfair to purchasers of FICO Scores in the State of California within the meaning of § 17200, California Business & Professions Code.

    g.  Defendants' acts and practices are fraudulent or deceptive within the meaning of § 17200 of the California Business & Professions Code.

    h.  Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

    i.  The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

    j.  The unlawful and unfair business practices of Defendants, as

described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supra-competitive and artificially inflated prices for FICO Scores sold in the State of California. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

k. The conduct of Defendants as alleged in this Complaint violated § 17200 of the California Business & Professions Code.

l. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.

m. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business & Professions Code §§ 17203 and 17204.

327. <u>District of Columbia</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.*

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which FICO Scores were sold, distributed or obtained in the District of Columbia.

b. The foregoing conduct constitutes "unlawful trade practices," within the

106

meaning of D.C. Code § 28- 3904.

      c.      Plaintiffs and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged.

      d.      There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores. Defendants had the sole power to set that price, and Plaintiffs and members of the Class had no power to negotiate a lower price.

      e.      Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges.

      f.      Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct with respect to fixing the price of FICO Scores at supracompetitive levels and overcharging consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

      g.      Defendants took grossly unfair advantage of Plaintiffs and members of the Class.

      h.      The suppression of competition that has resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for the FICO Scores. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout the District of

Columbia; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

i.     As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

328.    Florida: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

a.     The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

b.     A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

c.     Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

d.     Members of the Damages Class purchased FICO Scores within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price of

108

FICO Scores would have been lower, in an amount to be determined at trial.

e.     Defendants entered into contracts, combinations or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Florida.

f.     Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2006 and continuing through the date of this filing.

g.     Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

h.     Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Florida; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

i.     Defendants' unlawful conduct substantially affected Florida's trade and commerce.

j.     As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property by virtue of overcharges for FICO Scores and are threatened with further injury.

> k.     By reason of the foregoing, the members of the Damages Class are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

329.   <u>Hawaii</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

> a.     Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

> b.     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

> c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

> d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

330.   <u>Missouri</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

a.      Plaintiffs and the Damages Class purchased FICO Scores for personal, family, or household purposes.

b.      Defendants engaged in the conduct described herein in connection with the sale of credit scores in trade or commerce in a market that includes Missouri.

c.      Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which credit scores were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

d.      Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for credit scores. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of credit scores they purchased.

e.      Defendants' conduct concerning the price of credit scores was deceptive as it had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing credit scores at prices established by a free and fair market.

f.      Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Missouri; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of

111

free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra- competitive, artificially inflated prices for credit scores.

      g.      The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

      h.      As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

      i.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce...," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

331.   <u>Montana</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Consumer Protection Act, Mont. Code, §§ 30-14-101, *et seq.* and §§ 30- 14-201 *et seq.*

      a.      Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Montana; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of

free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra- competitive, artificially inflated prices for credit scores.

b.     During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and §§ 30- 14-201 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

332.   Nebraska: By reason of the conduct alleged herein, Defendants have violated Neb. Rev. Stat. § 59-1602, *et seq.*

a.     Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-1609.

b.     Defendants have entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Nebraska.

c.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a

substantial part of which occurred within Nebraska.

        d.      Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of Defendants' actions within the stream of Nebraska commerce.

        e.      Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

        f.      Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs and members-of-the-Class's ability to protect themselves.

        g.      Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

        h.      As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

        i.      By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59-1602, *et seq.*

    333.   <u>New Hampshire</u>: By reason of the conduct alleged herein, Defendants have violated N.H. Rev. Stat. T. XXXI, § 358-A, *et seq.*

        a.      Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007).

        b.      Defendants have entered into contracts, combinations, or conspiracies

between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within New Hampshire.

     c.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

     d.     Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of Defendants' actions within the stream of New Hampshire commerce.

     e.     Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

     f.     Defendants' conduct was willful and knowing.

     g.     Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

     h.     Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

     i.     As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

     j.     By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under N.H. Rev. Stat. T. XXXI, §§ 358-A:10 and 358-A:10-

334.    <u>New Mexico</u>: By reason of the conduct alleged herein, Defendants have violated

N.M. Stat. Ann. §§ 57-12-1, *et seq.*

      a.      Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Mexico.

      b.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which FICO Scores were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Class.

      c.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

      d.      Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

      e.      Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to and the members of the Damages Class.

      f.      Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

      g.      Plaintiff and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with

respect to the price charged by Defendants for FICO Scores. Defendant Fair Isaac had the sole power to set that price and Plaintiffs and members of the Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct to fix the price of FICO Scores at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class.

h.      The suppression of competition that resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for the FICO Scores.

i.      Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

j.      Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the

117

members of the Class and the price paid by them for FICO Scores as set forth in N.M. Stat.
Ann. § 57-12-2E.

     k.     Defendants' conduct was willful.

     l.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs
and the members of the Damages Class have been injured and are threatened with further
injury.

     m.     By reason of the foregoing, members of the Damages Class are entitled to
seek all forms of relief, including actual damages or up to $300 per violation, whichever is
greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

335.   <u>New York</u>: Defendants have engaged in unfair competition or unfair,
unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349 *et seq.*

     a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce
by affecting, controlling and/or maintaining, at artificial and non-competitive levels, the
prices at which FICO scores were sold, distributed, or obtained in New York and took
efforts to conceal their agreements from Plaintiffs and members of the Class, who are
Defendants' consumers.

     b.     Defendants made public statements about the prices of FICO Scores that
omitted material information that rendered the statements that they made materially
misleading; and Defendants alone possessed material information that were relevant to
consumers but failed to provide the information.

     c.     Because of Defendants' unlawful trade practices in the State of New York,
Class members who purchased FICO Scores were misled to believe that they were paying

a fair price for FICO Scores or the price increases for FICO Scores were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conduct.

d.      Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have an impact on New York consumers, including Plaintiffs and members of the Class.

e.      Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have a broad impact, causing Class members who purchased FICO Scores to be injured by paying more for FICO Scores than they would have paid in the absence of Defendants' unlawful trade acts and practices.

f.      The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New York; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

g.      During the Class Period, Defendants marketed, sold, or distributed FICO Scores in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

      h.      During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in New York.

      i.      Plaintiffs and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

336.    <u>North Carolina</u>: By reason of the conduct alleged herein, Defendants have violated N.C. Gen. Stat.§ 75-1, *et seq.*

      a.      Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

      b.      Defendants entered into contracts, combinations, or conspiracies in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within North Carolina.

      c.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Class. Defendants' conduct could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' illegal activity. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Class could not possibly have been aware. Defendants' public statements concerning the price of FICO Scores created the illusion of competitive pricing controlled by market forces rather than

supracompetitive pricing driven by Defendants' illegal conduct.

  d.  Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

  e.  Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

  f.  Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

  g.  Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

  h.  Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

  i.  Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

  j.  During the Class Period, Defendants marketed, sold, or distributed FICO Scores in North Carolina, and Defendants' illegal conduct substantially affected North

121

Carolina commerce and consumers. During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in North Carolina.

      k.      As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured and are threatened with further injury.

      l.      By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 75-16.

337.    <u>Oregon</u>: By reason of the conduct alleged herein, Defendants have violated Or. Rev. Stat. § 646.608, *et seq*.

      a.      Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Oregon.

      b.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.

      c.      Defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of Defendants' actions within the stream of Oregon commerce.

      d.      Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

      e.      Defendants' conduct misled consumers, withheld material facts, and had a

direct or indirect impact upon members-of-the-Class's ability to protect themselves.

       f.        Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

       g.       As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

       h.       By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under Or. Rev. Stat. § 646.638.

338.    <u>Rhode Island</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1 *et seq.*).

       a.       Members of this Class purchased FICO Scores for personal, family, or household purposes.

       b.       Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Rhode Island.

       c.       Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO Scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence.

       d.       Defendants misrepresented to all purchasers during the Class Period that

123

Defendants' FICO Scores prices were competitive and fair.

e. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

f. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market.

g. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO Scores they purchased.

h. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. §§ 6-13.1-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

339. <u>South Carolina</u>: By reason of the conduct alleged herein, Defendants have violated S.C. Code Ann. §§ 39-5-10, *et seq.*

a.  Defendants have entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within South Carolina.

b.  Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

c.  Defendants' monopolization had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores during the Class Period.

d.  Defendants' conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of Defendants' actions within the stream of South Carolina commerce.

e.  Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Carolina.

f.  Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

g.  Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

125

h.     Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as at least thousands of South Carolina businesses purchase FICO Scores.

i.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10 *et seq.*, and, accordingly, Plaintiffs and the members of the Class seek all relief available under that statute.

340.     South Dakota: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-6 *et seq.*).

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes South Dakota, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO credit scores were sold, distributed, or obtained in South Dakota.

b.     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO credit scores. Defendants misrepresented to all purchasers during the Class Period that Defendants' FICO credit scores prices were competitive and fair Defendants owed a duty to disclose such facts, and they breached that duty by their silence.

c.     Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout South

126

Dakota; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores.

     d.    As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.

     e.    That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO credit scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO credit scores at prices set by a free and fair market.

     f.    Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO credit scores they purchased.

     g.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §§37-24-6 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

341.   <u>Utah</u>: By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-11-1, *et seq.*

     a.    Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit

Score Market, a substantial part of which occurred within Utah.

        b.        Defendants are suppliers within the meaning of Utah Code Ann. §§ 13-11

        c.        Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the business market for credit scores, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

        d.        Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

        e.        Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions within the meaning of Utah Code Ann. §§ 13-11-3.

        f.        Defendants knew or had reason to know that its conduct was unconscionable.

        g.        Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

        h.        Defendants' unlawful conduct substantially affected Utah's trade and commerce.

        i.        As a direct and proximate cause of Defendants' unlawful conduct, the members Class have been injured in their business or property and are threatened with further injury.

        j.        By reason of the foregoing, the members of the Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief,

128

pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

342.    Utah: By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-5-1, *et seq.*

a.    Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Utah.

b.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

c.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.

d.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

e.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have been injured in their business or property and are threatened with further injury.

f.    By reason of the foregoing, the members of the Class are entitled to seek all forms of relief, including actual damages or $2000 per Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5- 14, *et seq.*

343.    Vermont: By reason of the conduct alleged herein, Defendants have violated Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

129

a. Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Vermont.

b. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Vermont, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

c. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for the FICO Scores.

d. Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' FICO Scores prices were competitive and fair.

e. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Vermont; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive,

130

artificially inflated prices for the FICO Scores.

f.          Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

g.          Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

h.          Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.*

i.          As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market.

j.          By reason of the foregoing, members of Class are entitled to seek all forms of relief available under Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

344.    <u>West Virginia</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code, §§46A-6-104 *et seq.*

a.          Defendants' unlawful conduct had the following effects: (1) FICO credit

131

scores price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores.

      b.      During the Class Period, Defendants marketed, sold, or distributed FICO credit scores in West Virginia, and Defendants' illegal conduct substantially affected West Virginia commerce and consumers.

      c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury.

345.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code, §§46A-6-104 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### EIGTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (On behalf of Plaintiffs and the Nationwide Class)

346.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

347.    This Claim is brought against all Defendants.

348.    As a result of its unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices of and unlawful profits from FICO Scores.

349.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains.

