# EXHIBIT 2

1
KOREIN TILLERY P.C.
Christopher Burke (CA 214799)
2
cburke@koreintillery.com
401 West A Street, Suite 1430
3
San Diego, CA 92101
Tel: (619) 625-5620
4

REINHARDT WENDORF & BLANCHFIELD
Garrett D. Blanchfield
g.blanchfield@rwblawfirm.com
80 South 8th Street, Suite 900,
Minneapolis, MN 55402
Telephone: 651-287-2100

5
*Attorneys for Direct Purchaser Plaintiffs*        *Attorneys for Indirect Purchaser Plaintiffs*

6

7

8
                    **UNITED STATES DISTRICT COURT**

9
                  **NORTHERN DISTRICT OF CALIFORNIA**

10
Direct Purchaser Plaintiffs and Indirect
Purchaser Plaintiffs,
11
                                        Misc. Case No. 24-80144

                          Petitioners,
12
                                        [Related case: *In re FICO Antitrust Litigation*,
                                        Case No. 1:20-CV-2114 (N.D. Ill. 2020)]
13
        v.
                                        **DECLARATION OF LABEAT RRAHMANI**
14
VantageScore Solutions, LLC,            **IN SUPPORT OF PLAINTIFFS' NOTICE**
                                        **OF MOTION AND MOTION TO COMPEL**
15
                          Respondent.   **VANTAGE SCORE SOLUTIONS LLC**

16

17

18

19

20

21

22

23

24

25

26

27

28

---

DECL. OF LABEAT RRAHMANI IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL VANTAGESCORE
Misc. Case No. 24-80144

## DECLARATION OF LABEAT RRAHMANI

I, Labeat Rrahmani, hereby declare as follows:

1.     I am an attorney at Korein Tillery LLC, counsel for Sky Federal Credit Union in the above-captioned matter.  I am a member in good standing of the Illinois State Bar and am admitted to practice before the United States District Courts for the Northern District of Illinois. I submit this declaration in support of Plaintiffs' Notice of Motion and Motion to Compel VantageScore Solutions, LLC's ("VantageScore") Compliance with Subpoena.

2.     I make this declaration on my own personal knowledge and, if called upon as a witness to do so, I could and would competently testify as to the matters set forth herein.

3.     Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs issued their Joint Subpoena to Produce Documents, Information, Or Objects or To Permit Inspection of Premises in a Civil Action ("Plaintiffs' Subpoena") to VantageScore on January 25, 2024.  Attached hereto as **Exhibit 1** is a true and correct copy of Plaintiffs' Subpoena.

4.     Attached hereto as **Exhibit 2** is a true and correct copy of the Complaint filed in *In re FICO Antitrust Litigation*, Case No. 1:20-CV-2114 (N.D. Ill. 2020) on April 2, 2020 by Sky Federal Credit Union.

5.     Attached hereto as **Exhibit 3** is a true and correct copy of the ECF No. 184, Direct Purchaser Plaintiffs' Consolidated Class Action First Amended Complaint filed on October 30, 2023.

6.     Attached hereto as **Exhibit 4** is a true and correct copy of ECF No. 185, Indirect Purchaser Plaintiffs' Second Amended Class Action Complaint filed on October 30, 2023.

7.     Attached hereto as **Exhibit 5** is a true and correct copy of VantageScore's February 19, 2024 Objections and Responses to Plaintiffs' Subpoena.

8.     I and other counsel for Plaintiffs met and conferred with counsel for VantageScore, Sabrina Rose-Smith, by videoconference for approximately an hour on each of February 26 and March 4, half an hour on March 8, and a quarter of an hour on each of April 26 and May 22, 2024. I and other counsel for Plaintiffs discussed Plaintiffs' Subpoena with Ms. Rose-Smith during each meeting in a good-faith attempt to resolve disputes.

DECL. OF LABEAT RRAHMANI IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL VANTAGESCORE
Misc. Case No. 24-80144

9.     During the February 26, 2024 meet and confer discussions, Ms. Rose-Smith represented that VantageScore, in connection with VantageScore's effort to persuade the Federal Housing Finance Agency to allow Fannie Mae and Freddie Mac to use VantageScore's product to assess credit risk for mortgages, submitted, among other things, information about the benefits of VantageScore products over FICO's.

10.     During the meet and confer discussions held on March 4, 2024, Ms. Rose-Smith represented that documents regarding market share and market analyses (responsive to, *e.g.*, Request Nos. 8 and 14) were not in VantageScore's possession because they were maintained by VantageScore's third-party consultants, Oliver Wyman and Charles River Associates.

11.     During the March 8, 2024 meet and confer, Ms. Rose-Smith advised that there are two agreements that may be responsive to Plaintiffs' Subpoena, an LLC agreement and an Intellectual Property agreement, created around the time the Credit Bureaus founded VantageScore.

12.     Attached hereto as **Exhibit 6** is a true and correct copy of a thread of email correspondence I exchanged with counsel for VantageScore between February 26, 2024 and March 20, 2024.

13.     Attached hereto as **Exhibit 7** is a true and correct copy of letter correspondence I sent to counsel for VantageScore on March 20, 2024.

14.     Attached hereto as **Exhibit 8** is a true and correct copy of a thread of email correspondence I exchanged with counsel for VantageScore between April 4, 2024 and June 11, 2024.

15.     Attached hereto as **Exhibit 9** is a true and correct copy of ECF No. 268, Non-Party VantageScore Solutions, LLC's Notice of Motion and Motion to Quash Subpoena, which concerned Fair Isaac's subpoena to VantageScore.

16.     Attached hereto as **Exhibit 10** is a true and correct copy of Plaintiffs' Subpoena to Third Party Oliver Wyman, LLC.

17.     Attached hereto as **Exhibit 11** is a true and correct copy of Plaintiffs' Subpoena to Third Party CRA International, Inc.

18.     Attached hereto as **Exhibit 12** is a true and correct copy of Oliver Wyman, LLC's letter of objections to Plaintiffs' subpoena dated April 24, 2024.

19.     Attached hereto as **Exhibit 13** is a true and correct copy of CRA International, Inc., D/B/A Charles River Associates' Objections and Responses to Plaintiffs' Subpoena Duces Tecum dated May 7, 2024.

20.     Attached hereto as **Exhibit 14** is a true and correct copy of email correspondence from counsel for Plaintiffs to Charles River Associates and counsel for VantageScore, Sabrina Rose-Smith.

21.     Attached hereto as **Exhibit 15** is a true and correct copy of letter correspondence from counsel for Plaintiffs to Charles River Associates, which was an attachment to Exhibit 15.

22.     Attached hereto as **Exhibit 16** is a true and correct copy of Fair Isaac's Subpoena to Produce Documents, Information, Or Objects or To Permit Inspection of Premises in A Civil Action to VantageScore dated December 21, 2023.

23.     Attached hereto as **Exhibit 17** is a true and correct copy of VantageScore's Notice of Motion and Motion to Quash Subpoena filed in *VantageScore Solutions, LLC v. Fair Isaac Corp.*, 4:24-mc-80033-DMR (N.D. Cal. 2024).

24.     Attached hereto as **Exhibit 18** is a true and correct copy of ECF No 271, Fair Isaac Corp.'s Combined Opposition to VantageScore Solutions, LLC's Motion to Quash Subpoena and Memorandum of Law in Support of its Cross-Motion to Compel dated March 13, 2024.

25.     Attached hereto as **Exhibit 19** is a true and correct copy of ECF No. 245, Plaintiffs' Joint Opposition to The Credit Bureaus' Motion to Dismiss dated January 16, 2024.

26.     Attached hereto as **Exhibit 20** is a true and correct copy of ECF No. 277, VantageScore Solutions, LLC's Combined Reply in Further Support of its Motion to Quash Subpoena and Memorandum of Law in Support of its Opposition to Fair Isaac Corp.'s Cross Motion to Compel dated April 10, 2024.

27.     During the meet and confer discussions held on April 26, 2024, Plaintiffs offered a compromise to VantageScore under which Plaintiffs would not move to compel on their

Subpoena if VantageScore agreed to sit for a deposition relatively promptly at a mutually agreeable date on mutually agreeable topics.

28. During the meet and confer discussions held on May 22, 2024, Ms. Rose-Smith stated that VantageScore had rejected Plaintiffs' proposal on the basis that FICO might cross-notice the deposition.

29. Attached hereto as **Exhibit 21** is a true and correct copy of correspondence from counsel for Plaintiffs to counsel for the Credit Bureaus dated May 31, 2024.

30. Attached hereto as **Exhibit 22** is a true and correct copy of ECF No. 199, the Agreed Confidentiality Order.

31. Attached hereto as **Exhibit 23** is a true and correct copy of a email thread counsel for Plaintiffs exchanged with Marsh McLennan Company regarding the Oliver Wyman subpoena between April 29, 2024 and June 4, 2024.

32. Attached hereto as **Exhibit 24** is a true and correct copy of a thread of email correspondence I exchanged with counsel for VantageScore between June 4, 2024 and June 10, 2024.

33. On May 28, 2024, I advised Ms. Rose-Smith by email that Plaintiffs understood the parties to be at impasse regarding Plaintiffs' subpoena and that Plaintiffs would be moving to compel. Plaintiffs proposed a briefing schedule and proposed stipulation transferring this case to the Northern District of Illinois, and all subsequent correspondence on that thread has concerned the briefing schedule and stipulation. *See* Exhibit 8.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11th day of June 2024.

*/s/ Labeat Rrahmani*
Labeat Rrahmani

DECL. OF LABEAT RRAHMANI IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL VANTAGESCORE
Misc. Case No. 24-80144

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE FICO ANTITRUST LITIGATION | No. 1:20-CV-02114 |
| This Document Relates to the Following Cases: | Judge Edmond E. Chang |
| ALL ACTIONS | Magistrate Judge David E. Weisman |

**NOTICE OF ISSUANCE OF SUBPOENA**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE, pursuant to Federal Rule of Civil Procedure 45, that the Direct Purchaser Plaintiffs and the Indirect Purchaser Plaintiffs will serve the attached Subpoena to Produce Documents on VantageScore Solutions, LLC.

Dated: January 25, 2024

Respectfully submitted,

*/s/ Randall P. Ewing, Jr.*
Randall P. Ewing, Jr.
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
rewing@koreintillery.com

*Counsel for Direct Purchaser Plaintiffs and the Proposed Direct Purchaser Class*

Steven F. Molo
Lauren F. Dayton
**MOLOLAMKEN LLP**
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Telephone: 312-450-6700
smolo@mololamken.com
ldayton@mololamken.com

Carmen Medici (*pro hac vice*)
Gary Foster (*pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-798-5319
cmedici@scott-scott.com
gfoster@scott-scott.com

1

Lauren M. Weinstein
Robert Y. Chen
**MOLOLAMKEN LLP**
600 New Hampshire Avenue, N.W.,
Suite 500
Washington, DC 20037
Telephone: 202-556-2000
lweinstein@mololamken.com
rchen@mololamken.com

*Liaison Counsel for Direct Purchaser
Plaintiffs and the Proposed Direct
Purchaser Class*

Christopher M. Burke
Walter Noss
Yifan (Kate) Lv
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: 619-6225-5620
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

George A. Zelcs
Chad E. Bell
Labeat Rrahmani
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
gzelcs@koreintillery.com
cbell@koreintillery.com
lrrahmani@koreintillery.com

Jennifer W. Sprengel
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone:312-782-4880
jsprengel@caffertyclobes.com

Joseph P. Guglielmo (N.D. Ill. 2759819)
Michelle E. Conston (*pro hac vice*)
Anna Hunanyan (*pro hac vice*)
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
jguglielmo@scott-scott.com
mconston@scott-scott.com
ahunanyan@scott-scott.com

Patrick McGahan (*pro hac vice*)
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct
Purchaser Plaintiffs and the Proposed Direct
Purchaser Class*

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
**SPERLING & SLATER, P.C.**
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Linda P. Nussbaum
Susan Schwaiger
**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas, 31st Floor
New York, NY 10036
Telephone: 917-438-9102

Barbara J. Hart (*pro hac vice*)
**GRANT & EISENHOFER**
485 Lexington Ave., 29th Floor
New York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

Brian M. Hogan
**DICELLO LEVITT LLP**
Ten North Dearborn Street Sixth Floor
Chicago, IL 60602
Telephone: 312-214-7900
bhogan@dicellolevitt.com

Gregory S. Asciolla (*pro hac vice*)
Karin E. Garvey (*pro hac vice*)
John M. Shaw (*pro hac vice*)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY 10017
Telephone: 646-933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
jshaw@dicellolevitt.com

Gary F. Lynch
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
glynch@carlsonlynch.com

Katrina Carroll
**LYNCH CARPENTER LLP**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
katrina@lcllp.com

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1908

lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Michael L. Roberts
Karen Sharp Halbert
**ROBERTS LAW FIRM, P.A.**
20 Rahling Circle
Little Rock, AR 72223
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Charles F. Barrett (*pro hac vice*)
**NEAL & HARWELL, PLC**
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: 615-244-1713
cbarrett@nealharwell.com

Don Barrett (*pro hac vice* forthcoming)
**BARRETT LAW GROUP, P.A.**
404 Court Square
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
dbarrett@barrettlawgroup.com

Richard R. Barrett (*pro hac vice* forthcoming)
**BARRETT LAW GROUP, P.A.**
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: 662-380-5018
rrb@rrblawfirm.net

Daniel E. Gustafson (*pro hac vice*)
Michelle J. Looby (*pro hac vice*)
Daniel J. Nordin (*pro hac vice*)
Anthony J. Stauber
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
dnordin@gustafsongluek.com

mlehmann@hausfeld.com
clebsock@hausfeld.com

Hilary K. Scherrer
Paul Gallagher
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington, DC 20006
Telephone: 202-540-7200
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Scott A. Martin
Irving Scher
Jeanette Bayoumi
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: 646-357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

tstauber@gustafsongluek.com

Dennis Stewart (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
600 B Street, 17th Floor
San Diego, CA 92101
Telephone: 619-595-3200
dstewart@gustafsongluek.com

Kenneth A. Wexler
Melinda J. Morales
Michelle Perkovic
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

*Counsel for Direct Purchaser Plaintiffs*
*and the Proposed Direct Purchaser Class*

Garrett D. Blanchfield (*pro hac vice*)
Brant D. Penney (*pro hac vice*)
Roberta A. Yard (*pro hac vice* forthcoming)
**REINHARDT WENDORF &**
**BLANCHFIELD**
222 South 9th Street, Suite 1600
Minneapolis, MN 55101
Telephone: 651-287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

*Interim Co-Lead Counsel for Indirect*
*Purchaser Plaintiffs and the Proposed Indirect*
*Purchaser Class*

Charles R. Watkins (3122790)
**GUIN, STOKES & EVANS, LLC**
321 South Plymouth Court, Suite 1250
Chicago, IL 60604
Telephone: 312-878-8391
charlesw@gseattorneys.com

Jeffrey J. Corrigan (*pro hac vice*)
William G. Caldes (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
Icee N. Etheridge (*pro hac vice*)
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: 215-496-0300
JCorriganf@srkattorneys.com
BCaldes@srkattorneys.com
JSpector@srkattorneys.com
IEtheridge@srkattorneys.com

Michael S. Smith (*pro hac vice*)
Gregory P. Hansel (*pro hac vice*)
Randall B. Weill (*pro hac vice*)
Elizabeth F. Quinby (*pro hac vice*)
**PRETI FLAHERTY, BELIVEAU &**
**PACHIOS LLP**
One City Center,

*Liaison Counsel for Indirect Purchaser
Plaintiffs and the Proposed Indirect
Purchaser Class*

Brian P. Murray (*pro hac vice* forthcoming)
Lee Albert (*pro hac vice* forthcoming)
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 358
New York, NY  10169
Telephone: 212-682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com

Simon B. Paris (*pro hac vice* forthcoming)
Patrick Howard (*pro hac vice* forthcoming)
**SALTZ MONGELUZZI &
BENDESKY, P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: 215-575-3985
sparis@smbb.com
phoward@smbb.com

Jonathan M. Jagher (*pro hac vice* forthcoming)
**FREED KANNER LONDON &
MILLEN LLC**
923 Fayette Street
Conshohocken, PA  19428
Telephone: 610-234-6487
jjagher@fklmlaw.com

Michael J. Boni (*pro hac vice* forthcoming)
Joshua D. Snyder (*pro hac vice* forthcoming)
John E. Sindoni (*pro hac vice* forthcoming)
**BONI, ZACK & SNYDER LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: 610-822-0200
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

P.O. Box 9546
Portland, ME 04101
Telephone: 207-791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com

David McLafferty (*pro hac vice* forthcoming)
**MCLAFFERTY LAW FIRM, P.C.**
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-940-4000, ext. 12
www.McLaffertyLaw.com

Douglas A. Millen
**FREED KANNER LONDON &
MILLEN LLC**
100 Tri-State International Drive, Suite 128
Lincolnshire, IL 60069
Telephone: 224-632-4500
dmillen@fklmlaw.com

*Counsel for Indirect Purchaser Plaintiffs
and the Proposed Indirect Purchaser Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Randall P. Ewing, Jr., hereby certify that on January 25, 2024, I caused the foregoing

Notice of Issuance of Subpoena to be served via email on counsel of record for Defendants Fair

Isaac Corporation, Equifax, Inc., TransUnion, LLC, and Experian Information Solutions, Inc.

*/s/ Randall P. Ewing, Jr.*
Randall P. Ewing, Jr.,

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Illinois

| | | |
|---|---|---|
| IN RE FICO ANTITRUST LITIGATION | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 1:20-CV-02114 |
| | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
VantageScore Solutions, LLC
c/o CSC - Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833-3505

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

Described in the attached Schedule A

| Place: Hausfeld LLP<br>600 Montgomery Street, Suite 3200<br>San Francisco, CA 94111 | Date and Time:<br><br>03/08/2024 9:00 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 01/25/2024

*CLERK OF COURT*

OR

_____          s/ Randall P. Ewing, Jr.
*Signature of Clerk or Deputy Clerk*                   *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs , who issues or requests this subpoena, are:

Randall P. Ewing, Jr., Korein Tillery LLC, 205 N. Michigan Ave., Ste 1950, Chicago, IL 60601, rewing@koreintillery.com, 312-899-9012

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  1:20-CV-02114

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

       I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

       ❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

       ❒  I returned the subpoena unexecuted because: _____

_____ .

       Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

       $ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

       I declare under penalty of perjury that this information is true.

Date: _____

                                         _____
                                            *Server's signature*

                                         _____
                                            *Printed name and title*

                                         _____
                                            *Server's address*

Additional information regarding attempted service, etc.:

## SCHEDULE A

Pursuant to the foregoing subpoena *duces tecum*, You are required to produce, by the date stated on the subpoena, the documents requested herein.

## DEFINITIONS

The definitions, instructions, words, and phrases used in Schedule A shall have the meanings ascribed to them under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Northern District of Illinois. The definitions referenced herein apply without regard to capitalization. In addition, the following terms shall have the meanings set forth below whenever used in any Request.

1. The "Action" means *In re FICO Antitrust Litig.*, Case No. 1:20-cv-02114 (N.D. Ill.).

2. "All," "any," and "each" shall be construed as encompassing "any and all."

3. "Agreement" means any oral, written, or implied contract, arrangement, understanding, or plan, or term thereof, whether formal or informal, between two or more persons, together with all modifications or amendments.

4. "B2B Credit Score" means credit scores sold by Fair Isaac, Experian, Equifax, TransUnion, or any other consumer reporting company, to any business for the assessment of credit risk. For the purposes of this definition only, "business" includes all entities other than individual consumers. "B2B Credit Score" includes both FICO Scores and VantageScores.

5. "B2B Credit Score Market" means the market for B2B Credit Scores.

6. "B2B Purchaser" means any purchaser of B2B Credit Scores.

7. "Competitor Credit Score Product" means any non-VantageScore credit score.

8. "Credit Bureau" refers to Experian, Equifax, and/or TransUnion.

9. "Complaints" means the DP Complaint and the IP Complaint, collectively.

1

10. "Document" is defined to be synonymous with the broadest possible meaning of the term as used in Fed. R. Civ. P. 45 and includes, without limitation, electronically or physically stored information and communications, as well as any writings, diagrams, or recordings. A draft or non-identical copy is a separate document within the meaning of this term.

11. "DP Complaint" means the Direct Purchaser Plaintiffs' First Amended Consolidated Class Action Complaint, ECF No. 184, filed in this Action.

12. "Electronically stored information" or "ESI" is defined to be synonymous with the broadest possible meaning of the term "electronically stored information," as used in Fed. R. Civ. P. 45.

13. "Fair Isaac" means Fair Isaac Corporation and its predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, or other persons acting or authorized to act on its behalf.

14. "Including" means "including without limitation" and "including but not limited to" and should not be construed as limiting the request in any way.

15. "IPP Complaint" means the Indirect Purchaser Plaintiffs' Second Amended Class Action Complaint, ECF No. 185, filed in this Action.

16. "Litigations" means the "VantageScore Solutions Litigation" or "TransUnion Litigation."

17. "Relating to" means concerning, connecting to, referring to, describing, evidencing, constituting, or bearing any kind of relationship with.

18.     "TransUnion Litigation" refers to the lawsuit filed by Fair Isaac against TransUnion and the counterclaims filed by TransUnion against Fair Isaac, Case No. 1:17-cv-08318 (N.D. Ill.).

19.     "VantageScore" means the credit score product created and sold by VantageScore Solutions, including all past and present versions of the product (*e.g.*, VantageScore 3.0 and VantageScore 4.0).

20.     "VantageScore Solutions" means VantageScore Solutions, LLC.

21.     "VantageScore Solutions Litigation" refers to the lawsuit filed by Fair Isaac against Experian, Equifax, and TransUnion and relating to VantageScore Solutions, Case No. 06-cv-4112 (D. Minn.).

22.     "You" or "Yours," "Equifax," "Experian," or "TransUnion" means, respectively, VantageScore Solutions, Equifax Inc., Experian Information Solutions, Inc., or TransUnion, LLC and their predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, other persons acting or authorized to act on its behalf, or joint ventures.

## **INSTRUCTIONS**

1.     All responsive Documents are to be produced in accordance with the Stipulation and Order Establishing the Protocol for Production of Documents and Electronically Stored Information, ECF No. 207, entered in this Action and attached hereto as **Exhibit A**.

2.     All responsive Documents are to be produced in accordance with the Confidentiality Order, ECF No. 199, entered in this Action and attached hereto as **Exhibit B**. Please indicate whether any documents produced in response to this subpoena should be designated as Confidential or Highly Confidential pursuant to the Confidentiality Order.

3.      The singular form of any word includes the plural and vice versa.

4.      Plaintiffs seek production of the Documents set forth in the numbered requests below that are in Your possession, custody, and control — control being construed as including in the possession of Your directors, officers, employees, representatives, subsidiaries, investigators, attorneys, managing agents, accountants, or other agents, and any entity which You have the legal right or practical ability to obtain Documents without service of legal process.

5.      The terms defined above and in the individual requests for production and inspection are to be construed broadly to the fullest extent of their meaning in a good faith effort to comply with the Federal Rules of Civil Procedure.  If, in responding to any of the requests below, You encounter any ambiguity in construing either the Request or a definition or instruction relevant to it, You shall set forth the matter deemed ambiguous and the construction used in responding to the Request.

6.      If You contend that the information sought is not in Your control, indicate the company and individuals who have such control.

7.      If any document is withheld, in whole or in part, for any reason, including any claim of privilege of any kind, work-product protection, trade secret, or confidentiality, You shall provide with respect to each such Document all information required to be furnished by Fed. R. Civ. P. 45(e)(2) or by any other Court Order in this case.

8.      Unless otherwise specified, the relevant time period is January 1, 2013 until the present.

## DOCUMENTS REQUIRED TO BE PRODUCED

### A.  Previous Investigations and Litigation

1.      All Documents produced or provided to the United States Department of Justice, or any other U.S. or foreign government agency, regulator, or department, concerning government investigations or contemplated investigations relating to B2B Credit Scores or the B2B Credit Score Market.

2.      All submissions, presentations, or other communications with legislators and legislative staff, including members and staff of legislative committees; government agencies and staff; executive branch officials and staff; and government-sponsored enterprises and their representatives regarding VantageScores.

3.      All Documents produced, provided, or served in connection with the Litigations, whether produced by you, another party (other than FICO), or a third party.

### B.  Agreements

4.      All Agreements between or among, You, Equifax, Experian, TransUnion, or any other consumer reporting company, relating to the marketing, sale, or distribution (or restrictions on the marketing, sale, or distribution) of B2B Credit Scores, including communications between or among You, Experian, Equifax, TransUnion, or any other entity distributing B2B Credit Scores relating to limitations, conditions, or any other restriction on the distribution of B2B Credit Scores, and any Documents relating to the negotiation of any such Agreement(s).

5.      All Documents, including communications, whether internal or with others, relating to the design of VantageScore 3.0, VantageScore 4.0, or any subsequent VantageScore product to avoid using an odds-to-score relationship aligned to the odds-to-score relationship of any Fair Isaac Analytic, or to avoid using adverse action code numeric values or descriptions that

match the adverse action code numeric values coupled with adverse action code reason descriptions of any Fair Isaac Analytic.

6.      All Documents, including communications, with TransUnion, Experian, and Equifax relating to their ability to distribute VantageScores, or any restrictions on their ability to distribute VantageScores, in light of their agreements with Fair Isaac, including, but not limited to licensing agreements.

###       C.      Competition

7.      All non-privileged Documents relating to competition or potential competition between FICO Scores and VantageScores, including but not limited to strategies or contemplated strategies for addressing competition or potential competition, or to gain market share.

8.      All non-privileged Documents relating to analysis of competition or potential competition from suppliers of Competitor Credit Score Products, including but not limited to strategies or contemplated strategies for addressing competition or potential competition.

9.      All non-privileged Documents relating to any projections, reports, forecasts, evaluations (or financial, commercial, regulatory, or legal analyses) performed by You and/or by any other third party relating to competition in the B2B Credit Score Market.

###       D.      The Relevant Market

10.      All Documents concerning the past, present, or anticipated future competition among FICO Scores, VantageScores, or any other Competitor Credit Score Product, including but not limited to switching among such products, the functional or economic substitutability of such products, the relative features, costs, or benefits of such products, factors affecting purchase decisions, competitive intelligence, price competition, and the cross-price elasticity of demand (*i.e*., the responsiveness of demand to changes in price) among such products.

11.     Documents sufficient to show Your past, current, and anticipated future B2B Credit Score market share or position, and the past, current, and anticipated future market share or position of any other entity distributing or selling B2B Credit Scores.

12.     Documents sufficient to show past, current, and anticipated future demand for B2B Credit Scores, including but not limited to Documents describing the factors that affect the demand for B2B Credit Scores.

**E.     Sales, Marketing, and Promotion**

13.     Documents and data, data compilations, data sets, and other forms of structured data used, generated, collected, held, tracked, or accessed by You relating to fees, royalties, and other prices charged or collected by You or Credit Bureaus to purchasers of B2B Credit Scores, including but not limited to the Plaintiffs and members of the proposed classes.

14.     Data, data compilations, data sets, data tables, and other forms of structured data used, generated, collected, held, tracked, or accessed by You in the ordinary course of business of the sale, supply, or distribution (or restriction on the sale, supply, or distribution) of B2B Credit Scores), including but not limited to transaction-level electronically stored sales information and data.   The relevant time period for this request is from January 1, 2013 until the present. Information requested includes, but is not limited to:

    a.     identifying product information;

    b.     any unique credit score request or transaction identifier;

    c.     date of transaction;

    d.     date invoice sent;

    e.     date payment was received;

    f.     customer identification information (*e.g.*, name, address, and customer number) for the bill-to customer, requesting customer, and any other

customer entity, including the downstream customer, named person, or entity on whose behalf the score was requested;

g.     customer type;

h.     total price and price per unit, including separately specifying any applicable discounts, rebates, chargebacks, or forgiven balances;

i.     total price and price per unit charged by any intermediary to the transaction;

j.     total quantity sold, specifying any applicable units that measure quantity;

k.     type of underlying transaction or loan, contemplated or actual, relating to the sale of the FICO Score or VantageScore;

l.     gross and net sales dollars, separately by revenue source;

m.     cost of sales, separately by revenue source;

n.     cost of goods sold, including sales and distribution cost and any fixed or variable costs, separately by type;

o.     licensing fees, royalties (including any royalties paid to Fair Isaac for a given transaction), and/or profit shares paid and received;

p.     gross profit;

q.     net profit;

r.     profit margin;

s.     operating income;

t.     net income;

u.     unit volume sold;

v.     unit volume sold net of returns;

w.     operating income;

x.     net income; and

y.     if the transaction is subject to a contract:

    i.     effective date of contract; and,

          ii.        contract type and other information outlining the general terms of the contractual arrangement between the B2B customer and the Credit Bureau.

15.      The relevant time period for this request is from January 1, 2013 until the present.

All Documents relating to Your projected and actual B2B Credit Scores:

        a.      sales;

        b.      gross sales revenue;

        c.      net sales revenue;

        d.      cost of goods sold;

        e.      sales and distribution cost;

        f.      marketing, advertising, promotional, and sales expenses;

        g.      other fixed or variable costs;

        h.      research and development expenditures;

        i.      licensing fees, royalties, and/or profits shares paid to and/or received from Fair Isaac or any other entity;

        j.      pricing, rebates, discounts, and chargebacks;

        k.      gross profit;

        l.      net profit;

        m.      profit margin;

        n.      unit volume sold;

        o.      unit volume sold by state;

        p.      unit volume sold net of returns;

        q.      cost and price analyses;

        r.      cost and price analyses by state; and

        s.      all specific costs You include in a fixed cost.

16.     Documents sufficient to show how the prices for B2B Credit Scores are or have been set during the Relevant Period, including any adjustments such as rebates or discounts or the price of other products.

**F.     The Credit Bureaus**

17.     Documents sufficient to show the rights Credit Bureaus have to receive revenue or other benefits from VantageScore Solutions.

18.     Documents sufficient to show the rights Credit Bureaus have to receive data and documents from VantageScore Solutions.

19.     Documents sufficient to show the rights Credit Bureaus have to control or influence the management of VantageScore Solutions.

20.     Documents sufficient to show the contributions of money, goods, or services by the Credit Bureaus to VantageScore Solutions.

**G.     Other**

21.     Organizational charts, personnel directories, telephone directories, and e-mail user and address lists for You as a whole and for each division, subsidiary, or affiliate of Yours that had, has, or will have any involvement in the sale of B2B Credit Scores.

22.     All non-privileged Documents relating to communications between You and Fair Isaac or the Credit Bureaus about this Action.

23.     Documents sufficient to identify and describe Your document destruction, preservation, retention, and archiving policies and practices and any changes in such polices, including Documents sufficient to identify and describe Your management of ESI, including the preservation of text messages and instant messaging or chat communications, intranet sites, and enterprise applications used in the ordinary course of business.

24.    All Documents relating to the named Plaintiffs in this Action.

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-02114 |
| *This document relates to:* | Judge Edmond E. Chang |
| ALL ACTIONS | Magistrate Judge David E. Weisman |

**STIPULATION AND ORDER ESTABLISHING THE**
**PROTOCOL FOR THE PRODUCTION OF DOCUMENTS AND**
**ELECTRONICALLY STORED INFORMATION ("ESI")**

Pursuant to the agreement reached between Plaintiffs and Defendants herein, this Court adopts and orders the following Protocol relating to the Production of Documents and Electronically Stored Information, which binds all parties and their counsel of record in the above-captioned case (the "Action"), whether they currently are involved or become so in the future (collectively, the "Parties"). The failure of this Protocol to address any particular issue is without prejudice to any position that a Party may take on that issue.

The parties are aware of the importance the Court places on cooperation and commit to cooperate in good faith regarding discovery issues pertaining to ESI, consistent with the Seventh Circuit Electronic Discovery Pilot Program Principle 1.02.

**I.      DEFINITIONS**

a.      "Action" means the above-captioned matter, and any and all cases consolidated or coordinated with it.

b.      "Document" shall have the same meaning as set forth in Federal Rule of Civil Procedure ("FRCP") 34(a)(l)(A) and when used herein, refers to both ESI and hard copy documents.

c.      "Electronically Stored Information" ("ESI") shall have the same meaning as set forth in FRCP 34(a)(l)(A) and refers to computer-generated information or data of any kind (including, but not limited to, Email, Structured and Unstructured Data, and data compilations), stored in or on any medium from which information can be obtained, such as computers, cellular telephones, file servers, disks, tape or other real or virtualized devices or media.

d.      "Email" means an electronic means for sending, receiving, and managing communications via different structured data applications (Email client software), including, but not limited to, Microsoft Outlook, Google Gmail, Yahoo Mail, or Lotus Notes, and the file(s) created or received by such means.

e.      "Instant Messages" means communications involving immediate correspondence between two or more users sent via chat application that are maintained in the ordinary course of business.

f.      "Extracted Text" means the text extracted from a native document, and includes all header, footer, and document body information, including any hidden content, when available.  A "Text File" is a file containing the full multi-page text of native or near-native files extracted directly from the native file, or, in the case of documents subject to OCR, a file containing the text resulting from the OCR.

g.      "Load File" means an electronic file containing information identifying a set of paper-scanned images or processed ESI and indicating where individual pages or files belong together as documents, including attachments, and where each document begins and ends.  A Load File will also contain data relevant to the individual Documents, including extracted and user-created Metadata, as well as identification of OCR or Extracted Text, should such data be available.

h.     "Media" means an object or device, including but not limited to a disc, tape, computer, or other device on which data is or was stored.

i.     "Metadata" means (i) information associated with or about a file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file, and which describes the characteristics, origins, or usage or validity of the electronic file; and (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, saved, or otherwise manipulated by a user of such system.

j.     "Native Format" means and refers to the file structure of a document created by the original creating application (in contrast to a Static Image).

k.     "OCR" means optical character recognition technology that is capable of reading text-based or paper/hard copy documents and making such documents searchable using appropriate software.

l.     "Parties" collectively shall mean all named parties to the above-captioned Action, including any Party added or joined to any complaint filed in the above-captioned Action, as well as named parties to actions that may be consolidated into or coordinated with the above-captioned Action.

m.     "Predictive Coding/Technology Assisted Review" shall mean processes for prioritizing or coding a collection of documents using computerized systems, such as machine-learning algorithms, that may rely on the judgments of one or more attorneys experienced in the subject matter of a litigation regarding the responsiveness of a subset of documents and that extrapolates those judgments to the remaining document collection.  For purposes of this Protocol, Predictive Coding/Technology Assisted Review is synonymous with computer-assisted review,

computer-aided review, content-based advanced analytics, or other terms used to refer to search methodologies that rely on machine-based learning to identify responsive documents.

n.       "Production" includes any exchange of Documents or ESI between the Parties, whether voluntarily or in response to a formal or informal request.

o.       "Search Term" means a combination of words (including synonyms) and phrases designed to capture potentially relevant ESI and includes strings of words and phrases joined by proximity and Boolean connectors.

p.       "Static Image" means or refers to a representation of ESI produced by converting a native file into a standard image format capable of being viewed and printed on standard computer systems.  A Tagged Image File Format ("TIFF") image is an example of a Static Image.

q.       "Structured Data" means ESI stored in a structured format, such as databases or data sets according to specific form and content rules as defined by each field of the database.

r.       "Unstructured Data" refers to free-form data that either does not have a data structure or has a data structure not easily readable by a computer without the use of a specific program designed to interpret the data, such as word processing documents, slide presentations, Email, and image files.

## II.    SCOPE

a.       **General**.  Pursuant to FRCP 5(b)(2)(E), the Parties agree to serve written discovery electronically.  The procedures and protocols outlined herein govern the Production of Documents and ESI by all Parties.  The Parties will take reasonable steps to comply with this agreed-upon Protocol.  Nothing in this Protocol is intended to be an exhaustive list of discovery obligations or rights of a Party requested to produce Documents or ESI ("Producing Party") or a Party requesting Documents or ESI ("Requesting Party").

The production specifications in this Protocol apply to Documents and ESI that are produced in the first instance in this Action. To the extent any Party is required to or agrees to produce Documents or ESI in this Action that originally were collected or produced in other cases or government investigations, such Documents or ESI may be produced in the same format in which they originally were produced in the other cases or to the government.

The Parties agree that nothing in this Protocol is intended to revise or alter the local rules, applicable state or federal statutes, the FRCP, Advisory Committee Notes, or other authorities with regard to the preservation and production of ESI, including but not limited to FRCP 26(b)(1) concerning the Scope in General of Discovery; FRCP 26(b)(2)(B) concerning the Specific Limitations on ESI; FRCP 26(c)(1) concerning Protective Orders; or FRCP 34 concerning Production of ESI.

b.     **Limitations and Non-Waiver**.  The Parties and their attorneys intend by this Protocol to make the mutual disclosures promised herein.  The Parties and their attorneys do not intend by this Protocol to waive their rights to any protection or privilege, including the attorney-client privilege and the work-product doctrine.  All Parties preserve their attorney-client privileges, work-product protection, and other privileges.  The Parties and their attorneys are not waiving, and specifically reserve, the right to object to any discovery request on any grounds.  Further, nothing in this Protocol shall be construed to affect the admissibility of Documents and ESI.  All objections to the discoverability or admissibility of any Documents and ESI are preserved and may be asserted at any time.

c.     **Reservation of Rights**.  For the avoidance of doubt, the inclusion of any platform, program, application, or software in this Protocol as an example does not create any independent obligation or commitment to preserve or collect ESI from such platform, program, application, or

software.  The Parties reserve all rights to object to any demand to collect or produce ESI from any or all of the examples listed in Section I, subject to the provisions of Section V.

    d.    **Modification by Agreement**.  Any practice or procedure set forth herein may be varied by agreement of affected Parties, which will be confirmed in writing, where such variance is deemed appropriate to facilitate the timely and economical exchange of Documents and ESI. Any Party added or joined to any complaint in this Action and any Party to actions that may be consolidated into or coordinated with the above-captioned matter after the date of this Protocol that seeks to deviate from this Protocol must obtain leave of Court to do so unless all affected Parties otherwise consent in writing.  Before seeking Court intervention, all affected Parties shall meet and confer in good faith regarding any modification.

    e.    **Modification by Court Order**.  Nothing in this Protocol waives the right of any Party to petition the Court for an Order modifying its terms upon good cause shown, provided, however, that counsel for such Party must first meet and confer with the counsel for the opposing Party and the Parties shall use reasonable best efforts to negotiate an exception from or modification to this Protocol prior to seeking relief from the Court.

## III.    PRESERVATION

The Parties agree to take reasonable steps to preserve relevant Documents and ESI, in accordance with their obligations under applicable law.  By preserving or producing information for the purpose of this Action, the Parties are not conceding that such material is discoverable.  The Parties will meet and confer regarding the scope of preservation, including custodians, data sources, date ranges, and categories of information that have been or should be preserved in connection with this Action.

## IV. PRODUCTION OF STRUCTURED DATA

Where a discovery request requires production of Structured Data, in lieu of producing structured data systems or applications, the Parties shall meet and confer on the content and format of a data sample from such structured data source. The Parties shall discuss and attempt to agree upon the sets of data or fields to be included in the sample and the format in which sample data extracted shall be produced, and the Producing Party shall make all necessary disclosures for the Requesting Party to understand and evaluate whether the content and format of the data sample would satisfy a production request, such as the data fields available, the meaning of data fields, as well as codes and abbreviations used in the data source and whether a data dictionary exists, the time period over which data exists, any database schema, or other relevant information. The Producing Party shall generate a report of such data sample for review by the Requesting Party or counsel after meeting and conferring with the Requesting Party as to the fields to be produced and the format of production. Nothing in this provision is meant to expand the producing party's obligations under FRCP 34. The Parties reserve all rights to object, including but not limited to objections for relevance, undue burden, and/or inaccessibility.

## V. IDENTIFICATION OF RESPONSIVE ESI

The Parties shall meet and confer in good faith regarding the methods to be used and locations identified to search Documents and ESI for potentially responsive documents or filter out Documents and ESI that are not subject to discovery, and such meet and confers will include disclosures necessary for the Requesting Party to understand and assess the sufficiency of the proposed search or filtering methodology, such as the nature of and processes of the search technology employed, the custodians and data sources and types to which it will and will not be applied, date ranges that may be used to filter documents, file types subject to or excluded from the methodology, search terms proposed to be used (if any), statistical sampling or validation

techniques the Producing Party has used or intends to use to evaluate the sufficiency of the methodology, and whether different search methodologies will be applied to different types or sources of data.

The Producing Party shall retain the sole right and responsibility to manage and control searches of its data files, including the right to propose revisions to search-term methods or advanced-technology procedures in order to make them more accurate and/or cost-effective and will disclose those proposed search methods and any revisions prior to implementation. Nothing in this section shall limit a Party's right to reasonably seek agreement from the other Parties or a Court ruling to modify previously agreed-upon search terms or other search parameters at any time prior to the completion of discovery.

A Producing Party need not provide discovery of ESI from sources that the Producing Party identifies as not reasonably accessible because of undue burden or cost. The Parties will identify and meet and confer over those sources of information that they propose should not be preserved, such as the following:

     1.     Backup data that is substantially duplicative of data that is more accessible elsewhere (utilized for disaster recovery purposes);

     2.     Random access memory (RAM), temporary files, or other ephemeral data that is difficult to preserve without disabling the operating system;

     3.     Obsolete legacy data (*i.e.*, information stored in an obsolete format);

     4.     Residual, fragmented, damaged, or other data only accessible by forensics;

     5.     Information stored in unallocated space in file systems on magnetic media;

     6.     On-line access data such as temporary internet files, history, cache, cookies, and the like;

7. Server, system, or network logs; and

8. Information created or copied during the routine, good-faith performance of processes for the deployment, maintenance, retirement, and disposition of computer equipment by the Party.

If any Producing Party identifies additional sources of not reasonably accessible ESI beyond those listed above that are believed to contain responsive information, it will notify the Requesting Party of that fact and those sources. Nothing in this paragraph shall relieve a Party of its obligation to produce otherwise readily accessible, responsive ESI that the Party knows to exist.

a. Search Terms:

Where the Parties agree that potentially responsive ESI shall be searched through the use of search terms, the Parties shall meet and confer to provide reasonable assurances to the Requesting Party that the Producing Party's search terms and methodology used to apply them are reasonably calculated to identify responsive Documents and ESI. Prior to or during such meet and confer, the Producing Party shall make the disclosures identified above.

If, after disclosure of the Producing Party's proposed search method, search parameters, and search terms, and prior to the conduct of any searches, and after a reasonable meet and confer process, a Requesting Party believes in good faith that the Producing Party's proposals regarding search, retrieval and production would result in deficiencies in production, the Requesting Party may make prompt requests for different or additional search methods, parameters, or search terms, but such requests shall only be made after the Parties have met and conferred as to the alleged deficiencies identified by the Requesting Party. If the Parties cannot resolve their disagreements regarding the above search term methodologies, they shall promptly bring the dispute to the Court for resolution.

       b.      Technology-Assisted-Review:

No Party shall use predictive coding/technology-assisted review for the purpose of culling the documents to be reviewed or produced without notifying the opposing Party prior to use and with ample time to meet and confer in good faith regarding a mutually agreeable protocol for the use of such technologies, if any. If the Parties cannot resolve their disagreements regarding technology-assisted review methodologies, they shall promptly bring the dispute to the Court for resolution. The fact that a Document or ESI is responsive to a search term or identified as responsive by any other technology used to identify potentially responsive Documents and ESI shall not prevent any Party from withholding such file from production on the grounds that the file is not responsive, that it is protected from disclosure by applicable privilege or work-product protection.

The Parties will not seek Court intervention on discovery matters without first attempting to resolve any disagreements in good faith, based upon all reasonably available information.

## VI.    PRODUCTION OF DOCUMENTS ORIGINATING AS PAPER

The following production specifications apply to Documents that existed in paper format prior to production ("hard copy documents"). Documents that originated as paper but that were scanned and maintained electronically by a Party prior to inception of this Action shall be produced in accordance with Part VII of this Protocol. The Parties agree to produce hard copy documents in the formats described below, to the extent reasonably practicable and not unduly burdensome. These formats are deemed to be productions in reasonably usable form. If a Producing Party intends to produce any hard copy documents in any manner other than as specified herein, the Producing Party shall notify the Requesting Party of its intent, including production format (*e.g.*, produced as paper, made available for inspection). If the proposed production format is not

acceptable to the Requesting Party, the Parties shall meet and confer to determine a mutually acceptable production format for such Documents.

     a.    **TIFFs**.  Documents should be produced as single-page, black and white, group IV TIFFs imaged at 300 dpi.  Bates numbers, confidentiality designations (in accordance with the protective order governing the case), and redactions (to the extent they are necessary) should be burned into the image.  TIFF image files should be provided in an "Images" folder.

     b.    **Unitizing Documents**.  If a document is more than one page, the unitization of the document will be maintained as it existed when collected by the Producing Party to the extent practicable.  Parties may unitize their documents using either physical unitization (*i.e.*, based on physical binding or organizational elements present with the original paper documents, like staples, clips, and binder inserts) or logical unitization (*i.e.*, a manual review of the paper to determine what logically constitutes a document, like page numbers or headers).

     c.    **Parent-Child Relationships.**  The Parties agree that if any part of a Document or its attachments is responsive, the entire Document and attachments will be produced, except any portions of the Document or attachments that must be withheld or redacted on the basis of privilege or work-product protection.  The Parties shall take reasonable steps to ensure that parent-child relationships within a document family (the association between an attachment and its parent document) are preserved.  The child-document(s) should be consecutively produced immediately after the parent-document.  Each document shall be produced with the production number for the first and last page of that document in the "BegBates" and "EndBates" fields of the data load file and with the "BegAttach" and "EndAttach" fields listing the production number for the first and last page in the document family.

d. **OCR**. Documents shall also be produced with the associated OCR, and with an image cross-reference file and a load file. No Producing Party shall be required to ensure that the OCR is an exact duplicate of the contents of the TIFF image. The OCR software shall maximize text quality. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process. To the extent that a document is redacted, the text files should not contain the text of the redacted portions. OCR should be delivered in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document. All text files shall be provided as a single document level text file for each item, not one text file per page. Text files should be provided in a "Text" folder.

e. **Unique IDs**. Each TIFF image should have a unique filename, which corresponds to the Bates number of that page. The filename should not contain any blank spaces and should be zero-padded (*e.g.*, ABC-000001), taking into consideration the estimated number of pages to be produced. If a Bates number or set of Bates numbers is skipped in a production, the Producing Party, to the extent it is aware of the issue, will so note in a cover letter or production log accompanying the production. Bates numbers will be unique across the entire production and prefixes will be consistent across all documents a Party produces in the Action.

f. **Data Load Files**. Documents should be provided with an Opticon Cross-Reference File and Concordance data load file using standard Concordance delimiters:

1. Field Separator: ASCII character 20 ("¶"); and

2. Quote: ASCII character 254 ("þ").

Concordance-compatible image and data load files should be provided in a "Data" folder. The following information shall be produced in the load file accompanying production of hard copy documents: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Custodian,

(f) AllCustodian, (g) Page Count, (h) Production Volume, (i) Confidentiality, (j) Privilege; and (k) Redacted (Y/N) or otherwise indicating that a redaction is present.

       g.    **Metadata**.  Each of the Metadata and coding fields set forth in Appendix A under the heading Hard Copy shall be produced for that Document.

       h.    **Color**.  Documents containing color need not be produced in color in the first instance, provided however, that the Producing Party shall retain a copy of produced hard copy documents in color.  However, if good cause exists for the Requesting Party to request production of certain documents in color, the Requesting Party may request production of such documents in color by providing (1) a list of the Bates numbers of documents it requests to be produced in color format; and (2) an explanation of the need for production in color format.  The Producing Party shall not unreasonably deny such requests.

## VII.    PRODUCTION FORMAT FOR UNSTRUCTURED ESI

       The Parties agree to produce in the formats described below.  These formats are deemed to be productions in reasonably usable form.  If any Party contends that particular Documents or ESI warrant a different format, the Parties will meet and confer to determine a mutually acceptable production format for such Documents.

       a.    **TIFFs**.  Documents and ESI should be produced as single-page, black and white, group IV 300 DPI TIFFs images.  The document's original orientation should be maintained (*i.e.*, portrait to portrait and landscape to landscape).  Hidden content, tracked changes or edits, comments, notes, and other similar information, to the extent viewable within a document in its native file format, shall also be imaged so that such content is viewable on the image file.  Bates numbers, confidentiality designations (in accordance with the protective order governing the case), and redactions (to the extent they are necessary) should be burned into the image.  TIFF image files should be provided in an "Images" folder.   Where Presentation files (.PPT, .PPTX, etc.) are

produced in a static, rather than native, format, they will be processed to TIFF format showing comments, hidden slides, speakers' notes, and similar data.

      b.    **Extracted Text Files**. The full text of native files should be extracted directly from the native file (not OCR), to the extent such extracted text is available, and should be delivered in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document. All text files shall be provided as a single document level text file for each item, not one text file per page. Text files should be provided in a "Text" folder. To the extent that a document is redacted, the document should undergo OCR after the text has been redacted in order to remove the redacted text.

      c.    **Instant Messages**. If Instant Messages are to be produced, the Parties will meet and confer to discuss the form of production and the producing party should use best efforts to produce such Instant Messages in a readily usable format.

      d.    **Unique IDs**. Each image should have a unique filename, which corresponds to the Bates number of that page. The filename should not contain any blank spaces and should be zero-padded (*e.g.*, ABC-000001), taking into consideration the estimated number of pages to be produced. If a Bates number or set of Bates numbers is skipped in a production, the Producing Party will so note in a cover letter or production log accompanying the production. Bates numbers will be unique across the entire production and prefixes will be consistent across all documents a party produces in this Action.

      e.    **Parent-Child Relationships**. The Parties agree that if any part of an Email or its attachments is responsive, the entire Email and attachments will be produced, except any portions of the Email or attachments that must be withheld or redacted on the basis of privilege or work-product protection. The relationship between attachments, enclosures, embedded files, and/or

exhibits to any parent document shall be preserved. The child-document should be consecutively produced immediately after the parent-document. Each document shall be produced with the production number for the first and last page of that document in the "BegBates" and "EndBates" fields of the data load file and with the "BegAttach" and "EndAttach" fields listing the production number for the first and last page in the document family.

      f.     **Metadata**. The Parties agree that Metadata will be produced for all ESI, whether produced in Native Format or Static Image formats. Appendix A sets forth the minimum Metadata fields that must be produced to the extent that Metadata exists for a particular document. To the extent that Metadata does not exist, is not reasonably accessible or available, or would be unduly burdensome to collect, nothing in this ESI Protocol shall require any party to extract, capture, collect or produce such data except for those fields marked for Hard Copy Documents in Appendix A, provided, however, that where such Metadata is not produced on such grounds, the Producing Party shall disclose which fields it will not produce. If Metadata is redacted or withheld, the Producing Party will so inform the Requesting Party and record the redaction on any privilege log prepared by the Producing Party; redacted Metadata shall be preserved.

      g.     **Production of Documents in Native Format**.

      1.     The processed native for all spreadsheets (*i.e.*, .XLS, .XLSX, .CSV, or similar), presentation files maintained in Microsoft Powerpoint format (.PPT, .PPTX, etc.), and electronic information containing audio or video components should be produced and linked to the database by the Metadata field "NativeLink."

      2.     Where native files are produced in lieu of TIFF images, each native file will be assigned a unique Bates number. The Producing Party will produce a placeholder (a single-page TIFF slip sheet indicating that the native item was produced) along with the

file itself in Native Format. The placeholder will be branded with the production number in the lower right hand corner and the phrase "PRODUCED IN NATIVE ONLY" branded in the center of the page. The Producing Party will also brand any confidentiality or similar endorsements in the lower left hand corner of the placeholder.

3.  To the extent that a native spreadsheet must be redacted, the Producing Party may redact either the native file or produce TIFF images with burned in redactions in lieu of a native file and TIFF placeholder image. If redacting TIFF images and to the extent that any of the following can be automated, the Producing Party, or its ediscovery vendor, should make reasonable efforts to: (1) reveal hidden rows, columns or sheets prior to converting the document to TIFF; (2) clear any filters that may conceal information; (3) adjust column widths so that numbers do not appear as symbols (*e.g.*, "#######"); (4) ensure that column and row headings print; (5) ensure that the tab name appears in the header or footer of the document; (6) process comments so that they are produced at the end of the spreadsheet; and (7) process spreadsheets so that they print across then down. If good cause exists, the Requesting Party may ask the Producing Party to manually undertake the foregoing for certain documents identified by Bates number by the Requesting Party to the extent the document was originally produced with concealed information. The Producing Party shall not unreasonably deny such a request.

4.  **Request for Native Format Production**. Other than as specifically set forth above, a Producing Party need not produce documents in Native Format. If good cause exists for the Requesting Party to request production of certain documents in Native Format, the Requesting Party may request production in Native Format by providing (1) a list of the Bates numbers of documents it requests to be produced in Native Format; and

(2) an explanation of the need for reviewing such documents in Native Format. The Producing Party shall not unreasonably deny such requests. The Producing Party shall produce an overlay to ensure that the "NativeLink" entry in the data load file indicates the relative file path to each native file in such production, and all Extracted Text and applicable metadata fields.

      h.    **Cellphone and Personal Device Data**: The Parties will meet and confer regarding whether ESI maintained on any custodian's cellphone(s) and/or personal device(s) is within the scope of permissible discovery in this Action. If such discovery is agreed upon by the Parties or ordered by the Court, the Parties will meet and confer regarding (1) the identity of any document custodian that may possess unique, responsive ESI maintained on their cellphone(s) and/or personal device(s) that is within the responding Party's possession, custody, or control, and (2) the appropriate search parameters and form of any production of such information.

      i.    **Track Changes and Comments**. To the extent that a Document or ESI contains tracked changes or comments, the Document or ESI should be imaged showing tracked changes and comments using standard functionality available from the software used to facilitate the Producing Party's review and production of Documents and ESI in this Action.

      j.    **Password-Protected Files**. The Parties will make reasonable efforts to ensure that all encrypted or password-protected Documents and ESI are successfully processed for review and production. The Producing Party will identify relevant and responsive encrypted or password-protected Documents and ESI that it cannot process so that the parties can meet and confer to determine if there are any alternative means to have such information produced in a usable format.

      k.    **Embedded Documents**. Embedded files in responsive documents shall be extracted during processing and produced as separate documents, to the extent practicable given

the application used.  To the extent the Producing Party becomes aware in the ordinary course of discovery that extracted documents cannot be produced, the Producing Party will notify the Requesting Party of the types of files, and Custodian for which such extracted documents cannot be produced.  The Bates Number of the source file from which the embedded file is extracted shall be provided as metadata associated with the embedded file, as described in Appendix A.

      l.    **Data Load Files**.  Documents should be provided with an Opticon Cross-Reference File and Concordance data load file using standard Concordance delimiters:

      1.    Field Separator

      2.    ¶ (ASCII 020) Text Qualifier þ (ASCII 254)

      3.    Substitute Carriage Return or New Line in data ® (ASCII 174)

      4.    Multi-value separator (followed by a space) ; (ASCII 059)

All rows will contain the same number of delimiters and fields.  The multi-value field delimiter must be consistent across all fields.  For example, if the CC field contains semi-colons between Email addresses, the Tag field should also contain semi-colons.  Concordance-compatible image and data load files should be provided in a "Data" folder. Parties have the option to exchange sample load files.  If this exchange occurs, the Requesting Party will have fourteen (14) days to respond with Load File change requests.  Nothing in this Order will limit the Parties from discussing Load File changes throughout the course of the Action.

      m.    **Email Collection and Processing**.

      1.    Email Threading:  The Parties may use Email thread suppression to avoid review and production of identical or duplicative information contained within an existing Email thread in another document being reviewed and produced, provided, however, that an Email that includes an attachment or content in the BCC or other blind copy field shall

not be treated as a lesser included version of an Email that does not include the attachment or content, even if all remaining content in the Email is identical. Under no circumstances will Email thread suppression eliminate (a) the ability of a requesting Party to identify every custodian who had a copy of a produced document or Email, to the extent this information is available on an automated basis through the use of industry-standard Email threading methods consistent with this paragraph; or (b) remove from a production any unique branches and/or attachments contained within an Email thread.

2. Email Domains: Producing parties may utilize an ESI search process to identify categories of documents, such as Emails from domains typically associated with junk Email (*e.g.*, fantasy football-related Emails, retailer advertising, and newsletters or alerts from non-industry sources).

n. **Deduplication**. A Producing Party shall globally deduplicate by exact duplicate families provided that (i) only exact duplicates are subject to deduplication; (ii) the Producing Party identifies all custodians in the main All Custodian metadata field, to the extent this information is available on an automated basis through the use of industry-standard deduplication methods consistent with this paragraph; and (iii) an Email that includes content in the BCC or other blind copy fields shall not be treated as a duplicate of an Email that does not include content in the BCC or other blind copy field, even if all remaining content in the Email is identical. Duplicate electronic documents shall be identified based on MD5 or SHA-1 hash values at the document family level. All electronic documents bearing an identical value are a duplicate group. De-duplication must be performed at the document family level. Stand-alone files will de-duplicate against other stand-alone files, but not against attachments contained in document families. Each party may also de-duplicate Emails in such a way as to eliminate earlier or

incomplete chains of Emails and therefore produce only the most complete iteration of an Email chain. In performing de-duplication described above, a Producing Party may not eliminate any unique, non-duplicative responsive information from chains of Emails that are not contained within the most complete iteration of an Email chain. Any other methodology for identification of duplicates, including Email field selection for hash value creation, must be discussed with the Requesting Party and approved in writing before implementation. If the Requesting Party objects to the methodology, it shall timely raise those concerns with the Producing Party. If a party opts not to deduplicate, it shall disclose such fact to the Requesting party prior to production of such non-deduplicated data.

o.    **Custodian or Originating Source**.  The custodian or originating source shall be identified in the Custodian field of the database load files. Documents found in the possession of a natural person (or on a natural person's allocated hardware or storage media) should be produced in such fashion as to identify the natural person. Documents found in the possession of a department, group, entity, or other common facility (*e.g*., office, file room, archive, network storage, file share, back-up, hard drive, etc.) should be produced in such a fashion as to identify the department, group, entity, or facility. A Producing Party shall use a uniform description of a particular custodian across productions.

p.    **Color**. Except for PowerPoint and other Documents produced natively, Documents containing color need not be produced in color in the first instance. However, if good cause exists for the Requesting Party to request production of certain documents in color, the Requesting Party may request production of such documents in color by providing (1) a list of the Bates numbers of documents it requests to be produced in color format; and (2) an explanation of the need for production in color format. The Producing Party shall not unreasonably deny such requests.

20

q.     **Foreign Language**.  Foreign language text files and Metadata should be delivered with the correct encoding to enable the preservation of the documents' original language.

r.     **Date Format**:

1.     Documents and ESI shall be processed using a single standard time zone (*e.g.*, GMT) selected by the Producing Party.

2.     If a time is not available, such as the estimate date for a coded document, then 12:00 am, or 00:00 should be assigned, *i.e.*, 12/21/1999 00:00

3.     Date delimiters, such as slashes and colons, must be consistent across all fields.  In the format of MM/DD/YYYY, there are no spaces and only forward slashes.

4.     Date formats must be consistent within any one field.

5.     Date formats must be consistent across all fields, *i.e.*, a record with a sent date should have the same format in the last modified date field.

s.     **Production Media**.  Producing documents may be done via secure FTP or secure file share, via CD, DVD, flash drive, or hard drive.  To the extent possible, physical media should be protected before it is produced.

1.     **Naming Convention for Production Media**.  Whether produced via secure FTP, file share, or physical media, the files produced should be combined into a compressed file such as .zip, .rar, etc.  The compressed file should be named so as to indicate Producing Party, the date of the production, and the sequence of the production (*e.g.*, "Fourth Production 20180508-001").  If the production is made using physical media, the media should be labeled to include the aforementioned information, as well as the Bates range of the materials contained on the media.

t.     **Replacement Productions**.  Any replacement production will be transmitted with a cover letter or Email to identify the production as a replacement and shall cross-reference the

BegBates and EndBates of the documents being replaced.  If the replacement production is being transmitted by physical media, the media shall include the phrase "Replacement Production."

      u.    **Encrypted Data**.  To the extent a production is encrypted before it is produced, the Producing Party shall contemporaneously transmit the credentials necessary to decrypt the data under separate cover.

      v.    **Zero-byte Files**.  The Parties may, but are not required to, filter out stand-alone files identified as zero-bytes in size that do not contain responsive file links or file names.  If the Requesting Party in good faith believes that a zero-byte file was withheld from production and contains information responsive to a request for production, the Requesting Party may request that the Producing Party produce the zero-byte file.  The Requesting Party may provide a Bates number to the Producing Party of any document that suggests a zero-byte file was withheld from production and contains information responsive to a request for production.

## VIII.  ASSERTIONS OF PRIVILEGE

      a.    **Privilege Logs**.  Privilege Logs shall be provided containing the following information, which may, in part, be supplied by metadata associated with the document that reasonably supplies the information identified below:

          1.    A sequential number associated with each Privilege Log record;

          2.    The date of the document redacted or withheld;

          3.    The Bates numbers of documents redacted or withheld;

          4.    The identity of all persons who sent, authored, signed or otherwise prepared the document or withheld portion of the document, and identification of which of them are attorneys;

          5.    The identity of all persons designated as addressees or copyees, and identification of which of them are attorneys;

6.      The title or subject of a document unless providing this information would reveal information that is itself privileged or protected;

7.      A description of the contents of the document that, without revealing information itself privileged or protected, is sufficient to understand the subject matter of the document and the basis of the claim of privilege or immunity; and

8.      The type or nature of the privilege asserted (*e.g.*, attorney-client privilege; work-product doctrine).

| Privilege Log #/ Bates # | Date | Author | From or Sender | Recipient | CC | BCC | Title | Subject | Privilege Log Description | Privilege |
|---|---|---|---|---|---|---|---|---|---|---|
| i, iii | ii | iv | iv | v | v | v | vi | vi | vii | viii |

b.      **Logging of Document Families.**  Where multiple members of a document "family" (*e.g.*, an Email and its attachment, multiple Email attachments, etc.) are withheld or redacted on the grounds of privilege, immunity, or any similar claim, these families may be jointly logged as a single entry on the privilege log with an indication in the description field that describes the family relationship, provided however, that information logged must be sufficient to assess the privilege for each family member.  For document families in which fewer than all of the documents are withheld or redacted as privileged or protected, the privilege log entry for the withheld document(s) shall identify the Bates number of the produced family member.

c.      The following documents presumptively need not be included on a Privilege Log:

1.      Communications exclusively between a Party and its outside counsel regarding this Action dated after the commencement of this Action;

2.      Work product created by outside counsel, or by an agent of outside counsel other than a Party, regarding this Action and created after commencement of this Action;

3. Communications exclusively between a Party and its outside counsel, or work product created by outside counsel, or by an agent of outside counsel other than a Party, concerning the action *Fair Isaac Corporation v. Trans Union LLC*, Case No. 1:17-cv-08318 (N.D. Ill.), provided that the Party claiming privilege or immunity over the communication or work product was a party to that action.

4. Documents not responsive to the Requesting Party's substantive document requests (as modified by the Producing Party's responses and objections to such requests).

## IX. COST ALLOCATION

Pursuant to FRCP 26, the Parties generally presume that the Producing Party bears all costs of preservation, retrieval, and production of its reasonably accessible ESI. However, there may be cost-sharing or cost-shifting upon agreement of the Producing and Requesting Parties or upon proper motion and Order of the Court, such as for ESI that is not reasonably accessible.

## X. THIRD PARTY DOCUMENTS

A Party that issues a non-party subpoena ("Issuing Party") shall include a copy of this Protocol with the subpoena and state that the Parties to the Action have requested that third parties produce Documents in accordance with the specifications set forth herein. The Issuing Party shall timely notify other Parties when it receives non-party productions, and shall, upon request by other Parties ("Requesting Parties" for purposes of this paragraph), provide copies of such productions to Requesting Parties in the format in which they were received from the third party. Nothing in this Protocol is intended to or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the Parties or third parties to object to a subpoena.

## XI. AUTHENTICATION

The Parties will meet and confer regarding an authentication stipulation concerning Documents produced in this Action.

IT IS SO ORDERED.

Dated: 11/29/2023

Edmond E. Chang
United States District Court Judge

Dated: November 6, 2023

Respectfully Submitted,

/s/ Lauren M. Weinstein
Lauren M. Weinstein
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.,
 Suite 500
Washington, DC 20037
Telephone: 202-556-2000
lweinstein@mololamken.com

Steven F. Molo
Lauren F. Dayton
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Telephone: 312-450-6700
smolo@mololamken.com
ldayton@mololamken.com

*Liaison Counsel for Direct Purchaser
Plaintiffs and the Proposed Direct
Purchaser Class*

Gary F. Lynch
CARLSON LYNCH LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
Facsimile: 412-231-0246
glynch@carlsonlynch.com

Katrina Carroll
CARLSON LYNCH LLP
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
kcarroll@carlsonlynch.com

/s/ Carmen Medici
Carmen Medici
  (admitted *pro hac vice*)
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone:  619-798-5319
cmedici@scott-scott.com

Joseph P. Guglielmo
  (N.D. Ill. 2759819)
Michelle E. Conston
  (admitted *pro hac vice*)
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com
mconston@scott-scott.com

Patrick McGahan
  (admitted *pro hac vice*)
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
156 S. Main St.
Colchester, CT 06415
Telephone:  860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct
Purchaser Plaintiffs and the Proposed
Direct Purchaser Class*

Christopher M. Burke
Walter Noss
Yifan (Kate) Lv
KOREIN TILLERY PC
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 6225-5620
Facsimile: (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

George A. Zelcs
Randall P. Ewing, Jr.
Ryan Z. Cortazar
KOREIN TILLERY, LLC
205 North Michigan Avenue,
Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Jennifer W. Sprengel
CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

Barbara J. Hart (admitted *pro hac vice*)
GRANT & EISENHOFER
485 Lexington Ave., 29th Floor New
York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Linda P. Nussbaum
Susan Schwaiger
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th
Floor
New York, NY 10036
Telephone: 917-438-9102
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Michael L. Roberts
Karen Sharp Halbert
ROBERTS LAW FIRM, P.A.
20 Rahling Circle Little Rock, AR
72223
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Gregory S. Asciolla
  (admitted *pro hac vice*)
Karin E. Garvey
  (admitted *pro hac vice*)
Robin A. van der Meulen
  (admitted *pro hac vice*)
Matthew J. Perez
  (admitted *pro hac vice*)
Jonathan S. Crevier
  (admitted *pro hac vice*)
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
rvandermeulen@dicellolevitt.com
mperez@dicellolevitt.com
jcrevier@dicellolevitt.com

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: 312-332-3400
mmiller@millerlawllc.com
lfanning@millerlawllc.com

Guillaume Buell
  (admitted *pro hac vice*)
THORNTON LAW FIRM LLP
1 Lincoln Street, 13th Floor
Boston, MA 02111
Telephone: 617-720-1333
gbuell@tenlaw.com

Daniel E. Gustafson
  (admitted *pro hac vice*)
Daniel C. Hedlund
  (admitted *pro hac vice*)
Michelle J. Looby
  (admitted *pro hac vice*)
Joshua J. Rissman
Ling S. Wang
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
lwang@gustafsongluek.com

Dennis Stewart (admitted *pro hac vice*)
GUSTAFSON GLUEK PLLC
600 B Street, 17th Floor
San Diego, CA 92101
Telephone: 619-595-3200
dstewart@gustafsongluek.com

Kenneth A. Wexler
Melinda J. Morales
Michelle Perkovic
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

Charles F. Barrett
  (admitted *pro hac vice*)
 NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: 615-244-1713
cbarrett@nealharwell.com

Don Barrett (*pro hac vice* forthcoming)
BARRETT LAW GROUP, P.A.
404 Court Square
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
dbarrett@barrettlawgroup.com
donbarrettpa@gmail.com

Richard R. Barrett
 (*pro hac vice* forthcoming)
BARRETT LAW GROUP, P.A.
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: 662-380-5018
rrb@rrblawfirm.net

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)
HAUSFELD LLP
600 Montgomery Street, Suite 3200 San
Francisco, CA 94111
Telephone: 415-633-1908
mlehmann@hausfeld.com
clebsock@hausfeld.com

Hilary K. Scherrer
Paul Gallagher
HAUSFELD LLP
1700 K Street, N.W., Suite 650
Washington, DC 20006
Telephone: 202-540-7200
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Scott A. Martin
Irving Scher
Jeanette Bayoumi
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: 646-357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

*Counsel for Direct Purchaser Plaintiffs*
*and the Proposed Direct Purchaser*
*Class*

REINHARDT WENDORF &
BLANCHFIELD
Garrett D. Blanchfield (*pro hac vice*)
Brant D. Penney (*pro hac vice*)
Roberta A. Yard
 (*pro hac vice* forthcoming)
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Telephone: 651-287-2100
Facsimile: 651-287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

SPECTOR ROSEMAN &
KODROFF, P.C.
Jeffrey J. Corrigan (*pro hac vice*)
William G. Caldes(*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
Icee N. Etheridge
  (*pro hac vice* forthcoming)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: 215-496-0300
Facsimile: 215-496-6611
JCorriganf@srkattorneys.com
Bcaldes@srkattorneys.com
Jspector@srkattorneys.com
Ietheridge@srkattorneys.com

*Interim Co-Lead Counsel for Indirect
Purchaser Plaintiffs and the Proposed
Indirect Purchaser Class*

GUIN, STOKES & EVANS, LLC
Charles R. Watkins (3122790)
321 South Plymouth Court
Suite 1250
Chicago, IL 60604
Telephone: 312-878-8391
Facsimile: 205-226-2357
charlesw@gseattorneys.com

*Liaison Counsel for Indirect Purchaser
Plaintiffs and the Proposed Indirect
Purchaser Class*

PRETI FLAHERTY, BELIVEAU &
PACHIOS LLP
Michael S. Smith
  (*pro hac vice* forthcoming)
Gregory P. Hansel
  (*pro hac vice* forthcoming)
Randall B. Weill
  (*pro hac vice* forthcoming)
Elizabeth F. Quinby
  (*pro hac vice* forthcoming)
One City Center, P.O. Box 9546
Portland, ME 04101
Telephone: 207-791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com

GLANCY PRONGAY & MURRAY
LLP
Brian P. Murray
  (*pro hac vice* forthcoming)
Lee Albert (*pro hac vice* forthcoming)
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: 212-682-5340
Facsimile: 212-884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

FREED KANNER LONDON &
MILLEN LLC
Douglas A. Millen
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: 224-632-4500
dmillen@fklmlaw.com

FREED KANNER LONDON &
MILLEN LLC
Jonathan M. Jagher
  (*pro hac vice* forthcoming)
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-234-6487
jjagher@fklmlaw.com

BONI, ZACK & SNYDER LLC
Michael J. Boni (*pro hac vice* forthcoming)
Joshua D. Snyder
  (*pro hac vice* forthcoming)
John E. Sindoni (*pro hac vice* forthcoming)
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: 610-822-0200
Facsimile: 610-822-0206
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

MCLAFFERTY LAW FIRM, P.C.
David McLafferty
  (*pro hac vice* forthcoming)
Attorneys at Law
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-940-4000, ext. 12
www.McLaffertyLaw.com

SALTZ MONGELUZZI &
BENDESKY, P.C.
Simon B. Paris, Esq.
  (*pro hac vice* forthcoming)
Patrick Howard, Esq.
  (*pro hac vice* forthcoming)
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: 215-575-3985
Facsimile: 215-496-0999
sparis@smbb.com
phoward@smbb.com

*Counsel for Indirect Purchaser
Plaintiffs and the Proposed Indirect
Purchaser Class*

/s/ *Matthew D. Provance*
Britt M. Miller
Matthew D. Provance
J. Gregory Deis
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
(312) 701-7711—Facsimile
bmiller@mayerbrown.com
mprovance@mayerbrown.com
gdeis@mayerbrown.com

*Counsel for Defendant Fair Isaac
Corporation*

## APPENDIX A: REQUIRED METADATA FIELDS

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| Bates Number Begin | Beginning page Bates number | x | x | x |
| Bates Number End | Ending page Bates number | x | x | x |
| Attachment Begin | Beginning page of attachment range | x | x | x |
| Attachment End | Ending page of attachment range | x | x | x |
| Attachment Count | Number of attachments to an Email | x | x | |
| Custodian | Primary Individual Custodian Name or Shared Resource Name the document was processed for production -- format: Last, First or ABC Dept. consistent naming and formatting should be used across all productions. | x | x | x |
| AllCustodian | Production custodians or non-human production data sources associated with the produced document; Format: Last, First or ABC Dept. | x | x | x |
| File Name | File name of document | | x | |
| File Extension | File extension of document | x | x | |
| LogicalPath | The directory structure of the | x | x | |

32

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| | original file(s); any container name is included in the path | | | |
| Page Count | For documents produced in TIFF form, number of pages in the document; for documents produced in native, page count will be 1 (for placeholder) | x | x | x |
| Email Subject | Subject of Email | x | x | |
| Author | Any value populated in the Author field of the document properties | | x | |
| From | Email author | x | x | |
| To | Email recipients | x | x | |
| CC | Email copyees | x | x | |
| BCC | Email blind copyees | x | x | |
| Importance | Email importance flag | x | x | |
| Date Sent | Date sent (MM/DD/YYYY format) | x | x | |
| Time Sent | Time sent (HH:MM:SS format) | x | x | |
| Date Received | Date received (MM/DD/YYYY format) | x | x | |
| Time Received | Time received (HH:MM:SS format) | x | x | |
| Date Created | Date created (MM/DD/YYYY HH:MM:SS format) | | x | |

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| DateLastModified | Last modification date (MM/DD/YYYY HH:MM:SS format) | x | x | |
| Hash Value (MD5 or SHA-1) | Unique electronic signature of Email or electronic file | x | x | |
| NativeFile | Native File Link | x | x | |
| Email Thread Family ID (if Email threading is used by Producing Party) | Unique identifier from Email threading algorithm to denote Emails from a single thread and all attachments | x | x | |
| Production Volume | Production volume name | x | x | x |
| Confidentiality | Confidentiality designation pursuant to the Protective Order | x | x | x |
| Redacted | Descriptor for documents that have been redacted (<yes> or <no>) | x | x | x |
| Withheld Placeholder | To the extent a document family member is fully withheld on the basis of privilege and other documents in that family are produced, this field must be populated with a "Y" | x | x | |
| Privilege | Populated if privilege is being asserted | x | x | x |
| Attachname | File name of attachment | x | | |

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| Title | Any value populated in the Title field of the document properties | | x | |
| Subject | Any value populated in the Subject field of the document properties | | x | |
| LastEditedBy | Any value populated in the Last Edited by or Last Modified By field of the document properties | | x | |

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-02114 |
| *This document relates to:*<br><br>ALL ACTIONS | Judge Edmond E. Chang<br><br>Magistrate Judge David E. Weisman |

## <u>AGREED CONFIDENTIALITY ORDER</u>

The parties[1] to this Agreed Confidentiality Order have agreed to the terms of this Order; accordingly, it is ORDERED:

1.     <u>Scope</u>.  All materials produced or adduced in the course of discovery, including initial disclosures, responses to discovery requests, deposition testimony and exhibits, and information derived directly therefrom (hereinafter collectively "documents"), shall be subject to this Agreed Confidentiality Order, as defined below.  This Order is subject to the Local Rules of this District and the Federal Rules of Civil Procedure ("FRCP") on matters of procedure and calculation of time periods.

2.     <u>Confidential Information</u>.  As used in this Order, "Confidential Information" means information designated as "CONFIDENTIAL" by the producing party, that falls within one or more of the following categories: (a) information prohibited from disclosure by statute; (b) research, technical, or commercial information that the party has maintained as confidential; (c) personally identifying information; (d) personal or financial information that the party has

---

[1] For purposes of this Order, "parties" shall mean the named parties in the above-referenced litigation.  In addition, any non-party that produces discovery pursuant to a subpoena or other process issued in this litigation shall have the rights and protections set forth in this Order.

maintained as confidential; or (e) other information the producing party reasonably believes is subject to protection. These categories are expressly provided for illustrative purposes only, and are not intended to be and should not be construed as exhaustive of the types of information that may be appropriately designated as "Confidential Information." The parties will make reasonable efforts to ensure that information or documents that are available to the public are not designated as Confidential Information.

3.   <u>Highly Confidential Information</u>.  As used in this Order, "Highly Confidential Information" means information designated as "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" by the producing party that is of a highly sensitive nature the disclosure of which could result in significant harm, including but not limited to competitive harm, to the business or operations of that party or non-party or to an individual. By way of example only, Highly Confidential Information may include but is not limited to: (a) documents or information relating to or reflecting nonpublic business or market strategies and research and development activities; (b) documents or information relating to or reflecting other trade secrets or nonpublic proprietary business information that bestows a competitive advantage on the producing party; (c) documents or information relating to or reflecting revenue, profit, costs or pricing; (d) documents or information reflecting customer details that could be used to subject the party to a competitive disadvantage; (e) copyrighted software and information reflecting computer or programming code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs; or (f) other information the disclosure of which would, in the good faith judgment of the designating party, create a risk of serious harm. The parties will make

reasonable efforts to ensure that information or documents that are available to the public are not designated as Highly Confidential Information.

4.  Designation.

(a)  A party may designate a document as Confidential Information or Highly Confidential Information for protection under this Order by placing or affixing the words "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" on the document and on all copies in a manner that will not interfere with the legibility of the document.

(b)  To the extent a document is produced in a form in which placing or affixing the words "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" on the document is not feasible, the producing party may designate the document as confidential by inserting a slip sheet, by affixing a label to the production media containing the document, by including the designation in the file title, or, if necessary, by including such designation in a cover letter.  As used in this Order, "copies" includes electronic images, duplicates, extracts, summaries, or descriptions that contain either Confidential Information or Highly Confidential Information.  The marking "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" shall be applied prior to or at the time the documents are produced or disclosed.  Applying the marking "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" to a document does not mean that the document has any status or protection by statute or otherwise except to the extent and for the purposes of this Order.  Any copies that are made of any documents marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" shall also be so marked, except that indices, electronic databases, or lists of documents that do not

contain substantial portions or images of the text of marked documents and do not otherwise disclose the substance of the Confidential Information or Highly Confidential Information are not required to be marked.

(c)    Upward Designation of Information or Items Produced by Other Parties or Non-Parties.  Subject to the definitions set forth in Paragraphs 2 and 3, a party may upward designate (*i.e.*, change a document produced without a designation to a designation of Confidential Information or Highly Confidential Information or designate a document produced as Confidential Information to a designation of Highly Confidential Information) any document produced by another party or non-party, provided that said document contains the upward designating party's own information it believes is Confidential Information or Highly Confidential Information. Upward designation shall be accomplished by providing written notice to all parties identifying (by Bates number or other individually identifiable information) the document to be re-designated upwardly.  Any party may object to the upward designation of any document pursuant to the procedures set forth in Paragraph 11 regarding challenging designations.

5.    Depositions.

(a)    A party or non-party may designate some or all of a witness's deposition testimony as Confidential or Highly Confidential Information for protection under this Order by orally designating the relevant testimony as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" on the record at the time the testimony is taken. Inadvertent failure to do so does not operate as a waiver.  The designating party must provide the specific page and line designations over which the party or non-party claims confidentiality within thirty (30) days after delivery of the final transcript by the court reporter to the designating party or non-party.  Deposition testimony shall be treated as "CONFIDENTIAL" or "HIGHLY

CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY," as orally designated, prior to the deadline. Thereafter, only those portions identified in the Notice of Designation shall remain protected under the terms of this Order.

(b)    In the event information designated as Confidential or Highly Confidential Information is to be shown to a witness at deposition, hearing, trial or otherwise, the witness shall be provided with a copy of this Order at the start of the examination, and the witness must comply with the terms of this Order. Except as provided herein, if the witness has refused to execute Attachment A as required by this Order, the party taking the deposition will read the text of Attachment A on the record, which shall serve as a substitute for the execution of Attachment A and shall permit examination of the witness on documents or other materials containing Confidential Information or Highly Confidential Information.

6.    Protection of Confidential Information or Highly Confidential Information.

(a)    General Protections. Except as set forth below, Confidential Information or Highly Confidential Information shall not be used or disclosed by the parties, counsel for the parties, or any other persons identified in Paragraph 6(b) for any purpose whatsoever other than prosecuting, defending, or settling this litigation, including any appeal thereof. Confidential Information or Highly Confidential Information may be disclosed only to the named plaintiff(s) and not to any other member of the putative class except under circumstances permitting such disclosure set forth in Paragraphs 6(b) and 7.

(b)    Limited Disclosures of Confidential Information. The parties and counsel for the parties shall not disclose or permit the disclosure of any Confidential Information to any person or entity except as set forth in subparagraphs 6(b)(1)-(12). Subject to these requirements, the following categories of persons may be allowed to review Confidential Information:

5

(1)     <u>Counsel</u>.  Outside or in-house counsel for the parties and employees or support staff of such counsel (including but not limited to attorneys, paralegals, information technology, litigation support, secretaries, law clerks, and investigators) who have responsibility for the preparation and trial of the action;

(2)     <u>Parties</u>.  Individual parties and employees of the parties, but only to the extent counsel determines in good faith that disclosure is reasonably necessary to the conduct of the litigation and the person has been advised of their obligations hereunder;

(3)     <u>Court</u>.  The Court and its personnel;

(4)     <u>Court Reporters and Video Recorders</u>.  Court reporters and video recorders engaged for depositions, but only after such persons have completed the certification contained in Attachment A;

(5)     <u>Contractors</u>.  Those persons specifically engaged for the purpose of providing litigation support, including computerized or electronic discovery support, providing photocopies, organizing or processing documents, including outside vendors hired to collect, process, or host electronically stored documents, but only after such persons have completed the certification contained in Attachment A;

(6)     <u>Consultants and Experts</u>.  Consultants, investigators, or experts or support staff of such consultants, investigators, or experts retained by the parties or Counsel for the parties to assist in the preparation and trial of this action, but only after such consultants, investigators, experts, or support staff have completed the certification contained in Attachment A.  This definition includes professional jury or trial consultants retained in connection with this litigation;

(7)     <u>Witnesses at Trial</u>.  Any witness at trial during the pendency of that trial, to whom counsel believes, in good faith, that such disclosure is reasonably necessary for the prosecution or defense of these proceedings and who has completed the certification contained in Attachment A;

(8)     <u>Witnesses at Depositions</u>.  During their depositions, witnesses in this action (and their counsel) if the witness has completed the certification contained in Attachment A, and to whom disclosure is limited to documents that (1) were produced by the witness's employer and created during the period of the witness's employment, (2) show on their face that the witness[2] authored or received them, (3) memorialize that the witness was privy to the document's contents (*e.g.*, a document refers to a meeting attended by the witness), or (4) are reasonably necessary to be shown to the witness according to the good faith judgment of counsel.  Neither witnesses nor their counsel shall retain a copy of any exhibit designated as Confidential Information, except witnesses and their counsel may receive copies of all exhibits marked at their depositions in connection with review of the deposition transcript.  After the conclusion of the litigation such witnesses and their counsel shall destroy those copies;

(9)     <u>Author or Recipient</u>.  Persons whom the Confidential material itself indicates, or the receiving party otherwise has a good-faith basis to believe, were the author, creator, producer, addressee, source, or recipient of a document (not including a person who received the document in the course of this action) may be shown only those documents that he or she authored or received; and any person whose statements, communications or actions are expressly mentioned, discussed, or referred to by actual name in the material as indicated on its face may be shown that

---

[2]     For purposes of this paragraph, a witness designated to testify on behalf of an organization taken pursuant to FRCP 30(b)(6) may be deemed to have "author[ed]" or "received" a document designated by that organization as Confidential so long as at least one employee of the organization authored or received the document.

portion of the document referring to them and such other portions as necessary to provide context for the reference to that person;

(10)  _Special Masters_.  Special masters and their direct staff;

(11)  _Mediators_.  Mediators and their direct staff, provided that they are bound by a confidentiality agreement acceptable to all parties; and

(12)  _Others by Consent_.  Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

(c)  _Disclosures of Highly Confidential Information_.  The parties and counsel for the parties shall not disclose or permit the disclosure of any Highly Confidential Information to any person or entity except as set forth in subparagraphs 6(c)(1)-(10).  Subject to these requirements, the following categories of persons may be allowed to review Highly Confidential Information:

(1)  _Outside Counsel_.  Outside counsel for the parties who have appeared in this action and employees or support staff of such counsel (including but not limited to attorneys, paralegals, secretaries, law clerks, and investigators), provided that such individuals do not regularly participate in the commercial business activities of the receiving party;

(2)  _Court_.  The Court and its personnel;

(3)  _Court Reporters and Video Recorders_.  Court reporters and video recorders engaged for depositions, but only after such persons have completed the certification contained in Attachment A;

(4)  _Contractors_.  Those persons specifically engaged for the purpose of providing litigation support, including computerized or electronic discovery support, providing photocopies, organizing or processing documents, including outside vendors hired to collect, process, or host

electronically stored documents, but only after such persons have completed the certification contained in Attachment A;

(5)   Consultants and Experts. Consultants, investigators, or experts employed by the parties or Counsel for the parties to assist in the preparation and trial of this action or support staff of such consultants, investigators, or experts, so long as any such consultants, investigator, experts or support staff are not employees or regular contractors of the parties or any affiliated entity, but only after such consultants, investigators, experts, or support staff have completed the certification contained in Attachment A. This definition includes professional jury or trial consultants retained in connection with this litigation;

(6)   Witnesses at Depositions.  During their depositions, witnesses in this action to whom disclosure is limited to documents that (1) were produced by the witness's employer and created during the period of their employment, (2) show on their face that the witness[3] authored or received them, or (3) memorialize that the witness was privy to the document's contents (*e.g.*, a document refers to a meeting attended by the witness).  Neither witnesses nor their counsel shall retain a copy of any exhibit designated as Highly Confidential Information, except witnesses and their counsel may receive copies of all exhibits marked at their depositions in connection with review of the deposition transcript.  After the conclusion of the litigation witnesses and their counsel shall destroy those copies;

(7)   Author or Recipient.  Persons whom the Highly Confidential material itself indicates, or the receiving party otherwise has a good-faith basis to believe, were the author, creator, producer, addressee, source, or recipient of a document (not including a person who

---

[3]      For purposes of this paragraph, a witness designated to testify on behalf of an organization taken pursuant to FRCP 30(b)(6) may be deemed to have "author[ed]" or "received" a document designated by that organization as Highly Confidential Information so long as at least one employee of the organization authored or received the document.

received the document in the course of this action) may be shown only those documents that he or she authored or received; and any person whose statements, communications or actions are expressly mentioned, discussed, or referred to by actual name in the material as indicated on its face may be shown that portion of the document referring to them and such other portions as necessary to provide context for the reference to that person;

(8)     Special Masters.  Special masters and their direct staff;

(9)     Mediators.  Mediators and their direct staff, provided that they are bound by a confidentiality agreement acceptable to all parties; and

(10)     Others by Consent.  Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

(d)     To the extent any person is required to complete the certification contained in Attachment A to this Order, facsimile signatures or signatures transferred in electronic format (*e.g.*, PDF) shall be treated as original signatures purposes of this Order.

(e)     Control of Documents.  Counsel for the parties shall make reasonable efforts to prevent unauthorized or inadvertent disclosure of Confidential Information or Highly Confidential Information.

(f)     Acknowledgment of Understanding and Agreement To Be Bound (Attachment A). To the extent that this Order requires any persons to acknowledge their obligations under this Order, that acknowledgment shall be accomplished by the execution of the Acknowledgment of Understanding and Agreement To Be Bound (Attachment A).  The counsel for the party that obtains such signed agreements shall maintain the originals of those forms for a period of one year after the termination of the case, including any appeal(s) thereof.

7.    <u>Failure To Designate</u>.    A failure to designate a document or testimony as Confidential Information or Highly Confidential Information does not, standing alone, waive the right to so designate the document or testimony.  If a party designates a document as Confidential Information or Highly Confidential Information after it was initially produced, the receiving party, on notification of the designation, must make a reasonable effort to ensure that the document is treated in accordance with the provisions of this Order.  No party shall be found to have violated this Order for failing to maintain the confidentiality of material during a time when that material has not been designated Confidential Information or Highly Confidential Information, even where the failure to so designate was inadvertent and where the material is subsequently designated Confidential Information or Highly Confidential Information.

8.    <u>Inadvertent Disclosure of Attorney-Client Privileged or Work-Product Protected Documents and Clawback Procedures</u>.  Pursuant to Federal Rule of Evidence 502(d) and (e), if, in connection with the action, information subject to a claim of attorney-client privilege, attorney work-product protection, or other evidentiary privilege or protection ("Protected Documents") is inadvertently disclosed, the disclosure does not constitute a waiver or forfeiture of such privilege or protection with respect to the privileged information or its subject matter, in this litigation or in any other federal or state proceeding.  Instead, the producing party shall be entitled to assert such privilege or protection, except as further discussed below, and the information and its subject matter shall be treated as if there has been no such disclosure.

(a)    Upon discovering the disclosure of information that the producing party believes in good faith to be covered by attorney-client privilege, work-product protection, or other evidentiary privilege or protection, the producing party shall promptly provide written notification to the receiving party identifying the documents or portions thereof that

11

contain privileged or protected information, in accordance with the requirements of FRCP 26(b)(5)(A).

(b)      Upon written notice of the production of a Protected Document by the producing party or oral notice if such notice is delivered on the record at a deposition, the receiving party must within seven (7) days, return, sequester, or destroy the specified document and any electronic or hard copies the receiving party has, and may not further use or disclose the Protected Document until the claim that it is a Protected Document has been resolved.  The receiving party may retain and sequester a copy of the document asserted to be privileged or protected for the purpose of resolving a dispute with the producing party as to whether the document is privileged or protected from disclosure, and the receiving party need not remove from the record any document that has been previously introduced until such dispute is resolved.  If the receiving party agrees that the document is privileged, it will promptly confirm in writing to the producing party that it has either returned or destroyed all versions of the document and will make no use of the information. Promptly following notification by the receiving party, the producing party shall provide the receiving party with a replacement production in the same format as the original production, with the protected information appropriately withheld or redacted.  If the receiving party disputes that material noticed pursuant to this paragraph is privileged or protected from disclosure, then the retention and sequester of such material shall be governed by Paragraph 8(f).

(c)      Where a producing party seeks to invoke its rights to claw back a document under Federal Rule of Evidence 502(d) and this Order with respect to a document that has been submitted to the Court as an exhibit or used as an exhibit in a deposition, the producing

party must do so within fourteen (14) days of the document being so filed or used. To the extent that the information contained in a document submitted to the Court as an exhibit or used as an exhibit in a deposition is subject to a claim that it contains privileged or protected information, then the receiving party will not further use such document(s) until the claim has been resolved. However, while the receiving party need not remove from the record any document that has been previously introduced until such dispute is resolved, the producing party may notify the Court and/or court reporting service that a dispute under this paragraph is pending and ask that the document(s) be sequestered and made not accessible to the public or parties until the dispute is resolved. To the extent a producing party does not seek to invoke its rights under Federal Rule of Evidence 502(d) and this Order to claw back a document that has been submitted to the Court as an exhibit or used as an exhibit in a deposition within fourteen (14) days of the document being so filed or used, the parties agree that Federal Rule of Evidence 502(d) will not apply to such filed or used document. However a party may seek to invoke its rights under Federal Rule of Evidence 502(b) to claw back such filed or used document.

(d)     If the receiving party has disclosed the specified document before being notified of its inadvertent production, it must take reasonable steps to retrieve it.

(e)     The producing party shall provide an updated privilege log as called for in Section VIII of the Stipulation and Order Establishing the Protocol for the Production of Documents and Electronically Stored Information, as well as any portion of the document that does not contain privileged or protected information.

(f)     The receiving party may challenge the assertion of any privilege discussed in this paragraph. Any challenge that cannot be resolved by the parties will be filed with

the court presiding over this litigation in the Northern District of Illinois and subject to the law in that District.  It shall be the receiving party's responsibility to initiate Court proceedings, if any.  The receiving party may not, however, publicly assert as a ground for such motion the fact or circumstances of the production or reveal the substance of the protected contents of the materials (including in contesting the assertion of protection or privilege).  Any motion contesting the privilege or work-product claim shall be submitted to the Court in camera for review or, if the Court directs, filed under seal.  Pending resolution of such a challenge, the receiving party must continue to sequester the information contained in any notes and, in the event the Court concludes that the information is protected from disclosure, delete the information from any notes or any portions thereof that reveal the substance of the privileged or protected information.  The producing party must preserve the information pending resolution of the challenge and, in the event the Court concludes that the information is not protected from disclosure, promptly provide the receiving party with a replacement production.

(g)    The producing party may challenge the receiving party's use of any Protected Document.  Any challenge that cannot be resolved by the parties will be filed with the court presiding over this litigation in the Northern District of Illinois and will be subject to the laws of that District.  In all instances in which the producing party asserts a privilege or protection, the producing party must preserve a copy of the document asserted to be privileged or protected until the claim of privilege is resolved.

(h)    The obligation of the receiving party to return or to destroy materials under this Order does not apply to multi-case disaster recovery databases maintained by the receiving party.  If these disaster recovery databases are accessed or restored, however,

then any Protected Documents on those databases relating to this action shall be destroyed if destruction is required elsewhere in this Order.

(i)     If a party independently discovers that it has received documents or information that reasonably appear to be privileged, the party shall timely notify the other party, and in any event, no later than ten (10) days after such discovery.

(j)     Except as otherwise set forth in Paragraph 8(c), where a document has been submitted to the Court as an exhibit or used as an exhibit in a deposition and no party has sought to claw back such document within fourteen (14) days of the document being so filed or used, this Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d) and (e), and Federal Rule of Evidence 502(b) shall not otherwise apply.  Nothing contained herein is intended to or shall limit a party's right to conduct a pre-production review of hard-copy documents, electronically stored information ("ESI") or any other information (including metadata) for relevance, responsiveness, privilege and/or protection, and nothing herein is intended to curtail a party's right to challenge any documents, ESI or any other information withheld based on a claim of relevance, responsiveness, privilege and/or protection.

(k)     Nothing in Paragraph 8 shall limit the right of any party to petition the Court for an in camera review of inadvertently disclosed Protected Documents.

9.     <u>Filing of Confidential Information or Highly Confidential Information</u>.  This Order does not, by itself, authorize the filing of any document under seal.  Any party wishing to file a document designated as Confidential Information or Highly Confidential Information in connection with a motion, brief or other submission to the Court must comply with LR 26.2 of the District Court for the Northern District of Illinois.

10. <u>No Greater Protection of Specific Documents</u>. Except on privilege grounds not addressed by this Order, no party may withhold information from discovery on the ground that it requires protection greater than that afforded by this Order unless the party moves for an order providing such special protection or the parties otherwise agree.

11. <u>Challenges by a Party to Designation as Confidential Information or Highly Confidential Information</u>. The designation of any material or document as Confidential Information or Highly Confidential Information is subject to challenge by any party. A party does not waive its right to challenge a designation by electing not to mount a challenge promptly after the original designation is disclosed. The following procedure shall apply to any such challenge.

(a) <u>Meet and Confer</u>. A party challenging the designation of Confidential Information or Highly Confidential Information must do so in good faith and must begin the process by conferring directly with counsel for the designating party. In conferring, the challenging party must identify in writing by Bates number or privilege log identifying number the material challenged and explain the basis for its belief that the designation was not proper. The designating party or nonparty must respond to the challenge within ten (10) business days. If agreement is reached confirming, changing or waiving the designation as to any material subject to the objection, the designating party or nonparty shall serve on all parties a notice specifying the document and the nature of the agreement. If the designation is changed or waived, the designating party or nonparty shall also produce copies of all materials with the amended, agreed-upon designation at the expense of the designating party or nonparty.

(b) <u>Judicial Intervention</u>. A party that elects to challenge a confidentiality designation may file and serve a motion that identifies the challenged material and sets forth in detail the basis for the challenge. The burden of persuasion in any such challenge proceeding shall be on the

designating party or nonparty. Until the Court rules on the challenge, all parties shall continue to treat the materials as Confidential Information or Highly Confidential Information under the terms of this Order.

12. <u>Challenges to Privilege Claims</u>. Following its receipt of a privilege/redaction log produced in this action, a party may identify, in writing (by Bates/unique identifying number), the particular documents that it believes require further explanation. The producing party shall endeavor to respond to such a request within ten (10) business days. If a party challenges a request for further information, the parties shall meet and confer to try to reach a mutually agreeable solution. If they cannot agree, the matter may be brought to the Court.

13. <u>Action by the Court</u>. Nothing in this Order or any action or agreement of a party under this Order limits the Court's power to make orders concerning the disclosure of documents produced in discovery or at trial.

14. <u>Use of Confidential Information or Highly Confidential Information at Motion Hearings</u>. Except as expressly set forth herein, nothing in this Order shall be construed to affect the use of Confidential Information or Highly Confidential Information in connection with any presentation of evidence and argument at hearings or trial. The parties will confer with each other and, as necessary, any affected non-party reasonably in advance of a hearing where Confidential Information or Highly Confidential Information will be discussed so that a designating party may request procedures it deems necessary to protect against the disclosure of proprietary or competitively sensitive information, including whether, or to what extent, the Court should restrict public attendance at the hearing. The Court may make such orders as are necessary to govern the use of Confidential Information or Highly Confidential Information at a hearing.

15.     Use of Confidential Information or Highly Confidential Information at Trial.  The use of Confidential Information or Highly Confidential Information at any trial in this matter will be addressed by a separate stipulation or pretrial order of the Court.

16.     Third Parties.  In seeking discovery from third parties, the parties shall attach this Order to a copy of any subpoena or other discovery request.  Third parties from whom discovery is requested are entitled to the protections of this Order in responding to such requests.

17.     Confidential Information or Highly Confidential Information Subpoenaed or Ordered Produced in Other Litigation:

(a)     If a receiving party is served with a discovery request, subpoena, civil investigative demand, grand jury subpoena, or an order issued in other litigation that would compel disclosure of any material or document designated in this action as Confidential Information or Highly Confidential Information, the receiving party must so notify the designating party, in writing, immediately and in no event more than five (5) business days after receiving the subpoena or order.  Such notification must include a copy of the subpoena or court order.

(b)     The receiving party also must immediately inform in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is the subject of this Order.  In addition, the receiving party must deliver a copy of this Order promptly to the party in the other action that caused the subpoena to issue.

(c)     The purpose of imposing these duties is to alert the interested persons to the existence of this Order, and to afford the designating party in this case an opportunity to try to protect its Confidential Information or Highly Confidential Information in the court from which the subpoena or order issued.  If the designating party or nonparty timely seeks a protective order, the receiving party served with the request shall not produce any information designated in this

18

action as "Confidential Information" or "Highly Confidential Information" before a determination by the court from which the request issued, unless the receiving party has obtained the designating party's permission. The receiving party shall cooperate with respect to all reasonable procedures sought to be pursued by the designating party or nonparty whose designated material may be affected. The designating party or nonparty shall bear the burden and the expense of seeking protection in that court of its Confidential Information or Highly Confidential Information, and nothing in these provisions should be construed as authorizing or encouraging a receiving party in this action to disobey a lawful directive from another court. The obligations set forth in this paragraph remain in effect while the party has in its possession, custody, or control Confidential Information or Highly Confidential Information produced by another party or nonparty to this case.

18.     <u>Challenges by Members of the Public to Sealing Orders</u>.  A member of the public may have a right to challenge the sealing of particular documents that have been filed under seal, and the party asserting confidentiality will have the burden of demonstrating the propriety of filing under seal.

19.     <u>Unauthorized Disclosure or Use</u>.  If a party learns that it or its counsel, officers, directors, employees, consultants, experts or other agents have disclosed documents designated as Confidential Information or Highly Confidential Information in any circumstance not authorized under this Order, that party must within two (2) business days of learning of such disclosure (a) notify the designating party of the disclosure and all pertinent facts relating thereto, (b) make every reasonable effort to prevent disclosure by each unauthorized person who received such information, (c) use reasonable best efforts to retrieve all copies of the protected documents disclosed to unauthorized persons, (d) inform the person or persons to whom unauthorized disclosures were made of the terms of this Order, and (e) request that each such person execute the

certification contained in Attachment A.  Nothing contained herein shall limit the right of the designating party to seek relief against the party responsible for such disclosure.

20.    Obligations on Conclusion of Litigation.

(a)    Order Continues in Force.  Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

(b)    Obligations at Conclusion of Litigation.  Within sixty (60) days after dismissal or entry of final judgment not subject to further appeal, all Confidential Information and Highly Confidential Information marked either as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" under this Order, including copies as defined in Paragraph 4(b), shall be returned to the producing party or destroyed to the extent practicable unless it has been offered into evidence or filed without restriction as to disclosure.  Within sixty-five (65) days after the final termination of this action, including any appeals, counsel for the receiving party shall certify in writing to the producing party that all such Confidential Information and Highly Confidential Information has been destroyed.

(c)    Retention of Work Product and Filed Documents. Notwithstanding the above requirements to return or destroy documents, outside or in-house counsel for the parties may retain archival copies of all pleadings, motion papers, transcripts, drafts or final expert reports, legal memoranda, correspondence, and all attorney work product, even if such materials contain Confidential Information or Highly Confidential Information.  Any retained Confidential Information or Highly Confidential Information shall continue to be protected under this Order and subject to the restrictions on third-party disclosures set forth in Paragraph 6.  An attorney may use his or her work product in subsequent litigation,

provided that its use does not disclose Confidential Information or Highly Confidential Information. Nothing in this Order shall be construed to require the destruction or return of Confidential Information or Highly Confidential Information stored in counsels' archives, back-up media, or disaster recovery media.

(d) <u>Deletion of Documents Filed Under Seal from Electronic Case Filing (ECF) System</u>. Filings under seal shall be deleted from the ECF system only upon order of the Court.

21. <u>Order Subject to Modification</u>. This Order shall be subject to modification by the Court on its own initiative or on motion of a party or any other person with standing concerning the subject matter.

22. <u>No Prior Judicial Determination</u>. This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any document or material designated Confidential Information or Highly Confidential Information by counsel or the parties is entitled to protection under FRCP 26(c) or otherwise until such time as the Court may rule on a specific document or issue.

23. <u>Persons Bound</u>. This Order shall take effect when entered and shall be binding upon all counsel of record and their law firms, the parties, and persons made subject to this Order by its terms.

24. <u>Future Parties</u>. The terms of this Order shall be binding upon all current and future parties to this litigation and their counsel; any party appearing in the litigation following entry of this Order shall be deemed to have joined the case subject to its provisions.

25. <u>Computing Time</u>. For deadlines and time periods that are stated in this Order as a number of "days," time shall be computed in accordance with FRCP 6(a)(1). For deadlines and time periods that are stated in this Order as a number of "business days," time shall be computed in accordance with FRCP 6(a)(1) except that Saturdays, Sundays, and legal holidays shall not be counted.

SO ORDERED.

Dated: 11/16/2023

Edmond E. Chang
U.S. District Court Judge

# ATTACHMENT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-02114 |
| *This document relates to:*<br><br>ALL ACTIONS | Judge Edmond E. Chang<br><br>Magistrate Judge David E. Weisman |

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

The undersigned hereby acknowledges that he/she/they has read the Confidentiality Order dated _____ in the above-captioned action and attached hereto, understands the terms thereof, and agrees to be bound by its terms. The undersigned submits to the jurisdiction of the United States District Court for the Northern District of Illinois in matters relating to the Confidentiality Order and understands that the terms of the Confidentiality Order obligate him/her/them to use materials designated as Confidential Information or Highly Confidential Information, in accordance with the Order solely for the purposes of the above-captioned action, and not to disclose any such Confidential Information or Highly Confidential Information to any other person, firm, or concern.

The undersigned acknowledges that violation of the Confidentiality Order may result in penalties for contempt of court.

**Name:**  _____

**Job Title:**  _____

**Employer:**  _____

**Business Address:**  _____

_____

_____

_____

Dated:  _____             _____
                                 Signature

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SKY FEDERAL CREDIT UNION, on Behalf of Itself and All Others Similarly Situated,<br><br>     Plaintiff,<br><br>v.<br><br>FAIR ISAAC CORPORATION,<br><br>     Defendant. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION ...................................................................... 1

II.    PARTIES .................................................................................................... 4

     A.    Plaintiff ........................................................................................... 4

     B.    Defendant ....................................................................................... 5

III.   JURISDICTION, VENUE, AND INTERSTATE COMMERCE ................. 5

IV.   ALLEGATIONS OF FACT SUPPORTING THE CLAIM FOR RELIEF ...... 6

     A.    Credit Scores .................................................................................. 6

     B.    The Markets for Credit Scores in the United States ......................... 7

     C.    Fair Isaac Has a Monopoly in the B2B Credit Score Market .............. 10

     D.    Attempts to Compete Have Been Stymied by Fair Isaac's Monopoly in
the B2B Credit Score Market........................................................... 11

     E.    Fair Isaac Has Contracted with the Credit Bureaus as Agents and
Co-Conspirators in Its Scheme to Monopolize.................................. 13

     F.    Fair Isaac's Other Anticompetitive and Exclusionary Conduct ........... 14

          1.    Fair Isaac and the Credit Bureaus Have Entered into Anticompetitive
Contract Terms that Restrict Their Ability to Compete and Sell
VantageScore ................................................................................. 15

               a.    The Anticompetitive Agreements Restrict the Credit Bureaus'
Ability to Develop or Sell Other Credit Scores Compatible
with B2B Purchasers' Existing Systems....................................... 15

               b.    Fair Isaac and the Credit Bureaus Have Agreed to a Penalty
Pricing and Bundling Scheme to Foreclose Competition from
Competitors in the B2B Credit Score Market............................... 17

               c.    Fair Isaac and the Credit Bureaus Have Agreed to Contract
Provisions that Allow Fair Isaac to Extract Monopoly Prices...... 18

          2.    Fair Isaac's Campaign to Create Fear, Uncertainty, and Doubt About
VantageScore Among B2B Purchasers .................................... 19

          3.    Fair Isaac's Anticompetitive and Exclusionary Conduct Harms
Competition................................................................................... 21

V.     CLASS ACTION ALLEGATIONS ......................................................... 22

VI.   STATUTES OF LIMITATIONS AND TOLLING...................................... 25

VII.  CLAIMS FOR RELIEF ........................................................................... 25

     CLAIM ONE: MONOPOLIZATION 15 U.S.C. §2................................... 25

     CLAIM TWO: CONSPIRACY TO MONOPOLIZE 15 U.S.C. §2 ............... 27

     CLAIM THREE: UNREASONABLE RESTRAINT OF TRADE 15 U.S.C. §1 ........... 29

     CLAIM FOUR: STATE ANTITRUST LAWS.......................................... 30

     CLAIM FIVE: STATE UNFAIR TRADE PRACTICES LAWS ................... 32

VIII.   PRAYER FOR RELIEF ................................................................................................... 33

IX.     DEMAND FOR JURY TRIAL ......................................................................................... 33

Plaintiff Sky Federal Credit Union, on behalf of itself and all other similarly situated residents of the United States, brings claims under the Sherman Act and state laws against Defendant Fair Isaac Corporation ("Fair Isaac") for redress of the injury and damages resulting from its monopolizing, conspiring to monopolize, and otherwise unreasonably restraining trade from at least as early as January 1, 2006, through the date by which the anticompetitive effects of Defendant's violations of law shall have ceased, but in any case no earlier than the present (the "Class Period"). Based upon personal knowledge, information and belief, proceedings and admissions made in Case No. 1:17-cv-08318 (N.D. Ill.), related ongoing federal government investigations, and investigation of counsel, Plaintiff alleges:

## I.    NATURE OF THE ACTION

1.      "Credit Scores" are three digit numbers that rank or "score" creditworthiness within a range by applying certain algorithms to credit histories. There are two distinct markets for Credit Scores in the United States: (1) the market for the sale of Credit Scores to lenders, financial institutions, and other businesses for risk management decisions (the "B2B Credit Score Market"); and (2) the market for the sale of Credit Scores directly to consumers to monitor their own credit records (the "business-to-consumer" or "B2C Credit Score Market").

2.      This case concerns the B2B Credit Score Market, over which Defendant Fair Isaac has unlawfully maintained a 90% monopoly for many years.

3.      Fair Isaac has abused its monopoly power by engaging in anticompetitive and exclusionary conduct and agreements. Fair Isaac has suppressed competition, stymied innovation, and limited access to credit for millions of Americans – all in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 & 2, as well as numerous state antitrust and unfair trade practices laws.

4.      Fair Isaac's FICO Credit Scores ("FICO Scores") have dominated the market for nearly three decades.  Fair Isaac executives have bragged that their FICO Scores are "the 800-pound gorilla" and are "deeply embedded in the system in North America."  Fair Isaac admitted in 2017 that it has "maintained a 90-plus percent market share for at least 13 years."  Fair Isaac advertises that its FICO Scores are used for 90% of all lending decisions in the United States and that Fair Isaac sells four times more FICO Scores per year than McDonald's sells hamburgers worldwide.

5.      TransUnion, Experian, and Equifax are credit reporting agencies that collect, standardize, and distribute information on consumer credit activity (collectively, the "Credit Bureaus").  Credit Bureaus sell lenders, financial institutions, and other businesses credit reports and Credit Scores – including Fair Isaac's FICO Scores – that are used to make decisions about whether and on what terms to evaluate and extend credit.  Credit Bureaus sell those credit reports and Credit Scores to businesses in every state.  For decades, Credit Bureaus have acted as Fair Isaac's agents and co-conspirators to broker sales between businesses and Fair Isaac of the dominant FICO Scores.  Fair Isaac has used these distribution agreements to place anticompetitive restrictions on the three dominant Credit Bureaus' ability to develop or distribute competitive Credit Scores; prohibited Credit Bureaus from individually negotiating royalty prices for access to FICO Scores; charged discriminatory and prohibitively high royalty prices for FICO Scores if a Credit Bureau customer purchases a FICO Score while providing the consumer with a competing score; and increased the royalty prices that must be paid by Credit Bureaus.  Nevertheless, the Credit Bureaus have agreed to, and acquiesced in, these restrictions.

6.      In 2006, VantageScore Solutions, LLC ("VantageScore"), a joint venture of the Credit Bureaus, launched a competitive Credit Score known as VantageScore.  From the outset,

VantageScore was competitively priced, highly predictive, and scored millions more Americans than Fair Isaac's FICO products. Today, by making full use of the Credit Bureaus' consumer data, including rental and utility payments, VantageScore is capable of providing Credit Scores for an additional 30 million Americans than FICO can. Were VantageScore widely adopted by businesses, millions more creditworthy Americans would have the opportunity to apply for a home mortgage, car loan, or credit card, and obtain credit at lower cost.

7.     Rather than compete on the merits with VantageScore, Fair Isaac has engaged in a pattern of anticompetitive conduct over the course of more than a decade to discourage the adoption of VantageScore and preserve its own monopoly, with the Credit Bureaus' assistance. Fair Isaac has abused its monopoly power to prevent the Credit Bureaus from successfully marketing and selling a competitive alternative to FICO Scores and has waged a disparaging public relations and advertising campaign to create fear, uncertainty, and doubt about VantageScore's viability and reliability with lenders and consumers.

8.     Through its exclusionary conduct, Fair Isaac has succeeded in preventing the substantial sales growth that VantageScore or a competing credit scoring system would have achieved though competition on the merits. Having suppressed competition, Fair Isaac has been able to significantly increase prices, including most recently in September 2019, for its FICO Scores. But for Fair Isaac's suppression of competition and the resulting contractual agreements not to compete, VantageScore or another competitive credit scoring system would have thrived and won substantial market share through its innovative product and would have reduced the prices paid for B2B Credit Scores by Plaintiff and members of the Class.

9.     Fair Isaac's anticompetitive and exclusionary conduct has harmed businesses that have been deprived of competitive pricing for instruments to allow them to gauge credit risk and

have had their freedom of choice restricted. Opening the market to competition is essential to competitive pricing and product innovation, including scoring the tens of millions of creditworthy Americans who have been denied access to credit.

10.    In February 2018, TransUnion filed antitrust counterclaims for monopolization and related claims against Fair Isaac in this District. *See Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318, ECF No. 38 (redacted counterclaims). In March 2019, The Honorable Sharon Johnson Coleman denied Fair Isaac's motion to dismiss TransUnion's antitrust counterclaims. *See id.*, ECF No. 96. The matter is ongoing.

11.    On March 15, 2020, Fair Isaac disclosed that it was under investigation by the Antitrust Division of the United States Department of Justice for exclusionary conduct relating to that alleged in the counterclaim upheld by Judge Coleman.[1]

## II.    PARTIES

### A.    Plaintiff

12.    Plaintiff Sky Federal Credit Union is a federally chartered credit union with a principal place of business in Livingston, Montana.

13.    Plaintiff is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers.

14.    During the Class Period, Plaintiff directly purchased B2B Credit Scores from Defendant and a Credit Bureau.

15.    Plaintiff was injured in its business or property as a direct, proximate, and material result of Defendant's violations of law.

---

[1]    *See* Press Release, Fair Isaac Corporation, FICO Statement Regarding Antitrust Investigation, https://www.prnewswire.com/news-releases/fico-statement-regarding-antitrust-investigation-301024452.html (Mar. 15, 2020).

16.     Plaintiff is threatened with future injury to its business and property by reason of Defendant's continuing violations of law.

**B.     Defendant**

17.     Defendant Fair Isaac Corporation is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California 95110.

## III.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE

18.     This action arises under Sections 1 and 2 of the Sherman Antitrust Act of 1890 (as amended), 15 U.S.C. §§1 & 2, and Sections 4 & 16 of the Clayton Antitrust Act of 1914 (as amended), 15 U.S.C. §§15 & 26.

19.     This Court has subject matter jurisdiction under 28 U.S.C. §§1331, 1332(d), and 1337.

20.     The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims.

21.     Venue is proper in this District under 15 U.S.C. §§15(a) & 22, and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period, Defendant resided, transacted business, was found, or had agents in the United States, including in this District, and a substantial portion of the alleged activity affected interstate trade and commerce, including in this District.

22.     During the Class Period, Defendant's conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.

23.     During the Class Period, Defendant used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the U.S. mail, to effectuate its illegal scheme.

24. Defendant's conduct also had a substantial effect on the intrastate commerce of at least Arizona; Arkansas; California; Connecticut; District of Columbia; Florida; Hawaii; Illinois; Iowa; Kansas; Maine; Maryland; Massachusetts; Michigan; Minnesota; Mississippi; Missouri; Montana; Nebraska; Nevada; New Mexico; New York; North Carolina; North Dakota; Oregon; Rhode Island; South Carolina; South Dakota; Tennessee; Utah; Vermont; West Virginia; and Wisconsin.

25. This Court has personal jurisdiction over Defendant because Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. The unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

26. Plaintiff purchased at least one FICO Score from Fair Isaac and TransUnion, which is headquartered in this District.

27. Defendant employs persons who work in its Credit Score business in this District.

28. Defendant is registered to do business in Illinois with the Illinois Secretary of State.

29. Defendant selected this District to institute Case No. 1:17-cv-08318, to which this case is filed as related by Plaintiff.

## IV. ALLEGATIONS OF FACT SUPPORTING THE CLAIM FOR RELIEF

### A. Credit Scores

30. Credit Scores are typically three-digit numbers that are designed to assess credit risk. Higher scores generally indicate that a consumer poses less credit risk. Credit Scores are produced using credit scoring systems that apply a credit scoring algorithm to a consumer credit report. Credit Scores are usually accompanied by "reason codes," which inform the lender about the reasons that contributed most significantly to reducing a particular consumer's Credit Score.

31.     Credit Scores are the most widely used indicators of consumers' creditworthiness in the United States.  Lenders, financial institutions, and other businesses rely on Credit Scores to decide whether and on what terms to extend credit to consumers.  Consumers, in contrast, rely on Credit Scores to determine whether they will be able to get a mortgage, credit card, auto loan, or other credit product and the rate they will pay.

32.     The Credit Bureaus collect and supply aggregated consumer credit data in the form of consumer reports.  The Credit Bureaus continuously gather credit and financial data about consumers from creditors, governmental entities, public records, collection agencies, and other third parties.  This information is then compiled into a "credit file."  The Credit Bureaus sell credit reports, which include information gathered from a consumer's credit file, to businesses and consumers.

33.     While Credit Scores are sometimes sold together with credit reports, credit reports are different from Credit Scores and can be sold independently.  A credit report is a statement that has detailed information about a consumer's credit activity and current credit situation.   A consumer's credit report might, for example, include information about that consumer's history of mortgage payments, credit card balances, credit card payments, and credit inquiries.  A Credit Score takes the detailed information in a credit report and turns it into a single three-digit number.

**B.     The Markets for Credit Scores in the United States**

34.     There are two distinct markets for Credit Scores in the United States: (1) the B2B Credit Score Market and (2) the B2C Credit Score Market.  B2B and B2C Credit Scores are priced, purchased, and used very differently and serve very different purposes.  The lenders, financial institutions, and other businesses in the B2B Credit Score Market that purchase and use Credit Scores to assess creditworthiness and make decisions about whether and on what terms to extend

credit or otherwise take on risk do not consider credit reports, insurance scores, or any other information about borrowers, to be a substitute for Credit Scores.

35.    Consumers in the B2C Credit Score Market purchase their own Credit Scores to better understand their own creditworthiness and how they likely will be viewed by potential lenders.

36.    The United States is the relevant geographic market in which B2B Credit Scores are provided.  The restraints on competition in the B2B Credit Score Market contained in Fair Isaac's contracts relate to the provision of B2B Credit Scores to businesses throughout the United States.

37.    Purchasers in the B2B Credit Score Market are comprised of lenders, financial institutions, and other businesses that purchase B2B Credit Scores in order to make risk management decisions ("B2B Purchasers").  Lenders, financial institutions, and other businesses that purchase Credit Reports from Defendant and/or the Credit Bureaus generally purchase Credit Scores in order to determine the credit-worthiness and identity of qualified borrowers to whom a preapproved credit offer will be extended ("pre-screening"), make lending decisions ("lending"), or review the risk associated with existing borrowers for purposes such as extending additional credit or changing other account terms ("account management").

38.    Customers in the B2C Credit Score Market, in contrast, purchase Credit Scores in order to manage their credit, protect their identity, or assess their likelihood of obtaining credit. Today, American consumers have signed up for over 160 million credit monitoring or identity protection accounts from businesses such as Capital One, Credit Karma, and LifeLock.  Many of those accounts include access to the consumer's own Credit Score.

39.     The credit risk scoring industry, industry analysts, policy analysts, and investors recognize the B2B Credit Score Market as distinct from the B2C Credit Score Market.  Fair Isaac also regularly acknowledges that the B2B Credit Score Market is distinct from the B2C Credit Score Market.  For example, in its 2019 Form 10-K, Fair Isaac distinguished between its "business-to-business scoring solutions and services" and "business-to-consumer scoring solutions and services including myFICO solutions for consumers."

40.     The B2B Credit Score Market is characterized by significant barriers to entry.  B2B Purchasers encounter significant "switching costs" if they adopt a new Credit Score that has different score-to-risk relationships or that uses different reason codes – regardless of whether it is an updated version of the score they already use or an entirely new brand of Credit Score (unlike consumers in the B2C Credit Score Market).  These switching costs arise because employees have to be trained in the properties and characteristics of a new score; B2B Purchasers must ensure that the new score will be adequately predictive of the creditworthiness of their own customer base; B2B Purchasers often conduct extensive, costly, and time-consuming validation tests to determine whether the new score is cost-effective; and B2B Purchasers may need to invest in updating their internal systems to ensure technical compatibility between those systems and a new score.

41.     Network effects also characterize the B2B Credit Score Market.  For example, in the mortgage and auto loan industries the consistent use of particular Credit Scores with similar score-to-risk relationships and reason codes facilitates the bundling of large groups of mortgage and auto loans from different originators into securities that can be sold to investors.  Because of the consistent use of a single type of Credit Score, marketing materials for these securities can include data on the average and stratified Credit Scores of the borrowers associated with the underlying loans.

### C. Fair Isaac Has a Monopoly in the B2B Credit Score Market

42. Fair Isaac has maintained a monopoly over the B2B Credit Score Market in the United States for roughly three decades, largely through the unlawfully achieved dominance of its FICO product line, which includes many different types of FICO Scores. Introduced in the 1980s, Fair Isaac's "FICO Classic" Credit Scores are the best known and most widely used B2B Credit Scores in the United States. FICO Classic applies an algorithm to each Credit Bureau's data and generates a score between 300 and 850 that purports to give an indication of the individual's credit risk. It also generates a set of "reason codes" that explain the reasons the consumer has not been assigned the maximum score.

43. Fair Isaac advertises its monopoly in the B2B Credit Score Market. On its website, Fair Isaac advertises: 10 billion FICO Scores are sold each year, which is four times the number of hamburgers that McDonald's sells worldwide each year; 27.4 million FICO Scores are sold every day, which is over twice the number of cups of coffee Starbucks sells worldwide in a day; and 90% of all lending decisions in the United States rely on FICO Scores.

44. Similarly, in its 2019 Form 10-K, Fair Isaac described its "FICO Scores" as "the standard measure in the U.S. of consumer credit risk" and reported that "FICO Scores are used . . . by nearly all of the major banks, credit card organizations, mortgage lenders, and auto loan originators."

45. Fair Isaac representatives have described Fair Isaac's FICO score as "***the 800-pound gorilla***" in the market for B2B Credit Scores and bragged about Fair Isaac's 90% market share. For example, in November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President, Michael Pung, stated that Fair Isaac's FICO Scores are:

- ***The "most widely used credit scoring system here in the U.S.";***

10

- *Used by "[v]irtually every major lender in the U.S."; and that*

- *Fair Isaac has "maintained a 90-plus percent market share for at least . . . 13 years."*

46.     Fair Isaac representatives have also recognized that FICO Scores have benefited from the network effects created by the widespread use of FICO Scores in many industries.  For example, in November 2011, then-CEO of Fair Isaac, Mark Greene, explained that the "network effect" of "FICO Scores . . . being sort of the standard language" and "*having everybody . . . standardize on a FICO Score, that's magic*."

47.     Fair Isaac's monopoly in the B2B Credit Score Market for Credit Scores has given it the power to control prices.  Indeed, Fair Isaac's CEO, Will Lansing, has noted that in the B2B Credit Score Market Fair Isaac has "*quite a bit of discretion in whether we want our margins to be higher or lower or where they are*."

### D.     Attempts to Compete Have Been Stymied by Fair Isaac's Monopoly in the B2B Credit Score Market

48.     In March 2006, VantageScore introduced the VantageScore Credit Score and credit scoring system.  VantageScore is a competitor to FICO Scores in the B2B Credit Score Market.

49.     From the time it was first released in 2006, VantageScore scored millions more consumers than the FICO scoring systems.  Whereas Fair Isaac's FICO scoring systems would not generate a score if a consumer had not used credit in more than six months or if a credit account was fewer than six months old, VantageScore calculated scores for consumers that had not used credit for up to two years.  It also reached more consumers by using utility and telecommunications payment histories when reported to the Credit Bureaus.

50.     Today, VantageScore scores 30 million more Americans than traditional FICO scoring systems.  Fair Isaac's outdated FICO Classic credit scoring systems – which are still used

11

by many lenders – exclude many creditworthy Americans that VantageScore can reliably score. About one-quarter of American adults – some 65 million people – do not have a traditional FICO score. VantageScore is capable of reducing the number of adults without a Credit Score by almost half. Ten million of those newly scored individuals are "prime" borrowers that should be attractive to traditional lenders.

51.      Without a Credit Score, it is difficult or impossible to apply for or successfully obtain a mortgage, car loan, or reasonable interest rates on personal lines of credit. Not having a Credit Score can also have drastic effects outside of the credit market. For example, Credit Scores are increasingly used by landlords to screen potential tenants.

52.      Those excluded by Fair Isaac's traditional FICO scoring systems – who face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and apartment housing – include disproportionate numbers of low-income and minority consumers.

53.      Indeed, one advocacy group focused on making it possible for people with limited incomes, especially people of color, to achieve financial security has observed: "Black and Hispanic individuals are . . . significantly more likely than white individuals to be credit invisible" – meaning that they have "no established credit history," are "unscored," and "lack[] sufficient or recent enough credit history to be given a [FICO] Credit Score." VantageScore calculates a score for 9.5 million Hispanic and Black consumers who do not have a FICO score, including 2.7 million minority consumers who should be considered "prime" borrowers.

54.      Despite the potential advantages of using VantageScore, Fair Isaac continues to maintain its monopoly in the B2B Credit Score Market. In February 2013, at a Morgan Stanley Conference, Fair Isaac's CEO, Will Lansing, explained that despite the existence of VantageScore,

"there [is] not that much competition around our [B2B] scores business" because "*FICO scores are very much part of the fabric of the banking industry*" *and* "*really deeply imbedded*."

E.   **Fair Isaac Has Contracted with the Credit Bureaus as Agents and Co-Conspirators in Its Scheme to Monopolize**

55.   With its dominant position in the B2B Credit Score Market, Fair Isaac uses the Credit Bureaus to perpetuate and extend its monopoly.  Fair Isaac's relationship with B2B Purchasers is often dependent on B2B Purchasers' relationships with the Credit Bureaus.  To facilitate the sale of its FICO Scores to B2B Purchasers, Fair Isaac enlists the assistance of the Credit Bureaus.

56.   When a B2B Purchaser requires a Credit Score, it purchases the report from the Credit Bureau, and the Credit Score jointly from the Credit Bureau and Fair Isaac.  Although the payment may at times occur in a single transaction, the practical reality, as expressly set forth in contracts governing the sale of Credit Scores to B2B Purchasers, is that both the Credit Bureau and Fair Isaac act as the provider of the FICO Score.

57.   B2B Purchasers' contracts for FICO Scores are often known as Credit Scoring Services Agreements ("CSSAs").  CSSAs provide for both the method of payment and fee model for the delivery of Credit Score services.

58.   For example, the CSSA between Plaintiff, its Credit Bureau, and Fair Isaac makes clear in the "Method of Payment" section that "Experian/Fair, Isaac will deliver to Subscriber invoices" for its Credit Scores and that "Subscriber will pay Experian/Fair, Isaac the amounts indicated on such invoices."  It also specifies that in "consideration of Experian/Fair, Isaac's performance of the Experian/Fair, Isaac Model, Subscriber will pay Experian/Fair, Isaac fees."

59.   In Plaintiff's and Class Members' procurement of FICO Scores, the Credit Bureaus act as co-conspirators and agents of Fair Isaac.  Indeed, Plaintiff's CSSA states that "the

Experian/Fair, Isaac Model results from the joint efforts of Experian Information Solutions, Inc. and Fair, Isaac and Company, Incorporated"; and authorizes the Credit Bureau to execute the contract "on behalf of itself and Fair, Isaac and Company, Incorporated." (Fair Isaac was formerly known as Fair, Isaac and Company.)

### F.  Fair Isaac's Other Anticompetitive and Exclusionary Conduct

60.     Fair Isaac has used its monopoly power to coordinate a multi-faceted campaign to eliminate competition from VantageScore.  Fair Isaac has been explicit that this is its goal.  In April 2015, Will Lansing informed investors on a quarterly earnings conference call that Fair Isaac's strategic goal was to ensure that "the entire industry adopts FICO scores instead of [other] scores."  To achieve this goal, Fair Isaac has enlisted its competitors (the Credit Bureaus, which jointly own and control VantageScore) to agree to anticompetitive contracts that: prevent them from developing or selling alternative Credit Scores that could be seamlessly integrated into many lenders' systems or used interchangeably with FICO Scores; prevent them from competing with each other to negotiate prices from FICO; and create a pricing scheme effectively foreclosing B2B Purchasers from choosing to use FICO Scores in their lending decisions at the same time as providing customers with a competing Credit Score, including VantageScore.  At the same time, Fair Isaac has waged a media campaign against VantageScore and made false and misleading statements in order to sow fear, uncertainty, and doubt about VantageScore's reliability.  By its anticompetitive and exclusionary conduct, Fair Isaac has injured competition in the B2B Credit Score Market, increased prices for Plaintiff and the Class, and limited access to credit for millions of Americans.

1. **Fair Isaac and the Credit Bureaus Have Entered into Anticompetitive Contract Terms that Restrict Their Ability to Compete and Sell VantageScore**

61.     In January 2015, Fair Isaac and TransUnion entered into a contract, the Analytic and Data License Agreement.  With TransUnion's prior contracts with Fair Isaac set to expire on December 31, 2014, Fair Isaac demanded that the parties enter into a new contract rather than renew their existing contracts.  Fair Isaac represented to TransUnion that Experian and Equifax had already agreed to materially similar new contracts with Fair Isaac.  If TransUnion did not agree to the terms demanded by Fair Isaac, it would lose substantial business from customers that depend on FICO Scores.  On information and belief, TransUnion, Equifax, and Experian all agreed to Fair Isaac's plan to exclude competitors and maintain its monopoly.

    a.     **The Anticompetitive Agreements Restrict the Credit Bureaus' Ability to Develop or Sell Other Credit Scores Compatible with B2B Purchasers' Existing Systems**

62.     Fair Isaac has imposed a similar or identical "No Equivalent Products" clause on each of the Credit Bureaus.  By imposing a "No Equivalent Products" term, Fair Isaac has sought to block the Credit Bureaus from offering alternative Credit Score products, such as VantageScore, that would allow B2B Purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems, or to use VantageScore alongside or interchangeably with FICO Scores.  The Credit Bureaus have agreed to and acquiesced in these anticompetitive agreements, terms, and resulting anticompetitive effects.

63.     The "No Equivalent Products" clause provides that a Credit Bureau may not internally develop a credit scoring system that is aligned to the odds-to-score relationship of any Fair Isaac Analytic or that uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic.  It also prohibits a Credit Bureau from distributing any competing analytic (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many

of the same reason codes, and the clause expressly names Vantage Score Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."

64.     For example, if a competing Credit Score product used a 700 score to indicate a less-than-five-percent risk of credit delinquency, and if a 700 FICO score also indicated the same risk of delinquency, then the "No Equivalent Products" clause prevents a Credit Bureau from distributing the competing product.  Similarly, if a competing Credit Score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause prohibits a Credit Bureau from distributing the product.

65.     The "No Equivalent Products" clause effectively prevents a Credit Bureau from developing (contrary to the original goal of VantageScore and the easy ability to do so) or selling an alternative to FICO's Credit Scores that would (i) be compatible with many B2B Purchasers' systems, models, and processes; and (ii) allow B2B Purchasers to have a legitimate choice between using FICO Scores and an alternative score.  Many B2B Purchasers have spent substantial effort and resources to develop systems, models, and processes that are designed for FICO Scores.  B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default).  For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

66.     The "No Equivalent Products" clause protects and sustains Fair Isaac's monopoly. The odds-to-score relationship is an arbitrary mapping between risk and score and does not reflect protectable intellectual property.  Similarly, the reason codes that may not be used by an

"Equivalent Product" were not invented by Fair Isaac but reflect well-established industry best practices for lending.

> **b.      Fair Isaac and the Credit Bureaus Have Agreed to a Penalty Pricing and Bundling Scheme to Foreclose Competition from Competitors in the B2B Credit Score Market**

67.      Fair Isaac's contracts with each Credit Bureau include a similar or identical "Dynamic Royalty Schedule" clause and a similar or identical "Pre-Qualification" royalty category.  Through the "Pre-Qualification" royalty category, Fair Isaac has effectively foreclosed lenders from the ability to purchase and use a FICO score in their lending decision while providing a consumer with a competing Credit Score, which drives lenders to buy exclusively Fair Isaac's FICO Scores and not to purchase competing Credit Scores.  As a consequence of Fair Isaac's imposition of the "Pre-Qualification" royalty category, TransUnion has lost sales of VantageScore to major banks to provide to consumers.

68.      In 2015, Fair Isaac unilaterally imposed, and the Credit Bureaus have complied with, a new "Pre-Qualification" royalty category, which Fair Isaac defines to "mean an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category distinguishes between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any Credit Score or credit data to consumers; and (2) lenders that use FICO Scores for "Pre-Qualification" while also providing Credit Scores or credit data to consumers "in connection" with the "Pre-Qualification."  Certain banks and lenders offer consumers opportunities to apply to qualify for credit opportunities (*e.g.*, a credit card or loan) and, at the same time, receive their personal Credit Score.  The offer of a free Credit Score to a consumer can entice consumers to apply for credit opportunities.

69.      The royalty price associated with a FICO score used for "Pre-Qualification" depends on whether other Credit Scores or credit data are provided to consumers.  If a lender

purchases a FICO score for use in "Pre-Qualification" and does not provide any Credit Score or credit data to the consumer "in connection" with the "Pre-Qualification," there is one per-score royalty rate. If the lender purchases a FICO score for use in "Pre-Qualification" and provides any other Credit Score (such as a VantageScore) to the consumer "in connection" with the "Pre-Qualification," there is a different per-score royalty rate that is higher – a penalty rate.

70. The penalty rate can be avoided in one of two ways, both of which involve purchasing exclusively FICO Scores. First, the B2B Purchaser could purchase a FICO score for use in "Pre-Qualification" and provide no Credit Score or credit data to the consumer. Second, the B2B Purchaser could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of scores by lenders with the provision of scores to consumers.

71. There is no legitimate business justification for the penalty rate agreed upon by Fair Isaac and the Credit Bureaus when the lender also purchases any other Credit Score to disclose to consumers. The transparent purpose of the "Pre-Qualification" royalty category is to drive all B2B Purchasers engaging in "Pre-Qualification" to purchase exclusively FICO Scores and make it cost-prohibitive for B2B Purchasers engaging in "Pre-Qualification" to purchase a competing Credit Score for disclosure to consumers. This scheme has been effective, and few, if any, B2B Purchasers have opted to pay the penalty rate.

<div align="center">

**c.      Fair Isaac and the Credit Bureaus Have Agreed to Contract Provisions that Allow Fair Isaac to Extract Monopoly Prices**

</div>

72. Fair Isaac's "Level Playing Field," requires that the prices that are made available to one Credit Bureau be made available to the other Credit Bureaus. Taken together, the "Dynamic Royalty Schedule" and the "Level Playing Field" clauses enable Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores. Fair Isaac's contracts with TransUnion, Equifax,

<div align="center">18</div>

and Experian include similar or identical "Level Playing Field" and "Dynamic Royalty Schedule" provisions.

73.     Fair Isaac has used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in its contracts with the Credit Bureaus to extract monopoly prices from B2B Purchasers.  These provisions disincentivize a Credit Bureau from negotiating for a lower price because it knows that even if it succeeds, it will not as a result gain a competitive advantage over the other Credit Bureaus.

### 2.     Fair Isaac's Campaign to Create Fear, Uncertainty, and Doubt About VantageScore Among B2B Purchasers

74.     Despite having successfully induced the Credit Bureaus to agree with Fair Isaac and with each other to impose restrictions on VantageScore's ability to compete with FICO, Fair Isaac has gone even further and waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScore.  In advertisements, letters, and blog posts, Fair Isaac has disparaged VantageScore by calling it a "Fako" score, falsely claimed that VantageScore is an unreliable measure of creditworthiness, and misrepresented the information considered by VantageScore's credit scoring system.

75.     On December 12, 2017, Fair Isaac took out a full-page advertisement in *The Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates" that disparaged VantageScore without identifying it by name.  The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative Credit Score, which is "owned by the credit bureaus," is less reliable than FICO Scores in evaluating credit risk, and fails to use "sound practices" or "science-based credit evaluation."  To anyone familiar with the market for Credit

Scores, the advertisement unambiguously conveys the false message that VantageScore is "[w]eakening scoring standards, [and] harm[ing] consumers, and the lending system," particularly in the B2B Credit Score Market.

76.     The *Wall Street Journal* advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name. One such blog post asserts: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

77.     Moreover, the implication that FICO Classic scoring systems provide Credit Scores for as many consumers as VantageScore is false and misleading. VantageScore provides Credit Scores for millions of American consumers that are not scored by FICO Classic scoring systems.

78.     Fair Isaac's website includes numerous posts disparaging VantageScore and making false or misleading statements about VantageScore's features. For example, one blog post claims that "[r]esearch results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance." This statement is false and misleading because it conveys the message that VantageScore's scoring model is "weak" and does a "poor job forecasting future performance" because it considers a consumer's full credit history even if the consumer has not used a traditional credit line in the last six months. In fact, studies have shown that VantageScore is strongly predictive.

79.     Another blog post claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not." This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0,

the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones.

80.    Fair Isaac's campaign against VantageScore is not new.  In 2006, just months after the launch of VantageScore, Fair Isaac filed a meritless lawsuit against the Credit Bureaus and VantageScore in the United States District Court for the District of Minnesota.  *See Fair Isaac Corporation v. Equifax Inc.*, No. 06-cv-04112 (D. Minn.).  This was the monopolist's first attempt to kill the nascent competitor.  Fair Isaac's numerous claims included a claim that the development of VantageScore violated the antitrust laws and a claim that the development of VantageScore constituted trademark infringement.  In its prayer for relief, Fair Isaac sought nothing less than the end of VantageScore:  it requested that the "Defendants be ordered to dissolve VantageScore."

81.    All of Fair Isaac's claims failed; in fact, the jury concluded that Fair Isaac was the wrongdoer.  In support of its trademark infringement claim, Fair Isaac had alleged that VantageScore's use of a scoring range of 501-990 constituted trademark infringement because it was similar to FICO's scoring range of 300-850.  The Credit Bureaus and VantageScore counterclaimed for fraud on the United States Patent and Trademark Office ("PTO"), alleging that Fair Isaac had misrepresented to the PTO that only FICO used the 300-850 score range.  The jury concluded that Fair Isaac had committed fraud on the PTO by making false statements as part of its application to register the score range of 300-850 as a trademark.

82.    The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

### 3.    Fair Isaac's Anticompetitive and Exclusionary Conduct Harms Competition

83.    Fair Isaac's campaign of exclusionary conduct to maintain and expand its monopoly has harmed and continues to harm participants in the B2B Credit Score Market.  Fair

Isaac's unlawful conduct, including that which has been taken in concert with the Credit Bureaus, has foreclosed competition in the B2B Credit Score Market by foreclosing opportunities for the Credit Bureaus to sell VantageScore or any other competitive products. The anticompetitive and exclusionary conduct has allowed Fair Isaac to maintain its monopoly and charge monopoly prices for B2B Credit Scores to B2B Purchasers during the Class Period.

84. Fair Isaac's conduct, in concert with the Credit Bureaus, including by the contracts entered into by the Credit Bureaus, has reduced choice for B2B Purchasers. The anticompetitive terms agreed to between Fair Isaac and the Credit Bureaus have frustrated the ability of B2B Purchasers to purchase VantageScore or any other competitive Credit Score that could be seamlessly integrated into lenders' existing processes and systems. Fair Isaac's media and advertising campaign against VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace.

85. Media sources, financial blogs, and consumers have absorbed Fair Isaac's message that VantageScore is a "***Fako***" ***score*** merely because it is not a FICO score. For example, thebalance.com – a website devoted to personal finance issues – posted in February 2017, and continues to display as of the date of this filing: "If you purchased your Credit Score anywhere but MyFICO.com, then it's a Fako score."[2]

## V. CLASS ACTION ALLEGATIONS

86. Plaintiff brings this action on behalf of itself, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of:

> **All B2B Purchasers residing in the United States that directly purchased a FICO Score from Fair Isaac and/or a Credit Bureau during the Class Period.**

---

[2] Latoya Irby, *FICO & FAKO Credit Scores*, THE BALANCE, https://www.thebalance.com/fico-and-fako-credit-scores-960497 (last visited Apr. 2, 2020).

87.     Excluded from the Class are: Defendant, its officers, directors, management, employees, subsidiaries, and affiliates.  Also expressly excluded are any natural persons that purchased their own Credit Score solely via myFico.com, the Credit Bureaus, or other entities for their personal use.

88.     Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household or the spouse of such a person.

89.     Members of the Class are so numerous and geographically dispersed that joinder is impracticable.  Further, members of the Class are readily identifiable from information and records in the possession of Defendant.

90.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendant.

91.     Plaintiff will fairly and adequately protect and represent the interests of members of the Class.  The interests of Plaintiff are coincident with, and not antagonistic to, those of members of the Class.

92.     Plaintiff is represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including class actions in the financial services industry.

93.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate.  Questions of law and fact common to members of the Class include, but are not limited to:

> a.   whether Defendant monopolized, conspired to monopolize, or unreasonably restrained trade in violation of federal law;

b. whether Defendant monopolized, conspired to monopolize, or unreasonably restrained trade in violation of certain state antitrust laws;

c. whether Defendant engaged in unfair or deceptive trade practices in violation of certain state laws;

d. the duration of the alleged unlawful conduct;

e. injury suffered by Plaintiff and members of the Class;

f. damages suffered by Plaintiff and members of the Class; and

g. whether Defendant has acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

94.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

95.     The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

96.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

97.     Plaintiff has defined members of the Class based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.   STATUTES OF LIMITATIONS AND TOLLING

98.     By its very nature, the unlawful activity in which Defendant engaged was self-concealing from Plaintiff and the Class.   As a result of Defendant's affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiff and members of the Class have been and are tolled, and Defendant is equitably estopped from raising statutes of limitations as a defense.

99.     Any applicable statutes of limitations were tolled at least until February 12, 2018, the date that TransUnion filed its Counterclaim against Defendant.

100.    The federal government's initiation of its antitrust investigation of Defendant's unlawful conduct also operates to toll any federal statute of limitations under 15 U.S.C. §16.

## VII.   CLAIMS FOR RELIEF

### CLAIM ONE:
### MONOPOLIZATION
### 15 U.S.C. §2

101.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

102.    The relevant product market is the market for the sale of B2B Credit Scores.

103.    The relevant geographic market for the sale of B2B Credit Scores is the United States.

104.    The B2B Credit Score Market is the relevant market.

105.    Fair Isaac has had and continues to have at least 90% market share in the B2B Credit Score Market.

106.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

107. Fair Isaac has had and continues to have the power to control prices or exclude competition in the B2B Credit Score Market.

108. Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B Credit Scores in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

109. Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand and to supracompetitive levels.

110. Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

111. Fair Isaac's monopolization has injured and will continue to injure competition in this market.

112. Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

113. The anticompetitive conduct raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

114. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

115. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

## CLAIM TWO:
## CONSPIRACY TO MONOPOLIZE
## 15 U.S.C. §2

116.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

117.    The relevant product market is the market for the sale of B2B Credit Scores.

118.    The relevant geographic market for the sale of B2B Credit Scores is the United States.

119.    The B2B Credit Score Market is the relevant market.

120.    Fair Isaac has had and continues to have at least 90% market share in the B2B Credit Score Market.

121.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

122.    Fair Isaac has had and continues to have the power to control prices or exclude competition in the B2B Credit Score Market.

123.    Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market for B2B Credit Score Market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

124.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand, and to supracompetitive levels.

125.    Fair Isaac entered into a combination or conspiracy with the Credit Bureaus to maintain its monopoly power in the B2B Credit Score Market.  Fair Isaac created and maintained this conspiracy through a series of agreements with each of the Credit Bureaus.   In these

27

agreements, the Credit Bureaus and Fair Isaac agreed that the Credit Bureaus would not offer or sell VantageScore or any other competing Credit Score to Plaintiff and members of the Class. Fair Isaac and the Credit Bureaus further agreed that the Credit Bureaus would act as Fair Isaac's agent in the sale of FICO Scores to Plaintiff and members of the Class.

126. These agreements foreclosed competition in a substantial portion of the B2B Credit Score Market and unlawfully maintained Fair Isaac's monopoly, resulting in Fair Isaac extracting supracompetitive prices for FICO Scores from Plaintiff and members of the Class.

127. Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

128. Fair Isaac's monopolization conspiracy has injured and will continue to injure competition in this market.

129. Fair Isaac has acted with the specific intent of monopolizing the market for B2B Credit Scores in the United States.

130. Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

131. The conspiracy raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

132. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 2 of the Sherman Act within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

133. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

## CLAIM THREE:
## UNREASONABLE RESTRAINT OF TRADE
## 15 U.S.C. §1

134.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

135.    The relevant product market is the market for the sale of B2B Credit Scores.

136.    The relevant geographic market for the sale of B2B Credit Scores is the United States.

137.    The B2B Credit Score Market is the relevant market.

138.    Fair Isaac and the Credit Bureaus have had and continue to collectively have at least 90% market share in the B2B Credit Score Market.

139.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

140.    Fair Isaac has had and continues to have the power to control prices or exclude competition in the B2B Credit Score Market.

141.    Fair Isaac entered into agreements with TransUnion, Experian, and Equifax that contained anticompetitive terms whereby each Credit Bureau agreed not to offer or sell VantageScore as a competing product to Plaintiff and members of the Class.

142.    The agreements between Fair Isaac and the Credit Bureaus had substantial anticompetitive effects.  The agreements excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

143.    The agreements raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

144.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

145. Plaintiff and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac does not cease its anticompetitive conduct.

146. Plaintiff and members of the Class have been injured in their business or property by reason of Defendant's violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

147. Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendant's continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

## CLAIM FOUR:
## STATE ANTITRUST LAWS

148. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

149. By reason of the foregoing, Defendant has violated, and Plaintiff and members of the Class are entitled to relief under, the antitrust laws of the States of Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

  i. Arizona Revised Statutes §44-1401, *et seq*.;

  ii. California Cartwright Act, California Business & Professions Code §16700, *et seq*.

  iii. Connecticut Antitrust Act, Conn. Gen. Stat. 35-24, *et seq*.;

  iv. District of Columbia Code §28-4501, *et seq*.;

  v. Hawaii Revised Statutes §480-2, *et seq*.;

    vi.   Illinois Antitrust Act, Illinois Complied Statutes §740, Ill. Comp. Stat. 1011, *et seq.*;

    vii.   Iowa Competition Law, Iowa Code §553.1, *et seq.*;

    viii.   Kansas Statutes Annotated §50-101, *et seq.*;

    ix.   Maine Revised Statutes Annotated, tit. 10, §1101, *et seq.*;

    x.   Maryland Code Annotated, Commercial Law, §11-204, *et seq.*;

    xi.   Michigan Compiled Laws §445.771, *et seq.*;

    xii.   Minnesota Antitrust Law of 1971, Minnesota Statutes §325D.49, *et seq.*;

    xiii.   Mississippi Code Annotated §75-21-1, *et seq.*;

    xiv.   Nebraska Revised Statutes §59-801, *et seq.*;

    xv.   Nevada Revised Statutes Annotated §598A.010, *et seq.*;

    xvi.   New Mexico Statutes Annotated §57-1-1, *et seq.*;

    xvii.   New York Donnelly Act, New York General Business Law §340, *et seq.*;

    xviii.   North Carolina General Statutes §75-1, *et seq.*;

    xix.   North Dakota Century Code §51-08.1-01, *et seq.*;

    xx.   Oregon Revised Statutes §646.705, *et seq.*;

    xxi.   Rhode Island General Laws §6-36-4, *et seq.*;

    xxii.   South Dakota Codified Laws §37-1-3.1, *et seq.*;

    xxiii.   Tennessee Code Annotated §47-25-101, *et seq.*;

    xxiv.   Utah Code Annotated §76-10-3104, *et seq.*;

    xxv.   Vermont Statutes Annotated, tit. 9, §2451, *et seq.*;

    xxvi.   West Virginia Code §47-18-1, *et seq.*; and

    xxvii.   Wisconsin Statutes §133.01, *et seq.*

## CLAIM FIVE:
## STATE UNFAIR TRADE PRACTICES LAWS

150.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

151.    By reason of the foregoing, Defendant has violated, and Plaintiff and members of the Class are entitled to relief under, the Unfair Trade Practices and Consumer Protection Laws of the States of Arkansas, California, Connecticut, Florida, Massachusetts, Missouri, Montana, New Mexico, New York, North Carolina, Rhode Island, South Carolina, and Vermont, as well as the District of Columbia, as follows:

      i.    Arkansas Code Annotated, §4-88-101, *et seq.*;

      ii.    California Business and Professions Code §17200, *et seq.*;

      iii.    Connecticut Unfair Trade Practices Act, Conn Gen. Stat. §42-110a, *et seq.*;

      iv.    District of Columbia Code §28-3901, *et seq.*;

      v.    Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.*;

      vi.    Massachusetts Consumer Protection Act, Mass. Gen. L. Ch. 93A, *et seq.*;

      vii.    Missouri Merchandising Practices Act, Mo. Rev. Stat. §407.010, *et seq.*;

      viii.    Montana Code, §30-14-103, *et seq.*, and §30-14-201, *et seq.*;

      ix.    New Mexico Statutes Annotated §57-12-1, *et seq.*;

      x.    New York General Business Law §349, *et seq.*;

      xi.    North Carolina General Statutes §75-1.1, *et seq.*;

      xii.    Rhode Island General Laws §6-13.1-1, *et seq.*;

      xiii.    South Carolina Code Annotated §39-5-10, *et seq.*; and

      xiv.    Vermont Statutes Annotated, tit. 9, §2451, *et seq.*

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and members of the Class, respectfully prays that This Honorable Court:

A.     Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that it be named a Class Representative, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B.     Adjudge that Defendant violated the federal antitrust laws as set forth above;

C.     Adjudge that Defendant violated the state antitrust and unfair trade practices laws as set forth above;

D.     Award Plaintiff and members of the Class actual, treble, and exemplary damages;

E.     Award Plaintiff and members of the Class attorneys' fees and costs of suit, including costs of consulting and testifying experts;

F.     Award Plaintiff and members of the Class pre- and post-judgment interest;

G.     Enjoin Defendant from its violations of law; and

H.     Grant such other, further and different relief, including structural relief, as may be just and proper.

## IX.    DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a Trial by Jury as to all issues so triable.

Dated:  April 2, 2020

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 s/ Joseph P. Guglielmo
Joseph P. Guglielmo (N.D. Ill. No. 2759819)
Peter A. Barile III (N.D. Ill. No. 4364295)

Justin W. Batten (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
jgugliemo@scott-scott.com
pbarile@scott-scott.com
jbatten@scott-scott.com

Christopher M. Burke (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone:  619-233-4565
Facsimile:  619-233-0508
cburke@scott-scott.com

George A. Zelcs (Ill. Bar No. 3123738)
Randall P. Ewing, Jr. (Ill. Bar No. 6294238)
Ryan Z. Cortazar (Ill. Bar No. 6323766)
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile:  312-641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Steven M. Berezney (N.D. Ill. Bar No. 56091)
Michael E. Klenov (Ill. Bar No. 6300228)
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: 314-241-4844
Facsimile:  314-241-3525
sberezney@koreintillery.com
mklenov@koreintillery.com

*Counsel for Plaintiff Sky Federal Credit Union*

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE FICO ANTITRUST LITIGATION | ) | Judge Edmond E. Chang |
|  | ) |  |
|  | ) | Magistrate Judge David E. Weisman |
| This Document Relates to the Following Cases: | ) |  |
|  | ) | No. 1:20-CV-02114 |
| DIRECT PURCHASER CASES | ) | JURY TRIAL DEMANDED |
|  | ) |  |

## DIRECT PURCHASER PLAINTIFFS'
## FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

NATURE OF THE ACTION ..................................................................................... 1

PARTIES ................................................................................................................ 6

    I.      PLAINTIFFS ............................................................................... 6

    II.     DEFENDANTS ............................................................................ 9

JURISDICTION, VENUE, AND INTERSTATE COMMERCE ............................... 9

FACTUAL ALLEGATIONS ................................................................................... 10

    I.      CREDIT SCORING AND REPORTING ........................................... 10

         A.    Credit Scores ...................................................................... 10

         B.    Credit Reports ..................................................................... 12

    II.     THE MARKETS FOR CREDIT SCORES IN THE UNITED STATES ............ 15

    III.    FAIR ISAAC'S MONOPOLY POWER IN THE B2B CREDIT SCORE MARKET ..................................................................................... 19

    IV.    VANTAGESCORE SOLUTIONS' ENTRY INTO THE B2B CREDIT SCORE MARKET AND ITS INNOVATIVE PRODUCT ................................. 23

    V.     FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT.. 27

         A.    Fair Isaac's Anticompetitive Litigation ................................. 27

         B.    Litigation Between Fair Isaac and TransUnion ........................ 29

         C.    Fair Isaac and the Credit Bureaus' Agreements to Restrain Competition 31

              1.    Fair Isaac and the Credit Bureaus Agree to Anticompetitive Provisions in Licensing Agreements ............................. 31

              2.    The Anticompetitive Terms of the Contracts Fair Isaac and the Credit Bureaus Entered into ........................................ 34

                   i.    The "No Equivalent Products" Provisions........................ 37

                   ii.    The "Dynamic Royalty Schedule" Provisions.................. 38

                   iii.    The "Level Playing Field" Provisions .............................. 41

         D.    Fair Isaac's Additional Efforts to Deter B2B Purchasers from Using VantageScore ..................................................................... 46

    VI.    THE CONTRACTS BETWEEN FAIR ISAAC AND EACH OF THE CREDIT BUREAUS CONTAINING ANTICOMPETITIVE TERMS, ALONG WITH FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT, HARM COMPETITION IN THE B2B CREDIT SCORE MARKET ................ 50

CLASS ACTION ALLEGATIONS .......................................................................... 51

STATUTES OF LIMITATIONS AND TOLLING...................................................... 53

I. THE STATUTES OF LIMITATIONS DID NOT BEGIN TO RUN BECAUSE PLAINTIFFS DID NOT DISCOVER, AND COULD NOT HAVE DISCOVERED, DEFENDANTS' UNLAWFUL SCHEME ............................... 53

II. FRAUDULENT CONCEALMENT TOLLED THE STATUTES OF LIMITATIONS ................................................................................. 55

III. DEFENDANTS' ACTIONS CONSTITUTE A CONTINUING VIOLATION .. 57

CLAIMS FOR RELIEF ................................................................................. 58

CLAIM ONE: UNREASONABLE RESTRAINT OF TRADE
(15 U.S.C. §§1, 3) ................................................................................. 58

CLAIM TWO: UNREASONABLE RESTRAINT OF TRADE
(15 U.S.C. §§1, 3) ................................................................................. 60

CLAIM THREE: UNREASONABLE RESTRAINT OF TRADE
(15 U.S.C. §§1, 3) ................................................................................. 62

CLAIM FOUR: UNREASONABLE RESTRAINT OF TRADE
(15 U.S.C. §§1, 3) ................................................................................. 64

CLAIM FIVE: MONOPOLIZATION
(15 U.S.C. §2) ................................................................................. 66

CLAIM SIX: STATE ANTITRUST LAWS ................................................. 67

CLAIM SEVEN: STATE UNFAIR AND DECEPTIVE TRADE PRACTICES
LAWS ................................................................................. 78

PRAYER FOR RELIEF ................................................................................. 92

DEMAND FOR JURY TRIAL ................................................................... 93

CERTIFICATE OF SERVICE ................................................................... 97

Plaintiffs Sky Federal Credit Union, Alcoa Community Federal Credit Union, Amalgamated Bank, City of Boston Credit Union, First Choice Federal Credit Union, Getten Credit Company, and Holmes County Bank & Trust Company ("Plaintiffs"), on behalf of themselves and all similarly situated entities in the United States and its territories, bring this action pursuant to Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§1, 2, 3) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26), as well as certain state antitrust and consumer protection laws, against Defendants Fair Isaac Corporation ("Fair Isaac"), Equifax, Inc. ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and TransUnion, LLC ("TransUnion") (collectively "Defendants," with the latter three referred to collectively as the "Credit Bureaus," the "Credit Rating Agencies," or the "Credit Bureau Defendants"), resulting from their restraining trade and Fair Isaac's monopolizing the B2B Credit Score Market from October 1, 2006 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased (the "Class Period"). The allegations of this Complaint are based on personal knowledge as to the allegations concerning each Plaintiff and on information and belief as to all other matters.

## NATURE OF THE ACTION

1.     A "credit score" is a three-digit numerical summary of a customer's creditworthiness based on factors such as payment history and the duration of that history; balances, available credit, and the percentage of existing credit lines being utilized; public records like bankruptcies or adverse judgments; and the assumption of new debt. There are two distinct markets for such scores. The first is the market for the sale of such scores to banks, mortgage companies, credit unions, and other businesses that assess individual credit risk – *i.e.*, business-to-business sales. That market is referred to herein as the "B2B Credit Score Market." The second

is the market for the sale of such scores to the individual who is the subject of them – *i.e.*, business-to-consumer. That market is referred to herein as the "B2C Credit Score Market."

2.      This case concerns the B2B Credit Score Market, which Defendant Fair Isaac has dominated for nearly three decades (and continues to dominate) with its FICO® Scores. FICO Scores are used routinely by lenders and others to assess individual credit risks. Fair Isaac executives have bragged that their FICO Scores are "the 800-pound gorilla" and are "deeply embedded in the system in North America."[1] Fair Isaac advertises that its FICO Scores are used for 90% of all lending decisions in the United States and that Fair Isaac sells four times more FICO Scores per year than McDonald's sells hamburgers worldwide. The dominance of FICO Scores is reflected in the following chart taken from a December 2019 "Investor Overview" presentation that is available on Fair Isaac's corporate website:[2]



---

[1]      Trans Union LLC's Redacted Counterclaims, Dkt. 38, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318, ¶2 (N.D. Ill. Feb. 12, 2018) ("TransUnion Counterclaims").

[2]      Fair Isaac, *FICO: The Decisions Company Investor Overview*, at 5 (Dec. 2019), https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.

3.     TransUnion, Experian, and Equifax are credit reporting agencies that collect, standardize, and distribute information on the credit and financial history of individuals.  Those Credit Bureaus sell lenders, financial institutions, and other businesses credit reports and credit scores – including Fair Isaac's FICO Scores – that are used to make decisions about whether and on what terms to evaluate and extend credit.  Credit Bureaus sell those credit reports and credit scores to businesses in every state.  The three Credit Bureau Defendants control virtually 100% of aggregate credit-related data formed by aggregating credit data collected from businesses, and they jointly dominate the market for B2B credit reports.

4.     For decades, the Credit Bureaus have worked with Fair Isaac, including by entering into licensing agreements with Fair Isaac, and distribution agreements with businesses and/or Fair Isaac to broker sales of FICO Scores.

5.     Fair Isaac also directly sells FICO Scores to creditors and other businesses – bypassing the Credit Bureaus, and competing with them, when it does so.

6.     In 2006, the Credit Bureaus banded together to launch VantageScore Solutions, LLC ("VantageScore Solutions") through a joint venture.  The Credit Bureaus own VantageScore Solutions.  The Credit Bureaus' purpose behind their joint venture was to create a competitor to the FICO Score, known as the "VantageScore."[3]

---

[3]     *See* Third Amended Complaint, Dkt. 436, *Fair Isaac Corporation v. Experian Info. Sols.*, No. 06-CV-4112, ¶63 (D. Minn. Nov. 10, 2008) ("VantageScore is owned by Equifax, Experian, and TransUnion."); Dkt. 477, Credit Bureaus' Answer to Third Amended Complaint, *Fair Isaac Corporation v. Experian Info. Sols.*, No. 06-CV-4112, ¶63 (D. Minn. Dec. 4, 2008) (admitting same); Business Wire, *VantageScore Solutions Hires Capital Markets Expert Latonia Hubbs as Senior Vice President* (Sept. 7, 2021), https://www.businesswire.com/news/home/20210907005583/en/VantageScore-Solutions-Hires-Capital-Markets-Expert-Latonia-Hubbs-as-Senior-Vice-President.

7.     From the outset, VantageScore was competitively priced, highly predictive, and scored millions more Americans than Fair Isaac's FICO Score.  VantageScore Solutions is capable of providing credit scores for 30 million more Americans than Fair Isaac can.  Notably, Fair Isaac leaves many people of color and lower-income individuals unscored.  Were VantageScores widely adopted by businesses, millions more creditworthy Americans would have the opportunity to apply for a home mortgage, car loan, or credit card, and to obtain credit at a lower cost.

8.     Rather than compete on the merits with VantageScore, Fair Isaac undertook a *decades-long campaign of anticompetitive conduct* to discourage the adoption of VantageScore and preserve its own monopoly.  Fair Isaac also entered into contracts with each Credit Bureau that contained anticompetitive provisions, including provisions that would necessarily eliminate or drastically reduce the competitive threat posed by VantageScore, thus unreasonably restraining trade.

9.     First, in 2006, Fair Isaac filed a lawsuit against TransUnion, Equifax, and Experian with the intended purpose of driving VantageScore Solutions out of business.  Experian settled in 2008 and entered into a lucrative partnership with Fair Isaac following the settlement.  TransUnion and Equifax fought on, eliminated most of Fair Isaac's claims through a summary judgment motion and won a jury trial on the remaining trademark claim.

10.    Second, when the litigation gambit failed, Fair Isaac entered into contracts with the Credit Bureaus containing anticompetitive restrictions aimed at extracting supracompetitive profits from B2B Purchasers.  Those contracts include contractual provisions that: (1) prohibit Credit Bureaus from marketing non-FICO credit scores (*i.e.*, VantageScore); (2) charge discriminatory and prohibitively high prices for FICO Scores if a Credit Bureau customer purchases a FICO Score while providing the consumer with a competing score (*i.e.*, a

VantageScore); and (3) eliminate price competition among the Credit Bureaus thereby disincentivizing the Credit Bureaus from negotiating a lower price for FICO Scores. The agreements had the effect of hobbling VantageScore Solutions' ability to compete and forcing B2B Purchasers to pay supracompetitive prices for credit scores.

11. Finally, Fair Isaac commenced a public smear campaign intended to dissuade potential customers from using VantageScore.

12. By unlawfully maintaining its monopoly through such anticompetitive tactics, Fair Isaac, with the agreement of the Credit Bureaus, has been able to exclude VantageScore from competing for customers in the B2B Credit Score Market. The effect of this exclusion has been Fair Isaac's ability to **maintain the prices for FICO Scores at a supracompetitive level for decades and raise prices with impunity for its credit scoring products**. For example, Fair Isaac's net income for the third quarter of 2021 was **more than double** that of the previous year period, increasing from $64.1 million in the third quarter of 2020 to $151.2 million in the third quarter of 2021.[4] Over time, Fair Isaac's net income has remained very high, with $236 million net income in 2020, $392 million in 2021, and $374 million in 2022.[5] Sources in the financial industry have attributed Fair Isaac's profitability to "[p]rice increases in its credit scoring segment and gains in

---

[4] Press Release, Fair Isaac, *FICO Announces Earnings of $5.18 per Share for Third Quarter Fiscal 2021* (Aug. 3, 2021), https://investors.fico.com/news-releases/news-release-details/fico-announces-earnings-518-share-third-quarter-fiscal-2021.

[5] Fair Isaac Corporation, Q4 2020 Earnings Call, BAMSEC (Nov. 10, 2020), https://www.bamsec.com/document-search?query=236&entityId=814547; Fair Isaac Corporation, Q4 2020 Earnings Call, BAMSEC (Nov. 10, 2020), https://www.bamsec.com/document-search?query=392&entityId=814547; Fair Isaac Corporation, Q4 2022 Earnings Call, BAMSEC (Nov. 9, 2022), https://www.bamsec.com/document-search?query=374&entityId=814547.

applications sold to banking institutions," which have "helped the company log year-over-year gains in revenue and profit."[6]

13.     Fair Isaac's and the Credit Bureaus' conduct harmed competition and injured Plaintiffs and members of the class by forcing them to pay supracompetitive prices for FICO Scores.

14.     Plaintiffs and the Class are the first purchasers from outside the Fair Isaac-Credit Bureaus conspiracies.

## PARTIES

### I.      PLAINTIFFS

15.     Plaintiff Sky Federal Credit Union ("Sky FCU") is a federally chartered credit union with a principal place of business at 111 North B Street, Livingston, Montana.  Sky FCU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers.  During the Class Period, Sky FCU directly purchased B2B credit scores from Fair Isaac and Experian.  Sky FCU was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law.  Sky FCU is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

16.     Plaintiff Alcoa Community Federal Credit Union ("Alcoa FCU") is a Federal Credit Union with its principal place of business at 1125 Military Road, Benton, Arkansas.  Alcoa FCU makes loans and other credit-related facilities available to consumers.  Alcoa FCU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards,

---

[6]      Motley Fool, *Fair Isaac Corporation Scores 13% Revenue Growth in the First Quarter* (Jan. 31, 2019), https://www.fool.com/investing/2019/01/31/fair-isaac-corporation-scores-13-revenue-growth-in.aspx.

and lending and other credit-related facilities for consumers. During the Class Period, Alcoa FCU directly purchased B2B credit scores from Fair Isaac, TransUnion, and Experian. Alcoa FCU was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Alcoa FCU is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

17. Plaintiff Amalgamated Bank ("Amalgamated Bank") is a New York State chartered commercial bank and trust company with a principal place of business at 275 Seventh Avenue, New York, New York. Amalgamated Bank is the largest union-owned bank in the United States. Workers United and affiliated organizations are the largest shareholders of Amalgamated Bank. Amalgamated Bank provides financial services, including personal banking services for consumers; services for businesses, non-profit organizations; and institutional investing services. During the Class Period, Amalgamated Bank directly purchased B2B credit scores from Fair Isaac, Experian, and Equifax. Amalgamated Bank was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Amalgamated Bank is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

18. Plaintiff City of Boston Credit Union ("City of Boston CU") is a credit union with its principal place of business at One Union Street, 3rd Floor, Boston, Massachusetts. City of Boston CU is a member-owned credit union that was established on November 15, 1915. City of Boston CU is one of the oldest credit unions in the United States. City of Boston CU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers. During the Class Period, City of Boston CU directly purchased B2B credit scores from Fair Isaac and Experian. City of Boston

CU was injured in its business or property as a direct, proximate, and material result of Defendants'
violations of law.  City of Boston CU is threatened with future injury to its business and property
by reason of Defendants' continuing violations of law.

19.     Plaintiff First Choice Federal Credit Union ("First Choice FCU") is a federally
chartered credit union with a principal place of business at 2209 West State Street, New Castle,
Pennsylvania.  First Choice FCU is a financial institution that provides financial services, including
deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for
consumers.  During the Class Period, First Choice FCU directly purchased B2B credit scores from
Fair Isaac and TransUnion.  First Choice FCU was injured in its business or property as a direct,
proximate, and material result of Defendants' violations of law.  First Choice FCU is threatened
with future injury to its business and property by reason of Defendants' continuing violations of
law.

20.     Plaintiff Getten Credit Company ("Getten") is a corporation with its principal place
of business at 1310 Sibley Memorial Highway, Mendota, Minnesota.  Getten is a small, family-
owned independent finance company that specializes in helping consumers with various financial
needs including debt consolidation, purchasing vehicles, and rebuilding credit.  During the Class
Period, Getten directly purchased B2B credit scores from TransUnion.  Getten was injured in its
business or property as a direct, proximate, and material result of Defendants' violations of law.
Getten is threatened with future injury to its business and property by reason of Defendants'
continuing violations of law.

21.     Plaintiff Holmes County Bank & Trust Company ("Holmes County Bank") is a
bank with its principal place of business at 316 Court Square, Lexington, Mississippi.  Holmes
County Bank has provided financial services to its customers since 1932.  During the Class Period,

8

Holmes County Bank directly purchased B2B credit scores from Equifax and TransUnion. Holmes County Bank was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Holmes County Bank is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

## II.    DEFENDANTS

22.    Defendant Fair Isaac is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California.

23.    Defendant Equifax is a Credit Bureau incorporated in Georgia that has its principal place of business at 1550 Peachtree St. NW, Atlanta, Georgia.

24.    Defendant Experian is a Credit Bureau incorporated in Ohio that has its principal place of business in the United States at 475 Anton Blvd., Costa Mesa, California.

25.    Defendant TransUnion is a Delaware limited liability Credit Bureau that has its principal place of business at 555 W. Adams St., Chicago, Illinois.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

26.    This action arises under Sections 1 through 3 of the Sherman Act (15 U.S.C. §§ 1-3) and Sections 4 & 16 of the Clayton Act (15 U.S.C. §§ 15 & 26).

27.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337.

28.    The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims.

29.    Venue is proper in this District under 15 U.S.C. §§ 15(a) & 22, and 28 U.S.C. § 1391(b), (c), and (d), because, during the Class Period, Defendants resided, transacted business, were found, or had agents in the United States, including in this District, and a substantial portion of the alleged activity affected interstate trade and commerce, including in this District.

30. During the Class Period, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States and its territories, including in this District.

31. During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States Mail, to effectuate their illegal scheme.

32. Defendants' conduct also had a substantial effect on the intrastate commerce of the states listed in counts Six and Seven of this Complaint.

33. This Court has personal jurisdiction over Defendants because Defendants transacted business, maintained substantial contacts, and are located and/or committed unlawful conduct in this District. Their unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

## FACTUAL ALLEGATIONS

## I. CREDIT SCORING AND REPORTING

### A. Credit Scores

34. A credit score is a three-digit number, typically between 300 and 850, designed to represent an individual's credit risk or the likelihood the individual will pay bills on time.

35. Credit scores are calculated using information in an individual's credit reports, including an individual's payment history, the amount of debt the individual has, and the length of the individual's credit history. Higher scores mean the individual has demonstrated responsible credit behavior in the past, which may make potential lenders and creditors more confident when evaluating a request for credit. Credit scoring companies like Fair Isaac and VantageScore Solutions apply complex algorithms to arrive at a numerical credit score.

36.     Credit scores are accompanied by "reason codes," which explain to the potential lender or creditor why the score was not higher.  VantageScore explains this process as follows:

No matter where you get your score, the documents that accompany it will include up to four or five statements explaining why your score wasn't higher.  These statements are called reason codes and sometimes go by several other names.  Some people call them score factors, others call them adverse action codes.  They're all the same thing.

The next time you see your credit score, regardless of where it comes from, look for the reason codes.  They'll be worded and displayed something like this:

Your Credit Score Is: 705

32: Balances on bankcard or revolving accounts too high compared to credit limits

16: The total of all balances on your open accounts is too high

85: You have too many inquiries on your credit report

13: Your most recently opened account is too new

The numbers preceding each statement are numeric identifiers; sometimes they appear with the text, and sometimes they do not.

The four (or five) factors are listed in order of the impact they have.  In this example, the number one reason the credit score is not higher is "Balances on bankcard or revolving accounts too high compared to credit limits."  That means the consumer's credit card debt is too high relative to his or her credit limits.

In our example, the reason with the second-greatest impact is "The total of all balances on your open accounts is too high."  That means the consumer is carrying too much debt on his or her open accounts.

The third reason the score isn't higher is "You have too many inquiries on your credit report."  This means the consumer has recently applied for credit several times, which led to some number of credit inquiries.

The fourth reason the score isn't higher is "Your most recently opened account is too new."  Clearly this means the consumer has a very new account on his or her credit report.[7]

---

[7]     VantageScore Solutions, *Reason Codes 101*, https://www.reasoncode.org/reasoncode101 (last visited on Oct. 30, 2023).

37.     Fair Isaac has a webpage that sets forth its various "reason codes."[8]  VantageScore also has a dedicated website that explains its various "reason codes."[9]

**B.     Credit Reports**

38.     Credit Bureaus collect and store financial data about individuals that is submitted to them by creditors, such as lenders, credit card companies, and other financial companies. Creditors are not required to report to every credit-reporting company.

39.     Utilizing these files, Credit Bureaus create a credit report, which is a statement that has information about an individual's credit activity and current credit situation, such as loan payment history and the status of credit accounts.  The information contained in such reports is used to create credit scores.

40.     Credit Bureaus sell these credit reports to lenders or creditors such as Plaintiffs and the Class ("B2B Purchasers") in the "B2B market."  They also sell them to individuals wishing to monitor their own credit ("B2C Purchasers").

41.     Fair Isaac works with the Credit Bureaus to perpetuate and extend its monopoly. Fair Isaac's relationship with B2B Purchasers is often dependent on B2B Purchasers' relationships with the Credit Bureaus: The Credit Bureaus facilitate the sale of FICO Scores to B2B Purchasers.

42.     FICO Scores and credit reports are often sold to businesses as a bundle.  Such bundles can be sold by Credit Bureaus, which are licensed by Fair Isaac to sell FICO Scores and in return, pay a royalty to Fair Isaac.  Thus, when a B2B Purchaser requires a credit score, it purchases a credit report from a Credit Bureau and a credit score from that Credit Bureau and Fair

---

[8]     Fair Isaac, *US FICO® Score Reason Codes*, https://www.fico.com/en/latest-thinking/solution-sheet/us-fico-score-reason-codes (link to download) (last visited on Oct. 30, 2023).

[9]     VantageScore Solutions, REASONCODE.ORG, https://www.reasoncode.org (last visited Oct. 26, 2023).

Isaac often through a contract with both Fair Isaac and the Credit Bureau. Although the payment for the credit report and the credit score may at times occur in a single transaction, the reality is that both the Credit Bureau and Fair Isaac act as the providers of the FICO Score. Indeed, certain Class members' contracts for the sale of FICO Scores and credit reports to B2B Purchasers specify that "in consideration of [the Credit Bureau]/Fair Isaac's performance" of their obligations to provide those products, the purchaser shall "pay [the Credit Bureau]/Fair Isaac fees" for those products.

43.     In its 2020 Form 10-K filed with the Securities and Exchange Commission, Fair Isaac stated that, "[d]uring fiscal 2020, 2019 and 2018, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for 32%, 29% and 25% of our total revenues, respectively."[10]  In its 2022 Form 10-K filed with the SEC, Fair Isaac disclosed significant increases of the revenue Fair Isaac generated from its agreements with the Credit Bureaus, reporting that "during fiscal 2022, 2021 and 2020, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for *39*%, *38*% and *33*% of our total revenues, respectively."[11]  The same Form 10-K describes the Credit Bureaus as Fair Isaac's "partners in offering [FICO's] scoring solutions."[12]

44.     The FICO Score and credit report bundles can also be sold by Fair Isaac to businesses. "In those situations, Fair Isaac requests a credit score and credit report from the Credit Bureau selected by the lender or consumer. The Credit Bureau applies Fair Isaac's Bureau-tailored

---

[10]     Fair Isaac Corporation, Annual Report (Form 10-K), at 11 (Nov. 10, 2020), https://fico.gcs-web.com/node/23951/html (hereinafter, "Fair Isaac 2020 10-K").

[11]     Fair Isaac Corporation, Annual Report (Form 10-K), at 9 (Nov. 9, 2022), https://fico.gcs-web.com/static-files/9050c8f5-9c87-4d41-8ecd-6d9f3d179a8a (hereinafter, "Fair Isaac 2022 10-K") (emphasis added).

[12]     *Id.*

FICO algorithm to a consumer's aggregated credit data and provides the consumer's credit report and credit score to Fair Isaac. Fair Isaac then delivers the bundle to the consumer or lender. Fair Isaac pays the Credit Bureau for the cost of processing and providing the bundle."[13]

45. Thus, Fair Isaac and the Credit Bureaus act as horizontal competitors and compete with each other for some B2B Purchasers – separate and apart from Fair Isaac's competition with VantageScore.

46. This direct competition between Fair Isaac and the Credit Bureaus, as well as the close relationship among them, continues to this day. At an August 3, 2021 earnings conference, Fair Isaac's Chief Executive Officer and Director, William J. Lansing, said, "we stay close to it [B2B scores] through our channel partners, the bureaus. But we also – certainly for all of the major institutions, we have direct sales relationships."[14] TransUnion's 2022 Form 10-K acknowledges that it "compete[s] with FICO in the Financial Services" market for B2B Purchasers.[15] Similarly, Equifax's 2022 Form 10-K acknowledges that it too "compete[s] with Fair Isaac Corporation with respect to certain of [its] analytical tools and solutions."[16] Experian has also recognized that its "comparator companies" include "FICO."[17]

---

[13]     *Fair Isaac Corp. v. Equifax, Inc*., No. 06-4112, 2008 WL 623120, at *2 (D. Minn. March 4, 2008).

[14]     Motley Fool, *Fair Isaac Corp. (FICO) Q3 2021 Earnings Call Transcript* (Aug. 3, 2021) (hereinafter, "Q3 Earnings Call"), https://www.fool.com/earnings/call-transcripts/2021/08/03/fair-isaac-corporation-fico-q3-2021-earnings-call/.

[15]     TransUnion, Annual Report (Form 10-K), at 12 (Feb. 14, 2023).

[16]     Equifax Inc., Annual Report (Form 10-K), at 8 (Feb. 23, 2023).

[17]     Experian *Annual Report 2022*, EXPERIAN PLC, (2022), at 139, https://www.experianplc.com/content/dam/marketing/global/plc/en/assets/documents/reports/2022/experian_ar2022_web.pdf.

## II.    THE MARKETS FOR CREDIT SCORES IN THE UNITED STATES

47.    As noted above, there are distinct B2B and B2C Credit Score Markets.  The B2B Credit Score Market comprises sales from a business (a credit score generator, such as Fair Isaac, directly or through a Credit Bureau) to a lender, creditor, or financial institution.  The B2C Credit Score Market comprises sales directly to an individual.  The claims in this case concern the B2B Credit Score Market.  The B2B Credit Score Market is the relevant product market in which the claims that require a market definition are to be assessed.

48.    Fair Isaac has recognized the existence of the distinct B2B and B2C markets.  For example, its 2020 Form-10K states: "*Scores*.  This segment includes our business-to-business scoring solutions and services, our business-to-consumer scoring solutions and services including myFICO® solutions for consumers, and associated professional services."[18]  Likewise, Fair Isaac measures quarterly scores revenues with "the company's business-to-business (B2B) scoring solutions and associated professional services, and business-to-consumer (B2C) service," as reflected in its recent earnings report for the first quarter of 2020.[19]

49.    The credit scores that lenders purchase often differ significantly from the credit scores that consumers purchase.  The Consumer Financial Protection Bureau ("CFPB") noted in a 2011 report to Congress that "many of the credit scores sold to lenders are not offered for sale to consumers."[20]  The agency went on to explain:

When a consumer purchases a score from a CRA [Credit Rating Agency], it is likely

---

[18]    Fair Isaac 2020 10-K, at 3.

[19]    Press Release, Fair Isaac Corp., *FICO Announces Earnings of $1.82 per Share for First Quarter Fiscal 2020* (Jan. 30, 2020), https://fico.gcs-web.com/news-releases/news-release-details/fico-announces-earnings-182-share-first-quarter-fiscal-2020.

[20]    Consumer Financial Protection Bureau, *The impact of differences between consumer- and creditor-purchased credit scores*, at 1 (July 19, 2011), https://files.consumerfinance.gov/f/2011/07/Report_20110719_CreditScores.pdf.

that the credit score that the consumer receives will not be the same score as that purchased and used by a lender to whom the consumer applies for a loan. This could occur if the score the consumer purchased is an educational score that is not used by lenders, but differences between the score a consumer buys and the score a lender buys can occur for other reasons as well. Since so many scores are in use in the marketplace, it could also be the case that the particular lender to which the consumer applies uses a different scoring model than the one purchased by the consumer, or that the CRA from which the consumer obtains a score is not the same CRA that the lender uses to obtain scores, or that the underlying data in the consumer's credit report changes significantly between the time the consumer purchases a score and the time the lender obtains a score for that consumer. It is also possible that a consumer and a lender could access different reports from the CRA, if they were to use different identifying information about the consumer. Any of these differences could lead to differences between the credit score a consumer sees and the credit score a lender uses to assess that consumer.[21]

50.    The United States (including its territories) is the relevant geographic market in which B2B credit scores are provided. The restraints on competition in the B2B Credit Score Market contained in Fair Isaac's contracts relate to the provision of B2B credit scores to businesses throughout the United States.

51.    The B2B Credit Score Market exhibits high barriers to entry. As noted in a 2018 article: "The deep integration of FICO scores and products into companies' operations has raised switching costs."[22]

52.    Likewise, VantageScore Solutions has observed that in the residential mortgage sector, Fair Isaac's "imprint *inhibits competition* by raising switching costs and granting the irreplaceable brand value of utter ubiquity. It gives FICO unparalleled and highly controversial negotiating leverage with almost every participant in the industry."[23]

---

[21]    *Id*.

[22]    *Fair Isaac: A Royalty on U.S. Credit Scoring* (Sept. 25, 2018), https://seekingalpha.com/article/4208014-fair-isaac-royalty-on-u-s-credit-scoring.

[23]    Press Release, VantageScore, *VantageScore Solutions Issues Statement Reacting to FHFA's Proposed Rules for Validating and Approving New Credit Scoring Models* (Dec. 17, 2018), https://vantagescore.com/press/vantagescore-solutions-issues-statement-reacting-to-fhfas-

53.     "Larger lenders use the [FICO] score as an input to customized models they've built for specific situations or portfolios.  After a recent review one major US lender recently identified over 600 places they were using a FICO score in their business processes.  Switching to a new score not only means proving the new score is better (a long process in itself) but extensive testing to ensure all of those moving parts are still working as designed.  Citibank recently announced that after an 18 month review they've decided it's safe to switch to the latest version of the FICO score (FICO 8).  This wasn't a migration to a new score mind you, just a more recent version of the score they're already using.  The **barriers to entry are indeed high** . . . and expensive."[24]

54.     "Network effects" – *i.e.*, the phenomenon where a product or service increases in value when the total number of customers increase – serve as a barrier to entry into the B2B Credit Score Market.  As one analyst has noted: "The 'network effects' keeping FICO's dominant position [are] indeed incredibly strong."[25]

55.     In 2011, at Fair Isaac's Analyst/Investor Day, Fair Isaac's then-CEO, Mark Greene, explained:  "In about 10 seconds, an entire commerce transaction taking place because 720 FICO was understood by the broker, by the mortgage banker on the other end of line and the customer to be shorthand for good credit risk, gave this guy a favorable mortgage rate.  And that network

---

proposed-rules-for-validating-and-approving-new-credit-scoring-models (emphasis added).

[24]    John Ulzheimer, *Why FICO Isn't Going Away Any Time Soon*, Smart Credit (July 5, 2011), https://blog.smartcredit.com/2011/07/05/why-fico-isnt-going-away-any-time-soon/ (emphasis added).

[25]    Harrison Schwartz, *Fair Isaac: Share Buybacks Likely To End As Cash Reserves Run Low*, Seeking Alpha (Dec. 17, 2019), https://seekingalpha.com/article/4312953-fair-isaac-share-buybacks-likely-to-end-cash-reserves-run-low.

effect, having everybody in the loop understand that shorthand and standardize on a FICO Score, that's magic."[26]

56.    The anticompetitive conduct by Fair Isaac alleged herein accounts in significant part for the FICO Score's dominance in the B2B Credit Score Market.

57.    The Credit Bureaus participate in a market for credit reports.  A credit report contains detailed information about a consumer's credit activity and current credit situation.  The detailed information in a credit report is used to generate a FICO Score for a specific customer, which B2B lenders can use in making their lending decisions.

58.    On information and belief, the Credit Bureaus control virtually all of the credit report market (they have been called a "triopoly") and enjoy roughly equivalent market shares.[27]

59.    The three Credit Bureaus are all members of a trade association called the Consumer Data Industry Association ("CDIA").  Through the CDIA, the three Credit Bureaus frequently work together, including to: (i) develop a standard electronic data reporting format called Metro 2®; (ii) issue joint statements on matters of public importance; (iii) provide guidelines to businesses that use credit reports; and (iv) respond to public criticisms of their industry.  The three Credit Bureaus also cooperated in the establishment of VantageScore Solutions as a joint venture.[28]

---

[26]    SA Transcripts, Seeking Alpha, *Fair Isaac Corp. – Analyst/Investor Day* (Nov. 3, 2011), https://seekingalpha.com/article/307417-fair-isaac-corp-analyst-investor-day.

[27]    *See* Consumer Financial Protection Bureau, *List of Consumer Reporting Companies* (2021), https://files.consumerfinance.gov/f/documents/cfpb_consumer-reporting-companies-list_2021-06.pdf.

[28]    *See* Consumer Data Industry Ass'n, *About CDIA*, https://www.cdiaonline.org/about/about-cdia/ (last visited Oct. 26, 2023); Consumer Data Industry Ass'n, *Metro 2 Format for Credit Reporting*, https://www.cdiaonline.org/resources/furnishers-of-data-overview/metro2-information/ (last visited Oct. 26, 2023); Dana Fowle, *Industry Pushes Back Against Claims of High Credit Reporting Errors*, Fox5 Atlanta (Sept. 15 2021), https://www.fox5atlanta.com/

## III.   FAIR ISAAC'S MONOPOLY POWER IN THE B2B CREDIT SCORE MARKET

60.   Fair Isaac came into existence in 1956, possessed a monopoly on credit-scoring

algorithms until the mid-1970s, and continues to wield a dominant market share.[29]

61.   Fair Isaac states in its 2020 Form 10-K:

> Our products and services serve clients in multiple industries, including primarily
> banking, insurance, retail, healthcare and public agencies.   End users of our
> products include 96 of the 100 largest financial institutions in the U.S., and two-
> thirds of the largest 100 banks in the world.   Our clients also include more than 600
> insurers, including nine of the top ten U.S. property and casualty insurers; more
> than 300 retailers and general merchandisers; more than 200 government or public
> agencies; and more than 200 healthcare and pharmaceuticals companies, including
> nine of the world's top ten pharmaceuticals companies.   Eight of the top ten
> companies on the 2020 *Fortune* 500 list use one or more of our solutions.   In
> addition, our consumer services are marketed to an estimated 200 million U.S.
> consumers whose credit relationships are reported to the three major U.S. credit
> reporting agencies.[30]

62.   Fair Isaac itself has touted its dominance, noting in its "About" page that FICO

Scores are "the most widely used credit scores," used by "90% of top lenders," and have been the

"industry standard for 30 years."[31]

---

news/industry-pushes-back-against-claims-of-high-credit-reporting-errors;   Press   Release,
Consumer Data Industry Ass'n, *Consumer Data Industry Association Releases Study on the Value
of Credit Reporting in U.S.* (June 15, 2020), https://cdia-news.s3.amazonaws.com/White+Paper+
Press+Release+6.15.20.pdf;   Kristina Poplawski, *Equifax, Experian, & TransUnion Endorse
CARES Act*, CONSUMER DATA INDUSTRY ASS'N (Mar. 30, 2020), https://www.cdiaonline.org/
equifax-experian-transunion-endorse-cares-act/;   Consumer Data Industry Ass'n, *COVID-19*,
https://www.cdiaonline.org/covid-19/ (last visited Oct. 26, 2023).

[29]   Raymond   Anderson,   *A   History   of   Credit   Scoring*,   at   75-76   (2019),
https://www.researchgate.net/profile/Raymond_Anderson4/publication/331533723_Chapter_B0
6_History_of_Credit_Scoring/links/5c7ed843299bf1268d3ccc5d/Chapter-B06-History-of-
Credit-Scoring.pdf?origin=publication_detail.

[30]   Fair Isaac 2020 10-K, at 10.

[31]   Fair Isaac, *About*, https://www.ficoscore.com/about (last visited Oct. 26, 2023).



63.     An infographic on Fair Isaac's website states: "10 BILLION FICO SCORES ARE SOLD EACH YEAR," which is "FOUR TIMES the number of hamburgers McDonald's sells WORLDWIDE in a year," and "27,400,000 FICO scores are sold every day," which is "OVER TWICE the number of cups of coffee Starbucks sells WORLDWIDE in a day."[32]

---

[32]     Fair Isaac, *Learn About the FICO Score and Its Long History*, https://www.fico.com/25years/ (last visited Oct. 26, 2023) [https://web.archive.org/web/2018 0602142433/https://www.fico.com/25years/].



64. Fair Isaac's 2020 Form 10-K states that FICO Scores "are used in the majority of U.S. credit decisions, by nearly all of the major banks, credit card organizations, mortgage lenders and auto loan originators," and it describes FICO Scores as "the standard measure in the U.S. of consumer credit risk."[33]

65. Fair Isaac's executives frequently tout FICO's dominance. In 2008, Craig Watts, a public affairs manager at Fair Isaac, described the FICO Score as the "800 pound gorilla."[34] In November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's former

---

[33] Fair Isaac 2020 10-K, at 3, 7.

[34] Dana Dratch, *What Does 'Good' Credit Really Mean?*, CNBC (Oct. 30, 2008), https://www.cnbc.com/id/27458815.

Chief Financial Officer and Executive Vice-President, Michael Pung, stated that Fair Isaac's FICO Scores are: the "most widely used credit scoring system here in the U.S.," used by "[v]irtually every major lender in the U.S.," and that Fair Isaac has "maintained a **90-plus percent market share** for at least .  .  . 13 years."[35]

66.     A May 2021 report by Yale University's Thurman Arnold Project, a collaborative project among Yale faculty and students, as well as other scholars dedicated to research on competition policy and antitrust enforcement, notes that Fair Isaac "enjoys *a virtual monopoly* in the credit score market" and that "[b]ecause of the lack of competition in this domain, there has been limited innovation in scoring methodology."[36]

67.     Fair Isaac's monopoly in the B2B Credit Score Market has given it the power to control prices and impose monopoly rents.  Indeed, Mr. Lansing, Fair Isaac's CEO, has noted that in the B2B Credit Score Market, Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are."[37]

68.     In February 2013, at a Morgan Stanley Conference, Mr. Lansing explained that Fair Isaac's "Scores business, which is the cash generator, is a very, very high-margin business.  It's *deeply embedded* into the systems of the bank customers who use it."[38]

---

[35]     TransUnion Counterclaims, ¶32 (emphasis added).

[36]     Yale University Thurman Arnold Project, *Updating Antitrust and Competition Policy: Finance Issues*, at 14, 15 (May 2021), https://som.yale.edu/sites/default/files/TeamFinance-Final.pdf (emphasis added).

[37]     TransUnion Counterclaims, ¶34.

[38]     Seeking Alpha, *Fair Isaac's CEO Presents at Morgan Stanley Technology, Media & Telecom Conference (Transcript)* (Feb. 27, 2013), https://seekingalpha.com/article/1231981-fair-isaacs-ceo-presents-at-morgan-stanley-technology-media-and-telecom-conference-transcript (emphasis added).

69.     And in a 2021 Earnings Call, in response to a question regarding an instance where Fair Isaac lost scoring business to a competitor, Mr. Lansing responded: "Our business in Scores is as strong as it has ever been.  Our volumes are very strong.  We have not seen a decline.  And we don't see major issuers switching away.  So I guess the best way to characterize that is a one-off."[39]

## IV.     VANTAGESCORE SOLUTIONS' ENTRY INTO THE B2B CREDIT SCORE MARKET AND ITS INNOVATIVE PRODUCT

70.     In March 2006, the three Credit Bureau Defendants founded VantageScore Solutions as a joint venture, with the purpose of offering a credit scoring model that would compete with FICO Scores.  The three Credit Bureau Defendants continue to own VantageScore Solutions.

71.     VantageScore Solutions offers its own credit scoring system and score called VantageScore.  VantageScore Solutions does not sell or market its VantageScore credit models or credit scores; instead, it licenses them to the three Credit Bureau Defendants, which may incorporate VantageScores in their credit reports.

72.     VantageScores are a competitor to FICO Scores in the B2B Credit Score Market.

73.     VantageScore was a response to a recognized need.  Many individuals receive no or lower scores under FICO.  For example, the CFPB has found that, as of 2010, 26 million consumers in the United States were "credit invisible" – *i.e.*, they lacked credit history with one of the nationwide credit reporting companies.[40]  Those individuals cannot be scored by FICO.[41]

---

[39]     Q3 Earnings Call, *supra* n.14.

[40]     CFPB Office of Research, *Data Point: Credit Invisibles*, at 4, 6 (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf.

[41]     *Id.*

74.     The CFPB's research suggests "a strong relationship between income and having a credit record.  Almost 30 percent of consumers in low-income neighborhoods are credit invisible and an additional 16 percent have unscored records.  These percentages are notably lower in higher-income neighborhoods.  For example, in upper-income neighborhoods, only 4 percent of the population is credit invisible and another 5 percent has an unscored record."[42]

75.     Moreover, the CFPB found "significant differences in the incidence of having a limited credit history across racial and ethnic groups," specifically, while White and Asian individuals "are almost equally likely to be credit invisible or have an unscored record, the shares of Black[] and Hispanic[] [individuals] with limited credit history are much larger," and individuals in those groups are thus less likely to be able to obtain a credit score.[43]

76.     According to the CFPB, "[a]bout 15 percent of Black[] and Hispanic[] [individuals] are credit invisible . . . and an additional 13 percent of [Black individuals] and 12 percent of [Hispanic individuals] have unscored records.  .  .  .  This elevated incidence . . . is observed across ages, suggesting that these differences across racial and ethnic groups materialize early in the adult lives of these consumers and persist thereafter."[44]

77.     The CFPB went on to conclude that "[t]hese results suggest that the problems that accompany having a limited credit history are disproportionally borne by Black[], Hispanic[], and lower-income consumers."[45]

---

[42]     *Id.* at 24.

[43]     *Id.*

[44]     *Id.* at 24-25.

[45]     *Id.* at 25.

78.     Credit Karma has summarized some of the key differences between FICO and VantageScore.  One is the duration of credit history needed to obtain a VantageScore as opposed to a FICO Score:

> To have FICO® scores, consumers need to have one or more accounts that have been open for at least six months and at least one account that has reported to the credit bureaus within the past six months (plus no indication on your credit reports of being deceased).  Otherwise, FICO won't generate your scores.
>
> On the other hand, the VantageScore® model may be able to score consumers who are new to credit or use credit infrequently.  VantageScore can use data of just one month's history and one account reported within the previous 24 months.
>
> So if you're new to credit or you haven't used credit in a while, you may not have FICO® credit scores, but you might have VantageScore® credit scores.[46]

79.     Another difference concerns treatment of tax liens and civil judgments:

> In July 2017, changes to public-record reporting requirements were implemented that affected the information sent to consumer credit bureaus, leading them to eliminate many tax liens and civil judgments from consumers' credit reports.  In response to the changes, tax liens aren't weighed as heavily (but can still have a significant impact) in the latest VantageScore version, VantageScore® 4.0.  And they can still have a significant impact on FICO® scoring models.[47]

80.     A third difference involves the treatment of credit inquiries:

> It's a Catch-22.  Applying for new lines of credit – such as student loans, credit cards or mortgages – can negatively affect your credit scores.  But applying for multiple lines in order to compare rates makes sense if you want to get the best deal.  To minimize the impact that shopping for credit can have on your scores, newer FICO® versions count multiple credit inquiries of the same type within a 45-day period as a single inquiry.  This can be especially helpful when you're shopping around for a major loan, like for a car, as multiple auto loan inquiries within that window should only count as one hard inquiry.  For some older FICO® versions, the single-inquiry period can be 14 days.
>
> VantageScore counts multiple inquiries, even for different types of loans, within a 14-day period as a single inquiry.  Multiple inquiries on your reports for the same

---

[46]     Jennifer Brozic, Credit Karma, *VantageScore vs. FICO: What's the difference?* (Sept. 1, 2019), https://www.creditkarma.com/advice/i/vantagescore-vs-fico/.

[47]     *Id.*

type of loan or credit, spanning more than a 14-day period, may have a greater impact to your VantageScore® credit scores than to your FICO® scores.[48]

81.     And the final difference of significance involves the use of trending data:

Credit scores represent a snapshot of an individual's credit profile at the specific point in time when the scores are generated.  The FICO® credit-scoring models, for example, use data about consumers' borrowing and credit utilization that's been reported to the credit bureaus at the time the scores are generated.

VantageScore® 4.0, on the other hand, incorporates data that reflects patterns of behavior over time.  The latest scores may include up to two years' worth of consumer spending and credit utilization data in its calculation.[49]

82.     VantageScore has achieved some limited success.  In a 2018 report, VantageScore Solutions stated:

During the twelve months ending in July 2017, over 1.4 billion VantageScore credit scores were delivered directly to consumers by lenders like Chase and Capital One and educational websites like CreditKarma, Lending Tree, and Mint.  These scores are calculated using the same VantageScore model used by lenders (i.e., not an "educational" model).  They are most often provided free of charge as part of educational offerings that include simulators, credit reports, educational articles, and explanations.[50]

83.     VantageScore Solutions went on to note that "[a]s lenders adopt VantageScore, we believe that such adoption will improve consumers' access to credit in certain segments and enable many more borrowers to obtain fairer pricing."[51]  VantageScore Solutions also reported that "many of the most sophisticated secondary market participants use the VantageScore model to help evaluate and monitor risk, and to price and benchmark deals more accurately."[52]

---

[48]     *Id.*

[49]     *Id.*

[50]     VantageScore Solutions, *VantageScore® Credit Scores and The Mortgage Market*, at 8 (2018)  ("VantageScore  Report"),  https://www.vantagescore.com/wp-content/uploads/2022/02/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf.

[51]     *Id.* at 5.

[52]     VantageScore  Solutions,  *Myth:  VantageScore  Is  Not  Accepted  by  Investors  in*

84.     Despite VantageScore's innovations and advantages, Fair Isaac has maintained its monopoly in the B2B Credit Score Market and extracted monopoly rents through anticompetitive and exclusionary conduct and through anticompetitive agreements with each Credit Bureau.

## V.     FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT

85.     Fair Isaac anticipated the threat VantageScore could pose to its dominance in the B2B Credit Score Market.  Fair Isaac's own models of future losses predicted "***substantial double-digit declines***" if the use of VantageScore continued to expand.[53]

86.     Faced with the prospect of a significant hit to its market dominance, and its profits, Fair Isaac used its monopoly power to launch a comprehensive attack on VantageScore that included filing anticompetitive litigation; signing licensing agreements with anticompetitive provisions with the Credit Bureaus; and undertaking a campaign of disparagement against, and disinformation about, VantageScore Solutions and VantageScore.

### A.     Fair Isaac's Anticompetitive Litigation

87.     Fair Isaac viewed the creation of VantageScore as a competitive threat and filed a lawsuit against the Credit Bureaus in October 2006, accusing them of copyright infringement (by using a three-digit credit score like Fair Isaac did), unfair advertising, and antitrust violations.  As part of its requested relief, Fair Isaac asked that the Credit Bureaus "be ordered to dissolve VantageScore and/or to take all measures necessary to prevent VantageScore from having an

---

*Securitization Markets* (Mar. 23, 2016), https://vantagescore.com/education/blog/myth-vantagescore-is-not-accepted-by-investors-in-securitization-markets.

[53]     *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, No. CV 06-4112, 2008 WL 11348223, at *2 (D. Minn. Nov. 3, 2008) (emphasis added).

unreasonable anticompetitive effect in any market."[54]  It made this claim even though, at the time, Fair Isaac had 94% of the B2B market.[55]

88.    VantageScore Solutions characterized the litigation Fair Isaac initiated as a "legal battle that **sought to put us out of business**, even as we scrambled to establish a competitive foothold."[56]  Fair Isaac raised bogus antitrust claims that it knew lacked foundation, given its then-94% share of the B2B Credit Score Market.  It also alleged trademark infringement that a jury found to be based on a trademark that Fair Isaac had fraudulently obtained from the U.S. Patent and Trademark Office ("PTO").  In addition, Fair Isaac's contention that the "300-850" marks were anything other than "merely" descriptive lacked all foundation because – as the U.S. Court of Appeals for the Eighth Circuit later held – "consumers in this market immediately understand '300-850' to describe the qualities and characteristics of FICO's credit score – that the credit score will be within the range of 300-850."[57]

89.    Equifax settled the litigation in June 2008 and formed "a partnership [with Fair Isaac] to develop and sell advanced analytics and scoring solutions for businesses and consumers."[58]

90.    The litigation against Equifax and TransUnion lasted into 2011.  While it was ongoing, VantageScore Solutions remained under a cloud, with Fair Isaac's lawsuit hobbling its

---

[54]    Second Amended Complaint, Dkt. 81, *Fair Isaac Corp. v. Equifax, Inc.*, No. 06 CV 4112, at 86 (D. Minn. Apr. 18, 2007).

[55]    *Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645 F. Supp. 2d 734, 738 (D. Minn. 2009).

[56]    VantageScore Solutions, Inc., *10 years, 10 milestones* (June 30, 2020), https://www.vantagescore.com/newsletter/10-years-10-milestones-1/ (emphasis added).

[57]    *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1148 (8th Cir. 2011).

[58]    Fair Isaac, *Equifax and Fair Isaac Enter Partnership to Accelerate Development and Delivery of New Analytic Solutions* (June 10, 2008), https://www.fico.com/en/newsroom/equifax-and-fair-isaac-enter-partnership-accelerate-development-and-delivery-new-analytic.

commercial prospects: Potential B2B Purchasers for VantageScore had no way of being sure that the product might not be declared infringing on Fair Isaac's trademarks or that VantageScore Solutions would not be dissolved.

91.     The district court entered summary judgment in favor of the Credit Bureaus on the antitrust and false advertising claims.  A jury found against Fair Isaac on the remaining claim for trademark infringement, finding that the mark "300-850" (which denoted the range of FICO Scores) was merely descriptive.  It also found that: (1) Fair Isaac made a false representation during the application process to the PTO for the registrations of the "300-850" marks; (2) Fair Isaac knew that representation to be false when it was made and intended to deceive the PTO; and (3) the PTO relied on the false representation in deciding to issue the registrations.[59]

92.     The district court upheld the verdict, noting that "[t]his extensive, expensive litigation seems to have been initiated largely *in response to a perceived threat to Fair Isaac's dominant position in the credit scoring industry*."[60]

93.     In 2011, the United States Court of Appeals for the Eighth Circuit affirmed both that decision and the earlier summary judgment ruling.[61]

94.     VantageScore Solutions' growth during its first few years was inhibited by the litigation, which was part of a continuing antitrust violation by Fair Isaac that goes on to this day.

### B.     Litigation Between Fair Isaac and TransUnion

96.     In December 2017, Fair Isaac sued TransUnion for unpaid royalties.[62]

---

[59]     *Fair Isaac*, 650 F.3d at 1148-50.

[60]     *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1000 (D. Minn. 2010) (emphasis added).

[61]     *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011).

[62]     *See* Complaint, Dkt. 1, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Nov. 16, 2017).

29

97.     In February 2018, TransUnion responded by filing antitrust counterclaims for, *inter alia*, monopolization against Fair Isaac. In paragraphs 42-60 of the counterclaims (which was partially redacted), the anticompetitive terms the Credit Bureaus and Fair Isaac had agreed upon were disclosed publicly for the first time. Those provisions are described in detail below.

98.     Fair Isaac moved to dismiss the counterclaims. Judge Coleman denied the motion, ruling that "TransUnion has adequately pled actual and attempted monopolization" through allegations that "FICO engages in practices that are intended to drive out competition" through "exclusive dealing provisions [that] are unlawful attempts to 'maintain monopoly power through exclusionary conduct.' "[63]

99.     In November 2020, TransUnion and Fair Isaac settled on undisclosed terms. One effect of this settlement was to cut Plaintiffs off from obtaining further information about the anticompetitive agreements between Fair Isaac and the Credit Bureaus. Fair Isaac essentially bought TransUnion off. This inference is bolstered by the fact that, in August 2021, TransUnion announced that it had entered into a long-term (presumably lucrative) contract to distribute FICO Scores to lenders and consumers in Canada.[64]

100.    The Antitrust Division of the United States Department of Justice took notice of Fair Isaac's conduct alleged in the TransUnion Action and instituted a civil investigation. That

---

[63]     *Fair Isaac Corp. v. Trans Union, LLC*, No. 17:cv-8318, 2019 WL 1382068, at *2 (N.D. Ill. Mar. 27, 2019).

[64]     *See* Press Release, TransUnion, *TransUnion Enters New Long-term Agreement with FICO to Distribute FICO® Score in Canada* (Aug. 3, 2021), https://www.globenewswire.com/news-release/2021/08/03/2273895/0/en/TransUnion-Enters-New-Long-term-Agreement-with-FICO-to-Distribute-FICO-Score-in-Canada.html.

investigation was closed without action in December 2020, shortly after TransUnion settled with Fair Isaac.[65]

### C.   Fair Isaac and the Credit Bureaus' Agreements to Restrain Competition

#### 1.   Fair Isaac and the Credit Bureaus Agree to Anticompetitive Provisions in Licensing Agreements

101.   Rebuffed by the courts in its attempts to snuff out VantageScore in its infancy, Fair Isaac elected to take another approach.  When its existing licensing agreements with each Credit Bureau expired in 2013 or 2015, Fair Isaac reentered into agreements with each Credit Bureaus containing new and anticompetitive provisions that aimed to crush the only real competition, (VantageScore), maintain Fair Isaac's monopoly, and extract monopoly rents from B2B Purchasers.

102.   Fair Isaac and the Credit Bureaus entered into new or renewed agreements that contained new provisions designed to restrict the competitive reach of VantageScore.  In their memorandum of law in support of their motion to dismiss, the Credit Bureaus characterized their licensing agreements with Fair Isaac as "vertical distribution agreements."[66]

103.   The anticompetitive contract provisions targeted the only significant competing credit score – VantageScore.  And they specifically restricted the Credit Bureaus' ability to market VantageScore to B2B Purchasers.

104.   On information and belief, the Credit Bureaus agreed to those provisions in return for Fair Isaac's acquiescence to a clause that protected them from price competition (and

---

[65]    *See* Press Release, Fair Isaac, *FICO Statement Regarding Antitrust Investigation* (Mar. 15, 2020),  https://fico.gcs-web.com/news-releases/news-release-details/fico-statement-regarding-antitrust-investigation.

[66]    *See* The Credit Bureaus' Motion to Dismiss Plaintiffs' Class Action Complaints, Dkt. 135, *In re FICO Antitrust Litig.*, No.1:20-cv-02114, at 2 (Jan. 18, 2022).

potentially in exchange for other benefits as well). The benefit of the *quid pro quo* for the Credit Bureaus was that they were able to charge consumers, *i.e.*, B2B Purchasers, supracompetitive prices for credit scores.

105.    The Credit Bureaus and Fair Isaac entered into these anticompetitive licensing agreements after what Fair Isaac considered a "rough year." In its second quarter of 2013 earnings call, Fair Isaac's Chief Financial Officer Michael Joseph Pung admitted:

> [W]e've been experiencing a long period of time, as you know, where our Scores business, and the volumes underneath our Scores business on the origination side, *have been going sideways*, and we are starting to see some improvement on that end. It just so happens *we had a tough comparable period for our B2B Scores business in that last year*.[67]

106.    The agreements were consummated at a critical time. In 2011 through the first part of 2013, developments occurred that should have furthered VantageScore's ability to compete with FICO Scores. In 2011, VantageScore Solutions formed a partnership with the Consumer Federation of America, "a nonprofit association of nearly 300 consumer groups founded in 1968 to advance the consumer interest through research, advocacy, and education"; that alliance led to the "use of annual consumer surveys to gauge awareness of credit scoring related issues."[68] In October 2012, "the Federal Deposit Insurance Corporation ["FDIC"] revised its rules for assessing default risk on loans issued by banks with deposits in excess of $10 billion. Instead of evaluating loans on a particular credit score, the revision calls for examining the underlying probability of default [] associated with those loans at the time of origination."[69] In March 2013, VantageScore

---

[67]    Q2 2013 FICO Earnings Conference Call – Final, SEEKING ALPHA (April 24, 2013), https://seekingalpha.com/article/1368671-fair-isaac-management-discusses-q2-2013-results-earnings-call-transcript (emphasis added).

[68]    VantageScore Solutions, *10 Years, 10 Milestones*, *supra* n.56.

[69]    *Id.*

Solutions debuted a new scoring model, VantageScore 3.0, which "built on the strengths of its predecessors and drew extensive news coverage for its ability to score 98 percent of adult consumers in the U.S. (including 30-35 million who cannot get scores from conventional credit-scoring models [*i.e.*, FICO]); its disregard of paid collections (including paid medical debt); and its simplified reason codes."[70] And, in July 2013, VantageScore Solutions published a white paper explaining how VantageScore could be aligned with the FDIC's new rules for evaluating probability of default.[71]

107. Fair Isaac's response to these developments – which signaled the possibility of increased competition between FICO Scores and VantageScore – was to agree on anticompetitive contract terms with the Credit Bureaus. The necessary consequence of the Credit Bureaus' and Fair Isaac's contracts was the stifling of competition in the B2B Credit Score Market.

108. Specifically, in May 2013, Fair Isaac and Experian entered into a contract containing anticompetitive terms (*i.e.*, the No Equivalent Products and Dynamic Royalty Schedule provisions, among others, as explained *infra*). In October 2013, Fair Isaac and Equifax entered into a contract containing anticompetitive terms (*i.e.*, the No Equivalent Products and Dynamic Royalty Schedule provisions, among others, as explained *infra*). And in February 2015, TransUnion and Fair Isaac entered into an Analytic and Data License Agreement ("ADLA") containing anticompetitive terms (*i.e.*, the No Equivalent Products and Dynamic Royalty Schedule provisions, among others, as explained *infra*).[72]

---

[70]      *Id*.

[71]      VantageScore Solutions, *FDIC New Definition of High Risk Consumer Loan Securities* (July 2013), https://paperzz.com/doc/8033743/fdic-new-definition-of-high-risk-consumer-loan-and-securi (last visited Oct. 27, 2023).

[72]      Fair Isaac and the Credit Bureaus executed parallel anticompetitive contracts at the first available opportunity. TransUnion's original agreement with Fair Isaac did not expire until 2015.

109.     Mr. Lansing, Fair Isaac's CEO, confirmed that the "exclusive deal[s]" Fair Isaac and the Credit Bureaus entered into essentially sidelined VantageScore, which never gained "a lot of traction in the banking space," and that, even though VantageScore was a joint venture of the Credit Bureaus, working together with FICO has been "a good thing for both of us [*i.e.*, both the Credit Bureaus and Fair Isaac]."[73]

110.     According to Mr. Lansing, instead of being "at war" with one another, the Credit Bureaus decided instead "to be partnered" with Fair Isaac.  Explaining the relationship with Experian, for example, Mr. Lansing stated that Experian and Fair Isaac "have a rev share arrangement with them that works for them and works for us really good."  Similarly, with respect to its arrangement with Equifax, Mr. Lansing stated "it is a rev share model. We're in it together."  Given Fair Isaac's own admission that all three Credit Bureaus have substantially similar contract terms, it follows that TransUnion would also have a similar revenue sharing arrangement with Fair Isaac.

###        2.       The Anticompetitive Terms of the Contracts Fair Isaac and the Credit Bureaus Entered into

111.     The terms of the contracts Fair Isaac and the Credit Bureaus entered into were not publicly revealed until February 2018.  Many of the contract terms remain confidential to this day.

112.     The discussion that follows is based on TransUnion's description of its ADLA in its counterclaims against Fair Isaac.  The ADLA was filed under seal in the TransUnion action and is unavailable to Plaintiffs beyond what TransUnion has quoted in its counterclaim.

---

As a result, there is a temporal gap between TransUnion's agreement with Fair Isaac and Fair Isaac's agreements with the other Credit Bureaus.

[73]     Remarks by William J. Lansing, President, CEO & Director, Fair Isaac, Fair Isaac Corp at Barclays Global Financial Services Conference (Sept. 25, 2015).

113.    While the counterclaims quote only the ADLA, TransUnion pled that "Fair Isaac represented to TransUnion that TransUnion's two major competitors, Experian and Equifax, had already agreed to materially similar new contracts with Fair Isaac."[74]

114.    Fair Isaac itself admitted that Equifax, Experian, and TransUnion agreed to the same or similar terms.  In FICO's Answer to Counterclaims in the TransUnion litigation, FICO "admit[ed] that prior to January 2015, it entered into separate contracts with Experian and Equifax that contained certain terms that were similar to certain terms in the ADLA."[75]

115.    In its April 2018 Answer to the Counterclaims, Fair Isaac "admit[ed] that *Equifax and Experian have agreed to 'No Equivalent Products'* provisions with terms similar to the terms agreed to by TransUnion in the ADLA."[76]  Fair Isaac also "admit[ted] that *Equifax and Experian have agreed to 'Dynamic Royalty Schedule' terms* that are similar to the terms agreed to by TransUnion in the ADLA, and that Equifax and Experian are subject to royalty schedules that contain a "Pre-Qualification" royalty category similar to that to which TransUnion is subject in its royalty schedule."[77]  Finally, Fair Isaac "admit[ed] that Equifax and Experian have agreed to 'Level Playing Field' terms similar to the term agreed to by TransUnion in the ADLA."[78]

116.    Fair Isaac has made similar admissions about the contract terms in its Answer in this case.  Fair Isaac admits that its agreement with TransUnion contains the "No Equivalent

---

[74]    TransUnion Counterclaims, ¶ 43.

[75]    Fair Isaac's Redacted Answer to TransUnion Counterclaims, Dkt. 62, *Fair Isaac Corp. v. TransUnion LLC*, No 1:17-cv-08318 at 21 (N.D. Ill. Apr. 10, 2018) ("FICO Answer to Counterclaims").

[76]    FICO Answer to Counterclaims at 24.

[77]    *Id.* at 27.

[78]    *Id.* at 29-30.

Products" provision.[79]  It admits that the "Dynamic Royalty Schedule" and "Level Playing Field" terms appear in its agreements with all three Credit Bureaus, and that the latter requires it to offer the most favorable royalty pricing as to all three Credit Bureaus.[80]  And it admits that the "Pre-Qualification" royalty category has applied since 2015.[81]  Thus, for the foregoing reasons, provisions substantially similar to the anticompetitive "No Equivalent Products" and "Dynamic Royalty Schedule" provisions that exist in the ADLA between TransUnion and Fair Isaac also exist in the agreement between Experian and Fair Isaac.  Likewise, provisions substantially similar to the anticompetitive No Equivalent Products and Dynamic Royalty Schedule provisions that exist in the ADLA between TransUnion and Fair Isaac also exist in the agreement between Equifax and Fair Isaac.  The allegations that follow therefore apply to all three Credit Bureau Defendants.

117.    The restraints imposed in the contracts consist primarily of: (a) "No Equivalent Products" provisions; and (b) "Dynamic Royalty Schedule" provisions.  A third set of provisions, the "Level Playing Field" provisions, compensated the Credit Bureaus for their agreement not to promote VantageScore under the former provisions, at the expense of B2B Purchasers.

118.    In an order dated September 28, 2023, this Court held that "the No Equivalent [Products] Provision and the Dynamic Royalty Schedule clauses together qualify as sufficient allegations of anticompetitive effects" to allow the Sherman Act §2 claim against Fair Isaac to proceed to discovery.  Those provisions are described in turn below.

---

[79]     Fair Isaac's Answer and Affirmative Defenses to Direct Purchaser Plaintiffs' Consolidated Class Action Complaint, Dkt. 182, No. 1:20-cv-02114 ("FICO Answer to DPP Complaint"), (Oct. 23, 2023) ¶109.

[80]     FICO Answer to DPP Complaint, ¶¶116, 124.

[81]     *Id.*, ¶118.

i.     The "No Equivalent Products" Provisions

119.    "Section 12.5 of the ADLA, the 'No Equivalent Products' provision, provides that TransUnion may not 'internally develop' a credit scoring system that is 'aligned to the odds-to-score relationship of any Fair Isaac Analytic' or uses more than a limited number of reason codes that 'match' reason codes used by any Fair Isaac Analytic.  Section 12.5 of the TransUnion ADLA further prohibits TransUnion from distributing 'any competing analytic' (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes, and it expressly names VantageScore Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an 'Equivalent Product.'"[82]

120.    The "No Equivalent Products" clause thus protects and sustains Fair Isaac's monopoly and unreasonably restrains trade.

121.    In practice, for example, if a competing credit score product used a 700 score to indicate a less-than five percent risk of credit delinquency, and if a 700 FICO Score also indicated the same risk of delinquency, the "No Equivalent Products" clause would prevent a Credit Bureau from distributing the competing product.  Similarly, if a competing credit score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause would prohibit a Credit Bureau from distributing the product.

122.    The "No Equivalent Products" clause undercuts VantageScore because it effectively prevents a Credit Bureau from offering an alternative to FICO Scores that would: (a) be compatible with many B2B Purchasers' systems, models, and processes; and (b) allow B2B Purchasers to have a legitimate choice between using FICO Scores and an alternative score.  As noted above, many B2B Purchasers have spent substantial effort and resources to develop systems,

---

[82]     *Id.*, ¶ 109.

models, and processes that are designed for FICO Scores.  B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers) and reason codes (the particular reasons cited for increased risk of default).  For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

123.    The odds-to-score relationship is an arbitrary mapping between risk and score and does not reflect protectable intellectual property.  Similarly, the reason codes that may not be used by an "Equivalent Product" were not invented by Fair Isaac, but rather reflect well-established industry best practices for lending.

124.    The "No Equivalent Products" clause is an effective restraint of trade because when one Credit Bureau stops using VantageScore, it becomes even less attractive to the other Credit Bureaus.  B2B Purchasers will not want to use a credit scoring system unless all of the main Credit Bureaus use it.  This phenomenon is often referred to as a "network effect."  By imposing a "No Equivalent Products" term, Fair Isaac sought to block the Credit Bureaus from enabling B2B Purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems and from using VantageScore alongside or interchangeably with FICO Scores.

125.    By entering contracts containing anticompetitive "No Equivalent Products" provisions, the Credit Bureaus agreed to terms that had the effect of eliminating or drastically reducing the competitive threat posed by VantageScore, thus unreasonably restraining trade.

ii.    The "Dynamic Royalty Schedule" Provisions

126.    The contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively, include a similar or identical "Dynamic Royalty Schedule" clause that allows Fair

Isaac to replace its existing royalty with a new one and thereby gives Fair Isaac the ability to control the prices of FICO Scores. The TransUnion ADLA Dynamic Royalty Schedule Provision (§ 9.2) provides that "'once every twelve (12) months during the Term, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing.'"[83]

127.    According to TransUnion, "Fair Isaac has abused and exploited this provision in 2015, 2016, and 2017 by not only raising prices, but also introducing entirely new and non-negotiated contract terms, royalty categories, and definitions."[84]

128.    In 2015, Fair Isaac unilaterally imposed (in a footnote to its royalty schedule) a new "Pre-Qualification" royalty category, which Fair Isaac defines to "mean an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category distinguishes between: "(1) lenders that use FICO Scores for 'Pre-Qualification' without providing any credit score or credit data to consumers; and (2) lenders that use FICO Scores for 'Pre-Qualification' while also providing credit score or credit data to consumers 'in connection' with 'Pre-Qualification.'" Certain B2B Purchasers offer consumers opportunities to apply to qualify for credit opportunities (*e.g.*, a credit card or loan) and, at the same time, receive their personal credit score. "The offer of a free credit score to a consumer can entice consumers to apply for credit opportunities."[85]

129.    "The royalty price associated with a FICO score used for 'Pre-Qualification' depends on whether other credit score or credit data are provided to a consumer. If a lender

---

[83]    TransUnion Counterclaims, ¶ 50.

[84]    *Id.*

[85]    *Id.*, ¶ 51.

purchases a FICO Score for use in 'Pre-Qualification' and does not provide any credit score or credit data to the consumer 'in connection' with the 'Pre-Qualification,' there is one per-score royalty rate. If the lender purchases a FICO score for use in 'Pre-Qualification' and provides a VantageScore (or any other credit score) to the consumer 'in connection' with the 'Pre-Qualification,'" Fair Isaac charges the lender a ***seven times penalty rate*** for that FICO Score. That steep penalty is meant to dissuade lenders from providing competing credit scores, such as a VantageScore.[86]

130.    "The penalty rate can be avoided in one of two ways, both of which involve ***purchasing exclusively FICO Scores***. First, the [B2B Purchaser] could purchase a FICO score for use in 'Pre-Qualification' and provide no credit score or credit data to the consumer. Second, the [B2B Purchaser] could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of scores by lenders (in the B2B market) with the provision of scores to consumers (in the B2C market)."[87]

131.    TransUnion accepted, complied with, and made royalty payments according to the new "Pre-Qualification" royalty category. On information and belief, so have Experian and Equifax.[88]

132.    The Dynamic Royalty Schedule provisions in the contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively, unreasonably restrain trade. Indeed, there is no legitimate business justification for the penalty rate agreed upon by Fair Isaac and each of the Credit Bureaus and that is charged when the B2B Purchaser also purchases other credit scores

---

[86]    *Id.*, ¶ 52.

[87]    *Id.*, ¶ 53 (emphasis added).

[88]    *See id.*, ¶ 55.

(*e.g.*, a VantageScore).  The purpose of the "Pre-Qualification" royalty category is to drive all B2B Purchasers engaging in "Pre-Qualification" to purchase exclusively FICO Scores and make it cost-prohibitive for B2B Purchasers engaging in "Pre-Qualification" to purchase a competing credit score for disclosure to consumers.

133.    According to TransUnion, "[t]his scheme has been effective, and no B2B Purchasers from TransUnion have opted to pay the penalty rate."[89]  The purpose and effect of this clause was to prevent VantageScore from obtaining market share, thereby unreasonably restraining trade.

### iii.    The "Level Playing Field" Provisions

134.    In exchange for agreeing to the "No Equivalent Products" and "Dynamic Royalty" provisions in their agreements with Fair Isaac – which effectively prevent the Credit Bureaus from marketing VantageScore to B2B Purchasers – Fair Isaac committed not to offer any Credit Bureau a more favorable price for FICO Scores than any other Credit Bureau.  This commitment was embodied in the Level Playing Field clauses of the agreements with the Credit Bureaus.  Those provisions forbid Fair Isaac to charge any Credit Bureau a price that is lower than the price it charges any other Credit Bureau.[90]

135.    The Level Playing Field provision of the TransUnion ADLA is contained in §9.16. Fair Isaac's contracts with TransUnion, Equifax, and Experian include similar or identical "Level

---

[89]     *Id.*, ¶ 54.

[90]     *See id.*, ¶ 59.

Playing Field" and "Dynamic Royalty Schedule" provisions.[91]  The Credit Bureaus agreed to, and have complied with, these contract provisions.[92]

136.    The Credit Bureaus advanced Fair Isaac's interests by agreeing to the No Equivalent Products and Dynamic Royalty Schedule clauses, which sabotaged the Credit Bureaus' own competing VantageScore and gave FICO flexibility to raise prices.  The Level Playing Field clause, in return, protected each Credit Bureau from the risk that Fair Isaac would selectively offer discounts that could expose it to price competition.

137.    The Level Playing Field provision also functions as a cost-information-sharing mechanism among the Credit Bureaus.  The Federal Trade Commission ("FTC") has determined that "when competing companies," like the Credit Bureaus, "exchang[e] price or other commercially sensitive information, that may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws."[93]  Indeed, "the sharing of information relating to price, *cost*, output, customers, or strategic planning is more likely to be of competitive concern than the sharing of less competitively sensitive information.[94]

138.    By ensuring that no one Credit Bureau receives a more favorable price than the other, the Level Playing Field provision essentially confirms to each Credit Bureau the price the other competing Credit Bureaus are paying for FICO's algorithm.  Information about what their competitors are paying for this must-have product is valuable to the Credit Bureaus who can then

---

[91]    FICO Answer to DPP Complaint, ¶116 (Dynamic Royalty Schedule), ¶124 (Level Playing Field).

[92]    *Id.*

[93]    Michael Bloom, *Information exchange: be reasonable*, FED. TRADE COMM'N (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable (emphasis added).

[94]    *Id*.

use this cost information to reduce price competition for the services they provide. As Fair Isaac has pointed out, previously, "a Credit Bureau could not be sure what its competitors' costs were and, consequently, to what extent its competitors could cut the price of their Credit Scores. This uncertainty could be used by Lenders to induce price competition among the Credit Bureaus."[95] Fair Isaac claimed in its earlier lawsuit that the Credit Bureaus sought to use VantageScore so that "each Credit Bureau will know that it is paying exactly the same cost as its competitors for its scoring algorithm, and Lenders will no longer be able to use this uncertainty to play one Credit Bureau against the others."[96] In a rich irony, the Level Playing Field provision does exactly what Fair Isaac accused the Credit Bureaus of trying to accomplish through VantageScore: prevent their customers from playing one Credit Bureau against the others, thereby reducing price competition for credit reports. The contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively – which all contain Level Playing Field provisions – thus unreasonably restrain trade.

139.    The provision is demonstrably important to the Credit Bureaus. As was revealed through Fair Isaac's suit against TransUnion, in the negotiations over its Canadian contract, TransUnion **insisted** that Fair Isaac include a "Level Playing Field" clause. That clause would have given TransUnion Canada a right to any discounts or special pricing terms that Fair Isaac might offer other Credit Bureaus for the license or distribution of FICO scores in Canada. The Level Playing Field clause was so valuable to TransUnion of Canada that it continued to insist on one until Fair Isaac threatened to withhold its Canadian business entirely.

140.    Fair Isaac and the Credit Bureaus have used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions to extract monopoly prices from B2B Purchasers. The

---

[95]    Third Amended Complaint, Dkt. 436, *Fair Isaac Corp. v. Experian Info Sols.*, No. 06-cv-4112 (D. Minn. Nov. 10, 2008), ¶ 138.
[96]    *Id.*

Level Playing Field clause, like a most-favored nation clause, reduces Fair Isaac's incentive to give any discounts to the Credit Bureaus given that, by the terms of that provision, the same discount would need to be extended to all Credit Bureaus.  On the other hand, by the terms of the provision, if Fair Isaac were to give any one Credit Bureau a discount, it would have to offer the same discount to the other Credit Bureaus.  Therefore, the provision ensures that no Credit Bureau could obtain a competitive price advantage, *i.e.*, more favorable pricing.  The provision thus substantially weakens the incentives the Credit Bureaus have to negotiate a lower price with Fair Isaac.  As a result, Fair Isaac can freely increase prices with little resistance from the Credit Bureaus.  And it has done so – Fair Isaac admitted in its Answer that "over the last several years" it has "increased the base (*i.e.*, undiscounted) royalty prices that it charges to the Credit Bureaus."[97] That price increase is ultimately borne by B2B Purchasers who pay a higher price for FICO Scores than they would have but for the Credit Bureaus' agreements to anticompetitive contract provisions.

141.    After entering into the contracts containing anticompetitive terms with the Credit Bureaus, Fair Isaac initiated multiple rounds of price increases.  In 2019, Fair Isaac reported: ***"On the B2B side, revenues were up 36% over the previous year***, ***due primarily to the 2018 price adjustments***."[98]  Again, in 2021, Fair Isaac reported that:

> *[R]evenues were $169 million, up 31% from the same period last year*.  *B2B was up 25% over the same period last year*, driven by continued high volumes in mortgage originations as well as some unit price increases across our different score

---

[97]     FICO Answer to DPP Complaint, ¶142.

[98]     Motley Fool Transcription, *Fair Isaac Corporation (FICO) Q1 2019 Earnings Conference Call Transcript*, MOTLEY FOOL (Updated Apr. 24, 2019), https://www.fool.com/earnings/call-transcripts/2019/01/30/fair-isaac-corporation-fico-q1-2019-earnings-confe.aspx.

categories. In the B2B business, we also had a royalty true-up and an annual license deal this quarter that had a small positive impact on overall revenues.[99]

142.   As TransUnion has explained, taken together with the Dynamic Royalty Schedule provisions, the Level Playing Field provisions "enable Fair Isaac to unilaterally increase the royalty prices it charges [the Credit Bureaus] for FICO scores."[100]

143.   Notably, TransUnion has admitted that, to the extent the Level Playing Field provision resulted in higher rates, those costs were ultimately also borne by "banks [and] mortgage lenders" (*i.e.*, B2B Purchasers).[101] Thus, through their contracts containing anticompetitive terms, the Credit Bureaus and Fair Isaac extracted supracompetitive profits from consumers (*i.e.*, B2B Purchasers).

144.   In discussing the impact of "the FICO price increase" on Experian, Experian Vice President and Chief Financial Officer, John W. Gamble confirmed during a 2019 earnings call that Experian "pass[es] it through to [its] customers."[102]

145.   Equifax's Chief Executive Officer, Mark W. Begor confirmed the same:  When FICO "put through a price increase . . . Equifax[,] TU and Experian deliver[ed] that price increase to the marketplace, when they increase the price of their credit score.  So that rolled through."[103]

---

[99]   Motley Fool Transcribers, *Fair Isaac Corp (FICO) Q2 2021 Earnings Call Transcript*, MOTLEY FOOL (May 6, 2021), https://www.fool.com/earnings/call-transcripts/2021/05/06/fair-isaac-corp-fico-q2-2021-earnings-call-transcr/.

[100]   TransUnion Counterclaims, ¶59.

[101]   *Id.*, ¶60.

[102]   John W. Gamble, VP & CFO, Remarks at Q1 2019 Equifax Inc. Earnings Call (May 10, 2019) (transcript available in Westlaw).

[103]   Mark W. Begor, CEO, Remarks at Q2 2023 Equifax Inc. Earnings Call (July 20, 2023) (transcript available in Westlaw).

> ### D. Fair Isaac's Additional Efforts to Deter B2B Purchasers from Using VantageScore

146. Having agreed with the Credit Bureaus to impose restrictions on VantageScore's ability to compete against FICO, Fair Isaac went even further and waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScore. In advertisements, letters, and blog posts, Fair Isaac disparaged VantageScore Solutions and VantageScore, falsely claiming that VantageScore is an unreliable measure of creditworthiness, and misrepresenting the information considered by VantageScore Solutions' credit scoring system.

147. On December 5, 2017, for example, Mr. Lansing criticized banks for using VantageScore, saying that credit score was "fako"; "'looks like it, smells like it, feels like it – it's being presented as some kind of an indication of your health, but if you look at the fine print, you'll discover that it's not a FICO score.'"[104]

148. Media sources, financial blogs, and consumers have absorbed Fair Isaac's message that VantageScore is a "Fako" score merely because it is not a FICO Score. For example, thebalance.com – a website devoted to personal finance issues – posted at least as far back as August 2018: "If you purchased your Credit Score anywhere but myFICO.com, then it's a Fako score." The post remains on the site to this day.[105]

149. Similarly, on December 12, 2017, "Fair Isaac took out a full-page advertisement in *The Wall Street Journal* addressed to 'Lenders, Policymakers and Consumer Advocates' that disparaged VantageScore Solutions and VantageScore without identifying it by name. The

---

[104] Alistair Gray, *Credit score row as FICO chief hits out at banks over 'Fako' rivals*, FIN. TIMES (Dec. 5, 2017), https://www.ft.com/content/2222880c-cfa5-11e7-9dbb-291a884dd8c6.

[105] Latoya Irby, THE BALANCE, *FICO & FAKO Credit Scores* (Oct. 30, 2021), https://www.thebalance.com/fico-and-fako-credit-scores-960497.

advertisement contrasted Fair Isaac, which 'is not owned by the credit bureaus' and whose FICO scores have been used 'by lenders and securitization investors for decades,' with an alternative credit score, which is 'owned by the credit bureaus,' is less reliable than FICO scores in evaluating credit risk, and fails to use 'sound practices' or 'science-based credit evaluation.'  To anyone familiar with the market for credit scores, the advertisement unambiguously conveys the false message that VantageScore is 'Weakening scoring standards, [and] harm[ing] consumers, and the lending system,'" particularly in the B2B Credit Score Market.[106]

150.    "The *Wall Street Journal* advertisement directed readers to '[l]earn more at FICO.com/independent,' a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name."[107]  One such blog post, written in 2016 by Joanne Gaskin, the Vice-President of Scores and Analytics at Fair Isaac, asserted: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."[108]

151.    Fair Isaac's disparagement and false or misleading statements are not limited to the "FICO.com/independent" page.  Fair Isaac's own blog (FICO.com/blogs) also includes numerous disparaging and false or misleading statements about VantageScore Solutions, VantageScore, and related topics.

152.    Fair Isaac executives have written multiple posts disparaging VantageScore Solutions and VantageScore.  Fair Isaac's Vice-President of FICO Scores and Predictive Analytics, Ethan Dornhelm, wrote: "We wanted to find out if it's possible to calculate a

---

[106]    TransUnion Counterclaims, ¶ 66 (alterations in original).

[107]    *Id.*, ¶ 67.

[108]    *Id.*

meaningful, reliable score using credit bureau data alone.  Spoiler alert: it's not.  Research results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance."[109]  Ms. Gaskin echoed those findings.[110]  Those statements are false and misleading because studies have shown that VantageScore is strongly predictive.[111]

153.    Another blog post written by Ms. Gaskin claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not."[112]  "This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections.  In fact, VantageScore 3.0 was the first credit scoring system to address medical debt.  VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones."[113]

154.    Similarly, Fair Isaac fought hard against the efforts to create a process that would allow alternative credit scoring models to be validated and approved by Fannie Mae and Freddie Mac when they purchase mortgages.  Such a rule would clearly benefit VantageScore, which could

---

[109]    Ethan Dornhelm, FICO BLOG, *Why Bureau Data Alone Can't Score More Consumers* (Nov. 16, 2015), https://www.fico.com/blogs/why-bureau-data-alone-cant-score-more-consumers.

[110]    Joanne Gaskin, FICO BLOG, *FICO Fact: Does FICO's Minimum Scoring Criteria Limit Consumers' Access to Credit?* (Oct. 12, 2021), https://www.fico.com/blogs/fico-fact-does-ficos-minimum-scoring-criteria-limit-consumers-access-credit ("Our research has consistently found that models that rely solely on sparse and/or outdated credit information are less reliable at forecasting future performance.").

[111]    *See* VantageScore Report, *supra* n.50 at 2, 4-6.

[112]    Joanne Gaskin, FICO BLOG, *Truth Squad: Is FICO Score 700 the Same as VantageScore 700?* (Feb. 6, 2017), https://www.fico.com/blogs/truth-squad-fico-score-700-same-vantagescore -700.

[113]    TransUnion Counterclaims, ¶71.

48

then attempt to break Fair Isaac's 100% monopoly in this sector. Public sentiment favored this move.[114] Fair Isaac did not. Indeed, it deployed Ms. Gaskin to give press interviews saying that Fair Isaac's alleged monopoly is a "myth."[115] Fair Isaac also hired a research group to present the argument that VantageScore's promise of home ownership to millions more Americans was deceptive and that the company's ownership by the Credit Bureaus was anticompetitive, an argument that failed during the trademark litigation discussed above.[116] The FHFA ultimately adopted a final rule that permitted rival generators of credit scores to apply to serve Fannie Mae and Freddie Mac, saying that "FHFA has concluded that allowing all credit score model developers to submit applications is more consistent with [the applicable statute], which does not prevent any credit score model from being considered for potential use in the mortgage market." [117]

155. The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

---

[114]   *See* Bloomberg Business News, *This Monopoly Is Holding Back the Mortgage Market*, (Jan. 18, 2018), https://www.bloomberg.com/opinion/articles/2018-01-18/this-credit-score-monopoly-is-holding-back-the-mortgage-market; Paul Weinstein, Jr., *No Company Should Have a Monopoly on Credit Scoring*, The Hill (Dec. 7, 2017), https://thehill.com/opinion/finance/363755-no-company-should-have-a-monopoly-on-credit-scoring.

[115]   *FICO: The 'Credit Score Monopoly' is a Myth*, DS News (Dec. 18, 2015), https://dsnews.com/news/12-18-2015/fico-the-credit-score-monopoly-is-a-myth.

[116]   Quantilytic LLC, *Risks and Opportunities in Expanding Mortgage Credit Availability Through New Credit Scores*, at 22 (Dec. 2017), https://www.progressivepolicy.org/wp-content/uploads/2017/12/UpdatedCreditScoring_2017.pdf (research sponsored by Fair Isaac).

[117]   Fed. Hous. Fin. Agency, *Validation and Approval of Credit Score Models Final Rule*, 12 C.F.R. 1254 at 23 (Aug. 16, 2019), https://www.fhfa.gov/SupervisionRegulation/Rules/RuleDocuments/8-7-19%20Validation%20Approval%20Credit%20Score%20Models%20Final%20Rule_to%20Fed%20Reg%20for%20Web.pdf.

## VI. THE CONTRACTS BETWEEN FAIR ISAAC AND EACH OF THE CREDIT BUREAUS CONTAINING ANTICOMPETITIVE TERMS, ALONG WITH FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT, HARM COMPETITION IN THE B2B CREDIT SCORE MARKET

156.     The anticompetitive terms contained in the contracts between Fair Isaac and each of the Credit Bureaus, along with Fair Isaac's campaign of exclusionary conduct to maintain and expand its monopoly has harmed and continues to harm participants in the B2B Credit Score Market.   Fair Isaac's unlawful conduct, including its agreements with the Credit Bureaus containing anticompetitive contract terms, has foreclosed competition in the B2B Credit Score Market by limiting the ability of VantageScore to compete with Fair Isaac.  The anticompetitive and exclusionary conduct unreasonably restrains trade and maintains Fair Isaac's monopoly by, among other things, allowing it to charge supracompetitive prices for B2B credit scores to B2B Purchasers during the Class Period.

157.     Fair Isaac's Scores business operates with an incredibly high operating margin of 86%.[118]  To maximize its monopoly rent, Fair Isaac has increased its prices for FICO Scores significantly in recent years.   In 2018, after securing agreements from each of the three Credit Bureaus to abide by anticompetitive contract terms, FICO implemented a special pricing increase for mortgage customers that was an approximately 75% increase from $0.06/score to $0.10/score.[119]  In the following two years, FICO again rolled out special pricing increases to its auto customers and to some credit card customers.[120]  FICO admitted in its Answer that, "over the last several years," it has "increased the base (*i.e.*, undiscounted) royalty prices that it charges to the Credit Bureaus."[121]

158.     Fair Isaac's conduct and the anticompetitive provisions agreed upon in contracts between the Credit Bureaus and Fair Isaac, have reduced choice for B2B Purchasers.   The anticompetitive terms agreed to between Fair Isaac and the Credit Bureaus have frustrated the

ability of B2B Purchasers to purchase VantageScore. Fair Isaac's media and advertising campaign against VantageScore Solutions and VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace.

### CLASS ACTION ALLEGATIONS

159.    Plaintiffs bring this action on behalf of themselves, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of:

> All B2B Purchasers residing in the United States and its territories that directly purchased a FICO score from Fair Isaac and/or a Credit Bureau during the period from October 1, 2006 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

Excluded from the Class are Defendants, their officers, directors, management, employees, subsidiaries, and affiliates. Also excluded are any natural persons who purchased their own credit score solely via myFico.com, the Credit Bureaus, or other entities for their personal use. Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household or the spouse of such a person.

160.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records in the possession of Defendants.

---

[118]    Jose Karlo Mari Tottoc, Yahoo! Finance, *Headwaters Capital: 'Fair Isaac Corp (FICO) Can Grow Its Free Cash Flow by 15-20% Annually'* (Jan. 23, 2021), https://finance.yahoo.com/news/headwaters-capital-fair-isaac-corp-202237954.html.

[119]    *Id.*

[120]    *Id.*

[121]    FICO Answer to DPP Complaint, ¶142.

161. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and members of the Class were damaged by the same wrongful conduct of Defendants.

162. Plaintiffs will fairly and adequately protect and represent the interests of members of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of members of the Class.

163. Plaintiffs are represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including class actions in the financial services industry.

164. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate. Questions of law and fact common to members of the Class include, but are not limited to:

        a. whether Fair Isaac monopolized, and whether Defendants entered into contracts that unreasonably restrain trade, in violation of federal law;

        b. whether Fair Isaac monopolized, and whether Defendants entered into contracts that unreasonably restrain trade, in violation of certain state antitrust laws;

        c. whether Defendants engaged in unfair or deceptive trade practices in violation of certain state laws;

        d. the duration of the alleged unlawful conduct;

        e. injury suffered by Plaintiffs and members of the Class;

        f. damages suffered by Plaintiffs and members of the Class; and

g.      whether Defendants have acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

165.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

166.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

167.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

168.    Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## STATUTES OF LIMITATIONS AND TOLLING

## I.    THE STATUTES OF LIMITATIONS DID NOT BEGIN TO RUN BECAUSE PLAINTIFFS DID NOT DISCOVER, AND COULD NOT HAVE DISCOVERED, DEFENDANTS' UNLAWFUL SCHEME

169.    Plaintiffs had no knowledge of the agreements, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) February 12, 2018, the date that TransUnion filed its Counterclaims against Fair Isaac.  Prior to that time, no information in

the public domain or available to Plaintiffs suggested that any Defendant was involved in an anticompetitive scheme involving the distribution of credit scores.

170.　Defendants repeatedly and expressly stated throughout the Class Period, including on their public websites, that they maintained policies that prohibited the type of anticompetitive conduct alleged in this First Amended Consolidated Complaint.　For example:

　　　　a.　Fair Isaac's Code of Business Conduct and Ethics states: "We seek to outperform our competition fairly and honestly.　We seek competitive advantages through superior performance, never through unethical or illegal business practices."[122]

　　　　b.　Equifax's Code of Ethics and Business Conduct states: "We believe in free and open competition and never engage in improper practices that may limit competition."[123]

　　　　c.　Experian's Code of Conduct states: "We will not engage in any form of agreement with competitors to fix prices, rig bids, allocate customers and/or restrict supply in the market place."　"We will comply with all applicable laws, rules, and regulations in every jurisdiction in which we operate, including but not limited to . . . antitrust/competition."[124]

　　　　d.　TransUnion's Code of Business Conduct states: "All TransUnion Team Members must understand how competition and antitrust laws affect their daily work.　You must fully and consistently comply with applicable competition and antitrust laws."[125]

---

[122]　Fair Isaac, *Code of Business Conduct and Ethics*, https://fico.gcs-web.com/static-files/ed6519a4-2148-4166-82f2-4636e0713531 (last visited Oct. 27, 2023).

[123]　Equifax, *Code of Ethics and Business Conduct* (Aug. 2019), https://web.archive.org/web/20210326175746/https://assets.equifax.com/assets/corp/code_of_ethics.pdf.

[124]　Experian, *Our Code of Conduct* (2019), https://www.experian.com/content/dam/marketing/na/assets/corp/procurement-documents/experian-code-of-conduct-final-board-approved.pdf.

[125]　TransUnion, *Code of Business Conduct* (2017), https://investors.transunion.com/~/media/Files/T/Transunion-IR/governance-documents/code-of-business-conduct-150618.pdf.

171. It was reasonable for Plaintiffs and members of the Class to believe that Defendants were complying with their own policies.

172. Moreover, upon information and belief, Plaintiffs and members of the Class could not have discovered the anticompetitive provisions in the licensing agreements between Fair Isaac and the Credit Bureaus, such as the TransUnion ADLA, as those agreements are subject to confidentiality provisions that have prohibited the credit reporting agencies from disclosing their terms to third parties absent written authorization from Fair Isaac.[126]

173. Finally, Plaintiffs and members of the Class, as customers of Defendants, had no means to discover the existence of Defendants' anticompetitive contract provisions.

174. For these reasons, the statutes of limitations applicable to Plaintiffs' claims did not begin to run until the date that TransUnion filed its counterclaims against Fair Isaac and have been tolled with respect to the claims that Plaintiffs have alleged in this First Amended Consolidated Complaint.

## II.  FRAUDULENT CONCEALMENT TOLLED THE STATUTES OF LIMITATIONS

175. In the alternative, the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiffs' claims.  During the Class Period, Defendants wrongfully and affirmatively concealed their unlawful conduct.  Plaintiffs and members of the Class had no knowledge of Defendants' anticompetitive contracts and could not have discovered them through the exercise of reasonable diligence until (at the earliest) February 12, 2018, when TransUnion filed its Counterclaims against Fair Isaac.

---

[126]  *See* Dkt. 32, Motion for Leave to File Under Seal, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Jan. 22, 2018), ¶2 ("contracts between the Parties . . . are subject to confidentiality provisions that prohibit TransUnion from disclosing the terms of the contract to third parties absent written authorization from Fair Isaac").

176. By their very nature, antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants contracted through confidential agreements that did not put Plaintiffs or the Class on inquiry notice that there were contracts to restrain trade that raised the prices for credit scores above the competitive level. Credit scores are not exempt from antitrust regulation, and thus, before TransUnion filed its Counterclaims against Fair Isaac, Plaintiffs reasonably considered the market to be competitive. Moreover, Defendants employed deceptive tactics and techniques to avoid detection of, and to conceal, their anticompetitive scheme.

177. Defendants wrongfully and affirmatively concealed the existence of their anticompetitive contracts from Plaintiffs and members of the Class by, among other things:

a. agreeing to confidentiality provisions that have prohibited the Credit Bureaus from disclosing the anticompetitive provisions in the licensing agreements between Fair Isaac and the Credit Bureaus, such as the TransUnion ADLA;

b. concealing the fact that Fair Isaac and the Credit Bureaus agreed, through the "No Equivalent Products" clause, not to internally develop a competing credit scoring system that is aligned with FICO Scores or uses too many of the same reason codes;

c. concealing the fact that the purpose of the "No Equivalent Products" clause was to prevent the Credit Bureaus from offering credit scoring products that would allow business-consumers a legitimate choice between FICO Scores and VantageScore or another alternative scoring product, thereby sustaining Fair Isaac's dominance in the market;

d. concealing the fact that Fair Isaac and the Credit Bureaus agreed, through the "Level Playing Field" clauses, that prices made available to one credit bureau be made available to all the others;

56

      e.     concealing the fact that the purpose and effect of the "Level Playing Field" and "Dynamic Royalty Schedule" clauses is to disincentivize each Credit Bureau from negotiating lower royalty prices for FICO Scores; and

      f.     as to Fair Isaac, engaging in a false and misleading campaign about VantageScore Solutions and VantageScore to misrepresent VantageScore's viability as a competitor to FICO Scores.

178.    As a result of Defendants' affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiffs and members of the Class have been and are tolled, and Defendants are equitably estopped from raising statutes of limitations as a defense.

## III.   DEFENDANTS' ACTIONS CONSTITUTE A CONTINUING VIOLATION

179.    In addition, and in the alternative, this Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statute of limitations.

180.    A claim accrued for Plaintiffs each time FICO Scores were sold to Plaintiffs at prices artificially inflated by Defendants' anticompetitive conduct. Each sale of FICO Scores at a supracompetitive price constituted another overt act in furtherance of Defendants' agreements to restrain trade. Moreover, Defendants' statements and actions described above demonstrate that throughout the Class Period they engaged in new overt acts that further served the objectives of their anticompetitive agreements to restrain trade.

181.    Defendants' new overt acts were more than the inertial consequences of Defendants' initial violation. Rather, their acts were new and independent acts that perpetuated their agreement and kept it current with market conditions, including by renewing agreements, or entering into new agreements, with anticompetitive terms. Defendants continuously renewed and

refined their agreement to reflect market conditions. With each refinement of their agreement, Defendants inflicted new and accumulating injury on Plaintiffs and members of the Class. For instance, as alleged above, Fair Isaac exploited the ADLA Royalty Schedule Provision in 2015, 2016, and 2017 to introduce entirely new and non-negotiated contract terms, royalty categories, and definitions that expanded the anticompetitive scheme.

182.     Therefore, Plaintiffs and members of the Class are entitled to recover damages they suffered during any applicable limitations period.

## CLAIMS FOR RELIEF

### CLAIM ONE: UNREASONABLE RESTRAINT OF TRADE
### (15 U.S.C. §§1, 3)

183.     Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

184.     This Claim One is brought against Defendant Fair Isaac.

185.     The relevant period of this Claim One is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

186.     The agreements between Fair Isaac and each of the Credit Bureau Defendants violate Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) because they are agreements between Fair Isaac and the Credit Bureaus that restrained trade in the relevant market.

187.     The relevant product market is the market for the sale of B2B credit scores.

188.     The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

189.     Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

58

190.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

191.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

192.    Fair Isaac entered into agreements with each of TransUnion, Experian, and Equifax that contained anticompetitive terms whereby each Credit Bureau agreed with Fair Isaac to contractual limitations that harmed the ability of the Credit Bureaus to market VantageScore, a competing product, to Plaintiffs and members of the Class and forestalled price competition in the B2B Credit Score Market.

193.    The agreements between Fair Isaac and each of the Credit Bureaus had substantial anticompetitive effects.   The agreements excluded VantageScore, a would-be significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

194.    The agreements raised the price for credit scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

195.    The aforesaid exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

196.    Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Defendants do not cease their anticompetitive conduct.

197.    Plaintiffs and members of the Class have been injured in their business or property by reason of Defendants' violation of Sections 1 and 3 of the Sherman Act, within the meaning of Section 4 of the Clayton Act (15 U.S.C. §15).

198.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Defendant Fair Isaac's violation of Sections 1 and 3 of the

Sherman Act (15 U.S.C §§1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. §26).

## CLAIM TWO: UNREASONABLE RESTRAINT OF TRADE
### (15 U.S.C. §§1, 3)

199.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

200.    This Claim Two is brought against Defendants Fair Isaac and Experian.

201.    The relevant period of this Claim Two is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

202.    The anticompetitive agreement between Fair Isaac and Experian violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), because it is a contract that unreasonably restrained trade – regardless of whether Experian shared Fair Isaac's anticompetitive purpose, and regardless of whether Experian accepted the agreement as a result of Fair Isaac's negotiating leverage.

203.    The relevant product market is the market for the sale of B2B credit scores.

204.    The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

205.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

206.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

207.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

208.    Fair Isaac entered into an agreement with Experian that contained anticompetitive terms whereby Experian agreed with Fair Isaac to contractual limitations that harmed

VantageScore's ability to compete and forestalled price competition in the B2B Credit Score Market.

209.    The agreement between Fair Isaac and Experian had substantial anticompetitive effects.   The agreement excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

210.    The agreement between Fair Isaac and Experian raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

211.    The foregoing exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

212.    Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac and Experian do not cease their anticompetitive conduct.

213.    Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac and Experian's violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3), within the meaning of Section 4 of the Clayton Act (15 U.S.C. § 15).

214.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac and Experian's continuing violation of Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. § 26).

215.    In addition to competing with Experian in the credit scores market, Fair Isaac licenses its algorithm to Experian, which uses the algorithm to calculate credit scores for B2B Purchasers.  As a result of the exclusionary contract terms, Experian discourages its customers from using or purchasing access to competing credit scores.  Because Experian has substantial

market power, it can harm its customers in this way without taking the risk that they will switch to competing Credit Bureaus. In return for contracting with Fair Isaac to restrain trade in the credit scores market, Experian benefits from the Level Playing Field clause, which reduces competition among the Credit Bureaus in the B2B credit reports market.

### CLAIM THREE: UNREASONABLE RESTRAINT OF TRADE
### (15 U.S.C. §§1, 3)

216.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

217.    This Claim Three is brought against Defendants Fair Isaac and Equifax.

218.    The relevant period of this Claim Three is from November 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

219.    The anticompetitive agreement between Fair Isaac and Equifax violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), because it unreasonably restrained trade – regardless of whether Equifax shared Fair Isaac's anticompetitive purpose, and regardless of whether Equifax accepted the agreement as a result of Fair Isaac's negotiating leverage.

220.    The relevant product market is the market for the sale of B2B credit scores.

221.    The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

222.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

223.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

224.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

225.     Fair Isaac entered into an agreement with Equifax that contained anticompetitive terms whereby Equifax agreed with Fair Isaac to contractual limitations that harmed VantageScore's ability to compete and forestalled price competition in the B2B Credit Score Market.

226.     The agreement between Fair Isaac and Equifax had substantial anticompetitive effects.   The agreement excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

227.     The agreement between Fair Isaac and Equifax raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

228.     The aforesaid exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

229.     Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac and Equifax do not cease their anticompetitive conduct.

230.     Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac and Equifax's violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3), within the meaning of Section 4 of the Clayton Act (15 U.S.C. §15).

231.     Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac and Equifax's continuing violation of Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. § 26).

232.     In addition to competing with Equifax in the credit scores market, Fair Isaac licenses its algorithm to Equifax, which uses the algorithm to calculate credit scores for B2B

Purchasers.  As a result of the exclusionary contract terms, Equifax discourages its customers from using or purchasing access to competing credit scores.  Because Equifax has substantial market power, it can harm its customers in this way without taking the risk that they will switch to competing Credit Bureaus.  In return for contracting with Fair Isaac to restrain trade in the credit scores market, Equifax benefits from the Level Playing Field clause, which reduces competition among the Credit Bureaus in the B2B credit reports market.

## CLAIM FOUR: UNREASONABLE RESTRAINT OF TRADE
### (15 U.S.C. §§1, 3)

233.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

234.    This Claim Four is brought against Defendants Fair Isaac and TransUnion.

235.    The relevant period of this Claim Four is from February 2015 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

236.    The anticompetitive agreement between Fair Isaac and TransUnion violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), because it unreasonably restrained trade – regardless of whether TransUnion shared Fair Isaac's anticompetitive purpose, and regardless of whether TransUnion accepted the agreement as a result of Fair Isaac's negotiating leverage.

237.    The relevant product market is the market for the sale of B2B credit scores.

238.    The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

239.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

240.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

241.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

242.    Fair Isaac entered into an agreement with TransUnion that contained anticompetitive terms whereby TransUnion agreed with Fair Isaac to contractual limitations that harmed VantageScore's ability to compete and forestalled price competition in the B2B Credit Score Market.

243.    The agreement between Fair Isaac and TransUnion had substantial anticompetitive effects.  The agreement excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

244.    The agreement between Fair Isaac and TransUnion raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

245.    The aforesaid exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

246.    Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac and TransUnion do not cease their anticompetitive conduct.

247.    Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac and TransUnion's violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3), within the meaning of Section 4 of the Clayton Act (15 U.S.C. §15).

248.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac and TransUnion's continuing violation of Sections 1 and 3 of the Sherman Act (15 U.S.C §§1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. §26).

249.     In addition to competing with TransUnion in the credit scores market, Fair Isaac licenses its algorithm to TransUnion, which uses the algorithm to calculate credit scores for B2B Purchasers.  As a result of the exclusionary contract terms, TransUnion discourages its customers from using or purchasing access to competing credit scores.  Because TransUnion has substantial market power, it can harm its customers in this way without taking the risk that they will switch to competing Credit Bureaus.  In return for contracting with Fair Isaac to restrain trade in the credit scores market, TransUnion benefits from the Level Playing Field clause, which reduces competition among the Credit Bureaus in the B2B credit reports market.

### CLAIM FIVE: MONOPOLIZATION
### (15 U.S.C. §2)

250.     Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

251.     This Claim Five is brought against Defendant Fair Isaac.

252.     The relevant product market is the market for the sale of B2B credit scores.

253.     The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

254.     Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

255.     Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

256.     Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

257.     Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market

for B2B credit scores in the United States in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

258.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand to supracompetitive levels.

259.    Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

260.    Fair Isaac's monopolization has injured and will continue to injure competition in this market.

261.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

262.    The anticompetitive conduct raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

263.    Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac's violation of Section 2 of the Sherman Act (15 U.S.C. § 2) within the meaning of Section 4 of the Clayton Antitrust Act (15 U.S.C. § 15).

264.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac's continuing violation of Section 2 of the Sherman Act (15 U.S.C. § 2) within the meaning of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26).

## CLAIM SIX: STATE ANTITRUST LAWS

265.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

266.    This Claim Six is brought against all Defendants.

67

267.     Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following antitrust statutes.

268.     Arizona: Defendants' anticompetitive conduct has restrained trade in violation of Arizona Revised Statutes §§ 44-1401 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of the unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Ariz. Rev. Stat. §§ 44-1401 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401 *et seq.*

269.     California: During the Class Period, Defendants engaged in anticompetitive conduct in unreasonable restraint of trade and commerce in violation of California Business & Professions Code §§ 16700 *et seq.* To the extent that Plaintiffs seek recovery for Fair Isaac's acts of monopolization under these statutory provisions, while § 16700 does not reach solely unilateral conduct by a monopolist, it encompasses agreements between a monopolist and its customers where the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement. That is what happened here. This conduct constitutes a "combination" under the Cartwright Act. As a direct result of Defendants' unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their FICO Scores. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under §16700.

270.     Connecticut: Defendants' anticompetitive conduct has restrained trade in violation of Connecticut General Statute §§ 35-26 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their

business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Connecticut General Statute §§ 35-26 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Connecticut General Statute §§ 35-26 *et seq*.

271.    District of Columbia: Defendants' anticompetitive conduct has restrained trade in violation of District of Columbia Code Annotated §§ 28-4501 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of District of Columbia Code Ann. §§ 28-4501 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501 *et seq*.

272.    Illinois: Defendants' anticompetitive conduct has restrained trade in violation of the Illinois Antitrust Act (740 ILCS 10/1 *et seq*.). During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of the Illinois Antitrust Act (740 ILCS 10/1 *et seq*.). Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the Illinois Antitrust Act (740 ILCS 10/1 *et seq*.).

273.    Iowa: Defendants' anticompetitive conduct has restrained trade in violation of Iowa Code §§ 553.1 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of Iowa Code §§ 553.1 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §§ 553 *et seq*.

274.    <u>Kansas</u>: Defendants' anticompetitive conduct has restrained trade in violation of Kansas Statutes Annotated §§ 50-101 *et seq.*  During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of Kansas Stat. Ann. §§ 50-101 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101 *et seq*.

275.    <u>Maine</u>: Defendants' anticompetitive conduct has restrained trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101 *et seq.*).  During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101 *et seq*.

276.    <u>Maryland</u>: Defendants' anticompetitive conduct has restrained trade in violation of Maryland Code, Commercial Law, §§ 11-204 *et seq.*  During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their

business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Maryland Code, Commercial Law, §§11-204 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Maryland Code, Commercial Law, §§11-204 *et seq*.

277. <u>Michigan</u>: Defendants' anticompetitive conduct has restrained trade in violation of Michigan Compiled Laws Annotated §§ 445.771 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Michigan Comp. Laws Ann. §§ 445.771 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771 *et seq*.

278. <u>Minnesota</u>: Defendants' anticompetitive conduct has restrained trade in violation of Minnesota Annotated Statutes §§ 325D.49 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Minnesota Stat. §§325D.49 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Minnesota Stat. §§ 325D.49 *et seq*.

279. <u>Mississippi</u>: Defendants' anticompetitive conduct has restrained trade in violation of Mississippi Code Annotated §§ 75-21-1 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of

Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Mississippi Code Ann. §§ 75-21-1 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Mississippi Code Ann. §§ 75-21-1 *et seq*.

280.    <u>Nebraska</u>: Defendants' anticompetitive conduct has restrained trade in violation of Nebraska Revised Statutes §§ 59-801 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Nebraska Revised Statutes §§ 59-801 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Nebraska Revised Statutes §§ 59-801 *et seq*.

281.    <u>Nevada</u>: Defendants' anticompetitive conduct has restrained trade in violation of Nevada Revised Statutes Annotated §§ 598A.010 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A *et seq*.

282.    <u>New Hampshire</u>: Defendants' anticompetitive conduct has restrained trade in violation of New Hampshire Revised Statutes §§ 356:1 *et seq*. During the Class Period,

Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of New Hampshire Revised Statutes §§ 356:1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under New Hampshire Revised Statutes §§ 356:1 *et seq.*

283. <u>New Mexico</u>: Defendants' anticompetitive conduct has restrained trade in violation of New Mexico Statutes Annotated §§ 57-1-1 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

284. <u>New York</u>: Defendants' anticompetitive conduct has restrained trade in violation of New York General Business Laws §§ 340 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of the New York's Donnelly Act, §§ 340 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under New York Gen. Bus. Law §§ 340 *et seq.*

285. <u>North Carolina</u>: Defendants' anticompetitive conduct has restrained trade in violation of North Carolina General Statutes §§ 75-1 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under North Carolina Gen. Stat. §§ 75-1 *et seq.*

286. <u>North Dakota</u>: Defendants' anticompetitive conduct has restrained trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

287. <u>Oregon</u>: Defendants' anticompetitive conduct has restrained trade in violation of Oregon Revised Statutes §§ 646.705 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Oregon Revised Statutes §§ 646.705 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Oregon Revised Statutes §§ 646.705 *et seq.*

288.  <u>Rhode Island</u>: Defendants' anticompetitive conduct has restrained trade in violation of Rhode Island General Laws, §§6-36-4 *et seq.*  During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of Rhode Island General Laws, §§6-36-4 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all relief available under Rhode Island General Laws, §§6-36-4 *et seq.*

289.  <u>South Dakota</u>: Defendants' anticompetitive conduct has restrained trade in violation of South Dakota Codified Laws Ann. §§37-1-3.1 *et seq.*  During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of South Dakota Codified Laws Ann. §§37-1 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all relief available under South Dakota Codified Laws Ann. §§37-1 *et seq.*

290.  <u>Tennessee</u>: Defendants' anticompetitive conduct has restrained trade in violation of Tennessee Code Annotated §§47-25-101 *et seq.*  During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of Tennessee Code Ann. §§47-25-101 *et seq.*

Accordingly, Plaintiffs and members of the Class seek all relief available under Tennessee Code Ann. §§ 47-25-10 *et seq*.

291.    <u>Utah</u>: Defendants' anticompetitive conduct has restrained trade in violation of Utah Code Annotated §§ 76-10-911 *et seq*.  During the Class Period, Defendants' illegal conduct substantially affected Utah commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of Utah Code Annotated §§ 76-10-911 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all relief available under Utah Code Annotated §§ 76-10-911 *et seq*.

292.    <u>Vermont</u>: Defendants' anticompetitive conduct has restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq*.  During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq*.  Accordingly, Plaintiffs and members of the Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453 *et seq*.

293.    <u>West Virginia</u>: Defendants' anticompetitive conduct has restrained trade in violation of West Virginia Code §§ 47-18-1 *et seq*.  During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of West Virginia Code §§ 47-18-1 *et seq*.

Accordingly, Plaintiffs and members of the Class seek all relief available under West Virginia Code §§ 47-18-1 *et seq.*

294.  Wisconsin: Defendants' anticompetitive conduct has restrained trade in violation of Wisconsin Statutes §§ 133.01 *et seq.*  During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have restrained trade in violation of Wisconsin Stat. §§ 133.01 *et seq.*  Accordingly, Plaintiffs and members of the Class seek all relief available under Wisconsin Stat. §§ 133.01 *et seq.*

295.  Plaintiffs and members of the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful monopolization, and anticompetitive agreements.  Plaintiffs and members of the Class have paid more for FICO Credit Scores than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type that the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

296.  In addition, Defendants have profited significantly from the aforesaid unlawful conduct.  Their profits derived from monopolistic and/or and conspiratorial anticompetitive conduct that was undertaken at the expense and to the detriment of Plaintiffs and members of the Class.

297.  Accordingly, Plaintiffs and members of the Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## CLAIM SEVEN: STATE UNFAIR AND DECEPTIVE TRADE PRACTICES LAWS

298.     Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

299.     This Claim Seven is brought against all Defendants.

300.     By reason of the foregoing, Defendants have violated, and Plaintiffs and members of the Class are entitled to relief under, the Unfair and Deceptive Trade Practices and Consumer Protection Laws of the following jurisdictions.

301.     <u>Arkansas</u>: Defendants have engaged in unfair, unconscionable, and/or deceptive practices in violation of Arkansas Code Annotated §§ 4-88-101 *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which FICO Scores were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Class.  The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).  Defendants' unlawful conduct had the following effects: (1) FICO Scores price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) FICO Scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.  During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated § 4-

78

88-107(a)(10) and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

302.  <u>California</u>: Defendants have engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of California Business & Professions Code §§ 17200 *et seq*.  During the Class Period, Defendants marketed, sold, or distributed FICO Scores in California, and committed and continue to commit acts of unfair competition, as defined by §§ 17200 *et seq*. of the California Business & Professions Code, by engaging in the acts and practices specified above.  This claim is instituted pursuant to sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from these Defendant for acts, as alleged herein, that violated section 17200 of the California Business & Professions Code, commonly known as the Unfair Competition Law.  Defendants' conduct as alleged herein violated section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business & Professions Code §§ 17200 *et seq*., including, but not limited to, the following: (1) the violations of Sections 1, 2, and 3 of the Sherman Act, as set forth above; and (2) the violations of §§ 16720 *et seq*. of the California Business & Professions Code, set forth above.  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of §§ 16720 *et seq*. of the California Business & Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of FICO Scores in the State of California within the meaning of § 17200, California Business & Professions Code; and (4) Defendants' acts and practices are fraudulent or

79

deceptive within the meaning of § 17200 of the California Business & Professions Code. Plaintiffs and members of the Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Class to pay supracompetitive and artificially inflated prices for FICO Scores. Plaintiffs and members of the Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violated § 17200 of the California Business & Professions Code. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business practices, pursuant to California Business & Professions Code §§ 17203 and 17204.

303. <u>District of Columbia</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in the District of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross

disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores.  Defendants had the sole power to set that price, and Plaintiffs and members of the Class had no power to negotiate a lower price.  Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges.  Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct with respect to fixing the price of FICO Scores at supracompetitive levels and overcharging consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class.  The suppression of competition that has resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for the FICO Scores.  Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.  As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

81

304. <u>Florida</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Florida; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. §§ 501.201 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

305. <u>Massachusetts</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Consumer Protection Law (Mass. Gen. Law Ch. 93A *et seq.*). Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Massachusetts, and Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result

of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Law Ch. 93A *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under Section 11 of that statute.

306. <u>Montana</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103 *et seq.*, and §§ 30-14-201 *et seq.* Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Montana; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103 *et seq.*, and §§ 30-14-201 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

307. <u>New Mexico</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. §§ 57-12-1 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices

83

at which FICO Scores were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Class and the prices paid by them for FICO Scores as set forth in N.M.S.A. § 57-12-2E. Plaintiffs and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores. Defendant Fair Isaac had the sole power to set that price and Plaintiffs and members of the Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct to fix the price of FICO Scores at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class. The suppression of competition that resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for the FICO Scores. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. §§ 57-12-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

308.    <u>New York</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO scores were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Class, who are Defendants' consumers. Defendants made public statements about the prices of FICO Scores that omitted material information that rendered the statements that they made materially misleading; and Defendants alone possessed material information that were relevant to consumers but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, Class members who purchased FICO Scores were misled to believe that they were paying a fair price for FICO Scores or the price increases for FICO Scores were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conduct. Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have an impact on New York consumers, including Plaintiffs and members of the Class. Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have a broad impact, causing Class members who purchased

FICO Scores to be injured by paying more for FICO Scores than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New York; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in New York. Plaintiffs and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

309. <u>North Carolina</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. §§ 75-1.1 *et seq.* Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Class. Defendants' conduct could not have succeeded absent deceptive conduct by Defendant to cover up their illegal acts. Secrecy was

integral to the formation, implementation, and maintenance of Defendants' illegal activity. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Class could not possibly have been aware. Defendants' public statements concerning the price of FICO Scores created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conduct. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in North Carolina. Plaintiffs and members of the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. §§ 75-1.1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

310. <u>Rhode Island</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1 *et seq.*).  Members of this Class purchased FICO Scores for personal, family, or household purposes.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Rhode Island.  Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO Scores.  Defendants owed a duty to disclose such facts, and they breached that duty by their silence.  Defendant misrepresented to all purchasers during the Class Period that Defendants' FICO Scores prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.  As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.  Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market.  Defendants'

affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO Scores they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. §§ 6-13.1-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

311.  <u>South Carolina</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10 *et seq.*).  Defendants' monopolization had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores during the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10 *et seq.*, and, accordingly, Plaintiffs and the members of the Class seek all relief available under that statute.

312.  <u>South Dakota</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-6 *et seq.*).  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes South

Dakota, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO credit scores were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO credit scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendants' FICO credit scores prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO credit scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO credit scores at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO credit scores they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §§37-24-6 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

90

313. <u>Vermont</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for the FICO Scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendants' FICO Scores prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Vermont; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or

deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

314.    <u>West Virginia</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code, §§46A-6-104 *et seq*.  Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores.  During the Class Period, Defendants marketed, sold, or distributed FICO credit scores in West Virginia, and Defendants' illegal conduct substantially affected West Virginia commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code, §§46A-6-104 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully prays that This Honorable Court:

A.    Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that Plaintiffs be named as Class Representatives, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B.    Adjudge that Defendants violated the federal antitrust laws as set forth above;

<div align="center">

92

</div>

C.      Adjudge that Defendants violated the state antitrust and unfair and deceptive trade practices laws as set forth above;

D.      Award Plaintiffs and members of the Class actual, treble, and exemplary damages;

E.      Award Plaintiffs and members of the Class attorneys' fees and costs of suit, including costs of consulting and testifying experts;

F.      Award Plaintiffs and members of the Class pre- and post-judgment interest;

G.      Enjoin Defendants from their violations of law; and

H.      Grant such other, further, and different relief, including structural relief, as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury as to all issues so triable.

Dated: October 30, 2023                    Respectfully submitted,

| | |
|---|---|
| */s/ Steven F. Molo* | */s/ Carmen Medici* |
| Steven F. Molo | Carmen Medici |
| Lauren F. Dayton | **SCOTT+SCOTT** |
| **MOLOLAMKEN LLP** | **ATTORNEYS AT LAW LLP** |
| 300 N. LaSalle Street, Suite 5350 | 600 West Broadway, Suite 3300 |
| Chicago, IL 60654 | San Diego, CA 92101 |
| Telephone: 312-450-6700 | Telephone: 619-798-5319 |
| smolo@mololamken.com | cmedici@scott-scott.com |
| ldayton@mololamken.com | |
| | Joseph P. Guglielmo (N.D. Ill. 2759819) |
| Lauren M. Weinstein | Michelle E. Conston (admitted *pro hac vice*) |
| **MOLOLAMKEN LLP** | **SCOTT+SCOTT** |
| 600 New Hampshire Avenue, N.W., | **ATTORNEYS AT LAW LLP** |
| Suite 500 | The Helmsley Building |
| Washington, DC 20037 | 230 Park Avenue, 17th Floor |
| Telephone: 202-556-2000 | New York, NY 10169 |
| lweinstein@mololamken.com | Telephone: 212-223-6444 |
| | Facsimile:  212-223-6334 |
| *Liaison Counsel for Direct Purchaser* | jguglielmo@scott-scott.com |
| *Plaintiffs and the Proposed Direct* | mconston@scott-scott.com |
| *Purchaser Class* | |

Gary F. Lynch
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
Facsimile: 412-231-0246
glynch@carlsonlynch.com

Katrina Carroll
**CARLSON LYNCH LLP**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
kcarroll@carlsonlynch.com

Jennifer W. Sprengel
**CAFFERTY CLOBES
MERIWETHER &
SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

Barbara J. Hart (admitted *pro hac vice*)
**GRANT & EISENHOFER**
485 Lexington Ave., 29th Floor New
York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
**SPERLING & SLATER, P.C.**
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Patrick McGahan (admitted *pro hac vice*)
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct
Purchaser Plaintiffs and the Proposed Direct
Purchaser Class*

Christopher M. Burke
Walter Noss
Yifan (Kate) Lv
**KOREIN TILLERY PC**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 6225-5620
Facsimile: (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

George A. Zelcs
Randall P. Ewing, Jr.
Ryan Z. Cortazar
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Michael L. Roberts
Karen Sharp Halbert
**ROBERTS LAW FIRM, P.A.**
20 Rahling Circle
Little Rock, AR 72223
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Gregory S. Asciolla (admitted *pro hac vice*)
Karin E. Garvey (admitted *pro hac vice*)

Linda P. Nussbaum
Susan Schwaiger
**NUSSBAUM LAW GROUP, P.C.**
1211 Avenue of the Americas
40th Floor
New York, NY 10036
Telephone: 917-438-9102
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Daniel E. Gustafson
(admitted *pro hac vice*)
Daniel C. Hedlund
(admitted *pro hac vice*)
Michelle J. Looby
(admitted *pro hac vice*)
Joshua J. Rissman
Ling S. Wang
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
lwang@gustafsongluek.com

Dennis Stewart (admitted pro hac vice)
**GUSTAFSON GLUEK PLLC**
600 B Street, 17th Floor San
Diego, CA 92101
Telephone: 619-595-3200
dstewart@gustafsongluek.com

Kenneth A. Wexler Melinda J.
Morales Michelle Perkovic
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

Robin A. van der Meulen (admitted *pro hac vice*)
Matthew J. Perez (admitted *pro hac vice*)
Jonathan S. Crevier (admitted *pro hac vice*)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
Telephone: 646-933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
rvandermeulen@dicellolevitt.com
mperez@dicellolevitt.com
jcrevier@dicellolevitt.com

Marvin A. Miller
Lori A. Fanning
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: 312-332-3400
mmiller@millerlawllc.com
lfanning@millerlawllc.com

Guillaume Buell (admitted pro hac vice)
**THORNTON LAW FIRM LLP**
1 Lincoln Street, 13th Floor
Boston, MA 02111
Telephone: 617-720-1333
gbuell@tenlaw.com

Don Barrett (pro hac vice forthcoming)
**BARRETT LAW GROUP, P.A.**
404 Court Square
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
dbarrett@barrettlawgroup.com
donbarrettpa@gmail.com

Richard R. Barrett (pro hac vice forthcoming)
**BARRETT LAW GROUP, P.A.**
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: 662-380-5018
rrb@rrblawfirm.net

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)

Charles F. Barrett
(admitted *pro hac vice*)
**NEAL & HARWELL, PLC**
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: 615-244-1713
cbarrett@nealharwell.com

**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1908
mlehmann@hausfeld.com
clebsock@hausfeld.com

Hilary K. Scherrer
Paul Gallagher
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington, DC 20006
Telephone: 202-540-7200
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Scott A. Martin
Irving Scher
Jeanette Bayoumi
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: 646-357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

*Counsel for Direct Purchaser Plaintiffs and the
Proposed Direct Purchaser Class*

## CERTIFICATE OF SERVICE

I, Carmen A. Medici, an attorney, hereby certify that on October 30, 2023, I caused a true

and correct copy of the foregoing Direct Purchaser Plaintiffs' First Amended Consolidated Class

Action Complaint to be filed and served electronically via the Court's CM/ECF system.

*s/ Carmen A. Medici*
Carmen A. Medici

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **IN RE FICO ANTITRUST LITIGATION** | **Judge Edmond E. Chang** |
| **This Document Relates to the Following Cases:** | **Magistrate Judge M. David Weisman** |
| **INDIRECT PURCHASER CASES** | **No. 1:20-CV-02114** |
| | **JURY TRIAL DEMANDED** |

# INDIRECT PURCHASER PLAINTIFFS'
## SECOND AMENDED CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................1

II.   PARTIES   …………………..........................................................6

III.   JURISDICTION AND VENUE   ....................................................8

IV.   FACTUAL ALLEGATIONS  ..........................................................9

    A. Credit Scores and Credit Reports ................................................9

    B. The Markets for Credit Scores in The United States .....................14

    C. Fair Isaac's FICO Score Has a Monopoly in the B2B Credit Score Market...............20

    D. Fair Isaac Has Been Able to Maintain its Monopoly ......................23

    E. Fair Isaac's Conduct in Furtherance of its Anticompetitive Scheme .........................27

        1.   Fair Isaac's Anticompetitive Litigation................................28

        2.   Fair Isaac and the Credit Bureaus' Anti-Competitive Agreements .....................33

            a.   Fair Isaac's Anticompetitive Contracts with the CBs...............................34

                i.   The "No Equivalent Products Clause" ...........................................38

                ii.   The "Dynamic Royalty Schedule"....................................39

                iii.   The "Level Playing Field" ............................................42

        3.   Fair Isaac's Negative Advertising Campaign in Furtherance of its Scheme .........46

    F. The Contracts Between Fair Isaac and Each Credit Bureau Containing Anticompetitive Terms, In Combination With Fair Isaac's Anticompetitive Conduct Has Harmed Competition In the B2B Credit Score Market.........................49

V.   CLASS ACTION ALLEGATIONS ...................................................51

VI.   STATUTES OF LIMITATION AND TOLLING ...........................54

VII.   DEFENDANTS' ACTIONS CONSTITUTE CONTINUING VIOLATIONS................57

VIII. CLAIMS FOR RELIEF   .............................................................58

FIRST CLAIM FOR RELIEF: UNREASONABLE RESTRAINT OF TRADE..............58

SECOND CLAIM FOR RELIEF: UNREASONABLE RESTRAINT OF TRADE.........60

THIRD CLAIM FOR RELIEF: UNREASONABLE RESTRAINT OF TRADE ...........63

FOURTH CLAIM FOR RELIEF: UNREASONABLE RESTRAINT OF TRADE.........65

FIFTH CLAIM FOR RELIEF: MONOPLIZATON .........................................................67

SIXTH CLAIM FOR RELIEF: VIOLATION OF STATE ANTITRUST
STATUTES            ………...................................................................................69

SEVENTH CLAIM FOR RELIEF: VIOLATIONS OF STATE CONSUMER
PROTECTION LAWS ...................................................................................103

EIGHTH CLAIM FOR RELIEF: UNJUST ENRICHMENT .......................................132

PRAYER FOR RELIEF            ………...................................................................................133

Plaintiffs Garner Properties & Management LLC ("Garner") and Lake City Exports, Inc. ("Lake City") (collectively, "Plaintiffs"), bring this action against Defendants Fair Isaac Corporation ("Fair Isaac"), Equifax, Inc. ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and TransUnion, LLC ("TransUnion") (collectively "Defendants," with the latter three referred to collectively as the "Credit Bureaus" or "CBs"), individually and on behalf of proposed Classes of all end-users that purchased FICO Scores[1] in the B2B Credit Score Market from any third-party other than Fair Isaac and/or a Credit Bureau from October 1, 2006 through the present.[2] Defendants have engaged in anticompetitive behavior, which forced Plaintiffs and members of the proposed Classes to pay artificially inflated prices for credit scoring services and generated millions of dollars in supra-competitive annual revenues for Defendants. Fair Isaac has maintained a monopoly share in excess of 90% of the market for credit scores by suppressing competition and inhibiting innovation. Therefore, Plaintiffs and the proposed Classes seek damages, injunctive relief and other relief pursuant to federal antitrust laws, state antitrust, unfair competition, and consumer protection laws, and the laws of unjust enrichment, and demand a trial by jury.

## I.    INTRODUCTION

1.    A "credit score" is a three-digit numerical summary of a customer's creditworthiness based on factors such as payment history and the duration of that history; balances, available credit, and the percentage of existing credit lines being utilized; public records like bankruptcies or adverse judgments; and the assumption of new debt. There are two distinct markets for such scores. The first is the market for the sale of such scores to banks,

---

[1] "FICO Score" includes a credit report that contains a FICO Score.

[2] "Third-party" constitutes any entity that purchased a FICO Score from any Defendant.

mortgage companies, credit unions, and other businesses that assess individual credit risk – *i.e.*, business-to- business sales. That market is referred to herein as the "B2B Credit Score Market." The second is the market for the sale of such scores to the individual who is the subject of them – i.e., business-to-consumer. That market is referred to herein as the "B2C Credit Score Market." This case concerns the B2B Credit Score Market.

2.    According to Fair Isaac, FICO Scores are used for over 90% of all lending decisions in the United States. Fair Isaac's FICO credit scores have dominated the market for nearly three decades and have "maintained a 90-plus percent market share for at least 13 years."[3]

3.    Credit Bureaus collect and maintain information for credit reports. The three major CBs in the United States are Defendants Equifax, Experian, and TransUnion. The CB Defendants control virtually 100% of aggregate credit-related data formed by aggregating credit data collected from businesses, and they jointly dominate the market for B2B credit reports.

4.    Credit reports list bill payment history, loans, current debt, and other financial information. They show where consumers work and live and whether they have been sued, arrested, or filed for bankruptcy.

5.    Credit reports help lenders decide if they will give consumers credit or approve a loan. The reports also help determine what interest rates consumers are charged. Employers, insurers, and rental property owners also use credit reports.

6.    CBs purchase FICO Scores and then sell them as part of the credit reporting services they provide to millions of lenders, financial institutions, landlords, employers, and other businesses, that then use the credit reports to determine credit history and/or default risk.

---

[3] TransUnion LLC's Redacted Counterclaims, Dkt 38, *Fair Isaac Corp. . TransUnion LLC*, No. 1:17-cv-08318, ¶ 32 (N.D. Ill. Feb. 12, 2018) ("TransUnion Counterclaims").)

2

7. Fair Isaac also directly sells FICO Scores to creditors and other businesses – bypassing the Credit Bureaus, and competing with them, when it does so.

8. Plaintiff Garner is a real estate brokerage and property management company that purchases Fair Isaac's FICO scores from third-parties which, in turn, purchase those FICO Scores from one of the three major CBs. The third-parties pass on to Garner and all other Class Members the cost of each FICO Score.

9. Plaintiff Lake City is a used automobile dealer that purchases Fair Isaac's FICO scores from third-parties which, in turn, purchase those FICO Scores from one of the three major CBs. The third-parties pass on to Lake City and all other Class Members the cost of each FICO Score.

10. In 2006, VantageScore Solutions, LLC ("VantageScore Solutions") launched VantageScore - a credit score to compete against Fair Isaac's FICO Scores. VantageScore Solutions is an independent joint venture of the Credit Bureaus. Similar to Fair Isaac's FICO Score, VantageScore Solutions uses scoring codes and algorithms to convert a consumer's information in a consumer credit report into a credit score. Thus, VantageScore presented a competitively priced alternative to FICO Scores.

11. In addition, a VantageScore has relevant and important advantages over a FICO Score. For example, a VantageScore considers a consumers' rental and utility payments, which enables it to provide a credit score for consumers with less than six months of credit history. Fair Isaac's FICO Score cannot do this. A VantageScore therefore provides a credit score for tens of millions more Americans than Fair Isaac's algorithms allow. If Plaintiffs and similarly situated businesses were able to purchase VantageScores on economically sensible terms, they would be able to see credit scores of tens of millions more consumers, enabling them to contract with

3

millions more customers, tenants, and employees than they can using FICO Scores alone.

12.     Rather than compete on the merits with VantageScore, Fair Isaac undertook a lengthy campaign of anticompetitive conduct to discourage the adoption of VantageScore and preserve its own monopoly. As part of that campaign Fair Isaac also entered into contracts with each CB, which contained substantially similar anticompetitive provisions that were designed to, and did, substantially reduce or altogether eliminate the competitive threat posed by VantageScore. Through these contracts Fair Isaac imposed unreasonable restraints on trade.

13.     As another part of that campaign, in 2006, Fair Isaac filed a lawsuit against TransUnion, Equifax, and Experian with the intended purpose of driving VantageScore Solutions out of business. Experian settled the case in 2008 and entered into a lucrative partnership with Fair Isaac following the settlement. TransUnion and Equifax fought on, eliminating most of Fair Isaac's claims through a summary judgment motion and winning a jury trial on the remaining trademark claim.

14.     When its lawsuit failed, Fair Isaac engaged in a further pattern of anticompetitive conduct designed to discourage use of alternatives to FICO Scores, including VantageScore. Fair Isaac accomplished this goal by abusing its monopoly power and entering into contracts with the CBs that contained anticompetitive restrictions aimed at extracting supracompetitive profits from B2B purchasers. Those contracts include contractual provisions that: (1) prohibit CBs from marketing non-FICO credit scores (*i.e.*, VantageScore); (2) charge discriminatory and prohibitively high prices for FICO Scores if a CB customer purchases a FICO Score while providing the consumer with a competing score (*i.e.*, a VantageScore); and (3) eliminate price competition among the CBs, thereby disincentivizing the CBs from negotiating a lower price for FICO Scores.

15.     The contracts were intended to, and had the effect of, hobbling VantageScore Solutions' ability to compete and forcing B2B Purchasers to pay supracompetitive prices for credit scores.

16.     As part of its goal of eliminating competition, Fair Isaac also waged a public relations and advertising campaign to disparage VantageScore and create uncertainty about the reliability of VantageScores. The purpose of Fair Isaac's anticompetitive scheme is to prevent competition from VantageScore and other scoring systems and to preserve Fair Isaac's monopoly.

17.     Fair Isaac's scheme worked. Through the anticompetitive conduct alleged herein, Fair Isaac succeeded in preventing VantageScore Solutions from gaining market share and thwarted the entry of other entities into the market for credit scores. Having successfully suppressed all other competition, Fair Isaac was able to, and did, artificially increase prices for its FICO products.

18.     For example, Fair Isaac's net income for the third quarter of 2021 was ***more than double*** that of the previous year period, increasing from $64.1 million in Q3 2020 to $151.2 million in Q3 2021.[4] Fair Isaac's yearly net income has remained high and increased year-over-year; for example, Fair Isaac reported a net income of $236 million in 2020, $392 million in 2021, $374 million in 2022, and is on pace to surpass its net earnings in 2023 from the previous year.[5] Sources in the financial industry have attributed Fair Isaac's profitability to "[p]rice

---

[4] Press Release, Fair Isaac, *FICO Announces Earnings of $5.18 per Share for Third Quarter Fiscal 2021* (Aug. 3, 2021), https://investors.fico.com/news-releases/news-release-details/fico-announces-earnings-518-share-third-quarter-fiscal-2021.

[5] Fair Isaac Corporation, Annual Report (Form 10-K), at 36 (Nov. 9, 2022), https://fico.gcs-web.com/static-files/9050c8f5-9c87-4d41-8ecd-6d9f3d179a8a (hereinafter, "Fair Isaac 2022 10-K"); *see also* Fair Isaac Corporation, Quarterly Report (Form 10-Q), at 18 (Aug. 2, 2023),

increases in its credit scoring segment and gains in applications sold to banking institutions," which have "helped the company log year-over-year gains in revenue and profit."[6] But for Fair Isaac's and the CBs' anticompetitive conduct, VantageScore and other competitors of Fair Isaac would have gained market share, allowing for price competition and reducing the prices Plaintiffs and similarly situated businesses paid for FICO Scores.

19.     Plaintiffs and other indirect purchasers of Fair Isaac's FICO Scores paid supracompetitive prices and have therefore suffered harm as a result of Defendants' anticompetitive conduct, which harmed competition in the B2B Credit Score Market. Opening this market to competition will spur innovation so that credit scores are fairly priced and more accurate.

20.     Plaintiffs and other similarly situated businesses are indirect purchasers of Fair Isaac's FICO Scores. They do not purchase FICO Scores directly from Defendants but instead purchase them from third-parties, who purchase them from Defendants.

## II.    PARTIES

21.     Plaintiff Garner Properties & Management LLC is a real estate brokerage and property management company located in Taylor, Michigan. During the Class Period, Garner purchased Fair Isaac's FICO Scores from third-parties which, in turn, purchased those FICO Scores from one of the CBs. The CBs, through the third-parties, sell FICO Scores to Plaintiffs and Class members pursuant to agreements between Fair Isaac and each Credit Bureau, which

---

https://fico.gcs-web.com/sec-filings?field_nir_sec_form_group_target_id%5B%5D=496&field_nir_sec_date_filed_value=#views-exposed-form-widget-sec-filings-table.

[6] Motley Fool, *Fair Isaac Corporation Scores 13% Revenue Growth in the First Quarter* (Jan. 31, 2019), https://www.fool.com/investing/2019/01/31/fair-isaac-corporation-scores-13-  revenue-growth-in.aspx.

provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to the Class. The artificially inflated cost of those FICO Scores is then passed on to Garner, and all other Class members.

22.    Plaintiffs Lake City Exports, Inc., is a used automobile dealer located in Maine. During the Class Period, Lake City purchased Fair Isaac's FICO Scores from third-parties which, in turn, purchased those FICO Scores from one of the CBs. The CBs, through the third-parties, sell FICO Scores to Plaintiffs and Class Members pursuant to separate agreements between Fair Isaac and each Credit Bureau, which provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to the Class. The artificially inflated cost of those FICO Scores is then passed on to Lake City, and all other Class members.

23.    Plaintiffs were injured in their business or property as a direct, proximate, and material result of Defendants' violation of the law. Plaintiffs are also threatened with future injury to their business and property by reason of Defendants' continuing violations of the law.

24.    Defendant Fair Isaac is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California, 95110.

25.    Defendant Equifax is a Credit Bureau incorporated in Georgia that has its principalplace of business at 1550 Peachtree St. NW, Atlanta, Georgia.

26.    Defendant Experian is a Credit Bureau incorporated in Ohio that has its principal place of business in the United States at 475 Anton Blvd., Costa Mesa, California.

27.    Defendant TransUnion is a Delaware limited liability Credit Bureau that has its principal place of business at 555 W. Adams St., Chicago, Illinois.

28.    Plaintiffs bring this state law class action on behalf of the proposed Classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and

post-judgment interest, costs, and attorneys' fees for the injuries caused by Defendants' conduct in restricting the development and sale of credit scores and causing the prices of FICO Scores to be artificially inflated. Plaintiffs also seek injunctive relief under Sections 1 and 2 of the Sherman Act.

## III.   JURISDICTION AND VENUE

29.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332(d) and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court possesses supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

30.    This Court has personal jurisdiction over Defendants because Defendants transacted business, maintained substantial contacts, and are located and/or committed unlawful conduct in this District. Their unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

31.    Venue is proper in this District pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d). Defendants regularly transact business within this District and a substantial portion of the affected interstate trade and commerce described in this Complaint were carried out in this District.

32.    Defendants market their products and receive substantial payments across state lines. Defendants' business activities that are the subject of this Complaint are within the law of and have substantially affected, interstate trade and commerce.

33.    During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States Mail, to effectuate their illegal scheme.

34.     Defendants' conduct also had a substantial effect on the intrastate commerce of the States listed in counts Seven and Eight of this Complaint.

## IV.     FACTUAL ALLEGATIONS

### A.     Credit Scores and Credit Reports

35.     A credit score is a numerical expression of a person's credit history and is designed to measure their creditworthiness. It helps creditors determine whether to give credit, decide the terms they offer and what interest rates consumers pay. Higher scores generally indicate that an individual or business poses less credit risk and is more likely to make payments under a contract and manage money more responsibly. Thus, having a high credit score can make it easier to get a loan, credit card, lower interest rates, rent an apartment, or provide access to lower insurance rates.

36.     Credit scores typically are produced by applying scoring algorithms to a person's consumer credit history. A credit score is based on multiple factors, such as payment history, outstanding balances, length of credit history, applications for new credit accounts, and types of credit accounts (*e.g.*, mortgages, car loans, credit cards).

37.     Credit scores usually are accompanied by "reason statements," which inform the purchaser about the factors that most significantly affected that individual's credit score. A number or alphanumeric code - called a "reason code"- is associated with each reason statement. Examples of reason statements include: "Account payment history is too new to rate"; "Amount owed on accounts is too high"; and "Too many recently active accounts." VantageScore explains this process as follows:

> No matter where you get your score, the documents that
> accompany it will include up to four or five statements
> explaining why your score wasn't higher. These statements
> are called reason codes and sometimes go by several other

9

names. Some people call them score factors; others call them adverse action codes. They're all the same thing.

The next time you see your credit score, regardless of where it comes from, look for the reason codes. They'll be worded and displayed something like this:

Your Credit Score Is: 705

32: Balances on bankcard or revolving accounts too high compared to credit limits

16: The total of all balances on your open accounts is too high

85: You have too many inquiries on your credit report

13: Your most recently opened account is too new

The numbers preceding each statement are numeric identifiers; sometimes they appear with the text, and sometimes they do not.

The four (or five) factors are listed in order of the impact they have. In this example, the number one reason the credit score is not higher is "Balances on bankcard or revolving accounts too high compared to credit limits." That means the consumer's credit card debt is too high relative to his or her credit limits.

In our example, the reason with the second-greatest impact is "The total of all balances on your open accounts is too high." That means the consumer is carrying too much debt on his or her open accounts.

The third reason the score isn't higher is "You have too many inquiries on your credit report." This means the consumer has recently applied for credit several times, which led to some number of credit inquiries.

The fourth reason the score isn't higher is "Your most recently opened account is too new." Clearly this means the consumer has a very new account on his or her credit report.[7]

---

[7] VantageScore Solutions, *Reason Codes 101*, https://www.reasoncode.org/reasoncode101.

10

38.     Fair Isaac has a webpage that sets forth its various "reason codes."[8] VantageScore also has a dedicated website that explains its various "reason codes."[9]

39.     CBs collect and store financial data about individuals that is submitted to them by creditors, such as lenders, credit card companies, and other financial companies. Creditors are not required to report to every credit-reporting company. Utilizing these files, the CBs create a credit report.

40.     The information in a credit report is often used to calculate a credit score. Credit reports list a consumer's bill payment history, loans, current debt, and other financial information. They show where the individual works and lives and whether they have been sued, arrested, or filed for bankruptcy. CBs essentially collect consumer credit data and present the aggregated information in the form of a credit report.

41.     CBs continually gather credit and financial data about individuals from creditors, government entities, public records, collection agencies, and other third parties, and compile this information into a credit file. The CBs then use an individual's credit file to populate a credit report on that individual for sale to businesses (B2B purchasers) and consumers (B2C purchasers).

42.     Credit reports help lenders decide if they will give credit or approve a loan. The reports also help determine what interest rate to charge. Employers, insurers, and rental property owners also look at credit reports.

43.     Credit scores are the most widely used indicators of consumers' creditworthiness in the United States and Fair Isaac's FICO Score is, by far, the most widely-used credit score.

---

[8] Fair Isaac, *US FICO® Score Reason Codes*, https://www.fico.com/en/latest-thinking/solution-sheet/us-fico-score-reason-codes (link to download).

[9] VantageScore Solutions, ReasonCode.org, https://www.reasoncode.org.

According to Fair Isaac, FICO Scores are used in over 90% of U.S. lending decisions.[10] They are crucial to millions of businesses that rely on indicators of creditworthiness to assess risk and make business decisions.

44. Credit scores and credit reports are separate and distinct products that can be sold together or independently.

45. Fair Isaac works with the CBs to perpetuate and extend its monopoly. Fair Isaac's relationship with B2B purchasers is often dependent on B2B purchasers' relationships with the CBs, which facilitate the sale of FICO Scores to B2B purchasers.

46. FICO Scores and credit reports are often sold to businesses as a bundle. Such bundles can be sold by the CBs, which are licensed by Fair Isaac to sell FICO Scores and in return, pay a royalty to Fair Isaac. Thus, when a B2B purchaser requires a credit score, it purchases a credit report from a CB and a credit score from that CB and Fair Isaac, often through a contract with both Fair Isaac and the CB. Although the payment for the credit report and the credit score may at times occur in a single transaction, the reality is that both the CB and Fair Isaac act as the providers of the FICO Score. In this example, Plaintiffs and proposed Class members would then purchase the credit report and credit score from the B2B purchaser.

47. In its 2020 Form 10-K filed with the SEC, Fair Isaac states that, "[d]uring fiscal 2020, 2019 and 2018, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for 32%, 29%, and 25% of our total revenues, respectively."[11]

48. And in its 2022 10-K, Fair Isaac disclosed significant increases in the revenues

[10] Fair Isaac, *FICO: The Decisions Company Investor Overview*, at 5 (Dec. 2019), https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.

[11] Fair Isaac Corporation, Annual Report (Form 10-K), at 4 (Nov. 12, 2020), https://fico.gcs-web.com/node/23951/html (hereinafter, "Fair Isaac 2020 10-K").

generated from these same agreements. According to Fair Isaac, "during fiscal 2022, 2021 and 2020, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for 39%, 38% and 33% of our total revenues, respectively."[12] Fair Isaac characterized the CBs as "partners in offering [FICO's] scoring solutions."

49. The FICO Score and credit report bundles can also be sold by Fair Isaac to businesses. "In those situations, Fair Isaac requests a credit score and credit report from the CBs-selected by the lender or consumer. The Credit Bureau applies Fair Isaac's CB-tailored FICO algorithm to a consumer's aggregated credit data and provides the consumer's credit report and credit score to Fair Isaac. Fair Isaac then delivers the bundle to the consumer or lender. Fair Isaac pays the CB for the cost of processing and providing the bundle."[13] Thus, Fair Isaac and the CBs act as horizontal competitors and compete with each other for some B2B Purchasers – separate and apart from Fair Isaac's competition with VantageScore.

50. This direct competition between Fair Isaac and the CBs, as well as the close relationship among them, continues to this day. At an August 3, 2021 earnings conference, Fair Isaac's CEO, William J. Lansing, said, "we stay close to it [B2B scores] through our channel partners, the bureaus. But we also – certainly for all of the major institutions, we have direct sales relationships."[14] TransUnion's 2022 Form 10-K acknowledges that it "compete[s] with FICO in the Financial Services" market for B2B purchasers.[15] Similarly, Equifax's 2022 Form

---

[12] Fair Isaac 2022 10-K at 9.

[13] *Fair Isaac Corp. v. Equifax, Inc.*, No. 06-4112, 2008 WL 623120, at *2 (D. Minn. March 4, 2008).

[14] Motley Fool, *Fair Isaac Corp. (FICO) Q3 2021 Earnings Call Transcript* (Aug. 3, 2021) (hereinafter, "Q3 Earnings Call"), https://www.fool.com/earnings/call-transcripts/2021/08/03/fair-isaac-corporation-fico-q3-2021-earnings-call/.

[15] TransUnion, Annual Report (Form 10-K) (Feb. 14, 2022), at 12.

10-K acknowledges that it too "compete[s] with Fair Isaac Corporation with respect to certain of [its] analytical tools and solutions."[16] Experian has also recognized that its "comparator companies" include FICO.[17]

### B.    The Markets for Credit Scores in The United States

51.    There are two distinct markets for credit scores—the "B2B Credit Score Market" and the "B2C Credit Score Market."

52.    The "B2B Credit Score Market" consists of sales from a business (a credit score generator, such as Fair Isaac, directly or through a CB, or indirectly through a third-party credit reporting company) to lenders, such as banks and credit card companies, financial institutions, and other businesses. The "B2C Credit Score Market" consists of credit scores sold to consumers to monitor their own credit records. The claims in this case concern the B2B Credit Score Market. The B2B Credit Score Market is the relevant product market in which the claims that require a market definition are to be assessed.

53.    In the B2B Credit Score Market, businesses purchase the credit scores of individuals and businesses to help them understand credit risk, make better-informed lending decisions, assess creditworthiness, and make business decisions. The B2B Credit Score Market also includes the FICO Scores that Plaintiffs and other businesses indirectly purchased from Fair Isaac and the CBs.

54.    In the B2C Credit Score Market, Fair Isaac and other credit score producers, as well as CBs, sell consumers their own credit scores. A consumer often purchases their own credit

---

[16] Equifax, Annual Report (Form 10-K) (Feb. 23, 2022), at 8.

[17]    Experian    plc,    *Annual    Report    2021*    (2022),    at    139, https://www.experianplc.com/media/4223/experian-annual-report-2021.pdf.

score for personal use, including to see how lenders view their creditworthiness, to understand the types and terms of financing they may be able to secure, to monitor their financial health, manage their debt, protect their identity, and to determine if they are potentially eligible to make certain purchases.

55. The B2B Credit Score Market for credit scores is a distinct product market for antitrust purposes. The businesses that use credit scores to assess creditworthiness, manage risk, and make business decisions do not consider credit reports, insurance scores, or any part of an individual's consumer and credit history to be a substitute for credit scores. Likewise, the businesses that resell or otherwise provide credit scores to their own downstream customers do not consider credit reports, insurance scores, or any part of an individual's consumer and credit history to be a substitute for credit scores.

56. The relevant geographic market in which B2B credit scores are provided is the United States (including its territories). The restraints on competition contained in Defendants' contracts relate to business and consumer credit scores in the United States.

57. Business customers, such as banks, credit card companies, financial institutions, real estate companies, insurance companies and other businesses, in the B2B Credit Score Market are a separate and distinct group of purchasers of credit scores. Business customers who purchase credit scores in the B2B Credit Score Market do not use credit scores in the same manner as consumer customers who purchase credit scores in the B2C Credit Score Market.

58. Business customers in the B2B Credit Score Market purchase credit scores to make informed decisions, sell, advertise, or complement another product. On the other hand, consumer customers in the B2C Credit Score Market purchase the credit scores as an end-product.

15

59.     Business customers in the B2B Credit Score Market also purchase credit scores in ways that consumer customers do not. For example, business customers in the B2B Credit Score Market who engage in pre-screening, such as credit card companies, often purchase credit scores in batches as part of their marketing efforts. They use credit scores as a method of selecting consumers in a particular credit score range that they wish to extend credit card offers to under particular terms. However, consumer customers in the B2C Credit Score Market only purchase their own score.

60.     The Consumer Financial Protection Bureau ("CFPB") noted in a 2011 report to Congress that "many of the credit scores sold to lenders are not offered for sale to consumers."[18] The agency went on to explain:

> When a consumer purchases a score from a CRA [Credit Rating Agency], it is likely that the credit score that the consumer receives will not be the same score as that purchased and used by a lender to whom the consumer applies for a loan. This could occur if the score the consumer purchased is an educational score that is not used by lenders, but differences between the score a consumer buys and the score a lender buys can occur for other reasons as well. Since so many scores are in use in the marketplace, it could also be the case that the particular lender to which the consumer applies uses a different scoring model than the one purchased by the consumer, or that the CRA from which the consumer obtains a score is not the same CRA that the lender uses to obtain scores, or that the underlying data in the consumer's credit report changes significantly between the time the consumer purchases a score and the time the lender obtains a score for that consumer. It is also possible that a consumer and a lender could access different reports from the CRA, if they were to use different identifying information about the consumer. Any of these differences could lead to differences between the credit score a consumer sees and the credit score a lender uses to assess that consumer.[19]

---

[18] Consumer Financial Protection Bureau, *The impact of differences between consumer- and creditor-purchased credit scores*, at 1 (July 19, 2011), https://files.consumerfinance.gov/f/2011/07/Report_20110719_CreditScores.pdf.

[19] *Id.*

16

61.     The vast majority of the credit reporting and credit scoring industry, industry analysts, policy analysts, and investors recognize the B2B Credit Score Market as a separate market from the B2C Credit Score Market. Fair Isaac itself recognizes its Business and Consumer offerings as distinct product and revenue lines. Fair Isaac has divided its "Scores" profits and revenues into separate "business-to-business" or "B2B" and "business-to-consumer" or "B2C" segments in its Securities and Exchange Commission filings and shareholder calls over the last several years. In its 10-K and 10-Q filings for the past several years, Fair Isaac has distinguished between its "business-to-business scoring solutions and services" and its "business-to-consumer scoring solutions and services including my FICO solutions for consumers."

62.     Purchases in the B2B Credit Score Market for credit scores and B2C Credit Score Market for credit scores are also different. While business customers purchase credit scores from Fair Isaac through CBs and/or third-party intermediaries, credit scores in the B2C Credit Score Market are often sold to consumers directly, such as when consumers purchase their credit score from Fair Isaac at myFICO.com.

63.     The B2B Credit Score Market exhibits high barriers to entry. As noted in a 2018 article: "The deep integration of FICO scores and products into companies' operations has raised switching costs."[20]

64.     Likewise, VantageScore Solutions has observed that in the residential mortgage sector, FICO's "imprint inhibits competition by raising switching costs and granting the irreplaceable brand value of utter ubiquity. It gives FICO unparalleled and highly controversial

---

[20] *Fair Isaac: A Royalty on U.S. Credit Scoring* (Sept. 25, 2018), https://seekingalpha.com/article/4208014-fair-isaac-royalty-on-u-s-credit-scoring.

negotiating leverage with almost every participant in the industry."[21]

65.     "Larger lenders use the [FICO] score as an input to customized models they've built for specific situations or portfolios. After a recent review one major US lender recently identified over 600 places they were using a FICO score in their business processes. Switching to a new score not only means proving the new score is better (a long process in itself) but extensive testing to ensure all of those moving parts are still working as designed. Citibank recently announced that after an 18 month review they've decided it's safe to switch to the latest version of the FICO score (FICO 8). This wasn't a migration to a new score mind you, just a more recent version of the score they're already using. The barriers to entry are indeed high . . . and expensive."[22]

66.     "Network effects" – *i.e.*, the phenomenon where a product or service increases in value when the total number of customers increase – serve as a barrier to entry into the B2B Credit Score Market. As one analyst has noted: "The 'network effects' keeping FICO's dominant position [are] indeed incredibly strong."[23]

67.     In 2011, at Fair Isaac's Analyst/Investor Day, Fair Isaac's then-CEO, Mark Greene, explained: "In about 10 seconds, an entire commerce transaction taking place because 720 FICO was understood by the broker, by the mortgage banker on the other end of line and

---

[21] Press Release, VantageScore, *VantageScore Solutions Issues Statement Reacting to FHFA's Proposed Rules for Validating and Approving New Credit Scoring Models* (Dec. 17, 2018), https://vantagescore.com/press/vantagescore-solutions-issues-statement-reacting-to-fhfas-proposed-rules-for-validating-and-approving-new-credit-scoring-models.

[22] John Ulzheimer, *Why FICO Isn't Going Away Any Time Soon*, Smart Credit (July 5, 2011), https://blog.smartcredit.com/2011/07/05/why-fico-isnt-going-away-any-time-soon/.

[23] Harrison Schwartz, *Fair Isaac: Share Buybacks Likely To End As Cash Reserves Run Low*, Seeking Alpha (Dec. 17, 2019), https://seekingalpha.com/article/4312953-fair-isaac-share-buybacks-likely-to-end-as-cash-reserves-run-low.

the customer to be shorthand for good credit risk, gave this guy a favorable mortgage rate. And that network effect, having everybody in the loop understand that shorthand and standardize on a FICO Score, that's magic."[24]

68.    The anticompetitive conduct by Fair Isaac alleged herein accounts in significant part for the FICO Score's dominance in the B2B Credit Score Market.

69.    The CBs participate in a market for credit reports. A credit report contains detailed information about a consumer's credit activity and current credit situation. The detailed information in a credit report is used to generate a FICO Score for a specific customer, which B2B lenders can use in making their lending decisions.

70.    On information and belief, the CBs control virtually all of the credit report market (they have been called a "triopoly") and enjoy roughly equivalent market shares."[25]

71.    The three CBs are all members of a trade association called the Consumer Data Industry Association ("CDIA"). Through the CDIA, the three CBs frequently work together, including to: (i) develop a standard electronic data reporting format called Metro 2®; (ii) issue joint statements on matters of public importance; (iii) provide guidelines to businesses that use credit reports; and (iv) respond to public criticisms of their industry. The three CBs also cooperated in the establishment of VantageScore Solutions as a joint venture.[26]

---

[24] SA Transcripts, Seeking Alpha, *Fair Isaac Corp. – Analyst/Investor Day* (Nov. 3, 2011), https://seekingalpha.com/article/307417-fair-isaac-corp-analyst-investor-day.

[25] *See* Consumer Financial Protection Bureau, *List of Consumer Reporting Companies* (2021), https://files.consumerfinance.gov/f/documents/cfpb_consumer-reporting-companies-  list_2021-06.pdf.

[26] *See* Consumer Data Industry Ass'n, *About CDIA*, https://www.cdiaonline.org/about/about-cdia/; Consumer Data Industry Ass'n, *Metro 2 Format for Credit Reporting*, https://www.cdiaonline.org/resources/furnishers-of-data-overview/metro2-information/;    Dana Fowle, *Industry Pushes Back Against Claims of High Credit Reporting Errors*, Fox5 Atlanta (Sept. 15,   2021),   https://www.fox5atlanta.com/news/industry-pushes-back-against-claims-of-high-

### C.   Fair Isaac's FICO Score Has a Monopoly in the B2B Credit Score Market

72.    Fair Isaac came into existence in 1956, possessed a monopoly on credit-scoring algorithms until the mid-1970s, and continues to wield a dominant market share.[27]

73.    Fair Isaac's "FICO Classic" credit scores are the best known and most widely used credit scores in the B2B Credit Score Market. Fair Isaac applies an algorithm to each credit reporting agency's data to generate a FICO Classic Score between 300 and 850 that purports to give an indication of the individual's credit risk. It also generates a set of "reason statements," with corresponding codes, that explain the reasons the consumer has not been assigned the maximum score.

74.    FICO Scores are the credit scores most widely used by lenders and are used in over 90% of U.S. credit lending decisions.[28] Every year, lenders access billions of FICO Scores to help them understand people's credit risk and make better-informed lending decisions.

75.    On its website, Fair Isaac claims that "10 billion FICO Scores are purchased every year" and "27 million Fico Scores are purchased every day." FICO Scores are also used in over 30 countries.[29]

76.    Fair Isaac also advertises that its FICO Score is "widely accepted" and "used by

---

credit- reporting-errors; Press Release, Consumer Data Industry Ass'n, *Consumer Data Industry Association Releases Study on the Value of Credit Reporting in U.S.* (June 15, 2020), https://cdia-news.s3.amazonaws.com/White+Paper+Press+Release+6.15.20.pdf; Consumer Data Industry Ass'n, *Equifax, Experian, & TransUnion Endorse CARES Act*, https://www.cdiaonline.org/equifax-experian-transunion-endorse-cares-act/; Consumer Data Industry Ass'n, *COVID-19*, https://www.cdiaonline.org/covid-19/.

[27] Raymond Anderson, *A History of Credit Scoring*, at 75-76   (2019), https://www.researchgate.net/profile/Raymond_Anderson4/publication/331533723_Chapter_B06_History_of_Credit_Scoring/links/5c7ed843299bf1268d3ccc5d/Chapter-B06-History-of-Credit-Scoring.pdf?origin=publication_detail.

[28] https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.

[29] https://www.ficoscore.com/about.

90% of top U.S. lenders." FICO Scores have been "an industry standard for over 30 years."[30]

77.     Fair Isaac's executives have confirmed the dominance of Fair Isaac's FICO Score. In November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President Michael Pung stated that the FICO scoring system "is the most widely used credit scoring system here in the U.S.," that "[v]irtually every major lender in the U.S. [uses] the FICO Score for some sort of credit lending decision," and that Fair Isaac has "maintained a 90-plus percent market share for at least the [last] 13 years."[31] In 2008, Craig Watts, a public affairs manager at Fair Isaac, described the FICO Score as the "800 pound gorilla."[32]

78.     Fair Isaac states in its 2020 Form 10-K:

> Our products and services serve clients in multiple industries, including primarily banking, insurance, retail, healthcare and public agencies. Endusers of our products include 96 of the 100 largest financial institutions in the U.S., and two-thirds of the largest 100 banks in the world. Our clients also include more than 600 insurers, including nine of the top ten U.S. property and casualty insurers; more than 300 retailers and general merchandisers; more than 200 government or public agencies; and morethan 200 healthcare and pharmaceuticals companies, including nine of the world's top ten pharmaceuticals companies. Eight of the top ten companies on the 2020 Fortune 500 list use one or more of our solutions. In addition, our consumer services are marketed to an estimated 200 million U.S. consumers whose credit relationships are reported to the three major U.S. credit reporting agencies.[33]

79.     An infographic on Fair Isaac's website states: "10 BILLION FICO SCORES

---

[30] *Id.*

[31] TransUnion Counterclaims, ¶ 32.

[32] Dana Dratch, *What Does 'Good' Credit Really Mean?*, CNBC (Oct. 30, 2008), https://www.cnbc.com/id/27458815.

[33]Fair Isaac 2020 10-K at 10.

ARE SOLD EACH YEAR," which is "FOUR TIMES the number of hamburgers McDonald's sells WORLDWIDE in a year," and "27,400,000 FICO scores are sold every day," which is "OVER TWICE the number of cups of coffee Starbucks sells WORLDWIDE in a day."[34]



80.     Fair Isaac's 2020 Form 10-K states that FICO Scores "are used in the majority of U.S. credit decisions, by nearly all of the major banks, credit card organizations, mortgage lenders and auto loan originators," and it describes FICO Scores as "the standard measure in the U.S. of consumer credit risk."[35]

---

[34]Fair Isaac, *Learn About the FICO™ Score and Its Long History*, https://www.fico.com/25years/.
[35]Fair Isaac 2020 10-K at 3, 7.

81.     A May 2021 report by Yale University's Thurman Arnold Project, a collaborative project among Yale faculty and students, as well as other scholars dedicated to research on competition policy and antitrust enforcement, notes that Fair Isaac "enjoys a virtual monopoly in the credit score market" and that "[b]ecause of the lack of competition in this domain, there has been limited innovation in scoring methodology."[36]

82.     Fair Isaac's monopoly in the B2B Credit Score Market has given it considerable power to control prices and impose monopoly rents. Mr. Lansing has noted that, in the B2B Credit Score Market, Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are."[37]

83.     In February 2013, at a Morgan Stanley Conference, Mr. Lansing explained that Fair Isaac's "Scores business, which is the cash generator, is a very, very high-margin business. It's deeply embedded into the systems of the bank customers who use it."[38]

### D.     Fair Isaac Has Been Able to Maintain its Monopoly

84.     Despite Fair Isaac's 90% share in the Business Market, several companies have attempted to compete with Fair Isaac's FICO Scores. These competitors' products use the same data as FICO Scores. However, many also incorporate data not used by FICO Scores—data such as, rental, utility, and telecom payment data and/or public records information, including property deeds, mortgages, liens, personal property titles, tax records, and licensing data.

85.     Some of these competitors to Fair Isaac's FICO Scores in the B2B Credit Score

---

[36] Yale University Thurman Arnold Project, *Updating Antitrust and Competition Policy: Finance Issues*, at 14, 15 (May 2021), https://som.yale.edu/sites/default/files/TeamFinance- Final.pdf.

[37] TransUnion Counterclaims, ¶ 34.

[38] Seeking Alpha, *Fair Isaac's CEO Presents at Morgan Stanley Technology, Media & Telecom Conference (Transcript)* (Feb. 27, 2013), https://seekingalpha.com/article/1231981-fair- isaacs-ceo-presents-at-morgan-stanley-technology-media-and-telecom-conference-transcript.

Market include: SageStream's Credit Optics Score; LexisNexis's RiskView score; CoreLogic Credco's Anthem Credit Score; PRBC; ChexSystems; L2C's Link2Credit Score; and ScoreLogix LLC's JSS Credit Score.

86.     Another competitor, VantageScore Solutions, represented the biggest threat to Fair Isaac's FICO Scores in the B2B Credit Score Market because it was a joint venture founded by the three major CBs. As part of its attempt to compete against Fair Isaac's FICO Scores in the B2B Credit Score Market, VantageScore Solutions introduced the VantageScore credit scoring system in March 2006. The three CB Defendants continue to own VantageScore Solutions.

87.     VantageScore Solutions does not sell or market its VantageScore credit models or credit scores; instead, it licenses them to the three CB Defendants, which may incorporate VantageScores in their credit reports.

88.     VantageScores are a competitor to FICO Scores in the B2B Credit Score Market.

89.     In addition to being backed by the three major CBs, the VantageScore credit scoring model provides reliable credit scores for millions more consumers than FICO Scores by relying on additional and alternative sources of data. VantageScore, for example, calculates scores for consumers who have not used credit for up to two years and use utility and telecommunications payment histories. As such, VantageScore provides insights into individuals' and businesses' desirability as customers, clients, and/or tenants that Fair Isaac's FICO Scores cannot. In contrast, Fair Isaac's FICO scoring systems do not generate a score if a consumer does not have at least one credit account that has been open for six months or more, or if no credit account of the consumer has been reported to the reporting CB. Thus, millions of otherwise creditworthy individuals do not have a FICO Score.

24

90.     Obtaining a mortgage, car loan, credit card or reasonable interest rates on personal lines of credit is almost impossible without a credit score. Landlords are also increasingly screening potential tenants using credit scores. Thus, those excluded by Fair Isaac's traditional FICO scoring systems--including a disproportionate number of low-income and minority consumers--face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and housing.

91.     For example, the CFPB has found that, as of 2010, 26 million consumers in the United States were "credit invisible" – *i.e.*, they lacked credit history with one of the nationwide credit reporting companies.[39] Those individuals cannot be scored by FICO.[40]

92.     The CFPB's research suggests "a strong relationship between income and having a credit record. Almost 30 percent of consumers in low-income neighborhoods are credit invisible and an additional 16 percent have unscored records. These percentages are notably lower in higher-income neighborhoods. For example, in upper-income neighborhoods, only 4 percent of the population is credit invisible and another 5 percent has an unscored record."[41]

93.     Moreover, the CFPB found "significant differences in the incidence of having a limited credit history across racial and ethnic groups," specifically, while White and Asian individuals "are almost equally likely to be credit invisible or have an unscored record, the shares of Black and Hispanic individuals with limited credit history are much larger," and individuals in those groups are thus less likely to be able to obtain a credit score.[42]

---

[39] CFPB Office of Research, *Data Point: Credit Invisibles*, at 4, 6 (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf.

[40] *Id.*

[41] Id. at 24.

[42] *Id.*

94.     According to the CFPB, "[a]bout 15 percent of Black[ ] and Hispanic[ ] [individuals] are credit invisible . . . and an additional 13 percent of [Black individuals] and 12 percent of [Hispanic individuals] have unscored records. . . . This elevated incidence . . . is observed across ages, suggesting that these differences across racial and ethnic groups materialize early in the adult lives of these consumers and persist thereafter."[43]

95.     The CFPB went on to conclude that "[t]hese results suggest that the problems that accompany having a limited credit history are disproportionally borne by Black[ ], Hispanic[ ], and lower-income consumers."[44]

96.      Furthermore, it is widely recognized that FICO Scores are a measure of past ability to pay. Competing products incorporate an analysis of prospective creditworthiness. For example, Scorelogix's JSS score incorporates job and income stability to determine whether the borrower will have the ability to repay debt in the future. L2C offers an alternative credit score that uses utility payment histories to determine creditworthiness, including future ability to pay.

97.     VantageScore has achieved some limited success. In a 2018 report, VantageScore Solutions stated:

> During the twelve months ending in July 2017, over 1.4 billion VantageScore credit scores were delivered directly to consumers by lenders like Chase and Capital One and educational websites like CreditKarma, Lending Tree, and Mint. These scores are calculated using the same VantageScore model used by lenders (i.e., not an "educational" model). They are most often provided free of charge as part of educational offerings that include simulators, credit reports, educational articles, and explanations.[45]

---

[43] *Id*. at 24-25.

[44] *Id*. at 25.

[45] VantageScore Solutions, *VantageScore® Credit Scores and The Mortgage Market*, at 8 (2018) ("VantageScore Report"), https://vantagescore.com/pdfs/FAQs-VantageScore-Credit- Scores-and-the-Mortgage-Market.pdf.

98.     VantageScore Solutions went on to note that "[a]s lenders adopt VantageScore, we believe that such adoption will improve consumers' access to credit in certain segments and enable many more borrowers to obtain fairer pricing."[46] VantageScore Solutions also reported that "many of the most sophisticated secondary market participants use the VantageScore model to help evaluate and monitor risk, and to price and benchmark deals more accurately."[47]

99.     Despite the advantages of using VantageScore or another competing credit scoring model, Fair Isaac continues to have a monopoly in the B2B Credit Score Market and extracts monopoly rents through anticompetitive and exclusionary conduct and anticompetitive agreements with each CB. In February 2013, Mr. Lansing explained that despite the existence of VantageScore, "there [is] not that much competition around our Scores business" because "FICO Scores are very much part of the fabric of the banking industry" and "really deeply embedded."

**E.     Fair Isaac's Conduct in Furtherance of its Anticompetitive Scheme**

100.     Fair Isaac anticipated the threat VantageScore could pose to its dominance in the B2B Credit Score Market. Fair Isaac's own models of future losses predicted "substantial double-digit declines" if the use of VantageScore continued to expand.[48]

101.     Faced with the prospect of a significant hit to its market dominance, and its profits, Fair Isaac used its monopoly power to coordinate a comprehensive attack on VantageScore that included filing anticompetitive litigation; enlisting the Credit Bureaus to sign

---

[46] *Id*. at 5.

[47] VantageScore Solutions, *Myth: VantageScore Is Not Accepted by Investors in Securitization Markets* (Mar. 23, 2016), https://vantagescore.com/education/blog/myth- vantagescore-is-not-accepted-by-investors-in-securitization-markets.

[48] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, No. CV 06-4112, 2008 WL 11348223, at *2 (D. Minn. Nov. 3, 2008).

on to licensing agreements with anticompetitive provisions that undermined their own joint venture; and undertaking a campaign of disparagement against, and disinformation about, VantageScore Solutions and VantageScore.

### 1. Fair Isaac's Anticompetitive Litigation

102. Fair Isaac, recognizing the creation of VantageScore as a competitive threat, initiated litigation against Equifax, Experian, TransUnion, and VantageScore Solutions. In October 2006, just after the introduction of VantageScore, Fair Isaac filed a meritless lawsuit against them, alleging that the development of VantageScore violated the antitrust laws and constituted trademark infringement. Fair Isaac sought the elimination of VantageScore Solutions, requesting that the "Defendants be ordered to dissolve VantageScore." *Fair Isaac Corp. v. Equifax, Inc. et al*, No. 0:06-cv-04112, Dkt. No. 1-1 at 65 (D. Minn. Oct. 11, 2006). This frivolous lawsuit represented Fair Isaac's first attempt to kill VantageScore before it could gain traction in the market.

103. VantageScore Solutions characterized the litigation that Fair Isaac initiated as a "legal battle that sought to put us out of business, even as we scrambled to establish a competitive foothold."[49] Fair Isaac raised bogus antitrust claims that it knew lacked foundation, given its then-94% share of the B2B Credit Score Market. It also alleged trademark infringement that a jury found to be based on a trademark that Fair Isaac had fraudulently obtained from the U.S. Patent and Trademark Office ("PTO"). In addition, Fair Isaac's contention that the "300-850" marks were anything other than "merely" descriptive lacked all foundation because – as the U.S. Court of Appeals for the Eighth Circuit later held – "consumers in this market

---

[49] VantageScore Solutions, Inc., *10 years, 10 milestones* (Mar. 2016), https://thescore.vantagescore.com/article/252/10-years-10-milestones.

immediately understand '300-850' to describe the qualities and characteristics of FICO's credit score – that the credit score will be within the range of 300-850."[50]

104.    Equifax settled the litigation in June 2008 and formed "a partnership [with Fair Isaac] to develop and sell advanced analytics and scoring solutions for businesses and consumers."[51]

105.    The litigation against Experian and TransUnion lasted into 2011. While it was ongoing, VantageScore Solutions remained under a cloud, with Fair Isaac's lawsuit hobbling its commercial prospects: Potential B2B Purchasers for VantageScore had no way of being sure that the product might not be declared infringing on Fair Isaac's trademarks or that VantageScore Solutions would not be dissolved.

106.    The district court entered summary judgment in favor of the Credit Bureaus on the antitrust and false advertising claims. A jury found against Fair Isaac on the remaining claim for trademark infringement, finding that the mark "300-850" (which denoted the range of FICO Scores) was merely descriptive. It also found that: (1) Fair Isaac made a false representation during the application process to the PTO for the registrations of the "300-850" marks; (2) Fair Isaac knew that representation to be false when it was made and intended to deceive the PTO; and (3) the PTO relied on the false representation in deciding to issue the registrations.[52]

107.    The district court upheld the verdict, noting that "[t]his extensive, expensive litigation seems to have been initiated largely in response to a perceived threat to Fair Isaac's

---

[50] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1148 (8th Cir. 2011).

[51] Fair Isaac, *Equifax and Fair Isaac Enter Partnership to Accelerate Development and Delivery of New Analytic Solutions* (June 10, 2008), https://www.fico.com/en/newsroom/equifax-and-fair-isaac-enter-partnership-accelerate-development-and-delivery-new-analytic.

[52] *Fair Isaac*, 650 F.3d at 1148-50.

dominant position in the credit scoring industry."[53]

108.    In 2011, the United States Court of Appeals for the Eighth Circuit affirmed both that decision and the earlier summary judgment ruling.[54]

109.    VantageScore Solutions's growth during its first few years was inhibited by the litigation, which was part of a continuing antitrust violation by Fair Isaac that goes on to this day.

110.    In December 2017, Fair Isaac sued TransUnion for unpaid royalties.[55]

111.    In February 2018, TransUnion responded by filing antitrust counterclaims for, *inter alia*, monopolization against Fair Isaac. In paragraphs 42-60 of the counterclaims (which was partially redacted), the anticompetitive terms the Credit Bureaus and Fair Isaac had agreed upon were disclosed publicly for the first time. Those provisions are described in detail below.

112.    Fair Isaac moved to dismiss the counterclaims. Judge Coleman denied the motion, ruling that "TransUnion has adequately pled actual and attempted monopolization" through allegations that "FICO engages in practices that are intended to drive out competition" through "exclusive dealing provisions [that] are unlawful attempts to 'maintain monopoly power through exclusionary conduct.'"[56]

113.    In November 2020, TransUnion and Fair Isaac settled on undisclosed terms. One effect of this settlement was to cut Plaintiffs and proposed Class members off from obtaining further information about the anticompetitive agreements between Fair Isaac and the CBs. Fair

---

[53] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1000 (D. Minn. 2010).

[54] *Fair Isaac Corp. v. Experian Info. Sols., Inc*., 650 F.3d 1139 (8th Cir. 2011).

[55] *See* Complaint, Dkt. 1, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill.Nov. 16, 2017).

[56] *Fair Isaac Corp. v. Trans Union, LLC*, No. 17:cv-8318, 2019 WL 1382068, at *2 (N.D.Ill. Mar. 27, 2019).

Isaac essentially bought TransUnion off. This inference is bolstered by the fact that, in August 2021, TransUnion announced that it had entered into a long-term (presumably lucrative) contract to distribute FICO Scores to lenders and consumers in Canada.[57]

114.    The Antitrust Division of the United States Department of Justice took notice of Fair Isaac's conduct alleged in the TransUnion Action and instituted a civil investigation. That investigation was closed without action in December 2020, shortly after TransUnion settled with Fair Isaac.[58]

## 2.    Fair Isaac and the Credit Bureaus' Anti-Competitive Agreements

115.    Business customers in the B2B Credit Score Market purchase credit reports and FICO Scores from CBs and third-party credit reporting companies. As part of this process, CBs have entered into contractual relationships, called "Credit Scoring Services Agreements" ("CSSAs"), with their customers that govern the terms by which businesses purchase FICO Scores. These terms include the amount(s) paid to the CB, the fee model for delivery of credit score services, the method of payment, the mode of delivery, and restrictions on the business's use of FICO Scores.

116.    The CBs and Fair Isaac have entered into separate licensing agreements which set forth the royalties that CBs must pay to Fair Isaac for the FICO Scores that the CBs sell to their customers. These royalties are passed on to Plaintiffs and other members of the proposed

---

[57] See Press Release, TransUnion, *TransUnion Enters New Long-term Agreement with FICO to Distribute FICO*® *Score in Canada* (Aug. 3, 2021), https://www.globenewswire.com/news-release/2021/08/03/2273895/0/en/TransUnion-Enters-New-Long-term-Agreement-with-FICO-to-Distribute-FICO-Score-in-Canada.html.

[58] See Press Release, Fair Isaac, *FICO Statement Regarding Antitrust Investigation* (Mar. 15, 2020), https://fico.gcs-web.com/news-releases/news-release-details/fico-statement-regarding-antitrust-investigation.

Classes.

117.     After its litigation efforts failed to eliminate VantageScore, Fair Isaac elected to take another approach. When its existing licensing agreements with each CB expired in 2013 or 2015, Fair Isaac reentered agreements containing new anticompetitive provisions with each CB that aimed to crush the only real competition, VantageScore, maintain Fair Isaac's monopoly, and extract monopoly rents from B2B Purchasers.

118.     Fair Isaac and the CBs entered into new or renewed agreements that contained new provisions designed to restrict the competitive reach of VantageScore. The CBs characterized the licensing agreements with Fair Isaac as "vertical distribution agreements" in their memorandum of law in support of their motion to dismiss in this litigation.[59] The anticompetitive contract provisions targeted the only significant competing credit score – VantageScore. And they specifically restricted the CBs' ability to market VantageScore to B2B purchasers. On information and belief, the CBs agreed to those provisions – cutting their own joint venture off at the knees – in return for Fair Isaac's acquiescence to a clause that protected them from price competition (and potentially in exchange for other benefits as well). The benefit of the quid pro quo to the CBs was that they could charge supracompetitive prices for credit scores to the consumers – the B2B purchasers.

119.     The agreements were consummated at a critical time. In 2011 through the first part of 2013, developments occurred that should have furthered VantageScore's ability to compete with FICO Scores. In 2011, VantageScore Solutions formed a partnership with the Consumer Federation of America, "a nonprofit association of nearly 300 consumer groups

---

[59] See The Credit Bureaus' Motion to Dismiss Plaintiffs' Class Action Complaints, Dkt. No. 135, *In re FICO Antitrust Litig.*, No.1:20-cv-02114, at 2 (Jan. 18, 2022).

founded in 1968 to advance the consumer interest through research, advocacy, and education"; that alliance led to the "use of annual consumer surveys to gauge awareness of credit scoring related issues."[60] In October 2012, "the Federal Deposit Insurance Corporation ["FDIC"] revised its rules for assessing default risk on loans issued by banks with deposits in excess of $10 billion. Instead of evaluating loans on a particular credit score, the revision calls for examining the underlying probability of default [] associated with those loans at the time of origination."[61] In March 2013, VantageScore Solutions debuted a new scoring model, VantageScore 3.0, which "built on the strengths of its predecessors and drew extensive news coverage for its ability to score 98 percent of adult consumers in the U.S. (including 30-35 million who cannot get scores from conventional credit-scoring models [*i.e.*, FICO]); its disregard of paid collections (including paid medical debt); and its simplified reason codes."[62] And, in July 2013, VantageScore Solutions published a white paper explaining how VantageScore could be aligned with the FDIC's new rules for evaluating probability of default.[63]

120.    Fair Isaac's response to these developments was to agree on anticompetitive contract terms with the CBs, commencing with Experian in May 2013, continuing with Equifax in November 2013, and culminating with the February 2015 Analytic and Data License Agreement ("ADLA") between Fair Isaac and TransUnion. These clauses would preserve Fair Isaac's monopoly while compensating the CBs for the marginalization of VantageScore. Fair

---

[60] VantageScore Solutions, *10 Years, 10 Milestones*, *supra* n. 52.

[61] *Id.*

[62] VantageScore, *10 years, 10 milestones*, *supra* n. 52.

[63] VantageScore Solutions, *FDIC New Definition of High Risk Consumer Loan Securities* (July 2013), https://paperzz.com/doc/8033743/fdic-new-definition-of-high-risk-consumer-loan-and-securi. l

Isaac and the CBs did not publicly reveal any of the terms of their agreements until February 2018.

121.    The necessary (and intended) consequences of the agreements between Fair Isaac and the CBs was the stifling of competition in the B2B Credit Score Market.

122.    In fact, Mr. Lansing, confirmed that the "exclusive deal[s]" Fair Isaac and the Credit Bureaus entered into essentially sidelined VantageScore, which never gained "a lot of traction in the banking space," and that, even though VantageScore was a joint venture of the Credit Bureaus, working together with FICO has been "a good thing for both of us [i.e., both the Credit Bureaus and Fair Isaac]."[64]

123.    According to Mr. Lansing, instead of being "at war" with one another, the Credit Bureaus decided instead "to be partnered" with Fair Isaac. Explaining the relationship with Experian, for example, Mr. Lansing stated that Experian and Fair Isaac "have a rev share arrangement with them that works for them and works for us really good." Similarly, with respect to its arrangement with Equifax, Mr. Lansing stated "it is a rev share model. We're in it together." Given Fair Isaac's own admission that all three Credit Bureaus have Level Playing Field clauses, it follows that TransUnion would also have a similar revenue sharing arrangement with Fair Isaac.

a.    **Fair Isaac's Anticompetitive Contracts with the CBs**

124.    The terms of the contracts between Fair Isaac and the Credit Bureaus were not publicly revealed until February 2018. Many of the contract terms remain confidential to this day.

---

[64] Remarks by William J. Lansing, President, CEO & Director, Fair Isaac, Fair Isaac Corp at Barclays Global Financial Services Conference (September 25, 2015).

125.    The discussion that follows is based on TransUnion's description of its ADLA in its counterclaims against Fair Isaac. The ADLA was filed under seal in the TransUnion action and is unavailable to Plaintiffs beyond what TransUnion has quoted in its counterclaims. While the counterclaims quote only the ADLA, TransUnion pled that "Fair Isaac represented to TransUnion that TransUnion's two major competitors, Experian and Equifax, had already agreed to materially similar new contracts with Fair Isaac."[65] In fact, Fair Isaac admitted that Equifax, Experian, and TransUnion agreed to the same or similar provisions: In FICO's Answer to Counterclaims in the TransUnion litigation, Fair Isaac "admit[ed] that prior to January 2015, it entered into separate contracts with Experian and Equifax that contained certain terms that were similar to certain terms in the ADLA."[66]

126.    Furthermore, Fair Isaac "admit[ed] that Equifax and Experian have agreed to 'No Equivalent Products' provisions with terms similar to the terms agreed to by TransUnion in the ADLA."[67] FICO also "admit[ted] that Equifax and Experian have agreed to 'Dynamic Royalty Schedule' terms that are similar to the terms agreed to by TransUnion in the ADLA, and that Equifax and Experian are subject to royalty schedules that contain a "Pre-Qualification" royalty category similar to that to which TransUnion is subject in its royalty schedule."[68] Finally, Fair Isaac "admit[ed] that Equifax and Experian have agreed to 'Level Playing Field' terms similar to the term agreed to by TransUnion in the ADLA."[69]

---

[65] TransUnion Counterclaims, ¶43.

[66] Fair Isaac's Redacted Answer to TransUnion Counterclaims, Dkt. No. 62, Fair Isaac Corp. v. TransUnion LLC, No 1:17-cv-08318 at 21 (N.D. Ill. Apr. 10, 2018) ("FICO Answer to Counterclaims").

[67] FICO Answer to Counterclaims at 24

[68] *Id.* at 27.

[69] *Id.* at 27.

127.   Fair Isaac has made similar admissions about the contract terms in its Answer in this litigation. Fair Isaac admits that its agreement with TransUnion contains the "No Equivalent Products" provision.[70] It also admits that the "Dynamic Royalty Schedule" and "Level Playing Field" terms appear in its agreements with all three credit bureaus,[71] and that the latter requires it to offer the most favorable royalty pricing as to all three credit bureaus.[72] Fair Isaac further admits that the "Pre-Qualification" royalty category has applied since 2015.[73] Thus, substantially similar anticompetitive No Equivalent Products and Dynamic Royalty Schedule provisions that exist in the ADLA between TransUnion and Fair Isaac also exist in the agreements between Experian and Fair Isaac and Equifax and Fair Isaac. The allegations that follow therefore apply to all three Credit Bureau Defendants.

128.   The restraints imposed in the contracts consist primarily of: (a) "No Equivalent Products" provisions; and (b) "Dynamic Royalty Schedule" provisions (the "Restrictive Terms"). A third set of provisions, the "Level Playing Field" provisions, compensated the CBs for their agreement not to promote VantageScore under the former provisions at the expense of B2B Purchasers.

129.   In an order dated September 28, 2023, this Court held that "the No Equivalent [Products] Provision and the Dynamic Royalty Schedule clauses together qualify as sufficient allegations of anticompetitive effects" to allow a claim against Fair Isaac under Act §2 of the

---

[70] Fair Isaac's Answer and Affirmative Defenses to Indirect Purchaser Plaintiffs' Consolidated Class Action Complaint, Dkt. No. 183, No. 1:20-cv-02114 ("FICO Answer to IPP Complaint"), (Oct. 23, 2023) ¶126.

[71] *Id.* at ¶125.

[72] *Id.* at ¶145.

[73] *Id.* at ¶138.

Sherman Act to proceed to discovery.[74] Those provisions are described in turn below.

i. **The "No Equivalent Products Clause"**

130.   The "No Equivalent Products" clause is located at Section 12.5 of the ADLA between Fair Isaac and TransUnion. This clause provides that TransUnion may not "internally develop" a credit scoring system that is "aligned to the odds-to-score relationship of any Fair Isaac Analytic" or uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic. Section 12.5 of the ADLA further prohibits TransUnion from distributing "any competing analytic" (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes. The Section also expressly names VantageScore Solutions, LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."[75]

131.   On information and belief, Fair Isaac has imposed similar or identical "No Equivalent Products" clauses on Equifax and Experian.[76] Thus, these CBs have agreed to and acquiesced in these anticompetitive agreements and the resulting anticompetitive effects.

132.   Fair Isaac's "No Equivalent Products" clause has effectively blocked the CBs from offering alternative credit scoring products, such as VantageScore, which would allow business customers in the B2B Credit Score Market to switch from FICO Scores without incurring the significant switching costs that using a new scoring system would entail. It also prevents the use of VantageScore or other credit scoring systems alongside or interchangeably with FICO Scores without the business customer incurring those same switching costs.

---

[74] Memorandum Opinion and Order, Dkt. No. 173, No. 1:20-cv-02114 (Sept. 28, 2023) at 13.

[75] TransUnion Counterclaims., ¶44.

[76] Fair Isaac has admitted its license agreements with Equifax and Experian include similar "No Equivalent Products" provisions. FICO Answer to IPP Complaint, ¶ 127.

37

133. The "No Equivalent Products" clause thus protects and sustains Fair Isaac's monopoly.

134. For example, if an alternative credit scoring product such as VantageScore used a score of 700 to indicate a less-than-five-percent risk of credit delinquency, and if a FICO Score of 700 also indicated the same risk of delinquency, the "No Equivalent Products" clause would prevent a CB from distributing the competing product. Similarly, if a competing credit score product used reason codes that match 20% of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause would prohibit a CB from distributing the product.

135. Due to years of Fair Isaac's dominance, many business customers of credit scores have modeled and designed their internal systems for FICO Scores. These business customers' systems, models, and processes are calibrated to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data that it collects internally, and automatically produce a lending decision. The "No Equivalent Products" clause effectively prohibits the CBs from selling an alternative to FICO's Scores since those scores would have to be incompatible with many businesses' existing systems. Thus, they are prevented from providing business customers a legitimate choice between using FICO Scores and an alternative score.

136. Notably, the "No Equivalent Products" clause does not sustain Fair Isaac's intellectual property. Rather, it protects and sustains Fair Isaac's monopoly. For example, the odds-to-score relationship is not protectable intellectual property. It is the arbitrary assignment of a number (score) to a related risk probability. The intellectual property entitled to protection

38

in this product market is the analysis and the process used to predict a consumer's risk of default, not the shorthand numerical representation of a "less-than-five-percent-risk-of-default" as "700."

137.    Similarly, the reason codes that are prohibited from matching Fair Isaac's, under the "No Equivalent Products" clause, were not invented by Fair Isaac. Rather, there is an established set of reason codes that reflect well-established industry measures of creditworthiness.

138.    The "No Equivalent Products" clause was an effective restraint of trade because when one CB stops using VantageScore, it becomes even less attractive to the other CBs. B2B purchasers will not want to use a credit scoring system unless all of the main CBs use it. This phenomenon is often referred to as a "network effect." By imposing a "No Equivalent Products" term, Fair Isaac sought to block the CBs from enabling B2B purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems and from using VantageScore alongside or interchangeably with FICO Scores.

139.    By entering contracts with the anticompetitive "No Equivalent Products" provisions, the CBs agreed to anticompetitive terms that had the effect of eliminating or drastically reducing the competitive threat posed by VantageScore, thus unreasonably restraining trade.

### ii.    The "Dynamic Royalty Schedule"

140.    The contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively, include a similar or identical "Dynamic Royalty Schedule" clause that allowed Fair Isaac to replace its existing royalty with a new one and thereby gave Fair Isaac the ability to control the prices of FICO Scores. The "Dynamic Royalty Schedule" is detailed in Section 9.2

of the ADLA between Fair Isaac and TransUnion. This provision states that "once every twelve (12) months during the Term, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing."[77]

141.   According to TransUnion, "Fair Isaac has abused and exploited this provision in 2015, 2016, and 2017 by not only raising prices, but also introducing entirely new and non-negotiated contract terms, royalty categories, and definitions."[78]

142.   In 2015, Fair Isaac inserted a new "Pre-Qualification" royalty category into its contracts with CBs. "Pre-Qualification" is defined as "an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category created a distinction between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any credit score or credit data to consumers, and (2) lenders that use FICO Scores for "Pre-Qualification" while also providing credit scores or credit data to consumers "in connection" with the "Pre-Qualification."

143.   As an incentive, some business customers in the B2B Credit Score Market provide to their consumer customers, to whom they are often offering credit, the opportunity to receive their personal credit score. This can serve as a valuable marketing tool for the business customers.

144.   Under Fair Isaac's contracts with the CBs, the royalty price paid to Fair Isaac for use of its FICO Score for "Pre-Qualification" is directly tied to whether credit scores or credit data are provided to consumers. There is a lower per-score royalty rate if a business customer purchases a FICO Score for use in "Pre-Qualification" and does not provide any credit score or

---

[77] TransUnion Counterclaims, ¶ 50.

[78] *Id.*

credit data to their consumer customer "in connection" with the "Pre-Qualification." If the lender purchases a FICO score for use in 'Pre-Qualification' and provides a VantageScore (or any other credit score) to the consumer 'in connection' with the 'Pre- Qualification,'" Fair Isaac charges the lender a seven times penalty rate for that FICO Score. That steep penalty is meant to dissuade lenders from providing competing credit scores, such as a VantageScore.[79]

145. The higher royalty rate can only be avoided if the business customer exclusively purchases FICO Scores. One way to avoid paying the higher royalty rate is for the business customer to purchase the FICO Score but not provide a credit score or credit data to the consumer. A second way to avoid the higher royalty rate requires the business customer to purchase a bundled FICO product from Fair Isaac and provide the bundled FICO Score to its consumer customer. Fair Isaac offers bundled products to lenders that combine the use of scores designed for use by business customers with the provision of scores to their consumer customers.[80]

146. TransUnion accepted, complied with, and made royalty payments according to the new "Pre-Qualification" royalty category. On information and belief, so have Equifax and Experian.[81]

147. The only reason for the higher royalty rate is to unreasonably restrain trade. There is no legitimate business justification for the higher royalty rate Fair Isaac and each CB agreed upon for FICO Scores when the business customer also purchases a competing credit score (i.e. VantageScore) to provide its consumer customers. The higher royalty rate has anticompetitive

---

[79] *Id.*, ¶ 52.

[80] *Id.*, ¶ 53.

[81] See *id.*, ¶ 55.

41

effects and has assisted Fair Isaac in maintaining its monopoly position as, on information and belief, few, if any, business customers have opted to pay the higher royalty rate.

148.    According to TransUnion, "[t]his scheme has been effective, and no B2B Purchasers from TransUnion have opted to pay the penalty rate."[82] The purpose and effect of this clause was to prevent VantageScore from obtaining market share, thereby unreasonably restraining trade.

### iii.    The "Level Playing Field"

149.    In exchange for agreeing to the "No Equivalent Products" and "Dynamic Royalty" provisions in their agreements with Fair Isaac – which effectively prevent the CBs from marketing VantageScore to B2B purchasers – Fair Isaac committed not to offer any CB a more favorable price for FICO Scores than any other CB. This commitment was embodied in the "Level Playing Field" clauses of the agreements with the CBs. Those provisions forbid Fair Isaac to charge any CB a price that is lower than the price it charges any other CB.[83]The "Level Playing Field" provision of the TransUnion ADLA is contained in §9.16. Fair Isaac's contracts with TransUnion, Equifax, and Experian include similar or identical "Level Playing Field" and "Dynamic Royalty Schedule" provisions.[84] The Credit Bureaus agreed to, and have complied with, these contract provisions.

150.    The Level Playing Field functions as a cost-information-sharing mechanism among the CBs. The FTC has determined that "when competing companies," like the Credit Bureaus, "exchang[e] price or other commercially sensitive information, that may facilitate

---

[82] *Id.*, ¶ 54.

[83] See *id.*, ¶ 59.

[84] FICO Answer to IPP Complaint, ¶136 (Dynamic Royalty Schedule), ¶145 (The Level Playing Field).

collusion or otherwise harm competition and consumers in violation of the antitrust laws." Indeed, "the sharing of information relating to price, cost, output, customers, or strategic planning is more likely to be of competitive concern than the sharing of less competitively sensitive information."[85]

151. The Level Playing Field provision offered the CBs several advantages, even though it effectively prevented the CBs from marketing VantageScore to B2B purchasers. First, it confirmed to each CB how much the other competing CBs are paying for FICO's algorithm. This knowledge protected the CBs from the risk that Fair Isaac would grant discounts that could expose them each to the risk of losing market share to their competitors. Second, the CBs used the information gleaned from the Level Playing Field provision to reduce price competition. As Fair Isaac has pointed out, previously, "a Credit Bureau could not be sure what its competitors' costs were and, consequently, to what extent its competitors could cut the price of their Credit Scores. This uncertainty could be used by Lenders to induce price competition among the Credit Bureaus." Fair Isaac claimed in its earlier lawsuit that the Credit Bureaus sought to use VantageScore so that "each Credit Bureau will know that it is paying exactly the same cost as its competitors for its scoring algorithm, and Lenders will no longer be able to use this uncertainty to play one Credit Bureau against the others."[86] In a rich irony, the Level Playing Field provision does exactly what Fair Isaac accused the CBs of trying to accomplish through VantageScore: prevent their customers from playing one CB against the others, thereby reducing

---

[85] Michael Bloom, Information exchange: be reasonable, FED. TRADE COMM'N (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable (emphasis added).

[86] Third Amended Complaint, Dkt. No. 436, Fair Isaac Corp. v. Experian Info Sols., No. 06-cv-4112 (D. Minn. Nov. 10, 2008), ¶138.

price competition for credit reports

152.    It also protected CBs from new market entrants. As Fair Isaac has pointed out, the CBs faced "the threat that independent scoring algorithm vendors, such as Fair Isaac, will facilitate the entry of new Credit Bureaus."[87] But by agreeing to the Level Playing Field provisions, Fair Isaac could not carry out that threat – by offering new credit bureaus prices lower than those it charges the incumbent CBs. Thus, the CBs have secured from Fair Isaac a significant source of protection from future competition in the market for the sale of credit reports to B2B Purchasers.

153.    The provision is demonstrably important to the Credit Bureaus. As was revealed through Fair Isaac's suit against TransUnion, in the negotiations over its Canadian contract, TransUnion insisted that Fair Isaac include a "Level Playing Field" clause. That clause would have given TransUnion Canada a right to any discounts or special pricing terms that Fair Isaac might offer other credit bureaus for the license or distribution of FICO scores in Canada. The Level Playing Field clause was so valuable to TransUnion of Canada that it continued to insist on one until Fair Isaac threatened to withhold its Canadian business entirely.

154.    Collectively, the "Dynamic Royalty Schedule" and "Level Playing Field" clauses allow Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores. These clauses also allow the CBs to extract monopoly prices from B2B Purchasers.

155.    The "Level Playing Field" and "Dynamic Royalty Schedule" clauses disincentivize CBs from negotiating for lower royalty prices for Fair Isaac's FICO Scores, because the CBs will not obtain a competitive advantage if they were to obtain lower pricing for

---

[87] *See* Third Amended Complaint, Dkt. 436, *Fair Isaac Corporation v. Experian Info. Sols.*, No. 06-CV-4112 (D. Minn. Nov. 10, 2008), ¶140.

44

royalty rates. The "Level Playing Field" clause does not provide Fair Isaac with any rights it does not have. Fair Isaac could offer the same royalty rates to all CBs absent the clause. The "Level Playing Field" clause exists to inform the CBs that negotiating for lower prices is useless.

156. Thus, Fair Isaac can freely increase prices with little resistance from the Credit Bureaus. And it has done so – Fair Isaac admitted in its answer that "over the last several years" it has "increased the base (i.e., undiscounted) royalty prices that it charges to the Credit Bureaus."[88] That price increase is ultimately borne by B2B Purchasers who pay a higher price for FICO Scores than they would have but for the CB's agreements and adherence to anticompetitive contract provisions.

157. After entering into the contracts containing anticompetitive terms with the Credit Bureaus, Fair Isaac initiated multiple rounds of price increases. In 2019, Fair Isaac reported: *"On the B2B side, revenues were up 36% over the previous year, due primarily to the 2018 price adjustments.*"[89] Again, in 2021, Fair Isaac reported that "*revenues were $169 million, up 31% from the same period last year. B2B was up 25% over the same period last year*, driven by continued high volumes in mortgage originations as well as some unit price increases across our different score categories. In the B2B business, we also had a royalty true-up and an annual license deal this quarter that had a small positive impact on overall revenues."[90]

158. As TransUnion has explained, taken together with the Dynamic Royalty Schedule provisions, the Level Playing Field provisions "enable Fair Isaac to unilaterally increase the royalty prices it charges [the Credit Bureaus] for FICO scores."[91]

---

[88] FICO Answer to IPP Complaint, ¶163.

[89] Q1 2019 Fair Isaac Corp Earning Call – Final (January 30, 2019).

[90] Q2 2021 Fair Isaac Corp Earnings Call – Final (May 5, 2021).

[91] TransUnion Counterclaims, ¶59.

159.    Notably, TransUnion has admitted that, to the extent the Level Playing Field provision resulted in higher rates, those costs were ultimately also borne by "banks [and] mortgage lenders" (*i.e.*, B2B purchasers).[92] While the CBs' agreement to the restrictive terms was against their self-interest, much of the cost was borne by B2B purchasers, while the CBs were otherwise compensated by the Level Playing Field provisions.

160.    Experian Vice President and Chief Financial Officer confirmed during a 2019 earnings call that while "the FICO price increase impacts" Experian, it also "impacts [Experian's] customers" because Experian "pass[es] it through to [its] customers."[93]

161.    Equifax's Chief Executive Officer confirmed the same: When Fair Isaac "put through a price increase . . . Equifax TU and Experian deliver[ed] that price increase to the marketplace, when they increase the price of their credit score. So that rolled through."[94]

162.    Thus, Fair Isaac and the CBs have used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in their contracts for anticompetitive purposes and to extract monopoly prices from all business customers in the B2B Credit Score Market.

### 3.    Fair Isaac's Negative Advertising Campaign in Furtherance of its Scheme

163.    Having agreed with each of the CBs to impose restrictions on VantageScore's ability to compete against FICO, Fair Isaac also engaged in an advertising campaign that disseminated false and misleading information with the goal of maintaining its monopoly in the B2B Credit Score Market. In advertisements, letters, and blog posts, Fair Isaac disparaged

---

[92] TransUnion Counterclaims, ¶60.

[93] John W. Gamble, VP & CFO, Remarks at Q1 2019 Equifax Inc. Earnings Call (May 10, 2019) (transcript available in Westlaw).

[94] Mark W. Begor, CEO, Remarks at Q2 2023 Equifax Inc. Earnings Call (July 20, 2023) (transcript available in Westlaw).

VantageScore and other credit scoring systems by calling them "FAKO" scores, falsely claimed that VantageScore and other alternative scoring systems do not reliably measure creditworthiness, and misrepresented the information considered by VantageScore and other credit scoring systems.

164.    For example, on December 12, 2017 Fair Isaac took out a full-page advertisement in the *Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates." This advertisement that attacked VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative credit score, which is owned by CBs. According to the advertisement, the credit score owned by CBs (impliedly VantageScore) is less reliable than FICO Scores in evaluating credit risk and does not use "sound practices" or "science-based credit evaluation." This advertisement conveyed Fair Isaac's false message that VantageScore is "Weakening scoring standards, [and] harm[ing] consumers, and the lending system."[95]

165.    Furthermore, the *Wall Street Journal* advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that links visitors to articles and blog posts that disparage VantageScore by name. One of these blog post claims: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

166.    Another example of Fair Isaac's false and misleading advertising campaign can be found on its website where a blog post claims that "Research results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job

---

[95] TransUnion Counterclaims, ¶ 66

forecasting future performance." This statement is false and misleading. VantageScore and other scoring models consider an individual consumer or business's full credit and financial history, even if the consumer has not used a traditional credit line in the last six months. Further, studies have shown that VantageScore and other competing credit scoring models are strongly predictive.[96]

167.    A blog post written by Joanne Gaskin ("Gaskin"), the Vice President of Scores and Analytics at Fair Isaac, claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not."[97] TransUnion responded "This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones."[98]

168.    Similarly, Fair Isaac fought hard against the efforts to create a process that would allow alternative credit scoring models to be validated and approved by Fannie Mae and Freddie Mac when they purchase mortgages. Such a rule would clearly benefit VantageScore, which could then attempt to break Fair Isaac's 100% monopoly in this sector. Public sentiment favored this move.[99] Fair Isaac did not. Indeed, it deployed Gaskin to give press interviews saying that

---

[96] *See* VantageScore Report, *supra* n.44, at 2, 4, 5-6

[97] Joanne Gaskin, FICO BLOG, *Truth Squad: Is FICO Score 700 the Same as VantageScore 700?* (Feb. 6, 2017), https://www.fico.com/blogs/truth-squad-fico-score-700-same-vantagescore-700.

[98] TransUnion Counterclaims, ¶71.

[99] *See* Bloomberg Business News, *This Monopoly Is Holding Back the Mortgage Market,*(Jan. 18, 2018), https://www.bloomberg.com/opinion/articles/2018-01-18/this-credit-score- monopoly-is-holding-back-the-mortgage-market; Paul Weinstein, Jr., *No Company Should Have a Monopoly*

Fair Isaac's alleged monopoly is a "myth."[100] Fair Isaac also hired a research group to present the argument that VantageScore's promise of home ownership to millions more Americans was deceptive and that the company's ownership by the CBs was anticompetitive, an argument that failed during the trademark litigation discussed above.[101] The FHFA ultimately adopted a final rule that permitted rival generators of credit scores to apply to serve Fannie Mae and Freddie Mac, saying that "FHFA has concluded that allowing all credit score model developers to submit applications is more consistent with [the applicable statute], which does not prevent any credit score model from being considered for potential use in the mortgage market." [102]

169. Fair Isaac's smear campaign against VantageScore was successful in sowing doubt about the reliability and accuracy of credit scoring alternatives to FICO Scores. For example, a media outlet devoted to personal finance issues, thebalance.com, posted in February 2017 that, "If you purchased your credit score from anywhere but MyFICO.com, then it's a FAKO score."

170. The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

**F.     The Contracts Between Fair Isaac and Each Credit Bureau Containing Anticompetitive Terms, In Combination With Fair Isaac's Anticompetitive Conduct Has Harmed Competition In the B2B Credit Score Market**

---

*on Credit Scoring*, The Hill (Dec. 7,2017), https://thehill.com/opinion/finance/363755-no-company-should-have-a-monopoly-on-credit- scoring.

[100] *FICO: The 'Credit Score Monopoly' is a Myth*, DS News (Dec. 18, 2015), https://dsnews.com/news/12-18-2015/fico-the-credit-score-monopoly-is-a-myth.

[101] Quantilytic LLC, *Risks and Opportunities in Expanding Mortgage Credit Availability Through New Credit Scores*, at 22 (Dec. 2017), https://www.progressivepolicy.org/wp-content/uploads/2017/12/UpdatedCreditScoring_2017.pdf (research sponsored by Fair Isaac).

[102] Fed. Hous. Fin. Agency, *Validation and Approval of Credit Score Models Final Rule*, 12 C.F.R. 1254 (Aug. 16, 2019).

171.    The CBs and Fair Isaac's anticompetitive conduct has harmed and continues to harm business customers in the B2B Credit Score Market. Fair Isaac's unlawful conduct, including the anticompetitive terms in its agreements with the CBs, has foreclosed competition in the B2B Credit Score Market by eliminating fair opportunities for VantageScore or any other credit score product to compete with Fair Isaac. This anticompetitive and exclusionary conduct has unreasonably restrained trade and maintained Fair Isaac's monopoly, by, among other things, allowing it to charge supracompetitive prices for B2B credit scores to B2B purchasers during the Class Period.

172.    FICO's Scores business operates with an incredibly high operating margin of 86%.[103] To maximize its monopoly rent, Fair Isaac has increased its prices for FICO Scores significantly in recent years. In 2018, after securing agreements from each of the three Credit Bureaus to abide by anticompetitive contract terms, FICO implemented a special pricing increase for mortgage customers that was an approximately 66% increase from $0.06/score to $0.10/score.[104] In the following two years, FICO again rolled out special pricing increases to its auto customers and to some credit card customers.[105]

173.    Fair Isaac's conduct and the anticompetitive provisions contained in contracts between the CBs and Fair Isaac, have reduced choice for business customers in the B2B Credit Score Market and frustrated the ability of business customers to purchase VantageScore or any other competing credit score. As a direct and proximate result of Fair Isaac's exclusionary and

---

[103] Jose Karlo Mari Tottoc, Yahoo! Finance, *Headwaters Capital: 'Fair Isaac Corp (FICO) Can Grow Its Free Cash Flow by 15-20% Annually'* (Jan. 23, 2021), https://finance.yahoo.com/news/headwaters-capital-fair-isaac-corp-202237954.html.

[104] *Id.*

[105] *Id.*

50

anticompetitive conduct, Fair Isaac has been able to indirectly charge Plaintiffs and all similarly situated businesses supracompetitive prices for credit scores. As indirect buyers of Fair Isaac's FICO Scores, Plaintiffs and all similarly situated businesses have been harmed by Fair Isaac's supracompetitive royalty prices.

174.    Fair Isaac's sales in the B2B Credit Score Market over the past five fiscal years have been extremely profitable. Fair Isaac maintains a supracompetitive profit margin on the revenue it earns from its Business Credit Scoring Products. Plaintiffs and similarly situated businesses have vastly overpaid for FICO Scores due to Fair Isaac's and the CBs' anticompetitive activities.

## V.    CLASS ACTION ALLEGATIONS

175.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All end-users who purchased a FICO Score in the B2B Credit Score Market from anyone other than Fair Isaac and/or a Credit Bureau from October 1, 2006 through the present (the "Class Period").

176.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws, as well as the law of unjust enrichment on behalf of the following class (the "Damages Class"):

> All end-users who in Indirect Purchaser States[106] purchased a FICO Score in the B2B Credit Score Market from anyone other than Fair Isaac and/or a Credit Bureau from October 1, 2006 through the present

---

[106] The "Indirect Purchaser States" are the states and Districts listed in the Seventh, Eighth and Ninth Claims for Relief.

(the "Class Period").

177.     The Nationwide Class and the Damages Class are referred to herein as the "Classes."

178.     These class definitions exclude any and all natural persons who are not members of these Classes by their definitions. Also excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased FICO Scores directly or for resale.

179.     While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least thousands of members in each Class. Members of the Classes are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Classes are readily identifiable from information and records in the possession of Defendants.

180.     Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and members of the Classes were damaged by the same wrongful conduct of Defendants.

181.     The interests of Plaintiffs are coincident with, and not antagonistic to, those of members of the Classes.

182.     Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

183.     Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Classes as a whole appropriate. Questions of law and fact common to members of the Classes include, but are not limited to:

a.     whether Fair Isaac monopolized, and whether Defendants entered into contracts that unreasonably restrain, trade in violation of federal law;

b.     whether Fair Isaac monopolized, and whether Defendants entered into contracts that unreasonably restrain, trade in violation of certain state antitrust laws;

c.     whether Defendants engaged in unfair or deceptive trade practices in violation of certain state laws;

d.     whether Defendants were unjustly enriched to the detriment of Plaintiffs and members of the Classes, thereby entitling Plaintiffs and members of the Classes to disgorgement of all benefits derived by Defendants;

e.     what was the duration of the alleged unlawful conduct;

f.     what injury was suffered by Plaintiffs and members of the Classes;

g.     what damages were suffered by Plaintiffs and members of the Classes; and

h.     whether Defendants acted or refused to act on grounds generally applicable to members of the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Classes as a whole.

184.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

185.     The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

186.     The prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

187.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

188.    Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

189.    Plaintiffs have defined members of the Classes based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.    STATUTES OF LIMITATION AND TOLLING

190.    Plaintiffs had no knowledge of the agreements or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) February 12, 2018, the date that TransUnion filed its Counterclaims against Fair Isaac. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in an anticompetitive scheme involving the distribution of credit scores.

191.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public websites, that they maintained policies that prohibited the type of anticompetitive conduct alleged in this Consolidated Complaint. For example:

    a.    Fair Isaac's Code of Business Conduct and Ethics states: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices."[107]

    b.    Equifax's Code of Ethics and Business Conduct states: "We believe in free and open competition and never engage in improper practices that may limit competition."[108]

---

[107] Fair Isaac, *Code of Business Conduct and Ethics*, https://fico.gcs-web.com/static-files/ed6519a4-2148-4166-82f2-4636e0713531.

[108] Equifax, *Code of Ethics and Business Conduct* (Aug. 2019), https://assets.equifax.com/assets/corp/code_of_ethics.pdf.

    c.    Experian's Code of Conduct states: "We will not engage in any form of agreement with competitors to fix prices, rig bids, allocate customers and/or restrict supply in the marketplace." "We will comply with all applicable laws, rules, and regulations in every jurisdiction in which we operate, including but not limited to . . . antitrust/competition."[109]

    d.    TransUnion's Code of Business Conduct states: "All TransUnion Team Members must understand how competition and antitrust laws affect their daily work. You must fully and consistently comply with applicable competition and antitrust laws.[110]

192.    It was reasonable for Plaintiffs and members of the Classes to believe that Defendants were complying with their own policies.

193.    Moreover, on information and belief, Plaintiffs and members of the Classes could not have discovered the anticompetitive provisions in the licensing agreements between Fair Isaac and the Credit Bureaus, such as the TransUnion ADLA, as those agreements are subject to confidentiality provisions that have prohibited the credit reporting agencies from disclosing their terms to third parties absent written authorization from Fair Isaac.[111]

194.    For these reasons, the statutes of limitations applicable to Plaintiffs' claims did not begin to run until the date that TransUnion filed its counterclaims against Fair Isaac and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

195.    The doctrine of fraudulent concealment tolled the statutes of limitations on

---

[109] Experian, *Our Code of Conduct* (2019), https://www.experian.com/content/dam/marketing/na/assets/corp/procurement-documents/experian-code-of-conduct-final-board-approved.pdf.

[110] TransUnion, *Code of Business Conduct* (2017), https://investors.transunion.com/~/media/Files/T/Transunion-IR/governance-documents/code-of-business-conduct-150618.pdf.

[111] *See* Dkt. 32, Motion for Leave to File Under Seal, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Jan. 22, 2018), ¶ 2 ("contracts between the Parties . . . are subject to confidentiality provisions that prohibit TransUnion from disclosing the terms of the contract to third parties absent written authorization from Fair Isaac").

Plaintiffs' claims. During the Class Period, Defendants wrongfully and affirmatively concealed their unlawful conduct. Plaintiffs and members of the Classes had no knowledge of Defendants' unlawful scheme and could not have discovered the scheme through the exercise of reasonable diligence until (at the earliest) February 12, 2018, when TransUnion filed its Counterclaims against Fair Isaac.

196.    By their very nature, antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants entered into confidential contracts with anticompetitive provisions that did not put Plaintiffs or the Classes on inquiry notice that the contracts had the effect of raising the prices for credit scores above the competitive level. Credit scores are not exempt from antitrust regulation, and thus, before TransUnion filed its Counterclaims against Fair Isaac, Plaintiffs reasonably considered the market to be competitive. Moreover, Defendants employed deceptive tactics and techniques to avoid detection of, and to conceal, their anticompetitive provisions.

197.    Defendants wrongfully and affirmatively concealed the existence of their anticompetitive contracts from Plaintiffs and members of the Classes by, among other things:

    a.    agreeing to confidentiality provisions that have prohibited the CBs from disclosing the anticompetitive provisions in the licensing agreements between Fair Isaac and the CBs, such as the TransUnion ADLA;

    b.    concealing the fact that Fair Isaac and the CBs agreed, through the "No Equivalent Products" clause, not to internally develop a competing credit scoring system that is aligned with FICO Scores or uses too many of the same reason codes;

    c.    concealing the fact that the purpose of the "No Equivalent Products" clause was to prevent the CBs from offering credit scoring products that would allow business-consumers a legitimate choice between FICO Scores and VantageScore or another alternative scoring product, thereby sustaining FICO Scores dominance in the market;

    d.    concealing the fact that Fair Isaac and the CBs agreed, through the "Level Playing Field" clauses, that prices made available to one credit bureau be

56

made available to all the others;

e.  concealing the fact that the purpose and effect of the "Level Playing Field" and "Dynamic Royalty Schedule" clauses is to disincentivize each CB from negotiating lower royalty prices for FICO Scores; and

f.  as to Fair Isaac, engaging in a false and misleading campaign about VantageScore Solutions and VantageScore to misrepresent VantageScore's viability as a competitor to FICO Scores.

198.  As a result of Defendants' affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiffs and members of the Classes have been and are tolled, and Defendants are equitably estopped from raising statutes of limitations as a defense.

## VII.  DEFENDANTS' ACTIONS CONSTITUTE CONTINUING VIOLATIONS

199.  In addition, and in the alternative, this Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statute of limitations.

200.  A claim accrued for the Class each time FICO Scores were sold to the Class at prices artificially inflated by Defendants' anticompetitive conduct. Each sale of FICO Scores at a supracompetitive price constituted another overt act in furtherance of Defendants' continuing anticompetitive schemes. Moreover, Defendants' statements and actions described above demonstrate that throughout the Class Period they engaged in new overt acts that further served the objectives of their anticompetitive schemes.

201.  Defendants' new overt acts were more than the inertial consequences of Defendants' initial violations. Rather, their acts were new and independent acts that perpetuated their agreements and kept them current with market conditions, including by renewing agreements, or entering into new agreements, with anticompetitive terms. Defendants continuously renewed and refined their agreements to reflect market conditions. With each

refinement of their agreements, Defendants inflicted new and accumulating injury on Plaintiffs and members of the Class. For instance, as alleged above, Fair Isaac exploited the ADLA Royalty Schedule Provision in 2015, 2016, and 2017 to introduce entirely new and non-negotiated contract terms, royalty categories, and definitions that expanded the anticompetitive schemes.

202.    Therefore, Plaintiffs and members of the Damages Class are entitled to recover damages they suffered during any applicable limitations period.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### UNREASONABLE RESTRAINT OF TRADE
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

203.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

204.    This Claim is brought against Defendant Fair Isaac.

205.    The relevant period of this Claim is from May 2013 through the date by which the anticompetitive effects of Defendant's violations of law shall have ceased.

206.    The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

207.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

208.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

209.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

58

210. Defendant entered into and engaged in contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). Specifically, Fair Isaac entered into agreements with Equifax, Experian, and TransUnion that contained anticompetitive terms whereby each CB agreed with Fair Isaac to contractual limitations that harmed the ability of the CBs to market VantageScore, a competing product, to Plaintiffs and members of the Class and forestalled price competition in the B2B Credit Score Market. The CBs and Fair Isaac thus knowingly formed schemes to unreasonably restrain trade in the B2B Credit Score Market.

211. The agreements between Fair Isaac and each of the CBs had substantial anticompetitive effects. The agreements effectively excluded VantageScore Solutions and every other competing provider of credit scores from competing for a substantial portion of transactions in the B2B Credit Score Market.

212. The agreements between Fair Isaac and each of the CBs raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

213. The acts done by Fair Isaac and each of the CBs as part of, and in furtherance of, their contracts, combinations, or conspiracies were authorized ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of its affairs.

214. The anticompetitive acts were directed at the B2B Credit Score Market in the United States and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

215. Fair Isaac's exclusionary and anticompetitive acts have injured and will continue

59

to injure competition in this market.

216.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property, and will continue to suffer such damages if Defendant does not cease its anticompetitive conduct.

217.     Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Defendant's continuing violations of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

218.     The alleged contracts, combinations, or conspiracies violates the federal antitrust laws because they are agreements between and among Fair Isaac and the CBs, all of whom are horizontal competitors who compete for the sale of credit scores in the B2B Credit Score Market. Upon entering the anticompetitive agreement with Fair Isaac, each CB acted against their economic self-interest because each agreement undermined the ability of VantageScore to compete. The CBs also knew that the Level Playing Field requirement in their agreements with Fair Isaac was meant to and did forestall price competition among the CBs in the market for credit reports, and hence was mutually beneficial for the CBs.

219.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Fair Isaac, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF:**
**UNREASONABLE RESTRAINT OF TRADE**
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

220.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

60

221.     This Claim is brought against Defendants Fair Isaac and Experian.

222.     The relevant period of this Claim is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

223.     The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

224.     Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

225.     Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

226.     Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

227.     Fair Isaac entered into an agreement with Experian that contained anticompetitive terms whereby Experian agreed with Fair Isaac to contractual limitations that harmed the ability of Experian to market VantageScore, a competing product, to Plaintiffs and members of the Class and forestalled price competition in the B2B Credit Score Market.

228.     The agreement between Fair Isaac and Experian had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

229.     The agreement between Fair Isaac and Experian raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

230.     The acts done by Fair Isaac and Experian as part of, and in furtherance of, their contract, combination, or conspiracy were authorized ordered, or done by their officers, agents,

employees, or representatives while actively engaged in the management of its affairs.

231.    The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

232.    Fair Isaac's and Experian's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

233.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and Experian do not cease their anticompetitive conduct.

234.    Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Fair Isaac's and Experian's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

235.    In addition to competing with Experian in the credit scores market, Fair Isaac licenses its algorithm to Experian, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, Experian discourages its customers from using or purchasing access to competing credit scores. Because Experian has substantial market power, it can harm its customers in this way without taking the risk that they will switch to competing CBs. In return for acting against its' self-interest and entering into the anticompetitive contract with Fair Isaac to restrain trade in the B2B Credit Scores Market, Experian benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor Experian's competitors and reduces competition among the CBs in the B2B Credit Score Market.

236.    Plaintiffs and members of the Nationwide Class are entitled to an injunction

62

against Fair Isaac and Experian, preventing and restraining the violations alleged herein.

<div align="center">

**THIRD CLAIM FOR RELIEF:**
**UNREASONABLE RESTRAINT OF TRADE**
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide**
**Class for Injunctive and Equitable Relief)**

</div>

237.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

238.    This Claim is brought against Defendants Fair Isaac and Equifax.

239.    The relevant period of this Claim is from November 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

240.    The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

241.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

242.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

243.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

244.    Fair Isaac entered into an agreement with Equifax that contained anticompetitive terms whereby Equifax agreed with Fair Isaac to contractual limitations that harmed the ability of Equifax to market VantageScore, a competing product, to Plaintiffs and members of the Nationwide Class and forestalled price competition in the B2B Credit Score Market.

245.    The agreement between Fair Isaac and Equifax had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider of

<div align="center">63</div>

credit scores from competing for a substantial portion of transactions in the relevant market.

246.    The agreement between Fair Isaac and Equifax raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

247.    The acts done by Fair Isaac and Equifax as part of, and in furtherance of, their contract, combination, or conspiracy were authorized ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of its affairs.

248.    The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

249.    Fair Isaac's and Equifax's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

250.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and Equifax do not cease their anticompetitive conduct.

251.    Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Fair Isaac's and Equifax's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

252.    In addition to competing with Equifax in the credit scores market, Fair Isaac licenses its algorithm to Equifax, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, Equifax discourages its customers from using or purchasing access to competing credit scores. Because Equifax has substantial market power, it can harm its customers in this way without taking the risk that they will switch to

competing CBs. In return for acting against its' self-interest and entering an anticompetitive agreement with Fair Isaac that had the intent and effect of restraining trade in the B2B Credit Score Market, Equifax benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor Equifax's competitors and reduces competition among the CBs in the B2B Credit Score Market.

253.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Fair Isaac and Equifax, preventing and restraining the violations alleged herein.

## FOURTH CLAIM FOR RELIEF:
## UNREASONABLE RESTRAINT OF TRADE
### Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3
### (On behalf of Plaintiffs and the Nationwide Class
### for Injunctive and Equitable Relief)

254.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

255.    This Claim is brought against Defendants Fair Isaac and TransUnion.

256.    The relevant period of this Claim is from February 2015 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

257.    The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

258.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

259.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

260.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

65

261.     Fair Isaac entered into an agreement with TransUnion that contained anticompetitive terms whereby TransUnion agreed with Fair Isaac to contractual limitations that harmed the ability of TransUnion to market VantageScore, a competing product, to Plaintiffs and members of the Nationwide Class and forestalled price competition in the B2B Credit Score Market.

262.     The agreement between Fair Isaac and TransUnion had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

263.     The agreement between Fair Isaac and TransUnion raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

264.     The acts done by Fair Isaac and TransUnion as part of, and in furtherance of, their contract, combination, or conspiracy were authorized ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of its affairs.

265.     The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

266.     Fair Isaac's and TransUnion's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

267.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and TransUnion do not cease their anticompetitive conduct.

268.     Plaintiffs and all other members of the Nationwide Class are threatened with future

66

injury to their business and property by reason of Fair Isaac's and TransUnion's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

269.    In addition to competing with TransUnion in the credit scores market, Fair Isaac licenses its algorithm to TransUnion, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, TransUnion discourages its customers from using or purchasing access to competing credit scores. Because TransUnion has substantial market power, it can harm its customers in this way without taking the risk that they will switch to competing CBs. In return for against its' self-interest and  entering an anticompetitive agreement with Fair Isaac that had the intent and effect of restraining trade in the B2B Credit Score Market, TransUnion benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor TransUnion's competitors and reduces competition among the CBs in the B2B Credit Score Market.

270.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

### FIFTH CLAIM FOR RELIEF: MONOPLIZATON
### Violation of Section 2 of the Sherman Act 15 U.S.C. § 2
### (On behalf of Plaintiffs and the Nationwide Class
### for Injunctive and Equitable Relief)

271.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

272.    This Claim is brought against Defendant Fair Isaac.

273.    The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

274.    Fair Isaac has had and continues to have at least a 90% market share in the B2B

Credit Score Market.

275.    Fair Isaac has had and continues to have monopoly power in B2B Credit Score Market.

276.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

277.    Fair Isaac entered into agreements with Equifax, Experian, and TransUnion that contained anticompetitive terms that were designed to eliminate Fair Isaac's competitors and to keep prices for FICO Scores artificially high.

278.    The agreements between Fair Isaac and the CBs had substantial anticompetitive effects. The agreements effectively excluded VantageScore Solutions and every other competing provider of credit scores from competing in the B2B Credit Score Market in the United States in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

279.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand to supracompetitive levels.

280.    Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

281.    Fair Isaac's monopolization has raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

282.    The acts done by the Fair Isaac were authorized, ordered, or done by its officers, agents, employees, or representatives while actively engaged in the management of its affairs.

283.    The anticompetitive acts were directed at the B2B Credit Score Market in the United States and had a substantial and foreseeable effect on interstate commerce and injured

competition nationwide.

284.    Fair Isaac's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

285.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property, and Plaintiffs and all other similarly situated businesses will continue to be injured if Fair Isaac does not cease its anticompetitive conduct.

286.    Plaintiffs and all other similarly situated businesses are threatened with future injury to their business and property by reason of Fair Isaac's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

287.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SIXTH CLAIM FOR RELIEF
## VIOLATION OF STATE ANTITRUST STATUTES
### (on behalf of Plaintiffs and the Damages Class)

288.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

289.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

290.    This Claim is brought against all Defendants.

291.    Arizona:  By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. § 44-1401, *et seq.*

    a.    Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce

69

in the Business Market for credit scores, a substantial part of which occurred within Arizona.

b.      Defendants' combinations or conspiracies had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Arizona; (2) credit score prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

d.      During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

e.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*

f.      Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

g.      As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business

70

or property and are threatened with further injury.

    h.    By reason of the foregoing, Plaintiffs and members of the Damages Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq.*

292.   <u>California</u>:  By reason of the conduct alleged herein, Defendants have violated California Business and Professions Code, §§ 16700, *et seq.*

    a.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

    b.    California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

    c.    Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

    d.    A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

    e.    Defendants entered into contracts, combinations, or conspiracies

between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within California.

     f.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

     g.    But for Defendants' conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

     h.    Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

     i.    Plaintiffs and members of Damages Class were injured in their business or property, with respect to purchases of FICO Scores in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

293.  <u>Connecticut</u>: By reason of the conduct alleged herein, Defendants have violated Connecticut General Statute §§ 35-26 *et seq.*

     a.    During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

     b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and

72

eliminated throughout Connecticut; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

      d.    By reason of the foregoing, Defendants have restrained trade in violation of Connecticut General Statute §§ 35-26 *et seq*.

      e.    Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Connecticut General Statute §§ 35-26 *et seq*.

294.   <u>District of Columbia</u>: By reason of the conduct alleged herein, Defendants have violated District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade).

      a.    Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the B2B Credit Score Market within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq*.

      b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were

deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*

f. Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28- 4509(a).

g. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

295. <u>Illinois</u>: By reason of the conduct alleged herein, Defendants have violated the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

a. Members of the Illinois Damages Class purchased FICO Scores within the State of Illinois during the Class Period.

b. But for Defendants' conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

74

c. Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 Ill. Comp. Stat. Ann. 10/7(2).

d. Defendants entered into contracts or engaged in combinations or conspiracies for the purpose of fixing, controlling or maintaining prices for FICO Scores sold within the State of Illinois.

e. Defendants further unreasonably restrained trade or commerce and established, maintained, or attempted to acquire monopoly power over the B2B Credit Score Market in Illinois for the purpose of excluding competition, in violation of 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

f. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

g. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

h. Members of the Illinois Damages Class were injured with respect to purchases of FICO Scores in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

296. <u>Iowa</u>: By reason of the conduct alleged herein, Defendants have violated the Iowa Competition Law, Iowa Code § 553.1, *et seq.*

a. Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or

75

did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Iowa Code § 553.1, *et seq.*

b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

d     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1, *et seq.*

f.     Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449 (Iowa 2002).

g.     Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

297.    <u>Kansas</u>:  By reason of the conduct alleged herein, Defendants have violated Kan.

76

Stat. Ann. § 50-101, *et seq.*

      a.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      b.      Defendants combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of credit scores, increasing the price of credit scores, or preventing competition in the sale of credit scores, in a manner that established the price of credit scores and precluded free and unrestricted competition among themselves in the sale of credit scores, in violation of Kan. Stat. Ann. § 50-101, *et seq*

      c.      During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

      d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50- 101, *et seq.*

      f.      Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan.

Stat. Ann § 50-161(b).

        g.      Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

298.  <u>Maine</u>:  By reason of the conduct alleged herein, Defendants have violated Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

        a.      Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of credit scores within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

        b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Maine; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

        c.      During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

        d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        e.      By reason of the foregoing, Defendants have entered into

agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

      f.     Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

      g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

299.   <u>Maryland</u>: By reason of the conduct alleged herein, Defendants have violated Maryland Code, Commercial Law, §§11-204 *et seq.*

      a.     During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

      b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Maryland; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

      d.     By reason of the foregoing, Defendants have restrained trade in violation of Maryland Code, Commercial Law, §§11-204 *et seq.*

      e.     Accordingly, Plaintiffs and members of the Class seek all relief available

79

under Maryland Code, Commercial Law, §§11-204 *et seq*.

300.   Michigan:  By reason of the conduct alleged herein, Defendants have violated the Michigan Compiled Laws Annotated §§ 445.771, *et seq*.

a.   Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in B2B Credit Score Market, in violation of Mich. Comp. Laws § 445.771, *et seq.*

b.   Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.   During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

f.   Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in

this Complaint. Mich. Comp. Laws. § 445.778(2).

g.    Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

301.    <u>Minnesota</u>:  By reason of the conduct alleged herein, Defendants have violated the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

a.    Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the B2B Credit Score Market within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the B2B Credit Score Market within the intrastate commerce of and outside of Minnesota; and fixed prices for credit scores within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq*.

b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.    During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct,

81

Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

  e.  By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*.

  f.  Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.57.

  g.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

302. <u>Mississippi</u>: By reason of the conduct alleged herein, Defendants have violated Mississippi Code Annotated §§ 75-21-1, *et seq*.

  a.  Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Mississippi.

  b.  Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Mississippi, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

  c.  Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Credit score prices were raised, fixed

82

maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      d.     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

      e.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      f.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

      g.     Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

      h.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

303.   <u>Missouri</u>: By reason of the conduct alleged herein, Defendants have violated Mo. Ann. Stat. § 407.010, *et seq.*

      a.     Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the Business Market for credit scores within the intrastate commerce of Missouri by possessing monopoly power in the

market and willfully maintaining that power through agreements to fix prices and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq.*

 b. Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

 c. During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce.

 d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

 e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mo. Ann. Stat. § 407.010, *et seq.*

 f. Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2008).

 g. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Mo. Ann. Stat. § 407.010, *et seq.*

304. <u>Nebraska</u>:  By reason of the conduct alleged herein, Defendants have violated the Nebraska Revised Statutes §§ 59-801, *et seq.*

a. Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the B2B Credit Score Market within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq.*

b. Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*

f. Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb.

85

Rev. Stat. § 59-821.

g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

305.   Nevada:  By reason of the conduct alleged herein, Defendants have violated the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

a.     Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq.*

b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into

agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

     f.     Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

     g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

306.   <u>New Hampshire</u>:  By reason of the conduct alleged herein, Defendants have violated the New Hampshire Revised Statutes §§ 356:1, *et seq.*

     a.     Defendants fixed, controlled or maintained prices for credit scores and established, maintained or used monopoly power, or attempted to, constituting contracts, combinations or conspiracies in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

     b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

     c.     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

     d.     As a direct and proximate result of Defendants' unlawful

87

conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*.

f.      Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

307.   <u>New Mexico</u>:  By reason of the conduct alleged herein, Defendants have violated the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

a.      Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for credit scores within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq*.

b.      Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

      d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

      f.      Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3(A).

      g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

308.   <u>New York</u>: By reason of the conduct alleged herein, Defendants have violated the New York General Business Laws §§ 340, *et seq.*

      a.      Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of credit scores and restrained competition in the free exercise of the conduct of the business of credit scores within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

      b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New York; (2) Credit score prices were raised, fixed

maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act.

f.      Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

309.    <u>North Carolina</u>:  By reason of the conduct alleged herein, Defendants have violated the North Carolina General Statutes §§ 75-1, *et seq*.

a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in

violation of North Carolina General Statutes §§ 75-1, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

f.      Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

310.    North Dakota: By reason of the conduct alleged herein, Defendants have violated the North Dakota Century Code §§ 51-08.1-01, *et seq.*

a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*. Defendants' violations of North Dakota law were flagrant.

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

f.      Under North Dakota law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this

92

Complaint. *See, e.g., Howe v. Microsoft Corp.*, 656 N.W.2d 285, 298 (N.D. 2003).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

311.    <u>Oregon</u>:  By reason of the conduct alleged herein, Defendants have violated the Oregon Revised Statutes §§ 646.705, *et seq.*

a.      Defendants contracted, combined, or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of credit scores, in violation of Or. Rev. Stat. § 646.705, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*

93

      f.     Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

      g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

312.   <u>Rhode Island</u>:  By reason of the conduct alleged herein, Defendants have violated R.I. Gen. Laws § 6-36-1, *et seq.*

      a.     Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

      b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.     During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.

      d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and

property and are threatened with further injury.

      e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

      f.    Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a).

      g.    Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under R.I. Gen. Laws § 6-36-1, *et seq.*

313.   <u>South Dakota</u>:  By reason of the conduct alleged herein, Defendants have violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

      a.    Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of credit scores within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1-3.1, *et seq.*

      b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.    During the Class Period, Defendants' illegal conduct substantially

affected South Dakota commerce.

       d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

       e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

       f.     Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

       g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

314.   <u>Tennessee</u>:  By reason of the conduct alleged herein, Defendants have violated the Tennessee Code Annotated §§ 47-25-101, *et seq.*

       a.     Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Tenn. Code, § 47-25-101, *et seq.*

       b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.     During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.

      d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*

      f.     Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

      g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25- 101, *et seq.*

315.    <u>Utah</u>:  By reason of the conduct alleged herein, Defendants have violated Utah Code Annotated §§ 76-10-3101, *et seq.*

      a.     Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Utah Code

97

Ann. § 76-10-3101, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Utah; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Utah commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq.*

f.      Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq.*

316.   <u>Vermont</u>:  By reason of the conduct alleged herein, Defendants have violated Vermont Stat. Ann. 9 §§ 2453, *et seq.*

a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Defendants' violations of Vermont law were flagrant.

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*

f.      Under Vermont law, indirect purchasers have standing to maintain an action under Vermont's antitrust laws based on the facts alleged in this Complaint. *Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all

99

relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

317.  <u>West Virginia</u>:  By reason of the conduct alleged herein, Defendants have violated West Virginia Code §§ 47-18-1, *et seq.*

        a.  Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of West Virginia Code §§ 47-18-1, *et seq.* Defendants' anticompetitive acts were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

        b.  Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

        c.  During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce.

        d.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et*

*seq.*

     f.     Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. Va. Code R. 142-9-2.

     g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

318.   <u>Wisconsin</u>:  By reason of the conduct alleged herein, Defendants have violated Wisconsin Statutes §§ 133.01, *et seq.*

     a.     Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of credit scores, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, *et seq.*

     b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

     c.     During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.

     d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and

property and are threatened with further injury.

      e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

      f.    Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(1)(a).

      g.    Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

319.    Defendants' anticompetitive activities have directly, foreseeably and proximately caused injury to members of the Damages Class. Plaintiffs and members of the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful monopolization and anticompetitive agreements. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced credit scores from Defendants and/or other sellers of credit scores, and/or (2) paying higher prices for FICO Scores than they would have in the absence of Defendants' conduct. These injuries are of the type of the laws of the above States were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

320.    In addition, Defendants have profited significantly from the aforesaid unlawful conduct. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

321.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**SEVENTH CLAIM FOR RELIEF:**
**VIOLATIONS OF STATE CONSUMER PROTECTION LAWS**
**(on behalf of Plaintiffs and the Damages Class)**

322.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

323.     This Claim is brought against all Defendants.

324.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

325.     <u>Arkansas</u>:  Defendants have knowingly entered into unlawful agreements in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.*

       a.     Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which credit scores were sold in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

       b.     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

       c.     Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

103

and the members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

     d.  During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

     e.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

     f.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

326.  <u>California</u>:  Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, et seq.

     a.  During the Class Period, Defendants marketed, sold, or distributed FICO Scores in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

     b.  The violations of federal antitrust law set forth above constitute violations of section 17200, *et seq.* of California Business and Professions Code.

     c.  This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated section 17200 of the California

Business & Professions Code, commonly known as the Unfair Competition Law.

      d.   Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

      e.   Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

      f.   Defendants' acts or practices are unfair to purchasers of FICO Scores in the State of California within the meaning of § 17200, California Business & Professions Code.

      g.   Defendants' acts and practices are fraudulent or deceptive within the meaning of § 17200 of the California Business & Professions Code.

      h.  Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

      i.  The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

      j.  The unlawful and unfair business practices of Defendants, as

described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supra-competitive and artificially inflated prices for FICO Scores sold in the State of California. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

k. The conduct of Defendants as alleged in this Complaint violated § 17200 of the California Business & Professions Code.

l. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.

m. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business & Professions Code §§ 17203 and 17204.

327. <u>District of Columbia</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.*

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which FICO Scores were sold, distributed or obtained in the District of Columbia.

b. The foregoing conduct constitutes "unlawful trade practices," within the

meaning of D.C. Code § 28- 3904.

c.     Plaintiffs and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged.

d.     There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores. Defendants had the sole power to set that price, and Plaintiffs and members of the Class had no power to negotiate a lower price.

e.     Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges.

f.     Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct with respect to fixing the price of FICO Scores at supracompetitive levels and overcharging consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

g.     Defendants took grossly unfair advantage of Plaintiffs and members of the Class.

h.     The suppression of competition that has resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for the FICO Scores. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout the District of

107

Columbia; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

     i.     As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

328.    <u>Florida</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

     a.     The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

     b.     A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

     c.     Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

     d.     Members of the Damages Class purchased FICO Scores within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price of

FICO Scores would have been lower, in an amount to be determined at trial.

   e.      Defendants entered into contracts, combinations or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Florida.

   f.      Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2006 and continuing through the date of this filing.

   g.      Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

   h.      Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Florida; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

   i.      Defendants' unlawful conduct substantially affected Florida's trade and commerce.

   j.      As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property by virtue of overcharges for FICO Scores and are threatened with further injury.

109

k.      By reason of the foregoing, the members of the Damages Class are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

329.    Hawaii: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

a.      Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

b.      During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

330.    Missouri: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

110

a. Plaintiffs and the Damages Class purchased FICO Scores for personal, family, or household purposes.

b. Defendants engaged in the conduct described herein in connection with the sale of credit scores in trade or commerce in a market that includes Missouri.

c. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which credit scores were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

d. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for credit scores. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of credit scores they purchased.

e. Defendants' conduct concerning the price of credit scores was deceptive as it had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing credit scores at prices established by a free and fair market.

f. Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Missouri; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of

111

free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra- competitive, artificially inflated prices for credit scores.

      g.      The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

      h.      As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

      i.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

331.    <u>Montana</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Consumer Protection Act, Mont. Code, §§ 30-14-101, *et seq.* and §§ 30- 14-201 *et seq.*

      a.      Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Montana; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of

112

free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra- competitive, artificially inflated prices for credit scores.

      b.      During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers.

      c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

      d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq*., and §§ 30- 14-201 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

332.    <u>Nebraska</u>: By reason of the conduct alleged herein, Defendants have violated Neb. Rev. Stat. § 59-1602, *et seq.*

      a.      Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-1609.

      b.      Defendants have entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Nebraska.

      c.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a

substantial part of which occurred within Nebraska.

      d.     Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of Defendants' actions within the stream of Nebraska commerce.

      e.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

      f.     Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs and members-of-the-Class's ability to protect themselves.

      g.     Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

      h.     As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

      i.     By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59-1602, *et seq.*

333.   <u>New Hampshire</u>: By reason of the conduct alleged herein, Defendants have violated N.H. Rev. Stat. T. XXXI, § 358-A, *et seq.*

      a.     Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007).

      b.     Defendants have entered into contracts, combinations, or conspiracies

between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within New Hampshire.

    c.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

    d.      Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of Defendants' actions within the stream of New Hampshire commerce.

    e.      Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

    f.      Defendants' conduct was willful and knowing.

    g.      Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

    h.      Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

    i.      As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

    j.      By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under N.H. Rev. Stat. T. XXXI, §§ 358-A:10 and 358-A:10-

334.    <u>New Mexico</u>: By reason of the conduct alleged herein, Defendants have violated

N.M. Stat. Ann. §§ 57-12-1, *et seq*.

      a.      Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Mexico.

      b.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which FICO Scores were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Class.

      c.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

      d.      Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

      e.      Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to and the members of the Damages Class.

      f.      Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

      g.      Plaintiff and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with

respect to the price charged by Defendants for FICO Scores. Defendant Fair Isaac had the sole power to set that price and Plaintiffs and members of the Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct to fix the price of FICO Scores at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class.

h.     The suppression of competition that resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for the FICO Scores.

i.     Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

j.     Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the

members of the Class and the price paid by them for FICO Scores as set forth in N.M. Stat. Ann. § 57-12-2E.

     k.     Defendants' conduct was willful.

     l.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

     m.     By reason of the foregoing, members of the Damages Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

335.    <u>New York</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349 *et seq.*

     a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO scores were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Class, who are Defendants' consumers.

     b.     Defendants made public statements about the prices of FICO Scores that omitted material information that rendered the statements that they made materially misleading; and Defendants alone possessed material information that were relevant to consumers but failed to provide the information.

     c.     Because of Defendants' unlawful trade practices in the State of New York, Class members who purchased FICO Scores were misled to believe that they were paying

118

a fair price for FICO Scores or the price increases for FICO Scores were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conduct.

       d.      Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have an impact on New York consumers, including Plaintiffs and members of the Class.

       e.      Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have a broad impact, causing Class members who purchased FICO Scores to be injured by paying more for FICO Scores than they would have paid in the absence of Defendants' unlawful trade acts and practices.

       f.      The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New York; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

       g.      During the Class Period, Defendants marketed, sold, or distributed FICO Scores in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

h.      During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in New York.

i.      Plaintiffs and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

336.    <u>North Carolina</u>: By reason of the conduct alleged herein, Defendants have violated N.C. Gen. Stat.§ 75-1, *et seq.*

a.      Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

b.      Defendants entered into contracts, combinations, or conspiracies in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within North Carolina.

c.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Class. Defendants' conduct could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' illegal activity. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Class could not possibly have been aware. Defendants' public statements concerning the price of FICO Scores created the illusion of competitive pricing controlled by market forces rather than

120

supracompetitive pricing driven by Defendants' illegal conduct.

d.  Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

e.  Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

f.  Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

g.  Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

h.  Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

i.  Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

j.  During the Class Period, Defendants marketed, sold, or distributed FICO Scores in North Carolina, and Defendants' illegal conduct substantially affected North

Carolina commerce and consumers. During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in North Carolina.

k.      As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured and are threatened with further injury.

l.      By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 75-16.

337.    Oregon: By reason of the conduct alleged herein, Defendants have violated Or. Rev. Stat. § 646.608, *et seq.*

a.      Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Oregon.

b.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.

c.      Defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of Defendants' actions within the stream of Oregon commerce.

d.      Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

e.      Defendants' conduct misled consumers, withheld material facts, and had a

122

direct or indirect impact upon members-of-the-Class's ability to protect themselves.

  f.  Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

  g.  As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

  h.  By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under Or. Rev. Stat. § 646.638.

338. <u>Rhode Island</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1 *et seq.*).

  a.  Members of this Class purchased FICO Scores for personal, family, or household purposes.

  b.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Rhode Island.

  c.  Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO Scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence.

  d.  Defendants misrepresented to all purchasers during the Class Period that

123

Defendants' FICO Scores prices were competitive and fair.

      e.      Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

      f.      As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market.

      g.      Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO Scores they purchased.

      h.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. §§ 6-13.1-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

      339.    <u>South Carolina</u>: By reason of the conduct alleged herein, Defendants have violated S.C. Code Ann. §§ 39-5-10, *et seq.*

a. Defendants have entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within South Carolina.

b. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

c. Defendants' monopolization had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores during the Class Period.

d. Defendants' conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of Defendants' actions within the stream of South Carolina commerce.

e. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Carolina.

f. Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

g. Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

125

h.      Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as at least thousands of South Carolina businesses purchase FICO Scores.

i.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10 *et seq.*, and, accordingly, Plaintiffs and the members of the Class seek all relief available under that statute.

340.    <u>South Dakota</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-6 *et seq.*).

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes South Dakota, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO credit scores were sold, distributed, or obtained in South Dakota.

b.      Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO credit scores. Defendants misrepresented to all purchasers during the Class Period that Defendants' FICO credit scores prices were competitive and fair Defendants owed a duty to disclose such facts, and they breached that duty by their silence.

c.      Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout South

Dakota; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores.

     d.     As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.

     e.     That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO credit scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO credit scores at prices set by a free and fair market.

     f.     Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO credit scores they purchased.

     g.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §§37-24-6 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

341.   <u>Utah</u>:  By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-11-1, *et seq.*

     a.     Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit

Score Market, a substantial part of which occurred within Utah.

b.      Defendants are suppliers within the meaning of Utah Code Ann. §§ 13-11

c.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the business market for credit scores, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

d.      Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

e.      Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions within the meaning of Utah Code Ann. §§ 13-11-3.

f.      Defendants knew or had reason to know that its conduct was unconscionable.

g.      Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

h.      Defendants' unlawful conduct substantially affected Utah's trade and commerce.

i.      As a direct and proximate cause of Defendants' unlawful conduct, the members Class have been injured in their business or property and are threatened with further injury.

j.      By reason of the foregoing, the members of the Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief,

128

pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

342.  Utah: By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-5-1, *et seq.*

      a.  Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Utah.

      b.  Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

      c.  Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.

      d.  Defendants' unlawful conduct substantially affected Utah's trade and commerce.

      e.  As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have been injured in their business or property and are threatened with further injury.

      f.  By reason of the foregoing, the members of the Class are entitled to seek all forms of relief, including actual damages or $2000 per Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5- 14, *et seq.*

343.  Vermont: By reason of the conduct alleged herein, Defendants have violated Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

a.      Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Vermont.

b.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Vermont, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

c.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for the FICO Scores.

d.      Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' FICO Scores prices were competitive and fair.

e.      Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Vermont; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive,

artificially inflated prices for the FICO Scores.

f.      Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

g.      Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

h.      Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.*

i.      As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market.

j.      By reason of the foregoing, members of Class are entitled to seek all forms of relief available under Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

344.    West Virginia: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code, §§46A-6-104 *et seq.*

a.      Defendants' unlawful conduct had the following effects: (1) FICO credit

scores price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores.

b.      During the Class Period, Defendants marketed, sold, or distributed FICO credit scores in West Virginia, and Defendants' illegal conduct substantially affected West Virginia commerce and consumers.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury.

345.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code, §§46A-6-104 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### EIGTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
#### (On behalf of Plaintiffs and the Nationwide Class)

346.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

347.    This Claim is brought against all Defendants.

348.    As a result of its unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices of and unlawful profits from FICO Scores.

349.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains.

132

350.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs and members of the Class in the following states: Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray that this Honorable Court:

1.    Order that this action may be maintained as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that they be named Representatives of the Classes, that the undersigned Interim Co-Lead Counsel be named Co-Lead Class Counsel, and that reasonable notice of this action be provided to members of the Class as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure;

2.    Adjudge that Defendants violated the federal antitrust laws as set forth above;

3.    Adjudge that Defendants violated the state antitrust and unfair trade practices laws as set forth above;

4.    Adjudge that Defendants were unjustly enriched as set forth above;

5.    Award Plaintiffs and members of the Damages Class actual, double, treble, and exemplary damages as permitted;

6.    Award Plaintiffs and members of the Classes pre-and post-judgment interest;

7.    Enjoin Defendants from continuing the unlawful actions alleged herein;

8. Award Plaintiffs attorneys' fees and all other costs, including costs of consulting and testifying experts, reasonably incurred in prosecution of this action; and

9. Award such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a Trial by Jury as to all issues so triable.

October 30, 2023                    Respectfully submitted,

By  */s/Garrett D. Blanchfield*
 Garrett D. Blanchfield

REINHARDT WENDORF & BLANCHFIELD
Garrett D. Blanchfield (*Pro Hac Vice*)
Brant D. Penney (*Pro Hac Vice*)
Roberta A. Yard (*Pro Hac Vice* forthcoming)
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

SPECTOR ROSEMAN & KODROFF, P.C.
Jeffrey J. Corrigan (*Pro Hac Vice*)
Jeffrey L. Spector (*Pro Hac Vice*)
William G. Caldes (*Pro Hac Vice*)
Icee N. Etheridge (*Pro Hac Vice* forthcoming)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611
JCorrigan@srkattorneys.com
JSpector@srkattorneys.com
BCaldes@srkattorneys.com
IEtheridge@srkattorneys.com

*Interim Co-Lead Counsel for Class Plaintiffs*

134

GUIN, STOKES & EVANS, LLC
Charles R. Watkins (3122790)
321 South Plymouth Court Suite 1250
Chicago, IL 60604
Tel: (312) 878-8391
Fax: (205) 226-2357
charlesw@gseattorneys.com

*Liaison Counsel for Class Plaintiffs*


PRETI FLAHERTY, BELIVEAU
& PACHIOS LLP
Michael S. Smith (Pro Hac Vice)
Gregory P. Hansel (Pro Hac Vice)
Randall B. Weill (Pro Hac Vice)
Elizabeth F. Quinby (Pro Hac Vice)
One City Center, P.O. Box 9546
Portland, ME 04101
Tel: (207) 791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com

GLANCY PRONGAY & MURRAY LLP
Brian P. Murray (*Pro Hac Vice* forthcoming)
Lee Albert (*Pro Hac Vice* forthcoming)
230 Park Avenue, Suite 358
New York, NY 10169
Tel: (212) 682-5340
Fax: (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

FREED KANNER LONDON
& MILLEN LLC
Douglas A. Millen
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
dmillen@fklmlaw.com

135

FREED KANNER LONDON
& MILLEN LLC
Jonathan M. Jagher (*Pro Hac Vice* forthcoming)
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
jjagher@fklmlaw.com

BONI, ZACK & SNYDER LLC
Michael J. Boni (*Pro Hac Vice* forthcoming)
Joshua D. Snyder (*Pro Hac Vice* forthcoming)
John E. Sindoni (*Pro Hac Vice* forthcoming)
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: 610-822-0200
Fax: 610-822-0206
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

MCLAFFERTY LAW FIRM, P.C.
David McLafferty (*Pro Hac Vice* forthcoming)
Attorneys at Law
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 940-4000 ext. 12
www.McLaffertyLaw.com

SALTZ, MONGELUZZI & BENDESKY, P.C.
Simon B. Paris, Esq. (*Pro Hac Vice* forthcoming)
Patrick Howard, Esq. (*Pro Hac Vice* forthcoming)
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Tel: (215) 575-3985
Fax: (215) 496-0999
sparis@smbb.com
phoward@smbb.com


*Attorneys for Class Plaintiffs*

# EXHIBIT 5



Sabrina Rose-Smith
+1 202 346 4185
SRoseSmith@goodwinlaw.com

Goodwin Procter LLP
1900 N St NW
Washington, DC 20036

goodwinlaw.com
+1 202 346 4000

February 19, 2024

**By Email Only: rewing@koreintillery.com**

Randall P. Ewing Jr.
Korein Tillery LLC
205 N. Michigan Ave.,
Suite 1950
Chicago, IL 60601

Re: <u>In Re FICO Antitrust Litigation</u>, File No. 1:20-cv-02114

Dear Mr. Ewing:

Pursuant to Rule 45(d)(2)(B) of the Federal Rules of Civil Procedure, VantageScore Solutions LLC ("VantageScore"), a nonparty in the above mentioned matter, objects to the Subpoena to Produce Documents, Information, or Objects ("subpoena") served on VantageScore by Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs ("Purchasers") as follows:

<p align="center">GENERAL OBJECTIONS</p>

1. VantageScore objects to the subpoena as overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks information protected from discovery by the attorney-client privilege, the work-product doctrine, the common interest privilege, right to privacy, and other applicable privileges, doctrines, laws, or rules protecting information from disclosure.

2. VantageScore objects to the subpoena as overly broad, unduly burdensome, and not proportional to the needs of the case because it subjects a nonparty to undue burden and expense in violation of Federal Rules of Civil Procedure 45(d)(1) because the requests attached to the subpoena (the "Requests") are unreasonably overbroad and, among other things, seek information and/or documents which are: (a) not relevant to any party's claims or defenses; (b) outside the possession, custody, or control of VantageScore; (c) highly confidential, proprietary, or competitively sensitive information belonging to VantageScore or other nonparties; (d) duplicative of information sought by Purchasers in discovery requests issued to other parties or in the possession of other parties to this litigation; and/or (e) in the public domain or otherwise equally accessible to Purchasers.

3. VantageScore objects to the subpoena as overly broad, unduly burdensome, and not proportional to the needs of the case because it calls for the disclosure of confidential or proprietary business and commercial information that may then be revealed to its primary competitor, including



Randall P. Ewing Jr.
Korein Tillery LLC
Page 2

information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected confidential, proprietary, commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law.

4. VantageScore objects to the subpoena as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks documents and/or information that are not relevant to the antitrust matter in controversy.

5. VantageScore objects to the subpoena as vague, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case because it uses the term "VantageScore" or "B2B Credit Score" to purportedly describe credit scores which are generated by VantageScore using its credit scoring models. VantageScore does not generate credit scores directly for End Users, but rather owns credit scoring models. Experian, Equifax, and TransUnion generate scores using VantageScore's credit scoring models.

6. VantageScore objects to the subpoena as overly broad, unduly burdensome, and not proportional to the needs of the case because the definition of the "Relevant Time Period" as January 1, 2013 to the Present—a period of more than 11 years—is overly broad, unduly burdensome, and disproportionate to the needs of the case.

Each of VantageScore's General Objections are specifically incorporated in each response to each of the Requests in the subpoena below, regardless of whether it is enumerated in the Specific Objections to that Request. VantageScore's Responses and Objections are not and shall not be deemed to constitute a representation or admission that any particular document or thing exists or is accessible to VantageScore. VantageScore reserves the right to amend or supplement any of its objections. VantageScore also specifically reserves the right to raise further objections and assert any applicable claims of privilege to any specific documents when or if any responsive documents are identified.

Subject to the General Objections and Specific Objections set forth herein, VantageScore is willing to meet and confer with Plaintiffs regarding the scope of the subpoena and VantageScore's objections to production.

### SPECIFIC OBJECTIONS TO DOCUMENTS REQUESTED

**A. Previous Investigations and Litigation**



Randall P. Ewing Jr.
Korein Tillery LLC
Page 3

**1.** **All Documents produced or provided to the United States Department of Justice, or any other U.S. or foreign government agency, regulator, or department, concerning government investigations or contemplated investigations relating to B2B Credit Scores or the B2B Credit Score Market.**

**OBJECTION:** VantageScore objects to this request as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent that it seeks information protected from discovery by the attorney-client privilege, the work-product doctrine, the common interest privilege, right to privacy, any other applicable privilege, doctrine, law, immunity, or rule protecting information from disclosure. VantageScore further objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore further objects on the grounds that the burden and expense posed by the Request on non-party VantageScore outweighs and is disproportionate to the relevance or usefulness of the requested documents and/or information in the litigation. VantageScore further objects to this Request on the grounds that it seeks documents and/or information that are not relevant to the antitrust matter in controversy. VantageScore further objects to this request as overly broad, unduly burdensome, and not proportional to the needs of the case because it calls for "All Documents" provided in response to "any" U.S. or foreign government agency, regulator, or department related in any way to "B2B Credit Scores or the B2B Credit Score Market", particularly when requested of a non-party and without specific nexus to issues to be determined in the litigation. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

**2.** **All submissions, presentations, or other communications with legislators and legislative staff, including members and staff of legislative committees; government agencies and staff; executive ' branch officials and staff; and government-sponsored enterprises and their representatives regarding VantageScores.**

**OBJECTION:** VantageScore objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case because the Request purports to seek "All" documents. VantageScore objects to this Request as vague, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case because it (a) includes vague and overbroad terms such as "All submissions, presentations or other communications with" and (b) does not limit itself to documents



Randall P. Ewing Jr.
Korein Tillery LLC
Page 4

that relate to FICO's conduct as alleged in the applicable complaint. VantageScore objects to this Request to the extent that it calls for information outside the possession, custody, and control of VantageScore. VantageScore further objects on the grounds that the burden and expense posed by the Request on non-party VantageScore outweighs and is disproportionate to the relevance or usefulness of the requested documents and/or information in the litigation. VantageScore further objects to this Request on the grounds that it seeks documents and/or information that are not relevant to the antitrust matter in controversy. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

3. **All Documents produced, provided, or served in connection with the Litigations, whether produced by you, another party (other than FICO), or a third party.**

**OBJECTION:** VantageScore objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case because the Request purports to seek "All" documents, particularly from a non-party to this litigation. VantageScore objects to this Request as overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to any issue in the litigation because the Request is not limited to documents that might be relevant to the *In re FICO Antitrust Litigation*, but rather calls for all documents produced in the subject Litigations. VantageScore objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case because the document productions related to the identified Litigations were voluminous and, assuming those document productions continue to exist, would require substantial effort to review and produce—including reviewing documents for confidentiality of third parties, for which there may be continuing notice obligations, including under the Confidentiality Order entered in the VantageScore Solutions Litigation (as that term is defined in the Subpoena). VantageScore objects to this Request because it seeks information that is publicly available, including documents filed on the PACER website, and which could therefore be obtained from some other source that is more convenient, less burdensome, or less expensive than VantageScore, and that the Request is cumulative and duplicative of documents and information available publicly. VantageScore objects to this Request on the basis that the requested documents could in many cases be obtained from a party to the litigation, and could therefore be obtained from some other source that is more convenient, less burdensome, or less expensive than VantageScore, and that the Request is cumulative and duplicative of documents and information available from a party to this litigation. VantageScore objects to this Request to the extent the Request calls for documents outside of VantageScore's possession, custody, or control. VantageScore objects to this Request to the extent that it calls for the disclosure of trade secrets and other information of confidential and proprietary nature, for which the relevance (if any) is outweighed by the harm in producing such material. VantageScore objects to this



Randall P. Ewing Jr.
Korein Tillery LLC
Page 5


Request to the extent that it seeks documents within the possession, custody, and control of VantageScore's attorneys and/or documents that are protected by the attorney-client privilege, the work-product doctrine, and/or any other privileges or immunities. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

**B. Agreements**

4. **All Agreements between or among, You, Equifax, Experian, TransUnion, or any other consumer reporting company, relating to the marketing, sale, or distribution (or restrictions on the marketing, sale, or distribution) of B2B Credit Scores, including communications between or among You, Experian, Equifax, TransUnion, or any other entity distributing B2B Credit Scores relating to limitations, conditions, or any other restriction on the distribution of B2B Credit Scores, and any Documents relating to the negotiation of any such Agreement(s).**

   **OBJECTION:** VantageScore objects to this Request as overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to any issue in the litigation because it is not directed or limited to the agreements that are the subject of Plaintiffs' claims in this action. VantageScore objects to this Request as vague, ambiguous, and overly broad because (a) it requests documents relating to undefined entities such as "any other consumer reporting company" and "any other entity distributing B2B Credit Scores" and because (b) it calls for documents "relating to limitations, conditions, or any other restriction," the meaning of which is vague and ambiguous. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

5. **All Documents, including communications, whether internal or with others, relating to the design of VantageScore 3.0, VantageScore 4.0, or any subsequent VantageScore product to avoid using an odds-to-score relationship aligned to the odds-to-score relationship of any Fair Isaac Analytic, or to avoid using adverse action code numeric values or descriptions that match the adverse action code numeric values coupled with adverse action code reason descriptions of any Fair Isaac Analytic.**

   **OBJECTION:** VantageScore objects to this request to the extent that this Request seeks information protected from discovery by the attorney-client privilege, the work-product doctrine, the common interest privilege, right to privacy, any other applicable privilege, doctrine, law, immunity, or rule protecting information from disclosure. VantageScore further objects to this Request to the extent it



Randall P. Ewing Jr.
Korein Tillery LLC
Page 6

calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore further objects to this Request to the extent that it calls for "All Documents…whether internal or with others" as overbroad, unduly burdensome, and not proportional to the needs of the case, particularly when requested of a non-party. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

6. **All Documents, including communications, with TransUnion, Experian, and Equifax relating to their ability to distribute VantageScores, or any restrictions on their ability to distribute VantageScores, in light of their agreements with Fair Isaac, including, but not limited to licensing agreements.**

**OBJECTION:** VantageScore objects to this request to the extent that this Request seeks information protected from discovery by the attorney-client privilege, the work-product doctrine, the common interest privilege, right to privacy, any other applicable privilege, doctrine, law, immunity, or rule protecting information from disclosure. VantageScore further objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore further objects to this Request to the extent it seeks documents which do not exist, or are otherwise not in its care, custody, or control. VantageScore further objects to this request to the extent that it calls for "All Documents" as facially overbroad, particularly when requested of a non-party. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

C. **Competition**

7. **All non-privileged Documents relating to competition or potential competition between FICO Scores and VantageScores, including but not limited to strategies or contemplated strategies for addressing competition or potential competition, or to gain market share.**



Randall P. Ewing Jr.
Korein Tillery LLC
Page 7


**OBJECTION:** VantageScore further objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore objects to this request to the extent that this Request seeks information protected from discovery by the attorney-client privilege, the work-product doctrine, the common interest privilege, right to privacy, any other applicable privilege, doctrine, law, immunity, or rule protecting information from disclosure. VantageScore objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case because the Request purports to seek "All" documents, particularly when requested from a non-party. VantageScore objects to this Request as vague, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, because it (a) includes ambiguous phrases such as "analysis of competition or potential competition," "for addressing competition or potential competition," and "strategies or contemplated strategies" and (b) is not limited to the scope of discovery necessary to advance Plaintiffs' claims. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

8. **All non-privileged Documents relating to analysis of competition or potential competition from suppliers of Competitor Credit Score Products, including but not limited to strategies or contemplated strategies for addressing competition or potential competition.**

**OBJECTION:** VantageScore objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case because the Request purports to seek "All" documents, particularly when requested from a non-party. VantageScore objects to this Request as vague, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, because it (a) includes ambiguous phrases such as "analysis of competition or potential competition," "for addressing competition or potential competition," and "strategies or contemplated strategies" and (b) is not limited to the scope of discovery necessary to



Randall P. Ewing Jr.
Korein Tillery LLC
Page 8

advance Plaintiffs' claims. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

9. **All non-privileged Documents relating to any projections, reports, forecasts, evaluations (or financial, commercial, regulatory, or legal analyses) performed by You and/or by any other third party relating to competition in the B2B Credit Score Market.**

**OBJECTION:** VantageScore objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case because the Request purports to seek "All" documents, particularly when requested from a non-party. VantageScore objects to this Request as vague, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, including because the Request calls for information seeking: "All Documents relating to any projections, reports, forecasts, evaluations (or financial, commercial, regulatory, or legal analyses) performed by You and/or by any other third-party" in regards to the entirety of VantageScore's involvement in the B2B Credit Score business. VantageScore objects to this Request in that it calls for documents outside of VantageScore's possession, custody, and control, including in that it calls for analyses performed "by any other third-party." VantageScore further objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore objects to this Request on the basis that some of the requested documents could in many cases be obtained from a party to the litigation, and could therefore be obtained from some other source that is more convenient, less burdensome, or less expensive than VantageScore, and that the Request is cumulative and duplicative of documents and information available from a party to this litigation. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

   D. **The Relevant Market**

10. **All Documents concerning the past, present, or anticipated future competition among FICO Scores, VantageScores, or any other Competitor Credit Score Product, including but not limited to switching among such products, the functional or economic substitutability of such products, the relative features, costs, or benefits of such products, factors affecting purchase decisions,**



**competitive intelligence, price competition, and the cross-price elasticity of demand (i.e., the responsiveness of demand to changes in price) among such products.**

**OBJECTION:** VantageScore objects to this request to the extent that this Request seeks information protected from discovery by the attorney-client privilege, the work-product doctrine, the common interest privilege, right to privacy, any other applicable privilege, doctrine, law, immunity, or rule protecting information from disclosure. VantageScore objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case because the Request purports to seek "All" documents, particularly when requested from a non-party. VantageScore further objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

**11. Documents sufficient to show Your past, current, and anticipated future B2B Credit Score market share or position, and the past, current, and anticipated future market share or position of any other entity distributing or selling B2B Credit Scores.**

**OBJECTION:** VantageScore objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore objects to this Request as vague, ambiguous, overly broad, and unduly burdensome because it (a) calls for the production of documents regarding VantageScore's "anticipated future" market share, (b) includes the vague and ambiguous term "distributing or selling B2B Credit Scores," and (c) calls for the production of "past, current, and anticipated future" market share data. VantageScore objects to this Request because it seeks information not maintained in the ordinary course of business in centralized, reasonably accessible sources. VantageScore objects to this request to the extent that this Request seeks information protected from discovery by the attorney-client privilege, the work-product doctrine, the common interest privilege, right to privacy, any other applicable privilege, doctrine, law, immunity, or rule protecting information from disclosure. VantageScore objects to this Request on the basis that it



Randall P. Ewing Jr.
Korein Tillery LLC
Page 10

calls for documents outside of VantageScore's possession, custody, and control, including but not limited to because it calls for documents relating to "any other entity . . . ." VantageScore objects to this Request on the basis that the requested documents could in many cases be obtained from a party to the litigation, and could therefore be obtained from some other source that is more convenient, less burdensome, or less expensive than VantageScore, and that the Request is cumulative and duplicative of documents and information available from a party to this litigation. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

**12. Documents sufficient to show past, current, and anticipated future demand for B2B Credit Scores, including but not limited to Documents describing the factors that affect the demand for B2B Credit Scores.**

**OBJECTION:** VantageScore objects to this request to the extent that this Request seeks information protected from discovery by the attorney-client privilege, the work-product doctrine, the common interest privilege, right to privacy, any other applicable privilege, doctrine, law, immunity, or rule protecting information from disclosure. VantageScore further objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore objects to this Request as vague and ambiguous because it (a) includes ambiguous and undefined terms such as "demand" for B2B Credit Scores and (b) includes ambiguous requests for documents "describing the factors that affect demand" as a subset of documents "sufficient to show … demand". VantageScore objects to this Request as overbroad, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case because it calls for the production of documents relating to "past, current, and anticipated future" demand. VantageScore objects to this Request because it seeks information not maintained in the ordinary course of business in centralized, reasonably accessible sources. VantageScore objects to this Request in that it calls for documents outside of VantageScore's possession, custody, and control. VantageScore objects to this Request on the basis that the requested documents could in many cases be obtained from a party to the litigation, and could therefore be obtained from some other source that is more convenient, less burdensome, or less expensive than VantageScore, and that the Request is cumulative and duplicative of documents and information available from a party to this litigation. VantageScore will not search for or produce



Randall P. Ewing Jr.
Korein Tillery LLC
Page 11


documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

    **E.  Sales, Marketing, and Promotion**

**13. Documents and data, data compilations, data sets, and other forms of structured data used, generated, collected, held, tracked, or accessed by You relating to fees, royalties, and other prices charged or collected by You or Credit Bureaus to purchasers of B2B Credit Scores, including but not limited to the Plaintiffs and members of the proposed classes.**

**OBJECTION:** VantageScore objects to this Request as vague, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case because it fails to describe the documents sought with sufficient particularity. VantageScore objects to this request to the extent that this Request seeks information protected from discovery by the attorney-client privilege, the work-product doctrine, the common interest privilege, right to privacy, any other applicable privilege, doctrine, law, immunity, or rule protecting information from disclosure. VantageScore further objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore objects to this Request because it seeks information not maintained in the ordinary course of business in centralized, reasonably accessible sources. VantageScore objects to this Request in that it calls for documents outside of VantageScore's possession, custody, and control. VantageScore objects to this Request on the basis that some of the requested documents could in many cases be obtained from a party to the litigation, and could therefore be obtained from some other source that is more convenient, less burdensome, or less expensive than VantageScore, and that the Request is cumulative and duplicative of documents and information available from a party to this litigation. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

**14.  Data, data compilations, data sets, data tables, and other forms of structured data used, generated, collected, held, tracked, or accessed by You in the ordinary course of business of the sale, supply, or distribution (or restriction on the sale, supply, or distribution) of B2B Credit Scores), including but not limited to transaction-level electronically stored sales information and**



Randall P. Ewing Jr.
Korein Tillery LLC
Page 12

data. The relevant time period for this request is from January 1, 2013 until the present.
Information requested includes, but is not limited to: (a) identifying product information; (b) any
unique credit score request or transaction identifier; (c) date of transaction; (d) date invoice sent;
(e) date payment was received; (f) customer identification information (e.g., name, address, and
customer number) for the bill-to customer, requesting customer, and any other customer entity,
including the downstream customer, named person, or entity on whose behalf the score was
requested; (g) customer type; (h) total price and price per unit, including separately specifying
any applicable discounts, rebates, chargebacks, or forgiven balances; (i) total price and price per
unit charged by any intermediary to the transaction; (j) total quantity sold, specifying any
applicable units that measure quantity; (k) type of underlying transaction or loan, contemplated
or actual, relating to the sale of the FICO Score or VantageScore; (l) gross and net sales dollars,
separately by revenue source; (m) cost of sales, separately by revenue source; (n) cost of goods
sold, including sales and distribution cost and any fixed or variable costs, separately by type; (o)
licensing fees, royalties (including any royalties paid to Fair Isaac for a given transaction), and/or
profit shares paid and received; (p) gross profit; (q) net profit; (r) profit margin; (s) operating
income; (t) net income; (u) unit volume sold; (v) unit volume sold net of returns; (w) operating
income; (x) net income; and (y) if the transaction is subject to a contract: (i) effective date of
contract; and, (ii) contract type and other information outlining the general terms of the
contractual arrangement between the B2B customer and the Credit Bureau.

**OBJECTION:** VantageScore objects to this Request as overly broad, unduly burdensome, and not
proportional to the needs of the case because it fails to identify the documents sought with sufficient
particularity, and seeks documents related to credit scores other than the credit score(s) at issue in the
*In re FICO Antitrust Litigation*. VantageScore objects to this Request as vague, ambiguous, and overly
broad because it includes ambiguous, undefined, and generalized phrases and terms such as such as
"data," "data compilations," "data sets," "structured data," and "relating to fees, royalties, and other
prices charged and collected". VantageScore further objects to this Request to the extent it calls for the
disclosure of confidential or proprietary business and commercial information that VantageScore is
obligated to keep confidential, or which otherwise constitutes protected commercial, financial,
competitively sensitive, and/or trade secret information, or which contains confidential and/or private
information of any third party or individual that is in VantageScore's possession pursuant to
confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore
objects to this Request because it seeks information not maintained in the ordinary course of business
in centralized, reasonably accessible sources. VantageScore objects to this Request in that it calls for
documents outside of VantageScore's possession, custody, and control. VantageScore objects to this
Request on the basis that some of the requested documents could in many cases be obtained from a



Randall P. Ewing Jr.
Korein Tillery LLC
Page 13

party to the litigation, and could therefore be obtained from some other source that is more convenient, less burdensome, or less expensive than VantageScore, and that the Request is cumulative and duplicative of documents and information available from a party to this litigation. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

**15. The relevant time period for this request is from January 1, 2013 until the present. All Documents relating to Your projected and actual B2B Credit Scores (a) sales; (b) gross sales revenue; (c) net sales revenue; (d) cost of goods sold; (e) sales and distribution cost; (f) marketing, advertising, promotional, and sales expenses; (g) other fixed or variable costs; (h) research and development expenditures; (i) licensing fees, royalties, and/or profits shares paid to and/or received from Fair Isaac or any other entity; (j) pricing, rebates, discounts, and chargebacks; (k) gross profit; (l) net profit; (m) profit margin; (n) unit volume sold; (o) unit volume sold by state; (p) unit volume sold net of returns; (q) cost and price analyses; (r) cost and price analyses by state; and (s) all specific costs You include in a fixed cost.**

**OBJECTION:** VantageScore objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore further objects to this Request on the grounds that it seeks documents and/or information that are not relevant to the antitrust matter in controversy, and does not articulate any nexus to any asserted claims or defenses. . VantageScore objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case because the Request purports to seek "All" documents, particularly from a non-party. VantageScore objects to this Request because it seeks information not maintained in the ordinary course of business in centralized, reasonably accessible sources. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

**16. Documents sufficient to show how the prices for B2B Credit Scores are or have been set during the Relevant Period, including any adjustments such as rebates or discounts or the price of other products.**



Randall P. Ewing Jr.
Korein Tillery LLC
Page 14


**OBJECTION:** VantageScore objects to this Request as vague, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case because VantageScore does not generate credit scores directly for End Users, but rather owns credit scoring models. Experian, Equifax, and TransUnion generate scores using VantageScore's credit scoring models. VantageScore further objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

### F. The Credit Bureaus

**17. Documents sufficient to show the rights Credit Bureaus have to receive revenue or other benefits from VantageScore Solutions.**

**OBJECTION:** VantageScore objects to this Request as vague and ambiguous because it includes ambiguous terms such as "the rights . . . to" and "other valuable consideration." VantageScore objects to this Request as overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to any issue in the litigation. VantageScore further objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore objects to this Request because it seeks information not maintained in the ordinary course of business in centralized, reasonably accessible sources. VantageScore objects to this Request on the basis that it calls for documents outside of VantageScore's possession, custody, and control, including in that it calls for documents relating to "the rights" of the Credit Bureaus. VantageScore objects to this Request to the extent that it seeks documents within the possession, custody, and control of VantageScore's attorneys and/or documents that are protected by the attorney-client privilege, the work-product doctrine, and/or any other privileges or immunities. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.



Randall P. Ewing Jr.
Korein Tillery LLC
Page 15

**18. Documents sufficient to show the rights Credit Bureaus have to receive data and documents from VantageScore Solutions.**

**OBJECTION:** VantageScore objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore objects to this Request as vague, ambiguous, and overly broad because it includes ambiguous, undefined, and unlimited terms such as "the rights . . . to" and "data and documents." VantageScore objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case the Request is not relevant to the claims at issue. VantageScore objects to this Request because it seeks information not maintained in the ordinary course of business in centralized, reasonably accessible sources. VantageScore objects to this Request on the basis that it calls for documents outside of VantageScore's possession, custody, and control, including in that it calls for documents relating to "the rights" of the Credit Bureaus. VantageScore objects to this Request to the extent that it seeks documents within the possession, custody, and control of VantageScore's attorneys and/or documents that are protected by the attorney-client privilege, the work-product doctrine, and/or any other privileges or immunities. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

**19. Documents sufficient to show the rights Credit Bureaus have to control or influence the management of VantageScore Solutions.**

**OBJECTION:** VantageScore objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore objects to this Request as vague and ambiguous because it includes ambiguous and undefined terms such as "the rights . . . to" and "control or influence." VantageScore objects to this Request as overly broad, unduly burdensome, not proportional to the needs of the case, because the requested information is not relevant to the claims at issue. VantageScore objects to this Request because it seeks information not maintained in the ordinary course of business in centralized, reasonably accessible sources. VantageScore objects to



Randall P. Ewing Jr.
Korein Tillery LLC
Page 16

this Request on the basis that it calls for documents outside of VantageScore's possession, custody, and control, including in that it calls for documents relating to "the rights" of other Credit Bureaus and VantageScore Solutions. VantageScore objects to this Request to the extent that it seeks documents within the possession, custody, and control of VantageScore's attorneys and/or documents that are protected by the attorney-client privilege, the work-product doctrine, and/or any other privileges or immunities. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

**20. Documents sufficient to show the contributions of money, goods, or services by the Credit Bureaus to VantageScore Solutions.**

**OBJECTION:** VantageScore objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore objects to this Request as overly broad, unduly burdensome, not proportional to the needs of the case, because the requested information is not relevant to the claims at issue. VantageScore objects to this Request because it seeks information not maintained in the ordinary course of business in centralized, reasonably accessible sources. VantageScore objects to this Request because it calls for documents outside of VantageScore's possession, custody, and control, including in that it calls for documents relating to "contributions" of other Credit Bureaus and VantageScore Solutions. VantageScore objects to this Request to the extent that it seeks documents within the possession, custody, and control of VantageScore's attorneys and/or that are protected by the attorney-client privilege, the work-product doctrine, and/or any other privileges or immunities. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

**G. Other**

**21. Organizational charts, personnel directories, telephone directories, and e-mail user and address lists for You as a whole and for each division, subsidiary, or affiliate of Yours that had, has, or will have any involvement in the sale of B2B Credit Scores.**



Randall P. Ewing Jr.
Korein Tillery LLC
Page 17


**OBJECTION:** VantageScore objects to this Request because VantageScore does not sell credit scores directly for End Users, but rather owns credit scoring models. Experian, Equifax, and TransUnion generate scores using VantageScore's credit scoring models.

**22. All non-privileged Documents relating to communications between You and Fair Isaac or the Credit Bureaus about this Action.**

**OBJECTION:** VantageScore objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case because the Request purports to seek "All" documents, particularly when requested from a non-party. VantageScore further objects to this Request to the extent it calls for the disclosure of confidential or proprietary business and commercial information that VantageScore is obligated to keep confidential, or which otherwise constitutes protected commercial, financial, competitively sensitive, and/or trade secret information, or which contains confidential and/or private information of any third party or individual that is in VantageScore's possession pursuant to confidentiality or non-disclosure restrictions imposed by any contract or applicable law. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

**23. Documents sufficient to identify and describe Your document destruction, preservation, retention, and archiving policies and practices and any changes in such polices, including Documents sufficient to identify and describe Your management of ESI, including the preservation of text messages and instant messaging or chat communications, intranet sites, and enterprise applications used in the ordinary course of business.**

**OBJECTION:** VantageScore objects to this Request as overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to any issue in the litigation because it is not clear from the Requests or the other pleadings in the Action, nor have Plaintiffs articulated any reasons, why this Request would be relevant to the claims at issue, particularly in light of the fact that VantageScore is a third party to the Action. VantageScore objects to this Request to the extent that it seeks documents within the possession, custody, and control of VantageScore's attorneys and/or that are protected by the attorney-client privilege, the work-product doctrine, and/or any other privileges or immunities. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.

**24. All Documents relating to the named Plaintiffs in this Action.**



Randall P. Ewing Jr.
Korein Tillery LLC
Page 18


**OBJECTION:** VantageScore objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case because the Request purports to seek "All" documents, particularly from a non-party. VantageScore objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case, because the requested information is not relevant to the claims at issue. VantageScore objects to this Request in that it calls for documents outside of VantageScore's possession, custody, and control. VantageScore objects to this Request on the basis that the requested documents could in many cases be obtained from a party to the litigation, and could therefore be obtained from some other source that is more convenient, less burdensome, or less expensive than VantageScore, and that the Request is cumulative and duplicative of documents and information available from a party to this litigation. VantageScore will not search for or produce documents in response to this Request at this time, but will meet and confer with Plaintiffs regarding the Request.


Sincerely,

Sabrina Rose-Smith

# EXHIBIT 6

## Rrahmani, Labeat

| | |
|---|---|
| **From:** | Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com> |
| **Sent:** | Wednesday, March 20, 2024 1:57 PM |
| **To:** | Rrahmani, Labeat |
| **Cc:** | Ewing Jr., Randall; Dindzans, Viktors M. |
| **Subject:** | RE: VantageScore Subpoena Discussion pt. 2 |

Labeat,
Thank you for the extension.  Please see my notes below in <span style="color:red">red</span> in response to your questions.  Starting tomorrow, I will be out of the office until April 1, so I am copying my colleague Viktors should you need anything further.  Please copy him on your letter when it is sent.
-Sabrina

---

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Friday, March 15, 2024 5:54 PM
**To:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Cc:** Ewing Jr., Randall <REwing@KoreinTillery.com>
**Subject:** RE: VantageScore Subpoena Discussion pt. 2

***EXTERNAL***
Hi Sabrina,

Thank you for confirming that VantageScore will produce information on its leadership team and its document-retention policy.  Plaintiffs agree to an extension until Thursday, March 21 for VantageScore to complete that production.

With regard to Plaintiffs' remaining document requests, Plaintiffs want to confirm our understanding of VantageScore's position before we assess how to proceed.  Based on our prior meet-and-confers, Plaintiffs understand that VantageScore's position is that documents it might produce in response to Plaintiffs' subpoena (other than those it has agreed to produce) are so competitively sensitive that it will not produce them absent a court order compelling their production, even if the production was made pursuant to the litigation's protective order and/or under an attorneys' eyes only designation. Is this correct? **This is correct as to the documents where we asserted that they were competitively sensitive.  In other instances, as you know, we asserted that search and production of the documents would be unduly burdensome given the extensive paper files and need to review email archives, while in others, we do not believe responsive documents exist.**

And if so, is VantageScore willing to propose language or provisions that could be added to the Protective Order that would allow it to produce these documents? **We do not believe the AEO provision is sufficient to protect VantageScore's competitively sensitive information, and we do not think additional provisions will resolve this fundamental issue given that VantageScore is a non-party.  We also do not think additional provisions will address the other issues I have raised with you (lack of responsive documents, burden and expense of email and paper doc searches).** Once VantageScore confirms its position on these questions, we will be able to assess our next steps and respond to you in turn about how we plan to proceed.

With regard to the VantageScore Member Agreement and IP agreements, is there anyone within VantageScore or under VantageScore's control (such as outside counsel) who has access to and might be directed to obtain the sealed filings? Alternatively, you mentioned having these documents in paper form—would VantageScore be willing to scan those documents as they are maintained in the ordinary course and produce them?  It doesn't seem like they would be too voluminous or that it would be too costly or burdensome to do so, but please let us know if we are mistaken.  **As I noted**

on our call, if the documents had previously been made public (such as having been filed on the docket as an exhibit in a prior case), I did not think I had a basis to object that the publicized versions should be withheld as competitively sensitive. However, as it turns out, the documents were not made publicly available – they were produced in prior litigation under an AEO provision and filed under seal. VantageScore's member agreement and IP agreement are business records that it does view as so competitively sensitive that it cannot agree to produce them. In the spirit of compromise (and just as a practical matter) if prior versions had been publicly available, I would view this differently, just as I have told you that publicly available market study information, data on VantageScore's website, etc. are also not things we would object to producing, but given that they are not, VantageScore declines to produce the member agreement and IP agreements, particularly in a case where it is a non-party.

You will receive a letter memorializing our meet and confer discussions early next week. Please feel free to reach out if you have any questions or if it would be productive to discuss.

Thanks,

Labeat

Labeat Rrahmani
**Korein Tillery**
205 N Michigan Avenue, Suite 1950
Chicago, IL 60601
312-641-9750
https://www.koreintillery.com

---------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
---------------------------

**From:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Sent:** Friday, March 15, 2024 1:58 PM
**To:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Cc:** Ewing Jr., Randall <REwing@KoreinTillery.com>
**Subject:** RE: VantageScore Subpoena Discussion pt. 2

Labeat,
Our subpoena return date is today based on the extension you previously granted. I do anticipate producing information on Vantage Score's leadership team and its retention policy, but I will not have authorization to do so before Tuesday of next week and request until Thursday of next week to do so. Also as you know, we do not intend to provide responses to your other requests at this time. You previously asked whether we would agree to produce to you anything we are ordered by the Court to produce as a result of the ongoing motion to quash/motion to compel dispute with FICO, and I can confirm we would do so (under the same terms as ordered by the Court). I can also confirm that I checked and the previous version of the Vantage Score Member Agreement and IP Agreements were filed under seal and I do not have access to the sealed docs or the production except in paper files.

Do plaintiffs intend to move to compel, or are you amenable to extending the return date in such a way that would allow the dispute to play out with FICO while reserving your rights?

Finally, I did not receive a follow up letter to our meet and confer. When do you anticipate sending it?

Thanks,
Sabrina

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Thursday, March 7, 2024 8:18 PM
**To:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Cc:** Ewing Jr., Randall <REwing@KoreinTillery.com>
**Subject:** RE: VantageScore Subpoena Discussion pt. 2

***EXTERNAL***
Sabrina, just checking in on the below as I haven't seen an invite come through.  Please let me know if I should send one along instead.

Best,

Labeat

Labeat Rrahmani
**Korein Tillery**
205 N Michigan Avenue, Suite 1950
Chicago, IL 60601
312-641-9750
https://www.koreintillery.com

---------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
---------------------------

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Thursday, March 7, 2024 9:19 AM
**To:** 'Rose-Smith, Sabrina M' <SRoseSmith@goodwinlaw.com>
**Cc:** Ewing Jr., Randall <REwing@KoreinTillery.com>
**Subject:** RE: VantageScore Subpoena Discussion pt. 2

Hi Sabrina, just circling back for tomorrow's discussion.  I've confirmed that 11:30 am et works for the folks on Plaintiffs' side.  Please let me know if I can address any questions in the meantime.

With thanks,

Labeat

Labeat Rrahmani
**Korein Tillery**
205 N Michigan Avenue, Suite 1950
Chicago, IL 60601
312-641-9750
https://www.koreintillery.com

---------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
---------------------------

3

**From:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Sent:** Friday, March 1, 2024 11:41 AM
**To:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Cc:** Ewing Jr., Randall <REwing@KoreinTillery.com>
**Subject:** Re: VantageScore Subpoena Discussion pt. 2

Yes, same time Monday works for me.  We will update the calendar invitation.

**Sabrina Rose-Smith**
GOODWIN
1900 N Street, NW
Washington, DC 20036
t  +1 202 346 4185
f  +1 202 204 7292
SRoseSmith@goodwinlaw.com | goodwinlaw.com

On Mar 1, 2024, at 11:35 AM, Rrahmani, Labeat <LRrahmani@koreintillery.com> wrote:

 ***EXTERNAL***
No problem, Sabrina, thanks for letting us know and I hope you feel better soon.  Can we plan for the same time on Monday?

Labeat Rrahmani
**Korein Tillery**
205 N Michigan Avenue, Suite 1950
Chicago, IL 60601
312-641-9750
https://www.koreintillery.com

---------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
---------------------------

**From:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Sent:** Friday, March 1, 2024 10:27 AM
**To:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>
**Subject:** RE: VantageScore Subpoena Discussion pt. 2

All,
I am now out of the office today and not feeling well.  Can we move this discussion to Monday afternoon sometime?

-----Original Appointment-----
**From:** Oselukwue, Ogechika <OOselukwue@goodwinlaw.com>
**Sent:** Monday, February 26, 2024 7:04 PM
**To:** Oselukwue, Ogechika; Dindzans, Viktors M.; Rose-Smith, Sabrina M; Rrahmani, Labeat; Ewing Jr., Randall

**Subject:** VantageScore Subpoena Discussion pt. 2
**When:** Friday, March 1, 2024 1:00 PM-2:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** https://goodwinlaw.zoom.us/j/93495634129?pwd=UTRTbC9BcGV0dmMxbW93T1Jmc0ZCQT09

Ogechika Oselukwue is inviting you to a scheduled Zoom meeting.

Join Zoom Meeting
https://goodwinlaw.zoom.us/j/93495634129?pwd=UTRTbC9BcGV0dmMxbW93T1Jmc0ZCQT09

Meeting ID: 934 9563 4129
Passcode: 600637

---

One tap mobile
+16469313860,,93495634129#,,,,*600637# US
+13017158592,,93495634129#,,,,*600637# US (Washington DC)

---

Dial by your location
• +1 646 931 3860 US
• +1 301 715 8592 US (Washington DC)
• +1 305 224 1968 US
• +1 309 205 3325 US
• +1 312 626 6799 US (Chicago)
• +1 646 558 8656 US (New York)
• +1 386 347 5053 US
• +1 507 473 4847 US
• +1 564 217 2000 US
• +1 669 444 9171 US
• +1 669 900 9128 US (San Jose)
• +1 689 278 1000 US
• +1 719 359 4580 US
• +1 253 205 0468 US
• +1 253 215 8782 US (Tacoma)
• +1 346 248 7799 US (Houston)
• +1 360 209 5623 US
• +33 1 7037 9729 France
• +33 1 7095 0103 France
• +33 1 7095 0350 France
• +33 1 8699 5831 France
• +33 1 7037 2246 France
• +49 69 7104 9922 Germany
• +49 69 3807 9883 Germany
• +49 69 3807 9884 Germany
• +49 69 5050 0951 Germany
• +49 69 5050 0952 Germany
• +49 695 050 2596 Germany
• +852 3008 3297 Hong Kong SAR
• +852 5803 3730 Hong Kong SAR
• +852 5803 3731 Hong Kong SAR

- +852 5808 6088 Hong Kong SAR
- +352 342 080 9265 Luxembourg
- +352 2786 1188 Luxembourg
- +352 2786 4277 Luxembourg
- +44 208 080 6592 United Kingdom
- +44 330 088 5830 United Kingdom
- +44 131 460 1196 United Kingdom
- +44 203 481 5237 United Kingdom
- +44 203 481 5240 United Kingdom
- +44 203 901 7895 United Kingdom
- +44 208 080 6591 United Kingdom

Meeting ID: 934 9563 4129
Passcode: 600637

Find your local number: https://goodwinlaw.zoom.us/u/at2XyKzdJ

---

Join by SIP
- 93495634129@zoomcrc.com

---

Join by H.323
- 162.255.37.11 (US West)
- 162.255.36.11 (US East)
- 115.114.131.7 (India Mumbai)
- 115.114.115.7 (India Hyderabad)
- 213.19.144.110 (Amsterdam Netherlands)
- 213.244.140.110 (Germany)
- 103.122.166.55 (Australia Sydney)
- 103.122.167.55 (Australia Melbourne)
- 209.9.211.110 (Hong Kong SAR)
- 64.211.144.160 (Brazil)
- 69.174.57.160 (Canada Toronto)
- 65.39.152.160 (Canada Vancouver)
- 207.226.132.110 (Japan Tokyo)
- 149.137.24.110 (Japan Osaka)

Meeting ID: 934 9563 4129
Passcode: 600637

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

*****************************************************************

# EXHIBIT 7

KOREIN TILLERY

*Attorneys at Law*

Michigan Plaza
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601-4263

www.KoreinTillery.com

Labeat Rrahmani
LRrahmani@koreintillery.com
*p: (312) 641-9750*
*f: (314) 241-3525*

March 20, 2024                                                                         Via E-mail

Sabrina Rose-Smith
Goodwin Procter LLP
1900 N St NW
Washington, DC 20036
SRoseSmith@goodwinlaw.com

Re:     ***IN RE FICO ANTITRUST LITIGATION***
             Case No. 1:20-cv-02114 (N.D. Ill.)

Dear Counsel:

I write on behalf of the Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs (collectively, "Plaintiffs") regarding your February 19, 2024 letter setting forth VantageScore Solutions LLC's ("VantageScore") objections and responses to Plaintiffs' Subpoena to Produce Documents, Information, or Objects ("subpoena") and to memorialize Plaintiffs' understanding of our discussions during meet-and-confer meetings that took place on February 26, March 4, and March 8, 2024. Plaintiffs' responses in this letter to VantageScore's objections and responses, including any identification of potential deficiencies, are made in the interest of making any further meet-and-confer discussions productive and are not meant to be exhaustive. Plaintiffs thus reserve all rights.

Plaintiffs first address two global issues:

<u>***Confidentiality***</u>**:** Plaintiffs understand that VantageScore objects to producing the vast majority of documents demanded, namely Request Nos. 1-5 and 7-20, because it asserts that they contain competitively-sensitive information. VantageScore's position is that it would be harmed by providing that information to Fair Isaac and Plaintiffs—even if produced subject to the Agreed Confidentiality Order (hereinafter "Confidentiality Order") already in place, Dkt. 199, and designated as "HIGHLY CONFIDENTIAL –

OUTSIDE ATTORNEYS' EYES ONLY" ("OAEO")—and it has moved to quash Fair Isaac's subpoena on this basis (Dkt. 268). Plaintiffs reiterate that they are open to any reasonable modification of the Confidentiality Order to address VantageScore's concerns, but understand that VantageScore has no modification to suggest. VantageScore also expressed that it was not receptive to alternative proposals, such as limiting access to these materials to a designated lawyer for each party. Plaintiffs disagree that VantageScore has satisfied its burden in refusing to produce documents almost wholesale based on claims that such documents contain competitively-sensitive information that would not be adequately protected by the terms of the governing protective order. *See MediaTec Pub., Inc. v. Lexington Ins. Co.*, No. 09 C 5545, 2011 WL 841245, at *2 (N.D. Ill. Mar. 8, 2011) (Courts regularly "assume" individuals "abide by protective orders," because, without that assumption, "[c]ourt[s] would be powerless to order discovery no matter how relevant."). Furthermore, VantageScore's production in other litigation— including to Fair Isaac—of material that VantageScore deems competitively sensitive here, e.g. Request Nos. 4, 17-20, undermines its position that an OAEO designation would here be insufficient to protect its competitively-sensitive information.

Please advise whether VantageScore is willing to reconsider its position or propose a modification to the protective order that might allow it to produce the responsive documents identified. As mentioned by email on Friday, March 15, 2024, we are still considering whether we intend to move to compel and the timing of any such motion if one is filed.

*__E-Mail Searching__*: Plaintiffs understand that VantageScore refuses to search emails for documents responsive to any of the demands because it contends doing so would be unduly burdensome. Plaintiffs are willing to engage in further discussions with respect to custodians or search terms for each of the requests (including analyzing hit counts) in order to accurately gauge whether doing so is unduly burdensome, but Plaintiffs understand that VantageScore refuses to do so pending resolution of the confidentiality concerns above. Plaintiffs disagree that VantageScore has demonstrated sufficient justification not to search e-mails in its possession, custody, or control, and they reserve all rights in the meantime.

Request No. 1

Plaintiffs' Request No. 1 requests "All Documents produced or provided to the United States Department of Justice, or any other U.S. or foreign government agency,

regulator, or department, concerning government investigations or contemplated investigations relating to B2B Credit Scores or the B2B Credit Score Market."

Plaintiffs understand that VantageScore has responded to two relevant inquiries by the Department of Justice, and that VantageScore produced documents in response to one of them. VantageScore represented that the documents produced to the Department of Justice still exist in hard-copy form in storage located in Chicago, Illinois.[1]

During meet-and-confer discussions, VantageScore represented that it will not produce such documents, including because that material might contain competitively-sensitive information and because it would be expensive for VantageScore to review it. Plaintiffs offered that the documents could be produced under a "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" ("OAEO") designation pursuant to the governing Confidentiality Order, but VantageScore expressed concerns that the OAEO designation would be insufficient to protect its information from its competitor, Fair Isaac, as described above.

VantageScore stated that it will not produce responsive material absent a court order compelling their production. Plaintiffs understand that we are at impasse pending resolution of VantageScore's Motion to Quash the Fair Isaac subpoena (Dkt. 268).

Request No. 2

Plaintiffs' Request No. 2 requests "All submissions, presentations, or other communications with legislators and legislative staff, including members and staff of legislative committees; government agencies and staff; executive branch officials and staff; and government-sponsored enterprises and their representatives regarding VantageScores."

VantageScore represented that it has no responsive documents concerning legislators except for a number of "leave behinds" which would contain information

---

[1] VantageScore represented that the estimated cost of digitizing the documents and reviewing would amount to approximately $703,050.00. To the extent this is the only format in which these documents exist, Plaintiffs request a breakdown of the costs to understand whether they are reasonable and whether the documents could be produced in a less costly manner. Plaintiffs nevertheless disagree that such cost is a sufficient basis by which not to produce such material.

Case: 1:20-cv-02114 Document: 304-2 Filed: 09/12/24 Page 5 of 15
Case: 3:21-md-03011-ELH Doc #: 304-2 Filed: 07/12/24 Page 1394 of 900 PageID #:7358

March 20, 2024
Page 4

present on VantageScore's website, but that such material is not centrally stored. Otherwise, VantageScore may have responsive material with respect to the Federal Housing Finance Agency ("FHFA"). That said, VantageScore's position is that documents it might produce in response to Request No. 2 are so competitively sensitive that it will not produce them absent a court order compelling their production. Plaintiffs understand that we are at impasse pending resolution of VantageScore's Motion to Quash the Fair Isaac subpoena (Dkt. 268).

<u>Request No. 3</u>

Plaintiffs' Request No. 3 requests "All Documents produced, provided, or served in connection with the Litigations, whether produced by you, another party (other than FICO), or a third party."

VantageScore represented during the meet-and-confer discussions that it produced documents in connection with the Litigations. Can you please specify which of the Litigations VantageScore produced documents in—i.e. the 2006 VantageScore Solutions Litigation, the 2017 TransUnion Litigation, or both? VantageScore stated that it is uncertain whether the specific, bates-labeled production files have been preserved, but confirmed that the documents themselves continue to exist.[2] VantageScore represented that these documents may overlap with the hard-copy files referenced in discussion regarding Request No. 1. VantageScore also asked Plaintiffs to identify which specific documents are contemplated by Request No. 3 to narrow this request.

That said, VantageScore's position is that documents it might produce in response to Request No. 3 are so competitively sensitive and producing the material under an OAEO designation would be insufficient to protect its information as described above. We understand VantageScore will thus not produce them absent a court order compelling their production. We thus are at impasse pending resolution of VantageScore's Motion to Quash the Fair Isaac subpoena (Dkt. 268).

<u>Request No. 4</u>

Plaintiffs' Request No. 4 requests "All Agreements between or among, You, Equifax, Experian, TransUnion, or any other consumer reporting company, relating to

---

[2] VantageScore represented that the hard-copy files identified above regarding Request No. 1 that are in storage in Chicago, Illinois, would also encompass these documents.

the marketing, sale, or distribution (or restrictions on the marketing, sale, or distribution) of B2B Credit Scores, including communications between or among You, Experian, Equifax, TransUnion, or any other entity distributing B2B Credit Scores relating to limitations, conditions, or any other restriction on the distribution of B2B Credit Scores, and any Documents relating to the negotiation of any such agreement(s)."

VantageScore represented during meet-and-confer discussions that it possesses a number of agreements responsive to Request No. 4. VantageScore represented that some of such agreements have been produced in other litigation under seal and were not made public. Plaintiffs asked whether anyone within VantageScore or under VantageScore's control (such as outside counsel) with access to such filings might be directed to obtain the sealed filings. Alternatively, Plaintiffs asked whether counsel for VantageScore would be willing to scan the hard-copy versions of those documents as they are maintained in the ordinary course and produce them. But VantageScore's position is that such agreements are business records that it views as so competitively sensitive that it will not produce them even under an OAEO designation. Plaintiffs understand that any such production VantageScore made under seal in other litigation would have also been made to Fair Isaac, party to those actions. Plaintiffs are therefore puzzled as to why VantageScore will not similarly produce such material here under an OAEO designation. Plaintiffs understand that we are at impasse pending resolution of VantageScore's Motion to Quash the Fair Isaac subpoena (Dkt. 268).

<u>Request No. 5</u>

Plaintiffs' Request No. 5 requests "All Documents, including communications, whether internal or with others, relating to the design of VantageScore 3.0, VantageScore 4.0, or any subsequent VantageScore product to avoid using an odds-to-score relationship aligned to the odds-to-score relationship of any Fair Isaac Analytic, or to avoid using adverse action code numeric values or descriptions that match the adverse action code numeric values coupled with adverse action code reason descriptions of any Fair Isaac Analytic."

VantageScore represented during meet-and-confer discussions that it may possess documents responsive to Request No. 5 but it is not willing to produce such documents, including because such material might contain competitively-sensitive information. VantageScore also represented that producing responsive communications would require it to conduct a review of emails, which, without articulating any burden in searching emails with any specificity, VantageScore is not willing to do. Plaintiffs also

understand VantageScore is unwilling at this point to discuss any limitations on custodians or search terms to ease any such burden pending resolution of VantageScore's Motion to Quash the Fair Isaac subpoena (Dkt. 268). Plaintiffs asked whether VantageScore is amenable to producing documents under an OAEO designation pursuant to the governing Confidentiality Order, which we understand VantageScore is not, as described above.

VantageScore's position is that it will not produce documents responsive to Request No. 5 absent an order by the Court. Plaintiffs understand that we are at impasse pending resolution of VantageScore's Motion to Quash the Fair Isaac subpoena (Dkt. 268).

Request No. 6

Plaintiffs' Request No. 6 requests "All Documents, including communications, with TransUnion, Experian, and Equifax relating to their ability to distribute VantageScores, or any restrictions on their ability to distribute VantageScores, in light of their agreements with Fair Isaac, including, but not limited to licensing agreements."

VantageScore represented during the meet-and-confer discussion that it does not have documents responsive to Request No. 6.

Request No. 7

Plaintiffs' Request No. 7 requests "All non-privileged Documents relating to competition or potential competition between FICO Scores and VantageScores, including but not limited to strategies or contemplated strategies for addressing competition or potential competition, or to gain market share."

VantageScore represented during the meet-and-confer discussions that it periodically publishes publicly-available market study reports and bases those reports on information provided to it by third-party consulting firms such as Oliver Wyman and Charles River, who in turn receive such information from the Credit Bureaus. VantageScore is not willing to produce information it receives from such third party entities that may be responsive to Request No. 7, including data underlying such reports, because such material might contain competitively-sensitive information and producing the material under an OAEO designation would be insufficient to protect its information

as described above. Plaintiffs understand that we are at impasse pending resolution of VantageScore's Motion to Quash the Fair Isaac subpoena (Dkt. 268).

Request No. 8

Plaintiffs' Request No. 8 requests "All non-privileged Documents relating to analysis of competition or potential competition from suppliers of Competitor Credit Score Products, including but not limited to strategies or contemplated strategies for addressing competition or potential competition."

VantageScore represented during the meet-and-confer discussions that it may possess non-privileged Documents responsive to Request No. 8 but it refuses to produce such material because such material might possess competitively-sensitive information as described above.

VantageScore will not produce such responsive material absent an order by the Court. Plaintiffs understand that we are at impasse pending resolution of VantageScore's Motion to Quash the Fair Isaac subpoena (Dkt. 268).

Request No. 9

Plaintiffs' Request No. 9 requests "All non-privileged Documents relating to any projections, reports, forecasts, evaluations (or financial, commercial, regulatory, or legal analyses) performed by You and/or by any other third party relating to competition in the B2B Credit Score Market."

VantageScore represented during the meet-and-confer discussions that it may possess non-privileged Documents responsive to Request No. 9 but it refuses to produce such material because such material might possess competitively-sensitive information as described above.

In an effort to compromise, Plaintiffs propose limiting Request No. 9 to exclude regulatory or legal analyses and documents from any third parties VantageScore identifies as in possession of those third parties. And Plaintiffs continue to consider ways in which to narrow Request No. 9 such that VantageScore can comply with Request No. 9. That said, Plaintiffs understand VantageScore will not produce such responsive material absent an order by the Court. Plaintiffs understand that we are at impasse

pending resolution of VantageScore's Motion to Quash the Fair Isaac subpoena (Dkt. 268).

<u>Request No. 10</u>

Plaintiffs' Request No. 10 requests "All Documents concerning the past, present, or anticipated future competition among FICO Scores, VantageScores, or any other Competitor Credit Score Product, including but not limited to switching among such products, the functional or economic substitutability of such products, the relative features, costs, or benefits of such products, factors affecting purchase decisions, competitive intelligence, price competition, and the cross-price elasticity of demand (i.e., the responsiveness of demand to changes in price) among such products."

VantageScore represented during the meet-and-confer discussions that it may possess documents responsive to Request No. 10, an example of which is a "model assessment report" that VantageScore represented is publicly available. Plaintiffs inquired whether VantageScore possesses non-public drafts of such reports. Please confirm whether such information exists and whether VantageScore will produce non-public material responsive to Request No. 10.

<u>Request No. 11</u>

Plaintiffs' Request No. 11 requests "Documents sufficient to show Your past, current, and anticipated future B2B Credit Score market share or position, and the past, current, and anticipated future market share or position of any other entity distributing or selling B2B Credit Scores."

VantageScore represented during the meet-and-confer discussions that it may possess documents responsive to Request No. 11. VantageScore also represented that it publishes publicly-available reports and press releases, of which there may be drafts relied on in preparing them, that may contain information responsive to Request No. 11 and bases those reports on information provided to it by third-party consulting firms such as Oliver Wyman and Charles River who in turn receive such information from the Credit Bureaus. Plaintiffs understand that VantageScore is not willing to produce information it receives from such third parties, including data underlying such reports, responsive to Request No. 11 because such material might contain competitively-sensitive information and producing the material under an OAEO designation would be insufficient to protect its information as described above. Plaintiffs understand that we

are at impasse pending resolution of VantageScore's Motion to Quash the Fair Isaac subpoena (Dkt. 268).

<u>Request No. 12</u>

Plaintiffs' Request No. 12 requests "Documents sufficient to show past, current, and anticipated future demand for B2B Credit Scores, including but not limited to Documents describing the factors that affect the demand for B2B Credit Scores."

VantageScore's position is that it does not possess material responsive to Request No. 12 because it is not a seller of B2B Credit Scores. Please confirm that, aside from the below, VantageScore does not possess material responsive to Request No. 12. Plaintiffs understand that, similar to the discussion regarding Request No. 7, VantageScore periodically publishes publicly-available market study reports and base those reports on information provided to it by third-party consulting firms such as Oliver Wyman and Charles River who in turn receive such information from the Credit Bureaus. VantageScore is not willing to produce information it receives from such third party entities, including data underlying such reports, responsive to Request No. 12 because such material might contain competitively-sensitive information and VantageScore believes producing the material under an OAEO designation would be insufficient to protect its information as described above. Plaintiffs understand that we are at impasse pending resolution of VantageScore's Motion to Quash the Fair Isaac subpoena (Dkt. 268).

<u>Request No. 13</u>

Plaintiffs' Request No. 13 requests "Documents and data, data compilations, data sets, and other forms of structured data used, generated, collected, held, tracked, or accessed by You relating to fees, royalties, and other prices charged or collected by You or Credit Bureaus to purchasers of B2B Credit Scores, including but not limited to the Plaintiffs and members of the proposed classes."

VantageScore represented during meet-and-confer discussions that it does not possess material responsive to Request No. 13 because it is not a seller of B2B Credit Scores and does not have pricing information from the Credit Bureaus. Plaintiffs further understand that, similar to the discussion regarding Request No. 7, VantageScore periodically publishes publicly-available market study reports and base those reports on information provided to it by third-party consulting firms such as Oliver Wyman and

Charles River who in turn receive such information from the Credit Bureaus. Plaintiffs understand that VantageScore is not willing to produce information it receives from such third party entities, including data underlying such reports, responsive to Request No. 13 because such material might contain competitively-sensitive information and VantageScore believes that producing the material under an OAEO designation would be insufficient to protect its information, as described above. Plaintiffs understand that we are at impasse pending resolution of VantageScore's Motion to Quash the Fair Isaac subpoena (Dkt. 268).

Request Nos. 14-16

Plaintiffs' Request No. 14 requests "Data, data compilations, data sets, data tables, and other forms of structured data used, generated, collected, held, tracked, or accessed by You in the ordinary course of business of the sale, supply, or distribution (or restriction on the sale, supply, or distribution) of B2B Credit Scores), including but not limited to transaction-level electronically stored sales information and data. The relevant time period for this request is from January 1, 2013 until the present. Information requested includes, but is not limited to: (a) identifying product information; (b) any unique credit score request or transaction identifier; (c) date of transaction; (d) date invoice sent; (e) date payment was received; (f) customer identification information (e.g., name, address, and customer number) for the bill-to customer, requesting customer, and any other customer entity, including the downstream customer, named person, or entity on whose behalf the score was requested; (g) customer type; (h) total price and price per unit, including separately specifying any applicable discounts, rebates, chargebacks, or forgiven balances; (i) total price and price per unit charged by any intermediary to the transaction; (j) total quantity sold, specifying any applicable units that measure quantity; (k) type of underlying transaction or loan, contemplated or actual, relating to the sale of the FICO Score or VantageScore; (l) gross and net sales dollars, separately by revenue source; (m) cost of sales, separately by revenue source; (n) cost of goods sold, including sales and distribution cost and any fixed or variable costs, separately by type; (o) licensing fees, royalties (including any royalties paid to Fair Isaac for a given transaction), and/or profit shares paid and received; (p) gross profit; (q) net profit; (r) profit margin; (s) operating income; (t) net income; (u) unit volume sold; (v) unit volume sold net of returns; (w) operating income; (x) net income; and (y) if the transaction is subject to a contract: (i) effective date of contract; and, (ii) contract type and other information outlining the general terms of the contractual arrangement between the B2B customer and the Credit Bureau."

Plaintiffs' Request No. 15 requests "The relevant time period for this request is from January 1, 2013 until the present. All Documents relating to Your projected and actual B2B Credit Scores: (a) sales; (b) gross sales revenue; (c) net sales revenue; (d) cost of goods sold; (e) sales and distribution cost; (f) marketing, advertising, promotional, and sales expenses; (g) other fixed or variable costs; (h) research and development expenditures; (i) licensing fees, royalties, and/or profits shares paid to and/or received from Fair Isaac or any other entity; (j) pricing, rebates, discounts, and chargebacks; (k) gross profit; (l) net profit; (m) profit margin; (n) unit volume sold; (o) unit volume sold by state; (p) unit volume sold net of returns; (q) cost and price analyses; (r) cost and price analyses by state; and (s) all specific costs You include in a fixed cost."

Plaintiffs' Request No. 16 requests "Documents sufficient to show how the prices for B2B Credit Scores are or have been set during the Relevant Period, including any adjustments such as rebates or discounts or the price of other products."

VantageScore refuses to produce information it possesses that may be responsive to Request Nos. 14-16 because such material might contain competitively-sensitive information, as described above. Plaintiffs further understand that, similar to the discussion regarding Request No. 7, VantageScore periodically publishes publicly-available market study reports and base those reports on information provided to it by third parties such as Oliver Wyman and Charles River who in turn receive such information from the Credit Bureaus. Plaintiffs understand that VantageScore is not willing to produce information it receives from such third party entities, including data underlying such reports, responsive to Request Nos. 14-16 because such material might contain competitively-sensitive information and VantageScore believes that producing the material under an OAEO designation would be insufficient to protect its information, as described above. VantageScore's position is that it refuses to produce documents responsive to Request No. 14-16 absent an order by the Court. Plaintiffs understand that we are at impasse pending resolution of VantageScore's Motion to Quash the Fair Isaac subpoena (Dkt. 268).

Request Nos. 17-20

Plaintiffs' Request No. 17 requests "Documents sufficient to show the rights Credit Bureaus have to receive revenue or other benefits from VantageScore Solutions."

Next, Plaintiffs' Request No. 18 requests "Documents sufficient to show the rights Credit Bureaus have to receive data and documents from VantageScore Solutions."

Plaintiffs' Request No. 19 requests "Documents sufficient to show the rights Credit Bureaus have to control or influence the management of VantageScore Solutions."

Finally, Plaintiffs' Request No. 20 requests "Documents sufficient to show the contributions of money, goods, or services by the Credit Bureaus to VantageScore Solutions."

VantageScore represented during the meet-and-confer discussions that, similar to material responsive to Request No. 4, VantageScore possesses a number of agreements that may also be responsive to Request Nos. 17-20. VantageScore represented that some of such agreements may have been produced in other litigation under seal and were not made public. Plaintiffs asked whether anyone within VantageScore or under VantageScore's control (such as outside counsel) with access to such filings might be directed to obtain the sealed filings. Alternatively, Plaintiffs asked whether counsel for VantageScore would be willing to scan the hard-copy versions of those documents as they are maintained in the ordinary course and produce them. But VantageScore's position is that such agreements are business records that it views as so competitively sensitive that it will not produce them even under an OAEO designation. Plaintiffs understand that any such production VantageScore made under seal in other litigation would have also been made to Fair Isaac, party to those actions. Plaintiffs are therefore puzzled as to why VantageScore will not similarly produce such material here under an OAEO designation. Plaintiffs understand that we are at impasse pending resolution of VantageScore's Motion to Quash the Fair Isaac subpoena (Dkt. 268).

<u>Request No. 21</u>

Plaintiffs' Request No. 21 requests "Organizational charts, personnel directories, telephone directories, and e-mail user and address lists for You as a whole and for each division, subsidiary, or affiliate of Yours that had, has, or will have any involvement in the sale of B2B Credit Scores."

Plaintiffs understand VantageScore will produce its organizational chart responsive to this request, and Plaintiffs agreed to extend VantageScore's deadline to make such production to Thursday, March 21, 2024. Pursuant to compromises made during meet-and-confer discussions, Plaintiffs and VantageScore agreed to narrow Request No. 21 such that VantageScore does not need to produce personnel directories, telephone directories, and e-mail user and address lists.

<u>Request No. 22</u>

Plaintiffs' Request No. 22 requests "All non-privileged Documents relating to communications between You and Fair Isaac or the Credit Bureaus about this Action."

VantageScore represented during the meet-and-confer discussions that the only communication between VantageScore and Fair Isaac about this Action is communication that counsel for VantageScore has had with counsel for Fair Isaac regarding the subpoena that Fair Isaac served on VantageScore and VantageScore's subsequent motion to quash that subpoena. VantageScore has otherwise not had communications with Fair Isaac regarding this Action.

VantageScore also represented that it may possess communications between VantageScore and the Credit Bureaus, but that VantageScore would not produce such communications responsive to Request No. 22. Can you please specify VantageScore's grounds for not producing such responsive communications? VantageScore also represented that each of the Credit Bureaus has a representative on VantageScore's Board of Directors. Can you please provide the identity of such persons on VantageScore's Board of Directors?

Finally, Plaintiffs understand that counsel for VantageScore gave a presentation to VantageScore's Board of Directors, which included the Credit Bureau representatives, concerning this Action and this subpoena and VantageScore's position is that it will not be producing such communications on the basis that they are privileged attorney-client communication. To the extent VantageScore withholds documents on the basis of privilege, Plaintiffs request that VantageScore, pursuant to and consistent with the ESI Protocol (Dkt. 207), log all privileged responsive documents on a privilege log, setting forth the specific basis for the privilege assertion on a document-by-document basis.

<u>Request No. 23</u>

Plaintiffs' Request No. 23 requests "Documents sufficient to identify and describe Your document destruction, preservation, retention, and archiving policies and practices and any changes in such polices, including Documents sufficient to identify and describe Your management of ESI, including the preservation of text messages and instant messaging or chat communications, intranet sites, and enterprise applications used in the ordinary course of business."

VantageScore agreed to produce its document retention policies responsive to Request No. 23, and Plaintiffs agreed to extend VantageScore's deadline to make such production to Thursday, March 21, 2024.

<u>Request No. 24</u>

Plaintiffs' Request No. 24 requests "All Documents relating to the named Plaintiffs in this Action."

VantageScore represented during the meet-and-confer discussions that it does not possess documents responsive to Request No. 24. Can you please specify efforts undertaken by VantageScore to determine that it possesses no such responsive documents?

* * *

Plaintiffs look forward to hearing from you regarding confirmation of the points raised in this letter. And Plaintiffs will be available to continue meet-and-confer discussions to address the points raised herein.

Sincerely,

Labeat Rrahmani

# EXHIBIT

Rose-Smith, Sabrina M
Rrahmani, Labeat
RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC
Tuesday, June 11, 2024 12:43:50 PM

Just to follow up, my client is ok with stipulation and it can be filed.

---

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Monday, June 10, 2024 2:08 PM
**To:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Cc:** Weinstein, Lauren <lweinstein@mololamken.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>; FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

***EXTERNAL***
Hi Sabrina, following up on the below.  Please let me know if you've had a chance to review.

Best,

Labeat

Labeat Rrahmani
**Korein Tillery**
205 N Michigan Avenue, Suite 1950
Chicago, IL 60601
312-641-9750
https://www.koreintillery.com

------------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
------------------------------

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Friday, June 7, 2024 4:45 PM
**To:** 'Rose-Smith, Sabrina M' <SRoseSmith@goodwinlaw.com>
**Cc:** Weinstein, Lauren <lweinstein@mololamken.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>; FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

Sabrina,

Plaintiffs drafted the attached stipulation regarding transfer, briefing schedule, and page limits, which we'll plan to file with our motion to compel.  Please let me know if this needs any revisions from VantageScore's perspective.  Also, please note that the signature for counsel for VantageScore needs to be updated.

We'll plan to file this with our motion to compel on Tuesday, June 11.  Can you please send any revisions before then?  I'm happy to address any questions in the meantime.

With thanks,

Labeat

Labeat Rrahmani
**Korein Tillery**
    N   ichigan Avenue,   uite
   hicago, IL
   ‾‾‾-‾‾‾-‾‾‾‾
https    www.koreintillery.com

-----------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
-----------------------------

**From:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Sent:** Tuesday, June 4, 2024 1:50 PM
**To:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Cc:** Weinstein, Lauren <lweinstein@mololamken.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>; FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

July 1 is fine.

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Tuesday, June 4, 2024 2:43 PM
**To:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Cc:** Weinstein, Lauren <lweinstein@mololamken.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>; FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

***EXTERNAL***
Thanks, Sabrina.  Just to close the loop on this, should the schedule have VS filing its opposition on July 1 or 2?

Labeat Rrahmani
**Korein Tillery**
    N   ichigan Avenue,   uite
   hicago, IL
   ‾‾‾-‾‾‾-‾‾‾‾
https    www.koreintillery.com

-----------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
-----------------------------

**From:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Sent:** Tuesday, June 4, 2024 10:33 AM
**To:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Cc:** Weinstein, Lauren <lweinstein@mololamken.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>; FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

The schedule you propose will work for us, and yes, we will stipulate to transfer of the motion.

---

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Tuesday, June 4, 2024 1:25 PM
**To:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Cc:** Weinstein, Lauren <lweinstein@mololamken.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>;
FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

***EXTERNAL***
Thank you for following up. We are happy to work with your preferred filing date but have an internal conflict on our end with your proposal. How does the following schedule sound? Plaintiffs to file Tuesday, June 11; VantageScore to file opposition Monday, July 1; Plaintiffs to file reply Monday, July 15. Plaintiffs can also be amenable to VantageScore filing its opposition Tuesday, July 2 (with Plaintiffs still filing Monday, July 15) if that is preferable to VantageScore. Please let me know what works best.

Separately, we intend to file in the Northern District of California pursuant to Rule 45, however, given that Judge Chang is handling the motion to compel against VantageScore filed by FICO (as well as the rest of this litigation), we believe it would be prudent to stipulate to the transfer of this motion to the Northern District of Illinois. We presume you are amenable to that given the stipulation reached with FICO. But please let us know if we have misunderstood.

Given our understanding that this motion will be heard in the ND Illinois, we believe the 15-page limit for all motion papers should apply. We will otherwise conform to the formatting requirements for the ND Cal (e.g., line numbers). Please let us know if you have a different understanding.

If a meeting or call to discuss these points would be helpful, we're happy to set up a time.

Labeat Rrahmani
**Korein Tillery**
    N    ichigan Avenue,   uite
  hicago, IL
     -    -
https    www.koreintillery.com

---------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
---------------------------

**From:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Sent:** Tuesday, June 4, 2024 7:11 AM
**To:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Cc:** Weinstein, Lauren <lweinstein@mololamken.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>;
FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

Thanks for letting us know. We have some internal conflicts with the dates below. Can we agree that Vantage Score's opposition will be due July 1, and Plaintiffs' reply would be due July 18 (which would be the same 10 day extension you would be granting us if I am counting correctly and also not put plaintiffs at a disadvantage given the July 4 holiday)?

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Tuesday, May 28, 2024 10:44 PM
**To:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Cc:** Weinstein, Lauren <lweinstein@mololamken.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>;
FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

***EXTERNAL***
Hi Sabrina,

Thank you for your time last week. After considering your counter-proposal, Plaintiffs have decided to move to compel VantageScore's compliance with Plaintiffs' subpoena. As a courtesy, Plaintiffs intend to move to compel Friday, June 7, which would under the local rules make VantageScore's response due on Friday, June 21, and Plaintiffs' reply due on Friday, June 28. If those dates pose any issues for VantageScore, Plaintiffs are amenable to compromise on the briefing schedule.

Please let me know if I can answer any questions in the meantime.

With thanks,

Labeat


Labeat Rrahmani
**Korein Tillery**
    N    ichigan Avenue,   uite
hicago, IL
       -      -
https   www.koreintillery.com

-----------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
-----------------------------

**From:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Sent:** Monday, May 20, 2024 12:58 PM
**To:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Cc:** Weinstein, Lauren <lweinstein@mololamken.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC


Wednesday at 2 will work for me.

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Monday, May 20, 2024 1:56 PM
**To:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Cc:** Weinstein, Lauren <lweinstein@mololamken.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

***EXTERNAL***

No problem and thank you.  If you are available after 2pm ET on Wednesday, I can circulate a calendar invite (I unfortunately have a conflict at noon on another matter).

Labeat Rrahmani
**Korein Tillery**
    N  ichigan Avenue,  uite
  hicago, IL
   -   -
https   www.koreintillery.com

-----------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
-----------------------------

**From:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Sent:** Monday, May 20, 2024 12:07 PM
**To:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Cc:** Weinstein, Lauren <lweinstein@mololamken.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>
**Subject:** Re: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

Labeat,
I'm so sorry. I am headed to London today for work and got caught up in a swirl of things to get done before I go.  Can we talk Wednesday at noon?

**Sabrina Rose-Smith**
GOODWIN
1900 N Street, NW
Washington, DC 20036
t  +1 202 346 4185
f  +1 202 204 7292
SRoseSmith@goodwinlaw.com | goodwinlaw.com

> On May 20, 2024, at 12:15 PM, Rrahmani, Labeat <LRrahmani@koreintillery.com> wrote:
>
> ***EXTERNAL***
>
> Sabrina – I'm following up on whether you are still available to call today.  If not, can you please let me know some days/times that work this week?
>
> Labeat Rrahmani
> **Korein Tillery**
>     N  ichigan Avenue,  uite
>   hicago, IL
>    -   -
> https   www.koreintillery.com

-----------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
-----------------------------

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Friday, May 17, 2024 12:13 PM
**To:** 'Rose-Smith, Sabrina M' <SRoseSmith@goodwinlaw.com>
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

Hi, again, Sabrina – just want to check in so I can circulate a time to anyone on our end that will need to join the call.  Thanks, again.

Labeat

Labeat Rrahmani
**Korein Tillery**
    N     ichigan Avenue,   uite
  hicago, IL
    _-_
https   www.koreintillery.com

------------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
------------------------------

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Thursday, May 16, 2024 6:40 PM
**To:** 'Rose-Smith, Sabrina M' <SRoseSmith@goodwinlaw.com>
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

Sure thing, thanks, Sabrina.  Any particular time work best on your end?

Labeat Rrahmani
**Korein Tillery**
    N     ichigan Avenue,   uite
  hicago, IL
    _-_
https   www.koreintillery.com

------------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
------------------------------

**From:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Sent:** Thursday, May 16, 2024 6:36 PM
**To:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Subject:** Re: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

Labeat,
I have been traveling but could we discuss on Monday?

**Sabrina Rose-Smith**
GOODWIN
1900 N Street, NW

Washington, DC 20036
t  +1 202 346 4185
f  +1 202 204 7292
SRoseSmith@goodwinlaw.com | goodwinlaw.com

On May 10, 2024, at 8:29 PM, Rrahmani, Labeat
<LRrahmani@koreintillery.com> wrote:

***EXTERNAL***

Hi Sabrina, I'm just checking in on whether you have any developments on our April
26 discussion.  Happy to connect again next week if we can answer any of your
questions.

With thanks,

Labeat

Labeat Rrahmani
**Korein Tillery**
       N    ichigan Avenue,   uite
     hicago, IL
  ‑    ‑
https   www.koreintillery.com

-----------------------------

This message is from a law firm and may contain privileged or confidential information for the sole use of the
intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately
and delete it from your system. If you have received this email in error, you do not have permission to forward, print,
copy or distribute or use the information in this message.

-----------------------------

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Wednesday, April 24, 2024 12:23 PM
**To:** 'Rose-Smith, Sabrina M' <SRoseSmith@goodwinlaw.com>
**Cc:** Dindzans, Viktors M. <VDindzans@goodwinlaw.com>; Oselukwue, Ogechika
<OOselukwue@goodwinlaw.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>;
FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore
Solutions, LLC

Thanks, Sabrina – I'll circulate a calendar invite for Friday at 12:30pm ET.  Let me
know if I can address any questions in the meantime.

Labeat Rrahmani
**Korein Tillery**
       N    ichigan Avenue,   uite
     hicago, IL
  ‑    ‑
https   www.koreintillery.com

-----------------------------

This message is from a law firm and may contain privileged or confidential information for the sole use of the
intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately
and delete it from your system. If you have received this email in error, you do not have permission to forward, print,

copy or distribute or use the information in this message.
-----------------------------

**From:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Sent:** Wednesday, April 24, 2024 12:11 PM
**To:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Cc:** Dindzans, Viktors M. <VDindzans@goodwinlaw.com>; Oselukwue, Ogechika <OOselukwue@goodwinlaw.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>; FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

Friday I am available from 12:30-2.

---

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Wednesday, April 24, 2024 1:09 PM
**To:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Cc:** Dindzans, Viktors M. <VDindzans@goodwinlaw.com>; Oselukwue, Ogechika <OOselukwue@goodwinlaw.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>; FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

***EXTERNAL***
Hi Sabrina, following up on the below.  Do any of the times on Thursday or Friday work for you?  If not, can you please let me know if you have availability next week?  Thanks, again.

Labeat

Labeat Rrahmani
**Korein Tillery**
N    ichigan Avenue,   uite
hicago, IL
-    -
https    www.koreintillery.com

-----------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
-----------------------------

**From:** Rrahmani, Labeat
**Sent:** Tuesday, April 23, 2024 11:31 AM
**To:** 'Rose-Smith, Sabrina M' <SRoseSmith@goodwinlaw.com>
**Cc:** Dindzans, Viktors M. <VDindzans@goodwinlaw.com>; Oselukwue, Ogechika <OOselukwue@goodwinlaw.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>; FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

Thanks, Sabrina.  Can you please let me know if you have availability during the following times (all Eastern)?

Tomorrow, Wednesday, April 24 - 10-10:45am;
Thursday, April 25 - 12-1pm;
Friday, April 26 - 10am - 2:30pm

Labeat Rrahmani
**Korein Tillery**
    N   ichigan Avenue,   uite
   hicago, IL
    -   -
https   www.koreintillery.com

----------------------------

This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.

----------------------------

**From:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Sent:** Tuesday, April 23, 2024 11:06 AM
**To:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Cc:** Dindzans, Viktors M. <VDindzans@goodwinlaw.com>; Oselukwue, Ogechika <OOselukwue@goodwinlaw.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>; FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

Apologies all.  I have been in meetings all morning.  Can we try for after 3:30 today?  Or, if tomorrow, since there are more folks on your side, maybe send us some times that will work?

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Tuesday, April 23, 2024 9:39 AM
**To:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Cc:** Dindzans, Viktors M. <VDindzans@goodwinlaw.com>; Oselukwue, Ogechika <OOselukwue@goodwinlaw.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>; FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** Re: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

***EXTERNAL***
Hi Sabrina, just circling back on the below.  Will that time today work?

Labeat Rrahmani

Labeat Rrahmani
**Korein Tillery**
    N   ichigan Avenue,   uite
   hicago, IL
    -   -

[https www.koreintillery.com](https://www.koreintillery.com)

---------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
---------------------------

On Apr 19, 2024, at 3:14 PM, Rrahmani, Labeat <[LRrahmani@koreintillery.com](mailto:LRrahmani@koreintillery.com)> wrote:

Thanks, Sabrina.  Can we please have the Tuesday slot from 12-1pm ET?  Please let me know if your team will send a calendar invite or if I should circulate one instead.

Labeat Rrahmani


**Labeat Rrahmani**

O
n
A
p
r
1
9
,
2
0
2
4
,
a
t
8
:
0
5

A
M
,
R
o
s

e-Smith, Sabrina M <SRoseSmith@goodwinlaw.com> wrote:

Labeat,

Happy to have a call.  On Monday, I am available from 11:30-1, or 2:30-3:30.  On Tuesday, I am available from 12-1, 2-3, or 3:30-5:30.  All times Eastern.  If none of those times work, please send options for Wednesday, as I have really good availability Wednesday afternoon (Monday and Tuesday are busy for me, unfortunately).

-Sabrina

---

**From:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>
**Sent:** Thursday, April 18, 2024 8:15 PM
**To:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>; Dindzans, Viktors M. <VDindzans@goodwinlaw.com>
**Cc:** Oselukwue, Ogechika <OOselukwue@goodwinlaw.com>; Ewing Jr., Randall <REwing@KoreinTillery.com>; FICOplaintiffs@scott-scott.com; FICO@srkattorneys.com
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114, Subpoena to VantageScore Solutions, LLC

***EXTERNAL***
Hi Sabrina,

Does next week work for a meet and confer?  If so, please let me know some times that work best for your team.  Thanks much and looking forward to checking in.

Best,

Labeat

**Labeat Rrahmani**
**Korein Tillery**
N    ichigan Avenue,   uite
 hicago, IL
  -   -
https   www.koreintillery.com

----------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
----------------------------

---

**From:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Sent:** Wednesday, April 10, 2024 8:03 PM
**To:** Rrahmani, Labeat <LRrahmani@KoreinTillery.com>; Dindzans, Viktors M. <VDindzans@goodwinlaw.com>

**Cc:** Oselukwue, Ogechika
<[OOselukwue@goodwinlaw.com](mailto:OOselukwue@goodwinlaw.com)>; Ewing Jr., Randall
<[REwing@KoreinTillery.com](mailto:REwing@KoreinTillery.com)>; [FICOplaintiffs@scott-scott.com](mailto:FICOplaintiffs@scott-scott.com); [FICO@srkattorneys.com](mailto:FICO@srkattorneys.com)
**Subject:** RE: In re FICO Antitrust Litig., 1:20-cv-02114,
Subpoena to VantageScore Solutions, LLC

Labeat,
In response to your questions below:

1. For the reasons that are set forth in VantageScore's
   motion to quash reply to be filed today, we are not.
2. VantageScore has not produced documents to FICO
   or the Bureaus in this case. Are you asking about in
   prior litigation? If so, how would that be relevant to
   plaintiffs' claims in any way?
3. We do not intend to move to quash. We have timely
   provided you with our objections and made
   production of documents in response to requests to
   which we have not objected by the deadlines to
   which we agreed, and subject to any further meet
   and confer discussions, we consider our response to
   your subpoena complete.

Also, I have been made aware of your subpoenas to
Charles River and Oliver Wyman.  We are evaluating our
ability to object, and, given the data you want from them is
largely Credit Bureau data, I suspect you will hear from
them as well, although I do not speak for any of the
Bureaus, to be clear.

Thanks,
Sabrina

---

**From:** Rrahmani, Labeat <[LRrahmani@KoreinTillery.com](mailto:LRrahmani@KoreinTillery.com)>
**Sent:** Tuesday, April 9, 2024 10:31 AM
**To:** Dindzans, Viktors M. <[VDindzans@goodwinlaw.com](mailto:VDindzans@goodwinlaw.com)>
**Cc:** Rose-Smith, Sabrina M
<[SRoseSmith@goodwinlaw.com](mailto:SRoseSmith@goodwinlaw.com)>; Oselukwue, Ogechika
<[OOselukwue@goodwinlaw.com](mailto:OOselukwue@goodwinlaw.com)>; Ewing Jr., Randall
<[REwing@KoreinTillery.com](mailto:REwing@KoreinTillery.com)>; [FICOplaintiffs@scott-scott.com](mailto:FICOplaintiffs@scott-scott.com); [FICO@srkattorneys.com](mailto:FICO@srkattorneys.com)
**Subject:** Re: In re FICO Antitrust Litig., 1:20-cv-02114,
Subpoena to VantageScore Solutions, LLC

***EXTERNAL***
Thanks, Viktors.  I appreciate you getting back to me.

Labeat Rrahmani

Labeat Rrahmani
**Korein Tillery**
    N   ichigan Avenue,   uite
  hicago, IL
    -    -
https   www.koreintillery.com

---------------------------
This message is from a law firm and may contain privileged or confidential
information for the sole use of the intended recipient(s). If you believe that you
have received this email in error, please notify the sender immediately and
delete it from your system. If you have received this email in error, you do not
have permission to forward, print, copy or distribute or use the information in
this message.
---------------------------

On Apr 9, 2024, at 9:22 AM, Dindzans, Vikt

ors M. <[Vindzans@goodwinlaw.com](mailto:Vindzans@goodwinlaw.com)> wrote:

Hi Labeat,

Sabrina is currently out of the office, but we expect to respond to your email below by Wednesday.

Best,

Viktors

*he/him/his*

<image001.png>

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
o  +1 212 813 8993
f  +1 212 504 8136
VDindzans@goodwinlaw.com | goodwinlaw.com

---

**From:** Rrahmani, Labeat
<LRrahmani@KoreinTillery.com>
**Sent:** Thursday, April 4, 2024 11:47 PM
**To:** Rose-Smith, Sabrina M
<SRoseSmith@goodwinlaw.com>; Dindzans,
Viktors M. <VDindzans@goodwinlaw.com>;
Oselukwue, Ogechika
<OOselukwue@goodwinlaw.com>
**Cc:** Ewing Jr., Randall
<REwing@KoreinTillery.com>;
'FICOplaintiffs@scott-scott.com'
<FICOplaintiffs@scott-scott.com>;
'FICO@srkattorneys.com'
<FICO@srkattorneys.com>
**Subject:** In re FICO Antitrust Litig., 1:20-cv-
02114, Subpoena to VantageScore Solutions,
LLC

***EXTERNAL***
Hi Sabrina,

Thank you for the production your team
made on March 21, 2024.  I'm checking in
regarding next steps.  We have the following
questions and ask for responses by Tuesday,
April 9.  If you will need additional time,
please let me know.  Otherwise, Plaintiffs will
understand that we are at impasse regarding
the points raised in my March 20, 2024
letter.

1. Can you confirm that VantageScore is
   not willing to reconsider its position or
   propose a modification to the
   protective order that might allow it to
   produce responsive documents
   requested?

2. Is VantageScore willing to produce
   responsive documents it has already

produced elsewhere to Fair Isaac or the Credit Bureaus?  If not, will you waive objections to Fair Isaac or the Credit Bureaus producing such responsive materials to Plaintiffs?

On our end, Plaintiffs are still weighing whether we will be moving to compel and will confirm as soon as I have more details.  To that end, can you advise as to whether VantageScore intends to move to quash?  In the event either of us files a motion, we would like to negotiate a reasonable briefing schedule.

With thanks,

Labeat

**Labeat Rrahmani**
**Korein Tillery**
     N   ichigan Avenue,   uite
   hicago, IL
    -    -
https   www.koreintillery.com

---------------------------
This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
---------------------------

*************************************
*****************************
This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
*************************************
*****************************

# EXHIBIT 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAURA A. STOLL, (SBN 255023)
LStoll@goodwinlaw.com
**GOODWIN PROCTER** LLP
601 S Figueroa St 41st Floor
Los Angeles, CA 90017
Tel.: +1 213 426 2500

*Attorneys for Non-Party Petitioner*
*VantageScore Solutions, LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| VantageScore Solutions, LLC,<br><br>              Petitioner,<br><br>       v.<br><br>Fair Isaac Corporation,<br><br>              Respondent. | Misc. Case No. 3:24-mc-80033<br><br>[Related case: *In re FICO Antitrust Litigation*, Case No. 20-cv-02114 (N.D. Ill. 2020)]<br><br>**NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA** |

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

## <u>NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA</u>

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on _____, 2024 at _____ or as soon thereafter as the matter may be heard by _____ in courtroom _____ in the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, non-party VantageScore Solutions, LLC ("VantageScore"), through its counsel, Goodwin Procter LLP, shall and does hereby move the Court to quash the Subpoena to Produce Documents, Information, or Objects or To Permit Inspection of Premises in a Civil Action, dated December 21, 2023 (the "Subpoena"), served on VantageScore by Defendant Fair Isaac Corporation ("FICO" or "Defendant").

VantageScore seeks an order from the Court quashing the Subpoena because the Subpoena: (1) seeks highly confidential competitive information and trade secrets; and (2) it subjects VantageScore to undue burden. *See* Fed. R. Civ. P. 45(d)(3)(A).

This Motion to Quash Subpoena is made and based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities in Support of Motion to Quash, the Declaration of Laura A. Stoll (the "Stoll Decl."), and all pleadings and other papers on file in the underlying action in the Northern District of Illinois, any other matter of which the Court may take judicial notice, and any additional arguments, authorities, and evidence that may be presented to the Court at or before a hearing on this Motion to Quash.

Dated: February 14, 2024

By: */s/ Laura A. Stoll*
LStoll@goodwinlaw.com
**GOODWIN PROCTER LLP**
601 S Figueroa St 41st Floor
Los Angeles, CA 90017
Tel.: +1 213 426 2500

*Counsel for Non-Party Petitioner*
*VantageScore Solutions LLC*

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 2

LEGAL STANDARD .............................................................................................................. 3

ARGUMENT .......................................................................................................................... 5

I.   THIS COURT SHOULD QUASH THE REQUESTS SEEKING HIGHLY
     CONFIDENTIAL DOCUMENTS IN POSSESSION OF PARTIES TO THE LITIGATION 5

II.  THE COURT SHOULD QUASH THE REQUESTS SEEKING NON-PUBLIC DATA
     WHICH UNDERLIES VANTAGESCORE'S MARKET RESEARCH AND STUDIES ...... 6

III. THIS COURT SHOULD QUASH THE REQUESTS SEEKING INFORMATION
     CONCERNING VANTAGESCORE'S PRODUCT DEVELOPMENT .............................. 10

IV.  THIS COURT SHOULD QUASH THE REQUESTS SEEKING COMPETITIVELY
     SENSITIVE COMMUNICATIONS ................................................................................ 11

V.   THIS COURT SHOULD QUASH THE REQUESTS SEEKING VANTAGESCORE'S
     CONFIDENTIAL FINANCIAL INFORMATION ............................................................ 12

VI.  THIS COURT SHOULD QUASH THE REQUESTS SEEKING VANTAGESCORE'S
     NON-PUBLIC GOVERNMENTAL COMMUNICATIONS ................................................ 12

CONCLUSION ...................................................................................................................... 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

1

<u>**TABLE OF AUTHORITIES**</u>

2
**Page(s)**

3
**Cases**

4

*Ameritox, Ltd. v. Millennium Labs., Inc.*,
   2012 U.S. Dist. LEXIS 177809 (N.D. Ill. Dec. 14, 2012) ...................................................... 4

*Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*,
   300 F.R.D. 406 (C.D. Cal. 2014) ...................................................................................... 4

*Cusumano v. Microsoft Corp.*,
   162 F.3d 708 (1st Cir. 1998) ............................................................................................ 4

*Cytodyne Techs., Inc. v. Biogenic Techs., Inc.*,
   216 F.R.D. 533 (M.D. Fla. 2003) ................................................................................. 4, 10

*Duong v. Groundhog Enterprises, Inc.*,
   2020 WL 2041939 (C.D. Cal. Feb. 28, 2020) ............................................................. 4, 12

*Elec. Scripting Prod., Inc. v. HTC Am. Inc.*,
   2021 WL 3773607 (N.D. Cal. Aug. 25, 2021) ................................................................. 5

*FICO v. Experian Info. Solutions, Inc.*,
   645 F. Supp. 2d 734 (D. Minn. 2009) .............................................................................. 2

*FICO v. Experian Info. Solutions, Inc.*,
   650 F.3d 1139 (8th Cir. 2011) ..................................................................................... 2, 3

*Fort James Corp. v. Sweetheart Cup Co.*,
   1998 U.S. Dist. LEXIS 15908 (S.D.N.Y. Oct. 7, 1998) ................................................. 9

*Free Stream Media Corp. v. Alphonso Inc.*,
   2017 WL 11632962 (C.D. Cal. May 4, 2017) ................................................................. 5

*Gopher Media, LLC v. Spain*,
   2020 WL 6741675 (S.D. Cal. Nov. 17, 2020) ............................................................. 6, 8

*High Tech Med. Instr., Inc. v. New Image Ind., Inc.*,
   161 F.R.D. 86 (N.D. Cal. 1995) ....................................................................................... 5

*Int'l Action Ctr. v. U.S.*,
   207 F.R.D. 1 (D.D.C. 2002) ........................................................................................... 13

*Legal Voice v. Stormans Inc.*,
   738 F.3d 1178 (9th Cir. 2013) .................................................................................... 4, 12

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

iv

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

*Little v. JB Pritzker for Governor,*
  2020 U.S. Dist. LEXIS 70668 (N.D. Ill. Apr. 22, 2020) ...................................................... 4, 8

*Moon v. SCP Pool Corp.,*
  232 F.R.D. 633 (C.D. Cal. 2005) ...................................................................................... 9, 12

*Nat'l Claims Mgmt. Corp. v. Mercedes-Benz,*
  1998 U.S. Dist. LEXIS 492 (N.D. Ill. Jan. 15, 1998) ............................................................ 8

*Painters Joint Comm. V. Emp. Painters Trust Health & Welfare Fund,*
  2011 WL 4549232 (D. Nev. Sept. 29, 2011) ......................................................................... 8

*U.S. ex rel. Tyson v. Amerigroup Ill., Inc.,*
  2005 U.S. Dist. LEXIS 24929 (N.D. Ill. Oct. 21, 2005) ........................................................ 4

*Viskase v. World Pac,*
  2010 U.S. Dist. LEXIS 93991 (N.D. Ill. Sep. 9, 2010) .......................................................... 9

*Waymo LLC v. Uber Techs., Inc.,*
  2017 U.S. Dist. LEXIS 132721 (N.D. Cal. Aug. 18, 2017) .................................................... 5

*Williams v. Cty. of San Diego,*
  2019 WL 5963969 (S.D. Cal. Nov. 13, 2019) ........................................................................ 5

**Other Authorities**

Fed. R. Civ. P. Rule 45 ................................................................................................................ 3, 4

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO QUASH SUBPOENA

## PRELIMINARY STATEMENT

Through this Subpoena, FICO seeks to finish business it started in 2020, when it subpoenaed VantageScore as part of a lawsuit FICO filed against TransUnion in 2017, styled as *Fair Isaac Corporation v. TransUnion LLC*, No. 17-cv-08318 (N.D. Ill.). Specifically, as part of the *TransUnion* lawsuit, FICO sought nearly identical information to that which it seeks through the instant subpoena. Ultimately, the suit settled during the course of motion practice regarding the propriety of the subpoena, and as result FICO never obtained access to VantageScore's highly confidential, competitively sensitive information. Through its most recent Subpoena, FICO has renewed its effort to use litigation to its advantage, and capitalize on a perceived opportunity in this suit to wrest the very same highly sensitive information from its only major competitor.

The Subpoena seeks a massive amount of information that FICO could never obtain in the course of ordinary competition (and certainly would never produce to VantageScore, were the roles reversed). *See* Stoll Decl., Ex. 1. For example, FICO requests VantageScore's business contracts with the three credit bureaus, detailed financial information, including VantageScore's financial statements, budgets, operating costs, capital expenses, and R&D expenses for a period spanning more than 11 years, and internal emails from VantageScore executives regarding VantageScore's market position and internal comparison of itself to FICO. FICO's requests are so broad and seek such competitively sensitive information that VantageScore can only conclude the requests seek competitive advantage rather than relevant discovery. Although the parties met and conferred in good faith, even FICO's compromise positions ask too much of a non-party and require that VantageScore give FICO information about VantageScore that would give FICO an even greater competitive advantage than it already has. The Court should not require VantageScore to disclose the materials sought—even under the terms of a protective order—because FICO seeks highly confidential competitive and trade secret information, and production presents unreasonable risks to non-party VantageScore, including the risk of inadvertent disclosure to FICO executives and the

general public, which would be economically injurious to VantageScore. For these and the reasons set forth below, this Court should quash the Subpoena in its entirety.

## **BACKGROUND**

FICO has historically dominated the credit scoring model market. *See, e.g.*, *FICO v. Experian Info. Solutions, Inc.*, 645 F. Supp. 2d 734, 738 (D. Minn. 2009) (FICO "quickly became dominant in the credit scoring market"). VantageScore is an LLC with three members – TransUnion, Equifax, and Experian (collectively "the Credit Bureaus") – developed to offer consumers an alternative in the credit scoring market. In 2005, the Eighth Circuit explained that "[t]he credit bureaus began meeting to develop a joint venture for the purpose of creating a tri-bureau credit score algorithm that could compete with FICO and reduce the amount the credit bureaus paid as royalty for using FICO's algorithms." *FICO v. Experian Info. Solutions, Inc.*, 650 F.3d 1139, 1144 (8th Cir. 2011).

In March 2006, the first VantageScore credit scoring model was introduced. *Id.* "The VantageScore credit-score algorithm was created using data common to the three bureaus [and] is licensed to each bureau" for a flat fee. *Id.* Only the Credit Bureaus sell credit scores using VantageScore's models, generated with the Credit Bureaus' combined consumer data. Importantly, ***VantageScore does not sell credit scores to end users (consumers or businesses)***. VantageScore licenses its algorithm, however, and thus is a competitor of FICO, which also develops credit scoring models.

Unfortunately, FICO has a history of anti-competitive behavior in its interactions with VantageScore, and the current subpoena is only the latest in a series of unfortunate events of this nature. In October 2006, only months after VantageScore started operating, FICO brought its first suit in federal court against the Credit Bureaus and VantageScore, asserting antitrust, trademark, and false-advertising claims. *FICO*, 650 F.3d at 1144. One of the remedies FICO sought was the dissolution of VantageScore under antitrust law as an allegedly improper joint venture between competitors.[1] The district court, however, found VantageScore's formation was

---

[1] *FICO v. Experian Info. Solutions, Inc.*, Civ. No. 06-4112 ADM/JSM (D. Minn. Nov. 10, 2008) (ECF No. 436) (3d Am Compl. Prayer for Relief) (FICO asking that defendants "be ordered to dissolve" VantageScore).

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

pro-competitive:

> Fair Isaac's antitrust claims suffer from a fundamental, indeed fatal, flaw. The alleged conspiracy does not employ tactics that seek to destroy or cut off competition *before it even has a chance to take hold*; rather, the alleged conspiracy is dependent on convincing the market…that greater value can be realized by switching from FICO scores to VantageScore credit scores. This is the very essence of competition.

*FICO*, 645 F. Supp. 2d at 752. "The district court dismissed FICO's antitrust and false-advertising claims" and the jury ruled against FICO on its trademark claim, finding FICO's mark "invalid." *FICO*, 650 F.3d at 1144. The jury also ruled in defendants' favor on their counterclaim, finding "that FICO had procured the registration [of its trademark] through fraud on the PTO." *Id.*

Then, in November 2017, FICO commenced another action, and in FICO's Amended Complaint, it asserted a Lanham Act claim based on TransUnion's allegedly false statements about VantageScore. *Fair Isaac Corporation v. Trans Union LLC*, No. 17-cv-08318 (N.D. Ill.), Am. Compl. ¶¶ 155-58 (ECF No. 63). Two years after filing the initial complaint in the TransUnion action, FICO subpoenaed VantageScore with Requests nearly identical to those issued here. There, as it does here, FICO sought a broad swath of confidential market and financial data that had limited or no relevance to the claims at issue in the case, but that, if obtained by FICO, even by accident, would be devastating to VantageScore. *Fair Isaac Corporation V. Trans Union LLC*, 1:20cv3834, ECF No. 1-6. The TransUnion action was resolved without a ruling on FICO's motion to compel the subpoenaed information, and now, a handful of years later, FICO is at it again.

## LEGAL STANDARD

Under the Federal Rules, a party "serving a subpoena must take reasonable steps to avoid imposing undue burden or expense" on the recipient, and if it fails to do so a court "must quash or modify a subpoena" imposing any such "undue burden." Federal Rule of Civil Procedure 45(d)(1); (d)(3)(A)(iv).  To accomplish this goal, courts are empowered "[t]o protect a person subject to or affected by a subpoena, . . . [by], on motion, quash[ing] or modify[ing] the subpoena if it requires…disclosing a trade secret or other confidential research, development, or

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

commercial information." Fed. R. Civ. P. Rule 45(d)(3)(B)(i).

As a non-party, VantageScore is entitled to even greater protection than that afforded the parties. *See Duong v. Groundhog Enterprises, Inc.*, No. 219CV01333DMGMAA, 2020 WL 2041939, at *7 (C.D. Cal. Feb. 28, 2020) (imposing sanctions on party for "failing to take reasonable steps to avoid imposing a burden" in issuing non-party subpoena); *see also Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1185 (9th Cir. 2013) (explaining that where a party does not consider the burden on a nonparty and "narrowly tailor a subpoena" sanctions are appropriate on the grounds that the subpoena was issued "in bad faith, for an improper purpose, or in a manner inconsistent with existing law"); *see also Ameritox, Ltd. v. Millennium Labs., Inc.*, No. 12-cv-7493, 2012 U.S. Dist. LEXIS 177809, at *7 (N.D. Ill. Dec. 14, 2012). Indeed, courts routinely recognize that a party's ability to subpoena a non-party is not unlimited. *Id.*; *Little v. JB Pritzker for Governor*, No. 18 C 6954, 2020 U.S. Dist. LEXIS 70668, at *4 (N.D. Ill. Apr. 22, 2020) (in denying motion to compel, recognizing that the issuer must take reasonable steps to protect non-parties from undue burden or expense). It has been consistently held that "'[c]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs' in a Rule 45 inquiry." *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 300 F.R.D. 406, 409 (C.D. Cal. 2014) (quoting *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998)) (collecting cases); *see also U.S. ex rel. Tyson v. Amerigroup Ill., Inc.*, No. 02 C 6074, 2005 U.S. Dist. LEXIS 24929, at **14-15, 20 (N.D. Ill. Oct. 21, 2005) ("[I]t has been consistently held that 'non-party status' is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue.").[2]

Courts are also careful to protect the confidential and competitive business information of non-parties because "courts have acknowledged that disclosure of confidential information to a competitor is presumed to be harmful to the disclosing entity." *Cytodyne Techs., Inc. v. Biogenic Techs., Inc.*, 216 F.R.D. 533, 535 (M.D. Fla. 2003) (denying motion to compel and granting

---

[2] "In addition to the need of the requesting party for the information and the burden on the non-party in complying with the subpoena, other factors a court should consider include the relevance of the requested information and the breadth or specificity of the discovery request." *Amini Innovation Corp.*, 300 F.R.D. at 409–10.

4

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

1    motion to quash). Moreover, courts routinely recognize the harm which might befall non-parties

2    when required to disclose highly competitive sensitive trade secrets, and the insufficiency of

3    protective orders to fully mitigate that risk. *See, e.g.*, *Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-

4    00939-WHA (JSC), 2017 U.S. Dist. LEXIS 132721 at *9-10 (N.D. Cal. Aug. 18, 2017) (noting in

5    granting motion to quash that "[w]hile the information could be produced subject to an attorneys-

6    eyes-only protective order, such orders do not guarantee that the information will not be

7    disclosed.").  In light of the foregoing, VantageScore's motion to quash should be granted.

8    <div align="center">**ARGUMENT**</div>

9    **I.    THIS COURT SHOULD QUASH THE REQUESTS SEEKING HIGHLY
10         CONFIDENTIAL DOCUMENTS IN POSSESSION OF PARTIES TO THE
         LITIGATION**

11

12    This Court should quash Request No. 1 and Request No. 2, which seek highly confidential

13    documents which are irrelevant to the issues to be tried. Request No. 1 seeks "All LLC agreements

14    or operating agreements of VantageScore Solutions, LLC that have been in effect during the

15    Relevant Time Period." Request No. 2 seeks "The license agreements under which [VantageScore]

16    ha[s] licensed credit scoring analytics, software, or intellectual property to Credit Bureaus during

17    the Relevant Time Period."

18    Preliminarily, each of these requests calls for materials FICO should first seek from parties

19    to the litigation prior to burdening VantageScore, a stranger to this litigation. *Free Stream Media*

20    *Corp. v. Alphonso Inc.*, No. 817MC00011CJCKESX, 2017 WL 11632962, at *2 (C.D. Cal. May 4,

21    2017) (citing *High Tech Med. Instr., Inc. v. New Image Ind., Inc.*, 161 F.R.D. 86, 88 (N.D. Cal.

22    1995)); *Williams v. Cty. of San Diego*, No. 17CV00815MMAJLB, 2019 WL 5963969, at *3 (S.D.

23    Cal. Nov. 13, 2019) (granting motion to quash subpoena on a determination that the same evidence

24    could be obtained from a party to the litigation); *Elec. Scripting Prod., Inc. v. HTC Am. Inc.*, No.

25    17-CV-05806-RS (RMI), 2021 WL 3773607, at *4 (N.D. Cal. Aug. 25, 2021) (granting motion to

26    quash finding "no good reason at all to subject non-party Valve to endure the cost and burden of

27    providing ESPI with discovery that could have been sought from Defendant HTC"). Moreover, the

28

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

agreements requested are competitively sensitive. For example, the licensing agreements requested reflect competitively sensitive information regarding some of VantageScore's early research related to its intellectual property. Finally, the documents called for by Request Nos. 1-2 are not relevant to Plaintiff's allegations that FICO improperly colluded with the Credit Bureaus and do not have any direct bearing on whether VantageScore was a viable competitor to FICO. Accordingly, this Court should quash Request Nos. 1-2. *See Gopher Media, LLC v. Spain*, No. 319CV02280CABKSC, 2020 WL 6741675, at *2 (S.D. Cal. Nov. 17, 2020) (noting that "the discovery sought in the Subpoenas must, at a minimum, be relevant to the claims and defenses ***in the underlying case***," and quashing requests that "may illuminate the 'relationship' between the nonparty and the defendants," but had no bearing on the allegations against the defendants) (emphasis in original).

## II. THE COURT SHOULD QUASH THE REQUESTS SEEKING NON-PUBLIC DATA WHICH UNDERLIES VANTAGESCORE'S MARKET RESEARCH AND STUDIES

This Court should quash Request Nos. 3-8, which seek highly sensitive market research data—including all source data which underlies Market Study Reports published publicly by VantageScore—much of which exists only in hardcopy format or is not in VantageScore's possession.

Request Nos. 3-5 seek, "the number and type of VantageScore Credit Scores generated or *distributed by Credit Reporting Agencies,*" and "the number and identity of *End Users and Resellers* that use or distribute VantageScore," and "[a]ll documents respectively that analyze, reflect, calculate, or estimate the number or share, on a percentage basis or otherwise, of VantageScore Credit Scores *used by End Users of any kind* (including businesses and consumers) in the United States," respectively (emphasis added). Request Nos. 3-4 further require that the information provided be "broken out by category referenced in the VantageScore Market Study Reports (i.e. credit card issuers, personal and installment loan companies, auto lenders, mortgage lenders, credit unions, banks, tenant screening, telecommunications screening, utility screening,

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

consumer websites, government entities, other), and the type of use case (e.g., prescreen activities, pre-qualification activities, credit origination, account review, consumer disclosures, marketing, or other) during each year of the [11-year] Relevant Time Period."

Preliminarily, each of Requests 3-5 misconstrues VantageScore's role vis-à-vis the Credit Bureaus in the process of generating and distributing credit scores. Specifically, VantageScore does not distribute credit scores, but rather licenses its credit scoring models and algorithms necessary to generate credit scores to the Credit Bureaus, which in turn use those models in conjunction with their own data sets in order to generate credit scores for End Users and Resellers. Accordingly, VantageScore does not regularly generate any specific information called for by Requests 3-5 and the extent of any information reasonably available to it concerning these topics is already available to FICO in sufficient detail within VantageScore's publicly available Market Study Reports.

Similarly, Request Nos. 5-8 target the full gamut of material which might exist which relates to any market studies it has conducted, including the publicly published VantageScore Market Study Reports and Market Adoption Study. Request No. 5 requires production of "all Documents that analyze, reflect, calculate, or estimate the number or share, on a percentage basis or otherwise, of VantageScore Credit Scores used by End Users of any kind (including businesses and consumers) in the United States." Request No. 6 requires production of "all Documents and Communications related to any market studies of VantageScore Credit Scores or FICO Scores, including but not limited to studies relating to brand awareness, consumer understanding or sentiment, or use and adoption by End Users," including but not limited to the VantageScore Market Study Reports and Market Adoption Study. Finally, Request Nos. 7-8 request all of the information which "provides the basis of the statistics referenced in" the VantageScore Market Study Reports and Market Adoption Study, and "all long-form summaries that were prepared in connection with" the same.

Each of the Requests 6-8 should also be quashed. Request No. 6 seeks to compel VantageScore, its only major competitor, to turn over wholesale "all" documents and communications which relate in any way to "any market studies of VantageScore Credit Scores *or*

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

FICO Scores." Request Nos. 7-8 more specifically target all of the data underlying the VantageScore Market Study Reports, the majority of which it has intentionally never possessed.

As an initial matter, VantageScore cannot comply with Request No. 7, which demands "[a]ll data and information [VantageScore] received from TransUnion, Equifax and Experian, or otherwise provided to Oliver Wyman or Charles River, which provides the basis of the statistics referenced in the VantageScore Market Study Reports (including, specifically, the 2017, 2018, 2019, and 2022 VantageScore Market Study Reports and the 2023 Market Adoption Study)."

First, in addition to being overly broad and unduly burdensome in seeking "all" documents,[3] Request No. 7 primarily seeks the Credit Bureau's highly confidential and proprietary information concerning their respective sales and the identity of their respective customers of competing credit scores. As explained to FICO's counsel, for antitrust, proprietary, and competitive reasons, the Credit Bureau data underlying those Studies **is not and has never been in VantageScore's possession, custody, or control**. Rather, the Credit Bureaus provide the information solely to external third-parties—including at various times the law firm of Berens & Miller, Oliver Wyman, and Charles River Associates—under strict confidentiality terms under which none of the parties is permitted to share the underlying data with VantageScore or amongst the Credit Bureaus. VantageScore therefore by prior agreement does not have access to, or control over, the requested data and, of course, cannot produce information over which it does not have control. Moreover, even assuming that VantageScore could somehow unilaterally require Berens & Miller, Oliver Wyman, or Charles River Associates to disclose the data underlying the Market Study Reports, even then it would be highly improper for FICO's competitor to receive data that VantageScore itself is not, and has never been, permitted to see. *Nat'l Claims Mgmt. Corp. v. Mercedes-Benz*, No. 97 C 6293, 1998 U.S. Dist. LEXIS 492, at *3-4 (N.D. Ill. Jan. 15, 1998)

---

[3] *See Gopher Media*, 2020 WL 6741675, at *3 (S.D. Cal. Nov. 17, 2020) ("As a rule, requests for 'any and all' documents or communications (or testimony about those materials) are facially overbroad."); *see also Painters Joint Comm. V. Emp. Painters Trust Health & Welfare Fund,* No. 2:10-cv-01385-JCM-PAL, 2011 WL 4549232, at *2 (D. Nev. Sept. 29, 2011) (finding subpoena for "any and all documents" overbroad)*; Little*, 2020 U.S. Dist. LEXIS 70668, at *16 (denying motion to compel and granting motion to quash where requests sought "*all* communications, leases, and service agreements…. It is fundamental that discovery requests that 'encompass an unlimited range of information' as plaintiffs' subpoena does in this case are overly broad").

Goodwin Procter LLP
Attorneys at Law

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

1  (granting motion to quash subpoena issued to non-party competitor which requested confidential

2  information on how the non-party competitor created its product and its profitability and business

3  practices because providing the information to the competing party "could ultimately result in [non-

4  party's] destruction" and "[f]orcing [non-party] to divulge confidential business information to its

5  competitor could cause it to suffer undue harm through adverse economic consequences").

6         Moreover, even to the extent VantageScore does possess the documents demanded by

7  Request Nos. 6-8, FICO should not be permitted to help itself to the full panoply of market

8  conditions information generated and paid for by its only major competitor to buttress its defense.

9  *Act, Inc. v. Sylan Learning Ctr.*, Misc. No. 99-63, 1999 U.S. Dist. LEXIS 7055, at *8 (E.D. Pa.

10  May 14, 1999) (denying motion to compel non-party competitor to produce market assessment

11  information that "would cause it serious commercial harm and allow its direct competitors to free

12  ride on its own investment in assessing the…market"); *Fort James Corp. v. Sweetheart Cup Co.*,

13  Civil Action # 97-C-1221 M8-85, 1998 U.S. Dist. LEXIS 15908 at *5 (S.D.N.Y. Oct. 7, 1998)

14  (denying motion to compel where plaintiff sought to "romp through the files of basically unrelated,

15  competitive entities without making the necessary showing of relevance" and "view[ed] Fed. R.

16  Civ. P. 45 subpoenas as substitutes for the presentation of evidence by expert witnesses").

17  Moreover, these Requests are overbroad and unduly burdensome, as they seek documents and data

18  from January 1, 2013 to the present—more than 11 years. *See Moon v. SCP Pool Corp.*, 232 F.R.D.

19  633, 637–38 (C.D. Cal. 2005) (quashing subpoena requests where, *inter alia*, party sought

20  "information over a ten year or greater period" from nonparty); *see also Viskase v. World Pac*, No.

21  09 C 5022, 2010 U.S. Dist. LEXIS 93991 at *3 (N.D. Ill. Sep. 9, 2010) (quashing subpoena where

22  plaintiff failed to demonstrate good cause to overcome the substantial burden placed on nonparty

23  competitor). The burden involved in complying with such a request is further compounded by the

24  fact that the majority of its documents relating to these issues are archived exclusively in hardcopy

25  with an offsite vendor. It would therefore be exorbitantly expensive to recall, scan, review, and

26  produce the materials demanded by these Requests.

27         Finally, the data underlying VantageScore's market studies is highly confidential,

28

competitive business information that VantageScore would not publicly disclose. The same is true of the non-public "long-form summaries" of the Market Study Reports called for by Request No. 8. VantageScore should not be compelled to produce market study data to its competitor. *See Cytodyne Techs.*, 216 F.R.D. at 535 (denying motion to compel and granting motion to quash because "courts have acknowledged that disclosure of confidential information to a competitor is presumed to be harmful to the disclosing entity").

## III. THIS COURT SHOULD QUASH THE REQUESTS SEEKING INFORMATION CONCERNING VANTAGESCORE'S PRODUCT DEVELOPMENT

This Court should quash Request Nos. 9-11, which primarily seek highly confidential information concerning the planning, development, and testing of VantageScore's scoring models, including specifically its assessments of its product in comparison to FICO's. Request Nos. 9-11 call for "All Documents and Communications" concerning a wide variety of information concerning VantageScore's evaluation of its own product relative to FICO's. Request No. 9 seeks all information "related to competitive assessments or comparisons between FICO Scores and VantageScore Credit Scores," without limitation. Request Nos. 10-11 seek all information "related to any study, evaluation, assessment, or attempt (whether consummated or not)" to "align the odds-to-score relationship between any VantageScore Credit Score and FICO Score" and to "align the reason codes between any VantageScore Credit Score and FICO Score."

Not only are each of these Requests facially overbroad in calling for "all documents and communications," this Court should also quash these requests as improper attempts on the part of FICO to obtain extremely sensitive information concerning VantageScore's product development and internal assessments of, and comparisons to, FICO. VantageScore's proprietary information concerning its own internal product development is not necessary to FICO's defenses or proving that it did not partake in anticompetitive behavior, and which its disclosure to FICO would likely result in catastrophic harm to VantageScore's competitive position relative to FICO. Accordingly, Requests 9-11 should be quashed.

## IV. THIS COURT SHOULD QUASH THE REQUESTS SEEKING COMPETITIVELY SENSITIVE COMMUNICATIONS

This Court should quash Request Nos. 12-13, which seek VantageScore's confidential, competitively sensitive information. Request No. 12 seeks "[a]ll Documents and Communications related to the terms, conditions, or provisions in FICO's license agreements with the Credit Bureaus, including but not limited to the 'No Equivalent Products,' 'Dynamic Royalty Schedule,' 'Pre-Qualification,' and 'Level Playing Field' provisions referenced in the DPP and IPP Amended Complaints. *See* DPP Amended Complaint ¶¶ 111-139; IPP Amended Complaint ¶¶ 124-155." Request No. 13 seeks "[a]ll Documents and Communications—including but not limited to all Documents and Communications that were sent, authored, or received by Barrett Burns, Silvio Tavarez, Dr. Rikard Bandebo, Susan Fahy, Anthony Hutchinson, Dr. Andrada Pacheco, Jeff Richardson, Benjamin Tagoe, Emre Sahingur, or anyone who has held predecessor or successor roles to the foregoing individuals—related to [18 separate] statements, press releases, and publications attributed to [VantageScore]" from January 1, 2013 to the Present.

Each of these Requests seek competitively sensitive information which is not necessary to the adjudication of the issues in the case, as well as overly broad and unduly burdensome insofar as they seek "all documents and communications," and therefore should be quashed. Request No. 12 seeks information concerning the terms, conditions, or provisions "in FICO's license agreements with the Credit Bureaus." To the extent that such information exists, any of VantageScore's internal communications regarding the terms of its competitor's agreements with the Credit Bureau customers they compete for is both highly sensitive and irrelevant to the antitrust issues at hand.

Moreover, Request No. 13 seeks "all" documents and communications concerning 18 separate publicly-available statements made by VantageScore-affiliated individuals. FICO cannot meet its burden to show that the relevance of ancillary communications surrounding publicly-available statements outweighs the time, resources, and expense involved in locating, collecting, reviewing, and producing those materials, which date back more than 11 years. Accordingly Request Nos. 12 and 13 should be quashed.

11

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

## V. THIS COURT SHOULD QUASH THE REQUESTS SEEKING VANTAGESCORE'S CONFIDENTIAL FINANCIAL INFORMATION

This Court should quash Request Nos. 14-16, which each seek VantageScore's highly confidential financial information. Request Nos. 14-16 seek, for a more than 11-year period, all of VantageScore's "audited financial statements," VantageScore's "annual budgets for each year," and documents reflecting VantageScore's "operating costs, capital expenses, R&D expenses, and investments in or by" VantageScore.

Each of these Requests are facially overbroad and unduly burdensome, as they seek documents and data from January 1, 2013 to the present—more than 11 years. *See Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637–38 (C.D. Cal. 2005) (quashing subpoena requests where, *inter alia*, party sought "information over a ten year or greater period" from nonparty); *Duong v. Groundhog Enterprises, Inc.*, No. 219CV01333DMGMAA, 2020 WL 2041939, at *7 (C.D. Cal. Feb. 28, 2020) (imposing sanctions on party for "failing to take reasonable steps to avoid imposing a burden" in issuing non-party subpoena); *see also Legal Voice*, 738 F.3d at 1185 (explaining that where a party does not consider the burden on a nonparty and "narrowly tailor a subpoena" sanctions are appropriate on the grounds that the subpoena was issued "in bad faith, for an improper purpose, or in a manner inconsistent with existing law"). Moreover, any relevance that VantageScore's detailed, sensitive financial information might have in adjudicating the antitrust claims presented here is tertiary at best, and certainly does not outweigh the potential impact disclosure of such information to a primary competitor would have on VantageScore.

## VI. THIS COURT SHOULD QUASH THE REQUESTS SEEKING VANTAGESCORE'S NON-PUBLIC GOVERNMENTAL COMMUNICATIONS

This Court should quash Request Nos. 17-18, which seek VantageScore's non-public governmental communications. Request Nos. 17-18 seek "all documents" which VantageScore has "provided any state or federal agency or trade association that relate to the use, adoption, acceptance, or competitive standing of VantageScore Credit Scores," and "provided in response to any governmental request or demand related to competition or business practices regarding Credit

1 Scores or Credit Reports," respectively.

2        Not only do each of these requests seek information which has no bearing on the matters to

3 be adjudicated in this antitrust litigation, FICO's effort to obtain this information is particularly

4 troublesome, overreaching, and anticompetitive, and may be fairly viewed as another tactic by

5 FICO to squash legitimate competition. In the government market, FICO is more than just

6 dominant. FICO has an undisputed, longstanding, government-sanctioned monopoly because its

7 models are the only ones that the Federal Housing Finance Agency, has *ever* permitted for use.

8 VantageScore has sought to bring competition to this arena. The Court should not order

9 VantageScore to produce such competitively sensitive, privileged information to FICO, a

10 competitor that has consistently opposed the acceptance by the FHFA of any scoring models but

11 its own. Indeed, given the nature of FHFA's requests for information, VantageScore would, at the

12 very least, need FHFA's permission to share any such information.

13        For all of the above reasons, the Court should deny FICO access to VantageScore's

14 confidential government communications. *See, e.g.*, *Int'l Action Ctr. v. U.S.*, 207 F.R.D. 1, 3

15 (D.D.C. 2002) (granting motion for protective order prohibiting discovery of information "courts

16 have long recognized…is protected by the First Amendment…[including] past political activities").

17 <u>**CONCLUSION**</u>

18        For the foregoing reasons, this Court should quash the FICO Subpoena in full.

19

20

21

22

23

24

25

26

27

28

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

13

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

Dated: February 14, 2024

By: */s/ Laura A. Stoll*
LStoll@goodwinlaw.com
**GOODWIN PROCTER LLP**
601 S Figueroa St 41st Floor
Los Angeles, CA  90017
Tel.: +1 213 426 2500

*Counsel for Non-Party Petitioner*
*VantageScore Solutions LLC*

14

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

# CERTIFICATE OF SERVICE

I, Laura A. Stoll, an attorney, hereby certify that the foregoing document was served by electronic mail to the parties listed below on February 14, 2024.

Michael Allen Olsen
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
Email: courtnotification@mayerbrown.com

Britt Marie Miller
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
Email: bmiller@mayerbrown.com

J. Gregory Deis
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 701-8035
Email: gdeis@mayerbrown.com

Matthew David Provance
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 701-8598
Email: mprovance@mayerbrown.com

*/s/ Laura A. Stoll*
Laura A. Stoll

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

# EXHIBIT 10

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION | No. 1:20-CV-2114 |
| This document relates to: | Judge Edmond E. Chang |
| ALL ACTIONS | Magistrate Judge David E. Weisman |

## NOTICE OF ISSUANCE OF SUBPOENA

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE, pursuant to Federal Rule of Civil Procedure 45, that the Direct

Purchaser Plaintiffs and the Indirect Purchaser Plaintiffs will serve the attached Subpoena to

Produce Documents on Oliver Wyman, LLC.

Dated: April 9, 2024                    Respectfully submitted,

                                        Respectfully submitted,

Steven F. Molo                            /s/ *Carmen Medici*  
Lauren F. Dayton                        Carmen Medici (*pro hac vice*)
**MOLOLAMKEN LLP**                      Gary Foster (*pro hac vice*)
300 N. LaSalle Street, Suite 5350       **SCOTT+SCOTT**
Chicago, IL 60654                         **ATTORNEYS AT LAW LLP**
Telephone: 312-450-6700                 600 West Broadway, Suite 3300
smolo@mololamken.com                    San Diego, CA 92101
ldayton@mololamken.com                  Telephone: 619-798-5319
                                        cmedici@scott-scott.com
                                        gfoster@scott-scott.com
Lauren M. Weinstein
Robert Y. Chen                          Joseph P. Guglielmo
**MOLOLAMKEN LLP**                      Michelle E. Conston (*pro hac vice*)
600 New Hampshire Avenue, N.W.,         Anna Hunanyan (*pro hac vice*)
Suite 500                               **SCOTT+SCOTT**
Washington, DC 20037                      **ATTORNEYS AT LAW LLP**
Telephone: 202-556-2000                 The Helmsley Building
lweinstein@mololamken.com               230 Park Avenue, 17th Floor
rchen@mololamken.com

*Liaison Counsel for Direct Purchaser
Plaintiffs and the Proposed Direct
Purchaser Class*

Christopher M. Burke
Walter Noss
Yifan (Kate) Lv
**KOREIN TILLERY PC**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: 619-625-5620
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

George A. Zelcs
Randall P. Ewing, Jr.
Chad E. Bell
Labeat Rrahmani
**KOREIN TILLERY, LLC**
205 North Michigan Avenue,
  Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com
cbell@koreintillery.com
lrrahmani@koreintillery.com

Jennifer W. Sprengel
**CAFFERTY CLOBES MERIWETHER &
  SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

Barbara J. Hart (*pro hac vice*)
**GRANT & EISENHOFER**
485 Lexington Ave., 29th Floor
New York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

New York, NY 10169
Telephone: 212-223-6444
jguglielmo@scott-scott.com
mconston@scott-scott.com
ahunanyan@scott-scott.com

Patrick McGahan (*pro hac vice*)
**SCOTT+SCOTT
  ATTORNEYS AT LAW LLP**
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct
Purchaser Plaintiffs and the Proposed
Purchaser Class*

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
**SPERLING & SLATER, P.C.**
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Linda P. Nussbaum
Susan Schwaiger
**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas, 31st Floor
New York, NY 10036
Telephone: 917-438-9102
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Michael L. Roberts
Karen Sharp Halbert
**ROBERTS LAW FIRM, P.A.**
20 Rahling Circle
Little Rock, AR 72223

Brian M. Hogan
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Telephone: 312-214-7900
bhogan@dicellolevitt.com

Gregory S. Asciolla (*pro hac vice*)
Karin E. Garvey (*pro hac vice*)
John M. Shaw (*pro hac vice*)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY 10017
Telephone: 646-933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
jshaw@dicellolevitt.com

Gary F. Lynch
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
gary@lcllp.com

Katrina Carroll
**LYNCH CARPENTER LLP**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
katrina@lcllp.com

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1908
mlehmann@hausfeld.com
clebsock@hausfeld.com

Hilary K. Scherrer
Paul Gallagher
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650

Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Charles F. Barrett (*pro hac vice*)
**NEAL & HARWELL, PLC**
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: 615-244-1713
cbarrett@nealharwell.com

Don Barrett (*pro hac vice* forthcoming)
**BARRETT LAW GROUP, P.A.**
404 Court Square
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
dbarrett@barrettlawgroup.com

Richard R. Barrett (*pro hac vice* forthcoming)
**BARRETT LAW GROUP, P.A.**
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: 662-380-5018
rrb@rrblawfirm.net

Daniel E. Gustafson (*pro hac vice*)
Michelle J. Looby (*pro hac vice*)
Daniel J. Nordin (*pro hac vice*)
Anthony J. Stauber
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
dnordin@gustafsongluek.com
tstauber@gustafsongluek.com

Dennis Stewart (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
600 B Street, 17th Floor
San Diego, CA 92101
Telephone: 619-595-3200
dstewart@gustafsongluek.com

Washington, DC 20006
Telephone: 202-540-7200
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Scott A. Martin
Irving Scher
Jeanette Bayoumi
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: 646-357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

Kenneth A. Wexler
Melinda J. Morales
Michelle Perkovic
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

*Counsel for Direct Purchaser Plaintiffs*
*and the Proposed Direct Purchaser Class*

Charles R. Watkins (3122790)
**GUIN, STOKES & EVANS, LLC**
321 South Plymouth Court
Suite 1250
Chicago, IL 60604
Telephone: 312-878-8391
charlesw@gseattorneys.com

*Liaison Counsel for Indirect Purchaser*
*Plaintiffs and the Proposed Indirect*
*Purchaser Class*

Garrett D. Blanchfield (*pro hac vice*)
Brant D. Penney (*pro hac vice*)
Roberta A. Yard (*pro hac vice* forthcoming)
**REINHARDT WENDORF &**
**  BLANCHFIELD**
222 South 9th Street, Suite 1600
Minneapolis, MN 55402
Telephone: 651-287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

Jeffrey J. Corrigan (*pro hac vice*)
William G. Caldes (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
Icee N. Etheridge (*pro hac vice*)
**SPECTOR ROSEMAN &**
**  KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: 215-496-0300
JCorriganf@srkattorneys.com
BCaldes@srkattorneys.com
JSpector@srkattorneys.com
IEtheridge@srkattorneys.com

4

*Interim Co-Lead Counsel for Indirect
Purchaser Plaintiffs and the Proposed
Indirect Purchaser Class*

Brian P. Murray (*pro hac vice* forthcoming)
Lee Albert (*pro hac vice* forthcoming)
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: 212-682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com


Simon B. Paris, Esq.
 (*pro hac vice* forthcoming)
Patrick Howard, Esq.
 (*pro hac vice* forthcoming)
**SALTZ MONGELUZZI &
 BENDESKY, P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: 215-575-3985
sparis@smbb.com
phoward@smbb.com


Jonathan M. Jagher
 (*pro hac vice* forthcoming)
**FREED KANNER LONDON &
 MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-234-6487
jjagher@fklmlaw.com


Michael J. Boni (*pro hac vice* forthcoming)
Joshua D. Snyder (*pro hac vice* forthcoming)
John E. Sindoni (*pro hac vice* forthcoming)
**BONI, ZACK & SNYDER LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: 610-822-0200
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

Michael S. Smith (*pro hac vice*)
Gregory P. Hansel (*pro hac vice*)
Randall B. Weill (*pro hac vice*)
Elizabeth F. Quinby (*pro hac vice*)
**PRETI FLAHERTY, BELIVEAU &
 PACHIOS LLP**
One City Center,
P.O. Box 9546
Portland, ME 04101
Telephone: 207-791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com


David McLafferty (*pro hac vice* forthcoming)
**MCLAFFERTY LAW FIRM, P.C.
 ATTORNEYS AT LAW**
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-940-4000, ext. 12
www.McLaffertyLaw.com


Douglas A. Millen
**FREED KANNER LONDON &
 MILLEN LLC**
100 Tri-State International Drive, Suite 128
Lincolnshire, IL 60069
Telephone: 224-632-4500
dmillen@fklmlaw.com

*Counsel for Indirect Purchaser Plaintiffs and the Proposed Indirect Purchaser Class*

## CERTFICATE OF SERVICE

I, Carmen Medici, hereby certify that on April 9, 2024, I caused the foregoing Notice of Issuance of Subpoena to be served via email on counsel of record for Defendants Fair Isaac Corporation, Equifax, Inc., TransUnion, LLC, and Experian Information Solutions, Inc.

*/s/ Carmen Medici*
Carmen Medici

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Illinois

| IN RE FICO ANTITRUST LITIGATION | ) | |
|---|---|---|
| _Plaintiff_ | ) | Civil Action No. 1:20-CV-02114 |
| v. | ) | |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Oliver Wyman, LLC
c/o C T Corporation System
28 Liberty Street, New York, NY 10005

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

   Described in the attached Schedule A

| Place: U.S. District Court for the Southern District of New York<br>Daniel Patrick Moynihan U.S. Courthouse<br>500 Pearl Street<br>New York, NY 10007-1312 | Date and Time:<br><br>05/22/2024 9:00 am |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

   The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 04/10/2024

_CLERK OF COURT_

OR

_____          /s/ Carmen Medici
_Signature of Clerk or Deputy Clerk_          _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs , who issues or requests this subpoena, are:
Carmen Medici, Scott+Scott Attorneys at Law LLP, 600 W. Broadway, Suite 3300, San Diego, CA 92101, Tel.: 619-798-5319, cmedici@scott-scott.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   1:20-CV-02114

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00      .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Print    Save As...    Add Attachment    Reset

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
       **(i)** is a party or a party's officer; or
       **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
       **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
       **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3) *Quashing or Modifying a Subpoena.***
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
       **(i)** fails to allow a reasonable time to comply;
       **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
       **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
       **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
       **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

       **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
       **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
       **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2) *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
       **(i)** expressly make the claim; and
       **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

Pursuant to the foregoing subpoena *duces tecum*, You are required to produce, by the date stated on the subpoena, the documents requested herein.

## DEFINITIONS

The definitions, instructions, words, and phrases used in Schedule A shall have the meanings ascribed to them under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Northern District of Illinois. The definitions referenced herein apply without regard to capitalization. In addition, the following terms shall have the meanings set forth below whenever used in any Request.

1. The "Action" means *In re FICO Antitrust Litig.*, Case No. 1:20-cv-02114 (N.D. Ill.).

2. "All," "any," and "each" shall be construed as encompassing "any and all."

3. "Agreement" means any oral, written, or implied contract, arrangement, understanding, or plan, or term thereof, whether formal or informal, between two or more persons, together with all modifications or amendments.

4. "B2B Credit Score" means credit scores sold, licensed or marketed by Fair Isaac, Experian, Equifax, TransUnion, VantageScore Solutions or any other consumer reporting company, to any business for the assessment of credit risk. For the purposes of this definition only, "business" includes all entities other than individual consumers. "B2B Credit Score" includes both FICO Scores and VantageScores.

5. "B2B Credit Score Market" means the market for B2B Credit Scores.

6. "B2B Purchaser" means any purchaser of B2B Credit Scores.

7. "Credit Bureau" refers to Experian, Equifax, and/or TransUnion.

8. "Complaints" means the DPP Complaint and the IPP Complaint, collectively.

1

9. "Document" is defined to be synonymous with the broadest possible meaning of the term as used in Fed. R. Civ. P. 45 and includes, without limitation, electronically or physically stored information and communications, as well as any writings, diagrams, or recordings. A draft or non-identical copy is a separate document within the meaning of this term.

10. "DPP Complaint" means the Direct Purchaser Plaintiffs' First Amended Consolidated Class Action Complaint, ECF No. 184, filed in this Action.

11. "Electronically stored information" or "ESI" is defined to be synonymous with the broadest possible meaning of the term "electronically stored information," as used in Fed. R. Civ. P. 45.

12. "Equifax" means Equifax, Inc. and its predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, other persons acting or authorized to act on its behalf, or joint ventures.

13. "Experian" means Experian Information Solutions, Inc. and its predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, other persons acting or authorized to act on its behalf, or joint ventures.

14. "Fair Isaac" means Fair Isaac Corporation and its predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, or other persons acting or authorized to act on its behalf.

15. "FICO Score" means all versions of FICO Score that existed from January 1, 2013, until the present.

16.     "Including" means "including without limitation" and "including but not limited to" and should not be construed as limiting the request in any way.

17.     "IPP Complaint" means the Indirect Purchaser Plaintiffs' Second Amended Class Action Complaint, ECF No. 185, filed in this Action.

18.     "Litigations" means the "VantageScore Solutions Litigation" and/or the "TransUnion Litigation."

19.     "Relating to" means concerning, connecting to, referring to, describing, evidencing, constituting, or bearing any kind of relationship with.

20.     "TransUnion" means TransUnion, LLC and its predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, other persons acting or authorized to act on its behalf, or joint ventures.

21.     "TransUnion Litigation" refers to the lawsuit filed by Fair Isaac against TransUnion and the counterclaims filed by TransUnion against Fair Isaac, Case No. 1:17-cv-08318 (N.D. Ill.).

22.     "VantageScore" means the credit score product created and sold, licensed or marketed by VantageScore Solutions, including all past and present versions of the product (*e.g.*, VantageScore 3.0 and VantageScore 4.0).

23.     "VantageScore Solutions" means VantageScore Solutions, LLC and its predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, other persons acting or authorized to act on its behalf, or joint ventures.

24.     "VantageScore Solutions Litigation" refers to the lawsuit filed by Fair Isaac against Experian, Equifax, and TransUnion and relating to VantageScore Solutions, Case No. 06-cv-4112 (D. Minn.).

25.     "You" or "Yours," means Oliver Wyman, LLC and its predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, other persons acting or authorized to act on its behalf, or joint ventures.

## INSTRUCTIONS

1.     All responsive Documents are to be produced in accordance with the Stipulation and Order Establishing the Protocol for Production of Documents and Electronically Stored Information, ECF No. 207, entered in this Action and attached hereto as **Exhibit A**.

2.     All responsive Documents are to be produced in accordance with the Confidentiality Order, ECF No. 199, entered in this Action and attached hereto as **Exhibit B**. Please indicate whether any documents produced in response to this subpoena should be designated as Confidential or Highly Confidential pursuant to the Confidentiality Order.

3.     The singular form of any word includes the plural and vice versa.

4.     Plaintiffs seek production of the Documents set forth in the numbered requests below that are in Your possession, custody, and control — control being construed as including in the possession of Your directors, officers, employees, representatives, subsidiaries, investigators, attorneys, managing agents, accountants, or other agents, and any entity which You have the legal right or practical ability to obtain Documents without service of legal process.

5.     The terms defined above and in the individual requests for production and inspection are to be construed broadly to the fullest extent of their meaning in a good faith effort

4

to comply with the Federal Rules of Civil Procedure. If, in responding to any of the requests below, You encounter any ambiguity in construing either the Request or a definition or instruction relevant to it, You shall set forth the matter deemed ambiguous and the construction used in responding to the Request.

6.      If You contend that the information sought is not in Your control, indicate the company and individuals who have such control.

7.      If any document is withheld, in whole or in part, for any reason, including any claim of privilege of any kind, work-product protection, trade secret, or confidentiality, You shall provide with respect to each such Document all information required to be furnished by Fed. R. Civ. P. 45(e)(2) or by any other Court Order in this case.

8.      Unless otherwise specified, the relevant time period is January 1, 2013, until the present.

## DOCUMENTS REQUIRED TO BE PRODUCED

### A.    Competition

1.      All non-privileged Documents (including communications), including analysis, relating to competition or potential competition (i) among all suppliers of credit score products and (ii) between Fair Isaac and VantageScore Solutions in specific.

2.      All non-privileged Documents relating to any projections, reports, forecasts, evaluations (or financial, commercial, regulatory, or legal analyses) performed by You and/or by any other party (including the Credit Bureaus) relating to competition in the B2B Credit Score Market, including but not limited to, Documents and data given to You by or given by You to any of the Credit Bureaus or VantageScore Solutions.

**B.  The Relevant Market**

3.      Documents sufficient to show the past, current, and anticipated future B2B Credit Score market share or position of VantageScores Solutions and Fair Isaac, and the past, current, and anticipated future market share or position of any other entity distributing or selling B2B Credit Scores.

4.      Documents sufficient to show past, current, and anticipated future demand for B2B Credit Scores, including but not limited to Documents describing the factors that affect the demand for B2B Credit Scores.

**C.  Sales, Marketing, and Promotion**

5.      Documents and data, data compilations, data sets, and any other forms of structured data used, generated, collected, held, tracked, or accessed by You relating to fees, royalties, and other prices charged or collected by VantageScore Solutions, Fair Isaac or Credit Bureaus to purchasers of B2B Credit Scores, including but not limited to the Plaintiffs and members of the proposed classes.

6.      Data, data compilations, data sets, data tables, and any other forms of structured data used, generated, collected, held, tracked, or accessed by You relating to the sale, supply, or distribution (or restriction on the sale, supply, or distribution) of B2B Credit Scores by each of VantageScore Solutions, Fair Isaac and each Credit Bureau, including but not limited to transaction-level electronically stored sales information and data.  The relevant time period for this request is from January 1, 2013, until the present.  For each of VantageScore Solutions, Fair Isaac and each Credit Bureau, information requested includes, but is not limited to:

      a.      identifying product information;

      b.      any unique credit score request or transaction identifier;

      c.      date of transaction;

d.       date invoice sent;

e.       date payment was received;

f.       customer identification information (*e.g.*, name, address, and customer number) for the bill-to customer, requesting customer, and any other customer entity, including the downstream customer, named person, or entity on whose behalf the score was requested;

g.       customer type;

h.       indicators of penalty rates applied, if applicable;

i.       product type (*e.g.*, whether the product is a bundled product to lenders that combines the use of scores by lenders (in the B2B market) with the provision of scores to consumers (in the B2C market));

j.       total price and price per unit, including separately specifying any applicable discounts, rebates, chargebacks, or forgiven balances;

k.       total price and price per unit charged by any intermediary to the transaction;

l.       total quantity sold, specifying any applicable units that measure quantity;

m.       type of underlying transaction or loan, contemplated or actual, relating to the sale of the FICO Score or VantageScore;

n.       gross and net sales dollars, separately by revenue source;

o.       cost of sales, separately by revenue source;

p.       cost of goods sold, including sales and distribution cost and any fixed or variable costs, separately by type;

q.       licensing fees, royalties (including any royalties paid to Fair Isaac for a given transaction), and/or profit shares paid and received;

r.       gross profit;

s.       net profit;

t.       profit margin;

u.       operating income;

v.       net income;

w.       unit volume sold;

       x.     unit volume sold net of returns;

       y.     operating income;

       z.     net income; and

      aa.    if the transaction is subject to a contract:

           i.     effective date of contract; and,

           ii.    contract type and other information outlining the general terms of the contractual arrangement between the B2B customer and the Credit Bureau.

7.     The relevant time period for this request is from January 1, 2013, until the present.

All Documents relating to VantageScore Solutions's projected and actual B2B Credit Scores[1]:

       a.     sales;

       b.     gross sales revenue;

       c.     net sales revenue;

       d.     cost of goods sold;

       e.     sales and distribution cost;

       f.     marketing, advertising, promotional, and sales expenses;

       g.     other fixed or variable costs;

       h.     research and development expenditures;

       i.     licensing fees, royalties, and/or profits shares paid to and/or received from Fair Isaac or any other entity;

       j.     pricing, rebates, discounts, and chargebacks;

       k.     gross profit;

       l.     net profit;

       m.    profit margin;

---

[1] For the avoidance of doubt, Request No. 7 seeks all documents on the projected and actual values enumerated whereas Request No. 6 is specific to structured data.

8

              n.        unit volume sold;

              o.        unit volume sold by state;

              p.        unit volume sold net of returns;

              q.        cost and price analyses;

              r.        cost and price analyses by state; and

              s.        all specific costs included in a fixed cost.

8.     Documents sufficient to show how the prices for B2B Credit Scores (disaggregated by credit score type, *e.g.*, FICO Score and VantageScore) are or have been set during the relevant time period including any adjustments such as rebates or discounts or the price of other products.

# EXHIBIT 11

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION | No. 1:20-CV-2114 |
| This document relates to: | Judge Edmond E. Chang |
| ALL ACTIONS | Magistrate Judge David E. Weisman |

## <u>NOTICE OF ISSUANCE OF SUBPOENA</u>

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE, pursuant to Federal Rule of Civil Procedure 45, that the Direct

Purchaser Plaintiffs and the Indirect Purchaser Plaintiffs will serve the attached Subpoena to

Produce Documents on CRA International, Inc.

Dated: April 9, 2024

Respectfully submitted,

| | |
|---|---|
| Steven F. Molo | _/s/ *Carmen Medici*_ |
| Lauren F. Dayton | Carmen Medici (*pro hac vice*) |
| **MOLOLAMKEN LLP** | Gary Foster (*pro hac vice*) |
| 300 N. LaSalle Street, Suite 5350 | **SCOTT+SCOTT** |
| Chicago, IL 60654 | **  ATTORNEYS AT LAW LLP** |
| Telephone: 312-450-6700 | 600 West Broadway, Suite 3300 |
| smolo@mololamken.com | San Diego, CA 92101 |
| ldayton@mololamken.com | Telephone: 619-798-5319 |
| | cmedici@scott-scott.com |
| | gfoster@scott-scott.com |
| Lauren M. Weinstein | |
| Robert Y. Chen | Joseph P. Guglielmo |
| **MOLOLAMKEN LLP** | Michelle E. Conston (*pro hac vice*) |
| 600 New Hampshire Avenue, N.W., | Anna Hunanyan (*pro hac vice*) |
| Suite 500 | **SCOTT+SCOTT** |
| Washington, DC 20037 | **  ATTORNEYS AT LAW LLP** |
| Telephone: 202-556-2000 | The Helmsley Building |
| lweinstein@mololamken.com | 230 Park Avenue, 17th Floor |
| rchen@mololamken.com | |

*Liaison Counsel for Direct Purchaser
Plaintiffs and the Proposed Direct
Purchaser Class*

Christopher M. Burke
Walter Noss
Yifan (Kate) Lv
**KOREIN TILLERY PC**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: 619-625-5620
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

George A. Zelcs
Randall P. Ewing, Jr.
Chad E. Bell
Labeat Rrahmani
**KOREIN TILLERY, LLC**
205 North Michigan Avenue,
  Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com
cbell@koreintillery.com
lrrahmani@koreintillery.com

Jennifer W. Sprengel
**CAFFERTY CLOBES MERIWETHER &
  SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

Barbara J. Hart (*pro hac vice*)
**GRANT & EISENHOFER**
485 Lexington Ave., 29th Floor
New York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

New York, NY 10169
Telephone: 212-223-6444
jguglielmo@scott-scott.com
mconston@scott-scott.com
ahunanyan@scott-scott.com

Patrick McGahan (*pro hac vice*)
**SCOTT+SCOTT
  ATTORNEYS AT LAW LLP**
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct
Purchaser Plaintiffs and the Proposed
Purchaser Class*

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
**SPERLING & SLATER, P.C.**
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Linda P. Nussbaum
Susan Schwaiger
**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas, 31st Floor
New York, NY 10036
Telephone: 917-438-9102
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Michael L. Roberts
Karen Sharp Halbert
**ROBERTS LAW FIRM, P.A.**
20 Rahling Circle
Little Rock, AR 72223

2

Brian M. Hogan
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Telephone: 312-214-7900
bhogan@dicellolevitt.com

Gregory S. Asciolla (*pro hac vice*)
Karin E. Garvey (*pro hac vice*)
John M. Shaw (*pro hac vice*)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY 10017
Telephone: 646-933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
jshaw@dicellolevitt.com

Gary F. Lynch
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
gary@lcllp.com

Katrina Carroll
**LYNCH CARPENTER LLP**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
katrina@lcllp.com

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1908
mlehmann@hausfeld.com
clebsock@hausfeld.com

Hilary K. Scherrer
Paul Gallagher
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650

Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Charles F. Barrett (*pro hac vice*)
**NEAL & HARWELL, PLC**
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: 615-244-1713
cbarrett@nealharwell.com

Don Barrett (*pro hac vice* forthcoming)
**BARRETT LAW GROUP, P.A.**
404 Court Square
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
dbarrett@barrettlawgroup.com

Richard R. Barrett (*pro hac vice* forthcoming)
**BARRETT LAW GROUP, P.A.**
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: 662-380-5018
rrb@rrblawfirm.net

Daniel E. Gustafson (*pro hac vice*)
Michelle J. Looby (*pro hac vice*)
Daniel J. Nordin (*pro hac vice*)
Anthony J. Stauber
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
dnordin@gustafsongluek.com
tstauber@gustafsongluek.com

Dennis Stewart (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
600 B Street, 17th Floor
San Diego, CA 92101
Telephone: 619-595-3200
dstewart@gustafsongluek.com

Washington, DC 20006
Telephone: 202-540-7200
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Scott A. Martin
Irving Scher
Jeanette Bayoumi
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: 646-357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

Kenneth A. Wexler
Melinda J. Morales
Michelle Perkovic
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

*Counsel for Direct Purchaser Plaintiffs
and the Proposed Direct Purchaser Class*

Charles R. Watkins (3122790)
**GUIN, STOKES & EVANS, LLC**
321 South Plymouth Court
Suite 1250
Chicago, IL 60604
Telephone: 312-878-8391
charlesw@gseattorneys.com

*Liaison Counsel for Indirect Purchaser
Plaintiffs and the Proposed Indirect
Purchaser Class*

Garrett D. Blanchfield (*pro hac vice*)
Brant D. Penney (*pro hac vice*)
Roberta A. Yard (*pro hac vice* forthcoming)
**REINHARDT WENDORF &
 BLANCHFIELD**
222 South 9th Street, Suite 1600
Minneapolis, MN 55402
Telephone: 651-287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

Jeffrey J. Corrigan (*pro hac vice*)
William G. Caldes (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
Icee N. Etheridge (*pro hac vice*)
**SPECTOR ROSEMAN &
 KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: 215-496-0300
JCorriganf@srkattorneys.com
BCaldes@srkattorneys.com
JSpector@srkattorneys.com
IEtheridge@srkattorneys.com

*Interim Co-Lead Counsel for Indirect Purchaser Plaintiffs and the Proposed Indirect Purchaser Class*

Brian P. Murray (*pro hac vice* forthcoming)
Lee Albert (*pro hac vice* forthcoming)
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: 212-682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com

Simon B. Paris, Esq.
 (*pro hac vice* forthcoming)
Patrick Howard, Esq.
 (*pro hac vice* forthcoming)
**SALTZ MONGELUZZI &**
 **BENDESKY, P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: 215-575-3985
sparis@smbb.com
phoward@smbb.com

Jonathan M. Jagher
 (*pro hac vice* forthcoming)
**FREED KANNER LONDON &**
 **MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-234-6487
jjagher@fklmlaw.com

Michael J. Boni (*pro hac vice* forthcoming)
Joshua D. Snyder (*pro hac vice* forthcoming)
John E. Sindoni (*pro hac vice* forthcoming)
**BONI, ZACK & SNYDER LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: 610-822-0200
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

Michael S. Smith (*pro hac vice*)
Gregory P. Hansel (*pro hac vice*)
Randall B. Weill (*pro hac vice*)
Elizabeth F. Quinby (*pro hac vice*)
**PRETI FLAHERTY, BELIVEAU &**
 **PACHIOS LLP**
One City Center,
P.O. Box 9546
Portland, ME 04101
Telephone: 207-791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com

David McLafferty (*pro hac vice* forthcoming)
**MCLAFFERTY LAW FIRM, P.C.**
 **ATTORNEYS AT LAW**
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-940-4000, ext. 12
www.McLaffertyLaw.com

Douglas A. Millen
**FREED KANNER LONDON &**
 **MILLEN LLC**
100 Tri-State International Drive, Suite 128
Lincolnshire, IL 60069
Telephone: 224-632-4500
dmillen@fklmlaw.com

*Counsel for Indirect Purchaser Plaintiffs and the Proposed Indirect Purchaser Class*

## <u>CERTFICATE OF SERVICE</u>

I, Carmen Medici, hereby certify that on April 9, 2024, I caused the foregoing Notice of Issuance of Subpoena to be served via email on counsel of record for Defendants Fair Isaac Corporation, Equifax, Inc., TransUnion, LLC, and Experian Information Solutions, Inc.

*/s/ Carmen Medici*
Carmen Medici

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Illinois

| IN RE FICO ANTITRUST LITIGATION | ) | |
|---|---|---|
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No. 1:20-CV-02114 |
| | ) | |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: CRA International, Inc.
c/o Corporation Service Company
84 State Street, Suite 400, Boston MA 02109

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

Described in the attached Schedule A

| Place: U.S. District Court for the District of Massachusetts<br>1 Courthouse Way<br>Boston, Massachusetts 02210 | Date and Time:<br>05/22/2024 9:00 am |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 04/10/2024

| _CLERK OF COURT_ | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Carmen Medici |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs , who issues or requests this subpoena, are:
Carmen Medici, Scott+Scott Attorneys at Law LLP, 600 W. Broadway, Suite 3300, San Diego, CA 92101, Tel.: 619-798-5319, cmedici@scott-scott.com

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:20-CV-02114

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____.

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

| Print | Save As... | Add Attachment | | Reset |

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

Pursuant to the foregoing subpoena *duces tecum*, You are required to produce, by the date stated on the subpoena, the documents requested herein.

## DEFINITIONS

The definitions, instructions, words, and phrases used in Schedule A shall have the meanings ascribed to them under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Northern District of Illinois. The definitions referenced herein apply without regard to capitalization. In addition, the following terms shall have the meanings set forth below whenever used in any Request.

1.      The "Action" means *In re FICO Antitrust Litig.*, Case No. 1:20-cv-02114 (N.D. Ill.).

2.      "All," "any," and "each" shall be construed as encompassing "any and all."

3.      "Agreement" means any oral, written, or implied contract, arrangement, understanding, or plan, or term thereof, whether formal or informal, between two or more persons, together with all modifications or amendments.

4.      "B2B Credit Score" means credit scores sold, licensed or marketed by Fair Isaac, Experian, Equifax, TransUnion, VantageScore Solutions or any other consumer reporting company, to any business for the assessment of credit risk. For the purposes of this definition only, "business" includes all entities other than individual consumers. "B2B Credit Score" includes both FICO Scores and VantageScores.

5.      "B2B Credit Score Market" means the market for B2B Credit Scores.

6.      "B2B Purchaser" means any purchaser of B2B Credit Scores.

7.      "Credit Bureau" refers to Experian, Equifax, and/or TransUnion.

8.      "Complaints" means the DPP Complaint and the IPP Complaint, collectively.

9. "Document" is defined to be synonymous with the broadest possible meaning of the term as used in Fed. R. Civ. P. 45 and includes, without limitation, electronically or physically stored information and communications, as well as any writings, diagrams, or recordings. A draft or non-identical copy is a separate document within the meaning of this term.

10. "DPP Complaint" means the Direct Purchaser Plaintiffs' First Amended Consolidated Class Action Complaint, ECF No. 184, filed in this Action.

11. "Electronically stored information" or "ESI" is defined to be synonymous with the broadest possible meaning of the term "electronically stored information," as used in Fed. R. Civ. P. 45.

12. "Equifax" means Equifax, Inc. and its predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, other persons acting or authorized to act on its behalf, or joint ventures.

13. "Experian" means Experian Information Solutions, Inc. and its predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, other persons acting or authorized to act on its behalf, or joint ventures.

14. "Fair Isaac" means Fair Isaac Corporation and its predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, or other persons acting or authorized to act on its behalf.

15. "FICO Score" means all versions of FICO Score that existed from January 1, 2013, until the present.

16.     "Including" means "including without limitation" and "including but not limited to" and should not be construed as limiting the request in any way.

17.     "IPP Complaint" means the Indirect Purchaser Plaintiffs' Second Amended Class Action Complaint, ECF No. 185, filed in this Action.

18.     "Litigations" means the "VantageScore Solutions Litigation" and/or the "TransUnion Litigation."

19.     "Relating to" means concerning, connecting to, referring to, describing, evidencing, constituting, or bearing any kind of relationship with.

20.     "TransUnion" means TransUnion, LLC and its predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, other persons acting or authorized to act on its behalf, or joint ventures.

21.     "TransUnion Litigation" refers to the lawsuit filed by Fair Isaac against TransUnion and the counterclaims filed by TransUnion against Fair Isaac, Case No. 1:17-cv-08318 (N.D. Ill.).

22.     "VantageScore" means the credit score product created and sold, licensed or marketed by VantageScore Solutions, including all past and present versions of the product (*e.g.*, VantageScore 3.0 and VantageScore 4.0).

23.     "VantageScore Solutions" means VantageScore Solutions, LLC and its predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, other persons acting or authorized to act on its behalf, or joint ventures.

24.     "VantageScore Solutions Litigation" refers to the lawsuit filed by Fair Isaac against Experian, Equifax, and TransUnion and relating to VantageScore Solutions, Case No. 06-cv-4112 (D. Minn.).

25.     "You" or "Yours," means CRA International, Inc. and its predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, other persons acting or authorized to act on its behalf, or joint ventures.

## **INSTRUCTIONS**

1.     All responsive Documents are to be produced in accordance with the Stipulation and Order Establishing the Protocol for Production of Documents and Electronically Stored Information, ECF No. 207, entered in this Action and attached hereto as **Exhibit A**.

2.     All responsive Documents are to be produced in accordance with the Confidentiality Order, ECF No. 199, entered in this Action and attached hereto as **Exhibit B**. Please indicate whether any documents produced in response to this subpoena should be designated as Confidential or Highly Confidential pursuant to the Confidentiality Order.

3.     The singular form of any word includes the plural and vice versa.

4.     Plaintiffs seek production of the Documents set forth in the numbered requests below that are in Your possession, custody, and control — control being construed as including in the possession of Your directors, officers, employees, representatives, subsidiaries, investigators, attorneys, managing agents, accountants, or other agents, and any entity which You have the legal right or practical ability to obtain Documents without service of legal process.

5.     The terms defined above and in the individual requests for production and inspection are to be construed broadly to the fullest extent of their meaning in a good faith effort

to comply with the Federal Rules of Civil Procedure.  If, in responding to any of the requests below, You encounter any ambiguity in construing either the Request or a definition or instruction relevant to it, You shall set forth the matter deemed ambiguous and the construction used in responding to the Request.

6.      If You contend that the information sought is not in Your control, indicate the company and individuals who have such control.

7.      If any document is withheld, in whole or in part, for any reason, including any claim of privilege of any kind, work-product protection, trade secret, or confidentiality, You shall provide with respect to each such Document all information required to be furnished by Fed. R. Civ. P. 45(e)(2) or by any other Court Order in this case.

8.      Unless otherwise specified, the relevant time period is January 1, 2013, until the present.

## DOCUMENTS REQUIRED TO BE PRODUCED

### A.      Competition

1.      All non-privileged Documents (including communications), including analysis, relating to competition or potential competition (i) among all suppliers of credit score products and (ii) between Fair Isaac and VantageScore Solutions in specific.

2.      All non-privileged Documents relating to any projections, reports, forecasts, evaluations (or financial, commercial, regulatory, or legal analyses) performed by You and/or by any other party (including the Credit Bureaus) relating to competition in the B2B Credit Score Market, including but not limited to, Documents and data given to You by or given by You to any of the Credit Bureaus or VantageScore Solutions.

### B. The Relevant Market

3. Documents sufficient to show the past, current, and anticipated future B2B Credit Score market share or position of VantageScores Solutions and Fair Isaac, and the past, current, and anticipated future market share or position of any other entity distributing or selling B2B Credit Scores.

4. Documents sufficient to show past, current, and anticipated future demand for B2B Credit Scores, including but not limited to Documents describing the factors that affect the demand for B2B Credit Scores.

### C. Sales, Marketing, and Promotion

5. Documents and data, data compilations, data sets, and any other forms of structured data used, generated, collected, held, tracked, or accessed by You relating to fees, royalties, and other prices charged or collected by VantageScore Solutions, Fair Isaac or Credit Bureaus to purchasers of B2B Credit Scores, including but not limited to the Plaintiffs and members of the proposed classes.

6. Data, data compilations, data sets, data tables, and any other forms of structured data used, generated, collected, held, tracked, or accessed by You relating to the sale, supply, or distribution (or restriction on the sale, supply, or distribution) of B2B Credit Scores by each of VantageScore Solutions, Fair Isaac and each Credit Bureau, including but not limited to transaction-level electronically stored sales information and data. The relevant time period for this request is from January 1, 2013, until the present. For each of VantageScore Solutions, Fair Isaac and each Credit Bureau, information requested includes, but is not limited to:

      a.      identifying product information;

      b.      any unique credit score request or transaction identifier;

      c.      date of transaction;

d.     date invoice sent;

e.     date payment was received;

f.     customer identification information (*e.g.*, name, address, and customer number) for the bill-to customer, requesting customer, and any other customer entity, including the downstream customer, named person, or entity on whose behalf the score was requested;

g.     customer type;

h.     indicators of penalty rates applied, if applicable;

i.     product type (*e.g.*, whether the product is a bundled product to lenders that combines the use of scores by lenders (in the B2B market) with the provision of scores to consumers (in the B2C market));

j.     total price and price per unit, including separately specifying any applicable discounts, rebates, chargebacks, or forgiven balances;

k.     total price and price per unit charged by any intermediary to the transaction;

l.     total quantity sold, specifying any applicable units that measure quantity;

m.     type of underlying transaction or loan, contemplated or actual, relating to the sale of the FICO Score or VantageScore;

n.     gross and net sales dollars, separately by revenue source;

o.     cost of sales, separately by revenue source;

p.     cost of goods sold, including sales and distribution cost and any fixed or variable costs, separately by type;

q.     licensing fees, royalties (including any royalties paid to Fair Isaac for a given transaction), and/or profit shares paid and received;

r.     gross profit;

s.     net profit;

t.     profit margin;

u.     operating income;

v.     net income;

w.     unit volume sold;

      x.      unit volume sold net of returns;

      y.      operating income;

      z.      net income; and

      aa.    if the transaction is subject to a contract:

          i.      effective date of contract; and,

          ii.     contract type and other information outlining the general terms of the contractual arrangement between the B2B customer and the Credit Bureau.

7.      The relevant time period for this request is from January 1, 2013, until the present.

All Documents relating to VantageScore Solutions's projected and actual B2B Credit Scores[1]:

      a.      sales;

      b.      gross sales revenue;

      c.      net sales revenue;

      d.      cost of goods sold;

      e.      sales and distribution cost;

      f.      marketing, advertising, promotional, and sales expenses;

      g.      other fixed or variable costs;

      h.      research and development expenditures;

      i.      licensing fees, royalties, and/or profits shares paid to and/or received from Fair Isaac or any other entity;

      j.      pricing, rebates, discounts, and chargebacks;

      k.      gross profit;

      l.      net profit;

      m.    profit margin;

---

[1] For the avoidance of doubt, Request No. 7 seeks all documents on the projected and actual values enumerated whereas Request No. 6 is specific to structured data.

n.    unit volume sold;

o.    unit volume sold by state;

p.    unit volume sold net of returns;

q.    cost and price analyses;

r.    cost and price analyses by state; and

s.    all specific costs included in a fixed cost.

8.    Documents sufficient to show how the prices for B2B Credit Scores (disaggregated by credit score type, *e.g.*, FICO Score and VantageScore) are or have been set during the relevant time period including any adjustments such as rebates or discounts or the price of other products.

# EXHIBIT 12



Case 1:24-mc-80144-LJC Document 1-2 Filed 06/14/24 Page 2 of 4



Rosalind Chandler
Senior Legal Assistant

Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, NY 10036
+1 212 345 8671
Fax +1 212 948 8759
rosalind.chandler@mmc.com
www.mmc.com

April 24, 2024

**VIA EMAIL ONLY (cmedici@scott-scott.com)**

Carmen Medici, Esq.
Scott + Scott Attorney at Law LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101

Subject: *In re: FICO Antitrust Litigation*
United States District Court, Northern District of Illinois, Civil Action No. 1:20-CV-02114

Dear Mr. Medici:

I write concerning the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action directed to Oliver Wyman, LLC ("OW"), dated April 10, 2024 and served on CT Corporation System, as registered agent for service of process, on this same date (the "Subpoena"), in the above-referenced action.

Pursuant to Federal Rule of Civil Procedure 45, OW, a non-party, objects to the Subpoena on all relevant grounds including, without limitation, as follows:

1. To the extent that it seeks documents that are already within the possession of, or more readily accessible and available to, parties to the action or other non-parties in a less burdensome or less expensive manner. Furthermore, party discovery should precede efforts to require production of documents from OW unless and until efforts to obtain the documents from the parties have been exhausted. To the same end, OW objects to the extent that the requests directed to, and the burden foisted upon it, is not proportional to the needs of the case given the other information available to the parties in the litigation. Moreover, such production is unnecessary, potentially cumulative and/or duplicative, and imposes undue burden.

2. The Subpoena is overbroad, vague and ambiguous, and unduly burdensome with respect to subject matter. First, the time period of January 1, 2013 to the present is unduly burdensome. Additionally, the Requests exceed the scope and nature of the allegations in the Complaint in this litigation. Further, the Requests are not proportional to the needs of the case and not narrowly tailored to reduce the burden on a non-party.

3. To the extent that the Subpoena, including its Definitions and Instructions, purports to impose obligations beyond those embodied in the applicable rules of civil procedure and/or in any prior rulings or orders entered by the Court. For example, the Subpoena calls for the

Page 2
April 24, 2024
Carmen Medici, Esq.
Scott + Scott Attorney at Law LLP

production of documents in accordance with the Stipulation and Order Establishing the Protocol of Documents and electronically stored information ("ESI"), ECF No. 207, but does not provide a copy of this document, as referenced in the Subpoena as Exhibit A. It also does not provide a copy of the Confidentiality Order, ECF No. 207, as referenced in the Subpoena as Exhibit B. Moreover, to the extent that the Subpoena calls for ESI, it requests that documents are to be produced at the U.S. District Court for the Southern District of New York, which makes it impossible to produce ESI other than via external storage devices, which bears upon the burden on a non-party. Please provide a copy of Exhibits A and B for OW to review so that it can comply, as appropriate, with the Subpoena.

4. The Subpoena, to the extent there are responsive documents after considering the objections above, seeks a response on May 22, 2024 and provides inadequate time for review or response thereto. The sheer passage of time, the loss of personnel over time and the number of systems and database changes in the proposed date range for production, likely present significant barriers to such a collection even if the breadth of the request were appropriate, which it is not.

5. OW objects to the defined terms "Equifax," "Experian," "Fair Isaac," "TransUnion," and "VantageScore Solutions" as overbroad, unduly burdensome, oppressive, vague and/or unclear. As defined, it is not possible to know all of the persons and entities that counsel purports to include within the definition. As used in OW's response to the Subpoena, the defined terms will be construed as referring only to the specifically named entity and any representative of that entity that can be readily identified.

6. OW objects to the terms "You" and "Yours" in ways that are overly broad, unduly burdensome and to the extent that they include entities outside of OW's control.

7. To the extent that it seeks confidential, proprietary business or financial information of OW, its clients and/or third parties, including documents constituting trade secrets or other confidential research, development, or commercial trade information.

8. To the extent that it purports to call for production of documents and information protected by the attorney-client privilege, the attorney work product doctrine, the self-critical analysis privilege, or other applicable privileges and/or immunities. In the event that any privileged or immune information is ultimately produced or otherwise disclosed, such disclosure is inadvertent and does not constitute a waiver of any privilege or immunity.

9. To the extent that Subpoena seeks documents outside the possession, custody, and control of OW.

10. Further to Objection 4, the Subpoena is overbroad, unduly burdensome, and oppressive to the extent that it purports to require OW to search for, restore and produce documents and ESI in a form and manner that would impose unreasonable costs under Federal Rule of Civil Procedure 45(e)(1). And the Subpoena is overbroad, unduly burdensome, oppressive, and costly to the extent that it requires OW to search for, restore, preserve, and produce ESI that is inaccessible under Federal Rule of Civil Procedure 45(e)(1)(D). Assuming we can reach an agreement on an appropriate scope of production, OW intends to comply with the Subpoena by producing documents that we deem to be reasonable under the circumstances, including TIFF or PDF files. OW objects to searching for any data or ESI

Page 3
April 24, 2024
Carmen Medici, Esq.
Scott + Scott Attorney at Law LLP

that is not reasonably accessible. We would expect that any expenses associated with our production (*e.g.*, Bates-stamping, imaging, etc.), would be borne by Plaintiff.

Subject to and without waiving any of the foregoing objections, and without waiving the right to amend these objections and add additional objections or additional defenses to the Subpoena and specific requests therein and as it learns more information through the meet and confer process regarding the Subpoena, OW requests a meet and confer to discuss the nature and scope of the Subpoena, and an extension of time for production of any documents.

Please contact us at rosalind.chandler@mmc.com and Jessica Fischweicher, Assistant General Counsel, Marsh & McLennan Companies, Inc. at jessica.fischweicher@mmc.com, with your availability for a call.

Sincerely,

*Rosalind Chandler*

Rosalind Chandler

Copy: Jessica Fischweicher

# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOUS**

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | Case No. 1:20-CV-02114 |
| *This document relates to:* | Hon. Edmond E. Chang Magistrate Judge David E. Weisman |
| ALL ACTIONS | |

**CRA INTERNATIONAL, INC., D/B/A CHARLES RIVER ASSOCIATES' OBJECTIONS AND RESPONSES TO PLAINTIFFS' SUBPOENA DUCES TECUM**

Pursuant to Fed. R. Civ. P. 45, CRA International, Inc., d/b/a Charles River Associates ("CRA"), objects and responds to the Subpoena To Produce Documents, Information, or Objects or To Permit Inspection of Premises in a Civil Action, dated April 10, 2024, as follows:

**PRELIMINARY STATEMENT**

1. These objections and responses are based on CRA's knowledge, information, and belief at this time. CRA reserves the right to supplement and amend its responses and objections as the facts and circumstances are more fully developed through additional investigation and discovery.

2. The fact that CRA objects or responds to a Request is not an admission that CRA accepts or admits the existence of any facts assumed by such Request, nor should a response or objection be taken to constitute admissible evidence as to any such assumed facts.

3. The statement that non-privileged documents will be produced in response to a particular Request does not mean that CRA knows the documents to exist, or to be in its possession, custody, or control.

4.      By agreeing to search for and produce documents in response to any Request, CRA does not waive, and does not agree to waive, any attorney work-product protection or any applicable privilege, including the attorney-client privilege.  Any inadvertent production of a protected document is not intended to waive any such protection, nor is the production of any protected document to be deemed a waiver of such protection as to any other document or information.

## GENERAL OBJECTIONS

The following General Objections apply to each and every one of the Requests and should be considered part of CRA's response to each and every one of the Requests.  Any Specific Objections provided below are made in addition to these General Objections, and failure to reiterate a General Objection below does not constitute a waiver or limitation of that or any other objection.

1.      For each Request, CRA incorporates by reference and adopts all objections of VantageScore Solutions LLC ("VantageScore") to similar requests served in this litigation. Specifically, CRA incorporates by reference and adopts VantageScore's responses and objections to subpoenas served by FICO and Plaintiffs, and arguments raised by VantageScore's Motion to Quash FICO's subpoena, Dkt. 260-1, Ex. A (the "Motion").  Any documents in CRA's possession that are responsive to these Requests were created for and at the direction of CRA's client VantageScore.  VantageScore has moved the Court to quash requests for the same or similar documents because, among other reasons, they contain "highly sensitive market research data" and other "highly confidential, competitive business information that VantageScore would not publicly disclose."  *Id.* at *6, 10.  VantageScore's Motion is currently pending before the Court.  CRA objects to each Request to the extent they purport to require

CRA to produce the same or similar documents or information to those subject to the pending Motion.

2.      CRA objects to each Request, Definition, and Instruction to the extent that it is broader than, or imposes conditions, obligations, or duties that exceed or differ from those required by the Federal Rules of Civil Procedure or the Civil Local Rules of the U.S. District Court for the Northern District of Illinois.

3.      CRA objects to each Request, Definition, and Instruction to the extent it is vague, ambiguous, overly broad, unduly burdensome, or seeks discovery of documents that are not relevant to the claims or defenses of any party to this action or not proportional to the needs of the case.

4.      CRA objects to each Request, Definition, and Instruction to the extent it seeks documents that are outside of CRA's possession, custody, or control.

5.      CRA objects to each Request, Definition, and Instruction to the extent it purports to require CRA to produce documents beyond what CRA is able to locate upon a reasonable search of its own files and from a reasonable inquiry of its current employees.

6.      CRA objects to each Request, Definition, and Instruction to the extent it purports to require CRA to generate documents that do not already exist.

7.      CRA objects to each Request to the extent that it requests "all documents" as overly broad, unduly burdensome, and not proportional to the needs of the case.

8.      CRA objects to each Request to the extent it purports to require CRA to provide documents that are publicly available or otherwise equally available to Plaintiffs.

9.      CRA objects to each Request to the extent it seeks the discovery of documents that are protected from disclosure by the attorney-client privilege, work-product doctrine, or

other applicable privilege. CRA intends to and does claim all such protections and privileges. To the extent privileged or protected documents are produced, such production is inadvertent and shall not constitute a waiver of any privilege or protection.

10. CRA objects to each Request to the extent it seeks disclosure of documents that CRA is under an obligation to a non-party or court order not to disclose.

11. CRA objects to each Request, Definition, and Instruction to the extent it seeks for CRA to produce confidential, proprietary, trade secret, or otherwise sensitive information for which the relevance is outweighed by the harm in producing such material.

12. CRA objects to each Request to the extent it seeks disclosure of information that would violate the privacy rights of non-parties under Illinois law or the applicable laws of any relevant jurisdiction.

13. CRA objects to each Request to the extent that it is inconsistent with the Case Management Order, Confidentiality Order, or ESI Protocol entered in this case, or any other order to be filed and entered in the case.

14. CRA objects to each Request to the extent that it is cumulative or duplicative of any other discovery requests that Plaintiffs or FICO have served in this case.

## SPECIFIC OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

The following Objections to Definitions and Instructions apply to each and every one of the Requests and should be considered part of CRA's response to each and every one of the Requests.

1. CRA objects to Definition No. 2 ("All," "any," and "each") as overly broad, unduly burdensome, and not proportional to the needs of the case.

2.      CRA objects to Definition No. 4 ("B2B Credit Score") as vague, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case.  For the purpose of responding to these Requests, CRA will interpret the term "B2B Credit Score" to mean (a) FICO Scores for credit risk (as opposed to, e.g., insurance scores), and (b) VantageScores sold to businesses.  CRA objects to Plaintiffs' definition of "business" as inconsistent with ordinary meaning.  For purposes of responding to these requests, CRA will interpret the term "business" to comport with its ordinary meaning.

3.      CRA objects to Definition No. 9 ("Document") to the extent that it is broader than a reasonable construction of the term as it is defined in Federal Rule of Civil Procedure 34(a)(1)(A) and used in Rule 45.

4.      CRA objects to Definition No. 11 ("Electronically stored information" or "ESI") to the extent that it is broader than a reasonable construction of the term as it is defined in Federal Rule of Civil Procedure 34(a)(1)(A) and used in Rule 45.

5.      CRA objects to Definition Nos. 12, 13, 14, 20, and 23 ("Equifax," "Experian," "Fair Isaac," "TransUnion," and "VantageScore Solutions," respectively) as overly broad, unduly burdensome, and not proportional to the needs of the case.  For purposes of responding to these requests, CRA will interpret these terms to refer to only the specifically named entity and any representative of that entity that can be readily identified.

6.      CRA objects to Definition No. 19 ("Relating to") as vague, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case.

7.      CRA objects to Definition No. 25 ("You," "Yours") as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent that those terms purport to require CRA to produce any documents or information outside of CRA's possession, custody,

or control, or on behalf of entities or persons other than or separate from CRA. CRA objects to the definition to the extent it contemplates the production of documents or information from CRA's attorneys that is protected by the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest doctrine, the First Amendment privilege, and/or any other privileges or immunities.

8.     CRA objects to Instruction No. 4 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent that those terms purport to require CRA to produce any documents or information outside of CRA's possession, custody, or control, or on behalf of entities or persons other than or separate from CRA. CRA further objects to the instruction to the extent it contemplates the production of documents or information from CRA's attorneys that is protected by the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest doctrine, the First Amendment privilege, and/or any other privileges or immunities.

9.     CRA objects to Instruction No. 5 to the extent that it seeks to expand CRA's obligations under Federal Rule of Civil Procedure 45. CRA has sought to identify ambiguities in Plaintiffs' Requests in these Objections and Responses and to indicate how it intends to interpret these ambiguities, but any failure to identify all ambiguities in the Requests may not be construed to represent a waiver of any objection on that basis.

10.     CRA objects to Instruction No. 6 to the extent it purports to require CRA to provide information about other companies or individuals, provide information that is not maintained in the ordinary course of business in centralized and reasonably accessible sources, or conduct an investigation. CRA objects to Instruction No. 6 on the basis that it seeks to expand

CRA's obligations under Federal Rule of Civil Procedure 45 and to serve as an improper third-party interrogatory.

11.    CRA objects to the relevant time period specified in Instruction No. 8 ("January 1, 2013, until the present") as overly broad, unduly burdensome, and not proportional to the needs of the case.

## SPECIFIC OBJECTIONS AND RESPONSES TO THE REQUESTS

In addition to the foregoing General Objections set forth above, CRA specifically objects and responds to the Requests as follows:

**REQUEST NO. 1**

All non-privileged Documents (including communications), including analysis, relating to competition or potential competition (i) among all suppliers of credit score products and (ii) between Fair Isaac and VantageScore Solutions in specific.

**RESPONSE TO REQUEST NO. 1**

CRA  CRA objects to Request No. 1 for all the same reasons that VantageScore has objected to the same or similar requests and incorporates by reference VantageScore's pending Motion (as well as any future related filings by VantageScore).

To the extent that Plaintiffs are seeking the annual reports CRA produced for VantageScore regarding the market adoption of VantageScore, those reports are publicly available on VantageScore's website.  *See*, *e.g.*, VantageScore Credit Score Usage Surges 42% to 27 Billion Credit Scores in 2023, https://www.vantagescore.com/ vantagescore-credit-score-usage-surges-42-to-27-billion-credit-scores-in-2023/ (accessed May 2, 2024); VantageScore Credit Score Usage Up 30% in 2022, https://www.vantagescore.com/ vantagescore-credit-score-usage-up-30-in-2022/ (accessed May 2, 2024).

Particularly given that versions of the reports CRA produced for VantageScore are publicly available, CRA objects to Request No. 1 as overly broad, unduly burdensome, and not

proportional to the needs of the case. Request No. 1 purports to demand that CRA search 11 years of documents and client files for documents that are of, at best, minimal value and contain information that is either available from other sources or highly confidential information belonging to other third parties. CRA is not in the credit scoring business and has no unique information about any purported market for credit scores. Any analyses in CRA's possession concerning credit scores would have been prepared using public information (which is also available to Plaintiffs) or the confidential information of other third parties, rather than information unique to CRA. CRA is a third party and nowhere mentioned in the Complaints. CRA's views or subjective analysis of any purported market for credit scores have no relevance to the claims Plaintiffs have asserted against FICO.

CRA further objects to Request No. 1 as vague and ambiguous. For example, Plaintiffs have not defined what would constitute "communications [or] analysis[] relating to competition or potential competition" or a "supplier[] of credit score products."

CRA is willing to meet and confer with Plaintiffs regarding all Requests after VantageScore's Motion is resolved by the Court.

**REQUEST NO. 2**

All non-privileged Documents relating to any projections, reports, forecasts, evaluations (or financial, commercial, regulatory, or legal analyses) performed by You and/or by any other party (including the Credit Bureaus) relating to competition in the B2B Credit Score Market, including but not limited to, Documents and data given to You by or given by You to any of the Credit Bureaus or VantageScore Solutions.

**RESPONSE TO REQUEST NO. 2**

CRA objects to Request No. 2 for all the same reasons that VantageScore has objected to the same or similar requests and incorporates by reference VantageScore's pending Motion (as well as any future related filings by VantageScore).

To the extent that Plaintiffs are seeking the annual reports CRA produced for VantageScore regarding the market adoption of VantageScore, those reports are publicly available on VantageScore's website. *See, e.g.*, VantageScore Credit Score Usage Surges 42% to 27 Billion Credit Scores in 2023, https://www.vantagescore.com/vantagescore-credit-score-usage-surges-42-to-27-billion-credit-scores-in-2023/ (accessed May 2, 2024); VantageScore Credit Score Usage Up 30% in 2022, https://www.vantagescore.com/ vantagescore-credit-score-usage-up-30-in-2022/ (accessed May 2, 2024).

Particularly given that versions of the reports CRA produced for VantageScore are publicly available, CRA objects to Request No. 2 as overly broad, unduly burdensome, and not proportional to the needs of the case. Request No. 2 purports to demand that CRA search 11 years of documents and client files for documents that are of, at best, minimal value and contain information that is either available from other sources or highly confidential information belonging to other third parties. CRA is not in the credit scoring business and has no unique information about any purported market for credit scores. Any analyses in CRA's possession concerning credit scores would have been prepared using public information (which is also available to Plaintiffs) or the confidential information of other third parties, rather than information unique to CRA. CRA is a third party and nowhere mentioned in the Complaints. CRA's views or subjective analysis of any purported market for credit scores have no relevance to the claims Plaintiffs have asserted against FICO.

CRA objects to Request No. 2 as vague and ambiguous. For example, Plaintiffs have not meaningful defined what documents would "relat[e] to B2B Credit Scores or the B2B Credit Score Market."

CRA objects to Request No. 2 – which expressly seeks "legal analyses" – to the extent

that it seeks documents within the possession, custody, or control of CRA's attorneys or that are
protected by the attorney-client privilege, the work-product doctrine, the joint defense privilege,
the common interest doctrine, the First Amendment privilege, and/or any other privileges or
immunities.

CRA is willing to meet and confer with Plaintiffs regarding all Requests after
VantageScore's Motion is resolved by the Court.

**REQUEST NO. 3**

Documents sufficient to show the past, current, and anticipated future B2B Credit Score
market share or position of VantageScore Solutions and Fair Isaac, and the past, current, and
anticipated future market share or position of any other entity distributing or selling B2B
Credit Scores.

**RESPONSE TO REQUEST NO. 3**

CRA objects to Request No. 3 for all the same reasons that VantageScore has objected to
the same or similar requests and incorporates by reference VantageScore's pending Motion (as
well as any future related filings by VantageScore).

To the extent that Plaintiffs are seeking the annual reports CRA produced for
VantageScore regarding the market adoption of VantageScore, those reports are publicly
available on VantageScore's website. *See*, *e.g.*, VantageScore Credit Score Usage Surges 42%
to 27 Billion Credit Scores in 2023, https://www.vantagescore.com/vantagescore-credit-score-
usage-surges-42-to-27-billion-credit-scores-in-2023/ (accessed May 2, 2024); VantageScore
Credit Score Usage Up 30% in 2022, https://www.vantagescore.com/ vantagescore-credit-score-
usage-up-30-in-2022/ (accessed May 2, 2024).

Particularly given that versions of the reports CRA produced for VantageScore are
publicly available, CRA objects to Request No. 3 as overly broad, unduly burdensome, and not
proportional to the needs of the case. Request No. 3 purports to demand that CRA search 11

years of documents and client files for documents that are of, at best, minimal value and contain information that is either available from other sources or highly confidential information belonging to other third parties. CRA is not in the credit scoring business and has no unique information about any purported market for credit scores. Any analyses in CRA's possession concerning credit scores would have been prepared using public information (which is also available to Plaintiffs) or the confidential information of other third parties, rather than information unique to CRA. CRA is a third party and nowhere mentioned in the Complaints. CRA's views or subjective analysis of any purported market for credit scores have no relevance to the claims Plaintiffs have asserted against FICO.

CRA objects to Request No. 3 as vague and ambiguous. For example, Plaintiffs have not defined "anticipated future," "market share or position," or "any other entity distributing or selling B2B Credit Scores."

CRA objects to Request No. 3 to the extent it requests information regarding past or current market share of FICO in the B2B market that Plaintiffs could obtain from FICO.

CRA is willing to meet and confer with Plaintiffs regarding all Requests after VantageScore's Motion is resolved by the Court.

## REQUEST NO. 4

Documents sufficient to show past, current, and anticipated future demand for B2B Credit Scores, including but not limited to Documents describing the factors that affect the demand for B2B Credit Scores.

## RESPONSE TO REQUEST NO. 4

CRA objects to Request No. 4 for all the same reasons that VantageScore has objected to the same or similar requests and incorporates by reference VantageScore's pending Motion (as well as any future related filings by VantageScore).

To the extent that Plaintiffs are seeking the annual reports CRA produced for VantageScore regarding the market adoption of VantageScore, those reports are publicly available on VantageScore's website. *See*, *e.g.*, VantageScore Credit Score Usage Surges 42% to 27 Billion Credit Scores in 2023, https://www.vantagescore.com/vantagescore-credit-score-usage-surges-42-to-27-billion-credit-scores-in-2023/ (accessed May 2, 2024); VantageScore Credit Score Usage Up 30% in 2022, https://www.vantagescore.com/ vantagescore-credit-score-usage-up-30-in-2022/ (accessed May 2, 2024).

Particularly given that versions of the reports CRA produced for VantageScore are publicly available, CRA objects to Request No. 4 as overly broad, unduly burdensome, and not proportional to the needs of the case. Request No. 4 purports to demand that CRA search 11 years of documents and client files for documents that contain information that is either available from other sources or highly confidential information belonging to other third parties that CRA. CRA is not in the credit scoring business and has no unique information about any purported market for credit scores. Any analyses in CRA's possession concerning credit scores would have been prepared using public information (which is also available to Plaintiffs) or confidential information belonging to other third parties, rather than information unique to CRA. CRA is a third party and nowhere mentioned in the Complaints. CRA is a third party and nowhere mentioned in the Complaints. CRA's views or subjective analysis of any purported market for credit scores have no relevance to the claims Plaintiffs have asserted against FICO.

CRA objects to Request No. 4 as vague and ambiguous. For example, Plaintiffs have not defined "anticipated future demand," and the phrase "[d]ocuments describing the factors that affect the demand for B2B Credit Scores" does not provide any meaningful criteria that CRA could use to determine which documents fall into this category or are responsive to this Request.

CRA is willing to meet and confer with Plaintiffs regarding all Requests after VantageScore's Motion is resolved by the Court.

**REQUEST NO. 5**

Documents and data, data compilations, data sets, and any other forms of structured data used, generated, collected, held, tracked, or accessed by You relating to fees, royalties, and other prices charged or collected by VantageScore Solutions, Fair Isaac or Credit Bureaus to purchasers of B2B Credit Scores, including but not limited to the Plaintiffs and members of the proposed classes.

**RESPONSE TO REQUEST NO. 5**

CRA objects to Request No. 5 for all the same reasons that VantageScore has objected to the same or similar requests and incorporates by reference VantageScore's pending Motion (as well as any future related filings by VantageScore).

To the extent that Plaintiffs are seeking the annual reports CRA produced for VantageScore regarding the market adoption of VantageScore, those reports are publicly available on VantageScore's website. *See*, *e.g.*, VantageScore Credit Score Usage Surges 42% to 27 Billion Credit Scores in 2023, https://www.vantagescore.com/vantagescore-credit-score-usage-surges-42-to-27-billion-credit-scores-in-2023/ (accessed May 2, 2024); VantageScore Credit Score Usage Up 30% in 2022, https://www.vantagescore.com/ vantagescore-credit-score-usage-up-30-in-2022/ (accessed May 2, 2024).

Particularly given that versions of the reports CRA produced for VantageScore are publicly available, CRA objects to Request No. 5 as overly broad, unduly burdensome, and not proportional to the needs of the case. Request No. 5 purports to demand that CRA search 11 years of documents and client files for documents and data that contain information that is either available from other sources or highly confidential information belonging to other third parties.

CRA is not in the credit scoring business and has no unique information about sales of credit scores or the royalties that are paid for credit scores.

CRA objects to Request No. 5 to the extent it requests information regarding FICO Scores and sales of FICO Scores that Plaintiffs could obtain from FICO.

CRA objects to Request No. 5 as an improper interrogatory. Request No. 5 appears to purport to require CRA to identify every occasion that VantageScore, FICO, or a Credit Bureau sold a score pursuant to a contract and describe that contract to Plaintiffs.

CRA objects to Request No. 5 as vague and ambiguous. For example, the terms and phrases such as "data," "data sets," "structured data," and "relating to fees, royalties, and other prices charged and collected" do not meaningfully define the categories of data that would be responsive to this Request, particularly when paired with overly broad language such as "held," "tracked" or "accessed."

CRA is willing to meet and confer with Plaintiffs regarding all Requests after VantageScore's Motion is resolved by the Court.

## REQUEST NO. 6

Data, data compilations, data sets, data tables, and any other forms of structured data used, generated, collected, held, tracked, or accessed by You relating to the sale, supply, or distribution (or restriction on the sale, supply, or distribution) of B2B Credit Scores by each of VantageScore Solutions, Fair Isaac and each Credit Bureau, including but not limited to transaction-level electronically stored sales information and data. The relevant time period for this request is from January 1, 2013, until the present. For each of VantageScore Solutions, Fair Isaac and each Credit Bureau, information requested includes, but is not limited to:

   a.   identifying product information;
   b.   any unique credit score request or transaction identifier;
   c.   date of transaction;
   d.   date invoice sent;
   e.   date payment was received;
   f.   customer identification information (*e.g.*, name, address, and customer number) for the bill-to customer, requesting customer, and any other customer entity,

including the downstream customer, named person, or entity on whose behalf the score was requested;

g.    customer type;

h.    indicators of penalty rates applied, if applicable;

i.    product type (*e.g.*, whether the product is a bundled product to lenders that combines the use of scores by lenders (in the B2B market) with the provision of scores to consumers (in the B2C market));

j.    total price and price per unit, including separately specifying any applicable discounts, rebates, chargebacks, or forgiven balances;

k.    total price and price per unit charged by any intermediary to the transaction;

l.    total quantity sold, specifying any applicable units that measure quantity;

m.    type of underlying transaction or loan, contemplated or actual, relating to the sale of the FICO Score or VantageScore;

n.    gross and net sales dollars, separately by revenue source;

o.    cost of sales, separately by revenue source;

p.    cost of goods sold, including sales and distribution cost and any fixed or variable costs, separately by type;

q.    licensing fees, royalties (including any royalties paid to Fair Isaac for a given transaction), and/or profit shares paid and received;

r.    gross profit;

s.    net profit;

t.    profit margin;

u.    operating income;

v.    net income;

w.    unit volume sold;

x.    unit volume sold net of returns;

y.    operating income;

z.    net income; and

aa.    if the transaction is subject to a contract:

    i.    effective date of contract; and,

    ii.    contract type and other information outlining the general terms of the contractual arrangement between the B2B customer and the Credit Bureau.

**RESPONSE TO REQUEST NO. 6**

CRA objects to Request No. 6 for all the same reasons that VantageScore has objected to the same or similar requests and incorporates by reference VantageScore's pending Motion (as well as any future related filings by VantageScore).

To the extent that Plaintiffs are seeking the annual reports CRA produced for VantageScore regarding the market adoption of VantageScore, those reports are publicly

available on VantageScore's website. *See*, *e.g.*, VantageScore Credit Score Usage Surges 42% to 27 Billion Credit Scores in 2023, https://www.vantagescore.com/vantagescore-credit-score-usage-surges-42-to-27-billion-credit-scores-in-2023/ (accessed May 2, 2024); VantageScore Credit Score Usage Up 30% in 2022, https://www.vantagescore.com/ vantagescore-credit-score-usage-up-30-in-2022/ (accessed May 2, 2024).

Particularly given that versions of the reports CRA produced for VantageScore are publicly available, CRA objects to Request No. 6 as overly broad, unduly burdensome, and not proportional to the needs of the case. Request No. 6 purports to demand that CRA search 11 years of documents and client files for documents and data that contain information that is either available from other sources or highly confidential information belonging to other third parties. CRA is not in the credit scoring business and has no unique information about sales of credit scores or the royalties that are paid for credit scores.

CRA objects to Request No. 6 to the extent it requests information regarding FICO Scores and sales of FICO Scores that Plaintiffs could obtain from FICO.

CRA objects to Request No. 6 as an improper interrogatory. Request No. 6 appears to purport to require CRA to identify every occasion that VantageScore, FICO, or a Credit Bureau sold a score pursuant to a contract and describe that contract to Plaintiffs.

CRA objects to Request No. 6 as vague and ambiguous. For example, Plaintiffs have not defined "identifying product information," "unique credit score request," "transaction identifier," "downstream customer," "intermediary," "underlying transaction or loan, contemplated or actual," "profit shares," or "contract type and other information outlining the general terms of the contractual arrangement between the B2B customer and the Credit Bureau."

CRA is willing to meet and confer with Plaintiffs regarding all Requests after

VantageScore's Motion is resolved by the Court.

**REQUEST NO. 7**

The relevant time period for this request is from January 1, 2013, until the present.  All Documents relating to VantageScore Solutions's projected and actual B2B Credit Scores:

a.      sales;
b.      gross sales revenue;
c.      net sales revenue;
d.      cost of goods sold;
e.      sales and distribution cost;
f.      marketing, advertising, promotional, and sales expenses;
g.      other fixed or variable costs;
h.      research and development expenditures;
i.      licensing fees, royalties, and/or profits shares paid to and/or received from Fair Isaac or any other entity;
j.      pricing, rebates, discounts, and chargebacks;
k.      gross profit;
l.      net profit;
m.      profit margin;
n.      unit volume sold;
o.      unit volume sold by state;
p.      unit volume sold net of returns;
q.      cost and price analyses;
r.      cost and price analyses by state; and
s.      all specific costs included in a fixed cost.

**RESPONSE TO REQUEST NO. 7**

CRA objects to Request No. 7 for all the same reasons that VantageScore has objected to the same or similar requests and incorporates by reference VantageScore's pending Motion (as well as any future related filings by VantageScore).

To the extent that Plaintiffs are seeking the annual reports CRA produced for VantageScore regarding the market adoption of VantageScore, those reports are publicly available on VantageScore's website.  *See*, *e.g.*, VantageScore Credit Score Usage Surges 42% to 27 Billion Credit Scores in 2023, https://www.vantagescore.com/vantagescore-credit-score-usage-surges-42-to-27-billion-credit-scores-in-2023/ (accessed May 2, 2024); VantageScore

Credit Score Usage Up 30% in 2022, https://www.vantagescore.com/ vantagescore-credit-score-usage-up-30-in-2022/ (accessed May 2, 2024).

Particularly given that versions of the reports CRA produced for VantageScore are publicly available, CRA objects to Request No. 7 as overly broad, unduly burdensome, and not proportional to the needs of the case. Request No. 7 purports to demand that CRA search 11 years of documents and client files for documents and data that contain information that is either available from other sources or highly confidential information belonging to other third parties. CRA is not in the credit scoring business and has no unique information about sales of credit scores or VantageScore's finances.

CRA objects to Request No. 7 because the details of VantageScore's finances have no relevance to the claims Plaintiffs have asserted against FICO.

CRA objects to Request No. 7 as vague and ambiguous. For example, Plaintiffs do not define "specific costs" "cost and price analyses," "marketing, advertising, promotional, and sales expenses," "other fixed or variable costs," or "research and development expenditures."

CRA is willing to meet and confer with Plaintiffs regarding all Requests after VantageScore's Motion is resolved by the Court, but will not produce any documents in response to Request No. 7 at this time.

**REQUEST NO. 8**

Documents sufficient to show how the prices for B2B Credit Scores (disaggregated by credit score type, *e.g.*, FICO Score and VantageScore) are or have been set during the relevant time period including any adjustments such as rebates or discounts or the price of other products.

**RESPONSE TO REQUEST NO. 8**

CRA objects to Request No. 8 for all the same reasons that VantageScore has objected to the same or similar requests and incorporates by reference VantageScore's pending Motion (as well as any future related filings by VantageScore).

CRA objects to Request No. 8 as overly broad, unduly burdensome, and not proportional to the needs of the case.  Request No. 8 purports to demand that CRA search 11 years of documents and client files for documents that are of, at best, minimal value and contain information that is either available from other sources or highly confidential information belonging to other third parties.  CRA is not in the credit scoring business and has no unique information about the pricing of credit scores or any purported market for credit scores.  Any analyses in CRA's possession concerning credit scores or the pricing of credit scores would have been prepared using public information (which is also available to Plaintiffs) or confidential information belonging to third parties, rather than information unique to CRA.

CRA objects to Request No. 8 as vague and ambiguous.  For example, Plaintiffs do not define "adjustments" or "the price of other products."

CRA is willing to meet and confer with Plaintiffs regarding all Requests after VantageScore's Motion is resolved by the Court.

Dated:  May 7, 2024

Respectfully submitted,

*Jonathan Yellin*

Jonathan D Yellin, General Counsel

CRA International, Inc.

# EXHIBIT

Anna    unanyan
 ellin, Jonathan   Rose-Smith, Sabrina M
S S Fair Isaac   b. penney   Rrahmani, Labeat   l einstein
RE: CRA s Response and Ob ections to Third Party Subpoena FICO Antitrust Litigation Matters
Tuesday, June 4, 2024 2:00:0  PM
image001.png
originallogo   003  0d-51d0-410d-  e0- be01 2  b   c.png
2024-0  -4 - C. Medici Ltr to CRA.pd

Jonathan, Sabrina,

Please find the attached correspondence regarding our meet-and-confer.

Regards,
Anna

**From:** Yellin, Jonathan <JYellin@crai.com>
**Sent:** Monday, June 3, 2024 1:43 PM
**To:** Anna Hunanyan <ahunanyan@scott-scott.com>
**Cc:** S+S Fair Isaac <FICO@scott-scott.com>; Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Subject:** Re: CRA's Response and Objections to Third Party Subpoena/FICO Antitrust Litigation Matters

Thank you

 onathan   .  ellin
E ecutive   ice President and General   ounsel
 harles River Associates
      larendon, T-
      larendon   treet
 oston,   A
 irect   ial (   )   -
 ell (      )   -
 a  (      )   -

www.crai.com

**From:** Anna Hunanyan <ahunanyan@scott-scott.com>
**Sent:** Monday, June 3, 2024 1:36:41 PM
**To:** Yellin, Jonathan <JYellin@crai.com>
**Cc:** S+S Fair Isaac <FICO@scott-scott.com>; Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Subject:** RE: CRA's Response and Objections to Third Party Subpoena/FICO Antitrust Litigation Matters

Jonathan, we confirmed 4pm today works for us. I'll update the calendar invite. Of course, let us know if this ultimately doesn't work. Tomorrow morning likely won't work for our group but we'll find another time if we can't have the call today.

Anna

**From:** Yellin, Jonathan <JYellin@crai.com>
**Sent:** Monday, June 3, 2024 1:25 PM
**To:** Anna Hunanyan <ahunanyan@scott-scott.com>
**Cc:** S+S Fair Isaac <FICO@scott-scott.com>; Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Subject:** Re: CRA's Response and Objections to Third Party Subpoena/FICO Antitrust Litigation Matters

Thank you for your understanding.   I am free all day tomorrow until 2pm est as well if that helps.

  onathan   .   ellin
E ecutive  ice President and General   ounsel
  harles River Associates
      larendon, T-
      larendon   treet
  oston,   A
  irect   ial (   )    -
  ell (    )    -
  a  (    )    -

www.crai.com

**From:** Anna Hunanyan <ahunanyan@scott-scott.com>
**Sent:** Monday, June 3, 2024 1:21:45 PM
**To:** Yellin, Jonathan <JYellin@crai.com>
**Cc:** S+S Fair Isaac <FICO@scott-scott.com>; Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Subject:** RE: CRA's Response and Objections to Third Party Subpoena/FICO Antitrust Litigation Matters

Hi Jonathan,

No problem – we will get back to you on whether 3 or 4 works. Of course, if it's better for you to push to tomorrow or later this week, we completely understand.

Anna

**From:** Yellin, Jonathan <JYellin@crai.com>
**Sent:** Monday, June 3, 2024 1:13 PM
**To:** Anna Hunanyan <ahunanyan@scott-scott.com>
**Cc:** S+S Fair Isaac <FICO@scott-scott.com>; Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>
**Subject:** Re: CRA's Response and Objections to Third Party Subpoena/FICO Antitrust Litigation Matters

Hello.   Can we push this to 3 or 4 pm est.  I had to deal with a medical issue with my wife and will not be out of dr for another hour or so.  Thank you.

onathan  .  ellin
E ecutive  ice President and General  ounsel
 harles River Associates
     larendon, T-
     larendon  treet
 oston,  A
 irect  ial ( )  -
 ell ( )  -
 a  ( )  -

[www.crai.com](www.crai.com)

---

**From:** Anna Hunanyan <[ahunanyan@scott-scott.com](ahunanyan@scott-scott.com)>
**Sent:** Tuesday, May 28, 2024 4:55:45 PM
**To:** Yellin, Jonathan <[JYellin@crai.com](JYellin@crai.com)>
**Cc:** S+S Fair Isaac <[FICO@scott-scott.com](FICO@scott-scott.com)>
**Subject:** RE: CRA's Response and Objections to Third Party Subpoena/FICO Antitrust Litigation Matters

Jonathan,

Are you available to have a meet-and-confer regarding Plaintiffs' subpoena this Thursday after 2pm eastern?

Thank you,

Anna



Attorney
212.519.0521
[ahunanyan@scott-scott.com](ahunanyan@scott-scott.com)
[www.scott-scott.com](www.scott-scott.com)
The Helmsley Building + 230 Park Avenue, 17th FL
New York, NY 10169

NEW YORK+CONNECTICUT+CALIFORNIA+DELAWARE+TEXAS+VIRGINIA+OHIO+NEBRASKA+ARIZONA
AMSTERDAM+BERLIN+LONDON

This e-mail may contain confidential or privileged information. If you believe you have received it in error, please notify the sender immediately and delete this message without copying or disclosing it.

---

**From:** Yellin, Jonathan <[JYellin@crai.com](JYellin@crai.com)>

**Sent:** Tuesday, May 7, 2024 10:19 AM
**To:** Carmen Medici <cmedici@scott-scott.com>
**Cc:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>; Dindzans, Viktors M.
<VDindzans@goodwinlaw.com>
**Subject:** CRA's Response and Objections to Third Party Subpoena/FICO Antitrust Litigation Matters

Dear Attorney Medici.  Please find CRA's Response and Objections to the Third-Party
Subpoena served in connection with the FICO Antitrust matters.   Regards, Jonathan Yellin

 onathan   .   ellin
E  ecutive   ice President and General    ounsel
 harles River Associates
    larendon, T-
    larendon    treet
 oston,    A
 irect   ial (    )     -
 ell (    )     -
 a  (    )     -

www.crai.com

This electronic message and its attachments contain information from the consulting firm of Charles River
Associates that may be confidential or privileged. If you are not the intended recipient we ask that you notify
us immediately via reply e-mail and delete or destroy this message and any copies of it. Thank you for your
cooperation.

# EXHIBIT 15



SCOTT + SCOTT

CARMEN + MEDICI

+ **PRIVILEGED AND CONFIDENTIAL** +

+ Via E-MAIL +

June 4, 2024

Jonathan D. Yellin
Executive Vice President and General Counsel
Charles River Associates
200 Clarendon, T-10
200 Clarendon Street
Boston, MA 02116
Direct Dial (617) 425-3198

   Re: *In re: FICO Antitrust Litigation*, Case No. 1:20-cv-02114 (N.D. Ill.)

Dear Mr. Yellin:

   I write on behalf of Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs (together, "Plaintiffs") to memorialize our June 3, 2024 meet-and-confer regarding CRA International, Inc.'s ("CRA") Objections and Responses to Plaintiffs' Subpoena Duces Tecum dated April 10, 2024 (the "CRA Subpoena"). CRA, Plaintiffs, and Sabrina Rose-Smith, counsel on behalf of VantageScore Solutions, LLC ("VantageScore"), joined the meet-and-confer.

   Based on our meet-and-confer discussions, Plaintiffs understand that CRA refuses to produce any documents responsive to the CRA Subpoena until VantageScore's Motion to Quash FICO's subpoena, Dkt. 268 (the "VantageScore Motion") is resolved by the Court. CRA stated that it objects to the CRA Subpoena on the grounds that their client, VantageScore, has instructed them not to produce any materials responsive to the subpoena unless compelled to produce documents by a Court order. VantageScore confirmed that they refuse to authorize the release of any documents by CRA at this time. Plaintiffs asked CRA if the Credit Bureaus have likewise objected to CRA producing documents responsive to the CRA Subpoena, to the extent CRA possesses Credit-Bureau data. CRA refused to provide a response to this question or to reveal whether any of the Credit Bureaus was a client of CRA's.

   CRA and VantageScore also stated that once the Court rules on the VantageScore Motion, CRA will negotiate in good faith the scope of the CRA Subpoena with Plaintiffs and will produce documents that are reasonably similar to documents the Court finds to be discoverable. VantageScore also confirmed that if the Court finds that some or all documents are discoverable, including in connection with the forthcoming motion to compel Plaintiffs intend to file against VantageScore, VantageScore will not argue that it does not have possession or control over such discoverable documents held by CRA and will instruct CRA to produce discoverable documents responsive to the CRA Subpoena.

   During the call, Plaintiffs requested that CRA provide a copy of CRA's engagement agreement with VantageScore in connection with CRA's engagement to prepare the market studies and similar reports, or, at a minimum, the provisions that form the basis for CRA's decision to adhere to VantageScore's instruction

to produce documents as opposed to the command to produce documents contained in the CRA Subpoena.[1] VantageScore stated that it had not reviewed the engagement agreement in detail, but agreed to review it and then confirm whether they are able to produce the agreement.

      As explained on our meet and confer, while we understand CRA's position, Plaintiffs do not believe that VantageScore's instruction is a legitimate basis under the Federal Rules to withhold all responsive documents, and Plaintiffs reserve all rights.

                                    Very truly yours,
SCOTT+SCOTT ATTORNEYS AT LAW LLP

Carmen Medici

---

[1] For the avoidance of doubt, Plaintiffs are interested in the engagement letter that governs CRA's provision of services in connection with preparing market adoption and similar reports such as those available on VantageScore's website. *See, e.g.,* VantageScore Credit Score Usage Surges 42% to 27 Billion Credit Scores in 2023, https://www.vantagescore.com/vantagescore-credit-score-usage-surges-42-to-27-billion-credit-scores-in-2023/ (accessed May 2, 2024); VantageScore Credit Score Usage Up 30% in 2022, https://www.vantagescore.com/vantagescore-credit-score-usage-up-30-in-2022/ (accessed May 2, 2024). We understand the provisions CRA relies on would address (i) ownership rights to any information used or developed in connection with CRA's services, and (ii) CRA's obligations relating to requests for confidential documents pursuant to a subpoena, court order or similar legal process.

# EXHIBIT 16

# EXHIBIT 1

# EXHIBIT 1

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Northern District of Illinois

| In re FICO Antitrust Litigation | ) | |
|---|---|---|
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 1:20-cv-02114 |
| | ) | |
| | ) | |
| *Defendant* | ) | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: VantageScore Solutions, LLC, c/o Corporation Service Company - 251 Little Falls Drive, Wilmington, DE 19808

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

| Place: VantageScore Solutions, LLC<br>601 Gateway Blvd., Suite 1210<br>South San Francisco, CA 94080 | Date and Time:<br>01/11/2024 11:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 12/21/2023

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | /s/ Matthew D. Provance |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Fair Isaac Corporation , who issues or requests this subpoena, are:
Matthew D. Provance, Mayer Brown LLP, 71 S. Wacker Dr., Chicago, IL 60606; Telephone: (312) 701-8598; Email: mprovance@mayerbrown.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:20-cv-02114

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

  ❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

  ❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____    _____
                 *Server's signature*

                _____
                 *Printed name and title*

                _____
                 *Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected..

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  **(A) Appearance Not Required.** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B) Objections.** A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
  **(A) When Required.** On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B) When Permitted.** To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A) Documents.** A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B) Form for Producing Electronically Stored Information Not Specified.** If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C) Electronically Stored Information Produced in Only One Form.** The person responding need not produce the same electronically stored information in more than one form.
  **(D) Inaccessible Electronically Stored Information.** The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A) Information Withheld.** A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B) Information Produced.** If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| *In re FICO Antitrust Litigation* | Case No. 20-cv-02114 |
| | Honorable Edmond E. Chang |
| *This document relates to:*<br>ALL ACTIONS | Magistrate Judge M. David Weisman |

## NOTICE OF SUBPOENA TO VANTAGESCORE SOLUTIONS, LLC

Through the serving of this document, Defendant Fair Isaac Corporation ("FICO")

hereby gives notice of its intent to serve on VantageScore Solutions, LLC a Subpoena to Produce

Documents, Information, or Objects in a Civil Action, pursuant to Rule 45 of the Federal Rules of

Civil Procedure. A copy of the subpoena is attached to this Notice.

Dated: December 21, 2023

Respectfully submitted,

*/s/ Matthew D. Provance*
Britt M. Miller
Matthew D. Provance
J. Gregory Deis
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
bmiller@mayerbrown.com
mprovance@mayerbrown.com
gdeis@mayerbrown.com

Counsel for Defendant
Fair Isaac Corporation

## SCHEDULE A

Pursuant to the foregoing subpoena duces tecum, You are required to produce, by the date stated on the subpoena and in accordance with the following Definitions and Instructions, the documents and things requested in the following Requests.

## DEFINITIONS

For the purposes of these Requests, the following terms have the following meanings:

1.      The term "Action" means the above-captioned consolidated action In re FICO Antitrust Litigation, Case No. 1:20-CV-02114, pending in the Northern District of Illinois.

2.      "DPP Amended Complaint" means the First Amended Complaint filed by the Direct Purchaser Plaintiffs in the above-captioned matter on October 30, 2023 (Dkt. 184).  For Your reference, a copy of the DPP Amended Complaint is attached hereto as **Exhibit 1**.

3.      "IPP Amended Complaint" means the Second Amended Complaint filed by the Indirect Purchaser Plaintiffs in the above-captioned matter on October 30, 2023 (Dkt. 185). For Your reference, a copy of the IPP Amended Complaint is attached hereto as **Exhibit 2**.

4.      "Communications" means the transmittal of information of any kind by any means, and includes, without limitation, any transfer or exchange between two or more persons or entities of any information, whether by document or oral means, including, but not limited to, in-person conversation, correspondence, telephone calls, electronic mail, text messages, and video conference.

5.      "Documents" is used in its broadest sense allowed by Rule 34 of the Federal Rules of Civil Procedure, and includes any kind of written, typewritten, printed, or recorded material, all communications, and all other writings, including, without limitation, any drawings, graphs, charts, photographs, phonograph records, tape recordings, notes, diaries, calendars, checkbooks,

books, papers, accounts, electronic or videotape recordings, internal or external websites, compact discs, computer files and disks, and electronically stored information.

6. "Defendant" or "FICO" means Fair Isaac Corporation and its Affiliates, as well as the officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors and predecessors of any of the foregoing, and all persons or entities acting on behalf of any of the foregoing.

7. "Equifax" means Equifax Inc., Equifax Information Services, LLC, and their Affiliates, as well as the officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors and predecessors of any of the foregoing, and all persons or entities acting on behalf of any of the foregoing.

8. "Experian" means Experian Information Solutions, Inc., Experian PLC, and their Affiliates, as well as the officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors and predecessors of any of the foregoing, and all persons or entities acting on behalf of any of the foregoing.

9. "TransUnion" means TransUnion, LLC and its Affiliates, as well as the officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors and predecessors of any of the foregoing, and all persons or entities acting on behalf of any of the foregoing.

10. "Credit Bureaus" means Equifax, Experian, and TransUnion.

11. "Credit Reporting Agency" means the Credit Bureaus, as well as any other entity (other than a Reseller) that is a "consumer reporting agency" as that term is defined under Fair Credit Reporting Act, 15 U.S.C. § 1681(f).

12.     "VantageScore," "You," and "Your" means VantageScore Solutions LLC and its Affiliates, as well as the officers, directors, members, principals, employees, agents, representatives, contractors, subsidiaries, parents, successors and predecessors of any of the foregoing, and all persons or entities acting on behalf of any of the foregoing.

13.     "Reseller" means any entity that distributes Credit Scores or Credit Reports from a Credit Bureau and includes, without limitation, any "reseller" as that term is used in the Fair Credit Reporting Act, 15 U.S.C. § 1681(u).

14.     "End User" means any business or consumer that uses Credit Scores.

15.     "Credit Score" means any numerical representation of credit risk generated by applying a scoring model to aggregated credit information, and has the same breadth of meaning as that term is used in the DPP Amended Complaint and IPP Amended Complaint.

16.     "Credit Report" means any product, report, document, or data sold, distributed, delivered, or generated pursuant to a transaction between a Credit Reporting Agency or Reseller and an End User. "Credit Report" includes, without limitation, any "consumer report" as that term is used in the Fair Credit Reporting Act, 15 U.S.C. § 1681a(d).

17.     "FICO Score" means any Credit Score generated using a credit scoring model developed by or on behalf of FICO.

18.     "VantageScore Credit Score" means any Credit Score generated using a credit scoring model developed by VantageScore.

19.     "VantageScore Market Study Report" means, without limitation, the 2017 VantageScore Market Study Report,[1] 2018 VantageScore Market Study Report,[2] 2019

---

[1] https://www.vantagescore.com/wp-content/uploads/2022/02/2017-VantageScore-Market-Study_Public_FINAL.pdf.
[2] https://www.vantagescore.com/wp-content/uploads/2022/02/2018-VS-Market-Adoption-Study-FINAL.pdf.

VantageScore Market Study Report,[3] 2022 VantageScore Market Study Report,[4] the 2023 Market Adoption Study,[5] and any similar studies or reports on the use or adoption of VantageScore during the Relevant Time Period conducted by Oliver Wyman, Charles River, or another consultant.

20. "Regarding" is to be construed broadly and includes anything in connection with, constituting, concerning, reflecting, referring to, discussing, describing, identifying, stating, quoting, incorporating, attaching, analyzing, or otherwise relating in any way to the topic identified in the discovery request.

21. "Person" and "entity" mean individuals and entities, including, but not limited to, all natural persons, businesses, firms, partnerships, associates, organizations, governmental units, joint ventures, corporations, and any other entities.

22. "Affiliate" means, with respect to any entity, any person or entity that, directly or indirectly, controls, is controlled by, or is under common control with, such entity.

23. The use of singular shall be deemed to include the plural, and the use of one gender shall include all others as are appropriate in the context.

24. The use of the verb in any tense shall be construed as the use of the verb in all other tenses.

25. "Or" is defined to include "and," and "and" is defined to include "or."

## INSTRUCTIONS

The following instructions apply to each Request contained herein:

1. In providing the documents or things called for by these Requests, You shall produce them as they are kept in the usual course of business, including all file folders, envelopes,

---

[3] https://www.vantagescore.com/wp-content/uploads/2022/01/2019-VantageScore-Market-Adoption-Study-FINAL-1.pdf.
[4] https://www.vantagescore.com/wp-content/uploads/2022/08/2022-VS-Market-Adoption-Study-Public-Report.pdf.
[5] https://www.vantagescore.com/vantagescore-credit-score-usage-up-30-in-2022/.

labels, indices, or other identifying or organizing material in which such documents are stored or filed, under which they are organized, or which accompany such documents or organize and label them to correspond with the specific request(s) to which they relate.

2.     You are instructed to produce all Documents and Communications identified by these Requests that are in Your actual or constructive possession, custody, or control, including Documents and Communications held by Oliver Wyman, Charles River Associates, or Berens & Miller at the direction of You or Your Affiliates.

3.     Each Request shall be construed independently, and no Request shall be viewed as limiting the scope of any other Request, except that Documents responsive to more than one Request need be produced only once.

4.     All responsive Documents are to be produced in accordance with the Stipulation and Order Establishing the Protocol for Production of Documents and Electronically Stored Information ("ESI Order") entered in this Action (Dkt. 207) and attached hereto as **Exhibit 3**.

5.     All responsive Documents are to be produced in accordance with the Confidentiality Order entered in this Action (Dkt. 199) and attached hereto as **Exhibit 4**. Please indicate whether any documents produced in response to this subpoena should be designated as Confidential or Highly Confidential pursuant to the Confidentiality Order.  In addition, please be advised of the Court's admonition that parties and non-party subpoena recipients should make "careful and reasonable designations rather than over-designations" pursuant to the Confidentiality Order.  *See* 11/16/2023 Minute Entry (Dkt. 198).

6.     Each and every draft and non-identical copy of a Document, whether different from the original because of stamps, indications of the recipient(s), handwritten notes, marks, attachments, or any other reason, is a separate Document that must be produced.

7.     If You find the meaning of any term set forth in a Request or Definition to be unclear, You should assume a reasonable meaning, state what that assumed meaning is, and answer the Request on the basis of that assumed meaning.

8.     If you cannot respond to any of the following Requests in full, respond as completely as possible, specifying the nature (if known) and reasons why you are unable to respond in full, and provide whatever information You have concerning the unprovided things, documents, or portions of documents, including the source or sources from which the things, documents, or portions of documents can be obtained and that portion of the documentation that can be produced.

9.     If You become aware of any Documents or Communications requested in these Requests that have been destroyed, lost, or misplaced, or otherwise cannot be produced, You are instructed to respond by providing the following information:

a.     The type of Document (e.g., e-mail, notes, letters, memoranda);

b.     A description of the Document and its contents;

c.     The identity of the author(s) of the Document;

d.     The circumstances under which the Document was destroyed, lost, misplaced, or otherwise rendered incapable of production; and

e.     The identity of all persons having knowledge of the Document or the circumstances under which the Document was destroyed, lost, misplaced, or otherwise rendered incapable of production.

10.     Unless otherwise indicated, all Requests relate to the time period January 1, 2013 to the present (the "Relevant Time Period").

6

11.     These Requests shall be deemed continuing in accordance with Federal Rule of Civil Procedure Rule 26(e). If you obtain or become aware of any further Documents responsive to these Requests, you are required to promptly produce those Documents.

12.     To the extent you object to responding to any Requests in full or in part, FICO is willing to meet and confer in order to determine whether a compromise as to the Request might be reached to eliminate the need for motions practice concerning the Request.

## REQUESTS FOR PRODUCTION

1.     All LLC agreements or operating agreements of VantageScore Solutions, LLC that have been in effect during the Relevant Time Period.

2.     The license agreements under which You have licensed credit scoring analytics, software, or intellectual property to Credit Bureaus during the Relevant Time Period.

3.     Documents sufficient to show the number and type of VantageScore Credit Scores generated or distributed by Credit Reporting Agencies, including the Credit Bureaus, or Resellers, broken out by category of End User, distribution channel (*e.g.*, business-to-business, direct-to-consumer, or other), and, if known, by type of use case (*e.g.*, prescreen activities, pre-qualification activities, credit origination, account review, consumer disclosures, marketing, or other) during each year of the Relevant Time Period.

4.     Documents sufficient to show the number and identity of End Users and Resellers that use or distribute VantageScore, broken out by category referenced in the VantageScore Market Study Reports (*i.e.* credit card issuers, personal and installment loan companies, auto lenders, mortgage lenders, credit unions, banks, tenant screening, telecommunications screening, utility screening, consumer websites, government entities, other), and the type of use case (*e.g.*, prescreen

7

activities, pre-qualification activities, credit origination, account review, consumer disclosures, marketing, or other) during each year of the Relevant Time Period.

5.  All Documents that analyze, reflect, calculate, or estimate the number or share, on a percentage basis or otherwise, of VantageScore Credit Scores used by End Users of any kind (including businesses and consumers) in the United States.

6.  All Documents and Communications related to any market studies of VantageScore Credit Scores or FICO Scores, including but not limited to studies relating to brand awareness, consumer understanding or sentiment, or use and adoption by End Users. For the avoidance of doubt, this Request includes but is not limited to all Documents and Communications related to the VantageScore Market Study Reports (including, specifically, the 2017, 2018, 2019, and 2022 VantageScore Market Study Reports and the 2023 Market Adoption Study).

7.  All data and information You received from TransUnion, Equifax and Experian, or otherwise provided to Oliver Wyman or Charles River, which provides the basis of the statistics referenced in the VantageScore Market Study Reports (including, specifically, the 2017, 2018, 2019, and 2022 VantageScore Market Study Reports and the 2023 Market Adoption Study).

8.  All long-form summaries that were prepared in connection with the VantageScore Market Study Reports (including, specifically, the 2017, 2018, 2019, and 2022 VantageScore Market Study Reports and the 2023 Market Adoption Study).

9.  All Documents and Communications related to competitive assessments or comparisons between FICO Scores and VantageScore Credit Scores, including but not limited to assessments or comparisons of model design, reason codes, predictive capability, accuracy, reliability, consistency, value, marketing, brand equity or awareness, or price.

8

10.     All Documents and Communications related to any study, evaluation, assessment, or attempt (whether consummated or not) to align the odds-to-score relationship between any VantageScore Credit Score and FICO Score, including but not limited to any study, evaluation or assessment of the need to align the odds-to-score relationship of VantageScore Credit Scores to the odds-to-score relationship of FICO Scores.

11.     All Documents and Communications related to any study, evaluation, assessment, or attempt (whether consummated or not) to align the reason codes between any VantageScore Credit Score and FICO Score, including but not limited to any study, evaluation or assessment of the need to replicate or copy FICO Score reason codes.

12.     All Documents and Communications related to the terms, conditions, or provisions in FICO's license agreements with the Credit Bureaus, including but not limited to the "No Equivalent Products," "Dynamic Royalty Schedule," "Pre-Qualification," and "Level Playing Field" provisions referenced in the DPP and IPP Amended Complaints. *See* DPP Amended Complaint ¶¶ 111-139; IPP Amended Complaint ¶¶ 124-155.

13.     All Documents and Communications—including but not limited to all Documents and Communications that were sent, authored, or received by Barrett Burns, Silvio Tavarez, Dr. Rikard Bandebo, Susan Fahy, Anthony Hutchinson, Dr. Andrada Pacheco, Jeff Richardson, Benjamin Tagoe, Emre Sahingur, or anyone who has held predecessor or successor roles to the foregoing individuals—related to the following statements, press releases, and publications attributed to You during the Relevant Time Period:

9

    a.   VantageScore Solutions, Myth: VantageScore Is Not Accepted by Investors Securitization Markets (Mar. 23, 2016). *See* DPP Amended Complaint ¶ 83; IPP Amended Complaint ¶ 98.[6]

    b.   Press Release, VantageScore, VantageScore Solutions Issues Statement Reacting to FHFA's Proposed Rules for Validating and Approving New Credit Scoring Models (Dec. 17, 2018). *See* DPP Amended Complaint ¶ 52; IPP Amended Complaint ¶ 64.[7]

    c.   VantageScore® Credit Scores and The Mortgage Market (2018). *See* DPP Amended Complaint ¶ 82; IPP Amended Complaint ¶ 97.[8]

    d.   Press Release, VantageScore, The FICO score is losing ground to a different credit score (November 25, 2015).[9]

    e.   Press Release, VantageScore, VantageScore Threatens FICO Credit Score Dominance (December 1, 2015).[10]

    f.   Press Release, VantageScore, Annual Usage of VantageScore Credit Scores Surges Past 8 Billion (October 21, 2016).[11]

---

[6] https://vantagescore.com/education/blog/myth-vantagescore-is-not-accepted-by-investors-in-securitization-markets.

[7] https://vantagescore.com/press/vantagescore-solutions-issues-statement-reacting-to-fhfas-proposed-rules-for-validating-and-approving-new-credit-scoring-models.

[8] https://www.vantagescore.com/wp-content/uploads/2022/02/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf.

[9] https://www.vantagescore.com/press_releases/the-fico-score-is-losing-ground-to-a-different-credit-score/.

[10] https://www.vantagescore.com/press_releases/vantagescore-threatens-fico-credit-score-dominance/.

[11] https://www.vantagescore.com/press_releases/annual-usage-of-vantagescore-credit-scores-surges-past-8-billion/.

g. Press release, VantageScore, Usage of VantageScore Credit Scores Surges More than 20 percent versus the Previous Year and Over 300 percent over the Past Five Years (October 15, 2018).[12]

h. Press Release, VantageScore, VantageScore Solutions Announces Score Use Grows to More than 12 Billion (Oct. 29, 2019).[13]

i. Press Release, VantageScore, Momentum of third-party credit scores to challenge FICO (October 31, 2019).[14]

j. VantageScore Newsletter, Market Adoption: 12.3 Billion & Counting (June 22, 2020).[15]

k. VantageScore Newsletter, Model usage surges 20+ percent (June 22, 2020).[16]

l. Press Release, VantageScore, FICO Score's Hold on the Credit Market Is Slipping (July 26, 2021).[17]

m. Press Release, VantageScore, 14.5 Billion VantageScore® Credit Scores Used by Over 3,000 Companies (August 2, 2022).[18]

---

[12] https://www.vantagescore.com/press_releases/usage-of-vantagescore-credit-scores-surges-more-than-20-percent-versus-the-previous-year-and-over-300-percent-over-the-past-five-years/.

[13] https://www.vantagescore.com/press_releases/vantagescore-solutions-announces-score-use-grows-to-more-than-12-billion/.

[14] https://www.vantagescore.com/press_releases/momentum-of-third-party-credit-scores-to-challenge-fico/.

[15] https://www.vantagescore.com/newsletter/market-adoption-12-3-billion-counting/.

[16] https://www.vantagescore.com/newsletter/model-usage-surges-20-percent/.

[17] https://www.vantagescore.com/press_releases/fico-scores-hold-on-the-credit-market-is-slipping/.

[18] https://www.vantagescore.com/press_releases/14-5-billion-vantagescore-credit-scores-used-by-over-3000-companies/.

     n.  VantageScore, 14.5 Billion Scores Used in 12-Months … VantageScore's Usage Grows by 18% According to New Study (August 2, 2022).[19]

     o.  Press Release, VantageScore, VantageScore® Credit Score Usage Up 30% in 2022, VantageScore Press Release (June 1, 2023).[20]

     p.  VantageScore, More Lenders Than Ever Are Accessing The Capital Markets with VantageScore (June 22, 2023).[21]

     q.  VantageScore, Automotive News: VantageScore Used for More Auto Finance Credit Checks In 2022 (August 9, 2023).[22]

     r.  VantageScore, Record Adoption of VantageScore in the ABS Market for 2023 (September 13, 2023).[23]

14.    All audited financial statements, including consolidated financial statements, prepared for You, that pertain to the Relevant Time Period.

15.    Your annual budgets for each year of the Relevant Time Period.

16.    All Documents sufficient to show Your operating costs, capital expenses, R&D expenses, and investments in or by You during each year of the Relevant Time Period.

17.    All Documents, including letters, comments, white papers, presentations, or written Communications that You have provided any state or federal agency or trade association that relate to the use, adoption, acceptance, or competitive standing of VantageScore Credit Scores.

---

[19] https://www.vantagescore.com/2022-market-adoption-study/.
[20] https://www.vantagescore.com/press_releases/vantagescore-credit-score-usage-up-30-in-2022/.
[21] https://www.vantagescore.com/more-lenders-than-ever-are-accessing-the-capital-markets-with-vantagescore/.
[22] https://www.vantagescore.com/automotive-news-vantagescore-used-for-more-auto-finance-credit-checks-in-2022/.
[23] https://www.vantagescore.com/abs-market-adoption-vantagescore-2023/.

18.     All Documents provided in response to any governmental request or demand related to competition or business practices regarding Credit Scores or Credit Reports.

# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE FICO ANTITRUST LITIGATION | ) ) ) | Judge Edmond E. Chang |
| This Document Relates to the Following Cases: | ) ) ) | Magistrate Judge David E. Weisman |
| | | No. 1:20-CV-02114 |
| DIRECT PURCHASER CASES | ) ) ) | JURY TRIAL DEMANDED |

**DIRECT PURCHASER PLAINTIFFS'**
**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

### TABLE OF CONTENTS

NATURE OF THE ACTION ............................................................................................ 1

PARTIES ........................................................................................................................... 6

    I.     PLAINTIFFS ................................................................................................. 6

    II.    DEFENDANTS ............................................................................................. 9

JURISDICTION, VENUE, AND INTERSTATE COMMERCE ................................... 9

FACTUAL ALLEGATIONS .......................................................................................... 10

    I.     CREDIT SCORING AND REPORTING ........................................... 10

        A.    Credit Scores .............................................................................. 10

        B.    Credit Reports ............................................................................ 12

    II.    THE MARKETS FOR CREDIT SCORES IN THE UNITED STATES............ 15

    III.   FAIR ISAAC'S MONOPOLY POWER IN THE B2B CREDIT SCORE
        MARKET......................................................................................................... 19

    IV.   VANTAGESCORE SOLUTIONS' ENTRY INTO THE B2B CREDIT SCORE
        MARKET AND ITS INNOVATIVE PRODUCT ............................................... 23

    V.    FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT.. 27

        A.    Fair Isaac's Anticompetitive Litigation .................................... 27

        B.    Litigation Between Fair Isaac and TransUnion ........................ 29

        C.    Fair Isaac and the Credit Bureaus' Agreements to Restrain Competition 31

            1.    Fair Isaac and the Credit Bureaus Agree to Anticompetitive
               Provisions in Licensing Agreements ............................ 31

            2.    The Anticompetitive Terms of the Contracts Fair Isaac and the
               Credit Bureaus Entered into ........................................ 34

                 i.    The "No Equivalent Products" Provisions........................ 37

                 ii.   The "Dynamic Royalty Schedule" Provisions................. 38

                 iii.  The "Level Playing Field" Provisions ............................. 41

        D.    Fair Isaac's Additional Efforts to Deter B2B Purchasers from Using
           VantageScore ............................................................................. 46

    VI.   THE CONTRACTS BETWEEN FAIR ISAAC AND EACH OF THE CREDIT
        BUREAUS CONTAINING ANTICOMPETITIVE TERMS, ALONG WITH
        FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT,
        HARM COMPETITION IN THE B2B CREDIT SCORE MARKET ................. 50

CLASS ACTION ALLEGATIONS ................................................................................ 51

STATUTES OF LIMITATIONS AND TOLLING.......................................................... 53

i

I. THE STATUTES OF LIMITATIONS DID NOT BEGIN TO RUN BECAUSE PLAINTIFFS DID NOT DISCOVER, AND COULD NOT HAVE DISCOVERED, DEFENDANTS' UNLAWFUL SCHEME ................................ 53

II. FRAUDULENT CONCEALMENT TOLLED THE STATUTES OF LIMITATIONS ..................................................................... 55

III. DEFENDANTS' ACTIONS CONSTITUTE A CONTINUING VIOLATION .. 57

CLAIMS FOR RELIEF ..................................................................... 58

CLAIM ONE: UNREASONABLE RESTRAINT OF TRADE (15 U.S.C. §§1, 3) ................................................................. 58

CLAIM TWO: UNREASONABLE RESTRAINT OF TRADE (15 U.S.C. §§1, 3) ................................................................. 60

CLAIM THREE: UNREASONABLE RESTRAINT OF TRADE (15 U.S.C. §§1, 3) ................................................................. 62

CLAIM FOUR: UNREASONABLE RESTRAINT OF TRADE (15 U.S.C. §§1, 3) ................................................................. 64

CLAIM FIVE: MONOPOLIZATION (15 U.S.C. §2) ................................................................. 66

CLAIM SIX: STATE ANTITRUST LAWS ........................................ 67

CLAIM SEVEN: STATE UNFAIR AND DECEPTIVE TRADE PRACTICES LAWS ........................................................... 78

PRAYER FOR RELIEF ..................................................................... 92

DEMAND FOR JURY TRIAL ............................................................ 93

CERTIFICATE OF SERVICE ........................................................... 97

Plaintiffs Sky Federal Credit Union, Alcoa Community Federal Credit Union, Amalgamated Bank, City of Boston Credit Union, First Choice Federal Credit Union, Getten Credit Company, and Holmes County Bank & Trust Company ("Plaintiffs"), on behalf of themselves and all similarly situated entities in the United States and its territories, bring this action pursuant to Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§1, 2, 3) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26), as well as certain state antitrust and consumer protection laws, against Defendants Fair Isaac Corporation ("Fair Isaac"), Equifax, Inc. ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and TransUnion, LLC ("TransUnion") (collectively "Defendants," with the latter three referred to collectively as the "Credit Bureaus," the "Credit Rating Agencies," or the "Credit Bureau Defendants"), resulting from their restraining trade and Fair Isaac's monopolizing the B2B Credit Score Market from October 1, 2006 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased (the "Class Period"). The allegations of this Complaint are based on personal knowledge as to the allegations concerning each Plaintiff and on information and belief as to all other matters.

**NATURE OF THE ACTION**

1.      A "credit score" is a three-digit numerical summary of a customer's creditworthiness based on factors such as payment history and the duration of that history; balances, available credit, and the percentage of existing credit lines being utilized; public records like bankruptcies or adverse judgments; and the assumption of new debt. There are two distinct markets for such scores. The first is the market for the sale of such scores to banks, mortgage companies, credit unions, and other businesses that assess individual credit risk – *i.e.*, business-to-business sales. That market is referred to herein as the "B2B Credit Score Market." The second

1

is the market for the sale of such scores to the individual who is the subject of them – *i.e.*, business-to-consumer. That market is referred to herein as the "B2C Credit Score Market."

2.     This case concerns the B2B Credit Score Market, which Defendant Fair Isaac has dominated for nearly three decades (and continues to dominate) with its FICO® Scores. FICO Scores are used routinely by lenders and others to assess individual credit risks. Fair Isaac executives have bragged that their FICO Scores are "the 800-pound gorilla" and are "deeply embedded in the system in North America."[1] Fair Isaac advertises that its FICO Scores are used for 90% of all lending decisions in the United States and that Fair Isaac sells four times more FICO Scores per year than McDonald's sells hamburgers worldwide. The dominance of FICO Scores is reflected in the following chart taken from a December 2019 "Investor Overview" presentation that is available on Fair Isaac's corporate website:[2]



---

[1]     Trans Union LLC's Redacted Counterclaims, Dkt. 38, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318, ¶2 (N.D. Ill. Feb. 12, 2018) ("TransUnion Counterclaims").

[2]     Fair Isaac, *FICO: The Decisions Company Investor Overview*, at 5 (Dec. 2019), https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.

3. TransUnion, Experian, and Equifax are credit reporting agencies that collect, standardize, and distribute information on the credit and financial history of individuals. Those Credit Bureaus sell lenders, financial institutions, and other businesses credit reports and credit scores – including Fair Isaac's FICO Scores – that are used to make decisions about whether and on what terms to evaluate and extend credit. Credit Bureaus sell those credit reports and credit scores to businesses in every state. The three Credit Bureau Defendants control virtually 100% of aggregate credit-related data formed by aggregating credit data collected from businesses, and they jointly dominate the market for B2B credit reports.

4. For decades, the Credit Bureaus have worked with Fair Isaac, including by entering into licensing agreements with Fair Isaac, and distribution agreements with businesses and/or Fair Isaac to broker sales of FICO Scores.

5. Fair Isaac also directly sells FICO Scores to creditors and other businesses – bypassing the Credit Bureaus, and competing with them, when it does so.

6. In 2006, the Credit Bureaus banded together to launch VantageScore Solutions, LLC ("VantageScore Solutions") through a joint venture. The Credit Bureaus own VantageScore Solutions. The Credit Bureaus' purpose behind their joint venture was to create a competitor to the FICO Score, known as the "VantageScore."[3]

---

[3] *See* Third Amended Complaint, Dkt. 436, *Fair Isaac Corporation v. Experian Info. Sols.*, No. 06-CV-4112, ¶63 (D. Minn. Nov. 10, 2008) ("VantageScore is owned by Equifax, Experian, and TransUnion."); Dkt. 477, Credit Bureaus' Answer to Third Amended Complaint, *Fair Isaac Corporation v. Experian Info. Sols.*, No. 06-CV-4112, ¶63 (D. Minn. Dec. 4, 2008) (admitting same); Business Wire, *VantageScore Solutions Hires Capital Markets Expert Latonia Hubbs as Senior Vice President* (Sept. 7, 2021), https://www.businesswire.com/news/home/20210907005583/en/VantageScore-Solutions-Hires-Capital-Markets-Expert-Latonia-Hubbs-as-Senior-Vice-President.

7.      From the outset, VantageScore was competitively priced, highly predictive, and scored millions more Americans than Fair Isaac's FICO Score. VantageScore Solutions is capable of providing credit scores for 30 million more Americans than Fair Isaac can. Notably, Fair Isaac leaves many people of color and lower-income individuals unscored. Were VantageScores widely adopted by businesses, millions more creditworthy Americans would have the opportunity to apply for a home mortgage, car loan, or credit card, and to obtain credit at a lower cost.

8.      Rather than compete on the merits with VantageScore, Fair Isaac undertook a *decades-long campaign of anticompetitive conduct* to discourage the adoption of VantageScore and preserve its own monopoly. Fair Isaac also entered into contracts with each Credit Bureau that contained anticompetitive provisions, including provisions that would necessarily eliminate or drastically reduce the competitive threat posed by VantageScore, thus unreasonably restraining trade.

9.      First, in 2006, Fair Isaac filed a lawsuit against TransUnion, Equifax, and Experian with the intended purpose of driving VantageScore Solutions out of business. Experian settled in 2008 and entered into a lucrative partnership with Fair Isaac following the settlement. TransUnion and Equifax fought on, eliminated most of Fair Isaac's claims through a summary judgment motion and won a jury trial on the remaining trademark claim.

10.     Second, when the litigation gambit failed, Fair Isaac entered into contracts with the Credit Bureaus containing anticompetitive restrictions aimed at extracting supracompetitive profits from B2B Purchasers. Those contracts include contractual provisions that: (1) prohibit Credit Bureaus from marketing non-FICO credit scores (*i.e.*, VantageScore); (2) charge discriminatory and prohibitively high prices for FICO Scores if a Credit Bureau customer purchases a FICO Score while providing the consumer with a competing score (*i.e.*, a

VantageScore); and (3) eliminate price competition among the Credit Bureaus thereby disincentivizing the Credit Bureaus from negotiating a lower price for FICO Scores. The agreements had the effect of hobbling VantageScore Solutions' ability to compete and forcing B2B Purchasers to pay supracompetitive prices for credit scores.

11.     Finally, Fair Isaac commenced a public smear campaign intended to dissuade potential customers from using VantageScore.

12.     By unlawfully maintaining its monopoly through such anticompetitive tactics, Fair Isaac, with the agreement of the Credit Bureaus, has been able to exclude VantageScore from competing for customers in the B2B Credit Score Market. The effect of this exclusion has been Fair Isaac's ability to *maintain the prices for FICO Scores at a supracompetitive level for decades and raise prices with impunity for its credit scoring products*. For example, Fair Isaac's net income for the third quarter of 2021 was *more than double* that of the previous year period, increasing from $64.1 million in the third quarter of 2020 to $151.2 million in the third quarter of 2021.[4] Over time, Fair Isaac's net income has remained very high, with $236 million net income in 2020, $392 million in 2021, and $374 million in 2022.[5] Sources in the financial industry have attributed Fair Isaac's profitability to "[p]rice increases in its credit scoring segment and gains in

---

[4]     Press Release, Fair Isaac, *FICO Announces Earnings of $5.18 per Share for Third Quarter Fiscal 2021* (Aug. 3, 2021), https://investors.fico.com/news-releases/news-release-details/fico-announces-earnings-518-share-third-quarter-fiscal-2021.

[5]     Fair Isaac Corporation, Q4 2020 Earnings Call, BAMSEC (Nov. 10, 2020), https://www.bamsec.com/document-search?query=236&entityId=814547; Fair Isaac Corporation, Q4 2020 Earnings Call, BAMSEC (Nov. 10, 2020), https://www.bamsec.com/document-search?query=392&entityId=814547; Fair Isaac Corporation, Q4 2022 Earnings Call, BAMSEC (Nov. 9, 2022), https://www.bamsec.com/document-search?query=374&entityId=814547.

applications sold to banking institutions," which have "helped the company log year-over-year gains in revenue and profit."[6]

13.    Fair Isaac's and the Credit Bureaus' conduct harmed competition and injured Plaintiffs and members of the class by forcing them to pay supracompetitive prices for FICO Scores.

14.    Plaintiffs and the Class are the first purchasers from outside the Fair Isaac-Credit Bureaus conspiracies.

## PARTIES

### I.    PLAINTIFFS

15.    Plaintiff Sky Federal Credit Union ("Sky FCU") is a federally chartered credit union with a principal place of business at 111 North B Street, Livingston, Montana. Sky FCU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers. During the Class Period, Sky FCU directly purchased B2B credit scores from Fair Isaac and Experian. Sky FCU was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Sky FCU is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

16.    Plaintiff Alcoa Community Federal Credit Union ("Alcoa FCU") is a Federal Credit Union with its principal place of business at 1125 Military Road, Benton, Arkansas. Alcoa FCU makes loans and other credit-related facilities available to consumers. Alcoa FCU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards,

---

[6]    Motley Fool, *Fair Isaac Corporation Scores 13% Revenue Growth in the First Quarter* (Jan. 31, 2019), https://www.fool.com/investing/2019/01/31/fair-isaac-corporation-scores-13-revenue-growth-in.aspx.

and lending and other credit-related facilities for consumers. During the Class Period, Alcoa FCU directly purchased B2B credit scores from Fair Isaac, TransUnion, and Experian. Alcoa FCU was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Alcoa FCU is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

17. Plaintiff Amalgamated Bank ("Amalgamated Bank") is a New York State chartered commercial bank and trust company with a principal place of business at 275 Seventh Avenue, New York, New York. Amalgamated Bank is the largest union-owned bank in the United States. Workers United and affiliated organizations are the largest shareholders of Amalgamated Bank. Amalgamated Bank provides financial services, including personal banking services for consumers; services for businesses, non-profit organizations; and institutional investing services. During the Class Period, Amalgamated Bank directly purchased B2B credit scores from Fair Isaac, Experian, and Equifax. Amalgamated Bank was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Amalgamated Bank is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

18. Plaintiff City of Boston Credit Union ("City of Boston CU") is a credit union with its principal place of business at One Union Street, 3rd Floor, Boston, Massachusetts. City of Boston CU is a member-owned credit union that was established on November 15, 1915. City of Boston CU is one of the oldest credit unions in the United States. City of Boston CU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers. During the Class Period, City of Boston CU directly purchased B2B credit scores from Fair Isaac and Experian. City of Boston

7

CU was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. City of Boston CU is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

19. Plaintiff First Choice Federal Credit Union ("First Choice FCU") is a federally chartered credit union with a principal place of business at 2209 West State Street, New Castle, Pennsylvania. First Choice FCU is a financial institution that provides financial services, including deposit accounts, credit and/or debit cards, and lending and other credit-related facilities for consumers. During the Class Period, First Choice FCU directly purchased B2B credit scores from Fair Isaac and TransUnion. First Choice FCU was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. First Choice FCU is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

20. Plaintiff Getten Credit Company ("Getten") is a corporation with its principal place of business at 1310 Sibley Memorial Highway, Mendota, Minnesota. Getten is a small, family-owned independent finance company that specializes in helping consumers with various financial needs including debt consolidation, purchasing vehicles, and rebuilding credit. During the Class Period, Getten directly purchased B2B credit scores from TransUnion. Getten was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Getten is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

21. Plaintiff Holmes County Bank & Trust Company ("Holmes County Bank") is a bank with its principal place of business at 316 Court Square, Lexington, Mississippi. Holmes County Bank has provided financial services to its customers since 1932. During the Class Period,

Holmes County Bank directly purchased B2B credit scores from Equifax and TransUnion. Holmes County Bank was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law. Holmes County Bank is threatened with future injury to its business and property by reason of Defendants' continuing violations of law.

## II.     DEFENDANTS

22.    Defendant Fair Isaac is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California.

23.    Defendant Equifax is a Credit Bureau incorporated in Georgia that has its principal place of business at 1550 Peachtree St. NW, Atlanta, Georgia.

24.    Defendant Experian is a Credit Bureau incorporated in Ohio that has its principal place of business in the United States at 475 Anton Blvd., Costa Mesa, California.

25.    Defendant TransUnion is a Delaware limited liability Credit Bureau that has its principal place of business at 555 W. Adams St., Chicago, Illinois.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

26.    This action arises under Sections 1 through 3 of the Sherman Act (15 U.S.C. §§ 1-3) and Sections 4 & 16 of the Clayton Act (15 U.S.C. §§ 15 & 26).

27.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337.

28.    The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims.

29.    Venue is proper in this District under 15 U.S.C. §§ 15(a) & 22, and 28 U.S.C. § 1391(b), (c), and (d), because, during the Class Period, Defendants resided, transacted business, were found, or had agents in the United States, including in this District, and a substantial portion of the alleged activity affected interstate trade and commerce, including in this District.

9

30.    During the Class Period, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States and its territories, including in this District.

31.    During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States Mail, to effectuate their illegal scheme.

32.    Defendants' conduct also had a substantial effect on the intrastate commerce of the states listed in counts Six and Seven of this Complaint.

33.    This Court has personal jurisdiction over Defendants because Defendants transacted business, maintained substantial contacts, and are located and/or committed unlawful conduct in this District.  Their unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

## FACTUAL ALLEGATIONS

### I.    CREDIT SCORING AND REPORTING

#### A.    Credit Scores

34.    A credit score is a three-digit number, typically between 300 and 850, designed to represent an individual's credit risk or the likelihood the individual will pay bills on time.

35.    Credit scores are calculated using information in an individual's credit reports, including an individual's payment history, the amount of debt the individual has, and the length of the individual's credit history.  Higher scores mean the individual has demonstrated responsible credit behavior in the past, which may make potential lenders and creditors more confident when evaluating a request for credit.  Credit scoring companies like Fair Isaac and VantageScore Solutions apply complex algorithms to arrive at a numerical credit score.

10

36.     Credit scores are accompanied by "reason codes," which explain to the potential

lender or creditor why the score was not higher.  VantageScore explains this process as follows:

> No matter where you get your score, the documents that accompany it will include
> up to four or five statements explaining why your score wasn't higher.  These
> statements are called reason codes and sometimes go by several other names.  Some
> people call them score factors, others call them adverse action codes.  They're all
> the same thing.

> The next time you see your credit score, regardless of where it comes from, look
> for the reason codes.  They'll be worded and displayed something like this:

> Your Credit Score Is: 705

> 32: Balances on bankcard or revolving accounts too high compared to credit limits

> 16: The total of all balances on your open accounts is too high

> 85: You have too many inquiries on your credit report

> 13: Your most recently opened account is too new

> The numbers preceding each statement are numeric identifiers; sometimes they
> appear with the text, and sometimes they do not.

> The four (or five) factors are listed in order of the impact they have.  In this
> example, the number one reason the credit score is not higher is "Balances on
> bankcard or revolving accounts too high compared to credit limits."  That means
> the consumer's credit card debt is too high relative to his or her credit limits.

> In our example, the reason with the second-greatest impact is "The total of all
> balances on your open accounts is too high."  That means the consumer is
> carrying too much debt on his or her open accounts.

> The third reason the score isn't higher is "You have too many inquiries on your
> credit report."  This means the consumer has recently applied for credit several
> times, which led to some number of credit inquiries.

> The fourth reason the score isn't higher is "Your most recently opened account is
> too new."  Clearly this means the consumer has a very new account on his or her
> credit report.[7]

---

[7]     VantageScore Solutions, *Reason Codes 101*, https://www.reasoncode.org/reasoncode101
(last visited on Oct. 30, 2023).

37.     Fair Isaac has a webpage that sets forth its various "reason codes."[8]  VantageScore also has a dedicated website that explains its various "reason codes."[9]

**B.     Credit Reports**

38.     Credit Bureaus collect and store financial data about individuals that is submitted to them by creditors, such as lenders, credit card companies, and other financial companies. Creditors are not required to report to every credit-reporting company.

39.     Utilizing these files, Credit Bureaus create a credit report, which is a statement that has information about an individual's credit activity and current credit situation, such as loan payment history and the status of credit accounts.  The information contained in such reports is used to create credit scores.

40.     Credit Bureaus sell these credit reports to lenders or creditors such as Plaintiffs and the Class ("B2B Purchasers") in the "B2B market."  They also sell them to individuals wishing to monitor their own credit ("B2C Purchasers").

41.     Fair Isaac works with the Credit Bureaus to perpetuate and extend its monopoly. Fair Isaac's relationship with B2B Purchasers is often dependent on B2B Purchasers' relationships with the Credit Bureaus: The Credit Bureaus facilitate the sale of FICO Scores to B2B Purchasers.

42.     FICO Scores and credit reports are often sold to businesses as a bundle.  Such bundles can be sold by Credit Bureaus, which are licensed by Fair Isaac to sell FICO Scores and in return, pay a royalty to Fair Isaac.  Thus, when a B2B Purchaser requires a credit score, it purchases a credit report from a Credit Bureau and a credit score from that Credit Bureau and Fair

---

[8]     Fair Isaac, *US FICO® Score Reason Codes*, https://www.fico.com/en/latest-thinking/solution-sheet/us-fico-score-reason-codes (link to download) (last visited on Oct. 30, 2023).

[9]     VantageScore Solutions, REASONCODE.ORG, https://www.reasoncode.org (last visited Oct. 26, 2023).

Isaac often through a contract with both Fair Isaac and the Credit Bureau. Although the payment for the credit report and the credit score may at times occur in a single transaction, the reality is that both the Credit Bureau and Fair Isaac act as the providers of the FICO Score. Indeed, certain Class members' contracts for the sale of FICO Scores and credit reports to B2B Purchasers specify that "in consideration of [the Credit Bureau]/Fair Isaac's performance" of their obligations to provide those products, the purchaser shall "pay [the Credit Bureau]/Fair Isaac fees" for those products.

43.     In its 2020 Form 10-K filed with the Securities and Exchange Commission, Fair Isaac stated that, "[d]uring fiscal 2020, 2019 and 2018, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for 32%, 29% and 25% of our total revenues, respectively."[10] In its 2022 Form 10-K filed with the SEC, Fair Isaac disclosed significant increases of the revenue Fair Isaac generated from its agreements with the Credit Bureaus, reporting that "during fiscal 2022, 2021 and 2020, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for *39%*, *38%* and *33%* of our total revenues, respectively."[11] The same Form 10-K describes the Credit Bureaus as Fair Isaac's "partners in offering [FICO's] scoring solutions."[12]

44.     The FICO Score and credit report bundles can also be sold by Fair Isaac to businesses. "In those situations, Fair Isaac requests a credit score and credit report from the Credit Bureau selected by the lender or consumer. The Credit Bureau applies Fair Isaac's Bureau-tailored

---

[10]     Fair Isaac Corporation, Annual Report (Form 10-K), at 11 (Nov. 10, 2020), https://fico.gcs-web.com/node/23951/html (hereinafter, "Fair Isaac 2020 10-K").

[11]     Fair Isaac Corporation, Annual Report (Form 10-K), at 9 (Nov. 9, 2022), https://fico.gcs-web.com/static-files/9050c8f5-9c87-4d41-8ecd-6d9f3d179a8a (hereinafter, "Fair Isaac 2022 10-K") (emphasis added).

[12]     *Id.*

FICO algorithm to a consumer's aggregated credit data and provides the consumer's credit report and credit score to Fair Isaac. Fair Isaac then delivers the bundle to the consumer or lender. Fair Isaac pays the Credit Bureau for the cost of processing and providing the bundle."[13]

45.     Thus, Fair Isaac and the Credit Bureaus act as horizontal competitors and compete with each other for some B2B Purchasers – separate and apart from Fair Isaac's competition with VantageScore.

46.     This direct competition between Fair Isaac and the Credit Bureaus, as well as the close relationship among them, continues to this day. At an August 3, 2021 earnings conference, Fair Isaac's Chief Executive Officer and Director, William J. Lansing, said, "we stay close to it [B2B scores] through our channel partners, the bureaus. But we also – certainly for all of the major institutions, we have direct sales relationships."[14] TransUnion's 2022 Form 10-K acknowledges that it "compete[s] with FICO in the Financial Services" market for B2B Purchasers.[15] Similarly, Equifax's 2022 Form 10-K acknowledges that it too "compete[s] with Fair Isaac Corporation with respect to certain of [its] analytical tools and solutions."[16] Experian has also recognized that its "comparator companies" include "FICO."[17]

---

13      *Fair Isaac Corp. v. Equifax, Inc.*, No. 06-4112, 2008 WL 623120, at *2 (D. Minn. March 4, 2008).

14      Motley Fool, *Fair Isaac Corp. (FICO) Q3 2021 Earnings Call Transcript* (Aug. 3, 2021) (hereinafter, "Q3 Earnings Call"), https://www.fool.com/earnings/call-transcripts/2021/08/03/fair-isaac-corporation-fico-q3-2021-earnings-call/.

15      TransUnion, Annual Report (Form 10-K), at 12 (Feb. 14, 2023).

16      Equifax Inc., Annual Report (Form 10-K), at 8 (Feb. 23, 2023).

17      Experian *Annual Report 2022*, EXPERIAN PLC, (2022), at 139, https://www.experianplc.com/content/dam/marketing/global/plc/en/assets/documents/reports/2022/experian_ar2022_web.pdf.

## II.  THE MARKETS FOR CREDIT SCORES IN THE UNITED STATES

47.    As noted above, there are distinct B2B and B2C Credit Score Markets.  The B2B Credit Score Market comprises sales from a business (a credit score generator, such as Fair Isaac, directly or through a Credit Bureau) to a lender, creditor, or financial institution.  The B2C Credit Score Market comprises sales directly to an individual.  The claims in this case concern the B2B Credit Score Market.  The B2B Credit Score Market is the relevant product market in which the claims that require a market definition are to be assessed.

48.    Fair Isaac has recognized the existence of the distinct B2B and B2C markets.  For example, its 2020 Form-10K states: "*Scores*.  This segment includes our business-to-business scoring solutions and services, our business-to-consumer scoring solutions and services including myFICO® solutions for consumers, and associated professional services."[18]  Likewise, Fair Isaac measures quarterly scores revenues with "the company's business-to-business (B2B) scoring solutions and associated professional services, and business-to-consumer (B2C) service," as reflected in its recent earnings report for the first quarter of 2020.[19]

49.    The credit scores that lenders purchase often differ significantly from the credit scores that consumers purchase.  The Consumer Financial Protection Bureau ("CFPB") noted in a 2011 report to Congress that "many of the credit scores sold to lenders are not offered for sale to consumers."[20]  The agency went on to explain:

> When a consumer purchases a score from a CRA [Credit Rating Agency], it is likely

---

[18]    Fair Isaac 2020 10-K, at 3.

[19]    Press Release, Fair Isaac Corp., *FICO Announces Earnings of $1.82 per Share for First Quarter Fiscal 2020* (Jan. 30, 2020), https://fico.gcs-web.com/news-releases/news-release-details/fico-announces-earnings-182-share-first-quarter-fiscal-2020.

[20]    Consumer Financial Protection Bureau, *The impact of differences between consumer- and creditor-purchased credit scores*, at 1 (July 19, 2011), https://files.consumerfinance.gov/f/2011/07/Report_20110719_CreditScores.pdf.

that the credit score that the consumer receives will not be the same score as that purchased and used by a lender to whom the consumer applies for a loan. This could occur if the score the consumer purchased is an educational score that is not used by lenders, but differences between the score a consumer buys and the score a lender buys can occur for other reasons as well. Since so many scores are in use in the marketplace, it could also be the case that the particular lender to which the consumer applies uses a different scoring model than the one purchased by the consumer, or that the CRA from which the consumer obtains a score is not the same CRA that the lender uses to obtain scores, or that the underlying data in the consumer's credit report changes significantly between the time the consumer purchases a score and the time the lender obtains a score for that consumer. It is also possible that a consumer and a lender could access different reports from the CRA, if they were to use different identifying information about the consumer. Any of these differences could lead to differences between the credit score a consumer sees and the credit score a lender uses to assess that consumer.[21]

50.     The United States (including its territories) is the relevant geographic market in which B2B credit scores are provided. The restraints on competition in the B2B Credit Score Market contained in Fair Isaac's contracts relate to the provision of B2B credit scores to businesses throughout the United States.

51.     The B2B Credit Score Market exhibits high barriers to entry. As noted in a 2018 article: "The deep integration of FICO scores and products into companies' operations has raised switching costs."[22]

52.     Likewise, VantageScore Solutions has observed that in the residential mortgage sector, Fair Isaac's "imprint *inhibits competition* by raising switching costs and granting the irreplaceable brand value of utter ubiquity. It gives FICO unparalleled and highly controversial negotiating leverage with almost every participant in the industry."[23]

---

[21]     *Id.*

[22]     *Fair Isaac: A Royalty on U.S. Credit Scoring* (Sept. 25, 2018), https://seekingalpha.com/article/4208014-fair-isaac-royalty-on-u-s-credit-scoring.

[23]     Press Release, VantageScore, *VantageScore Solutions Issues Statement Reacting to FHFA's Proposed Rules for Validating and Approving New Credit Scoring Models* (Dec. 17, 2018), https://vantagescore.com/press/vantagescore-solutions-issues-statement-reacting-to-fhfas-

53.    "Larger lenders use the [FICO] score as an input to customized models they've built for specific situations or portfolios. After a recent review one major US lender recently identified over 600 places they were using a FICO score in their business processes. Switching to a new score not only means proving the new score is better (a long process in itself) but extensive testing to ensure all of those moving parts are still working as designed. Citibank recently announced that after an 18 month review they've decided it's safe to switch to the latest version of the FICO score (FICO 8). This wasn't a migration to a new score mind you, just a more recent version of the score they're already using. The *barriers to entry are indeed high* . . . and expensive."[24]

54.    "Network effects" – *i.e.*, the phenomenon where a product or service increases in value when the total number of customers increase – serve as a barrier to entry into the B2B Credit Score Market. As one analyst has noted: "The 'network effects' keeping FICO's dominant position [are] indeed incredibly strong."[25]

55.    In 2011, at Fair Isaac's Analyst/Investor Day, Fair Isaac's then-CEO, Mark Greene, explained: "In about 10 seconds, an entire commerce transaction taking place because 720 FICO was understood by the broker, by the mortgage banker on the other end of line and the customer to be shorthand for good credit risk, gave this guy a favorable mortgage rate. And that network

---

proposed-rules-for-validating-and-approving-new-credit-scoring-models (emphasis added).

[24]    John Ulzheimer, *Why FICO Isn't Going Away Any Time Soon*, Smart Credit (July 5, 2011), https://blog.smartcredit.com/2011/07/05/why-fico-isnt-going-away-any-time-soon/ (emphasis added).

[25]    Harrison Schwartz, *Fair Isaac: Share Buybacks Likely To End As Cash Reserves Run Low*, Seeking Alpha (Dec. 17, 2019), https://seekingalpha.com/article/4312953-fair-isaac-share-buybacks-likely-to-end-cash-reserves-run-low.

17

effect, having everybody in the loop understand that shorthand and standardize on a FICO Score, that's magic."[26]

56.     The anticompetitive conduct by Fair Isaac alleged herein accounts in significant part for the FICO Score's dominance in the B2B Credit Score Market.

57.     The Credit Bureaus participate in a market for credit reports. A credit report contains detailed information about a consumer's credit activity and current credit situation. The detailed information in a credit report is used to generate a FICO Score for a specific customer, which B2B lenders can use in making their lending decisions.

58.     On information and belief, the Credit Bureaus control virtually all of the credit report market (they have been called a "triopoly") and enjoy roughly equivalent market shares.[27]

59.     The three Credit Bureaus are all members of a trade association called the Consumer Data Industry Association ("CDIA"). Through the CDIA, the three Credit Bureaus frequently work together, including to: (i) develop a standard electronic data reporting format called Metro 2®; (ii) issue joint statements on matters of public importance; (iii) provide guidelines to businesses that use credit reports; and (iv) respond to public criticisms of their industry. The three Credit Bureaus also cooperated in the establishment of VantageScore Solutions as a joint venture.[28]

---

[26]     SA Transcripts, Seeking Alpha, *Fair Isaac Corp. – Analyst/Investor Day* (Nov. 3, 2011), https://seekingalpha.com/article/307417-fair-isaac-corp-analyst-investor-day.

[27]     *See* Consumer Financial Protection Bureau, *List of Consumer Reporting Companies* (2021), https://files.consumerfinance.gov/f/documents/cfpb_consumer-reporting-companies-list_2021-06.pdf.

[28]     *See* Consumer Data Industry Ass'n, *About CDIA*, https://www.cdiaonline.org/about/about-cdia/ (last visited Oct. 26, 2023); Consumer Data Industry Ass'n, *Metro 2 Format for Credit Reporting*, https://www.cdiaonline.org/resources/furnishers-of-data-overview/metro2-information/ (last visited Oct. 26, 2023); Dana Fowle, *Industry Pushes Back Against Claims of High Credit Reporting Errors*, Fox5 Atlanta (Sept. 15 2021), https://www.fox5atlanta.com/

## III.    FAIR ISAAC'S MONOPOLY POWER IN THE B2B CREDIT SCORE MARKET

60.    Fair Isaac came into existence in 1956, possessed a monopoly on credit-scoring algorithms until the mid-1970s, and continues to wield a dominant market share.[29]

61.    Fair Isaac states in its 2020 Form 10-K:

Our products and services serve clients in multiple industries, including primarily banking, insurance, retail, healthcare and public agencies.  End users of our products include 96 of the 100 largest financial institutions in the U.S., and two-thirds of the largest 100 banks in the world.  Our clients also include more than 600 insurers, including nine of the top ten U.S. property and casualty insurers; more than 300 retailers and general merchandisers; more than 200 government or public agencies; and more than 200 healthcare and pharmaceuticals companies, including nine of the world's top ten pharmaceuticals companies.  Eight of the top ten companies on the 2020 *Fortune* 500 list use one or more of our solutions.  In addition, our consumer services are marketed to an estimated 200 million U.S. consumers whose credit relationships are reported to the three major U.S. credit reporting agencies.[30]

62.    Fair Isaac itself has touted its dominance, noting in its "About" page that FICO Scores are "the most widely used credit scores," used by "90% of top lenders," and have been the "industry standard for 30 years."[31]

---

news/industry-pushes-back-against-claims-of-high-credit-reporting-errors;    Press    Release, Consumer Data Industry Ass'n, *Consumer Data Industry Association Releases Study on the Value of Credit Reporting in U.S.* (June 15, 2020), https://cdia-news.s3.amazonaws.com/White+Paper+ Press+Release+6.15.20.pdf; Kristina Poplawski, *Equifax, Experian, & TransUnion Endorse CARES Act*, CONSUMER DATA INDUSTRY ASS'N (Mar. 30, 2020), https://www.cdiaonline.org/ equifax-experian-transunion-endorse-cares-act/; Consumer Data Industry Ass'n, *COVID-19*, https://www.cdiaonline.org/covid-19/ (last visited Oct. 26, 2023).

[29]    Raymond    Anderson,    *A    History    of    Credit    Scoring*,    at    75-76    (2019), https://www.researchgate.net/profile/Raymond_Anderson4/publication/331533723_Chapter_B0 6_History_of_Credit_Scoring/links/5c7ed843299bf1268d3ccc5d/Chapter-B06-History-of-Credit-Scoring.pdf?origin=publication_detail.

[30]    Fair Isaac 2020 10-K, at 10.

[31]    Fair Isaac, *About*, https://www.ficoscore.com/about (last visited Oct. 26, 2023).

19



63.     An infographic on Fair Isaac's website states: "10 BILLION FICO SCORES ARE SOLD EACH YEAR," which is "FOUR TIMES the number of hamburgers McDonald's sells WORLDWIDE in a year," and "27,400,000 FICO scores are sold every day," which is "OVER TWICE the number of cups of coffee Starbucks sells WORLDWIDE in a day."[32]

---

[32]     Fair Isaac, *Learn About the FICO Score and Its Long History*, https://www.fico.com/25years/ (last visited Oct. 26, 2023) [https://web.archive.org/web/2018 0602142433/https://www.fico.com/25years/].



64.     Fair Isaac's 2020 Form 10-K states that FICO Scores "are used in the majority of

U.S. credit decisions, by nearly all of the major banks, credit card organizations, mortgage lenders

and auto loan originators," and it describes FICO Scores as "the standard measure in the U.S. of

consumer credit risk."[33]

65.     Fair Isaac's executives frequently tout FICO's dominance.  In 2008, Craig Watts, a

public affairs manager at Fair Isaac, described the FICO Score as the "800 pound gorilla."[34]  In

November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's former

---

[33]     Fair Isaac 2020 10-K, at 3, 7.

[34]     Dana Dratch, *What Does 'Good' Credit Really Mean?*, CNBC (Oct. 30, 2008),
https://www.cnbc.com/id/27458815.

Chief Financial Officer and Executive Vice-President, Michael Pung, stated that Fair Isaac's FICO Scores are: the "most widely used credit scoring system here in the U.S.," used by "[v]irtually every major lender in the U.S.," and that Fair Isaac has "maintained a *90-plus percent market share* for at least . . . 13 years."[35]

66.    A May 2021 report by Yale University's Thurman Arnold Project, a collaborative project among Yale faculty and students, as well as other scholars dedicated to research on competition policy and antitrust enforcement, notes that Fair Isaac "enjoys *a virtual monopoly* in the credit score market" and that "[b]ecause of the lack of competition in this domain, there has been limited innovation in scoring methodology."[36]

67.    Fair Isaac's monopoly in the B2B Credit Score Market has given it the power to control prices and impose monopoly rents. Indeed, Mr. Lansing, Fair Isaac's CEO, has noted that in the B2B Credit Score Market, Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are."[37]

68.    In February 2013, at a Morgan Stanley Conference, Mr. Lansing explained that Fair Isaac's "Scores business, which is the cash generator, is a very, very high-margin business. It's *deeply embedded* into the systems of the bank customers who use it."[38]

---

[35]    TransUnion Counterclaims, ¶ 32 (emphasis added).

[36]    Yale University Thurman Arnold Project, *Updating Antitrust and Competition Policy: Finance Issues*, at 14, 15 (May 2021), https://som.yale.edu/sites/default/files/TeamFinance-Final.pdf (emphasis added).

[37]    TransUnion Counterclaims, ¶ 34.

[38]    Seeking Alpha, *Fair Isaac's CEO Presents at Morgan Stanley Technology, Media & Telecom Conference (Transcript)* (Feb. 27, 2013), https://seekingalpha.com/article/1231981-fair-isaacs-ceo-presents-at-morgan-stanley-technology-media-and-telecom-conference-transcript (emphasis added).

69.    And in a 2021 Earnings Call, in response to a question regarding an instance where Fair Isaac lost scoring business to a competitor, Mr. Lansing responded: "Our business in Scores is as strong as it has ever been. Our volumes are very strong. We have not seen a decline. And we don't see major issuers switching away. So I guess the best way to characterize that is a one-off."[39]

## IV.    VANTAGESCORE SOLUTIONS' ENTRY INTO THE B2B CREDIT SCORE MARKET AND ITS INNOVATIVE PRODUCT

70.    In March 2006, the three Credit Bureau Defendants founded VantageScore Solutions as a joint venture, with the purpose of offering a credit scoring model that would compete with FICO Scores. The three Credit Bureau Defendants continue to own VantageScore Solutions.

71.    VantageScore Solutions offers its own credit scoring system and score called VantageScore. VantageScore Solutions does not sell or market its VantageScore credit models or credit scores; instead, it licenses them to the three Credit Bureau Defendants, which may incorporate VantageScores in their credit reports.

72.    VantageScores are a competitor to FICO Scores in the B2B Credit Score Market.

73.    VantageScore was a response to a recognized need. Many individuals receive no or lower scores under FICO. For example, the CFPB has found that, as of 2010, 26 million consumers in the United States were "credit invisible" -- *i.e.*, they lacked credit history with one of the nationwide credit reporting companies.[40] Those individuals cannot be scored by FICO.[41]

---

[39]    Q3 Earnings Call, *supra* n.14.

[40]    CFPB Office of Research, *Data Point: Credit Invisibles*, at 4, 6 (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf.

[41]    *Id.*

23

74.     The CFPB's research suggests "a strong relationship between income and having a credit record. Almost 30 percent of consumers in low-income neighborhoods are credit invisible and an additional 16 percent have unscored records. These percentages are notably lower in higher-income neighborhoods. For example, in upper-income neighborhoods, only 4 percent of the population is credit invisible and another 5 percent has an unscored record."[42]

75.     Moreover, the CFPB found "significant differences in the incidence of having a limited credit history across racial and ethnic groups," specifically, while White and Asian individuals "are almost equally likely to be credit invisible or have an unscored record, the shares of Black[] and Hispanic[] [individuals] with limited credit history are much larger," and individuals in those groups are thus less likely to be able to obtain a credit score.[43]

76.     According to the CFPB, "[a]bout 15 percent of Black[] and Hispanic[] [individuals] are credit invisible . . . and an additional 13 percent of [Black individuals] and 12 percent of [Hispanic individuals] have unscored records. . . . This elevated incidence . . . is observed across ages, suggesting that these differences across racial and ethnic groups materialize early in the adult lives of these consumers and persist thereafter."[44]

77.     The CFPB went on to conclude that "[t]hese results suggest that the problems that accompany having a limited credit history are disproportionally borne by Black[], Hispanic[], and lower-income consumers."[45]

---

[42]     *Id.* at 24.

[43]     *Id.*

[44]     *Id.* at 24-25.

[45]     *Id.* at 25.

78. Credit Karma has summarized some of the key differences between FICO and VantageScore. One is the duration of credit history needed to obtain a VantageScore as opposed to a FICO Score:

> To have FICO® scores, consumers need to have one or more accounts that have been open for at least six months and at least one account that has reported to the credit bureaus within the past six months (plus no indication on your credit reports of being deceased). Otherwise, FICO won't generate your scores.
>
> On the other hand, the VantageScore® model may be able to score consumers who are new to credit or use credit infrequently. VantageScore can use data of just one month's history and one account reported within the previous 24 months.
>
> So if you're new to credit or you haven't used credit in a while, you may not have FICO® credit scores, but you might have VantageScore® credit scores.[46] '

79. Another difference concerns treatment of tax liens and civil judgments:

> In July 2017, changes to public-record reporting requirements were implemented that affected the information sent to consumer credit bureaus, leading them to eliminate many tax liens and civil judgments from consumers' credit reports. In response to the changes, tax liens aren't weighed as heavily (but can still have a significant impact) in the latest VantageScore version, VantageScore® 4.0. And they can still have a significant impact on FICO® scoring models.[47]

80. A third difference involves the treatment of credit inquiries:

> It's a Catch-22. Applying for new lines of credit – such as student loans, credit cards or mortgages – can negatively affect your credit scores. But applying for multiple lines in order to compare rates makes sense if you want to get the best deal. To minimize the impact that shopping for credit can have on your scores, newer FICO® versions count multiple credit inquiries of the same type within a 45-day period as a single inquiry. This can be especially helpful when you're shopping around for a major loan, like for a car, as multiple auto loan inquiries within that window should only count as one hard inquiry. For some older FICO® versions, the single-inquiry period can be 14 days.
>
> VantageScore counts multiple inquiries, even for different types of loans, within a 14-day period as a single inquiry. Multiple inquiries on your reports for the same

---

[46] Jennifer Brozic, Credit Karma, *VantageScore vs. FICO: What's the difference?* (Sept. 1, 2019), https://www.creditkarma.com/advice/i/vantagescore-vs-fico/.

[47] *Id.*

type of loan or credit, spanning more than a 14-day period, may have a greater impact to your VantageScore® credit scores than to your FICO® scores.[48]

81.     And the final difference of significance involves the use of trending data:

Credit scores represent a snapshot of an individual's credit profile at the specific point in time when the scores are generated. The FICO® credit-scoring models, for example, use data about consumers' borrowing and credit utilization that's been reported to the credit bureaus at the time the scores are generated.

VantageScore® 4.0, on the other hand, incorporates data that reflects patterns of behavior over time. The latest scores may include up to two years' worth of consumer spending and credit utilization data in its calculation.[49]

82.     VantageScore has achieved some limited success. In a 2018 report, VantageScore Solutions stated:

During the twelve months ending in July 2017, over 1.4 billion VantageScore credit scores were delivered directly to consumers by lenders like Chase and Capital One and educational websites like CreditKarma, Lending Tree, and Mint. These scores are calculated using the same VantageScore model used by lenders (i.e., not an "educational" model). They are most often provided free of charge as part of educational offerings that include simulators, credit reports, educational articles, and explanations.[50]

83.     VantageScore Solutions went on to note that "[a]s lenders adopt VantageScore, we believe that such adoption will improve consumers' access to credit in certain segments and enable many more borrowers to obtain fairer pricing."[51] VantageScore Solutions also reported that "many of the most sophisticated secondary market participants use the VantageScore model to help evaluate and monitor risk, and to price and benchmark deals more accurately."[52]

---

[48]     *Id.*

[49]     *Id.*

[50]     VantageScore Solutions, *VantageScore® Credit Scores and The Mortgage Market*, at 8 (2018) ("VantageScore Report"), https://www.vantagescore.com/wp-content/uploads/2022/02/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf.

[51]     *Id.* at 5.

[52]     VantageScore Solutions, *Myth: VantageScore Is Not Accepted by Investors in*

84.     Despite VantageScore's innovations and advantages, Fair Isaac has maintained its monopoly in the B2B Credit Score Market and extracted monopoly rents through anticompetitive and exclusionary conduct and through anticompetitive agreements with each Credit Bureau.

## V.     FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT

85.     Fair Isaac anticipated the threat VantageScore could pose to its dominance in the B2B Credit Score Market.  Fair Isaac's own models of future losses predicted "***substantial double-digit declines***" if the use of VantageScore continued to expand.[53]

86.     Faced with the prospect of a significant hit to its market dominance, and its profits, Fair Isaac used its monopoly power to launch a comprehensive attack on VantageScore that included filing anticompetitive litigation; signing licensing agreements with anticompetitive provisions with the Credit Bureaus; and undertaking a campaign of disparagement against, and disinformation about, VantageScore Solutions and VantageScore.

### A.     Fair Isaac's Anticompetitive Litigation

87.     Fair Isaac viewed the creation of VantageScore as a competitive threat and filed a lawsuit against the Credit Bureaus in October 2006, accusing them of copyright infringement (by using a three-digit credit score like Fair Isaac did), unfair advertising, and antitrust violations.  As part of its requested relief, Fair Isaac asked that the Credit Bureaus "be ordered to dissolve VantageScore and/or to take all measures necessary to prevent VantageScore from having an

---

*Securitization Markets* (Mar. 23, 2016), https://vantagescore.com/education/blog/myth-vantagescore-is-not-accepted-by-investors-in-securitization-markets.

[53]     *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, No. CV 06-4112, 2008 WL 11348223, at *2 (D. Minn. Nov. 3, 2008) (emphasis added).

unreasonable anticompetitive effect in any market."[54] It made this claim even though, at the time, Fair Isaac had 94% of the B2B market.[55]

88.     VantageScore Solutions characterized the litigation Fair Isaac initiated as a "legal battle that *sought to put us out of business*, even as we scrambled to establish a competitive foothold."[56] Fair Isaac raised bogus antitrust claims that it knew lacked foundation, given its then-94% share of the B2B Credit Score Market. It also alleged trademark infringement that a jury found to be based on a trademark that Fair Isaac had fraudulently obtained from the U.S. Patent and Trademark Office ("PTO"). In addition, Fair Isaac's contention that the "300-850" marks were anything other than "merely" descriptive lacked all foundation because – as the U.S. Court of Appeals for the Eighth Circuit later held – "consumers in this market immediately understand '300-850' to describe the qualities and characteristics of FICO's credit score – that the credit score will be within the range of 300-850."[57]

89.     Equifax settled the litigation in June 2008 and formed "a partnership [with Fair Isaac] to develop and sell advanced analytics and scoring solutions for businesses and consumers."[58]

90.     The litigation against Equifax and TransUnion lasted into 2011. While it was ongoing, VantageScore Solutions remained under a cloud, with Fair Isaac's lawsuit hobbling its

---

[54]     Second Amended Complaint, Dkt. 81, *Fair Isaac Corp. v. Equifax, Inc.*, No. 06 CV 4112, at 86 (D. Minn. Apr. 18, 2007).

[55]     *Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645 F. Supp. 2d 734, 738 (D. Minn. 2009).

[56]     VantageScore Solutions, Inc., *10 years, 10 milestones* (June 30, 2020), https://www.vantagescore.com/newsletter/10-years-10-milestones-1/ (emphasis added).

[57]     *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1148 (8th Cir. 2011).

[58]     Fair Isaac, *Equifax and Fair Isaac Enter Partnership to Accelerate Development and Delivery of New Analytic Solutions* (June 10, 2008), https://www.fico.com/en/newsroom/equifax-and-fair-isaac-enter-partnership-accelerate-development-and-delivery-new-analytic.

commercial prospects: Potential B2B Purchasers for VantageScore had no way of being sure that the product might not be declared infringing on Fair Isaac's trademarks or that VantageScore Solutions would not be dissolved.

91. The district court entered summary judgment in favor of the Credit Bureaus on the antitrust and false advertising claims. A jury found against Fair Isaac on the remaining claim for trademark infringement, finding that the mark "300-850" (which denoted the range of FICO Scores) was merely descriptive. It also found that: (1) Fair Isaac made a false representation during the application process to the PTO for the registrations of the "300-850" marks; (2) Fair Isaac knew that representation to be false when it was made and intended to deceive the PTO; and (3) the PTO relied on the false representation in deciding to issue the registrations.[59]

92. The district court upheld the verdict, noting that "[t]his extensive, expensive litigation seems to have been initiated largely *in response to a perceived threat to Fair Isaac's dominant position in the credit scoring industry*."[60]

93. In 2011, the United States Court of Appeals for the Eighth Circuit affirmed both that decision and the earlier summary judgment ruling.[61]

94. VantageScore Solutions' growth during its first few years was inhibited by the litigation, which was part of a continuing antitrust violation by Fair Isaac that goes on to this day.

**B.     Litigation Between Fair Isaac and TransUnion**

96. In December 2017, Fair Isaac sued TransUnion for unpaid royalties.[62]

---

[59]    *Fair Isaac*, 650 F.3d at 1148-50.

[60]    *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1000 (D. Minn. 2010) (emphasis added).

[61]    *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011).

[62]    *See* Complaint, Dkt. 1, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Nov. 16, 2017).

97.     In February 2018, TransUnion responded by filing antitrust counterclaims for, *inter alia*, monopolization against Fair Isaac. In paragraphs 42-60 of the counterclaims (which were partially redacted), the anticompetitive terms the Credit Bureaus and Fair Isaac had agreed upon were disclosed publicly for the first time. Those provisions are described in detail below.

98.     Fair Isaac moved to dismiss the counterclaims. Judge Coleman denied the motion, ruling that "TransUnion has adequately pled actual and attempted monopolization" through allegations that "FICO engages in practices that are intended to drive out competition" through "exclusive dealing provisions [that] are unlawful attempts to 'maintain monopoly power through exclusionary conduct.'"[63]

99.     In November 2020, TransUnion and Fair Isaac settled on undisclosed terms. One effect of this settlement was to cut Plaintiffs off from obtaining further information about the anticompetitive agreements between Fair Isaac and the Credit Bureaus. Fair Isaac essentially bought TransUnion off. This inference is bolstered by the fact that, in August 2021, TransUnion announced that it had entered into a long-term (presumably lucrative) contract to distribute FICO Scores to lenders and consumers in Canada.[64]

100.    The Antitrust Division of the United States Department of Justice took notice of Fair Isaac's conduct alleged in the TransUnion Action and instituted a civil investigation. That

---

[63]     *Fair Isaac Corp. v. Trans Union, LLC*, No. 17:cv-8318, 2019 WL 1382068, at *2 (N.D. Ill. Mar. 27, 2019).

[64]     *See* Press Release, TransUnion, *TransUnion Enters New Long-term Agreement with FICO to Distribute FICO® Score in Canada* (Aug. 3, 2021), https://www.globenewswire.com/news-release/2021/08/03/2273895/0/en/TransUnion-Enters-New-Long-term-Agreement-with-FICO-to-Distribute-FICO-Score-in-Canada.html.

investigation was closed without action in December 2020, shortly after TransUnion settled with Fair Isaac.[65]

### C. Fair Isaac and the Credit Bureaus' Agreements to Restrain Competition

#### 1. Fair Isaac and the Credit Bureaus Agree to Anticompetitive Provisions in Licensing Agreements

101.    Rebuffed by the courts in its attempts to snuff out VantageScore in its infancy, Fair Isaac elected to take another approach.  When its existing licensing agreements with each Credit Bureau expired in 2013 or 2015, Fair Isaac reentered into agreements with each Credit Bureaus containing new and anticompetitive provisions that aimed to crush the only real competition, (VantageScore), maintain Fair Isaac's monopoly, and extract monopoly rents from B2B Purchasers.

102.    Fair Isaac and the Credit Bureaus entered into new or renewed agreements that contained new provisions designed to restrict the competitive reach of VantageScore.  In their memorandum of law in support of their motion to dismiss, the Credit Bureaus characterized their licensing agreements with Fair Isaac as "vertical distribution agreements."[66]

103.    The anticompetitive contract provisions targeted the only significant competing credit score – VantageScore.  And they specifically restricted the Credit Bureaus' ability to market VantageScore to B2B Purchasers.

104.    On information and belief, the Credit Bureaus agreed to those provisions in return for Fair Isaac's acquiescence to a clause that protected them from price competition (and

---

[65]    See Press Release, Fair Isaac, *FICO Statement Regarding Antitrust Investigation* (Mar. 15, 2020),    https://fico.gcs-web.com/news-releases/news-release-details/fico-statement-regarding-antitrust-investigation.

[66]    See The Credit Bureaus' Motion to Dismiss Plaintiffs' Class Action Complaints, Dkt. 135, *In re FICO Antitrust Litig.*, No.1:20-cv-02114, at 2 (Jan. 18, 2022).

potentially in exchange for other benefits as well).  The benefit of the *quid pro quo* for the Credit

Bureaus was that they were able to charge consumers, *i.e.*, B2B Purchasers, supracompetitive

prices for credit scores.

105.     The Credit Bureaus and Fair Isaac entered into these anticompetitive licensing

agreements after what Fair Isaac considered a "rough year."  In its second quarter of 2013 earnings

call, Fair Isaac's Chief Financial Officer Michael Joseph Pung admitted:

> [W]e've been experiencing a long period of time, as you know, where our Scores
> business, and the volumes underneath our Scores business on the origination side,
> *have been going sideways*, and we are starting to see some improvement on that
> end. It just so happens *we had a tough comparable period for our B2B Scores
> business in that last year*.[67]

106.     The agreements were consummated at a critical time.  In 2011 through the first part

of 2013, developments occurred that should have furthered VantageScore's ability to compete with

FICO Scores.   In 2011, VantageScore Solutions formed a partnership with the Consumer

Federation of America, "a nonprofit association of nearly 300 consumer groups founded in 1968

to advance the consumer interest through research, advocacy, and education"; that alliance led to

the "use of annual consumer surveys to gauge awareness of credit scoring related issues."[68]  In

October 2012, "the Federal Deposit Insurance Corporation ['FDIC'] revised its rules for assessing

default risk on loans issued by banks with deposits in excess of $10 billion.  Instead of evaluating

loans on a particular credit score, the revision calls for examining the underlying probability of

default [] associated with those loans at the time of origination."[69]  In March 2013, VantageScore

---

[67]     Q2 2013 FICO Earnings Conference Call – Final, SEEKING ALPHA (April 24, 2013),
https://seekingalpha.com/article/1368671-fair-isaac-management-discusses-q2-2013-results-
earnings-call-transcript (emphasis added).

[68]     VantageScore Solutions, *10 Years, 10 Milestones*, *supra* n.56.

[69]     *Id.*

Solutions debuted a new scoring model, VantageScore 3.0, which "built on the strengths of its predecessors and drew extensive news coverage for its ability to score 98 percent of adult consumers in the U.S. (including 30-35 million who cannot get scores from conventional credit-scoring models [*i.e.*, FICO]); its disregard of paid collections (including paid medical debt); and its simplified reason codes."[70] And, in July 2013, VantageScore Solutions published a white paper explaining how VantageScore could be aligned with the FDIC's new rules for evaluating probability of default.[71]

107.    Fair Isaac's response to these developments – which signaled the possibility of increased competition between FICO Scores and VantageScore – was to agree on anticompetitive contract terms with the Credit Bureaus.   The necessary consequence of the Credit Bureaus' and Fair Isaac's contracts was the stifling of competition in the B2B Credit Score Market.

108.    Specifically, in May 2013, Fair Isaac and Experian entered into a contract containing anticompetitive terms (*i.e.*, the No Equivalent Products and Dynamic Royalty Schedule provisions, among others, as explained *infra*).   In October 2013, Fair Isaac and Equifax entered into a contract containing anticompetitive terms (*i.e.*, the No Equivalent Products and Dynamic Royalty Schedule provisions, among others, as explained *infra*).    And in February 2015, TransUnion and Fair Isaac entered into an Analytic and Data License Agreement ("ADLA") containing anticompetitive terms (*i.e.*, the No Equivalent Products and Dynamic Royalty Schedule provisions, among others, as explained *infra*).[72]

---

[70]    *Id.*

[71]    VantageScore Solutions, *FDIC New Definition of High Risk Consumer Loan Securities* (July 2013), https://paperzz.com/doc/8033743/fdic-new-definition-of-high-risk-consumer-loan-and-securi (last visited Oct. 27, 2023).

[72]    Fair Isaac and the Credit Bureaus executed parallel anticompetitive contracts at the first available opportunity.   TransUnion's original agreement with Fair Isaac did not expire until 2015.

109.     Mr. Lansing, Fair Isaac's CEO, confirmed that the "exclusive deal[s]" Fair Isaac and the Credit Bureaus entered into essentially sidelined VantageScore, which never gained "a lot of traction in the banking space," and that, even though VantageScore was a joint venture of the Credit Bureaus, working together with FICO has been "a good thing for both of us [*i.e.*, both the Credit Bureaus and Fair Isaac]."[73]

110.     According to Mr. Lansing, instead of being "at war" with one another, the Credit Bureaus decided instead "to be partnered" with Fair Isaac. Explaining the relationship with Experian, for example, Mr. Lansing stated that Experian and Fair Isaac "have a rev share arrangement with them that works for them and works for us really good." Similarly, with respect to its arrangement with Equifax, Mr. Lansing stated "it is a rev share model. We're in it together." Given Fair Isaac's own admission that all three Credit Bureaus have substantially similar contract terms, it follows that TransUnion would also have a similar revenue sharing arrangement with Fair Isaac.

### 2.     The Anticompetitive Terms of the Contracts Fair Isaac and the Credit Bureaus Entered into

111.     The terms of the contracts Fair Isaac and the Credit Bureaus entered into were not publicly revealed until February 2018. Many of the contract terms remain confidential to this day.

112.     The discussion that follows is based on TransUnion's description of its ADLA in its counterclaims against Fair Isaac. The ADLA was filed under seal in the TransUnion action and is unavailable to Plaintiffs beyond what TransUnion has quoted in its counterclaim.

---

As a result, there is a temporal gap between TransUnion's agreement with Fair Isaac and Fair Isaac's agreements with the other Credit Bureaus.

[73]     Remarks by William J. Lansing, President, CEO & Director, Fair Isaac, Fair Isaac Corp at Barclays Global Financial Services Conference (Sept. 25, 2015).

34

113.    While the counterclaims quote only the ADLA, TransUnion pled that "Fair Isaac represented to TransUnion that TransUnion's two major competitors, Experian and Equifax, had already agreed to materially similar new contracts with Fair Isaac."[74]

114.    Fair Isaac itself admitted that Equifax, Experian, and TransUnion agreed to the same or similar terms.  In FICO's Answer to Counterclaims in the TransUnion litigation, FICO "admit[ed] that prior to January 2015, it entered into separate contracts with Experian and Equifax that contained certain terms that were similar to certain terms in the ADLA."[75]

115.    In its April 2018 Answer to the Counterclaims, Fair Isaac "admit[ed] that *Equifax and Experian have agreed to 'No Equivalent Products'* provisions with terms similar to the terms agreed to by TransUnion in the ADLA."[76]  Fair Isaac also "admit[ted] that *Equifax and Experian have agreed to 'Dynamic Royalty Schedule' terms* that are similar to the terms agreed to by TransUnion in the ADLA, and that Equifax and Experian are subject to royalty schedules that contain a "Pre-Qualification" royalty category similar to that to which TransUnion is subject in its royalty schedule."[77]  Finally, Fair Isaac "admit[ed] that Equifax and Experian have agreed to 'Level Playing Field' terms similar to the term agreed to by TransUnion in the ADLA."[78]

116.    Fair Isaac has made similar admissions about the contract terms in its Answer in this case.  Fair Isaac admits that its agreement with TransUnion contains the "No Equivalent

---

[74]    TransUnion Counterclaims, ¶ 43.

[75]    Fair Isaac's Redacted Answer to TransUnion Counterclaims, Dkt. 62, *Fair Isaac Corp. v. TransUnion LLC*, No 1:17-cv-08318 at 21 (N.D. Ill. Apr. 10, 2018) ("FICO Answer to Counterclaims").

[76]    FICO Answer to Counterclaims at 24.

[77]    *Id.* at 27.

[78]    *Id.* at 29-30.

Products" provision.[79] It admits that the "Dynamic Royalty Schedule" and "Level Playing Field" terms appear in its agreements with all three Credit Bureaus, and that the latter requires it to offer the most favorable royalty pricing as to all three Credit Bureaus.[80] And it admits that the "Pre-Qualification" royalty category has applied since 2015.[81] Thus, for the foregoing reasons, provisions substantially similar to the anticompetitive "No Equivalent Products" and "Dynamic Royalty Schedule" provisions that exist in the ADLA between TransUnion and Fair Isaac also exist in the agreement between Experian and Fair Isaac. Likewise, provisions substantially similar to the anticompetitive No Equivalent Products and Dynamic Royalty Schedule provisions that exist in the ADLA between TransUnion and Fair Isaac also exist in the agreement between Equifax and Fair Isaac. The allegations that follow therefore apply to all three Credit Bureau Defendants.

117. The restraints imposed in the contracts consist primarily of: (a) "No Equivalent Products" provisions; and (b) "Dynamic Royalty Schedule" provisions. A third set of provisions, the "Level Playing Field" provisions, compensated the Credit Bureaus for their agreement not to promote VantageScore under the former provisions, at the expense of B2B Purchasers.

118. In an order dated September 28, 2023, this Court held that "the No Equivalent [Products] Provision and the Dynamic Royalty Schedule clauses together qualify as sufficient allegations of anticompetitive effects" to allow the Sherman Act §2 claim against Fair Isaac to proceed to discovery. Those provisions are described in turn below.

---

[79] Fair Isaac's Answer and Affirmative Defenses to Direct Purchaser Plaintiffs' Consolidated Class Action Complaint, Dkt. 182, No. 1:20-cv-02114 ("FICO Answer to DPP Complaint"), (Oct. 23, 2023) ¶109.

[80] FICO Answer to DPP Complaint, ¶¶116, 124.

[81] *Id.*, ¶118.

i.      The "No Equivalent Products" Provisions

119.    "Section 12.5 of the ADLA, the 'No Equivalent Products' provision, provides that TransUnion may not 'internally develop' a credit scoring system that is 'aligned to the odds-to-score relationship of any Fair Isaac Analytic' or uses more than a limited number of reason codes that 'match' reason codes used by any Fair Isaac Analytic. Section 12.5 of the TransUnion ADLA further prohibits TransUnion from distributing 'any competing analytic' (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes, and it expressly names VantageScore Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an 'Equivalent Product.'"[82]

120.    The "No Equivalent Products" clause thus protects and sustains Fair Isaac's monopoly and unreasonably restrains trade.

121.    In practice, for example, if a competing credit score product used a 700 score to indicate a less-than five percent risk of credit delinquency, and if a 700 FICO Score also indicated the same risk of delinquency, the "No Equivalent Products" clause would prevent a Credit Bureau from distributing the competing product. Similarly, if a competing credit score product used reason codes that match 20% or more of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause would prohibit a Credit Bureau from distributing the product.

122.    The "No Equivalent Products" clause undercuts VantageScore because it effectively prevents a Credit Bureau from offering an alternative to FICO Scores that would: (a) be compatible with many B2B Purchasers' systems, models, and processes; and (b) allow B2B Purchasers to have a legitimate choice between using FICO Scores and an alternative score. As noted above, many B2B Purchasers have spent substantial effort and resources to develop systems,

---

[82]     *Id.*, ¶ 109.

models, and processes that are designed for FICO Scores. B2B Purchasers' systems, models, and processes are tailored to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers) and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

123. The odds-to-score relationship is an arbitrary mapping between risk and score and does not reflect protectable intellectual property. Similarly, the reason codes that may not be used by an "Equivalent Product" were not invented by Fair Isaac, but rather reflect well-established industry best practices for lending.

124. The "No Equivalent Products" clause is an effective restraint of trade because when one Credit Bureau stops using VantageScore, it becomes even less attractive to the other Credit Bureaus. B2B Purchasers will not want to use a credit scoring system unless all of the main Credit Bureaus use it. This phenomenon is often referred to as a "network effect." By imposing a "No Equivalent Products" term, Fair Isaac sought to block the Credit Bureaus from enabling B2B Purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems and from using VantageScore alongside or interchangeably with FICO Scores.

125. By entering contracts containing anticompetitive "No Equivalent Products" provisions, the Credit Bureaus agreed to terms that had the effect of eliminating or drastically reducing the competitive threat posed by VantageScore, thus unreasonably restraining trade.

        **ii.**       **The "Dynamic Royalty Schedule" Provisions**

126. The contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively, include a similar or identical "Dynamic Royalty Schedule" clause that allows Fair

38

Isaac to replace its existing royalty with a new one and thereby gives Fair Isaac the ability to control the prices of FICO Scores. The TransUnion ADLA Dynamic Royalty Schedule Provision (§ 9.2) provides that "'once every twelve (12) months during the Term, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing.'"[83]

127. According to TransUnion, "Fair Isaac has abused and exploited this provision in 2015, 2016, and 2017 by not only raising prices, but also introducing entirely new and non-negotiated contract terms, royalty categories, and definitions."[84]

128. In 2015, Fair Isaac unilaterally imposed (in a footnote to its royalty schedule) a new "Pre-Qualification" royalty category, which Fair Isaac defines to "mean an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category distinguishes between: "(1) lenders that use FICO Scores for 'Pre-Qualification' without providing any credit score or credit data to consumers; and (2) lenders that use FICO Scores for 'Pre-Qualification' while also providing credit score or credit data to consumers 'in connection' with 'Pre-Qualification.'" Certain B2B Purchasers offer consumers opportunities to apply to qualify for credit opportunities (*e.g.*, a credit card or loan) and, at the same time, receive their personal credit score. "The offer of a free credit score to a consumer can entice consumers to apply for credit opportunities."[85]

129. "The royalty price associated with a FICO score used for 'Pre-Qualification' depends on whether other credit score or credit data are provided to a consumer. If a lender

---

[83] TransUnion Counterclaims, ¶ 50.

[84] *Id.*

[85] *Id.*, ¶ 51.

purchases a FICO Score for use in 'Pre-Qualification' and does not provide any credit score or credit data to the consumer 'in connection' with the 'Pre-Qualification,' there is one per-score royalty rate. If the lender purchases a FICO score for use in 'Pre-Qualification' and provides a VantageScore (or any other credit score) to the consumer 'in connection' with the 'Pre-Qualification,'" Fair Isaac charges the lender a *seven times penalty rate* for that FICO Score. That steep penalty is meant to dissuade lenders from providing competing credit scores, such as a VantageScore.[86]

130.    "The penalty rate can be avoided in one of two ways, both of which involve *purchasing exclusively FICO Scores*. First, the [B2B Purchaser] could purchase a FICO score for use in 'Pre-Qualification' and provide no credit score or credit data to the consumer. Second, the [B2B Purchaser] could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of scores by lenders (in the B2B market) with the provision of scores to consumers (in the B2C market)."[87]

131.    TransUnion accepted, complied with, and made royalty payments according to the new "Pre-Qualification" royalty category. On information and belief, so have Experian and Equifax.[88]

132.    The Dynamic Royalty Schedule provisions in the contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively, unreasonably restrain trade. Indeed, there is no legitimate business justification for the penalty rate agreed upon by Fair Isaac and each of the Credit Bureaus and that is charged when the B2B Purchaser also purchases other credit scores

---

[86]    *Id.*, ¶ 52.

[87]    *Id.*, ¶ 53 (emphasis added).

[88]    *See id.*, ¶ 55.

(*e.g.*, a VantageScore). The purpose of the "Pre-Qualification" royalty category is to drive all B2B Purchasers engaging in "Pre-Qualification" to purchase exclusively FICO Scores and make it cost-prohibitive for B2B Purchasers engaging in "Pre-Qualification" to purchase a competing credit score for disclosure to consumers.

133. According to TransUnion, "[t]his scheme has been effective, and no B2B Purchasers from TransUnion have opted to pay the penalty rate."[89] The purpose and effect of this clause was to prevent VantageScore from obtaining market share, thereby unreasonably restraining trade.

### iii. The "Level Playing Field" Provisions

134. In exchange for agreeing to the "No Equivalent Products" and "Dynamic Royalty" provisions in their agreements with Fair Isaac – which effectively prevent the Credit Bureaus from marketing VantageScore to B2B Purchasers – Fair Isaac committed not to offer any Credit Bureau a more favorable price for FICO Scores than any other Credit Bureau. This commitment was embodied in the Level Playing Field clauses of the agreements with the Credit Bureaus. Those provisions forbid Fair Isaac to charge any Credit Bureau a price that is lower than the price it charges any other Credit Bureau.[90]

135. The Level Playing Field provision of the TransUnion ADLA is contained in §9.16. Fair Isaac's contracts with TransUnion, Equifax, and Experian include similar or identical "Level

---

[89] *Id.*, ¶ 54.

[90] *See id.*, ¶ 59.

Playing Field" and "Dynamic Royalty Schedule" provisions.[91] The Credit Bureaus agreed to, and have complied with, these contract provisions.[92]

136.    The Credit Bureaus advanced Fair Isaac's interests by agreeing to the No Equivalent Products and Dynamic Royalty Schedule clauses, which sabotaged the Credit Bureaus' own competing VantageScore and gave FICO flexibility to raise prices.  The Level Playing Field clause, in return, protected each Credit Bureau from the risk that Fair Isaac would selectively offer discounts that could expose it to price competition.

137.    The Level Playing Field provision also functions as a cost-information-sharing mechanism among the Credit Bureaus.  The Federal Trade Commission ("FTC") has determined that "when competing companies," like the Credit Bureaus, "exchang[e] price or other commercially sensitive information, that may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws."[93]  Indeed, "the sharing of information relating to price, *cost*, output, customers, or strategic planning is more likely to be of competitive concern than the sharing of less competitively sensitive information.[94]

138.    By ensuring that no one Credit Bureau receives a more favorable price than the other, the Level Playing Field provision essentially confirms to each Credit Bureau the price the other competing Credit Bureaus are paying for FICO's algorithm.  Information about what their competitors are paying for this must-have product is valuable to the Credit Bureaus who can then

---

[91]    FICO Answer to DPP Complaint, ¶116 (Dynamic Royalty Schedule), ¶124 (Level Playing Field).

[92]    *Id.*

[93]    Michael Bloom, *Information exchange: be reasonable*, FED. TRADE COMM'N (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable (emphasis added).

[94]    *Id.*

42

use this cost information to reduce price competition for the services they provide. As Fair Isaac has pointed out, previously, "a Credit Bureau could not be sure what its competitors' costs were and, consequently, to what extent its competitors could cut the price of their Credit Scores. This uncertainty could be used by Lenders to induce price competition among the Credit Bureaus."[95] Fair Isaac claimed in its earlier lawsuit that the Credit Bureaus sought to use VantageScore so that "each Credit Bureau will know that it is paying exactly the same cost as its competitors for its scoring algorithm, and Lenders will no longer be able to use this uncertainty to play one Credit Bureau against the others."[96] In a rich irony, the Level Playing Field provision does exactly what Fair Isaac accused the Credit Bureaus of trying to accomplish through VantageScore: prevent their customers from playing one Credit Bureau against the others, thereby reducing price competition for credit reports. The contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively – which all contain Level Playing Field provisions – thus unreasonably restrain trade.

139. The provision is demonstrably important to the Credit Bureaus. As was revealed through Fair Isaac's suit against TransUnion, in the negotiations over its Canadian contract, TransUnion *insisted* that Fair Isaac include a "Level Playing Field" clause. That clause would have given TransUnion Canada a right to any discounts or special pricing terms that Fair Isaac might offer other Credit Bureaus for the license or distribution of FICO scores in Canada. The Level Playing Field clause was so valuable to TransUnion of Canada that it continued to insist on one until Fair Isaac threatened to withhold its Canadian business entirely.

140. Fair Isaac and the Credit Bureaus have used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions to extract monopoly prices from B2B Purchasers. The

---

[95] Third Amended Complaint, Dkt. 436, *Fair Isaac Corp. v. Experian Info Sols.*, No. 06-cv-4112 (D. Minn. Nov. 10, 2008), ¶ 138.
[96] *Id.*

Level Playing Field clause, like a most-favored nation clause, reduces Fair Isaac's incentive to give any discounts to the Credit Bureaus given that, by the terms of that provision, the same discount would need to be extended to all Credit Bureaus. On the other hand, by the terms of the provision, if Fair Isaac were to give any one Credit Bureau a discount, it would have to offer the same discount to the other Credit Bureaus. Therefore, the provision ensures that no Credit Bureau could obtain a competitive price advantage, *i.e.*, more favorable pricing. The provision thus substantially weakens the incentives the Credit Bureaus have to negotiate a lower price with Fair Isaac. As a result, Fair Isaac can freely increase prices with little resistance from the Credit Bureaus. And it has done so -- Fair Isaac admitted in its Answer that "over the last several years" it has "increased the base (*i.e.*, undiscounted) royalty prices that it charges to the Credit Bureaus."[97] That price increase is ultimately borne by B2B Purchasers who pay a higher price for FICO Scores than they would have but for the Credit Bureaus' agreements to anticompetitive contract provisions.

141.    After entering into the contracts containing anticompetitive terms with the Credit Bureaus, Fair Isaac initiated multiple rounds of price increases. In 2019, Fair Isaac reported: ***"On the B2B side, revenues were up 36% over the previous year, due primarily to the 2018 price adjustments."***[98] Again, in 2021, Fair Isaac reported that:

> *[R]evenues were $169 million, up 31% from the same period last year. B2B was up 25% over the same period last year*, driven by continued high volumes in mortgage originations as well as some unit price increases across our different score

---

[97]    FICO Answer to DPP Complaint, ¶142.

[98]    Motley Fool Transcription, *Fair Isaac Corporation (FICO) Q1 2019 Earnings Conference Call Transcript*, MOTLEY FOOL (Updated Apr. 24, 2019), https://www.fool.com/earnings/call-transcripts/2019/01/30/fair-isaac-corporation-fico-q1-2019-earnings-confe.aspx.

categories. In the B2B business, we also had a royalty true-up and an annual license deal this quarter that had a small positive impact on overall revenues.[99]

142. As TransUnion has explained, taken together with the Dynamic Royalty Schedule provisions, the Level Playing Field provisions "enable Fair Isaac to unilaterally increase the royalty prices it charges [the Credit Bureaus] for FICO scores."[100]

143. Notably, TransUnion has admitted that, to the extent the Level Playing Field provision resulted in higher rates, those costs were ultimately also borne by "banks [and] mortgage lenders" (*i.e.*, B2B Purchasers).[101] Thus, through their contracts containing anticompetitive terms, the Credit Bureaus and Fair Isaac extracted supracompetitive profits from consumers (*i.e.*, B2B Purchasers).

144. In discussing the impact of "the FICO price increase" on Experian, Experian Vice President and Chief Financial Officer, John W. Gamble confirmed during a 2019 earnings call that Experian "pass[es] it through to [its] customers."[102]

145. Equifax's Chief Executive Officer, Mark W. Begor confirmed the same: When FICO "put through a price increase . . . Equifax[,] TU and Experian deliver[ed] that price increase to the marketplace, when they increase the price of their credit score. So that rolled through."[103]

---

[99]  Motley Fool Transcribers, *Fair Isaac Corp (FICO) Q2 2021 Earnings Call Transcript*, MOTLEY FOOL (May 6, 2021), https://www.fool.com/earnings/call-transcripts/2021/05/06/fair-isaac-corp-fico-q2-2021-earnings-call-transcr/.

[100]  TransUnion Counterclaims, ¶59.

[101]  *Id.*, ¶60.

[102]  John W. Gamble, VP & CFO, Remarks at Q1 2019 Equifax Inc. Earnings Call (May 10, 2019) (transcript available in Westlaw).

[103]  Mark W. Begor, CEO, Remarks at Q2 2023 Equifax Inc. Earnings Call (July 20, 2023) (transcript available in Westlaw).

**D.     Fair Isaac's Additional Efforts to Deter B2B Purchasers from Using VantageScore**

146.    Having agreed with the Credit Bureaus to impose restrictions on VantageScore's ability to compete against FICO, Fair Isaac went even further and waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead B2B Purchasers about the qualities and characteristics of FICO Scores and VantageScore. In advertisements, letters, and blog posts, Fair Isaac disparaged VantageScore Solutions and VantageScore, falsely claiming that VantageScore is an unreliable measure of creditworthiness, and misrepresenting the information considered by VantageScore Solutions' credit scoring system.

147.    On December 5, 2017, for example, Mr. Lansing criticized banks for using VantageScore, saying that credit score was "fako"; "'looks like it, smells like it, feels like it – it's being presented as some kind of an indication of your health, but if you look at the fine print, you'll discover that it's not a FICO score.'"[104]

148.    Media sources, financial blogs, and consumers have absorbed Fair Isaac's message that VantageScore is a "Fako" score merely because it is not a FICO Score.  For example, thebalance.com – a website devoted to personal finance issues – posted at least as far back as August 2018: "If you purchased your Credit Score anywhere but myFICO.com, then it's a Fako score."  The post remains on the site to this day.[105]

149.    Similarly, on December 12, 2017, "Fair Isaac took out a full-page advertisement in *The Wall Street Journal* addressed to 'Lenders, Policymakers and Consumer Advocates' that disparaged VantageScore Solutions and VantageScore without identifying it by name.   The

---

[104]    Alistair Gray, *Credit score row as FICO chief hits out at banks over 'Fako' rivals*, FIN. TIMES (Dec. 5, 2017), https://www.ft.com/content/2222880c-cfa5-11e7-9dbb-291a884dd8c6.

[105]    Latoya Irby, THE BALANCE, *FICO & FAKO Credit Scores* (Oct. 30, 2021), https://www.thebalance.com/fico-and-fako-credit-scores-960497.

46

advertisement contrasted Fair Isaac, which 'is not owned by the credit bureaus' and whose FICO scores have been used 'by lenders and securitization investors for decades,' with an alternative credit score, which is 'owned by the credit bureaus,' is less reliable than FICO scores in evaluating credit risk, and fails to use 'sound practices' or 'science-based credit evaluation.' To anyone familiar with the market for credit scores, the advertisement unambiguously conveys the false message that VantageScore is 'Weakening scoring standards, [and] harm[ing] consumers, and the lending system,'" particularly in the B2B Credit Score Market.[106]

150. "The *Wall Street Journal* advertisement directed readers to '[l]earn more at FICO.com/independent,' a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name."[107] One such blog post, written in 2016 by Joanne Gaskin, the Vice-President of Scores and Analytics at Fair Isaac, asserted: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."[108]

151. Fair Isaac's disparagement and false or misleading statements are not limited to the "FICO.com/independent" page. Fair Isaac's own blog (FICO.com/blogs) also includes numerous disparaging and false or misleading statements about VantageScore Solutions, VantageScore, and related topics.

152. Fair Isaac executives have written multiple posts disparaging VantageScore Solutions and VantageScore. Fair Isaac's Vice-President of FICO Scores and Predictive Analytics, Ethan Dornhelm, wrote: "We wanted to find out if it's possible to calculate a

---

[106] TransUnion Counterclaims, ¶ 66 (alterations in original).

[107] *Id.*, ¶ 67.

[108] *Id.*

47

meaningful, reliable score using credit bureau data alone. Spoiler alert: it's not. Research results
consistently showed that scoring models relying solely on sparse or old credit data were weak and
did a poor job forecasting future performance."[109] Ms. Gaskin echoed those findings.[110] Those
statements are false and misleading because studies have shown that VantageScore is strongly
predictive.[111]

153.  Another blog post written by Ms. Gaskin claims that whereas "FICO Score 9
differentiates medical from non-medical collections," "VantageScore does not."[112] "This
statement conveys the false message that VantageScore does not differentiate medical from non-
medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address
medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical
collection accounts from non-medical collection accounts and penalizes medical collections less
than non-medical ones."[113]

154.  Similarly, Fair Isaac fought hard against the efforts to create a process that would
allow alternative credit scoring models to be validated and approved by Fannie Mae and Freddie
Mac when they purchase mortgages. Such a rule would clearly benefit VantageScore, which could

---

[109]  Ethan Dornhelm, FICO BLOG, *Why Bureau Data Alone Can't Score More Consumers*
(Nov. 16, 2015), https://www.fico.com/blogs/why-bureau-data-alone-cant-score-more-
consumers.

[110]  Joanne Gaskin, FICO BLOG, *FICO Fact: Does FICO's Minimum Scoring Criteria Limit
Consumers' Access to Credit?* (Oct. 12, 2021), https://www.fico.com/blogs/fico-fact-does-ficos-
minimum-scoring-criteria-limit-consumers-access-credit ("Our research has consistently found
that models that rely solely on sparse and/or outdated credit information are less reliable at
forecasting future performance.").

[111]  *See* VantageScore Report, *supra* n.50 at 2, 4-6.

[112]  Joanne Gaskin, FICO BLOG, *Truth Squad: Is FICO Score 700 the Same as VantageScore
700?* (Feb. 6, 2017), https://www.fico.com/blogs/truth-squad-fico-score-700-same-vantagescore
-700.

[113]  TransUnion Counterclaims, ¶ 71.

then attempt to break Fair Isaac's 100% monopoly in this sector. Public sentiment favored this move.[114] Fair Isaac did not. Indeed, it deployed Ms. Gaskin to give press interviews saying that Fair Isaac's alleged monopoly is a "myth."[115] Fair Isaac also hired a research group to present the argument that VantageScore's promise of home ownership to millions more Americans was deceptive and that the company's ownership by the Credit Bureaus was anticompetitive, an argument that failed during the trademark litigation discussed above.[116] The FHFA ultimately adopted a final rule that permitted rival generators of credit scores to apply to serve Fannie Mae and Freddie Mac, saying that "FHFA has concluded that allowing all credit score model developers to submit applications is more consistent with [the applicable statute], which does not prevent any credit score model from being considered for potential use in the mortgage market." [117]

155.    The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

---

[114]    *See* Bloomberg Business News, *This Monopoly Is Holding Back the Mortgage Market*, (Jan. 18, 2018), https://www.bloomberg.com/opinion/articles/2018-01-18/this-credit-score-monopoly-is-holding-back-the-mortgage-market; Paul Weinstein, Jr., *No Company Should Have a Monopoly on Credit Scoring*, The Hill (Dec. 7, 2017), https://thehill.com/opinion/finance/363755-no-company-should-have-a-monopoly-on-credit-scoring.

[115]    *FICO: The 'Credit Score Monopoly' is a Myth*, DS News (Dec. 18, 2015), https://dsnews.com/news/12-18-2015/fico-the-credit-score-monopoly-is-a-myth.

[116]    Quantilytic LLC, *Risks and Opportunities in Expanding Mortgage Credit Availability Through New Credit Scores*, at 22 (Dec. 2017), https://www.progressivepolicy.org/wp-content/uploads/2017/12/UpdatedCreditScoring_2017.pdf (research sponsored by Fair Isaac).

[117]    Fed. Hous. Fin. Agency, *Validation and Approval of Credit Score Models Final Rule*, 12 C.F.R. 1254 at 23 (Aug. 16, 2019), https://www.fhfa.gov/SupervisionRegulation/Rules/RuleDocuments/8-7-19%20Validation%20Approval%20Credit%20Score%20Models%20Final%20Rule_to%20Fed%20Reg%20for%20Web.pdf.

## VI. THE CONTRACTS BETWEEN FAIR ISAAC AND EACH OF THE CREDIT BUREAUS CONTAINING ANTICOMPETITIVE TERMS, ALONG WITH FAIR ISAAC'S ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT, HARM COMPETITION IN THE B2B CREDIT SCORE MARKET

156.    The anticompetitive terms contained in the contracts between Fair Isaac and each of the Credit Bureaus, along with Fair Isaac's campaign of exclusionary conduct to maintain and expand its monopoly has harmed and continues to harm participants in the B2B Credit Score Market.  Fair Isaac's unlawful conduct, including its agreements with the Credit Bureaus containing anticompetitive contract terms, has foreclosed competition in the B2B Credit Score Market by limiting the ability of VantageScore to compete with Fair Isaac.  The anticompetitive and exclusionary conduct unreasonably restrains trade and maintains Fair Isaac's monopoly by, among other things, allowing it to charge supracompetitive prices for B2B credit scores to B2B Purchasers during the Class Period.

157.    Fair Isaac's Scores business operates with an incredibly high operating margin of 86%.[118]  To maximize its monopoly rent, Fair Isaac has increased its prices for FICO Scores significantly in recent years.  In 2018, after securing agreements from each of the three Credit Bureaus to abide by anticompetitive contract terms, FICO implemented a special pricing increase for mortgage customers that was an approximately 75% increase from $0.06/score to $0.10/score.[119]  In the following two years, FICO again rolled out special pricing increases to its auto customers and to some credit card customers.[120]  FICO admitted in its Answer that, "over the last several years," it has "increased the base (*i.e.*, undiscounted) royalty prices that it charges to the Credit Bureaus."[121]

158.    Fair Isaac's conduct and the anticompetitive provisions agreed upon in contracts between the Credit Bureaus and Fair Isaac, have reduced choice for B2B Purchasers.  The anticompetitive terms agreed to between Fair Isaac and the Credit Bureaus have frustrated the

ability of B2B Purchasers to purchase VantageScore. Fair Isaac's media and advertising campaign against VantageScore Solutions and VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace.

## CLASS ACTION ALLEGATIONS

159.    Plaintiffs bring this action on behalf of themselves, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of:

> All B2B Purchasers residing in the United States and its territories that directly purchased a FICO score from Fair Isaac and/or a Credit Bureau during the period from October 1, 2006 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

Excluded from the Class are Defendants, their officers, directors, management, employees, subsidiaries, and affiliates. Also excluded are any natural persons who purchased their own credit score solely via myFico.com, the Credit Bureaus, or other entities for their personal use. Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household or the spouse of such a person.

160.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records in the possession of Defendants.

---

[118]    Jose Karlo Mari Tottoc, Yahoo! Finance, *Headwaters Capital: 'Fair Isaac Corp (FICO) Can Grow Its Free Cash Flow by 15-20% Annually'* (Jan. 23, 2021), https://finance.yahoo.com/news/headwaters-capital-fair-isaac-corp-202237954.html.

[119]    *Id.*

[120]    *Id.*

[121]    FICO Answer to DPP Complaint, ¶142.

161.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and members of the Class were damaged by the same wrongful conduct of Defendants.

162.    Plaintiffs will fairly and adequately protect and represent the interests of members of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of members of the Class.

163.    Plaintiffs are represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including class actions in the financial services industry.

164.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate.  Questions of law and fact common to members of the Class include, but are not limited to:

a.    whether Fair Isaac monopolized, and whether Defendants entered into contracts that unreasonably restrain trade, in violation of federal law;

b.    whether Fair Isaac monopolized, and whether Defendants entered into contracts that unreasonably restrain trade, in violation of certain state antitrust laws;

c.    whether Defendants engaged in unfair or deceptive trade practices in violation of certain state laws;

d.    the duration of the alleged unlawful conduct;

e.    injury suffered by Plaintiffs and members of the Class;

f.    damages suffered by Plaintiffs and members of the Class; and

       g.     whether Defendants have acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

165.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

166.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

167.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

168.    Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## STATUTES OF LIMITATIONS AND TOLLING

I.    **THE STATUTES OF LIMITATIONS DID NOT BEGIN TO RUN BECAUSE PLAINTIFFS DID NOT DISCOVER, AND COULD NOT HAVE DISCOVERED, DEFENDANTS' UNLAWFUL SCHEME**

169.    Plaintiffs had no knowledge of the agreements, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) February 12, 2018, the date that TransUnion filed its Counterclaims against Fair Isaac. Prior to that time, no information in

the public domain or available to Plaintiffs suggested that any Defendant was involved in an anticompetitive scheme involving the distribution of credit scores.

170.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public websites, that they maintained policies that prohibited the type of anticompetitive conduct alleged in this First Amended Consolidated Complaint.  For example:

a.    Fair Isaac's Code of Business Conduct and Ethics states: "We seek to outperform our competition fairly and honestly.  We seek competitive advantages through superior performance, never through unethical or illegal business practices."[122]

b.    Equifax's Code of Ethics and Business Conduct states: "We believe in free and open competition and never engage in improper practices that may limit competition."[123]

c.    Experian's Code of Conduct states: "We will not engage in any form of agreement with competitors to fix prices, rig bids, allocate customers and/or restrict supply in the market place."  "We will comply with all applicable laws, rules, and regulations in every jurisdiction in which we operate, including but not limited to . . . antitrust/competition."[124]

d.    TransUnion's Code of Business Conduct states: "All TransUnion Team Members must understand how competition and antitrust laws affect their daily work.  You must fully and consistently comply with applicable competition and antitrust laws."[125]

---

[122]    Fair Isaac, *Code of Business Conduct and Ethics*, https://fico.gcs-web.com/static-files/ed6519a4-2148-4166-82f2-4636e0713531 (last visited Oct. 27, 2023).

[123]    Equifax, *Code of Ethics and Business Conduct* (Aug. 2019), https://web.archive.org/web/20210326175746/https://assets.equifax.com/assets/corp/code_of_ethics.pdf.

[124]    Experian, *Our Code of Conduct* (2019), https://www.experian.com/content/dam/marketing/na/assets/corp/procurement-documents/experian-code-of-conduct-final-board-approved.pdf.

[125]    TransUnion, *Code of Business Conduct* (2017), https://investors.transunion.com/~/media/Files/T/Transunion-IR/governance-documents/code-of-business-conduct-150618.pdf.

171.     It was reasonable for Plaintiffs and members of the Class to believe that Defendants were complying with their own policies.

172.     Moreover, upon information and belief, Plaintiffs and members of the Class could not have discovered the anticompetitive provisions in the licensing agreements between Fair Isaac and the Credit Bureaus, such as the TransUnion ADLA, as those agreements are subject to confidentiality provisions that have prohibited the credit reporting agencies from disclosing their terms to third parties absent written authorization from Fair Isaac.[126]

173.     Finally, Plaintiffs and members of the Class, as customers of Defendants, had no means to discover the existence of Defendants' anticompetitive contract provisions.

174.     For these reasons, the statutes of limitations applicable to Plaintiffs' claims did not begin to run until the date that TransUnion filed its counterclaims against Fair Isaac and have been tolled with respect to the claims that Plaintiffs have alleged in this First Amended Consolidated Complaint.

## II.     FRAUDULENT CONCEALMENT TOLLED THE STATUTES OF LIMITATIONS

175.     In the alternative, the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiffs' claims.    During the Class Period, Defendants wrongfully and affirmatively concealed their unlawful conduct.    Plaintiffs and members of the Class had no knowledge of Defendants' anticompetitive contracts and could not have discovered them through the exercise of reasonable diligence until (at the earliest) February 12, 2018, when TransUnion filed its Counterclaims against Fair Isaac.

---

[126]     *See* Dkt. 32, Motion for Leave to File Under Seal, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Jan. 22, 2018), ¶ 2 ("contracts between the Parties .    .    . are subject to confidentiality provisions that prohibit TransUnion from disclosing the terms of the contract to third parties absent written authorization from Fair Isaac").

176.    By their very nature, antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants contracted through confidential agreements that did not put Plaintiffs or the Class on inquiry notice that there were contracts to restrain trade that raised the prices for credit scores above the competitive level. Credit scores are not exempt from antitrust regulation, and thus, before TransUnion filed its Counterclaims against Fair Isaac, Plaintiffs reasonably considered the market to be competitive. Moreover, Defendants employed deceptive tactics and techniques to avoid detection of, and to conceal, their anticompetitive scheme.

177.    Defendants wrongfully and affirmatively concealed the existence of their anticompetitive contracts from Plaintiffs and members of the Class by, among other things:

a.      agreeing to confidentiality provisions that have prohibited the Credit Bureaus from disclosing the anticompetitive provisions in the licensing agreements between Fair Isaac and the Credit Bureaus, such as the TransUnion ADLA;

b.      concealing the fact that Fair Isaac and the Credit Bureaus agreed, through the "No Equivalent Products" clause, not to internally develop a competing credit scoring system that is aligned with FICO Scores or uses too many of the same reason codes;

c.      concealing the fact that the purpose of the "No Equivalent Products" clause was to prevent the Credit Bureaus from offering credit scoring products that would allow business-consumers a legitimate choice between FICO Scores and VantageScore or another alternative scoring product, thereby sustaining Fair Isaac's dominance in the market;

d.      concealing the fact that Fair Isaac and the Credit Bureaus agreed, through the "Level Playing Field" clauses, that prices made available to one credit bureau be made available to all the others;

56

> e.     concealing the fact that the purpose and effect of the "Level Playing Field" and "Dynamic Royalty Schedule" clauses is to disincentivize each Credit Bureau from negotiating lower royalty prices for FICO Scores; and

> f.     as to Fair Isaac, engaging in a false and misleading campaign about VantageScore Solutions and VantageScore to misrepresent VantageScore's viability as a competitor to FICO Scores.

178.    As a result of Defendants' affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiffs and members of the Class have been and are tolled, and Defendants are equitably estopped from raising statutes of limitations as a defense.

## III.    DEFENDANTS' ACTIONS CONSTITUTE A CONTINUING VIOLATION

179.    In addition, and in the alternative, this Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statute of limitations.

180.    A claim accrued for Plaintiffs each time FICO Scores were sold to Plaintiffs at prices artificially inflated by Defendants' anticompetitive conduct.  Each sale of FICO Scores at a supracompetitive price constituted another overt act in furtherance of Defendants' agreements to restrain trade.  Moreover, Defendants' statements and actions described above demonstrate that throughout the Class Period they engaged in new overt acts that further served the objectives of their anticompetitive agreements to restrain trade.

181.    Defendants' new overt acts were more than the inertial consequences of Defendants' initial violation.  Rather, their acts were new and independent acts that perpetuated their agreement and kept it current with market conditions, including by renewing agreements, or entering into new agreements, with anticompetitive terms.  Defendants continuously renewed and

refined their agreement to reflect market conditions. With each refinement of their agreement, Defendants inflicted new and accumulating injury on Plaintiffs and members of the Class. For instance, as alleged above, Fair Isaac exploited the ADLA Royalty Schedule Provision in 2015, 2016, and 2017 to introduce entirely new and non-negotiated contract terms, royalty categories, and definitions that expanded the anticompetitive scheme.

182.    Therefore, Plaintiffs and members of the Class are entitled to recover damages they suffered during any applicable limitations period.

## CLAIMS FOR RELIEF

### CLAIM ONE: UNREASONABLE RESTRAINT OF TRADE
### (15 U.S.C. §§1, 3)

183.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

184.    This Claim One is brought against Defendant Fair Isaac.

185.    The relevant period of this Claim One is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

186.    The agreements between Fair Isaac and each of the Credit Bureau Defendants violate Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) because they are agreements between Fair Isaac and the Credit Bureaus that restrained trade in the relevant market.

187.    The relevant product market is the market for the sale of B2B credit scores.

188.    The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

189.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

190.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

191.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

192.    Fair Isaac entered into agreements with each of TransUnion, Experian, and Equifax that contained anticompetitive terms whereby each Credit Bureau agreed with Fair Isaac to contractual limitations that harmed the ability of the Credit Bureaus to market VantageScore, a competing product, to Plaintiffs and members of the Class and forestalled price competition in the B2B Credit Score Market.

193.    The agreements between Fair Isaac and each of the Credit Bureaus had substantial anticompetitive effects.   The agreements excluded VantageScore, a would-be significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

194.    The agreements raised the price for credit scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

195.    The aforesaid exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

196.    Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Defendants do not cease their anticompetitive conduct.

197.    Plaintiffs and members of the Class have been injured in their business or property by reason of Defendants' violation of Sections 1 and 3 of the Sherman Act, within the meaning of Section 4 of the Clayton Act (15 U.S.C. §15).

198.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Defendant Fair Isaac's violation of Sections 1 and 3 of the

Sherman Act (15 U.S.C §§1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. §26).

## CLAIM TWO: UNREASONABLE RESTRAINT OF TRADE
### (15 U.S.C. §§1, 3)

199.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

200.    This Claim Two is brought against Defendants Fair Isaac and Experian.

201.    The relevant period of this Claim Two is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

202.    The anticompetitive agreement between Fair Isaac and Experian violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), because it is a contract that unreasonably restrained trade – regardless of whether Experian shared Fair Isaac's anticompetitive purpose, and regardless of whether Experian accepted the agreement as a result of Fair Isaac's negotiating leverage.

203.    The relevant product market is the market for the sale of B2B credit scores.

204.    The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

205.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

206.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

207.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

208.    Fair Isaac entered into an agreement with Experian that contained anticompetitive terms whereby Experian agreed with Fair Isaac to contractual limitations that harmed

60

VantageScore's ability to compete and forestalled price competition in the B2B Credit Score Market.

209. The agreement between Fair Isaac and Experian had substantial anticompetitive effects. The agreement excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

210. The agreement between Fair Isaac and Experian raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

211. The foregoing exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

212. Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac and Experian do not cease their anticompetitive conduct.

213. Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac and Experian's violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3), within the meaning of Section 4 of the Clayton Act (15 U.S.C. § 15).

214. Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac and Experian's continuing violation of Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. § 26).

215. In addition to competing with Experian in the credit scores market, Fair Isaac licenses its algorithm to Experian, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, Experian discourages its customers from using or purchasing access to competing credit scores. Because Experian has substantial

61

market power, it can harm its customers in this way without taking the risk that they will switch to competing Credit Bureaus. In return for contracting with Fair Isaac to restrain trade in the credit scores market, Experian benefits from the Level Playing Field clause, which reduces competition among the Credit Bureaus in the B2B credit reports market.

### CLAIM THREE: UNREASONABLE RESTRAINT OF TRADE
### (15 U.S.C. §§1, 3)

216.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

217.    This Claim Three is brought against Defendants Fair Isaac and Equifax.

218.    The relevant period of this Claim Three is from November 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

219.    The anticompetitive agreement between Fair Isaac and Equifax violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), because it unreasonably restrained trade – regardless of whether Equifax shared Fair Isaac's anticompetitive purpose, and regardless of whether Equifax accepted the agreement as a result of Fair Isaac's negotiating leverage.

220.    The relevant product market is the market for the sale of B2B credit scores.

221.    The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

222.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

223.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

224.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

225.     Fair Isaac entered into an agreement with Equifax that contained anticompetitive terms whereby Equifax agreed with Fair Isaac to contractual limitations that harmed VantageScore's ability to compete and forestalled price competition in the B2B Credit Score Market.

226.     The agreement between Fair Isaac and Equifax had substantial anticompetitive effects.  The agreement excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

227.     The agreement between Fair Isaac and Equifax raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

228.     The aforesaid exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

229.     Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac and Equifax do not cease their anticompetitive conduct.

230.     Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac and Equifax's violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3), within the meaning of Section 4 of the Clayton Act (15 U.S.C. §15).

231.     Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac and Equifax's continuing violation of Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. §26).

232.     In addition to competing with Equifax in the credit scores market, Fair Isaac licenses its algorithm to Equifax, which uses the algorithm to calculate credit scores for B2B

Purchasers. As a result of the exclusionary contract terms, Equifax discourages its customers from using or purchasing access to competing credit scores. Because Equifax has substantial market power, it can harm its customers in this way without taking the risk that they will switch to competing Credit Bureaus. In return for contracting with Fair Isaac to restrain trade in the credit scores market, Equifax benefits from the Level Playing Field clause, which reduces competition among the Credit Bureaus in the B2B credit reports market.

<div align="center">

**CLAIM FOUR: UNREASONABLE RESTRAINT OF TRADE**
**(15 U.S.C. §§1, 3)**

</div>

233.   Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

234.   This Claim Four is brought against Defendants Fair Isaac and TransUnion.

235.   The relevant period of this Claim Four is from February 2015 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

236.   The anticompetitive agreement between Fair Isaac and TransUnion violates Sections 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3), because it unreasonably restrained trade – regardless of whether TransUnion shared Fair Isaac's anticompetitive purpose, and regardless of whether TransUnion accepted the agreement as a result of Fair Isaac's negotiating leverage.

237.   The relevant product market is the market for the sale of B2B credit scores.

238.   The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

239.   Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

240.   Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

<div align="center">64</div>

241.   Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

242.   Fair Isaac entered into an agreement with TransUnion that contained anticompetitive terms whereby TransUnion agreed with Fair Isaac to contractual limitations that harmed VantageScore's ability to compete and forestalled price competition in the B2B Credit Score Market.

243.   The agreement between Fair Isaac and TransUnion had substantial anticompetitive effects.   The agreement excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market.

244.   The agreement between Fair Isaac and TransUnion raised the price for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

245.   The aforesaid exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide and in the territories of the United States.

246.   Plaintiffs and members of the Class continue to suffer damage, and will continue to do so, if Fair Isaac and TransUnion do not cease their anticompetitive conduct.

247.   Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac and TransUnion's violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§1, 3), within the meaning of Section 4 of the Clayton Act (15 U.S.C. §15).

248.   Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac and TransUnion's continuing violation of Sections 1 and 3 of the Sherman Act (15 U.S.C §§1, 3), within the meaning of Section 16 of the Clayton Act (15 U.S.C. §26).

249.     In addition to competing with TransUnion in the credit scores market, Fair Isaac licenses its algorithm to TransUnion, which uses the algorithm to calculate credit scores for B2B Purchasers.  As a result of the exclusionary contract terms, TransUnion discourages its customers from using or purchasing access to competing credit scores.  Because TransUnion has substantial market power, it can harm its customers in this way without taking the risk that they will switch to competing Credit Bureaus.  In return for contracting with Fair Isaac to restrain trade in the credit scores market, TransUnion benefits from the Level Playing Field clause, which reduces competition among the Credit Bureaus in the B2B credit reports market.

## CLAIM FIVE: MONOPOLIZATION
## (15 U.S.C. §2)

250.     Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

251.     This Claim Five is brought against Defendant Fair Isaac.

252.     The relevant product market is the market for the sale of B2B credit scores.

253.     The relevant geographic market for the sale of B2B credit scores is the United States and its territories.

254.     Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market.

255.     Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

256.     Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

257.     Through unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements, Fair Isaac has substantially foreclosed competition in the market

66

for B2B credit scores in the United States in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

258.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand to supracompetitive levels.

259.    Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

260.    Fair Isaac's monopolization has injured and will continue to injure competition in this market.

261.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

262.    The anticompetitive conduct raised the prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to consumers.

263.    Plaintiffs and members of the Class have been injured in their business or property by reason of Fair Isaac's violation of Section 2 of the Sherman Act (15 U.S.C. § 2) within the meaning of Section 4 of the Clayton Antitrust Act (15 U.S.C. § 15).

264.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Fair Isaac's continuing violation of Section 2 of the Sherman Act (15 U.S.C. § 2) within the meaning of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26).

**CLAIM SIX: STATE ANTITRUST LAWS**

265.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

266.    This Claim Six is brought against all Defendants.

67

267.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following antitrust statutes.

268.    <u>Arizona</u>: Defendants' anticompetitive conduct has restrained trade in violation of Arizona Revised Statutes §§ 44-1401 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of the unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Ariz. Rev. Stat. §§ 44-1401 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401 *et seq*.

269.    <u>California</u>: During the Class Period, Defendants engaged in anticompetitive conduct in unreasonable restraint of trade and commerce in violation of California Business & Professions Code §§ 16700 *et seq*. To the extent that Plaintiffs seek recovery for Fair Isaac's acts of monopolization under these statutory provisions, while § 16700 does not reach solely unilateral conduct by a monopolist, it encompasses agreements between a monopolist and its customers where the monopolist effectively coerces the customer to accede to the restraint in order to obtain the good or service that is the subject of the agreement. That is what happened here. This conduct constitutes a "combination" under the Cartwright Act. As a direct result of Defendants' unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their FICO Scores. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under § 16700.

270.    <u>Connecticut</u>: Defendants' anticompetitive conduct has restrained trade in violation of Connecticut General Statute §§ 35-26 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their

business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Connecticut General Statute §§ 35-26 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Connecticut General Statute §§ 35-26 *et seq*.

271. <u>District of Columbia</u>: Defendants' anticompetitive conduct has restrained trade in violation of District of Columbia Code Annotated §§ 28-4501 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of District of Columbia Code Ann. §§ 28-4501 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501 *et seq*.

272. <u>Illinois</u>: Defendants' anticompetitive conduct has restrained trade in violation of the Illinois Antitrust Act (740 ILCS 10/1 *et seq*.). During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of the Illinois Antitrust Act (740 ILCS 10/1 *et seq*.). Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the Illinois Antitrust Act (740 ILCS 10/1 *et seq*.).

273. <u>Iowa</u>: Defendants' anticompetitive conduct has restrained trade in violation of Iowa Code §§ 553.1 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Iowa Code §§ 553.1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §§ 553 *et seq.*

274. <u>Kansas</u>: Defendants' anticompetitive conduct has restrained trade in violation of Kansas Statutes Annotated §§ 50-101 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Kansas Stat. Ann. §§ 50-101 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101 *et seq.*

275. <u>Maine</u>: Defendants' anticompetitive conduct has restrained trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101 *et seq.*). During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101 *et seq.*

276. <u>Maryland</u>: Defendants' anticompetitive conduct has restrained trade in violation of Maryland Code, Commercial Law, §§ 11-204 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their

business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Maryland Code, Commercial Law, §§11-204 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Maryland Code, Commercial Law, §§11-204 *et seq*.

277. <u>Michigan</u>: Defendants' anticompetitive conduct has restrained trade in violation of Michigan Compiled Laws Annotated §§445.771 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Michigan Comp. Laws Ann. §§445.771 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Michigan Comp. Laws Ann. §§445.771 *et seq*.

278. <u>Minnesota</u>: Defendants' anticompetitive conduct has restrained trade in violation of Minnesota Annotated Statutes §§325D.49 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Minnesota Stat. §§325D.49 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under Minnesota Stat. §§325D.49 *et seq*.

279. <u>Mississippi</u>: Defendants' anticompetitive conduct has restrained trade in violation of Mississippi Code Annotated §§75-21-1 *et seq*. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of

Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Mississippi Code Ann. §§ 75-21-1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Mississippi Code Ann. §§ 75-21-1 *et seq.*

280. <u>Nebraska</u>: Defendants' anticompetitive conduct has restrained trade in violation of Nebraska Revised Statutes §§ 59-801 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Nebraska Revised Statutes §§ 59-801 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Nebraska Revised Statutes §§ 59-801 *et seq.*

281. <u>Nevada</u>: Defendants' anticompetitive conduct has restrained trade in violation of Nevada Revised Statutes Annotated §§ 598A.010 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A *et seq.*

282. <u>New Hampshire</u>: Defendants' anticompetitive conduct has restrained trade in violation of New Hampshire Revised Statutes §§ 356:1 *et seq.* During the Class Period,

Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of New Hampshire Revised Statutes §§ 356:1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under New Hampshire Revised Statutes §§ 356:1 *et seq.*

283. <u>New Mexico</u>: Defendants' anticompetitive conduct has restrained trade in violation of New Mexico Statutes Annotated §§ 57-1-1 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

284. <u>New York</u>: Defendants' anticompetitive conduct has restrained trade in violation of New York General Business Laws §§ 340 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of the New York's Donnelly Act, §§ 340 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under New York Gen. Bus. Law §§ 340 *et seq.*

285. <u>North Carolina</u>: Defendants' anticompetitive conduct has restrained trade in violation of North Carolina General Statutes §§ 75-1 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under North Carolina Gen. Stat. §§ 75-1 *et seq.*

286. <u>North Dakota</u>: Defendants' anticompetitive conduct has restrained trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

287. <u>Oregon</u>: Defendants' anticompetitive conduct has restrained trade in violation of Oregon Revised Statutes §§ 646.705 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Oregon Revised Statutes §§ 646.705 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Oregon Revised Statutes §§ 646.705 *et seq.*

74

288. <u>Rhode Island</u>: Defendants' anticompetitive conduct has restrained trade in violation of Rhode Island General Laws, §§6-36-4 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Rhode Island General Laws, §§6-36-4 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Rhode Island General Laws, §§6-36-4 *et seq.*

289. <u>South Dakota</u>: Defendants' anticompetitive conduct has restrained trade in violation of South Dakota Codified Laws Ann. §§37-1-3.1 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of South Dakota Codified Laws Ann. §§37-1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under South Dakota Codified Laws Ann. §§37-1 *et seq.*

290. <u>Tennessee</u>: Defendants' anticompetitive conduct has restrained trade in violation of Tennessee Code Annotated §§47-25-101 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Tennessee Code Ann. §§47-25-101 *et seq.*

Accordingly, Plaintiffs and members of the Class seek all relief available under Tennessee Code Ann. §§ 47-25-10 *et seq.*

291.    Utah: Defendants' anticompetitive conduct has restrained trade in violation of Utah Code Annotated §§ 76-10-911 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Utah Code Annotated §§ 76-10-911 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Utah Code Annotated §§ 76-10-911 *et seq.*

292.    Vermont: Defendants' anticompetitive conduct has restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453 *et seq.*

293.    West Virginia: Defendants' anticompetitive conduct has restrained trade in violation of West Virginia Code §§ 47-18-1 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of West Virginia Code §§ 47-18-1 *et seq.*

Accordingly, Plaintiffs and members of the Class seek all relief available under West Virginia Code §§ 47-18-1 *et seq.*

294. <u>Wisconsin</u>: Defendants' anticompetitive conduct has restrained trade in violation of Wisconsin Statutes §§ 133.01 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have restrained trade in violation of Wisconsin Stat. §§ 133.01 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under Wisconsin Stat. §§ 133.01 *et seq.*

295. Plaintiffs and members of the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful monopolization, and anticompetitive agreements. Plaintiffs and members of the Class have paid more for FICO Credit Scores than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

296. In addition, Defendants have profited significantly from the aforesaid unlawful conduct. Their profits derived from monopolistic and/or and conspiratorial anticompetitive conduct that was undertaken at the expense and to the detriment of Plaintiffs and members of the Class.

297. Accordingly, Plaintiffs and members of the Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## CLAIM SEVEN: STATE UNFAIR AND DECEPTIVE TRADE PRACTICES LAWS

298.     Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

299.     This Claim Seven is brought against all Defendants.

300.     By reason of the foregoing, Defendants have violated, and Plaintiffs and members of the Class are entitled to relief under, the Unfair and Deceptive Trade Practices and Consumer Protection Laws of the following jurisdictions.

301.     <u>Arkansas</u>: Defendants have engaged in unfair, unconscionable, and/or deceptive practices in violation of Arkansas Code Annotated §§ 4-88-101 *et seq.*  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which FICO Scores were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Class.  The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).  Defendants' unlawful conduct had the following effects: (1) FICO Scores price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) FICO Scores prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.  During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated § 4-

78

88-107(a)(10) and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

302.    <u>California</u>: Defendants have engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of California Business & Professions Code §§ 17200 *et seq.* During the Class Period, Defendants marketed, sold, or distributed FICO Scores in California, and committed and continue to commit acts of unfair competition, as defined by §§ 17200 *et seq.* of the California Business & Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to sections 17203 and 17204 of the California Business & Professions Code, to obtain restitution from these Defendant for acts, as alleged herein, that violated section 17200 of the California Business & Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business & Professions Code §§ 17200 *et seq.*, including, but not limited to, the following: (1) the violations of Sections 1, 2, and 3 of the Sherman Act, as set forth above; and (2) the violations of §§ 16720 *et seq.* of the California Business & Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of §§ 16720 *et seq.* of the California Business & Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of FICO Scores in the State of California within the meaning of § 17200, California Business & Professions Code; and (4) Defendants' acts and practices are fraudulent or

79

deceptive within the meaning of § 17200 of the California Business & Professions Code. Plaintiffs and members of the Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Class to pay supracompetitive and artificially inflated prices for FICO Scores. Plaintiffs and members of the Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violated § 17200 of the California Business & Professions Code. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business practices, pursuant to California Business & Professions Code §§ 17203 and 17204.

303. <u>District of Columbia</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in the District of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross

disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores. Defendants had the sole power to set that price, and Plaintiffs and members of the Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct with respect to fixing the price of FICO Scores at supracompetitive levels and overcharging consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class. The suppression of competition that has resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for the FICO Scores. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

304. <u>Florida</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Florida; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. §§ 501.201 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

305. <u>Massachusetts</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Consumer Protection Law (Mass. Gen. Law Ch. 93A *et seq.*). Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Massachusetts, and Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result

of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Law Ch. 93A *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under Section 11 of that statute.

306. <u>Montana</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103 *et seq.*, and §§ 30-14-201 *et seq.* Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Montana; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103 *et seq.*, and §§ 30-14-201 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

307. <u>New Mexico</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. §§ 57-12-1 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices

83

at which FICO Scores were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Class and the prices paid by them for FICO Scores as set forth in N.M.S.A. § 57-12-2E. Plaintiffs and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores. Defendant Fair Isaac had the sole power to set that price and Plaintiffs and members of the Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct to fix the price of FICO Scores at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class. The suppression of competition that resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for the FICO Scores. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Class were deprived of free and open

84

competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. §§ 57-12-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

308. <u>New York</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO scores were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Class, who are Defendants' consumers. Defendants made public statements about the prices of FICO Scores that omitted material information that rendered the statements that they made materially misleading; and Defendants alone possessed material information that were relevant to consumers but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, Class members who purchased FICO Scores were misled to believe that they were paying a fair price for FICO Scores or the price increases for FICO Scores were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conduct. Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have an impact on New York consumers, including Plaintiffs and members of the Class. Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have a broad impact, causing Class members who purchased

FICO Scores to be injured by paying more for FICO Scores than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New York; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in New York. Plaintiffs and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

309. <u>North Carolina</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. §§ 75-1.1 *et seq*. Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Class. Defendants' conduct could not have succeeded absent deceptive conduct by Defendant to cover up their illegal acts. Secrecy was

86

integral to the formation, implementation, and maintenance of Defendants' illegal activity. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Class could not possibly have been aware. Defendants' public statements concerning the price of FICO Scores created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conduct. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants marketed, sold, or distributed FICO Scores in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in North Carolina. Plaintiffs and members of the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. §§ 75-1.1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

310. <u>Rhode Island</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1 *et seq.*). Members of this Class purchased FICO Scores for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO Scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendants' FICO Scores prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market. Defendants'

affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO Scores they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. §§ 6-13.1-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

311. <u>South Carolina</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10 *et seq.*). Defendants' monopolization had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores during the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10 *et seq.*, and, accordingly, Plaintiffs and the members of the Class seek all relief available under that statute.

312. <u>South Dakota</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-6 *et seq.*). Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes South

Dakota, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO credit scores were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO credit scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendants' FICO credit scores prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO credit scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO credit scores at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO credit scores they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §§37-24-6 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

313. <u>Vermont</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for the FICO Scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendant misrepresented to all purchasers during the Class Period that Defendants' FICO Scores prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Vermont; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or

deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

314. <u>West Virginia</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code, §§46A-6-104 *et seq.* Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores. During the Class Period, Defendants marketed, sold, or distributed FICO credit scores in West Virginia, and Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code, §§46A-6-104 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully prays that This Honorable Court:

A. Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that Plaintiffs be named as Class Representatives, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B. Adjudge that Defendants violated the federal antitrust laws as set forth above;

C. Adjudge that Defendants violated the state antitrust and unfair and deceptive trade practices laws as set forth above;

D. Award Plaintiffs and members of the Class actual, treble, and exemplary damages;

E. Award Plaintiffs and members of the Class attorneys' fees and costs of suit, including costs of consulting and testifying experts;

F. Award Plaintiffs and members of the Class pre- and post-judgment interest;

G. Enjoin Defendants from their violations of law; and

H. Grant such other, further, and different relief, including structural relief, as may be just and proper.

## DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury as to all issues so triable.

Dated: October 30, 2023        Respectfully submitted,

/s/ Steven F. Molo

Steven F. Molo
Lauren F. Dayton
**MOLOLAMKEN LLP**
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Telephone: 312-450-6700
smolo@mololamken.com
ldayton@mololamken.com

Lauren M. Weinstein
**MOLOLAMKEN LLP**
600 New Hampshire Avenue, N.W.,
Suite 500
Washington, DC 20037
Telephone: 202-556-2000
lweinstein@mololamken.com

*Liaison Counsel for Direct Purchaser Plaintiffs and the Proposed Direct Purchaser Class*

/s/ Carmen Medici

Carmen Medici
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-798-5319
cmedici@scott-scott.com

Joseph P. Guglielmo (N.D. Ill. 2759819)
Michelle E. Conston (admitted *pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com
mconston@scott-scott.com

93

Gary F. Lynch
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
Facsimile: 412-231-0246
glynch@carlsonlynch.com

Katrina Carroll
**CARLSON LYNCH LLP**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
kcarroll@carlsonlynch.com

Jennifer W. Sprengel
**CAFFERTY CLOBES
MERIWETHER &
SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

Barbara J. Hart (admitted *pro hac vice*)
**GRANT & EISENHOFER**
485 Lexington Ave., 29th Floor New
York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
**SPERLING & SLATER, P.C.**
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Patrick McGahan (admitted *pro hac vice*)
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct
Purchaser Plaintiffs and the Proposed Direct
Purchaser Class*

Christopher M. Burke
Walter Noss
Yifan (Kate) Lv
**KOREIN TILLERY PC**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 6225-5620
Facsimile: (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

George A. Zelcs
Randall P. Ewing, Jr.
Ryan Z. Cortazar
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Michael L. Roberts
Karen Sharp Halbert
**ROBERTS LAW FIRM, P.A.**
20 Rahling Circle
Little Rock, AR 72223
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Gregory S. Asciolla (admitted *pro hac vice*)
Karin E. Garvey (admitted *pro hac vice*)

94

Linda P. Nussbaum
Susan Schwaiger
**NUSSBAUM LAW GROUP, P.C.**
1211 Avenue of the Americas
40th Floor
New York, NY 10036
Telephone: 917-438-9102
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Daniel E. Gustafson
(admitted *pro hac vice*)
Daniel C. Hedlund
(admitted *pro hac vice*)
Michelle J. Looby
(admitted *pro hac vice*)
Joshua J. Rissman
Ling S. Wang
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
lwang@gustafsongluek.com

Dennis Stewart (admitted pro hac vice)
**GUSTAFSON GLUEK PLLC**
600 B Street, 17th Floor San
Diego, CA 92101
Telephone: 619-595-3200
dstewart@gustafsongluek.com

Kenneth A. Wexler Melinda J.
Morales Michelle Perkovic
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

Robin A. van der Meulen (admitted *pro hac vice*)
Matthew J. Perez (admitted *pro hac vice*)
Jonathan S. Crevier (admitted *pro hac vice*)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
Telephone: 646-933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
rvandermeulen@dicellolevitt.com
mperez@dicellolevitt.com
jcrevier@dicellolevitt.com

Marvin A. Miller
Lori A. Fanning
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: 312-332-3400
mmiller@millerlawllc.com
lfanning@millerlawllc.com

Guillaume Buell (admitted pro hac vice)
**THORNTON LAW FIRM LLP**
1 Lincoln Street, 13th Floor
Boston, MA 02111
Telephone: 617-720-1333
gbuell@tenlaw.com

Don Barrett (pro hac vice forthcoming)
**BARRETT LAW GROUP, P.A.**
404 Court Square
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
dbarrett@barrettlawgroup.com
donbarrettpa@gmail.com

Richard R. Barrett (pro hac vice forthcoming)
**BARRETT LAW GROUP, P.A.**
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: 662-380-5018
rrb@rrblawfirm.net

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)

95

Charles F. Barrett
(admitted *pro hac vice*)
**NEAL & HARWELL, PLC**
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: 615-244-1713
cbarrett@nealharwell.com

**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1908
mlehmann@hausfeld.com
clebsock@hausfeld.com

Hilary K. Scherrer
Paul Gallagher
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington, DC 20006
Telephone: 202-540-7200
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Scott A. Martin
Irving Scher
Jeanette Bayoumi
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: 646-357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

*Counsel for Direct Purchaser Plaintiffs and the*
*Proposed Direct Purchaser Class*

## CERTIFICATE OF SERVICE

I, Carmen A. Medici, an attorney, hereby certify that on October 30, 2023, I caused a true

and correct copy of the foregoing Direct Purchaser Plaintiffs' First Amended Consolidated Class

Action Complaint to be filed and served electronically via the Court's CM/ECF system.

<div style="text-align: right;">

*s/ Carmen A. Medici*
Carmen A. Medici

</div>

# EXHIBIT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE FICO ANTITRUST LITIGATION | Judge Edmond E. Chang |
| This Document Relates to the Following Cases: | Magistrate Judge M. David Weisman |
| INDIRECT PURCHASER CASES | No. 1:20-CV-02114 |
| | JURY TRIAL DEMANDED |

INDIRECT PURCHASER PLAINTIFFS'
SECOND AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................1

II.  PARTIES  …………………….............................................................6

III.  JURISDICTION AND VENUE  .........................................................8

IV.  FACTUAL ALLEGATIONS  ..............................................................9

    A. Credit Scores and Credit Reports .................................................9

    B. The Markets for Credit Scores in The United States ...................14

    C. Fair Isaac's FICO Score Has a Monopoly in the B2B Credit Score Market...............20

    D. Fair Isaac Has Been Able to Maintain its Monopoly ...................23

    E. Fair Isaac's Conduct in Furtherance of its Anticompetitive Scheme ...........................27

       1.  Fair Isaac's Anticompetitive Litigation.................................28

       2.  Fair Isaac and the Credit Bureaus' Anti-Competitive Agreements .......................33

          a.  Fair Isaac's Anticompetitive Contracts with the CBs................................34

             i.  The "No Equivalent Products Clause" ............................................38

             ii.  The "Dynamic Royalty Schedule"..................................................39

             iii.  The "Level Playing Field" .............................................................42

       3.  Fair Isaac's Negative Advertising Campaign in Furtherance of its Scheme .........46

    F. The Contracts Between Fair Isaac and Each Credit Bureau Containing Anticompetitive Terms, In Combination With Fair Isaac's Anticompetitive Conduct Has Harmed Competition In the B2B Credit Score Market.........................................49

V.  CLASS ACTION ALLEGATIONS ........................................................51

VI.  STATUTES OF LIMITATION AND TOLLING..............................................54

VII.  DEFENDANTS' ACTIONS CONSTITUTE CONTINUING VIOLATIONS.................57

VIII. CLAIMS FOR RELIEF  ...................................................................58

i

FIRST CLAIM FOR RELIEF: UNREASONABLE RESTRAINT OF TRADE..............58

SECOND CLAIM FOR RELIEF: UNREASONABLE RESTRAINT OF TRADE.........60

THIRD CLAIM FOR RELIEF: UNREASONABLE RESTRAINT OF TRADE ............63

FOURTH CLAIM FOR RELIEF: UNREASONABLE RESTRAINT OF TRADE.........65

FIFTH CLAIM FOR RELIEF: MONOPLIZATON ...........................................67

SIXTH CLAIM FOR RELIEF: VIOLATION OF STATE ANTITRUST
STATUTES ............................................................................69

SEVENTH CLAIM FOR RELIEF: VIOLATIONS OF STATE CONSUMER
PROTECTION LAWS .................................................................103

EIGHTH CLAIM FOR RELIEF: UNJUST ENRICHMENT ........................................132

PRAYER FOR RELIEF ............................................................................133

ii

Plaintiffs Garner Properties & Management LLC ("Garner") and Lake City Exports, Inc. ("Lake City") (collectively, "Plaintiffs"), bring this action against Defendants Fair Isaac Corporation ("Fair Isaac"), Equifax, Inc. ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and TransUnion, LLC ("TransUnion") (collectively "Defendants," with the latter three referred to collectively as the "Credit Bureaus" or "CBs"), individually and on behalf of proposed Classes of all end-users that purchased FICO Scores[1] in the B2B Credit Score Market from any third-party other than Fair Isaac and/or a Credit Bureau from October 1, 2006 through the present.[2] Defendants have engaged in anticompetitive behavior, which forced Plaintiffs and members of the proposed Classes to pay artificially inflated prices for credit scoring services and generated millions of dollars in supra-competitive annual revenues for Defendants. Fair Isaac has maintained a monopoly share in excess of 90% of the market for credit scores by suppressing competition and inhibiting innovation. Therefore, Plaintiffs and the proposed Classes seek damages, injunctive relief and other relief pursuant to federal antitrust laws, state antitrust, unfair competition, and consumer protection laws, and the laws of unjust enrichment, and demand a trial by jury.

## I. INTRODUCTION

1. A "credit score" is a three-digit numerical summary of a customer's creditworthiness based on factors such as payment history and the duration of that history; balances, available credit, and the percentage of existing credit lines being utilized; public records like bankruptcies or adverse judgments; and the assumption of new debt. There are two distinct markets for such scores. The first is the market for the sale of such scores to banks,

---

[1] "FICO Score" includes a credit report that contains a FICO Score.

[2] "Third-party" constitutes any entity that purchased a FICO Score from any Defendant.

1

mortgage companies, credit unions, and other businesses that assess individual credit risk – *i.e.*, business-to- business sales. That market is referred to herein as the "B2B Credit Score Market." The second is the market for the sale of such scores to the individual who is the subject of them – i.e., business-to-consumer. That market is referred to herein as the "B2C Credit Score Market. This case concerns the B2B Credit Score Market.

2.      According to Fair Isaac, FICO Scores are used for over 90% of all lending decisions in the United States. Fair Isaac's FICO credit scores have dominated the market for nearly three decades and have "maintained a 90-plus percent market share for at least 13 years."[3]

3.      Credit Bureaus collect and maintain information for credit reports. The three major CBs in the United States are Defendants Equifax, Experian, and TransUnion. The CB Defendants control virtually 100% of aggregate credit-related data formed by aggregating credit data collected from businesses, and they jointly dominate the market for B2B credit reports.

4.      Credit reports list bill payment history, loans, current debt, and other financial information. They show where consumers work and live and whether they have been sued, arrested, or filed for bankruptcy.

5.      Credit reports help lenders decide if they will give consumers credit or approve a loan. The reports also help determine what interest rates consumers are charged. Employers, insurers, and rental property owners also use credit reports.

6.      CBs purchase FICO Scores and then sell them as part of the credit reporting services they provide to millions of lenders, financial institutions, landlords, employers, and other businesses, that then use the credit reports to determine credit history and/or default risk.

---

[3] TransUnion LLC's Redacted Counterclaims, Dkt 38, *Fair Isaac Corp. . TransUnion LLC*, No. 1:17-cv-08318, ¶ 32 (N.D. Ill. Feb. 12, 2018) ("TransUnion Counterclaims").)

2

7.      Fair Isaac also directly sells FICO Scores to creditors and other businesses –
bypassing the Credit Bureaus, and competing with them, when it does so.

8.      Plaintiff Garner is a real estate brokerage and property management company
that purchases Fair Isaac's FICO scores from third-parties which, in turn, purchase those FICO
Scores from one of the three major CBs. The third-parties pass on to Garner and all other Class
Members the cost of each FICO Score.

9.      Plaintiff Lake City is a used automobile dealer that purchases Fair Isaac's FICO
scores from third-parties which, in turn, purchase those FICO Scores from one of the three major
CBs. The third-parties pass on to Lake City and all other Class Members the cost of each FICO
Score.

10.     In 2006, VantageScore Solutions, LLC ("VantageScore Solutions") launched
VantageScore - a credit score to compete against Fair Isaac's FICO Scores. VantageScore
Solutions is an independent joint venture of the Credit Bureaus. Similar to Fair Isaac's FICO Score,
VantageScore Solutions uses scoring codes and algorithms to convert a consumer's information
in a consumer credit report into a credit score. Thus, VantageScore presented a competitively
priced alternative to FICO Scores.

11.     In addition, a VantageScore has relevant and important advantages over a FICO
Score. For example, a VantageScore considers a consumers' rental and utility payments, which
enables it to provide a credit score for consumers with less than six months of credit history. Fair
Isaac's FICO Score cannot do this. A VantageScore therefore provides a credit score for tens of
millions more Americans than Fair Isaac's algorithms allow. If Plaintiffs and similarly situated
businesses were able to purchase VantageScores on economically sensible terms, they would be
able to see credit scores of tens of millions more consumers, enabling them to contract with

3

millions more customers, tenants, and employees than they can using FICO Scores alone.

12.     Rather than compete on the merits with VantageScore, Fair Isaac undertook a lengthy campaign of anticompetitive conduct to discourage the adoption of VantageScore and preserve its own monopoly. As part of that campaign Fair Isaac also entered into contracts with each CB, which contained substantially similar anticompetitive provisions that were designed to, and did, substantially reduce or altogether eliminate the competitive threat posed by VantageScore. Through these contracts Fair Isaac imposed unreasonable restraints on trade.

13.     As another part of that campaign, in 2006, Fair Isaac filed a lawsuit against TransUnion, Equifax, and Experian with the intended purpose of driving VantageScore Solutions out of business. Experian settled the case in 2008 and entered into a lucrative partnership with Fair Isaac following the settlement. TransUnion and Equifax fought on, eliminating most of Fair Isaac's claims through a summary judgment motion and winning a jury trial on the remaining trademark claim.

14.     When its lawsuit failed, Fair Isaac engaged in a further pattern of anticompetitive conduct designed to discourage use of alternatives to FICO Scores, including VantageScore. Fair Isaac accomplished this goal by abusing its monopoly power and entering into contracts with the CBs that contained anticompetitive restrictions aimed at extracting supracompetitive profits from B2B purchasers. Those contracts include contractual provisions that: (1) prohibit CBs from marketing non-FICO credit scores (*i.e.*, VantageScore); (2) charge discriminatory and prohibitively high prices for FICO Scores if a CB customer purchases a FICO Score while providing the consumer with a competing score (*i.e.*, a VantageScore); and (3) eliminate price competition among the CBs, thereby disincentivizing the CBs from negotiating a lower price for FICO Scores.

4

15.     The contracts were intended to, and had the effect of, hobbling VantageScore Solutions' ability to compete and forcing B2B Purchasers to pay supracompetitive prices for credit scores.

16.     As part of its goal of eliminating competition, Fair Isaac also waged a public relations and advertising campaign to disparage VantageScore and create uncertainty about the reliability of VantageScores. The purpose of Fair Isaac's anticompetitive scheme is to prevent competition from VantageScore and other scoring systems and to preserve Fair Isaac's monopoly.

17.     Fair Isaac's scheme worked. Through the anticompetitive conduct alleged herein, Fair Isaac succeeded in preventing VantageScore Solutions from gaining market share and thwarted the entry of other entities into the market for credit scores. Having successfully suppressed all other competition, Fair Isaac was able to, and did, artificially increase prices for its FICO products.

18.     For example, Fair Isaac's net income for the third quarter of 2021 was ***more than double*** that of the previous year period, increasing from $64.1 million in Q3 2020 to $151.2 million in Q3 2021.[4] Fair Isaac's yearly net income has remained high and increased year-over-year; for example, Fair Isaac reported a net income of $236 million in 2020, $392 million in 2021, $374 million in 2022, and is on pace to surpass its net earnings in 2023 from the previous year.[5] Sources in the financial industry have attributed Fair Isaac's profitability to "[p]rice

---

[4] Press Release, Fair Isaac, *FICO Announces Earnings of $5.18 per Share for Third Quarter Fiscal 2021* (Aug. 3, 2021), https://investors.fico.com/news-releases/news-release-details/fico-announces-earnings-518-share-third-quarter-fiscal-2021.

[5] Fair Isaac Corporation, Annual Report (Form 10-K), at 36 (Nov. 9, 2022), https://fico.gcs-web.com/static-files/9050c8f5-9c87-4d41-8ecd-6d9f3d179a8a (hereinafter, "Fair Isaac 2022 10-K"); *see also* Fair Isaac Corporation, Quarterly Report (Form 10-Q), at 18 (Aug. 2, 2023),

increases in its credit scoring segment and gains in applications sold to banking institutions," which have "helped the company log year-over-year gains in revenue and profit."[6] But for Fair Isaac's and the CBs' anticompetitive conduct, VantageScore and other competitors of Fair Isaac would have gained market share, allowing for price competition and reducing the prices Plaintiffs and similarly situated businesses paid for FICO Scores.

19.     Plaintiffs and other indirect purchasers of Fair Isaac's FICO Scores paid supracompetitive prices and have therefore suffered harm as a result of Defendants' anticompetitive conduct, which harmed competition in the B2B Credit Score Market. Opening this market to competition will spur innovation so that credit scores are fairly priced and more accurate.

20.     Plaintiffs and other similarly situated businesses are indirect purchasers of Fair Isaac's FICO Scores. They do not purchase FICO Scores directly from Defendants but instead purchase them from third-parties, who purchase them from Defendants.

## II.     PARTIES

21.     Plaintiff Garner Properties & Management LLC is a real estate brokerage and property management company located in Taylor, Michigan. During the Class Period, Garner purchased Fair Isaac's FICO Scores from third-parties which, in turn, purchased those FICO Scores from one of the CBs. The CBs, through the third-parties, sell FICO Scores to Plaintiffs and Class members pursuant to agreements between Fair Isaac and each Credit Bureau, which

---

https://fico.gcs-web.com/sec-filings?field_nir_sec_form_group_target_id%5B%5D=496&field_nir_sec_date_filed_value=#views-exposed-form-widget-sec-filings-table.

[6] Motley Fool, *Fair Isaac Corporation Scores 13% Revenue Growth in the First Quarter* (Jan. 31, 2019), https://www.fool.com/investing/2019/01/31/fair-isaac-corporation-scores-13-  revenue-growth-in.aspx.

6

provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to the Class. The artificially inflated cost of those FICO Scores is then passed on to Garner, and all other Class members.

22.     Plaintiffs Lake City Exports, Inc., is a used automobile dealer located in Maine. During the Class Period, Lake City purchased Fair Isaac's FICO Scores from third-parties which, in turn, purchased those FICO Scores from one of the CBs. The CBs, through the third-parties, sell FICO Scores to Plaintiffs and Class Members pursuant to separate agreements between Fair Isaac and each Credit Bureau, which provide for royalty payments to be paid to Fair Isaac for each FICO Score sold to the Class. The artificially inflated cost of those FICO Scores is then passed on to Lake City, and all other Class members.

23.     Plaintiffs were injured in their business or property as a direct, proximate, and material result of Defendants' violation of the law. Plaintiffs are also threatened with future injury to their business and property by reason of Defendants' continuing violations of the law.

24.     Defendant Fair Isaac is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California, 95110.

25.     Defendant Equifax is a Credit Bureau incorporated in Georgia that has its principalplace of business at 1550 Peachtree St. NW, Atlanta, Georgia.

26.     Defendant Experian is a Credit Bureau incorporated in Ohio that has its principal place of business in the United States at 475 Anton Blvd., Costa Mesa, California.

27.     Defendant TransUnion is a Delaware limited liability Credit Bureau that has its principal place of business at 555 W. Adams St., Chicago, Illinois.

28.     Plaintiffs bring this state law class action on behalf of the proposed Classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and

7

post-judgment interest, costs, and attorneys' fees for the injuries caused by Defendants' conduct in restricting the development and sale of credit scores and causing the prices of FICO Scores to be artificially inflated. Plaintiffs also seek injunctive relief under Sections 1 and 2 of the Sherman Act.

## III.    JURISDICTION AND VENUE

29.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332(d) and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court possesses supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

30.    This Court has personal jurisdiction over Defendants because Defendants transacted business, maintained substantial contacts, and are located and/or committed unlawful conduct in this District. Their unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

31.    Venue is proper in this District pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d). Defendants regularly transact business within this District and a substantial portion of the affected interstate trade and commerce described in this Complaint were carried out in this District.

32.    Defendants market their products and receive substantial payments across state lines. Defendants' business activities that are the subject of this Complaint are within the law of and have substantially affected, interstate trade and commerce.

33.    During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States Mail, to effectuate their illegal scheme.

8

34.     Defendants' conduct also had a substantial effect on the intrastate commerce of the States listed in counts Seven and Eight of this Complaint.

IV.     **FACTUAL ALLEGATIONS**

    A.     **Credit Scores and Credit Reports**

35.     A credit score is a numerical expression of a person's credit history and is designed to measure their creditworthiness. It helps creditors determine whether to give credit, decide the terms they offer and what interest rates consumers pay. Higher scores generally indicate that an individual or business poses less credit risk and is more likely to make payments under a contract and manage money more responsibly. Thus, having a high credit score can make it easier to get a loan, credit card, lower interest rates, rent an apartment, or provide access to lower insurance rates.

36.     Credit scores typically are produced by applying scoring algorithms to a person's consumer credit history. A credit score is based on multiple factors, such as payment history, outstanding balances, length of credit history, applications for new credit accounts, and types of credit accounts (*e.g.*, mortgages, car loans, credit cards).

37.     Credit scores usually are accompanied by "reason statements," which inform the purchaser about the factors that most significantly affected that individual's credit score. A number or alphanumeric code - called a "reason code"- is associated with each reason statement. Examples of reason statements include: "Account payment history is too new to rate"; "Amount owed on accounts is too high"; and "Too many recently active accounts." VantageScore explains this process as follows:

> No matter where you get your score, the documents that accompany it will include up to four or five statements explaining why your score wasn't higher. These statements are called reason codes and sometimes go by several other

names. Some people call them score factors; others call them adverse action codes. They're all the same thing.

The next time you see your credit score, regardless of where it comes from, look for the reason codes. They'll be worded and displayed something like this:

Your Credit Score Is: 705

32: Balances on bankcard or revolving accounts too high compared to credit limits

16: The total of all balances on your open accounts is too high

85: You have too many inquiries on your credit report

13: Your most recently opened account is too new

The numbers preceding each statement are numeric identifiers; sometimes they appear with the text, and sometimes they do not.

The four (or five) factors are listed in order of the impact they have. In this example, the number one reason the credit score is not higher is "Balances on bankcard or revolving accounts too high compared to credit limits." That means the consumer's credit card debt is too high relative to his or her credit limits.

In our example, the reason with the second-greatest impact is "The total of all balances on your open accounts is too high." That means the consumer is carrying too much debt on his or her open accounts.

The third reason the score isn't higher is "You have too many inquiries on your credit report." This means the consumer has recently applied for credit several times, which led to some number of credit inquiries.

The fourth reason the score isn't higher is "Your most recently opened account is too new." Clearly this means the consumer has a very new account on his or her credit report.[7]

---

[7] VantageScore Solutions, *Reason Codes 101*, https://www.reasoncode.org/reasoncode101.

10

38.     Fair Isaac has a webpage that sets forth its various "reason codes."[8] VantageScore also has a dedicated website that explains its various "reason codes."[9]

39.     CBs collect and store financial data about individuals that is submitted to them by creditors, such as lenders, credit card companies, and other financial companies. Creditors are not required to report to every credit-reporting company. Utilizing these files, the CBs create a credit report.

40.     The information in a credit report is often used to calculate a credit score. Credit reports list a consumer's bill payment history, loans, current debt, and other financial information. They show where the individual works and lives and whether they have been sued, arrested, or filed for bankruptcy. CBs essentially collect consumer credit data and present the aggregated information in the form of a credit report.

41.     CBs continually gather credit and financial data about individuals from creditors, government entities, public records, collection agencies, and other third parties, and compile this information into a credit file. The CBs then use an individual's credit file to populate a credit report on that individual for sale to businesses (B2B purchasers) and consumers (B2C purchasers).

42.     Credit reports help lenders decide if they will give credit or approve a loan. The reports also help determine what interest rate to charge. Employers, insurers, and rental property owners also look at credit reports.

43.     Credit scores are the most widely used indicators of consumers' creditworthiness in the United States and Fair Isaac's FICO Score is, by far, the most widely-used credit score.

---

[8] Fair Isaac, *US FICO® Score Reason Codes*, https://www.fico.com/en/latest-thinking/solution-sheet/us-fico-score-reason-codes (link to download).

[9] VantageScore Solutions, ReasonCode.org, https://www.reasoncode.org.

According to Fair Isaac, FICO Scores are used in over 90% of U.S. lending decisions.[10] They are crucial to millions of businesses that rely on indicators of creditworthiness to assess risk and make business decisions.

44. Credit scores and credit reports are separate and distinct products that can be sold together or independently.

45. Fair Isaac works with the CBs to perpetuate and extend its monopoly. Fair Isaac's relationship with B2B purchasers is often dependent on B2B purchasers' relationships with the CBs, which facilitate the sale of FICO Scores to B2B purchasers.

46. FICO Scores and credit reports are often sold to businesses as a bundle. Such bundles can be sold by the CBs, which are licensed by Fair Isaac to sell FICO Scores and in return, pay a royalty to Fair Isaac. Thus, when a B2B purchaser requires a credit score, it purchases a credit report from a CB and a credit score from that CB and Fair Isaac, often through a contract with both Fair Isaac and the CB. Although the payment for the credit report and the credit score may at times occur in a single transaction, the reality is that both the CB and Fair Isaac act as the providers of the FICO Score. In this example, Plaintiffs and proposed Class members would then purchase the credit report and credit score from the B2B purchaser.

47. In its 2020 Form 10-K filed with the SEC, Fair Isaac states that, "[d]uring fiscal 2020, 2019 and 2018, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for 32%, 29%, and 25% of our total revenues, respectively."[11]

48. And in its 2022 10-K, Fair Isaac disclosed significant increases in the revenues

---

[10] Fair Isaac, *FICO: The Decisions Company Investor Overview*, at 5 (Dec. 2019), https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.

[11] Fair Isaac Corporation, Annual Report (Form 10-K), at 4 (Nov. 12, 2020), https://fico.gcs-web.com/node/23951/html (hereinafter, "Fair Isaac 2020 10-K").

generated from these same agreements. According to Fair Isaac, "during fiscal 2022, 2021 and 2020, revenues generated from our agreements with Experian, TransUnion and Equifax collectively accounted for 39%, 38% and 33% of our total revenues, respectively."[12] Fair Isaac characterized the CBs as "partners in offering [FICO's] scoring solutions."

49.     The FICO Score and credit report bundles can also be sold by Fair Isaac to businesses. "In those situations, Fair Isaac requests a credit score and credit report from the CBs selected by the lender or consumer. The Credit Bureau applies Fair Isaac's CB-tailored FICO algorithm to a consumer's aggregated credit data and provides the consumer's credit report and credit score to Fair Isaac. Fair Isaac then delivers the bundle to the consumer or lender. Fair Isaac pays the CB for the cost of processing and providing the bundle."[13] Thus, Fair Isaac and the CBs act as horizontal competitors and compete with each other for some B2B Purchasers – separate and apart from Fair Isaac's competition with VantageScore.

50.     This direct competition between Fair Isaac and the CBs, as well as the close relationship among them, continues to this day. At an August 3, 2021 earnings conference, Fair Isaac's CEO, William J. Lansing, said, "we stay close to it [B2B scores] through our channel partners, the bureaus. But we also -- certainly for all of the major institutions, we have direct sales relationships."[14] TransUnion's 2022 Form 10-K acknowledges that it "compete[s] with FICO in the Financial Services" market for B2B purchasers.[15] Similarly, Equifax's 2022 Form

---

[12] Fair Isaac 2022 10-K at 9.

[13] *Fair Isaac Corp. v. Equifax, Inc.*, No. 06-4112, 2008 WL 623120, at *2 (D. Minn. March 4, 2008).

[14] Motley Fool, *Fair Isaac Corp. (FICO) Q3 2021 Earnings Call Transcript* (Aug. 3, 2021) (hereinafter, "Q3 Earnings Call"), https://www.fool.com/earnings/call-transcripts/2021/08/03/fair-isaac-corporation-fico-q3-2021-earnings-call/.

[15] TransUnion, Annual Report (Form 10-K) (Feb. 14, 2022), at 12.

10-K acknowledges that it too "compete[s] with Fair Isaac Corporation with respect to certain of [its] analytical tools and solutions."[16] Experian has also recognized that its "comparator companies" include FICO.[17]

**B.    The Markets for Credit Scores in The United States**

51.    There are two distinct markets for credit scores—the "B2B Credit Score Market" and the "B2C Credit Score Market."

52.    The "B2B Credit Score Market" consists of sales from a business (a credit score generator, such as Fair Isaac, directly or through a CB, or indirectly through a third-party credit reporting company) to lenders, such as banks and credit card companies, financial institutions, and other businesses. The "B2C Credit Score Market" consists of credit scores sold to consumers to monitor their own credit records. The claims in this case concern the B2B Credit Score Market. The B2B Credit Score Market is the relevant product market in which the claims that require a market definition are to be assessed.

53.    In the B2B Credit Score Market, businesses purchase the credit scores of individuals and businesses to help them understand credit risk, make better-informed lending decisions, assess creditworthiness, and make business decisions. The B2B Credit Score Market also includes the FICO Scores that Plaintiffs and other businesses indirectly purchased from Fair Isaac and the CBs.

54.    In the B2C Credit Score Market, Fair Isaac and other credit score producers, as well as CBs, sell consumers their own credit scores. A consumer often purchases their own credit

---

[16] Equifax, Annual Report (Form 10-K) (Feb. 23, 2022), at 8.

[17]    Experian    plc,    *Annual    Report    2021*    (2022),    at    139, https://www.experianplc.com/media/4223/experian-annual-report-2021.pdf.

score for personal use, including to see how lenders view their creditworthiness, to understand the types and terms of financing they may be able to secure, to monitor their financial health, manage their debt, protect their identity, and to determine if they are potentially eligible to make certain purchases.

55. The B2B Credit Score Market for credit scores is a distinct product market for antitrust purposes. The businesses that use credit scores to assess creditworthiness, manage risk, and make business decisions do not consider credit reports, insurance scores, or any part of an individual's consumer and credit history to be a substitute for credit scores. Likewise, the businesses that resell or otherwise provide credit scores to their own downstream customers do not consider credit reports, insurance scores, or any part of an individual's consumer and credit history to be a substitute for credit scores.

56. The relevant geographic market in which B2B credit scores are provided is the United States (including its territories). The restraints on competition contained in Defendants' contracts relate to business and consumer credit scores in the United States.

57. Business customers, such as banks, credit card companies, financial institutions, real estate companies, insurance companies and other businesses, in the B2B Credit Score Market are a separate and distinct group of purchasers of credit scores. Business customers who purchase credit scores in the B2B Credit Score Market do not use credit scores in the same manner as consumer customers who purchase credit scores in the B2C Credit Score Market.

58. Business customers in the B2B Credit Score Market purchase credit scores to make informed decisions, sell, advertise, or complement another product. On the other hand, consumer customers in the B2C Credit Score Market purchase the credit scores as an end-product.

15

59. Business customers in the B2B Credit Score Market also purchase credit scores in ways that consumer customers do not. For example, business customers in the B2B Credit Score Market who engage in pre-screening, such as credit card companies, often purchase credit scores in batches as part of their marketing efforts. They use credit scores as a method of selecting consumers in a particular credit score range that they wish to extend credit card offers to under particular terms. However, consumer customers in the B2C Credit Score Market only purchase their own score.

60. The Consumer Financial Protection Bureau ("CFPB") noted in a 2011 report to Congress that "many of the credit scores sold to lenders are not offered for sale to consumers."[18] The agency went on to explain:

> When a consumer purchases a score from a CRA [Credit Rating Agency], it is likely that the credit score that the consumer receives will not be the same score as that purchased and used by a lender to whom the consumer applies for a loan. This could occur if the score the consumer purchased is an educational score that is not used by lenders, but differences between the score a consumer buys and the score a lender buys can occur for other reasons as well. Since so many scores are in use in the marketplace, it could also be the case that the particular lender to which the consumer applies uses a different scoring model than the one purchased by the consumer, or that the CRA from which the consumer obtains a score is not the same CRA that the lender uses to obtain scores, or that the underlying data in the consumer's credit report changes significantly between the time the consumer purchases a score and the time the lender obtains a score for that consumer. It is also possible that a consumer and a lender could access different reports from the CRA, if they were to use different identifying information about the consumer. Any of these differences could lead to differences between the credit score a consumer sees and the credit score a lender uses to assess that consumer.[19]

---

[18] Consumer Financial Protection Bureau, *The impact of differences between consumer- and creditor-purchased credit scores*, at 1 (July 19, 2011), https://files.consumerfinance.gov/f/2011/07/Report_20110719_CreditScores.pdf.

[19] *Id.*

61.     The vast majority of the credit reporting and credit scoring industry, industry analysts, policy analysts, and investors recognize the B2B Credit Score Market as a separate market from the B2C Credit Score Market. Fair Isaac itself recognizes its Business and Consumer offerings as distinct product and revenue lines. Fair Isaac has divided its "Scores" profits and revenues into separate "business-to-business" or "B2B" and "business-to-consumer" or "B2C" segments in its Securities and Exchange Commission filings and shareholder calls over the last several years. In its 10-K and 10-Q filings for the past several years, Fair Isaac has distinguished between its "business-to-business scoring solutions and services" and its "business-to-consumer scoring solutions and services including my FICO solutions for consumers."

62.     Purchases in the B2B Credit Score Market for credit scores and B2C Credit Score Market for credit scores are also different. While business customers purchase credit scores from Fair Isaac through CBs and/or third-party intermediaries, credit scores in the B2C Credit Score Market are often sold to consumers directly, such as when consumers purchase their credit score from Fair Isaac at myFICO.com.

63.     The B2B Credit Score Market exhibits high barriers to entry. As noted in a 2018 article: "The deep integration of FICO scores and products into companies' operations has raised switching costs."[20]

64.     Likewise, VantageScore Solutions has observed that in the residential mortgage sector, FICO's "imprint inhibits competition by raising switching costs and granting the irreplaceable brand value of utter ubiquity. It gives FICO unparalleled and highly controversial

---

[20] *Fair Isaac: A Royalty on U.S. Credit Scoring* (Sept. 25, 2018), https://seekingalpha.com/article/4208014-fair-isaac-royalty-on-u-s-credit-scoring.

negotiating leverage with almost every participant in the industry."[21]

65.     "Larger lenders use the [FICO] score as an input to customized models they've built for specific situations or portfolios. After a recent review one major US lender recently identified over 600 places they were using a FICO score in their business processes. Switching to a new score not only means proving the new score is better (a long process in itself) but extensive testing to ensure all of those moving parts are still working as designed. Citibank recently announced that after an 18 month review they've decided it's safe to switch to the latest version of the FICO score (FICO 8). This wasn't a migration to a new score mind you, just a more recent version of the score they're already using. The barriers to entry are indeed high . . . and expensive."[22]

66.     "Network effects" – *i.e.*, the phenomenon where a product or service increases in value when the total number of customers increase – serve as a barrier to entry into the B2B Credit Score Market. As one analyst has noted: "The 'network effects' keeping FICO's dominant position [are] indeed incredibly strong."[23]

67.     In 2011, at Fair Isaac's Analyst/Investor Day, Fair Isaac's then-CEO, Mark Greene, explained: "In about 10 seconds, an entire commerce transaction taking place because 720 FICO was understood by the broker, by the mortgage banker on the other end of line and

---

[21] Press Release, VantageScore, *VantageScore Solutions Issues Statement Reacting to FHFA's Proposed Rules for Validating and Approving New Credit Scoring Models* (Dec. 17, 2018), https://vantagescore.com/press/vantagescore-solutions-issues-statement-reacting-to-fhfas-proposed-rules-for-validating-and-approving-new-credit-scoring-models.

[22] John Ulzheimer, *Why FICO Isn't Going Away Any Time Soon*, Smart Credit (July 5, 2011), https://blog.smartcredit.com/2011/07/05/why-fico-isnt-going-away-any-time-soon/.

[23] Harrison Schwartz, *Fair Isaac: Share Buybacks Likely To End As Cash Reserves Run Low*, Seeking Alpha (Dec. 17, 2019), https://seekingalpha.com/article/4312953-fair-isaac-share-buybacks-likely-to-end-cash-reserves-run-low.

the customer to be shorthand for good credit risk, gave this guy a favorable mortgage rate. And that network effect, having everybody in the loop understand that shorthand and standardize on a FICO Score, that's magic."[24]

68.     The anticompetitive conduct by Fair Isaac alleged herein accounts in significant part for the FICO Score's dominance in the B2B Credit Score Market.

69.     The CBs participate in a market for credit reports. A credit report contains detailed information about a consumer's credit activity and current credit situation. The detailed information in a credit report is used to generate a FICO Score for a specific customer, which B2B lenders can use in making their lending decisions.

70.     On information and belief, the CBs control virtually all of the credit report market (they have been called a "triopoly") and enjoy roughly equivalent market shares."[25]

71.     The three CBs are all members of a trade association called the Consumer Data Industry Association ("CDIA"). Through the CDIA, the three CBs frequently work together, including to: (i) develop a standard electronic data reporting format called Metro 2®; (ii) issue joint statements on matters of public importance; (iii) provide guidelines to businesses that use credit reports; and (iv) respond to public criticisms of their industry. The three CBs also cooperated in the establishment of VantageScore Solutions as a joint venture.[26]

---

[24] SA Transcripts, Seeking Alpha, *Fair Isaac Corp. – Analyst/Investor Day* (Nov. 3, 2011), https://seekingalpha.com/article/307417-fair-isaac-corp-analyst-investor-day.

[25] *See* Consumer Financial Protection Bureau, *List of Consumer Reporting Companies* (2021), https://files.consumerfinance.gov/f/documents/cfpb_consumer-reporting-companies-  list_2021-06.pdf.

[26] *See* Consumer Data Industry Ass'n, *About CDIA*, https://www.cdiaonline.org/about/about-cdia/; Consumer Data Industry Ass'n, *Metro 2 Format for Credit Reporting*, https://www.cdiaonline.org/resources/furnishers-of-data-overview/metro2-information/; Dana Fowle, *Industry Pushes Back Against Claims of High Credit Reporting Errors*, Fox5 Atlanta (Sept. 15, 2021), https://www.fox5atlanta.com/news/industry-pushes-back-against-claims-of-high-

C. **Fair Isaac's FICO Score Has a Monopoly in the B2B Credit Score Market**

72. Fair Isaac came into existence in 1956, possessed a monopoly on credit-scoring algorithms until the mid-1970s, and continues to wield a dominant market share.[27]

73. Fair Isaac's "FICO Classic" credit scores are the best known and most widely used credit scores in the B2B Credit Score Market. Fair Isaac applies an algorithm to each credit reporting agency's data to generate a FICO Classic Score between 300 and 850 that purports to give an indication of the individual's credit risk. It also generates a set of "reason statements," with corresponding codes, that explain the reasons the consumer has not been assigned the maximum score.

74. FICO Scores are the credit scores most widely used by lenders and are used in over 90% of U.S. credit lending decisions.[28] Every year, lenders access billions of FICO Scores to help them understand people's credit risk and make better-informed lending decisions.

75. On its website, Fair Isaac claims that "10 billion FICO Scores are purchased every year" and "27 million Fico Scores are purchased every day." FICO Scores are also used in over 30 countries.[29]

76. Fair Isaac also advertises that its FICO Score is "widely accepted" and "used by

---

credit- reporting-errors; Press Release, Consumer Data Industry Ass'n, *Consumer Data Industry Association Releases Study on the Value of Credit Reporting in U.S.* (June 15, 2020), https://cdia-news.s3.amazonaws.com/White+Paper+Press+Release+6.15.20.pdf; Consumer Data Industry Ass'n, *Equifax, Experian, & TransUnion Endorse CARES Act,* https://www.cdiaonline.org/equifax-experian-transunion-endorse-cares-act/; Consumer Data Industry Ass'n, *COVID-19,* https://www.cdiaonline.org/covid-19/.

[27] Raymond Anderson, *A History of Credit Scoring,* at 75-76 (2019), https://www.researchgate.net/profile/Raymond_Anderson4/publication/331533723_Chapter_B0 6_History_of_Credit_Scoring/links/5c7ed843299bf1268d3ccc5d/Chapter-B06-History-of-Credit-Scoring.pdf?origin=publication_detail.

[28] https://fico.gcs-web.com/static-files/946e4204-cdbb-4797-b7e0-24d71191698b.

[29] https://www.ficoscore.com/about.

90% of top U.S. lenders." FICO Scores have been "an industry standard for over 30 years."[30]

77.    Fair Isaac's executives have confirmed the dominance of Fair Isaac's FICO Score. In November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President Michael Pung stated that the FICO scoring system "is the most widely used credit scoring system here in the U.S.," that "[v]irtually every major lender in the U.S. [uses] the FICO Score for some sort of credit lending decision," and that Fair Isaac has "maintained a 90-plus percent market share for at least the [last] 13 years."[31] In 2008, Craig Watts, a public affairs manager at Fair Isaac, described the FICO Score as the "800 pound gorilla."[32]

78.    Fair Isaac states in its 2020 Form 10-K:

> Our products and services serve clients in multiple industries, including primarily banking, insurance, retail, healthcare and public agencies. Endusers of our products include 96 of the 100 largest financial institutions in the U.S., and two-thirds of the largest 100 banks in the world. Our clients also include more than 600 insurers, including nine of the top ten U.S. property and casualty insurers; more than 300 retailers and general merchandisers; more than 200 government or public agencies; and morethan 200 healthcare and pharmaceuticals companies, including nine of the world's top ten pharmaceuticals companies. Eight of the top ten companies on the 2020 Fortune 500 list use one or more of our solutions. In addition, our consumer services are marketed to an estimated 200 million U.S. consumers whose credit relationships are reported to the three major U.S. credit reporting agencies.[33]

79.    An infographic on Fair Isaac's website states: "10 BILLION FICO SCORES

---

[30] *Id.*

[31] TransUnion Counterclaims, ¶ 32.

[32] Dana Dratch, *What Does 'Good' Credit Really Mean?*, CNBC (Oct. 30, 2008), https://www.cnbc.com/id/27458815.

[33] Fair Isaac 2020 10-K at 10.

ARE SOLD EACH YEAR," which is "FOUR TIMES the number of hamburgers McDonald's sells WORLDWIDE in a year," and "27,400,000 FICO scores are sold every day," which is "OVER TWICE the number of cups of coffee Starbucks sells WORLDWIDE in a day."[34]



80.    Fair Isaac's 2020 Form 10-K states that FICO Scores "are used in the majority of U.S. credit decisions, by nearly all of the major banks, credit card organizations, mortgage lenders and auto loan originators," and it describes FICO Scores as "the standard measure in the U.S. of consumer credit risk."[35]

---

[34]Fair Isaac, *Learn About the FICO Score and Its Long History*, https://www.fico.com/25years/.
[35]Fair Isaac 2020 10-K at 3, 7.

22

81. A May 2021 report by Yale University's Thurman Arnold Project, a collaborative project among Yale faculty and students, as well as other scholars dedicated to research on competition policy and antitrust enforcement, notes that Fair Isaac "enjoys a virtual monopoly in the credit score market" and that "[b]ecause of the lack of competition in this domain, there has been limited innovation in scoring methodology."[36]

82. Fair Isaac's monopoly in the B2B Credit Score Market has given it considerable power to control prices and impose monopoly rents. Mr. Lansing has noted that, in the B2B Credit Score Market, Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are."[37]

83. In February 2013, at a Morgan Stanley Conference, Mr. Lansing explained that Fair Isaac's "Scores business, which is the cash generator, is a very, very high-margin business. It's deeply embedded into the systems of the bank customers who use it."[38]

**D.    Fair Isaac Has Been Able to Maintain its Monopoly**

84. Despite Fair Isaac's 90% share in the Business Market, several companies have attempted to compete with Fair Isaac's FICO Scores. These competitors' products use the same data as FICO Scores. However, many also incorporate data not used by FICO Scores—data such as, rental, utility, and telecom payment data and/or public records information, including property deeds, mortgages, liens, personal property titles, tax records, and licensing data.

85. Some of these competitors to Fair Isaac's FICO Scores in the B2B Credit Score

---

[36] Yale University Thurman Arnold Project, *Updating Antitrust and Competition Policy: Finance Issues*, at 14, 15 (May 2021), https://som.yale.edu/sites/default/files/TeamFinance- Final.pdf.

[37] TransUnion Counterclaims, ¶ 34.

[38] Seeking Alpha, *Fair Isaac's CEO Presents at Morgan Stanley Technology, Media & Telecom Conference (Transcript)* (Feb. 27, 2013), https://seekingalpha.com/article/1231981-fair- isaacs-ceo-presents-at-morgan-stanley-technology-media-and-telecom-conference-transcript.

Market include: SageStream's Credit Optics Score; LexisNexis's RiskView score; CoreLogic Credco's Anthem Credit Score; PRBC; ChexSystems; L2C's Link2Credit Score; and ScoreLogix LLC's JSS Credit Score.

86. Another competitor, VantageScore Solutions, represented the biggest threat to Fair Isaac's FICO Scores in the B2B Credit Score Market because it was a joint venture founded by the three major CBs. As part of its attempt to compete against Fair Isaac's FICO Scores in the B2B Credit Score Market, VantageScore Solutions introduced the VantageScore credit scoring system in March 2006. The three CB Defendants continue to own VantageScore Solutions.

87. VantageScore Solutions does not sell or market its VantageScore credit models or credit scores; instead, it licenses them to the three CB Defendants, which may incorporate VantageScores in their credit reports.

88. VantageScores are a competitor to FICO Scores in the B2B Credit Score Market.

89. In addition to being backed by the three major CBs, the VantageScore credit scoring model provides reliable credit scores for millions more consumers than FICO Scores by relying on additional and alternative sources of data. VantageScore, for example, calculates scores for consumers who have not used credit for up to two years and use utility and telecommunications payment histories. As such, VantageScore provides insights into individuals' and businesses' desirability as customers, clients, and/or tenants that Fair Isaac's FICO Scores cannot. In contrast, Fair Isaac's FICO scoring systems do not generate a score if a consumer does not have at least one credit account that has been open for six months or more, or if no credit account of the consumer has been reported to the reporting CB. Thus, millions of otherwise creditworthy individuals do not have a FICO Score.

90.     Obtaining a mortgage, car loan, credit card or reasonable interest rates on personal lines of credit is almost impossible without a credit score. Landlords are also increasingly screening potential tenants using credit scores. Thus, those excluded by Fair Isaac's traditional FICO scoring systems--including a disproportionate number of low-income and minority consumers--face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and housing.

91.     For example, the CFPB has found that, as of 2010, 26 million consumers in the United States were "credit invisible" – *i.e.*, they lacked credit history with one of the nationwide credit reporting companies.[39] Those individuals cannot be scored by FICO.[40]

92.     The CFPB's research suggests "a strong relationship between income and having a credit record. Almost 30 percent of consumers in low-income neighborhoods are credit invisible and an additional 16 percent have unscored records. These percentages are notably lower in higher-income neighborhoods. For example, in upper-income neighborhoods, only 4 percent of the population is credit invisible and another 5 percent has an unscored record."[41]

93.     Moreover, the CFPB found "significant differences in the incidence of having a limited credit history across racial and ethnic groups," specifically, while White and Asian individuals "are almost equally likely to be credit invisible or have an unscored record, the shares of Black and Hispanic individuals with limited credit history are much larger," and individuals in those groups are thus less likely to be able to obtain a credit score.[42]

---

[39] CFPB Office of Research, *Data Point: Credit Invisibles*, at 4, 6 (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf.

[40] *Id.*

[41] Id. at 24.

[42] *Id.*

94.     According to the CFPB, "[a]bout 15 percent of Black[ ] and Hispanic[ ] [individuals] are credit invisible . . . and an additional 13 percent of [Black individuals] and 12 percent of [Hispanic individuals] have unscored records. . . . This elevated incidence . . . is observed across ages, suggesting that these differences across racial and ethnic groups materialize early in the adult lives of these consumers and persist thereafter."[43]

95.     The CFPB went on to conclude that "[t]hese results suggest that the problems that accompany having a limited credit history are disproportionally borne by Black[ ], Hispanic[ ], and lower-income consumers."[44]

96.     Furthermore, it is widely recognized that FICO Scores are a measure of past ability to pay. Competing products incorporate an analysis of prospective creditworthiness. For example, Scorelogix's JSS score incorporates job and income stability to determine whether the borrower will have the ability to repay debt in the future. L2C offers an alternative credit score that uses utility payment histories to determine creditworthiness, including future ability to pay.

97.     VantageScore has achieved some limited success. In a 2018 report, VantageScore Solutions stated:

> During the twelve months ending in July 2017, over 1.4 billion VantageScore credit scores were delivered directly to consumers by lenders like Chase and Capital One and educational websites like CreditKarma, Lending Tree, and Mint. These scores are calculated using the same VantageScore model used by lenders (i.e., not an "educational" model). They are most often provided free of charge as part of educational offerings that include simulators, credit reports, educational articles, and explanations.[45]

---

[43] *Id.* at 24-25.

[44] *Id.* at 25.

[45] VantageScore Solutions, *VantageScore® Credit Scores and The Mortgage Market*, at 8 (2018) ("VantageScore Report"), https://vantagescore.com/pdfs/FAQs-VantageScore-Credit-Scores-and-the-Mortgage-Market.pdf.

26

98.     VantageScore Solutions went on to note that "[a]s lenders adopt VantageScore, we believe that such adoption will improve consumers' access to credit in certain segments and enable many more borrowers to obtain fairer pricing."[46] VantageScore Solutions also reported that "many of the most sophisticated secondary market participants use the VantageScore model to help evaluate and monitor risk, and to price and benchmark deals more accurately."[47]

99.     Despite the advantages of using VantageScore or another competing credit scoring model, Fair Isaac continues to have a monopoly in the B2B Credit Score Market and extracts monopoly rents through anticompetitive and exclusionary conduct and anticompetitive agreements with each CB. In February 2013, Mr. Lansing explained that despite the existence of VantageScore, "there [is] not that much competition around our Scores business" because "FICO Scores are very much part of the fabric of the banking industry" and "really deeply embedded."

**E.     Fair Isaac's Conduct in Furtherance of its Anticompetitive Scheme**

100.     Fair Isaac anticipated the threat VantageScore could pose to its dominance in the B2B Credit Score Market. Fair Isaac's own models of future losses predicted "substantial double-digit declines" if the use of VantageScore continued to expand.[48]

101.     Faced with the prospect of a significant hit to its market dominance, and its profits, Fair Isaac used its monopoly power to coordinate a comprehensive attack on VantageScore that included filing anticompetitive litigation; enlisting the Credit Bureaus to sign

---

[46] *Id.* at 5.

[47] VantageScore Solutions, *Myth: VantageScore Is Not Accepted by Investors in Securitization Markets* (Mar. 23, 2016), https://vantagescore.com/education/blog/myth- vantagescore-is-not-accepted-by-investors-in-securitization-markets.

[48] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, No. CV 06-4112, 2008 WL 11348223, at *2 (D. Minn. Nov. 3, 2008).

27

on to licensing agreements with anticompetitive provisions that undermined their own joint venture; and undertaking a campaign of disparagement against, and disinformation about, VantageScore Solutions and VantageScore.

### 1. Fair Isaac's Anticompetitive Litigation

102. Fair Isaac, recognizing the creation of VantageScore as a competitive threat, initiated litigation against Equifax, Experian, TransUnion, and VantageScore Solutions. In October 2006, just after the introduction of VantageScore, Fair Isaac filed a meritless lawsuit against them, alleging that the development of VantageScore violated the antitrust laws and constituted trademark infringement. Fair Isaac sought the elimination of VantageScore Solutions, requesting that the "Defendants be ordered to dissolve VantageScore." *Fair Isaac Corp. v. Equifax, Inc. et al*, No. 0:06-cv-04112, Dkt. No. 1-1 at 65 (D. Minn. Oct. 11, 2006). This frivolous lawsuit represented Fair Isaac's first attempt to kill VantageScore before it could gain traction in the market.

103. VantageScore Solutions characterized the litigation that Fair Isaac initiated as a "legal battle that sought to put us out of business, even as we scrambled to establish a competitive foothold."[49] Fair Isaac raised bogus antitrust claims that it knew lacked foundation, given its then-94% share of the B2B Credit Score Market. It also alleged trademark infringement that a jury found to be based on a trademark that Fair Isaac had fraudulently obtained from the U.S. Patent and Trademark Office ("PTO"). In addition, Fair Isaac's contention that the "300-850" marks were anything other than "merely" descriptive lacked all foundation because – as the U.S. Court of Appeals for the Eighth Circuit later held – "consumers in this market

---

[49] VantageScore Solutions, Inc., *10 years, 10 milestones* (Mar. 2016), https://thescore.vantagescore.com/article/252/10-years-10-milestones.

immediately understand '300-850' to describe the qualities and characteristics of FICO's credit score – that the credit score will be within the range of 300-850."[50]

104.    Equifax settled the litigation in June 2008 and formed "a partnership [with Fair Isaac] to develop and sell advanced analytics and scoring solutions for businesses and consumers."[51]

105.    The litigation against Experian and TransUnion lasted into 2011. While it was ongoing, VantageScore Solutions remained under a cloud, with Fair Isaac's lawsuit hobbling its commercial prospects: Potential B2B Purchasers for VantageScore had no way of being sure that the product might not be declared infringing on Fair Isaac's trademarks or that VantageScore Solutions would not be dissolved.

106.    The district court entered summary judgment in favor of the Credit Bureaus on the antitrust and false advertising claims. A jury found against Fair Isaac on the remaining claim for trademark infringement, finding that the mark "300-850" (which denoted the range of FICO Scores) was merely descriptive. It also found that: (1) Fair Isaac made a false representation during the application process to the PTO for the registrations of the "300-850" marks; (2) Fair Isaac knew that representation to be false when it was made and intended to deceive the PTO; and (3) the PTO relied on the false representation in deciding to issue the registrations.[52]

107.    The district court upheld the verdict, noting that "[t]his extensive, expensive litigation seems to have been initiated largely in response to a perceived threat to Fair Isaac's

---

[50] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1148 (8th Cir. 2011).

[51] Fair Isaac, *Equifax and Fair Isaac Enter Partnership to Accelerate Development and Delivery of New Analytic Solutions* (June 10, 2008), https://www.fico.com/en/newsroom/equifax-and-fair-isaac-enter-partnership-accelerate-development-and-delivery-new-analytic.

[52] *Fair Isaac*, 650 F.3d at 1148-50.

dominant position in the credit scoring industry."[53]

108.    In 2011, the United States Court of Appeals for the Eighth Circuit affirmed both that decision and the earlier summary judgment ruling.[54]

109.    VantageScore Solutions's growth during its first few years was inhibited by the litigation, which was part of a continuing antitrust violation by Fair Isaac that goes on to this day.

110.    In December 2017, Fair Isaac sued TransUnion for unpaid royalties.[55]

111.    In February 2018, TransUnion responded by filing antitrust counterclaims for, *inter alia*, monopolization against Fair Isaac. In paragraphs 42-60 of the counterclaims (which was partially redacted), the anticompetitive terms the Credit Bureaus and Fair Isaac had agreed upon were disclosed publicly for the first time. Those provisions are described in detail below.

112.    Fair Isaac moved to dismiss the counterclaims. Judge Coleman denied the motion, ruling that "TransUnion has adequately pled actual and attempted monopolization" through allegations that "FICO engages in practices that are intended to drive out competition" through "exclusive dealing provisions [that] are unlawful attempts to 'maintain monopoly power through exclusionary conduct.'"[56]

113.    In November 2020, TransUnion and Fair Isaac settled on undisclosed terms. One effect of this settlement was to cut Plaintiffs and proposed Class members off from obtaining further information about the anticompetitive agreements between Fair Isaac and the CBs. Fair

---

[53] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1000 (D. Minn. 2010).

[54] *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011).

[55] *See* Complaint, Dkt. 1, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Nov. 16, 2017).

[56] *Fair Isaac Corp. v. Trans Union, LLC*, No. 17:cv-8318, 2019 WL 1382068, at *2 (N.D. Ill. Mar. 27, 2019).

Isaac essentially bought TransUnion off. This inference is bolstered by the fact that, in August 2021, TransUnion announced that it had entered into a long-term (presumably lucrative) contract to distribute FICO Scores to lenders and consumers in Canada.[57]

114. The Antitrust Division of the United States Department of Justice took notice of Fair Isaac's conduct alleged in the TransUnion Action and instituted a civil investigation. That investigation was closed without action in December 2020, shortly after TransUnion settled with Fair Isaac.[58]

## 2. Fair Isaac and the Credit Bureaus' Anti-Competitive Agreements

115. Business customers in the B2B Credit Score Market purchase credit reports and FICO Scores from CBs and third-party credit reporting companies. As part of this process, CBs have entered into contractual relationships, called "Credit Scoring Services Agreements" ("CSSAs"), with their customers that govern the terms by which businesses purchase FICO Scores. These terms include the amount(s) paid to the CB, the fee model for delivery of credit score services, the method of payment, the mode of delivery, and restrictions on the business's use of FICO Scores.

116. The CBs and Fair Isaac have entered into separate licensing agreements which set forth the royalties that CBs must pay to Fair Isaac for the FICO Scores that the CBs sell to their customers. These royalties are passed on to Plaintiffs and other members of the proposed

---

[57] See Press Release, TransUnion, *TransUnion Enters New Long-term Agreement with FICO to Distribute FICO® Score in Canada* (Aug. 3, 2021), https://www.globenewswire.com/news-release/2021/08/03/2273895/0/en/TransUnion-Enters-New-Long-term-Agreement-with-FICO-to-Distribute-FICO-Score-in-Canada.html.

[58] See Press Release, Fair Isaac, *FICO Statement Regarding Antitrust Investigation* (Mar. 15, 2020), https://fico.gcs-web.com/news-releases/news-release-details/fico-statement-regarding-antitrust-investigation.

Classes.

117.     After its litigation efforts failed to eliminate VantageScore, Fair Isaac elected to take another approach. When its existing licensing agreements with each CB expired in 2013 or 2015, Fair Isaac reentered agreements containing new anticompetitive provisions with each CB that aimed to crush the only real competition, VantageScore, maintain Fair Isaac's monopoly, and extract monopoly rents from B2B Purchasers.

118.     Fair Isaac and the CBs entered into new or renewed agreements that contained new provisions designed to restrict the competitive reach of VantageScore. The CBs characterized the licensing agreements with Fair Isaac as "vertical distribution agreements" in their memorandum of law in support of their motion to dismiss in this litigation.[59] The anticompetitive contract provisions targeted the only significant competing credit score – VantageScore. And they specifically restricted the CBs' ability to market VantageScore to B2B purchasers. On information and belief, the CBs agreed to those provisions – cutting their own joint venture off at the knees – in return for Fair Isaac's acquiescence to a clause that protected them from price competition (and potentially in exchange for other benefits as well). The benefit of the quid pro quo to the CBs was that they could charge supracompetitive prices for credit scores to the consumers – the B2B purchasers.

119.     The agreements were consummated at a critical time. In 2011 through the first part of 2013, developments occurred that should have furthered VantageScore's ability to compete with FICO Scores. In 2011, VantageScore Solutions formed a partnership with the Consumer Federation of America, "a nonprofit association of nearly 300 consumer groups

---

[59] See The Credit Bureaus' Motion to Dismiss Plaintiffs' Class Action Complaints, Dkt. No. 135, *In re FICO Antitrust Litig.*, No.1:20-cv-02114, at 2 (Jan. 18, 2022).

founded in 1968 to advance the consumer interest through research, advocacy, and education";
that alliance led to the "use of annual consumer surveys to gauge awareness of credit scoring
related issues."[60] In October 2012, "the Federal Deposit Insurance Corporation ["FDIC"]
revised its rules for assessing default risk on loans issued by banks with deposits in excess of
$10 billion. Instead of evaluating loans on a particular credit score, the revision calls for
examining the underlying probability of default [] associated with those loans at the time of
origination."[61] In March 2013, VantageScore Solutions debuted a new scoring model,
VantageScore 3.0, which "built on the strengths of its predecessors and drew extensive news
coverage for its ability to score 98 percent of adult consumers in the U.S. (including 30-35
million who cannot get scores from conventional credit-scoring models [*i.e.*, FICO]); its
disregard of paid collections (including paid medical debt); and its simplified reason codes."[62]
And, in July 2013, VantageScore Solutions published a white paper explaining how
VantageScore could be aligned with the FDIC's new rules for evaluating probability of
default.[63]

120.    Fair Isaac's response to these developments was to agree on anticompetitive
contract terms with the CBs, commencing with Experian in May 2013, continuing with Equifax
in November 2013, and culminating with the February 2015 Analytic and Data License
Agreement ("ADLA") between Fair Isaac and TransUnion. These clauses would preserve Fair
Isaac's monopoly while compensating the CBs for the marginalization of VantageScore. Fair

---

[60] VantageScore Solutions, *10 Years, 10 Milestones, supra* n. 52.

[61] *Id.*

[62] VantageScore, *10 years, 10 milestones, supra* n. 52.

[63] VantageScore Solutions, *FDIC New Definition of High Risk Consumer Loan Securities* (July 2013), https://paperzz.com/doc/8033743/fdic-new-definition-of-high-risk-consumer-loan-and-securi. I

Isaac and the CBs did not publicly reveal any of the terms of their agreements until February 2018.

121.    The necessary (and intended) consequences of the agreements between Fair Isaac and the CBs was the stifling of competition in the B2B Credit Score Market.

122.    In fact, Mr. Lansing, confirmed that the "exclusive deal[s]" Fair Isaac and the Credit Bureaus entered into essentially sidelined VantageScore, which never gained "a lot of traction in the banking space," and that, even though VantageScore was a joint venture of the Credit Bureaus, working together with FICO has been "a good thing for both of us [i.e., both the Credit Bureaus and Fair Isaac]."[64]

123.    According to Mr. Lansing, instead of being "at war" with one another, the Credit Bureaus decided instead "to be partnered" with Fair Isaac. Explaining the relationship with Experian, for example, Mr. Lansing stated that Experian and Fair Isaac "have a rev share arrangement with them that works for them and works for us really good." Similarly, with respect to its arrangement with Equifax, Mr. Lansing stated "it is a rev share model. We're in it together." Given Fair Isaac's own admission that all three Credit Bureaus have Level Playing Field clauses, it follows that TransUnion would also have a similar revenue sharing arrangement with Fair Isaac.

         a.     **Fair Isaac's Anticompetitive Contracts with the CBs**

124.    The terms of the contracts between Fair Isaac and the Credit Bureaus were not publicly revealed until February 2018. Many of the contract terms remain confidential to this day.

---

[64] Remarks by William J. Lansing, President, CEO & Director, Fair Isaac, Fair Isaac Corp at Barclays Global Financial Services Conference (September 25, 2015).

125.    The discussion that follows is based on TransUnion's description of its ADLA in its counterclaims against Fair Isaac. The ADLA was filed under seal in the TransUnion action and is unavailable to Plaintiffs beyond what TransUnion has quoted in its counterclaims. While the counterclaims quote only the ADLA, TransUnion pled that "Fair Isaac represented to TransUnion that TransUnion's two major competitors, Experian and Equifax, had already agreed to materially similar new contracts with Fair Isaac."[65] In fact, Fair Isaac admitted that Equifax, Experian, and TransUnion agreed to the same or similar provisions: In FICO's Answer to Counterclaims in the TransUnion litigation, Fair Isaac "admit[ed] that prior to January 2015, it entered into separate contracts with Experian and Equifax that contained certain terms that were similar to certain terms in the ADLA."[66]

126.    Furthermore, Fair Isaac "admit[ed] that Equifax and Experian have agreed to 'No Equivalent Products' provisions with terms similar to the terms agreed to by TransUnion in the ADLA."[67] FICO also "admit[ted] that Equifax and Experian have agreed to 'Dynamic Royalty Schedule' terms that are similar to the terms agreed to by TransUnion in the ADLA, and that Equifax and Experian are subject to royalty schedules that contain a "Pre-Qualification" royalty category similar to that to which TransUnion is subject in its royalty schedule."[68] Finally, Fair Isaac "admit[ed] that Equifax and Experian have agreed to 'Level Playing Field' terms similar to the term agreed to by TransUnion in the ADLA."[69]

---

[65] TransUnion Counterclaims, ¶43.

[66] Fair Isaac's Redacted Answer to TransUnion Counterclaims, Dkt. No. 62, Fair Isaac Corp. v. TransUnion LLC, No 1:17-cv-08318 at 21 (N.D. Ill. Apr. 10, 2018) ("FICO Answer to Counterclaims").

[67] FICO Answer to Counterclaims at 24

[68] *Id.* at 27.

[69] *Id.* at 27.

127.    Fair Isaac has made similar admissions about the contract terms in its Answer in this litigation. Fair Isaac admits that its agreement with TransUnion contains the "No Equivalent Products" provision.[70] It also admits that the "Dynamic Royalty Schedule" and "Level Playing Field" terms appear in its agreements with all three credit bureaus,[71] and that the latter requires it to offer the most favorable royalty pricing as to all three credit bureaus.[72] Fair Isaac further admits that the "Pre-Qualification" royalty category has applied since 2015.[73] Thus, substantially similar anticompetitive No Equivalent Products and Dynamic Royalty Schedule provisions that exist in the ADLA between TransUnion and Fair Isaac also exist in the agreements between Experian and Fair Isaac and Equifax and Fair Isaac. The allegations that follow therefore apply to all three Credit Bureau Defendants.

128.    The restraints imposed in the contracts consist primarily of: (a) "No Equivalent Products" provisions; and (b) "Dynamic Royalty Schedule" provisions (the "Restrictive Terms"). A third set of provisions, the "Level Playing Field" provisions, compensated the CBs for their agreement not to promote VantageScore under the former provisions at the expense of B2B Purchasers.

129.    In an order dated September 28, 2023, this Court held that "the No Equivalent [Products] Provision and the Dynamic Royalty Schedule clauses together qualify as sufficient allegations of anticompetitive effects" to allow a claim against Fair Isaac under Act §2 of the

---

[70] Fair Isaac's Answer and Affirmative Defenses to Indirect Purchaser Plaintiffs' Consolidated Class Action Complaint, Dkt. No. 183, No. 1:20-cv-02114 ("FICO Answer to IPP Complaint"), (Oct. 23, 2023) ¶126.

[71] *Id.* at ¶125.

[72] *Id.* at ¶145.

[73] *Id.* at ¶138.

Sherman Act to proceed to discovery.[74] Those provisions are described in turn below.

### i.    The "No Equivalent Products Clause"

130.    The "No Equivalent Products" clause is located at Section 12.5 of the ADLA between Fair Isaac and TransUnion. This clause provides that TransUnion may not "internally develop" a credit scoring system that is "aligned to the odds-to-score relationship of any Fair Isaac Analytic" or uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic. Section 12.5 of the ADLA further prohibits TransUnion from distributing "any competing analytic" (*i.e.*, credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes. The Section also expressly names VantageScore Solutions, LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."[75]

131.    On information and belief, Fair Isaac has imposed similar or identical "No Equivalent Products" clauses on Equifax and Experian.[76] Thus, these CBs have agreed to and acquiesced in these anticompetitive agreements and the resulting anticompetitive effects.

132.    Fair Isaac's "No Equivalent Products" clause has effectively blocked the CBs from offering alternative credit scoring products, such as VantageScore, which would allow business customers in the B2B Credit Score Market to switch from FICO Scores without incurring the significant switching costs that using a new scoring system would entail. It also prevents the use of VantageScore or other credit scoring systems alongside or interchangeably with FICO Scores without the business customer incurring those same switching costs.

---

[74] Memorandum Opinion and Order, Dkt. No. 173, No. 1:20-cv-02114 (Sept. 28, 2023) at 13.

[75] TransUnion Counterclaims., ¶44.

[76] Fair Isaac has admitted its license agreements with Equifax and Experian include similar "No Equivalent Products" provisions. FICO Answer to IPP Complaint, ¶ 127.

133.    The "No Equivalent Products" clause thus protects and sustains Fair Isaac's monopoly.

134.    For example, if an alternative credit scoring product such as VantageScore used a score of 700 to indicate a less-than-five-percent risk of credit delinquency, and if a FICO Score of 700 also indicated the same risk of delinquency, the "No Equivalent Products" clause would prevent a CB from distributing the competing product. Similarly, if a competing credit score product used reason codes that match 20% of the reason codes used by FICO scoring systems, the "No Equivalent Products" clause would prohibit a CB from distributing the product.

135.    Due to years of Fair Isaac's dominance, many business customers of credit scores have modeled and designed their internal systems for FICO Scores. These business customers' systems, models, and processes are calibrated to FICO's odds-to-score relationship (*i.e.*, each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data that it collects internally, and automatically produce a lending decision. The "No Equivalent Products" clause effectively prohibits the CBs from selling an alternative to FICO's Scores since those scores would have to be incompatible with many businesses' existing systems. Thus, they are prevented from providing business customers a legitimate choice between using FICO Scores and an alternative score.

136.    Notably, the "No Equivalent Products" clause does not sustain Fair Isaac's intellectual property. Rather, it protects and sustains Fair Isaac's monopoly. For example, the odds-to-score relationship is not protectable intellectual property. It is the arbitrary assignment of a number (score) to a related risk probability. The intellectual property entitled to protection

38

in this product market is the analysis and the process used to predict a consumer's risk of default, not the shorthand numerical representation of a "less than-five-percent-risk-of-default" as "700."

137. Similarly, the reason codes that are prohibited from matching Fair Isaac's, under the "No Equivalent Products" clause, were not invented by Fair Isaac. Rather, there is an established set of reason codes that reflect well-established industry measures of creditworthiness.

138. The "No Equivalent Products" clause was an effective restraint of trade because when one CB stops using VantageScore, it becomes even less attractive to the other CBs. B2B purchasers will not want to use a credit scoring system unless all of the main CBs use it. This phenomenon is often referred to as a "network effect." By imposing a "No Equivalent Products" term, Fair Isaac sought to block the CBs from enabling B2B purchasers to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems and from using VantageScore alongside or interchangeably with FICO Scores.

139. By entering contracts with the anticompetitive "No Equivalent Products" provisions, the CBs agreed to anticompetitive terms that had the effect of eliminating or drastically reducing the competitive threat posed by VantageScore, thus unreasonably restraining trade.

### ii. The "Dynamic Royalty Schedule"

140. The contracts between Fair Isaac and Equifax, Experian, and TransUnion, respectively, include a similar or identical "Dynamic Royalty Schedule" clause that allowed Fair Isaac to replace its existing royalty with a new one and thereby gave Fair Isaac the ability to control the prices of FICO Scores. The "Dynamic Royalty Schedule" is detailed in Section 9.2

of the ADLA between Fair Isaac and TransUnion. This provision states that "once every twelve (12) months during the Term, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing."[77]

141. According to TransUnion, "Fair Isaac has abused and exploited this provision in 2015, 2016, and 2017 by not only raising prices, but also introducing entirely new and non-negotiated contract terms, royalty categories, and definitions."[78]

142. In 2015, Fair Isaac inserted a new "Pre-Qualification" royalty category into its contracts with CBs. "Pre-Qualification" is defined as "an End User's qualification of a potential consumer customer for an End User's own internal lending offering." This royalty category created a distinction between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any credit score or credit data to consumers, and (2) lenders that use FICO Scores for "Pre-Qualification" while also providing credit scores or credit data to consumers "in connection" with the "Pre-Qualification."

143. As an incentive, some business customers in the B2B Credit Score Market provide to their consumer customers, to whom they are often offering credit, the opportunity to receive their personal credit score. This can serve as a valuable marketing tool for the business customers.

144. Under Fair Isaac's contracts with the CBs, the royalty price paid to Fair Isaac for use of its FICO Score for "Pre-Qualification" is directly tied to whether credit scores or credit data are provided to consumers. There is a lower per-score royalty rate if a business customer purchases a FICO Score for use in "Pre-Qualification" and does not provide any credit score or

---

[77] TransUnion Counterclaims, ¶ 50.

[78] *Id.*

40

credit data to their consumer customer "in connection" with the "Pre-Qualification." If the lender purchases a FICO score for use in 'Pre-Qualification' and provides a VantageScore (or any other credit score) to the consumer 'in connection' with the 'Pre- Qualification,'" Fair Isaac charges the lender a seven times penalty rate for that FICO Score. That steep penalty is meant to dissuade lenders from providing competing credit scores, such as a VantageScore.[79]

145.    The higher royalty rate can only be avoided if the business customer exclusively purchases FICO Scores. One way to avoid paying the higher royalty rate is for the business customer to purchase the FICO Score but not provide a credit score or credit data to the consumer. A second way to avoid the higher royalty rate requires the business customer to purchase a bundled FICO product from Fair Isaac and provide the bundled FICO Score to its consumer customer. Fair Isaac offers bundled products to lenders that combine the use of scores designed for use by business customers with the provision of scores to their consumer customers.[80]

146.    TransUnion accepted, complied with, and made royalty payments according to the new "Pre-Qualification" royalty category. On information and belief, so have Equifax and Experian.[81]

147.    The only reason for the higher royalty rate is to unreasonably restrain trade. There is no legitimate business justification for the higher royalty rate Fair Isaac and each CB agreed upon for FICO Scores when the business customer also purchases a competing credit score (i.e. VantageScore) to provide its consumer customers. The higher royalty rate has anticompetitive

---

[79] *Id.*, ¶ 52.

[80] *Id.*, ¶ 53.

[81] See *id.*, ¶ 55.

41

effects and has assisted Fair Isaac in maintaining its monopoly position as, on information and belief, few, if any, business customers have opted to pay the higher royalty rate.

148.    According to TransUnion, "[t]his scheme has been effective, and no B2B Purchasers from TransUnion have opted to pay the penalty rate."[82] The purpose and effect of this clause was to prevent VantageScore from obtaining market share, thereby unreasonably restraining trade.

### iii.    The "Level Playing Field"

149.    In exchange for agreeing to the "No Equivalent Products" and "Dynamic Royalty" provisions in their agreements with Fair Isaac – which effectively prevent the CBs from marketing VantageScore to B2B purchasers – Fair Isaac committed not to offer any CB a more favorable price for FICO Scores than any other CB. This commitment was embodied in the "Level Playing Field" clauses of the agreements with the CBs. Those provisions forbid Fair Isaac to charge any CB a price that is lower than the price it charges any other CB.[83]The "Level Playing Field" provision of the TransUnion ADLA is contained in §9.16. Fair Isaac's contracts with TransUnion, Equifax, and Experian include similar or identical "Level Playing Field" and "Dynamic Royalty Schedule" provisions.[84] The Credit Bureaus agreed to, and have complied with, these contract provisions.

150.    The Level Playing Field functions as a cost-information-sharing mechanism among the CBs. The FTC has determined that "when competing companies," like the Credit Bureaus, "exchang[e] price or other commercially sensitive information, that may facilitate

---

[82] *Id.*, ¶54.

[83] See *id.*, ¶59.

[84] FICO Answer to IPP Complaint, ¶136 (Dynamic Royalty Schedule), ¶145 (The Level Playing Field).

42

collusion or otherwise harm competition and consumers in violation of the antitrust laws." Indeed, "the sharing of information relating to price, cost, output, customers, or strategic planning is more likely to be of competitive concern than the sharing of less competitively sensitive information."[85]

151.    The Level Playing Field provision offered the CBs several advantages, even though it effectively prevented the CBs from marketing VantageScore to B2B purchasers. First, it confirmed to each CB how much the other competing CBs are paying for FICO's algorithm. This knowledge protected the CBs from the risk that Fair Isaac would grant discounts that could expose them each to the risk of losing market share to their competitors. Second, the CBs used the information gleaned from the Level Playing Field provision to reduce price competition. As Fair Isaac has pointed out, previously, "a Credit Bureau could not be sure what its competitors' costs were and, consequently, to what extent its competitors could cut the price of their Credit Scores. This uncertainty could be used by Lenders to induce price competition among the Credit Bureaus." Fair Isaac claimed in its earlier lawsuit that the Credit Bureaus sought to use VantageScore so that "each Credit Bureau will know that it is paying exactly the same cost as its competitors for its scoring algorithm, and Lenders will no longer be able to use this uncertainty to play one Credit Bureau against the others."[86] In a rich irony, the Level Playing Field provision does exactly what Fair Isaac accused the CBs of trying to accomplish through VantageScore: prevent their customers from playing one CB against the others, thereby reducing

---

[85] Michael Bloom, Information exchange: be reasonable, FED. TRADE COMM'N (Dec. 11, 2014), https://www.ftc.gov/enforcement/competition-matters/2014/12/information-exchange-be-reasonable (emphasis added).

[86] Third Amended Complaint, Dkt. No. 436, Fair Isaac Corp. v. Experian Info Sols., No. 06-cv-4112 (D. Minn. Nov. 10, 2008), ¶138.

price competition for credit reports

152.    It also protected CBs from new market entrants. As Fair Isaac has pointed out, the CBs faced "the threat that independent scoring algorithm vendors, such as Fair Isaac, will facilitate the entry of new Credit Bureaus."[87] But by agreeing to the Level Playing Field provisions, Fair Isaac could not carry out that threat – by offering new credit bureaus prices lower than those it charges the incumbent CBs. Thus, the CBs have secured from Fair Isaac a significant source of protection from future competition in the market for the sale of credit reports to B2B Purchasers.

153.    The provision is demonstrably important to the Credit Bureaus. As was revealed through Fair Isaac's suit against TransUnion, in the negotiations over its Canadian contract, TransUnion insisted that Fair Isaac include a "Level Playing Field" clause. That clause would have given TransUnion Canada a right to any discounts or special pricing terms that Fair Isaac might offer other credit bureaus for the license or distribution of FICO scores in Canada. The Level Playing Field clause was so valuable to TransUnion of Canada that it continued to insist on one until Fair Isaac threatened to withhold its Canadian business entirely.

154.    Collectively, the "Dynamic Royalty Schedule" and "Level Playing Field" clauses allow Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores. These clauses also allow the CBs to extract monopoly prices from B2B Purchasers.

155.    The "Level Playing Field" and "Dynamic Royalty Schedule" clauses disincentivize CBs from negotiating for lower royalty prices for Fair Isaac's FICO Scores, because the CBs will not obtain a competitive advantage if they were to obtain lower pricing for

---

[87] *See* Third Amended Complaint, Dkt. 436, *Fair Isaac Corporation v. Experian Info. Sols.*, No. 06-CV-4112 (D. Minn. Nov. 10, 2008), ¶ 140.

royalty rates. The "Level Playing Field" clause does not provide Fair Isaac with any rights it does not have. Fair Isaac could offer the same royalty rates to all CBs absent the clause. The "Level Playing Field" clause exists to inform the CBs that negotiating for lower prices is useless.

156.    Thus, Fair Isaac can freely increase prices with little resistance from the Credit Bureaus. And it has done so – Fair Isaac admitted in its answer that "over the last several years" it has "increased the base (i.e., undiscounted) royalty prices that it charges to the Credit Bureaus."[88] That price increase is ultimately borne by B2B Purchasers who pay a higher price for FICO Scores than they would have but for the CB's agreements and adherence to anticompetitive contract provisions.

157.    After entering into the contracts containing anticompetitive terms with the Credit Bureaus, Fair Isaac initiated multiple rounds of price increases. In 2019, Fair Isaac reported: *"On the B2B side, revenues were up 36% over the previous year, due primarily to the 2018 price adjustments."*[89] Again, in 2021, Fair Isaac reported that *"revenues were $169 million, up 31% from the same period last year. B2B was up 25% over the same period last year,* driven by continued high volumes in mortgage originations as well as some unit price increases across our different score categories. In the B2B business, we also had a royalty true-up and an annual license deal this quarter that had a small positive impact on overall revenues."[90]

158.    As TransUnion has explained, taken together with the Dynamic Royalty Schedule provisions, the Level Playing Field provisions "enable Fair Isaac to unilaterally increase the royalty prices it charges [the Credit Bureaus] for FICO scores."[91]

---

[88] FICO Answer to IPP Complaint, ¶163.

[89] Q1 2019 Fair Isaac Corp Earning Call – Final (January 30, 2019).

[90] Q2 2021 Fair Isaac Corp Earnings Call – Final (May 5, 2021).

[91] TransUnion Counterclaims, ¶59.

45

159.    Notably, TransUnion has admitted that, to the extent the Level Playing Field provision resulted in higher rates, those costs were ultimately also borne by "banks [and] mortgage lenders" (*i.e.*, B2B purchasers).[92] While the CBs' agreement to the restrictive terms was against their self-interest, much of the cost was borne by B2B purchasers, while the CBs were otherwise compensated by the Level Playing Field provisions.

160.    Experian Vice President and Chief Financial Officer confirmed during a 2019 earnings call that while "the FICO price increase impacts" Experian, it also "impacts [Experian's] customers" because Experian "pass[es] it through to [its] customers."[93]

161.    Equifax's Chief Executive Officer confirmed the same: When Fair Isaac "put through a price increase . . . Equifax TU and Experian deliver[ed] that price increase to the marketplace, when they increase the price of their credit score. So that rolled through."[94]

162.    Thus, Fair Isaac and the CBs have used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in their contracts for anticompetitive purposes and to extract monopoly prices from all business customers in the B2B Credit Score Market.

### 3.    Fair Isaac's Negative Advertising Campaign in Furtherance of its Scheme

163.    Having agreed with each of the CBs to impose restrictions on VantageScore's ability to compete against FICO, Fair Isaac also engaged in an advertising campaign that disseminated false and misleading information with the goal of maintaining its monopoly in the B2B Credit Score Market. In advertisements, letters, and blog posts, Fair Isaac disparaged

---

[92] TransUnion Counterclaims, ¶60.

[93] John W. Gamble, VP & CFO, Remarks at Q1 2019 Equifax Inc. Earnings Call (May 10, 2019) (transcript available in Westlaw).

[94] Mark W. Begor, CEO, Remarks at Q2 2023 Equifax Inc. Earnings Call (July 20, 2023) (transcript available in Westlaw).

VantageScore and other credit scoring systems by calling them "FAKO" scores, falsely claimed that VantageScore and other alternative scoring systems do not reliably measure creditworthiness, and misrepresented the information considered by VantageScore and other credit scoring systems.

164.    For example, on December 12, 2017 Fair Isaac took out a full-page advertisement in the *Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates." This advertisement that attacked VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative credit score, which is owned by CBs. According to the advertisement, the credit score owned by CBs (impliedly VantageScore) is less reliable than FICO Scores in evaluating credit risk and does not use "sound practices" or "science-based credit evaluation." This advertisement conveyed Fair Isaac's false message that VantageScore is "Weakening scoring standards, [and] harm[ing] consumers, and the lending system."[95]

165.    Furthermore, the *Wall Street Journal* advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that links visitors to articles and blog posts that disparage VantageScore by name. One of these blog post claims: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

166.    Another example of Fair Isaac's false and misleading advertising campaign can be found on its website where a blog post claims that "Research results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job

---

[95] TransUnion Counterclaims, ¶ 66

47

forecasting future performance." This statement is false and misleading. VantageScore and other scoring models consider an individual consumer or business's full credit and financial history, even if the consumer has not used a traditional credit line in the last six months. Further, studies have shown that VantageScore and other competing credit scoring models are strongly predictive.[96]

167.    A blog post written by Joanne Gaskin ("Gaskin"), the Vice President of Scores and Analytics at Fair Isaac, claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not."[97] TransUnion responded "This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones."[98]

168.    Similarly, Fair Isaac fought hard against the efforts to create a process that would allow alternative credit scoring models to be validated and approved by Fannie Mae and Freddie Mac when they purchase mortgages. Such a rule would clearly benefit VantageScore, which could then attempt to break Fair Isaac's 100% monopoly in this sector. Public sentiment favored this move.[99] Fair Isaac did not. Indeed, it deployed Gaskin to give press interviews saying that

---

[96] *See* VantageScore Report, *supra* n.44, at 2, 4, 5-6

[97] Joanne Gaskin, FICO BLOG, *Truth Squad: Is FICO Score 700 the Same as VantageScore 700?* (Feb. 6, 2017), https://www.fico.com/blogs/truth-squad-fico-score-700-same-vantagescore-700.

[98] TransUnion Counterclaims, ¶71.

[99] *See* Bloomberg Business News, *This Monopoly Is Holding Back the Mortgage Market,*(Jan. 18, 2018), https://www.bloomberg.com/opinion/articles/2018-01-18/this-credit-score- monopoly-is-holding-back-the-mortgage-market; Paul Weinstein, Jr., *No Company Should Have a Monopoly*

48

Fair Isaac's alleged monopoly is a "myth."[100] Fair Isaac also hired a research group to present the argument that VantageScore's promise of home ownership to millions more Americans was deceptive and that the company's ownership by the CBs was anticompetitive, an argument that failed during the trademark litigation discussed above.[101] The FHFA ultimately adopted a final rule that permitted rival generators of credit scores to apply to serve Fannie Mae and Freddie Mac, saying that "FHFA has concluded that allowing all credit score model developers to submit applications is more consistent with [the applicable statute], which does not prevent any credit score model from being considered for potential use in the mortgage market." [102]

169.    Fair Isaac's smear campaign against VantageScore was successful in sowing doubt about the reliability and accuracy of credit scoring alternatives to FICO Scores. For example, a media outlet devoted to personal finance issues, thebalance.com, posted in February 2017 that, "If you purchased your credit score from anywhere but MyFICO.com, then it's a FAKO score."

170.    The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers nationwide.

### F.    The Contracts Between Fair Isaac and Each Credit Bureau Containing Anticompetitive Terms, In Combination With Fair Isaac's Anticompetitive Conduct Has Harmed Competition In the B2B Credit Score Market

---

*on Credit Scoring*, The Hill (Dec. 7,2017), https://thehill.com/opinion/finance/363755-no-company-should-have-a-monopoly-on-credit- scoring.

[100] *FICO: The 'Credit Score Monopoly' is a Myth*, DS News (Dec. 18, 2015), https://dsnews.com/news/12-18-2015/fico-the-credit-score-monopoly-is-a-myth.

[101] Quantilytic LLC, *Risks and Opportunities in Expanding Mortgage Credit Availability Through New Credit Scores*, at 22 (Dec. 2017), https://www.progressivepolicy.org/wp-content/uploads/2017/12/UpdatedCreditScoring_2017.pdf (research sponsored by Fair Isaac).

[102] Fed. Hous. Fin. Agency, *Validation and Approval of Credit Score Models Final Rule*, 12 C.F.R. 1254 (Aug. 16, 2019).

49

171.    The CBs and Fair Isaac's anticompetitive conduct has harmed and continues to harm business customers in the B2B Credit Score Market. Fair Isaac's unlawful conduct, including the anticompetitive terms in its agreements with the CBs, has foreclosed competition in the B2B Credit Score Market by eliminating fair opportunities for VantageScore or any other credit score product to compete with Fair Isaac. This anticompetitive and exclusionary conduct has unreasonably restrained trade and maintained Fair Isaac's monopoly, by, among other things, allowing it to charge supracompetitive prices for B2B credit scores to B2B purchasers during the Class Period.

172.    FICO's Scores business operates with an incredibly high operating margin of 86%.[103] To maximize its monopoly rent, Fair Isaac has increased its prices for FICO Scores significantly in recent years. In 2018, after securing agreements from each of the three Credit Bureaus to abide by anticompetitive contract terms, FICO implemented a special pricing increase for mortgage customers that was an approximately 66% increase from $0.06/score to $0.10/score.[104] In the following two years, FICO again rolled out special pricing increases to its auto customers and to some credit card customers.[105]

173.    Fair Isaac's conduct and the anticompetitive provisions contained in contracts between the CBs and Fair Isaac, have reduced choice for business customers in the B2B Credit Score Market and frustrated the ability of business customers to purchase VantageScore or any other competing credit score. As a direct and proximate result of Fair Isaac's exclusionary and

---

[103] Jose Karlo Mari Tottoc, Yahoo! Finance, *Headwaters Capital: 'Fair Isaac Corp (FICO) Can Grow Its Free Cash Flow by 15-20% Annually'* (Jan. 23, 2021), https://finance.yahoo.com/news/headwaters-capital-fair-isaac-corp-202237954.html.

[104] *Id.*

[105] *Id.*

50

anticompetitive conduct, Fair Isaac has been able to indirectly charge Plaintiffs and all similarly situated businesses supracompetitive prices for credit scores. As indirect buyers of Fair Isaac's FICO Scores, Plaintiffs and all similarly situated businesses have been harmed by Fair Isaac's supracompetitive royalty prices.

174.    Fair Isaac's sales in the B2B Credit Score Market over the past five fiscal years have been extremely profitable. Fair Isaac maintains a supracompetitive profit margin on the revenue it earns from its Business Credit Scoring Products. Plaintiffs and similarly situated businesses have vastly overpaid for FICO Scores due to Fair Isaac's and the CBs' anticompetitive activities.

## V.    CLASS ACTION ALLEGATIONS

175.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All end-users who purchased a FICO Score in the B2B Credit Score Market from anyone other than Fair Isaac and/or a Credit Bureau from October 1, 2006 through the present (the "Class Period").

176.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws, as well as the law of unjust enrichment on behalf of the following class (the "Damages Class"):

> All end-users who in Indirect Purchaser States[106] purchased a FICO Score in the B2B Credit Score Market from anyone other than Fair Isaac and/or a Credit Bureau from October 1, 2006 through the present

---

[106] The "Indirect Purchaser States" are the states and Districts listed in the Seventh, Eighth and Ninth Claims for Relief.

(the "Class Period").

177.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

178.    These class definitions exclude any and all natural persons who are not members of these Classes by their definitions. Also excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased FICO Scores directly or for resale.

179.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least thousands of members in each Class. Members of the Classes are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Classes are readily identifiable from information and records in the possession of Defendants.

180.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and members of the Classes were damaged by the same wrongful conduct of Defendants.

181.    The interests of Plaintiffs are coincident with, and not antagonistic to, those of members of the Classes.

182.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

183.    Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Classes as a whole appropriate. Questions of law and fact common to members of the Classes include, but are not limited to:

a.  whether Fair Isaac monopolized, and whether Defendants entered into contracts that unreasonably restrain, trade in violation of federal law;

b.  whether Fair Isaac monopolized, and whether Defendants entered into contracts that unreasonably restrain, trade in violation of certain state antitrust laws;

c.  whether Defendants engaged in unfair or deceptive trade practices in violation of certain state laws;

d.  whether Defendants were unjustly enriched to the detriment of Plaintiffs and members of the Classes, thereby entitling Plaintiffs and members of the Classes to disgorgement of all benefits derived by Defendants;

e.  what was the duration of the alleged unlawful conduct;

f.  what injury was suffered by Plaintiffs and members of the Classes;

g.  what damages were suffered by Plaintiffs and members of the Classes; and

h.  whether Defendants acted or refused to act on grounds generally applicable to members of the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Classes as a whole.

184.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

185.  The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

186.  The prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

53

187.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

188.    Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

189.    Plaintiffs have defined members of the Classes based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.    STATUTES OF LIMITATION AND TOLLING

190.    Plaintiffs had no knowledge of the agreements or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) February 12, 2018, the date that TransUnion filed its Counterclaims against Fair Isaac. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in an anticompetitive scheme involving the distribution of credit scores.

191.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public websites, that they maintained policies that prohibited the type of anticompetitive conduct alleged in this Consolidated Complaint. For example:

  a.    Fair Isaac's Code of Business Conduct and Ethics states: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices."[107]

  b.    Equifax's Code of Ethics and Business Conduct states: "We believe in free and open competition and never engage in improper practices that may limit competition."[108]

---

[107] Fair Isaac, *Code of Business Conduct and Ethics*, https://fico.gcs-web.com/static-files/ed6519a4-2148-4166-82f2-4636e0713531.

[108] Equifax, *Code of Ethics and Business Conduct* (Aug. 2019), https://assets.equifax.com/assets/corp/code_of_ethics.pdf.

54

    c.    Experian's Code of Conduct states: "We will not engage in any form of agreement with competitors to fix prices, rig bids, allocate customers and/or restrict supply in the marketplace." "We will comply with all applicable laws, rules, and regulations in every jurisdiction in which we operate, including but not limited to . . . antitrust/competition."[109]

    d.    TransUnion's Code of Business Conduct states: "All TransUnion Team Members must understand how competition and antitrust laws affect their daily work. You must fully and consistently comply with applicable competition and antitrust laws.[110]

192.    It was reasonable for Plaintiffs and members of the Classes to believe that Defendants were complying with their own policies.

193.    Moreover, on information and belief, Plaintiffs and members of the Classes could not have discovered the anticompetitive provisions in the licensing agreements between Fair Isaac and the Credit Bureaus, such as the TransUnion ADLA, as those agreements are subject to confidentiality provisions that have prohibited the credit reporting agencies from disclosing their terms to third parties absent written authorization from Fair Isaac.[111]

194.    For these reasons, the statutes of limitations applicable to Plaintiffs' claims did not begin to run until the date that TransUnion filed its counterclaims against Fair Isaac and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

195.    The doctrine of fraudulent concealment tolled the statutes of limitations on

---

[109] Experian, *Our Code of Conduct* (2019), https://www.experian.com/content/dam/marketing/na/assets/corp/procurement-documents/experian-code-of-conduct-final-board-approved.pdf.

[110] TransUnion, *Code of Business Conduct* (2017), https://investors.transunion.com/~/media/Files/T/Transunion-IR/governance-documents/code-of-business-conduct-150618.pdf.

[111] *See* Dkt. 32, Motion for Leave to File Under Seal, *Fair Isaac Corp. v. Trans Union LLC*, No. 1:17-cv-08318 (N.D. Ill. Jan. 22, 2018), ¶ 2 ("contracts between the Parties . . . are subject to confidentiality provisions that prohibit TransUnion from disclosing the terms of the contract to third parties absent written authorization from Fair Isaac").

Plaintiffs' claims. During the Class Period, Defendants wrongfully and affirmatively concealed their unlawful conduct. Plaintiffs and members of the Classes had no knowledge of Defendants' unlawful scheme and could not have discovered the scheme through the exercise of reasonable diligence until (at the earliest) February 12, 2018, when TransUnion filed its Counterclaims against Fair Isaac.

196. By their very nature, antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants entered into confidential contracts with anticompetitive provisions that did not put Plaintiffs or the Classes on inquiry notice that the contracts had the effect of raising the prices for credit scores above the competitive level. Credit scores are not exempt from antitrust regulation, and thus, before TransUnion filed its Counterclaims against Fair Isaac, Plaintiffs reasonably considered the market to be competitive. Moreover, Defendants employed deceptive tactics and techniques to avoid detection of, and to conceal, their anticompetitive provisions.

197. Defendants wrongfully and affirmatively concealed the existence of their anticompetitive contracts from Plaintiffs and members of the Classes by, among other things:

a. agreeing to confidentiality provisions that have prohibited the CBs from disclosing the anticompetitive provisions in the licensing agreements between Fair Isaac and the CBs, such as the TransUnion ADLA;

b. concealing the fact that Fair Isaac and the CBs agreed, through the "No Equivalent Products" clause, not to internally develop a competing credit scoring system that is aligned with FICO Scores or uses too many of the same reason codes;

c. concealing the fact that the purpose of the "No Equivalent Products" clause was to prevent the CBs from offering credit scoring products that would allow business-consumers a legitimate choice between FICO Scores and VantageScore or another alternative scoring product, thereby sustaining FICO Scores dominance in the market;

d. concealing the fact that Fair Isaac and the CBs agreed, through the "Level Playing Field" clauses, that prices made available to one credit bureau be

56

made available to all the others;

e. concealing the fact that the purpose and effect of the "Level Playing Field" and "Dynamic Royalty Schedule" clauses is to disincentivize each CB from negotiating lower royalty prices for FICO Scores; and

f. as to Fair Isaac, engaging in a false and misleading campaign about VantageScore Solutions and VantageScore to misrepresent VantageScore's viability as a competitor to FICO Scores.

198.    As a result of Defendants' affirmative acts, misrepresentations, and nondisclosures as alleged herein, any applicable statutes of limitation on claims asserted by Plaintiffs and members of the Classes have been and are tolled, and Defendants are equitably estopped from raising statutes of limitations as a defense.

## VII.    DEFENDANTS' ACTIONS CONSTITUTE CONTINUING VIOLATIONS

199.    In addition, and in the alternative, this Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statute of limitations.

200.    A claim accrued for the Class each time FICO Scores were sold to the Class at prices artificially inflated by Defendants' anticompetitive conduct. Each sale of FICO Scores at a supracompetitive price constituted another overt act in furtherance of Defendants' continuing anticompetitive schemes. Moreover, Defendants' statements and actions described above demonstrate that throughout the Class Period they engaged in new overt acts that further served the objectives of their anticompetitive schemes.

201.    Defendants' new overt acts were more than the inertial consequences of Defendants' initial violations. Rather, their acts were new and independent acts that perpetuated their agreements and kept them current with market conditions, including by renewing agreements, or entering into new agreements, with anticompetitive terms. Defendants continuously renewed and refined their agreements to reflect market conditions. With each

refinement of their agreements, Defendants inflicted new and accumulating injury on Plaintiffs and members of the Class. For instance, as alleged above, Fair Isaac exploited the ADLA Royalty Schedule Provision in 2015, 2016, and 2017 to introduce entirely new and non-negotiated contract terms, royalty categories, and definitions that expanded the anticompetitive schemes.

202.    Therefore, Plaintiffs and members of the Damages Class are entitled to recover damages they suffered during any applicable limitations period.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### UNREASONABLE RESTRAINT OF TRADE
### Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3
### (On behalf of Plaintiffs and the Nationwide Class
### for Injunctive and Equitable Relief)

203.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

204.    This Claim is brought against Defendant Fair Isaac.

205.    The relevant period of this Claim is from May 2013 through the date by which the anticompetitive effects of Defendant's violations of law shall have ceased.

206.    The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

207.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

208.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

209.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

58

210.    Defendant entered into and engaged in contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). Specifically, Fair Isaac entered into agreements with Equifax, Experian, and TransUnion that contained anticompetitive terms whereby each CB agreed with Fair Isaac to contractual limitations that harmed the ability of the CBs to market VantageScore, a competing product, to Plaintiffs and members of the Class and forestalled price competition in the B2B Credit Score Market. The CBs and Fair Isaac thus knowingly formed schemes to unreasonably restrain trade in the B2B Credit Score Market.

211.    The agreements between Fair Isaac and each of the CBs had substantial anticompetitive effects. The agreements effectively excluded VantageScore Solutions and every other competing provider of credit scores from competing for a substantial portion of transactions in the B2B Credit Score Market.

212.    The agreements between Fair Isaac and each of the CBs raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

213.    The acts done by Fair Isaac and each of the CBs as part of, and in furtherance of, their contracts, combinations, or conspiracies were authorized ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of its affairs.

214.    The anticompetitive acts were directed at the B2B Credit Score Market in the United States and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

215.    Fair Isaac's exclusionary and anticompetitive acts have injured and will continue

to injure competition in this market.

216.  Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property, and will continue to suffer such damages if Defendant does not cease its anticompetitive conduct.

217.  Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Defendant's continuing violations of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

218.  The alleged contracts, combinations, or conspiracies violates the federal antitrust laws because they are agreements between and among Fair Isaac and the CBs, all of whom are horizontal competitors who compete for the sale of credit scores in the B2B Credit Score Market. Upon entering the anticompetitive agreement with Fair Isaac, each CB acted against their economic self-interest because each agreement undermined the ability of VantageScore to compete. The CBs also knew that the Level Playing Field requirement in their agreements with Fair Isaac was meant to and did forestall price competition among the CBs in the market for credit reports, and hence was mutually beneficial for the CBs.

219.  Plaintiffs and members of the Nationwide Class are entitled to an injunction against Fair Isaac, preventing and restraining the violations alleged herein.

### SECOND CLAIM FOR RELIEF:
### UNREASONABLE RESTRAINT OF TRADE
Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3
(On behalf of Plaintiffs and the Nationwide Class
for Injunctive and Equitable Relief)

220.  Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

221. This Claim is brought against Defendants Fair Isaac and Experian.

222. The relevant period of this Claim is from May 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

223. The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

224. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

225. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

226. Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

227. Fair Isaac entered into an agreement with Experian that contained anticompetitive terms whereby Experian agreed with Fair Isaac to contractual limitations that harmed the ability of Experian to market VantageScore, a competing product, to Plaintiffs and members of the Class and forestalled price competition in the B2B Credit Score Market.

228. The agreement between Fair Isaac and Experian had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

229. The agreement between Fair Isaac and Experian raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

230. The acts done by Fair Isaac and Experian as part of, and in furtherance of, their contract, combination, or conspiracy were authorized ordered, or done by their officers, agents,

61

employees, or representatives while actively engaged in the management of its affairs.

231.    The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

232.    Fair Isaac's and Experian's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

233.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and Experian do not cease their anticompetitive conduct.

234.    Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Fair Isaac's and Experian's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

235.    In addition to competing with Experian in the credit scores market, Fair Isaac licenses its algorithm to Experian, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, Experian discourages its customers from using or purchasing access to competing credit scores. Because Experian has substantial market power, it can harm its customers in this way without taking the risk that they will switch to competing CBs. In return for acting against its' self-interest and entering into the anticompetitive contract with Fair Isaac to restrain trade in the B2B Credit Scores Market, Experian benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor Experian's competitors and reduces competition among the CBs in the B2B Credit Score Market.

236.    Plaintiffs and members of the Nationwide Class are entitled to an injunction

62

against Fair Isaac and Experian, preventing and restraining the violations alleged herein.

**THIRD CLAIM FOR RELIEF:**
**UNREASONABLE RESTRAINT OF TRADE**
Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3
(On behalf of Plaintiffs and the Nationwide
Class for Injunctive and Equitable Relief)

237. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

238. This Claim is brought against Defendants Fair Isaac and Equifax.

239. The relevant period of this Claim is from November 2013 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

240. The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

241. Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

242. Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

243. Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

244. Fair Isaac entered into an agreement with Equifax that contained anticompetitive terms whereby Equifax agreed with Fair Isaac to contractual limitations that harmed the ability of Equifax to market VantageScore, a competing product, to Plaintiffs and members of the Nationwide Class and forestalled price competition in the B2B Credit Score Market.

245. The agreement between Fair Isaac and Equifax had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider of

63

credit scores from competing for a substantial portion of transactions in the relevant market.

246.    The agreement between Fair Isaac and Equifax raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

247.    The acts done by Fair Isaac and Equifax as part of, and in furtherance of, their contract, combination, or conspiracy were authorized ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of its affairs.

248.    The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

249.    Fair Isaac's and Equifax's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

250.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and Equifax do not cease their anticompetitive conduct.

251.    Plaintiffs and all other members of the Nationwide Class are threatened with future injury to their business and property by reason of Fair Isaac's and Equifax's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

252.    In addition to competing with Equifax in the credit scores market, Fair Isaac licenses its algorithm to Equifax, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, Equifax discourages its customers from using or purchasing access to competing credit scores. Because Equifax has substantial market power, it can harm its customers in this way without taking the risk that they will switch to

competing CBs. In return for acting against its' self-interest and entering an anticompetitive agreement with Fair Isaac that had the intent and effect of restraining trade in the B2B Credit Score Market, Equifax benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor Equifax's competitors and reduces competition among the CBs in the B2B Credit Score Market.

253.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Fair Isaac and Equifax, preventing and restraining the violations alleged herein.

**FOURTH CLAIM FOR RELIEF:**
**UNREASONABLE RESTRAINT OF TRADE**
**Violation of Section 1 of the Sherman Act 15 U.S.C. §§ 1, 3**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

254.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

255.    This Claim is brought against Defendants Fair Isaac and TransUnion.

256.    The relevant period of this Claim is from February 2015 through the date by which the anticompetitive effects of Defendants' violations of law shall have ceased.

257.    The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

258.    Fair Isaac has had and continues to have at least a 90% market share in the B2B Credit Score Market in the United States and its territories.

259.    Fair Isaac has had and continues to have monopoly power in the B2B Credit Score Market.

260.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

65

261.     Fair Isaac entered into an agreement with TransUnion that contained anticompetitive terms whereby TransUnion agreed with Fair Isaac to contractual limitations that harmed the ability of TransUnion to market VantageScore, a competing product, to Plaintiffs and members of the Nationwide Class and forestalled price competition in the B2B Credit Score Market.

262.     The agreement between Fair Isaac and TransUnion had substantial anticompetitive effects. The agreement effectively excluded VantageScore and every other competing provider of credit scores from competing for a substantial portion of transactions in the relevant market.

263.     The agreement between Fair Isaac and TransUnion raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

264.     The acts done by Fair Isaac and TransUnion as part of, and in furtherance of, their contract, combination, or conspiracy were authorized ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of its affairs.

265.     The anticompetitive acts were directed at the B2B Credit Score Market and had a substantial and foreseeable effect on interstate commerce and injured competition nationwide.

266.     Fair Isaac's and TransUnion's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

267.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property and will continue to suffer such damages if Fair Isaac and TransUnion do not cease their anticompetitive conduct.

268.     Plaintiffs and all other members of the Nationwide Class are threatened with future

injury to their business and property by reason of Fair Isaac's and TransUnion's continuing violation of Sections 1 and 3 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

269.    In addition to competing with TransUnion in the credit scores market, Fair Isaac licenses its algorithm to TransUnion, which uses the algorithm to calculate credit scores for B2B Purchasers. As a result of the exclusionary contract terms, TransUnion discourages its customers from using or purchasing access to competing credit scores. Because TransUnion has substantial market power, it can harm its customers in this way without taking the risk that they will switch to competing CBs. In return for against its' self-interest and  entering an anticompetitive agreement with Fair Isaac that had the intent and effect of restraining trade in the B2B Credit Score Market, TransUnion benefits from the Level Playing Field clause, which guarantees that Fair Isaac will not favor TransUnion's competitors and reduces competition among the CBs in the B2B Credit Score Market.

270.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

### FIFTH CLAIM FOR RELIEF: MONOPLIZATON
**Violation of Section 2 of the Sherman Act 15 U.S.C. § 2**
**(On behalf of Plaintiffs and the Nationwide Class**
**for Injunctive and Equitable Relief)**

271.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

272.    This Claim is brought against Defendant Fair Isaac.

273.    The B2B Credit Score Market in the United States and its territories constitutes the relevant market.

274.    Fair Isaac has had and continues to have at least a 90% market share in the B2B

67

Credit Score Market.

275.    Fair Isaac has had and continues to have monopoly power in B2B Credit Score Market.

276.    Fair Isaac has had and continues to have the power to control prices and/or exclude competition in the B2B Credit Score Market.

277.    Fair Isaac entered into agreements with Equifax, Experian, and TransUnion that contained anticompetitive terms that were designed to eliminate Fair Isaac's competitors and to keep prices for FICO Scores artificially high.

278.    The agreements between Fair Isaac and the CBs had substantial anticompetitive effects. The agreements effectively excluded VantageScore Solutions and every other competing provider of credit scores from competing in the B2B Credit Score Market in the United States in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

279.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding increase in demand to supracompetitive levels.

280.    Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

281.    Fair Isaac's monopolization has raised prices for FICO Scores above the competitive level and otherwise injured competition without any offsetting procompetitive benefit to business customers.

282.    The acts done by the Fair Isaac were authorized, ordered, or done by its officers, agents, employees, or representatives while actively engaged in the management of its affairs.

283.    The anticompetitive acts were directed at the B2B Credit Score Market in the United States and had a substantial and foreseeable effect on interstate commerce and injured

68

competition nationwide.

284.    Fair Isaac's exclusionary and anticompetitive acts have injured and will continue to injure competition in this market.

285.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property, and Plaintiffs and all other similarly situated businesses will continue to be injured if Fair Isaac does not cease its anticompetitive conduct.

286.    Plaintiffs and all other similarly situated businesses are threatened with future injury to their business and property by reason of Fair Isaac's continuing violation of Section 2 of the Sherman Act within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

287.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

### SIXTH CLAIM FOR RELIEF
### VIOLATION OF STATE ANTITRUST STATUTES
#### (on behalf of Plaintiffs and the Damages Class)

288.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

289.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

290.    This Claim is brought against all Defendants.

291.    Arizona:  By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. § 44-1401, *et seq.*

      a.       Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce

in the Business Market for credit scores, a substantial part of which occurred within Arizona.

b. Defendants' combinations or conspiracies had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Arizona; (2) credit score prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

d. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

e. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*

f. Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

g. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business

70

or property and are threatened with further injury.

h.      By reason of the foregoing, Plaintiffs and members of the Damages
Class are entitled to seek all forms of relief available under Arizona Revised
Statute § 44-1401, *et seq.*

292.    <u>California</u>: By reason of the conduct alleged herein, Defendants have violated
California Business and Professions Code, §§ 16700, *et seq.*

a.      The California Business & Professions Code generally governs
conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§
16700-16770, governs antitrust violations in California.

b.      California policy is that "vigorous representation and protection of
consumer interests are essential to the fair and efficient functioning of a free
enterprise market economy," including by fostering competition in the
marketplace. Cal. Bus. & Prof. Code § 301.

c.      Under the Cartwright Act, indirect purchasers have standing to
maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof.
Code § 16750(a).

d.      A trust in California is any combination of capital, skills or acts by
two or more persons intended for various purposes, including but not limited to
creating or carrying out restrictions in trade or commerce, limiting or reducing the
production or increasing the price of any commodity, or preventing competition
in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in
California is unlawful except as provided by the Code. *Id.* at § 16726.

e.      Defendants entered into contracts, combinations, or conspiracies

71

between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within California.

f.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

g.      But for Defendants' conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

h.      Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

i.      Plaintiffs and members of Damages Class were injured in their business or property, with respect to purchases of FICO Scores in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

293.    <u>Connecticut</u>: By reason of the conduct alleged herein, Defendants have violated Connecticut General Statute §§ 35-26 *et seq.*

a.      During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and

72

eliminated throughout Connecticut; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have restrained trade in violation of Connecticut General Statute §§ 35-26 *et seq.*

e.     Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Connecticut General Statute §§ 35-26 *et seq.*

294.   <u>District of Columbia</u>: By reason of the conduct alleged herein, Defendants have violated District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade).

a.     Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the B2B Credit Score Market within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq.*

b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were

73

deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*

f. Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28- 4509(a).

g. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

295. <u>Illinois</u>: By reason of the conduct alleged herein, Defendants have violated the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

a. Members of the Illinois Damages Class purchased FICO Scores within the State of Illinois during the Class Period.

b. But for Defendants' conduct set forth herein, the price of FICO Scores would have been lower, in an amount to be determined at trial.

74

     c.      Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 Ill. Comp. Stat. Ann. 10/7(2).

     d.      Defendants entered into contracts or engaged in combinations or conspiracies for the purpose of fixing, controlling or maintaining prices for FICO Scores sold within the State of Illinois.

     e.      Defendants further unreasonably restrained trade or commerce and established, maintained, or attempted to acquire monopoly power over the B2B Credit Score Market in Illinois for the purpose of excluding competition, in violation of 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

     f.      During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

     g.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

     h.      Members of the Illinois Damages Class were injured with respect to purchases of FICO Scores in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

296.    <u>Iowa</u>: By reason of the conduct alleged herein, Defendants have violated the Iowa Competition Law, Iowa Code § 553.1, *et seq.*

     a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or

75

did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Iowa Code § 553.1, *et seq.*

b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

d     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1, *et seq.*

f.     Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449 (Iowa 2002).

g.     Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

297.   <u>Kansas</u>: By reason of the conduct alleged herein, Defendants have violated Kan.

76

Stat. Ann. § 50-101, *et seq.*

      a.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      b.      Defendants combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of credit scores, increasing the price of credit scores, or preventing competition in the sale of credit scores, in a manner that established the price of credit scores and precluded free and unrestricted competition among themselves in the sale of credit scores, in violation of Kan. Stat. Ann. § 50-101, *et seq*

      c.      During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

      d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50- 101, *et seq.*

      f.      Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan.

Stat. Ann § 50-161(b).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

298.    <u>Maine</u>:  By reason of the conduct alleged herein, Defendants have violated Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

a.      Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of credit scores within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Maine; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into

78

agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

      f.    Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

      g.    Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

299.    <u>Maryland</u>: By reason of the conduct alleged herein, Defendants have violated Maryland Code, Commercial Law, §§11-204 *et seq.*

      a.    During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

      b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Maryland; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

      d.    By reason of the foregoing, Defendants have restrained trade in violation of Maryland Code, Commercial Law, §§11-204 *et seq.*

      e.    Accordingly, Plaintiffs and members of the Class seek all relief available

79

under Maryland Code, Commercial Law, §§11-204 *et seq.*

300.   Michigan: By reason of the conduct alleged herein, Defendants have violated the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

   a.   Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in B2B Credit Score Market, in violation of Mich. Comp. Laws § 445.771, *et seq.*

   b.   Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

   c.   During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

   d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

   e.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

   f.   Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in

80

this Complaint. Mich. Comp. Laws. § 445.778(2).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

301.    <u>Minnesota</u>: By reason of the conduct alleged herein, Defendants have violated the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

a.      Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the B2B Credit Score Market within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the B2B Credit Score Market within the intrastate commerce of and outside of Minnesota; and fixed prices for credit scores within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct,

81

Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      e.      By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.*

      f.      Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.57.

      g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

302.   <u>Mississippi</u>: By reason of the conduct alleged herein, Defendants have violated Mississippi Code Annotated §§ 75-21-1, *et seq.*

      a.      Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Mississippi.

      b.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Mississippi, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

      c.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Credit score prices were raised, fixed

82

maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

        d.      During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

        e.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        f.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*

        g.      Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

        h.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

303.   <u>Missouri</u>: By reason of the conduct alleged herein, Defendants have violated Mo. Ann. Stat. § 407.010, *et seq.*

        a.      Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the Business Market for credit scores within the intrastate commerce of Missouri by possessing monopoly power in the

market and willfully maintaining that power through agreements to fix prices and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq.*

      b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for credit scores.

      c.     During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce.

      d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mo. Ann. Stat. § 407.010, *et seq.*

      f.     Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2008).

      g.     Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Mo. Ann. Stat. § 407.010, *et seq.*

304.   <u>Nebraska</u>: By reason of the conduct alleged herein, Defendants have violated the Nebraska Revised Statutes §§ 59-801, *et seq.*

84

a.     Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the B2B Credit Score Market within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq.*

b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*

f.     Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb.

85

Rev. Stat. § 59-821.

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

305.    Nevada:  By reason of the conduct alleged herein, Defendants have violated the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into

86

agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

      f.     Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

      g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

306.   <u>New Hampshire</u>:  By reason of the conduct alleged herein, Defendants have violated the New Hampshire Revised Statutes §§ 356:1, *et seq.*

      a.     Defendants fixed, controlled or maintained prices for credit scores and established, maintained or used monopoly power, or attempted to, constituting contracts, combinations or conspiracies in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

      b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

      d.     As a direct and proximate result of Defendants' unlawful

conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.*

    f.    Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

    g.    Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

307.   <u>New Mexico</u>: By reason of the conduct alleged herein, Defendants have violated the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

    a.    Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for credit scores within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq.*

    b.    Defendant's combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

f. Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3(A).

g. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

308. <u>New York</u>: By reason of the conduct alleged herein, Defendants have violated the New York General Business Laws §§ 340, *et seq.*

a. Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of credit scores and restrained competition in the free exercise of the conduct of the business of credit scores within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

b. Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout New York; (2) Credit score prices were raised, fixed

89

maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

     c.     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

     d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

     e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a *per se* violation of the Act.

     f.     Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

     g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

309.   <u>North Carolina</u>:  By reason of the conduct alleged herein, Defendants have violated the North Carolina General Statutes §§ 75-1, *et seq.*

     a.     Defendants contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in

violation of North Carolina General Statutes §§ 75-1, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

f.      Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

310.    North Dakota: By reason of the conduct alleged herein, Defendants have violated the North Dakota Century Code §§ 51-08.1-01, *et seq.*

91

a.      Defendants contracted, combined or conspired to restrain or monopolize trade in the Business Market for credit scores, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of North Dakota Century Code §§ 51-08.1-01, *et seq.* Defendants' violations of North Dakota law were flagrant.

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

f.      Under North Dakota law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this

92

Complaint. *See, e.g.*, *Howe v. Microsoft Corp.*, 656 N.W.2d 285, 298 (N.D. 2003).

      g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

311.    <u>Oregon</u>: By reason of the conduct alleged herein, Defendants have violated the Oregon Revised Statutes §§ 646.705, *et seq.*

      a.      Defendants contracted, combined, or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of credit scores, in violation of Or. Rev. Stat. § 646.705, *et seq.*

      b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.      During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce.

      d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*

     f.     Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

     g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

312.    <u>Rhode Island</u>: By reason of the conduct alleged herein, Defendants have violated R.I. Gen. Laws § 6-36-1, *et seq.*

     a.     Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

     b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

     c.     During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.

     d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and

property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

f.      Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a).

g.      Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under R.I. Gen. Laws § 6-36-1, *et seq.*

313.    <u>South Dakota</u>: By reason of the conduct alleged herein, Defendants have violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

a.      Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of credit scores within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1-3.1, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially

95

affected South Dakota commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

f.     Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

g.     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

314.    <u>Tennessee</u>: By reason of the conduct alleged herein, Defendants have violated the Tennessee Code Annotated §§ 47-25-101, *et seq.*

a.     Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Tenn. Code, § 47-25-101, *et seq.*

b.     Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and

Case: 1:20-cv-02114 Document #: 185 Filed: 10/30/23 Page 100 of 139 PageID #:3982

members of the Damages Class were deprived of free and open competition; and
(4) Plaintiffs and members of the Damages Class paid supra-competitive,
artificially inflated prices for credit scores.

      c.      During the Class Period, Defendants' illegal conduct substantially
affected Tennessee commerce.

      d.      As a direct and proximate result of Defendants' unlawful conduct,
Plaintiffs and members of the Damages Class have been injured in their business and
property and are threatened with further injury.

      e.      By reason of the foregoing, Defendants have entered into
agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101,
*et seq.*

      f.      Under Tennessee law, indirect purchasers have standing under the
Tennessee Trade Practice Acts to maintain an action based on the facts alleged in
this Complaint. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520
(Tenn. 2005).

      g.      Accordingly, Plaintiffs and members of the Damages Class seek all
relief available under Tennessee Code Ann. §§ 47-25- 101, *et seq.*

315.    Utah: By reason of the conduct alleged herein, Defendants have violated Utah
Code Annotated §§ 76-10-3101, *et seq.*

      a.      Defendants contracted, combined or conspired to restrain or
monopolize trade in the B2B Credit Score Market, and attempted to establish or
did in fact establish a monopoly for the purpose of excluding competition or
controlling, fixing or maintaining prices for credit scores, in violation of Utah Code

97

Ann. § 76-10-3101, *et seq.*

        b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Utah; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

        c.      During the Class Period, Defendants' illegal conduct substantially affected Utah commerce.

        d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq.*

        f.      Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

        g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq.*

316.    <u>Vermont</u>: By reason of the conduct alleged herein, Defendants have violated Vermont Stat. Ann. 9 §§ 2453, *et seq.*

a. Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Defendants' violations of Vermont law were flagrant.

b. Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c. During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*

f. Under Vermont law, indirect purchasers have standing to maintain an action under Vermont's antitrust laws based on the facts alleged in this Complaint. *Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

g. Accordingly, Plaintiffs and members of the Damages Class seek all

99

relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

317.   <u>West Virginia</u>: By reason of the conduct alleged herein, Defendants have violated West Virginia Code §§ 47-18-1, *et seq.*

      a.    Defendants contracted, combined or conspired to restrain or monopolize trade in the B2B Credit Score Market, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for credit scores, in violation of West Virginia Code §§ 47-18-1, *et seq.* Defendants' anticompetitive acts were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

      b.    Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

      c.    During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce.

      d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et*

*seq.*

f.      Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. Va. Code R. 142-9-2.

g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

318.    <u>Wisconsin</u>:  By reason of the conduct alleged herein, Defendants have violated Wisconsin Statutes §§ 133.01, *et seq.*

a.      Defendants contracted, combined or conspired in restraint of trade or commerce of credit scores, and monopolized or attempted to monopolize the trade or commerce of credit scores, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, *et seq.*

b.      Defendants' combinations or conspiracies had the following effects: (1) Credit score price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Credit score prices were raised, fixed maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

c.      During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and

101

property and are threatened with further injury.

       e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

       f.      Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(1)(a).

       g.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

    319.    Defendants' anticompetitive activities have directly, foreseeably and proximately caused injury to members of the Damages Class. Plaintiffs and members of the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful monopolization and anticompetitive agreements. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced credit scores from Defendants and/or other sellers of credit scores, and/or (2) paying higher prices for FICO Scores than they would have in the absence of Defendants' conduct. These injuries are of the type of the laws of the above States were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

    320.    In addition, Defendants have profited significantly from the aforesaid unlawful conduct. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

    321.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### SEVENTH CLAIM FOR RELIEF:
## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS
### (on behalf of Plaintiffs and the Damages Class)

322. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this Complaint.

323. This Claim is brought against all Defendants.

324. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

325. Arkansas: Defendants have knowingly entered into unlawful agreements in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*.

    a. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which credit scores were sold in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

    b. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

    c. Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

103

and the members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

       d.   During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

       e.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

       f.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

326.   <u>California</u>:   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, et seq.

       a.   During the Class Period, Defendants marketed, sold, or distributed FICO Scores in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

       b.   The violations of federal antitrust law set forth above constitute violations of section 17200, *et seq.* of California Business and Professions Code.

       c.   This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated section 17200 of the California

Business & Professions Code, commonly known as the Unfair Competition Law.

d. Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

e. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

f. Defendants' acts or practices are unfair to purchasers of FICO Scores in the State of California within the meaning of § 17200, California Business & Professions Code.

g. Defendants' acts and practices are fraudulent or deceptive within the meaning of § 17200 of the California Business & Professions Code.

h. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

i. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

j. The unlawful and unfair business practices of Defendants, as

105

described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supra-competitive and artificially inflated prices for FICO Scores sold in the State of California. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

k. The conduct of Defendants as alleged in this Complaint violated § 17200 of the California Business & Professions Code.

l. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.

m. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business & Professions Code §§ 17203 and 17204.

327. District of Columbia: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.*

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which FICO Scores were sold, distributed or obtained in the District of Columbia.

b. The foregoing conduct constitutes "unlawful trade practices," within the

meaning of D.C. Code § 28- 3904.

    c.        Plaintiffs and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged.

    d.        There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for FICO Scores. Defendants had the sole power to set that price, and Plaintiffs and members of the Class had no power to negotiate a lower price.

    e.        Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges.

    f.        Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct with respect to fixing the price of FICO Scores at supracompetitive levels and overcharging consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

    g.        Defendants took grossly unfair advantage of Plaintiffs and members of the Class.

    h.        The suppression of competition that has resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for the FICO Scores. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout the District of

107

Columbia; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

i.      As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code §§ 28-3901 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

328.    <u>Florida</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

a.      The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

b.      A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

c.      Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

d.      Members of the Damages Class purchased FICO Scores within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price of

FICO Scores would have been lower, in an amount to be determined at trial.

e.      Defendants entered into contracts, combinations or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Florida.

f.      Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2006 and continuing through the date of this filing.

g.      Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

h.      Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Florida; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

i.      Defendants' unlawful conduct substantially affected Florida's trade and commerce.

j.      As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property by virtue of overcharges for FICO Scores and are threatened with further injury.

k.    By reason of the foregoing, the members of the Damages Class are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

329.    <u>Hawaii</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

a.    Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for credit scores.

b.    During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

330.    <u>Missouri</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

110

a.      Plaintiffs and the Damages Class purchased FICO Scores for personal, family, or household purposes.

b.      Defendants engaged in the conduct described herein in connection with the sale of credit scores in trade or commerce in a market that includes Missouri.

c.      Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which credit scores were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

d.      Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for credit scores. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of credit scores they purchased.

e.      Defendants' conduct concerning the price of credit scores was deceptive as it had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing credit scores at prices established by a free and fair market.

f.      Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Missouri; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of

111

free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra- competitive, artificially inflated prices for credit scores.

g.      The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

h.      As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

i.      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

331.    <u>Montana</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Consumer Protection Act, Mont. Code, §§ 30-14-101, *et seq.* and §§ 30- 14-201 *et seq.*

a.      Defendants' unlawful conduct had the following effects: (1) credit score price competition was restrained, suppressed, and eliminated throughout Montana; (2) credit score prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of

112

free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra- competitive, artificially inflated prices for credit scores.

b.      During the Class Period, Defendants marketed, sold, or distributed FICO Scores in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and §§ 30- 14-201 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

332.   <u>Nebraska</u>: By reason of the conduct alleged herein, Defendants have violated Neb. Rev. Stat. § 59-1602, *et seq.*

a.      Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-1609.

b.      Defendants have entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Nebraska.

c.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a

113

substantial part of which occurred within Nebraska.

        d.      Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of Defendants' actions within the stream of Nebraska commerce.

        e.      Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

        f.      Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs and members-of-the-Class's ability to protect themselves.

        g.      Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

        h.      As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

        i.      By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59-1602, *et seq.*

    333.   <u>New Hampshire</u>: By reason of the conduct alleged herein, Defendants have violated N.H. Rev. Stat. T. XXXI, § 358-A, *et seq.*

        a.      Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007).

        b.      Defendants have entered into contracts, combinations, or conspiracies

between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within New Hampshire.

c.  Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

d.  Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of Defendants' actions within the stream of New Hampshire commerce.

e.  Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

f.  Defendants' conduct was willful and knowing.

g.  Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

h.  Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

i.  As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

j.  By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under N.H. Rev. Stat. T. XXXI, §§ 358-A:10 and 358-A:10-

334.  <u>New Mexico</u>: By reason of the conduct alleged herein, Defendants have violated

115

N.M. Stat. Ann. §§ 57-12-1, *et seq.*

    a.      Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Mexico.

    b.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which FICO Scores were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Class.

    c.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Business Market for credit scores, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

    d.      Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

    e.      Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to and the members of the Damages Class.

    f.      Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

    g.      Plaintiff and members of the Class were not aware of Defendants' illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with

116

respect to the price charged by Defendants for FICO Scores. Defendant Fair Isaac had the sole power to set that price and Plaintiffs and members of the Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Class lacked any meaningful choice in purchasing FICO Scores because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs and members of the Class could avoid the overcharges. Defendants' conduct with regard to sales of FICO Scores, including their illegal conduct to fix the price of FICO Scores at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Class.

h.      The suppression of competition that resulted from Defendants' conduct has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for the FICO Scores.

i.      Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

j.      Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the

117

members of the Class and the price paid by them for FICO Scores as set forth in N.M. Stat. Ann. § 57-12-2E.

k.  Defendants' conduct was willful.

l.  As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

m.  By reason of the foregoing, members of the Damages Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

335.  <u>New York</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349 *et seq.*

a.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO scores were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Class, who are Defendants' consumers.

b.  Defendants made public statements about the prices of FICO Scores that omitted material information that rendered the statements that they made materially misleading; and Defendants alone possessed material information that were relevant to consumers but failed to provide the information.

c.  Because of Defendants' unlawful trade practices in the State of New York, Class members who purchased FICO Scores were misled to believe that they were paying

118

a fair price for FICO Scores or the price increases for FICO Scores were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conduct.

d.      Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have an impact on New York consumers, including Plaintiffs and members of the Class.

e.      Defendants knew that their unlawful trade practices with respect to pricing FICO Scores would have a broad impact, causing Class members who purchased FICO Scores to be injured by paying more for FICO Scores than they would have paid in the absence of Defendants' unlawful trade acts and practices.

f.      The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout New York; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

g.      During the Class Period, Defendants marketed, sold, or distributed FICO Scores in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

        h.      During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in New York.

        i.      Plaintiffs and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

336.   <u>North Carolina</u>: By reason of the conduct alleged herein, Defendants have violated N.C. Gen. Stat.§ 75-1, *et seq.*

        a.      Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

        b.      Defendants entered into contracts, combinations, or conspiracies in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within North Carolina.

        c.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Class. Defendants' conduct could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' illegal activity. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Class could not possibly have been aware. Defendants' public statements concerning the price of FICO Scores created the illusion of competitive pricing controlled by market forces rather than

120

supracompetitive pricing driven by Defendants' illegal conduct.

d.      Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

e.      Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

f.      Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

g.      Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

h.      Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

i.      Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO Scores.

j.      During the Class Period, Defendants marketed, sold, or distributed FICO Scores in North Carolina, and Defendants' illegal conduct substantially affected North

121

Carolina commerce and consumers. During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed FICO Scores in North Carolina.

      k.      As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured and are threatened with further injury.

      l.      By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 75-16.

337.    Oregon: By reason of the conduct alleged herein, Defendants have violated Or. Rev. Stat. § 646.608, *et seq.*

      a.      Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Oregon.

      b.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.

      c.      Defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of Defendants' actions within the stream of Oregon commerce.

      d.      Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

      e.      Defendants' conduct misled consumers, withheld material facts, and had a

direct or indirect impact upon members-of-the-Class's ability to protect themselves.

f.        Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

g.       As a direct and proximate cause of Defendants' unlawful conduct, members of the Class have been injured in their business or property and are threatened with further injury.

h.       By reason of the foregoing, the members of the Class are entitled to seek all forms of relief available under Or. Rev. Stat. § 646.638.

338.    Rhode Island: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1 et seq.).

a.        Members of this Class purchased FICO Scores for personal, family, or household purposes.

b.       Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Rhode Island.

c.        Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO Scores. Defendants owed a duty to disclose such facts, and they breached that duty by their silence.

d.       Defendants misrepresented to all purchasers during the Class Period that

123

Defendants' FICO Scores prices were competitive and fair.

e.      Defendants' unlawful conduct had the following effects: (1) FICO Scores'
price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2)
FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels
throughout Rhode Island; (3) Plaintiffs and members of the Class were deprived of free
and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive,
artificially inflated prices for FICO Scores.

f.      As a direct and proximate result of Defendants' violations of law, Plaintiffs
and members of the Class suffered an ascertainable loss of money or property as a result
of Defendants' use or employment of unconscionable and deceptive commercial practices
as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as
described herein. Defendants' deception, including their affirmative misrepresentations
and omissions concerning the price of the FICO Scores, likely misled all purchasers acting
reasonably under the circumstances to believe that they were purchasing FICO Scores at
prices set by a free and fair market.

g.      Defendants' affirmative misrepresentations and omissions constitute
information important to Plaintiffs and members of the Class as they related to the cost of
FICO Scores they purchased.

h.      Defendants have engaged in unfair competition or unfair or deceptive acts
or practices in violation of Rhode Island Gen. Laws. §§ 6-13.1-1 *et seq.*, and, accordingly,
Plaintiffs and members of the Class seek all relief available under that statute.

339.    <u>South Carolina</u>: By reason of the conduct alleged herein, Defendants have violated
S.C. Code Ann. §§ 39-5-10, *et seq.*

a. Defendants have entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within South Carolina.

b. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

c. Defendants' monopolization had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for the FICO Scores during the Class Period.

d. Defendants' conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of Defendants' actions within the stream of South Carolina commerce.

e. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Carolina.

f. Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon members-of-the-Class's ability to protect themselves.

g. Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

h.      Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as at least thousands of South Carolina businesses purchase FICO Scores.

i.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10 *et seq.*, and, accordingly, Plaintiffs and the members of the Class seek all relief available under that statute.

340.    <u>South Dakota</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-6 *et seq.*).

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes South Dakota, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO credit scores were sold, distributed, or obtained in South Dakota.

b.      Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for FICO credit scores. Defendants misrepresented to all purchasers during the Class Period that Defendants' FICO credit scores prices were competitive and fair Defendants owed a duty to disclose such facts, and they breached that duty by their silence.

c.      Defendants' unlawful conduct had the following effects: (1) FICO credit scores price competition was restrained, suppressed, and eliminated throughout South

126

Dakota; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores.

      d.     As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.

      e.     That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of the FICO credit scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO credit scores at prices set by a free and fair market.

      f.     Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Class as they related to the cost of FICO credit scores they purchased.

      g.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §§37-24-6 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

341.   <u>Utah</u>: By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-11-1, *et seq.*

      a.     Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit

127

Score Market, a substantial part of which occurred within Utah.

       b.       Defendants are suppliers within the meaning of Utah Code Ann. §§ 13-11

       c.       Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the business market for credit scores, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

       d.       Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

       e.       Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions within the meaning of Utah Code Ann. §§ 13-11-3.

       f.       Defendants knew or had reason to know that its conduct was unconscionable.

       g.       Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the Class.

       h.       Defendants' unlawful conduct substantially affected Utah's trade and commerce.

       i.       As a direct and proximate cause of Defendants' unlawful conduct, the members Class have been injured in their business or property and are threatened with further injury.

       j.       By reason of the foregoing, the members of the Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief,

pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

342. <u>Utah</u>: By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-5-1, *et seq.*

    a.    Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Utah.

    b.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

    c.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.

    d.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

    e.    As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have been injured in their business or property and are threatened with further injury.

    f.    By reason of the foregoing, the members of the Class are entitled to seek all forms of relief, including actual damages or $2000 per Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5- 14, *et seq.*

343. <u>Vermont</u>: By reason of the conduct alleged herein, Defendants have violated Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

a.      Defendants entered into contracts, combinations, or conspiracies between two or more persons in restraint of, or to monopolize, trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Vermont.

b.      Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the B2B Credit Score Market, a substantial part of which occurred within Vermont, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the B2B Credit Score Market.

c.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which FICO Scores were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for the FICO Scores.

d.      Defendants owed a duty to disclose such facts, and they breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' FICO Scores prices were competitive and fair.

e.      Defendants' unlawful conduct had the following effects: (1) FICO Scores' price competition was restrained, suppressed, and eliminated throughout Vermont; (2) FICO Scores' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive,

130

artificially inflated prices for the FICO Scores.

      f.      Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

      g.      Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

      h.      Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont §§ 2451 *et seq.*

      i.      As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of FICO Scores, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing FICO Scores at prices set by a free and fair market.

      j.      By reason of the foregoing, members of Class are entitled to seek all forms of relief available under Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

344.   <u>West Virginia</u>: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code, §§46A-6-104 *et seq.*

      a.      Defendants' unlawful conduct had the following effects: (1) FICO credit

scores price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) FICO credit scores prices were raised, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for FICO credit scores.

b.      During the Class Period, Defendants marketed, sold, or distributed FICO credit scores in West Virginia, and Defendants' illegal conduct substantially affected West Virginia commerce and consumers.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury.

345.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code, §§46A-6-104 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## EIGTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
### (On behalf of Plaintiffs and the Nationwide Class)

346.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

347.    This Claim is brought against all Defendants.

348.    As a result of its unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices of and unlawful profits from FICO Scores.

349.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains.

350.    Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs and members of the Class in the following states: Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray that this Honorable Court:

1.      Order that this action may be maintained as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that they be named Representatives of the Classes, that the undersigned Interim Co-Lead Counsel be named Co-Lead Class Counsel, and that reasonable notice of this action be provided to members of the Class as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure;

2.      Adjudge that Defendants violated the federal antitrust laws as set forth above;

3.      Adjudge that Defendants violated the state antitrust and unfair trade practices laws as set forth above;

4.      Adjudge that Defendants were unjustly enriched as set forth above;

5.      Award Plaintiffs and members of the Damages Class actual, double, treble, and exemplary damages as permitted;

6.      Award Plaintiffs and members of the Classes pre-and post-judgment interest;

7.      Enjoin Defendants from continuing the unlawful actions alleged herein;

133

8.      Award Plaintiffs attorneys' fees and all other costs, including costs of consulting and testifying experts, reasonably incurred in prosecution of this action; and

9.      Award such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a Trial by Jury as to all issues so triable.

October 30, 2023                    Respectfully submitted,

                            By ___ */s/Garrett D. Blanchfield* ___
                             Garrett D. Blanchfield

                            REINHARDT WENDORF & BLANCHFIELD
                            Garrett D. Blanchfield (*Pro Hac Vice*)
                            Brant D. Penney (*Pro Hac Vice*)
                            Roberta A. Yard (*Pro Hac Vice* forthcoming)
                            332 Minnesota Street, Suite W-1050
                            St. Paul, MN 55101
                            Tel: (651) 287-2100
                            Fax: (651) 287-2103
                            g.blanchfield@rwblawfirm.com
                            b.penney@rwblawfirm.com
                            r.yard@rwblawfirm.com

                            SPECTOR ROSEMAN & KODROFF, P.C.
                            Jeffrey J. Corrigan (*Pro Hac Vice*)
                            Jeffrey L. Spector (*Pro Hac Vice*)
                            William G. Caldes (*Pro Hac Vice*)
                            Icee N. Etheridge (*Pro Hac Vice* forthcoming)
                            2001 Market Street, Suite 3420
                            Philadelphia, PA 19103
                            Tel: (215) 496-0300
                            Fax: (215) 496-6611
                            JCorrigan@srkattorneys.com
                            JSpector@srkattorneys.com
                            BCaldes@srkattorneys.com
                            IEtheridge@srkattorneys.com

                            *Interim Co-Lead Counsel for Class Plaintiffs*

134

GUIN, STOKES & EVANS, LLC
Charles R. Watkins (3122790)
321 South Plymouth Court Suite 1250
Chicago, IL 60604
Tel: (312) 878-8391
Fax: (205) 226-2357
charlesw@gseattorneys.com

*Liaison Counsel for Class Plaintiffs*

PRETI FLAHERTY, BELIVEAU
& PACHIOS LLP
Michael S. Smith (Pro Hac Vice)
Gregory P. Hansel (Pro Hac Vice)
Randall B. Weill (Pro Hac Vice)
Elizabeth F. Quinby (Pro Hac Vice)
One City Center, P.O. Box 9546
Portland, ME 04101
Tel: (207) 791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com

GLANCY PRONGAY & MURRAY LLP
Brian P. Murray (*Pro Hac Vice* forthcoming)
Lee Albert (*Pro Hac Vice* forthcoming)
230 Park Avenue, Suite 358
New York, NY 10169
Tel: (212) 682-5340
Fax: (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

FREED KANNER LONDON
& MILLEN LLC
Douglas A. Millen
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
dmillen@fklmlaw.com

135

FREED KANNER LONDON
& MILLEN LLC
Jonathan M. Jagher (*Pro Hac Vice* forthcoming)
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
jjagher@fklmlaw.com

BONI, ZACK & SNYDER LLC
Michael J. Boni (*Pro Hac Vice* forthcoming)
Joshua D. Snyder (*Pro Hac Vice* forthcoming)
John E. Sindoni (*Pro Hac Vice* forthcoming)
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: 610-822-0200
Fax: 610-822-0206
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

MCLAFFERTY LAW FIRM, P.C.
David McLafferty (*Pro Hac Vice* forthcoming)
Attorneys at Law
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 940-4000 ext. 12
www.McLaffertyLaw.com

SALTZ, MONGELUZZI & BENDESKY, P.C.
Simon B. Paris, Esq. (*Pro Hac Vice* forthcoming)
Patrick Howard, Esq. (*Pro Hac Vice* forthcoming)
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Tel: (215) 575-3985
Fax: (215) 496-0999
sparis@smbb.com
phoward@smbb.com

*Attorneys for Class Plaintiffs*

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-02114 |
| *This document relates to:* ALL ACTIONS | Judge Edmond E. Chang Magistrate Judge David E. Weisman |

## <u>STIPULATION AND ORDER ESTABLISHING THE PROTOCOL FOR THE PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION ("ESI")</u>

Pursuant to the agreement reached between Plaintiffs and Defendants herein, this Court adopts and orders the following Protocol relating to the Production of Documents and Electronically Stored Information, which binds all parties and their counsel of record in the above-captioned case (the "Action"), whether they currently are involved or become so in the future (collectively, the "Parties"). The failure of this Protocol to address any particular issue is without prejudice to any position that a Party may take on that issue.

The parties are aware of the importance the Court places on cooperation and commit to cooperate in good faith regarding discovery issues pertaining to ESI, consistent with the Seventh Circuit Electronic Discovery Pilot Program Principle 1.02.

## I. DEFINITIONS

a.  "Action" means the above-captioned matter, and any and all cases consolidated or coordinated with it.

b.  "Document" shall have the same meaning as set forth in Federal Rule of Civil Procedure ("FRCP") 34(a)(l)(A) and when used herein, refers to both ESI and hard copy documents.

c. "Electronically Stored Information" ("ESI") shall have the same meaning as set forth in FRCP 34(a)(l)(A) and refers to computer-generated information or data of any kind (including, but not limited to, Email, Structured and Unstructured Data, and data compilations), stored in or on any medium from which information can be obtained, such as computers, cellular telephones, file servers, disks, tape or other real or virtualized devices or media.

d. "Email" means an electronic means for sending, receiving, and managing communications via different structured data applications (Email client software), including, but not limited to, Microsoft Outlook, Google Gmail, Yahoo Mail, or Lotus Notes, and the file(s) created or received by such means.

e. "Instant Messages" means communications involving immediate correspondence between two or more users sent via chat application that are maintained in the ordinary course of business.

f. "Extracted Text" means the text extracted from a native document, and includes all header, footer, and document body information, including any hidden content, when available. A "Text File" is a file containing the full multi-page text of native or near-native files extracted directly from the native file, or, in the case of documents subject to OCR, a file containing the text resulting from the OCR.

g. "Load File" means an electronic file containing information identifying a set of paper-scanned images or processed ESI and indicating where individual pages or files belong together as documents, including attachments, and where each document begins and ends. A Load File will also contain data relevant to the individual Documents, including extracted and user-created Metadata, as well as identification of OCR or Extracted Text, should such data be available.

h. "Media" means an object or device, including but not limited to a disc, tape, computer, or other device on which data is or was stored.

i. "Metadata" means (i) information associated with or about a file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file, and which describes the characteristics, origins, or usage or validity of the electronic file; and (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, saved, or otherwise manipulated by a user of such system.

j. "Native Format" means and refers to the file structure of a document created by the original creating application (in contrast to a Static Image).

k. "OCR" means optical character recognition technology that is capable of reading text-based or paper/hard copy documents and making such documents searchable using appropriate software.

l. "Parties" collectively shall mean all named parties to the above-captioned Action, including any Party added or joined to any complaint filed in the above-captioned Action, as well as named parties to actions that may be consolidated into or coordinated with the above-captioned Action.

m. "Predictive Coding/Technology Assisted Review" shall mean processes for prioritizing or coding a collection of documents using computerized systems, such as machine-learning algorithms, that may rely on the judgments of one or more attorneys experienced in the subject matter of a litigation regarding the responsiveness of a subset of documents and that extrapolates those judgments to the remaining document collection. For purposes of this Protocol, Predictive Coding/Technology Assisted Review is synonymous with computer-assisted review,

computer-aided review, content-based advanced analytics, or other terms used to refer to search methodologies that rely on machine-based learning to identify responsive documents.

n. "Production" includes any exchange of Documents or ESI between the Parties, whether voluntarily or in response to a formal or informal request.

o. "Search Term" means a combination of words (including synonyms) and phrases designed to capture potentially relevant ESI and includes strings of words and phrases joined by proximity and Boolean connectors.

p. "Static Image" means or refers to a representation of ESI produced by converting a native file into a standard image format capable of being viewed and printed on standard computer systems. A Tagged Image File Format ("TIFF") image is an example of a Static Image.

q. "Structured Data" means ESI stored in a structured format, such as databases or data sets according to specific form and content rules as defined by each field of the database.

r. "Unstructured Data" refers to free-form data that either does not have a data structure or has a data structure not easily readable by a computer without the use of a specific program designed to interpret the data, such as word processing documents, slide presentations, Email, and image files.

## II. SCOPE

a. **General.** Pursuant to FRCP 5(b)(2)(E), the Parties agree to serve written discovery electronically. The procedures and protocols outlined herein govern the Production of Documents and ESI by all Parties. The Parties will take reasonable steps to comply with this agreed-upon Protocol. Nothing in this Protocol is intended to be an exhaustive list of discovery obligations or rights of a Party requested to produce Documents or ESI ("Producing Party") or a Party requesting Documents or ESI ("Requesting Party").

The production specifications in this Protocol apply to Documents and ESI that are produced in the first instance in this Action. To the extent any Party is required to or agrees to produce Documents or ESI in this Action that originally were collected or produced in other cases or government investigations, such Documents or ESI may be produced in the same format in which they originally were produced in the other cases or to the government.

The Parties agree that nothing in this Protocol is intended to revise or alter the local rules, applicable state or federal statutes, the FRCP, Advisory Committee Notes, or other authorities with regard to the preservation and production of ESI, including but not limited to FRCP 26(b)(1) concerning the Scope in General of Discovery; FRCP 26(b)(2)(B) concerning the Specific Limitations on ESI; FRCP 26(c)(1) concerning Protective Orders; or FRCP 34 concerning Production of ESI.

b. **Limitations and Non-Waiver.** The Parties and their attorneys intend by this Protocol to make the mutual disclosures promised herein. The Parties and their attorneys do not intend by this Protocol to waive their rights to any protection or privilege, including the attorney-client privilege and the work-product doctrine. All Parties preserve their attorney-client privileges, work-product protection, and other privileges. The Parties and their attorneys are not waiving, and specifically reserve, the right to object to any discovery request on any grounds. Further, nothing in this Protocol shall be construed to affect the admissibility of Documents and ESI. All objections to the discoverability or admissibility of any Documents and ESI are preserved and may be asserted at any time.

c. **Reservation of Rights.** For the avoidance of doubt, the inclusion of any platform, program, application, or software in this Protocol as an example does not create any independent obligation or commitment to preserve or collect ESI from such platform, program, application, or

software.  The Parties reserve all rights to object to any demand to collect or produce ESI from any or all of the examples listed in Section I, subject to the provisions of Section V.

      d.    **Modification by Agreement**.  Any practice or procedure set forth herein may be varied by agreement of affected Parties, which will be confirmed in writing, where such variance is deemed appropriate to facilitate the timely and economical exchange of Documents and ESI. Any Party added or joined to any complaint in this Action and any Party to actions that may be consolidated into or coordinated with the above-captioned matter after the date of this Protocol that seeks to deviate from this Protocol must obtain leave of Court to do so unless all affected Parties otherwise consent in writing.  Before seeking Court intervention, all affected Parties shall meet and confer in good faith regarding any modification.

      e.    **Modification by Court Order**.  Nothing in this Protocol waives the right of any Party to petition the Court for an Order modifying its terms upon good cause shown, provided, however, that counsel for such Party must first meet and confer with the counsel for the opposing Party and the Parties shall use reasonable best efforts to negotiate an exception from or modification to this Protocol prior to seeking relief from the Court.

**III.**    **PRESERVATION**

      The Parties agree to take reasonable steps to preserve relevant Documents and ESI, in accordance with their obligations under applicable law.  By preserving or producing information for the purpose of this Action, the Parties are not conceding that such material is discoverable.  The Parties will meet and confer regarding the scope of preservation, including custodians, data sources, date ranges, and categories of information that have been or should be preserved in connection with this Action.

## IV.    PRODUCTION OF STRUCTURED DATA

Where a discovery request requires production of Structured Data, in lieu of producing structured data systems or applications, the Parties shall meet and confer on the content and format of a data sample from such structured data source.  The Parties shall discuss and attempt to agree upon the sets of data or fields to be included in the sample and the format in which sample data extracted shall be produced, and the Producing Party shall make all necessary disclosures for the Requesting Party to understand and evaluate whether the content and format of the data sample would satisfy a production request, such as the data fields available, the meaning of data fields, as well as codes and abbreviations used in the data source and whether a data dictionary exists, the time period over which data exists, any database schema, or other relevant information.  The Producing Party shall generate a report of such data sample for review by the Requesting Party or counsel after meeting and conferring with the Requesting Party as to the fields to be produced and the format of production.  Nothing in this provision is meant to expand the producing party's obligations under FRCP 34. The Parties reserve all rights to object, including but not limited to objections for relevance, undue burden, and/or inaccessibility.

## V.    IDENTIFICATION OF RESPONSIVE ESI

The Parties shall meet and confer in good faith regarding the methods to be used and locations identified to search Documents and ESI for potentially responsive documents or filter out Documents and ESI that are not subject to discovery, and such meet and confers will include disclosures necessary for the Requesting Party to understand and assess the sufficiency of the proposed search or filtering methodology, such as the nature of and processes of the search technology employed, the custodians and data sources and types to which it will and will not be applied, date ranges that may be used to filter documents, file types subject to or excluded from the methodology, search terms proposed to be used (if any), statistical sampling or validation

techniques the Producing Party has used or intends to use to evaluate the sufficiency of the methodology, and whether different search methodologies will be applied to different types or sources of data.

The Producing Party shall retain the sole right and responsibility to manage and control searches of its data files, including the right to propose revisions to search-term methods or advanced-technology procedures in order to make them more accurate and/or cost-effective and will disclose those proposed search methods and any revisions prior to implementation. Nothing in this section shall limit a Party's right to reasonably seek agreement from the other Parties or a Court ruling to modify previously agreed-upon search terms or other search parameters at any time prior to the completion of discovery.

A Producing Party need not provide discovery of ESI from sources that the Producing Party identifies as not reasonably accessible because of undue burden or cost. The Parties will identify and meet and confer over those sources of information that they propose should not be preserved, such as the following:

1. Backup data that is substantially duplicative of data that is more accessible elsewhere (utilized for disaster recovery purposes);

2. Random access memory (RAM), temporary files, or other ephemeral data that is difficult to preserve without disabling the operating system;

3. Obsolete legacy data (*i.e.*, information stored in an obsolete format);

4. Residual, fragmented, damaged, or other data only accessible by forensics;

5. Information stored in unallocated space in file systems on magnetic media;

6. On-line access data such as temporary internet files, history, cache, cookies, and the like;

7.  Server, system, or network logs; and

8.  Information created or copied during the routine, good-faith performance of processes for the deployment, maintenance, retirement, and disposition of computer equipment by the Party.

If any Producing Party identifies additional sources of not reasonably accessible ESI beyond those listed above that are believed to contain responsive information, it will notify the Requesting Party of that fact and those sources. Nothing in this paragraph shall relieve a Party of its obligation to produce otherwise readily accessible, responsive ESI that the Party knows to exist.

a.  Search Terms:

Where the Parties agree that potentially responsive ESI shall be searched through the use of search terms, the Parties shall meet and confer to provide reasonable assurances to the Requesting Party that the Producing Party's search terms and methodology used to apply them are reasonably calculated to identify responsive Documents and ESI. Prior to or during such meet and confer, the Producing Party shall make the disclosures identified above.

If, after disclosure of the Producing Party's proposed search method, search parameters, and search terms, and prior to the conduct of any searches, and after a reasonable meet and confer process, a Requesting Party believes in good faith that the Producing Party's proposals regarding search, retrieval and production would result in deficiencies in production, the Requesting Party may make prompt requests for different or additional search methods, parameters, or search terms, but such requests shall only be made after the Parties have met and conferred as to the alleged deficiencies identified by the Requesting Party. If the Parties cannot resolve their disagreements regarding the above search term methodologies, they shall promptly bring the dispute to the Court for resolution.

9

b.    Technology-Assisted-Review:

No Party shall use predictive coding/technology-assisted review for the purpose of culling the documents to be reviewed or produced without notifying the opposing Party prior to use and with ample time to meet and confer in good faith regarding a mutually agreeable protocol for the use of such technologies, if any.  If the Parties cannot resolve their disagreements regarding technology-assisted review methodologies, they shall promptly bring the dispute to the Court for resolution.  The fact that a Document or ESI is responsive to a search term or identified as responsive by any other technology used to identify potentially responsive Documents and ESI shall not prevent any Party from withholding such file from production on the grounds that the file is not responsive, that it is protected from disclosure by applicable privilege or work-product protection.

The Parties will not seek Court intervention on discovery matters without first attempting to resolve any disagreements in good faith, based upon all reasonably available information.

## VI.    PRODUCTION OF DOCUMENTS ORIGINATING AS PAPER

The following production specifications apply to Documents that existed in paper format prior to production ("hard copy documents").  Documents that originated as paper but that were scanned and maintained electronically by a Party prior to inception of this Action shall be produced in accordance with Part VII of this Protocol.  The Parties agree to produce hard copy documents in the formats described below, to the extent reasonably practicable and not unduly burdensome.  These formats are deemed to be productions in reasonably usable form.  If a Producing Party intends to produce any hard copy documents in any manner other than as specified herein, the Producing Party shall notify the Requesting Party of its intent, including production format (*e.g.*, produced as paper, made available for inspection).  If the proposed production format is not

acceptable to the Requesting Party, the Parties shall meet and confer to determine a mutually acceptable production format for such Documents.

a. **TIFFs**. Documents should be produced as single-page, black and white, group IV TIFFs imaged at 300 dpi. Bates numbers, confidentiality designations (in accordance with the protective order governing the case), and redactions (to the extent they are necessary) should be burned into the image. TIFF image files should be provided in an "Images" folder.

b. **Unitizing Documents**. If a document is more than one page, the unitization of the document will be maintained as it existed when collected by the Producing Party to the extent practicable. Parties may unitize their documents using either physical unitization (*i.e.*, based on physical binding or organizational elements present with the original paper documents, like staples, clips, and binder inserts) or logical unitization (*i.e.*, a manual review of the paper to determine what logically constitutes a document, like page numbers or headers).

c. **Parent-Child Relationships.** The Parties agree that if any part of a Document or its attachments is responsive, the entire Document and attachments will be produced, except any portions of the Document or attachments that must be withheld or redacted on the basis of privilege or work-product protection. The Parties shall take reasonable steps to ensure that parent-child relationships within a document family (the association between an attachment and its parent document) are preserved. The child-document(s) should be consecutively produced immediately after the parent-document. Each document shall be produced with the production number for the first and last page of that document in the "BegBates" and "EndBates" fields of the data load file and with the "BegAttach" and "EndAttach" fields listing the production number for the first and last page in the document family.

11

d. **OCR.** Documents shall also be produced with the associated OCR, and with an image cross-reference file and a load file. No Producing Party shall be required to ensure that the OCR is an exact duplicate of the contents of the TIFF image. The OCR software shall maximize text quality. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process. To the extent that a document is redacted, the text files should not contain the text of the redacted portions. OCR should be delivered in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document. All text files shall be provided as a single document level text file for each item, not one text file per page. Text files should be provided in a "Text" folder.

e. **Unique IDs.** Each TIFF image should have a unique filename, which corresponds to the Bates number of that page. The filename should not contain any blank spaces and should be zero-padded (*e.g.*, ABC-000001), taking into consideration the estimated number of pages to be produced. If a Bates number or set of Bates numbers is skipped in a production, the Producing Party, to the extent it is aware of the issue, will so note in a cover letter or production log accompanying the production. Bates numbers will be unique across the entire production and prefixes will be consistent across all documents a Party produces in the Action.

f. **Data Load Files.** Documents should be provided with an Opticon Cross-Reference File and Concordance data load file using standard Concordance delimiters:

1. Field Separator: ASCII character 20 ("¶"); and

2. Quote: ASCII character 254 ("þ").

Concordance-compatible image and data load files should be provided in a "Data" folder. The following information shall be produced in the load file accompanying production of hard copy documents: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Custodian,

12

(f) AllCustodian, (g) Page Count, (h) Production Volume, (i) Confidentiality, (j) Privilege; and (k) Redacted (Y/N) or otherwise indicating that a redaction is present.

g.    **Metadata**. Each of the Metadata and coding fields set forth in Appendix A under the heading Hard Copy shall be produced for that Document.

h.    **Color**. Documents containing color need not be produced in color in the first instance, provided however, that the Producing Party shall retain a copy of produced hard copy documents in color. However, if good cause exists for the Requesting Party to request production of certain documents in color, the Requesting Party may request production of such documents in color by providing (1) a list of the Bates numbers of documents it requests to be produced in color format; and (2) an explanation of the need for production in color format. The Producing Party shall not unreasonably deny such requests.

## VII.   PRODUCTION FORMAT FOR UNSTRUCTURED ESI

The Parties agree to produce in the formats described below. These formats are deemed to be productions in reasonably usable form. If any Party contends that particular Documents or ESI warrant a different format, the Parties will meet and confer to determine a mutually acceptable production format for such Documents.

a.    **TIFFs**. Documents and ESI should be produced as single-page, black and white, group IV 300 DPI TIFFs images. The document's original orientation should be maintained (*i.e.*, portrait to portrait and landscape to landscape). Hidden content, tracked changes or edits, comments, notes, and other similar information, to the extent viewable within a document in its native file format, shall also be imaged so that such content is viewable on the image file. Bates numbers, confidentiality designations (in accordance with the protective order governing the case), and redactions (to the extent they are necessary) should be burned into the image. TIFF image files should be provided in an "Images" folder. Where Presentation files (.PPT, .PPTX, etc.) are

produced in a static, rather than native, format, they will be processed to TIFF format showing comments, hidden slides, speakers' notes, and similar data.

      b.     **Extracted Text Files**. The full text of native files should be extracted directly from the native file (not OCR), to the extent such extracted text is available, and should be delivered in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document. All text files shall be provided as a single document level text file for each item, not one text file per page. Text files should be provided in a "Text" folder. To the extent that a document is redacted, the document should undergo OCR after the text has been redacted in order to remove the redacted text.

      c.     **Instant Messages**. If Instant Messages are to be produced, the Parties will meet and confer to discuss the form of production and the producing party should use best efforts to produce such Instant Messages in a readily usable format.

      d.     **Unique IDs**. Each image should have a unique filename, which corresponds to the Bates number of that page. The filename should not contain any blank spaces and should be zero-padded (*e.g.*, ABC-000001), taking into consideration the estimated number of pages to be produced. If a Bates number or set of Bates numbers is skipped in a production, the Producing Party will so note in a cover letter or production log accompanying the production. Bates numbers will be unique across the entire production and prefixes will be consistent across all documents a party produces in this Action.

      e.     **Parent-Child Relationships**. The Parties agree that if any part of an Email or its attachments is responsive, the entire Email and attachments will be produced, except any portions of the Email or attachments that must be withheld or redacted on the basis of privilege or work-product protection. The relationship between attachments, enclosures, embedded files, and/or

exhibits to any parent document shall be preserved. The child-document should be consecutively produced immediately after the parent-document. Each document shall be produced with the production number for the first and last page of that document in the "BegBates" and "EndBates" fields of the data load file and with the "BegAttach" and "EndAttach" fields listing the production number for the first and last page in the document family.

     f.    **Metadata**. The Parties agree that Metadata will be produced for all ESI, whether produced in Native Format or Static Image formats. Appendix A sets forth the minimum Metadata fields that must be produced to the extent that Metadata exists for a particular document. To the extent that Metadata does not exist, is not reasonably accessible or available, or would be unduly burdensome to collect, nothing in this ESI Protocol shall require any party to extract, capture, collect or produce such data except for those fields marked for Hard Copy Documents in Appendix A, provided, however, that where such Metadata is not produced on such grounds, the Producing Party shall disclose which fields it will not produce. If Metadata is redacted or withheld, the Producing Party will so inform the Requesting Party and record the redaction on any privilege log prepared by the Producing Party; redacted Metadata shall be preserved.

     g.    **Production of Documents in Native Format**.

     1.    The processed native for all spreadsheets (*i.e.*, .XLS, .XLSX, .CSV, or similar), presentation files maintained in Microsoft Powerpoint format (.PPT, .PPTX, etc.), and electronic information containing audio or video components should be produced and linked to the database by the Metadata field "NativeLink."

     2.    Where native files are produced in lieu of TIFF images, each native file will be assigned a unique Bates number. The Producing Party will produce a placeholder (a single-page TIFF slip sheet indicating that the native item was produced) along with the

file itself in Native Format. The placeholder will be branded with the production number in the lower right hand corner and the phrase "PRODUCED IN NATIVE ONLY" branded in the center of the page. The Producing Party will also brand any confidentiality or similar endorsements in the lower left hand corner of the placeholder.

3.      To the extent that a native spreadsheet must be redacted, the Producing Party may redact either the native file or produce TIFF images with burned in redactions in lieu of a native file and TIFF placeholder image. If redacting TIFF images and to the extent that any of the following can be automated, the Producing Party, or its ediscovery vendor, should make reasonable efforts to: (1) reveal hidden rows, columns or sheets prior to converting the document to TIFF; (2) clear any filters that may conceal information; (3) adjust column widths so that numbers do not appear as symbols (*e.g.*, "########"); (4) ensure that column and row headings print; (5) ensure that the tab name appears in the header or footer of the document; (6) process comments so that they are produced at the end of the spreadsheet; and (7) process spreadsheets so that they print across then down. If good cause exists, the Requesting Party may ask the Producing Party to manually undertake the foregoing for certain documents identified by Bates number by the Requesting Party to the extent the document was originally produced with concealed information. The Producing Party shall not unreasonably deny such a request.

4.      **Request for Native Format Production.** Other than as specifically set forth above, a Producing Party need not produce documents in Native Format. If good cause exists for the Requesting Party to request production of certain documents in Native Format, the Requesting Party may request production in Native Format by providing (1) a list of the Bates numbers of documents it requests to be produced in Native Format; and

16

(2) an explanation of the need for reviewing such documents in Native Format. The Producing Party shall not unreasonably deny such requests. The Producing Party shall produce an overlay to ensure that the "NativeLink" entry in the data load file indicates the relative file path to each native file in such production, and all Extracted Text and applicable metadata fields.

h.      **Cellphone and Personal Device Data**: The Parties will meet and confer regarding whether ESI maintained on any custodian's cellphone(s) and/or personal device(s) is within the scope of permissible discovery in this Action. If such discovery is agreed upon by the Parties or ordered by the Court, the Parties will meet and confer regarding (1) the identity of any document custodian that may possess unique, responsive ESI maintained on their cellphone(s) and/or personal device(s) that is within the responding Party's possession, custody, or control, and (2) the appropriate search parameters and form of any production of such information.

i.      **Track Changes and Comments**. To the extent that a Document or ESI contains tracked changes or comments, the Document or ESI should be imaged showing tracked changes and comments using standard functionality available from the software used to facilitate the Producing Party's review and production of Documents and ESI in this Action.

j.      **Password-Protected Files**. The Parties will make reasonable efforts to ensure that all encrypted or password-protected Documents and ESI are successfully processed for review and production. The Producing Party will identify relevant and responsive encrypted or password-protected Documents and ESI that it cannot process so that the parties can meet and confer to determine if there are any alternative means to have such information produced in a usable format.

k.      **Embedded Documents**. Embedded files in responsive documents shall be extracted during processing and produced as separate documents, to the extent practicable given

17

the application used.  To the extent the Producing Party becomes aware in the ordinary course of discovery that extracted documents cannot be produced, the Producing Party will notify the Requesting Party of the types of files, and Custodian for which such extracted documents cannot be produced.  The Bates Number of the source file from which the embedded file is extracted shall be provided as metadata associated with the embedded file, as described in Appendix A.

l.      **Data Load Files**.  Documents should be provided with an Opticon Cross-Reference File and Concordance data load file using standard Concordance delimiters:

1.      Field Separator

2.      ¶ (ASCII 020) Text Qualifier þ (ASCII 254)

3.      Substitute Carriage Return or New Line in data ® (ASCII 174)

4.      Multi-value separator (followed by a space) ; (ASCII 059)

All rows will contain the same number of delimiters and fields.  The multi-value field delimiter must be consistent across all fields.  For example, if the CC field contains semi-colons between Email addresses, the Tag field should also contain semi-colons.  Concordance-compatible image and data load files should be provided in a "Data" folder. Parties have the option to exchange sample load files.  If this exchange occurs, the Requesting Party will have fourteen (14) days to respond with Load File change requests.  Nothing in this Order will limit the Parties from discussing Load File changes throughout the course of the Action.

m.      **Email Collection and Processing**.

1.      Email Threading:  The Parties may use Email thread suppression to avoid review and production of identical or duplicative information contained within an existing Email thread in another document being reviewed and produced, provided, however, that an Email that includes an attachment or content in the BCC or other blind copy field shall

18

not be treated as a lesser included version of an Email that does not include the attachment or content, even if all remaining content in the Email is identical. Under no circumstances will Email thread suppression eliminate (a) the ability of a requesting Party to identify every custodian who had a copy of a produced document or Email, to the extent this information is available on an automated basis through the use of industry-standard Email threading methods consistent with this paragraph; or (b) remove from a production any unique branches and/or attachments contained within an Email thread.

2.      Email Domains: Producing parties may utilize an ESI search process to identify categories of documents, such as Emails from domains typically associated with junk Email (*e.g.*, fantasy football-related Emails, retailer advertising, and newsletters or alerts from non-industry sources).

n.      **Deduplication.** A Producing Party shall globally deduplicate by exact duplicate families provided that (i) only exact duplicates are subject to deduplication; (ii) the Producing Party identifies all custodians in the main All Custodian metadata field, to the extent this information is available on an automated basis through the use of industry-standard deduplication methods consistent with this paragraph; and (iii) an Email that includes content in the BCC or other blind copy fields shall not be treated as a duplicate of an Email that does not include content in the BCC or other blind copy field, even if all remaining content in the Email is identical. Duplicate electronic documents shall be identified based on MD5 or SHA-1 hash values at the document family level. All electronic documents bearing an identical value are a duplicate group. De-duplication must be performed at the document family level. Stand-alone files will de-duplicate against other stand-alone files, but not against attachments contained in document families. Each party may also de-duplicate Emails in such a way as to eliminate earlier or

incomplete chains of Emails and therefore produce only the most complete iteration of an Email chain. In performing de-duplication described above, a Producing Party may not eliminate any unique, non-duplicative responsive information from chains of Emails that are not contained within the most complete iteration of an Email chain. Any other methodology for identification of duplicates, including Email field selection for hash value creation, must be discussed with the Requesting Party and approved in writing before implementation. If the Requesting Party objects to the methodology, it shall timely raise those concerns with the Producing Party. If a party opts not to deduplicate, it shall disclose such fact to the Requesting party prior to production of such non-deduplicated data.

o.      **Custodian or Originating Source.** The custodian or originating source shall be identified in the Custodian field of the database load files. Documents found in the possession of a natural person (or on a natural person's allocated hardware or storage media) should be produced in such fashion as to identify the natural person. Documents found in the possession of a department, group, entity, or other common facility (*e.g.*, office, file room, archive, network storage, file share, back-up, hard drive, etc.) should be produced in such a fashion as to identify the department, group, entity, or facility. A Producing Party shall use a uniform description of a particular custodian across productions.

p.      **Color.** Except for PowerPoint and other Documents produced natively, Documents containing color need not be produced in color in the first instance. However, if good cause exists for the Requesting Party to request production of certain documents in color, the Requesting Party may request production of such documents in color by providing (1) a list of the Bates numbers of documents it requests to be produced in color format; and (2) an explanation of the need for production in color format. The Producing Party shall not unreasonably deny such requests.

20

q.      **Foreign Language.**  Foreign language text files and Metadata should be delivered with the correct encoding to enable the preservation of the documents' original language.

r.      **Date Format:**

1.      Documents and ESI shall be processed using a single standard time zone (*e.g.*, GMT) selected by the Producing Party.

2.      If a time is not available, such as the estimate date for a coded document, then 12:00 am, or 00:00 should be assigned, *i.e.*, 12/21/1999 00:00

3.      Date delimiters, such as slashes and colons, must be consistent across all fields.  In the format of MM/DD/YYYY, there are no spaces and only forward slashes.

4.      Date formats must be consistent within any one field.

5.      Date formats must be consistent across all fields, *i.e.*, a record with a sent date should have the same format in the last modified date field.

s.      **Production Media.**  Producing documents may be done via secure FTP or secure file share, via CD, DVD, flash drive, or hard drive.  To the extent possible, physical media should be protected before it is produced.

1.      **Naming Convention for Production Media.**  Whether produced via secure FTP, file share, or physical media, the files produced should be combined into a compressed file such as .zip, .rar, etc.  The compressed file should be named so as to indicate Producing Party, the date of the production, and the sequence of the production (*e.g.*, "Fourth Production 20180508-001").  If the production is made using physical media, the media should be labeled to include the aforementioned information, as well as the Bates range of the materials contained on the media.

t.      **Replacement Productions.**  Any replacement production will be transmitted with a cover letter or Email to identify the production as a replacement and shall cross-reference the

BegBates and EndBates of the documents being replaced. If the replacement production is being transmitted by physical media, the media shall include the phrase "Replacement Production."

u. **Encrypted Data**. To the extent a production is encrypted before it is produced, the Producing Party shall contemporaneously transmit the credentials necessary to decrypt the data under separate cover.

v. **Zero-byte Files**. The Parties may, but are not required to, filter out stand-alone files identified as zero-bytes in size that do not contain responsive file links or file names. If the Requesting Party in good faith believes that a zero-byte file was withheld from production and contains information responsive to a request for production, the Requesting Party may request that the Producing Party produce the zero-byte file. The Requesting Party may provide a Bates number to the Producing Party of any document that suggests a zero-byte file was withheld from production and contains information responsive to a request for production.

## VIII. ASSERTIONS OF PRIVILEGE

a. **Privilege Logs**. Privilege Logs shall be provided containing the following information, which may, in part, be supplied by metadata associated with the document that reasonably supplies the information identified below:

1. A sequential number associated with each Privilege Log record;

2. The date of the document redacted or withheld;

3. The Bates numbers of documents redacted or withheld;

4. The identity of all persons who sent, authored, signed or otherwise prepared the document or withheld portion of the document, and identification of which of them are attorneys;

5. The identity of all persons designated as addressees or copyees, and identification of which of them are attorneys;

22

6. The title or subject of a document unless providing this information would reveal information that is itself privileged or protected;

7. A description of the contents of the document that, without revealing information itself privileged or protected, is sufficient to understand the subject matter of the document and the basis of the claim of privilege or immunity; and

8. The type or nature of the privilege asserted (*e.g.*, attorney-client privilege; work-product doctrine).

| Privilege Log #/ Bates # | Date | Author | From or Sender | Recipient | CC | BCC | Title | Subject | Privilege Log Description | Privilege |
|---|---|---|---|---|---|---|---|---|---|---|
| i, iii | ii | iv | iv | v | v | v | vi | vi | vii | viii |

b. **Logging of Document Families.** Where multiple members of a document "family" (*e.g.*, an Email and its attachment, multiple Email attachments, etc.) are withheld or redacted on the grounds of privilege, immunity, or any similar claim, these families may be jointly logged as a single entry on the privilege log with an indication in the description field that describes the family relationship, provided however, that information logged must be sufficient to assess the privilege for each family member. For document families in which fewer than all of the documents are withheld or redacted as privileged or protected, the privilege log entry for the withheld document(s) shall identify the Bates number of the produced family member.

c. The following documents presumptively need not be included on a Privilege Log:

1. Communications exclusively between a Party and its outside counsel regarding this Action dated after the commencement of this Action;

2. Work product created by outside counsel, or by an agent of outside counsel other than a Party, regarding this Action and created after commencement of this Action;

23

3. Communications exclusively between a Party and its outside counsel, or work product created by outside counsel, or by an agent of outside counsel other than a Party, concerning the action *Fair Isaac Corporation v. Trans Union LLC*, Case No. 1:17-cv-08318 (N.D. Ill.), provided that the Party claiming privilege or immunity over the communication or work product was a party to that action.

4. Documents not responsive to the Requesting Party's substantive document requests (as modified by the Producing Party's responses and objections to such requests).

## IX. COST ALLOCATION

Pursuant to FRCP 26, the Parties generally presume that the Producing Party bears all costs of preservation, retrieval, and production of its reasonably accessible ESI. However, there may be cost-sharing or cost-shifting upon agreement of the Producing and Requesting Parties or upon proper motion and Order of the Court, such as for ESI that is not reasonably accessible.

## X. THIRD PARTY DOCUMENTS

A Party that issues a non-party subpoena ("Issuing Party") shall include a copy of this Protocol with the subpoena and state that the Parties to the Action have requested that third parties produce Documents in accordance with the specifications set forth herein. The Issuing Party shall timely notify other Parties when it receives non-party productions, and shall, upon request by other Parties ("Requesting Parties" for purposes of this paragraph), provide copies of such productions to Requesting Parties in the format in which they were received from the third party. Nothing in this Protocol is intended to or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the Parties or third parties to object to a subpoena.

## XI. AUTHENTICATION

The Parties will meet and confer regarding an authentication stipulation concerning Documents produced in this Action.

24

IT IS SO ORDERED.

Dated: 11/29/2023

Edmond E. Chang
United States District Court Judge

Dated: November 6, 2023

Respectfully Submitted,

/s/ Lauren M. Weinstein
Lauren M. Weinstein
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.,
  Suite 500
Washington, DC 20037
Telephone: 202-556-2000
lweinstein@mololamken.com

Steven F. Molo
Lauren F. Dayton
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Telephone: 312-450-6700
smolo@mololamken.com
ldayton@mololamken.com

*Liaison Counsel for Direct Purchaser
Plaintiffs and the Proposed Direct
Purchaser Class*

Gary F. Lynch
CARLSON LYNCH LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
Facsimile: 412-231-0246
glynch@carlsonlynch.com

Katrina Carroll
CARLSON LYNCH LLP
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
kcarroll@carlsonlynch.com

/s/ Carmen Medici
Carmen Medici
  (admitted *pro hac vice*)
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-798-5319
cmedici@scott-scott.com

Joseph P. Guglielmo
  (N.D. Ill. 2759819)
Michelle E. Conston
  (admitted *pro hac vice*)
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com
mconston@scott-scott.com

Patrick McGahan
  (admitted *pro hac vice*)
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct
Purchaser Plaintiffs and the Proposed
Direct Purchaser Class*

Christopher M. Burke
Walter Noss
Yifan (Kate) Lv
KOREIN TILLERY PC
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: (619) 6225-5620
Facsimile: (314) 241-3525
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

George A. Zelcs
Randall P. Ewing, Jr.
Ryan Z. Cortazar
KOREIN TILLERY, LLC
205 North Michigan Avenue,
Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Jennifer W. Sprengel
CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

Barbara J. Hart (admitted *pro hac vice*)
GRANT & EISENHOFER
485 Lexington Ave., 29th Floor New
York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Linda P. Nussbaum
Susan Schwaiger
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th
Floor
New York, NY 10036
Telephone: 917-438-9102
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Michael L. Roberts
Karen Sharp Halbert
ROBERTS LAW FIRM, P.A.
20 Rahling Circle Little Rock, AR
72223
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Gregory S. Asciolla
  (admitted *pro hac vice*)
Karin E. Garvey
  (admitted *pro hac vice*)
Robin A. van der Meulen
  (admitted *pro hac vice*)
Matthew J. Perez
  (admitted *pro hac vice*)
Jonathan S. Crevier
  (admitted *pro hac vice*)
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
rvandermeulen@dicellolevitt.com
mperez@dicellolevitt.com
jcrevier@dicellolevitt.com

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: 312-332-3400
mmiller@millerlawllc.com
lfanning@millerlawllc.com

Guillaume Buell
  (admitted *pro hac vice*)
THORNTON LAW FIRM LLP
1 Lincoln Street, 13th Floor
Boston, MA 02111
Telephone: 617-720-1333
gbuell@tenlaw.com

Daniel E. Gustafson
  (admitted *pro hac vice*)
Daniel C. Hedlund
  (admitted *pro hac vice*)
Michelle J. Looby
  (admitted *pro hac vice*)
Joshua J. Rissman
Ling S. Wang
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
lwang@gustafsongluek.com

Dennis Stewart (admitted *pro hac vice*)
GUSTAFSON GLUEK PLLC
600 B Street, 17th Floor
San Diego, CA 92101
Telephone: 619-595-3200
dstewart@gustafsongluek.com

Kenneth A. Wexler
Melinda J. Morales
Michelle Perkovic
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

Charles F. Barrett
  (admitted *pro hac vice*)
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: 615-244-1713
cbarrett@nealharwell.com

28

Don Barrett (*pro hac vice* forthcoming)
BARRETT LAW GROUP, P.A.
404 Court Square
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
dbarrett@barrettlawgroup.com
donbarrettpa@gmail.com

Richard R. Barrett
 (*pro hac vice* forthcoming)
BARRETT LAW GROUP, P.A.
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: 662-380-5018
rrb@rrblawfirm.net

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)
HAUSFELD LLP
600 Montgomery Street, Suite 3200 San
Francisco, CA 94111
Telephone: 415-633-1908
mlehmann@hausfeld.com
clebsock@hausfeld.com

Hilary K. Scherrer
Paul Gallagher
HAUSFELD LLP
1700 K Street, N.W., Suite 650
Washington, DC 20006
Telephone: 202-540-7200
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Scott A. Martin
Irving Scher
Jeanette Bayoumi
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: 646-357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

*Counsel for Direct Purchaser Plaintiffs
and the Proposed Direct Purchaser
Class*

REINHARDT WENDORF &
BLANCHFIELD
Garrett D. Blanchfield (*pro hac vice*)
Brant D. Penney (*pro hac vice*)
Roberta A. Yard
 (*pro hac vice* forthcoming)
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Telephone: 651-287-2100
Facsimile: 651-287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

SPECTOR ROSEMAN &
KODROFF, P.C.
Jeffrey J. Corrigan (*pro hac vice*)
William G. Caldes(*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
Icee N. Etheridge
 (*pro hac vice* forthcoming)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: 215-496-0300
Facsimile: 215-496-6611
JCorriganf@srkattorneys.com
Bcaldes@srkattorneys.com
Jspector@srkattorneys.com
Ietheridge@srkattorneys.com

*Interim Co-Lead Counsel for Indirect*
*Purchaser Plaintiffs and the Proposed*
*Indirect Purchaser Class*

GUIN, STOKES & EVANS, LLC
Charles R. Watkins (3122790)
321 South Plymouth Court
Suite 1250
Chicago, IL 60604
Telephone: 312-878-8391
Facsimile: 205-226-2357
charlesw@gseattorneys.com

*Liaison Counsel for Indirect Purchaser*
*Plaintiffs and the Proposed Indirect*
*Purchaser Class*

PRETI FLAHERTY, BELIVEAU &
PACHIOS LLP
Michael S. Smith
 (*pro hac vice* forthcoming)
Gregory P. Hansel
 (*pro hac vice* forthcoming)
Randall B. Weill
 (*pro hac vice* forthcoming)
Elizabeth F. Quinby
 (*pro hac vice* forthcoming)
One City Center, P.O. Box 9546
Portland, ME 04101
Telephone: 207-791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com

GLANCY PRONGAY & MURRAY
LLP
Brian P. Murray
 (*pro hac vice* forthcoming)
Lee Albert (*pro hac vice* forthcoming)
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: 212-682-5340
Facsimile: 212-884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

FREED KANNER LONDON &
MILLEN LLC
Douglas A. Millen
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: 224-632-4500
dmillen@fklmlaw.com

FREED KANNER LONDON &
MILLEN LLC
Jonathan M. Jagher
 (*pro hac vice* forthcoming)
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-234-6487
jjagher@fklmlaw.com

BONI, ZACK & SNYDER LLC
Michael J. Boni (*pro hac vice* forthcoming)
Joshua D. Snyder
  (*pro hac vice* forthcoming)
John E. Sindoni (*pro hac vice* forthcoming)
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: 610-822-0200
Facsimile: 610-822-0206
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

MCLAFFERTY LAW FIRM, P.C.
David McLafferty
  (*pro hac vice* forthcoming)
Attorneys at Law
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-940-4000, ext. 12
www.McLaffertyLaw.com

SALTZ MONGELUZZI &
BENDESKY, P.C.
Simon B. Paris, Esq.
  (*pro hac vice* forthcoming)
Patrick Howard, Esq.
  (*pro hac vice* forthcoming)
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: 215-575-3985
Facsimile: 215-496-0999
sparis@smbb.com
phoward@smbb.com

*Counsel for Indirect Purchaser
Plaintiffs and the Proposed Indirect
Purchaser Class*

/s/ Matthew D. Provance
Britt M. Miller
Matthew D. Provance
J. Gregory Deis
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
(312) 701-7711—Facsimile
bmiller@mayerbrown.com
mprovance@mayerbrown.com
gdeis@mayerbrown.com

*Counsel for Defendant Fair Isaac
Corporation*

## APPENDIX A: REQUIRED METADATA FIELDS

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| Bates Number Begin | Beginning page Bates number | x | x | x |
| Bates Number End | Ending page Bates number | x | x | x |
| Attachment Begin | Beginning page of attachment range | x | x | x |
| Attachment End | Ending page of attachment range | x | x | x |
| Attachment Count | Number of attachments to an Email | x | x | |
| Custodian | Primary Individual Custodian Name or Shared Resource Name the document was processed for production -- format: Last, First or ABC Dept. consistent naming and formatting should be used across all productions. | x | x | x |
| AllCustodian | Production custodians or non-human production data sources associated with the produced document; Format: Last, First or ABC Dept. | x | x | x |
| File Name | File name of document | | x | |
| File Extension | File extension of document | x | x | |
| LogicalPath | The directory structure of the | x | x | |

32

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| | original file(s); any container name is included in the path | | | |
| Page Count | For documents produced in TIFF form, number of pages in the document; for documents produced in native, page count will be 1 (for placeholder) | x | x | x |
| Email Subject | Subject of Email | x | x | |
| Author | Any value populated in the Author field of the document properties | | x | |
| From | Email author | x | x | |
| To | Email recipients | x | x | |
| CC | Email copyees | x | x | |
| BCC | Email blind copyees | x | x | |
| Importance | Email importance flag | x | x | |
| Date Sent | Date sent (MM/DD/YYYY format) | x | x | |
| Time Sent | Time sent (HH:MM:SS format) | x | x | |
| Date Received | Date received (MM/DD/YYYY format) | x | x | |
| Time Received | Time received (HH:MM:SS format) | x | x | |
| Date Created | Date created (MM/DD/YYYY HH:MM:SS format) | | x | |

Case:Case:1:20-1:20-cv-02114-D0cv-02044-DMR#Document#1:Document20d1-Fi07/Filed:03/Page:0d/34:3 Page:34 of 35ge ID34:7773

Case: 1:20-cv-02114 Document #: 207 Filed: 11/29/23 Page 34 of 35 PageID #:4303

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| DateLastModified | Last modification date (MM/DD/YYYY HH:MM:SS format) | x | x | |
| Hash Value (MD5 or SHA-1) | Unique electronic signature of Email or electronic file | x | x | |
| NativeFile | Native File Link | x | x | |
| Email Thread Family ID (if Email threading is used by Producing Party) | Unique identifier from Email threading algorithm to denote Emails from a single thread and all attachments | x | x | |
| Production Volume | Production volume name | x | x | x |
| Confidentiality | Confidentiality designation pursuant to the Protective Order | x | x | x |
| Redacted | Descriptor for documents that have been redacted (<yes> or <no>) | x | x | x |
| Withheld Placeholder | To the extent a document family member is fully withheld on the basis of privilege and other documents in that family are produced, this field must be populated with a "Y" | x | x | |
| Privilege | Populated if privilege is being asserted | x | x | x |
| Attachname | File name of attachment | x | | |

| Field | Description | Email | Non- Email ESI | Hard Copy |
|---|---|---|---|---|
| Title | Any value populated in the Title field of the document properties | | x | |
| Subject | Any value populated in the Subject field of the document properties | | x | |
| LastEditedBy | Any value populated in the Last Edited by or Last Modified By field of the document properties | | x | |

# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-02114 |
| *This document relates to:* | Judge Edmond E. Chang |
| ALL ACTIONS | Magistrate Judge David E. Weisman |

## AGREED CONFIDENTIALITY ORDER

The parties[1] to this Agreed Confidentiality Order have agreed to the terms of this Order; accordingly, it is ORDERED:

1.    Scope.  All materials produced or adduced in the course of discovery, including initial disclosures, responses to discovery requests, deposition testimony and exhibits, and information derived directly therefrom (hereinafter collectively "documents"), shall be subject to this Agreed Confidentiality Order, as defined below.  This Order is subject to the Local Rules of this District and the Federal Rules of Civil Procedure ("FRCP") on matters of procedure and calculation of time periods.

2.    Confidential Information.  As used in this Order, "Confidential Information" means information designated as "CONFIDENTIAL" by the producing party, that falls within one or more of the following categories: (a) information prohibited from disclosure by statute; (b) research, technical, or commercial information that the party has maintained as confidential; (c) personally identifying information; (d) personal or financial information that the party has

---

[1] For purposes of this Order, "parties" shall mean the named parties in the above-referenced litigation.  In addition, any non-party that produces discovery pursuant to a subpoena or other process issued in this litigation shall have the rights and protections set forth in this Order.

maintained as confidential; or (e) other information the producing party reasonably believes is subject to protection. These categories are expressly provided for illustrative purposes only, and are not intended to be and should not be construed as exhaustive of the types of information that may be appropriately designated as "Confidential Information." The parties will make reasonable efforts to ensure that information or documents that are available to the public are not designated as Confidential Information.

3.     Highly Confidential Information. As used in this Order, "Highly Confidential Information" means information designated as "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" by the producing party that is of a highly sensitive nature the disclosure of which could result in significant harm, including but not limited to competitive harm, to the business or operations of that party or non-party or to an individual. By way of example only, Highly Confidential Information may include but is not limited to: (a) documents or information relating to or reflecting nonpublic business or market strategies and research and development activities; (b) documents or information relating to or reflecting other trade secrets or nonpublic proprietary business information that bestows a competitive advantage on the producing party; (c) documents or information relating to or reflecting revenue, profit, costs or pricing; (d) documents or information reflecting customer details that could be used to subject the party to a competitive disadvantage; (e) copyrighted software and information reflecting computer or programming code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs; or (f) other information the disclosure of which would, in the good faith judgment of the designating party, create a risk of serious harm. The parties will make

2

reasonable efforts to ensure that information or documents that are available to the public are not designated as Highly Confidential Information.

4. <u>Designation.</u>

(a) A party may designate a document as Confidential Information or Highly Confidential Information for protection under this Order by placing or affixing the words "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" on the document and on all copies in a manner that will not interfere with the legibility of the document.

(b) To the extent a document is produced in a form in which placing or affixing the words "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" on the document is not feasible, the producing party may designate the document as confidential by inserting a slip sheet, by affixing a label to the production media containing the document, by including the designation in the file title, or, if necessary, by including such designation in a cover letter. As used in this Order, "copies" includes electronic images, duplicates, extracts, summaries, or descriptions that contain either Confidential Information or Highly Confidential Information. The marking "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" shall be applied prior to or at the time the documents are produced or disclosed. Applying the marking "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" to a document does not mean that the document has any status or protection by statute or otherwise except to the extent and for the purposes of this Order. Any copies that are made of any documents marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" shall also be so marked, except that indices, electronic databases, or lists of documents that do not

3

contain substantial portions or images of the text of marked documents and do not otherwise disclose the substance of the Confidential Information or Highly Confidential Information are not required to be marked.

(c)     Upward Designation of Information or Items Produced by Other Parties or Non-Parties.  Subject to the definitions set forth in Paragraphs 2 and 3, a party may upward designate (*i.e.*, change a document produced without a designation to a designation of Confidential Information or Highly Confidential Information or designate a document produced as Confidential Information to a designation of Highly Confidential Information) any document produced by another party or non-party, provided that said document contains the upward designating party's own information it believes is Confidential Information or Highly Confidential Information. Upward designation shall be accomplished by providing written notice to all parties identifying (by Bates number or other individually identifiable information) the document to be re-designated upwardly.  Any party may object to the upward designation of any document pursuant to the procedures set forth in Paragraph 11 regarding challenging designations.

5.     Depositions.

(a)     A party or non-party may designate some or all of a witness's deposition testimony as Confidential or Highly Confidential Information for protection under this Order by orally designating the relevant testimony as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" on the record at the time the testimony is taken. Inadvertent failure to do so does not operate as a waiver.  The designating party must provide the specific page and line designations over which the party or non-party claims confidentiality within thirty (30) days after delivery of the final transcript by the court reporter to the designating party or non-party.  Deposition testimony shall be treated as "CONFIDENTIAL" or "HIGHLY

4

CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY," as orally designated, prior to the deadline. Thereafter, only those portions identified in the Notice of Designation shall remain protected under the terms of this Order.

(b)     In the event information designated as Confidential or Highly Confidential Information is to be shown to a witness at deposition, hearing, trial or otherwise, the witness shall be provided with a copy of this Order at the start of the examination, and the witness must comply with the terms of this Order. Except as provided herein, if the witness has refused to execute Attachment A as required by this Order, the party taking the deposition will read the text of Attachment A on the record, which shall serve as a substitute for the execution of Attachment A and shall permit examination of the witness on documents or other materials containing Confidential Information or Highly Confidential Information.

6.     <u>Protection of Confidential Information or Highly Confidential Information.</u>

(a)     <u>General Protections</u>. Except as set forth below, Confidential Information or Highly Confidential Information shall not be used or disclosed by the parties, counsel for the parties, or any other persons identified in Paragraph 6(b) for any purpose whatsoever other than prosecuting, defending, or settling this litigation, including any appeal thereof. Confidential Information or Highly Confidential Information may be disclosed only to the named plaintiff(s) and not to any other member of the putative class except under circumstances permitting such disclosure set forth in Paragraphs 6(b) and 7.

(b)     <u>Limited Disclosures of Confidential Information</u>. The parties and counsel for the parties shall not disclose or permit the disclosure of any Confidential Information to any person or entity except as set forth in subparagraphs 6(b)(1)-(12). Subject to these requirements, the following categories of persons may be allowed to review Confidential Information:

5

(1)    <u>Counsel</u>. Outside or in-house counsel for the parties and employees or support staff of such counsel (including but not limited to attorneys, paralegals, information technology, litigation support, secretaries, law clerks, and investigators) who have responsibility for the preparation and trial of the action;

(2)    <u>Parties</u>.  Individual parties and employees of the parties, but only to the extent counsel determines in good faith that disclosure is reasonably necessary to the conduct of the litigation and the person has been advised of their obligations hereunder;

(3)    <u>Court</u>.  The Court and its personnel;

(4)    <u>Court Reporters and Video Recorders</u>.  Court reporters and video recorders engaged for depositions, but only after such persons have completed the certification contained in Attachment A;

(5)    <u>Contractors</u>.  Those persons specifically engaged for the purpose of providing litigation support, including computerized or electronic discovery support, providing photocopies, organizing or processing documents, including outside vendors hired to collect, process, or host electronically stored documents, but only after such persons have completed the certification contained in Attachment A;

(6)    <u>Consultants and Experts</u>.  Consultants, investigators, or experts or support staff of such consultants, investigators, or experts retained by the parties or Counsel for the parties to assist in the preparation and trial of this action, but only after such consultants, investigators, experts, or support staff have completed the certification contained in Attachment A.  This definition includes professional jury or trial consultants retained in connection with this litigation;

(7)    Witnesses at Trial.  Any witness at trial during the pendency of that trial, to whom counsel believes, in good faith, that such disclosure is reasonably necessary for the prosecution or defense of these proceedings and who has completed the certification contained in Attachment A;

(8)    Witnesses at Depositions.  During their depositions, witnesses in this action (and their counsel) if the witness has completed the certification contained in Attachment A, and to whom disclosure is limited to documents that (1) were produced by the witness's employer and created during the period of the witness's employment, (2) show on their face that the witness[2] authored or received them, (3) memorialize that the witness was privy to the document's contents (*e.g.*, a document refers to a meeting attended by the witness), or (4) are reasonably necessary to be shown to the witness according to the good faith judgment of counsel.  Neither witnesses nor their counsel shall retain a copy of any exhibit designated as Confidential Information, except witnesses and their counsel may receive copies of all exhibits marked at their depositions in connection with review of the deposition transcript.  After the conclusion of the litigation such witnesses and their counsel shall destroy those copies;

(9)    Author or Recipient.  Persons whom the Confidential material itself indicates, or the receiving party otherwise has a good-faith basis to believe, were the author, creator, producer, addressee, source, or recipient of a document (not including a person who received the document in the course of this action) may be shown only those documents that he or she authored or received; and any person whose statements, communications or actions are expressly mentioned, discussed, or referred to by actual name in the material as indicated on its face may be shown that

---

[2]    For purposes of this paragraph, a witness designated to testify on behalf of an organization taken pursuant to FRCP 30(b)(6) may be deemed to have "author[ed]" or "received" a document designated by that organization as Confidential so long as at least one employee of the organization authored or received the document.

portion of the document referring to them and such other portions as necessary to provide context for the reference to that person;

(10)    Special Masters.  Special masters and their direct staff;

(11)    Mediators.  Mediators and their direct staff, provided that they are bound by a confidentiality agreement acceptable to all parties; and

(12)    Others by Consent.  Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

(c)    Disclosures of Highly Confidential Information.  The parties and counsel for the parties shall not disclose or permit the disclosure of any Highly Confidential Information to any person or entity except as set forth in subparagraphs 6(c)(1)-(10).  Subject to these requirements, the following categories of persons may be allowed to review Highly Confidential Information:

(1)    Outside Counsel.  Outside counsel for the parties who have appeared in this action and employees or support staff of such counsel (including but not limited to attorneys, paralegals, secretaries, law clerks, and investigators), provided that such individuals do not regularly participate in the commercial business activities of the receiving party;

(2)    Court.  The Court and its personnel;

(3)    Court Reporters and Video Recorders.  Court reporters and video recorders engaged for depositions, but only after such persons have completed the certification contained in Attachment A;

(4)    Contractors.  Those persons specifically engaged for the purpose of providing litigation support, including computerized or electronic discovery support, providing photocopies, organizing or processing documents, including outside vendors hired to collect, process, or host

8

electronically stored documents, but only after such persons have completed the certification contained in Attachment A;

(5) <u>Consultants and Experts</u>. Consultants, investigators, or experts employed by the parties or Counsel for the parties to assist in the preparation and trial of this action or support staff of such consultants, investigators, or experts, so long as any such consultants, investigator, experts or support staff are not employees or regular contractors of the parties or any affiliated entity, but only after such consultants, investigators, experts, or support staff have completed the certification contained in Attachment A. This definition includes professional jury or trial consultants retained in connection with this litigation;

(6) <u>Witnesses at Depositions</u>. During their depositions, witnesses in this action to whom disclosure is limited to documents that (1) were produced by the witness's employer and created during the period of their employment, (2) show on their face that the witness[3] authored or received them, or (3) memorialize that the witness was privy to the document's contents (*e.g.*, a document refers to a meeting attended by the witness). Neither witnesses nor their counsel shall retain a copy of any exhibit designated as Highly Confidential Information, except witnesses and their counsel may receive copies of all exhibits marked at their depositions in connection with review of the deposition transcript. After the conclusion of the litigation witnesses and their counsel shall destroy those copies;

(7) <u>Author or Recipient.</u> Persons whom the Highly Confidential material itself indicates, or the receiving party otherwise has a good-faith basis to believe, were the author, creator, producer, addressee, source, or recipient of a document (not including a person who

---

[3] For purposes of this paragraph, a witness designated to testify on behalf of an organization taken pursuant to FRCP 30(b)(6) may be deemed to have "author[ed]" or "received" a document designated by that organization as Highly Confidential Information so long as at least one employee of the organization authored or received the document.

9

received the document in the course of this action) may be shown only those documents that he or she authored or received; and any person whose statements, communications or actions are expressly mentioned, discussed, or referred to by actual name in the material as indicated on its face may be shown that portion of the document referring to them and such other portions as necessary to provide context for the reference to that person;

(8)  Special Masters.  Special masters and their direct staff;

(9)  Mediators.  Mediators and their direct staff, provided that they are bound by a confidentiality agreement acceptable to all parties; and

(10)  Others by Consent.  Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

(d)  To the extent any person is required to complete the certification contained in Attachment A to this Order, facsimile signatures or signatures transferred in electronic format (*e.g.*, PDF) shall be treated as original signatures purposes of this Order.

(e)  Control of Documents.  Counsel for the parties shall make reasonable efforts to prevent unauthorized or inadvertent disclosure of Confidential Information or Highly Confidential Information.

(f)  Acknowledgment of Understanding and Agreement To Be Bound (Attachment A). To the extent that this Order requires any persons to acknowledge their obligations under this Order, that acknowledgment shall be accomplished by the execution of the Acknowledgment of Understanding and Agreement To Be Bound (Attachment A).  The counsel for the party that obtains such signed agreements shall maintain the originals of those forms for a period of one year after the termination of the case, including any appeal(s) thereof.

7.    Failure To Designate.   A failure to designate a document or testimony as Confidential Information or Highly Confidential Information does not, standing alone, waive the right to so designate the document or testimony.  If a party designates a document as Confidential Information or Highly Confidential Information after it was initially produced, the receiving party, on notification of the designation, must make a reasonable effort to ensure that the document is treated in accordance with the provisions of this Order.  No party shall be found to have violated this Order for failing to maintain the confidentiality of material during a time when that material has not been designated Confidential Information or Highly Confidential Information, even where the failure to so designate was inadvertent and where the material is subsequently designated Confidential Information or Highly Confidential Information.

8.    Inadvertent Disclosure of Attorney-Client Privileged or Work-Product Protected Documents and Clawback Procedures.  Pursuant to Federal Rule of Evidence 502(d) and (e), if, in connection with the action, information subject to a claim of attorney-client privilege, attorney work-product protection, or other evidentiary privilege or protection ("Protected Documents") is inadvertently disclosed, the disclosure does not constitute a waiver or forfeiture of such privilege or protection with respect to the privileged information or its subject matter, in this litigation or in any other federal or state proceeding.  Instead, the producing party shall be entitled to assert such privilege or protection, except as further discussed below, and the information and its subject matter shall be treated as if there has been no such disclosure.

(a)    Upon discovering the disclosure of information that the producing party believes in good faith to be covered by attorney-client privilege, work-product protection, or other evidentiary privilege or protection, the producing party shall promptly provide written notification to the receiving party identifying the documents or portions thereof that

contain privileged or protected information, in accordance with the requirements of FRCP 26(b)(5)(A).

(b)     Upon written notice of the production of a Protected Document by the producing party or oral notice if such notice is delivered on the record at a deposition, the receiving party must within seven (7) days, return, sequester, or destroy the specified document and any electronic or hard copies the receiving party has, and may not further use or disclose the Protected Document until the claim that it is a Protected Document has been resolved.  The receiving party may retain and sequester a copy of the document asserted to be privileged or protected for the purpose of resolving a dispute with the producing party as to whether the document is privileged or protected from disclosure, and the receiving party need not remove from the record any document that has been previously introduced until such dispute is resolved.  If the receiving party agrees that the document is privileged, it will promptly confirm in writing to the producing party that it has either returned or destroyed all versions of the document and will make no use of the information. Promptly following notification by the receiving party, the producing party shall provide the receiving party with a replacement production in the same format as the original production, with the protected information appropriately withheld or redacted.  If the receiving party disputes that material noticed pursuant to this paragraph is privileged or protected from disclosure, then the retention and sequester of such material shall be governed by Paragraph 8(f).

(c)     Where a producing party seeks to invoke its rights to claw back a document under Federal Rule of Evidence 502(d) and this Order with respect to a document that has been submitted to the Court as an exhibit or used as an exhibit in a deposition, the producing

12

party must do so within fourteen (14) days of the document being so filed or used. To the extent that the information contained in a document submitted to the Court as an exhibit or used as an exhibit in a deposition is subject to a claim that it contains privileged or protected information, then the receiving party will not further use such document(s) until the claim has been resolved. However, while the receiving party need not remove from the record any document that has been previously introduced until such dispute is resolved, the producing party may notify the Court and/or court reporting service that a dispute under this paragraph is pending and ask that the document(s) be sequestered and made not accessible to the public or parties until the dispute is resolved. To the extent a producing party does not seek to invoke its rights under Federal Rule of Evidence 502(d) and this Order to claw back a document that has been submitted to the Court as an exhibit or used as an exhibit in a deposition within fourteen (14) days of the document being so filed or used, the parties agree that Federal Rule of Evidence 502(d) will not apply to such filed or used document. However a party may seek to invoke its rights under Federal Rule of Evidence 502(b) to claw back such filed or used document.

(d)     If the receiving party has disclosed the specified document before being notified of its inadvertent production, it must take reasonable steps to retrieve it.

(e)     The producing party shall provide an updated privilege log as called for in Section VIII of the Stipulation and Order Establishing the Protocol for the Production of Documents and Electronically Stored Information, as well as any portion of the document that does not contain privileged or protected information.

(f)     The receiving party may challenge the assertion of any privilege discussed in this paragraph. Any challenge that cannot be resolved by the parties will be filed with

the court presiding over this litigation in the Northern District of Illinois and subject to the law in that District. It shall be the receiving party's responsibility to initiate Court proceedings, if any. The receiving party may not, however, publicly assert as a ground for such motion the fact or circumstances of the production or reveal the substance of the protected contents of the materials (including in contesting the assertion of protection or privilege). Any motion contesting the privilege or work-product claim shall be submitted to the Court in camera for review or, if the Court directs, filed under seal. Pending resolution of such a challenge, the receiving party must continue to sequester the information contained in any notes and, in the event the Court concludes that the information is protected from disclosure, delete the information from any notes or any portions thereof that reveal the substance of the privileged or protected information. The producing party must preserve the information pending resolution of the challenge and, in the event the Court concludes that the information is not protected from disclosure, promptly provide the receiving party with a replacement production.

(g)     The producing party may challenge the receiving party's use of any Protected Document. Any challenge that cannot be resolved by the parties will be filed with the court presiding over this litigation in the Northern District of Illinois and will be subject to the laws of that District. In all instances in which the producing party asserts a privilege or protection, the producing party must preserve a copy of the document asserted to be privileged or protected until the claim of privilege is resolved.

(h)     The obligation of the receiving party to return or to destroy materials under this Order does not apply to multi-case disaster recovery databases maintained by the receiving party. If these disaster recovery databases are accessed or restored, however,

14

then any Protected Documents on those databases relating to this action shall be destroyed if destruction is required elsewhere in this Order.

(i) If a party independently discovers that it has received documents or information that reasonably appear to be privileged, the party shall timely notify the other party, and in any event, no later than ten (10) days after such discovery.

(j) Except as otherwise set forth in Paragraph 8(c), where a document has been submitted to the Court as an exhibit or used as an exhibit in a deposition and no party has sought to claw back such document within fourteen (14) days of the document being so filed or used, this Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d) and (e), and Federal Rule of Evidence 502(b) shall not otherwise apply. Nothing contained herein is intended to or shall limit a party's right to conduct a pre-production review of hard-copy documents, electronically stored information ("ESI") or any other information (including metadata) for relevance, responsiveness, privilege and/or protection, and nothing herein is intended to curtail a party's right to challenge any documents, ESI or any other information withheld based on a claim of relevance, responsiveness, privilege and/or protection.

(k) Nothing in Paragraph 8 shall limit the right of any party to petition the Court for an in camera review of inadvertently disclosed Protected Documents.

9. <u>Filing of Confidential Information or Highly Confidential Information</u>. This Order does not, by itself, authorize the filing of any document under seal. Any party wishing to file a document designated as Confidential Information or Highly Confidential Information in connection with a motion, brief or other submission to the Court must comply with LR 26.2 of the District Court for the Northern District of Illinois.

15

10.    No Greater Protection of Specific Documents.  Except on privilege grounds not addressed by this Order, no party may withhold information from discovery on the ground that it requires protection greater than that afforded by this Order unless the party moves for an order providing such special protection or the parties otherwise agree.

11.    Challenges by a Party to Designation as Confidential Information or Highly Confidential Information.  The designation of any material or document as Confidential Information or Highly Confidential Information is subject to challenge by any party.  A party does not waive its right to challenge a designation by electing not to mount a challenge promptly after the original designation is disclosed. The following procedure shall apply to any such challenge.

(a)    Meet and Confer.  A party challenging the designation of Confidential Information or Highly Confidential Information must do so in good faith and must begin the process by conferring directly with counsel for the designating party.  In conferring, the challenging party must identify in writing by Bates number or privilege log identifying number the material challenged and explain the basis for its belief that the designation was not proper.  The designating party or nonparty must respond to the challenge within ten (10) business days.  If agreement is reached confirming, changing or waiving the designation as to any material subject to the objection, the designating party or nonparty shall serve on all parties a notice specifying the document and the nature of the agreement.  If the designation is changed or waived, the designating party or nonparty shall also produce copies of all materials with the amended, agreed-upon designation at the expense of the designating party or nonparty.

(b)    Judicial Intervention.  A party that elects to challenge a confidentiality designation may file and serve a motion that identifies the challenged material and sets forth in detail the basis for the challenge.  The burden of persuasion in any such challenge proceeding shall be on the

16

designating party or nonparty. Until the Court rules on the challenge, all parties shall continue to treat the materials as Confidential Information or Highly Confidential Information under the terms of this Order.

12.    Challenges to Privilege Claims. Following its receipt of a privilege/redaction log produced in this action, a party may identify, in writing (by Bates/unique identifying number), the particular documents that it believes require further explanation. The producing party shall endeavor to respond to such a request within ten (10) business days. If a party challenges a request for further information, the parties shall meet and confer to try to reach a mutually agreeable solution. If they cannot agree, the matter may be brought to the Court.

13.    Action by the Court. Nothing in this Order or any action or agreement of a party under this Order limits the Court's power to make orders concerning the disclosure of documents produced in discovery or at trial.

14.    Use of Confidential Information or Highly Confidential Information at Motion Hearings. Except as expressly set forth herein, nothing in this Order shall be construed to affect the use of Confidential Information or Highly Confidential Information in connection with any presentation of evidence and argument at hearings or trial. The parties will confer with each other and, as necessary, any affected non-party reasonably in advance of a hearing where Confidential Information or Highly Confidential Information will be discussed so that a designating party may request procedures it deems necessary to protect against the disclosure of proprietary or competitively sensitive information, including whether, or to what extent, the Court should restrict public attendance at the hearing. The Court may make such orders as are necessary to govern the use of Confidential Information or Highly Confidential Information at a hearing.

15. <u>Use of Confidential Information or Highly Confidential Information at Trial</u>. The use of Confidential Information or Highly Confidential Information at any trial in this matter will be addressed by a separate stipulation or pretrial order of the Court.

16. <u>Third Parties</u>. In seeking discovery from third parties, the parties shall attach this Order to a copy of any subpoena or other discovery request. Third parties from whom discovery is requested are entitled to the protections of this Order in responding to such requests.

17. <u>Confidential Information or Highly Confidential Information Subpoenaed or Ordered Produced in Other Litigation</u>:

(a)     If a receiving party is served with a discovery request, subpoena, civil investigative demand, grand jury subpoena, or an order issued in other litigation that would compel disclosure of any material or document designated in this action as Confidential Information or Highly Confidential Information, the receiving party must so notify the designating party, in writing, immediately and in no event more than five (5) business days after receiving the subpoena or order. Such notification must include a copy of the subpoena or court order.

(b)     The receiving party also must immediately inform in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is the subject of this Order. In addition, the receiving party must deliver a copy of this Order promptly to the party in the other action that caused the subpoena to issue.

(c)     The purpose of imposing these duties is to alert the interested persons to the existence of this Order, and to afford the designating party in this case an opportunity to try to protect its Confidential Information or Highly Confidential Information in the court from which the subpoena or order issued. If the designating party or nonparty timely seeks a protective order, the receiving party served with the request shall not produce any information designated in this

action as "Confidential Information" or "Highly Confidential Information" before a determination by the court from which the request issued, unless the receiving party has obtained the designating party's permission. The receiving party shall cooperate with respect to all reasonable procedures sought to be pursued by the designating party or nonparty whose designated material may be affected. The designating party or nonparty shall bear the burden and the expense of seeking protection in that court of its Confidential Information or Highly Confidential Information, and nothing in these provisions should be construed as authorizing or encouraging a receiving party in this action to disobey a lawful directive from another court. The obligations set forth in this paragraph remain in effect while the party has in its possession, custody, or control Confidential Information or Highly Confidential Information produced by another party or nonparty to this case.

18.    <u>Challenges by Members of the Public to Sealing Orders</u>.  A member of the public may have a right to challenge the sealing of particular documents that have been filed under seal, and the party asserting confidentiality will have the burden of demonstrating the propriety of filing under seal.

19.    <u>Unauthorized Disclosure or Use</u>.  If a party learns that it or its counsel, officers, directors, employees, consultants, experts or other agents have disclosed documents designated as Confidential Information or Highly Confidential Information in any circumstance not authorized under this Order, that party must within two (2) business days of learning of such disclosure (a) notify the designating party of the disclosure and all pertinent facts relating thereto, (b) make every reasonable effort to prevent disclosure by each unauthorized person who received such information, (c) use reasonable best efforts to retrieve all copies of the protected documents disclosed to unauthorized persons, (d) inform the person or persons to whom unauthorized disclosures were made of the terms of this Order, and (e) request that each such person execute the

19

certification contained in Attachment A. Nothing contained herein shall limit the right of the designating party to seek relief against the party responsible for such disclosure.

20.     Obligations on Conclusion of Litigation.

(a)     Order Continues in Force. Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

(b)     Obligations at Conclusion of Litigation. Within sixty (60) days after dismissal or entry of final judgment not subject to further appeal, all Confidential Information and Highly Confidential Information marked either as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" under this Order, including copies as defined in Paragraph 4(b), shall be returned to the producing party or destroyed to the extent practicable unless it has been offered into evidence or filed without restriction as to disclosure. Within sixty-five (65) days after the final termination of this action, including any appeals, counsel for the receiving party shall certify in writing to the producing party that all such Confidential Information and Highly Confidential Information has been destroyed.

(c)     Retention of Work Product and Filed Documents. Notwithstanding the above requirements to return or destroy documents, outside or in-house counsel for the parties may retain archival copies of all pleadings, motion papers, transcripts, drafts or final expert reports, legal memoranda, correspondence, and all attorney work product, even if such materials contain Confidential Information or Highly Confidential Information. Any retained Confidential Information or Highly Confidential Information shall continue to be protected under this Order and subject to the restrictions on third-party disclosures set forth in Paragraph 6. An attorney may use his or her work product in subsequent litigation,

20

provided that its use does not disclose Confidential Information or Highly Confidential Information. Nothing in this Order shall be construed to require the destruction or return of Confidential Information or Highly Confidential Information stored in counsels' archives, back-up media, or disaster recovery media.

(d) Deletion of Documents Filed Under Seal from Electronic Case Filing (ECF) System. Filings under seal shall be deleted from the ECF system only upon order of the Court.

21. Order Subject to Modification. This Order shall be subject to modification by the Court on its own initiative or on motion of a party or any other person with standing concerning the subject matter.

22. No Prior Judicial Determination. This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any document or material designated Confidential Information or Highly Confidential Information by counsel or the parties is entitled to protection under FRCP 26(c) or otherwise until such time as the Court may rule on a specific document or issue.

23. Persons Bound. This Order shall take effect when entered and shall be binding upon all counsel of record and their law firms, the parties, and persons made subject to this Order by its terms.

24. Future Parties. The terms of this Order shall be binding upon all current and future parties to this litigation and their counsel; any party appearing in the litigation following entry of this Order shall be deemed to have joined the case subject to its provisions.

25.     <u>Computing Time</u>.  For deadlines and time periods that are stated in this Order as a number of "days," time shall be computed in accordance with FRCP 6(a)(1).  For deadlines and time periods that are stated in this Order as a number of "business days," time shall be computed in accordance with FRCP 6(a)(1) except that Saturdays, Sundays, and legal holidays shall not be counted.

SO ORDERED.

Dated: <u>11/16/2023</u>

Edmond E. Chang
U.S. District Court Judge

22

## ATTACHMENT A

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-02114 |
| *This document relates to:* | Judge Edmond E. Chang |
| ALL ACTIONS | Magistrate Judge David E. Weisman |

### ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

The undersigned hereby acknowledges that he/she/they has read the Confidentiality Order dated _____ in the above-captioned action and attached hereto, understands the terms thereof, and agrees to be bound by its terms. The undersigned submits to the jurisdiction of the United States District Court for the Northern District of Illinois in matters relating to the Confidentiality Order and understands that the terms of the Confidentiality Order obligate him/her/them to use materials designated as Confidential Information or Highly Confidential Information, in accordance with the Order solely for the purposes of the above-captioned action, and not to disclose any such Confidential Information or Highly Confidential Information to any other person, firm, or concern.

23

The undersigned acknowledges that violation of the Confidentiality Order may result in penalties for contempt of court.

**Name:** _____

**Job Title:** _____

**Employer:** _____

**Business Address:** _____

_____

_____

_____

Dated: _____        _____
                          Signature

# EXHIBIT 17

1   LAURA A. STOLL, (SBN 255023)
2   *LStoll@goodwinlaw.com*
    **GOODWIN PROCTER LLP**
3   601 S Figueroa St 41st Floor
    Los Angeles, CA 90017
4   Tel.: +1 213 426 2500

5
    *Attorneys for Non-Party Petitioner*
6   *VantageScore Solutions, LLC*

7
                    **UNITED STATES DISTRICT COURT**
8
                    **NORTHERN DISTRICT OF CALIFORNIA**
9
                    **SAN FRANCISCO DIVISION**
10

11

12                                              | Misc. Case No. 3:24-mc-80033

13  VantageScore Solutions, LLC,                | [Related case: *In re FICO Antitrust
                                                | Litigation*, Case No. 20-cv-02114 (N.D.
14              Petitioner,                      | Ill. 2020)]
            v.
15                                              | **NON-PARTY VANTAGESCORE
16  Fair Isaac Corporation,                     | SOLUTIONS, LLC'S NOTICE OF
                                                | MOTION AND MOTION TO
17              Respondent.                      | QUASH SUBPOENA**

18

19

20

21

22

23

24

25

26

27

28

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

## NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on _____, 2024 at _____ or as soon thereafter as the matter may be heard by _____ in courtroom _____ in the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, non-party VantageScore Solutions, LLC ("VantageScore"), through its counsel, Goodwin Procter LLP, shall and does hereby move the Court to quash the Subpoena to Produce Documents, Information, or Objects or To Permit Inspection of Premises in a Civil Action, dated December 21, 2023 (the "Subpoena"), served on VantageScore by Defendant Fair Isaac Corporation ("FICO" or "Defendant").

VantageScore seeks an order from the Court quashing the Subpoena because the Subpoena: (1) seeks highly confidential competitive information and trade secrets; and (2) it subjects VantageScore to undue burden. *See* Fed. R. Civ. P. 45(d)(3)(A).

This Motion to Quash Subpoena is made and based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities in Support of Motion to Quash, the Declaration of Laura A. Stoll (the "Stoll Decl."), and all pleadings and other papers on file in the underlying action in the Northern District of Illinois, any other matter of which the Court may take judicial notice, and any additional arguments, authorities, and evidence that may be presented to the Court at or before a hearing on this Motion to Quash.

Dated: February 14, 2024

By: */s/ Laura A. Stoll*
LStoll@goodwinlaw.com
**GOODWIN PROCTER LLP**
601 S Figueroa St 41st Floor
Los Angeles, CA 90017
Tel.: +1 213 426 2500

*Counsel for Non-Party Petitioner*
*VantageScore Solutions LLC*

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

1

**TABLE OF CONTENTS**

2
                                                                                                **Page**

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND .......................................................................................................... 2

LEGAL STANDARD ................................................................................................... 3

ARGUMENT ................................................................................................................ 5

I.    THIS COURT SHOULD QUASH THE REQUESTS SEEKING HIGHLY
      CONFIDENTIAL DOCUMENTS IN POSSESSION OF PARTIES TO THE LITIGATION 5

II.   THE COURT SHOULD QUASH THE REQUESTS SEEKING NON-PUBLIC DATA
      WHICH UNDERLIES VANTAGESCORE'S MARKET RESEARCH AND STUDIES ...... 6

III.  THIS COURT SHOULD QUASH THE REQUESTS SEEKING INFORMATION
      CONCERNING VANTAGESCORE'S PRODUCT DEVELOPMENT .............................. 10

IV.   THIS COURT SHOULD QUASH THE REQUESTS SEEKING COMPETITIVELY
      SENSITIVE COMMUNICATIONS ................................................................................ 11

V.    THIS COURT SHOULD QUASH THE REQUESTS SEEKING VANTAGESCORE'S
      CONFIDENTIAL FINANCIAL INFORMATION ........................................................... 12

VI.   THIS COURT SHOULD QUASH THE REQUESTS SEEKING VANTAGESCORE'S
      NON-PUBLIC GOVERNMENTAL COMMUNICATIONS .............................................. 12

CONCLUSION ........................................................................................................... 13

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Ameritox, Ltd. v. Millennium Labs., Inc.*,
2012 U.S. Dist. LEXIS 177809 (N.D. Ill. Dec. 14, 2012) ........................................ 4

6

*Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*,
300 F.R.D. 406 (C.D. Cal. 2014) ...................................................................... 4

7

8

*Cusumano v. Microsoft Corp.*,
162 F.3d 708 (1st Cir. 1998) ........................................................................... 4

9

10

*Cytodyne Techs., Inc. v. Biogenic Techs., Inc.*,
216 F.R.D. 533 (M.D. Fla. 2003) ............................................................... 4, 10

11

*Duong v. Groundhog Enterprises, Inc.*,
2020 WL 2041939 (C.D. Cal. Feb. 28, 2020) ........................................... 4, 12

12

13

*Elec. Scripting Prod., Inc. v. HTC Am. Inc.*,
2021 WL 3773607 (N.D. Cal. Aug. 25, 2021) ................................................. 5

14

15

*FICO v. Experian Info. Solutions, Inc.*,
645 F. Supp. 2d 734 (D. Minn. 2009) ............................................................. 2

16

*FICO v. Experian Info. Solutions, Inc.*,
650 F.3d 1139 (8th Cir. 2011) ..................................................................... 2, 3

17

18

*Fort James Corp. v. Sweetheart Cup Co.*,
1998 U.S. Dist. LEXIS 15908 (S.D.N.Y. Oct. 7, 1998) ................................. 9

19

20

*Free Stream Media Corp. v. Alphonso Inc.*,
2017 WL 11632962 (C.D. Cal. May 4, 2017) ................................................. 5

21

*Gopher Media, LLC v. Spain*,
2020 WL 6741675 (S.D. Cal. Nov. 17, 2020) ............................................. 6, 8

22

23

*High Tech Med. Instr., Inc. v. New Image Ind., Inc.*,
161 F.R.D. 86 (N.D. Cal. 1995) ...................................................................... 5

24

25

*Int'l Action Ctr. v. U.S.*,
207 F.R.D. 1 (D.D.C. 2002) .......................................................................... 13

26

*Legal Voice v. Stormans Inc.*,
738 F.3d 1178 (9th Cir. 2013) .................................................................. 4, 12

27

28

iv

*Little v. JB Pritzker for Governor*,
    2020 U.S. Dist. LEXIS 70668 (N.D. Ill. Apr. 22, 2020) ...................................................... 4, 8

*Moon v. SCP Pool Corp.*,
    232 F.R.D. 633 (C.D. Cal. 2005) ...................................................................................... 9, 12

*Nat'l Claims Mgmt. Corp. v. Mercedes-Benz*,
    1998 U.S. Dist. LEXIS 492 (N.D. Ill. Jan. 15, 1998) ............................................................ 8

*Painters Joint Comm. V. Emp. Painters Trust Health & Welfare Fund*,
    2011 WL 4549232 (D. Nev. Sept. 29, 2011) ........................................................................ 8

*U.S. ex rel. Tyson v. Amerigroup Ill., Inc.*,
    2005 U.S. Dist. LEXIS 24929 (N.D. Ill. Oct. 21, 2005)........................................................ 4

*Viskase v. World Pac*,
    2010 U.S. Dist. LEXIS 93991 (N.D. Ill. Sep. 9, 2010)......................................................... 9

*Waymo LLC v. Uber Techs., Inc.*,
    2017 U.S. Dist. LEXIS 132721 (N.D. Cal. Aug. 18, 2017).................................................... 5

*Williams v. Cty. of San Diego*,
    2019 WL 5963969 (S.D. Cal. Nov. 13, 2019) ...................................................................... 5

**Other Authorities**

Fed. R. Civ. P. Rule 45 ............................................................................................................... 3, 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO QUASH SUBPOENA

### PRELIMINARY STATEMENT

Through this Subpoena, FICO seeks to finish business it started in 2020, when it subpoenaed VantageScore as part of a lawsuit FICO filed against TransUnion in 2017, styled as *Fair Isaac Corporation v. TransUnion LLC*, No. 17-cv-08318 (N.D. Ill.). Specifically, as part of the *TransUnion* lawsuit, FICO sought nearly identical information to that which it seeks through the instant subpoena. Ultimately, the suit settled during the course of motion practice regarding the propriety of the subpoena, and as result FICO never obtained access to VantageScore's highly confidential, competitively sensitive information. Through its most recent Subpoena, FICO has renewed its effort to use litigation to its advantage, and capitalize on a perceived opportunity in this suit to wrest the very same highly sensitive information from its only major competitor.

The Subpoena seeks a massive amount of information that FICO could never obtain in the course of ordinary competition (and certainly would never produce to VantageScore, were the roles reversed). *See* Stoll Decl., Ex. 1. For example, FICO requests VantageScore's business contracts with the three credit bureaus, detailed financial information, including VantageScore's financial statements, budgets, operating costs, capital expenses, and R&D expenses for a period spanning more than 11 years, and internal emails from VantageScore executives regarding VantageScore's market position and internal comparison of itself to FICO. FICO's requests are so broad and seek such competitively sensitive information that VantageScore can only conclude the requests seek competitive advantage rather than relevant discovery. Although the parties met and conferred in good faith, even FICO's compromise positions ask too much of a non-party and require that VantageScore give FICO information about VantageScore that would give FICO an even greater competitive advantage than it already has. The Court should not require VantageScore to disclose the materials sought—even under the terms of a protective order—because FICO seeks highly confidential competitive and trade secret information, and production presents unreasonable risks to non-party VantageScore, including the risk of inadvertent disclosure to FICO executives and the

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

2

0

pro-competitive:

> Fair Isaac's antitrust claims suffer from a fundamental, indeed fatal, flaw. The alleged conspiracy does not employ tactics that seek to destroy or cut off competition *before it even has a chance to take hold*; rather, the alleged conspiracy is dependent on convincing the market…that greater value can be realized by switching from FICO scores to VantageScore credit scores. This is the very essence of competition.

*FICO*, 645 F. Supp. 2d at 752. "The district court dismissed FICO's antitrust and false-advertising claims" and the jury ruled against FICO on its trademark claim, finding FICO's mark "invalid." *FICO*, 650 F.3d at 1144. The jury also ruled in defendants' favor on their counterclaim, finding "that FICO had procured the registration [of its trademark] through fraud on the PTO." *Id.*

Then, in November 2017, FICO commenced another action, and in FICO's Amended Complaint, it asserted a Lanham Act claim based on TransUnion's allegedly false statements about VantageScore. *Fair Isaac Corporation v. Trans Union LLC*, No. 17-cv-08318 (N.D. Ill.), Am. Compl. ¶¶ 155-58 (ECF No. 63). Two years after filing the initial complaint in the TransUnion action, FICO subpoenaed VantageScore with Requests nearly identical to those issued here. There, as it does here, FICO sought a broad swath of confidential market and financial data that had limited or no relevance to the claims at issue in the case, but that, if obtained by FICO, even by accident, would be devastating to VantageScore. *Fair Isaac Corporation V. Trans Union LLC*, 1:20cv3834, ECF No. 1-6. The TransUnion action was resolved without a ruling on FICO's motion to compel the subpoenaed information, and now, a handful of years later, FICO is at it again.

## **LEGAL STANDARD**

Under the Federal Rules, a party "serving a subpoena must take reasonable steps to avoid imposing undue burden or expense" on the recipient, and if it fails to do so a court "must quash or modify a subpoena" imposing any such "undue burden." Federal Rule of Civil Procedure 45(d)(1); (d)(3)(A)(iv). To accomplish this goal, courts are empowered "[t]o protect a person subject to or affected by a subpoena, . . . [by], on motion, quash[ing] or modify[ing] the subpoena if it requires…disclosing a trade secret or other confidential research, development, or

3

1    commercial information." Fed. R. Civ. P. Rule 45(d)(3)(B)(i).

2          As a non-party, VantageScore is entitled to even greater protection than that afforded the

3    parties. *See Duong v. Groundhog Enterprises, Inc.*, No. 219CV01333DMGMAA, 2020 WL

4    2041939, at *7 (C.D. Cal. Feb. 28, 2020) (imposing sanctions on party for "failing to

5    take reasonable steps to avoid imposing a burden" in issuing non-party subpoena); *see also Legal*

6    *Voice v. Stormans Inc.*, 738 F.3d 1178, 1185 (9th Cir. 2013) (explaining that where a party does

7    not consider the burden on a nonparty and "narrowly tailor a subpoena" sanctions are appropriate

8    on the grounds that the subpoena was issued "in bad faith, for an improper purpose, or in a

9    manner inconsistent with existing law"); *see also Ameritox, Ltd. v. Millennium Labs., Inc.*, No.

10   12-cv-7493, 2012 U.S. Dist. LEXIS 177809, at *7 (N.D. Ill. Dec. 14, 2012). Indeed, courts

11   routinely recognize that a party's ability to subpoena a non-party is not unlimited. *Id.*; *Little v. JB*

12   *Pritzker for Governor*, No. 18 C 6954, 2020 U.S. Dist. LEXIS 70668, at *4 (N.D. Ill. Apr. 22,

13   2020) (in denying motion to compel, recognizing that the issuer must take reasonable steps to

14   protect non-parties from undue burden or expense). It has been consistently held that "'[c]oncern

15   for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating

16   the balance of competing needs' in a Rule 45 inquiry." *Amini Innovation Corp. v. McFerran*

17   *Home Furnishings, Inc.*, 300 F.R.D. 406, 409 (C.D. Cal. 2014) (quoting *Cusumano v. Microsoft*

18   *Corp.*, 162 F.3d 708, 717 (1st Cir. 1998)) (collecting cases); *see also U.S. ex rel. Tyson v.*

19   *Amerigroup Ill., Inc.*, No. 02 C 6074, 2005 U.S. Dist. LEXIS 24929, at **14-15, 20 (N.D. Ill.

20   Oct. 21, 2005) ("[I]t has been consistently held that 'non-party status' is a significant factor to be

21   considered in determining whether the burden imposed by a subpoena is undue.").[2]

22          Courts are also careful to protect the confidential and competitive business information of

23   non-parties because "courts have acknowledged that disclosure of confidential information to a

24   competitor is presumed to be harmful to the disclosing entity." *Cytodyne Techs., Inc. v. Biogenic*

25   *Techs., Inc.*, 216 F.R.D. 533, 535 (M.D. Fla. 2003) (denying motion to compel and granting

26

27   _____

     [2] "In addition to the need of the requesting party for the information and the burden on the non-party in complying
     with the subpoena, other factors a court should consider include the relevance of the requested information and the
28   breadth or specificity of the discovery request." *Amini Innovation Corp.*, 300 F.R.D. at 409–10.

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

1  motion to quash).  Moreover, courts routinely recognize the harm which might befall non-parties

2  when required to disclose highly competitive sensitive trade secrets, and the insufficiency of

3  protective orders to fully mitigate that risk. *See, e.g.*, *Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-

4  00939-WHA (JSC), 2017 U.S. Dist. LEXIS 132721 at *9-10 (N.D. Cal. Aug. 18, 2017) (noting in

5  granting motion to quash that "[w]hile the information could be produced subject to an attorneys-

6  eyes-only protective order, such orders do not guarantee that the information will not be

7  disclosed.").  In light of the foregoing, VantageScore's motion to quash should be granted.

8  <div align="center">**ARGUMENT**</div>

9  **I.  THIS COURT SHOULD QUASH THE REQUESTS SEEKING HIGHLY**
   **CONFIDENTIAL DOCUMENTS IN POSSESSION OF PARTIES TO THE**
10  **LITIGATION**

11

12  This Court should quash Request No. 1 and Request No. 2, which seek highly confidential

13  documents which are irrelevant to the issues to be tried. Request No. 1 seeks "All LLC agreements

14  or operating agreements of VantageScore Solutions, LLC that have been in effect during the

15  Relevant Time Period." Request No. 2 seeks "The license agreements under which [VantageScore]

16  ha[s] licensed credit scoring analytics, software, or intellectual property to Credit Bureaus during

17  the Relevant Time Period."

18  Preliminarily, each of these requests calls for materials FICO should first seek from parties

19  to the litigation prior to burdening VantageScore, a stranger to this litigation. *Free Stream Media*

20  *Corp. v. Alphonso Inc.*, No. 817MC00011CJCKESX, 2017 WL 11632962, at *2 (C.D. Cal. May 4,

21  2017) (citing *High Tech Med. Instr., Inc. v. New Image Ind., Inc.*, 161 F.R.D. 86, 88 (N.D. Cal.

22  1995)); *Williams v. Cty. of San Diego*, No. 17CV00815MMAJLB, 2019 WL 5963969, at *3 (S.D.

23  Cal. Nov. 13, 2019) (granting motion to quash subpoena on a determination that the same evidence

24  could be obtained from a party to the litigation); *Elec. Scripting Prod., Inc. v. HTC Am. Inc.*, No.

25  17-CV-05806-RS (RMI), 2021 WL 3773607, at *4 (N.D. Cal. Aug. 25, 2021) (granting motion to

26  quash finding "no good reason at all to subject non-party Valve to endure the cost and burden of

27  providing ESPI with discovery that could have been sought from Defendant HTC"). Moreover, the

28

<div align="center">5</div>

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

agreements requested are competitively sensitive. For example, the licensing agreements requested reflect competitively sensitive information regarding some of VantageScore's early research related to its intellectual property. Finally, the documents called for by Request Nos. 1-2 are not relevant to Plaintiff's allegations that FICO improperly colluded with the Credit Bureaus and do not have any direct bearing on whether VantageScore was a viable competitor to FICO. Accordingly, this Court should quash Request Nos. 1-2. *See Gopher Media, LLC v. Spain*, No. 319CV02280CABKSC, 2020 WL 6741675, at *2 (S.D. Cal. Nov. 17, 2020) (noting that "the discovery sought in the Subpoenas must, at a minimum, be relevant to the claims and defenses ***in the underlying case***," and quashing requests that "may illuminate the 'relationship' between the nonparty and the defendants," but had no bearing on the allegations against the defendants) (emphasis in original).

## II. THE COURT SHOULD QUASH THE REQUESTS SEEKING NON-PUBLIC DATA WHICH UNDERLIES VANTAGESCORE'S MARKET RESEARCH AND STUDIES

This Court should quash Request Nos. 3-8, which seek highly sensitive market research data—including all source data which underlies Market Study Reports published publicly by VantageScore—much of which exists only in hardcopy format or is not in VantageScore's possession.

Request Nos. 3-5 seek, "the number and type of VantageScore Credit Scores generated or *distributed by Credit Reporting Agencies,*" and "the number and identity of *End Users and Resellers* that use or distribute VantageScore," and "[a]ll documents respectively that analyze, reflect, calculate, or estimate the number or share, on a percentage basis or otherwise, of VantageScore Credit Scores *used by End Users of any kind* (including businesses and consumers) in the United States," respectively (emphasis added). Request Nos. 3-4 further require that the information provided be "broken out by category referenced in the VantageScore Market Study Reports (i.e. credit card issuers, personal and installment loan companies, auto lenders, mortgage lenders, credit unions, banks, tenant screening, telecommunications screening, utility screening,

consumer websites, government entities, other), and the type of use case (e.g., prescreen activities, pre-qualification activities, credit origination, account review, consumer disclosures, marketing, or other) during each year of the [11-year] Relevant Time Period."

Preliminarily, each of Requests 3-5 misconstrues VantageScore's role vis-à-vis the Credit Bureaus in the process of generating and distributing credit scores. Specifically, VantageScore does not distribute credit scores, but rather licenses its credit scoring models and algorithms necessary to generate credit scores to the Credit Bureaus, which in turn use those models in conjunction with their own data sets in order to generate credit scores for End Users and Resellers. Accordingly, VantageScore does not regularly generate any specific information called for by Requests 3-5 and the extent of any information reasonably available to it concerning these topics is already available to FICO in sufficient detail within VantageScore's publicly available Market Study Reports.

Similarly, Request Nos. 5-8 target the full gamut of material which might exist which relates to any market studies it has conducted, including the publicly published VantageScore Market Study Reports and Market Adoption Study. Request No. 5 requires production of "all Documents that analyze, reflect, calculate, or estimate the number or share, on a percentage basis or otherwise, of VantageScore Credit Scores used by End Users of any kind (including businesses and consumers) in the United States." Request No. 6 requires production of "all Documents and Communications related to any market studies of VantageScore Credit Scores or FICO Scores, including but not limited to studies relating to brand awareness, consumer understanding or sentiment, or use and adoption by End Users," including but not limited to the VantageScore Market Study Reports and Market Adoption Study. Finally, Request Nos. 7-8 request all of the information which "provides the basis of the statistics referenced in" the VantageScore Market Study Reports and Market Adoption Study, and "all long-form summaries that were prepared in connection with" the same.

Each of the Requests 6-8 should also be quashed. Request No. 6 seeks to compel VantageScore, its only major competitor, to turn over wholesale "all" documents and communications which relate in any way to "any market studies of VantageScore Credit Scores *or*

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

1    FICO Scores." Request Nos. 7-8 more specifically target all of the data underlying the

2    VantageScore Market Study Reports, the majority of which it has intentionally never possessed.

3           As an initial matter, VantageScore cannot comply with Request No. 7, which demands "[a]ll

4    data and information [VantageScore] received from TransUnion, Equifax and Experian, or

5    otherwise provided to Oliver Wyman or Charles River, which provides the basis of the statistics

6    referenced in the VantageScore Market Study Reports (including, specifically, the 2017, 2018,

7    2019, and 2022 VantageScore Market Study Reports and the 2023 Market Adoption Study)."

8           First, in addition to being overly broad and unduly burdensome in seeking "all"

9    documents,[3] Request No. 7 primarily seeks the Credit Bureau's highly confidential and proprietary

10   information concerning their respective sales and the identity of their respective customers of

11   competing credit scores. As explained to FICO's counsel, for antitrust, proprietary, and competitive

12   reasons, the Credit Bureau data underlying those Studies **is not and has never been in**

13   **VantageScore's possession, custody, or control**. Rather, the Credit Bureaus provide the

14   information solely to external third-parties—including at various times the law firm of Berens &

15   Miller, Oliver Wyman, and Charles River Associates—under strict confidentiality terms under

16   which none of the parties is permitted to share the underlying data with VantageScore or amongst

17   the Credit Bureaus. VantageScore therefore by prior agreement does not have access to, or control

18   over, the requested data and, of course, cannot produce information over which it does not have

19   control. Moreover, even assuming that VantageScore could somehow unilaterally require Berens

20   & Miller, Oliver Wyman, or Charles River Associates to disclose the data underlying the Market

21   Study Reports, even then it would be highly improper for FICO's competitor to receive data that

22   VantageScore itself is not, and has never been, permitted to see. *Nat'l Claims Mgmt. Corp. v.*

23   *Mercedes-Benz*, No. 97 C 6293, 1998 U.S. Dist. LEXIS 492, at *3-4 (N.D. Ill. Jan. 15, 1998)

24

25   [3] *See Gopher Media*, 2020 WL 6741675, at *3 (S.D. Cal. Nov. 17, 2020) ("As a rule, requests for 'any and all'
     documents or communications (or testimony about those materials) are facially overbroad."); *see also Painters Joint*
26   *Comm. V. Emp. Painters Trust Health & Welfare Fund*, No. 2:10-cv-01385-JCM-PAL, 2011 WL 4549232, at *2 (D.
     Nev. Sept. 29, 2011) (finding subpoena for "any and all documents" overbroad)*; Little*, 2020 U.S. Dist. LEXIS
27   70668, at *16 (denying motion to compel and granting motion to quash where requests sought "*all* communications,
     leases, and service agreements…. It is fundamental that discovery requests that 'encompass an unlimited range of
28   information' as plaintiffs' subpoena does in this case are overly broad").

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

(granting motion to quash subpoena issued to non-party competitor which requested confidential information on how the non-party competitor created its product and its profitability and business practices because providing the information to the competing party "could ultimately result in [non-party's] destruction" and "[f]orcing [non-party] to divulge confidential business information to its competitor could cause it to suffer undue harm through adverse economic consequences").

Moreover, even to the extent VantageScore does possess the documents demanded by Request Nos. 6-8, FICO should not be permitted to help itself to the full panoply of market conditions information generated and paid for by its only major competitor to buttress its defense. *Act, Inc. v. Sylan Learning Ctr.*, Misc. No. 99-63, 1999 U.S. Dist. LEXIS 7055, at *8 (E.D. Pa. May 14, 1999) (denying motion to compel non-party competitor to produce market assessment information that "would cause it serious commercial harm and allow its direct competitors to free ride on its own investment in assessing the…market"); *Fort James Corp. v. Sweetheart Cup Co.*, Civil Action # 97-C-1221 M8-85, 1998 U.S. Dist. LEXIS 15908 at *5 (S.D.N.Y. Oct. 7, 1998) (denying motion to compel where plaintiff sought to "romp through the files of basically unrelated, competitive entities without making the necessary showing of relevance" and "view[ed] Fed. R. Civ. P. 45 subpoenas as substitutes for the presentation of evidence by expert witnesses"). Moreover, these Requests are overbroad and unduly burdensome, as they seek documents and data from January 1, 2013 to the present—more than 11 years. *See Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637–38 (C.D. Cal. 2005) (quashing subpoena requests where, *inter alia*, party sought "information over a ten year or greater period" from nonparty); *see also Viskase v. World Pac*, No. 09 C 5022, 2010 U.S. Dist. LEXIS 93991 at *3 (N.D. Ill. Sep. 9, 2010) (quashing subpoena where plaintiff failed to demonstrate good cause to overcome the substantial burden placed on nonparty competitor). The burden involved in complying with such a request is further compounded by the fact that the majority of its documents relating to these issues are archived exclusively in hardcopy with an offsite vendor. It would therefore be exorbitantly expensive to recall, scan, review, and produce the materials demanded by these Requests.

Finally, the data underlying VantageScore's market studies is highly confidential,

1    competitive business information that VantageScore would not publicly disclose. The same is true

2    of the non-public "long-form summaries" of the Market Study Reports called for by Request No.

3    8. VantageScore should not be compelled to produce market study data to its competitor. *See*

4    *Cytodyne Techs.*, 216 F.R.D. at 535 (denying motion to compel and granting motion to quash

5    because "courts have acknowledged that disclosure of confidential information to a competitor is

6    presumed to be harmful to the disclosing entity").

7    **III.    THIS COURT SHOULD QUASH THE REQUESTS SEEKING INFORMATION CONCERNING VANTAGESCORE'S PRODUCT DEVELOPMENT**

8

9        This Court should quash Request Nos. 9-11, which primarily seek highly confidential

10   information concerning the planning, development, and testing of VantageScore's scoring models,

11   including specifically its assessments of its product in comparison to FICO's. Request Nos. 9-11

12   call for "All Documents and Communications" concerning a wide variety of information

13   concerning VantageScore's evaluation of its own product relative to FICO's. Request No. 9 seeks

14   all information "related to competitive assessments or comparisons between FICO Scores and

15   VantageScore Credit Scores," without limitation. Request Nos. 10-11 seek all information "related

16   to any study, evaluation, assessment, or attempt (whether consummated or not)" to "align the odds-

17   to-score relationship between any VantageScore Credit Score and FICO Score" and to "align the

18   reason codes between any VantageScore Credit Score and FICO Score."

19       Not only are each of these Requests facially overbroad in calling for "all documents and

20   communications," this Court should also quash these requests as improper attempts on the part of

21   FICO to obtain extremely sensitive information concerning VantageScore's product development

22   and internal assessments of, and comparisons to, FICO. VantageScore's proprietary information

23   concerning its own internal product development is not necessary to FICO's defenses or proving

24   that it did not partake in anticompetitive behavior, and which its disclosure to FICO would likely

25   result in catastrophic harm to VantageScore's competitive position relative to FICO. Accordingly,

26   Requests 9-11 should be quashed.

27

28

GOODWIN PROCTER LLP
ATTORNEYS AT LAW

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

## IV. THIS COURT SHOULD QUASH THE REQUESTS SEEKING COMPETITIVELY SENSITIVE COMMUNICATIONS

This Court should quash Request Nos. 12-13, which seek VantageScore's confidential, competitively sensitive information. Request No. 12 seeks "[a]ll Documents and Communications related to the terms, conditions, or provisions in FICO's license agreements with the Credit Bureaus, including but not limited to the 'No Equivalent Products,' 'Dynamic Royalty Schedule,' 'Pre-Qualification,' and 'Level Playing Field' provisions referenced in the DPP and IPP Amended Complaints. *See* DPP Amended Complaint ¶¶ 111-139; IPP Amended Complaint ¶¶ 124-155." Request No. 13 seeks "[a]ll Documents and Communications—including but not limited to all Documents and Communications that were sent, authored, or received by Barrett Burns, Silvio Tavarez, Dr. Rikard Bandebo, Susan Fahy, Anthony Hutchinson, Dr. Andrada Pacheco, Jeff Richardson, Benjamin Tagoe, Emre Sahingur, or anyone who has held predecessor or successor roles to the foregoing individuals—related to [18 separate] statements, press releases, and publications attributed to [VantageScore]" from January 1, 2013 to the Present.

Each of these Requests seek competitively sensitive information which is not necessary to the adjudication of the issues in the case, as well as overly broad and unduly burdensome insofar as they seek "all documents and communications," and therefore should be quashed. Request No. 12 seeks information concerning the terms, conditions, or provisions "in FICO's license agreements with the Credit Bureaus." To the extent that such information exists, any of VantageScore's internal communications regarding the terms of its competitor's agreements with the Credit Bureau customers they compete for is both highly sensitive and irrelevant to the antitrust issues at hand.

Moreover, Request No. 13 seeks "all" documents and communications concerning 18 separate publicly-available statements made by VantageScore-affiliated individuals. FICO cannot meet its burden to show that the relevance of ancillary communications surrounding publicly-available statements outweighs the time, resources, and expense involved in locating, collecting, reviewing, and producing those materials, which date back more than 11 years. Accordingly Request Nos. 12 and 13 should be quashed.

11

**V.     THIS COURT SHOULD QUASH THE REQUESTS SEEKING VANTAGESCORE'S CONFIDENTIAL FINANCIAL INFORMATION**

This Court should quash Request Nos. 14-16, which each seek VantageScore's highly confidential financial information. Request Nos. 14-16 seek, for a more than 11-year period, all of VantageScore's "audited financial statements," VantageScore's "annual budgets for each year," and documents reflecting VantageScore's "operating costs, capital expenses, R&D expenses, and investments in or by" VantageScore.

Each of these Requests are facially overbroad and unduly burdensome, as they seek documents and data from January 1, 2013 to the present—more than 11 years. *See Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637–38 (C.D. Cal. 2005) (quashing subpoena requests where, *inter alia*, party sought "information over a ten year or greater period" from nonparty); *Duong v. Groundhog Enterprises, Inc.*, No. 219CV01333DMGMAA, 2020 WL 2041939, at *7 (C.D. Cal. Feb. 28, 2020) (imposing sanctions on party for "failing to take reasonable steps to avoid imposing a burden" in issuing non-party subpoena); *see also Legal Voice*, 738 F.3d at 1185 (explaining that where a party does not consider the burden on a nonparty and "narrowly tailor a subpoena" sanctions are appropriate on the grounds that the subpoena was issued "in bad faith, for an improper purpose, or in a manner inconsistent with existing law"). Moreover, any relevance that VantageScore's detailed, sensitive financial information might have in adjudicating the antitrust claims presented here is tertiary at best, and certainly does not outweigh the potential impact disclosure of such information to a primary competitor would have on VantageScore.

**VI.     THIS COURT SHOULD QUASH THE REQUESTS SEEKING VANTAGESCORE'S NON-PUBLIC GOVERNMENTAL COMMUNICATIONS**

This Court should quash Request Nos. 17-18, which seek VantageScore's non-public governmental communications. Request Nos. 17-18 seek "all documents" which VantageScore has "provided any state or federal agency or trade association that relate to the use, adoption, acceptance, or competitive standing of VantageScore Credit Scores," and "provided in response to any governmental request or demand related to competition or business practices regarding Credit

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

1    Scores or Credit Reports," respectively.

2          Not only do each of these requests seek information which has no bearing on the matters to

3    be adjudicated in this antitrust litigation, FICO's effort to obtain this information is particularly

4    troublesome, overreaching, and anticompetitive, and may be fairly viewed as another tactic by

5    FICO to squash legitimate competition. In the government market, FICO is more than just

6    dominant. FICO has an undisputed, longstanding, government-sanctioned monopoly because its

7    models are the only ones that the Federal Housing Finance Agency, has *ever* permitted for use.

8    VantageScore has sought to bring competition to this arena. The Court should not order

9    VantageScore to produce such competitively sensitive, privileged information to FICO, a

10   competitor that has consistently opposed the acceptance by the FHFA of any scoring models but

11   its own. Indeed, given the nature of FHFA's requests for information, VantageScore would, at the

12   very least, need FHFA's permission to share any such information.

13         For all of the above reasons, the Court should deny FICO access to VantageScore's

14   confidential government communications. *See, e.g.*, *Int'l Action Ctr. v. U.S.*, 207 F.R.D. 1, 3

15   (D.D.C. 2002) (granting motion for protective order prohibiting discovery of information "courts

16   have long recognized…is protected by the First Amendment…[including] past political activities").

17                                    **<u>CONCLUSION</u>**

18         For the foregoing reasons, this Court should quash the FICO Subpoena in full.

19

20

21

22

23

24

25

26

27

28

Goodwin Procter LLP
Attorneys at Law

                                              13

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

1 | Dated: February 14, 2024

2 | By: */s/ Laura A. Stoll*
LStoll@goodwinlaw.com
3 | **GOODWIN PROCTER LLP**
601 S Figueroa St 41st Floor
4 | Los Angeles, CA 90017
Tel.: +1 213 426 2500
5 |

6 | *Counsel for Non-Party Petitioner*
*VantageScore Solutions LLC*
7 |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

# CERTIFICATE OF SERVICE

  I, Laura A. Stoll, an attorney, hereby certify that the foregoing document was served by electronic mail to the parties listed below on February 14, 2024.

Michael Allen Olsen
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
Email: courtnotification@mayerbrown.com

Britt Marie Miller
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
Email: bmiller@mayerbrown.com

J. Gregory Deis
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 701-8035
Email: gdeis@mayerbrown.com

Matthew David Provance
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 701-8598
Email: mprovance@mayerbrown.com

*/s/ Laura A. Stoll*
Laura A. Stoll

NON-PARTY VANTAGESCORE SOLUTIONS, LLC'S
NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA

# EXHIBIT 18

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *In re FICO Antitrust Litigation* | Case No. 20-cv-02114 |
| *This document relates to:* | Honorable Edmond E. Chang |
| *VantageScore Solutions, LLC v. Fair Isaac Corporation*, Case No. 1:24-cv-01634 | Magistrate Judge M. David Weisman |

**FAIR ISAAC CORPORATION'S COMBINED OPPOSITION TO VANTAGESCORE SOLUTIONS, LLC'S MOTION TO QUASH SUBPOENA AND MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION TO COMPEL**

Dated: March 13, 2024

Matthew D. Provance
Joshua W. Eastby
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
(312) 701-7711—Facsimile
mprovance@mayerbrown.com
jeastby@mayerbrown.com

*Counsel for Defendant*
*Fair Isaac Corporation*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND BACKGROUND ................................................................. 1

ARGUMENT .......................................................................................................... 3

    I.     FICO's Subpoena Requests are Relevant and Proportional. ................................. 4

         A.     Requests 1 and 2 ......................................................................... 4

         B.     Requests 3 through 8 ................................................................... 6

         C.     Requests 10 and 11 ..................................................................... 9

         D.     Requests 12 and 13 ................................................................... 11

         E.     Requests 14 through 16............................................................. 13

         F.     Requests 17 and 18. .................................................................. 14

    II.    The Court Should Grant FICO's Cross-Motion to Compel................................ 15

CONCLUSION...................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Act, Inc. v. Sylvan Learning Sys., Inc.*,
1999 WL 305300 (E.D. Pa. May 14, 1999) ...........................................................9

*Allstate Ins. Co. v. Electrolux Home Prods., Inc.*,
2017 WL 5478297 (N.D. Ill. Nov. 15, 2017) .........................................................3

*U.S. v. Amerigroup Ill., Inc.*, 2005 WL 3111972 (N.D. Ill. Oct. 21, 2005) ....................................8

*Ameritox, Ltd. v. Millennium Labs., Inc.*, 2012 WL 6568226 (N.D. Ill. Dec. 14,
2012) .....................................................................................................................5

*In re Broiler Chicken Antitrust Litig.*,
2017 WL 4417447 (N.D. Ill. Sept. 28, 2017) ..................................................6, 14

*Cent. States, Se. & Sw. Areas Pension Fund v. GWT 2005, Inc.*,
2009 WL 3255246 (N.D. Ill. Oct. 6, 2009) ...........................................................2

*CSC Holdings, Inc. v. Redisi*,
309 F.3d 988 (7th Cir. 2002) .................................................................................3

*Cytodyne Techs., Inc. v. Biogenic Techs., Inc.*,
216 F.R.D. 533 (M.D. Fla. 2003) ...........................................................................9

*In re Dealer Mgmt. Sys. Antitrust Litg.*,
2019 WL 11583441 (N.D. Ill. May 14, 2019) .......................................................6

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
2018 WL 6413199 (N.D. Ill. Dec. 6, 2018) ....................................................6, 13

*Flagstar Bank, FSB v. Freestar Bank, N.A.*,
2009 WL 2706965 (N.D. Ill. Aug. 25, 2009) ........................................................2

*Fort James Corp. v. Sweetheart Cup Co.*,
1998 WL 709813 (S.D.N.Y. Oct. 8, 1998) ............................................................9

*Forth v. Walgreen Co.*,
2019 WL 10255628 (N.D. Ill. July 10, 2019) ........................................................4

*Golden Quality Ice Cream Co., Inc.*, 87 F.R.D. 53 (E.D. Pa. 1980) ............................................14

*Gopher Media, LLC v. Spain*,
2020 WL 6741675 (S.D. Cal. Nov. 17, 2020) .....................................................10

*Gulf Oil Co. v. Bernard*,
    452 U.S. 89 (1981) .................................................................................................9

*Little v. JB Pritzker for Governor*,
    2020 WL 1939358 (N.D. Ill. Apr. 22, 2020) ................................................10, 11

*Moon v. SCP Pool Corp.*,
    232 F.R.D. 633 (C.D. Cal. 2005) .............................................................................8

*Nat'l Claims Mgmt. Corp. v. Mercedes-Benz*,
    1998 WL 27136 (N.D. Ill. Jan. 15, 1998) ................................................................9

*Pac. Century Int'l, Ltd. v. Does 1-27*,
    282 F.R.D. 189 (N.D. Ill. 2012) ..............................................................................3

*Painters Joint Comm. v. Emp. Painters Tr. Health & Welfare Fund*,
    2011 WL 4549232 (D. Nev. Sept. 29, 2011) .........................................................10

*Papst Licensing GmbH v. Apple, Inc.*,
    2017 WL 1233047 (N.D. Ill. Apr. 4, 2017) .........................................4, 5, 8, 11, 12

*Parvati Corp. v. Oak Forest*,
    2010 WL 3365911 (N.D. Ill. Aug. 23, 2010) ........................................................11

*In re Plastics Additives Antitrust Litig.*,
    2004 WL 2743591 (E.D. Pa. Nov. 29, 2004) ........................................................14

*PsyBio Therapeutics, Inc. v. Corbin*,
    2021 WL 4459527 (N.D. Ill. Sept. 29, 2021) ..........................................................3

*Reed v. Ill.*,
    318 F.R.D. 77 (N.D. Ill. 2016) ..........................................................................3, 11

*Rumble, Inc. v. Google LLC*,
    2023 WL 3751797 (N.D. Cal. May 31, 2023) ......................................................14

*In re Sulfuric Acid Antitrust Litig.*,
    231 F.R.D. 351 (N.D. Ill. 2005) ..............................................................................5

*Tresóna Multimedia, LLC v. Legg*,
    2015 WL 4911093 (N.D. Ill. Aug. 17, 2015) ..........................................................3

*In re Wirebound Boxes Antitrust Litig.*,
    126 F.R.D. 554 (D. Minn. 1989) ...........................................................................14

**Other Authorities**

Fed. R. Civ. P. 45 .............................................................................................................2, 3

*FICO Announces DOJ Antitrust Investigation Closed*, PR NEWSWIRE (Dec. 8, 2020), https://www.prnewswire.com/news-releases/fico-announces-doj-antitrust-investigation-closed-301188930.html ....................................................................14

Fair Isaac Corporation ("FICO") respectfully submits this combined response in opposition to VantageScore Solutions, LLC's ("VantageScore") Motion to Quash Subpoena (Dkt. 268) ("Mot. Quash") and memorandum of law in support of its Cross-Motion to Compel ("Mot. Compel").

## INTRODUCTION AND BACKGROUND

Claims at the heart of this consolidated antitrust litigation allege that certain terms in FICO's license agreements with the Credit Bureaus operate to exclude FICO's primary competitor, VantageScore, from the market. Yet, in the years since FICO began to enter into those agreements, VantageScore has reported unprecedented competitive successes—for example, that use and adoption of its credit scores increased by *360%* between 2013 and 2019.[1] VantageScore's own CEO attributed this growth to "*an increasingly competitive marketplace for credit scores*[.]"[2] Evidence pertaining to these and similar statements—as well as VantageScore's competitive standing during the period 2013 to the present—will provide a powerful rebuttal to Plaintiffs' theory that competition among credit score providers has been substantially foreclosed. In reality, as VantageScore itself has repeatedly claimed, competition has flourished.

To defend itself against Plaintiffs' claims, FICO is entitled to discovery, and some of that discovery is only available from VantageScore. Accordingly, FICO served a Rule 45 subpoena on VantageScore for 18 categories of documents. Stoll Decl., Ex. 1 (Dkt. 268-2) ("Subpoena"). FICO then attempted in good faith to meet and confer with VantageScore, making several offers to narrow its requests in an effort to address VantageScore's stated objections. Provance Decl. ¶¶ 8-

---

[1]    2019 VantageScore Market Study Report, at 2 (Provance Decl. Ex. 4); VantageScore Press Release, October 15, 2018 (Provance Decl. Ex. 3 at 3-4).

[2]    VantageScore Press Release, October 31, 2019 (Provance Decl. Ex. 3 at 6-7).

18. As explained below, each category of documents FICO seeks is directly relevant to disputed issues in the underlying litigation and otherwise unavailable through party discovery.

VantageScore's refusal to comply with any aspect of the Subpoena is unsupportable, and is all the more concerning in light of VantageScore's conduct during the meet-and-confer process. VantageScore asked for and received several extensions of its deadline to comply with the Subpoena, which FICO granted on the belief that the parties were engaged in good-faith negotiations over the Subpoena's scope. Provance Decl. ¶¶ 7, 19. But after two seemingly productive discussions, VantageScore abruptly sought to quash the Subpoena—several days *after* its deadline to do so. *Id.* ¶¶ 19-20.[3]

The Subpoena's scope—as originally drafted—is reasonable, and VantageScore fails to carry its burden of showing otherwise. But even if the Subpoena were not reasonable on its face, VantageScore admits that FICO offered "compromise positions," Mot. Quash at 1, but wholly fails to describe those positions or explain why they would be insufficient to address VantageScore's professed concerns with the Subpoena's scope. In reality, FICO offered (and continues to be amenable to) several compromises that directly address VantageScore's positions regarding the scope of FICO's requests, and these compromises further demonstrate the insufficiency of VantageScore's Motion to Quash. *See* Provance Decl. ¶¶ 11-12, 13, 15, 16, 17.

VantageScore's arguments regarding the burden or competitive sensitivity of the Subpoena should be given little weight in any event, as VantageScore does not: (1) support them with any evidence or provide any particularized information about the time, cost, or expense that complying

---

[3]    A party seeking to quash a subpoena must seek such relief "[o]n timely motion." Fed. R. Civ. P. 45(d)(3). This Court recognizes that a "timely" motion to quash must be made "at or before the time of compliance." *Flagstar Bank, FSB v. Freestar Bank, N.A.*, 2009 WL 2706965, at *3 (N.D. Ill. Aug. 25, 2009); *see also Cent. States, Se. & Sw. Areas Pension Fund v. GWT 2005, Inc.*, 2009 WL 3255246, at *1 (N.D. Ill. Oct. 6, 2009) (same). The untimely nature of VantageScore's motion is an independent basis for its denial.

with the Subpoena would actually entail, (2) take into account the offers to narrow the Subpoena that FICO made in an effort to address VantageScore's objections, or (3) acknowledge the existence of a robust, two-tiered Agreed Confidentiality Order (Dkt. 199) that is designed to protect VantageScore from competitive harm—much less show why those protections are insufficient.[4] Neither VantageScore's animus towards FICO nor its mere desire to have nothing to do with this litigation is grounds to quash the Subpoena. FICO's Subpoena requests—particularly as refined during the meet-and-confer process that VantageScore prematurely abandoned—are relevant and proportional to the needs of the case. The Court should deny VantageScore's Motion to Quash and grant FICO's Cross-Motion to Compel.

## ARGUMENT

"The scope of material obtainable pursuant to a Rule 45 subpoena is as broad as what is otherwise permitted under Rule 26(b)(1)." *Allstate Ins. Co. v. Electrolux Home Prods., Inc.*, 2017 WL 5478297, at *2 (N.D. Ill. Nov. 15, 2017) (cleaned up). To demonstrate grounds for quashing or modifying FICO's Subpoena, VantageScore must show that the Subpoena subjects it to "undue burden" or requires "disclosing a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(d)(3)(A)(iv), (B)(i); *see Tresóna Multimedia, LLC v. Legg*, 2015 WL 4911093, at *2 (N.D. Ill. Aug. 17, 2015) ("The party seeking to quash a subpoena bears the burden of establishing Rule 45(d)(3)[(A)](iv)'s requirements") (citing *Pac. Century Int'l, Ltd. v. Does 1-27*, 282 F.R.D. 189, 193 (N.D. Ill. 2012)). A "particularized showing" is required: rank speculation and conclusory assertions are not enough. *Reed v. Ill.*, 318 F.R.D. 77, 79 (N.D.

---

[4] Worse still, VantageScore asserts that FICO's Subpoena "seek[s] competitive advantage rather than relevant discovery," Mot. Quash at 1, which amounts to a baseless accusation that FICO and its counsel intend to willfully violate the Confidentiality Order. That is belied by both the relevance of FICO's Subpoena requests to the underlying litigation and the fact that Plaintiffs—who do not compete with and have no ulterior motive to gain a competitive advantage over VantageScore—*also* subpoenaed VantageScore for many similar categories of documents. *See* Dkt. 264 ¶ 14.

Ill. 2016) (citing *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 993 (7th Cir. 2002)).[5] Similarly, for FICO's Cross-Motion to Compel, once relevance is shown, VantageScore, "as the objecting party, 'bears the burden of showing why [FICO's] request[s are] improper.'" *Forth v. Walgreen Co.*, 2019 WL 10255628, at *4 (N.D. Ill. July 10, 2019) (citations omitted).

VantageScore does not—and cannot—come close to meeting its burden to demonstrate that any Subpoena request is improper, particularly when the Court considers that FICO offered to modify the Subpoena in some respects to address VantageScore's purported concerns.

## I.     FICO's Subpoena Requests are Relevant and Proportional.

### A.     Requests 1 and 2

FICO requests that VantageScore produce its LLC agreement, Mot. Compel ¶ 1, which according to its own counsel reflects all terms of VantageScore's agreements with the Credit Bureaus and has already been made publicly available. *See* Provance Decl. ¶ 8.

**Relevance.** As noted above, Plaintiffs allege that certain terms of FICO's license agreements with the Credit Bureaus have impaired VantageScore's ability to compete.[6] Basic information about how VantageScore operates is relevant to establishing an accurate picture of the competitive landscape. The terms of VantageScore's agreements with the Credit Bureaus will also

---

[5]     Merely claiming that the Subpoena imposes *some* unspecified level of burden is insufficient. *See, e.g.*, *PsyBio Therapeutics, Inc. v. Corbin*, 2021 WL 4459527, at *3 (N.D. Ill. Sept. 29, 2021) ("non-parties are not 'exempt from the basic obligation of all citizens to provide evidence of which they are capable upon appropriate request.'") (citations and alterations omitted); *Papst Licensing GmbH v. Apple, Inc.*, 2017 WL 1233047, at *4 (N.D. Ill. Apr. 4, 2017) ("The law does not seek to absolve nonparties from any burden, nor could it. Effort of some sort is an inherent part of life.").

[6]     *See, e.g.*, Indirect Purchaser Pls.' Second Am. Class Action Compl. ¶ 12, Dkt. 185 ("Rather than compete on the merits with VantageScore, Fair Isaac undertook a lengthy campaign of anticompetitive conduct to discourage the adoption of VantageScore and preserve its own monopoly. As part of that campaign Fair Isaac also entered into contracts with each [Credit Bureau], which contained substantially similar anticompetitive provisions that were designed to, and did, substantially reduce or altogether eliminate the competitive threat posed by VantageScore.") ("IPP Compl."); *id.* at ¶¶ 13-17, 102-03, 109, 132, 138-39, 151, 171; *accord* Direct Purchaser Pls.' First Am. Consol. Class Action Compl. ¶¶ 8, 10, 12, 88, 122, 125, 133, 136, 156, 158, Dkt. 184 ("DPP Compl.").

show, for example, how the Credit Bureaus have agreed to promote VantageScore and whether the Credit Bureaus are obligated to favor it over FICO in any respects.

**Burden.** VantageScore's counsel represented that a single LLC agreement has been in place during the entire relevant time period and contains all of the relevant licensing terms between VantageScore and the Credit Bureaus. Provance Decl. ¶ 8. If that is correct, a single document will satisfy these Subpoena requests. VantageScore offers no specific articulation of the burden associated with producing one document, *see* Mot. Quash at 5-6, because there is none.[7] VantageScore's argument that "each of these requests calls for materials FICO should first seek from parties to the litigation," *id.* at 5, is also easily rejected. As FICO explained during the meet-and-confer process, Provance Decl. ¶ 9, the only other parties to the litigation who might have a copy of the VantageScore LLC agreement—the Credit Bureaus—are presently deemed "non-parties" for purposes of discovery. *See* Dkt. 227. FICO is not required to pursue discovery from non-parties in VantageScore's preferred order (with VantageScore last). Such a rule has no support in any case law and would be manifestly unfair for FICO, as the other non-parties would invariably take similar positions and non-party discovery would grind to halt.

**Confidentiality.** VantageScore provides no evidence or details to support its bald assertion that its LLC agreement is "competitively sensitive." Mot. Quash at 6. Moreover, VantageScore's counsel indicated during the parties' meet-and-confer discussions that she believed the LLC

---

[7]    "[B]ald assertions regarding the undue burden of the discovery requests" will not relieve a subpoena recipient from the obligation to comply. *Ameritox, Ltd. v. Millennium Labs., Inc.*, 2012 WL 6568226, at *2 (N.D. Ill. Dec. 14, 2012) (subpoena recipients "fail[ed] to demonstrate with particularity the unduly burdensome nature of the document requests other than vaguely asserting the possible length of time it would take to search paper and electronic documents"); *Papst Licensing GmbH*, 2017 WL 1233047, at *3-4 ("The party asserting undue burden must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request."); *.In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 360-61 (N.D. Ill. 2005) (showing undue burden requires "affirmative proof in the form of affidavits or record evidence," "the *ipse dixit* of counsel . . . is not sufficient").

agreement had been filed previously in other litigation and thus was in the "public domain." Provance Decl. ¶ 7. Even if the LLC agreement *is* somehow competitively sensitive, the existing Confidentiality Order allows a two-tier designation for any "Confidential" or "Highly Confidential – Outside Attorneys' Eyes Only" discovery material that warrants protection.[8]

## B.    Requests 3 through 8

FICO requests that VantageScore produce: (1) the data in its possession, custody, or control that underlies its Market Study Reports/Market Adoption Study ("Market Studies"), (2) documents sufficient to show the number and type of VantageScore credit scores distributed by the Credit Bureaus or Resellers, broken out by category of end user, distribution channel, and, if known, by use case, during each year of the relevant time period (2013-2023), and (3) documents sufficient to show VantageScore's market share calculations over the same period. Mot. Compel ¶ 2.

**Relevance.** Fundamental to each of Plaintiffs' antitrust claims are whether FICO possesses monopoly power in the relevant market and the extent to which VantageScore has been foreclosed from competition. VantageScore's Market Studies, published in 2017, 2018, 2019, 2022, and 2023, show consistent and tremendous year-over-year growth in the use of VantageScore among both consumers and business end-users—the very *opposite* of what Plaintiffs claim has occurred. *See supra*, at 1 nn.1-2 (360% growth between 2013 and 2019). These data will help FICO and its

---

[8]    It is well settled that two-tier confidentiality orders are sufficient to address objections by non-party witnesses that a subpoena seeks confidential information. *See, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2019 WL 11583441, at *4 (N.D. Ill. May 14, 2019) (noting that "there are plenty of federal cases that hold two-tiered protective orders . . . are sufficient to accommodate a non-party's confidentiality concerns" and collecting cases); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6413199, at *3 (N.D. Ill. Dec. 6, 2018) (overruling non-party's "[b]road and speculative allegations of harm, unsubstantiated by specific examples or articulated reasoning" and granting motion to compel because "the current Confidentiality Order is sufficient to protect" the alleged confidentiality interests); *In re Broiler Chicken Antitrust Litig.*, 2017 WL 4417447, at *5 (N.D. Ill. Sept. 28, 2017) (two-tier protective order resolves claim that "confidential information will be disclosed" because the producing party can "ensure appropriate protection for their documents . . . by designating them under the protective order.") (internal quotations omitted).

experts demonstrate that there has been no substantial foreclosure of competition, as will similar documents showing VantageScore's growth and market share during the relevant time period. In an alleged monopolization case, one could scarcely imagine more relevant information.

**Burden.** VantageScore has confirmed that it maintains "long-form summaries" of the underlying credit score use data referenced in the Market Studies. Provance Decl. ¶ 11. The Studies describe them as "a summary of deduped, anonymized data." *Id.* ¶ 11 & Ex. 4 (2019 Market Study Report). VantageScore does not articulate any burden associated with producing the long-form summaries. Instead, it argues that that *other, more granular* data about the Market Studies is maintained by third parties "for antitrust, proprietary, and competitive reasons" and therefore is "not . . . in VantageScore's possession, custody, or control." Mot. Quash at 8. FICO made it clear during the parties' meet-and-confer discussions that it is not seeking documents outside VantageScore's possession, custody, or control. Provance Decl. ¶ 11 & Ex. 1. If VantageScore's representation is accurate, it could comply with FICO's request for data underlying the Market Studies with minimal burden by producing one category of documents: its long-form summaries. Further, if it is true that the more detailed or granular data is maintained by other non-parties, production of VantageScore's long-form summaries will enable FICO to properly assess whether it is necessary to subpoena those other parties for additional data.

To limit the burden of FICO's requests for other data on VantageScore's adoption and market share during the relevant period, FICO is willing to accept documents "sufficient to show" the requested information. *See* Mot. Compel ¶ 2. VantageScore's contention that FICO has requested and insists on receiving "all" such documents is inaccurate[9] and stems from VantageScore's premature abandonment of the meet-and-confer process.

---

[9]    Even as originally drafted, four of the six requests included in this section of the Subpoena were *not* broad requests for "all" documents or communications "related to" a general topic. *See* Subpoena

These requests are also not "overbroad" because they cover a relevant time period of 2013 to 2023. Mot. Quash at 9. The alleged class periods in the underlying litigation are nearly *twice* as long,[10] and the first license agreement between FICO and the Credit Bureaus that Plaintiffs challenge as anticompetitive was executed in 2013.[11] It is proportional for FICO to seek information "sufficient to show" VantageScore's adoption rates during a subset of the alleged class period—2013 to 2023—that is most relevant to Plaintiffs' claims and FICO's defenses.[12]

Finally, VantageScore fails to substantiate its burden arguments—either as applied to the Subpoena requests as written or as FICO has narrowed them—with any evidence. VantageScore therefore fails to meet its burden to demonstrate that the Subpoena is unduly burdensome through "affirmative and compelling proof." *U.S. v. Amerigroup Ill., Inc.*, 2005 WL 3111972, at *2 (N.D. Ill. Oct. 21, 2005) ("*Ipse dixits* will not suffice") (collecting cases); s*ee also, e.g., Papst Licensing GmbH*, 2017 WL 1233047, at *3 ("The party asserting undue burden must present an affidavit or other evidentiary proof of the time or expense involved"); *id.* ("Undue burden or expense . . . must

---

Request 3 ("Documents sufficient to show …"), 4 ("Documents sufficient to show . . ."), 7 ("All data and information You received . . . which provides the basis of the statistics referenced in the VantageScore Market Study Reports"), and 8 ("All long-form summaries that were prepared in connection with the VantageScore Market Study Reports"). FICO's Subpoena only requests "all" of a particularized categories of documents. Thus, the cases that VantageScore cites addressing requests for "all" documents and communications on various subject matter, Mot. Quash at 8 n.3, are inapposite.

[10]   *See* DPP Compl. ¶ 175 (defining the "Class Period" as October 1, 2006 to the present); IPP Compl. ¶ 175 (same). The only case VantageScore cites for the proposition that a "ten year or greater" relevant time period is improper actually supports FICO's position. *See* Mot. Quash at 9 (citing *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637-38 (C.D. Cal. 2005)). The subpoena in *Moon* sought discovery unrelated to the claims at issue in the case and covered a "ten year or greater period" despite the fact that the underlying contract at issue covered only a three year period, *Moon*, 232 F.R.D. at 637, while FICO's Subpoena covers a narrower time period than the entire period at issue based on Plaintiffs' complaints.

[11]   *See* IPP Compl. ¶ 120; DPP Compl. ¶ 108.

[12]   The only case VantageScore cites for the proposition that a "ten year or greater" relevant time period is improper actually supports FICO's position. *See* Mot. Quash at 9 (citing *Moon*, 232 F.R.D. at 637-38). The subpoena in *Moon* sought discovery that was unrelated to the claims at issue in the case and covered a "ten year or greater period" despite the fact that the underlying contract at issue covered only a three year period. *Moon*, 232 F.R.D. at 637. In contrast, the time period covered by FICO's Subpoena is narrower than the relevant time period contained in Plaintiffs' complaints.

be shown by 'a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.'") (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981)).[13]

**Confidentiality.** VantageScore asserts in conclusory terms that the requested information "is highly confidential," "highly sensitive," "highly confidential and proprietary," and would be "highly improper" to produce, Mot. Quash at 6-8, but fails to articulate any competitive harm that would result from producing "a summary of deduped, anonymized data" related to the Market Studies or the other high-level information called for in these requests.[14] Moreover, even if the documents at issue are competitively sensitive in some respect, VantageScore does not attempt to explain why the robust protections afforded by the Confidentiality Order are insufficient.[15]

## C.    Requests 10 and 11[16]

FICO requests that VantageScore produce documents related to any efforts or evaluation by it during the relevant time period to adopt the odds-to-score relationship (the probability of

---

[13]    For example, VantageScore asserts that "the majority of its documents relating to these issues are archived exclusively in hardcopy with an offsite vendor[, and i]t would therefore be exorbitantly expensive to recall, scan, review, and produce the materials demanded by these Requests." Mot. Quash at 9. Yet VantageScore fails to offer any detail to support this claim, such as the volume of responsive documents responsive that supposedly exist only in hardcopy or the expense that would be incurred in producing them, let alone why it could not produce the "minority" of documents it concedes exist in digital form.

[14]    Provance Decl. ¶ 11 & Ex. 4 (2019 Market Study Rpt.).

[15]    It is telling that VantageScore can point only to cases that are unpublished, decades old, and/or from outside this district. Mot. Quash at 8-10 (citing *Nat'l Claims Mgmt. Corp. v. Mercedes-Benz*, 1998 WL 27136, at *1 (N.D. Ill. Jan. 15, 1998); *Act, Inc. v. Sylan Learning Sys., Inc.*, 1999 WL 305300, at *2 (E.D. Pa. May 14, 1999) (referred to as "*Act., Inc. v. Sylan Learning Ctr.*"); *Fort James Corp. v. Sweetheart Cup Co.*, 1998 WL 709813, at *3 (S.D.N.Y. Oct. 8, 1998); *Cytodyne Techs., Inc. v. Biogenic Techs., Inc.*, 216 F.R.D. 533, 535 (M.D. Fla. 2003)). *Nat'l Claims Mgmt. Corp.* involved a subpoena seeking discovery of a competitor's unique business practices where "such information [was] not necessary" to that party's defense. *Nat'l Claims Mgmt. Corp.*, 1998 WL 27136, at *1. And the few cases *Cytodyne* cites for the proposition VantageScore quotes merely assert that disclosure to a competitor could be more harmful than disclosure to a noncompetitor. Even if true as a broad statement, that principle does not change the fact that, as the much more recent precedent from this district makes clear, a confidentiality order like the one entered here adequately protects a non-party's confidential information even when the party seeking discovery is a competitor.

[16]    FICO offered to withdraw Subpoena request 9 during the parties' meet-and-confer discussions if VantageScore would produce documents in response to requests 10 and 11. Provance Decl. ¶ 13. VantageScore failed to mention this compromise in its motion.

default at a given credit score) or reason codes (explanations of the factors determining a given credit score) used by FICO Scores. Mot. Compel ¶ 3.

**Relevance.** Plaintiffs allege that the "No Equivalent Products" provision in FICO's license agreements with the Credit Bureaus is anticompetitive because it prevents the Credit Bureaus from distributing competing credit scores that intentionally copy the odds-to-score relationship of a FICO Score or greater than a certain number of FICO reason codes.[17] If VantageScore has never considered copying these FICO Score characteristics, or if it determined that copying them was not desirable for other reasons, then the No Equivalent Products provision cannot have had any adverse effect on competition. And if VantageScore did evaluate or attempt to copy FICO's odds-to-score relationship or reason codes, evidence of those efforts could support FICO's justification for the No Equivalent Products provision as a safeguard against the misappropriation of its intellectual property, not an anticompetitive effort to stifle a competitor.[18] VantageScore is simply incorrect that this discovery is irrelevant. *See* Mot. Quash at 10.

**Burden.** VantageScore's burden argument is conclusory; it simply objects to the use of the word "all" in these requests as "overbroad." *Id.* But using the word "all" in non-party discovery requests is not categorically improper.[19] Moreover, VantageScore does not provide any evidence

---

[17]   DPP Compl. ¶ 119; IPP Compl. ¶ 130.

[18]   Def. Fair Isaac Co.'s Answer & Affirmative Defs. IPPs' Am. Class Action Compl. at 142-46, Dkt. 183 (Second and Third Affirmative Defenses); Def. Fair Isaac Co.'s Answer & Affirmative Defs. DPPs' Consol. Class Action Compl. at 111-14 (same).

[19]   VantageScore's motion posits the purported "rule" that "'requests for 'any and all' documents or communications (or testimony about those materials) are facially overbroad.'" Mot. Quash at 8 n.3 (citing *Gopher Media, LLC v. Spain*, 2020 WL 6741675, at *3 (S.D. Cal. Nov. 17, 2020)). Yet, the only case *Gopher Media* cites for that supposed "rule," another unpublished case that VantageScore also cites, held only that a *specific* discovery request was overbroad in the context of that case "because it seeks any and all documents relating to seven entities over a five-year period of time." *Painters Joint Comm. v. Emp. Painters Tr. Health & Welfare Fund*, 2011 WL 4549232, at *1 (D. Nev. Sept. 29, 2011). VantageScore's citation to *Little* is likewise inapposite. Mot. Quash at 8 n.3 (citing *Little v. JB Pritzker for Gov.*, 2020 WL 1939358, at *6 (N.D. Ill. Apr. 22, 2020)). There, the plaintiffs asserted claims relating to the structural integrity of one of defendant's campaign offices and in that context, the Court quashed a subpoena that sought "all communications, leases, and service agreements" between the owner of the building and the

or details about the supposed burden it would incur by producing "all documents" responsive to these specific requests, let alone why it would be undue on VantageScore in the context of this case, and VantageScore declined to engage with FICO to narrow the document review burden associated with these requests through the use of search terms or custodians. VantageScore "has not made the particularized showing the law requires of anyone claiming undue burden." *Papst Licensing GmbH*, 2017 WL 1233047, at *4; *see also Reed*, 318 F.R.D. at 79.

**Confidentiality.** VantageScore claims that producing this discovery would "result in catastrophic harm to VantageScore's competitive position relative to FICO," Mot. Quash at 10, but it does not explain why this would happen, nor does it offer any evidence, in the form of a declaration or otherwise, that would substantiate this claim. Even if VantageScore had made the required "particularized showing," the Confidentiality Order allows for designating discovery material as "Highly Confidential – Outside Attorneys' Eyes Only" if it "is of a highly sensitive nature the disclosure of which could result in significant harm," including "competitive harm . . . to the business operations of" the producing party. Dkt. 199 at 2. VantageScore fails to explain why these protections are insufficient to protect its confidential information.

### D.   Requests 12 and 13

FICO requests that VantageScore produce documents related to its understanding of the challenged provisions of FICO's license agreements, Mot. Compel ¶¶ 4-5, and communications

---

defendant, "without addressing the communications' content or time frame." *Little*, 2020 WL 1939358, at *6. Thus, even these opinions do not hold that the phrase "all documents" in a discovery request makes the request improper. Indeed, while it is often the case that discovery requests that start out as calling for "all documents" become significantly narrower during the meet and confer process (which VantageScore unilaterally and prematurely terminated), courts still can—and do—grant motions to compel the production of "all documents" in appropriate cases. *See, e.g., Parvati Corp. v. Oak Forest*, 2010 WL 3365911, at *2 (N.D. Ill. Aug. 23, 2010) (granting motion to compel as to twelve separate "all documents" requests).

11

between a limited number of VantageScore executives about 10 specific public statements issued by VantageScore concerning its competitive standing, *id.* ¶ 5.

**Relevance.** VantageScore's understanding of the challenged terms of FICO's agreements will provide the perspective of FICO's primary competitor on whether they have the exclusionary effects that Plaintiffs claim. The press releases and public statements identified in Subpoena request 13 publicize VantageScore's competitive strides during the relevant time period; communications between VantageScore's executives about these statements will provide crucial context for the statements and their implication for VantageScore's business.

**Burden.** VantageScore's conclusory burden arguments once again fail to provide grounds sufficient to grant its Motion to Quash.[20] And VantageScore again ignores FICO's offers to reduce the number of public statements included in Subpoena request 13 and negotiate targeted ESI search terms, custodians, and date ranges that are likely to dramatically limit the volume of documents VantageScore would need to review. Provance Decl. ¶ 15. VantageScore could comply by searching the email of a handful of employees using targeted search terms during narrow time periods surrounding each statement. The requests are *not* unduly burdensome.

**Confidentiality.** VantageScore again offers nothing but conclusory and unsubstantiated statements that the requested discovery is "highly sensitive." Mot. Quash 11. This argument has already been amply refuted. *See supra*, at 6 & n.8; 9 & n.15.

---

[20]     VantageScore states, incorrectly, that it is FICO's "burden" to demonstrate that these requests are *not* unduly burdensome. Mot. Quash at 11. As the party seeking to avoid its discovery obligations, it is *VantageScore* that must show it will be unduly burdened, and VantageScore has failed to do so. "It will not do for [VantageScore] to attempt to shift the burden Rule 45 has long imposed on a person complaining about a subpoena. . . . It is rather obvious that the person claiming that the burden of production imposed on him is too great is in a better position to explain why than is the party seeking information or documents." *Papst Licensing GmbH*, 2017 WL 1233047, at *4.

### E. Requests 14 through 16

FICO requests that VantageScore produce documents sufficient to show its aggregated financial information, such as annual revenue, operating costs, capital expenses, R&D expenses, and investments during the relevant time period (2013 through 2023). Mot. Compel ¶ 6.

**Relevance and Burden.** VantageScore's capitalization and investments in R&D during the relevant period are evidence of its ongoing viability as a competitor, and will refute claims that FICO's alleged conduct and contracting practices have stunted its development. This information does not otherwise appear to be publicly available because VantageScore is a private company. In its discussion of the purported burden associated with these requests, VantageScore omits the fact that FICO offered to accept "one set of high-level financial information on a quarterly or annual basis" to satisfy them. Provance Decl. ¶ 16. Any burden associated with these requests, particularly if limited as FICO has offered, is reasonable and proportionate to the needs of the case, and VantageScore does not come close to making the particularized showing required to quash or modify the Subpoena.

**Confidentiality.** The high-level financial information that FICO seeks is akin to what FICO itself and all other publicly-traded companies are required to report publicly about their business operations. VantageScore does not explain why comparable information about its own operations is particularly "sensitive." Mot. Quash at 12. VantageScore's arguments are particularly unpersuasive in light of the additional protections afforded to it under the Confidentiality Order. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6413199, at *3 (overruling non-party's "[b]road and speculative allegations of harm, unsubstantiated by specific examples or articulated reasoning" because "the current Confidentiality Order is sufficient").

## F.  Requests 17 and 18.

FICO requests VantageScore's productions to DOJ related to an antitrust investigation of FICO that DOJ opened and later closed—taking no enforcement action—in 2020. Mot. Compel ¶ 7; *see also* Provance Decl. ¶ 17.[21]

**Relevance and Burden.** The complaints in this case were filed on the heels of the announcement of DOJ's brief investigation. The documents produced by VantageScore to DOJ in connection with an overlapping investigation are relevant, as numerous courts presiding over antitrust litigation have recognized in ordering parties and non-parties alike to produce similar documents.[22] VantageScore's assertion that that the documents "ha[ve] no bearing on the matters to be adjudicated in this litigation" is simply not credible. Mot. Quash at 13.

There is effectively no burden associated with this request. The documents have already been collected, reviewed, and produced before. VantageScore need only reproduce them.

---

[21]    *See FICO Announces DOJ Antitrust Investigation Closed*, PR NEWSWIRE (Dec. 8, 2020), https://www.prnewswire.com/news-releases/fico-announces-doj-antitrust-investigation-closed-301188930.html (announcing that "the Department of Justice informed FICO that it has closed [its] investigation. As a result, no enforcement action is being taken."). Curiously, VantageScore does not mention its DOJ production at all in its Motion to Compel, focusing instead on communications between it and the Federal Housing Finance Agency ("FHFA") related to the rules and regulations that govern the use of credit scores to originate residential mortgages eligible for purchase by Fannie Mae and Freddie Mac. Mot. Quash at 12-13. These documents were not identified by VantageScore during the meet-and-confer process. Provance Decl. ¶ 18. Despite their disclosure for the first time in VantageScore's Motion to Quash, FICO seeks only the DOJ production at this time. Mot. Compel ¶ 7.

[22]    *See, e.g., In re Broiler Chicken Antitrust Litig.*, 2017 WL 4417447, at *5, 7 (ordering production of certain documents produced in response to a government CID where documents relate to issues "at the core of Plaintiffs' allegations in this case" and the party resisting the subpoena failed to "quantify, or even describe, the economic or administrative burden" of producing those documents); *Rumble, Inc. v. Google LLC*, 2023 WL 3751797, at *7-8 (N.D. Cal. May 31, 2023) (granting motion to compel production of documents previously produced in response to DOJ investigation that had "significant factual and legal overlap" with the underlying litigation); *In re Plastics Additives Antitrust Litig.*, 2004 WL 2743591, at *12-13 (E.D. Pa. Nov. 29, 2004) (in ordering production of documents produced to DOJ, noting that "cases recognize the relevance of these documents to antitrust litigation," "the production of these documents will impose only a minimum burden . . . 'since the documents in question have already been identified and sorted,'" and "ordering production of these documents 'seems to accord with prevailing practice.'") (citing *In re Wirebound Boxes Antitrust Litig.*, 126 F.R.D. 554, 556 (D. Minn. 1989); *Golden Quality Ice Cream Co., Inc.*, 87 F.R.D. 53, 59 (E.D. Pa. 1980)).

14

**Confidentiality.** VantageScore does not identify what is in its DOJ production, let alone explain how any of the documents are actually competitively sensitive. Instead, it levies more baseless accusations that the Subpoena "may be fairly viewed as another tactic by FICO to squash legitimate competition." Mot. Quash at 13. VantageScore's accusations are wholly unsupported by any evidence and are particularly specious given their misrepresentation of what documents FICO is actually seeking under the Subpoena.

## II. The Court Should Grant FICO's Cross-Motion to Compel.

VantageScore's refusal to comply with any aspect of the Subpoena has already resulted in an unnecessary drain on the time, resources, and attention of the parties and the Court and frustrated FICO's legitimate attempts to obtain relevant discovery. Given VantageScore's decision to abandon discussions about the Subpoena and file a motion to quash the Subpoena in its entirety, an order directing the parties to engage further in the meet-and-confer process is unlikely to resolve this dispute. Moreover, FICO has already made significant concessions to reduce both the burden and the purportedly "sensitive" nature of the Subpoena—even though VantageScore has not done the same, and refuses to produce categories of documents that are clearly relevant and appear to create no burden or confidentiality concerns whatsoever. *See, e.g.*, *supra* at 4-6 (LLC agreement) and 6-9 (Market Study long-form summaries). A court order directing VantageScore to comply with the Subpoena—as narrowed by FICO's compromise offers reflected in its Motion to Compel—is needed to end VantageScore's stonewalling.[23]

## CONCLUSION

For the foregoing reasons, VantageScore's Motion to Quash should be denied and FICO's Cross-Motion to Compel should be granted.

---

[23]    Should such an order issue, FICO is prepared to promptly meet and confer with VantageScore regarding the use of ESI search terms, custodians, and date limiters for certain Subpoena requests.

Dated: March 13, 2024

Respectfully submitted,

_/s/ Matthew D. Provance_____
Matthew D. Provance
Joshua W. Eastby
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600
(312) 701-7711—Facsimile
mprovance@mayerbrown.com
jeastby@mayerbrown.com

*Counsel for Defendant*
*Fair Isaac Corporation*

## CERTIFICATE OF SERVICE

I, Matthew D. Provance, an attorney, hereby certify that on March 13, 2024, I caused a true and correct copy of the foregoing **FAIR ISAAC CORPORATION'S COMBINED OPPOSITION TO VANTAGESCORE SOLUTIONS, LLC'S MOTION TO QUASH SUBPOENA AND MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION TO COMPEL** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

/s/ *Matthew D. Provance*
Matthew D. Provance
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
mprovance@mayerbrown.com

# EXHIBIT 19

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-2114 |
| | Judge Edmond E. Chang |
| This document relates to: | Magistrate Judge M. David Weisman |
| ALL ACTIONS | |

# PLAINTIFFS' JOINT OPPOSITION
## TO THE CREDIT BUREAUS' MOTION TO DISMISS

## **<u>TABLE OF CONTENTS</u>**

Page

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

I.    The Credit Bureaus' Contracts with Fair Isaac ......................................................... 2

II.   TransUnion's Lawsuit Against Fair Isaac .................................................................. 3

III.  This Court's Previous Ruling that the Credit Bureaus' Contracts
with Fair Isaac Have Anticompetitive Effects .......................................................... 4

IV.  The Operative Complaints Address the Deficiencies the Court Identified ............... 5

LEGAL STANDARD ......................................................................................................... 6

ARGUMENT ..................................................................................................................... 6

I.    The Operative Complaints State a Section 1 Claim Against the Bureaus ................. 6

II.   The Operative Complaints Plausibly Allege that the Level Playing Field Provision
Has Anticompetitive Effects ................................................................................... 10

      A.    Sharing Price Information Among the Credit Bureaus Through the
Level Playing Field Provision Causes Anticompetitive Effects .................... 11

      B.    The Credit Bureaus' Agreements with Fair Isaac Show How and
Why They Made Peace (To Line Their Own Pockets) ................................... 17

III.  The Operative Complaints Plausibly Allege Anticompetitive Effects from the
Individual Agreements Between Each Credit Bureau and Fair Isaac ....................... 18

IV.  The Credit Bureaus' Recycled Arguments Fail ....................................................... 22

V.   The State-Law Claims Rise, but Do Not Fall, with the Federal Claims .................. 23

VI.  Any Dismissal Should Be Without Prejudice to Amending at the Conclusion of
Document Production .............................................................................................. 24

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*,
881 F.2d 1396 (7th Cir. 1989) ...................................................14

*Agnew v. NCAA*,
683 F.3d 328 (7th Cir. 2012) .................................................6, 7

*AliveCor, Inc. v. Apple Inc.*,
592 F. Supp. 3d 904 (N.D. Cal. 2022) ......................................20

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019)...........................................................17

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)...............................................................15

*Associated Milk Dealers, Inc. v. Milk Drivers Union, Local 753*,
422 F.2d 546 (7th Cir. 1970) ............................................10, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................2, 6

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ...................................................10

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) .......................................13

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)...............................................................21

*Carroll v. Lynch*,
698 F.3d 561 (7th Cir. 2012) .................................................7, 9

*Champagne Metals v. Ken-Mac Metals, Inc.*,
458 F.3d 1073 (10th Cir. 2006) ................................................7

*Chisholm v. Foothill Cap. Corp.*,
940 F. Supp. 1273 (N.D. Ill. 1996) ..........................................24

*In re Cipro Cases I & II*,
348 P.3d 845 (Cal. 2015).........................................................23

*Connell Constr. Co., Inc. v. Plumbers & Steamfitters Local Union No. 100*,
421 U.S. 616 (1975)...............................................................14

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
370 U.S. 690 (1962)...................................................................................................9

*Denny's Marina, Inc. v. Renfro Prods., Inc.,*
8 F.3d 1217 (7th Cir. 1993) ......................................................................................6

*Epic Games, Inc. v. Apple, Inc.,*
67 F.4th 946 (9th Cir. 2023) ................................................................................8, 23

*Foman v. Davis,*
371 U.S. 178 (1962)...................................................................................................9

*Frame-Wilson v. Amazon.com, Inc.,*
591 F. Supp. 3d 975 (W.D. Wash. 2022).................................................................23

*FTC v. Actavis, Inc.,*
570 U.S. 136 (2013).................................................................................................18

*FTC v. Ind. Fed'n of Dentists,*
476 U.S. 447 (1986)...........................................................................................19, 20

*Garot Anderson Mktg., Inc. v. Blue Cross & Blue Shield United,*
772 F. Supp. 1054 (N.D. Ill. 1990) .........................................................................24

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n,*
830 F.2d 716 (7th Cir. 1987) ..................................................................................17

*Great Atl. & Pac. Tea Co., Inc. v. FTC,*
440 U.S. 69 (1979)...................................................................................................13

*Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v.
AT&T Commn'cns, Inc.,* No. 92-cv-7862, 1996 WL 312535
(S.D.N.Y. June 10, 1996).........................................................................................24

*In re Humira (Adalimumab) Antitrust Litig.,*
465 F. Supp. 3d 811 (N.D. Ill. 2020) ......................................................................23

*Ill. Brick Co. v. Illinois,*
431 U.S. 720 (1977).................................................................................................17

*In re Ins. Brokerage Antitrust Litig.,*
618 F.3d 300 (3d Cir. 2010).......................................................................................6

*Isaksen v. Vt. Castings, Inc.,*
825 F.2d 1158 (7th Cir. 1987) ..................................................................................8

*Mailand v. Burckle*,
   572 P.2d 1142 (Cal. 1978) ........................................................................................23

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
   29 F.4th 337 (7th Cir. 2022) ...............................................................................9, 10

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
   952 F.3d 832 (7th Cir. 2020) .....................................................................................5

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*,
   62 F.3d 967 (7th Cir. 1995) ....................................................................................7, 8

*McMaken ex rel. Chemonics Int'l, Inc. Emp. Stock Ownership Plan v.*
   *Greatbanc Tr. Co.*, No. 17-cv-4983, 2019 WL 10891860
   (N.D. Ill. Dec. 27, 2019) ..........................................................................................24

*McReynolds v. Merrill Lynch & Co.*,
   694 F.3d 873 (7th Cir. 2012) .......................................................................15, 20, 21

*Moehrl v. Nat'l Ass'n of Realtors*,
   492 F. Supp. 3d 768 (N.D. Ill. 2020) .......................................................................15

*Montano v. City of Chicago*,
   375 F.3d 593 (7th Cir. 2004) ....................................................................................23

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ..............................................................................................19

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*,
   No. 19-cv-8318, 2020 WL 6134982 (N.D. Ill. Oct. 19, 2020) .................................13

*Omnicare, Inc. v. Unitedhealth Grp., Inc.*,
   524 F. Supp. 2d 1031 (N.D. Ill. 2007) .......................................................................5

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
   630 F. Supp. 3d 968 (N.D. Ill. 2022) .........................................................................7

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) .....................................................................................23

*Premier Elec. Constr. Co. v. Miller-Davis Co.*,
   422 F.2d 1132 (7th Cir. 1970) ..................................................................................17

*In re Pork Antitrust Litig.*,
   495 F. Supp. 3d 753 (D. Minn. 2020) .......................................................................13

*Sanner v. Bd. of Trade of City of Chi.*,
   62 F.3d 918 (7th Cir. 1995) ......................................................................................13

*Silverman v. Bd. of Educ. of City of Chi.*,
No. 08-cv-2220, 2010 WL 3000187 (N.D. Ill. July 26, 2010) ...............................................22

*Starr v. Sony BMG Music Ent.*,
592 F.3d 314 (2d Cir. 2010)...............................................................................................11

*Systemcare, Inc. v. Wang Labs. Corp.*,
117 F.3d 1137 (10th Cir. 1997) ...........................................................................................7

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ...............................................................................................6

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)...............................................................................................14

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) .............................................................................19, 20, 21

*United Mine Workers of Am. v. Pennington*,
381 U.S. 657 (1965)...........................................................................................................15

*United States v. Bullis*,
77 F.3d 1553 (7th Cir. 1996) .........................................................................................8, 22

*United States v. Container Corp. of Am.*,
393 U.S. 333 (1969)..............................................................................................11, 12, 14

*United States v. Delta Dental of R.I.*,
943 F. Supp. 172 (D.R.I. 1996)..........................................................................................14

*Vasquez v. Ind. Univ. Health, Inc.*,
40 F.4th 582 (7th Cir. 2022) ...................................................................6, 8, 13, 21

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ..........................................................................15, 20

*Zimmerman v. Bornick*,
25 F.4th 491 (7th Cir. 2022) ...............................................................................................7

## STATUTES

15 U.S.C. § 1 ........................................................................................................................1

28 U.S.C. § 1367(c)(3) ...................................................................................................23, 24

### OTHER AUTHORITIES

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2d ed. 2003)...........................................7

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2014) .......................................17

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
    (3d ed. 2023) ................................................................................................................................9

U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* (2023) .............................13, 20

## INTRODUCTION

The Sherman Act proscribes (1) "every ***contract***, combination . . . or conspiracy" (2) that unreasonably restrains trade (3) resulting in antitrust injury. 15 U.S.C. § 1 (emphasis added). The Credit Bureaus do not dispute that they contracted with Fair Isaac, satisfying the first element. Dkt. 220 ("CB Br.") at 3. The Bureaus also do not dispute that their contracts contain "the No Equivalent [Products] Provision and the Dynamic Royalty Schedule clauses" that this Court has held in the Section 2 context "together qualify as sufficient" to plead "anticompetitive effects," satisfying the second and third elements. Dkt. 173 ("MTD Op.") at 13. Each Credit Bureau contract is an actual agreement to unreasonably restrain trade. Plaintiffs have thus plausibly alleged sufficient facts to proceed to discovery on the Section 1 claims against the Credit Bureaus.

The Credit Bureaus' arguments to the contrary miss the mark. The Bureaus wrongly contend that Plaintiffs have "double[d] down on their argument" that "each Bureau can plausibly be viewed as conspiring with FICO to undermine the Bureaus' own competing VantageScore joint venture." CB Br. 2. That claim mischaracterizes the operative complaints. Plaintiffs no longer allege a conspiracy, or conspiracies, of any kind; rather, they allege separate anticompetitive contracts between each Credit Bureau and Fair Isaac that restrain trade through provisions this Court has already determined to be anticompetitive. *See, e.g.*, Dkt. 184 ("DPAC") ¶ 10; Dkt. 185 ("IPAC") ¶¶ 12-15; *see also* MTD Op. at 13, 27.[1]

That the anticompetitive contract terms "were either imposed by the alleged monopolist FICO," or "are exactly what each Bureau would seek to protect its individual ability to compete against the other Bureaus and FICO in the sale of credit," as the Bureaus argue (at 1), is irrelevant.

---

[1] "DPAC" refers to Direct Purchaser Plaintiffs' First Amended Consolidated Complaint, Dkt. 184; "IPAC" refers to Indirect Purchaser Plaintiffs' Second Amended Consolidated Complaint, Dkt. 185.

The Bureaus undisputedly **agreed** to those contract terms.  Finally, the Credit Bureaus' claim that they would have independently agreed to the contract terms in order to compete against the other Bureaus is just another way of arguing that Plaintiffs have failed to present allegations sufficient to show the concerted action required to prove conspiracy.  But such allegations have been required only as "proof of a § 1 conspiracy," which Plaintiffs no longer allege.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).  The motion to dismiss should be denied in its entirety.

## BACKGROUND

### I.    THE CREDIT BUREAUS' CONTRACTS WITH FAIR ISAAC

Before 2006, each Credit Bureau had developed its own proprietary credit score: TransUnion had "TransRisk," Experian had "ScorexPlus" (for lenders) and "Plus" (for consumers), and Equifax had "ERS."  TransUnion Counterclaims ("TUCC") ¶36, *Fair Isaac Corp. v. Trans Union LLC*, No. 17-cv-8318, Dkt. 38 (N.D. Ill. Feb. 12, 2018).[2]  Having "failed to gain substantial market share," the Bureaus abandoned their own in-house scoring products.  *Id.*

In 2006, the Credit Bureaus launched a joint venture called VantageScore "to compete against Fair Isaac."  DPAC ¶6; IPAC ¶10.  Fair Isaac responded by bringing antitrust, false advertising, and trademark claims against the Credit Bureaus and VantageScore.  DPAC ¶¶8, 87; IPAC ¶¶12, 102.  The Credit Bureaus won summary judgment on the antitrust and false advertising claims, and a jury rejected Fair Isaac's trademark claims.  DPAC ¶¶91-92; IPAC ¶¶106-07.

Subsequently, each Bureau signed contracts with Fair Isaac that permitted them to distribute FICO Scores subject to "new provisions designed to restrict the competitive reach of VantageScore."  DPAC ¶¶101-02; IPAC ¶¶117-18.  Those provisions include:

---

[2] "TUCC" refers to the TransUnion Redacted Counterclaims, *Fair Isaac Corp. v. Trans Union LLC*, No. 17-cv-8318 (N.D. Ill.), Dkt. 38, which are publicly available and incorporated by reference into the operative complaints.  *See, e.g.*, DPAC ¶¶97, 112; IPAC ¶¶111, 125.

- the "No Equivalent Products" provision, which prohibits the Credit Bureaus from "distributing" VantageScore in the relevant business-to-business ("B2B") market, <u>DPAC</u> ¶¶ 119-25; <u>IPAC</u> ¶¶ 130-39;

- the "Dynamic Royalty Schedule" provision, which punishes B2B customers for using VantageScore, <u>DPAC</u> ¶¶ 126-33; <u>IPAC</u> ¶¶ 140-48; and

- the "Level Playing Field" provision, which requires FICO to disclose to the other Bureaus any "written agreement" with another Bureau "that has any royalty amount" for FICO Scores that is "lower than the corresponding royalty amount" established between Fair Isaac and the other Bureaus, 2015 Analytic and Data License Agreement ("ADLA") § 9.16, Ex. 1 to FICO Mot. to Dismiss (Dkt. 225-2); *see* <u>DPAC</u> ¶ 134; <u>IPAC</u> ¶ 149.[3]

The contracts also contain "revenue sharing arrangement[s]" through which Fair Isaac gives each Credit Bureau a cut of FICO Score sales. <u>DPAC</u> ¶ 110; <u>IPAC</u> ¶ 123.

## II. TRANSUNION'S LAWSUIT AGAINST FAIR ISAAC

In December 2017, Fair Isaac sued TransUnion for unpaid royalties, and TransUnion counterclaimed, alleging Sherman Act violations against Fair Isaac based on the same contractual provisions at issue here. <u>DPAC</u> ¶ 96-97; <u>IPAC</u> ¶ 110-11; *see* <u>TUCC</u> ¶¶ 42-64. TransUnion alleged that the "No Equivalent Products" provision "effectively prevents TransUnion from selling an alternative to FICO's credit scores that would be compatible with many businesses' systems, models, and processes and allow lenders to have a legitimate choice between using FICO scores and an alternative score." <u>TUCC</u> ¶ 46. According to TransUnion, the "Dynamic Royalty Schedule" provision "effectively foreclose[s] the credit reporting agencies from selling lenders FICO scores for use in the B2B market and VantageScore for use in the B2C market, and drives

---

[3] Plaintiffs have not included hyperlinks to documents filed under seal. Fair Isaac and TransUnion agreed by emails dated January 10 and 12, respectively, that Plaintiffs may quote the No Equivalent Products, Dynamic Royalty Schedule, and Level Playing Field provisions and a portion of the royalty schedule in publicly filed documents (Sections 9.1, 9.2, 9.16, and 12.5 of the ADLA, and footnote (i) of the royalty schedule). References to, or quotations from, any other provisions have been redacted pursuant to this Court's order on Fair Isaac's request for sealing (<u>Dkt. 227</u>).

lenders to buy exclusively Fair Isaac's FICO scores." *Id.* ¶55. Further, TransUnion claimed that "Fair Isaac has used the 'Level Playing Field' and 'Dynamic Royalty Schedule' provisions" to "prevent any credit reporting agency from negotiating lower royalty prices." *Id.* ¶60.

The court denied Fair Isaac's motion to dismiss, concluding that the provisions in the contract between TransUnion and Fair Isaac "are unlawful attempts to 'maintain monopoly power.'" *Fair Isaac Corp. v. Trans Union, LLC*, No. 17-cv-8318, Dkt. 96 at 4 (N.D. Ill. Mar. 27, 2019). TransUnion and Fair Isaac settled on undisclosed terms in 2020. DPAC ¶99; IPAC ¶113.

### III. THIS COURT'S PREVIOUS RULING THAT THE CREDIT BUREAUS' CONTRACTS WITH FAIR ISAAC HAVE ANTICOMPETITIVE EFFECTS

Plaintiffs filed their lawsuit in 2020. Following consolidation of the actions, Plaintiffs filed complaints alleging monopolization of the B2B Credit Score market by Fair Isaac in violation of Section 2 of the Sherman Act; a conspiracy among the Credit Bureaus and Fair Isaac and conspiracies between each Bureau and Fair Isaac to restrain trade, in violation of Section 1 of the Sherman Act; and related state-law claims. Dkt. 121; Dkt. 122. To support the conspiracy allegations, Plaintiffs alleged that Fair Isaac facilitated each Bureau's participation in the scheme, Dkt. 121 ¶¶107-08; Dkt. 122 ¶¶124-25; that the Bureaus had ample opportunities to conspire, Dkt. 121 ¶¶58, 103; Dkt. 122 ¶¶70, 120; and a quid pro quo: Fair Isaac agreed to the Level Playing Field provision in exchange for the Credit Bureaus agreeing to the No Equivalent Products and Dynamic Royalty Schedule provisions. Dkt. 121 ¶125; Dkt. 122 ¶146.

Defendants filed motions to dismiss, which this Court granted and denied in part. This Court ruled that Plaintiffs had adequately pled a monopolization claim against Fair Isaac, holding that "the No Equivalent Provision and the Dynamic Royalty Schedule clauses" in Fair Isaac's contracts with the Credit Bureaus "together qualify as sufficient allegations of anticompetitive effects." MTD Op. at 13. The Court also held that, "[i]n addition to the three clauses, the Plaintiffs

have plausibly alleged that FICO's Equifax Litigation was itself an anticompetitive act." *Id.* By contrast, the Court found Plaintiffs' Section 1 conspiracy allegations implausible and dismissed the Section 1 claims on that basis. *Id.* at 19, 21-22.

## IV. THE OPERATIVE COMPLAINTS ADDRESS THE DEFICIENCIES THE COURT IDENTIFIED

This Court granted Plaintiffs leave to replead their Section 1 claims, suggesting that Plaintiffs should consider whether "there really is a fix for the problems identified in the Opinion." MTD Op. 30. Plaintiffs did precisely that. Responding to this Court's holding that the conspiracies alleged were implausible, the operative complaints no longer allege any conspiracy claims.[4] Dkts. 220-1 pp. 1, 4-6, 31, 35-36, 41-42, 48, 57-59, 61-77, 79-81, 91 & 220-2 pp. 4-5, 29, 33-35, 38-40, 43, 47, 54-55, 57, 59-74, 76-78, 111 (redlines). Instead, the complaints limit their Section 1 claims to the contracts between each Bureau and Fair Isaac. *See, e.g.*, DPAC ¶¶ 101-18; IPAC ¶¶ 102-29. Plaintiffs allege that those contracts – and more specifically, the No Equivalent Products, Dynamic Royalty Schedule, and Level Playing Field provisions – have "the effect of eliminating or drastically reducing the competitive threat posed by VantageScore" and other competing credit scores, resulting in injury to competition. DPAC ¶¶ 101-45; IPAC ¶¶ 102-62.

The operative complaints present additional facts to support those three separate Section 1 claims. For example, they incorporate admissions by Fair Isaac that its contracts with each Credit

---

[4] The operative complaints strip out all references to conspiracy with the exception of a single allegation in the Direct Purchasers' complaint that "Plaintiffs and the Class are the first purchasers from outside the Fair Isaac-Credit Bureaus conspiracies." DPAC ¶ 14. "Conspiracy" is used there to describe the "conspiracy 'exception' to the *Illinois Brick* rule," which "is not so much a real exception as it is a way of determining which firm, or group of firms collectively, should be considered to be the relevant seller (and from that, identifying which one is the direct purchaser) for purposes of the rule." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 839 (7th Cir. 2020). That "exception" applies whether the violators are co-conspirators or contracting parties. *See, e.g.*, *Omnicare, Inc. v. Unitedhealth Grp., Inc.*, 524 F. Supp. 2d 1031, 1042 (N.D. Ill. 2007) (*Illinois Brick* "no bar" because plaintiff alleged "it contracted directly with" defendant).

Bureau contain the challenged provisions.  DPAC ¶¶114-16; IPAC ¶¶125-27.  And they allege that each Credit Bureau has a "revenue sharing arrangement with Fair Isaac" providing each Bureau with a cut of Fair Isaac's revenue from FICO Score sales.  DPAC ¶110; IPAC ¶123. Plaintiffs also allege that Defendants view their contracts as mutually beneficial: in the words of Fair Isaac's CEO, "a good thing for both of us."  DPAC ¶109; IPAC ¶122.

## LEGAL STANDARD

To defeat a motion to dismiss, Plaintiffs "need only present 'enough fact to raise a reasonable expectation that discovery will reveal evidence' of illegal acts."  *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 587 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "[T]he complaint must establish a nonnegligible probability that the claim is valid; but the probability need not be as great as such terms as 'preponderance of the evidence' " connote."  *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010).

## ARGUMENT

### I.    THE OPERATIVE COMPLAINTS STATE A SECTION 1 CLAIM AGAINST THE BUREAUS

Section 1 of the Sherman Act "requires proof of three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury."  *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993).  Where, as here, a plaintiff challenges a contract under Section 1, "the first showing of an agreement or contract" is "not at issue."  *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012).

No one disputes that each Credit Bureau entered into a contract with Fair Isaac.  That is "direct evidence" of agreement, which is "independently adequate" to satisfy the first element. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323-24 (3d Cir. 2010); *see Text Messaging Antitrust Litig.*, 630 F.3d at 628-29 ("direct evidence" that defendants "agreed explicitly" is a "smoking gun").  Although the Bureaus supply many reasons why they would not ***want*** to agree

to the anticompetitive provisions, the fact remains that they ***did agree***. Why they agreed is beside

the point. *See Agnew*, 683 F.3d at 335; *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d

1073, 1085 (10th Cir. 2006) ("[W]hen evaluating direct evidence of an agreement, we need not

worry whether such an agreement would have been a rational one" (citing 2 Philip E. Areeda &

Herbert Hovenkamp, *Antitrust Law* 101 (2d ed. 2003))); *Systemcare, Inc. v. Wang Labs. Corp.*,

117 F.3d 1137, 1143 (10th Cir. 1997) ("To say that the buyer, having agreed to the contract, did

not agree to an express term because the buyer would have preferred a contract without the term

makes little sense.").[5]

      Regarding the second and third elements, no one disputes that the contracts between the

Bureaus and Fair Isaac contain the No Equivalent Products and Dynamic Royalty Schedule clauses

that this Court held "together qualify as sufficient allegations of anticompetitive effects." MTD

Op. 13. If the Plaintiffs' allegations regarding those provisions are "sufficient allegations of anti-

competitive effects" as to Fair Isaac in the Section 2 context, they are also "sufficient allegations

of anticompetitive effects" as to the Credit Bureaus in the Section 1 context. *Id.* "Treatment of

the identical conduct" does not "vary under section 1 based upon the identity of the defendant."

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 974 (7th Cir. 1995). The Credit

Bureaus do not explain how they can escape Section 1 liability when they, too, signed contracts

with provisions that have anticompetitive effects. The argument is therefore waived. *See Carroll*

*v. Lynch*, 698 F.3d 561, 568 (7th Cir. 2012) (arguments "not raised in [an] opening brief" are

---

[5] The Bureaus incorrectly assert that Plaintiffs have "abandon[ed] . . . any claim of a 'per se' anti-
trust violation." CB Br. 10. Plaintiffs need not plead a specific antitrust standard. *See Zimmerman*
*v. Bornick*, 25 F.4th 491, 493 (7th Cir. 2022). The applicable standard depends on what the
evidence reveals. This Court will have the opportunity to determine the appropriate standard at
summary judgment or, more likely, when it rules on jury instructions. *See, e.g.*, *In re Outpatient*
*Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 989 (N.D. Ill. 2022) (collecting cases).

waived).  Nor do the Bureaus offer the Court any reason to reconsider its ruling that the provisions are anticompetitive – in fact, they urge the Court ***not*** to "reconsider its prior order(s)."  CB Br. 12. Contrary to the Bureaus' assertion (at 13) that Plaintiffs seek reconsideration, Plaintiffs ***agree*** this Court should not revisit its ruling that those provisions are anticompetitive.

Stuck with the implications of this Court's ruling, the Credit Bureaus resort to irrelevant arguments and mischaracterization.  Specifically, the Credit Bureaus cast themselves as the "victims" of their contracts with Fair Isaac.  CB Br. 4.  That inference in their favor is not permitted at this stage, *Vasquez*, 40 F.4th at 583, particularly given that the Bureaus benefitted handsomely from the bargain they negotiated, obtaining perks like revenue share agreements, DPAC ¶110; IPAC ¶123.  Moreover, the Bureaus' claimed victimhood "is of no moment; an agreement procured by threats is still an agreement for purposes of section 1."  *Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1163 (7th Cir. 1987); *see MCM Partners*, 62 F.3d at 974.  "[T]o hold that a contract is exempt from antitrust scrutiny simply because one party 'reluctant[ly]' accepted its terms 'would be to read the word[] 'contract' out of the statute."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982 (9th Cir. 2023) (alterations in original).[6]

The Credit Bureaus emphasize this Court's ruling that the ***Level Playing Field*** provision does not plausibly provide the Credit Bureaus "protection from the wispy specter of external competition [from a hypothetical new credit bureau]."  CB Br. 12 (alteration in original).  That, too, is irrelevant.  Whether the Level Playing Field provision is anticompetitive in isolation (which,

---

[6] And the Credit Bureaus do not argue that they withdrew from the conspiracy; they insist there was no conspiracy. Such an argument would fail in any event because the operative complaints do not support an inference that the Bureaus "cease[d] [their] activity in the conspiracy" and undertook "an affirmative act to defeat or disavow the conspiracy's purpose."  *United States v. Bullis*, 77 F.3d 1553, 1562 (7th Cir. 1996).  To the contrary, the complaints allege that the Bureaus have affirmatively agreed to provisions that have anticompetitive effects.

to be sure, Plaintiffs do allege) has no bearing on the anticompetitive effects of the No Equivalent Products and Dynamic Royalty Schedule provisions, whose anticompetitive impacts, considered together, are independently sufficient to uphold the Section 1 claims. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (courts must look at complaints as a whole).

The Credit Bureaus mischaracterize the operative complaints as "substantively identical" to the prior ones. CB Br. 12. A comparison demonstrates that is not true. *See* Dkt. 220-1 pp. 1, 4-6, 14-15, 31, 35-39, 40-44, 46-52, 57-59, 61-77, 79-81, 91 & Dkt. 220-2 pp. 4-7, 14, 29-30, 33-40, 41-43, 45-51, 54-55, 57, 59-74, 76-78, 111 (redlines). Plaintiffs added factual allegations to respond to the Court's ruling on Defendants' initial motions to dismiss, including allegations that (1) the Level Playing Field provision is a price-information sharing mechanism that stabilizes prices for FICO scores, DPAC ¶¶137-38; IPAC ¶¶150-51; (2) Fair Isaac admitted the contracts exist, DPAC ¶¶102, 109-10, 114-16; IPAC ¶¶118, 122-23, 125-27; and (3) Fair Isaac pays the Bureaus a revenue share based on their sales of FICO Scores, DPAC ¶110; IPAC ¶123. No rule requires Plaintiffs to dramatically overhaul their complaints when they amend. Nor is it improper to amend to "state an alternative theory for recovery." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *See* 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §1474 & nn.7, 9-10, 15 (3d ed. 2023) (collecting cases).

The Credit Bureaus do not claim that Plaintiffs' contract-based allegations are implausible. That argument is therefore waived. *See Carroll*, 698 F.3d at 568. The Bureaus' only substantive argument regarding the No Equivalent Products and Dynamic Royalty Schedule provisions focuses on Plaintiffs' inability to allege conspiracy under *Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*, 29 F.4th 337 (7th Cir. 2022). CB Br. 14. But the Seventh Circuit affirmed the dismissal in *Marion* because the amended complaint – which changed the case theory from a hub-

and-spokes conspiracy to separate vertical conspiracies – did not allege "sufficient circumstantial evidence" to render the conspiracies plausible. 29 F.4th at 340, 350. Here, Plaintiffs are not pursuing Sherman Act claims on the basis of conspiracies, but on the basis of ***anticompetitive contractual agreements*** between Fair Isaac and each Credit Bureau. That theory was unavailable in *Marion* because the defendant distributors were not parties to, or "involved in negotiating" the Net Dealer Contracts with the alleged monopolist that allowed the monopolist to "raise prices" above competitive levels. *Id.* at 350-51. *Marion* thus sheds no light on the issues here.[7]

## II. THE OPERATIVE COMPLAINTS PLAUSIBLY ALLEGE THAT THE LEVEL PLAYING FIELD PROVISION HAS ANTICOMPETITIVE EFFECTS

Plaintiffs' Section 1 claims may be upheld solely on the basis of the No Equivalent Products and Dynamic Royalty Schedule provisions, but they should encompass the Level Playing Field provision as well. That provision – which requires Fair Isaac to share with the Credit Bureaus information about the royalties it charges the other Bureaus – is anticompetitive too.

The Credit Bureaus wrongly suggest that the Seventh Circuit has blessed the "general legality" of most-favored-nation ("MFN") provisions like the Level Playing Field clause. CB Br. 15 & n.5. As the Credit Bureaus' own cases show, MFNs (like any other contract provision) are illegal if they unreasonably restrain trade. *Id.* at 2-3, 16 (citing *Associated Milk Dealers, Inc. v. Milk Drivers Union, Local 753*, 422 F.2d 546, 554 (7th Cir. 1970) (remanding for factfinding on MFN's "anticompetitive effect")). Even in *Blue Cross & Blue Shield United of*

---

[7] Another obstacle in *Marion* was that the plaintiffs alleged conspiracies involving only two distributors in a market where there were "at least four major distributors." 29 F.4th at 350. Given those market characteristics, it was "not plausible" that "vertical conspiracies involving just two distributors . . . could plausibly influence the prices that the Providers pay for the Products, regardless of which distributor they purchase from." *Id.* That concern is not present here because Plaintiffs allege a triopoly on distribution of credit scores comprising the three named Credit Bureau defendants. *See* pp. 20-21, *infra*.

*Wisconsin v. Marshfield Clinic*, on which the Credit Bureaus rely (at 14-15), the Seventh Circuit acknowledged that MFNs can be "misused to anticompetitive ends." 65 F.3d 1406, 1415 (7th Cir. 1995); *see Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 319 (2d Cir. 2010) (upholding Section 1 claims based on defendants' agreement on a "wholesale price floor" that they "enforced in part through MFN agreements"). Facilitating the "exchange of price information" is one way an MFN can produce anticompetitive effects: Such exchanges can have the effect of "chilling the vigor of price competition." *See United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969).

That is precisely what the Level Playing Field provision does: It contractually obligates Fair Isaac to provide pricing information to the Credit Bureaus, thereby diminishing price competition among the Bureaus. Specifically, the clause requires Fair Isaac to share with a Credit Bureau any "royalty schedule" entered into with the other two Bureaus "that is lower than the corresponding royalty amount" applicable to that Bureau. ADLA §9.16. Sharing that royalty information allows the Bureaus to stabilize prices for FICO Scores at artificially high levels. DPAC ¶¶137-38; IPAC ¶¶150-51. Such a provision is not a "routine MFN"; it is an anticompetitive price-information-sharing mechanism. CB Br. 14; *see, e.g.*, *Container Corp.*, 393 U.S. at 336-37.

## A. Sharing Price Information Among the Credit Bureaus Through the Level Playing Field Provision Causes Anticompetitive Effects

The Credit Bureaus admit that "the Level Playing Field provision provided each Bureau with the minimum price that its rivals were paying for FICO Scores." CB Br. 16. That admission, coupled with the operative complaints' allegations regarding the market conditions under which the Bureaus agreed to that provision and the effects that provision has had on prices for FICO Scores, is sufficient for a Section 1 claim against the Credit Bureaus to proceed.

For example, in *Container Corporation*, the Supreme Court held that allegations that corrugated container sellers shared with their competitors "information as to the most recent price

charged" was sufficient to plead a Section 1 violation. 393 U.S. at 335. Although the Court recognized that "[p]rice information exchanged in some markets may have no effect on a truly competitive price," it nevertheless found plausible anticompetitive effects because the industry was "dominated by relatively few sellers." *Id.* at 337. Given those circumstances, defendants' price sharing plausibly had the effect of "[s]tabilizing prices" and was "within the ban of § 1." *Id.*

Similar circumstances are present here. First, through the Level Playing Field clause, each Credit Bureau agreed to share their pricing for FICO Scores with their only two competitors and to receive those two competitors' pricing in return. DPAC ¶¶ 137-38; IPAC ¶¶ 150-51.[8] Second, the market is "dominated by relatively few sellers." 393 U.S. at 335. In fact, the three Credit Bureaus "control virtually all of the credit report market." DPAC ¶ 58 & IPAC ¶ 70 (describing their "triopoly"). Third, demand for the product at issue is "inelastic," as both the containers at issue in *Container Corporation* and the credit reports at issue here are sold only for "immediate, short-run needs." 393 U.S. at 337; DPAC ¶ 57 & IPAC ¶ 69 (credit reports are used, for example, for "generat[ing] a FICO Score for a specific customer, which B2B lenders can use in making their lending decisions."). And fourth, as in *Container Corporation*, the information sharing required under the Level Playing Field clause has resulted in FICO Score prices that are "stabilized at artificially high levels." DPAC ¶ 301; IPAC ¶ 293. The Credit Bureaus have used the Level Playing Field provision to share the prices they pay for a key input to their services (FICO Scores) and have thereby "reduce[d] price competition for the services they provide." DPAC ¶ 138; *see* IPAC ¶ 151.

---

[8] That Fair Isaac does the sharing on behalf of the Credit Bureaus instead of the Credit Bureaus directly sharing the pricing information with each other is a distinction without a difference. The point is that the Credit Bureaus agreed to provisions through which they would receive and share price information with their only competitors. *See Container Corp.*, 393 U.S. at 335.

Courts in this district and elsewhere routinely reject motions to dismiss Sherman Act Section 1 claims with similar allegations of price-information sharing. *See, e.g.*, *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, No. 19-cv-8318, 2020 WL 6134982, at *6 (N.D. Ill. Oct. 19, 2020) ("Plaintiffs adequately allege an anti-competitive effect . . . resulting from the information exchanged"); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 783 (N.D. Ill. 2017); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 766-67 (D. Minn. 2020). With good reason: "In a competitive market, uncertainty among sellers will cause them to compete for business by offering buyers lower prices." *Great Atl. & Pac. Tea Co., Inc. v. FTC*, 440 U.S. 69, 80 (1979). But, as the Supreme Court has explained, in a market like this one where competitors share price information, "[t]he exchange of price information, . . . by reducing uncertainty, lead[s] to price matching and anticompetitive cooperation among sellers." *Id.* The federal antitrust agencies agree: "A market is more susceptible to coordination if a firm's behavior can be promptly and easily observed by its rivals," *i.e.*, when competitively sensitive information such as costs "are readily discernible and relatively observable" via "exchange of information." U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 2.3.B (2023).

The Credit Bureaus do not – and cannot – dispute those basic facts and economic realities. They claim (at 16) that the information shared is "limited," but "the Level Playing Field provision essentially confirms to each Credit Bureau the price the other competing Credit Bureaus are paying for FICO's algorithm." DPAC ¶ 138; *see* IPAC ¶ 151. Given Fair Isaac's 90% market share and that FICO Scores are a "must have," CB Br. 3, that is hardly a "limited" exchange. The Bureaus are not entitled to the opposite inference. *See Vasquez*, 40 F.4th at 583. Moreover, the importance or scope of the information shared presents a factual dispute that "should not be resolved on a motion to dismiss." *Sanner v. Bd. of Trade of City of Chi.*, 62 F.3d 918, 926 (7th Cir. 1995).

The Credit Bureaus next assert that the price-information sharing required by the Level Playing Field provision cannot "create[] antitrust concerns" because "the Bureaus are no longer even alleged to have colluded with one another." CB Br. 16-17. But "information exchange itself" can violate Section 1. *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.) (observing that, in *Container Corp.*, "the Supreme Court held that information exchange itself could constitute a § 1 violation"). Even the Credit Bureaus admit that information sharing creates antitrust concerns if it "facilitate[s] collusion *or otherwise harm[s] competition*." CB Br. 16 (emphasis added). As explained, the Level Playing Field provision harms competition by reducing price competition for B2B Credit Scores and facilitating pricing coordination among the Bureaus.

Calling the Level Playing Field clause an "MFN provision" does not change that conclusion. CB Br. 15. As noted, the Seventh Circuit and other courts recognize that MFNs can have anticompetitive effects. *See* pp. 10-11, *supra* (collecting cases); *see, e.g.*, *United States v. Delta Dental of R.I.*, 943 F. Supp. 172, 180 (D.R.I. 1996) (rejecting arguments that MFN was not an "'unreasonable restraint' on trade" and denying motion to dismiss).

The Credit Bureaus claim that because the Level Playing Field clause is an MFN, the operative complaints were required to allege that it was adopted with "predatory purpose." *See, e.g.*, CB Br. 15 n.5, 17. But the Seventh Circuit requires allegations of "predatory purpose" only for breaches of labor agreements that are alleged to violate Section 1 of the Sherman Act. *Associated Milk Dealers*, 422 F.2d at 553; *see Connell Constr. Co., Inc. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 621-22 (1975) (discussing labor exception); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1401 (7th Cir. 1989) ("intent plays no useful role in [antitrust] litigation" even in "predatory pricing cases"). And that is only because labor agreements are ordinarily "exempt[] from the antitrust laws." *Associated Milk Dealers*, 422 F.2d

at 553.  No exception from the antitrust laws applies here (nor do the Credit Bureaus claim any such exception applies).  The Credit Bureaus' assertion (at 15 n.5) that MFNs are only unlawful if they were adopted with "predatory purpose" is thus false.

Even so, the operative complaints do allege predatory purpose:  They allege that the Bureaus agreed to restrain their ability to promote VantageScore to benefit themselves.  As the Credit Bureaus concede (at 17), the Level Playing Field provision "protect[s] each Credit Bureau from the risk that Fair Isaac would selectively offer discounts that could expose it to price competition."  DPAC ¶136; *see* IPAC ¶151 (similar).  "By ensuring that no one Credit Bureau receives a more favorable price than the other, the Level Playing Field provision essentially confirms to each Credit Bureau the price the other competing Credit Bureaus are paying for FICO's algorithm.  Information about what their competitors are paying for this must-have product is valuable to the Credit Bureaus who can then use this cost information to reduce price competition for the services they provide."  DPAC ¶138; *see* IPAC ¶151.  "It is just such restraints upon the freedom of economic units to act according to their own choice and discretion that run counter to antitrust policy."  *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 668 (1965).[9]

The Credit Bureaus claim it is implausible that they would "'sabotage their own joint venture,'" CB Br. 12, but the complaints support the inference that going along with Fair Isaac is more profitable for the Bureaus than protecting VantageScore.  *See McReynolds v. Merrill Lynch*

---

[9] Tellingly, the Credit Bureaus do not dispute the economic importance of the provision to them. They focus on Plaintiffs' allegations about TransUnion's negotiations with Fair Isaac in Canada and claim (at 18) that "the market dynamics of credit scoring in Canada are irrelevant" because "the relevant market here is limited to the United States."  But courts routinely consider competitive dynamics in "other markets" to assess the relevant market. *See, e.g.*, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603 & n.30 (1985); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 463 (7th Cir. 2020).  "Comparable international markets" are no exception. *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 775 (N.D. Ill. 2020).

& *Co.*, 694 F.3d 873, 879 (7th Cir. 2012) (court must "draw[] reasonable inferences in the plaintiffs' favor"). Given Fair Isaac's monopoly, the Bureaus need FICO Scores as an input for the credit-reporting services they sell. *See* DPAC ¶138 (FICO Score is a "must-have"); IPAC ¶2 ("FICO Scores are used for 90% of all lending decisions in the United States"). The Bureaus earn their money from selling those services. DPAC ¶40; IPAC ¶52. They also earn undisclosed sums from revenue-share agreements with Fair Isaac. DPAC ¶110; IPAC ¶123. Thus, having entered into anticompetitive contracts with Fair Isaac, the Credit Bureaus had (and continue to have) every economic incentive to promote and sell FICO Scores. By contrast, there are no allegations in the operative complaints that the Credit Bureaus receive revenue from VantageScore, much less revenue at a level high enough to render the Bureaus' agreements with Fair Isaac unprofitable or irrational. Nor have the Credit Bureaus claimed as much. As they made clear last time around, "VantageScore is a stand-alone venture, distinct from any of the Bureaus." Dkt. 135 at 29.

The operative complaints also allege that, "to the extent the Level Playing Field provision resulted in higher rates, those costs were ultimately also borne by 'banks [and] mortgage lenders' (*i.e.*, B2B Purchasers)" who had no alternative supplier or credit score they could turn to in order to avoid those price increases. DPAC ¶143, IPAC ¶159; *see* DPAC ¶144 & IPAC ¶160 (Experian CFO confirming that the Bureau "pass[es]" FICO price increases "through to [its] customers"); DPAC ¶145 & IPAC ¶161 (Equifax CEO confirming that price increases "rolled through" to customers). The Credit Bureaus do not (and, at the motion-to-dismiss stage, cannot) dispute that they do not bear the full (and potentially any) cost of FICO Score price increases.

Seizing on their own quotes about passing on price hikes to customers (*i.e.*, Plaintiffs and the classes they represent), the Credit Bureaus claim (at 19) that "if FICO's price hikes were deemed anticompetitive, the Bureaus would be the direct victims of such overcharges, and thus

entitled to recover those overcharges in full despite any ability to pass on the added cost" under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). But they stop short of arguing that *Illinois Brick* bars Direct Purchaser Plaintiffs' claims. With good reason. Even if the Bureaus could pursue some direct purchaser claims against Fair Isaac,[10] that would not bar Plaintiffs' direct purchaser claims. The Supreme Court made that clear in *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019). *See id.* at 1525 (holding that "the 'mere fact that an antitrust violation produces two different classes of victims hardly entails that their injuries are duplicative of one another.'" (citing 2A Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 339d, at 136 (4th ed. 2014)). But those issues are not currently before the Court. As this Court held previously, "a direct payment from a plaintiff to the defendant [i]s the key element in deeming the plaintiff as the direct purchaser," and Plaintiffs allege direct payments to Fair Isaac. MTD Op. 23; DPAC ¶ 42.[11]

## B. The Credit Bureaus' Agreements with Fair Isaac Show How and Why They Made Peace (To Line Their Own Pockets)

The Credit Bureaus assert that "mak[ing] peace" with Fair Isaac "do[es] not support Plaintiffs' conspiracy allegations." CB Br. 20. The Bureaus again misunderstand the operative complaints; there are no conspiracy allegations to support anymore.

The Bureaus also assert that because Fair Isaac and the Bureaus have previously sued each other, "Plaintiffs therefore cannot state a claim based on the Level Playing Field provision, and

---

[10] And it is unclear that the Credit Bureaus could, given that they are active participants in, and financially benefit from, the anticompetitive contracts at issue. *See Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 830 F.2d 716, 722-23 (7th Cir. 1987). In any event, such a defense involves "[d]ifficult factual questions" that cannot be resolved on a motion to dismiss. *Premier Elec. Constr. Co. v. Miller-Davis Co.*, 422 F.2d 1132, 1138 (7th Cir. 1970).

[11] Moreover, Plaintiffs do not allege a distribution chain. They allege that Fair Isaac and the Credit Bureaus jointly produce a single product for use by the Direct Purchaser Plaintiffs – a product that Plaintiffs are the first, and direct, purchasers of. The Credit Bureaus pay Fair Isaac royalties in exchange for the right to use its algorithms to generate credit scores; the Direct Purchaser Plaintiffs purchase the scores themselves from Fair Isaac. *See, e.g.*, DPAC ¶¶ 35, 42.

Case 2:20-cv-02114-... Document ... Filed 01/15/24 Page 18 of ... Page ID ...

Opposition to Credit Bureaus' Motion to Dismiss

thus cannot state a claim with respect to any of the provisions at issue." CB Br. 21. That is nonsensical. First, it does not follow that because the Bureaus and Fair Isaac have sued each other at various points in history Plaintiffs "cannot state a claim" based on the provisions at issue. *Id.* The Credit Bureaus have provided no authority to support that spurious argument. Second, the No Equivalent Products and Dynamic Royalty Schedule provisions are anticompetitive for the reasons the Court found previously: Respectively, they "exclude the Credit Bureaus from using VantageScore" and "give[] FICO the ability to control the prices of FICO Scores in an abusive and exploitative manner." MTD Op. 12. Further, as previously explained, the Level Playing Field provision is an anticompetitive information-sharing mechanism. *See* pp. 11-13, *supra*. The provisions are anticompetitive for reasons that are ***independent of*** the history of litigation between the parties (although the "Equifax Litigation was itself an anticompetitive act" as this Court previously held, MTD Op. 13-14). It does not follow that if Plaintiffs cannot state a claim based on the Level Playing Field provision they cannot state a claim based on the ***other two*** anticompetitive provisions Plaintiffs have identified either.

Finally, the Credit Bureaus wrongly suggest that statements by Fair Isaac's CEO that Fair Isaac had been "at war" with the Bureaus and then decided to "be partnered" with them are irrelevant. CB Br. 20. Settlements of business disputes, like any other agreements, "can . . . unreasonably diminish competition in violation of the antitrust laws." *FTC v. Actavis, Inc.*, 570 U.S. 136, 141 (2013). That is particularly true for the settlement of TransUnion's counterclaims, through which Fair Isaac "bought TransUnion off." DPAC ¶99; IPAC ¶113.

## III. THE OPERATIVE COMPLAINTS PLAUSIBLY ALLEGE ANTICOMPETITIVE EFFECTS FROM THE INDIVIDUAL AGREEMENTS BETWEEN EACH CREDIT BUREAU AND FAIR ISAAC

The Credit Bureaus argue that none of them "individually possesses significant market power in the claimed market for credit scores sold to businesses." CB Br. 21. That contradicts

their admission (at 20) that they are "one of the key means by which the FICO Score is distributed." And it is wrong for multiple reasons. There are "two ways of proving market power": showing (1) "direct evidence of anticompetitive effects," or (2) "that the defendant's share" of the relevant market "exceeds whatever threshold is important for the practice in the case." *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000); ); *see FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986). Plaintiffs have plausibly alleged both.

For direct effects, Plaintiffs must allege "actual detrimental effects" on competition, "such as reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (citation and quotation marks omitted).

**Reduced output.** Plaintiffs allege that each Credit Bureau "agreed to terms that had the effect of eliminating or drastically reducing the competitive threat posed by VantageScore," "frustrat[ing] the ability of B2B Purchasers to purchase VantageScore." DPAC ¶¶125, 158; IPAC ¶¶139, 173. Each agreement had independent anticompetitive effects "because when one Credit Bureau stops using VantageScore, it becomes even less attractive to the other Credit Bureaus." DPAC ¶124; IPAC ¶138. "B2B Purchasers will not want to use a credit scoring system unless all of the main Credit Bureaus use it." DPAC ¶124; IPAC ¶138.

**Increased prices.** Plaintiffs allege that in 2018, Fair Isaac "implemented a special pricing increase for mortgage customers that was an approximately 75% increase from $0.06/score to $0.10/score. In the following two years, FICO again rolled out special pricing increases to its auto customers and to some credit card customers." DPAC ¶157; IPAC ¶172.

**Decreased quality.** Plaintiffs allege that the Credit Bureaus' agreements decreased quality by, among other things, foreclosing the only credit score (VantageScore) that scored low-income,

"credit invisible" individuals.  DPAC ¶¶ 73-81; IPAC ¶¶ 89-96.[12]

Those allegations are independently sufficient to plead anticompetitive effects.  The operative complaints, however, go further and also allege market power using market-share measures.  Such allegations require "showing that the defendant's share exceeds whatever threshold is important for the practice in the case."  *Toys "R" Us*, 221 F.3d at 937.  In a Section 1 case like this one, "something more than 30%" is more than enough.  *Id.*; *see* U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 2.1 (2023) ("a merger that creates a firm with a share over thirty percent is . . . presumed to substantially lessen competition or tend to create a monopoly").  Plaintiffs have alleged just that, pleading that the Credit Bureau "triopoly" "control[s] virtually all of the credit report market" for distribution of FICO or VantageScores. DPAC ¶ 58; IPAC ¶ 70.  The Credit Bureaus "enjoy roughly equivalent market shares": 33% a piece of the 100% whole.  DPAC ¶ 58; IPAC ¶ 70.  Each Bureau thus has "more than 30%" of the relevant market, which is enough in a Section 1 case, *Toys "R" Us*, 221 F.3d at 937, particularly where the complaints offer other facts showing that the challenged "arrangement has the potential for genuine adverse effects on competition," *Ind. Fed'n of Dentists*, 476 U.S. at 460-61.

The Credit Bureaus suggest (at 22) that "FICO itself" is one of their competitors.  But they cannot dilute their market shares by gerrymandering Fair Isaac into the ***credit report*** market.

---

[12] The Bureaus make a big deal about VantageScore still being "very much in business," and the Bureaus "continu[ing] to distribute its scores."  CB Br. 6.  But they nowhere discuss whether, and to what extent, they distribute VantageScores ***in the relevant market*** (B2B Credit Scores) – something each of their contracts with Fair Isaac forecloses.  And they ignore that "imped[ing]" VantageScore's "expansion" is anticompetitive even if VantageScore was not stamped out of existence.  *Viamedia*, 951 F.3d at 483.  In any event, the Bureaus cannot ask the Court to credit factual assertions in their favor by seeking to incorporate by reference websites cited in the complaints.  *See McReynolds*, 694 F.3d at 879 (court must make inferences in plaintiffs' favor); *AliveCor, Inc. v. Apple Inc.* 592 F. Supp. 3d 904, 913 (N.D. Cal. 2022) (declining to "interpret the incorporated documents to contradict well-pled factual allegations in the complaint").

Indeed, this suggestion contradicts the complaints' allegations that the Credit Bureau "triopoly" "control[s] virtually all of the credit report market." DPAC ¶58; IPAC ¶70. And it is belied by the Bureaus' own recognition of who their competitors are. The Credit Bureaus agree they face no other competitors, repeatedly emphasizing that there is no "hypothetical new credit bureau" waiting to challenge their entrenched triopoly. CB Br. 8, 12. Such "[i]ndustry or public recognition" of who an entity competes against is compelling evidence regarding the scope of the relevant market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *see id.* ("The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity.").[13]

Finally, TransUnion's own claims confirm that, however market power is measured, each of the Bureaus' agreements with Fair Isaac has anticompetitive "effect[s] in the market." *Toys "R" Us*, 221 F.3d at 937. TransUnion alleged that the No Equivalent Products provision "***effectively prevents TransUnion*** from selling an alternative to FICO's credit scores" and that the "Dynamic Royalty Schedule" provision "***effectively foreclose[s]*** the credit reporting agencies from selling lenders FICO scores for use in the B2B market and VantageScore for use in the B2C market, and drives lenders to buy exclusively Fair Isaac's FICO scores." TUCC ¶¶42-58 (emphasis added). TransUnion also claimed that "Fair Isaac has used the 'Level Playing Field' and 'Dynamic Royalty Schedule' provisions" to "extract monopoly prices from all three credit

---

[13] The Bureaus essentially argue (at 22) that their contracts with Fair Isaac do not harm competition because VantageScore could enter the market through other distributors. But Plaintiffs allege that there are no other distributors. *See supra*, pp. 20-21. Defendants are not entitled to the opposite inference. *See Vasquez*, 40 F.4th at 583. Moreover, Fair Isaac cannot be a relevant, competing distributor because there is no indication – in the operative complaints or elsewhere – that it would ever distribute scores produced by its direct competitor, VantageScore. It would be an inappropriate inference in the Bureaus' favor to conclude on a motion to dismiss that VantageScore could somehow enter the market through Fair Isaac. *See McReynolds*, 694 F.3d at 879.

reporting agencies and ***their customers*** and prevent any credit reporting agency from negotiating lower royalty prices than the others." *Id.* ¶¶ 59-60 (emphasis added).

## IV. THE CREDIT BUREAUS' RECYCLED ARGUMENTS FAIL

The Credit Bureaus devote a few sentences (at 23) to incorporating by reference arguments they made in their prior motion to dismiss. Such "[s]kirting" page "limits through 'incorporation by reference' is impermissible." *Silverman v. Bd. of Educ. of City of Chi.*, No. 08-cv-2220, 2010 WL 3000187, at *1 (N.D. Ill. July 26, 2010), *aff'd*, 637 F.3d 729 (7th Cir. 2011). In any event, the arguments are just as meritless today as they were two years ago.

TransUnion claims in a parenthetical that its abandoned "antitrust claim against FICO" warrants dismissal of this lawsuit. Not so. It never withdrew from the challenged contracts. To the contrary, Plaintiffs allege that Fair Isaac "bought TransUnion off" so that it would abandon its challenge to the contracts. DPAC ¶ 99; IPAC ¶ 113. TransUnion thus cannot benefit from a withdrawal defense. *See Bullis*, 77 F.3d at 1562.

Experian asserts in a parenthetical that the claims against it should be dismissed because it is "a direct purchaser from FICO, and because Experian entered its agreements with FICO before any other Bureau." CB Br. 23. But its claim to be a direct purchaser doesn't help it. *See* pp. 16-17 & n.11, *supra*. And ***when*** Experian entered into contracts with Fair Isaac is utterly irrelevant given that Plaintiffs are no longer alleging that the timing of entry into the contracts is evidence of conspiracy.

Equifax raises the same timing argument in a parenthetical. It is just as unhelpful to Equifax as it is to Experian.[14]

---

[14] To the extent it matters, Plaintiffs allege that the Bureaus and Fair Isaac "executed parallel anticompetitive contracts at the first available opportunity." DPAC ¶ 108 n.72; *see* IPAC ¶ 120.

## V. THE STATE-LAW CLAIMS RISE, BUT DO NOT FALL, WITH THE FEDERAL CLAIMS

The Credit Bureaus argue (at 23-24) that the state-law claims fall with the federal law claims. That is not true. Because of differences in the elements of multiple state laws, state-law antitrust claims can survive even if the Sherman Act claims are dismissed.

For example, California's Unfair Competition Law proscribes a wide range of "unfair" business conduct – even if that conduct "fail[s] to establish Sherman Act liability." *Epic Games*, 67 F.4th at 1001. California's Cartwright Act is similarly "broader in range and deeper in reach than the Sherman Act." *In re Cipro Cases I & II*, 348 P.3d 845, 872 (Cal. 2015). Under the Cartwright Act, a price restraint like the Level Playing Field provision is "per se illegal[ ]" regardless of whether it is deemed "horizontal or vertical." *Mailand v. Burckle*, 572 P.2d 1142, 1147-48 (Cal. 1978). Thus, to succeed on their Cartwright Act claim, Plaintiffs need not allege that the Level Playing Field provision "had an actual anticompetitive effect." *Id.* at 1150. Maryland's antitrust law is similar. *See Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 993 (W.D. Wash. 2022) (discussing Maryland law). Those are just a handful of examples.

For the Credit Bureaus' remaining dismissal arguments, because the state-law analysis "mirrors the Sherman Act analysis," their challenges to the state-law claims fail for the same reasons as their challenges to the Sherman Act claims. *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 831-32 (9th Cir. 2022).[15]

In any event, if this Court dismisses the federal claims against the Credit Bureaus, it should retain supplemental jurisdiction over the state-law claims. A district court may decline supplemental jurisdiction only if it "has dismissed all claims over which it has original

---

[15] The Credit Bureaus rely on *In re Humira (Adalimumab) Antitrust Litigation*, 465 F. Supp. 3d 811 (N.D. Ill. 2020), but the plaintiffs there "agree[d] that if the federal antitrust claims are dismissed, the state-law antitrust claims should be dismissed, too." *Id.* Plaintiffs here disagree for the reasons explained above.

jurisdiction," 28 U.S.C. §1367(c)(3), or if another §1367(c) factor is met. *See Montano v. City of Chicago*, 375 F.3d 593, 601 (7th Cir. 2004). Here, if the Court rejects Fair Isaac's attempt to overturn this Court's denial of its first motion to dismiss (as it should), not all federal claims will be dismissed. And Plaintiffs' claims against the Credit Bureaus concern settled state antitrust law, which would not predominate over the related federal claims. Moreover, no exceptional circumstances exist for declining jurisdiction. Thus, none of the §1367(c) factors are met. Because "the same evidence, witnesses, and parties are involved" with prosecuting the federal claims against Fair Isaac and state-law claims against the Credit Bureaus, "judicial economy, convenience, and fairness interests will be served by this [C]ourt hearing Plaintiffs' state claims." *Garot Anderson Mktg., Inc. v. Blue Cross & Blue Shield United*, 772 F. Supp. 1054, 1064 (N.D. Ill. 1990). If Plaintiffs were required to refile their state-law claims in another court, all parties – Plaintiffs, Fair Isaac, and the Credit Bureaus – would be forced to litigate the same facts and very similar claims in at least two different fora (and likely many more).

## VI. ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE TO AMENDING AT THE CONCLUSION OF DOCUMENT PRODUCTION

The Credit Bureaus urge dismissal with prejudice. CB Br. 24. For the foregoing reasons, the claims against the Credit Bureaus should not be dismissed at all. If this Court disagrees, however, Plaintiffs respectfully request dismissal without prejudice with leave to amend after the conclusion of document discovery, which the Court has allowed to proceed against Fair Isaac and the Credit Bureaus (as non-parties). Dkts. 198, 227. Courts routinely permit plaintiffs to renew dismissed claims "[a]fter discovery," if the evidence reveals "sufficient support to do so." *Chisholm v. Foothill Cap. Corp.*, 940 F. Supp. 1273, 1281 (N.D. Ill. 1996).[16]

---

[16] *See, e.g.*, *McMaken ex rel. Chemonics Int'l, Inc. Emp. Stock Ownership Plan v. Greatbanc Trust Co.*, No. 17-cv-4983, 2019 WL 10891860, at *2 (N.D. Ill. Dec. 27, 2019) (similar); *Grupo*

Discovery is likely to reveal further support for Plaintiffs' claims against the Credit Bureaus. Case in point: The only documents produced in this case to date (the 2015 ADLA with TransUnion and a royalty schedule) reveal **_additional_** anticompetitive provisions that Plaintiffs could not have discovered previously because of confidentiality provisions in the agreements. DPAC ¶ 172 & n.126; IPAC ¶ 193 & n.111. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████  ADLA at 6. ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████  And that is not the only additional anticompetitive provision Plaintiffs have uncovered. ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████  ADLA § 2.5.

It is likely that discovery will reveal even more evidence substantiating Plaintiffs' claims.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Credit Bureaus' motion to dismiss or, in the alternative, dismiss without prejudice to amending at the conclusion of document discovery.

---

*Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT&T Commn'cns, Inc.*, No. 92-cv-7862, 1996 WL 312535, *7 (S.D.N.Y. June 10, 1996) (similar).

Dated: January 16, 2024

Respectfully Submitted,

  /s/ Steven F. Molo  

Steven F. Molo
Lauren F. Dayton
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Telephone: 312-450-6700
smolo@mololamken.com
ldayton@mololamken.com

Lauren M. Weinstein
Robert Y. Chen
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.,
  Suite 500
Washington, DC 20037
Telephone: 202-556-2000
lweinstein@mololamken.com
rchen@mololamken.com

*Liaison Counsel for Direct Purchaser
Plaintiffs and the Proposed Direct
Purchaser Class*

Christopher M. Burke
Walter Noss
Yifan (Kate) Lv
KOREIN TILLERY PC
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: 619-625-5620
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

  /s/ Carmen Medici  

Carmen Medici (*pro hac vice*)
Gary Foster (*pro hac vice*)
SCOTT+SCOTT
  ATTORNEYS AT LAW LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-798-5319
cmedici@scott-scott.com
gfoster@scott-scott.com

Joseph P. Guglielmo (N.D. Ill. 2759819)
Michelle E. Conston (*pro hac vice*)
Anna Hunanyan (*pro hac vice*)
SCOTT+SCOTT
  ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
jguglielmo@scott-scott.com
mconston@scott-scott.com
ahunanyan@scott-scott.com

Patrick McGahan (*pro hac vice*)
SCOTT+SCOTT
  ATTORNEYS AT LAW LLP
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct
Purchaser Plaintiffs and the Proposed Direct
Purchaser Class*

George A. Zelcs
Randall P. Ewing, Jr.
Chad E. Bell
Labeat Rrahmani
KOREIN TILLERY, LLC
205 North Michigan Avenue,
  Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com
cbell@koreintillery.com
lrrahmani@koreintillery.com

Jennifer W. Sprengel
CAFFERTY CLOBES MERIWETHER &
  SPRENGEL LLP
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

Barbara J. Hart (*pro hac vice*)
GRANT & EISENHOFER
485 Lexington Ave., 29th Floor
New York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

Brian M. Hogan
DICELLO LEVITT LLP
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Telephone: 312-214-7900
bhogan@dicellolevitt.com

Gregory S. Asciolla (*pro hac vice*)
Karin E. Garvey (*pro hac vice*)
John M. Shaw (*pro hac vice*)
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, NY 10017
Telephone: 646-933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
jshaw@dicellolevitt.com

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Linda P. Nussbaum
Susan Schwaiger
NUSSBAUM LAW GROUP, P.C.
1133 Avenue of the Americas, 31st Floor
New York, NY 10036
Telephone: 917-438-9102
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Michael L. Roberts
Karen Sharp Halbert
ROBERTS LAW FIRM, P.A.
20 Rahling Circle
Little Rock, AR 72223
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Charles F. Barrett (*pro hac vice*)
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: 615-244-1713
cbarrett@nealharwell.com

Don Barrett (*pro hac vice* forthcoming)
BARRETT LAW GROUP, P.A.
404 Court Square
P.O. Box 927
Lexington, MS 39095
Telephone: 662-834-2488
dbarrett@barrettlawgroup.com

27

Gary F. Lynch
LYNCH CARPENTER LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
gary@lcllp.com

Katrina Carroll
LYNCH CARPENTER LLP
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
katrina@lcllp.com

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1908
mlehmann@hausfeld.com
clebsock@hausfeld.com

Hilary K. Scherrer
Paul Gallagher
HAUSFELD LLP
1700 K Street, N.W., Suite 650
Washington, DC 20006
Telephone: 202-540-7200
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Scott A. Martin
Irving Scher
Jeanette Bayoumi
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: 646-357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

Richard R. Barrett (*pro hac vice* forthcoming)
BARRETT LAW GROUP, P.A.
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: 662-380-5018
rrb@rrblawfirm.net

Daniel E. Gustafson (*pro hac vice*)
Michelle J. Looby (*pro hac vice*)
Daniel J. Nordin (*pro hac vice*)
Anthony J. Stauber
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
dnordin@gustafsongluek.com
tstauber@gustafsongluek.com

Dennis Stewart (*pro hac vice*)
GUSTAFSON GLUEK PLLC
600 B Street, 17th Floor
San Diego, CA 92101
Telephone: 619-595-3200
dstewart@gustafsongluek.com

Kenneth A. Wexler
Melinda J. Morales
Michelle Perkovic
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

*Counsel for Counsel for Direct Purchaser Plaintiffs*
*and the Proposed Direct Purchaser Class*

  /s/ Garrett D. Blanchfield
Garrett D. Blanchfield (*pro hac vice*)
Brant D. Penney (*pro hac vice*)
Roberta A. Yard (*pro hac vice* forthcoming)
REINHARDT WENDORF &
  BLANCHFIELD
222 South 9th Street, Suite 1600
Minneapolis, MN 55101
Telephone: 651-287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

*Interim Co-Lead Counsel for Indirect
Purchaser Plaintiffs and the Proposed
Indirect Purchaser Class*

Charles R. Watkins (3122790)
GUIN, STOKES & EVANS, LLC
321 South Plymouth Court
Suite 1250
Chicago, IL 60604
Telephone: 312-878-8391
charlesw@gseattorneys.com

*Liaison Counsel for Indirect Purchaser
Plaintiffs and the Proposed Indirect
Purchaser Class*

Brian P. Murray (*pro hac vice* forthcoming)
Lee Albert (*pro hac vice* forthcoming)
GLANCY PRONGAY & MURRAY LLP
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: 212-682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com

Jeffrey J. Corrigan (*pro hac vice*)
William G. Caldes (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
Icee N. Etheridge (*pro hac vice*)
SPECTOR ROSEMAN &
  KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: 215-496-0300
JCorriganf@srkattorneys.com
BCaldes@srkattorneys.com
JSpector@srkattorneys.com
IEtheridge@srkattorneys.com

Michael S. Smith (*pro hac vice*)
Gregory P. Hansel (*pro hac vice*)
Randall B. Weill (*pro hac vice*)
Elizabeth F. Quinby (*pro hac vice*)
PRETI FLAHERTY, BELIVEAU &
  PACHIOS LLP
One City Center,
P.O. Box 9546
Portland, ME 04101
Telephone: 207-791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com

David McLafferty (*pro hac vice* forthcoming)
MCLAFFERTY LAW FIRM, P.C.
  ATTORNEYS AT LAW
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-940-4000, ext. 12
www.McLaffertyLaw.com

Douglas A. Millen
FREED KANNER LONDON &
  MILLEN LLC
100 Tri-State International Drive, Suite 128
Lincolnshire, IL 60069
Telephone: 224-632-4500
dmillen@fklmlaw.com

Simon B. Paris, Esq.
  (*pro hac vice* forthcoming)
Patrick Howard, Esq.
  (*pro hac vice* forthcoming)
SALTZ MONGELUZZI & BENDESKY, P.C.
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: 215-575-3985
sparis@smbb.com
phoward@smbb.com

Jonathan M. Jagher
  (*pro hac vice* forthcoming)
FREED KANNER LONDON &
  MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-234-6487
jjagher@fklmlaw.com

Michael J. Boni (*pro hac vice* forthcoming)
Joshua D. Snyder (*pro hac vice* forthcoming)
John E. Sindoni (*pro hac vice* forthcoming)
BONI, ZACK & SNYDER LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: 610-822-0200
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

*Counsel for Indirect Purchaser Plaintiffs*
*and the Proposed Indirect Purchaser Class*

# EXHIBIT 20

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| *In re FICO Antitrust Litigation* | Case No. 20-cv-02114 |
| *This document relates to:* | Honorable Edmond E. Chang |
| *VantageScore Solutions, LLC v. Fair Isaac Corporation*, Case No. 1:24-cv-01634 | Magistrate Judge M. David Weisman |

**VANTAGESCORE SOLUTIONS, LLC'S COMBINED REPLY IN FURTHER SUPPORT
OF ITS MOTION TO QUASH SUBPOENA AND MEMORANDUM OF
LAW IN SUPPORT OF ITS OPPOSITION TO
FAIR ISAAC CORPORATIONS' CROSS-MOTION TO COMPEL**

Dated: April 10, 2024

Sabrina Rose-Smith
GOODWIN PROCTER LLP
1900 N Street NW
Washington, D.C.
Tel.: 202.346.4000
SRoseSmith@goodwinlaw.com

*Counsel for Non-Party Movant
VantageScore Solutions LLC*

VantageScore submits this combined reply supporting its Motion to Quash Subpoena (Dkt. 268) ("MTQ") and opposition to FICO's Cross-Motion to Compel (Dkt 269) ("MTC").

# I.   <u>BACKGROUND</u>

## A.   **VantageScore's Contentious History With FICO**

As detailed in VantageScore's Motion to Quash, MTQ at 1-3, FICO has a lengthy history of competitive animosity towards VantageScore, so it is not unreasonable for VantageScore to be concerned about FICO's subpoena. In its papers, FICO characterizes VantageScore's detailing of this contentious history as unfair mudslinging. But for VantageScore, this background is important for the Court to understand how tightly competitive the credit scoring market is and has been, and why the relative market positions of these two competitors make FICO's subpoena especially egregious in VantageScore's view. Indeed, this lawsuit alleging FICO has engaged in anticompetitive wrongdoing has given FICO thin cover to extract detailed information regarding its chief competitor's business contracts, investment decisions, growth penetrations, budgeting allocations, internal strategic deliberations among VantageScore's key executives, and VantageScore's view of its own successes, weaknesses, and future. If allowed, the discovery FICO seeks would give FICO an even greater competitive advantage than it already enjoys, and may facilitate exactly the kind of information exchange that antitrust law restricts as among competitors. *See Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins.*, 784 F.2d 1325, 1346 (citing *General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 597 (7th Cir. 1984)). Given the unique aspects of the credit scoring market and the parties' history, the Court should not permit FICO access to such competitively sensitive information from VantageScore under any circumstances.[1]

---

[1] VantageScore requests that the Court grant its Motion. Alternatively, since motions to dismiss are pending, and FICO seeks to stay discovery (Dkt 255), if the Court views any production is warranted, it should take the matter under advisement until party discovery is developed, then revisit whether discovery from VantageScore is still needed.

1

### B.    VantageScore Met & Conferred With FICO In Good Faith

As described in FICO's Opposition, VantageScore's counsel met and conferred several times with FICO's counsel in an effort to reach a compromise solution which would adequately address VantageScore's legitimate concerns regarding its extremely unique position as a non-party facing sweeping demands for highly competitively sensitive information from its primary competitor. Contrary to FICO's intimations in its Opposition, VantageScore engaged in these discussions in good faith until such time that it became clear that even the "compromise" positions FICO suggested—but never confirmed—it "might" accept would not meaningfully ameliorate the risks presented to VantageScore's business.[2] As FICO has made clear that it does not give adequate weight to VantageScore's concerns relative to its own interests, VantageScore moved to quash.

## II.    <u>ARGUMENT</u>

### A.    An Attorneys' Eyes Only Provision is No Panacea for VantageScore's Legitimate Confidentiality Concerns.

FICO argues in its Opposition that VantageScore's concerns regarding the protection of its highly commercially sensitive information can be completely eliminated through use of an "Attorneys' Eyes Only" provision. *See* Dkt 271 ("FICO Opp.") at 3, 5-6, 11. FICO's position fails to address both the unique posture of VantageScore vis-à-vis FICO and the practical reality of the limitations of the protection an "Attorneys' Eyes Only" provision actually provides.

First, FICO fails to acknowledge that the parties' history and the market in which they compete, are highly relevant to the risks to VantageScore here. Specifically, FICO has for decades

---

[2] FICO's passing mention that VantageScore did not timely move to quash is without merit, as evidenced by FICO's other allegation that VantageScore somehow also ***prematurely ended*** the meet and confer process by moving to quash. VantageScore timely served its responses and objections to the Subpoena on January 24, 2024, *see* Rose-Smith Decl. ¶¶ 4-5, and engaged in good faith negotiations with FICO's counsel until it became clear that VantageScore could not comply with either the original Subpoena Requests or the compromise positions FICO's counsel stated FICO would consider (but did not memorialize or confirm). Rose-Smith Decl. ¶ 10.

been, and remains to this day, the eight-hundred-pound gorilla of the credit scoring business, while VantageScore has worked steadily since 2006 to gain traction and, as such, now truly is a primary competitor (*i.e.* threat) to FICO's market dominance. Thus, given the lack of breadth of players within the credit scoring market, the plans, activities, and actions of either party have magnified potential impact on the other, and disclosure of competitively sensitive information from the non-dominant, disclosing party could seriously impact the disclosing party's ability to fairly compete.

Next, FICO's arguments ignore the practical realities of the implementation of an "Attorneys' Eyes Only" provision. Though designation of materials as "Attorneys' Eyes Only" affords VantageScore some level of assurance that its information will not be indiscriminately disseminated, it is certainly not the panacea FICO claims it is. Specifically, even assuming that counsel to all parties involved abide by their ethical obligations to comply with the protective order—and VantageScore is not suggesting otherwise—placing such competitively sensitive information in its primary competitor's hands requires a one-sided level of trust on VantageScore's part that is not warranted given the parties' antagonistic history, has VantageScore's senior executives understandably alarmed, and would be catastrophic if broken.

More concerning, VantageScore's designation of material as "Attorneys' Eyes Only" will not prevent disclosure of such information to all FICO-affiliated individuals who are involved in the litigation. For example, the expert reports in this matter will likely incorporate highly confidential VantageScore materials—whether directly through quotation or summary, or indirectly in the experts' analysis—making it difficult to parse that information out of the expert reports FICO-affiliated individuals will necessarily review as part of the litigation, and which will ultimately be filed publicly. Of course, even where the terms of the protective order do not permit those individuals to be shown "Attorneys' Eyes Only" material, or to retain material shown to

them in circumstances permitted by the protective order, it is impossible to eradicate the information learned from the memory of a FICO-affiliated individual or ensure it will not impact future decision-making.[3] In a market this competitive, Court intervention cannot un-ring that bell.

Finally, VantageScore's designation of material as "Attorneys' Eyes Only" will not automatically prevent disclosure of such information in public court documents or at trial. See Dkt. 199 ¶ 9. Rather, FICO's proposed solution would require VantageScore to either (i) rely upon the filing party to adequately advocate to keep such material sealed on its behalf; or (ii) take upon itself the burden of diligently monitoring the case as it develops so that it can intercede as necessary to ensure none of its commercially sensitive information is disclosed. Neither solution is tenable or an appropriate burden for a non-party. Other District Courts have acknowledged the unenviable position non-parties are in when subpoenaed by competitors:

> What happens with any information disclosed by Congoleum in response to Mannington's subpoena, particularly at trial, is anyone's guess. Although the protective order allows the designation by Congoleum that such information is confidential and limits initial disclosure to outside counsel, the parties to this litigation are left with the option of how disclosure of such confidential information is handled at trial. As a result, control is in the hands of Congoleum's undisputed competitors and the court. Despite Mannington's arguments to the contrary, "it would be divorced from reality to believe that either party here would serve as the champion of its competitor ... to maintain the confidentiality designation or to limit public disclosure ... during trial." *Micro Motion*, 894 F.2d at 1325. Moreover, courts have traditionally recognized that disclosure to a competitor is more harmful than disclosure to a noncompetitor.

*Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525, 530–31 (D. Del. 2002).

Accordingly, in light of FICO's failure to demonstrate a compelling need for the competitively sensitive information it seeks sufficient to overcome the burden imposed, the Court should grant VantageScore's Motion to Quash and deny FICO's Cross-Motion to Compel.

---

[3] FICO will argue that the protective order could include notice and a chance to object before VantageScore's information is disclosed. But creating such a process will only obligate VantageScore to pay for counsel to rush into court at unknown points over the next year (or several) as this lawsuit unfolds.

## B. FICO's Amended Requests Impose an Undue and Unnecessary Burden

### 1. Requests 1 and 2[4]

FICO seeks to require VantageScore to produce its "LLC agreement, and Documents sufficient to show (to the extent not reflected in the LLC agreement itself) the terms on which VantageScore licenses its credit scoring algorithms and software to the Credit Bureaus." MTC ¶ 1. During the meet and confer process, counsel for VantageScore stated that: (i) its LLC Agreement *likely* reflected all of the terms of its agreements with the Credit Bureaus; (ii) it was *possible* that its LLC agreement had been attached to a public filing in an earlier case to which VantageScore was a party; and (iii) if it had previously been publicly disclosed, VantageScore could not practically object to producing the prior disclosed version of the agreement in response to the Subpoena. *See* Rose-Smith Decl. ¶ 7; Provance Decl. ¶ 8. Subsequent investigation has revealed that VantageScore's LLC agreement has not previously been publicly disclosed, but rather was filed as a sealed exhibit in previous litigation to which it was a party and that exhibit remains sealed to the present. *See* Rose-Smith Decl. ¶ 8. VantageScore's counsel also has confirmed that VantageScore possesses an Intellectual Property Agreement ("IP Agreement"), with additional terms of its agreements with the Credit Bureaus. *Id*.

*Relevance.* FICO argues in its Motion to Compel that the information called for by Amended Requests 1 & 2 should be produced by VantageScore to demonstrate the competitive landscape for credit scores and to test its asserted theory that the agreements contain language that the Credit Bureaus have agreed to promote or favor VantageScore. *See* FICO Opp. at 4. But the competitive landscape is best understood from what is happening as a practical matter in the

---

[4] Though FICO's counsel previously suggested during the meet and confer process only that FICO *may* be willing to revise its Requests (and did not subsequently confirm those compromise positions in writing), Rose-Smith Decl. ¶ 9, now that FICO's Motion to Compel states the specific information it seeks, VantageScore addresses FICO's requests as revised (the "Amended Requests").

market, not via VantageScore's founding documentation. FICO's argument also misses the point—Plaintiffs' allegations center on actions purportedly taken by FICO to stifle competition (*i.e.* VantageScore). Information concerning the terms of any agreements between VantageScore and the Credit Bureaus will have no bearing on the truth or falsity of Plaintiffs' allegations concerning FICO's conduct, nor whether VantageScore was or is a viable competitor to FICO.

*Confidentiality.* Even if FICO could meet its burden to demonstrate that the LLC and IP agreements are somehow relevant to confirm or deny the allegations around FICO's conduct in the credit score market, the LLC agreement and IP Agreement sought by Amended Requests 1 & 2 reflect sensitive information which VantageScore should not be forced to disclose to its primary competitor, which undisputedly has dominated the credit scoring market for decades. For example, the LLC agreement (and amendments) contains detailed budgeting information, meeting guidelines, and similar minute details concerning VantageScore's operations and strategy. Similarly, the IP Agreement (and amendments) reflect competitively sensitive information regarding VantageScore's early research related to the development of its intellectual property, and the plans, rights, and obligations of the agreement's parties for further development.

*Burden.* FICO argues there is little burden associated with Amended Requests 1 & 2 because: (i) the information sought is in one—or, including the IP agreement, two—documents; and (ii) the Credit Bureaus are also 'non-parties' for discovery purposes. FICO Opp. at 5.

First, FICO's argument ignores that, while the burden of physically producing copies of the LLC agreement and IP Agreement may be slight, any production of such information by VantageScore would necessarily be designated as "Attorneys' Eyes Only." As discussed above, even if VantageScore derives some protections from designating material "Attorneys' Eyes Only," production of such information poses a continuing burden to VantageScore, which would

thereafter be required to either (i) rely upon the Parties to properly safeguard its confidential information from unnecessary disclosure to FICO-affiliated individuals during the course of litigation, and in instances where the Parties seek to reference and/or attach such information to submissions to the court in motion practice or at trial; *or* (ii) itself assume the burden of conducting that vigilance and filing motions to seal with the Court in each such instance. Such a position is untenable for a non-party, as VantageScore has been and necessarily will be removed from the day-to-day machinations of the underlying proceedings. Moreover, as discussed above, VantageScore's designation of material as "Attorneys' Eyes Only" will not prevent disclosure of such information to FICO-affiliated individuals who participate in this litigation, whether through review of expert reports which rely on VantageScore's confidential information or otherwise. If FICO-affiliated individuals learn VantageScore's trade secret, confidential and proprietary information through their participation in the litigation, they will retain that knowledge regardless of any prohibition on their retention of the documents, reports, transcripts, or pleadings themselves.

Second, while the Court has temporarily addressed the Credit Bureaus' motion to stay discovery by ordering that they be treated as non-parties for the time being (Dkt. 227), it does not follow that VantageScore and the Credit Bureaus are equal in any analysis of who ought to bear the burdens of discovery when identical information is equally available from each. Specifically, VantageScore is alleged by Plaintiffs to be the primary target or victim of an illegal collusive scheme designed to stamp out the competitive threat posed to FICO by VantageScore. The Credit Bureaus are, at least, named defendants and subject to Plaintiffs' allegations until such time as the Credit Bureaus are dismissed. Thus—regardless of the Court's interim discovery order— VantageScore and the Credit Bureaus are not equally situated *vis-à-vis* this litigation, and VantageScore is facing no allegations at all. Therefore, though VantageScore strongly asserts that

the LLC Agreement and IP Agreement should not be disclosed to FICO in the first place under any circumstance, in the event the Court determines that information regarding the Credit Bureaus' relationship with VantageScore is relevant, the equities weigh in favor of FICO seeking information from the nominal parties where information is equally available to FICO from either the Credit Bureaus or VantageScore. To be clear, VantageScore does not suggest that the LLC Agreement and IP Agreement are any more relevant or less sensitive if FICO sought to obtain them from the Credit Bureaus, but if they seek information about the Credit Bureaus' relationship with VantageScore, the best source for that information would not be VantageScore.

### 2. Requests 3 through 8

FICO seeks to require VantageScore to produce: (1) the data in VantageScore's possession, custody, or control that underlies its 2017, 2018, 2019, and 2022 Market Study Reports and its 2023 Market Adoption Study; (2) Documents sufficient to show the number and type of VantageScore scores distributed by the Credit Bureaus or Resellers, broken out by category of end user, distribution channel, and, if known, by use case, from 2013 to 2023; and (3) Documents sufficient to show VantageScore's market share calculations over the same period. MTC ¶ 2.

As explained during the meet and confer process and in its Motion to Quash, VantageScore does not generate credit scores for commercial sale, but rather merely licenses scoring algorithms it develops to the Credit Bureaus, who may then distribute the credit scores. *See* MTQ at 8-9. Because VantageScore does not distribute its own credit scores, VantageScore has engaged an outside consultant to study and publish information related to VantageScore's adoption in the marketplace. Given the sensitivity of the raw data obtained from the Credit Bureaus to support these studies, VantageScore does not receive the raw data; it has been handled entirely by VantageScore's consultants. VantageScore's consultants over the years have provided summary level information to VantageScore, and in more recent years, VantageScore has published a

version of these studies, which are publicly available for FICO and its experts to review. VantageScore addresses these Requests as to the information that may be in its actual possession, which does not include as a matter of policy and practice[5] the raw data.

*Relevance.* FICO argues that the documents and data underlying the market studies will demonstrate the competition in the marketplace. Regarding its first request in this category, FICO's attempt to review the underlying data suggests it does not believe the accuracy of the published results and FICO fails to explain why it needs to check VantageScore's reputable, outside consultant's work by reviewing the underlying data or why validating the results of VantageScore's published studies is relevant to how FICO has conducted itself in the marketplace.

Regarding FICO's second request in this category, since at least 2015, VantageScore has published documents sufficient to show the number of VantageScore credit scores used, and since approximately 2017 has also published the type of VantageScore credit scores broken out by the requested end-user categories. For example, among other information, the publicly available 2024 VantageScore Market Study Report includes a table—VantageScore Market Analysis, 2023; VantageScore Credit Score Use by User Type—which provides detailed information FICO has requested for 2021, 2022, and 2023. *See* Rose-Smith Decl., Ex. 1 at 6 (Table 1).[6]

FICO also fails to explain why VantageScore's own internal market share calculations over a ten-year period would be any more illuminating than FICO's own internal projections, or the analysis of experts it is free to retain. To the extent VantageScore has assessed its market share,

---

[5] FICO has and will argue that VantageScore has control over the raw data sought here because it is in possession of vendors VantageScore hired. However, it always has been VantageScore's policy not to take possession of this data from the Credit Bureaus to avoid even a hint of antitrust concern (which FICO would undoubtedly raise if it could).

[6] FICO does ask for certain nonpublic data: studies before 2015, distribution channel, and if known, by use case. However, FICO does not establish why the breadth of information published by VantageScore stating its growth in the marketplace is insufficient.

such information would be an estimate based on limited information. Although FICO does not appear to similarly publish how many FICO credit scores are used each year it surely possesses that information and can use VantageScore's public information to calculate market share, placing FICO in the best position to reveal the market share. FICO has not established why any VantageScore estimates to gauge where its efforts are having any traction are more relevant than a calculation FICO is capable of producing using its non-public data and VantageScore's public data. In the absence of such an explanation, FICO should not be permitted access to its primary competitor's investment in market share projections, which are highly competitively sensitive. *Act, Inc. v. Sylvan Learning Sys.*, Inc., Misc. No. 99-63, 1999 U.S. Dist. LEXIS 7055, at *8 (E.D. Pa. May 14, 1999) (declining to compel non-party competitor to produce market assessment information that "would cause it serious commercial harm and allow its direct competitors to free ride on its own investment in assessing the…market").

*Burden.* As described above, VantageScore does not generate or maintain copies of the raw data which underlies the Market Studies requested by FICO, and therefore cannot produce that data.[7] FICO seemingly accepts this reality, FICO Opp. at 7. But FICO argues that VantageScore nevertheless ought to be compelled to produce non-public "long-form" summaries provided to it by the third parties which generate the Market Studies notwithstanding that those "long-form" summaries summarize highly sensitive data owned by the Credit Bureaus.

To the extent VantageScore possesses the "long-form" summaries of the Credit Bureau data, pulling this information would involve a search of electronic and hard-copy format documents. While certain more recent records may be capable of identification from current employees, identifying the full scope of summaries of the market adoption data would involve the

---

[7] If any raw data underlying the Market Studies ever had been transmitted to VantageScore, it would be in paper-based and email archives which, as described below, are prohibitively expensive to search.

review of email and hard-copy archives. Certain of the "long-form" summaries FICO seeks are kept—if at all—in hard copy format in a paper-based archive comprised of approximately 478 boxes of paper records, the majority of which are the records of VantageScore's former outside counsel, of which VantageScore's current outside counsel recently took possession. VantageScore preliminarily estimates that the cost of digitizing this archive to make it electronically searchable—excluding the cost of attorney review—would be at least $481,000, while the cost of a manual review of the paper files would range from $592,720 to $745,680. *See* Briggs Decl. ¶¶ 5-6.

Similarly, VantageScore's historical market share projections, if they still exist at all, are likewise stored only within these paper and email archives. Similar to the paper-based archive, the cost involved in merely collecting the email data and processing it to make it searchable is likely to amount to $30,000, even before the cost of reviewing documents for responsiveness and privilege, which would similarly involve substantial additional costs. *Id.* ¶¶ 12-15. Accordingly, VantageScore should not be compelled to produce the "long-form" summaries, nor its own internal market share projections, which are of dubious relevance relative to other information available to FICO and for which the cost for VantageScore far outweighs any benefit.

Finally, production of the material sought by Requests 3 through 8 would necessarily be designated as "Attorneys' Eyes Only," which for the reasons described above would impose further burdens on VantageScore while not fully safeguarding its competitively sensitive information throughout the ordinary course of discovery, motion practice, and trial.

*Confidentiality.* While the data FICO seeks from VantageScore in Requests 3 through 8 would be most properly sought from the Credit Bureaus as parties to the litigation, in reality the data sought is so competitively sensitive that no party should be compelled to disclose it to FICO because to do so would provide VantageScore's chief competitor a roadmap of VantageScore's

business plans. Specifically, the "long-form" summaries contain more detailed information than what is disclosed in the public Market Studies, including information regarding the identities and concentration of VantageScore users, and penetration within market segments. Bandebo Decl. ¶ 4-6. Requiring VantageScore to share this information would enable its competitors to know with precision where to target or reduce their future efforts. *Id*. In addition, the "long-form" summaries reveal sensitive, completely internal information regarding the use of VantageScore and its various models, which VantageScore uses to make decisions regarding its product roadmap, and disclosure of which would permit a competitor to anticipate the same. *Id*. In sum, the "long-form" summaries and internal market share projection data is highly sensitive information which, if disclosed, in deposition testimony, expert reports, or at trial, would harm VantageScore.

### 3. Requests 10 and 11

FICO also seeks any study, evaluation, assessment, or attempt (whether consummated or not) to align the odds-to-score relationship or reason codes between VantageScore Credit Scores and FICO Scores, including any assessment of the need to do so. MTC ¶ 3. VantageScore has conducted a reasonable and good faith search of its business records, but has been unable to locate any information or documents regarding any VantageScore study, evaluation, assessment, or any evidence of any VantageScore attempt (whether consummated or not), nor any written policies or directives restricting VantageScore's ability to attempt, to align the odds-to-score relationship or reason codes between any VantageScore Credit Scores and FICO Scores. In an abundance of caution, VantageScore also consulted its prior outside counsel who represented the company from the very early days of VantageScore's founding before VantageScore established its current legal department to confirm. She too, is unaware of any such VantageScore documents or policy. *See*

Berens Decl. ¶ 4-5.  Accordingly, VantageScore does not possess and cannot produce documents in response to FICO's Amended Requests 10 and 11.[8]

### 4. *Requests 12 and 13*

FICO seeks documents that reflect VantageScore's awareness or understanding of the "No Equivalent Products," "Dynamic Royalty Schedule," "Pre-Qualification," and "Level Playing Field" provisions of FICO's license agreements with the Credit Bureaus. MTC ¶ 4. FICO also seeks documents authored, sent, or received by nine senior employees or executives (and their predecessors/successors) related to 10 separate statements attributed to VantageScore. *Id.* ¶ 5.

*Relevance.*  FICO's arguments as to why the information sought by Requests 12 and 13 is relevant suffer from several fatal flaws. First, FICO has not bothered to lay any sort of foundation to demonstrate that VantageScore is even aware of the quoted contractual terms in an agreement between FICO and the Credit Bureaus, never mind demonstrated that VantageScore's internal perspective on various provisions in those agreements **to which it is not even a party and about which it has no non-public information** is relevant. Second, FICO does not explain why VantageScore's opinion about FICO's contract terms is relevant to determine its effects or would be superior to analyzing the exclusionary effects of FICO's conduct. Indeed, the public statements in Request 13 speak for themselves and FICO's assertion that VantageScore senior executives may have communicated additional context for those statements is speculative. VantageScore should not be compelled to undertake a costly ESI review based upon FICO's speculation.

*Burden.*  If VantageScore even possesses information responsive to Requests 12 and 13, it is stored in VantageScore employees' email and its hardcopy archive. FICO's dismissive attitude

---

[8] VantageScore has not searched its email and hard copy archives for **any possible communication** regarding aligning the odds-to-score relationship or reason codes because of the cost and burden of doing so. However, given the lack of any present or historic efforts by VantageScore to attempt alignment, it would be unreasonable for VantageScore to conduct such a search to prove a negative.

regarding VantageScore's legitimate concerns regarding the time and money required to collect and search ESI and hardcopy materials—and particularly since the requested information would be of marginal usefulness at best—highlights the problem with FICO's approach to non-party discovery. FICO's contention that VantageScore could comply with Requests 12 and 13 by "searching the email of a handful of employees using targeted search terms during narrow time periods" ignores that practical realities of ESI search and review. Preliminarily, FICO has not requested that VantageScore search the email accounts of "a handful" of employees, but rather has requested communications *to or from* nine separate individuals *and* "anyone who held these individuals' roles as predecessors or successors" over the course of ten years. In addition, the cost involved in merely collecting and processing the data needed to complete the requested searches is likely to amount to $30,000, even before the cost of responsiveness and privilege review, which also would involve substantial costs. *See* Briggs Decl. ¶¶ 12-15. These costs are disproportionate to the purported relevance of the materials, and VantageScore should not be burdened in service of FICO's fishing expedition.

### 5. *Requests 14 through 16*

FICO also seeks aggregated financial information from 2013-2023. MTC ¶ 6.

*Relevance and Burden.* FICO's argument that VantageScore's financial information is necessary evidence of "its ongoing viability as a competitor," ignores myriad other, less-intrusive means of supporting FICO's theories available to FICO. Indeed, in its Opposition, FICO quoted VantageScore's publicly disclosed Market Study information and statements to the press which demonstrate VantageScore's successes and development over time. *See* FICO Opp. at 1, 6. FICO's agreement to accept a summary of VantageScore's financial information on a quarterly or annual basis does not change the fact that VantageScore as a private company should not be required to produce such sensitive information to its primary competitor.

14

*Confidentiality.* FICO argues that VantageScore's concerns regarding the confidentiality of its financial information can be brushed aside because FICO and other publicly-traded companies report such information publicly misses the point. Public companies knowingly accept the requirements concerning publication of their financial information at the stage of development of their choosing specifically in exchange for the various benefits attendant to being publicly traded. VantageScore is a private company that has neither assumed the burden or reaped the benefits of disclosing its financial information externally, much less to its primary competitor. Like the Market Studies FICO seeks, disclosure of VantageScore's financial information would unfairly disadvantage VantageScore in a business in which the deck is already stacked in FICO's favor. FICO's relevance argument does not justify such disclosure when numerous other less intrusive avenues are available to FICO to demonstrate VantageScore's viability as a competitor.

### 6. *Requests 17 and 18*

FICO seeks any documents VantageScore produced or provided to the Department of Justice ("DOJ") in connection with DOJ's 2020 investigation of FICO. MTC ¶ 7. VantageScore has determined that it did not produce any records, narrative responses, or data compilations or summaries in connection with the DOJ's 2020 investigation of FICO for potential exclusionary practices. *See* Berens Decl. ¶ 2. Accordingly, VantageScore does not possess and cannot produce any documents in response to FICO's Amended Requests 17 and 18.

## III.  CONCLUSION

For the foregoing reasons, the Court should grant VantageScore's Motion to Quash, award VantageScore its costs in moving to quash, and deny FICO's Cross-Motion to Compel. VantageScore further requests that, if the Court determines a hearing is necessary, that such hearing be set at the Court's first availability given the sensitive nature of the information sought.

Dated: April 10, 2024

Respectfully submitted,

/s/ Sabrina Rose-Smith

Sabrina Rose-Smith
GOODWIN PROCTER LLP
1900 N Street NW
Washington, D.C.
Tel.: 202.346.4000
SRoseSmith@goodwinlaw.com

*Counsel for Non-Party Movant*
*VantageScore Solutions LLC*

## CERTIFICATE OF SERVICE

I, Sabrina Rose-Smith, an attorney, hereby certify that on April 10, 2024, I caused a true and correct copy of the foregoing **VANTAGESCORE SOLUTIONS, LLC'S COMBINED REPLY IN FURTHER SUPPORT OF ITS MOTION TO QUASH SUBPOENA AND MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSITION TO FAIR ISAAC CORPORATIONS' CROSS-MOTION TO COMPEL** to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

_/s/ Sabrina Rose-Smith_

Sabrina Rose-Smith
GOODWIN PROCTER LLP
1900 N Street NW
Washington, D.C.
Tel.: 202.346.4000
SRoseSmith@goodwinlaw.com

# EXHIBIT 21



**MINNESOTA OFFICE**
CANADIAN PACIFIC PLAZA
120 S. 6TH ST., STE 2600
MINNEAPOLIS, MN 55402

**CALIFORNIA OFFICE**
600 W. BROADWAY
SUITE 3300
SAN DIEGO, CA 92101

**DANIEL J. NORDIN**
dnordin@gustafsongluek.com
TEL (612) 333-8844 • FAX (612) 339-6622
MINNESOTA OFFICE

May 31, 2024

**VIA EMAIL**

| | | |
|---|---|---|
| Michael P. Mayer | Bryan Gant | Leslie Pope |
| Winston & Strawn LLP | White & Case LLP | Kellogg, Hansen, Todd, Figel |
| 35 West Wacker Drive | 1221 Avenue of the Americas | & Frederick P.L.L.C. |
| Chicago, IL 60601 | New York, NY 10020 | 1615 M Street NW, Suite 400 |
| mmayer@winston.com | bgant@whitecase.com | Washington DC 20036 |
| | | lpope@kellogghansen.com |

RE:    *In re FICO Antitrust Litig.*, Case No. 1:20-cv-02114
            Plaintiffs' Subpoenas Issued to Equifax, Experian, and TransUnion

Dear Counsel:

      I write on behalf of Plaintiffs in response to the Credit Bureaus' letter of May 22, 2024, regarding the subpoenas Plaintiffs served on the Credit Bureaus on December 28, 2023.

      **Relevant Time Period.** Plaintiffs have narrowed their requests considerably over the course of meeting and conferring on these subpoenas and have repeatedly explained their reasons for the relevant time period. Your correspondence ignores the fact that Plaintiffs have agreed to narrow the time period for certain requests, *e.g.*, No. 5, and have expressed willingness to narrow the time period for other Requests to the extent possible. At this point, Plaintiffs' position is that the onus is on the Credit Bureaus to explain either why the relevant time period is too burdensome for specific requests, to provide an explanation why the requested information is not available for the relevant time period, or to suggest a narrower time period appropriate to capture data responsive to the Requests.

      **Request No. 1.** This Request seeks documents the Credit Bureaus produced to the DOJ or other regulators in connection with their investigations concerning FICO's conduct relating to B2B Credit Scores or the B2B Credit Score Market. Plaintiffs appreciate the Credit Bureaus' efforts investigating whether they produced such documents. As committed in my May 6, 2024, letter, Plaintiffs inquired with FICO whether it is familiar with any other investigations that would be relevant to this request. FICO has indicated that it is not familiar with any such requests. Given your clarification that there was no additional investigation around the time VantageScore was created, Plaintiffs do not believe any other investigations are at issue in this Request.

Page 2
May 31, 2024

Thank you for confirming that TransUnion did in fact produce documents in connection with the DOJ's 2020 investigation of FICO. Please confirm that TransUnion will produce those documents in response to this request or explain in detail why it will not.

Plaintiffs understand Experian is still continuing its weeks-long investigation. Please confirm when Experian expects its investigation to conclude.

Thank you for confirming that Equifax did not produce any such documents. With that representation, Plaintiffs consider this request resolved as to Equifax.

And thank you for clarifying that the additional investigation mentioned during our last meet and confer as potentially being responsive to the Request is not, in fact, responsive.

**Request No. 2.** This Request, as narrowed by the proposal in my letter dated March 18, 2024, seeks all submissions, presentations, or other communications with legislators and legislative staff regarding FICO Scores, VantageScores, or any Competitor Credit Score Products.

Plaintiffs understand the Credit Bureaus' position to be that even this narrowed request is too broad, and that Plaintiffs should identify submissions related to a particular legislative proposal and/or a particular submission to legislators. As expressed during our conversations, Plaintiffs' position is that they do not have in their possession any information that would allow them to identify the instances when the Credit Bureaus provided such documents to the legislative branch, so it is not reasonable for them to have to identify specific submissions. Moreover, it is unlikely that FICO would be familiar with all such submissions the Credit Bureaus have made. Your claim that Plaintiffs provided no "guidance regarding the types of materials Plaintiffs had in mind" is inaccurate; on our April 25, 2024, call, Plaintiffs identified the lobbying campaign to allow Fannie Mae and Freddie Mac to accept VantageScore for mortgage-lending decisions.

Regardless, we understand that the Credit Bureaus will not further consider producing documents in response to this request until Plaintiffs' Motion to Compel against FICO (Dkt. No. 282) is resolved. The suggestion that any *Noerr-Pennington* objection FICO may prevail on would apply to the Bureaus is misplaced; *Noerr-Pennington* is a defense to liability, and Plaintiffs are not seeking to use lobbying materials against the Bureaus to show *their* liability. Rather, Plaintiffs seek these documents to demonstrate industry views of the anticompetitive market that FICO has created.

Although, because you specifically mention it in your letter, if Plaintiffs exclude the "Competitor Credit Score Products" portion of this request, would the Credit Bureaus be willing to produce documents in response to this request? Failing that, Plaintiffs do not see how the parties' positions can be reconciled.

**Request No. 3.** This Request seeks all documents produced, provided, filed under seal, or served in connection with the *VantageScore* and *TransUnion* Litigations whether produced by the Credit Bureaus, another party (other than FICO), or a third party.

Plaintiffs agree with TransUnion's proposal to revisit this request once it is determined whether Plaintiffs will be receiving responsive *TransUnion* litigation documents from FICO.

Page 3
May 31, 2024

With respect to the *VantageScore* litigation, the Credit Bureaus have been investigating for weeks whether they have retained copies of the sealed filings in that litigation. Please advise when you expect the investigation to conclude.

**Request No. 4.** This Request seeks documents concerning the negotiation of any agreement between the Credit Bureaus (or any two Bureaus) regarding the marketing, sale, or distribution of B2B Credit Scores.

Setting aside the agreements that created VantageScore to discuss in relation to Requests 8 and 19 as you suggest, that leaves the aspects of this request that do not pertain to VantageScore. As I've previously explained, Plaintiffs disagree with the assertion that such agreements are not relevant to Plaintiffs' present claims against FICO. Plaintiffs seek such agreements not for the purpose of establishing any liability as to the Credit Bureaus, but rather to show the market impacts of FICO's anticompetitive conduct. To the extent the Bureaus have entered into agreements with one another to facilitate the distribution of FICO Scores, that would be relevant to Plaintiffs' § 2 claims against FICO.

Plaintiffs have offered that this request would be moot if such agreements do not exist, but the Credit Bureaus have declined to reveal whether such agreements exist. If such agreements do exist, Plaintiffs would be amenable to narrowing the relevant time period to focus on the timeframes around which each agreement was signed, similar to Request No. 5. A response to this simple question, moreover, would facilitate negotiations over the relevance of these Requests. As it stands, Plaintiffs are in the dark regarding what agreements, if any, exist responsive to this Request. Please advise whether you will answer this question so we may negotiate productively. If you will not, we will understand that we are at impasse.

**Request No. 5.** This Request seeks documents relating to the Bureaus' analyses of their contracts with FICO, including the "No Equivalent Products," "Dynamic Royalty Schedule," and "Level Playing Field" provisions.

Rather than the Credit Bureaus themselves identifying which custodians would have documents responsive to this request, the Credit Bureaus requested that Plaintiffs seek FICO's permission to disclose the personnel from the Credit Bureaus that FICO disclosed to Plaintiffs in its discovery responses to Plaintiffs as being involved in the relevant negotiations. Plaintiffs have done so, and FICO has consented to Plaintiffs disclosing to the Credit Bureaus the names of the Credit Bureau employees who were involved in negotiating the relevant contracts with FICO. Per our agreement with FICO, contemporaneously with the sending of this correspondence, we will send under separate cover to each Credit Bureau the names of their personnel that FICO identified. We ask that the Credit Bureaus not exchange that information with each other, per Plaintiffs' agreement with FICO.

Having provided that information, Plaintiffs request that the Credit Bureaus confirm this is the appropriate universe of custodians for this Request—*i.e.*, that the individuals identified are those likeliest to have unique information responsive to this Request—or identify any additional custodians. Plaintiffs also request that the Credit Bureaus propose search terms, as they are better positioned to assess which terms and phrases are used internally to discuss these agreements.

Page 4
May 31, 2024

Please confirm the Credit Bureaus agree to do so. To the extent they do not, please explain with particularity the reason why.

As previously discussed, based on the Credit Bureaus' representation that analyses of the relevant contract terms took place mostly within a window three months prior and three months after the execution of these agreements, Plaintiffs can accept such relevant time periods for each Credit Bureau for this request. If your review reveals that representation was incorrect or inaccurate in any way, we ask that you propose a broader time period.

**Request No. 6.** This Request seeks documents related to the "Pre-Qualification" royalty category—including documentation of instances when the Bureaus or another entity have paid that royalty. As requested by the Credit Bureaus, and as indicated in my previous letter, Plaintiffs have sought clarification from FICO regarding whether it can produce such documents in the first instance. FICO responded as follows:

> As a general matter, FICO anticipates that structured data produced in response to Plaintiffs' discovery requests, subject to and without waiver of its objections, will include royalty payments by the Credit Bureaus for the Prequalification royalty category.

While Plaintiffs pursue obtaining this data from FICO, this request is tabled. We will revisit this Request if FICO is eventually unable to produce this data, or the data it is able to produce is insufficient.

**Request No. 7.** This Request seeks documents regarding analysis of competition or potential competition from suppliers of Competitor Credit Score Products, a term defined in the subpoenas as "any non-FICO or non-VantageScore credit score."

The Credit Bureaus initially indicated that "any non-FICO or non-VantageScore credit score" encompassed far too many credit scores, but when Plaintiffs asked which scores they were referring to, or even which categories of scores were implicated, the Credit Bureaus refused to answer. When the Credit Bureaus initially asked whether Plaintiffs meant "general-purpose generic credit risk scores," Plaintiffs indicated that *may* be what is meant, but also requested clarification of what would be excluded by that definition, a clarification the Credit Bureaus refused to provide. Plaintiffs never requested that the Credit Bureaus tell Plaintiffs what *Plaintiffs* mean by this term; rather Plaintiffs have simply repeatedly requested that the Credit Bureaus tell Plaintiffs what the *Credit Bureaus* mean when they use it. That request is eminently reasonable since the term "general-purpose generic credit risk scores," does not appear to be subject to a single definition and a Google search for the exact phrase yields no results.

Plaintiffs' hope has been for a productive discussion of different types of scores that would allow Plaintiffs to narrow down the list of responsive score and ultimately arrive at an agreeable subset. That would likely allow Plaintiffs to narrow the timeframe of this Request as well since some of the responsive scores may not have come into existence until after the beginning date for the Relevant Period. If the Bureaus refuse to provide information on the scores they are aware of

Page 5
May 31, 2024

other than FICO Scores and VantageScores, we understand the parties are at impasse on this Request.[1]

**Request Nos. 8, 19.** These Requests seek documents related to VantageScore Solutions. As stated in my previous letter, Plaintiffs would consider the agreements the Credit Bureaus executed to establish VantageScore as a sufficient response to these Requests. Contrary to your assertion, seeking these documents from the Credit Bureaus would not "undermine the Court's ability to consider" VantageScore's motion to quash and FICO's cross-motion to compel (ECF Nos. 268-69), as the Credit Bureaus are not a party to that motion.

In any event, you represented during our meet and confer that an additional hurdle to producing the requested agreements was that VantageScore has a contractual right to object to the Bureaus' production of such documents. We agreed to inquire with counsel for VantageScore whether they would be willing to waive that objection. When we spoke to counsel for VantageScore, she advised that counsel for the Bureaus had already reached out to her on this point—something that you never disclosed to us—and confirmed to us that VantageScore would not agree to waive its objections.

Plaintiffs understand the Credit Bureaus' position to be that they will not produce these agreements until the VantageScore motions are resolved, and the parties are therefore at an impasse.

**Request Nos. 9-16, 18-22.** Contrary to your assertions, Plaintiffs' proposal is not in any way "harassing" or in bad faith. Such unfounded and gratuitous accusations are unhelpful and unproductive. Plaintiffs propounded a good-faith list of requests for structured data and related documents in their subpoena. Per our agreement at our April 25, 2024, meet and confer, Plaintiffs spent considerable time narrowing those proposals to identify materials Plaintiffs would need regardless of whether the Bureaus remain defendants in the case. Plaintiffs also prepared another list of what would be necessary if the Bureaus remain defendants. Plaintiffs' narrowed proposal is in keeping with the Credit Bureaus' position that they will only produce structured data once, regardless of the outcome of their motion to dismiss. Suggesting that Plaintiffs should defer their data requests to the Credit Bureaus until such time that the Court has issued a ruling on the Credit Bureaus' motion to dismiss is a solution to a problem of the Credit Bureaus' own making: the insistence that they only produce data one time, even if the Court denies their motion to dismiss.

Contrary to your assertion, Plaintiffs *have* provided a proposal for combining the "third-party" data needed from the Credit Bureaus with the "party" data discovery Plaintiffs will need when the Court denies the Credit Bureaus' motion to dismiss: the two lists of data that the Credit Bureaus themselves requested Plaintiffs provide. Your letter inaccurately implies that Plaintiffs have "admitted" Request 14 is directed toward damages for claims against the Credit Bureaus. As

---

[1] You claim in a footnote (n.3) that you had "hoped to find some type of list or primer or other educational background material that might help Plaintiffs understand credit scoring." But you never made any such offer during our meet and confer. Instead, as noted in our correspondence, counsel for TransUnion suggested we consult a specific Consumer Financial Protection Bureau publication to help refine our request. On investigation, as also noted in our correspondence, that publication does not exist. Your letter appears to confirm the same.

Page 6
May 31, 2024

Plaintiffs have made clear, including in my March 18, 2024, letter, this Request is directed toward data that would be used to calculate damages against *FICO*, not the Credit Bureaus. As Plaintiffs have explained numerous times, the Indirect Purchaser Plaintiffs will be performing a passthrough analysis, as will Direct Purchaser Plaintiffs for their state-law claims, and such data is therefore relevant to their calculation of damages against FICO. Because FICO's data alone would not be sufficient for such an analysis, Plaintiffs have requested such data from the Credit Bureaus.

Regarding the time period requested for structured data, Plaintiffs have requested data for this length of time commensurate with the class periods alleged in the Complaints, which begin in 2006. *See* Dkt. No. 184 ¶ 159; Dkt. No. 185 ¶¶ 175-76. Plaintiffs seek data from a couple of years before 2006 to potentially use such data from before the class period as a "benchmark" against data during the class period. Plaintiffs recognize that the practicalities of data storage may mean that data is simply not reasonably accessible for that entire time period. Plaintiffs remain willing to discuss such complications and have no intention of insisting that the Credit Bureaus produce data that is not accessible without undue burden.

Your letter inaccurately claims that Plaintiffs seek broader damages information from the Credit Bureaus than from FICO.

For clarification, Plaintiffs do not seek data from every country in which the Credit Bureaus do business. Rather, Plaintiffs specifically seek data corresponding to the United States, Canada, the United Kingdom, and Australia in order to use such data as point of comparison for damages. I apologize for neglecting to include the specific countries for which Plaintiffs are seeking structured data in my previous letter.

With regard to the data needed in the event the Credit Bureaus do not prevail on their motion to dismiss, Plaintiffs can clarify that aspect of the data request as follows:

All balance sheets, profit and loss statements, cost calculations, investment analyses, management reports, and presentations to the Board of Directors created by the Credit Bureaus in the ordinary course of business at a regular interval (*e.g.*, quarterly, yearly, etc.) by country (United States, Canada, United Kingdom, and Australia) and by business segment (e.g., B2B Credit Reports) for every business unit engaged in the sale of B2B Credit Scores or products containing B2B Credit Scores, and supporting documents sufficient to show how each value in each document was calculated and derived. The relevant time period for this Request is from January 1, 2001, until the present.

Please confirm whether this clarification is acceptable to you, or make a counterproposal.

Finally, your letter does not appear to respond to Plaintiffs' list of data that will be needed regardless of whether the Credit Bureaus prevail on their motion to dismiss. Please confirm whether that list of data is acceptable, or make a counterproposal.

In making any counterproposal, please identify the categories of structured data each Credit Bureau is willing to produce and the specific reasons why each Credit Bureau refuses to produce others, and the period of time for which the data is available for each Credit Bureau. Short of

Page 7
May 31, 2024

substantive engagement with this proposal, Plaintiffs will understand we are at impasse on these data Requests.

**Request No. 17.** This Request seeks documents prepared by, submitted to, or received from third-party consulting firms regarding the calculation, determination, distribution, marketing, profitability, pricing, or sale of credit reports.

Given that the Credit Bureaus have not yet agreed to search for any responsive documents, nor have they indicated which search terms will be used, Plaintiffs cannot accept the Credit Bureaus' proposal to not search specifically for responsive documents but to produce documents responsive to this request identified through other reasonable searches.

Plaintiffs expect that in the process of confirming whether the Credit Bureaus retained third-party consulting firms for such purposes, they will also determine where such responsive documents are stored. Failing that, Plaintiffs expect that responsive documents can be located straightforwardly using search terms (including, *e.g.*, the names of the consulting firms). Plaintiffs recognize that the answers to whether such consultants are used, and how output from such consultants is stored will likely vary between the Credit Bureaus and therefore expect that the resolution of this Request will likely be different for each of the Credit Bureaus. Please confirm when your investigation of whether the Credit Bureaus retained third-party firms to analyze credit report pricing will conclude and whether you identified any centralized repositories of data prepared by, or received from, such consultants.

**Request No. 23.** This Request seeks organizational charts, personnel directories, telephone directories, and email user and address lists for the Bureaus and their affiliates. The purpose of this Request is to gain an understanding of the structure of the Credit Bureaus to evaluate the Credit Bureaus' proposed custodians—or propose our own in the event the Bureaus persist in their refusal to identify custodians. But the Credit Bureaus have to this point refused to provide organization charts (to the extent they exist) or any reasonable substitute.

Your proposal that we review ***FICO's documents*** to identify the relevant custodians from the Bureaus is not a suitable substitute for providing organization charts or similar information. Even if Plaintiffs were to analyze the entirety of FICO's production for potential custodians from each of the Credit Bureaus, Plaintiffs would still lack a sufficient understanding of the structure and function of each business unit within each Credit Bureau to identify the appropriate custodians for each Request. Moreover, the proposal would unreasonably protract discovery: we would not even begin to negotiate custodians, which is a basic parameter for ESI negotiations, until FICO *completes* its production and Plaintiffs have had the time to review it in its entirety. The Credit Bureaus have in their possession the information necessary to respond to this Request in a reasonable manner and to propose custodians for Plaintiffs' requests, yet they refuse to do so.

Providing organization charts, or similar information regarding relevant personnel, is a basic starting point for electronic discovery. Plaintiffs expect to negotiate custodians for electronically stored information and require some basic information about your clients' organizations to do so intelligently. Having refused to provide the organization charts in your possession or any suitable substitute, Plaintiffs understand we are at impasse on this Request.

Page 8
May 31, 2024

     **Request Nos. 24-25.** These Requests seek the Credit Bureaus' document retention and antitrust policies. Plaintiffs have offered legal and factual bases for these Requests (see, e.g., my March 18, 2024, letter). It is clear from your letter that the Credit Bureaus disagree and are firm in that position. We remain at an impasse on this Request, as stated in my previous letter.

     **Request No. 26.** This Request seeks all documents relating to the named Plaintiffs in this action. At the Credit Bureaus' request, Plaintiffs provided a list of the primary individual employee(s) from each Credit Bureau with whom Plaintiffs correspond so that their data can be searched (using the names of Plaintiffs as search terms). Plaintiffs agree that the Credit Bureaus need not provide hit reports in the first instance. If, however, any of the Credit Bureaus claims that any search terms result in a volume of documents that is too burdensome, Plaintiffs request that the Credit Bureau provide hit reports to evaluate such claims.

     Plaintiffs cannot accept the Credit Bureaus' demand that the personnel who interacted with Plaintiffs be the only custodians for all of Plaintiffs' Requests in the subpoenas. Such a limitation is nonsensical given the subject matter of Plaintiffs' other requests (*e.g.*, Request No. 5, Request No. 7). The Bureaus have offered no reason why the personnel responsible for working with the named Plaintiffs would be the same personnel responsible for other tasks relevant to the other Requests. For example, there is no overlap between the Credit Bureau personnel who interact with the named Plaintiffs and the personnel identified as likely custodians for Request No. 5. If we accepted the Credit Bureaus' proposal, the result would be that the Bureaus would search the entirely wrong set of files for documents responsive to Request No. 5 and that they would miss the vast majority of responsive, non-privileged documents in their possession. Searching the files of the personnel identified in connection with Request No. 26 would likely yield the same unacceptable result for other Requests as well.

     Please confirm you will run searches and produce responsive documents for this Request as described above. If the Credit Bureaus adhere to the position that the individuals identified in connection with Request No. 23 are the only ones whose data the Credit Bureaus will search for any other Requests, we will understand we are at impasse.

<p style="text-align:center">* * *</p>

     Thank you for your clarification of the Credit Bureaus' position regarding non-data discovery in the event the Credit Bureaus' motion to dismiss is denied.

     As throughout this process, Plaintiffs remain hopeful that they will be able to reach an agreement with any or all of the Credit Bureaus that will obviate the need for motion practice. If you believe further discussion would be productive, please let us know.

     We ask that you respond to this correspondence by June 10, 2024.

Page 9
May 31, 2024

Best regards,

GUSTAFSON GLUEK PLLC

Daniel J. Nordin

# EXHIBIT 22

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-02114 |
| *This document relates to:*<br><br>ALL ACTIONS | Judge Edmond E. Chang<br><br>Magistrate Judge David E. Weisman |

## **AGREED CONFIDENTIALITY ORDER**

The parties[1] to this Agreed Confidentiality Order have agreed to the terms of this Order; accordingly, it is ORDERED:

1.    <u>Scope</u>.  All materials produced or adduced in the course of discovery, including initial disclosures, responses to discovery requests, deposition testimony and exhibits, and information derived directly therefrom (hereinafter collectively "documents"), shall be subject to this Agreed Confidentiality Order, as defined below.  This Order is subject to the Local Rules of this District and the Federal Rules of Civil Procedure ("FRCP") on matters of procedure and calculation of time periods.

2.    <u>Confidential Information</u>.  As used in this Order, "Confidential Information" means information designated as "CONFIDENTIAL" by the producing party, that falls within one or more of the following categories: (a) information prohibited from disclosure by statute; (b) research, technical, or commercial information that the party has maintained as confidential; (c) personally identifying information; (d) personal or financial information that the party has

---

[1] For purposes of this Order, "parties" shall mean the named parties in the above-referenced litigation.  In addition, any non-party that produces discovery pursuant to a subpoena or other process issued in this litigation shall have the rights and protections set forth in this Order.

maintained as confidential; or (e) other information the producing party reasonably believes is subject to protection. These categories are expressly provided for illustrative purposes only, and are not intended to be and should not be construed as exhaustive of the types of information that may be appropriately designated as "Confidential Information." The parties will make reasonable efforts to ensure that information or documents that are available to the public are not designated as Confidential Information.

3. <u>Highly Confidential Information</u>. As used in this Order, "Highly Confidential Information" means information designated as "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" by the producing party that is of a highly sensitive nature the disclosure of which could result in significant harm, including but not limited to competitive harm, to the business or operations of that party or non-party or to an individual. By way of example only, Highly Confidential Information may include but is not limited to: (a) documents or information relating to or reflecting nonpublic business or market strategies and research and development activities; (b) documents or information relating to or reflecting other trade secrets or nonpublic proprietary business information that bestows a competitive advantage on the producing party; (c) documents or information relating to or reflecting revenue, profit, costs or pricing; (d) documents or information reflecting customer details that could be used to subject the party to a competitive disadvantage; (e) copyrighted software and information reflecting computer or programming code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs; or (f) other information the disclosure of which would, in the good faith judgment of the designating party, create a risk of serious harm. The parties will make

reasonable efforts to ensure that information or documents that are available to the public are not designated as Highly Confidential Information.

4. <u>Designation</u>.

(a) A party may designate a document as Confidential Information or Highly Confidential Information for protection under this Order by placing or affixing the words "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" on the document and on all copies in a manner that will not interfere with the legibility of the document.

(b) To the extent a document is produced in a form in which placing or affixing the words "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" on the document is not feasible, the producing party may designate the document as confidential by inserting a slip sheet, by affixing a label to the production media containing the document, by including the designation in the file title, or, if necessary, by including such designation in a cover letter. As used in this Order, "copies" includes electronic images, duplicates, extracts, summaries, or descriptions that contain either Confidential Information or Highly Confidential Information. The marking "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" shall be applied prior to or at the time the documents are produced or disclosed. Applying the marking "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" to a document does not mean that the document has any status or protection by statute or otherwise except to the extent and for the purposes of this Order. Any copies that are made of any documents marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" shall also be so marked, except that indices, electronic databases, or lists of documents that do not

contain substantial portions or images of the text of marked documents and do not otherwise disclose the substance of the Confidential Information or Highly Confidential Information are not required to be marked.

(c)     Upward Designation of Information or Items Produced by Other Parties or Non-Parties.  Subject to the definitions set forth in Paragraphs 2 and 3, a party may upward designate (*i.e.*, change a document produced without a designation to a designation of Confidential Information or Highly Confidential Information or designate a document produced as Confidential Information to a designation of Highly Confidential Information) any document produced by another party or non-party, provided that said document contains the upward designating party's own information it believes is Confidential Information or Highly Confidential Information. Upward designation shall be accomplished by providing written notice to all parties identifying (by Bates number or other individually identifiable information) the document to be re-designated upwardly.  Any party may object to the upward designation of any document pursuant to the procedures set forth in Paragraph 11 regarding challenging designations.

5.     Depositions.

(a)     A party or non-party may designate some or all of a witness's deposition testimony as Confidential or Highly Confidential Information for protection under this Order by orally designating the relevant testimony as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" on the record at the time the testimony is taken. Inadvertent failure to do so does not operate as a waiver.  The designating party must provide the specific page and line designations over which the party or non-party claims confidentiality within thirty (30) days after delivery of the final transcript by the court reporter to the designating party or non-party.  Deposition testimony shall be treated as "CONFIDENTIAL" or "HIGHLY

CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY," as orally designated, prior to the deadline. Thereafter, only those portions identified in the Notice of Designation shall remain protected under the terms of this Order.

(b)    In the event information designated as Confidential or Highly Confidential Information is to be shown to a witness at deposition, hearing, trial or otherwise, the witness shall be provided with a copy of this Order at the start of the examination, and the witness must comply with the terms of this Order. Except as provided herein, if the witness has refused to execute Attachment A as required by this Order, the party taking the deposition will read the text of Attachment A on the record, which shall serve as a substitute for the execution of Attachment A and shall permit examination of the witness on documents or other materials containing Confidential Information or Highly Confidential Information.

6.    Protection of Confidential Information or Highly Confidential Information.

(a)    General Protections. Except as set forth below, Confidential Information or Highly Confidential Information shall not be used or disclosed by the parties, counsel for the parties, or any other persons identified in Paragraph 6(b) for any purpose whatsoever other than prosecuting, defending, or settling this litigation, including any appeal thereof. Confidential Information or Highly Confidential Information may be disclosed only to the named plaintiff(s) and not to any other member of the putative class except under circumstances permitting such disclosure set forth in Paragraphs 6(b) and 7.

(b)    Limited Disclosures of Confidential Information. The parties and counsel for the parties shall not disclose or permit the disclosure of any Confidential Information to any person or entity except as set forth in subparagraphs 6(b)(1)-(12). Subject to these requirements, the following categories of persons may be allowed to review Confidential Information:

(1)    <u>Counsel</u>.  Outside or in-house counsel for the parties and employees or support staff of such counsel (including but not limited to attorneys, paralegals, information technology, litigation support, secretaries, law clerks, and investigators) who have responsibility for the preparation and trial of the action;

(2)    <u>Parties</u>.  Individual parties and employees of the parties, but only to the extent counsel determines in good faith that disclosure is reasonably necessary to the conduct of the litigation and the person has been advised of their obligations hereunder;

(3)    <u>Court</u>.  The Court and its personnel;

(4)    <u>Court Reporters and Video Recorders</u>.  Court reporters and video recorders engaged for depositions, but only after such persons have completed the certification contained in Attachment A;

(5)    <u>Contractors</u>.  Those persons specifically engaged for the purpose of providing litigation support, including computerized or electronic discovery support, providing photocopies, organizing or processing documents, including outside vendors hired to collect, process, or host electronically stored documents, but only after such persons have completed the certification contained in Attachment A;

(6)    <u>Consultants and Experts</u>.  Consultants, investigators, or experts or support staff of such consultants, investigators, or experts retained by the parties or Counsel for the parties to assist in the preparation and trial of this action, but only after such consultants, investigators, experts, or support staff have completed the certification contained in Attachment A.  This definition includes professional jury or trial consultants retained in connection with this litigation;

(7)    <u>Witnesses at Trial</u>.  Any witness at trial during the pendency of that trial, to whom counsel believes, in good faith, that such disclosure is reasonably necessary for the prosecution or defense of these proceedings and who has completed the certification contained in Attachment A;

(8)    <u>Witnesses at Depositions</u>.  During their depositions, witnesses in this action (and their counsel) if the witness has completed the certification contained in Attachment A, and to whom disclosure is limited to documents that (1) were produced by the witness's employer and created during the period of the witness's employment, (2) show on their face that the witness[2] authored or received them, (3) memorialize that the witness was privy to the document's contents (*e.g.*, a document refers to a meeting attended by the witness), or (4) are reasonably necessary to be shown to the witness according to the good faith judgment of counsel.  Neither witnesses nor their counsel shall retain a copy of any exhibit designated as Confidential Information, except witnesses and their counsel may receive copies of all exhibits marked at their depositions in connection with review of the deposition transcript.  After the conclusion of the litigation such witnesses and their counsel shall destroy those copies;

(9)    <u>Author or Recipient</u>.  Persons whom the Confidential material itself indicates, or the receiving party otherwise has a good-faith basis to believe, were the author, creator, producer, addressee, source, or recipient of a document (not including a person who received the document in the course of this action) may be shown only those documents that he or she authored or received; and any person whose statements, communications or actions are expressly mentioned, discussed, or referred to by actual name in the material as indicated on its face may be shown that

---

[2]    For purposes of this paragraph, a witness designated to testify on behalf of an organization taken pursuant to FRCP 30(b)(6) may be deemed to have "author[ed]" or "received" a document designated by that organization as Confidential so long as at least one employee of the organization authored or received the document.

portion of the document referring to them and such other portions as necessary to provide context for the reference to that person;

(10)   _Special Masters_.  Special masters and their direct staff;

(11)   _Mediators_.  Mediators and their direct staff, provided that they are bound by a confidentiality agreement acceptable to all parties; and

(12)   _Others by Consent_.  Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

(c)   _Disclosures of Highly Confidential Information_.  The parties and counsel for the parties shall not disclose or permit the disclosure of any Highly Confidential Information to any person or entity except as set forth in subparagraphs 6(c)(1)-(10).  Subject to these requirements, the following categories of persons may be allowed to review Highly Confidential Information:

(1)   _Outside Counsel_.  Outside counsel for the parties who have appeared in this action and employees or support staff of such counsel (including but not limited to attorneys, paralegals, secretaries, law clerks, and investigators), provided that such individuals do not regularly participate in the commercial business activities of the receiving party;

(2)   _Court_.  The Court and its personnel;

(3)   _Court Reporters and Video Recorders_.  Court reporters and video recorders engaged for depositions, but only after such persons have completed the certification contained in Attachment A;

(4)   _Contractors_. Those persons specifically engaged for the purpose of providing litigation support, including computerized or electronic discovery support, providing photocopies, organizing or processing documents, including outside vendors hired to collect, process, or host

electronically stored documents, but only after such persons have completed the certification contained in Attachment A;

(5)      Consultants and Experts. Consultants, investigators, or experts employed by the parties or Counsel for the parties to assist in the preparation and trial of this action or support staff of such consultants, investigators, or experts, so long as any such consultants, investigator, experts or support staff are not employees or regular contractors of the parties or any affiliated entity, but only after such consultants, investigators, experts, or support staff have completed the certification contained in Attachment A. This definition includes professional jury or trial consultants retained in connection with this litigation;

(6)      Witnesses at Depositions.  During their depositions, witnesses in this action to whom disclosure is limited to documents that (1) were produced by the witness's employer and created during the period of their employment, (2) show on their face that the witness[3] authored or received them, or (3) memorialize that the witness was privy to the document's contents (*e.g.*, a document refers to a meeting attended by the witness).  Neither witnesses nor their counsel shall retain a copy of any exhibit designated as Highly Confidential Information, except witnesses and their counsel may receive copies of all exhibits marked at their depositions in connection with review of the deposition transcript.  After the conclusion of the litigation witnesses and their counsel shall destroy those copies;

(7)      Author or Recipient.  Persons whom the Highly Confidential material itself indicates, or the receiving party otherwise has a good-faith basis to believe, were the author, creator, producer, addressee, source, or recipient of a document (not including a person who

---

[3]      For purposes of this paragraph, a witness designated to testify on behalf of an organization taken pursuant to FRCP 30(b)(6) may be deemed to have "author[ed]" or "received" a document designated by that organization as Highly Confidential Information so long as at least one employee of the organization authored or received the document.

received the document in the course of this action) may be shown only those documents that he or she authored or received; and any person whose statements, communications or actions are expressly mentioned, discussed, or referred to by actual name in the material as indicated on its face may be shown that portion of the document referring to them and such other portions as necessary to provide context for the reference to that person;

(8)     Special Masters.  Special masters and their direct staff;

(9)     Mediators.  Mediators and their direct staff, provided that they are bound by a confidentiality agreement acceptable to all parties; and

(10)    Others by Consent.  Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

(d)     To the extent any person is required to complete the certification contained in Attachment A to this Order, facsimile signatures or signatures transferred in electronic format (*e.g.*, PDF) shall be treated as original signatures purposes of this Order.

(e)     Control of Documents.  Counsel for the parties shall make reasonable efforts to prevent unauthorized or inadvertent disclosure of Confidential Information or Highly Confidential Information.

(f)     Acknowledgment of Understanding and Agreement To Be Bound (Attachment A). To the extent that this Order requires any persons to acknowledge their obligations under this Order, that acknowledgment shall be accomplished by the execution of the Acknowledgment of Understanding and Agreement To Be Bound (Attachment A).  The counsel for the party that obtains such signed agreements shall maintain the originals of those forms for a period of one year after the termination of the case, including any appeal(s) thereof.

7. <u>Failure To Designate</u>. A failure to designate a document or testimony as Confidential Information or Highly Confidential Information does not, standing alone, waive the right to so designate the document or testimony. If a party designates a document as Confidential Information or Highly Confidential Information after it was initially produced, the receiving party, on notification of the designation, must make a reasonable effort to ensure that the document is treated in accordance with the provisions of this Order. No party shall be found to have violated this Order for failing to maintain the confidentiality of material during a time when that material has not been designated Confidential Information or Highly Confidential Information, even where the failure to so designate was inadvertent and where the material is subsequently designated Confidential Information or Highly Confidential Information.

8. <u>Inadvertent Disclosure of Attorney-Client Privileged or Work-Product Protected Documents and Clawback Procedures</u>. Pursuant to Federal Rule of Evidence 502(d) and (e), if, in connection with the action, information subject to a claim of attorney-client privilege, attorney work-product protection, or other evidentiary privilege or protection ("Protected Documents") is inadvertently disclosed, the disclosure does not constitute a waiver or forfeiture of such privilege or protection with respect to the privileged information or its subject matter, in this litigation or in any other federal or state proceeding. Instead, the producing party shall be entitled to assert such privilege or protection, except as further discussed below, and the information and its subject matter shall be treated as if there has been no such disclosure.

(a) Upon discovering the disclosure of information that the producing party believes in good faith to be covered by attorney-client privilege, work-product protection, or other evidentiary privilege or protection, the producing party shall promptly provide written notification to the receiving party identifying the documents or portions thereof that

contain privileged or protected information, in accordance with the requirements of FRCP 26(b)(5)(A).

(b)     Upon written notice of the production of a Protected Document by the producing party or oral notice if such notice is delivered on the record at a deposition, the receiving party must within seven (7) days, return, sequester, or destroy the specified document and any electronic or hard copies the receiving party has, and may not further use or disclose the Protected Document until the claim that it is a Protected Document has been resolved.  The receiving party may retain and sequester a copy of the document asserted to be privileged or protected for the purpose of resolving a dispute with the producing party as to whether the document is privileged or protected from disclosure, and the receiving party need not remove from the record any document that has been previously introduced until such dispute is resolved.  If the receiving party agrees that the document is privileged, it will promptly confirm in writing to the producing party that it has either returned or destroyed all versions of the document and will make no use of the information. Promptly following notification by the receiving party, the producing party shall provide the receiving party with a replacement production in the same format as the original production, with the protected information appropriately withheld or redacted.  If the receiving party disputes that material noticed pursuant to this paragraph is privileged or protected from disclosure, then the retention and sequester of such material shall be governed by Paragraph 8(f).

(c)     Where a producing party seeks to invoke its rights to claw back a document under Federal Rule of Evidence 502(d) and this Order with respect to a document that has been submitted to the Court as an exhibit or used as an exhibit in a deposition, the producing

party must do so within fourteen (14) days of the document being so filed or used.  To the extent that the information contained in a document submitted to the Court as an exhibit or used as an exhibit in a deposition is subject to a claim that it contains privileged or protected information, then the receiving party will not further use such document(s) until the claim has been resolved.  However, while the receiving party need not remove from the record any document that has been previously introduced until such dispute is resolved, the producing party may notify the Court and/or court reporting service that a dispute under this paragraph is pending and ask that the document(s) be sequestered and made not accessible to the public or parties until the dispute is resolved.  To the extent a producing party does not seek to invoke its rights under Federal Rule of Evidence 502(d) and this Order to claw back a document that has been submitted to the Court as an exhibit or used as an exhibit in a deposition within fourteen (14) days of the document being so filed or used, the parties agree that Federal Rule of Evidence 502(d) will not apply to such filed or used document.  However a party may seek to invoke its rights under Federal Rule of Evidence 502(b) to claw back such filed or used document.

(d)      If the receiving party has disclosed the specified document before being notified of its inadvertent production, it must take reasonable steps to retrieve it.

(e)      The producing party shall provide an updated privilege log as called for in Section VIII of the Stipulation and Order Establishing the Protocol for the Production of Documents and Electronically Stored Information, as well as any portion of the document that does not contain privileged or protected information.

(f)      The receiving party may challenge the assertion of any privilege discussed in this paragraph.  Any challenge that cannot be resolved by the parties will be filed with

the court presiding over this litigation in the Northern District of Illinois and subject to the law in that District. It shall be the receiving party's responsibility to initiate Court proceedings, if any. The receiving party may not, however, publicly assert as a ground for such motion the fact or circumstances of the production or reveal the substance of the protected contents of the materials (including in contesting the assertion of protection or privilege). Any motion contesting the privilege or work-product claim shall be submitted to the Court in camera for review or, if the Court directs, filed under seal. Pending resolution of such a challenge, the receiving party must continue to sequester the information contained in any notes and, in the event the Court concludes that the information is protected from disclosure, delete the information from any notes or any portions thereof that reveal the substance of the privileged or protected information. The producing party must preserve the information pending resolution of the challenge and, in the event the Court concludes that the information is not protected from disclosure, promptly provide the receiving party with a replacement production.

(g)   The producing party may challenge the receiving party's use of any Protected Document. Any challenge that cannot be resolved by the parties will be filed with the court presiding over this litigation in the Northern District of Illinois and will be subject to the laws of that District. In all instances in which the producing party asserts a privilege or protection, the producing party must preserve a copy of the document asserted to be privileged or protected until the claim of privilege is resolved.

(h)   The obligation of the receiving party to return or to destroy materials under this Order does not apply to multi-case disaster recovery databases maintained by the receiving party. If these disaster recovery databases are accessed or restored, however,

then any Protected Documents on those databases relating to this action shall be destroyed if destruction is required elsewhere in this Order.

(i)     If a party independently discovers that it has received documents or information that reasonably appear to be privileged, the party shall timely notify the other party, and in any event, no later than ten (10) days after such discovery.

(j)     Except as otherwise set forth in Paragraph 8(c), where a document has been submitted to the Court as an exhibit or used as an exhibit in a deposition and no party has sought to claw back such document within fourteen (14) days of the document being so filed or used, this Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d) and (e), and Federal Rule of Evidence 502(b) shall not otherwise apply.  Nothing contained herein is intended to or shall limit a party's right to conduct a pre-production review of hard-copy documents, electronically stored information ("ESI") or any other information (including metadata) for relevance, responsiveness, privilege and/or protection, and nothing herein is intended to curtail a party's right to challenge any documents, ESI or any other information withheld based on a claim of relevance, responsiveness, privilege and/or protection.

(k)     Nothing in Paragraph 8 shall limit the right of any party to petition the Court for an in camera review of inadvertently disclosed Protected Documents.

9.     <u>Filing of Confidential Information or Highly Confidential Information</u>.  This Order does not, by itself, authorize the filing of any document under seal.  Any party wishing to file a document designated as Confidential Information or Highly Confidential Information in connection with a motion, brief or other submission to the Court must comply with LR 26.2 of the District Court for the Northern District of Illinois.

10.    <u>No Greater Protection of Specific Documents</u>.  Except on privilege grounds not addressed by this Order, no party may withhold information from discovery on the ground that it requires protection greater than that afforded by this Order unless the party moves for an order providing such special protection or the parties otherwise agree.

11.    <u>Challenges by a Party to Designation as Confidential Information or Highly Confidential Information</u>.    The designation of any material or document as Confidential Information or Highly Confidential Information is subject to challenge by any party.  A party does not waive its right to challenge a designation by electing not to mount a challenge promptly after the original designation is disclosed. The following procedure shall apply to any such challenge.

(a)    <u>Meet and Confer</u>.  A party challenging the designation of Confidential Information or Highly Confidential Information must do so in good faith and must begin the process by conferring directly with counsel for the designating party.  In conferring, the challenging party must identify in writing by Bates number or privilege log identifying number the material challenged and explain the basis for its belief that the designation was not proper.  The designating party or nonparty must respond to the challenge within ten (10) business days.  If agreement is reached confirming, changing or waiving the designation as to any material subject to the objection, the designating party or nonparty shall serve on all parties a notice specifying the document and the nature of the agreement.  If the designation is changed or waived, the designating party or nonparty shall also produce copies of all materials with the amended, agreed-upon designation at the expense of the designating party or nonparty.

(b)    <u>Judicial Intervention</u>.  A party that elects to challenge a confidentiality designation may file and serve a motion that identifies the challenged material and sets forth in detail the basis for the challenge.  The burden of persuasion in any such challenge proceeding shall be on the

16

designating party or nonparty.  Until the Court rules on the challenge, all parties shall continue to treat the materials as Confidential Information or Highly Confidential Information under the terms of this Order.

12.     <u>Challenges to Privilege Claims</u>.  Following its receipt of a privilege/redaction log produced in this action, a party may identify, in writing (by Bates/unique identifying number), the particular documents that it believes require further explanation.  The producing party shall endeavor to respond to such a request within ten (10) business days.  If a party challenges a request for further information, the parties shall meet and confer to try to reach a mutually agreeable solution.  If they cannot agree, the matter may be brought to the Court.

13.     <u>Action by the Court</u>.  Nothing in this Order or any action or agreement of a party under this Order limits the Court's power to make orders concerning the disclosure of documents produced in discovery or at trial.

14.     <u>Use of Confidential Information or Highly Confidential Information at Motion Hearings</u>.  Except as expressly set forth herein, nothing in this Order shall be construed to affect the use of Confidential Information or Highly Confidential Information in connection with any presentation of evidence and argument at hearings or trial.  The parties will confer with each other and, as necessary, any affected non-party reasonably in advance of a hearing where Confidential Information or Highly Confidential Information will be discussed so that a designating party may request procedures it deems necessary to protect against the disclosure of proprietary or competitively sensitive information, including whether, or to what extent, the Court should restrict public attendance at the hearing.  The Court may make such orders as are necessary to govern the use of Confidential Information or Highly Confidential Information at a hearing.

15.     Use of Confidential Information or Highly Confidential Information at Trial.  The use of Confidential Information or Highly Confidential Information at any trial in this matter will be addressed by a separate stipulation or pretrial order of the Court.

16.     Third Parties.  In seeking discovery from third parties, the parties shall attach this Order to a copy of any subpoena or other discovery request.  Third parties from whom discovery is requested are entitled to the protections of this Order in responding to such requests.

17.     Confidential Information or Highly Confidential Information Subpoenaed or Ordered Produced in Other Litigation:

(a)     If a receiving party is served with a discovery request, subpoena, civil investigative demand, grand jury subpoena, or an order issued in other litigation that would compel disclosure of any material or document designated in this action as Confidential Information or Highly Confidential Information, the receiving party must so notify the designating party, in writing, immediately and in no event more than five (5) business days after receiving the subpoena or order.  Such notification must include a copy of the subpoena or court order.

(b)     The receiving party also must immediately inform in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is the subject of this Order.  In addition, the receiving party must deliver a copy of this Order promptly to the party in the other action that caused the subpoena to issue.

(c)     The purpose of imposing these duties is to alert the interested persons to the existence of this Order, and to afford the designating party in this case an opportunity to try to protect its Confidential Information or Highly Confidential Information in the court from which the subpoena or order issued.  If the designating party or nonparty timely seeks a protective order, the receiving party served with the request shall not produce any information designated in this

action as "Confidential Information" or "Highly Confidential Information" before a determination by the court from which the request issued, unless the receiving party has obtained the designating party's permission. The receiving party shall cooperate with respect to all reasonable procedures sought to be pursued by the designating party or nonparty whose designated material may be affected. The designating party or nonparty shall bear the burden and the expense of seeking protection in that court of its Confidential Information or Highly Confidential Information, and nothing in these provisions should be construed as authorizing or encouraging a receiving party in this action to disobey a lawful directive from another court. The obligations set forth in this paragraph remain in effect while the party has in its possession, custody, or control Confidential Information or Highly Confidential Information produced by another party or nonparty to this case.

18. <u>Challenges by Members of the Public to Sealing Orders</u>. A member of the public may have a right to challenge the sealing of particular documents that have been filed under seal, and the party asserting confidentiality will have the burden of demonstrating the propriety of filing under seal.

19. <u>Unauthorized Disclosure or Use</u>. If a party learns that it or its counsel, officers, directors, employees, consultants, experts or other agents have disclosed documents designated as Confidential Information or Highly Confidential Information in any circumstance not authorized under this Order, that party must within two (2) business days of learning of such disclosure (a) notify the designating party of the disclosure and all pertinent facts relating thereto, (b) make every reasonable effort to prevent disclosure by each unauthorized person who received such information, (c) use reasonable best efforts to retrieve all copies of the protected documents disclosed to unauthorized persons, (d) inform the person or persons to whom unauthorized disclosures were made of the terms of this Order, and (e) request that each such person execute the

certification contained in Attachment A. Nothing contained herein shall limit the right of the designating party to seek relief against the party responsible for such disclosure.

20. <u>Obligations on Conclusion of Litigation</u>.

(a) <u>Order Continues in Force</u>. Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

(b) <u>Obligations at Conclusion of Litigation</u>. Within sixty (60) days after dismissal or entry of final judgment not subject to further appeal, all Confidential Information and Highly Confidential Information marked either as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY" under this Order, including copies as defined in Paragraph 4(b), shall be returned to the producing party or destroyed to the extent practicable unless it has been offered into evidence or filed without restriction as to disclosure. Within sixty-five (65) days after the final termination of this action, including any appeals, counsel for the receiving party shall certify in writing to the producing party that all such Confidential Information and Highly Confidential Information has been destroyed.

(c) <u>Retention of Work Product and Filed Documents</u>. Notwithstanding the above requirements to return or destroy documents, outside or in-house counsel for the parties may retain archival copies of all pleadings, motion papers, transcripts, drafts or final expert reports, legal memoranda, correspondence, and all attorney work product, even if such materials contain Confidential Information or Highly Confidential Information. Any retained Confidential Information or Highly Confidential Information shall continue to be protected under this Order and subject to the restrictions on third-party disclosures set forth in Paragraph 6. An attorney may use his or her work product in subsequent litigation,

20

provided that its use does not disclose Confidential Information or Highly Confidential Information. Nothing in this Order shall be construed to require the destruction or return of Confidential Information or Highly Confidential Information stored in counsels' archives, back-up media, or disaster recovery media.

(d) Deletion of Documents Filed Under Seal from Electronic Case Filing (ECF) System. Filings under seal shall be deleted from the ECF system only upon order of the Court.

21. Order Subject to Modification. This Order shall be subject to modification by the Court on its own initiative or on motion of a party or any other person with standing concerning the subject matter.

22. No Prior Judicial Determination. This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any document or material designated Confidential Information or Highly Confidential Information by counsel or the parties is entitled to protection under FRCP 26(c) or otherwise until such time as the Court may rule on a specific document or issue.

23. Persons Bound. This Order shall take effect when entered and shall be binding upon all counsel of record and their law firms, the parties, and persons made subject to this Order by its terms.

24. Future Parties. The terms of this Order shall be binding upon all current and future parties to this litigation and their counsel; any party appearing in the litigation following entry of this Order shall be deemed to have joined the case subject to its provisions.

25.    <u>Computing Time</u>.  For deadlines and time periods that are stated in this Order as a number of "days," time shall be computed in accordance with FRCP 6(a)(1).  For deadlines and time periods that are stated in this Order as a number of "business days," time shall be computed in accordance with FRCP 6(a)(1) except that Saturdays, Sundays, and legal holidays shall not be counted.

SO ORDERED.

Dated: 11/16/2023

Edmond E. Chang
U.S. District Court Judge

**ATTACHMENT A**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-02114 |
| *This document relates to:* | Judge Edmond E. Chang |
| ALL ACTIONS | Magistrate Judge David E. Weisman |

**ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND**

The undersigned hereby acknowledges that he/she/they has read the Confidentiality Order dated _____ in the above-captioned action and attached hereto, understands the terms thereof, and agrees to be bound by its terms. The undersigned submits to the jurisdiction of the United States District Court for the Northern District of Illinois in matters relating to the Confidentiality Order and understands that the terms of the Confidentiality Order obligate him/her/them to use materials designated as Confidential Information or Highly Confidential Information, in accordance with the Order solely for the purposes of the above-captioned action, and not to disclose any such Confidential Information or Highly Confidential Information to any other person, firm, or concern.

The undersigned acknowledges that violation of the Confidentiality Order may result in penalties for contempt of court.

**Name:** _____

**Job Title:** _____

**Employer:** _____

**Business Address:** _____

_____

_____

_____

Dated: _____                    _____

                                        Signature

# EXHIBIT

Anna   unanyan
Rrahmani, Labeat
F   : In re: FICO Antitrust Litigation - Subpoena to Oliver    yman, LLC
Tuesday, June 11, 2024   :1  :5  PM
image002.png
image003.png
image004.png
originallogo   003   0d-51d0-410d-   e0-  be01 2  b   c.png

---

**From:** Chandler, Rosalind <Rosalind.Chandler@mmc.com>
**Sent:** Tuesday, June 4, 2024 8:28 AM
**To:** Anna Hunanyan <ahunanyan@scott-scott.com>; Fischweicher, Jessica <Jessica.Fischweicher@mmc.com>; Silva Cano, Gustavo <gustavo.silvacano@oliverwyman.com>
**Cc:** S+S Fair Isaac <FICO@scott-scott.com>; Carmen Medici <cmedici@scott-scott.com>
**Subject:** RE: In re: FICO Antitrust Litigation - Subpoena to Oliver Wyman, LLC

Hi Anna,

We have a preliminary production ready to run by counsel for VantageScore.  However, we have been unsuccessful in scheduling time to discuss the subpoena and potentially responsive documents with counsel for VantageScore.  Therefore, we request additional time, until June 21, 2024 to further respond to the Subpoena.  Please confirm that you agree to this extension.

Best,
Rosalind

**Rosalind Chandler**
  enior Legal Assistant, Legal,    ompliance    Pu  lic Affairs
T +1 212 345 86  1

1166 Avenue of the Americas
New York, New York 10036
www.mmc.com



---

**From:** Anna Hunanyan <ahunanyan@scott-scott.com>
**Sent:** Monday, June 3, 2024 9:17 PM
**To:** Fischweicher, Jessica <Jessica.Fischweicher@mmc.com>; Chandler, Rosalind <Rosalind.Chandler@mmc.com>; Silva Cano, Gustavo <gustavo.silvacano@oliverwyman.com>
**Cc:** S+S Fair Isaac <FICO@scott-scott.com>; Carmen Medici <cmedici@scott-scott.com>
**Subject:** RE: In re: FICO Antitrust Litigation - Subpoena to Oliver Wyman, LLC

**CAUTION:** This email originated outside the company. Do not click links or open attachments unless you are

expecting them from the sender.

Jessica,

Following up on my emails below, please let us know if you are available to meet and confer regarding the status of the subpoena or if you are able to provide a written update.

Regards,
Anna

**From:** Anna Hunanyan <ahunanyan@scott-scott.com>
**Sent:** Thursday, May 30, 2024 9:46 AM
**To:** Fischweicher, Jessica <Jessica.Fischweicher@mmc.com>; Chandler, Rosalind <Rosalind.Chandler@mmc.com>; Silva Cano, Gustavo <gustavo.silvacano@oliverwyman.com>
**Cc:** S+S Fair Isaac <FICO@scott-scott.com>; Carmen Medici <cmedici@scott-scott.com>
**Subject:** RE: In re: FICO Antitrust Litigation - Subpoena to Oliver Wyman, LLC

Jessica,

Following up on the below.

Anna

**From:** Anna Hunanyan <ahunanyan@scott-scott.com>
**Sent:** Friday, May 24, 2024 12:23 PM
**To:** Fischweicher, Jessica <Jessica.Fischweicher@mmc.com>; Chandler, Rosalind <Rosalind.Chandler@mmc.com>; Silva Cano, Gustavo <gustavo.silvacano@oliverwyman.com>
**Cc:** S+S Fair Isaac <FICO@scott-scott.com>; Carmen Medici <cmedici@scott-scott.com>
**Subject:** RE: In re: FICO Antitrust Litigation - Subpoena to Oliver Wyman, LLC

Jessica,

I hope you're doing great. Could you be able to please provide an update on the status of your review, including whether you have had a chance to touch base with Vantage core regarding signoff on productions? Thanks very much.

Anna



**Anna Hunanyan,** Attorney
212.519.0521
ahunanyan@scott-scott.com
www.scott-scott.com
The Helmsley Building • 230 Park Avenue, 17th FL
New York, NY 10169

NEW YORK • CONNECTICUT • CALIFORNIA • DELAWARE • TEXAS • VIRGINIA • NEBRASKA • ARKANSAS • CANADA

A    TERDA  +BERL N+L  ND  N

This e mail ma  contain confidential or privileged information.  f  ou  elieve  ou have received it in error,
please notif  the sender immediatel  and delete this message without cop ing or disclosing it.

---

**From:** Fischweicher, Jessica <Jessica.Fischweicher@mmc.com>
**Sent:** Thursday, May 2, 2024 11:35 AM
**To:** Anna Hunanyan <ahunanyan@scott-scott.com>; Chandler, Rosalind
<Rosalind.Chandler@mmc.com>; Silva Cano, Gustavo <gustavo.silvacano@oliverwyman.com>
**Cc:** S+S Fair Isaac <FICO@scott-scott.com>; Carmen Medici <cmedici@scott-scott.com>
**Subject:** RE: In re: FICO Antitrust Litigation - Subpoena to Oliver Wyman, LLC

Thank you, Anna.

**Jessica Fischweicher**
Assistant General  ounsel,   arsh   ercer Litigation
T +1 212 345 5840     +1 34   964 3902
 essica.fischweicher@mmc.com

1166 Avenue of the Americas, New York, NY 10036
www.mmc.com

Attorne   lient  ommunication
Privileged and  onfidential

---

**From:** Anna Hunanyan <ahunanyan@scott-scott.com>
**Sent:** Thursday, May 2, 2024 11:33 AM
**To:** Fischweicher, Jessica <Jessica.Fischweicher@mmc.com>; Chandler, Rosalind
<Rosalind.Chandler@mmc.com>; Silva Cano, Gustavo <gustavo.silvacano@oliverwyman.com>
**Cc:** S+S Fair Isaac <FICO@scott-scott.com>; Carmen Medici <cmedici@scott-scott.com>
**Subject:** Re: In re: FICO Antitrust Litigation - Subpoena to Oliver Wyman, LLC

> **CAUTION:** This email originated outside the company. Do not click links or open attachments unless you are
> expecting them from the sender.

---

Jessica, that's fine, thank you.

**From:** Fischweicher, Jessica <Jessica.Fischweicher@mmc.com>
**Sent:** Thursday, May 2, 2024 10:52:35 AM
**To:** Anna Hunanyan <ahunanyan@scott-scott.com>; Chandler, Rosalind
<Rosalind.Chandler@mmc.com>; Silva Cano, Gustavo <gustavo.silvacano@oliverwyman.com>
**Cc:** S+S Fair Isaac <FICO@scott-scott.com>; Carmen Medici <cmedici@scott-scott.com>
**Subject:** RE: In re: FICO Antitrust Litigation - Subpoena to Oliver Wyman, LLC

Thank you for speaking with us yesterday. I just want to clarify – as we understand it, the original due date for production was May 22nd. What I was asking on the call was for an extension of that due date for 3 weeks to June 12th. Please let me know if that is acceptable on your end. We are happy to provide an update as we engage in a search. Thank you.

Regards,

**Jessica Fischweicher**
Assistant General  ounsel,   arsh   ercer Litigation
T +1 212 345 5840    +1 34   964 3902
 essica.fischweicher@mmc.com

1166 Avenue of the Americas, New York, NY 10036
www.mmc.com

Attorne    lient   ommunication
Privileged and   onfidential

---

**From:** Anna Hunanyan <ahunanyan@scott-scott.com>
**Sent:** Wednesday, May 1, 2024 11:00 PM
**To:** Chandler, Rosalind <Rosalind.Chandler@mmc.com>; Fischweicher, Jessica <Jessica.Fischweicher@mmc.com>; Silva Cano, Gustavo <gustavo.silvacano@oliverwyman.com>
**Cc:** S+S Fair Isaac <FICO@scott-scott.com>; Carmen Medici <cmedici@scott-scott.com>
**Subject:** RE: In re: FICO Antitrust Litigation - Subpoena to Oliver Wyman, LLC

> **CAUTION:** This email originated outside the company. Do not click links or open attachments unless you are expecting them from the sender.

 essica and team,

Thank  ou for meeting with us toda . As discussed, we are fine with e tending the production deadline to three weeks from toda , which falls on   a  22.   e discussed that  our team would confer with  our client and review  our client s files for materials responsive to the su  poena, and work to  egin producing documents  efore the original deadline, if possi  le.   e understand that  ou will let us know what documents are availa  le in response to each re  uest and  uantif  the associated   urden of production.   e also understand that at this stage  ou will not restore emails or run custodian searches,   ut will target searches to locate documents as re  uested in the su  poena.

To the e tent possi  le, we d greatl  appreciate an update on   a  8 on the status of the review process.   e are happ  to meet and confer again soon to discuss an   additional  uestions  ou might have.   e look forward to working with  ou.

Best,
Anna



**Anna Hunanyan,** Attorne
212.519.0521
ahunan_an@scott_scott.com
www.scott_scott.com
The elmsle Building + 230 Park Avenue, 1 th l
New York, NY 10169

NE   Y  R +L ND N+A     TERDA  +BERL N+  AL     RN A+    NNE  T    T+V RG N A+        +AR    NA+TEXA

This e mail ma  contain confidential or privileged information.  f  ou  elieve  ou have received it in error, please notif  the sender immediatel  and delete this message without cop ing or disclosing it.

-----Original Appointment-----
**From:** Chandler, Rosalind <Rosalind.Chandler@mmc.com>
**Sent:** Monday, April 29, 2024 4:03 PM
**To:** Chandler, Rosalind; Anna Hunanyan; S+S Fair Isaac; Fischweicher, Jessica; Carmen Medici; Silva Cano, Gustavo
**Subject:** In re: FICO Antitrust Litigation - Subpoena to Oliver Wyman, LLC
**When:** Wednesday, May 1, 2024 4:00 PM-4:30 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** https://mmc.zoom.us/j/95012026799?pwd=RVVHNHhQQllaSWJ1djIzaDFrcXh1UT09

-----Original Appointment-----
**From:** Chandler, Rosalind <Rosalind.Chandler@mmc.com>
**Sent:** Monday, April 29, 2024 12:56 PM
**To:** Chandler, Rosalind; Fischweicher, Jessica; Carmen Medici; Silva Cano, Gustavo
**Subject:** In re: FICO Antitrust Litigation - Subpoena to Oliver Wyman, LLC
**When:** Wednesday, May 1, 2024 4:00 PM-4:30 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** https://mmc.zoom.us/j/95012026799?pwd=RVVHNHhQQllaSWJ1djIzaDFrcXh1UT09

 oin  oom   eeting

Password          5   400
 eeting   RL      https  mmc.zoom.us  95012026  99
                  pwd  RVV  N  h     lla     1d  zaD  rcXh1  T09

## Join by telephone

**o  ile one tap**   +16465189805,,95012026 99  or +13126266 99,,95012026 99
or +16699006833,,95012026 99
 nited  ingdom +44203481523 ,,95012026 99  or
+441314601196,,95012026 99
Australia +613 0182005,,95012026 99  or
+618 1501149,,95012026 99  or +61280156011,,95012026 99
Brazil +55213958 888,,95012026 99  or
+551146806 88,,95012026 99
 anada +158 3281099,,95012026 99  or
+164 3 44685,,95012026 99  or +1438809  99,,95012026 99
 rance +331 03 9 29,,95012026 99  or
+33186995831,,95012026 99  or +331 03 2246,,95012026 99
German  +4969380 9884,,95012026 99  or
+496950502596,,95012026 99  or +4969 1049922,,95012026 99  or
+4969380 9883,,95012026 99
 ong  ong  AR +85258086088,,95012026 99  or
+8523008329 ,,95012026 99  or +85258033 30,,95012026 99
Netherlands +3120 940854,,95012026 99  or
+3120 94 345,,95012026 99  or +31202410288,,95012026 99
 reland  +35316533895,,95012026 99  or
+35361639031,,95012026 99  or +35315369320,,95012026 99
El  alvador +50321366444,,95012026 99  or
+50321139088,,95012026 99
Estonia +3 28801188,,95012026 99  or +3 26601699,,95012026 99
 inland  +358942451488,,95012026 99  or
+358341092129,,95012026 99

**Dial**       +1 646 518 9805 or +1 312 626 6  99 or +1 669 900 6833
 nited  ingdom +44 203 481 523  or +44 131 460 1196
Australia +61 3  018 2005 or +61 8  150 1149 or +61 2 8015 6011
Brazil +55 21 3958  888 or +55 11 4680 6  88
 anada +1 58  328 1099 or +1 64  3 4 4685 or +1 438 809  99
 rance +33 1  03  9 29 or +33 1 8699 5831 or +33 1  03  2246
German  +49 69 380  9884 or +49 695 050 2596 or +49 69  104 9922
or +49 69 380  9883
 ong  ong  AR +852 5808 6088 or +852 3008 329  or +852 5803
3  30
Netherlands +31 20  94 0854 or +31 20  94  345 or +31 20 241 0288
 reland  +353 1 653 3895 or +353 6 163 9031 or +353 1 536 9320
El  alvador +503 2136 6444 or +503 2113 9088
Estonia +3  2 880 1188 or +3  2 660 1699
 inland  +358 9 4245 1488 or +358 3 4109 2129

**eeting  D**     950 1202 6  99

| Password | 5 400 |
|---|---|

<u>Additional international and toll free num ers are availa le</u>.

### Join from an H.323/SIP room system

| .323 | 162.255.3 .11 | est |
|---|---|---|
| | 162.255.36.11 | East |
| | 221.122.88.195 | ainland hina |
| | 115.114.131. | ndia um ai |
| | 115.114.115. | ndia dera ad |
| | 213.19.144.110 | Amsterdam Netherlands |
| | 213.244.140.110 | German |
| | 103.122.166.55 | Australia dne |
| | 103.122.16 .55 | Australia el ourne |
| | 209.9.211.110 | ong ong AR |
| | 149.13 .40.110 | ingapore |
| | 64.211.144.160 | Brazil |
| | 149.13 .68.253 | e ico |
| | 69.1 4.5 .160 | anada Toronto |
| | 65.39.152.160 | anada Vancouver |
| | 20 .226.132.110 | apan Tok o |
| | 149.13 .24.110 | apan saka |
| eeting D | 950 1202 6 99 | |
| Password | 5 400 | |
| P | 95012026 99@zoomcrc.com | |
| Password | 5 400 | |

Best,
Rosalind

**Rosalind Chandler**
enior Legal Assistant, Legal, ompliance Pu lic Affairs
T +1 212 345 86 1

1166 Avenue of the Americas
New York, New York 10036
www.mmc.com



---

*********************************************************************
This e mail, including an  attachments that accompan  it, ma  contain
information that is confidential or privileged. This e mail is
intended solel  for the use of the individual s  to whom it was intended to  e
addressed.  f  ou have received this e mail and are not an intended recipient,
an  disclosure, distri ution, cop ing or other use or
retention of this email or information contained within it are prohi ited.
 f  ou have received this email in error, please immediatel
repl  to the sender via e mail and also permanentl
delete all copies of the original message together with an  of its attachments
from  our computer or device.
*********************************************************************

---

*********************************************************************
This e mail, including an  attachments that accompan  it, ma  contain
information that is confidential or privileged. This e mail is
intended solel  for the use of the individual s  to whom it was intended to  e
addressed.  f  ou have received this e mail and are not an intended recipient,
an  disclosure, distri ution, cop ing or other use or
retention of this email or information contained within it are prohi ited.
 f  ou have received this email in error, please immediatel
repl  to the sender via e mail and also permanentl
delete all copies of the original message together with an  of its attachments
from  our computer or device.
*********************************************************************

---

*********************************************************************
This e mail, including an  attachments that accompan  it, ma  contain
information that is confidential or privileged. This e mail is
intended solel  for the use of the individual s  to whom it was intended to  e
addressed.  f  ou have received this e mail and are not an intended recipient,
an  disclosure, distri ution, cop ing or other use or
retention of this email or information contained within it are prohi ited.
 f  ou have received this email in error, please immediatel
repl  to the sender via e mail and also permanentl
delete all copies of the original message together with an  of its attachments
from  our computer or device.
*********************************************************************

---

*********************************************************************
This e mail, including an  attachments that accompan  it, ma  contain
information that is confidential or privileged. This e mail is

intended solel  for the use of the individual s  to whom it was intended to  e
addressed.  f  ou have received this e mail and are not an intended recipient,
an   disclosure, distri ution, cop ing or other use or
retention of this email or information contained within it are prohi ited.
 f  ou have received this email in error, please immediatel
repl  to the sender via e mail and also permanentl
delete all copies of the original message together with an   of its attachments
from  our computer or device.
*********************************************************************

# EXHIBIT   4

Rose-Smith, Sabrina M
Rrahmani, Labeat
Re: In re: FICO Antitrust Litigation – Issue regarding Subpoena to Oliver Wyman, LLC
Monday, June 10, 2024 2:00:11 PM

M

---

Yes, sorry. We did speak to Oliver Wyman. They believe there may be some information they can produce that we would not object to, so they are reviewing and will ask us to review and approve per their policy. But as to confidential information, our position is the same as with CRA.

**Sabrina Rose-Smith**
GOODWIN
1900 N Street, NW
Washington, DC 20036
t  +1 202 346 4185
f  +1 202 204 7292
SRoseSmith@goodwinlaw.com | goodwinlaw.com

> On Jun 10, 2024, at 2:28 PM, Rrahmani, Labeat <LRrahmani@koreintillery.com> wrote:
>
>  ***EXTERNAL***
> Hi again, Sabrina.  I also want to circle back to this as I don't believe Plaintiffs have received a response.  Please let me know if I can answer any questions.
>
> Thanks again,
>
> Labeat
>
> Labeat Rrahmani
> **Korein Tillery**
> 205 N Michigan Avenue, Suite 1950
> Chicago, IL 60601
> 312-641-9750
> https://www.koreintillery.com
> ----------------------------
> This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.
> ----------------------------

**From:** Rrahmani, Labeat <LRrahmani@ oreinTillery.com>
**Sent:** Tuesday, June 4, 2024 1:40 PM
**To:** Rose-Smith, Sabrina M <SRoseSmith@goodwinlaw.com>

**Cc:** Anna Hunanyan <ahunanyan@scott-scott.com>; Medici, Carmen <cmedici@scott-scott.com>; Weinstein, Lauren <lweinstein@mololamken.com>; ell, Chad <C ell@ oreinTillery.com>; rant Penney <b.penney@rwblawfirm.com>
**Subject:** In re: FICO Antitrust Litigation – Issue regarding Subpoena to Oliver Wyman, LLC

Hi Sabrina,

I want to check in regarding an issue with Plaintiffs' subpoena to Oliver Wyman, LLC. We understand that Oliver Wyman has a preliminary production ready but it has not been able to reach VantageScore to discuss it with VantageScore. We presume your position with regard to Oliver Wyman is the same as your position with regard to CRA – that VantageScore will instruct Oliver Wyman not to produce anything to Plaintiffs without an order from the court compelling the material's production. ut please let us know if we have that wrong. I'm happy to address any questions you have in the meantime.

 est,

Labeat

Labeat Rrahmani
**Korein Tillery**
205 N Michigan Avenue, Suite 1950
Chicago, IL 60601
312-641-9750
https://www.koreintillery.com

----------------------------

This message is from a law firm and may contain privileged or confidential information for the sole use of the intended recipient(s). If you believe that you have received this email in error, please notify the sender immediately and delete it from your system. If you have received this email in error, you do not have permission to forward, print, copy or distribute or use the information in this message.

----------------------------

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*