UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: FICO ANTITRUST LITIGATION | ) | |
| RELATED CASES | ) | |
| | ) | No. 1:20-CV-02114 |
| | ) | |
| | ) | Judge Edmond E. Chang |
| This document relates to: | ) | |
| | ) | |
| ALL ACTIONS | ) | |

MEMORANDUM OPINION AND ORDER

The Plaintiffs in these consolidated antitrust class actions allege that Fair Isaac Company (better known in the industry and to consumers as FICO) and the three major credit bureaus—TransUnion, Equifax, and Experian (collectively called the Credit Bureaus for convenience's sake)—engaged in monopolistic behavior that caused the Plaintiffs to overpay for FICO credit scores in violation of the Sherman Act, 15 U.S.C. §§ 1, 2, as well as pertinent accompanying provisions of the Clayton Act, 15 U.S.C. §§ 15, 26, and various state laws.[1] Two categories of plaintiffs have filed separate amended complaints: (1) entities like Sky Federal Credit Union (grouped together as the Direct Purchasers) allege that they bought credit scores from FICO through agreements with FICO and the Credit Bureaus, R. 184, Direct Purchaser Am. Compl. (DPAC) ¶¶ 15–21;[2] and (2) entities like Garner Properties &

---

[1]The Court has subject matter jurisdiction over the Sherman Act and Clayton Act claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

Management LLC (grouped together as the Indirect Purchasers) allege that they bought FICO Scores not directly from FICO or a Credit Bureau, but instead from some intermediary company, R. 185, Indirect Purchaser Second Am. Compl. (IPSAC) ¶¶ 21–22. After the Plaintiffs initially filed their complaints, the Court granted the Credit Bureaus' motion to dismiss both complaints and granted in part FICO's motion to dismiss. *In re FICO Antitrust Litigation Related Cases*, 2023 WL 6388247 (N.D. Ill. Sept. 28, 2023). The Plaintiffs have now filed Amended Complaints, and the Credit Bureaus and FICO again move to dismiss all claims. R. 219, CB Mot.; R. 221, FICO Mot. For the reasons explained below, the Sherman Act Section 2 and accompanying state law claims against FICO may proceed, but the remaining claims against FICO and the Credit Bureaus are dismissed, this time with prejudice.

## I. Background

Both of the Amended Complaints allege that FICO overcharged for credit scores. A credit score is a three-digit number, typically between 300 and 850, that is supposed to convey the creditworthiness of a consumer based on his or her credit history. DPAC ¶¶ 1, 34–35; IPSAC ¶¶ 1, 35–36. Consumers can buy information on their own credit scores to monitor their own creditworthiness; the market for those scores is called the business-to-consumer market. DPAC ¶¶ 1, 34–35, 40; IPSAC ¶¶ 1, 35–36. But the cases now before the Court are about the so-called B2B market, or business-to-business market, in which businesses buy consumers' credit scores to assess the risk of extending credit or engaging in transactions with those consumers. DPAC ¶¶ 2, 40, 42; IPSAC ¶¶ 1, 3, 46.

2

FICO has allegedly maintained a 90% monopoly (that is, 90% of top lenders rely on FICO) over the B2B credit-score market for many years. DPAC ¶¶ 2, 61; IPSAC ¶¶ 2, 78–79. The Plaintiffs allege that FICO has been aided by the three main credit bureaus—Experian, Equifax, and TransUnion—which collect, standardize, and distribute the credit and financial history of individuals through credit reports. DPAC ¶¶ 3, 38–40, 56; IPSAC ¶¶ 3–5, 39–41. Together, the Credit Bureaus control nearly 100% of the aggregate credit-related data formed by aggregating credit data collected from businesses. DPAC ¶ 3; IPSAC ¶ 3. The Credit Bureaus allegedly acted with FICO to negotiate sales of credit scores to businesses on terms that favor FICO, and then distributed FICO Scores to businesses. DPAC ¶¶ 4, 8, 41–42; IPSAC ¶¶ 6, 12, 46.

