**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-2114 |
| This document relates to:<br><br>ALL ACTIONS | Honorable April M. Perry<br><br>Magistrate Judge M. David Weisman |

**DIRECT PURCHASER PLAINTIFFS AND INDIRECT PURCHASER PLAINTIFFS'
REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL
FAIR ISAAC CORPORATION'S COMPLIANCE WITH
PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION**

# INTRODUCTION[1]

Fair Isaac Corporation ("Fair Isaac" or "FICO") seeks to withhold certain information that Plaintiffs need to develop damages models. More specifically, Plaintiffs require foreign transaction-level royalty structured data (in addition to domestic data) in order to benchmark Fair Isaac's anticompetitive conduct in the United States B2B credit-score market against competitive foreign markets—plus a very limited set of custodial documents to contextualize the data. Additionally, Plaintiffs seek discovery regarding their allegation that Fair Isaac maintained its monopoly by buying off TransUnion via the contract with TransUnion in Canada.

The relevance of Fair Isaac's international business data is straightforward: it is essential for comparator analyses. Plaintiffs are entitled to show the factfinder what a competitive market would look like. Indeed, benchmarking domestic markets against international ones is a tool frequently employed in antitrust cases. *See* Br. at 4 (citing AREEDA & HOVENKAMP, "Antitrust Law: An Analysis of Antitrust Principles and Their Application," § 340a2; *Frame-Wilson v. Amazon.com, Inc.*, No. C20-424RSM, 2023 WL 4201679, at *3 (W.D. Wash. June 27, 2023)).[2] Thus, that Plaintiffs' allegations in their complaints are centered around the United States is not relevant. Fair Isaac has not established that its business in Canada or the United Kingdom is so different that a benchmark analysis cannot be conducted.[3] Even if there were meaningful differences between those markets and the U.S. B2B credit-score market, any examination of those

---

[1] Given that Judge Perry's rule on reassigned cases provides that "[a]ll previously-set […] briefing schedules remain intact," Plaintiffs respectfully file this reply pursuant to the motion practice schedule set when the case was pending before Judge Chang. *See* ECF No. 340.

[2] As used herein, "Br." refers to Plaintiffs' Memorandum in Support of Their Motion to Compel (ECF No. 334) and "Opp." refers to Fair Isaac's Memorandum of Law in Opposition to Plaintiffs' Motion to Compel (ECF No. 348).

[3] In light of Fair Isaac belatedly admitting that it "does not have any consumer credit scoring operations in Australia," Decl. of Nathan Jones, ¶ 20, ECF No. 348-1, Plaintiffs retract their requests insofar as they seek information on nonexistent Australian operations.

purported differences—and the ability to control for them—are best suited for expert cross examination and, potentially, *Daubert* motions. They are **not** bases to withhold discovery. Additionally, no burden exists as to structured data—Fair Isaac is already producing data from the database in question. As to the limited custodial searches, Fair Isaac has rebuffed Plaintiffs' efforts to discuss and narrow geographic limitations for these relevant documents.

Fair Isaac also refuses to produce discovery on its negotiations with TransUnion over the Fair Isaac/TransUnion contract in Canada on the basis that the Court's dismissal of Plaintiffs' Section 1 claims somehow makes such information irrelevant. Those documents remain relevant to Plaintiffs' claims, including their Section 2 claims, and should be produced. Plaintiffs' motion should be granted.

## ARGUMENT

### I. DISCOVERY OF FAIR ISAAC'S LICENSING ACTIVITIES OUTSIDE THE UNITED STATES IS RELEVANT AND PROPORTIONAL.

Plaintiffs have met their "initial burden of establishing, *with specificity*," that information on Fair Isaac's international operations is "relevant" to their claims. *Greenbank v. Great Am. Assurance Co.*, 2019 WL 6522885, at *3 (S.D. Ind. Dec. 4, 2019). As Plaintiffs have repeatedly explained to Fair Isaac, this information is commonly produced in antitrust actions and is essential to this one, as it provides a necessary benchmark against which to calculate the damages wrought by Fair Isaac's anticompetitive conduct in the United States. *See, e.g.*, *Frame-Wilson v. Amazon.com, Inc.*, 2023 WL 4201679, at *3 (W.D. Wash. June 27, 2023). The need for this foreign data is even more pressing here in light of the longstanding nature of Fair Isaac's U.S. monopoly, which makes it all but impossible to obtain domestic data untainted by Fair Isaac's anticompetitive conduct, necessitating the use of a geographic benchmark.

