## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **IN RE: FICO ANTITRUST LITIGATION RELATED CASES** | **No. 1:20-CV-2114** |
| | **Honorable April M. Perry** |
| **This document relates to:** | **Magistrate Judge M. David Weisman** |
| **ALL ACTIONS** | |

## PLAINTIFFS' MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR
## MOTION TO COMPEL DISCOVERY FROM VANTAGESCORE

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ................................................................................................. 3

    I.  The Documents Plaintiffs Seek Are Relevant to Plaintiffs' Section 2
      Claims .................................................................................................. 4

        A.  The Documents Plaintiffs Seek Are Relevant to Establishing
            the  Relevant Market and FICO's Monopoly Power in that Market..... 5

        B.  The Documents Plaintiffs Seek Are Relevant to Establishing
            Harm to Competition ........................................................................ 7

    II.   This Court's Ruling on FICO's Subpoena to VantageScore Does
       Not Resolve Plaintiffs' Motion ....................................................... 9

        A.  Plaintiffs and FICO Requested Different Information
            from VantageScore ......................................................................... 9

        B.  The Court's Bases for Denying FICO's Requests Do Not
            Apply to Plaintiffs' Requests ......................................................... 11

    III.   VantageScore's Counterarguments Lack Merit .......................................... 14

        A.  VantageScore Has Not Shown Undue Burden .................................. 14

        B.  The Confidentiality Order Adequately Protects VantageScore .......... 14

        C.  VantageScore Has Obstructed Plaintiffs' Subpoenas
            to Other Non-Parties ....................................................................... 15

CONCLUSION.............................................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Endsley v. City of Chicago*,
    230 F.3d 276 (7th Cir. 2000) ...................................................................................14

*Fair Isaac Corp. v. Experian Info. Sols. Inc.*,
    645 F. Supp. 2d 734 (D. Minn. 2009)........................................................................2

*Fair Isaac Corp. v. Experian Info. Sols., Inc.*,
    711 F. Supp. 2d 991 (D. Minn. 2010)........................................................................3

*In re FICO Antitrust Litig.*,
    No. 1:20-CV-02114, ECF No. 341 (N.D. Ill. Nov. 24, 2024) (Chang, J.)............................1, 2

*N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*,
    2016 WL 3452757 (D.N.M. May 10, 2016) ...........................................................6

Pursuant to the Court's April 24, 2025 Minute Entry asking "the parties to file updated briefs reflecting the current state of the litigation," ECF No. 415, Plaintiffs submit this memorandum in further support of their motion to compel VantageScore Solutions, LLC's ("VantageScore") compliance with Plaintiffs' January 25, 2024 subpoena. Plaintiffs respectfully reiterate their request that the Court grant their motion and order VantageScore to produce nonprivileged documents responsive to Request Nos. 1-4, 6-7, 9, and 11-20 in its possession or the possession of its agents, including consultants Oliver Wyman, LLC and CRA International, Inc. (d/b/a Charles River), and its current and former counsel.

Plaintiffs incorporate by reference as if fully set forth herein their opening and reply briefs filed at ECF Nos. 314-1 and 317.[1]

## PRELIMINARY STATEMENT

Since Plaintiffs' motion to compel VantageScore was fully briefed on July 15, 2024, several notable developments have occurred, each of which further supports Plaintiffs' request for documents from VantageScore.

*First*, on November 24, 2024, the Court ruled on two motions to dismiss, sustaining Plaintiffs' Sherman Act Section 2 and accompanying state law claims against Defendant Fair Isaac ("FICO") but dismissing Section 1 claims against FICO and the Credit Bureaus.[2] *See In re FICO Antitrust Litig.*, No. 1:20-CV-02114, ECF No. 341, at 2 (N.D. Ill. Nov. 24, 2024) (Chang, J.)

---

[1] *See* Plaintiffs' Joint Mem. in Supp. of Mot. to Compel VantageScore Solutions, LLC's Compliance with Subpoena, *originally filed in* Misc. Case No. 24-80144 (N.D. Cal. June 11, 2024), *re-filed in* 1:20-CV-2114, ECF No. 314-1 (N.D. Ill. July 12, 2024) ("Br."); VantageScore Solutions, LLC's Amended Mem. in Supp. of Opp'n to Pls.' Mot. to Compel, 1:20-CV-2114, ECF No. 312 (N.D. Ill. July 3, 2024) ("Opp."); and Pls' Joint Reply Mem. in Supp. of Mot. to Compel Disc., 1:20-CV-2114, ECF No. 317 (N.D. Ill. July 15, 2024) ("Reply").
[2] Credit Bureaus refers to Equifax, Inc., Experian Information Solutions, Inc., and TransUnion, LLC.

