**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES | No. 1:20-CV-2114 |
| | Judge April M. Perry |
| This document relates to: | Magistrate Judge M. David Weisman |
| ALL ACTIONS | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION
TO ENFORCE EQUIFAX'S AND TRANSUNION'S COMPLIANCE WITH
PLAINTIFFS' SUBPOENAS[1]**

---

[1] As required by Federal Rule of Civil Procedure 45, Plaintiffs filed this motion against Equifax in the district of compliance, the Northern District of Georgia. Equifax has consented to the transfer of this motion to the Northern District of Illinois (Magistrate Judge Weisman). Plaintiffs and Equifax intend to file a stipulation and motion to transfer in the Northern District of Georgia once a case number is assigned to this motion.

Because the issues presented with respect to Plaintiffs' subpoenas to Equifax and TransUnion almost completely overlap, in the interest of judicial efficiency, Plaintiffs have styled this motion in omnibus form against both TransUnion and Equifax. Plaintiffs filed identical versions of the memorandum in support of their motions to compel in the Northern District of Georgia (against Equifax) and in the Northern District of Illinois (against TransUnion). The memorandum presumes the transfer from the Northern District of Georgia will be granted and that the motion will be adjudicated in the Northern District of Illinois as to both TransUnion and Equifax.

## PRELIMINARY STATEMENT[2]

Plaintiffs respectfully seek an order compelling Equifax Inc. and TransUnion, LLC (the "Credit Bureaus" or "Bureaus") to produce transaction-level data from Canada, Australia, and the United Kingdom responsive to Plaintiffs' Request Nos. 9-16 and 18-22.[3] Plaintiffs expect their economic experts will use this data to develop econometric models that compare the prices charged for business-to-business ("B2B") Credit Scores in the monopolized U.S. market with the prices consumers pay in more competitive foreign markets. Plaintiffs expect to use those models to prove harm to competition in the relevant market and damages to Plaintiffs and the class members.

If this issue sounds familiar, it is because this Court has already ruled in a dispute between Plaintiffs and Fair Isaac ("FICO") that such foreign data is relevant to the issues in this litigation. *See* ECF 400 at 1-2. Like the Credit Bureaus do now, FICO objected to requests for transaction data from Canada, the UK, and Australia as "unduly burdensome, seeking irrelevant information, and seeking information not within its custody or control," and "refused to produce responsive documents." *Id.* at 1. This Court rejected those objections and compelled FICO to produce the requested data. Specifically, the Court held that Plaintiffs' representation that they intended to use the data " 'to calculate damages by comparing output and pricing in the anticompetitive U.S. market against output and pricing in foreign jurisdictions, presuming they are not tainted by the kind of anticompetitive conduct that Fair Isaac has undertaken in the United States' " was sufficient

---

[2] Plaintiffs state pursuant to Northern District of Illinois Local Rule 37.2 and this Court's case procedures that they met and conferred in good faith with counsel for Equifax and TransUnion via teleconference to resolve the disputes addressed in this motion on February 14, February 22, March 4, April 25, and July 9, 2024. Plaintiffs met and conferred with TransUnion's counsel individually on September 5, 2024, and March 25, May 1, May 8, and May 16, 2025. They met and conferred with Equifax's counsel individually on September 13, 2024, and March 24, April 22, May 8, and May 16, 2025. Plaintiffs and the Credit Bureaus exchanged numerous letters and emails in an effort to resolve their disputes. Plaintiffs understand the Bureaus oppose this motion.

[3] TransUnion has represented it does not have a subsidiary that sells credit scores in Australia.

to "[s]atisfy[ ] Rule 26(b)'s threshold relevance requirement." *Id.* at 1-2. Despite that ruling, the Bureaus have refused to produce similar data, relying on arguments the Court has already rejected.

The Bureaus have also failed to substantiate any burden associated with producing the requested data. Plaintiffs, by contrast, have articulated a compelling need for the data. The Credit Bureaus possess unique foreign transaction-level data – *i.e.*, data showing what purchasers (like Plaintiffs) ultimately paid for FICO Scores and credit reports containing FICO Scores, as well as similar cost and sales data for non-FICO Scores – on which Plaintiffs' experts will rely. That data is important despite FICO's production of foreign transaction-level data: The FICO data demonstrates only the royalty FICO charged the relevant Credit Bureau, not the price consumers in the same position as class members paid for scores. Moreover, FICO's data is limited to FICO Scores; the Credit Bureaus' data would reflect sales of non-FICO scores in foreign markets.

Given the established relevance of the data, the unsubstantiated burden of production on the Bureaus, and Plaintiffs' demonstrated need, Plaintiffs' motion should be granted.[4]

## BACKGROUND

### I. PLAINTIFFS FILED ANTITRUST CLAIMS AGAINST FICO AND THE CREDIT BUREAUS

This class action lawsuit alleges that FICO monopolized the market for B2B credit scores in violation of the Sherman Act. Plaintiffs originally named as defendants FICO, TransUnion,

---

[4] Plaintiffs and the Bureaus have met and conferred multiple times since this Court set a deadline for filing motions to compel against the Bureaus. The day this brief was due, counsel for Equifax and Plaintiffs' counsel conferred again. During that call, Equifax for the first time suggested a compromise to avoid motion practice on this issue, specifically that Equifax might produce some Canadian data, some limited UK data, but no Australian data. Counsel for Equifax did not provide further details or send anything in writing. Later on filing day, counsel for TransUnion called to suggest a compromise might be possible but provided no details on what compromise TransUnion would offer. Plaintiffs are hopeful they will be able to resolve their disputes with the Bureaus during the pendency of this motion but felt compelled to file given the Court's deadline, which had already been extended previously. *See* Ex. 16, May 16, 2025 D. Nordin Email.

