IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: FICO ANTITRUST LITIGATION RELATED CASES. | )<br>)<br>)<br>)<br>) | No. 20-cv-2114<br><br>Magistrate Judge M. David Weisman |

### ORDER

Before the Court is plaintiffs' motion to compel VantageScore to comply with their requests for production of documents ("RFPs"). For the reasons set forth below, the Court grants in part and denies in part the motion. (ECF 314.)

### Discussion

Plaintiffs ask the Court to compel VantageScore to produce documents responsive to RFPs 1-4, 6-7, 9, and 11-20. RFPs 1-3 seek:

> 1. All Documents produced or provided to the United States Department of Justice, or any other U.S. or foreign government agency, regulator, or department, concerning government investigations or contemplated investigations relating to B2B Credit Scores or the B2B Credit Score Market.

> 2. All submissions, presentations, or other communications with legislators and legislative staff, including members and staff of legislative committees; government agencies and staff; executive branch officials and staff; and government-sponsored enterprises and their representatives regarding VantageScores.

> 3. All Documents produced, provided, or served in connection with the [VantageScore Solutions Litigation and TransUnion litigation] whether produced by you, another party (other than FICO), or a third party.

(ECF 314-2, Ex. 1.)

VantageScore says it does not have any documents responsive to RFP 1 because it did not give any documents to the Department of Justice in connection with the 2020 antitrust investigation of FICO. Because the Court cannot order VantageScore to produce documents it does not have, the Court denies plaintiffs' motion with respect to RFP 1.

VantageScore also asks the Court to deny RFP 2 because it seeks production of "highly confidential and commercially sensitive information" (ECF 312-1 at 5) that VantageScore submitted to the Federal Housing Finance Agency "to persuade it to allow Fannie Mae and Freddie Mac to use VantageScores to assess credit risk for mortgages."

(ECF 314-1 at 7.) The requested materials contain information about the benefits and performance of VantageScores, information plaintiffs contend is relevant to FICO's assertion that VantageScore's growth has been limited because it has an inferior product, not because of FICO's allegedly anticompetitive conduct. VantageScore argues that any relevance of these materials is outweighed by the burden production would impose on it because the responsive materials are sensitive, proprietary, and not shared with competitors or the general public.

The Court appreciates VantageScore's concern about the confidentiality of its information. But there is a confidentiality order in place, and VantageScore does not explain why that order, or an amended version of it, would not safeguard its materials. Absent that explanation, and given the responsive materials' relevance, the Court grants plaintiffs' motion as to RFP 2.

In RFP 3, as amended, plaintiffs ask for non-publicly filed documents VantageScore produced in the 2006 Litigation with FICO. (*See* ECF 314-1 at 6 n.8.) Plaintiffs say they need these documents to support their claim that FICO's litigation against VantageScore was undertaken for anticompetitive reasons. VantageScore contends that plaintiffs can obtain these documents from FICO, thereby not burdening third party Vantage Score with production. If, as here, the requested information can be "obtained from some other source that is more convenient, less burdensome, or less expensive," or subjects the respondent to undue burden, the Court must quash or modify the subpoena. Fed. R. Civ. P. 26(b)(2), 45(d). *See Breuder v. Bd. of Trs. of Cmty. Coll. Dist. No. 502*, No. 15 CV 9323, 2020 WL 4676666, at *2 (N.D. Ill. Aug. 12, 2020) ("[G]enerally speaking, non-parties are not required to produce documents that have [been] or can be obtained from a party in discovery."); *Tresona Multimedia, LLC v. Legg*, No. 15 C 4834, 2015 WL 4911093, at *3 (N.D. Ill. Aug. 17, 2015) ("A non-party subpoena seeking information that is readily available from a party through discovery may be quashed as duplicative or cumulative."). Because plaintiffs can obtain the documents requested in RFP 3 from FICO, the Court sustains VantageScore's objection to this RFP.

