**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| IN RE: FICO ANTITRUST LITIGATION | No. 1:20-CV-2114 |
| This document relates to: | Judge April M. Perry |
|  | Chief Magistrate Judge M. David Weisman |
| ALL ACTIONS |  |

**JOINT STATUS REPORT**

The parties respectfully submit this Joint Status Report pursuant to the Court's February 12 and March 2, 2026 Minute Orders. ECF Nos. 638 and 639, respectively.

I.      **FICO'S DOCUMENT PRODUCTION ISSUES**

**Plaintiffs' Statement:**

Plaintiffs provide an update regarding the document production issues identified in the parties' February 10, 2026 Joint Status Report. ECF No. 637. The following provision regarding search terms from the operative ESI Order is pertinent to two of the issues (personal emails and Request for Production No. 71) discussed below:

> [T]he Parties shall meet and confer to provide reasonable assurances to the Requesting Party that the Producing Party's search terms and methodology used to apply them are reasonably calculated to identify responsive Documents and ESI . . . . If, after disclosure of the Producing Party's proposed search method, search parameters, and search terms, and prior to the conduct of any searches, and after a reasonable meet and confer process, a Requesting Party believes in good faith that the Producing Party's proposals regarding search, retrieval and production would result in deficiencies in production, the Requesting Party may make prompt requests for different or additional search methods, parameters, or search terms, but such requests shall only be made after the Parties have met and conferred as to the alleged deficiencies identified by the Requesting Party. If the Parties cannot resolve

their disagreements regarding the above search term methodologies, they shall promptly bring the dispute to the Court for resolution.

ECF No. 207 §V(a).

Remaining issues stemming from FICO's newly discovered documents:

On February 2, 2026, following its production of close to 66,000 documents from the so-called "newly discovered universe," FICO represented that "it has substantially completed its production of documents from this newly discovered universe." Plaintiffs followed up with FICO on February 3, 2026, to inquire whether FICO was still reviewing any documents for responsiveness and to ask whether FICO was still undertaking a privilege review of documents in the newly discovered universe. FICO confirmed on February 17, 2026 that it had completed its responsiveness review but said that it was "evaluating [Plaintiffs'] questions related to [the volume and timing of] FICO's privilege review and will respond in the near term." Plaintiffs followed up twice—on February 24 and March 3, 2026—regarding their privilege questions. FICO finally responded on March 5, 2026, stating that it was "currently engaged in a privilege review of approximately **40,000 documents**" (emphasis added) and said that it was "still evaluating [its] likely timetable for completion of that review."

Now, for the first time, FICO argues in this JSR that "any timetable for service of this supplemental privilege log must be determined in conjunction with" a deadline for Plaintiffs' ongoing privilege log challenges. In two successive rulings now, this Court has been clear that FICO's privilege log has failed to satisfy the plain requirements of Rule 26(b)(5). *See* ECF Nos. 517, 640. Despite FICO's complaint that the Court's rulings have created "complexity" in logging privileged documents, there has never been any ambiguity regarding FICO's obligations. Indeed, the Court's recent ruling was based on the plain text of Rule 26(b)(5), which requires that a privilege log must "*enable other parties to assess the claim.*" ECF No. 640 at 3 (emphasis in

2

original). To date, FICO has failed to meet those obligations. Furthermore, given FICO's conduct to date, Plaintiffs are wary that FICO's supplemental log will raise new issues that the Plaintiffs could not possibly be aware of currently.[1] FICO's attempt to hold its supplemental privilege log ransom for an unspecified period of time should be rejected.

Plaintiffs are evaluating FICO's productions of documents from the newly discovered universe, and, needless to say, once Plaintiffs receive FICO's updated privilege log, it will take some time for Plaintiffs to review and analyze it.

Personal emails:

In the course of reviewing FICO's privilege log, Plaintiffs discovered that two senior FICO custodians, William Lansing (CEO) and Nathan Jones (Vice President - Operations and Strategy), used their personal email accounts for business purposes. On August 7, 2025, Plaintiffs asked FICO to confirm whether it had collected, reviewed, and produced responsive documents from those accounts, and on August 14, 2025, FICO confirmed that it had not done so. The parties held a meet and confer to discuss this issue on August 26, 2025, after which FICO stated on August 29, 2025, "FICO will collect the personal email accounts of Mr. Lansing and Mr. Jones, and test those personal emails *against the parties' agreed-upon search terms* to assess whether potentially relevant documents exist. However, FICO reserves its right to *request a modification of such search terms* should they result in an overly burdensome review." (emphasis added). In Court on December 2, 2025, counsel for FICO reiterated that it would involve Plaintiffs in the development of the search terms: "But we're going to have the emails, and we'll be able to let them [Plaintiffs]

---

[1] As an example, and as discussed in greater detail below, FICO's December 19, 2025 operative privilege log included—for the first time—thousands of log entries with the "recipients" field left blank. Plaintiffs could never have anticipated the need to raise this issue with FICO's two previous logs, because this issue only affected eight documents on FICO's prior log.

know how we would propose going about the search. If they don't oppose that, it shouldn't take long at all to get to them." Dec. 2, 2025 Hr'g Tr. at 28:13-16.

On December 31, 2025, FICO emailed Plaintiffs to inform them that it had collected information from Mr. Lansing's and Mr. Jones's[2] personal email accounts and was in the process of reviewing these collections for relevance and privilege. FICO also attached a spreadsheet containing the search terms FICO applied at the time of collection of Mr. Lansing's personal email. Surprisingly, FICO had elected to unilaterally determine how to modify the prior agreed upon set of search strings to function on the Gmail platform instead of meeting and conferring with Plaintiffs as is required under the operative ESI Order (ECF No. 207 §V(a), quoted on pages 1-2, *supra*, and as FICO had promised to do in its correspondence and in open court. Specifically, FICO unilaterally decided to only use the proper spelling of the term "VantageScore" in certain searches even though all previous searches in this case included at least one alternative spelling of that term.

Plaintiffs investigated and analyzed the search strings that FICO unilaterally had chosen to deploy, which could have been avoided if FICO had met and conferred with Plaintiffs prior to executing the search strings. On February 2, 2026, Plaintiffs requested clarification as to why FICO had failed to include certain alternative spellings of "VantageScore" in some of its searches without any prior consultation with Plaintiffs, and the parties subsequently exchanged emails about this. As justification for its refusal to abide by the clear terms of the ESI Order, FICO adopted the novel position that it does not have possession, custody, or control over Mr. Lansing's personal email.

---

[2] Currently, the parties do not have any disputes regarding FICO's collection of Mr. Jones's personal email.

Case law from this District makes clear that FICO indeed does have possession, custody, or control over its executives' personal email used for business purposes.

FICO also claims that alternative spellings of "VantageScore" hit on a high number of false positives for certain terms, but FICO has provided no estimate of the number of false positives, nor any search term hit reports to substantiate its claim. It is FICO's obligation to substantiate any claimed burden from applying reasonable search terms, and it has failed to do so.

The parties met and conferred over Zoom about this issue on March 3, 2026, and reached impasse when FICO declared that it had met its obligations and that it would not make any further collections of Mr. Lansing's documents. Then, on March 6, 2026, FICO emailed with additional information regarding its search terms and offered to further discuss Plaintiffs' concerns about the searches it unilaterally chose to perform. Over two months after telling Plaintiffs that it unilaterally chose certain search terms to use, FICO appears ready to engage in the manner Plaintiffs expected prior to the collection and review and which FICO represented to the Court it would undertake. Plaintiffs continue to consider the representations and questions posed by FICO in that correspondence.

In the February 12, 2026 Joint Status Report, FICO represented that it would make productions from Messrs. Lansing and Jones's personal emails on February 20, 2026 (ECF No. 637 at 5), but FICO did not make that production until March 4, 2026. Plaintiffs are in the process of assessing FICO's production.