132

350.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs and members of the Class in the following states: Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray that this Honorable Court:

1.    Order that this action may be maintained as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that they be named Representatives of the Classes, that the undersigned Interim Co-Lead Counsel be named Co-Lead Class Counsel, and that reasonable notice of this action be provided to members of the Class as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure;

2.    Adjudge that Defendants violated the federal antitrust laws as set forth above;

3.    Adjudge that Defendants violated the state antitrust and unfair trade practices laws as set forth above;

4.    Adjudge that Defendants were unjustly enriched as set forth above;

5.    Award Plaintiffs and members of the Damages Class actual, double, treble, and exemplary damages as permitted;

6.    Award Plaintiffs and members of the Classes pre-and post-judgment interest;

7.    Enjoin Defendants from continuing the unlawful actions alleged herein;

133

8. Award Plaintiffs attorneys' fees and all other costs, including costs of consulting and testifying experts, reasonably incurred in prosecution of this action; and

9. Award such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a Trial by Jury as to all issues so triable.

October 30, 2023                    Respectfully submitted,


By ___ */s/Garrett D. Blanchfield* ___
Garrett D. Blanchfield

REINHARDT WENDORF & BLANCHFIELD
Garrett D. Blanchfield (*Pro Hac Vice*)
Brant D. Penney (*Pro Hac Vice*)
Roberta A. Yard (*Pro Hac Vice* forthcoming)
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

SPECTOR ROSEMAN & KODROFF, P.C.
Jeffrey J. Corrigan (*Pro Hac Vice*)
Jeffrey L. Spector (*Pro Hac Vice*)
William G. Caldes (*Pro Hac Vice*)
Icee N. Etheridge (*Pro Hac Vice* forthcoming)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611
JCorrigan@srkattorneys.com
JSpector@srkattorneys.com
BCaldes@srkattorneys.com
IEtheridge@srkattorneys.com

*Interim Co-Lead Counsel for Class Plaintiffs*

134

GUIN, STOKES & EVANS, LLC
Charles R. Watkins (3122790)
321 South Plymouth Court Suite 1250
Chicago, IL 60604
Tel: (312) 878-8391
Fax: (205) 226-2357
charlesw@gseattorneys.com

*Liaison Counsel for Class Plaintiffs*

PRETI FLAHERTY, BELIVEAU
& PACHIOS LLP
Michael S. Smith (Pro Hac Vice)
Gregory P. Hansel (Pro Hac Vice)
Randall B. Weill (Pro Hac Vice)
Elizabeth F. Quinby (Pro Hac Vice)
One City Center, P.O. Box 9546
Portland, ME 04101
Tel: (207) 791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com

GLANCY PRONGAY & MURRAY LLP
Brian P. Murray (*Pro Hac Vice* forthcoming)
Lee Albert (*Pro Hac Vice* forthcoming)
230 Park Avenue, Suite 358
New York, NY 10169
Tel: (212) 682-5340
Fax: (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

FREED KANNER LONDON
& MILLEN LLC
Douglas A. Millen
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
dmillen@fklmlaw.com

135

FREED KANNER LONDON
& MILLEN LLC
Jonathan M. Jagher (*Pro Hac Vice* forthcoming)
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
jjagher@fklmlaw.com

BONI, ZACK & SNYDER LLC
Michael J. Boni (*Pro Hac Vice* forthcoming)
Joshua D. Snyder (*Pro Hac Vice* forthcoming)
John E. Sindoni (*Pro Hac Vice* forthcoming)
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: 610-822-0200
Fax: 610-822-0206
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

MCLAFFERTY LAW FIRM, P.C.
David McLafferty (*Pro Hac Vice* forthcoming)
Attorneys at Law
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 940-4000 ext. 12
www.McLaffertyLaw.com

SALTZ, MONGELUZZI & BENDESKY, P.C.
Simon B. Paris, Esq. (*Pro Hac Vice* forthcoming)
Patrick Howard, Esq. (*Pro Hac Vice* forthcoming)
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Tel: (215) 575-3985
Fax: (215) 496-0999
sparis@smbb.com
phoward@smbb.com

*Attorneys for Class Plaintiffs*

136

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-02114 |
| _This document relates to:_<br><br>ALL ACTIONS | Judge Edmond E. Chang<br><br>Magistrate Judge David E. Weisman |

## STIPULATION AND ORDER ESTABLISHING THE PROTOCOL FOR THE PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION ("ESI")

Pursuant to the agreement reached between Plaintiffs and Defendants herein, this Court adopts and orders the following Protocol relating to the Production of Documents and Electronically Stored Information, which binds all parties and their counsel of record in the above-captioned case (the "Action"), whether they currently are involved or become so in the future (collectively, the "Parties"). The failure of this Protocol to address any particular issue is without prejudice to any position that a Party may take on that issue.

The parties are aware of the importance the Court places on cooperation and commit to cooperate in good faith regarding discovery issues pertaining to ESI, consistent with the Seventh Circuit Electronic Discovery Pilot Program Principle 1.02.

## I. DEFINITIONS

a.  "Action" means the above-captioned matter, and any and all cases consolidated or coordinated with it.

b.  "Document" shall have the same meaning as set forth in Federal Rule of Civil Procedure ("FRCP") 34(a)(l)(A) and when used herein, refers to both ESI and hard copy documents.

c.      "Electronically Stored Information" ("ESI") shall have the same meaning as set forth in FRCP 34(a)(l)(A) and refers to computer-generated information or data of any kind (including, but not limited to, Email, Structured and Unstructured Data, and data compilations), stored in or on any medium from which information can be obtained, such as computers, cellular telephones, file servers, disks, tape or other real or virtualized devices or media.

d.      "Email" means an electronic means for sending, receiving, and managing communications via different structured data applications (Email client software), including, but not limited to, Microsoft Outlook, Google Gmail, Yahoo Mail, or Lotus Notes, and the file(s) created or received by such means.

e.      "Instant Messages" means communications involving immediate correspondence between two or more users sent via chat application that are maintained in the ordinary course of business.

f.      "Extracted Text" means the text extracted from a native document, and includes all header, footer, and document body information, including any hidden content, when available.  A "Text File" is a file containing the full multi-page text of native or near-native files extracted directly from the native file, or, in the case of documents subject to OCR, a file containing the text resulting from the OCR.

g.      "Load File" means an electronic file containing information identifying a set of paper-scanned images or processed ESI and indicating where individual pages or files belong together as documents, including attachments, and where each document begins and ends.  A Load File will also contain data relevant to the individual Documents, including extracted and user-created Metadata, as well as identification of OCR or Extracted Text, should such data be available.

2

h.    "Media" means an object or device, including but not limited to a disc, tape, computer, or other device on which data is or was stored.

i.    "Metadata" means (i) information associated with or about a file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file, and which describes the characteristics, origins, or usage or validity of the electronic file; and (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, saved, or otherwise manipulated by a user of such system.

j.    "Native Format" means and refers to the file structure of a document created by the original creating application (in contrast to a Static Image).

k.    "OCR" means optical character recognition technology that is capable of reading text-based or paper/hard copy documents and making such documents searchable using appropriate software.

l.    "Parties" collectively shall mean all named parties to the above-captioned Action, including any Party added or joined to any complaint filed in the above-captioned Action, as well as named parties to actions that may be consolidated into or coordinated with the above-captioned Action.

m.    "Predictive Coding/Technology Assisted Review" shall mean processes for prioritizing or coding a collection of documents using computerized systems, such as machine-learning algorithms, that may rely on the judgments of one or more attorneys experienced in the subject matter of a litigation regarding the responsiveness of a subset of documents and that extrapolates those judgments to the remaining document collection. For purposes of this Protocol, Predictive Coding/Technology Assisted Review is synonymous with computer-assisted review,

3

computer-aided review, content-based advanced analytics, or other terms used to refer to search methodologies that rely on machine-based learning to identify responsive documents.

n.      "Production" includes any exchange of Documents or ESI between the Parties, whether voluntarily or in response to a formal or informal request.

o.      "Search Term" means a combination of words (including synonyms) and phrases designed to capture potentially relevant ESI and includes strings of words and phrases joined by proximity and Boolean connectors.

p.      "Static Image" means or refers to a representation of ESI produced by converting a native file into a standard image format capable of being viewed and printed on standard computer systems.  A Tagged Image File Format ("TIFF") image is an example of a Static Image.

q.      "Structured Data" means ESI stored in a structured format, such as databases or data sets according to specific form and content rules as defined by each field of the database.

r.      "Unstructured Data" refers to free-form data that either does not have a data structure or has a data structure not easily readable by a computer without the use of a specific program designed to interpret the data, such as word processing documents, slide presentations, Email, and image files.

## II.     SCOPE

a.      **General**.  Pursuant to FRCP 5(b)(2)(E), the Parties agree to serve written discovery electronically.  The procedures and protocols outlined herein govern the Production of Documents and ESI by all Parties.  The Parties will take reasonable steps to comply with this agreed-upon Protocol.  Nothing in this Protocol is intended to be an exhaustive list of discovery obligations or rights of a Party requested to produce Documents or ESI ("Producing Party") or a Party requesting Documents or ESI ("Requesting Party").

The production specifications in this Protocol apply to Documents and ESI that are produced in the first instance in this Action. To the extent any Party is required to or agrees to produce Documents or ESI in this Action that originally were collected or produced in other cases or government investigations, such Documents or ESI may be produced in the same format in which they originally were produced in the other cases or to the government.

The Parties agree that nothing in this Protocol is intended to revise or alter the local rules, applicable state or federal statutes, the FRCP, Advisory Committee Notes, or other authorities with regard to the preservation and production of ESI, including but not limited to FRCP 26(b)(1) concerning the Scope in General of Discovery; FRCP 26(b)(2)(B) concerning the Specific Limitations on ESI; FRCP 26(c)(1) concerning Protective Orders; or FRCP 34 concerning Production of ESI.

b. **Limitations and Non-Waiver.** The Parties and their attorneys intend by this Protocol to make the mutual disclosures promised herein. The Parties and their attorneys do not intend by this Protocol to waive their rights to any protection or privilege, including the attorney-client privilege and the work-product doctrine. All Parties preserve their attorney-client privileges, work-product protection, and other privileges. The Parties and their attorneys are not waiving, and specifically reserve, the right to object to any discovery request on any grounds. Further, nothing in this Protocol shall be construed to affect the admissibility of Documents and ESI. All objections to the discoverability or admissibility of any Documents and ESI are preserved and may be asserted at any time.

c. **Reservation of Rights.** For the avoidance of doubt, the inclusion of any platform, program, application, or software in this Protocol as an example does not create any independent obligation or commitment to preserve or collect ESI from such platform, program, application, or

5

software.  The Parties reserve all rights to object to any demand to collect or produce ESI from any or all of the examples listed in Section I, subject to the provisions of Section V.

      d.    **Modification by Agreement**.  Any practice or procedure set forth herein may be varied by agreement of affected Parties, which will be confirmed in writing, where such variance is deemed appropriate to facilitate the timely and economical exchange of Documents and ESI.  Any Party added or joined to any complaint in this Action and any Party to actions that may be consolidated into or coordinated with the above-captioned matter after the date of this Protocol that seeks to deviate from this Protocol must obtain leave of Court to do so unless all affected Parties otherwise consent in writing.  Before seeking Court intervention, all affected Parties shall meet and confer in good faith regarding any modification.

      e.    **Modification by Court Order**.  Nothing in this Protocol waives the right of any Party to petition the Court for an Order modifying its terms upon good cause shown, provided, however, that counsel for such Party must first meet and confer with the counsel for the opposing Party and the Parties shall use reasonable best efforts to negotiate an exception from or modification to this Protocol prior to seeking relief from the Court.