In 2006, the Credit Bureaus launched VantageScore—an intended competitor to FICO Scores. DPAC ¶ 6; IPSAC ¶ 10. Like FICO Scores, VantageScore employed scoring codes and algorithms to translate consumer information into a credit score. DPAC ¶¶ 6, 35; IPSAC ¶ 10. VantageScore allegedly distinguished itself through its competitive pricing and ability to provide a credit score for millions of people that would otherwise be unable to access one. DPAC ¶¶ 6–7, 77–81; IPSAC ¶¶ 11, 91. That same year, FICO filed a lawsuit against the Credit Bureaus and VantageScore "with the intended purpose of driving VantageScore Solutions out of business." DPAC ¶ 9; *see* DPAC ¶ 86; IPSAC ¶¶ 102–05. FICO alleged antitrust, trademark, false advertising, and trade secret claims. *See generally Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011). FICO argued that VantageScore infringed on

FICO's trademark over credit score numbers in the range of 300–850 (VantageScore used a 501–900 scale). *Id.* at 1147. In 2011, the Eighth Circuit ultimately affirmed a jury verdict against FICO. *Id.* at 1143, 1153.

Between 2013 and 2015, FICO renewed its licensing and distribution agreements with the Credit Bureaus. FICO entered into a new contract with Experian in May 2013, Equifax in October 2013, and TransUnion in February 2015. DPAC ¶ 108; IPSAC ¶ 120. The Plaintiffs allege that these agreements contained anticompetitive clauses that prevented the Credit Bureaus from marketing non-FICO credit scores and allowed FICO to penalize customers that sought both a FICO Score and a VantageScore. DPAC ¶¶ 10, 108; IPSAC ¶¶ 14, 125–28. According to the Plaintiffs, the Credit Bureaus accepted these provisions—even though the requirements would harm their own joint venture—on a *quid pro quo* basis, that is, the Credit Bureaus in turn received a beneficial clause in the agreements that would prevent competition amongst the Credit Bureaus. DPAC ¶¶ 104, 117, 136; IPSAC ¶¶ 128, 149. The allegedly anticompetitive provisions and the bureau-benefitting clause are described in further detail next.

***No Equivalent Products.*** The No Equivalent Products clause prohibits the Credit Bureaus from developing or distributing a non-FICO analytic "that is 'aligned to the odds-to-score relationship of any Fair Isaac Analytic' or uses more than a limited number of reason codes that 'match' reason codes used by any Fair Isaac Analytic." DPAC ¶ 119; IPSAC ¶ 130; *see* DPAC ¶¶ 120–25; IPSAC ¶¶ 131–39. The odds-to-score relationship describes the relationship between a numerical score and the

4

risk that a consumer will default on a particular loan. DPAC ¶¶ 119–25; IPSAC ¶¶ 130–39. "Reason codes" describe the rationale for why a score is not higher. *Id.*

**Dynamic Royalty Schedule.** The Dynamic Royalty Schedule clause allows FICO to control the pricing of FICO Scores through the royalties that FICO charges the Credit Bureaus. DPAC ¶¶ 126–33; IPSAC ¶¶ 140–48. According to TransUnion, FICO "abused and exploited" this provision by establishing new contract terms and royalty categories. DPAC ¶ 127; IPSAC ¶ 141. For example, FICO implemented a "Pre-Qualification" royalty category in 2015. DPAC ¶ 128; IPSAC ¶ 142. This category imposed a seven-times penalty rate on lenders that purchased a FICO Score for use in "Pre-Qualification" along with VantageScore (or any other credit score). DPAC ¶ 129; IPSAC ¶ 144. The Plaintiffs allege that this penalty was intended to prevent, and did in fact prevent, lenders from relying on additional or alternative credit scores such as VantageScore's. DPAC ¶¶ 127, 131; IPSAC ¶¶ 141, 146.