Fair Isaac's arguments contesting the relevance of the requested material are beside the point—they raise *Daubert* challenges instead of credible bases to withhold discovery. Further, Fair Isaac has failed to identify a burden sufficient to render the production of the requested material disproportionate to the needs of this litigation. *See Loughnane v. Zukowski, Rogers, Flood & McArdle*, 2019 WL 13073480, at *8 (N.D. Ill. Dec. 2, 2019) ("A party claiming that a request is unduly burdensome 'must adequately demonstrate the nature and extent of the claimed burden by making a specific showing as to how disclosure of the requested documents and information would be particularly burdensome.'" (quoting *Rawat v. Navistar Int'l. Corp.*, 2011 WL 3876957, at *8 (N.D. Ill. Sept. 1, 2011))). The requested material should be produced.

### A. Differences Between Fair Isaac's Domestic and International Score Operations Provide No Basis to Withhold Discovery.

Fair Isaac attempts to undermine Plaintiffs' clearly articulated "theory of relevance" by alleging differences between Fair Isaac's domestic and international operations. Opp. at 8 (quoting *Epic Games, Inc. v. Apple, Inc.*, 2020 WL 7779017, at *1 (N.D. Cal. Dec. 31, 2020)).[4] But this places the cart before the horse. In essence, Fair Isaac's argument amounts to a preemptive (and unconvincing) attack on the ***reliability*** of a damages model constructed with the requested foreign information, not the ***relevance*** of that information. Whether or not this argument may be viable in a future *Daubert* motion, it has no place in the discovery dispute at issue here.

---

[4] *Epic Games* is inapposite. The court there denied a motion to compel international discovery only because, as to relevance, "Epic ha[d] explained nothing." 2020 WL 7779017 at *2. Epic instead "abjure[d] that task entirely, insisting that because its Complaint allege[d] global markets, it ha[d] no obligation to explain how the documents [were] relevant within the meaning of Rule 26 to claims or defenses under U.S. domestic law." *Id.* Not so here. Plaintiffs have consistently and exhaustively explained the relevance of the discovery sought. *See* Br. at 6-9. Notably, *Epic Games* observed that "the Court cannot endorse a simplistic holding that documents about foreign conduct are always relevant or never relevant because neither proposition is true." 2020 WL 7779017 at *1.

For example, Fair Isaac cites *Rockford v. Mallinckrodt ARD, Inc.*, 2024 WL 1363544, at *7 (N.D. Ill. Mar. 29, 2024), to suggest that it should not have to produce data from distinguishable foreign markets. But that case had nothing to do with the discoverability of foreign market data. Rather, it was a ruling on a *Daubert* challenge to the reliability of a particular damages model.[5] Fair Isaac's citation to *In re Surescripts Antitrust Litigation*, 2024 WL 4851539, at *6, 13 (N.D. Ill. Nov. 21, 2024), is similarly unavailing as it, too, was a *Daubert* ruling regarding damages models (with no international component).

Fair Isaac's criticism of Plaintiffs for failing to "engag[e] in any actual analysis of why FICO's international Scores businesses would make a suitable benchmark" demonstrates exactly how and why Fair Isaac's argument is entirely off base. Opp. at 9. The suitability of the benchmark is a question for expert analysis and examination, not a requirement for establishing relevance in the discovery phase. Nor does Fair Isaac explain how Plaintiffs can even make that "actual analysis" (or determine the degree to which any differences may or may not exist) without seeing the relevant data in the first place. Whether or not its reliability argument bears fruit at a later stage, Fair Isaac cannot now cling to discoverable information with no more than a poorly supported assertion that "the required similarity between FICO's U.S. and non-U.S. Scores operations does not exist." *Id.* at 8.