("MTD Opinion"). In its opinion on the motion to dismiss, the Court noted the importance of VantageScore to this litigation, observing that Plaintiffs allege that the 2006 lawsuit filed by FICO against VantageScore and the Credit Bureaus (the "VantageScore litigation"[3]) "was one aspect of FICO's 'comprehensive attack on VantageScore that included filing anticompetitive litigation; signing licensing agreements with anticompetitive provisions with the Credit Bureaus; and undertaking a campaign of disparagement against, and disinformation about, VantageScore Solutions and VantageScore." MTD Opinion at 18. The Court held that "Plaintiffs have plausibly alleged that the [VantageScore] litigation was a part of a practice of anticompetitive acts that continue to this day." *Id.* (quoting DPAC ¶ 86; IPAC ¶ 98).

*Second*, this Court granted Plaintiffs' motion to compel documents from FICO relating to its lobbying efforts against VantageScore, disagreeing with FICO "that the relevance of the materials is speculative." *See* Order Granting in Part and Denying in Part Plaintiffs' Motion to Compel FICO, No. 1:20-cv-02114, ECF No. 385 at 2-3 (N.D. Ill. Jan. 28, 2025). Those relevant materials include documents that reflect FICO's campaign to persuade Fannie Mae and Freddie Mac to not permit the use of VantageScore for assessing credit risk.

*Third*, on April 7, 2025, this Court issued an Order denying FICO the discovery it sought from VantageScore, *see In re FICO Antitrust Litig.*, No. 1:20-CV-02114, ECF No. 411 slip op. (N.D. Ill. Apr. 7, 2025), for reasons inapplicable to Plaintiffs' motion, as explained below. This Court held that FICO had failed to explain adequately the relevance of the documents it sought. *Id.* at 2. In a previous ruling on that dispute, the Court rejected VantageScore's chief concern, *i.e.*, that it would be compelled to produce competitively sensitive information. *See* ECF No. 386,

---

[3] *See Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645 F. Supp. 2d 734, 738 (D. Minn. 2009).

January 28, 2025 Order at 1 n.1.  Nothing in the operative ruling undermined the Court's prior rejection of VantageScore's confidentiality concerns, which are meritless in any event given the existence of a robust confidentiality order in this case. *See* Br. at 11; Reply at 11-13; Agreed Confidentiality Order, ECF No. 199.

Each of these rulings bolsters Plaintiffs' arguments from the initial briefing on this motion as to why VantageScore should be compelled to produce the discovery Plaintiffs seek.

## ARGUMENT

Unlike FICO's briefing, which this Court held was deficient, Plaintiffs' briefing in support of their motion to compel adequately established why the requested information is relevant and necessary to litigating their Section 2 claims.  *See generally* Br. at 5-10; Reply at 2-11. VantageScore notably failed to explain why Plaintiffs' requests were not relevant or unduly burdensome.  *See* Opp. at 13 (seeking to withhold discovery on grounds that "other evidence available to the Parties is both more relevant and less intrusive").

To refresh, Plaintiffs seek three categories of documents from VantageScore.

*One*, in Request Nos. 1-3, Plaintiffs seek documents produced or presented by VantageScore to the government or in litigation.  More specifically, Plaintiffs seek documents that: (a) VantageScore produced or presented to the government in connection with the government's investigation of FICO for anticompetitive conduct; (b) VantageScore used as part of its lobbying efforts to convince Fannie Mae and Freddie Mac to use VantageScores for assessing creditworthiness; and (c) VantageScore produced in prior litigation against FICO, an action that the relevant district court described as undertaken by FICO "in response to a perceived threat [by VantageScore] to Fair Isaac's dominant position in the credit scoring industry." *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 711 F. Supp. 2d 991, 1000 (D. Minn. 2010).  The documents these Requests seek are directly relevant to FICO's attempts to limit VantageScore's adoption—as

3

described at length in Plaintiffs' complaints, DPAC ¶¶ 70-100; IPAC ¶¶ 84-114—and are therefore directly relevant to the willful acquisition or maintenance of monopoly prongs of Plaintiffs' Sherman Act § 2 claim. Notably, FICO did not seek this material.