Experian, and Equifax ("Defendants").  Plaintiffs alleged that FICO violated Sherman Act § 2 by entering into anticompetitive agreements, pursuing meritless litigation against its only meaningful competitor (VantageScore), and making false statements about that competitor.  *See* ECF 147 at 14.  They alleged that all Defendants violated Sherman Act § 1 by conspiring to suppress competition in the relevant market.  Plaintiffs also raised related state-law claims.  Defendants moved to dismiss.  ECF 135, 138.  No discovery took place during the pendency of the motions.

The Court ultimately denied FICO's motion to dismiss the § 2 and state-law claims but dismissed the § 1 claims and all claims against TransUnion, Equifax, and Experian.  ECF 173.  Plaintiffs filed amended complaints, and Defendants again moved to dismiss.  ECF 219, 221.

## II.  THE COURT DENIED TRANSUNION, EQUIFAX, AND EXPERIAN'S ATTEMPT TO AVOID DISCOVERY

During the pendency of the second set of motions to dismiss, Plaintiffs and FICO began discovery.  TransUnion, Equifax, and Experian refused to participate in negotiations over the case schedule, ECF 200 at 1-2, and filed a motion to stay all discovery as to them pending resolution of the motions to dismiss, ECF 187.  Plaintiffs opposed, arguing that even if the Court permitted only claims against FICO to proceed, Plaintiffs would still require discovery from TransUnion, Equifax, and Experian to prosecute their case against FICO.  ECF 200 at 8 ("The Credit Bureaus will be subject to discovery one way or the other, whether as parties or third parties.").

The Court agreed.  It held that during the pendency of the motions to dismiss, Plaintiffs could "move forward with discovery as to the Credit Bureaus as if they were non-part[ies]" because "[t]oo many facts must be uncovered as to FICO to simply block all discovery . . . from the Credit Bureaus."  ECF 227.  The Court ultimately dismissed all claims against TransUnion, Equifax, and Experian, allowing Plaintiffs' § 2 and state-law claims to proceed as to FICO.  ECF 341.  Plaintiffs have, therefore, pursued only nonparty discovery against the Bureaus.

3

### III.   THE BUREAUS REFUSED TO PRODUCE LIMITED FOREIGN TRANSACTION-LEVEL DATA

In December 2023, Plaintiffs served substantively identical subpoenas on the Bureaus. *See* Ex. 1 (Subpoena).[5] Plaintiffs have worked diligently since then to attempt to resolve any disputes. Despite Plaintiffs' efforts at compromise, Equifax and TransUnion have refused to produce transaction-level data from their operations in the United Kingdom, Australia, and Canada.[6]

**TransUnion.** TransUnion objected on multiple grounds. First, it claimed the subpoena did not seek foreign transaction data. Ex. 5, Oct. 7, 2024 L. Pope Ltr. at 3. Plaintiffs explained, however, that the subpoena sought transaction-level data generally, without limitation as to geographic scope. Ex. 1, Subpoena at 5-11; Ex. 7, Oct. 22, 2024 D. Nordin Ltr. at 6.

TransUnion next objected that the data Plaintiffs seek is irrelevant because Plaintiffs had not alleged anticompetitive conduct in foreign markets and because "Plaintiffs have not offered any explanation as to why they believe that Canada, the United Kingdom, or Australia are comparable markets." Ex. 8, Nov. 6, 2024 L. Pope Ltr. at 5; *see* Ex. 5, Oct. 7, 2024 L. Pope Ltr. at 3; Ex. 11, Dec. 24, 2024 L. Pope Ltr. at 1-2. Plaintiffs, however, explained that the data is important to develop models showing harm to competition in the relevant U.S. market as well as damages. *See* Ex. 12, Jan. 6, 2025 D. Nordin Ltr. at 2. Plaintiffs also pointed TransUnion to this Court's ruling ordering FICO to produce foreign transaction-level data, where this Court rejected those arguments. Ex. 14, Mar. 31, 2025 D. Nordin Ltr. at 2-3; *see* ECF 400 at 1-2 (rejecting same arguments). Despite this Court's ruling, TransUnion held fast to its relevance objections.

TransUnion also claimed Plaintiffs' data requests were duplicative of their requests to FICO. Ex. 11, Dec. 24, 2024 L. Pope Ltr. at 2. But Plaintiffs explained that was not so because

---

[5] References to exhibits are to the exhibits to the Nordin Declaration.

[6] Experian will be providing a sworn declaration substantiating its claim to lack possession, custody, or control of responsive data.

FICO's data would not reflect data for sales of "non-FICO credit score products that compete with the FICO score" in more competitive jurisdictions, nor would FICO's data "reflect the ultimate price paid by customers who purchase [credit] scores." Ex. 12, Jan. 6, 2025 D. Nordin Ltr. at 2.