RFPs 4, 6, and 17-20 seek:

4. All Agreements between or among, You, Equifax, Experian, TransUnion, or any other consumer reporting company, relating to the marketing, sale, or distribution (or restrictions on the marketing, sale, or distribution) of B2B Credit Scores, including communications between or among You, Experian, Equifax, TransUnion, or any other entity distributing B2B Credit Scores relating to limitations, conditions, or any other restriction on the distribution of B2B Credit Scores, and any Documents relating to the negotiation of any such Agreement(s).

6. All Documents, including communications, with TransUnion, Experian, and Equifax relating to their ability to distribute VantageScores, or any restrictions on their ability to distribute VantageScores, in light of their agreements with Fair Isaac, including, but not limited to licensing agreements.

2

17. Documents sufficient to show the rights Credit Bureaus have to receive revenue or other benefits from VantageScore Solutions

18. Documents sufficient to show the rights Credit Bureaus have to receive data and documents from VantageScore Solutions.

19. Documents sufficient to show the rights Credit Bureaus have to control or influence the management of VantageScore Solutions.

20. Documents sufficient to show the contributions of money, goods, or services by the Credit Bureaus to VantageScore Solutions.

(ECF 314-2, Ex. 1.)

VantageScore objects to these requests because the only responsive documents it has are the LLC agreement and IP license agreement between VantageScore and the credit bureaus. VantageScore argues that:

> The Court should deny these Requests because both agreements, and any communications VantageScore may still possess regarding negotiation of those agreements, reflect confidential and competitively sensitive business and strategy information which VantageScore should not be forced to disclose to Plaintiffs or its primary competitor. In addition, the agreements are not relevant to Plaintiffs' underlying claims because VantageScore and the Credit Bureaus entered into these agreements in 2006, at least 7 years before FICO entered the allegedly "anticompetitive" contracts at issue.

(ECF 312 at 8.)

Plaintiffs assert that responsive documents are necessary to understand how VantageScore operates and how the credit bureaus' agreements with VantageScore may limit their ability to distribute VantageScores in light of the bureaus' agreements with FICO. As the Court said when it denied FICO's request for the same documents: "VantageScore's LLC agreement, the terms on which it licenses its technology, and its confidential financial information will not shed light on whether FICO has acquired or maintained monopoly power in the market." (ECF 411 at 2.) Accordingly, the Court denies plaintiffs' motion with respect to RFPs 4, 6, and 17-20.

RFPs 7, 9, and 11-16 seek:

7. All non-privileged Documents relating to competition or potential competition between FICO Scores and VantageScores, including but not limited to strategies or contemplated strategies for addressing competition or potential competition, or to gain market share.

9. All non-privileged Documents relating to any projections, reports, forecasts, evaluations (or financial, commercial, regulatory, or legal analyses) performed by

3

You and/or by any other third party relating to competition in the B2B Credit Score Market.

11. Documents sufficient to show Your past, current, and anticipated future B2B Credit Score market share or position, and the past, current, and anticipated future market share or position of any other entity distributing or selling B2B Credit Scores.

12. Documents sufficient to show past, current, and anticipated future demand for B2B Credit Scores, including but not limited to Documents describing the factors that affect the demand for B2B Credit Scores.

13. Documents and data, data compilations, data sets, and other forms of structured data used, generated, collected, held, tracked, or accessed by You relating to fees, royalties, and other prices charged or collected by You or Credit Bureaus to purchasers of B2B Credit Scores, including but not limited to the Plaintiffs and members of the proposed classes.

14. Data, data compilations, data sets, data tables, and other forms of structured data used, generated, collected, held, tracked, or accessed by You in the ordinary course of business of the sale, supply, or distribution (or restriction on the sale, supply, or distribution of B2B Credit Scores), including but not limited to transaction-level electronically stored sales information and data. The relevant time period for this request is from January 1, 2013 until the present. . . .