FICO's responses to Plaintiffs' Request for Production ("RFP") No. 71:

Plaintiffs served their Third Set of Requests for Production (which includes RFP No. 71) on April 25, 2025. FICO has commenced production of documents responsive to some of those Requests, but the parties have not been able to reach an agreement on the search parameters in

response to RFP No. 71, which involves members of Congress urging then-President Biden and the Department of Justice to investigate FICO for anticompetitive practices and violating federal antitrust law. In particular, the parties have not been able to agree on the search strings to be used to identify potentially responsive documents or who should be identified as custodians.

FICO identified "four *existing* custodians [who it claims] are most likely to possess material responsive to this Request." Plaintiffs repeatedly inquired as to whether there are FICO personnel who are *not* currently agreed-upon custodians who would have material responsive to the Request because this RFP was propounded a year after the parties had agreed on custodians for the first sets of RFPs and involves a different time period than had been agreed to for almost all other RFPs. Instead of identifying any other personnel, FICO ignored the question for two months, simply repeating its assertion that it had identified the four *existing* custodians who it believed would have responsive information. In addition to the inquiry about whether there were other non-custodian personnel, Plaintiffs suggested adding three additional *existing* custodians who Plaintiffs believed were likely to have responsive documents: (1) William Lansing, the CEO, who is *highly* likely to have responsive documents regarding potential investigations into FICO's monopoly; (2) Nikhil Behl, an EVP and Chief Marketing Officer, who worked closely with Daniel Nestel (one of the custodians identified by FICO) and would likely have been involved in a strategy to respond to the letters; and (3) Cathi Kennedy, Director of Scores Bureau Alliances, whom Plaintiffs identified as also possibly involved in a strategy to respond to the letters. Plaintiffs specified these individuals based on their positions and a review of documents produced from their files; that review informed Plaintiffs' belief that these custodians were likely to have documents responsive to RFP No. 71.[3] Plaintiffs requested that search term reports be provided across each

---

[3] FICO's claim below that Plaintiffs insisted on adding *new* custodians is a misdirection. Although Plaintiffs inquired into whether FICO was aware of other individuals with responsive documents, these three

of these seven custodians in order to assess FICO's claim that it had identified the proper custodians, which, in effect, requested that a "custodian" term be added to the search string. But FICO has refused to produce such reports on the basis that the parties have not used search term reports in this manner in this case previously. Plaintiffs maintain that each of those individuals are highly likely to have responsive documents regarding the potential investigation into FICO's monopoly.

Plaintiffs also determined that FICO's proposed search string was too narrow on its face because it seemed designed to return only files that specifically contained a copy of the letters at issue and would exclude from the review universe any documents that did not contain a copy of one of the letters. In particular, it requires that both "DOJ" or "Department of Justice" *and* a variation of "monopoly" appear in a document in order for it to hit on the search terms. Of course, FICO employees likely would have communicated about the letters without actually attaching them to every communication or even referring to FICO's monopoly or the DOJ. Plaintiffs proposed an alternative search string that was designed to capture other discussions about the letters. Without explaining what terms in Plaintiffs' search string created false hits, FICO rejected Plaintiffs' proposed search string.

FICO makes much of the fact in this JSR that 18,600 hits resulting from Plaintiffs' search string is unduly burdensome for a discrete and singular RFP. However, it may well be that a high number of those hits *are* relevant and appropriate for review, but neither Plaintiffs nor the Court have any way to know that absent further justification. Indeed, in this JSR, FICO confirms that its objection is based on mere speculation that the search string is overbroad, not on actual testing of

---

individuals have been agreed custodians for every prior search, and FICO has provided no basis for their exclusion other than its own *ipse dixit*.

the relevance of documents hitting on the terms, as it declared, "[T]he likelihood of false positives is best determined here by evaluating the search term on its face."

On February 25, 2026, FICO unilaterally stated that it would begin review using its proposed search terms and a limited set of document custodians, notwithstanding Plaintiffs' continued objections. FICO's "rules for thee but not for me" approach represents the second time in recent months that FICO has unilaterally adopted search terms to which Plaintiffs did not agree (*see* FICO's search across the personal emails of Mr. Lansing, *supra*).

Plaintiffs must also respond to FICO's complaint below that it "has responded to an endless stream of requests from Plaintiffs for discovery-related information." To be clear, FICO has never questioned the relevance of RFP No. 71, and it is FICO's obligation under Rules 26 and 34 to conduct an adequate search for responsive documents. Plaintiffs' requests have been for information that FICO is required to provide; indeed, this is information that FICO has always provided up until recently. As the parties resume negotiations on the remaining discovery requests in this case, FICO's current approach to discovery negotiations is highly concerning.

Plaintiffs are contemplating the options the parties discussed at the meet-and-confer, but believe it is possible that the parties have reached impasse, in which case Plaintiffs anticipate that they will soon file a motion to compel on these issues.

Plaintiffs' Fourth Set of Requests for Production:

Plaintiffs served their Fourth Set of Requests for Production on June 13, 2025, which were held in abeyance by agreement of the parties due to broader delays in the case schedule. The parties agree that discovery has now progressed to the point where they can continue moving these requests forward. FICO has represented that its productions in response to RFP Nos. 90 and 91 are complete, leaving only two requests outstanding in the Fourth Set: RFP Nos. 88 and 89. The parties

met and conferred on March 3, 2026, regarding deadlines relating to these requests and are continuing their discussions.

**FICO's Statement:**

FICO provides updates and responses to Plaintiffs' statement regarding the document production topics discussed in the parties' February 10, 2026 Joint Status Report.

FICO's Forthcoming Supplemental Privilege Log (addressed by Plaintiffs in their section titled "Remaining issues stemming from FICO's newly discovered documents"):

As discussed in prior Joint Status Reports and in FICO's Motion for Protective Order (ECF No. 593), FICO previously identified, through an audit with its e-discovery vendor, additional documents that required review. The parties were unable to agree on parameters to review these additional documents for responsiveness to Plaintiffs' documents requests, so FICO filed a Motion for Protective Order (ECF No. 592, 593). The Court granted FICO's motion on December 3, 2025. ECF No. 616. Following that ruling, FICO began its review of these additional documents. FICO has made clear to Plaintiffs on multiple occasions, including in the correspondence and in the parties' February 10, 2026 Joint Status Report (ECF No. 637 at 4), that FICO substantially completed its production of responsive document families from this set on February 2, 2026, *excluding* any document families that require further review for privilege analysis and privilege logging purposes.

FICO has now begun its further review for privilege of approximately 40,000 documents resulting from FICO's recent responsiveness reviews. The size of that document set requiring further privilege analysis—of which some documents will certainly be determined in this ongoing review to be not privileged, in full or in part—should come as no surprise to Plaintiffs, given the volume of FICO's document review and the types of documents Plaintiffs have sought in this

9

litigation. And in light of the complexity of the privilege logging process FICO must follow pursuant to previous Orders in this litigation, which require FICO to separately log all privileged attachments to emails as well as each individual privileged email in multi-email chains, it has taken FICO some time to evaluate how long this process is reasonably likely to take.

Moreover, it is FICO's position that any timetable for service of this supplemental privilege log must be determined in conjunction with both a deadline for Plaintiffs to raise any remaining challenges to FICO's December 2025 privilege log, including as to its structure and format, and with the resolution of any such challenges. Plaintiffs' claim in this JSR that there has "never been any ambiguity regarding FICO's obligations" is incorrect. Plaintiffs and FICO have had, and continue to have, disputes regarding the form and format of FICO's December 2025 privilege log. Allowing these disputes to be resolved before FICO serves its forthcoming supplemental log, the form and format of which will necessarily be impacted by the outcome of those disputes, would reduce inefficiencies for FICO, the Court, and the case as a whole.