**III.    PRESERVATION**

      The Parties agree to take reasonable steps to preserve relevant Documents and ESI, in accordance with their obligations under applicable law.  By preserving or producing information for the purpose of this Action, the Parties are not conceding that such material is discoverable.  The Parties will meet and confer regarding the scope of preservation, including custodians, data sources, date ranges, and categories of information that have been or should be preserved in connection with this Action.

## IV.    PRODUCTION OF STRUCTURED DATA

Where a discovery request requires production of Structured Data, in lieu of producing structured data systems or applications, the Parties shall meet and confer on the content and format of a data sample from such structured data source.  The Parties shall discuss and attempt to agree upon the sets of data or fields to be included in the sample and the format in which sample data extracted shall be produced, and the Producing Party shall make all necessary disclosures for the Requesting Party to understand and evaluate whether the content and format of the data sample would satisfy a production request, such as the data fields available, the meaning of data fields, as well as codes and abbreviations used in the data source and whether a data dictionary exists, the time period over which data exists, any database schema, or other relevant information.  The Producing Party shall generate a report of such data sample for review by the Requesting Party or counsel after meeting and conferring with the Requesting Party as to the fields to be produced and the format of production.  Nothing in this provision is meant to expand the producing party's obligations under FRCP 34. The Parties reserve all rights to object, including but not limited to objections for relevance, undue burden, and/or inaccessibility.

## V.    IDENTIFICATION OF RESPONSIVE ESI

The Parties shall meet and confer in good faith regarding the methods to be used and locations identified to search Documents and ESI for potentially responsive documents or filter out Documents and ESI that are not subject to discovery, and such meet and confers will include disclosures necessary for the Requesting Party to understand and assess the sufficiency of the proposed search or filtering methodology, such as the nature of and processes of the search technology employed, the custodians and data sources and types to which it will and will not be applied, date ranges that may be used to filter documents, file types subject to or excluded from the methodology, search terms proposed to be used (if any), statistical sampling or validation

techniques the Producing Party has used or intends to use to evaluate the sufficiency of the methodology, and whether different search methodologies will be applied to different types or sources of data.

The Producing Party shall retain the sole right and responsibility to manage and control searches of its data files, including the right to propose revisions to search-term methods or advanced-technology procedures in order to make them more accurate and/or cost-effective and will disclose those proposed search methods and any revisions prior to implementation. Nothing in this section shall limit a Party's right to reasonably seek agreement from the other Parties or a Court ruling to modify previously agreed-upon search terms or other search parameters at any time prior to the completion of discovery.

A Producing Party need not provide discovery of ESI from sources that the Producing Party identifies as not reasonably accessible because of undue burden or cost. The Parties will identify and meet and confer over those sources of information that they propose should not be preserved, such as the following:

1.      Backup data that is substantially duplicative of data that is more accessible elsewhere (utilized for disaster recovery purposes);

2.      Random access memory (RAM), temporary files, or other ephemeral data that is difficult to preserve without disabling the operating system;

3.      Obsolete legacy data (*i.e.*, information stored in an obsolete format);

4.      Residual, fragmented, damaged, or other data only accessible by forensics;

5.      Information stored in unallocated space in file systems on magnetic media;

6.      On-line access data such as temporary internet files, history, cache, cookies, and the like;

7.      Server, system, or network logs; and

8.      Information created or copied during the routine, good-faith performance of processes for the deployment, maintenance, retirement, and disposition of computer equipment by the Party.

If any Producing Party identifies additional sources of not reasonably accessible ESI beyond those listed above that are believed to contain responsive information, it will notify the Requesting Party of that fact and those sources. Nothing in this paragraph shall relieve a Party of its obligation to produce otherwise readily accessible, responsive ESI that the Party knows to exist.

a.     Search Terms:

Where the Parties agree that potentially responsive ESI shall be searched through the use of search terms, the Parties shall meet and confer to provide reasonable assurances to the Requesting Party that the Producing Party's search terms and methodology used to apply them are reasonably calculated to identify responsive Documents and ESI. Prior to or during such meet and confer, the Producing Party shall make the disclosures identified above.

If, after disclosure of the Producing Party's proposed search method, search parameters, and search terms, and prior to the conduct of any searches, and after a reasonable meet and confer process, a Requesting Party believes in good faith that the Producing Party's proposals regarding search, retrieval and production would result in deficiencies in production, the Requesting Party may make prompt requests for different or additional search methods, parameters, or search terms, but such requests shall only be made after the Parties have met and conferred as to the alleged deficiencies identified by the Requesting Party. If the Parties cannot resolve their disagreements regarding the above search term methodologies, they shall promptly bring the dispute to the Court for resolution.

> b.     Technology-Assisted-Review:

No Party shall use predictive coding/technology-assisted review for the purpose of culling the documents to be reviewed or produced without notifying the opposing Party prior to use and with ample time to meet and confer in good faith regarding a mutually agreeable protocol for the use of such technologies, if any. If the Parties cannot resolve their disagreements regarding technology-assisted review methodologies, they shall promptly bring the dispute to the Court for resolution. The fact that a Document or ESI is responsive to a search term or identified as responsive by any other technology used to identify potentially responsive Documents and ESI shall not prevent any Party from withholding such file from production on the grounds that the file is not responsive, that it is protected from disclosure by applicable privilege or work-product protection.

The Parties will not seek Court intervention on discovery matters without first attempting to resolve any disagreements in good faith, based upon all reasonably available information.

## VI.     PRODUCTION OF DOCUMENTS ORIGINATING AS PAPER

The following production specifications apply to Documents that existed in paper format prior to production ("hard copy documents"). Documents that originated as paper but that were scanned and maintained electronically by a Party prior to inception of this Action shall be produced in accordance with Part VII of this Protocol. The Parties agree to produce hard copy documents in the formats described below, to the extent reasonably practicable and not unduly burdensome. These formats are deemed to be productions in reasonably usable form. If a Producing Party intends to produce any hard copy documents in any manner other than as specified herein, the Producing Party shall notify the Requesting Party of its intent, including production format (*e.g.*, produced as paper, made available for inspection). If the proposed production format is not

acceptable to the Requesting Party, the Parties shall meet and confer to determine a mutually acceptable production format for such Documents.

    a.    **TIFFs.** Documents should be produced as single-page, black and white, group IV TIFFs imaged at 300 dpi. Bates numbers, confidentiality designations (in accordance with the protective order governing the case), and redactions (to the extent they are necessary) should be burned into the image. TIFF image files should be provided in an "Images" folder.

    b.    **Unitizing Documents.** If a document is more than one page, the unitization of the document will be maintained as it existed when collected by the Producing Party to the extent practicable. Parties may unitize their documents using either physical unitization (*i.e.*, based on physical binding or organizational elements present with the original paper documents, like staples, clips, and binder inserts) or logical unitization (*i.e.*, a manual review of the paper to determine what logically constitutes a document, like page numbers or headers).

    c.    **Parent-Child Relationships.** The Parties agree that if any part of a Document or its attachments is responsive, the entire Document and attachments will be produced, except any portions of the Document or attachments that must be withheld or redacted on the basis of privilege or work-product protection. The Parties shall take reasonable steps to ensure that parent-child relationships within a document family (the association between an attachment and its parent document) are preserved. The child-document(s) should be consecutively produced immediately after the parent-document. Each document shall be produced with the production number for the first and last page of that document in the "BegBates" and "EndBates" fields of the data load file and with the "BegAttach" and "EndAttach" fields listing the production number for the first and last page in the document family.

     d.    **OCR**.  Documents shall also be produced with the associated OCR, and with an image cross-reference file and a load file. No Producing Party shall be required to ensure that the OCR is an exact duplicate of the contents of the TIFF image. The OCR software shall maximize text quality. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process. To the extent that a document is redacted, the text files should not contain the text of the redacted portions. OCR should be delivered in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document. All text files shall be provided as a single document level text file for each item, not one text file per page. Text files should be provided in a "Text" folder.

     e.    **Unique IDs**. Each TIFF image should have a unique filename, which corresponds to the Bates number of that page. The filename should not contain any blank spaces and should be zero-padded (*e.g.*, ABC-000001), taking into consideration the estimated number of pages to be produced. If a Bates number or set of Bates numbers is skipped in a production, the Producing Party, to the extent it is aware of the issue, will so note in a cover letter or production log accompanying the production. Bates numbers will be unique across the entire production and prefixes will be consistent across all documents a Party produces in the Action.

     f.    **Data Load Files**. Documents should be provided with an Opticon Cross-Reference File and Concordance data load file using standard Concordance delimiters:

       1.  Field Separator: ASCII character 20 ("¶"); and

       2.  Quote: ASCII character 254 ("þ").

Concordance-compatible image and data load files should be provided in a "Data" folder. The following information shall be produced in the load file accompanying production of hard copy documents: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Custodian,

(f) AllCustodian, (g) Page Count, (h) Production Volume, (i) Confidentiality, (j) Privilege; and (k) Redacted (Y/N) or otherwise indicating that a redaction is present.

   g.  **Metadata**. Each of the Metadata and coding fields set forth in Appendix A under the heading Hard Copy shall be produced for that Document.

   h.  **Color**. Documents containing color need not be produced in color in the first instance, provided however, that the Producing Party shall retain a copy of produced hard copy documents in color. However, if good cause exists for the Requesting Party to request production of certain documents in color, the Requesting Party may request production of such documents in color by providing (1) a list of the Bates numbers of documents it requests to be produced in color format; and (2) an explanation of the need for production in color format. The Producing Party shall not unreasonably deny such requests.