**Level Playing Field.** The Plaintiffs allege that, in exchange for the Credit Bureaus adopting the two clauses above, FICO provided a Level Playing Field clause that benefitted the Credit Bureaus. DPAC ¶¶ 134–45; IPSAC ¶¶ 149–62. This provision prevents FICO from offering any Credit Bureau a more favorable price for distributing FICO Scores than that offered to any other Credit Bureau. *Id.* Because the Level Playing Field clause effectively prevents any fluctuations in the price of FICO Scores for the Credit Bureaus, the Plaintiffs allege the incentive that FICO could otherwise offer (more favorable pricing) to entice a new credit bureau to enter the market is eliminated. *Id.*

In November 2017, FICO sued TransUnion, alleging that TransUnion underpaid royalties, committed copyright infringement and conversion, breached several written agreements, and committed false advertising related to VantageScore. *Fair Isaac Corp. v. TransUnion, LLC* (*TransUnion I*), 2019 WL 1436018, at *1 (N.D. Ill. Mar. 30, 2019). In January 2018, TransUnion filed counterclaims against FICO, alleging that FICO violated Section 2 of the Sherman Act. *See* R. 38, TransUnion LLC's Redacted Counterclaims, *Fair Isaac Corp. v. TransUnion LLC*, No. 1:17-cv-08318 (N.D. Ill. filed Feb. 12, 2018). The district court held that TransUnion "adequately pled actual and attempted monopolization" because TransUnion "put[] forth claims that, if proven, could establish that FICO's exclusive dealing provisions are unlawful attempts to maintain monopoly power through exclusionary conduct." *Fair Isacc Corp. v. TransUnion, LLC*, 2019 WL 1382068, at *2 (N.D. Ill. Mar. 27, 2019) (cleaned up).[3] The parties ultimately settled on undisclosed terms, with TransUnion entering into a long-term contract with FICO to distribute FICO Scores. DPAC ¶ 99; IPSAC ¶ 113.

During the pendency of the *TransUnion* litigation, in April 2020, Sky Federal Credit Union filed a class-action complaint against FICO. R. 1. Nine other complaints against FICO soon followed, asserting federal and state antitrust claims. *See In re FICO Antitrust Litig. Related Cases*, 2021 WL 4478042, at *1 (N.D. Ill. Sept. 30,

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

2021). In September 2021, this Court addressed how the 10 related cases should be consolidated and how the Plaintiffs should be apportioned. *Id.* at *3. The Court appointed Scott+Scott as Interim Class Counsel representing the consolidated Direct Purchaser Action, and also appointed Cohen Milstein Sellers & Toll PLLC as Interim Class Counsel representing the Indirect Purchaser Action. *Id.* at *6. A description of these plaintiff categories follows:

*Direct Purchaser Plaintiffs.* Direct Purchasers are entities that directly purchased B2B credit scores from FICO and one or more Credit Bureaus, submitting payment to FICO, to the Credit Bureaus, or to both. DPAC ¶¶ 15–21, 42; *see In re FICO,* 2021 WL 4478042, at *2.

*Indirect Purchaser Plaintiffs.* Indirect Purchasers are entities that bought FICO Scores not from FICO or a Credit Bureau, but from an intermediary group. For example, Garner Properties & Management LLC, a named Indirect Purchaser Plaintiff, is a real estate brokerage and property management company that buys FICO Scores from third-parties, which in turn buy the scores from the Credit Bureaus. IP-SAC ¶¶ 21–23; *see In re FICO,* 2021 WL 4478042, at *2.

In December 2021, the Direct Purchasers filed their consolidated class action complaint, R. 121. That same month, the Indirect Purchasers filed their amended class action complaint, R. 122. This Court granted the motion to dismiss both complaints filed by the Credit Bureaus and granted in part and denied in part the motion filed by FICO. *In re FICO Antitrust Litigation Related Cases*, 2023 WL 6388247 (N.D. Ill. Sept. 28, 2023). The Direct and Indirect Purchasers then each filed Amended

7

Complaints, withdrawing their Sherman Act Section 2 conspiracy claims against all the Defendants, and adding some allegations to their Sherman Act Section 1 claims. *See* DPAC; IPSAC. The Credit Bureaus and FICO again move to dismiss all claims. CB Mot.; FICO Mot.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

## III. Analysis

### A. Monopolization

The Plaintiffs allege that FICO violated Section 2 of the Sherman Act "[t]hrough unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements" that "substantially foreclosed competition in the market for B2B credit scores in the United States." DPAC ¶ 257; *see id.* ¶¶ 250–64 (Count 5); IPSAC ¶¶ 271–287 (Count 5). Earlier in the lawsuit, the Court denied FICO's motion to dismiss these claims, and the Plaintiffs' allegations in their Amended Complaints are largely unchanged. Still, FICO once again moves to dismiss these claims, arguing that the Plaintiffs do not plausibly allege anticompetitive conduct. R. 222, FICO Br. at 1–4.