In short, Fair Isaac's assertion that  is not a basis to withhold discovery. *Id.* at 8 (citing Jones Decl. ¶¶ 2-19). Nor are the purported differences between Fair

---

[5] To the extent reliability is even relevant at this stage, *Rockford* notes that "antitrust damages cannot be calculated with exactitude," explaining that any attempt "to quantify the difference 'between what actually happened and what would have happened in a hypothetical free market' will always involve some degree of uncertainty[.]'" *Id.* (quoting *Fishman v. Est. of Wirtz*, 807 F.2d 520, 550 (7th Cir. 1986)).

Isaac's U.S. and international operations. To the extent there are differences in market structure, distribution models, and pricing arrangements in the requested jurisdictions, experts can analyze and account for those differences. But Fair Isaac cannot withhold discovery on that basis, precluding Plaintiffs' experts from such evaluations altogether. Fair Isaac's bare insistence that

██████████████████████████████████████████████████████████████████

████████████████ is something for the experts to grapple with **after** discovery. *Id.* at 3. It cannot, however, provide Fair Isaac with a basis to withhold discoverable information *a priori*. And it flies in the face of case law and economic literature. *See* Br. at 4.

**B.      Fair Isaac Should Produce Its International Royalty Data.**

In addition to its general argument about the purported differences between its domestic and international operations, Fair Isaac offers two more justifications for its failure to produce international transaction-level royalty data. First, Fair Isaac says, this data is "not actually responsive to Plaintiffs' second requests for production ('RFPs')." Opp. at 10. Second, Fair Isaac complains that it has already produced a more limited set of revenue and cost data "without geographic restrictions," suggesting that any additional data is not accurate or complete enough to be used in a potential damages model. *Id.* at 9. Neither argument is valid.

Fair Isaac's transaction-level royalty data is responsive to Plaintiffs' second set of RFPs. Fair Isaac insists that "RFPs 57-59 do not call for transaction-level data," noting that its "transaction-level royalty data ██████████████████████████████████████████████

████████████████████████████████ *Id.* at 10. But transaction-level royalty data would show the existence of sales (itself a predicate to establishing sales volume), and may be sufficient to help derive sales volumes, making it responsive to RFP 57.

Transaction-level royalty data is not only responsive to RFP 57, but also is essential to fulfill the request because transaction-level royalty data provides details for accurately calculating

sales volume, revenue, and profit by country, including the amount of revenue generated and the associated costs. Such royalty data also allows for identifying and analyzing trends and patterns in sales, revenue, and profit across different countries. Additionally, transaction-level royalty data is responsive to RFP 59 because royalty data helps attribute revenue to specific products or services—a key component of profit and loss statements asked for by RFP 59.

Although Fair Isaac insists that it "has already produced its structured data on international revenues and costs in both the most comprehensive and granular manner available," Opp. at 10, that is beside the point—Fair Isaac is **withholding** international transaction-level ***royalty data***. *See id.* at 6 ("Transaction-level royalty data has been produced for the U.S. only."). And given that Plaintiffs have affirmatively asked for this transaction-level royalty data, the authority that Fair Isaac points to is simply irrelevant. *Id.* at 11 (citing *Eley v. Herman*, 2006 WL 276741, at *3 (N.D. Ind. Feb. 2, 2006) (denying discovery that was not requested); *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 222 (N.D. Ill. 2013) (same)).

Fair Isaac has failed to identify any burden with producing this data. *See Loughnane*, 2019 WL 13073480 at *8. That is because there is no burden—Fair Isaac is already producing data from this database and is affirmatively choosing to increase its burden by culling this requested data out.