*Two*, Plaintiffs seek documents relating to VantageScore's founding (Request Nos. 4, 6, and 17-20). Though some overlap exists between these Requests and FICO's, the Court's bases for rejecting FICO's requests do not apply to Plaintiffs. Unlike FICO, Plaintiffs have explained the relevance of this material to proving their Section 2 claims. Specifically, Plaintiffs argued that facts about VantageScore's founding "are critical to tell Plaintiffs' story at trial," namely that VantageScore "became FICO's only real competitor, causing FICO to respond by trying to squash it at every turn." Reply at 7. Plaintiffs also argued they would be "hardpressed to explain VantageScore's founding without the founding contracts (or testimony from knowledgeable witnesses solicited with the aid of those contracts)." *Id.*

*Three*, Plaintiffs seek documents relating to VantageScore's market analysis (Request Nos. 7, 9, and 11-16). Those documents are relevant to defining the relevant market and demonstrating market power, both of which Plaintiffs bear the burden of proving for their Section 2 claims. Though FICO sought similar data, it did not seek data related to pricing, information relating to VantageScore's market strategies, or forecasts of future market share. Moreover, Plaintiffs and FICO are not similarly situated in terms of their relative need for this material. Therefore, the Court's bases for rejecting FICO's related requests also do not apply to Plaintiffs.

For the reasons in its initial briefing and the additional reasons presented below, Plaintiffs respectfully request that the Court grant their motion.

## I. The Documents Plaintiffs Seek Are Relevant to Plaintiffs' Section 2 Claims

Well before the Court ruled on motions to dismiss, Plaintiffs explained the relevance and

necessity of information from VantageScore to litigating their Section 2 claims. *See* Br. at 10; Reply at 10-11. The Court's recent MTD Opinion only bolsters the relevance of the information Plaintiffs seek from VantageScore to establish Section 2 violations against FICO.

Plaintiffs—not FICO—bear the burden of showing that "FICO violated Section 2 of the Sherman Act '[t]hrough unlawful, interconnected, and mutually reinforcing anticompetitive and exclusionary acts and agreements' that 'substantially foreclosed competition in the market for B2B credit scores in the United States.'" MTD Opinion at 9; *see also* Opp. at 1 ("To win their Section 2 claim, Plaintiffs must show that FICO has had a monopoly in the relevant market and has willfully acquired and maintained this monopoly").[4] That showing requires "two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power . . . ." MTD Opinion at 9 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). As Plaintiffs have explained, information from VantageScore is paramount to meet that burden. *See* Reply at 10.

### A. The Documents Plaintiffs Seek Are Relevant to Establishing the Relevant Market and FICO's Monopoly Power in that Market

Plaintiffs seek documents regarding VantageScore's analyses of competition and factors impacting the prices it charges for VantageScores in Request Nos. 7, 9, and 11-16. Br. at 9. As Plaintiffs have explained, responsive documents will reveal "VantageScore's views on the parameters of the relevant market, who the competitors are, what the competitive landscape looks like, and how VantageScore sets its prices." Br. at 10. As explained in their briefs, information from VantageScore is relevant to defining the product market (*i.e.*, the market for B2B credit

---

[4] B2B credit scores are scores sold "to banks, mortgage companies, credit unions, and other businesses that assess individual credit risk – i.e., business-to-business sales." DPAC ¶ 1; IPAC ¶ 1.

scores), and FICO's possession of monopoly power in that market.  *See* Br. at 10; Reply at 10 ("[A] non-party's views of the market can nonetheless inform the inquiry, especially where the third party is not just a market participant but the only meaningful competitor to the alleged monopolist.").

**Relevant Market.**  As the Court recently held in the MTD Opinion, "[a] 'relevant market' under the Sherman Act is comprised of the 'commodities reasonably interchangeable by consumers for the same purposes.'"  MTD Opinion at 10 (quoting *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916-17 (7th Cir. 2020)).  "Without question, competitors' views and evaluation of the market are relevant to defining a market and evaluating market power."  Br. at 10 (quoting *N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 2016 WL 3452757, at *3 (D.N.M. May 10, 2016)).  VantageScore is by far the most successful would-be competitor against FICO.  *See* DPAC ¶¶ 70-86; IPAC ¶¶ 84-101.  Its "views and evaluation of the market" of competition thus are central to Plaintiffs' establishment of a relevant market and FICO's monopoly power in that market.  *N.M. Oncology*, 2016 WL 3452757, at *3.

Beyond establishing liability, the raw data VantageScore relies on to form its views on competition, the relevant market, and price-setting are also relevant to Plaintiffs' damages claims. *See* Br. at 10.  After all, VantageScore's underlying data is invaluable to construction of a damages benchmark based on a but-for world in which VantageScore had been permitted to gain significant market share.  *See* Reply at 11.  With this data, Plaintiffs can also determine overcharge and measure market power by accounting for differences in costs and fees when comparing final prices paid by Plaintiffs for FICO Scores versus VantageScores.  *See id.*  VantageScore's publicly available ***summaries*** are simply not an adequate alternative.