Finally, TransUnion argued that data from the Canadian and UK markets was not in its possession. Ex. 8, Nov. 6, 2024 L. Pope Ltr. at 5. TransUnion stated it "is a Delaware corporation, with its principal place of business in Illinois," and that "[d]ata concerning sales of credit scores in Canada . . . would be in the possession of TransUnion of Canada, Inc., which is incorporated in Canada," and "[d]ata concerning sales of credit scores in the United Kingdom . . . would be in the possession of Trans Union Information Group, Limited, which is incorporated in the United Kingdom." *Id.*; *see* Ex. 11, Dec. 24, 2024 L. Pope Ltr. at 2 (similar). TransUnion never claimed to lack ***custody or control*** of the data.

On March 3, 2025, TransUnion confirmed impasse, stating that "it cannot and will not produce foreign data." Ex. 13, Mar. 3, 2025 L. Pope Ltr. at 2.[7]

**Equifax.** Unlike TransUnion, which never pressed an undue burden objection, Equifax objected to producing the requested data primarily on the basis of undue burden. Specifically, Equifax claimed "it would be extremely burdensome to produce 'transaction-level data' for Canada, the UK, and Australia, as that data is maintained and stored in separate databases which are operated by separate Equifax entities in those countries." Ex. 6, Oct. 7, 2024 M. Mayer Ltr. at 2. Equifax never quantified that burden or produced additional detail supporting its burden claim.

Equifax initially seemed to acknowledge that the Court's resolution of Plaintiffs and FICO's dispute over foreign data would be dispositive of Plaintiffs' requests to the Bureaus for

---

[7] TransUnion has claimed it "cannot" produce the requested foreign data but has failed to explain why despite months of meeting and conferring on the issue. Ex. 13, Mar. 3, 2025 L. Pope Ltr. at 2. TransUnion should not be permitted to do so for the first time in opposition to this motion.

foreign data, stating that it believed Plaintiffs' foreign data requests should be tabled until the motion against FICO was resolved. Ex. 10, Nov. 27, 2024 M. Mayer Ltr. at 4. Plaintiffs acquiesced in the hope of avoiding motion practice. However, when Plaintiffs informed Equifax that the Court had ordered FICO to produce foreign data, Equifax still failed to agree to produce the requested data. Ex. 15, Mar. 31, 2025 D. Nordin Ltr. at 2.[8]

## ARGUMENT

Discovery is permitted into "'any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *Illinois, ex rel. Raoul v. Monsanto Co., Solutia Inc.*, 345 F.R.D. 459, 462 (N.D. Ill. 2023) (Weisman, J.) (citation omitted). That standard applies to nonparty, as well as party, discovery. *See Breuder v. Bd. of Trs. of Cmty. Coll. Dist. No. 502*, No. 15 CV 9323, 2020 WL 4676666, at *3 (N.D. Ill. Aug. 12, 2020) ("'The limits and breadth of discovery expressed in Rule 26 are applicable to non-party discovery.'").

"Relevance, particularly in the discovery phase, is a low bar to meet. Evidence is relevant, per the Federal Rules, if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. However, in determining the scope of discovery under Rule 26 of the Federal Rules of Civil Procedure, relevance is construed broadly." *Architectural Iron Workers' Local No. 63 Welfare Fund v. Legna Installers, Inc.*, No. 22 C 5757, 2023 WL 2974083, at *4 (N.D. Ill. Apr. 17, 2023) (quotation marks and citations omitted). The entity "'opposing discovery has the burden of showing the discovery is overly broad, unduly burdensome, or not relevant.'" *HTG Cap. Partners, LLC v. Doe(s)*, No. 15 C 02129, 2015 WL 5611333, at *3, 7

---

[8] During the day-of-filing call referenced *supra* (at 2 n.4), Equifax's counsel stated for the first time that Equifax believes this Court's ruling on the motion to compel foreign data from FICO does not apply to nonparties. Counsel did not elaborate further. Plaintiffs respectfully disagree: This Court held the material requested was relevant to the litigation, full stop. Nothing in the Court's ruling suggests similar material would be irrelevant if requested from a nonparty.

(N.D. Ill. Sept. 22, 2015) (citation omitted); *see Williams v. Blagojevich*, No. 05 C 4673, 2008 WL 68680, at *3 (N.D. Ill. Jan. 2, 2008) (same).  Even a nonparty must substantiate a claim of undue burden with a "particularized showing."  *Reed v. Illinois*, 318 F.R.D. 77, 79 (N.D. Ill. 2016).

## I.  THE REQUESTED DATA IS RELEVANT

### A.  Courts Routinely Permit Discovery of International Data in Antitrust Cases

A yardstick analysis is a "well accepted" methodology for proving harm and damages in antitrust cases.  *Fishman v. Est. of Wirtz*, 807 F.2d 520, 550-51 (7th Cir. 1986).  In such an analysis, prices charged in an allegedly monopolized market (here, the United States) are compared to prices charged in competitive markets (here, the United Kingdom, Canada, and Australia) to determine what price would have been charged for the relevant product in the relevant market in the but-for world, *i.e.*, a world in which the relevant market had not been monopolized.  *See* Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 340a2 (2007); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 257-66 (1946).