15. All Documents from January 1, 2013 until the present relating to Your projected and actual B2B Credit Scores: a. sales; b. gross sales revenue; c. net sales revenue; d. cost of goods sold; e. sales and distribution cost; f. marketing, advertising, promotional, and sales expenses; g. other fixed or variable costs; h. research and development expenditures; i. licensing fees, royalties, and/or profits shares paid to and/or received from Fair Isaac or any other entity; j. pricing, rebates, discounts, and chargebacks; k. gross profit; l. net profit; m. profit margin; n. unit volume sold; o. unit volume sold by state; p. unit volume sold net of returns; q. cost and price analyses; r. cost and price analyses by state; and s. all specific costs You include in a fixed cost.

16. Documents sufficient to show how the prices for B2B Credit Scores are or have been set during the Relevant Period, including any adjustments such as rebates or discounts on the price of other products.

(ECF 314-2, Ex.1.)

Plaintiffs contend that documents responsive to these RFPs "will reveal VantageScore's views on the parameters of the relevant market, who the competitors are, what the competitive landscape looks like, and how VantageScore sets its prices." (ECF 314-1 at 10.) Plaintiffs argue that this information is relevant because "competitors' views and evaluation of the market are relevant to defining a market and evaluating market

power." (*Id.*) (quoting *N.M. Oncology and Hematology Consultants Ltd v. Presbyterian Healthcare Serv.*, 12-526 MV/GBW, 2016 WL 3452757, at *3 (D.N.M. May 10, 2016)). *See Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 873 (W.D.N.Y. 1994), *decision supplemented*, No. CIV. A. 94-6454L, 1995 WL 215307 (W.D.N.Y. Mar. 6, 1995) ("One means utilized to determine the relevant product market is to analyze how the competitors themselves view the market.") However, as VantageScore points out, there are also cases that say competitors' views on the relevant market are irrelevant. *See In re eBay Seller Antitrust Litig.*, No. C09-0735RAJ, 2009 WL 10677051, at *5 (W.D. Wash. Aug. 17, 2009) ("An assessment of the relevant markets for Plaintiffs' antitrust case is an objective inquiry, not one that depends on Amazon's views on the subject.") (citing *ACT, Inc. v. Sylvan Learning Sys., Inc.*, Misc. No. 99-63, 1999 WL 305300, at *2 (E.D. Pa. May 14, 1999) ("Nor does ACT offer any argument for why ASI's 'perspective' on the market in particular is relevant or necessary to ACT's claims.")).

The Court agrees with the reasoning in *In re eBay*. It is well-settled that the relevant market "must 'correspond to the commercial realities of the industry.'" *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020) (quoting *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 336 (1962)); *Ducere LLC v. Enbridge (U.S.) Inc.*, No. 1:24-CV-01217, 2025 WL 81373, at *3 (N.D. Ill. Jan. 13, 2025) ("Courts apply a pragmatic and factual approach when defining a geographic market to ensure correspondence 'to the commercial realities of the industry.'") (quoting *Sharif*); *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, No. 14-CV-02705, 2020 WL 5642941, at *6 (N.D. Ill. Sept. 22, 2020) ("'The antitrust statutes require a pragmatic and factual approach to defining the geographic market. . . . The market must correspond to the commercial realities of the industry.'") (quoting *Sharif*, 950 F.3d at 917), *aff'd*, 15 F.4th 831 (7th Cir. 2021)). VantageScore's views on the parameters of the relevant market, who the competitors are, what the competitive landscape looks like, and how VantageScore sets its prices, which is what plaintiffs say they want to glean from VantageScore's production, have little, if any bearing, on the determination of the relevant market. Additionally, the broad nature of these requests, and the burden that production would create on VantageScore, a third party, coupled with the fleeting relevance as noted, is a further basis for granting VantageScore's request. Thus, the Court denies plaintiffs' motion with respect to RFPs 7, 9, and 11-16.

**SO ORDERED.**                    ENTERED:  December 1, 2025

**M. David Weisman**
**United States Magistrate Judge**

5