Personal Email Accounts:

FICO continues to maintain that a search of personal email accounts for Mr. Lansing and Mr. Jones is neither necessary nor proportional. Nevertheless, in the interest of avoiding yet another discovery dispute, FICO agreed to search for and produce emails responsive to Plaintiffs' discovery requests from the personal accounts of these two custodians. To do so, FICO secured the voluntary cooperation of both Mr. Lansing and Mr. Jones; as FICO has noted in previous Joint Status Reports, it does not have any right to wholesale access to the contents of employee personal email accounts. Both individuals also have legitimate privacy interests that needed to be addressed in connection with any searches of their personal emails.

FICO collected information from these two employees' personal email accounts. With respect to Mr. Lansing's personal emails, FICO applied a set of search terms at the point of collection based on the broadest set of search terms used for discovery in this case, consistent with Mr. Lansing's legitimate request that reasonable steps be taken to ensure that only work-related communications with possible relevance to the litigation be obtained from his personal email account. FICO disclosed to Plaintiffs the keyword searches it applied at the time of collection in order to help reduce the prospect of capturing non-relevant and personal information. Plaintiffs waited ***more than a month*** to even respond to FICO's disclosure of search terms, and even then, did not and still do not dispute that the majority of those terms are even broader than the June 2024 search terms that this Court found FICO need not apply in its Order granting FICO's Motion for Protective Order (ECF No. 616). Nor do Plaintiffs now dispute that FICO has made its production of documents from Mr. Lansing's and Mr. Jones' personal email accounts.[4]

Notwithstanding Plaintiffs' recitation on this topic above, FICO understands that the only remaining dispute as to FICO's collection and production of personal emails is the fact that FICO did not include the word "VS" in a limited number of search strings that it ran over Mr. Lansing's personal email data. As FICO has separately explained to Plaintiffs, in these instances, "VS" was not used based on a concern that it results in a significant number of false positives—as the term "vs" is commonly used as an abbreviation for "versus," "against," or "in contrast to," thus pulling in personal (not work-related) communications from Mr. Lansing's personal email account. FICO maintains that its search and collection process for Mr. Lansing's personal email was reasonable and sufficient, but nonetheless emailed Plaintiffs' counsel on March 6, 2026 in an attempt to

---

[4] FICO did not, as Plaintiffs suggest, represent it would produce these documents by a date certain, but instead had stated that it "expect[ed]" to produce these documents "by approximately" February 20, 2026. *See* ECF No. 637 at 5. Regardless, this production is now complete.

confirm the scope of dispute—including to ask Plaintiffs to confirm that the only remaining disagreement is that FICO did not include the words "VS" in specific search strings—because Plaintiffs had not, even at the March 3, 2026 meet and confer, made any explicit request of FICO. Plaintiffs responded on March 11, 2026 only to say they were evaluating FICO's email. FICO maintains that the process it has followed to date is more than sufficient, but it is entitled to an understanding of what specific relief Plaintiffs are now seeking in their declaration of impasse.

Plaintiffs' Request for Production No. 71:

The parties' sole remaining dispute related to Plaintiffs' Third Set of Requests for Production ("RFPs") concerns RFP No. 71.[5] Specifically, the parties disagree as to (1) the appropriate search term and (2) the appropriate custodians to be used for purposes of FICO's response to RFP No. 71. On both fronts, Plaintiffs demand search conditions that are unduly burdensome and not proportional to the needs of the case, particularly given the highly targeted nature of this RFP which relates to specific, identifiable subject matter.

As negotiated by the parties, RFP No. 71 seeks documents dated between March 12, 2024 through April 25, 2025, concerning three specific letters from members of Congress that accused FICO of maintaining a monopoly and requested that the U.S. Department of Justice investigate FICO. To FICO's knowledge, the U.S. Department of Justice did not open an investigation of FICO in response to these letters. FICO agreed to search for and produce responsive documents related to this narrow and discrete subject from the files of the four existing case custodians who are most likely to possess material responsive to this request. One of those custodians, Daniel Nestel, is FICO's Vice President of Government Relations.

---

[5] With the exception of RFP No. 71, FICO has substantially completed its productions of documents, excluding any document families that require further review for privilege analysis and privilege logging purposes, responsive to Plaintiffs' Third Set of RFPs.

12

Nearly two months after FICO identified the four custodians it designated for this limited time-period, single RFP, Plaintiffs requested that FICO use three *additional* custodians, despite FICO's prior confirmation that the four it had already identified were the custodians most likely to possess responsive material. Nor have Plaintiffs provided any basis for adding entirely *new* custodians for this purpose. Designating more custodians for this single, limited-time-period RFP is disproportionately burdensome and unnecessary.

FICO also provided Plaintiffs with a search term that it proposed using for purposes of RFP No. 71. That search term is reasonably tailored to the single request at issue and would result in FICO reviewing approximately 1,000 documents from FICO's four custodians, for this one RFP covering an approximately 13-month time period. 1,000 documents is not a small number. That FICO's search term would capture documents referencing a variation of "monopoly" as well as "Department of Justice" or "DOJ" is entirely appropriate given the substance of the letters related to RFP No. 71, and the search term is designed to catch not just copies of those letters, but any substantive discussions about or draft responses to them. Plaintiffs' proposed search term, in contrast, is overbroad on its face. As FICO explained to Plaintiffs, by way of example, Plaintiffs' search term would pull in documents related to *any* Congressional hearing or investigation regardless of subject matter, including those that are unrelated to FICO.

Plaintiffs claim that FICO has refused to provide a search term hit report to establish that this search term results in a high number of false positives. But that hit report, on this single search term, would do nothing more than tell Plaintiffs that the term would require FICO to review more than 18,600 documents from FICO's four agreed custodians, information FICO has already provided to Plaintiffs. A search term hit report does not identify false positives; instead, the likelihood of false positives is best determined here by evaluating the search term on its face.

13

Plaintiffs also demanded that FICO provide a hit report broken out by each of the four custodians, something that neither side has provided in this litigation to date. FICO is not aware of any requirement to provide this information or basis to think that it would help resolve the parties' dispute.

In email correspondence explaining this issue, FICO stated that it "intends to review the documents that hit on [its proposed] parameters." FICO has not yet begun its review of documents for RFP No. 71, but favors a speedy resolution of this dispute so that the parties can move forward.

Plaintiffs' Fourth Set of Requests for Production:

Only two RFPs from Plaintiffs' Fourth Set of RFPs remain outstanding. The parties are in discussions regarding a schedule for both sides' responses to *all* outstanding discovery requests, including FICO's responses to these two RFPs, and no dispute is ripe for the Court's consideration.

## II. PLAINTIFFS' RFA RESPONSES AND DOCUMENT PRODUCTION ISSUES

**FICO's Statement:**

FICO's RFA Nos. 1-2 and Interrogatory No. 4:

On November 7, 2025, FICO contacted counsel for the so-called Direct Purchaser Plaintiffs ("Plaintiffs") regarding their deficient responses to FICO's Request for Admission ("RFA") Nos. 1-2 and related Interrogatory No. 4. These discovery requests relate to whether the Plaintiffs made payments directly to FICO for credit scores. Whether Plaintiffs made payments directly to FICO for credit scores is an important issue because only direct purchasers can recover damages for a violation of the Sherman Act. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). If Plaintiffs did not make direct payments to FICO, Plaintiffs have no standing to sue for damages under the Sherman Act, meaning those claims should be dismissed as a matter of law. FICO contends that

14

Plaintiffs, despite calling themselves "Direct Purchasers," did not make direct purchases from FICO and therefore cannot recover damages on their Sherman Act claims.

The parties discussed these requests at the February 12, 2026 status hearing. The Court expressed its view that more discovery should be completed before FICO seeks to compel further responses to RFA Nos. 1 and 2, but Interrogatory No. 4 was differently situated and could be raised "sooner rather than later." *See* Feb. 12, 2026 Hr'g Tr. at 27:1-5. The parties are in discussions regarding a schedule for Plaintiffs' amended response to Interrogatory No. 4. FICO may seek to compel a further response to this Interrogatory if it believes Plaintiffs' responses are deficient.