## VII. PRODUCTION FORMAT FOR UNSTRUCTURED ESI

   The Parties agree to produce in the formats described below. These formats are deemed to be productions in reasonably usable form. If any Party contends that particular Documents or ESI warrant a different format, the Parties will meet and confer to determine a mutually acceptable production format for such Documents.

   a.  **TIFFs**. Documents and ESI should be produced as single-page, black and white, group IV 300 DPI TIFFs images. The document's original orientation should be maintained (*i.e.*, portrait to portrait and landscape to landscape). Hidden content, tracked changes or edits, comments, notes, and other similar information, to the extent viewable within a document in its native file format, shall also be imaged so that such content is viewable on the image file. Bates numbers, confidentiality designations (in accordance with the protective order governing the case), and redactions (to the extent they are necessary) should be burned into the image. TIFF image files should be provided in an "Images" folder. Where Presentation files (.PPT, .PPTX, etc.) are

produced in a static, rather than native, format, they will be processed to TIFF format showing comments, hidden slides, speakers' notes, and similar data.

    b.    **Extracted Text Files**. The full text of native files should be extracted directly from the native file (not OCR), to the extent such extracted text is available, and should be delivered in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document. All text files shall be provided as a single document level text file for each item, not one text file per page. Text files should be provided in a "Text" folder. To the extent that a document is redacted, the document should undergo OCR after the text has been redacted in order to remove the redacted text.

    c.    **Instant Messages**. If Instant Messages are to be produced, the Parties will meet and confer to discuss the form of production and the producing party should use best efforts to produce such Instant Messages in a readily usable format.

    d.    **Unique IDs**. Each image should have a unique filename, which corresponds to the Bates number of that page. The filename should not contain any blank spaces and should be zero-padded (*e.g.*, ABC-000001), taking into consideration the estimated number of pages to be produced. If a Bates number or set of Bates numbers is skipped in a production, the Producing Party will so note in a cover letter or production log accompanying the production. Bates numbers will be unique across the entire production and prefixes will be consistent across all documents a party produces in this Action.

    e.    **Parent-Child Relationships**. The Parties agree that if any part of an Email or its attachments is responsive, the entire Email and attachments will be produced, except any portions of the Email or attachments that must be withheld or redacted on the basis of privilege or work-product protection. The relationship between attachments, enclosures, embedded files, and/or

exhibits to any parent document shall be preserved. The child-document should be consecutively produced immediately after the parent-document. Each document shall be produced with the production number for the first and last page of that document in the "BegBates" and "EndBates" fields of the data load file and with the "BegAttach" and "EndAttach" fields listing the production number for the first and last page in the document family.

      f.     **Metadata**. The Parties agree that Metadata will be produced for all ESI, whether produced in Native Format or Static Image formats. Appendix A sets forth the minimum Metadata fields that must be produced to the extent that Metadata exists for a particular document. To the extent that Metadata does not exist, is not reasonably accessible or available, or would be unduly burdensome to collect, nothing in this ESI Protocol shall require any party to extract, capture, collect or produce such data except for those fields marked for Hard Copy Documents in Appendix A, provided, however, that where such Metadata is not produced on such grounds, the Producing Party shall disclose which fields it will not produce. If Metadata is redacted or withheld, the Producing Party will so inform the Requesting Party and record the redaction on any privilege log prepared by the Producing Party; redacted Metadata shall be preserved.

      g.     **Production of Documents in Native Format**.

          1.     The processed native for all spreadsheets (*i.e.*, .XLS, .XLSX, .CSV, or similar), presentation files maintained in Microsoft Powerpoint format (.PPT, .PPTX, etc.), and electronic information containing audio or video components should be produced and linked to the database by the Metadata field "NativeLink."

          2.     Where native files are produced in lieu of TIFF images, each native file will be assigned a unique Bates number. The Producing Party will produce a placeholder (a single-page TIFF slip sheet indicating that the native item was produced) along with the

file itself in Native Format. The placeholder will be branded with the production number in the lower right hand corner and the phrase "PRODUCED IN NATIVE ONLY" branded in the center of the page. The Producing Party will also brand any confidentiality or similar endorsements in the lower left hand corner of the placeholder.

3.      To the extent that a native spreadsheet must be redacted, the Producing Party may redact either the native file or produce TIFF images with burned in redactions in lieu of a native file and TIFF placeholder image. If redacting TIFF images and to the extent that any of the following can be automated, the Producing Party, or its ediscovery vendor, should make reasonable efforts to: (1) reveal hidden rows, columns or sheets prior to converting the document to TIFF; (2) clear any filters that may conceal information; (3) adjust column widths so that numbers do not appear as symbols (*e.g.*, "########"); (4) ensure that column and row headings print; (5) ensure that the tab name appears in the header or footer of the document; (6) process comments so that they are produced at the end of the spreadsheet; and (7) process spreadsheets so that they print across then down. If good cause exists, the Requesting Party may ask the Producing Party to manually undertake the foregoing for certain documents identified by Bates number by the Requesting Party to the extent the document was originally produced with concealed information. The Producing Party shall not unreasonably deny such a request.

4.      **Request for Native Format Production**. Other than as specifically set forth above, a Producing Party need not produce documents in Native Format. If good cause exists for the Requesting Party to request production of certain documents in Native Format, the Requesting Party may request production in Native Format by providing (1) a list of the Bates numbers of documents it requests to be produced in Native Format; and

(2) an explanation of the need for reviewing such documents in Native Format. The Producing Party shall not unreasonably deny such requests. The Producing Party shall produce an overlay to ensure that the "NativeLink" entry in the data load file indicates the relative file path to each native file in such production, and all Extracted Text and applicable metadata fields.

h. **Cellphone and Personal Device Data**: The Parties will meet and confer regarding whether ESI maintained on any custodian's cellphone(s) and/or personal device(s) is within the scope of permissible discovery in this Action. If such discovery is agreed upon by the Parties or ordered by the Court, the Parties will meet and confer regarding (1) the identity of any document custodian that may possess unique, responsive ESI maintained on their cellphone(s) and/or personal device(s) that is within the responding Party's possession, custody, or control, and (2) the appropriate search parameters and form of any production of such information.

i. **Track Changes and Comments**. To the extent that a Document or ESI contains tracked changes or comments, the Document or ESI should be imaged showing tracked changes and comments using standard functionality available from the software used to facilitate the Producing Party's review and production of Documents and ESI in this Action.

j. **Password-Protected Files**. The Parties will make reasonable efforts to ensure that all encrypted or password-protected Documents and ESI are successfully processed for review and production. The Producing Party will identify relevant and responsive encrypted or password-protected Documents and ESI that it cannot process so that the parties can meet and confer to determine if there are any alternative means to have such information produced in a usable format.

k. **Embedded Documents**. Embedded files in responsive documents shall be extracted during processing and produced as separate documents, to the extent practicable given

17

the application used. To the extent the Producing Party becomes aware in the ordinary course of discovery that extracted documents cannot be produced, the Producing Party will notify the Requesting Party of the types of files, and Custodian for which such extracted documents cannot be produced. The Bates Number of the source file from which the embedded file is extracted shall be provided as metadata associated with the embedded file, as described in Appendix A.

      l.      **Data Load Files**. Documents should be provided with an Opticon Cross-Reference File and Concordance data load file using standard Concordance delimiters:

      1.      Field Separator

      2.      ¶ (ASCII 020) Text Qualifier þ (ASCII 254)

      3.      Substitute Carriage Return or New Line in data ® (ASCII 174)

      4.      Multi-value separator (followed by a space) ; (ASCII 059)

All rows will contain the same number of delimiters and fields. The multi-value field delimiter must be consistent across all fields. For example, if the CC field contains semi-colons between Email addresses, the Tag field should also contain semi-colons. Concordance-compatible image and data load files should be provided in a "Data" folder. Parties have the option to exchange sample load files. If this exchange occurs, the Requesting Party will have fourteen (14) days to respond with Load File change requests. Nothing in this Order will limit the Parties from discussing Load File changes throughout the course of the Action.

      m.      **Email Collection and Processing**.

      1.      Email Threading: The Parties may use Email thread suppression to avoid review and production of identical or duplicative information contained within an existing Email thread in another document being reviewed and produced, provided, however, that an Email that includes an attachment or content in the BCC or other blind copy field shall

not be treated as a lesser included version of an Email that does not include the attachment or content, even if all remaining content in the Email is identical. Under no circumstances will Email thread suppression eliminate (a) the ability of a requesting Party to identify every custodian who had a copy of a produced document or Email, to the extent this information is available on an automated basis through the use of industry-standard Email threading methods consistent with this paragraph; or (b) remove from a production any unique branches and/or attachments contained within an Email thread.

       2.      Email Domains: Producing parties may utilize an ESI search process to identify categories of documents, such as Emails from domains typically associated with junk Email (*e.g.*, fantasy football-related Emails, retailer advertising, and newsletters or alerts from non-industry sources).

       n.      **Deduplication.** A Producing Party shall globally deduplicate by exact duplicate families provided that (i) only exact duplicates are subject to deduplication; (ii) the Producing Party identifies all custodians in the main All Custodian metadata field, to the extent this information is available on an automated basis through the use of industry-standard deduplication methods consistent with this paragraph; and (iii) an Email that includes content in the BCC or other blind copy fields shall not be treated as a duplicate of an Email that does not include content in the BCC or other blind copy field, even if all remaining content in the Email is identical. Duplicate electronic documents shall be identified based on MD5 or SHA-1 hash values at the document family level. All electronic documents bearing an identical value are a duplicate group. De-duplication must be performed at the document family level. Stand-alone files will de-duplicate against other stand-alone files, but not against attachments contained in document families. Each party may also de-duplicate Emails in such a way as to eliminate earlier or

incomplete chains of Emails and therefore produce only the most complete iteration of an Email chain. In performing de-duplication described above, a Producing Party may not eliminate any unique, non-duplicative responsive information from chains of Emails that are not contained within the most complete iteration of an Email chain. Any other methodology for identification of duplicates, including Email field selection for hash value creation, must be discussed with the Requesting Party and approved in writing before implementation. If the Requesting Party objects to the methodology, it shall timely raise those concerns with the Producing Party. If a party opts not to deduplicate, it shall disclose such fact to the Requesting party prior to production of such non-deduplicated data.

o. **Custodian or Originating Source.** The custodian or originating source shall be identified in the Custodian field of the database load files. Documents found in the possession of a natural person (or on a natural person's allocated hardware or storage media) should be produced in such fashion as to identify the natural person. Documents found in the possession of a department, group, entity, or other common facility (*e.g.*, office, file room, archive, network storage, file share, back-up, hard drive, etc.) should be produced in such a fashion as to identify the department, group, entity, or facility. A Producing Party shall use a uniform description of a particular custodian across productions.

p. **Color.** Except for PowerPoint and other Documents produced natively, Documents containing color need not be produced in color in the first instance. However, if good cause exists for the Requesting Party to request production of certain documents in color, the Requesting Party may request production of such documents in color by providing (1) a list of the Bates numbers of documents it requests to be produced in color format; and (2) an explanation of the need for production in color format. The Producing Party shall not unreasonably deny such requests.

q.     **Foreign Language.**  Foreign language text files and Metadata should be delivered with the correct encoding to enable the preservation of the documents' original language.

r.     **Date Format:**

1.     Documents and ESI shall be processed using a single standard time zone (*e.g.*, GMT) selected by the Producing Party.

2.     If a time is not available, such as the estimate date for a coded document, then 12:00 am, or 00:00 should be assigned, *i.e.*, 12/21/1999 00:00

3.     Date delimiters, such as slashes and colons, must be consistent across all fields.  In the format of MM/DD/YYYY, there are no spaces and only forward slashes.

4.     Date formats must be consistent within any one field.

5.     Date formats must be consistent across all fields, *i.e.*, a record with a sent date should have the same format in the last modified date field.

s.     **Production Media.**  Producing documents may be done via secure FTP or secure file share, via CD, DVD, flash drive, or hard drive.  To the extent possible, physical media should be protected before it is produced.

1.     **Naming Convention for Production Media.**  Whether produced via secure FTP, file share, or physical media, the files produced should be combined into a compressed file such as .zip, .rar, etc.  The compressed file should be named so as to indicate Producing Party, the date of the production, and the sequence of the production (*e.g.*, "Fourth Production 20180508-001").  If the production is made using physical media, the media should be labeled to include the aforementioned information, as well as the Bates range of the materials contained on the media.

t.     **Replacement Productions.**  Any replacement production will be transmitted with a cover letter or Email to identify the production as a replacement and shall cross-reference the

BegBates and EndBates of the documents being replaced. If the replacement production is being transmitted by physical media, the media shall include the phrase "Replacement Production."

u. **Encrypted Data.** To the extent a production is encrypted before it is produced, the Producing Party shall contemporaneously transmit the credentials necessary to decrypt the data under separate cover.

v. **Zero-byte Files.** The Parties may, but are not required to, filter out stand-alone files identified as zero-bytes in size that do not contain responsive file links or file names. If the Requesting Party in good faith believes that a zero-byte file was withheld from production and contains information responsive to a request for production, the Requesting Party may request that the Producing Party produce the zero-byte file. The Requesting Party may provide a Bates number to the Producing Party of any document that suggests a zero-byte file was withheld from production and contains information responsive to a request for production.