Under Section 2 of the Sherman Act, monopoly power in a defined market must be sufficiently alleged for the Plaintiffs to survive a motion to dismiss. Section 2 makes it unlawful for anyone to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce ...." 15 U.S.C. § 2. This section of the Sherman Act prohibits "the employment of unjustifiable means to gain that power" and requires "two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power ...." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

9

### 1. Relevant Market

To successfully plead the first element of a Section 2 claim, the complaint must adequately set forth a relevant market. "A 'relevant market' under the Sherman Act is comprised of the 'commodities reasonably interchangeable by consumers for the same purposes.'" *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916–17 (7th Cir. 2020) (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). Put another way, a relevant market is defined "by the reasonable interchangeability of the use or the cross-elasticity of demand between the product itself and substitutes for it." *Sharif*, 950 F.3d at 918 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). "[W]here plaintiffs fail to identify any facts from which the court can infer that defendants had sufficient market power to have been able to create a monopoly, their § 2 claim may be properly dismissed." *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000).

As explained in the Court's prior decision, the Plaintiffs have plausibly alleged that FICO holds more than a 90% market share in the B2B credit-score market. According to Michael Pung, FICO's former Chief Financial Officer and Executive Vice-President, FICO has "maintained a *90-plus percent market share* for at least … 13 years." DPAC ¶ 65 (emphasis and alteration in original). This percentage allegedly has been confirmed by FICO, which states on its "About" page that FICO Scores are "the most widely used credit score" and are used by "90% of top lenders." *Id.* ¶ 63. This percentage exceeds the percentage in comparable cases concerning market-share-based monopoly power for other Section 2 cases. *See, e.g.*, *Grinnell*, 384 U.S. at

571 (87% market share); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (holding that two-thirds of the market is a "substantial monopoly"); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1107 (7th Cir. 1983) (70% to 80% market share); *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 902 (N.D. Ill. 2009) (holding that an alleged 65% market share is sufficient). This element is satisfied. FICO does not argue that the Plaintiffs have failed to plausibly allege monopoly power in the relevant B2B market, except in the context of prequalification scores, which the Court will address next. *See* FICO Br. at 13–14.

### 2. Anticompetitive Effects

Moving on to the next element, the Plaintiffs must also allege "the willful acquisition or maintenance" of monopoly power by FICO. In defining what constitutes "the willful acquisition or maintenance" of monopoly power, the Seventh Circuit has explained that "the conduct must harm the competitive *process* and thereby harm consumers." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020) (cleaned up) (emphasis in original); *see NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135, (1998) (instructing that plaintiffs "must allege and prove harm, not just to a single competitor, but to the competitive process, i.e., to competition itself"). Because a Section 2 violation is "broader and less categorical in its definition of proscribed conduct" than a Section 1 claim, Areeda & Hovenkamp, *Antitrust Law* ¶ 777a, at 324, "a dominant firm's conduct may be susceptible to more than one court-defined category of anticompetitive conduct," *Viamedia*, 951 F.3d at 453.

Here, the Plaintiffs argue that the No Equivalent Products, Dynamic Royalty Schedule, and Level Playing Field clauses in FICO's agreements with the Credit Bureaus are anticompetitive. In contrast to FICO's first motion to dismiss, FICO now submits, as an exhibit to its motion to dismiss, a licensing agreement between FICO and TransUnion to dispute the Plaintiffs' characterizations of these clauses. R. 225-2, FICO Br., Exh. 1, Agr. (sealed).[4] FICO argues that the Court may consider this exhibit because the Amended Complaints refer to the agreement and it is central to the claims. FICO Br. at 2 n.3 (citing *Elzeftawy v. Pernix Grp., Inc.*, 477 F. Supp. 3d 734, 758 (N.D. Ill. 2020)); R. 251, FICO Reply at 2. But this agreement was not incorporated by the Plaintiffs into their amended pleadings. Indeed, the Plaintiffs did not even have access to this document when the Amended Complaints were filed, so the copy of the agreement is external to the Amended Complaints. *See* DPAC ¶¶ 111–12; IPSAC ¶¶ 124–25 (explaining that "many of the contract terms" are "confidential," the Amended Complaints' allegations are "based on TransUnion's description of its [licensing agreement] in its counterclaims against [FICO]" and not review of the actual contracts). As a formal matter, then, the Court cannot consider the agreement when evaluating the Amended Complaints. *See Thompson v. Illinois Dept. of Prof. Regulation*, 300 F.3d 750, 753 (7th Cir. 2002) ("The consideration of a 12(b)(6) motion