Faced with the obvious responsiveness of the international transaction-level royalty data, Fair Isaac takes a different tack, insisting that Plaintiffs should be content with the more limited revenue and cost data it has already produced. This information—in Fair Isaac's view, at least— "is sufficient . . . to enable Plaintiffs to explore their highly speculative assertion that FICO's international business might serve as some type of 'benchmark' for a theoretical damages model." Opp. at 9. But this take-what-we-give-you approach cannot overcome Fair Isaac's obligation to produce relevant information, especially when Fair Isaac fails to point to any undue burden in

producing the additional data. If anything, Fair Isaac has saddled ***itself*** with the burden of culling out and withholding responsive data based on its own self-serving criteria.

Fair Isaac cannot continue to withhold data as not relevant or proportional, retain the right only for itself to examine the entirety of company data, identify particular data helpful to Fair Isaac, and produce only that self-serving data. *See* Br. at 1. This approach is both unfair and impermissible. *See DR Distributors, LLC v. 21 Cent. Smoking, Inc.*, 513 F. Supp. 3d 839, 940 (N.D. Ill. 2021) ("[A] party cannot withhold or fail to produce information or documents and then feed those documents to its expert as a backdoor attempt to later introduce the evidence.").

Finally, Fair Isaac speculates that "[t]he transactional royalty data from outside the U.S. that Plaintiffs seek would not further [Plaintiffs' damages] analysis." Opp. at 9. But Plaintiffs have already noted that non-U.S. transaction-level royalty data can fill gaps in Fair Isaac's revenue and cost databases. *See* Br. at 7. Indeed, such data can be used to identify, at a minimum, (a) discrepancies, (b) similarities, (c) unique factors that may influence revenue and cost structures, and (d) trends or patterns that would otherwise be missed. That ███████████████████ ████████████████████████████████ Opp. at 9-10 n.7 (citing Jones Decl., ¶ 23), does not provide an appropriate basis to withhold relevant data: █████████ ████████████████████████████████████████ ████████████████████. *See Euroholdings Cap. & Inv. Corp. v. Harris Tr. & Sav. Bank*, 602 F. Supp. 2d 928, 938 (N.D. Ill. 2009) (accepting expert analysis that "openly identif[ied] reasonable assumptions that support his computations" and "acknowledge[d] any limitations of the data, and set out several alternate scenarios for what profits may have been realized."); Yiran Dong & Chao-Ying J. Peng, *Principled Missing Data Methods for Researchers*, SPRINGERPLUS 2, 222 (2013), available at https://doi.org/10.1186/2193-1801-2-222 ("Quality of research will be

enhanced if (a) researchers explicitly acknowledge missing data problems and the conditions under which they occurred, (b) principled methods are employed to handle missing data, and (c) the appropriate treatment of missing data is incorporated into review standards[.]"). The point stands that Plaintiffs will take the data as it exists. *See* Br. at 8-9. The discovery is plainly relevant and should be produced.

### C. Fair Isaac Should Produce Custodial Documents Related to Its Operations in Canada and the United Kingdom.

Fair Isaac also offers a slew of excuses for why it should not be compelled to produce custodial documents related to its operations in Canada and the United Kingdom. It complains, for example, that the documents "are not tied to the [U.S.] market at all," that Plaintiffs "fail[ed] to explain how they selected" Canada and the United Kingdom as the relevant jurisdictions, and that producing the requested documents would involve an undue burden because Fair Isaac "has already completed a massive custodial review." Opp. at 11-12 (emphasis removed). These complaints ring hollow.

The fact that the requested documents "are not tied to the [U.S.] market" does not undermine their relevance—it is the very ***source*** of their relevance. As Plaintiffs have explained, information on Fair Isaac's operations in foreign competitive markets is essential to proving and quantifying the damage caused by Fair Isaac's anticompetitive conduct in the ***domestic*** market. *See, e.g.*, *Mr. Dee's Inc. v. Inmar, Inc.*, 2021 WL 4224720, at \*4 (M.D.N.C. Sept. 16, 2021) (antitrust plaintiffs may "seek to isolate harm flowing from the challenged anticompetitive conduct by comparing the experience of the plaintiff in a market subject to anticompetitive conduct to the experience of . . . another firm[] in a comparable market unaffected by the defendant's violation") (citation omitted). As for Plaintiffs' purported failure to explain how they selected Canada and the United Kingdom as the chosen comparators, Fair Isaac offers no authority for such a requirement.