Indeed, VantageScore has conceded that triers of fact "can better understand 'the

6

competitive landscape' from what is happening in the market." ECF No. 411 at 1. "What is happening in the market" necessarily involves what ***VantageScore*** is doing in that market and what it understands is happening in the market as demonstrated by its own market analyses. The requested discovery from VantageScore is plainly relevant to defining the relevant market.

**Monopoly Power.** The requested discovery is also relevant to proving FICO's monopoly power. The Court recently held that "Plaintiffs have plausibly alleged that FICO holds more than a 90% market share in the B2B credit-score market." MTD Opinion at 10. Plaintiffs will have to prove market power at trial on their Section 2 claim. *See* MTD Opinion at 11. VantageScore's documents analyzing the market are directly relevant to making that showing. *See* Br. at 10.

Relatedly, information concerning harm that VantageScore, FICO's strongest would-be competitor, suffered is also relevant to establishing FICO's willful maintenance of monopoly power, a necessary element of a Section 2 claim. As the Court noted in its ruling on the motion to dismiss, Plaintiffs have alleged that FICO's imposition of a penalty beginning "on lenders that purchased a FICO Score for use in 'Pre-Qualification' along with VantageScore was intended to prevent and did in fact prevent, lenders from relying on additional or alternative credit scores such as VantageScore's." MTD Opinion at 5. VantageScore's documents reflecting the extent to which its product was prevented from competing is plainly relevant.

### B. The Documents Plaintiffs Seek Are Relevant to Establishing Harm to Competition

Plaintiffs also bear the burden of proving that FICO's conduct "harm[ed] the competitive process and thereby harm[ed] consumers." MTD Opinion at 11 (quoting *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453 (7th Cir. 2020)). VantageScore's documents will show precisely that: VantageScore is and has been the only viable competitor to FICO. Plaintiffs expect that VantageScore possesses documents showing FICO's systematic suppression of VantageScore,

beginning in its nascency and lasting through today. Those documents are plainly relevant to showing how FICO has harmed competition in relevant market.

Plaintiffs have challenged FICO's licensing agreements with the Credit Bureaus as anticompetitive in that they have enabled FICO to maintain its monopoly.[5] FICO disputes that claim, arguing that "[n]othing in" those licensing agreements "excludes VantageScore (or any other FICO competitor) from the alleged market." ECF No. 251 at 6; *see* MTD Opinion at 14-15 (noting that FICO has also argued that the terms of its agreements with the Credit Bureaus "specifically carves out VantageScore Solutions, LLC" from certain restrictive terms). Documents revealing VantageScore's own assessment of the effect of FICO's agreements with the Credit Bureaus on VantageScore's business—including whether VantageScore faced potential losses because of them—are plainly necessary to showing harm to competition. *See* MTD Opinion at 15. "[H]ow freely (or not)" VantageScore "could compete with FICO's credit scoring" is a critical question for proving competitive harm. *Id.* And VantageScore's documents showing the extent to which it was hamstrung are no doubt relevant to making that showing. "[T]he publicly available reports," VantageScore has claimed would suffice are insufficient because they "do not include any pricing information, *i.e.*, the amounts VantageScore charges the Bureaus to license its algorithm, disaggregated data showing total usage of VantageScores by the Bureaus broken out by category of products and users, or disaggregated data showing costs incurred by VantageScore." Reply at 11

---

[5]      *See* DPAC ¶ 156 ("Fair Isaac's unlawful conduct, including its agreements with the Credit Bureaus containing anticompetitive contract terms, has foreclosed competition in the B2B Credit Score Market by limiting the ability of VantageScore to compete with Fair Isaac. The anticompetitive and exclusionary conduct unreasonably restrains trade and maintains Fair Isaac's monopoly by, among other things, allowing it to charge supracompetitive prices for B2B credit scores to B2B Purchasers during the Class Period."); IPAC ¶ 171.

This Section 2 case remains about FICO's "decades-long scheme to squash VantageScore—its only significant competitor—through anticompetitive conduct and to monopolize the relevant credit-scoring market, causing Plaintiffs to pay inflated prices for credit scores." Br. at 1; Opp. at 1. The Court's dismissal of other claims leaves undisturbed the simple fact that "VantageScore's documents are critically relevant to those allegations." Br. at 1.