Plaintiffs in antitrust cases routinely rely on foreign-market data to support yardstick analyses.  For example, in *Moehrl v. National Association of Realtors*, No. 19-cv-1610, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023), the plaintiffs' expert identified "Australia, the Netherlands, and the United Kingdom" as comparator markets for use in a yardstick analysis.  *Id.* at *7-8.  In denying a *Daubert* motion, the court observed that " 'the yardstick approach is a well-established methodology' in antitrust actions," even if the comparator markets are located in other jurisdictions.  *Id.* at *8; *see also Serv. Spring, Inc. v. Cambria Spring Co.*, No. 81-cv-1835, 1984 WL 2925, at *5 (N.D. Ill. Jan. 6, 1984) (accepting the 'yardstick theory' based on prices of foreign manufacturers not involved in the conspiracy" as a means of determining "every purchaser's deviation from the market price"); *Frame-Wilson v. Amazon.com, Inc.*, No. 20-cv-424, 2023 WL 4201679, at *3 (W.D. Wash. June 27, 2023) ("data from Amazon sales in the United Kingdom and

Germany are relevant and important to resolving" damages issues in the case); *Floyd v. Amazon.com, Inc.*, No. 22-cv-1599, ECF 138, at 4 (W.D. Wash. Sept. 9, 2024) (similar).

Indeed, this Court has already recognized that Plaintiffs' "intention to use [the requested data] 'to calculate damages by comparing output and pricing in the anticompetitive U.S. market against output and pricing in foreign jurisdictions, presuming they are not tainted by the kind of anticompetitive conduct that Fair Isaac has undertaken in the United States' . . . [s]atisf[ies] Rule 26(b)'s threshold relevance requirement." ECF 400 at 1-2. The data is relevant, the Court ruled, even though Plaintiffs have proposed a "U.S. market definition." *Id.* at 2.

As this Court has recognized, foreign transaction data is particularly important in this case because other methods of proving harm to competition and damages may well be unavailable. A temporal benchmarking analysis – *i.e.*, a benchmarking analysis that involves comparing prices charged in the pre-monopolization period to prices charged in the post-monopolization period – is likely not possible given how long FICO has maintained its monopoly. Plaintiffs alleged that FICO's anticompetitive conduct began in 2006. *See* ECF 184 ¶6; ECF 185 ¶13. Equifax and TransUnion have stated, however, that they do not have data from years prior to 2018 and 2015, respectively. *See* Ex. 6, Oct. 7, 2024 M. Mayer Ltr. at 2; Ex. 4, Aug. 23, 2024 L. Pope Ltr. at 3. Similarly, a comparison of different U.S. markets likely would not work because FICO's anti-competitive conduct impacted the *entire* U.S. market. *See* ECF 184 ¶¶47-59; ECF 185 ¶¶51-71.

A yardstick analysis using the requested data is the most promising avenue for proving antitrust injury and damages – elements Plaintiffs must prove as part of their § 2 case against FICO. *See Loc. Beauty Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197, 1201 (7th Cir. 1986) (" 'antitrust injury' " is required "to maintain an antitrust action" (citation omitted)); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 115 (S.D.N.Y. 2010) ("The final element of an antitrust claim

is damages."). That is reason enough to compel production. *See Illinois, ex rel. Raoul*, 345 F.R.D. at 462 (information is relevant where it " 'bears on' " an element of the case (citation omitted)); *see, e.g.*, *In re Folding Carton Antitrust Litig.*, 76 F.R.D. 420, 430-31 (N.D. Ill. 1977) (granting motion to compel production of financial documents "relevant and necessary for use by . . . experts and economists" to calculate antitrust damages); *In re Novartis & Par Antitrust Litig.*, No. 19-MC-00149, 2019 WL 5722055, at *1-3, 6 (E.D. Pa. Nov. 5, 2019) (compelling nonparty to produce data to allow plaintiffs to calculate damages); *Direct Purchaser Class Plaintiffs v. Apotex Corp.*, No. 16-62492-MC, 2017 WL 4230124, at *3-5 (S.D. Fla. May 15, 2017) (similar).

## B. TransUnion's Arguments Against Relevance Fail

TransUnion has asserted the data Plaintiffs seek is not relevant to this litigation. But this Court already rejected those arguments in its decision against FICO. Equifax, for its part, has not pressed any specific relevance objections during meet and confers or in its correspondence regarding foreign data. It cannot raise those objections now in opposing this motion.

*First,* TransUnion asserts that foreign data is not relevant because Plaintiffs have pleaded a relevant geographic market limited to the United States. *See, e.g.*, Ex. 11, Dec. 24, 2024 L. Pope Ltr. at 1. This Court has already rejected that argument. When FICO made the same argument, this Court held that "Plaintiffs' proposed U.S. market definition does not render irrelevant the international data they seek." ECF 400 at 1. Numerous courts have reached similar conclusions. *See, e.g.*, *Moehrl*, 2023 WL 2683199, at *7-8 (price comparison with Australia, Netherlands, and United Kingdom markets relevant for proving harm in U.S. market); *Tawfilis v. Allergan, Inc.*, No. 15-cv-307, 2017 WL 3084275, at *3 (C.D. Cal. June 26, 2017) (South Korean market); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 354 (N.D. Cal. 2005) (European market); *Burnett v. Nat'l Ass'n of Realtors*, No. 19-cv-332, 2022 WL 1203100, at *12-13 (W.D. Mo. Apr. 22, 2022)

(Australian market); *Frame-Wilson*, 2023 WL 4201679, at *3 (UK and German markets). Data from foreign markets is routinely used to prove harm in U.S. markets, making the data relevant.