First Choice's Supplemental Document Production:

The parties have reached agreement that Plaintiff First Choice will supplement its document production in response to certain of FICO's Requests for Production. First Choice made its first such supplemental production on March 9, 2026. FICO requests an opportunity to discuss a deadline for Plaintiffs to complete this production.

**Plaintiffs' Statement:**

FICO's RFA Nos. 1-2 and Interrogatory No. 4:

On December 6, 2023, FICO served Interrogatory ("ROG") No. 4 on Named Direct Purchaser Plaintiffs ("Named DPPs,"), asking Named DPPs to identify the dates, amounts, and descriptions of any payments from Named DPPs to FICO for FICO Scores or Credit Reports. On March 6, 2024, Named DPPs served responses to ROG No. 4, stating that they would produce documents responsive to the request pursuant to Rule 33(d). Additionally, on June 6, 2024, FICO served Requests for Admission ("RFA") Nos. 1 and 2 on Named DPPs, asking Named DPPs to admit that (1) they paid the Credit Bureaus for all credit scores they purchased during the relevant time period and (2) they did not pay FICO for any credit scores they purchased during the relevant

15

time period. On April 21, 2025, Named DPPs responded that they did not have information sufficient to respond to RFA Nos. 1 and 2.

On November 7, 2025, FICO requested that Plaintiffs supplement their responses to RFA Nos. 1 and 2, as well as ROG No. 4.

At the February 12, 2026 status conference, and in its subsequent Minute Order, the Court instructed the parties that FICO's request for Plaintiffs to amend its responses to RFA Nos. 1 and 2 was premature. ECF No. 638; *see also* Feb. 12, 2026 Hr'g Tr. at 24:18-25 ("I think we ought to wait a few months to [amend Named DPPs' RFA Responses] . . . . we've got to mature the discovery process a bit more."

FICO renewed its request for Named DPPs to amend their responses to ROG No. 4 on February 18, 2026. The parties discussed that issue during a March 3, 2026 meet and confer and are continuing those discussions.

<u>First Choice's Supplemental Document Production:</u>

Plaintiff First Choice made a supplemental production on March 9, 2026, from two of the three agreed-upon sources. The only remaining review and production concerns a review of a small universe of hard copy files maintained by First Choice's CEO, which has been delayed due to scheduling conflicts and illness. Plaintiffs are willing to discuss a deadline with FICO but note that FICO has not raised any concerns about this production, nor has FICO ever asked Plaintiffs to agree to a deadline. Thus, it is not ripe for Court intervention.

### III.     FICO'S PRIVILEGE LOG

**Plaintiffs' Statement:**

On December 3, 2025, Plaintiffs received FICO's Third Amended Privilege Log, which FICO amended pursuant to the Court's October 6, 2025 Order. ECF No. 543. Plaintiffs pointed out

16

a number of issues with that log, resulting in FICO serving a Corrected Third Amended Privilege Log on December 19, 2025. Plaintiffs are in the process of reviewing FICO's amended privilege log but have identified numerous issues affecting tens of thousands of entries.

In the parties' November 26, 2025 Joint Status Report (ECF No. 612), Plaintiffs identified three issues with FICO's privilege log which were under discussion by the parties (communications involving no attorneys, communications on which attorneys were only CCed or BCCed, and spreadsheets). Those issues are not yet resolved.

No Attorneys on the Log Entry:

On January 30, 2026, Plaintiffs raised with FICO the issue of communications with no attorneys listed on FICO's log—an issue about which the parties had previously reached impasse, and the parties held a meet and confer over Zoom on February 6, 2026. FICO's statement below that many of the affected documents are earlier-in-time emails that FICO was recently ordered to log is perplexing as that statement only serves to highlight how widespread FICO's logging issues were (and still are).

Following their February 6, 2026 meet and confer, both parties agreed to provide proposals on how they may limit this dispute. On February 20, 22, and March 5, 2026, Plaintiffs did just that; after re-reviewing all of the entries containing no attorneys, Plaintiffs limited their objections to those containing certain descriptions and asserted that FICO has waived any viable claim of privilege as to those withheld documents.[6] FICO has not provided any proposal of its own and

---

[6] In the parties' February 10, 2026 joint status report (ECF No. 637 at 11 n.4)—and again at the February 12, 2026 status conference (Feb. 12, 2026 Hr'g Tr. at 35:22-36:1)—FICO made reference to a privilege log entry that stated, in part, "email between clients discussing legal advice." The parties and the Court discussed this entry during the conference, and Plaintiffs acknowledged that that entry "sounds like it could be privileged." *Id.* at 40:15-16. But, as Plaintiffs also noted at the status conference, "This sounds like it could be the exception to the rule" that communications involving no attorneys are typically not privileged. *Id.* at 40:16-17. Indeed, in Plaintiffs' March 5 challenge to FICO's log entries not containing any attorneys, Plaintiffs did not challenge any entries containing the description "email between clients

17

stated in a meet and confer on February 20, 2026, that it did not intend to undertake any additional review of its log entries with no attorneys. FICO maintains this position at its own peril. Both this Court and Judge Perry have already stated that FICO had an obligation to substantiate its privilege claims and explain *why* people were (or, by extension, were not) included on a particular communication. Dec. 2, 2025 Hr'g Tr. at 16:19-17:5 ("[O]ne of the things we need to look at is, you know, why each person was included on the privileged email . . . . for us to really analyze the assertion of privilege, we need to understand why someone would have gotten certain things."); Oct. 23, 2025 Hr'g Tr. at 10:3-7 ("So I've seen first[-hand] business people all of the time smack an attorney into the middle of an email chain and call it privileged. Though there is no basis in fact for it. But they think that's how they get a privilege, right. So your people should have been looking for that on the front end because that is a common practice amongst corporations but it is not a valid one."). FICO's failure to document the nature of the involvement of attorneys in communications—both those originally included on FICO's log and in thousands of earlier-in-time communications—demonstrates that FICO has still not met its burden.

To underscore just how suspect—and deficient—FICO's log entries containing no attorneys are, it is worth mentioning that for over 5,600 entries which, again, ***contain no attorneys***, FICO's log includes the descriptions "email between ***attorney(s)*** and clients" or "email between ***attorneys***" (emphasis added). Furthermore, Plaintiffs have observed that numerous entries on FICO's log are emails between non-attorneys and third parties with which FICO has never claimed it enjoys privilege, including the federal government, each of the Credit Bureaus, and the Wall

---

discussing legal advice" except for one very specific instance that is clearly a business-related topic ("financial analyses"), which implicated only 93 documents out of 6,870 total in Plaintiffs' current challenge. Moreover it is a complete misdirection if FICO is suggesting that the Court's observation that the single example provided by FICO "sounds totally fine" should be extended to the other thousands of entries on FICO's log with significantly less adequate descriptions.

18

Street Journal. Below, FICO argues that communications with such entities may be privileged, notwithstanding the Court's clear finding that this is rarely, if ever, true. *See* ECF No. 640 at 1 ("The attorney-client privilege only shields communications that were intended to be confidential, so communications made to an attorney in the presence of a third party or made with the intent that they will be disclosed to a third party are not privileged.") (quotation omitted).[7]

It is distressing that despite now being on its third privilege log, FICO continues to assert privilege over documents (a) for which the log entry descriptions cannot possibly be correct and (b) that cannot possibly be privileged. FICO states below that it is "reviewing" or "evaluating" these issues, but this is simply too little, too late. As this Court observed, it "has given FICO multiple opportunities to compile a legally sufficient privilege log, and we will not give FICO another." ECF No. 640 at 3. FICO has therefore waived any viable privilege claim over these entries and should produce them immediately.