## VIII. ASSERTIONS OF PRIVILEGE

a. **Privilege Logs.** Privilege Logs shall be provided containing the following information, which may, in part, be supplied by metadata associated with the document that reasonably supplies the information identified below:

1. A sequential number associated with each Privilege Log record;

2. The date of the document redacted or withheld;

3. The Bates numbers of documents redacted or withheld;

4. The identity of all persons who sent, authored, signed or otherwise prepared the document or withheld portion of the document, and identification of which of them are attorneys;

5. The identity of all persons designated as addressees or copyees, and identification of which of them are attorneys;

6. The title or subject of a document unless providing this information would reveal information that is itself privileged or protected;

7. A description of the contents of the document that, without revealing information itself privileged or protected, is sufficient to understand the subject matter of the document and the basis of the claim of privilege or immunity; and

8. The type or nature of the privilege asserted (*e.g.*, attorney-client privilege; work-product doctrine).

| Privilege Log #/ Bates # | Date | Author | From or Sender | Recipient | CC | BCC | Title | Subject | Privilege Log Description | Privilege |
|---|---|---|---|---|---|---|---|---|---|---|
| i, iii | ii | iv | iv | v | v | v | vi | vi | vii | viii |

b. **Logging of Document Families.** Where multiple members of a document "family" (*e.g.*, an Email and its attachment, multiple Email attachments, etc.) are withheld or redacted on the grounds of privilege, immunity, or any similar claim, these families may be jointly logged as a single entry on the privilege log with an indication in the description field that describes the family relationship, provided however, that information logged must be sufficient to assess the privilege for each family member. For document families in which fewer than all of the documents are withheld or redacted as privileged or protected, the privilege log entry for the withheld document(s) shall identify the Bates number of the produced family member.

c. The following documents presumptively need not be included on a Privilege Log:

1. Communications exclusively between a Party and its outside counsel regarding this Action dated after the commencement of this Action;

2. Work product created by outside counsel, or by an agent of outside counsel other than a Party, regarding this Action and created after commencement of this Action;

3. Communications exclusively between a Party and its outside counsel, or work product created by outside counsel, or by an agent of outside counsel other than a Party, concerning the action *Fair Isaac Corporation v. Trans Union LLC*, Case No. 1:17-cv-08318 (N.D. Ill.), provided that the Party claiming privilege or immunity over the communication or work product was a party to that action.

4. Documents not responsive to the Requesting Party's substantive document requests (as modified by the Producing Party's responses and objections to such requests).

## IX. COST ALLOCATION

Pursuant to FRCP 26, the Parties generally presume that the Producing Party bears all costs of preservation, retrieval, and production of its reasonably accessible ESI. However, there may be cost-sharing or cost-shifting upon agreement of the Producing and Requesting Parties or upon proper motion and Order of the Court, such as for ESI that is not reasonably accessible.

## X. THIRD PARTY DOCUMENTS

A Party that issues a non-party subpoena ("Issuing Party") shall include a copy of this Protocol with the subpoena and state that the Parties to the Action have requested that third parties produce Documents in accordance with the specifications set forth herein. The Issuing Party shall timely notify other Parties when it receives non-party productions, and shall, upon request by other Parties ("Requesting Parties" for purposes of this paragraph), provide copies of such productions to Requesting Parties in the format in which they were received from the third party. Nothing in this Protocol is intended to or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the Parties or third parties to object to a subpoena.

## XI. AUTHENTICATION

The Parties will meet and confer regarding an authentication stipulation concerning Documents produced in this Action.

24

IT IS SO ORDERED.

Dated: 11/29/2023

Edmond E. Chang
United States District Court Judge

Dated: November 6, 2023

/s/ Lauren M. Weinstein
Lauren M. Weinstein
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.,
  Suite 500
Washington, DC 20037
Telephone: 202-556-2000
lweinstein@mololamken.com

Steven F. Molo
Lauren F. Dayton
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Telephone: 312-450-6700
smolo@mololamken.com
ldayton@mololamken.com

*Liaison Counsel for Direct Purchaser
Plaintiffs and the Proposed Direct
Purchaser Class*

Gary F. Lynch
CARLSON LYNCH LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
Facsimile: 412-231-0246
glynch@carlsonlynch.com

Katrina Carroll
CARLSON LYNCH LLP
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
kcarroll@carlsonlynch.com

Respectfully Submitted,

/s/ Carmen Medici
Carmen Medici
  (admitted *pro hac vice*)
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-798-5319
cmedici@scott-scott.com

Joseph P. Guglielmo
  (N.D. Ill. 2759819)
Michelle E. Conston
  (admitted *pro hac vice*)
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com
mconston@scott-scott.com

Patrick McGahan
  (admitted *pro hac vice*)
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct
Purchaser Plaintiffs and the Proposed
Direct Purchaser Class*

26

Christopher M. Burke
Walter Noss
Yifan (Kate) Lv
KOREIN TILLERY PC
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 6225-5620
Facsimile: (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

George A. Zelcs
Randall P. Ewing, Jr.
Ryan Z. Cortazar
KOREIN TILLERY, LLC
205 North Michigan Avenue,
Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Jennifer W. Sprengel
CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

Barbara J. Hart (admitted *pro hac vice*)
GRANT & EISENHOFER
485 Lexington Ave., 29th Floor New
York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Linda P. Nussbaum
Susan Schwaiger
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th
Floor
New York, NY 10036
Telephone: 917-438-9102
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Michael L. Roberts
Karen Sharp Halbert
ROBERTS LAW FIRM, P.A.
20 Rahling Circle Little Rock, AR
72223
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Gregory S. Asciolla
  (admitted *pro hac vice*)
Karin E. Garvey
  (admitted *pro hac vice*)
Robin A. van der Meulen
  (admitted *pro hac vice*)
Matthew J. Perez
  (admitted *pro hac vice*)
Jonathan S. Crevier
  (admitted *pro hac vice*)
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
rvandermeulen@dicellolevitt.com
mperez@dicellolevitt.com
jcrevier@dicellolevitt.com

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: 312-332-3400
mmiller@millerlawllc.com
lfanning@millerlawllc.com

Guillaume Buell
  (admitted *pro hac vice*)
THORNTON LAW FIRM LLP
1 Lincoln Street, 13th Floor
Boston, MA 02111
Telephone: 617-720-1333
gbuell@tenlaw.com

Daniel E. Gustafson
  (admitted *pro hac vice*)
Daniel C. Hedlund
  (admitted *pro hac vice*)
Michelle J. Looby
  (admitted *pro hac vice*)
Joshua J. Rissman
Ling S. Wang
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
lwang@gustafsongluek.com

Dennis Stewart (admitted *pro hac vice*)
GUSTAFSON GLUEK PLLC
600 B Street, 17th Floor
San Diego, CA 92101
Telephone: 619-595-3200
dstewart@gustafsongluek.com

Kenneth A. Wexler
Melinda J. Morales
Michelle Perkovic
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

Charles F. Barrett
  (admitted *pro hac vice*)
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: 615-244-1713
cbarrett@nealharwell.com

28

Don Barrett (*pro hac vice* forthcoming)
BARRETT LAW GROUP, P.A.
404 Court Square
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
dbarrett@barrettlawgroup.com
donbarrettpa@gmail.com

Richard R. Barrett
  (*pro hac vice* forthcoming)
BARRETT LAW GROUP, P.A.
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: 662-380-5018
rrb@rrblawfirm.net

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)
HAUSFELD LLP
600 Montgomery Street, Suite 3200 San
Francisco, CA 94111
Telephone: 415-633-1908
mlehmann@hausfeld.com
clebsock@hausfeld.com

Hilary K. Scherrer
Paul Gallagher
HAUSFELD LLP
1700 K Street, N.W., Suite 650
Washington, DC 20006
Telephone: 202-540-7200
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Scott A. Martin
Irving Scher
Jeanette Bayoumi
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: 646-357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

*Counsel for Direct Purchaser Plaintiffs
and the Proposed Direct Purchaser
Class*

REINHARDT WENDORF &
BLANCHFIELD
Garrett D. Blanchfield (*pro hac vice*)
Brant D. Penney (*pro hac vice*)
Roberta A. Yard
  (*pro hac vice* forthcoming)
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Telephone: 651-287-2100
Facsimile: 651-287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

SPECTOR ROSEMAN &
KODROFF, P.C.
Jeffrey J. Corrigan (*pro hac vice*)
William G. Caldes(*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
Icee N. Etheridge
 (*pro hac vice* forthcoming)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: 215-496-0300
Facsimile: 215-496-6611
JCorriganf@srkattorneys.com
Bcaldes@srkattorneys.com
Jspector@srkattorneys.com
Ietheridge@srkattorneys.com

*Interim Co-Lead Counsel for Indirect
Purchaser Plaintiffs and the Proposed
Indirect Purchaser Class*

GUIN, STOKES & EVANS, LLC
Charles R. Watkins (3122790)
321 South Plymouth Court
Suite 1250
Chicago, IL 60604
Telephone: 312-878-8391
Facsimile: 205-226-2357
charlesw@gseattorneys.com

*Liaison Counsel for Indirect Purchaser
Plaintiffs and the Proposed Indirect
Purchaser Class*

PRETI FLAHERTY, BELIVEAU &
PACHIOS LLP
Michael S. Smith
 (*pro hac vice* forthcoming)
Gregory P. Hansel
 (*pro hac vice* forthcoming)
Randall B. Weill
 (*pro hac vice* forthcoming)
Elizabeth F. Quinby
 (*pro hac vice* forthcoming)
One City Center, P.O. Box 9546
Portland, ME 04101
Telephone: 207-791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com

GLANCY PRONGAY & MURRAY
LLP
Brian P. Murray
 (*pro hac vice* forthcoming)
Lee Albert (*pro hac vice* forthcoming)
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: 212-682-5340
Facsimile: 212-884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

FREED KANNER LONDON &
MILLEN LLC
Douglas A. Millen
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: 224-632-4500
dmillen@fklmlaw.com

FREED KANNER LONDON &
MILLEN LLC
Jonathan M. Jagher
 (*pro hac vice* forthcoming)
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-234-6487
jjagher@fklmlaw.com

BONI, ZACK & SNYDER LLC
Michael J. Boni (*pro hac vice* forthcoming)
Joshua D. Snyder
 (*pro hac vice* forthcoming)
John E. Sindoni (*pro hac vice* forthcoming)
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: 610-822-0200
Facsimile: 610-822-0206
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

MCLAFFERTY LAW FIRM, P.C.
David McLafferty
 (*pro hac vice* forthcoming)
Attorneys at Law
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-940-4000, ext. 12
www.McLaffertyLaw.com