---

[4]Although the Court denotes when the Opinion cites to a sealed exhibit with the parenthetical (sealed), nothing in this Opinion discloses information that could possibly overcome the Seventh Circuit's high bar for sealing facts that are relied on for judicial decision-making. *Baxter Int'l v. Abbott Lab'ys*, 297 F.3d 544, 546–47 (7th Cir. 2002). So no redactions appear in this Opinion. Where possible, the Court has cited to the public, redacted version of the filings.

is restricted solely to the pleadings, which consist generally of the complaint, any exhibits attached thereto, and supporting briefs. … [I]f additional evidence was relied upon or introduced, the motion would be converted into a 56(c) motion for summary judgment.").

Second, the agreement cited by FICO does not warrant dismissal of the Sherman Act Section 2 claims. To be sure, it is easy to imagine a far simpler case, in which a plaintiff does not have access to a central document and the defendant provides it in moving to dismiss. If there were no question about whether the exhibit was the relevant document—and the only relevant version of the document—that applied to the parties' dispute, then perhaps the court could consider it at the pleading stage, and even dismiss a complaint on the basis of the document. But that is not the scenario here: FICO submits *one* licensing agreement with TransUnion as an example that covers an unspecified time period, when there are three credit bureaus involved in the lawsuit. And to vouch for the agreement's representative nature, FICO states only that it "does not dispute for purposes of this motion, that the challenged provisions in FICO's license agreements with Experian and Equifax contain the 'same or *similar* terms.'" FICO Br. at 2 n.3 (emphasis added) (quoting amended pleadings). It is not enough for FICO to dribble out one version of the licensing agreement with one credit bureau, and potentially only one that is "similar" to the other agreements. Moreover, as explained next, the language of the document itself is open to interpretation and cannot resolve the parties' dispute at the pleading stage.

13

The Plaintiffs argue that the No Equivalent Products clause is anticompetitive for two reasons: (1) it prevents the Credit Bureaus from using any alternative credit scoring system that relies on similar analytics as FICO's analytic (otherwise known as the odds-to-score relationship) and (2) it prevents the Credit Bureaus from using any alternative credit-scoring system that uses 20% or more of the reason codes used by FICO's scoring system. DPAC ¶¶ 119–25; IPSAC ¶¶ 130–39. For example, if VantageScore "used a 700 Score to indicate a less-than five percent risk of credit delinquency, and if a 700 FICO Score also indicated the same risk of delinquency," the No Equivalent Products Clause would exclude the Credit Bureaus from using VantageScore. DPAC ¶ 121. Similarly, if VantageScore used reason codes that "match[ed] 20% or more of the reason codes used by FICO scoring systems," the clause would prevent the Credit Bureaus from distributing it. *Id.*

FICO concedes that the language quoted by the Plaintiffs is in the sample agreement, but points out the following additional language from the No Equivalent Products clause: "Trans Union represents and warrants that, to its knowledge, neither: (i) VantageScore 3.0 nor (ii) any analytic publicly announced and commercialized by Trans Union prior to the Effective date, is a competing analytic." FICO Br. at 8–9; Agr. at 34–35 (sealed). According to FICO, because the agreement allowed the Credit Bureaus to sell VantageScore products, it is not anticompetitive. FICO also argues that the language of the agreement prevents TransUnion from internally developing competing analytics, but specifically carves out VantageScore Solutions, LLC and other third-parties from the provision. FICO Br. at 9–10; Agr. at 34–35

14

(sealed). But the mere allowance to deploy that one particular version of Van-tageScore 3.0 sheds no particular light, at the pleading stage, on how freely (or not) TransUnion (let alone the other Credit Bureaus) could compete with FICO's credit scoring. So the one agreement fails to definitively establish, at the pleading stage, that FICO did not engage in anticompetitive behavior.