Nonetheless, the reason should be obvious: Plaintiffs do not allege that Fair Isaac engaged in the same anticompetitive conduct in those markets.

Finally, Fair Isaac has itself to blame for any burden associated with this request. Fair Isaac claims undue burden in complying with requests Plaintiffs served in April 2024, arguing that it "has already *completed* a massive custodial review." Opp. at 12. But it "began its custodial review in June 2024"—two months after receiving these requests. *Id*. Fair Isaac elected not to include these requests in its initial review and thus cannot now claim undue burden for a choice it made. Fair Isaac also criticizes Plaintiffs for not "includ[ing] these requests in their initial round of discovery requests," but the requests were unquestionably timely. *Id.* at 13. Fair Isaac alone put itself in this position.

## II.    THE FAIR ISAAC/TRANSUNION CANADIAN CONTRACT NEGOTIATIONS ARE RELEVANT.

Fair Isaac appears to take the view that its contract negotiations with TransUnion for Canada only implicated Plaintiffs' Section 1 claims. *See id.* at 15. But that is wrong. Such allegations are also implicated in Plaintiffs' Section 2 claim of monopolization against Fair Isaac. *See* DPAC ¶¶ 250-64; IPAC ¶¶ 271-87.[6] Indeed, Plaintiffs' allegations about the negotiations and eventual contract with TransUnion for Canada are couched in sections of the Complaints specifically titled, "Fair Isaac's Anticompetitive And Exclusionary Conduct," DPAC ¶¶ 85-155, and "Fair Isaac's Conduct in Furtherance of its Anticompetitive Scheme," IPAC ¶¶ 100-70.

The pleadings from the *TransUnion* litigation, which Fair Isaac fails to address altogether, demonstrate the obvious relevance of the negotiations between Fair Isaac and TransUnion over their Canada agreement. TransUnion has admitted that discovery into those negotiations would

---

[6] "DPAC" is Direct Purchaser Plaintiffs' First Amended Consolidated Complaint, ECF No. 184; "IPAC" is Indirect Purchaser Plaintiffs' Second Amended Consolidated Complaint, ECF No. 185.

"determine whether FICO threatened to end a valuable relationship to further its monopoly in the United States by strong-arming TransUnion into accepting its exclusionary practices." Ex. 11 at 1-2, TransUnion's Reply in Supp. of Its Mot. for Leave to Serve Written Disc. Regarding FICO's Interference with Antitrust Countercls., *Trans Union*, No. 1:17-cv-08318 (Dec. 3, 2019), ECF No. 163. Plaintiffs are entitled to discovery on whether Fair Isaac's conduct in the Canadian negotiations was an effort at "strong-arming TransUnion into accepting its exclusionary practices," *id.*, which ties directly into whether, as Plaintiffs allege, "Fair Isaac has substantially foreclosed competition in the market for B2B credit scores in the United States in violation of Section 2 of the Sherman Act (15 U.S.C. §2)" through "unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements." DPAC ¶ 257.[7]

Fair Isaac has yet to identify any burden associated with producing this relevant material or provide evidence of such a burden. *See Loughnane*, 2019 WL 13073480 at *8. Discovery squarely relevant to Plaintiffs' allegations ought to be produced. Plaintiffs thus respectfully request that Fair Isaac also be compelled to produce discovery responsive to Request No. 62.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Compel Fair Isaac Corporation's Compliance with Plaintiffs' Second Set of Requests for Production should be granted.

Dated: December 20, 2024                    Respectfully submitted,

/s/ *Carmen Medici*                          /s/ *Chad E. Bell*
Carmen Medici (*pro hac vice*)               Christopher M. Burke
Gary Foster (*pro hac vice*)                 Walter Noss
                                             Yifan (Kate) Lv

---

[7] *See also* IPAC ¶ 171 ("Fair Isaac's unlawful conduct, including the anticompetitive terms in its agreements with the CBs, has foreclosed competition in the B2B Credit Score Market by eliminating fair opportunities for VantageScore or any other credit score product to compete with Fair Isaac. This anticompetitive and exclusionary conduct has unreasonably restrained trade and maintained Fair Isaac's monopoly, by, among other things, allowing it to charge supracompetitive prices for B2B credit scores to B2B purchasers during the Class Period.").