## II. This Court's Ruling on FICO's Subpoena to VantageScore Does Not Resolve Plaintiffs' Motion

### A. Plaintiffs and FICO Requested Different Information from VantageScore

This Court's resolution of FICO's subpoena to VantageScore does not "obviate the need to resolve" Plaintiffs' motion. Br. at 5-6. Even had it been granted, FICO's motion to compel would not have "provide[d] Plaintiffs the documents they need to prosecute this case." Br. at 6. Thus, the Court's reasoning in its ruling resolving motions on FICO's subpoena to VantageScore do not apply to Plaintiffs' Requests discussed below (Nos. 1-3, 4, 6-7, 9, 11-13 and 15-20).

*First*, Plaintiffs' Request Nos. 1-3, which concern documents VantageScore produced or presented to the government or produced in litigation, do not overlap with FICO's subpoena requests. FICO did not seek materials VantageScore provided during the DOJ's investigation (RFP 1), submitted to the Federal Housing Finance Agency (RFP 2), or produced in other litigations against FICO (Plaintiffs' RFP 3). Br. at 6-7. Even VantageScore admitted as much with regard to Request No. 3. *See* Opp. at 3 n.3 ("Plaintiffs' Request 3 does seek information FICO did not request."). The Court thus has not had occasion to resolve whether VantageScore should be compelled to produce that material.[6]

---

[6] To the extent the Court has considered some of this material previously, it has ruled it relevant. Specifically, the Court held that material produced to the Federal Housing Finance Agency regarding the use of VantageScore to assess credit risk is relevant to this litigation. *See*

*Second*, even where there is some overlap between FICO's and Plaintiffs' Requests, Plaintiffs' requests seek different material. Namely, Plaintiffs seek documents about VantageScore's founding as a joint venture among the Credit Bureaus (Request Nos. 4, 6, and 17-20).[7] Br. at 7. Even though FICO sought VantageScore's LLC agreements (FICO RFP No. 1), FICO never sought, as Plaintiffs do, "documents concerning how those agreements or other documents may restrict the Credit Bureaus' ability to distribute VantageScore products in light of their agreements with FICO, the rights the Credit Bureaus have to receive benefits from VantageScore, or documents showing the contributions the Credit Bureaus have made to VantageScore." Br. at 9. VantageScore's documents reflecting how FICO's contracts impacted its ability to compete or cemented FICO's dominant position are squarely relevant to Plaintiffs' Section 2 claims.

Similarly, although FICO's subpoena called for VantageScore's market analyses and underlying data, as explained, "Plaintiffs' requests meaningfully differ from FICO's" because they seek: "(i) documents showing VantageScore's strategies for gaining a foothold in the credit-scoring market (RFP No. 7); (ii) *future* market share and demand forecasts for VantageScores (RFP Nos. 9, 11, 15), and for credit scores more broadly (RFP No. 12); and (iii) data regarding VantageScore's fee and price-setting decisions (RFP Nos. 13 & 15-16)." Br. at 10. As explained before and above, this material is plainly relevant for showing relevant market, market power, and

---

Order Granting in Part and Denying in Part Plaintiffs' Motion to Compel FICO, No. 1:20-cv-02114, ECF No. 385 at 2-3 (N.D. Ill. Jan. 28, 2025). VantageScore has not, and cannot now, contest the relevance of material responsive to RFP 2.

[7] VantageScore has previously taken the position that the governing agreements should be sought in the first instance from the Credit Bureaus who, unlike VantageScore, are "named defendants." Br. at 9 (Ex. 20, at 7-8). That argument no longer applies because the Credit Bureaus are no longer defendants.

anticompetitive effect—all of which are elements of Plaintiffs' Section 2 claim. VantageScore did not meaningfully dispute that argument. *See* Reply at 9 ("VantageScore does not dispute that a competitor's 'subjective' assessment of the market can be used in litigation to inform a party's experts' objective views of the market.").

## B. The Court's Bases for Denying FICO's Requests Do Not Apply to Plaintiffs' Requests

Where FICO and Plaintiffs sought the same material, Plaintiffs offered different justifications than FICO. Accordingly, the Court's reasoning behind rejecting FICO's Requests does not apply *a fortiori* to Plaintiffs' Requests.