**Second,** TransUnion argues "Plaintiffs have not offered any explanation as to why they believe that Canada, the United Kingdom, or Australia are comparable markets" to the domestic B2B credit score market. Ex. 11, Dec. 24, 2024 L. Pope Ltr. at 1. That is untrue and beside the point. As this Court ruled in granting Plaintiffs' motion to compel FICO to produce foreign data: "[T]he issue is not whether plaintiffs' inchoate damages model is sound but whether they have articulated a theory of relevance for the data they seek, and they have." ECF 400 at 2.

In any event, TransUnion is wrong to claim Plaintiffs failed to articulate why discovery from the United Kingdom, Canada, and Australia markets is relevant. Plaintiffs explained they selected those markets because they are "developed countries with well-established lending markets" similar to the United States, except for "the absence of the anticompetitive conduct challenged in this case." Ex. 12, Jan. 6, 2025 D. Nordin Ltr. at 1-2. TransUnion apparently disagrees. But it cannot withhold discovery on that basis. A party "is not required to limit its request to the materials" a subpoenaed entity "deems most relevant." ECF 386 at 1.

Regardless, it would be premature to resolve at this stage whether the at-issue markets function as comparators for Plaintiffs' proposed yardstick analysis. "Arguments about what factors" should be used "in conducting a yardstick analysis generally go to the weight, rather than the admissibility, of the expert's testimony." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1074 (N.D. Ill. 2022); *Moehrl*, 2023 WL 2683199, at *7 (same).[9] Such arguments certainly have no place in a discovery dispute. *See Illinois, ex rel. Raoul*, 345 F.R.D. at 462.

---

[9] *See, e.g.*, *Burnett v. Nat'l Ass'n of Realtors*, No. 19-cv-332, 2022 WL 17730880, at *3 (W.D. Mo. Dec. 16, 2022) (objections to yardstick analysis "generally go to . . . weight," not

## II.   THE REQUESTED DISCOVERY IS PROPORTIONAL TO THE NEEDS OF THE CASE

Plaintiffs' requests for foreign data are proportional to the needs of the case, considering the Bureaus' resources, the "importance of the issues at stake," the "amount in controversy," and the entities' relative access to the information. Fed. R. Civ. P. 26(b)(1). The Credit Bureaus have immense resources: They are two of the world's largest companies, they earn billions of dollars in annual revenue, and they employ more than 10,000 individuals each.[10] This is an important antitrust matter involving substantial sums in controversy that could transform the B2B credit score market – a market that affects millions of Americans seeking access to credit.[11] And the data requested bears directly on the key issues of antitrust injury and damages. *See* pp. 7-9, *supra*.

The Credit Bureaus, moreover, have failed to make a "particularized showing" of undue burden associated with the production of the requested data. *Reed*, 318 F.R.D. at 79; *see HTG*, 2015 WL 5611333, at *3. Having failed to substantiate any burden during the year-and-a-half-long meet and confer process, the Bureaus should not be permitted to introduce evidence

---

admissibility); *Cason-Merenda v. Detroit Med. Ctr.*, No. 06-cv-15601, 2013 WL 1721651, at *12 (E.D. Mich. Apr. 22, 2013) (comparability issues were "another 'battle of the experts' . . . not appropriate for resolution in the context of a Rule 702 motion"); *In re Prograf Antitrust Litig.*, No. 1:11-md-02242, 2014 WL 7641156, at *3 (D. Mass. Dec. 23, 2014) (similar).

[10] Michelle Black, *What You Need To Know about the Three Main Credit Bureaus*, Forbes (Jan. 15, 2021), https://www.forbes.com/advisor/credit-score/3-credit-bureaus/; Transunion Annual Report (Form 10-K) at 23 (2023), https://investors.transunion.com/~/media/Files/T/Transunion-IR-V2/annual-reports/2023/2023-annual-report.pdf; Equifax Annual Report (Form 10-K) at 13 (2023), https://d1io3yog0oux5.cloudfront.net/_697b5bfbd4f175e8f5f58238f89ca035/equifax/db/2054/19426/annual_report/2023+Annual+Report.pdf.

[11] Indeed, Senators from both parties have recently called for investigations into FICO's anticompetitive conduct. *See, e.g.*, Oct. 16, 2024 Ltr. from Sen. Warren to Pres. Joseph R. Biden, https://www.warren.senate.gov/imo/media/doc/letter_to_admin_reloweringhousingcosts.pdf; Apr. 3, 2025 Ltr. from Sen. Hawley to Assistant Attorney General Slater, https://www.hawley. senate.gov/wp-content/uploads/2025/04/Hawley-Follow-Up-Letter-to-DOJ-re-FICO-.pdf.

supporting a claim of burden now that Plaintiffs have been forced to file a motion. *See Zissa v. County of Los Angeles*, No. 2:18-cv-10174, 2021 WL 4620953, at *3 (C.D. Cal. Jan. 19, 2021).