Plaintiffs expect that they will soon file a motion relating to the entries on FICO's privilege log that contain no attorneys.

Attorneys Only Copied:

On August 29, 2025, FICO stated that it would undertake a re-review of 4,765 entries on its then-operative log where an attorney was only CCed or BCCed. FICO represented to this Court in the parties' November 26, 2025 joint status report that its forthcoming amended privilege log would include the results of this re-review. ECF No. 612 at 9. Plaintiffs continue their review of

---

[7] FICO's accusation below that Plaintiffs did not previously argue that the presence of the three Credit Bureaus, the government, and the Wall Street Journal broke privilege is 100% inaccurate as to the Credit Bureaus and the government. Indeed, Plaintiff specifically referenced the Credit Bureaus and government entities in an April 10, 2025 letter, and Plaintiffs also listed at least one publisher and noted that "these are just examples." Through subsequent correspondence, Plaintiffs asked FICO to provide a list of the entities with which FICO believed it enjoyed a privileged relationship. When FICO ultimately provided that list on July 25, 2025, the list did *not* include the Credit Bureaus, government entities, or publishers. Thus, Plaintiffs did not include those entities in their motion to compel.

entries where an attorney is only copied in FICO's operative privilege log. Plaintiffs note that this issue is related to the "no attorneys" issue, and therefore Plaintiffs have focused on distilling those issues first rather than unnecessarily creating a second track of negotiations.

Spreadsheets:

On June 9, 2025, Plaintiffs requested that FICO re-review 159 withheld spreadsheets on its then-operative privilege log. FICO represented to this Court in the parties' November 26, 2025 status conference that its forthcoming amended privilege log would include the results of this re-review. On February 20, 2026, Plaintiffs sent FICO a letter detailing their amended objections to withheld spreadsheets on FICO's operative log. FICO has not yet responded to Plaintiffs' letter. Plaintiffs look forward to receiving FICO's position, so that the parties may limit this dispute for the Court.

"Recipient" Field Left Blank:

In its Order on Plaintiffs' Motion to Compel FICO to Re-Do Certain Aspects of its Privilege Log and to Produce any De-Logged Documents (ECF No. 517), the Court ordered FICO to log all earlier-in-time emails in a chain. FICO has failed to adequately do so. For 14,958 emails on its log, FICO has left the "Recipient" field completely blank.[8] FICO has represented that the entries affected by this issue are earlier-in-time emails that were sent from an individual's mobile device, and as a result the "recipient" field was not visible on the face of the document. On February 27, 2026, Plaintiffs explained to FICO that the metadata for these earlier-in-time emails could have still been separately stored and asked FICO whether this metadata was retrievable. FICO has not yet responded substantively.

---

[8] Of these, 10,506 entries on FICO's log do not include any attorney.

Even if metadata for earlier-in-time emails is not retrievable, this does not relieve FICO of its responsibility to complete the "Recipients" field for earlier-in-time emails. Indeed, this Court has already clearly stated that "FICO's use of metadata alone to populate the privilege log for email families is appropriate only if the metadata contains enough information to assess the claim of privilege for each member of the email or document family." ECF No. 517 at 2. It is therefore FICO's responsibility to make sure that its log has all necessary information, whether or not it is available using metadata. Further, it is not true (as FICO contends) that information sufficient to evaluate FICO's privilege claims is available looking at the entire email chain in tandem. As Judge Perry specifically instructed, it is common for lawyers to be copied on non-privileged communications in an attempt to create privilege, when there is no actual basis for a privilege claim. Oct. 23, 2025 Hr'g Tr. at 10:3-9 ("I've seen first[-hand] business people all of the time smack an attorney into the middle of an email chain and call it privileged . . . . that is a common practice amongst corporations but it is not a valid one."). By failing to provide the name of each recipient to each earlier-in-time email, FICO's log does not foreclose this possibility. And Judge Perry has already observed that FICO has to live with choices it made in terms of how it uploaded documents. Oct. 23, 2025 Hr'g Tr. at 42:25-43:1 (saying to FICO, "If you had done it [*i.e.*, uploaded documents] a different way in the first instance, it would be no problem.").

FICO's Request for a Schedule Regarding Privilege Log Challenges:

Plaintiffs must separately respond to FICO's request, below, for deadlines to raise any additional challenges to its privilege log. Plaintiffs oppose FICO's request, as the volume of Plaintiffs' privilege log challenges are solely a result of FICO's own inadequate logging and refusal to engage in meaningful discussion for how to resolve remaining deficiencies.

21

FICO specifically complains that, since February 12, 2026, Plaintiffs have sent four letters to FICO regarding deficiencies on its privilege log. The fact that Plaintiffs have sent multiple letters, containing different challenges, was deliberate; Plaintiffs are trying to ensure that these disputes move forward as expeditiously as possible. Moreover, FICO omits the reason that three of these letters were necessary: the parties agreed during their February 6, 2026 meet and confer to make proposals to each other regarding how to narrow the broader dispute raised by Plaintiffs on January 30, 2026, when Plaintiffs identified to FICO over 16,000 entries on FICO's log with no attorneys on them. Subsequently, FICO walked back its offer to provide proposals of its own and stands by that position below.

At bottom, FICO's privilege log has numerous, overlapping, fundamental problems affecting tens of thousands of entries. Plaintiffs only received FICO's operative privilege log— consisting of over 140,000 entries—on December 19, 2025, and over the past months have been working tirelessly to untangle the Gordian knot that FICO's sloppy logging has created. This should never have been Plaintiffs' burden in the first place; the burden to provide an adequate log rests with FICO alone.[9]

Plaintiffs also note that much of the delay FICO complains of is attributable to FICO's own conduct. To date, FICO has not responded to a *single* one of the letters Plaintiffs have sent since February 12, 2026.[10] Further, as discussed above, FICO refuses to commit to a timeline to provide a supplemental privilege log encompassing FICO's review of over 40,000 additional documents

---

[9] Indeed, despite FICO's ceaseless complaints about the time and expense it has incurred to address Plaintiffs' privilege log challenges, Plaintiffs' counsel have spent an inordinate amount of time reviewing FICO's log and raising challenges. The amount of work Plaintiffs have undertaken to force FICO to provide a log that is even halfway adequate has significantly prejudiced Plaintiffs.

[10] FICO claims below that it has been waiting to respond to these letters until it receives guidance from the Court on the process for Plaintiffs to raise future challenges. Plaintiffs did not learn this was FICO's intention until the morning of filing this Joint Status Report despite the fact that FICO received the first of these letters almost three weeks ago.

22

from the newly discovered documents that were located by FICO nearly a year after FICO had certified substantial completion of its productions. Given the delays FICO has exhibited, Plaintiffs' approach has created efficiencies by raising issues as Plaintiffs uncover them, rather than waiting weeks for a response from FICO.

This Court has already been clear that FICO will not get an additional chance to correct its privilege log. ECF No. 640 at 3. Plaintiffs have undertaken an immense burden to address fundamental issues on FICO's log while satisfying their meet and confer obligations under Local Rule 37.2. FICO should not be entitled to dictate Plaintiffs' efforts to fix the mess FICO has created, exacerbated, and failed to remedy over the past year.

**FICO's Statement:**

On December 3, 2025, FICO served an amended privilege log consistent with Judge Perry's October 23, 2025 Order (ECF No. 577). FICO served a corrected version of that log on December 19, 2025. Because FICO has now provided separate log entries for privileged email attachments that were previously logged in the same entry as their privileged parent email, and for each privileged email within a given email chain document, FICO's operative amended privilege log now includes more than 140,000 entries.