SALTZ MONGELUZZI &
BENDESKY, P.C.
Simon B. Paris, Esq.
 (*pro hac vice* forthcoming)
Patrick Howard, Esq.
 (*pro hac vice* forthcoming)
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: 215-575-3985
Facsimile: 215-496-0999
sparis@smbb.com
phoward@smbb.com

*Counsel for Indirect Purchaser
Plaintiffs and the Proposed Indirect
Purchaser Class*

/s/ *Matthew D. Provance*
Britt M. Miller
Matthew D. Provance
J. Gregory Deis
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
(312) 701-7711—Facsimile
bmiller@mayerbrown.com
mprovance@mayerbrown.com
gdeis@mayerbrown.com

*Counsel for Defendant Fair Isaac
Corporation*

31

## APPENDIX A: REQUIRED METADATA FIELDS

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| Bates Number Begin | Beginning page Bates number | x | x | x |
| Bates Number End | Ending page Bates number | x | x | x |
| Attachment Begin | Beginning page of attachment range | x | x | x |
| Attachment End | Ending page of attachment range | x | x | x |
| Attachment Count | Number of attachments to an Email | x | x | |
| Custodian | Primary Individual Custodian Name or Shared Resource Name the document was processed for production -- format: Last, First or ABC Dept. consistent naming and formatting should be used across all productions. | x | x | x |
| AllCustodian | Production custodians or non-human production data sources associated with the produced document; Format: Last, First or ABC Dept. | x | x | x |
| File Name | File name of document | | x | |
| File Extension | File extension of document | x | x | |
| LogicalPath | The directory structure of the | x | x | |

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| | original file(s); any container name is included in the path | | | |
| Page Count | For documents produced in TIFF form, number of pages in the document; for documents produced in native, page count will be 1 (for placeholder) | x | x | x |
| Email Subject | Subject of Email | x | x | |
| Author | Any value populated in the Author field of the document properties | | x | |
| From | Email author | x | x | |
| To | Email recipients | x | x | |
| CC | Email copyees | x | x | |
| BCC | Email blind copyees | x | x | |
| Importance | Email importance flag | x | x | |
| Date Sent | Date sent (MM/DD/YYYY format) | x | x | |
| Time Sent | Time sent (HH:MM:SS format) | x | x | |
| Date Received | Date received (MM/DD/YYYY format) | x | x | |
| Time Received | Time received (HH:MM:SS format) | x | x | |
| Date Created | Date created (MM/DD/YYYY HH:MM:SS format) | | x | |

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| DateLastModified | Last modification date (MM/DD/YYYY HH:MM:SS format) | x | x | |
| Hash Value (MD5 or SHA-1) | Unique electronic signature of Email or electronic file | x | x | |
| NativeFile | Native File Link | x | x | |
| Email Thread Family ID (if Email threading is used by Producing Party) | Unique identifier from Email threading algorithm to denote Emails from a single thread and all attachments | x | x | |
| Production Volume | Production volume name | x | x | x |
| Confidentiality | Confidentiality designation pursuant to the Protective Order | x | x | x |
| Redacted | Descriptor for documents that have been redacted (<yes> or <no>) | x | x | x |
| Withheld Placeholder | To the extent a document family member is fully withheld on the basis of privilege and other documents in that family are produced, this field must be populated with a "Y" | x | x | |
| Privilege | Populated if privilege is being asserted | x | x | x |
| Attachname | File name of attachment | x | | |

34

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| Title | Any value populated in the Title field of the document properties | | x | |
| Subject | Any value populated in the Subject field of the document properties | | x | |
| LastEditedBy | Any value populated in the Last Edited by or Last Modified By field of the document properties | | x | |

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-02114 |
| *This document relates to:* | Judge Edmond E. Chang |
| ALL ACTIONS | Magistrate Judge David E. Weisman |

## AGREED CONFIDENTIALITY ORDER

The parties[1] to this Agreed Confidentiality Order have agreed to the terms of this Order; accordingly, it is ORDERED:

1.    Scope.  All materials produced or adduced in the course of discovery, including initial disclosures, responses to discovery requests, deposition testimony and exhibits, and information derived directly therefrom (hereinafter collectively "documents"), shall be subject to this Agreed Confidentiality Order, as defined below.  This Order is subject to the Local Rules of this District and the Federal Rules of Civil Procedure ("FRCP") on matters of procedure and calculation of time periods.

2.    Confidential Information.  As used in this Order, "Confidential Information" means information designated as "CONFIDENTIAL" by the producing party, that falls within one or more of the following categories: (a) information prohibited from disclosure by statute; (b) research, technical, or commercial information that the party has maintained as confidential; (c) personally identifying information; (d) personal or financial information that the party has

---

[1] For purposes of this Order, "parties" shall mean the named parties in the above-referenced litigation.  In addition, any non-party that produces discovery pursuant to a subpoena or other process issued in this litigation shall have the rights and protections set forth in this Order.

maintained as confidential; or (e) other information the producing party reasonably believes is subject to protection. These categories are expressly provided for illustrative purposes only, and are not intended to be and should not be construed as exhaustive of the types of information that may be appropriately designated as "Confidential Information." The parties will make reasonable efforts to ensure that information or documents that are available to the public are not designated as Confidential Information.

3.    <u>Highly Confidential Information</u>.  As used in this Order, "Highly Confidential Information" means information designated as "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" by the producing party that is of a highly sensitive nature the disclosure of which could result in significant harm, including but not limited to competitive harm, to the business or operations of that party or non-party or to an individual.  By way of example only, Highly Confidential Information may include but is not limited to: (a) documents or information relating to or reflecting nonpublic business or market strategies and research and development activities; (b) documents or information relating to or reflecting other trade secrets or nonpublic proprietary business information that bestows a competitive advantage on the producing party; (c) documents or information relating to or reflecting revenue, profit, costs or pricing; (d) documents or information reflecting customer details that could be used to subject the party to a competitive disadvantage; (e) copyrighted software and information reflecting computer or programming code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs; or (f) other information the disclosure of which would, in the good faith judgment of the designating party, create a risk of serious harm.  The parties will make

reasonable efforts to ensure that information or documents that are available to the public are not designated as Highly Confidential Information.

4. <u>Designation</u>.

(a) A party may designate a document as Confidential Information or Highly Confidential Information for protection under this Order by placing or affixing the words "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" on the document and on all copies in a manner that will not interfere with the legibility of the document.

(b) To the extent a document is produced in a form in which placing or affixing the words "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" on the document is not feasible, the producing party may designate the document as confidential by inserting a slip sheet, by affixing a label to the production media containing the document, by including the designation in the file title, or, if necessary, by including such designation in a cover letter. As used in this Order, "copies" includes electronic images, duplicates, extracts, summaries, or descriptions that contain either Confidential Information or Highly Confidential Information. The marking "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" shall be applied prior to or at the time the documents are produced or disclosed. Applying the marking "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" to a document does not mean that the document has any status or protection by statute or otherwise except to the extent and for the purposes of this Order. Any copies that are made of any documents marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" shall also be so marked, except that indices, electronic databases, or lists of documents that do not

contain substantial portions or images of the text of marked documents and do not otherwise disclose the substance of the Confidential Information or Highly Confidential Information are not required to be marked.

(c) <u>Upward Designation of Information or Items Produced by Other Parties or Non-Parties</u>. Subject to the definitions set forth in Paragraphs 2 and 3, a party may upward designate (*i.e.*, change a document produced without a designation to a designation of Confidential Information or Highly Confidential Information or designate a document produced as Confidential Information to a designation of Highly Confidential Information) any document produced by another party or non-party, provided that said document contains the upward designating party's own information it believes is Confidential Information or Highly Confidential Information. Upward designation shall be accomplished by providing written notice to all parties identifying (by Bates number or other individually identifiable information) the document to be re-designated upwardly. Any party may object to the upward designation of any document pursuant to the procedures set forth in Paragraph 11 regarding challenging designations.

5. <u>Depositions.</u>

(a) A party or non-party may designate some or all of a witness's deposition testimony as Confidential or Highly Confidential Information for protection under this Order by orally designating the relevant testimony as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" on the record at the time the testimony is taken. Inadvertent failure to do so does not operate as a waiver. The designating party must provide the specific page and line designations over which the party or non-party claims confidentiality within thirty (30) days after delivery of the final transcript by the court reporter to the designating party or non-party. Deposition testimony shall be treated as "CONFIDENTIAL" or "HIGHLY

4

CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY," as orally designated, prior to the deadline. Thereafter, only those portions identified in the Notice of Designation shall remain protected under the terms of this Order.

(b)    In the event information designated as Confidential or Highly Confidential Information is to be shown to a witness at deposition, hearing, trial or otherwise, the witness shall be provided with a copy of this Order at the start of the examination, and the witness must comply with the terms of this Order. Except as provided herein, if the witness has refused to execute Attachment A as required by this Order, the party taking the deposition will read the text of Attachment A on the record, which shall serve as a substitute for the execution of Attachment A and shall permit examination of the witness on documents or other materials containing Confidential Information or Highly Confidential Information.

6.    Protection of Confidential Information or Highly Confidential Information.

(a)    General Protections. Except as set forth below, Confidential Information or Highly Confidential Information shall not be used or disclosed by the parties, counsel for the parties, or any other persons identified in Paragraph 6(b) for any purpose whatsoever other than prosecuting, defending, or settling this litigation, including any appeal thereof. Confidential Information or Highly Confidential Information may be disclosed only to the named plaintiff(s) and not to any other member of the putative class except under circumstances permitting such disclosure set forth in Paragraphs 6(b) and 7.

(b)    Limited Disclosures of Confidential Information. The parties and counsel for the parties shall not disclose or permit the disclosure of any Confidential Information to any person or entity except as set forth in subparagraphs 6(b)(1)-(12). Subject to these requirements, the following categories of persons may be allowed to review Confidential Information:

5

(1)     <u>Counsel</u>. Outside or in-house counsel for the parties and employees or support staff of such counsel (including but not limited to attorneys, paralegals, information technology, litigation support, secretaries, law clerks, and investigators) who have responsibility for the preparation and trial of the action;

(2)     <u>Parties</u>.  Individual parties and employees of the parties, but only to the extent counsel determines in good faith that disclosure is reasonably necessary to the conduct of the litigation and the person has been advised of their obligations hereunder;

(3)     <u>Court</u>. The Court and its personnel;

(4)     <u>Court Reporters and Video Recorders</u>. Court reporters and video recorders engaged for depositions, but only after such persons have completed the certification contained in Attachment A;

(5)     <u>Contractors</u>.  Those persons specifically engaged for the purpose of providing litigation support, including computerized or electronic discovery support, providing photocopies, organizing or processing documents, including outside vendors hired to collect, process, or host electronically stored documents, but only after such persons have completed the certification contained in Attachment A;

(6)     <u>Consultants and Experts</u>. Consultants, investigators, or experts or support staff of such consultants, investigators, or experts retained by the parties or Counsel for the parties to assist in the preparation and trial of this action, but only after such consultants, investigators, experts, or support staff have completed the certification contained in Attachment A. This definition includes professional jury or trial consultants retained in connection with this litigation;

6

(7)    <u>Witnesses at Trial</u>.  Any witness at trial during the pendency of that trial, to whom counsel believes, in good faith, that such disclosure is reasonably necessary for the prosecution or defense of these proceedings and who has completed the certification contained in Attachment A;

(8)    <u>Witnesses at Depositions</u>.  During their depositions, witnesses in this action (and their counsel) if the witness has completed the certification contained in Attachment A, and to whom disclosure is limited to documents that (1) were produced by the witness's employer and created during the period of the witness's employment, (2) show on their face that the witness[2] authored or received them, (3) memorialize that the witness was privy to the document's contents (*e.g.*, a document refers to a meeting attended by the witness), or (4) are reasonably necessary to be shown to the witness according to the good faith judgment of counsel.  Neither witnesses nor their counsel shall retain a copy of any exhibit designated as Confidential Information, except witnesses and their counsel may receive copies of all exhibits marked at their depositions in connection with review of the deposition transcript.  After the conclusion of the litigation such witnesses and their counsel shall destroy those copies;

(9)    <u>Author or Recipient</u>.  Persons whom the Confidential material itself indicates, or the receiving party otherwise has a good-faith basis to believe, were the author, creator, producer, addressee, source, or recipient of a document (not including a person who received the document in the course of this action) may be shown only those documents that he or she authored or received; and any person whose statements, communications or actions are expressly mentioned, discussed, or referred to by actual name in the material as indicated on its face may be shown that

---

[2]    For purposes of this paragraph, a witness designated to testify on behalf of an organization taken pursuant to FRCP 30(b)(6) may be deemed to have "author[ed]" or "received" a document designated by that organization as Confidential so long as at least one employee of the organization authored or received the document.