The Plaintiffs also contend that the Dynamic Royalty Schedule clause is anti-competitive because it gives FICO the ability to control the prices of FICO Scores in an abusive and exploitative manner. DPAC ¶¶ 126–33; IPSAC ¶¶ 140–48. In the agreement between FICO and TransUnion, the clause provides that "once every twelve (12) months during the Term, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing." DPAC ¶ 126. According to the Plaintiffs, the Dynamic Royalty Schedule clause carries a stiff penalty for including a competitor's credit score to consumers: in the "Pre-Qualification" context, the lender pays *seven times* the rate if a FICO Score is provided in connection with a non-FICO score. *Id.* ¶ 129.

Once again, FICO concedes that the sample agreement provides for a royalty schedule, but argues that there is no penalty rate, because the royalty applies to online disclosure of *any* credit score in connection with pre-qualification, not only competing credit scores such as VantageScore. FICO Br. at 11–12; R. 225-3, FICO Br., Exh. 2, Royalty Sched. (sealed). But (once again) this argument about contractual interpretation cannot be resolved at the pleading stage. FICO also argues that the Plaintiffs did not allege any facts about the pre-qualification credit score market in

15

particular (and within that market, online disclosure of credit scores to consumers). FICO Br. at 13–14. But as explained above, the Plaintiffs have satisfied their pleading burden of identifying a relevant market with the B2B credit-score market, and FICO asks too much of the Plaintiffs by narrowing in on the pre-qualification market based on contractual language that would not be available to the Plaintiffs without discovery.

Even without relying on the Level Playing Field clause, the No Equivalent Provision and Dynamic Royalty Schedule clauses together qualify as sufficient allegations of anticompetitive effects. At the pleading stage, the Plaintiffs have alleged sufficient facts to proceed to discovery on the nature of these clauses' anticompetitive effects. Although FICO's arguments to the contrary are unpersuasive at the pleading stage, in part because the language of the sample agreement is ambiguous, it does not mean that FICO's contracts with the Credit Bureaus are definitively ambiguous. The Court may be able to conclude with more factual context that the contracts can only be interpreted in one way at the summary judgment stage—but at the end of discovery.

The Court also held on the first motion to dismiss that the Plaintiffs' claims are not time-barred under the four-year antitrust statute of limitations, at least at the pleading stage. *See* 15 U.S.C. § 15b. This is because "a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). Instead, a "conceivable set of facts, consistent with the complaint, that would

16

defeat a statute-of-limitations defense" is sufficient at the pleading stage. *Id.* Applying this standard, the Court held that the Plaintiffs plausibly asserted facts that could overcome the statute of limitations defense on both fraudulent concealment and continuing violations grounds. *See In re FICO Antitrust Litigation Related Cases*, 2023 WL 6388247, at *6 (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194–95 (1997); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982)).

FICO now argues that even if there may be a conceivable set of facts for the claim based on the licensing agreements themselves, any claims based on the Equifax litigation are time-barred. FICO Br. at 20–23. FICO seeks a partial dismissal to limit the scope of discovery. FICO Reply at 14. The Plaintiffs allege that in 2006, FICO filed a lawsuit against the Credit Bureaus and VantageScore "with the intended purpose of driving VantageScore Solutions out of business." DPAC ¶¶ 9, 87; IPSAC ¶¶ 13, 102. FICO brought antitrust, trademark, false advertising, and trade secret claims. *See generally Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645 F. Supp. 2d 734, 738 (D. Minn. 2009). The district court granted summary judgement against FICO on the antitrust and false advertising claims, and a jury found FICO's purported trademark of the "300-850" FICO score range was merely descriptive. DPAC ¶ 91. The district court, in upholding the jury's verdict, noted that "[t]his extensive, expensive litigation seems to have been initiated largely *in response to a perceived threat to Fair Isaac's dominant position in the credit scoring industry.*" *Id.* ¶ 92 (quoting *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1000 (D. Minn. 2010) (emphasis added)). The Eighth Circuit eventually upheld the jury verdict and

17

the earlier summary judgment ruling, both of which went against FICO. *Id.* ¶ 93 (citing *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139 (8th Cir. 2011)). The Plaintiffs allege that this litigation was one aspect of FICO's "comprehensive attack on VantageScore that included filing anticompetitive litigation; signing licensing agreements with anticompetitive provisions with the Credit Bureaus; and undertaking a campaign of disparagement against, and disinformation about, VantageScore Solutions and VantageScore." DPAC ¶ 86; IPSAC ¶ 98.