**SCOTT+SCOTT**
  **ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-798-5319
cmedici@scott-scott.com
gfoster@scott-scott.com

Karin E. Garvey
Brian M. Hogan
Joseph P. Guglielmo
Michelle E. Conston (*pro hac vice*)
Anna Hunanyan (*pro hac vice*)
**SCOTT+SCOTT**
  **ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-6444
kgarvey@scott-scott.com
brian.hogan@scott-scott.com
jguglielmo@scott-scott.com
mconston@scott-scott.com
ahunanyan@scott-scott.com

Patrick McGahan (*pro hac vice*)
**SCOTT+SCOTT**
  **ATTORNEYS AT LAW LLP**
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct
Purchaser Plaintiffs and the Proposed Direct
Purchaser Class*

Anden Chow
Nathaniel Rubin
Cody Wiles
**MOLOLAMKEN LLP**
430 Park Avenue
New York, NY 10022
Telephone: 212-607-5951
achow@mololamken.com
nrubin@mololamken.com
cwiles@mololamken.com

**KOREIN TILLERY PC**
401 West A Street, Suite 1430
San Diego, CA 92101
Telephone: 619-625-5620
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

George A. Zelcs
Randall P. Ewing, Jr.
Chad E. Bell
Labeat Rrahmani
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com
cbell@koreintillery.com
lrrahmani@koreintillery.com

/s/ *Steven F. Molo*
Steven F. Molo
Lauren F. Dayton
**MOLOLAMKEN LLP**
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Telephone: 312-450-6700
smolo@mololamken.com
ldayton@mololamken.com

Lauren M. Weinstein
Christian I. Bale
**MOLOLAMKEN LLP**
600 New Hampshire Ave., N.W., Suite 500
Washington, DC 20037
Telephone: 202-556-2000
lweinstein@mololamken.com
cbale@mololamken.com

Paul E. Slater
Joseph M. Vanek
Michael G. Dickler
Matthew T. Slater
**SPERLING & SLATER, P.C.**
55 W. Monroe Street, Suite 3200

*Liaison Counsel for Direct Purchaser*
*Plaintiffs and the Proposed Direct*
*Purchaser Class*

Jennifer W. Sprengel
**CAFFERTY CLOBES MERIWETHER &**
  **SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

Barbara J. Hart (*pro hac vice*)
**GRANT & EISENHOFER**
485 Lexington Ave., 29th Floor
New York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

Gregory S. Asciolla (*pro hac vice*)
John M. Shaw (*pro hac vice*)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY 10017
Telephone: 646-933-1000
gasciolla@dicellolevitt.com
jshaw@dicellolevitt.com

Michael P. Lehmann (SBN 77152)
Christopher Lebsock (SBN 184546)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: 415-633-1908
mlehmann@hausfeld.com
clebsock@hausfeld.com

Hilary K. Scherrer
Paul Gallagher
**HAUSFELD LLP**
1700 K Street, N.W., Suite 650
Washington, DC 20006

Chicago, IL 60603
Telephone: 312-641-3200
pes@sperling-law.com
jvanek@sperling-law.com
mdickler@sperling-law.com
mslater@sperling-law.com

Linda P. Nussbaum
Susan Schwaiger
**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas, 31st Floor
New York, NY 10036
Telephone: 917-438-9102
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Michael L. Roberts
Karen Sharp Halbert
**ROBERTS LAW FIRM, P.A.**
6834 Cantrell Road, Suite #1131
Little Rock, AR 72207
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

Gary F. Lynch
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
gary@lcllp.com

Katrina Carroll
**LYNCH CARPENTER LLP**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: 312-750-1265
katrina@lcllp.com