FICO sought "VantageScore's founding documents" but did so solely to determine "the competitive landscape." ECF No. 411 at 1. The Court rejected that basis of relevance, finding that "VantageScore's LLC Agreement . . . will not shed light on whether FICO has acquired or maintained monopoly power in the market." ECF No. 411 at 2. Plaintiffs sought the same material (Request Nos. 4, 6, and 17-20) but advanced a different argument. Specifically, Plaintiffs argued that they needed the requested documents "to explain VantageScore's founding and operations to the jury," which "are critical to tell Plaintiffs' story at trial: VantageScore was founded as a joint venture among the Bureaus and subsequently became FICO's only real competitor, ***causing FICO to respond by trying to squash it at every turn***." Reply at 7 (emphasis added). It is hard to see how Plaintiffs could "explain VantageScore's founding without the founding contracts (or testimony from knowledgeable witnesses solicited with the aid of those contracts)." *Id.* Documents concerning VantageScore's founding remain crucial to proving Plaintiffs' Section 2 claims and telling the story at trial of how FICO unlawfully maintained its monopoly.

VantageScore's argument that the competitive landscape "is best understood from what is happening as a practical matter in the market" simply does not apply to Plaintiffs. ECF No. 386

at 1. Plaintiffs do not want to show "the competitive landscape," they want to persuade a jury that FICO illegally maintained a monopoly by squashing its only real competition.

FICO also sought VantageScore's licensing agreement with the Credit Bureaus. The Court initially rejected FICO's request because "FICO [did] not identify the claims or defenses to which VantageScore's licensing agreements with the Credit Bureaus are relevant." ECF No. 368 at 1. Plaintiffs have. The Court later rejected FICO's requests on grounds that such material "will not shed light on whether FICO has acquired or maintained monopoly power in the market." ECF No. 411 at 2. FICO's expressed need for VantageScore's license agreements was to "determine how 'VantageScore credit scores are marketed and distributed to putative class members'" to "rebut[ ] Plaintiffs' allegations that FICO has maintained an unlawful monopoly." ECF No. 411 at 2.

Plaintiffs, however, have offered a different justification that is directly relevant to their Section 2 claims. Specifically, "if the Credit Bureaus receive only minimal profit-sharing from VantageScore – but rich profit-sharing from FICO – they would have every incentive to push FICO Scores over VantageScores, even if not contractually constrained in their ability to distribute VantageScores." Br. at 8. That directly relates to whether FICO's conduct "aimed to crush the only real competition, (VantageScore), maintain Fair Isaac's monopoly, and extract monopoly rents from B2B Purchasers," as Plaintiffs allege. DPAC ¶ 101; IPAC ¶ 117. This discovery from VantageScore squarely relates to FICO's maintenance of monopoly power. And, again, Plaintiffs can go to no other competitor given that VantageScore alone serves as a potential substitute to FICO. This information must come from VantageScore.

Finally, even if some of the material Plaintiffs seek was relevant to Plaintiffs' now-dismissed Section 1 claims, for reasons explained in Plaintiffs' initial motion papers, that material is *also* relevant to their Section 2 monopoly-maintenance claims. Plaintiffs argued that

12

"[u]nderstanding how the Credit Bureaus' agreements with VantageScore may limit the Credit Bureaus' ability to distribute VantageScore in light of their agreements with FICO is highly relevant to proving" that "FICO entered into anticompetitive agreements with the Credit Bureaus to hamper VantageScore's growth." Br. at 8. Information that shows how FICO limited the distribution of VantageScores, and the resulting impact on VantageScore, is squarely relevant to Plaintiffs' Section 2 claims. That the information was **also** relevant to since-dismissed Section 1 claims is not a basis to deny Plaintiffs discovery.

Finally, FICO also sought the data underlying VantageScore's market analyses. The Court held that FICO had failed to show that such data "are vital to this case and it cannot obtain them at a lower cost from another source" ruling that "the burden of producing the requested information outweighs its relevance." ECF No. 386 at 2. All FICO had offered was that the requested data "'may allow' analysis of switching rates between FICO and VantageScore and 'may support' estimates of how VantageScore's market share has increased over time." ECF No. 411 at 2. The Court rejected FICO's justification as having "speculative relevance." *Id.*

By contrast, Plaintiffs did not just speculate; they explained precisely why the data is relevant and specifically argued that they could not otherwise obtain the data from another source. Plaintiffs argued that "the raw data underlying the publicly available summaries would provide information useful to prove the relevant market and FICO's market power – information that ***Plaintiffs cannot otherwise obtain***." Reply at 11 (emphasis added). Moreover, Plaintiffs argued, "the data would allow Plaintiffs' experts to construct a damages benchmark based on a but-for world in which VantageScore had been permitted to gain significant market share. The data would also permit Plaintiffs' experts to account for differences in costs and fees when comparing final prices paid by Plaintiffs for FICO Scores versus VantageScores in determining overcharges and/or

13

measuring market power." *Id.* FICO's claims that it "may" need the data for unspecified reasons are a far cry from Plaintiffs' detailed explanation of precisely why they need the data and what they would do with the data if VantageScore were ordered to produce it.[8]

### III. VantageScore's Counterarguments Lack Merit

#### A. VantageScore Has Not Shown Undue Burden

As the entity attempting to defeat discovery, VantageScore was required to show undue burden, but it failed to do so. Br. at 13-14; Reply at 13-14. That fact has not changed.