Even if the Bureaus had demonstrated an appreciable burden – which they have not – Plaintiffs' acute need for the data would nonetheless justify compelling its production. *See, e.g.*, *Frame-Wilson*, 2023 WL 4201679, at *4 (applying proportionality factors); *SPS Techs., LLC v. Boeing Co.*, No. 19 C 3365, 2019 WL 2409601, at *6 (N.D. Ill. June 7, 2019) (similar).

## III. THE CREDIT BUREAUS' JUSTIFICATIONS FOR WITHHOLDING THE REQUESTED DATA LACK MERIT

### A. The Bureaus' Nonparty Status Does Not Shield the Data from Disclosure

Throughout the last year and a half, the Bureaus have relied extensively on their nonparty status in attempts to avoid discovery. *See* p. 3, *supra* (describing motion to stay discovery); Ex. 11, Dec. 24, 2024 L. Pope Ltr. at 1 ("Plaintiffs appear to forget that Trans Union LLC is a third party."); Ex. 10, Nov. 27, 2024 M. Mayer Ltr. at 4 (similar). Plaintiffs expect the Bureaus will rely heavily on their nonparty status to oppose this motion.

But the law is clear: " 'The scope of material obtainable pursuant to a Rule 45 subpoena is as broad as what is otherwise permitted under Rule 26(b)(1).' " *Allstate Ins. Co. v. Electrolux Home Prods., Inc.*, No. 16-cv-4161, 2017 WL 5478297, at *2 (N.D. Ill. Nov. 15, 2017) (citation omitted); *In re Kleimar N.V. v. Benxi Iron & Steel Am., Ltd.*, No. 17-CV-01287, 2017 WL 3386115, at *7 (N.D. Ill. Aug. 7, 2017) (similar). As a result, courts routinely order nonparties to comply with discovery requests even if there is some burden associated with compliance. *See, e.g.*, *PsyBio Therapeutics, Inc. v. Corbin*, No. 20 C 3340, 2021 WL 4459527, at *3 (N.D. Ill. Sept. 29, 2021) ("[N]on-parties are not 'exempt . . . from the basic obligation of all citizens to provide evidence of which they are capable upon appropriate request.' " (citation omitted)). That is because "[t]he law does not seek to absolve nonparties from any burden, nor could it. Effort of

some sort is an inherent part of life." *Papst Licensing GmbH v. Apple, Inc.*, No. 6:15-cv-1095, 2017 WL 1233047, at *4 (N.D. Ill. Apr. 4, 2017).[12] Additionally, like parties, nonparties must substantiate undue burden claims with a "particularized showing." *Reed*, 318 F.R.D. at 79. The Bureaus have failed to do so here, offering nothing more than boilerplate complaints about unquantified "burdens."[13]

The Credit Bureaus, moreover, are not just any "nonparties." The Court has already recognized that the Bureaus play a significant role in this litigation – even though it has been limited to § 2 and related state-law claims against FICO – given their contractual relationships with FICO and their indispensable function in FICO's credit-score business. *See* ECF 227 at 1 ("Too many facts must be uncovered as to FICO to simply block all discovery . . . from the Credit Bureaus."); ECF 237 at 3 (protocol granting more depositions from Bureaus than other nonparties). Given the "alleged central role" the Bureaus "played in the events at issue" in this litigation, the Bureaus should be compelled to produce the requested data. *See SPS Techs.*, 2019 WL 2409601, at *6.

### B.     Plaintiffs Cannot Obtain the Requested Data from FICO

The Bureaus claim they need not produce the requested data because Plaintiffs can obtain it from FICO. Ex. 13, Mar. 3, 2025 L. Pope Ltr. at 2; Ex. 10, Nov. 27, 2024 M. Mayer Ltr. at 4.

---

[12] *See, e.g.*, *In re Delta Dental Antitrust Litig.*, No. 19 CV 6734, 2023 WL 8043400, at *3-4 (N.D. Ill. July 18, 2023) (ordering production of data from nonparties); *In re Blue Cross Blue Shield Antitrust Litig.*, 2:13-CV-20000, 2017 WL 10410065, at *1-3 (N.D. Ala. Mar. 22, 2017) (similar); *Uppal v. Rosalind Franklin Univ. of Med. & Sci.*, 124 F. Supp. 3d 811, 813 (N.D. Ill. 2015) (similar).

[13] Where courts have denied or quashed motions to compel discovery from nonparties, the party seeking discovery (i) failed to articulate a theory of relevance, or "at best," established only marginal relevance; (ii) failed to show a substantial need for the information; (iii) sought plainly irrelevant information; or (iv) could have obtained the information from a party. *See, e.g.*, *Signal Fin. Holdings LLC v. Looking Glass Fin. LLC*, No. 17 C 8816, 2021 WL 4935162, at *3-4 (N.D. Ill. June 10, 2021); *Little v. JB Pritzker for Governor*, No. 18 C 6954, 2020 WL 1939358, at *5-6 (N.D. Ill. Apr. 22, 2020). None of that is true here, as explained above.