Number and Timing of Privilege Log Challenges:

Since the February 12, 2026 status hearing, Plaintiffs have sent FICO *four separate letters*—between February 20 and March 5, 2026—raising a set of seemingly overlapping objections to thousands of entries on FICO's December 2025 privilege log.[11] This barrage is only the latest example in Plaintiffs' continuous campaign, now more than one year in duration, to challenge the form and format of FICO's privilege log. Plaintiffs have pursued this campaign even

---

[11] FICO has not yet sent Plaintiffs correspondence in response to these letters because it first requests an opportunity to discuss with the Court a more orderly process and schedule for privilege challenges.

after FICO has twice amended its original privilege log—most recently, through the extremely burdensome and costly process required to generate its December 2025 log—and even as FICO is now in the process of creating a supplemental privilege log to reflect FICO's most recent document reviews and productions. Plaintiffs should not be permitted to continue to bring privilege log challenges to a head in a piecemeal fashion—on a timeline completely of their own choosing, raising issues months after first having FICO's December 2025 log in hand—and create the major inefficiencies that result from their chosen approach.

FICO requests an opportunity to discuss deadlines by which Plaintiffs must (1) raise with FICO any and all remaining challenges to the December 2025 privilege log by following the process outlined in Paragraph 12 of the Agreed Confidentiality Order, ECF 199, including identifying any challenged entries by privilege log identification number, and (2) subsequently file any consolidated motion on any and all unresolved challenges to that log they wish to pursue.

Entries Plaintiffs Describe As Having "No Attorneys on the Log Entry":

Plaintiffs have raised objections to privilege log entries that they describe as having "no attorneys" because the log does not list an attorney as a sender or recipient of the communication at issue, even though every entry on the log indicates the "Attorney(s) Creating Privilege" in a separate column by that name. Given this column, it is incorrect for Plaintiffs to assert that there are "no attorneys on the log entry." FICO notes that this issue was discussed at the February 12, 2026 status hearing, where the Court noted that the exemplar privilege entry FICO described on the record—an entry for an email that did not include an attorney as a sender or recipient, and which, as FICO confirmed at the hearing, has a level of detail that is typical of FICO's other log entries—"sounds totally fine to me." *See* Feb. 12, 2026 Hr'g Tr. at 37:6-38:6.

24

The parties met and conferred on February 6, 2026, at which time FICO noted that it would continue to review a letter Plaintiffs had sent on January 30, 2026—identifying thousands of privilege log entries that Plaintiffs describe as not including an attorney—to evaluate whether there was any reasonable way to narrow the dispute. FICO did not, as Plaintiffs suggest in this JSR, commit at that time to providing such a proposal, and FICO is not now "walk[ing] back" any offer, as Plaintiffs now claim. Indeed, based on the generalized, categorical objection Plaintiffs raised in their January 30, 2026 letter, there appeared to FICO no such option, short of yet another re-review of all documents reflected in the many thousands of entries at issue, which is clearly unwarranted. When the parties next conferred, on February 20, 2026, Plaintiffs informed FICO that they would be sending yet another letter about certain of the entries at issue later that same day, which FICO noted it would review but could not react to in advance. In fact, Plaintiffs have since sent three separate letters about log entries that they claim "contain no attorneys"—most recently, on March 5, 2026—as well as a fourth letter regarding spreadsheets on FICO's log.

In this Joint Status Report, Plaintiffs point to statements by this Court and Judge Perry made in the contexts of other discussions about the privilege log. But they ignore that, as explained at the last hearing, FICO has already provided log entries for each and every privileged email in email chains that include a narrative description (e.g., "Email between clients discussing legal advice regarding license agreement drafting and/or review.") and populated an "Attorney(s) Creating Privilege" column identifying the attorney or attorneys who are the source of the privilege, making clear the "nature of involvement" of these attorneys—to use Plaintiffs' phrase— and otherwise satisfying FICO's obligations with respect to its privilege log.

Plaintiffs also take issue with FICO's use of the phrase "email between attorneys" for 16 entries—a tiny percentage of entries, given that there are more than 140,000 log entries in total—

where the sender was not an attorney and the recipients are either not listed in that specific entry (but are apparent based on the log entries for other emails in the same email chain document), or are identified as non-attorneys. FICO is reviewing those entries and will clarify the descriptions for Plaintiffs as appropriate.

Plaintiffs are also challenging FICO's use of the phrase "email between attorney(s) and clients" for more than 5,000 log entries. A large majority of these entries are ones for which Plaintiffs claim there is "no attorney" because the recipient fields on the log are blank; FICO addresses that topic below in its "Recipient" Fields Left Blank" section.

Plaintiffs also assert, in their most recent letter on March 5, that there are logged communications showing certain third parties. For clarity, this issue relates to log entries purportedly involving third parties that were not challenged in Plaintiffs' Motion to Compel FICO to Produce Certain Documents from Its Privilege Log, and Related Motions (ECF Nos. 501, 514, 522, 548, 565, 581, 624, 625). FICO is evaluating the entries identified by Plaintiffs.

Entries Plaintiffs Describe As "Attorneys Only Copied":

Plaintiffs describe entries where an attorney "was only CCed or BCCed," but have raised no objection regarding these entries from the December 2025 log with FICO. As FICO has previously stated, these types of communications, which undisputably include an attorney, may be privileged. Moreover, it is nonsensical for Plaintiffs to state that this category of entries, which Plaintiffs identify *based on their inclusion of an attorney on the communication*, is "related to" entries for which Plaintiffs say there are "no attorneys."

Spreadsheets:

In a February 20, 2026 letter, Plaintiffs repeated their baseless and categorical objection that FICO has improperly logged 278 spreadsheets—roughly half of which were produced with

26

limited privilege redactions—because "typically spreadsheets contain facts or data—content which is ordinarily not privileged." Of course, spreadsheets, like any other document format, may also be used to convey legal advice or otherwise be protected by the attorney-client privilege. FICO is reviewing Plaintiffs' correspondence on this issue.

"Recipient" Fields Left Blank:

FICO has adequately logged all privileged earlier-in-time emails in email chains. As FICO has explained to Plaintiffs, it is FICO's understanding, based on consultation with its e-discovery vendor, that when an email is sent from a mobile device, earlier-in-time emails that are embedded below the email being sent may not display the recipients. As a result, the log entry for such an earlier-in-time email will indicate the sender of the email, but will not have names in the "To," "CC," or "BCC" columns on the log because the technological tool FICO's e-discovery vendor used to populate those fields for earlier-in-time emails—which it developed specifically for this review—relies on the text for the specific email that appears on the face of the document.

Despite this technological limitation, FICO's log is adequate. Here, FICO has provided a separate log entry for every single privileged email in email chains. FICO's log is also organized so that privileged emails in chains appear sequentially; in other words, it is apparent from the log that particular entries relate to emails from the same chain document. As a result, Plaintiffs have full visibility into the recipients of surrounding emails on all of the email chains at issue. That wealth of contextual information makes it apparent who the recipients were for each of the earlier-in-time emails impacted by this mobile device issue.

### IV.     NON-PARTY DISCOVERY

**Documents from the *VantageScore* Litigation:**

**Joint Statement:**

Pursuant to the Court's December 2, 2025 minute order, the parties filed a joint status report on December 12, 2025 (ECF No. 620) to provide the Court with an update on Plaintiffs' dispute with VantageScore and the Credit Bureaus regarding FICO's production of documents from the lawsuit FICO brought against VantageScore and the Credit Bureaus in the District of Minnesota. *Fair Isaac Corp. v. Equifax, Inc.*, Case No. 06-cv-4112, (D. Minn.). As the parties informed the Court, Plaintiffs had resolved their disputes with VantageScore and the Credit Bureaus, but FICO reserved its right to review the documents that Plaintiffs were no longer requesting and to object to their omission to the extent it would result in an incomplete or misleading evidentiary record or would otherwise prejudice FICO.

As of February 24, 2026, FICO has produced to Plaintiffs all documents that VantageScore agreed FICO may produce in full, as well as certain documents that VantageScore redacted.