7

portion of the document referring to them and such other portions as necessary to provide context for the reference to that person;

(10)    Special Masters.  Special masters and their direct staff;

(11)    Mediators.  Mediators and their direct staff, provided that they are bound by a confidentiality agreement acceptable to all parties; and

(12)    Others by Consent.  Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

(c)    Disclosures of Highly Confidential Information.  The parties and counsel for the parties shall not disclose or permit the disclosure of any Highly Confidential Information to any person or entity except as set forth in subparagraphs 6(c)(1)-(10).  Subject to these requirements, the following categories of persons may be allowed to review Highly Confidential Information:

(1)    Outside Counsel.  Outside counsel for the parties who have appeared in this action and employees or support staff of such counsel (including but not limited to attorneys, paralegals, secretaries, law clerks, and investigators), provided that such individuals do not regularly participate in the commercial business activities of the receiving party;

(2)    Court.  The Court and its personnel;

(3)    Court Reporters and Video Recorders.  Court reporters and video recorders engaged for depositions, but only after such persons have completed the certification contained in Attachment A;

(4)    Contractors.  Those persons specifically engaged for the purpose of providing litigation support, including computerized or electronic discovery support, providing photocopies, organizing or processing documents, including outside vendors hired to collect, process, or host

electronically stored documents, but only after such persons have completed the certification contained in Attachment A;

(5) <u>Consultants and Experts</u>. Consultants, investigators, or experts employed by the parties or Counsel for the parties to assist in the preparation and trial of this action or support staff of such consultants, investigators, or experts, so long as any such consultants, investigator, experts or support staff are not employees or regular contractors of the parties or any affiliated entity, but only after such consultants, investigators, experts, or support staff have completed the certification contained in Attachment A. This definition includes professional jury or trial consultants retained in connection with this litigation;

(6) <u>Witnesses at Depositions</u>. During their depositions, witnesses in this action to whom disclosure is limited to documents that (1) were produced by the witness's employer and created during the period of their employment, (2) show on their face that the witness[3] authored or received them, or (3) memorialize that the witness was privy to the document's contents (*e.g.*, a document refers to a meeting attended by the witness). Neither witnesses nor their counsel shall retain a copy of any exhibit designated as Highly Confidential Information, except witnesses and their counsel may receive copies of all exhibits marked at their depositions in connection with review of the deposition transcript. After the conclusion of the litigation witnesses and their counsel shall destroy those copies;

(7) <u>Author or Recipient.</u> Persons whom the Highly Confidential material itself indicates, or the receiving party otherwise has a good-faith basis to believe, were the author, creator, producer, addressee, source, or recipient of a document (not including a person who

---

[3] For purposes of this paragraph, a witness designated to testify on behalf of an organization taken pursuant to FRCP 30(b)(6) may be deemed to have "author[ed]" or "received" a document designated by that organization as Highly Confidential Information so long as at least one employee of the organization authored or received the document.

received the document in the course of this action) may be shown only those documents that he or she authored or received; and any person whose statements, communications or actions are expressly mentioned, discussed, or referred to by actual name in the material as indicated on its face may be shown that portion of the document referring to them and such other portions as necessary to provide context for the reference to that person;

(8)     Special Masters.  Special masters and their direct staff;

(9)     Mediators.  Mediators and their direct staff, provided that they are bound by a confidentiality agreement acceptable to all parties; and

(10)     Others by Consent.  Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

(d)     To the extent any person is required to complete the certification contained in Attachment A to this Order, facsimile signatures or signatures transferred in electronic format (*e.g.*, PDF) shall be treated as original signatures purposes of this Order.

(e)     Control of Documents.  Counsel for the parties shall make reasonable efforts to prevent unauthorized or inadvertent disclosure of Confidential Information or Highly Confidential Information.

(f)     Acknowledgment of Understanding and Agreement To Be Bound (Attachment A). To the extent that this Order requires any persons to acknowledge their obligations under this Order, that acknowledgment shall be accomplished by the execution of the Acknowledgment of Understanding and Agreement To Be Bound (Attachment A).  The counsel for the party that obtains such signed agreements shall maintain the originals of those forms for a period of one year after the termination of the case, including any appeal(s) thereof.

10

7.      <u>Failure To Designate</u>.   A  failure  to  designate  a  document  or  testimony  as Confidential Information or Highly Confidential Information does not, standing alone, waive the right to so designate the document or testimony.  If a party designates a document as Confidential Information or Highly Confidential Information after it was initially produced, the receiving party, on notification of the designation, must make a reasonable effort to ensure that the document is treated in accordance with the provisions of this Order.  No party shall be found to have violated this Order for failing to maintain the confidentiality of material during a time when that material has not been designated Confidential Information or Highly Confidential Information, even where the failure to so designate was inadvertent and where the material is subsequently designated Confidential Information or Highly Confidential Information.

8.      <u>Inadvertent Disclosure of Attorney-Client Privileged or Work-Product Protected Documents and Clawback Procedures</u>.  Pursuant to Federal Rule of Evidence 502(d) and (e), if, in connection with the action, information subject to a claim of attorney-client privilege, attorney work-product protection, or other evidentiary privilege or protection ("Protected Documents") is inadvertently disclosed, the disclosure does not constitute a waiver or forfeiture of such privilege or protection with respect to the privileged information or its subject matter, in this litigation or in any other federal or state proceeding.  Instead, the producing party shall be entitled to assert such privilege or protection, except as further discussed below, and the information and its subject matter shall be treated as if there has been no such disclosure.

(a)      Upon discovering the disclosure of information that the producing party believes in good faith to be covered by attorney-client privilege, work-product protection, or other evidentiary privilege or protection, the producing party shall promptly provide written notification to the receiving party identifying the documents or portions thereof that

contain privileged or protected information, in accordance with the requirements of FRCP 26(b)(5)(A).

(b)     Upon written notice of the production of a Protected Document by the producing party or oral notice if such notice is delivered on the record at a deposition, the receiving party must within seven (7) days, return, sequester, or destroy the specified document and any electronic or hard copies the receiving party has, and may not further use or disclose the Protected Document until the claim that it is a Protected Document has been resolved. The receiving party may retain and sequester a copy of the document asserted to be privileged or protected for the purpose of resolving a dispute with the producing party as to whether the document is privileged or protected from disclosure, and the receiving party need not remove from the record any document that has been previously introduced until such dispute is resolved. If the receiving party agrees that the document is privileged, it will promptly confirm in writing to the producing party that it has either returned or destroyed all versions of the document and will make no use of the information. Promptly following notification by the receiving party, the producing party shall provide the receiving party with a replacement production in the same format as the original production, with the protected information appropriately withheld or redacted. If the receiving party disputes that material noticed pursuant to this paragraph is privileged or protected from disclosure, then the retention and sequester of such material shall be governed by Paragraph 8(f).

(c)     Where a producing party seeks to invoke its rights to claw back a document under Federal Rule of Evidence 502(d) and this Order with respect to a document that has been submitted to the Court as an exhibit or used as an exhibit in a deposition, the producing

party must do so within fourteen (14) days of the document being so filed or used. To the extent that the information contained in a document submitted to the Court as an exhibit or used as an exhibit in a deposition is subject to a claim that it contains privileged or protected information, then the receiving party will not further use such document(s) until the claim has been resolved. However, while the receiving party need not remove from the record any document that has been previously introduced until such dispute is resolved, the producing party may notify the Court and/or court reporting service that a dispute under this paragraph is pending and ask that the document(s) be sequestered and made not accessible to the public or parties until the dispute is resolved. To the extent a producing party does not seek to invoke its rights under Federal Rule of Evidence 502(d) and this Order to claw back a document that has been submitted to the Court as an exhibit or used as an exhibit in a deposition within fourteen (14) days of the document being so filed or used, the parties agree that Federal Rule of Evidence 502(d) will not apply to such filed or used document. However a party may seek to invoke its rights under Federal Rule of Evidence 502(b) to claw back such filed or used document.

(d)     If the receiving party has disclosed the specified document before being notified of its inadvertent production, it must take reasonable steps to retrieve it.

(e)     The producing party shall provide an updated privilege log as called for in Section VIII of the Stipulation and Order Establishing the Protocol for the Production of Documents and Electronically Stored Information, as well as any portion of the document that does not contain privileged or protected information.

(f)     The receiving party may challenge the assertion of any privilege discussed in this paragraph. Any challenge that cannot be resolved by the parties will be filed with

the court presiding over this litigation in the Northern District of Illinois and subject to the law in that District. It shall be the receiving party's responsibility to initiate Court proceedings, if any. The receiving party may not, however, publicly assert as a ground for such motion the fact or circumstances of the production or reveal the substance of the protected contents of the materials (including in contesting the assertion of protection or privilege). Any motion contesting the privilege or work-product claim shall be submitted to the Court in camera for review or, if the Court directs, filed under seal. Pending resolution of such a challenge, the receiving party must continue to sequester the information contained in any notes and, in the event the Court concludes that the information is protected from disclosure, delete the information from any notes or any portions thereof that reveal the substance of the privileged or protected information. The producing party must preserve the information pending resolution of the challenge and, in the event the Court concludes that the information is not protected from disclosure, promptly provide the receiving party with a replacement production.

(g)     The producing party may challenge the receiving party's use of any Protected Document. Any challenge that cannot be resolved by the parties will be filed with the court presiding over this litigation in the Northern District of Illinois and will be subject to the laws of that District. In all instances in which the producing party asserts a privilege or protection, the producing party must preserve a copy of the document asserted to be privileged or protected until the claim of privilege is resolved.

(h)     The obligation of the receiving party to return or to destroy materials under this Order does not apply to multi-case disaster recovery databases maintained by the receiving party. If these disaster recovery databases are accessed or restored, however,

then any Protected Documents on those databases relating to this action shall be destroyed

if destruction is required elsewhere in this Order.