As the Court explained last time, although the Equifax Litigation ended in 2011, the Plaintiffs have plausibly alleged that the litigation was a part of a practice of anticompetitive acts that continue to this day. FICO has not cited any precedent for restricting the factual allegations of an antitrust claim on statute of limitations grounds at the pleading stage. And the Seventh Circuit "applie[s] a demanding standard to dismissals on timeliness grounds at the pleading stage of antitrust cases." *Vasquez v. Indiana Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022); *see Xechem, Inc. v. Brisol-Myers Squibb Co.* 372 F.3d 899, 901–02 (reversing dismissal of a claim based on the continuing violations doctrine when at least some of the alleged acts fell "within the four-year period preceding the complaint"). So the limitations defense cannot be resolved now. As the Court already explained, however, FICO may seek leave to file an early summary judgment motion if discovery shows that there is no basis for the Plaintiffs' equitable-tolling and fraudulent-concealment claims (and if considering an early summary judgment motion makes case-management sense, which is not a foregone conclusion).

Similarly, FICO seeks a partial dismissal of the claims that are premised on FICO's disparagement of VantageScore through an aggressive public relations campaign. FICO Br. at 23–25. The allegations are not the sole basis of the Plaintiffs' claims. *See* DPAC ¶ 86 (claiming that FICO "used its monopoly power to launch a comprehensive attack on VantageScore that included filing anticompetitive litigation; signing licensing agreements with anticompetitive provisions with the Credit Bureaus; and undertaking a campaign of disparagement against, and disinformation about, VantageScore Solutions and VantageScore); IPSAC ¶ 101. Because allegations about disparagement are not necessary to state a Sherman Act Section 2 claim, the Court need not rule on these factual allegations at the pleading stage. *See Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 396–97 (7th Cir. 2000) (describing the requirements of a Sherman Act Section 2 claim at the pleading stage).

### B. Other Federal Claims

In response to the Court's prior decision, the Amended Complaints dropped the Sherman Act Section 2 conspiracy claims and Sherman Act Section 1 "hub and spokes" conspiracy claims. Instead, the Plaintiffs allege only that FICO entered into vertical agreements with each of the Credit Bureaus to restrain trade in the B2B credit score market, violating Section 1 of the Sherman Act. DPAC ¶¶ 183–289 (Counts 1–4); IPSAC ¶¶ 203–70 (Counts 1–4). For these remaining claims, FICO and the Credit Bureaus argue that the Plaintiffs do not plead new facts that overcome

this Court's prior ruling dismissing them, so they should be dismissed again. FICO Br. at 4–7; R. 220, CB Br. at 14–20.

As the Court previously explained, Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Some restraints to businesses are unreasonable per se because they almost always tend to restrict competition. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018). Restraints that are unreasonable per se usually include only restraints "imposed by agreement between competitors," or horizontal restraints. *Id.* at 2283–84 (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)). If a restraint is not per se unreasonable, then the next question is whether it violates the rule of reason. *Am. Express Co.*, 138 S. Ct. at 2284. The rule of reason may be violated by an agreement that has an adverse effect on competition in the relevant market. *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012); *see also Twombly*, 550 U.S. at 553 (explaining that § 1 of the Sherman Act only prohibits restraints on trade "effected by a contract, combination, or conspiracy" (cleaned up)).