Daniel E. Gustafson (*pro hac vice*)
Michelle J. Looby (*pro hac vice*)
Daniel J. Nordin (*pro hac vice*)
Anthony J. Stauber
**GUSTAFSON GLUEK PLLC**
120 S. Sixth Street, Suite 2600
Minneapolis, MN 55402

Telephone: 202-540-7200
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Scott A. Martin
Irving Scher
Jeanette Bayoumi
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: 646-357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
dnordin@gustafsongluek.com
tstauber@gustafsongluek.com

Dennis Stewart (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 612-333-8844
dstewart@gustafsongluek.com

Kenneth A. Wexler
Melinda J. Morales
Michelle Perkovic
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312-346-2222
kaw@wexlerwallace.com
mjm@wexlerwallace.com
mp@wexlerwallace.com

*Counsel for Direct Purchaser Plaintiffs*
*and the Proposed Direct Purchaser Class*

/s/ Garrett D. Blanchfield
Garrett D. Blanchfield (*pro hac vice*)
Brant D. Penney (*pro hac vice*)
Roberta A. Yard (*pro hac vice* forthcoming)
**REINHARDT WENDORF &**
 **BLANCHFIELD**
80 South 8th Street, Suite 900,
Minneapolis, MN 55402
Telephone: 651-287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

*Interim Co-Lead Counsel for Indirect*
*Purchaser Plaintiffs and the Proposed*
*Indirect Purchaser Class*

Charles R. Watkins (3122790)
**GUIN, STOKES & EVANS, LLC**
321 South Plymouth Court, Suite 1250
Chicago, IL 60604
Telephone: 312-878-8391
charlesw@gseattorneys.com

*Liaison Counsel for Indirect Purchaser*
*Plaintiffs and the Proposed Indirect*
*Purchaser Class*

Brian P. Murray (*pro hac vice* forthcoming)
Lee Albert (*pro hac vice* forthcoming)
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: 212-682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com

Douglas A. Millen
**FREED KANNER LONDON &**
 **MILLEN LLC**
100 Tri-State International Drive, Suite 128
Lincolnshire, IL 60069
Telephone: 224-632-4500
dmillen@fklmlaw.com

Jeffrey J. Corrigan (*pro hac vice*)
William G. Caldes (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
Icee N. Etheridge (*pro hac vice*)
**SPECTOR ROSEMAN &**
 **KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: 215-496-0300
JCorriganf@srkattorneys.com
BCaldes@srkattorneys.com
JSpector@srkattorneys.com
IEtheridge@srkattorneys.com

Michael S. Smith (*pro hac vice*)
Gregory P. Hansel (*pro hac vice*)
Randall B. Weill (*pro hac vice*)
Elizabeth F. Quinby (*pro hac vice*)
**PRETI FLAHERTY, BELIVEAU &**
 **PACHIOS LLP**
One City Center,
P.O. Box 9546
Portland, ME 04101
Telephone: 207-791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com

David McLafferty (*pro hac vice* forthcoming)
**MCLAFFERTY LAW FIRM, P.C.**
 **ATTORNEYS AT LAW**
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-940-4000, ext. 12
dmclafferty@mclaffertylaw.com

Simon B. Paris, Esq. (*pro hac vice* forthcoming)
Patrick Howard, Esq. (*pro hac vice* forthcoming)
**SALTZ MONGELUZZI &**
  **BENDESKY, P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: 215-575-3985
sparis@smbb.com
phoward@smbb.com

Jonathan M. Jagher (*pro hac vice* forthcoming)
**FREED KANNER LONDON &**
  **MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-234-6487
jjagher@fklmlaw.com

Michael J. Boni (*pro hac vice* forthcoming)
Joshua D. Snyder (*pro hac vice* forthcoming)
John E. Sindoni (*pro hac vice* forthcoming)
**BONI, ZACK & SNYDER LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: 610-822-0200
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

*Counsel for Indirect Purchaser Plaintiffs*
*and the Proposed Indirect Purchaser Class*

## **CERTIFICATE OF SERVICE**

I, Chad E. Bell, an attorney, hereby certify that on December 20, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

/s/ *Chad E. Bell*
Chad E. Bell