Moreover, VantageScore has rejected Plaintiffs' painstaking attempts to lessen any burden on VantageScore. "Plaintiffs suggested ways to minimize the burden on VantageScore, including negotiating limited custodians and narrow search terms. But VantageScore flatly refused." Br. at 3. Plaintiffs' need, explained above, outweighs VantageScore's purported burden.

#### B. The Confidentiality Order Adequately Protects VantageScore

VantageScore's reluctance to produce anything of substance is rooted in its concern that the existing Confidentiality Order would not protect adequately any confidential "competitively sensitive" information responsive material may contain. As explained, that argument lacks any merit. *See* Br. at 11-12; Reply at 11-13. The Court agreed in its initial ruling addressing FICO's subpoena to VantageScore, holding that, while it "appreciates VantageScore's concern about keeping its LLC agreement confidential," "there is a two-tiered confidentiality order in place, and the Court has no reason to believe that any attorney in this case would jeopardize his or her law license by violating the terms of that order." ECF No. 386 at 1 n.1. Moreover, the Court explained

---

[8]     Plaintiffs also highlighted their heightened need for the data when compared with FICO: "Plaintiffs have a more acute need for that information given that they bear the burden of proving the relevant market and FICO's market power." Br. at 10 (citing *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000).

that "[t]he fact that VantageScore is a private company does not absolve it from producing relevant information, and its understandable concerns about confidentiality can be addressed by the confidentiality order." *Id.* Given Plaintiffs' pressing need for VantageScore's information, as detailed above, VantageScore thus has no basis to continue withholding responsive material.

Given the high relevance to Plaintiffs' claims, the Court should order production of the requested materials from VantageScore.

### C. VantageScore Has Obstructed Plaintiffs' Subpoenas to Other Non-Parties

It is one thing to resist discovery, but it is quite another to interfere. While it has refused to produce relevant materials, VantageScore has also frustrated Plaintiffs' efforts to obtain from other non-parties material relevant to their Section 2 claims. *See* Br. at 4. VantageScore initially refused to produce certain documents regarding market share and market analyses on grounds that such material was maintained by VantageScore's consultants, Oliver Wyman and Charles River Associates. *See* Br. at 4. When Plaintiffs subpoenaed those consultants for this discovery, however, VantageScore instructed Charles River Associates not to produce *any* documents to Plaintiffs without a court order. *Id.* Moreover, Oliver Wyman even had a production ready to produce but ultimately did not do so because VantageScore instructed it not to make that production. *See* Br. at 4 n.5.

VantageScore should not be permitted to keep thwarting and delaying discovery here.

### CONCLUSION

For the foregoing reasons and those explained in their initial briefing, Plaintiffs respectfully request that the Court grant their motion to compel (ECF No. 314) and order VantageScore to produce nonprivileged documents responsive to Request Nos. 1-4, 6-7, 9, and 11-20.

Dated: May 9, 2025

Respectfully submitted,

*/s/ Lauren M. Weinstein*
Steven F. Molo
Lauren F. Dayton
Eric Posner
**MOLOLAMKEN LLP**
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Telephone: 312-450-6700
smolo@mololamken.com
ldayton@mololamken.com
eposner@mololamken.com

Lauren M. Weinstein
Christian I. Bale
**MOLOLAMKEN LLP**
600 New Hampshire Avenue, N.W.,
 Suite 500
Washington, DC 20037
Telephone: 202-556-2000
lweinstein@mololamken.com
cbale@mololamken.com

Anden Chow
Cody Wiles
**MOLOLAMKEN LLP**
430 Park Avenue
New York, NY 10022
Telephone: 212-607-5951
achow@mololamken.com
cwiles@mololamken.com

*Liaison Counsel for Direct Purchaser*
*Plaintiffs and the Proposed Direct*
*Purchaser Class*

*/s/ Karin E. Garvey*
Karin E. Garvey
Brian M. Hogan
Joseph P. Guglielmo
Michelle E. Conston (*pro hac vice*)
Anna Hunanyan (*pro hac vice*)
**SCOTT+SCOTT**
 **ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-6444
kgarvey@scott-scott.com
brian.hogan@scott-scott.com
jguglielmo@scott-scott.com
mconston@scott-scott.com
ahunanyan@scott-scott.com