That is wrong. The Bureaus have unique information that Plaintiffs expect to use to develop their yardstick model. Most critical for Plaintiffs' purposes, Plaintiffs understand the Bureaus' sales and profit data reflects the prices paid by B2B customers for FICO Scores. *See* Ex. 12, Jan. 6, 2025 D. Nordin Ltr. at 2. FICO does not have that data; FICO's data reflects only royalties FICO charged the Bureaus.

The Bureaus' data should also reflect similar information for cost and sales of non-FICO Scores – including credit scores created by the Credit Bureaus – which will inform Plaintiffs' analysis. FICO, of course, does not have data regarding sales of non-FICO scores.

### C. The Bureaus Must Produce Data Within Their Custody or Control

In a last-ditch attempt to avoid producing responsive data, the Bureaus insist they are not responsible for producing data in the possession of their foreign affiliates. *See, e.g.*, Ex. 11, Dec. 24, 2024 L. Pope Ltr. at 2; Ex. 6, Oct. 7, 2024 M. Mayer Ltr. at 2. That is not true.

As an initial matter, having failed to claim that they lack custody or control of their foreign affiliates' data or documents in their responses and objections to the at-issue subpoenas (Exs. 2 & 3), the Credit Bureaus have waived the argument. *See Ott v. City of Milwaukee*, 682 F.3d 552, 558 (7th Cir. 2012) (affirming ruling that nonparties waived arguments by failing to raise them in their initial objections). The Court need not consider the argument further.

The argument also fails on the merits. The Credit Bureaus, like all subpoena recipients, must produce responsive materials within their "possession, custody, or control." Fed. R. Civ. P. 45(a)(1)(iii). "[I]t is 'well-settled that a party need not have actual possession of the documents to be deemed in control of them;' rather, the 'test is whether the party has a legal right to obtain them.'" *Dexia Credit Local v. Rogan*, 231 F.R.D. 538, 542 (N.D. Ill. 2004) (citation omitted). Where an entity has "control" of documents, it "is still obligated to produce the responsive documents – regardless of possession." *Illinois, ex rel. Raoul*, 2023 WL 4083934, at *2; *see*

*Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, No. 16-cv-3401, 2017 WL 4287205, at \*2 (N.D. Ill. Sept. 27, 2017) (similar).

The Bureaus have not argued that they lack the legal authority to obtain the requested data from their foreign affiliates. That is because they plainly *can* obtain the data from their affiliates; they are just *choosing not to*. Surely if the Bureaus lacked custody or control over their foreign affiliates' documents, they would have represented as much to avoid burdening the Court with a motion. That is precisely what Experian did to avoid motion practice. *See* p. 4 n.6, *supra*. Equifax and TransUnion, however, cannot do the same. They have never claimed to lack the legal right to access their foreign affiliates' data. To the contrary, in connection with a DOJ investigation into FICO, TransUnion produced documents related to TransUnion of Canada, belying its argument that it "cannot" produce foreign affiliates' data. Ex. 12, Jan. 6, 2025 D. Nordin Ltr. at 2. Moreover, the Bureaus' filing-day compromise offers demonstrate they *do* have custody or control of the requested data – they could not offer to produce responsive material otherwise.

TransUnion and Equifax – both of which hold themselves out to be "global" companies[14] – should not be able to avoid producing critically important discovery by relying on meritless, unsubstantiated objections based on corporate form.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court grant Plaintiffs' Motion to Compel the Credit Bureaus' Compliance with Plaintiffs' Requests for Production and order the Credit Bureaus to produce discovery responsive to Plaintiffs' Request Nos. 9-16, and 18-22.

---

[14] Transunion Annual Report (Form 10-K) at 1 (2023), https://investors.transunion.com/~/media/ Files/T/Transunion-IR-V2/annual-reports/2023/2023-annual-report.pdf; Equifax Annual Report (Form 10-K) at 2 (2023), https://d1io3yog0oux5.cloudfront.net/_697b5bfbd4f175e8f5f58238f 89ca035/equifax/db/2054/19426/annual_report/2023+Annual+Report.pdf.

Dated: May 16, 2025

Respectfully submitted,

*/s/ Lauren M. Weinstein*
Steven F. Molo
Lauren F. Dayton
Eric Posner
**MOLOLAMKEN LLP**
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Telephone: 312-450-6700
smolo@mololamken.com
ldayton@mololamken.com
eposner@mololamken.com

Lauren M. Weinstein
Christian I. Bale
**MOLOLAMKEN LLP**
600 New Hampshire Avenue, N.W.,
  Suite 500
Washington, DC 20037
Telephone: 202-556-2000
lweinstein@mololamken.com
cbale@mololamken.com

Anden Chow
Cody Wiles
**MOLOLAMKEN LLP**
430 Park Avenue
New York, NY 10022
Telephone: 212-607-5951
achow@mololamken.com
cwiles@mololamken.com

*Liaison Counsel for Direct Purchaser
Plaintiffs and the Proposed Direct
Purchaser Class*

Christopher M. Burke
Yifan (Kate) Lv
**BURKE LLP**
402 West Broadway, Suite 1890
San Diego, CA 92101
Telephone: 619-369-8244
cburke@burke.law