**FICO's Additional Statement:**

Separately, FICO has raised an objection to the agreement reached between Plaintiffs and VantageScore not to produce certain documents from the VantageScore Litigation, specifically, the LLC and IP licensing agreements between VantageScore and the Credit Bureaus. The agreements are discussed in the decisions and orders issued in the VantageScore Litigation, and thus, their omission from FICO's production leaves an incomplete record of that prior litigation. On February 25, 2026, FICO made a proposal to redact content in the agreements before producing them, which counsel for VantageScore did not accept. FICO is evaluating whether to seek further relief from this Court with regard to the LLC and IP licensing agreements.

28

**VantageScore's Production of Documents in Response to Plaintiffs' Subpoena:**

**Joint Statement:**

On January 21, 2026, the Court denied (ECF No. 631) VantageScore's motion for reconsideration (ECF No. 621) of the Court's December 1, 2025 Order that VantageScore produce certain documents in response to Plaintiffs' subpoena. ECF No. 613. VantageScore produced responsive documents on February 18, 2026.

**Plaintiffs' Additional Statement:**

Plaintiffs are in the process of evaluating VantageScore's production.

**Experian Data Production:**

**Plaintiffs' Statement:**

At the February 12, 2026 status conference, the Court ordered that Experian complete its production of domestic transactional data by March 20, 2026. ECF No. 638. Presently, Plaintiffs do not have any disputes with Experian that are ripe for resolution by the Court.

**Equifax Data Production:**

**Plaintiffs' Statement:**

On October 8, 2024, in the context of negotiating Equifax's production of domestic transactional data pursuant to Plaintiffs' subpoena, Equifax provided sample data. This data included customer names. In response to this sample, Plaintiffs requested in a November 1, 2024, letter that, in addition to bill-to and-ship-to customer names, Equifax also include customer addresses. On November 27, 2024, Equifax "agree[d] to provide Plaintiffs with the bill-to and ship-to addresses of its customers."

On December 12, 2025, Equifax produced its transactional structured data pursuant to Plaintiffs' subpoena. In its production letter, Equifax simply stated, "Customer names have been

29

redacted." However, Equifax did not raise the prospect of redacting customer names with Plaintiffs at any point since agreeing to produce that information. Plaintiffs began analyzing this data and, on January 2, 2026, sent a letter to counsel for Equifax outlining data interpretation questions and raising the issue of Equifax redacting customer names and omitting customer addresses. Equifax responded on March 6, 2026, re-asserting its position that it would only perform one data pull for Plaintiffs' and FICO's separate subpoenas and further stating:

> Because Equifax considers FICO to be a market competitor, Equifax redacted its customer names from its transactional data production for confidentiality reasons. Equifax believes this was entirely proper given that the Court previously ordered the Credit Bureaus to produce certain data to FICO in redacted form (*see* Dkt. 457 at 3). As such, Equifax maintains that its redactions are proper, and it will not provide Plaintiffs with the customer names.

Plaintiffs are stunned by Equifax's breach of its prior commitments and confused by Equifax's claim of confidentiality concerns in light of the fact that this Court has consistently rejected another non-party's (VantageScore Solutions, LLC) confidentiality-related arguments. A year ago, the Court stated that it "appreciates [the non-party's] concern about keeping [a particular document] confidential. But there is a two-tiered confidentiality order in place, and the Court has no reason to believe that any attorney in this case would jeopardize his or her law license by violating the terms of that order." ECF No. 386 at 1 n.1. The Court again rejected those arguments a month ago. ECF No. 613 at 2. Moreover, TransUnion produced its transactional data with customer information intact.

If Equifax does not change course and honor its prior commitments, Plaintiffs anticipate that they will need to file a motion to compel. Plaintiffs plan to meet and confer with Equifax regarding this issue on the afternoon of Monday, March 16. Because that is after the status conference, Plaintiffs welcome the Court's guidance on this issue.

**Non-Party Subpoenas:**

**Plaintiffs' Statement:**

Plaintiffs have prepared subpoenas directed to a number of consultants employed by FICO in connection with its anticompetitive conduct but had not yet served these subpoenas given FICO's claim that some documents associated with a number of those consultants were privileged. With the Court now having rejected such privilege claims (ECF No. 640), Plaintiffs will commence with serving those subpoenas. Plaintiffs understand that FICO does not believe the Court has ruled on privilege claims including the non-parties Plaintiffs intend to subpoena. Plaintiffs do not intend to end-run FICO's legitimate privilege claims (to the extent it has made any) nor preempt the Court's rulings. Therefore, Plaintiffs welcome the Court's guidance on when to serve these subpoenas.

Plaintiffs also intend to serve a number of subpoenas on certain credit score resellers.

**FICO's Statement:**

FICO does not believe the Court's March 10, 2026 Order (ECF No. 640) resolves the parties' dispute regarding third parties included on FICO's privilege log. The scope of the Order is addressed in Section VI, below. FICO objects to Plaintiffs serving any subpoena on third parties that requests the production of documents protected by the attorney-client privilege or attorney work product doctrine.

## V. CASE SCHEDULE

At the October 6, 2025 status conference, the Court agreed to suspend the case schedule while the parties assessed the time needed for FICO to work on the document productions it has now substantially completed. The parties are diligently moving discovery forward, including by negotiating a schedule to respond to the discovery served on June 13, 2025, that they had

31

previously held in abeyance. The parties expect to continue those negotiations and to discuss a broader case schedule in the coming weeks. The parties jointly request that the case schedule remain stayed for the time being.

**Plaintiffs' Statement:**

With so many issues outstanding regarding FICO's privilege log—to say nothing of the ensuing document productions likely to result from Plaintiffs' challenges—as well as the additional documents productions that FICO must make in response to Plaintiffs' outstanding Requests for Production, Plaintiffs do not believe that it makes sense to try to set a schedule right now. Plaintiffs hope that the parties will be in a position to propose a schedule (or competing schedules) in an upcoming joint status report in May 2026.

Plaintiffs have been working diligently since the case schedule was stayed in October 2025 to continue pushing discovery forward in this matter. While Plaintiffs agree that progress has been made with regard to certain of FICO's document productions, discovery continues to be held up due to issues of FICO's own creation. For example, in the past month (1) FICO has not responded to a single one of Plaintiffs' letters regarding deficiencies in FICO's privilege log; (2) FICO has refused to commit to a timeline to complete its privilege review for the newly discovered universe of documents, encompassing 40,000 additional documents; and (3) FICO has stated its intention to appeal this Court's recent order regarding blast emails and third parties to Judge Perry. FICO's delay holds tens of thousands of responsive documents in the balance, which will highly prejudice Plaintiffs if they are required to proceed to depositions and other discovery without full document discovery.

**FICO's Statement:**

FICO believes that the parties should be in a position to provide an agreed case schedule proposal, or competing proposals, in the April joint status report. Although it made sense to temporarily suspend the case schedule in October 2025 based on the need for FICO to review and produce additional documents, FICO has now substantially completed those productions. Entry of a revised case schedule will assist the parties in moving this case forward to resolution.

## VI.    PENDING MOTIONS

**Plaintiffs' Statement:**

In light of the Court's March 10, 2026 Order (ECF No. 640), Plaintiffs do not believe that there are any motions currently pending before this Court. The Order began, "Before the Court is plaintiffs' motion to compel FICO to produce from its amended privilege the so-called email blasts *and* the documents sent to third parties. For the reasons set forth below, the Court grants in part the *motions*." *Id.* at 1 (emphasis added). Then, this Court clearly found, "The attorney-client privilege only shields communications that were intended to be confidential, so communications made to an attorney in the presence of a third party or made with the intent that they will be disclosed to a third party are not privileged." *Id.* at 1 (quotation omitted). In light of that language, Plaintiffs believe that, contrary to FICO's statement immediately below, the Court granted Plaintiffs' Motion to Compel FICO to Produce Certain Documents from Its Privilege Log, and Related Motions (ECF Nos. 501, 514, 522, 548, 565, 581, 624, 625) with respect to communications involving third parties and granted Plaintiffs' Motion in part regarding blast

emails, allowing FICO to maintain privilege over "emails that were sent solely by and to lawyers, paralegals, and other legal personnel." ECF No. 640 at 2.