(i)     If a party independently discovers that it has received documents or

information that reasonably appear to be privileged, the party shall timely notify the other

party, and in any event, no later than ten (10) days after such discovery.

(j)     Except as otherwise set forth in Paragraph 8(c), where a document has been

submitted to the Court as an exhibit or used as an exhibit in a deposition and no party has

sought to claw back such document within fourteen (14) days of the document being so

filed or used, this Order shall be interpreted to provide the maximum protection allowed

by Federal Rule of Evidence 502(d) and (e), and Federal Rule of Evidence 502(b) shall not

otherwise apply.  Nothing contained herein is intended to or shall limit a party's right to

conduct a pre-production review of hard-copy documents, electronically stored

information ("ESI") or any other information (including metadata) for relevance,

responsiveness, privilege and/or protection, and nothing herein is intended to curtail a

party's right to challenge any documents, ESI or any other information withheld based on

a claim of relevance, responsiveness, privilege and/or protection.

(k)     Nothing in Paragraph 8 shall limit the right of any party to petition the Court

for an in camera review of inadvertently disclosed Protected Documents.

9.     <u>Filing of Confidential Information or Highly Confidential Information</u>.  This Order

does not, by itself, authorize the filing of any document under seal.  Any party wishing to file a

document designated as Confidential Information or Highly Confidential Information in

connection with a motion, brief or other submission to the Court must comply with LR 26.2 of the

District Court for the Northern District of Illinois.

10.     <u>No Greater Protection of Specific Documents</u>.  Except on privilege grounds not addressed by this Order, no party may withhold information from discovery on the ground that it requires protection greater than that afforded by this Order unless the party moves for an order providing such special protection or the parties otherwise agree.

11.     <u>Challenges by a Party to Designation as Confidential Information or Highly Confidential Information</u>.   The designation of any material or document as Confidential Information or Highly Confidential Information is subject to challenge by any party.  A party does not waive its right to challenge a designation by electing not to mount a challenge promptly after the original designation is disclosed. The following procedure shall apply to any such challenge.

(a)     <u>Meet and Confer</u>.  A party challenging the designation of Confidential Information or Highly Confidential Information must do so in good faith and must begin the process by conferring directly with counsel for the designating party.  In conferring, the challenging party must identify in writing by Bates number or privilege log identifying number the material challenged and explain the basis for its belief that the designation was not proper.  The designating party or nonparty must respond to the challenge within ten (10) business days.  If agreement is reached confirming, changing or waiving the designation as to any material subject to the objection, the designating party or nonparty shall serve on all parties a notice specifying the document and the nature of the agreement.  If the designation is changed or waived, the designating party or nonparty shall also produce copies of all materials with the amended, agreed-upon designation at the expense of the designating party or nonparty.

(b)     <u>Judicial Intervention</u>.  A party that elects to challenge a confidentiality designation may file and serve a motion that identifies the challenged material and sets forth in detail the basis for the challenge.  The burden of persuasion in any such challenge proceeding shall be on the

16

designating party or nonparty. Until the Court rules on the challenge, all parties shall continue to treat the materials as Confidential Information or Highly Confidential Information under the terms of this Order.

12.     <u>Challenges to Privilege Claims</u>. Following its receipt of a privilege/redaction log produced in this action, a party may identify, in writing (by Bates/unique identifying number), the particular documents that it believes require further explanation. The producing party shall endeavor to respond to such a request within ten (10) business days. If a party challenges a request for further information, the parties shall meet and confer to try to reach a mutually agreeable solution. If they cannot agree, the matter may be brought to the Court.

13.     <u>Action by the Court</u>. Nothing in this Order or any action or agreement of a party under this Order limits the Court's power to make orders concerning the disclosure of documents produced in discovery or at trial.

14.     <u>Use of Confidential Information or Highly Confidential Information at Motion Hearings</u>. Except as expressly set forth herein, nothing in this Order shall be construed to affect the use of Confidential Information or Highly Confidential Information in connection with any presentation of evidence and argument at hearings or trial. The parties will confer with each other and, as necessary, any affected non-party reasonably in advance of a hearing where Confidential Information or Highly Confidential Information will be discussed so that a designating party may request procedures it deems necessary to protect against the disclosure of proprietary or competitively sensitive information, including whether, or to what extent, the Court should restrict public attendance at the hearing. The Court may make such orders as are necessary to govern the use of Confidential Information or Highly Confidential Information at a hearing.

15.    <u>Use of Confidential Information or Highly Confidential Information at Trial</u>.  The use of Confidential Information or Highly Confidential Information at any trial in this matter will be addressed by a separate stipulation or pretrial order of the Court.

16.    <u>Third Parties</u>.  In seeking discovery from third parties, the parties shall attach this Order to a copy of any subpoena or other discovery request.  Third parties from whom discovery is requested are entitled to the protections of this Order in responding to such requests.

17.    <u>Confidential Information or Highly Confidential Information Subpoenaed or Ordered Produced in Other Litigation</u>:

(a)    If a receiving party is served with a discovery request, subpoena, civil investigative demand, grand jury subpoena, or an order issued in other litigation that would compel disclosure of any material or document designated in this action as Confidential Information or Highly Confidential Information, the receiving party must so notify the designating party, in writing, immediately and in no event more than five (5) business days after receiving the subpoena or order.  Such notification must include a copy of the subpoena or court order.

(b)    The receiving party also must immediately inform in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is the subject of this Order.  In addition, the receiving party must deliver a copy of this Order promptly to the party in the other action that caused the subpoena to issue.

(c)    The purpose of imposing these duties is to alert the interested persons to the existence of this Order, and to afford the designating party in this case an opportunity to try to protect its Confidential Information or Highly Confidential Information in the court from which the subpoena or order issued.  If the designating party or nonparty timely seeks a protective order, the receiving party served with the request shall not produce any information designated in this

18

action as "Confidential Information" or "Highly Confidential Information" before a determination by the court from which the request issued, unless the receiving party has obtained the designating party's permission. The receiving party shall cooperate with respect to all reasonable procedures sought to be pursued by the designating party or nonparty whose designated material may be affected. The designating party or nonparty shall bear the burden and the expense of seeking protection in that court of its Confidential Information or Highly Confidential Information, and nothing in these provisions should be construed as authorizing or encouraging a receiving party in this action to disobey a lawful directive from another court. The obligations set forth in this paragraph remain in effect while the party has in its possession, custody, or control Confidential Information or Highly Confidential Information produced by another party or nonparty to this case.

18. <u>Challenges by Members of the Public to Sealing Orders</u>. A member of the public may have a right to challenge the sealing of particular documents that have been filed under seal, and the party asserting confidentiality will have the burden of demonstrating the propriety of filing under seal.

19. <u>Unauthorized Disclosure or Use</u>. If a party learns that it or its counsel, officers, directors, employees, consultants, experts or other agents have disclosed documents designated as Confidential Information or Highly Confidential Information in any circumstance not authorized under this Order, that party must within two (2) business days of learning of such disclosure (a) notify the designating party of the disclosure and all pertinent facts relating thereto, (b) make every reasonable effort to prevent disclosure by each unauthorized person who received such information, (c) use reasonable best efforts to retrieve all copies of the protected documents disclosed to unauthorized persons, (d) inform the person or persons to whom unauthorized disclosures were made of the terms of this Order, and (e) request that each such person execute the

19

certification contained in Attachment A. Nothing contained herein shall limit the right of the designating party to seek relief against the party responsible for such disclosure.

20. <u>Obligations on Conclusion of Litigation</u>.

(a) <u>Order Continues in Force</u>. Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

(b) <u>Obligations at Conclusion of Litigation</u>. Within sixty (60) days after dismissal or entry of final judgment not subject to further appeal, all Confidential Information and Highly Confidential Information marked either as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" under this Order, including copies as defined in Paragraph 4(b), shall be returned to the producing party or destroyed to the extent practicable unless it has been offered into evidence or filed without restriction as to disclosure. Within sixty-five (65) days after the final termination of this action, including any appeals, counsel for the receiving party shall certify in writing to the producing party that all such Confidential Information and Highly Confidential Information has been destroyed.

(c) <u>Retention of Work Product and Filed Documents</u>. Notwithstanding the above requirements to return or destroy documents, outside or in-house counsel for the parties may retain archival copies of all pleadings, motion papers, transcripts, drafts or final expert reports, legal memoranda, correspondence, and all attorney work product, even if such materials contain Confidential Information or Highly Confidential Information. Any retained Confidential Information or Highly Confidential Information shall continue to be protected under this Order and subject to the restrictions on third-party disclosures set forth in Paragraph 6. An attorney may use his or her work product in subsequent litigation,

20

provided that its use does not disclose Confidential Information or Highly Confidential Information. Nothing in this Order shall be construed to require the destruction or return of Confidential Information or Highly Confidential Information stored in counsels' archives, back-up media, or disaster recovery media.

(d)     Deletion of Documents Filed Under Seal from Electronic Case Filing (ECF) System.  Filings under seal shall be deleted from the ECF system only upon order of the Court.

21.     Order Subject to Modification.  This Order shall be subject to modification by the Court on its own initiative or on motion of a party or any other person with standing concerning the subject matter.

22.     No Prior Judicial Determination.  This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery.  Nothing herein shall be construed or presented as a judicial determination that any document or material designated Confidential Information or Highly Confidential Information by counsel or the parties is entitled to protection under FRCP 26(c) or otherwise until such time as the Court may rule on a specific document or issue.

23.     Persons Bound.  This Order shall take effect when entered and shall be binding upon all counsel of record and their law firms, the parties, and persons made subject to this Order by its terms.

24.     Future Parties.  The terms of this Order shall be binding upon all current and future parties to this litigation and their counsel; any party appearing in the litigation following entry of this Order shall be deemed to have joined the case subject to its provisions.

25.    <u>Computing Time</u>.  For deadlines and time periods that are stated in this Order as a number of "days," time shall be computed in accordance with FRCP 6(a)(1).  For deadlines and time periods that are stated in this Order as a number of "business days," time shall be computed in accordance with FRCP 6(a)(1) except that Saturdays, Sundays, and legal holidays shall not be counted.

SO ORDERED.

Dated: <u>11/16/2023</u>

Edmond E. Chang
U.S. District Court Judge

## ATTACHMENT A

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-02114 |
| *This document relates to:* | Judge Edmond E. Chang |
| ALL ACTIONS | Magistrate Judge David E. Weisman |

### ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

The undersigned hereby acknowledges that he/she/they has read the Confidentiality Order dated _____ in the above-captioned action and attached hereto, understands the terms thereof, and agrees to be bound by its terms. The undersigned submits to the jurisdiction of the United States District Court for the Northern District of Illinois in matters relating to the Confidentiality Order and understands that the terms of the Confidentiality Order obligate him/her/them to use materials designated as Confidential Information or Highly Confidential Information, in accordance with the Order solely for the purposes of the above-captioned action, and not to disclose any such Confidential Information or Highly Confidential Information to any other person, firm, or concern.

The undersigned acknowledges that violation of the Confidentiality Order may result in penalties for contempt of court.

**Name:** _____

**Job Title:** _____

**Employer:** _____

**Business Address:** _____

_____

_____

_____

Dated: _____          _____
                            Signature