As the Court already decided, the Plaintiffs fail to state a Section 1 claim because the Level Playing Field provision is not plausibly a sufficient incentive for each Credit Bureau to conspire separately with FICO, and the Amended Complaints do not overcome this problem. The Plaintiffs allege that the Credit Bureaus individually agreed with FICO to receive the beneficial Level Playing Field provision in exchange

for adopting the anticompetitive No Equivalent Products and Dynamic Royalty Schedule clauses. DPAC ¶ 117; IPSAC ¶ 128. The Level Playing Field clause forbids FICO from charging "any Credit Bureau a price that is lower than the price it charges any other Credit Bureau." DPAC ¶ 134; *see id.* ¶¶ 134–45; IPSAC ¶¶ 149–62. In other words, it is a "most favored nations"-type clause, and these clauses "are standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995), *as amended on denial of reh'g* (Oct. 13, 1995). The Seventh Circuit has held that most-favored-nations clauses are "not price-fixing." *Id.*; *see Associated Milk Dealers, Inc. v. Milk Drivers Union, Loc. 753, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 422 F.2d 546, 554 (7th Cir. 1970) (requiring "proof of predatory purpose as a prerequisite to finding that a most favored nation clause violates the antitrust laws").

Just as the Court pointed out in the prior decision, there are other facts in the Amended Complaints that render the conspiracy allegation implausible: (1) the Credit Bureaus were sued by FICO shortly after their agreement, making it unlikely that they conspired with FICO in exchange for protection from competition, DPAC ¶ 96; IPSAC ¶ 110; (2) the claims of protection from an outside competitor ring hollow, given that the Plaintiffs do not allege that a new credit bureau was likely to emerge or that FICO took steps to threaten Credit Bureaus with helping new entrants; (3) the Credit Bureaus took significant measures to invest and to support VantageScore

as a "competitively priced, highly predictive" alternative to FICO Scores, DPAC ¶ 7; IPSAC ¶ 10; and (4) recent litigation involving TransUnion suggests that the Credit Bureaus are emboldened to *resist* pressure from FICO, rather than seek out its protection, DPAC ¶ 96; IPSAC ¶ 110. In light of these competing factual allegations, the Plaintiffs do not adequately allege that the Level Playing Field clause was so lucrative for each Credit Bureau that they served to advance FICO's monopoly power.

In the Amended Complaints, the Plaintiffs do add some new facts: the Plaintiffs allege that the Credit Bureaus entered into these agreements during a "rough year" for them financially, DPAC ¶ 105; the Credit Bureaus decided "to be partnered" instead of "at war" with FICO, *id.* ¶ 110; during negotiations with FICO in Canada, TransUnion threatened to withhold its entire business unless the Level Playing Field clause was included in the contract, *id.* ¶ 139; and FICO's revenues increased after entering into the contracts with the Credit Bureaus, with price increases passed on to customers, *id.* ¶¶ 141, 144. *See* IPSAC ¶¶ 48, 123, 153, 156–57, 160. The Amended Complaints also now characterize the Level Playing Field clause as a "cost-information-sharing mechanism." DPAC ¶ 137; IPSAC ¶ 150. But none of these new allegations address the problems identified in the first decision, namely, that the Level Playing Field clause is a standard most-favored-nations provision and does not plausibly allege a Section 1 violation in light of the Amended Complaints' other allegations. And the Plaintiffs' main argument that some most-favored-nations clauses are anticompetitive does not make it so in this case. *See* R. 243, Pls.' FICO Resp. at 18; R. 245, Pls.' CB Resp. at 10–11. The Credit Bureaus and FICO's motions to dismiss

are granted, and Counts 1 through 4 of both Amended Complaints are dismissed, this time with prejudice.

### D. State Law Claims

Finally, the Plaintiffs bring suit under a variety of state antitrust laws. DPAC ¶¶ 265–314 (Counts 6, 7); IPSAC ¶¶ 288–350 (Counts 6–8). Because the alleged conduct that forms the basis for the state law claims as asserted against the Credit Bureaus is the same as the conduct that fails to plausibly set forth a conspiracy with FICO, all of the state law claims against the Credit Bureaus fail on that basis too. But because the Plaintiffs have plausibly alleged a Sherman Act Section 2 monopolization claim against FICO, the state law claims against FICO survive.

### IV. Conclusion

The Court grants the Credit Bureaus' motion to dismiss in its entirety (all federal and state claims). With regard to FICO's motion to dismiss, the Court grants the motion as to Counts 1 through 4 in both Amended Complaints, but denies the motion as to Count 5 (the Section 2 claim against FICO only) and the state law claims against FICO (Counts 6 through 7 of the Direct Purchaser Amended Complaint and Counts 6 through 8 of the Indirect Purchaser Second Amended Complaint).

ENTERED:


s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 24, 2024

23