Carmen Medici (*pro hac vice*)
Gary Foster (*pro hac vice*)
**SCOTT+SCOTT**
 **ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-798-5319
cmedici@scott-scott.com
gfoster@scott-scott.com

Patrick McGahan (*pro hac vice*)
**SCOTT+SCOTT**
 **ATTORNEYS AT LAW LLP**
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct*
*Purchaser Plaintiffs and the Proposed Direct*
*Purchaser Class*

Christopher M. Burke
Yifan (Kate) Lv
**BURKE LLP**
402 West Broadway, Suite 1890
San Diego, CA 92101
Telephone: 619-369-8244
cburke@burke.law
klv@burke.law

Barbara J. Hart (*pro hac vice*)
**GRANT & EISENHOFER**
485 Lexington Ave., 29th Floor
New York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

Gregory S. Asciolla (*pro hac vice*)
John M. Shaw (*pro hac vice*)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY 10017
Telephone: 646-933-1000
gasciolla@dicellolevitt.com
jshaw@dicellolevitt.com

Daniel E. Gustafson (*pro hac vice*)
Michelle J. Looby (*pro hac vice*)
Daniel J. Nordin (*pro hac vice*)
Anthony J. Stauber (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
120 S. Sixth Street, Suite 2600
Minneapolis, MN 55402
dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
dnordin@gustafsongluek.com
tstauber@gustafsongluek.com

Dennis Stewart (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 612-333-8844
dstewart@gustafsongluek.com

George A. Zelcs
Randall P. Ewing, Jr.
Chad E. Bell
Labeat Rrahmani
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com
cbell@koreintillery.com
lrrahmani@koreintillery.com

Michael L. Roberts
Karen Sharp Halbert
Christopher B. Sanchez
**ROBERTS LAW FIRM, P.A.**
6834 Cantrell Road, Suite #1131
Little Rock, AR 72207
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us
chrissanchez@robertslawfirm.us

Gary F. Lynch
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
gary@lcllp.com

*Counsel for Direct Purchaser Plaintiffs*
*and the Proposed Direct Purchaser Class*

Garrett D. Blanchfield (*pro hac vice*)
Brant D. Penney (*pro hac vice*)
Roberta A. Yard (*pro hac vice* forthcoming)
**REINHARDT WENDORF &**
  **BLANCHFIELD**
80 South 8th Street, Suite 900,
Minneapolis, MN 55402
Telephone: 651-287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

*Interim Co-Lead Counsel for Indirect
Purchaser Plaintiffs and the Proposed
Indirect Purchaser Class*

Charles R. Watkins (3122790)
**GUIN, STOKES & EVANS, LLC**
321 South Plymouth Court, Suite 1250
Chicago, IL  60604
Telephone: 312-878-8391
charlesw@gseattorneys.com

*Liaison Counsel for Indirect Purchaser
Plaintiffs and the Proposed Indirect
Purchaser Class*

Jeffrey J. Corrigan (*pro hac vice*)
William G. Caldes (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
Rachel E. Kopp (*pro hac vice*)
**SPECTOR ROSEMAN &**
  **KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: 215-496-0300
JCorriganf@srkattorneys.com
BCaldes@srkattorneys.com
JSpector@srkattorneys.com
RKopp@srkattorneys.com

Lee Albert
**GLANCY PRONGAY & MURRAY, LLP**
230 Park Avenue, Ste. 358
New York, NY  10169
Telephone: 212-682-5340
lalbert@glancylaw.com

Michael S. Smith (*pro hac vice*)
Gregory P. Hansel (*pro hac vice*)
Randall B. Weill (*pro hac vice*)
Elizabeth F. Quinby (*pro hac vice*)
**PRETI FLAHERTY, BELIVEAU &**
  **PACHIOS LLP**
One City Center,
P.O. Box 9546
Portland, ME 04101
Telephone: 207-791-3000
msmith@preti.com
ghansel@preti.com
rweill@preti.com
equinby@preti.com

*Counsel for Indirect Purchaser Plaintiffs
and the Proposed Indirect Purchaser Class*

18

## <u>CERTIFICATE OF SERVICE</u>

I, Labeat Rrahmani, an attorney, hereby certify that on May 9, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

<u>/s/ *Labeat Rrahmani*</u>

Labeat Rrahmani
**KOREIN TILLERY, LLC**
205 North Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
lrrahmani@koreintillery.com

1