*/s/ Karin E. Garvey*
Karin E. Garvey
Brian M. Hogan
Joseph P. Guglielmo
Michelle E. Conston (*pro hac vice*)
Anna Hunanyan (*pro hac vice*)
**SCOTT+SCOTT**
  **ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-6444
kgarvey@scott-scott.com
brian.hogan@scott-scott.com
jguglielmo@scott-scott.com
mconston@scott-scott.com
ahunanyan@scott-scott.com

Carmen Medici (*pro hac vice*)
Gary Foster (*pro hac vice*)
**SCOTT+SCOTT**
  **ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-798-5319
cmedici@scott-scott.com
gfoster@scott-scott.com

Patrick McGahan (*pro hac vice*)
**SCOTT+SCOTT**
  **ATTORNEYS AT LAW LLP**
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct
Purchaser Plaintiffs and the Proposed
Direct Purchaser Class*

George A. Zelcs
Randall P. Ewing, Jr.
Chad E. Bell

klv@burke.law

Barbara J. Hart (*pro hac vice*)
**GRANT & EISENHOFER**
485 Lexington Ave., 29th Floor
New York, NY 10017
Telephone: 646-722-8526
bhart@gelaw.com

Gregory S. Asciolla (*pro hac vice*)
John M. Shaw (*pro hac vice*)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY 10017
Telephone: 646-933-1000
gasciolla@dicellolevitt.com
jshaw@dicellolevitt.com

Daniel E. Gustafson (*pro hac vice*)
Daniel C. Hedlund (*pro hac vice*)
Daniel J. Nordin (*pro hac vice*)
Anthony J. Stauber (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
120 S. Sixth Street, Suite 2600
Minneapolis, MN 55402
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com
tstauber@gustafsongluek.com

Dennis Stewart (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 612-333-8844
dstewart@gustafsongluek.com

Labeat Rrahmani
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com
cbell@koreintillery.com
lrrahmani@koreintillery.com

Michael L. Roberts
Karen Sharp Halbert
Christopher B. Sanchez
**ROBERTS LAW FIRM, P.A.**
6834 Cantrell Road, Suite #1131
Little Rock, AR 72207
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us
chrissanchez@robertslawfirm.us

Gary F. Lynch
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
gary@lcllp.com

Jennifer W. Sprengel
**CAFFERTY CLOBES MERIWETHER
&
 SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

*Counsel for Direct Purchaser Plaintiffs
 and the Proposed Direct Purchaser Class*

Garrett D. Blanchfield (*pro hac vice*)
Brant D. Penney (*pro hac vice*)
Roberta A. Yard (*pro hac vice* forthcoming)
**REINHARDT WENDORF &
  BLANCHFIELD**
332 Minnesota Street, Suite W-1050
St. Paul, MN 55101
Telephone: 651-287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

Charles R. Watkins
**GUIN & EVANS, LLC**
805 Lake Street, #226
Oak Park, IL 60603
Telephone: 312-878-8397
charlesw@gseattorneys.com

*Liaison Counsel for Indirect Purchaser
Plaintiffs and the Proposed Indirect
Purchaser Class*

Michael S. Smith (*pro hac vice*)
Gregory P. Hansel (*pro hac vice*)
Elizabeth F. Quinby (*pro hac vice*)
**PRETI FLAHERTY, BELIVEAU &
  PACHIOS LLP**
One City Center,
P.O. Box 9546
Portland, ME 04101
Telephone: 207-791-3000
msmith@preti.com
ghansel@preti.com
equinby@preti.com

Brian P. Murray
Lee Albert
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: 212-682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com

William G. Caldes (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)
Rachel E. Kopp (*pro hac vice*)
**SPECTOR ROSEMAN &
  KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: 215-496-0300
BCaldes@srkattorneys.com
JSpector@srkattorneys.com
RKopp@srkattorneys.com

*Interim Co-Lead Counsel for Indirect
Purchaser Plaintiffs and the Proposed
Indirect Purchaser Class*

David McLafferty
**MCLAFFERTY LAW FIRM, P.C.**
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-940-4000
dmclafferty@mclaffertylaw.com

Simon B. Paris
Patrick Howard
**SALTZ, MONGELUZZI & BENDESKY,
P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: 215-575-3985
sparis@smbb.com
phoward@smbb.com

William E. Hoese
**KOHN, SWIFT & GRAF, P.C.**
1600 Market Street, Suite 2500
Philadelphia, PA 19103

Douglas A. Millen
Robert J. Wozniak
**FREED KANNER LONDON &
MILLER LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: 224-632-4500
Dmillen@fklmlaw.com
Rwozniak@fklmlaw.com

Jonathan M. Jagher
**FREED KANNER LONDON &
MILLER LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: 610-234-6487
Jjagher@fklmlaw.com

Telephone: 215-238-1700
Whoese@kohnswift.com

David Cialkowski
Ian McFarland
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone 612-341-0400
David.cialkowski@zimmreed.com
Ian.mcfarland@zimmreed.com

Michael J. Boni
Joshua D. Snyder
John E. Sindoni
**BONI, ZACK & SNYDER LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: 610-822-0200
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

*Attorneys for Indirect Purchaser Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Karin E. Garvey, an attorney, hereby certify that on May 16, 2025, I caused the

foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which

will send notification of such filing to the email addresses denoted on the Electronic Mail Notice

List.

/s/ Karin E. Garvey
Karin E. Garvey