Having said that, the parties clearly read the Order differently, and thus Plaintiffs also welcome this Court's clarification.

**FICO's Statement:**

FICO understands this Court's March 10, 2026 Order (ECF No. 640) on Plaintiffs' Motion to Compel FICO to Produce Certain Documents from Its Privilege Log, and Related Motions (ECF Nos. 501, 514, 522, 548, 565, 581, 624, 625) to resolve only Plaintiffs' distinct challenge to FICO's claims of privilege over emails with 10 or more recipients (or so-called "blast emails"). The Motion to Compel raised three distinct disputes as to privilege claims involving: (1) email distribution lists (which was subsequently resolved by the parties' agreement) (briefed by Plaintiffs at ECF No. 501-1, Section I (pp. 5-7)); (2) communications with certain third parties (*id.*, Section II (pp. 7-11)); and (3) "blast emails," which specifically challenged privileged communications with 10 or more recipients (*id.*, Section III (pp. 11-14)). Each challenge was addressed in a separate section of Plaintiffs' Motion and raised separate issues and legal arguments. The March 10 Order states, "the Court grants in part the motions." ECF No. 640 at 1.

The discussion of the Court's ruling set forth in the Order refers specifically to the "number of recipients involved," ECF No. 640 at 3, which is an issue that is specific to Plaintiffs' "blast emails" challenge, but does not relate to the inclusion of certain third parties on privileged communications. For this reason, and because the Order refers to granting Plaintiffs' Motion "in

34

part," FICO asks that the Court clarify whether the March 10 Order is intended to resolve Plaintiffs' Motion to Compel as it relates to third parties in addition to "blast emails."

FICO also notifies the Court that it intends to file an objection to the March 10 Order as it relates to "blast emails" pursuant to Fed. R. Civ. P. 72(a).

### VII.   UPCOMING HEARINGS

There are presently three hearings scheduled, as follows:

- Status hearing set for March 16, 2026, at 11:00 a.m. ECF No. 639.

- Status hearing set for April 9, 2026 at 1:15 p.m. ECF No. 638.

- Status hearing set for April 28, 2026 at 12:00 p.m. ECF No. 638.

The parties have agreed to keep the April 9 hearing on calendar and would propose moving the April 28 hearing to the week of May 11, 2026, if convenient for the Court.

### VIII.   FUTURE JOINT STATUS REPORTS

**Joint Statement:**

The parties appreciate the opportunity to submit joint status reports and discuss them at monthly status conferences, which have been a useful mechanism to raise and resolve ongoing disputes without burdening the Court with extensive motion practice. However, the parties respectfully ask for guidance from the Court as to the form and format of the joint status reports submitted by the parties. In particular, in light of the length to which the Joint Status Report has stretched, the parties would like to know whether the Court finds the level of substantive argument included in this and previous reports helpful or if it would prefer that the parties use a different format for subsequent joint status reports, such as, for example, a neutral statement of the issues that each side wishes to raise with the Court.

* * * * * *

35

The parties are, of course, available to discuss any additional issues into which the Court may wish to inquire.

Dated: March 12, 2026

*/s/ Karin E. Garvey*
Karin E. Garvey
Brian M. Hogan
Joseph P. Guglielmo
Michelle E. Conston (*pro hac vice*)
Daniel F. Loud (*pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-6444
kgarvey@scott-scott.com
brian.hogan@scott-scott.com
jguglielmo@scott-scott.com
mconston@scott-scott.com
dloud@scott-scott.com

Carmen Medici (*pro hac vice*)
Gary Foster (*pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-798-5319
cmedici@scott-scott.com
gfoster@scott-scott.com

Patrick McGahan (*pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

*Interim Lead Class Counsel for Direct*
*Purchaser Plaintiffs and the Proposed Direct*
*Purchaser Class*

Christopher M. Burke
Yifan (Kate) Lv
**BURKE LLP**
402 West Broadway, Suite 1890

Respectfully submitted,

Steven F. Molo
Lauren F. Dayton
Eric Posner
**MOLOLAMKEN LLP**
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Telephone: 312-450-6700
smolo@mololamken.com
ldayton@mololamken.com
eposner@mololamken.com

Christian I. Bale
**MOLOLAMKEN LLP**
600 New Hampshire Avenue, N.W.,
Suite 500
Washington, DC 20037
Telephone: 202-556-2000
cbale@mololamken.com

Anden Chow
Cody Wiles
**MOLOLAMKEN LLP**
430 Park Avenue
New York, NY 10022
Telephone: 212-607-5951
achow@mololamken.com
cwiles@mololamken.com

*Liaison Counsel for Direct Purchaser*
*Plaintiffs and the Proposed Direct*
*Purchaser Class*

George A. Zelcs
Randall P. Ewing, Jr.
Chad E. Bell
Labeat Rrahmani
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com
cbell@koreintillery.com
lrrahmani@koreintillery.com

37

San Diego, CA 92101
Telephone: 619-369-8244
cburke@burke.law
klv@burke.law

Daniel E. Gustafson (*pro hac vice*)
Daniel C. Hedlund (*pro hac vice*)
Daniel J. Nordin (*pro hac vice*)
Anthony J. Stauber (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
120 S. Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com
tstauber@gustafsongluek.com

Dennis Stewart (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 612-333-8844
dstewart@gustafsongluek.com

Gary F. Lynch
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412-322-9243
gary@lcllp.com

Garrett D. Blanchfield (*pro hac vice*)
Brant D. Penney (*pro hac vice*)
Roberta A. Yard (*pro hac vice*)
**REINHARDT WENDORF &
BLANCHFIELD**
80 So. 8th Street, Suite 900
Minneapolis, MN 55402
Telephone: 651-287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

William G. Caldes (*pro hac vice*)
Jeffrey L. Spector (*pro hac vice*)

Michael L. Roberts
Karen Sharp Halbert
Christopher B. Sanchez
**ROBERTS LAW FIRM, P.A.**
6834 Cantrell Road, Suite #1131
Little Rock, AR 72207
Telephone: 501-821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us
chrissanchez@robertslawfirm.us

Jennifer W. Sprengel
**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, IL 60606
Telephone: 312-782-4880
jsprengel@caffertyclobes.com

*Counsel for Direct Purchaser Plaintiffs
and the Proposed Direct Purchaser Class*

Rachel E. Kopp (*pro hac vice*)
**SPECTOR ROSEMAN &
KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: 215-496-0300
BCaldes@srkattorneys.com
JSpector@srkattorneys.com
RKopp@srkattorneys.com

*Interim Co-Lead Counsel for Indirect
Purchaser Plaintiffs and the Proposed
Indirect Purchaser Class*

Charles R. Watkins
**GUIN & EVANS, LLC**
805 Lake Street, #226
Oak Park, IL 60603
Telephone: 312-878-8397
charlesw@gseattorneys.com

*Liaison Counsel for Indirect Purchaser
Plaintiffs and the Proposed Indirect
Purchaser Class*

*/s/ Matthew D. Provance*
Britt M. Miller
J. Gregory Deis
Matthew D. Provance
Megan E. Stride
**MAYER BROWN LLP**
71 South Wacker Drive
Chicago, IL 60606-4637
Telephone: 312-782-0600
Facsimile: 312-701-7711
bmiller@mayerbrown.com
gdeis@mayerbrown.com
mprovance@mayerbrown.com
mstride@mayerbrown.com

*Counsel for Defendant Fair Isaac Corporation*

39